**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANE OWENS,** | : | |
| | : | **Case No. 2:20-cv-03785** |
| **Plaintiff,** | : | |
| | : | **CHIEF JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Jolson** |
| **FIRSTENERGY CORP., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

| | | |
|---|---|---|
| **CHANA FRAND,** | : | |
| | : | **Case No. 2:20-cv-04287** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **FIRSTENERGY CORP., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

### I. INTRODUCTION

On July 21, 2020, the U.S. Attorney for the Southern District of Ohio brought criminal charges against Speaker of the Ohio House of Representatives, Larry Householder ("Householder"), and four other individuals for their involvement in orchestrating a $60 million bribery and racketeering scheme with FirstEnergy Corp. ("FirstEnergy" or the "Company"). Following these charges, two FirstEnergy shareholders, Diane Owens and Chana Frand, each brought securities class actions against the Company and certain Company executives, asserting they improperly engaged in a corrupt campaign with Ohio politicians to secure legislation that

1

provided the Company with a $1.3 billion ratepayer-funded bailout to keep the Company's failing nuclear facilities in operation.

Currently before the Court are six motions to consolidate the related class actions. Specifically, the following parties have moved the Court to consolidate: (1) James J. Durrett, Jr.; (2) California Public Employees' Retirement System ("CalPERS"); (3) Ironworkers Locals 40, 361 & 417 Union Security Funds ("Ironworkers Locals"); (4) State Teachers Retirement System of Ohio ("Ohio STRS"); (5) Los Angeles County Employees Retirement Association ("LACERA"); and (6) The City of Philadelphia Board of Pensions and Retirement ("Philadelphia Pensions"). The cases subject to these motions include *Owens v. FirstEnergy Corp.*, No. 2:20-cv-03785 (S.D. Ohio) and *Frand v. FirstEnergy Corp.*, No. 2:20-cv-04287 (S.D. Ohio).

The same six plaintiffs submitted motions to appoint lead plaintiff and approve selection of lead counsel, but only three of these motions are currently active[1]: CalPERS, Ohio STRS, and LACERA. Each of the active parties have responded to the competing motions.

Finally, Ohio STRS requested the Court to appoint it Co-Lead Plaintiff in its Response and Reply to the Competing Lead Plaintiff Motions. (ECF Nos. 44, 58).

## II. BACKGROUND

### A. Facts

Taking the facts as stated by the movants, the security class actions have been brought against FirstEnergy and certain Company executives for their roles in a large bribery and money-laundering scandal that implicated Ohio politicians. FirstEnergy is an Ohio-based utility company that generates and transmits electricity to approximately 6 million customers in seven states. (2:20-

---

[1] Three of the parties later withdrew: James J. Durrett, Jr., Philadelphia Pensions, and Ironworkers Locals. (No. 2:20-cv-03785, ECF Nos. 43, 61, 64).

cv-03785, Pl.'s Compl. ¶ 2, ECF No. 1). The fraud involved legislative and regulatory "solutions" that FirstEnergy sought to procure from Ohio regulators to offset significant losses the Company incurred from two aging, financially unsustainable Ohio nuclear power plants. (*Id.* at ¶ 3). Rather than secure these solutions legitimately, the Company allegedly engaged in an illicit multi-year campaign to funnel secretly tens of millions of dollars in bribes to Ohio legislators in exchange for passing House Bill 6 ("HB6"), a $1.3 billion bailout funded by Ohio ratepayers. (*Id.*).

The campaign began in late 2016, when FirstEnergy faced significant financial strain due to the two obsolete plants, and the Company announced it was pursuing "legislative efforts" to resolve the problem. (*Id.* at ¶ 30). FirstEnergy met with Larry Householder ("Householder") in January 2017, shortly after he won back his seat in the Ohio House of Representatives, during a flight on a private FirstEnergy jet. (*Id.* at ¶ 20). The Company promised to give millions of dollars to Householder to support his bid for Speakership in exchange for his securing the passage of HB6. (*Id.*). Within two months of this agreement, Householder established to a 501(c)(4) entity called "Generation Now," and FirstEnergy and its subsidiaries began making clandestine quarterly payments of $250,000 to it. (*Id.* at ¶ 21). As lobbyist and co-conspirator, Neil Clark, stated in a secretly recorded conversations, "Nobody knows the money goes into the [Householder's] account . . . it's not recorded." (*Id.*).

Householder's bid for Speaker was successful, and he introduced HB6 in the Ohio state legislature soon thereafter, in January 2019. (*Id.* at ¶ 23). This bill effectively prevented the shutdown of FirstEnergy's two money-losing Ohio nuclear plants by granting a ratepayer-funded subsidy to "clean" energy generation. (*Id.*). FirstEnergy's nuclear subsidiaries were the primary beneficiaries of the bill; they were projected to collect approximately 94% of the payments, or roughly $160 million annually. (*Id.*). Householder communicated frequently with FirstEnergy, its

3

affiliates, and Company executives throughout the period that encompassed HB6's passage—for example, throughout this six-month span, Householder called former FirstEnergy CEO Defendant Jones at least 30 times. (*Id.* at ¶ 25). The Company achieved its aim in July 2019, when HB6 was passed and signed into law. (*Id.* at ¶ 26).

Almost immediately, House Bill 6's enactment was met with strong public outcry, and citizens groups introduced a statewide ballot referendum seeking to repeal the bill. (*Id.*). In response, FirstEnergy wired an additional $38 million through Generation Now and other covert organizations. (*Id.*). Those additional funds paid for a media blitz attacking the initiative and for efforts to thwart the collection of signatures in support of the referendum. (*Id.*).

Numerous indicators dating back to at least 2016 suggest that FirstEnergy and certain Company executives concealed this scheme from the public, in part by making materially false and misleading statements during the Class Period. For example, Company executives filed annual and quarterly reports with the U.S. Securities and Exchange Commission ("SEC") in 2016, 2017, 2018, 2019, and 2020—incorrectly claiming that FirstEnergy's nuclear power business complied with federal regulations. (*Id.* at ¶¶ 30−41). At the same time, the Company continued to highlight the efforts of its management to secure a legislative fix for the problems posed by the unprofitable nuclear facilities in Ohio to the SEC, analysts, and its investors. (*Id.*).

The U.S. Attorney's Office for the Southern District of Ohio charged Householder and four other Ohioans, including a former Chairperson of the Ohio Republican Party and a former budget director for the Ohio Republican Caucus, on July 21, 2020. (*Id.* at ¶¶ 19, 43−46). Reports of FirstEnergy's involvement surfaced almost immediately. (*Id.* at ¶¶ 45−46). The next day, on July 22, 2020, FirstEnergy stock price fell 45%, from $41.26 per share to $22.85 per share. (*Id.* at ¶

47). FirstEnergy shareholders claim massive losses as a result of the declines precipitated by the Company's misconduct.

### B.  Procedural History

On July 28, 2020, Diane Owens filed a securities class action against FirstEnergy on behalf all persons and entities that purchased or acquired FirstEnergy common stock between February 21, 2017 and July 21, 2020 (the "Class Period"). (No. 2:20-cv-03785, ECF No. 1). On August 21, 2020, Chana Frand filed an additional class action against FirstEnergy on behalf of persons and entities that purchased or acquired securities of any type during the Class Period. (No. 2:20-cv-04287, ECF No. 1). The actions assert that FirstEnergy and certain current and former executives (collectively, "Defendants") defrauded FirstEnergy investors in violation of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 14 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, promulgated thereunder. (17 C.F.R. § 240.10b-5). The Court determined that the two actions are related (the "Related Actions") on October 8, 2020. (No. 2:20-cv-04287, ECF No. 24).

Various class members moved this Court to consolidate the Related Actions, appoint a lead plaintiff, and approve the lead plaintiff's selection of counsel. Those class members include James J. Durrett, Jr.,[2] CalPERS,[3] Ironworkers Locals,[4] Ohio STRS,[5] LACERA,[6] and Philadelphia

---

[2] *Owens v. FirstEnergy, Corp.*, No. 2:20-cv-03785 (S.D. Ohio), ECF No. 27; *Frand v. FirstEnergy, Corp.*, No. 2:20-cv-04287 (S.D. Ohio), ECF No. 18.

[3] *Owens v. FirstEnergy, Corp.*, No. 2:20-cv-03785 (S.D. Ohio), ECF No. 28; *Frand v. FirstEnergy, Corp.*, No. 2:20-cv-04287 (S.D. Ohio), ECF No. 19.

[4] *Owens v. FirstEnergy, Corp.*, No. 2:20-cv-03785 (S.D. Ohio), ECF No. 30; *Frand v. FirstEnergy, Corp.*, No. 2:20-cv-04287 (S.D. Ohio), ECF No. 20.

[5] *Owens v. FirstEnergy, Corp.*, No. 2:20-cv-03785 (S.D. Ohio), ECF No. 32.

[6] *Owens v. FirstEnergy, Corp.*, No. 2:20-cv-03785 (S.D. Ohio), ECF No. 33.

Pensions[7]. Later, Plaintiffs James J. Durrett, Jr. and Philadelphia Pensions each filed noticed of non-opposition to the competing motions to appoint lead plaintiff and lead counsel, and each subsequently formally withdrew its motion for appointment. (No. 2:20-cv-03785, ECF Nos. 37, 42, 46, 61). Ironworkers Locals also withdrew. (*Id.*, ECF No. 64).

On October 19, 2020, CalPERS, Ohio STRS, and LACERA responded to the above-listed motions, opposing the competing motions for lead plaintiff and lead counsel. (ECF Nos. 43, 44, and 45). On November 2, 2020, CalPERS and LACERA filed replies to the oppositional responses to advance arguments as to why the other lead plaintiff candidates are less qualified for the designation. (*Id.*, ECF Nos. 56, 57, and 58). No class member has submitted a response opposing consolidation. Ohio STRS also filed a response and a reply; in those filings, Ohio STRS requested the Court to appoint it Co-Lead Plaintiff. (*Id.*, ECF Nos. 44, 58).

Additionally, Ohio STRS filed a Motion for Leave to Submit a Sur-Reply to Competing Lead Plaintiff Motions on November 11, 2020. (*Id.*, ECF No. 60). In the Sur-Reply, Ohio STRS raised a new argument about how the candidates' financial interest in the case should be calculated.

Finally, the parties have jointly requested the Court to extend the time for Defendants' response to the Complaint until after the Court appoints lead plaintiff and lead counsel (No. 2:20-cv-03785, ECF No. 13; No. 2:20-cv-04287, ECF No. 28), which the Court granted. (No. 2:20-cv-03785, ECF No. 15; No. 2:20-cv-04287, ECF No. 33). They anticipate that the Lead Plaintiff(s) will file a consolidated or amended complaint after appointment and that Defendants will move to dismiss such a complaint. (*Id.*).

---

[7] *Owens v. FirstEnergy, Corp.*, No. 2:20-cv-03785 (S.D. Ohio), ECF No. 31; *Frand v. FirstEnergy, Corp.*, No. 2:20-cv-04287 (S.D. Ohio), ECF No. 21.

### III. LAW AND ANALYSIS

#### A. Consolidation

The Private Securities Litigation Reform Act ("PSLRA" or "Reform Act") stipulates that, when more than one securities class action asserting "substantially the same claim or claims arising under this [chapter or subchapter] has been filed," the Court must wait to determine the most adequate plaintiff until "after the decision on the motion to consolidate is rendered." 15 U.S.C. § 78u-4(a)(3)(B)(ii). The PSLRA encourages courts to appoint a lead plaintiff for the consolidated action "[a]s soon as practicable after [the consolidation] decision is rendered." *Id.*

Consolidation is appropriate when the actions before the court involve common questions of law or fact. *See* Fed. R. Civ. P. 42(a). The underlying purpose of Rule 42 is to "administer the court's business with expedition and economy while providing justice to the parties." *Rice v. Javitch Block & Rathbone, LLP*, No. 2:04-cv-00951, 2012 WL 506833, at *3 (S.D. Ohio Feb. 15, 2012) (citing *Advey v. Celotex, Corp.*, 962 F.2d 1177, 1181 (6th Cir. 1992)). Consolidation under Rule 42 falls within the discretion of the Court. *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1993). To determine whether consolidation is appropriate, courts must consider a number of factors, including the risks of prejudice to the parties and jury confusion, the burden on the parties and available judicial resources, and the time and expense of litigating a single suit as compared to multiple suits. *Guild Assocs., Inc. v. Bio-Energy (Washington), LLC*, 309 F.D.R. 436 (S.D. Ohio 2015). Courts find that "consolidation is particularly appropriate in securities class action litigation." *French v. CBL Assocs. Props., Inc.*, No. 1:16-CV-165-TWP-CHS, 2016 WL 7668501, at *1 (E.D. Tenn. Sept. 26, 2016).

Here, six class members have requested the Court to consolidate the Related Actions, and no class member has opposed consolidation. Furthermore, the Related Actions involve the same

operative questions of fact and law. Both actions contend that Defendants issued materially false and misleading statements and omissions regarding the Company's legislative efforts, which artificially inflated the price of FirstEnergy's securities and subsequently damaged the putative class when the price of those securities fell after the criminal charges were filed. Accordingly, the Related Actions each assert claims under the Exchange Act on behalf of investors who were allegedly defrauded by FirstEnergy and certain Company directors and officers. Given these commonalities, the Court finds that consolidation will promote judicial economy and conserve the parties' resources by preventing the duplicative motions, discovery, and trials that would result from litigating each action separately. The Court also finds that consolidation is unlikely to prejudice the rights of any party. The Court therefore **GRANTS** the motions to consolidate the Related Actions.

## B.  Legal Framework of the PSLRA

The PSLRA sets forth procedures for appointing the lead plaintiff in class actions brought under the Exchange Act. The Reform Act directs courts to appoint a lead plaintiff during the initial stage of litigation and "as soon as practicable" after consolidation. 15 U.S.C. § 78u-4(a0(3)(B)(ii). The PSLRA further requires the chosen lead plaintiff to be able to represent adequately the interests of all class members. 15 U.S.C. § 78u-4(a0(3)(B)(i) ("[T]he court . . . shall appoint as lead plaintiff the member or members of the purported plaintiff class the court determines to be most capable of adequately representing the interests of class members. . .").

Candidates for lead plaintiff must file a certification that states the following:

(i) . . . the plaintiff has reviewed the complaint and authorized its filing;

(ii) . . . the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel in order to participate in any private action arising under this chapter;

> (iii) . . . the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

15 U.S.C. § 78u-4(a)(2)(A)(i)−(iii). The certification must also detail the plaintiff's transactions in the company's stock, disclose any action in which the plaintiff has served as lead plaintiff in the past three years, and include a pledge that the plaintiff will not accept payment for serving as a representative party in excess of the plaintiff's pro rata share. 15 U.S.C. § 78u-4(a)(2)(A)(iv)–(vi).

To determine which candidate should be designated lead plaintiff, courts engage in a two-step inquiry, first "calculating which candidate has the largest financial interest, and then determining whether that candidate meets the typicality and adequacy requirements of Rule 23(a)." *In re Cardinal Health, Inc. Sec. Litig.* ("*Cardinal Health I*"), 226 F.R.D 298, 302 (S.D. Ohio 2005) (citing *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002)). The Reform Act presumes that the most adequate plaintiff is the candidate with the largest financial interest, so long as that candidate satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice . . . ;
>
> (bb) in the determination of the Court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii). This presumption can be overcome by showing that the candidate with the largest financial interest will be subject to unique defenses or is otherwise inadequate. 15 U.S.C. § 78u-4(a)(3)(iii)(II). Below, the Court analyzes the extent to which each lead plaintiff candidate meets the criteria established by the PSLRA.

## C. Largest Financial Interest

The PSLRA does not provide a definitive method for determining the largest financial interest in securities class actions, but most courts employ a four-factor inquiry called the *Olsen-Lax* test. *See* 7 Newberg on Class Actions § 22:42 (5th ed.); *see also Cardinal Health I*, 226 F.R.D. at 302−03; *Cardinal II*, 2020 WL 339660, at *5. Under this test, courts consider: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered." *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.* ("*Cardinal Health II*"), No. 2:19-cv-3347, 2020 WL 3396660, at * 5 (S.D. Ohio June 19, 2020). The *Olsen-Lax* test has been widely accepted because it provides courts with helpful additional information for measuring financial stake beyond the ultimate question of damages. *Cardinal Health I*, 226 F.R.D. at 303 (citing *Manual for Complex Litigation § 31.31* (4th ed. 2004)). The objective indicators included in *Olsen-Lax* "reveal[] whether plaintiffs actually profited during the Class Period from the inflated stock prices." *Id.* Nevertheless, the trial retains full discretion over the specific methods used to calculate loss "and the factors considered in determining each [candidate's] financial interest." *Blitz v. AgFeed Indus., Inc.*, No. 3:11-0992, 2012 WL 1192814, at *7 (M.D. Tenn. Apr. 10, 2012) (quoting *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-01211, 2010 WL 1790763, at *3 (M.D. Tenn. Apr. 30, 2010)).

In their motions to appoint lead plaintiff and lead counsel, the parties declared their financial interests, providing information on their FirstEnergy common stock transactions during the Class Period, including total shares purchased, net shares purchased, net expenditures, and losses calculated via two different methodologies.

| FirstEnergy Common Stock | | | | | |
|---|---|---|---|---|---|
| Candidate | 1. Total Purchases | 2. Net Shares Purchased | 3. Net Expenditures | 4(a). LIFO Losses | 4(b). FIFO Losses |
| CalPERS | 3,566,272 | 1,364,653 | ($50,382,601) | ($10,961,187) | ($17,591,256) |
| LACERA | 1,522,037 | 654,495 | ($30,715,523) | ($11,701,584) | ($11,701,584) |
| Ohio STRS | 369,877 | 172,529 | ($6,298,105) | ($1,262,281) | ($1,695,778) |
| Ironworkers | 33,722 | 14,796 | ($715,628) | ($288,208) | ($288,208) |

While the candidates generally agree on the above figures, CalPERS[8] and LACERA[9] have each contested how the other incorporates its FirstEnergy bond transactions into its disclosures. The same two class members also dispute how the largest financial interest should be determined.[10]

---

[8] CalPERS argues that LACERA included losses from two bonds in its financial disclosures that are unrelated to the claims in the Related Actions because it sold those bonds at least three months before the July 21, 2020 corrective disclosure that revealed FirstEnergy's fraudulent scheme. (ECF No. 43 at 8 & n.9.). Because these two bonds account for 98% of its bond-related losses, CalPERS submits that LACERA presents an inaccurate calculation that distorts its actual LIFO losses. *Id.*

| FirstEnergy Bonds | | | | | |
|---|---|---|---|---|---|
| Candidate | 1. Total Purchases | 2. Net Purchases | 3. Net Expenditures | 4. LIFO Losses | 4. LIFO Losses Excluding Bonds Sold Before 07/21/2020 |
| CalPERS | 7,000,000 | 7,000,000 | ($6,989,500) | ($27,440) | ($27,440) |
| LACERA | 2,783,000 | 454,000 | ($602,922) | ($152,168) | ($2,565) |

CalPERS admits, though, that this change in bonds calculation only impacts LACERA's *overall* LIFO losses (which includes both bonds and common stocks) by 1.28%. (ECF No. 43 at 8).

[9] LACERA contends that CalPERS' true gains from its transactions in FirstEnergy bonds are obscured because CalPERS omitted its $534,000 gain on its Class Period purchase of FirstEnergy 2.65% bonds in its calculation. (ECF No. 45 at 2 n.2, 9 & n.12). Additionally, LACERA asserts that CalPERS omitted millions of dollars' worth of FirstEnergy subsidiary bonds that it purchased during the Class Period and that, if incorporated, would decrease CalPERS' financial interest in this case. (*Id.*).

[10] Ironworkers Locals has withdrawn its motion for appointment as lead plaintiff. (ECF No. 64). STRS Ohio concedes that it does not have the largest financial loss of the candidates for lead plaintiff.

They disagree about which method should be used to calculate loss under the fourth *Olsen-Lax* factor, whether bond gains should be aggregated with the loss, and the extent to which the other three *Olsen-Lax* factors should be considered. The Court considers these arguments in turn.

1. Loss Calculation Methodology

CalPERS implores the Court to use the First-In First-Out ("FIFO") method to calculate losses, while LACERA urges the Court to use the Last-In First-Out ("LIFO") method. Additionally, Ohio STRS argues that LIFO losses should be calculated according to the *Dura* damages analysis.

a. FIFO vs. LIFO

The FIFO method calculates loss according to the following process:

> [T]he first shares sold are matched against the first shares purchased. If the 'first shares purchased' are pre-class period purchases, then the first shares sold are matched against these pre-class purchases and the resulting gain or loss is excluded from the loss calculation. Thereafter, class period sales are matched against class period purchases to calculate losses. For any shares retained at the end of the class period, those shares are assigned a value, often a 60-day or 90-day post-fraud disclosure average.

Under this approach, a lead plaintiff candidate can "zero[] out" class period sales by matching them to pre-class period purchases, which can "grossly inflate[]" damages to institutional investors. *Cardinal Health I*, 226 F.R.D. at 303; *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *4 (N.D. Ohio May 12, 2004).

By contrast, under the LIFO approach, a plaintiff's gains during the class period are offset from its ultimate losses. This is because the "plaintiff's sales of the defendant's stock during the class period are matched against the last shares purchased." *Cardinal Health I*, 226 F.R.D. at 304. In other words, LIFO helps to reveal whether plaintiffs actually profited from class period transactions due to inflated stock prices. The LIFO method aligns better with the *Olsen-Lax* test because both inquiries focus on transactions occurring during the class period. *Id.* (citing *In re*

12

*Comdisco Sec. Litig.*, No. 01 C 2110, 2004 WL 905938, at *3 (N.D. Ill. Apr. 26, 2004); *see also In re Goodyear*, 2004 WL 3314943, at *7 (demonstrating how the *Olsen-Lax* test exposed a candidate's attempts to hide its gains using the FIFO method). Finding that the LIFO method more accurately depicts the financial interests of lead plaintiff candidates in securities class actions, this Court opts to use the LIFO method.

It is true that courts in the Southern District of Ohio sometimes use FIFO to calculate loss when determining financial interest in securities class action cases. CalPERS cites two instances in particular: *Cardinal Health II* and *Cardinal Health I*. The reasons for using FIFO in these cases, however, do not apply here. In *Cardinal II*, the court applied the FIFO method because one party first presented its losses using FIFO but then later condemned that method. 2020 WL 3396660, at *6 (citing *Garden City Emps. Ret. Sys.*, 2010 WL 1790763 (M.D. Tenn. Apr. 30, 2010) ("The Sixth Circuit has expressed disapproval for vacillating advocacy such as this, especially as it pertains to calculating losses for appointment as lead plaintiff."). In *Cardinal Health I*, this Court explained that it "resort[ed] to the FIFO methodology for the immediate narrow purpose" of evaluating the lead plaintiff candidates because they "did not provide the Court with a breakdown of losses under LIFO" but had provided FIFO losses, which constituted "enough information to conclude that the designated Lead Plaintiff is the same under either methodology." 226 F.R.D. at 304 (internal quotations omitted) (quoting *Thompson v. Shaw Grp.*, No. Civ.A.04-1685, 2004 WL 2988503, at *5 (E.D. La. Dec. 14, 2004)). The Court explicitly noted that its use of FIFO "in no way demonstrated a modicum of approval of FIFO." *Id*. Neither of these extraneous circumstances apply to the case before the Court here, which does not warrant using the FIFO method.

b. *Dura* Damages Analysis

Ohio STRS submits that the greatest financial interest is not as straightforward as the other candidates have presented because they fail to account for *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), which is the "seminal Supreme Court case concerning the plaintiff's ability to recover in a PSLRA action." *Galmi v. Teva Pharms. Ltd.*, 302 F. Supp. 3d 485, 498 (D. Conn. 2017).[11] *Dura* held that plaintiffs in securities fraud actions must prove a causal connection between their losses and the defendants' misconduct in order to recover damages. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342−43 (2005). If a plaintiff sells its shares before the first corrective disclosure about the company, the causal connection is lacking, and there is no recoverable loss. *Id.*

Courts in the Second Circuit read *Dura* to require courts to consider this causal connection when evaluating financial interest at the lead plaintiff stage. *See, e.g.*, *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015) ("[W]hen evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in [the Second] Circuit consider that plaintiff's recoverable loss, and do not take into account losses from shares sold prior to corrective disclosures.") (collecting cases).

In the case sub judice, only one corrective disclosure occurred: the July 21, 2020 arrest of Larry Householder and related revelation that FirstEnergy was at the center of the corruption scheme. Ohio STRS recalculates CalPERS' and LACERA's losses, using both LIFO and FIFO calculations, by excluding the losses and gains they incurred prior to that date.

---

[11] On November 11, 2020, Ohio STRS requested leave to file a sur-reply on the issue of calculating financial interest, asserting that other candidates for lead plaintiff missed a material issue that informs the proper calculation method. (No. 2:20-cv-03785, ECF No. 60).

| Candidate | FIFO Loss | *Dura* FIFO Loss | LIFO Loss | *Dura* LIFO Loss |
|---|---|---|---|---|
| CalPERS | ($17,591,256) | ($24,333,538) | ($10,961,187) | ($13,268,715) |
| LACERA | ($11,701,584) | ($12,220,756) | ($11,701,584) | ($9,604,670) |

Most courts in the Sixth Circuit do not adopt the *Dura* analysis to calculate financial interest at the lead plaintiff stage. *See, e.g.*, *Blitz*, 2012 WL 1192814, at *4 (rejecting the *Dura* damages analysis because it "was not a case involving the appointment of a Lead Plaintiff under the PSLRA, and *Dura* does not discuss FIFO or LIFO losses"). This Court agrees with this majority and declines to use the *Dura* method to calculate the lead plaintiff candidates' losses.

## 2. Bonds

CalPERS and LACERA also disagree about whether FirstEnergy bond and common stock losses should be offset with gains from different FirstEnergy bonds (i.e., those with different CUSIP identification numbers), including bonds from FirstEnergy subsidiaries. CalPERS did not offset gains from transactions in different debt securities, while LACERA did offset. This issue is largely academic because LACERA demonstrates greater LIFO losses under either approach.

CalPERS argues that LIFO losses (which include losses from bonds and common stocks) should not be offset with gains from different FirstEnergy bonds. CalPERS highlights that some courts that have found offsetting stock losses with gains from other profitable transactions to be inconsistent with the language of the PSLRA. *See, e.g.*, *In re Sepracor Inc. Sec. Litig.*, 233 F.R.D. 52, 54 (D. Mass. 2005) ("I find a transaction-based methodology, which allows claims for unprofitable transactions without offsetting that recoverable loss with gains from profitable transactions, to be more consistent with the provisions of the statute and rule."); *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 680 (E.D. Pa. 2004) ("The language of Section 10(b) and Rule 10b-5 is more consistent with a transaction-based methodology than a cumulative one."). CalPERS also points to settlement plans of allocation in securities class

15

actions, which it says typically employ formulas that do not offset gains on different securities and instead set the recognized loss to zero for securities with a gain.[12]

LACERA argues that stock losses should be offset by bond gains and that doing so is not inconsistent with the PSLRA. In support, it highlights that the Exchange Act expressly forbids individuals from recovering "a total amount in excess of the actual damages to that person on account of the act complained of." 15 U.S.C. § 78bb(a)(1). LACERA argues that the Court should not allow CalPERS to "calculate its financial interest with respect to one security that is the subject of the complaint while ignoring the Class Period gains it experienced on another" because doing so enables the hiding of gains. (ECF No. 57 at 12 n.12). Accordingly, LACERA advocates for the following loss calculation:

| Candidate | FirstEnergy Common Stock | | | FirstEnergy Bonds with Offsetting Gains | | | Combined Losses |
|---|---|---|---|---|---|---|---|
| | 1. Total Purchases | 2. Net Purchases | 3. Net Expenditures | 1. Total Purchases | 2. Net Purchases | 3. Net Expenditures | 4. LIFO Losses |
| CalPERS | 3,566,272 | 1,364,653 | ($50,382,601) | 27,000,000 | 27,000,000 | ($26,975,300) | ($10,447,827) |
| LACERA | 1,522,037 | 654,495 | ($30,715,523) | 14,162,000 | 4,951,000 | ($5,113,030) | ($11,497,045) |

Both parties acknowledge that LACERA has the largest LIFO losses, regardless of whether the Court looks solely to common stock transactions or to both stock and bond transactions. Under the combined approach, the disparity between CalPERS' and LACERA's losses grows from approximately $740,000 to over $1 million.

---

[12] For example, in the *In re Enron Corp. Securities Litig.* Plan of Allocation, the parties agreed: "In the case of Enron common stock and options on that stock, gains and losses on both the stock and options will be combined and thereafter netted against each other. In all other cases, gains and losses will not be netted or aggregated across different Eligible Securities." (ECF No. 43-1, Ex. 7, at 4).

| | Bond Gains under LIFO | Stock Losses under LIFO | Combined Stock Losses & Bond Gains under LIFO |
|---|---|---|---|
| CalPERS | $513,360 | ($10,961,187) | ($10,447,827) |
| LACERA | $204,538 | ($11,701,584) | ($11,497,045) |
| Difference | CalPERS: + $308,822 | LACERA: − $740,397 | LACERA: − 1,049,218 |

Because these figures do not affect the Court's determination of financial interest for purposes of appointing a lead plaintiff, the Court need wade into the merits of this technical issue now. Such arguments will be more pertinent to the calculation of damages, if and when an award of damages occurs. Under the LIFO method, as both CalPERS and LACERA acknowledge, LACERA is the lead plaintiff candidate with the most significant stock losses. While CalPERS also demonstrates substantial LIFO losses, the Court finds that the fourth *Olsen-Lax* factor weighs in favor of LACERA using this methodology.

### 3. Weight of the *Olsen-Lax* Factors

Both parties acknowledge that LACERA has the largest LIFO losses regardless of how the Court treats bond gains, but they disagree about the extent to which the Court should consider the non-loss *Olsen-Lax* factors. CalPERS argues that all four *Olsen-Lax* factors are important in determining which lead plaintiff candidate has the largest financial interest. It also contends that the second factor, the number of net shares purchased during the class period, should be given the greatest weight. LACERA maintains that the amount of loss alone controls the issue of financial interest and that the other three factors are unilluminating. Neither the PSLRA nor a unified judicial approach makes clear "what weight these factors should be given in relation to the amount of loss." *In re Bally Total Fitness Sec. Litig.*, No. 04C3530, 2005 WL 627960, at *2 (N.D. Ill. Mar. 15, 2005).

a. Considering All Four *Olsen-Lax* Factors

CalPERS submits that the Court should consider all four *Olsen-Lax* factors when appointing Lead Plaintiff rather than looking solely to loss, citing three decisions from district courts within the Sixth Circuit: *City of Hollywood Firefighters' Pension Fund v. TransDigm Grp., Inc.*, No 1:17-dv-1677, 2017 WL 6028213 (N.D. Ohio Dec. 5, 2017); *Pio v. Gen. Motors Co.*, No. 14-11191, 2014 WL 5421230 (E.D. Mich. Oct. 24, 2014); and *In re Goodyear*, 2004 WL 3314943. Each of these cases, however, present unusual circumstances that render loss an inadequate factor on its own. In *City of Hollywood*, one of the candidates "sold out its position [stock] during the class period," which negated the candidate's loss. 2017 WL 6028213, at *2. Moreover, the difference in the losses between the two lead plaintiff candidates was only approximately $35,000. *Id.* at *9.[13] In *Pio*, the lead plaintiff candidates employed varying calculation methods from brief to brief, making it impossible for the court to compare their losses fairly. 2014 WL 5421230, at *4; *see also In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2s 1017, (N.D. Cal. 1999) (relying on net shares purchased because the parties submitted confusing and erroneous financial figures). And in *Goodyear*, one of the candidates engaged in and benefitted from an alleged fraud. 2004 WL 3314943, at *4. None of these circumstances apply here.

CalPERS also highlights several courts that choose to consider all four *Olsen-Lax* factors when one candidate's loss under the fourth factor are only slightly higher than other candidates'

---

[13] CalPERS also highlights that the Sixth Circuit upheld the district court's consideration of all four *Olsen-Lax* factors. *In re Dist. 9, Int'l Ass'n of Machinists & Aero. Workers Pension Tr.*, No. 18-3154, 2018 App. LEXIS 8715, at *3 (6th Cir. Apr. 5, 2018). The Sixth Circuit found that the objecting candidate did not show a "clear abuse of discretion by the district court in basing its determination on the four [*Olsen-Lax*] factors" because the court did not disregard any specific provision of the PSLRA. Instead, the PSLRA directs the court to appoint the lead plaintiff that it "determines to be most capable of adequately representing the interests of the class members[.]" *Id.* at *2−3 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(i)).

losses. These cases derive from the Southern District of New York, and they typically involve loss differentials of $20,000 or less. *See, e.g.*, *Cortina v. Anavex Life Sci. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 1337305, at *2 (S.D.N.Y. Apr. 5, 2016) (holding that significantly higher net shares purchased and net funds expended outweigh a $1,132 loss differential, which "only slightly favors" the competing candidate); *Westchester Putnam Cntys. Heavy & Highway Laborers Local 60 Benefit Funds v. Brixmore Prop. Grp., Inc.*, No. 16-CV-02400 (AT)(SN), 2016 WL 11648466, at *2 (S.D.N.Y. Nov. 29, 2016) (appointing a lead plaintiff that the first three factors "overwhelmingly" favored over a candidate that incurred a $20,884 larger loss); *Alkhoury v. Lululemon Athletica, Inc.*, No. 13 Civ. 4596 (KBF), 2013 WL 5496171, at *1 (S.D.N.Y. Oct. 1, 2013) (holding that a "slightly higher" loss amount of approximately $2,000 was a "negligible difference" and was "insufficient to outweigh the substantial financial interest . . . evidenced by other factors").

The facts of this case do not align with the cases CalPERS cites from within the Sixth Circuit or the Southern District of New York. Unlike the relatively small loss differentials in the New York cases, here there is a significant disparity between the two candidates' losses. LACERA has a $740,397 greater financial loss than CalPERS under the LIFO calculation that excludes bond gains, and a $1,049,218 greater LIFO loss if the calculation includes the offsetting gains. There is likewise no evidence that LACERA sold out its position during the Class Period, used impermissible loss calculation methods in the pleadings, or engaged in fraud. Thus, the Court does not find the line of cases CalPERS cites to be controlling in this case. Instead, this Court follows the dominant approach in the Southern District of Ohio and in the Sixth Circuit at large, which is to treat the loss factor as determinative. The Court details this approach and its corresponding case law in Subsection (c) below.

19

b. Net Shares Purchased as the Determinative Factor

Additionally, CalPERS proposes that the second *Olsen-Lax* factor, net shares purchased, be given the greatest weight because this factor represents "recoverable losses" by focusing on the shares purchased during and retained at the end of the Class Period. *See Pio*, 2014 WL 5421230, at *4 (noting "some courts have found the second factor—retained shares—to be the most determinative factor in approximating an investor's potential recovery"). In CalPERS' view, the significance of this factor is especially evident when applying the "retained shares" methodology. *See id.*, at *5 & n.5 (citing *Eichenholtz v. Verifone Holdings, Inc.*, No. C 07-06140-MHP, 2008 WL 3925289, at *4 (N.D. Cal. Aug. 22, 2008)). Under this approach, the court calculates losses on the retained shares using the following criteria:

> [I]f a share was not sold within 90 days subsequent to [the date the fraud was disclosed to the public], the loss is to be measured using an average of the daily closing price of [the target company's] stock during the 90-day period beginning [on the disclosure date]. If a share was sold within 90 days subsequent to [the disclosure date], the loss is to be measured using the higher of the actual sale price or an average of the daily closing price from [the disclosure date] to the date of sale.

*Id.* (alterations in original). Applying the retained shares methodology, CalPERS calculates that it has $16,925,109 in recoverable losses while LACERA has $7,990,524 in recoverable losses. (No. 2:20-03785, ECF No. 43 at 6).

As previously discussed*,* the *Pio* case presented the Court with unusual challenges because the parties submitted a wide array of methodologies and criteria for calculating financial loss. *Pio*, 2014 WL 5421230, at *4 ("[The movants] have not framed their arguments in [*Olsen-Lax*] factor terms, instead presenting a dizzying array of damages calculations in their briefs and declarations.") (internal quotations omitted). To avoid "wading through complex [and] fact-dependent arguments relative to the parties' calculations," the Court instead opted to use the retained shares calculations that one party submitted "for purposes, only, of assessing the final *Lax*

20

factor." *Id.* at *7. The *Pio* court's use of the retained shares methodology has since been recognized as a "proxy for estimating total loss" that is not necessary when the parties present more straightforward loss calculations. *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare*, No. 3:18-cv-00988, 2019 WL 494129, at *4−*5 (M.D. Tenn. Jan. 9, 2019) ("The Court finds no reason to depart from its prior practice of looking to the fourth *Olsen-Lax* factor as the most important."). Here, the figures that LACERA and CalPERS have submitted facilitate the Court's consideration of the loss factor without presenting the need for relying on the candidates' retained shares. The Court therefore declines to resort to this method and does not treat the parties' net shares purchased as the most instructive *Olsen-Lax* factor.

### c. Loss as the Determinative Factor

LACERA emphasizes that most courts in the Sixth Circuit[14] adopt the fourth factor, loss, as the most important in determining financial interest. For example, in *Cardinal Health II*, Judge Sargus recently observed that "most courts have emphasized that greater consideration ought to be given to the fourth factor: approximate losses suffered." 2020 WL 3396660, at *6 (finding the candidate with the greatest losses to have the most significant financial interest, even though two of the *Olsen-Lax* factors favored the other candidate); *see also Acadia Healthcare Co., Inc.*, 2019 WL 494129, at *3 (appointing the candidate with $80,000 greater loss despite the competing movants' larger total and net shares purchased and greater net expenditures).

In *Cardinal Health I*, this Court also relied on the loss factor to appoint lead plaintiff. 226 F.R.D. 298 at 302−05. This Court explained that the other *Olsen-Lax* factors provide "additional

---

[14] LACERA also notes that the *Lax* case itself determined that one candidate had the largest financial interest "owing to the fact that the plaintiffs that make up the group have suffered the largest alleged losses." *Lax v. First Merchants Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997).

information" that can reveal whether lead plaintiff candidates "actually profited during the Class Period from the inflated stock prices." *Id.* at 304 (quoting *Thompson*, 2004 WL 2988503, at *4) ("[U]nder the LIFO approach, a plaintiff's sales of the defendant's stock during the class period are matched against the last shares purchased, resulting in an offset of class-period gains from a plaintiff's ultimate losses."). Such additional information is helpful in cases where the parties do not submit LIFO-calculated losses, as the parties did not in *Cardinal Health I*. Here, however, the additional factors are less useful because the LIFO method incorporates them into its calculation methodology. Since the LIFO method performs the same disclosure function by exposing candidates who experience net gains during the class period, the non-loss *Olsen-Lax* factors have less utility when the Court is able to use LIFO to calculate loss.

Two cogent circuit court decisions informed this Court's approach in using loss as the most important *Olsen-Lax* factor in *Cardinal Health I*: *In re Cendant Corp. Litigation*, 264 F.3d 201 (3rd Cir. 2001) and *In re Cavanaugh*, 306 F.3d 726. *See id.* at 304−05. In *Cendant Corp.*, the Third Circuit asserted nine times that the candidate with the "largest losses" will be the lead plaintiff if it satisfies the typicality and adequacy requirements. 264 F.3d at 264−68 (finding that the "threshold determination" is "whether the [candidate] with the largest financial losses" also satisfies the Rule 23 adequacy and typicality requirements). Similarly, in *Cavanaugh*, the Ninth Circuit found that "district court[s] must consider the losses allegedly suffered by the various plaintiffs before selecting [] the 'presumptively most adequate plaintiff'" to serve as lead. 306 F.3d at 729−30. As it did in *Cardinal Health I*, this Court continues to follow this line of thinking when appointing a lead plaintiff in securities actions.

Many district courts within the Sixth Circuit also follow this approach and analyze the financial interests of lead plaintiff candidates without mentioning the first three *Olsen-Lax* factors.

22

*See, e.g.*, *Walker v. L Brands, Inc.*, No. 2:19-cv-3186, 2019 WL 10733381, at *3 (S.D. Ohio Oct. 16, 2019) (noting the candidate's loss without mentioning any other factor); *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-cv-1106, 2017 WL 5759361, at *8 (same); *Eshe Fund v. Fifth Third Bancorp*, No. 1:08-CV-421, 2008 WL 11322108, at *5 (S.D. Ohio Dec. 16, 2008) (same); *Ohio Pub. Emps. Ret. Sys. v. Fannie Mae*, 357 F. Supp. 2d 1027, 1033 (S.D. Ohio 2005) (same); *Steiner v. Frankino*, No. 1:98-CV-264, 1998 WL 34309018, at *3 (N.D. Ohio July 16, 1998) (same). Still others analyze each of the *Olsen-Lax* factors but emphasize the loss factor. *See, e.g.*, *Cardinal Health II*, 2020 WL 33966600, at *6 (recognizing the candidates' shares and expended funds but placing greater weight on the losses suffered); *In re Goodyear*, 2004 WL 3314943, at *3−*6 (finding that a movant's loss "is not the greatest loss incurred by the movants" and that she was therefore "not the best candidate for lead plaintiff").

In keeping with the courts of this Circuit and its previous decisions, this Court treats the fourth loss *Olsen-Lax* factor as the determinative one. LACERA has suffered the largest LIFO losses regardless of whether bond gains are included in the calculation, and LACERA therefore has the largest financial interest in this matter.

### D. Rule 23 Typicality and Adequacy of Representation

The PSLRA mandates that the presumptive lead plaintiff—i.e., the candidate with the largest financial interest—must "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). Under Rule 23(a), a party may serve as a class representative only if the following four requirements are met:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Only two of the four prerequisites, typicality and adequacy, directly relate to the personal characteristics of class representatives. *Fannie Mae*, 357 F. Supp. 2d at 1034. At this stage in the proceedings, Plaintiffs meet their burden if they make a prima facie showing that they satisfy the typicality and adequacy prerequisites of Rule 23. *Id.* (citing *In re Cendant Corp.*, 264 F.3d at 263−64). Courts therefore generally limit their inquiries to the typicality and adequacy prongs of Rule 23(a) when considering a motion to serve as lead plaintiff, and they defer the remaining requirements until the motion for class certification. *Id.*

### 1. LACERA's Typicality and Adequacy

A candidate for lead plaintiff meets the typicality requirement if its claims arise out of the same conduct or series of events and rely on the same legal theory as the claims of the other class members. *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996) ("[A] Plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.") (citations omitted). Minor factual differences do not defeat typicality. *See In re Unumprovident Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 24633, at *25 (E.D. Tenn. Nov. 6, 2003).

A candidate for lead plaintiff demonstrates that it can fairly and adequately represent the interests of class members under Rule 23(a)(4) when it appears that (1) the candidate's interests do not conflict with those of the class and (2) the candidate's selected counsel is qualified to lead the litigation. *Fannie Mae*, 357 F. Supp. 2d at 1034 (citing *In re CMS Energy Sec. Litig.*, No. 02-CV-72004-DT, slip op. at 5 (E.D. Mich. Nov. 14, 2002). The presumption that a candidate for lead plaintiff meets the typicality and adequacy requirements can be rebutted by showing that the candidate is not in fact adequate or will be subject to unique defenses. *See, e.g., Cardinal Health*

24

*I*, 226 F.R.D. at 305; *In re Network Assocs.*, 76 F. Supp. 2d at 1029 (finding that the proposed lead plaintiff did not meet the adequacy requirement because it faced an unrelated fraud investigation).

In the present action, LACERA asserts claims that seemingly arise out of the same course of conduct or series of events as alleged by other members of the purported class, and such claims are based on the same legal theories as the other members of the purported class. Specifically, LACERA states that it, like all class members, purchased FirstEnergy securities at artificially inflated prices during the Class Period and suffered a loss as a result of Defendants' alleged misrepresentations and omissions. (No. 2:20-cv-03785, ECF No. 45 at 3−4). Moreover, LACERA and the other putative class members have identical legal claims in that all movants allege Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10-b(5) promulgated thereunder. LACERA's claims are therefore typical of the class. (*Id.*).

With respect to the adequacy requirement under Rule 23(a), LACERA contends that it has no interests antagonistic to those of the class. (*Id.* at 6). No other movant has raised concerns about any potential conflict of interest on LACERA's part, and nothing in the pleadings otherwise suggests that LACERA cannot fairly and adequately represent the class.

<u>2. Counsel Qualifications</u>

The PSLRA grants the lead plaintiff the authority to select and retain counsel to represent the putative class so long as the Court approves. 15 U.S.C. 78u-4(a)(3)(B)(v); *In re Cavanaugh*, 306 F.3d at 733. Generally, courts only disrupt a lead plaintiff's choice of counsel if doing so is necessary to protect the interests of the class. *Fannie Mae*, 357 F. Supp. 2d at 1034; *see also In re Cavanaugh,* 306 F.3d at 733 ("[T]he district court must approve the lead plaintiff's choice of counsel, but Congress gave the lead plaintiff, and not the court, the power to select a lawyer for the class.").

LACERA's choice of counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), possesses the requisite expertise and experience necessary to handle a case of this magnitude and complexity. For example, in the first half of 2020 alone, Robbins Geller cites that it has recovered more than $2.5 billion on behalf of investors in securities class action cases, including more than $1 billion in *In re Am. Capital Props., Inc. Litig.*, No. 1:15-mc-00040-AKH (S.D.N.Y.) and approximately $1.2 billion in *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658-MAS-LHG (D.N.J.). Robbins Geller also represents that it achieved the largest securities class action recovery in the Sixth Circuit and in the Southern District of Ohio, *In re Cardinal Health Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) ($600 million settlement), and that is has successfully litigated a securities action against FirstEnergy, *In re FirstEnergy Sec. Litig.*, No. 5:03-cv-01684 (N.D. Ohio) ($85 million settlement). In addition to this substantial track record of success, there are no facts or arguments before the Court that suggest appointing Robbins Geller as Lead Counsel could disrupt the interests of the class.

This Court is also impressed by Robbins Geller because its proposed leadership team of five lawyers includes one woman and at least two minority lawyers. The firm's overall composition is also diverse: thirteen percent of its partners are minorities, its management committee is comprised of approximately twenty-five percent minorities, and thirty-five percent of its attorneys are female. The Court looks favorably upon this composition because, whenever possible, the Court strives to "appoint a diverse leadership team that is representative of the diversity of the [p]laintiffs." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 U.S. Dist. LEXIS 81742, at *26−27; *see also In re FirstEnergy Corp. S'holder Derivative Litig.*, No. 2:20-cv-04813, ECF No. 44 (S.D. Ohio). The FirstEnergy shareholders who bring this action—including the constituents of CalPERS, LACERA, Iron Workers, Ohio STRS, and others—encompass a broad

range of individuals who are diverse in ethnicity, race, and gender. Lead Counsel in this case will represent a large and heterogeneous group of investors, and the Court finds that the diverse team put forth by Robbins Geller is well-suited to represent the plaintiffs' diversity and to act on their behalf.

LACERA has sufficiently met the typicality and adequacy requirements. Its claims are typical of the putative class claims, its interests are not antagonistic to the class, and its chosen counsel is qualified and competent. The Court also notes that LACERA is an institutional investor, which comports with the PSLRA's expressed preference for such lead plaintiffs. H.R. Conf. Rep. No. 104-369, at 34 (1995) ("[I]n many cases the beneficiaries of pension funds . . . ultimately have the greatest stake in the outcome of the lawsuit."). Further, the Court determines that LACERA is a well-grounded and sophisticated institutional investor that can commit substantial resources to this litigation.

Because LACERA has demonstrated that it has the largest financial interest at stake and has satisfied the adequacy and typicality requirements of Rule 23, LACERA is entitled to a presumption that it is the most adequate plaintiff. Additionally, no purported class member has submitted evidence that LACERA will not fairly or adequately protect class interests, or that it is subject to unique defenses. LACERA is therefore the most adequate plaintiff to lead the securities fraud class actions pending before this Court.

### E. Ohio STRS' Motion to Be Appointed Co-Lead Plaintiff

Ohio STRS asks the Court to exercise its discretion to appoint Ohio STRS as Co-Lead Plaintiff together with CalPERS and/or LACERA, and to appoint its counsel, Bleichmar Fonti & Auld LLP, as Co-Lead Counsel. It offers three reasons for doing so: (1) its strong interest in

deterring political corruption in its own state; (2) its experience litigating actions like this one[15]; and (3) its willingness to cooperate with the other Co-Lead Plaintiff the Court selects.

While the PSLRA requires the Court to appoint the movant with the "largest financial interest," Ohio STRS argues there is no statutory restriction on the Court's appointment of a co-lead plaintiff once the Court has chosen the movant with the largest financial interest. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Indeed, Ohio STRS emphasizes that financial interest was incorporated into the PLSRA as a proxy for preventing lawyer-driven litigation and ensuring that the candidate selected to serve as Lead Plaintiff is most incentivized to oversee the litigation and achieve favorable results for the class:

> [T]he lead plaintiff provisions of the PSLRA were intended to curtail the vice of "lawyer-driven" litigation, *i.e.*, lawsuits that, because of the huge potential fees available in contingent securities fraud class actions, were initiated and controlled by the lawyers and appeared to be litigated more for their benefit than for the benefit of the shareholders they ostensibly represented. To help combat this problem, the lead plaintiff provisions of the PSLRA required that a court appoint as a lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members. Further, the provisions created a "rebuttable presumption" that the "most adequate" plaintiff is, *inter alia*, the person or group of persons that has the largest financial interest in the relief sought by the class. The theory of these provisions was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff—frequently a large institution or otherwise sophisticated investor—would be motivated to act like a 'real' client, carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price.

---

[15] Ohio STRS also highlights its proven track record of serving as Lead and Co-Lead Plaintiff in securities class actions. *See e.g.*, *In re Bank of Am. Corp. Litig.*, No. 1:09-md-02058 (S.D.N.Y.) (securing a $2.4 billion recovery for the class); *Ohio Pub. Emps. Ret. Sys. v. Freddie Mac*, No. 03-cv-4261 (S.D.N.Y.) (recovering $410 million for the class); *In re Allergan Inc. Proxy Violation Sec. Litig.*, No 8:14-cv-02004 (C.D. Cal.) (serving as Co-Lead Plaintiff and obtaining $250 million for investors). This history, however, does not answer the ultimate question of whether Ohio STRS and LACERA could work together well to litigate this case.

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009) (internal citations and quotations omitted); *see also* H.R. Rep. No. 104-369, at *32 (1995), *reprinted in* 1996 U.S.C.C.A.N. 730, 733 (1995) ("[The PSLRA was] intended to encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class.").

Ohio STRS concedes that its $1.3 million LIFO losses do not constitute the largest financial interest at stake in this case, but argues that it has a particular institutional interest in vigorously prosecuting it. Specifically, Ohio STRS seeks to assure the teachers whose funds STRS manages "that it is protecting their financial interests in a matter so close to home." (ECF No. 58 at 3). It also believes that it has a compelling interest to serve a merits-focused leadership role in "extracting the maximum amount possible from all culpable parties to maximize the deterrent effect on political corruption." (ECF No. 44 at 1−2). Accordingly, Ohio STRS argues that this Court should appoint it as Co-Lead Counsel because doing so would best serve the interests of the class.

Ohio STRS encourages a case-specific evaluation to determine whether aggregating co-lead plaintiffs is the appropriate here, citing a case previously in front of this Court. *See Cardinal Health I*, 226 F.R.D. at 307. In *Cardinal Health I*, six large investors formed a group and requested this Court to appoint it as lead plaintiff. *Id.* This Court permitted the aggregation after taking into account "the size of the group, the purpose for adding any particular individual or entity to the group and the likelihood that the group, as constituted effectively, could serve the lead plaintiff function contemplated by the PSLRA." *Id.* (quoting *In re Office Max, Inc. Sec. Litig.*, No. 1:00-cv-2432, slip op. at 13−14 (N.D. Ohio Mar. 21, 2001)). The Court found that the group had "indeed

29

established a cohesive relationship" and permitted them to serve as co-lead plaintiff together. *Id.* In making such a determination, this Court notes that "the crucial question is the group's ability to make decisions, communicate, and represent the class." *Id.*

Whether Ohio STRS and LACERA could form a cohesive relationship or work together effectively to represent the class is speculative at best. Ohio STRS called LACERA to discuss possible coordination, but the two groups could not reach an agreement. Furthermore, LACERA opposes Ohio STRS' proposal, in part because Ohio STRS does not possess the largest financial interest and therefore does not satisfy the PSLRA presumption. *See Cavanaugh*, 306 F.3d at 732 ("So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status . . . ."); *see also In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 451 (S.D. Tex. 2002) (denying lead plaintiff candidates despite the "important concerns" they raised because they do not have the largest financial interest).

LACERA also argues that appointing Ohio STRS as Co-Lead Plaintiff would contravene the principle of efficiency. At least two courts in this Circuit have denied candidates' requests to be appointed as co-lead plaintiff due to similar concerns. For example, in *Goodyear*, the court declined to appoint a co-lead plaintiff because doing so "likely would result in increased costs and duplication efforts). 2004 WL 3314943, at *3 (also noting that the candidate expended the least funds, purchased the fewest shares, and incurred the least loss of the moving candidates); *see also In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 815 (N.D. Ohio 1999) ("While the PSLRA refers to 'a person or group of persons' as capable of serving as the lead plaintiff, the surrounding statutory language forecloses the appointment of multiple groups or multiple persons not part of a cohesive group. . . . especially if multiple law firms are to represent their interests.").

Ohio STRS counters by citing another court that appointed co-lead plaintiffs in securities class actions despite a lack of agreement among the movants. *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 49 (S.D.N.Y. 1998). In *Oxford*, the court appointed three candidates to serve as co-lead plaintiffs together and three co-lead counsel, even though one of the candidates objected to the arrangement. *See id.* at 51. The three parties the court appointed included a state employees' pension fund, a private investment management company, and a group of three individual shareholders. *Id.* at 44−45. These three candidates, who had the three largest financial interests in the case, each represented different types of class members. *Id.* The court found that aggregation of such "diverse representation" and "joint funding" would help ensure "the interests of all class members [would] be adequately represented in the prosecution of the action and in the negotiation and approval of fair settlement." *Id.* at 45, 49. This reasoning does not apply to Ohio STRS' petition for appointment as co-lead plaintiff because LACERA and Ohio STRS both represent the retirement fund interests of public employees, and Ohio STRS is not the candidate with the second largest financial interest.

This Court is generally amenable to appointing co-lead plaintiffs to litigate securities actions when doing so does not pose the potential for confusion, duplicative services, or unnecessary fees. *See Kubiak v. Barbas*, No.3:11-cv-141, 2011 WL 2443715, at *2 (S.D. Ohio June 14, 2011) ("[I]t is essential [for lead counsel] to have one voice."). For example, this Court recently appointed two co-lead plaintiffs to lead the shareholder derivative actions against FirstEnergy that are related to this matter. *In re FirstEnergy Corp. S'holder Derivative Litig.*, No. 2:20-cv-04813, ECF No. 44. There, the co-lead plaintiffs had a track record of litigating derivative actions together and achieving favorable results as a team. The two plaintiffs also moved the court for appointment as co-lead plaintiffs together, with each party each fully supporting the joint

appointment. Here, Ohio STRS and LACERA do not have a track record of working together, and LACERA opposes the aggregation. The Court therefore **DENIES** Ohio STRS' requests to be appointed as co-lead plaintiff and to have its law firm appointed as co-lead counsel.

## V. CONCLUSION

In accordance with the above, the Court **GRANTS** the motions to consolidate. Additionally, Court **GRANTS** LACERA's Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel [#33]; **DENIES** CalPERS' Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel [#28][16]; and **DENIES** Ohio STRS' Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel [#32]. Finally, the Court **GRANTS** Ohio STRS' Motion for Leave to File Sur-Reply to Competing Lead Plaintiff Motions [#60].

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: November 23, 2020**

---

[16] This motion also appears as ECF No. 19 in 2:20-cv-03785 (S.D. Ohio).