UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |
| ALL ACTIONS. | ) ) ) ) | DEMAND FOR JURY TRIAL |

CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
  murray@mmmb.com
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)




Liaison Counsel

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS (darrenr@rgrdlaw.com)
MARK SOLOMON (marks@rgrdlaw.com)
JASON A. FORGE (jforge@rgrdlaw.com)
TOR GRONBORG (torg@rgrdlaw.com)
BRIAN E. COCHRAN (bcochran@rgrdlaw.com)
SARA B. POLYCHRON (spolychron@rgrdlaw.com)
TING H. LIU (tliu@rgrdlaw.com)
FRANCISCO J. MEJIA (fmejia@rgrdlaw.com)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

Lead Plaintiff Los Angeles County Employees Retirement Association ("Lead Plaintiff"), together with Plaintiffs Amalgamated Bank (defined herein), City of Irving Supplemental Benefit Plan and Wisconsin Laborers' Pension Fund (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to each Plaintiff and each Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by FirstEnergy Corp. ("FirstEnergy" or the "Company," which terms include subsidiaries that FirstEnergy owned and controlled, unless otherwise indicated), as well as media reports about the Company and case filings in *USA v. Borges*, 1:20-mj-00526 (S.D. Oh.) (the "Criminal Proceedings"). Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This is a securities class action on behalf of all purchasers of FirstEnergy securities between February 21, 2017 and July 21, 2020, inclusive (the "Class Period"). Plaintiffs seek to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder, against FirstEnergy, certain current and former senior Company insiders, and the investment banks which underwrote two FirstEnergy debt offerings during the Class Period.

2. FirstEnergy is an electric utility company headquartered in Akron, Ohio that serves much of the Midwest and Mid-Atlantic regions. Its family of ten operating companies comprise one of the largest investor-owned utility companies in the United States.

4823-8789-7564.v3

3.     Throughout the Class Period, FirstEnergy and its most senior executives bankrolled one of the largest corruption and bribery schemes in U.S. history.  Unbeknownst to investors, FirstEnergy spent tens of millions of dollars on an unprecedented multi-year scheme to corrupt legislators and regulators, who FirstEnergy used to draft and pass legislation designed to provide $2 billion in benefits to FirstEnergy – all at ratepayers' expense.  FirstEnergy's scheme extended to the highest offices of the Ohio legislature, including the office of the Speaker of the House, and to the top energy regulator in the state, the Chairman of the Public Utilities Commission of Ohio ("PUCO").  FirstEnergy employed an elaborate network of lobbyists, shell companies and political action committees; saturated media markets with a false and misleading advertising campaign funded through difficult-to-trace dark money networks; and directly subverted the free and fair operation of Ohio elections.

4.     FirstEnergy's scheme to corrupt the political process and suborn the regulatory framework was not the work of rogue employees, but personally overseen and facilitated by the senior echelon of Company management, including FirstEnergy's then-Chief Executive Officer ("CEO") Charles E. Jones and numerous other executives responsible for FirstEnergy's regulatory affairs, legal compliance, financial reporting and investor disclosures.  Corruption became a fundamental aspect of the Company's business model as the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges.

5.     Specifically, during the Class Period, FirstEnergy claimed that it was pursuing and ultimately secured a "solution" for the bailout of its two failing nuclear plants, the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station (the "Nuclear Plants"), through the passage of Ohio House Bill 6 ("HB6").  HB6 was a purported "clean energy" bill designed to incentivize low carbon dioxide emitting power production, in particular nuclear power generation. In addition to a ratepayer-funded $1.3 billion bailout of the Nuclear Plants, HB6 also included a

– 2 –

ratepayer-funded "decoupling" provision worth some $700 million in subsidized revenues for FirstEnergy. "Decoupling" in this context means that FirstEnergy could charge higher rates for electricity than supply-and-demand principles would otherwise justify, allowing FirstEnergy to lock-in hefty profits regardless of how much electricity ratepayers actually used.

6.       This corruption-based business model exposed FirstEnergy to catastrophic risks (and now the reality) of financial, regulatory, legal and reputational loss, and FirstEnergy and its senior insiders went to great lengths during the Class Period to conceal these risks from investors. In fact, FirstEnergy and its executives repeatedly affirmatively reassured investors that the Company was **_not_** engaged in any illicit activities and "compl[ied]" with all laws and regulations applicable to its regulatory affairs and investor disclosure obligations. FirstEnergy also provided investors with pages of "Risk Factors" purporting to detail the most significant risks facing the Company, while concealing any mention of the monumental risks stemming from the political corruption scheme then being spearheaded by the Company and its executives. FirstEnergy's misrepresentations of material facts about these corrupt activities was part of an overarching "Bailout Scheme" designed to generate billions of dollars in illicit proceeds for the Company.

7.       For a time, the Bailout Scheme was a resounding success. During the Class Period, the price of FirstEnergy stock soared to over $50 per share, allowing the Company to raise $5 billion in a "transformational" equity raise and two public bond offerings. Company insiders were also richly rewarded, receiving tens of millions of dollars in excess compensation tied to FirstEnergy's apparent success. For example, in 2019 alone, FirstEnergy paid Jones over $20 million, which included $18 million in performance-based stock units. Numerous Company insiders also took advantage of FirstEnergy's inflated stock price to sell millions of dollars of their own personal FirstEnergy shareholdings. Jones alone sold nearly 265,000 FirstEnergy shares for $10 million at

- 3 –

artificially inflated prices during the Class Period – more than double the number of shares he sold in the preceding ten years.

8.     On July 21, 2020, however, the U.S. Attorney's Office for the Southern District of Ohio and the Federal Bureau of Investigation ("FBI") announced the arrests of Ohio House Speaker Larry Householder ("Householder") and several accomplices and publicly filed a criminal complaint and supporting 80-page affidavit (the "Criminal Complaint."), revealing critical aspects of the Bailout Scheme.  The Criminal Complaint was the product of a years-long investigation that included court-authorized wire intercepts of phone calls and text messages, extensive analyses of financial records, documents seized pursuant to court-authorized search warrants, media reports, legislative records and witness interviews.  The Criminal Complaint detailed how FirstEnergy (identified as "Company A") had served as the criminal enterprise's corrupt corporate kingpin, financing its illegal operations and closely coordinating with the criminal defendants to ensure the passage of HB6 and, later, thwart a democratic referendum to repeal the bill.  The Criminal Complaint documented how the Company was dubbed the "Bank" by conspirators for its willingness to spend "unlimited" money to further its corrupt ends, a partnership which FirstEnergy's own lobbyist referred to as the "unholy alliance."  In short, the Criminal Complaint described how FirstEnergy and its top executives illegally funneled $60 million into the hands of corrupt politicians to get HB6 passed into law and avoid its repeal.  The return on investment of the Company's $60 million corrupt investment in HB6 promised to be extraordinary:  $2 billion at the expense of Ohio ratepayers.

9.     On the news of FirstEnergy's central role in the Bailout Scheme, the price of FirstEnergy stock plummeted, falling below $23 per share on July 22, 2020, down ***45%*** from its closing price of more than $41 per share on July 20, 2020, inflicting billions of dollars of losses on FirstEnergy investors.

- 4 –

10.     In the days that followed, Jones attempted to disavow any culpability for the activities revealed in the Criminal Complaint, proclaiming that "FirstEnergy acted properly in this matter," and that, "at no time [did] our support for nuclear plants in Ohio interfere or supersede our ethical obligations to conduct our business properly. The facts will become clear as the investigation progresses." He reassured investors, "I've never made a payment directly to a lobbyist in my life nor asked any lobbyists to make a payment to anyone else on behalf of our company in my life."

11.     As would later be revealed, these and similar statements merely sought to perpetuate the Bailout Scheme, as FirstEnergy confirmed in October 2020 by firing Jones and other top executives for their roles in the scheme. Among other misconduct, FirstEnergy identified Jones's role in an illicit $4 million payment to the former head of PUCO, Chairman Samuel Randazzo ("Randazzo"), who had drafted key portions of HB6 in consultation with and at the direction of FirstEnergy representatives and publicly testified in support of the bill.

12.     Due to the Bailout Scheme's exposure, the Company, *inter alia*: (i) is now the subject of dozens of lawsuits and regulatory and governmental investigations; (ii) has lost an estimated $2 billion in purported benefits promised by HB6; (iii) admitted to internal control deficiencies and wrongdoing by its most senior executives; (iv) drew down nearly $2 billion from credit facilities to cover expected costs associated with fallout over its role in the Bailout Scheme; and (v) and suffered credit downgrades to junk status for its corporate debt by all three major credit rating agencies.

13.     As a result of the Bailout Scheme, FirstEnergy investors have suffered billions of dollars in losses and economic damages under the federal securities laws, which this lawsuit seeks to recover.

## JURISDICTION AND VENUE

14.     Jurisdiction is conferred by 28 U.S.C. §1331, §22 of the Securities Act and §27 of the Exchange Act. The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act

- 5 –

(15 U.S.C. §§77k, 77l(a)(2) and 77o) and §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

15.     Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b) because FirstEnergy conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District. In addition, the Criminal Proceeding is pending in this District, as is civil litigation against the Company for the complained of scheme by Ohio ratepayers, *Smith v. FirstEnergy Corp., et al.*, 2:20-cv-03755 (S.D. Ohio).

16.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of FirstEnergy securities during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, FirstEnergy Solutions Corp. ("FES"), FirstEnergy Nuclear Operating Company ("FENOC") and Energy Harbor LLC, Energy Harbor Corp. and Energy Harbor Nuclear Corp. (collectively, "Energy Harbor"), at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FirstEnergy common stock was actively traded on the NYSE, and FirstEnergy debt was actively traded in relevant debt markets. While the exact number

of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by FirstEnergy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice customarily used in securities class actions.

19.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act and/or the Securities Act were violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations and management of FirstEnergy; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

4823-8789-7564.v3

## PLAINTIFFS

23. Lead Plaintiff Los Angeles County Employees Retirement Association ("LACERA") is a governmental pension plan that administers defined retirement benefits for employees of Los Angeles County and participating agencies. Established in 1938, LACERA is the largest county retirement system in the United States. As of June 30, 2020, LACERA had over 170,000 members and maintained assets of more than $58 billion. LACERA, as set forth in its previously filed Certification in this action (ECF No. 33-4), which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

24. Plaintiff Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund ("Amalgamated Bank"), is a New York City-based investment bank. Amalgamated Bank serves thousands of labor unions, nonprofits, social impact enterprises, political organizations, foundations and individuals. Amalgamated Bank has over $40 billion in assets under management and custody. Amalgamated Bank, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

25. Plaintiff Wisconsin Laborers' Pension Fund is a multi-employer defined benefit plan operated for the benefit of more than 9,000 active and retired construction craft laborers in Wisconsin. Wisconsin Laborers' Pension Fund, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

26. Plaintiff City of Irving Supplemental Benefit Plan provides supplemental benefits for government and police employees for the City of Irving, Texas. City of Irving Supplemental Benefit Plan, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

## EXCHANGE ACT ALLEGATIONS

**Exchange Act Defendants**

27. Defendant FirstEnergy is an electric utility company headquartered in Akron, Ohio with subsidiaries and affiliates involved in the distribution, transmission and generation of electricity, as well as energy management and other energy-related services. Its ten electric utility operating companies comprise one of the United States' largest investor-owned utilities, serving more than six million customers in Ohio, Pennsylvania, West Virginia, Virginia, Maryland, New Jersey and New York. During the Class Period, the Company also owned and operated the Nuclear Plants. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "FE."

28. Defendant Charles E. Jones ("Jones") served as CEO and a director of FirstEnergy during the Class Period. He was terminated by the Company in October 2020 for his role in the Bailout Scheme.

29. Defendant James F. Pearson ("Pearson") served as Chief Financial Officer ("CFO") of FirstEnergy until March 2018, at which time he transitioned to Vice President of Finance of FirstEnergy until his retirement in April 2019. He was also a key member of the FES Restructuring Working Group, which oversaw the Company's efforts to reduce its liabilities in connection with the Nuclear Plants.

30. Defendant Steven E. Strah ("Strah") was appointed Acting CEO of FirstEnergy in October 2020. Prior to this time, he served as President of FirstEnergy, a position he had held since

– 9 –

May 2020.  Strah also previously served as FirstEnergy's CFO beginning March 2018 and, prior to that time, the Company's Senior Vice President of FirstEnergy's Utilities Operations.

31.     Defendant K. Jon Taylor ("Taylor") took over as FirstEnergy's CFO from Strah. Prior to assuming this position, he was the Company's Controller and Chief Accounting Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, its Vice President of Utilities Operations.

32.     Defendant Michael Dowling ("Dowling") served as FirstEnergy's Senior Vice President ("SVP") of External Affairs during the Class Period.  He was terminated by the Company in October 2020 for his role in the Bailout Scheme.

33.     Defendant Dennis M. Chack ("Chack") served as FirstEnergy's SVP of Product Development, Marketing and Branding during the Class Period.  He was terminated by the Company in October 2020 for his role in the Bailout Scheme.

34.     Defendant Ty R. Pine ("Pine") served as a FirstEnergy lobbyist and its Ohio Director of State Affairs during the Class Period.

35.     Defendant Robert Reffner ("Reffner") served as FirstEnergy's SVP Chief Legal Officer.  Previously, during the Class Period, Reffner served as FirstEnergy's VP Legal and VP General Counsel in 2018.  He was terminated by the Company in November 2020 for his role in the Bailout Scheme.

36.     Defendant Leila L. Vespoli ("Vespoli") served as FirstEnergy's Executive VP of Corporate Strategy and Regulatory Affairs and Chief Legal Officer until her retirement in April 2019.  She was also a key member of the FES Restructuring Working Group, which oversaw the Company's efforts to reduce its liabilities in connection with the Nuclear Plants.

- 10 –

37. Defendant John Judge ("Judge") is the CEO and President of Energy Harbor. He assumed this position in February 2019, prior to which he served as the Chief Risk Officer of FirstEnergy.

38. Defendant Donald R. Schneider ("Schneider") served as CEO and Chairman of FES at the start of the Class Period. He remained CEO of FES until defendant Judge assumed that position in March 2019. Schneider remained FES Chairman until FES completed its bankruptcy restructuring and emerged as Energy Harbor.

39. The defendants referenced in ¶¶28-38, above, are collectively referred to as the "Officer Defendants." FirstEnergy and the Officer Defendants are referred to as the "Exchange Act Defendants" or "defendants."

40. During the Class Period, the Officer Defendants ran the Company as hands-on managers, overseeing FirstEnergy's operations, business practices and finances, and made the materially false and misleading statements described herein. The Officer Defendants had intimate knowledge about core aspects of FirstEnergy's financial and business operations, including the Company's nuclear operations, the Company's external affairs and lobbying efforts, and the activities alleged in the Criminal Proceedings. They were also intimately involved in deciding which disclosures would be made by the Company. The Officer Defendants personally orchestrated the corrupt and fraudulent scheme detailed herein, and several have been fired subsequently by FirstEnergy for their involvement in the Bailout Scheme and related misconduct.

## SUBSTANTIVE ALLEGATIONS

### A. FirstEnergy's Nuclear Problem

41. FirstEnergy and its subsidiaries comprise one of the nation's largest investor-owned electric systems, historically generating electricity from nuclear, fossil fuel, wind and solar sources and serving over six million customers in the Midwest and Mid-Atlantic regions. FirstEnergy's

service areas encompass approximately 65,000 square miles in Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York, with a combined population of approximately 13.3 million.

42.     FirstEnergy owned and operated the Nuclear Plants through its wholly owned subsidiaries, FES and FENOC.[1]  Beginning in 1996, FENOC failed to properly implement corrosion control and corrective action programs at its Davis-Besse plant.  To conceal the damage from these failures, in late 2001, FENOC made a series of false statements to the United States Nuclear Regulatory Commission (the "NRC").  Eventually, inspectors discovered at Davis-Besse the worst corrosion ever found at a U.S. reactor, including an acid leak that closed the plant for extensive repairs from 2002 to 2004.  In January 2006, FENOC admitted to making false representations to the NRC, but, to avoid a criminal conviction, FENOC entered into a deferred prosecution agreement with the government that required it to pay $28 million in fines and community service projects.  FirstEnergy also entered into an $85 million settlement with investors to resolve allegations of fraud in connection with the incident.  *See In re First Energy S'holder Derivative Litig.*, No. 5:03-cv-01826 (N.D. Ohio).

43.     In the wake of the Davis-Besse incident, the maintenance costs at the Nuclear Plants continued to climb as demand for nuclear power declined due to less-expensive alternatives, such as natural gas.  FirstEnergy focused on cost reductions, asset sales and deactivations, but FirstEnergy continued to leak profits through the Nuclear Plants.

44.     By 2016, FirstEnergy had decided to exit the competitive energy-generation market entirely to focus on the monopolistic regulated energy-transmission market.  The Nuclear Plants

---

[1]     Following a March 2018 bankruptcy and later reorganization, FES and FENOC were renamed Energy Harbor LLC (a subsidiary of Energy Harbor Corp.) and Energy Harbor Nuclear Corp., respectively.  Although these subsidiaries were separated and deconsolidated from FirstEnergy's financial results, the Company continued to have numerous, material financial entanglements with FES and FENOC and an active role in financing and overseeing the corrupt conspiracy to pass HB6, as detailed herein.

4823-8789-7564.v3

were key obstacles to this transition, as FirstEnergy forecast that the Nuclear Plants would result in hundreds of millions of dollars in losses. The Nuclear Plants grew to dominate FirstEnergy earnings calls and analyst coverage, as investors grew increasingly concerned about the potential liabilities stemming from the Nuclear Plants. In response, defendants reassured investors that FirstEnergy was pursuing a legislative fix. For example, in FirstEnergy's 2016 Annual Report, filed on February 21, 2017, the Company stated that it intended to pursue "legislative or regulatory solutions" to address the problem. Likewise, FirstEnergy's CEO, Jones, repeated this plan on the Company's annual earnings call held with investors the next day, stating that FirstEnergy sought "legislative or regulatory initiatives for [nuclear power] generation that recognize its environmental or energy security benefits."

**B.     FirstEnergy Tries and Fails to Escape Its Liabilities Through Bankruptcy Proceedings**

45.     Despite being ostensibly a separate company with its own board of directors, FES was deeply intertwined with, and dependent upon, FirstEnergy. To escape the potentially limitless expenses associated with decommissioning the Nuclear Plants, as well as environmental liabilities from closing its fossil fuel sites (such as coal-burning sites), FirstEnergy needed to get rid of FES. Towards this end, on March 28, 2018, FirstEnergy announced its intention to shut down the Nuclear Plants. Then, on March 31, 2018, FES, FENOC and related entities (collectively referred to as "FES") filed for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio.

46.     After entering FES into bankruptcy, FirstEnergy deconsolidated FES from its financial statements. According to FirstEnergy's 1Q18 Form 10-Q, filed on April 23, 2018, the deconsolidation resulted in a $1.2 billion gain for FirstEnergy. However, FirstEnergy and FES remained operationally intertwined. For example, FES did not have the ability to perform functions like "external affairs and communications." As part of the bankruptcy, these services would

– 13 –

continue to be provided by FirstEnergy via its subsidiary, FirstEnergy Service Corporation ("FESC"), under a shared services agreement between FirstEnergy and FES.

47. FES was so dependent on FirstEnergy, the bankruptcy court described the two companies as "joined at the hip" and FES as "utterly incapable" of operating without the shared services agreement. The bankruptcy court described the continuing reliance on FirstEnergy by FES – including for FES's legal, external affairs and communications activities – in pertinent part as follows:

> *One of the FE Non-Debtor Parties, FirstEnergy Service Corporation ("FESC"), has historically provided shared corporate-level services to [FES] and [FirstEnergy] alike. These functions include*, *inter alia*, human resources, information technology, controller, ***legal, external affairs and communications***, corporate real estate and records management, supply chain, fleet engineering, fleet operations and outage support, environmental, and corporate affairs and community involvement services (the "Shared Services"). ***As of the Petition Date, the Debtors had little or no personnel or equipment of their own dedicated to these functions***, and many of these services would have been, as stated in the declaration of the Debtors' chief restructuring officer, "nearly impossible and prohibitively expensive for the Debtors to replace . . . . ***The Debtors would be utterly incapable of operating their businesses in any form, let alone in a 'business-as-usual' manner, absent the Shared Services***." (Decl. of Charles M. Moore, ECF No. 24, ¶22.) The Debtors and FE Non-Debtor Parties are also party to a number of intercompany agreements related to the core generation business of the Debtors, including, *inter alia*, power purchase agreements, operating and maintenance agreements, and fuel supply agreements. . . . ***These are only two significant ways among several that the Debtors and FE Non-Debtor Parties were joined at the hip as of the Petition Date***.[2]

48. FirstEnergy and FES were equally enmeshed financially, as FirstEnergy had loaned (on both a secured and unsecured basis) more than $700 million to FES. Bankruptcy filings described the continued financial entanglement between the two companies as follows:

> FE Corp. is both a secured creditor and an unsecured creditor of FES and is expected to play an active role in the Debtors' chapter 11 cases. FE Corp. is owed

---

[2]     *In re LLC Energy Harbor, Pleasants Corp.*, No. 5:18-BK-50757, ECF No. 3135 (Bankr. N.D. Ohio Aug. 29, 2019). All "Bankruptcy ECF No." references contained in this sub-section refer to filings in the bankruptcy proceeding. Emphasis is added and citations are omitted throughout unless otherwise indicated.

$700 million on account of the secured revolving credit facility and approximately $4.4 million in unsecured debt obligations.[3]

49.     FES's creditors saw no meaningful distinction between FirstEnergy and FES, accusing the companies of failing to recognize any of the formal corporate boundaries purportedly separating them, as reflected in the following bankruptcy filing:

> Prior to the commencement of these Cases, it appears that the Debtors' ultimate parent, FirstEnergy Corp. ("FEC"), ***operated the Debtors without regard to corporate boundaries, legal separateness, and independent fiduciary duties***. As the Court is aware, the Committee is analyzing an array of dubious prepetition transactions that appear to have been orchestrated by non-debtor FEC to the detriment of one or more of the Debtors.[4]

50.     Because FirstEnergy was operationally and financially intertwined with FES, FES's creditors were prepared to commence litigation against FirstEnergy over FES's inability to pay its debts. For all practical purposes, any actual or potential FES liabilities were also potential liabilities for FirstEnergy, including the billions of dollars needed to decommission the Nuclear Plants. Though FirstEnergy had paid into a trust fund for decommissioning costs, the funds were insufficient. Some estimates put the shortfall at well over a billion dollars. FirstEnergy was left with two options: (i) obtain a release of future liabilities from the bankruptcy court; or (ii) postpone the decommissioning process to delay those expenses as far into the future as possible.

51.     To resolve its liabilities tied to the Nuclear Plants (and fossil-fuel sites), FirstEnergy proposed to the bankruptcy court a "settlement" with FES in which: (i) FirstEnergy would contribute cash, assets and debt forgiveness to satisfy FES's creditors; (ii) FES's creditors would release FirstEnergy from liability for FES's debts; and (iii) the bankruptcy court would grant FirstEnergy sweeping releases from any and all future claims asserted against FES by parties not involved in the bankruptcy.

---

[3]     Bankruptcy ECF No. 55.

[4]     Bankruptcy ECF No. 756.

52.     The broad release sought by FirstEnergy met stiff resistance from multiple stakeholders.  If granted, FirstEnergy would be released from potential claims brought by local, state or federal agencies, as well as citizens or environmental groups, in connection with nuclear decommissioning or environmental cleanup expenses.  The Department of Justice ("DOJ"), on behalf of the Environmental Protection Agency ("EPA"), panned the release as attempting to saddle the debtors with liabilities arising from FirstEnergy's ownership of the impacted sites, stating in pertinent part as follows:

> Here, [FirstEnergy] owned and/or operated many of the Sites for years before the Debtors became owners or operators and therefore have significant independent liabilities based on their own acts or omissions during the time of their ownership and operation that have nothing to do with the Debtors.[5]

53.     Various stakeholders also protested FirstEnergy's efforts to keep them out of the negotiations, including various governmental agencies, including the EPA and the Office of the Ohio Attorney General ("Ohio AG"), as well as citizens and environmental groups.  For instance, a January 29, 2019 notice from the relevant governmental agencies complained that they had been excluded from negotiations and stated their "particular concern" regarding FirstEnergy's "liability for decommissioning Debtors' nuclear facilities."[6]

54.     On March 12, 2019, the DOJ, on behalf of the EPA, formally objected to the plan of reorganization, contending that because the breadth of the proposed releases violated environmental laws.  The DOJ's bankruptcy filing stated in pertinent part as follows:

> The Disclosure Statement should explain the legal authority for allowing the Reorganized Debtors to not protect public health and safety from hazards, contamination, or defects on their property should they arise in whole or part from acts or omissions prior to the Effective Date.  The Disclosure Statement should note

---

[5]     Bankruptcy ECF No. 2398 at 3.

[6]     Bankruptcy ECF No. 2035 at 2.

that the Governments believe that this and any similar provision in the Plan is forbidden by law.[7]

55.     Further briefing by the DOJ accused FirstEnergy and FES of "abus[ing]" the bankruptcy process by placing the nuclear decommissioning costs and other environmental liabilities on FES while releasing FirstEnergy, the culpable party.  The DOJ filing stated in pertinent part as follows:

> *At this point, the contours of the deal struck by the Debtors, FE Non-Debtor Parties, and favored creditors are clear: FirstEnergy Corp. would agree to contribute cash and other value to the reorganization, and in exchange the Debtors would seek to use the bankruptcy proceeding to release FirstEnergy Corp. and all other FE Non-Debtors from extensive independent, non-derivative liabilities (to the Governments and others)* based on the FE Non-Debtors' own independent acts or omissions.  *This scheme is an abuse of the bankruptcy system* that would impermissibly allow the FE Non-Debtors "to receive a major benefit of the bankruptcy process without having to be subject to any of its burdens and safeguards."[8]

56.     Other stakeholders piled on.  For example, the Ohio Consumer Counsel focused on the future costs of decommissioning the Nuclear Plants, stating in pertinent part as follows:

> [T]he Plan allows FES's future equity holders (owners) to enjoy the upsides of any future improvement in FES's operations while they shed certain downside risks that could instead be ultimately imposed upon Ohioans.  Were funds for decommissioning to be inadequate, for example, consumers or taxpayers might be (unfairly) called upon to fund FirstEnergy and FES's power plant decommissioning liabilities to federal and state governments.  Under FES's own Plan these decommissioning events will stretch for at least 60 years into the future.  Even FES concedes that its projected decommissioning costs for power plants and related environmental liabilities exceeds $2 billion.[9]

57.     The Environmental Law and Policy Center ("ELPC") likewise objected that FES's revenues would be insufficient to cover cleanup and decommissioning expenses, so if the bankruptcy

---

[7]     Bankruptcy ECF No. 2276.

[8]     Bankruptcy ECF No. 2423.

[9]     Bankruptcy ECF No. 2395 at 2-3.

court allowed FirstEnergy to escape its liability for these expenses, ratepayers would be stuck with the bill.[10]

58.     In response to these objections, FES described the releases as "essential" terms of the plan of reorganization and a "condition precedent" to obtaining assets and funds from FirstEnergy that would satisfy FES's creditors.  FES warned the bankruptcy court that it was "highly likely" that its settlement with FirstEnergy would be "terminated" if the court did not approve the releases, which it claimed provided the "cornerstone" to the bankruptcy agreement between FirstEnergy, FES and its creditors.

59.     In a subsequent bankruptcy filing, FES predicted that if the Court did not approve the terms of release, FirstEnergy would renege on its settlement agreement with FES and FES's creditors (which it was entitled to do by its terms), thus withdrawing billions in financial support, and sue FES over its debt obligations.  FES stated in pertinent part as follows:

> Without these releases, and the related consideration and claims waivers being provided under the FE Settlement Agreement, not only would this Plan not be possible, but it is unlikely that [FES] would be able to reorganize at all.  Instead, [FES] would likely expend all [its] resources litigating against [FirstEnergy], ***leaving the Debtors unable to confirm a plan*** over the rejection and objection of [FirstEnergy] – who hold[s] over $2 billion in asserted claims (including $700 million in secured claims) against [FES].[11]

60.     FirstEnergy submitted its own briefing in which it continued to describe the third-party releases as necessary pieces of the settlement, the plan of reorganization and FirstEnergy's proposed contribution of $3 billion into the FES estate.  FirstEnergy threatened that removal of the releases would have "disastrous" effects on the agreements in place between FirstEnergy, FES and the creditors, stating in pertinent part as follows:

---

[10]     Bankruptcy ECF No. 2419 at 3, 6.

[11]     Bankruptcy ECF No. 2397 at 4-5.

4823-8789-7564.v3

[FirstEnergy] strongly[s] support [FES's] effort to successfully reorganize their businesses and responsibly decommission their power facilities and have agreed to contribute approximately $3 billion of value towards those efforts pursuant to a settlement agreement approved by this Court.  In exchange for this substantial contribution, ***[FirstEnergy] require[s] that their businesses and operations be separated completely from the Debtors, their businesses and liabilities related thereto***.  [FirstEnergy's] Third Party Release is one of many aspects of this separation.

During the March 19, 2019, hearing . . . the Court asked for supplemental briefing on two questions . . . .  With regard to the first question, the scope and effect of the [FirstEnergy's] Third Party Release – ***as well as the disastrous consequences of its removal from the Plan*** – are set forth in detail in the Disclosure Statement and are further described herein for the Court's benefit.[12]

61.     FES's creditors also threatened that the bankruptcy "would fall apart" if the Court did not approve the "essential" releases.  Without them, the creditors asserted, FirstEnergy, FES and the creditors would end up in endless litigation, stating in pertinent part as follows:

The releases being provided in the Plan to [FES's] non-debtor parent, FirstEnergy Corporation, and its non-debtor subsidiaries (*i.e.*, the "FE Non-Debtor Parties") are ***essential*** to the success of the Debtors' reorganization. . . .  ***Without these releases, the FE Settlement Agreement would fall apart***, the Debtors and their creditors would be back to the drawing board on a plan of reorganization (if one were still possible), the estates and the FE Non-Debtor Parties would find themselves enmeshed in sprawling, expensive, and complex litigation of indefinite duration . . . .[13]

62.     On April 4, 2019, the bankruptcy court held a hearing on the issue of the third-party non-consensual releases and found them to be unconfirmable under Sixth Circuit precedent.  The Court orally denied the motion to approve FES's disclosure statement – effectively halting the bankruptcy process.  The next day, April 5, 2019, *Crain's Cleveland Business* published an article titled "Judge puts up major roadblock in FirstEnergy Solutions' bankruptcy case," which stated in pertinent part as follows:

---

[12]     Bankruptcy ECF No. 2400 at 2.

[13]     Bankruptcy ECF No. 2399 at 2.

But Judge Alan Koschik gaveled a **_huge wrench_** into the companies' attempts to separate and survive independently.  That was evident in a 5.5% decline in FirstEnergy Corp.'s (NYSE: FE) stock price.

\*      \*      \*

Whether Koschik put the case **_in the garbage or back to square one_** remains to be seen.  What he did do, according to court dockets, was deny the approval of what is often a routine but critical document in a bankruptcy case. . . .

In this case, it's no small issue over no small potential amount of cash.  FirstEnergy's plan was to separate itself from FES and any future responsibility it and FES might have for the cleanup of old coal plants and the Davis-Besse and Perry nuclear power plants, with FirstEnergy contributing around $1 billion to a deal that would leave FES a stand-alone company owned by its creditors.

63.     Having failed to convince the bankruptcy court to grant it an express release of liability for the decommissioning expenses, and with one of its failing nuclear plants set to close in less than a year, FirstEnergy was left with only one option.  Specifically, FirstEnergy now needed to postpone expected decommissioning expenses for the Nuclear Plants indefinitely.  The Company had been laying the groundwork for this backup plan for two years, placing in motion a corrupt scheme that would ultimately result in the passage of HB6.

C.      **The Legislative "Fix"**

1.      **The Corrupt Passage of HB6**

64.     Throughout the Class Period, FirstEnergy maintained to the investing public that it had ample "decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures [were] legally permissible and in the best interests of FirstEnergy."  Externally, the Company used its political action committee ("FirstEnergy PAC") to establish a facade of legitimate corporate contributions, all while it secretly poured millions into the Bailout Scheme to subvert Ohio's political process for its own gain.  FirstEnergy utilized a complex web of individuals and entities to carry out its massive corruption scheme, through which it drafted, introduced, passed and then defended HB6.

- 20 –

65. Householder's name was synonymous with public corruption, having finished his prior term as a state representative in 2004 while under federal investigation. Back in office in 2017, FirstEnergy was already courting him, including taking him (and his sons) on a trip aboard FirstEnergy's private jet to President Trump's inauguration ceremony in January of that year. In the months that followed, FirstEnergy further solidified its relationship with Householder by initiating payments to two newly minted 501(c)(4) organizations and bringing in additional members to the scheme: (i) Partners for Progress (formed January 26, 2017); and (ii) Generation Now (formed February 6, 2017).

66. On March 5, 2017, the *Pittsburgh Post-Gazette* published an article titled "Beaver Valley Plant Hopes for State Aid." The article reported that, according to Jones, FirstEnergy's top priority was "getting legislation that would recognize – monetarily – nuclear energy's lack of carbon emissions" and that in Ohio the legislation would "create a program where customers would pay a surcharge to fund zero-emission credits given to nuclear plants." The article further reported that Jones was "expect[ing] an Ohio bill in support of nuclear energy to be introduced soon" and was "optimistic, 'given the discussions we've had so far,' that it will pass."

67. Leading up to Ohio's spring 2018 primary elections – the first critical step in drumming up support for Householder's election to the speakership – FirstEnergy PAC had officially disbursed (and disclosed) a total of $464,204 in political contributions since 2017. The unusual size of these donations caught the eyes of the press. For example, on April 20, 2018, *Cleveland.com* posted a story titled, "FirstEnergy PAC writes big checks to House Speaker hopeful Larry Householder, campaign allies," which reported that these "big checks" totaled about $149,000 in early 2018 alone. Disclosing these contributions, which represented only a fraction of FirstEnergy's true financial contributions to Householder and his affiliates, allowed FirstEnergy to distract attention away from its largesse in support of the Bailout Scheme, including, *inter alia*:

- 21 –

(a) In 2017 and 2018, First Energy contributed $2.9 million to the Bailout Scheme, which defendants concealed throughout the Class Period.

(b) On a single day in 2019, April 30, 2019 – about two weeks after HB6 was officially introduced – FirstEnergy made a $1.5 million payment to the Bailout Scheme, which defendants concealed throughout the Class Period.

(c) In May 2019, FirstEnergy contributed $8 million to the Bailout Scheme, which defendants concealed throughout the Class Period.

68. FirstEnergy routed most of its payments through Generation Now, whose bank accounts Jeff Longstreth ("Longstreth"), Householder's strategist, had opened. Almost immediately after its formation, FirstEnergy began making $250,000 quarterly payments to Generation Now, while also seeding Partners for Progress with $5 million soon after its launch.

69. Longstreth has since pled guilty, admitting his involvement in the criminal conspiracy "to conceal the nature, source, ownership, and control of payments made by [FirstEnergy] to GENERATION NOW" for the benefit of Householder and other politicians and lobbyists "relating to the passage and preservation of [HB6] that would go into effect and save the operation of [the Nuclear Plants]."

70. FirstEnergy's illegally large and illegally concealed contributions and payoffs enabled it to do exactly what campaign finance limits are designed to prevent: unfairly and clandestinely influence elections by buying the loyalty of Householder and other public officials to get HB6 written, considered and passed into law. The Bailout Scheme used FirstEnergy money for primary and general elections, successfully placing in office candidates who supported Householder's bid to become Ohio's Speaker of the House and, ultimately, pass HB6.

71. With FirstEnergy's corrupt backing, on January 7, 2019, Householder was elected to serve as Speaker of the House for Ohio's 133rd General Assembly.

- 22 –

72.     Soon thereafter, FirstEnergy executives broadened the reach of the Bailout Scheme by buying the support of soon-to-be PUCO Chairman Randazzo with an illicit $4 million payment. Shortly after receiving FirstEnergy's money, Randazzo performed his part, using his position as PUCO Commissioner to help write and support HB6.

73.     On April 12, 2019, Householder introduced HB6 in the Ohio House.

74.     On May 29, 2019, Ohio's corrupted House members gathered enough votes to pass HB6.  The bill provided the "fix" for FirstEnergy's nuclear problems, including $1.3 billion in subsidies for the Nuclear Plants funded by Ohio ratepayers.  These subsidies meant the Nuclear Plants would not have to be decommissioned and FirstEnergy could avoid billions in decommissioning expenses.

75.     In the months that followed passage in the Ohio House, FirstEnergy paid over $7 million more to buy support in the Ohio Senate.  In exchange, a lucrative "decoupling" provision was added to HB6, providing another $100 million to FirstEnergy *annually*, again at ratepayers' expense.  Through decoupling, HB6 effectively locked in the Company's 2018 revenue level – a record year due to hot weather and other factors – for the next five years.  Regulators would later extend the effect of this provision until 2030.  As a result, the public would be forced to continue paying higher rates to FirstEnergy, even if consumers used less electricity.

76.     "Decoupling" refers to regulatory measures that break the link between electricity sales and profits.  In theory, without revenue decoupling, utilities have a strong incentive to increase their revenues with wasteful and costly energy consumption increases and a strong disincentive to advance energy efficiency – undermining society's environmental interests.  Decoupling measures flip these incentives by paying utility companies to promote various energy-saving initiatives and programs, effectively compensating them for encouraging the public to use less electricity, which would otherwise reduce the companies' revenues.

- 23 –

77.    What made the HB6 decoupling provision such an unprecedented windfall for FirstEnergy, at the public's expense, is that it did not include the standard mandates to require the Company to promote various energy-saving initiatives and programs. For FirstEnergy, it was money for nothing (other than the corrupt payments in support of the Bailout Scheme, that is). As summarized by the National Resources Defense Council:

> HB 6 contains what some have called a "decoupling" provision, but this section of the law passed last year had absolutely nothing to do with energy efficiency (which HB 6 effectively extinguished as a priority for all the state's major utilities). ***Instead, that section awarded FirstEnergy a legal entitlement to unconscionably inflated annual revenues, usurping the authority of the state's utility regulators***. That revenue guarantee should go straight into the legislative dustbin, along with the rest of HB 6.

> This kind of chicanery has nothing to do with "revenue decoupling," which uses small annual rate adjustments (both up and down) to ensure that fluctuations in sales don't affect utilities' ability to recover costs to operate their business as authorized by their regulators, following an open public process.

78.    The Ohio Senate passed this amended version of HB6. On July 23, 2019, the Ohio House voted to approve the amended bill, and Ohio's governor signed it into law the same day.

79.    In a July 24, 2019 press release, Judge, on behalf of Energy Harbor, applauded the enactment of HB6 into law, calling it "a monumental step in helping to avoid the premature closure of the company's two nuclear plants in Ohio while preserving 4,300 highly-skilled jobs and an important economic engine for the state economy." Judge commended Ohio's legislature for "'drafting a bill that preserves the state's nuclear assets, reduces the customers' electric bills and provides rigorous oversight to protect customers if market conditions change.'" Judge praised the Bailout Scheme's quarterback, Householder, stating, "'We're also thankful for the support and commitment by Speaker Householder.'"

80.    By July 2019, FirstEnergy's reported contributions through its PAC had increased to nearly $1 million. Again, FirstEnergy's disclosure of what seemed like large contributions gave the appearance of business as usual, diverting attention from the Bailout Scheme. As the *Columbus*

- 24 –

*Dispatch* reported shortly after the passage of HB6: "There's nothing wayward about it – the donations are legal and disclosed – but you can safely say FirstEnergy Corp. realized a good return on its investment in Ohio politicians."  Using these disclosed contributions for cover, FirstEnergy shot down any notion of impropriety, representing, "'FirstEnergy Corp. *makes and discloses all campaign contributions* in accordance with applicable state and federal laws.'"

## 2.    The Corrupt Fight Against the Repeal of HB6

81.    Due to the negative impact HB6 would have on Ohio ratepayers and environmental efficiency efforts, a referendum movement to repeal HB6 sprung up immediately.  To appear on the upcoming ballot, supporters of the referendum had to collect approximately 265,000 signatures.  FirstEnergy, Householder, and the other members of the Bailout Scheme jumped into action to prevent the referendum from making it to a vote.

82.    From July 2019 to October 2019, FirstEnergy paid over $38 million into the Bailout Scheme (which defendants concealed throughout the Class Period).[14]  At this point, the scheme was using other shell entities to further obscure FirstEnergy's connection to these payoffs, including Ohioans for Energy Security (which received $23 million from Generation Now).  It was reported that in 2019, FirstEnergy also "donated $20 million to a dark money group, Partners for Progress" and "[t]he money from FirstEnergy Solutions found its way to Generation Now shortly before the Senate and House voted, on July 17 and 23, respectively, to pass House Bill 6, which was signed into law by DeWine."

83.    FirstEnergy spent millions of dollars on mailers and ads discouraging Ohioans from signing the petitions.  The ad campaign used offensive and misleading tactics, such as tying the repeal effort to the communist Chinese government as reflected in the following ad:

---

[14]    According to one report, FES (now known as Energy Harbor), also paid $1.88 million to Generation Now on July 5, 2019.





84.     Lobbyist and co-conspirator Matt Borges executed other means to defeat the proposed referendum.  Borges and his company, 17 Consulting Group, served as a conduit through which the Bailout Scheme spent over $1 million to defeat the proposed referendum.  To that end, Borges used accounts he controlled to transfer $600,000 from Generation Now to Juan Cespedes ("Cespedes") (a lobbyist also working on behalf of FirstEnergy in furtherance of the Bailout Scheme), who used this money to disrupt signature collection efforts, engage others in anti-referendum efforts, and enrich himself.

85.     FirstEnergy went so far as to fund over a half-million dollars in payments to 15 separate signature collection operations.  These firms were paid to do absolutely nothing, effectively

- 26 –

preventing them from working for the repeal side. The Bailout Scheme also hired "blockers," meant to disrupt signature gathering efforts by intimidating those who may consider signing in support of the referendum. Borges even bribed those working for the repeal campaign for inside information or to stop collecting signatures.

86.     Defendants' payoffs once again paid off. The repeal campaign simply could not overcome the Bailout Scheme's unscrupulous tactics despite enjoying widespread public support, failing to meet an October 21, 2019 deadline. The very next day, FirstEnergy used an affiliate to send an additional $3 million to Generation Now.

87.     Defendants wasted no time in taking a victory lap. On November 4, 2019, during the Company's third quarter 2019 analyst conference call, Jones boasted that the HB6 decoupling provision "essentially takes about 1/3 of our company and I think makes it somewhat recession-proof."

### 3.     Meanwhile, Back in Bankruptcy Court

88.     On April 18, 2019, less than a week after Householder had introduced HB6 in the Ohio House, FES filed with the bankruptcy court an amended plan of re-organization that removed the supposedly indispensable non-consensual third-party releases. Despite FirstEnergy's prior threats to the contrary, the bankruptcy settlement did not unravel. HB6 provided the secret key ingredient to FirstEnergy's longstanding efforts to resolve its liabilities and potential claims relating to the Nuclear Plants.

89.     That same day, FirstEnergy issued a press release contradicting its prior statements that the third-party non-consensual releases were the cornerstone of the settlement between FirstEnergy, FES and the creditors and were necessary to justify the capital contributions it was making to the FES estate. Now, with HB6 providing the necessary financial support, FirstEnergy

stated it no longer expected the removal of the releases to impact its future liability, stating in pertinent part as follows:

> Standing behind our corporate responsibilities is a core value of FirstEnergy, including through the FES bankruptcy. . . .
>
> Following the judge's recent decision involving FES['s] bankruptcy, FES committed to engage with the Department of Justice and other concerned parties. In light of this commitment, we agreed to remove the broad third-party releases from the comprehensive settlement. While the non-consensual releases served to bring finality to FirstEnergy's involvement with these legacy assets, *this change does not, in our assessment and experience, increase liabilities or obligations to our company*.

90.     On August 2, 2019, ELPC filed another objection to the latest plan of reorganization, despite the removal of the third-party releases, on the same basis it had previously articulated, *i.e.*, that FirstEnergy was leaving FES with inadequate funding to cover the future costs for nuclear decommissioning and environmental clean ups at the fossil fuel sites owned or being transferred to FES.

91.     FirstEnergy's response made clear that HB6 alleviated the Company's prior concerns. With HB6 having been signed into law, FES stated that any concern over deficient capitalization was alleviated by the legislative bailout. As a result of HB6, FES would be the recipient of substantial cash flows to further support future cleanup costs. In support of its opposition to the ELPC objection, FES submitted an expert declaration opining on the impacts of HB6 on FES's operations, as well as the bankruptcy proceedings, which highlighted that HB6 would delay nuclear decommissioning for the Nuclear Plants, reduce the decommission trust deficit, and provide resources to cover future environmental liabilities. The filing stated in pertinent part as follows:

> Listed below are key activities that are expected to occur with the passage of HB6:
>
> Reorganized NG would receive a nuclear resource credit (cash) up to $9.00 for each MWh of electricity a nuclear resource produces. Based on the anticipated annual generation of the Debtors' nuclear stations in Ohio, this would yield *incremental operating cash flow of approximately $150 million per year*.

- 28 –

\*        \*        \*

Nuclear decommissioning activities and associated cash outlays, including spent fuel management costs and any required nuclear decommission trust deficit payments, ***are expected to be reduced during the projection period as a result of rescinding deactivation notices*** for the Ohio nuclear units.

\*        \*        \*

If the scenario described above is realized, the Debtors' capacity to meet expected post-emergence obligations of the Debtors would ***increase*** as a result of generating incremental cash flow over an extended period of time, thus ***increasing available cash resources*** to cover future environmental liabilities and other obligations.  At the same time, ***post-emergence obligations would likely decrease*** as a result of ceasing deactivation activities at several plants.[15]

92.     The bankruptcy court ultimately approved the plan of reorganization, noting that ELPC's concerns about decommissioning costs were now remote in time (a postponement solely attributable to HB6), stating in pertinent part as follows:

And I think that the expenses that have been identified by the experts here, that are distant in time, are not unimportant – they're certainly important, but they are remote.  And, therefore, the value of them as a present value is relatively *de minimis* compared to all of the other assets and claims that we have before us.  And so I don't think it threatens feasibility.[16]

### 4.     The Numerous Methods and Means of Defendants' Bailout Scheme

93.     As set forth above, the Bailout Scheme employed many methods and means, including the following:

(a)     Using bankruptcy proceedings to try to evade liability for the Nuclear Plants;

(b)     Concealing the Bailout Scheme from the investing public and the bankruptcy court presiding over proceedings related to the Nuclear Plants;

(c)     Paying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6;

---

[15]     Bankruptcy ECF No. 3057 at 2-3.

[16]     Bankruptcy ECF No. 3101 (August 26, 2019 Transcript at 265).

- 29 –

(d) Creating and using a web of pass-through entities to transfer and conceal the money to finance the Bailout Scheme;

(e) Making personal payments to corrupt politicians and at least one regulator;

(f) Financing and supporting political campaigns with undisclosed contributions far greater than legally permitted;

(g) Using corrupted politicians to advance HB6 for consideration, to amend HB6 for FirstEnergy's additional benefit, and ultimately to pass the bill;

(h) Using a corrupted regulator to help write and support HB6; and

(i) Corruptly preventing a referendum to repeal HB6.

94. In addition to these methods and means, defendants also executed the Bailout Scheme through a series of materially false and misleading public statements, including statements about the following topics:

(a) FirstEnergy's compliance with laws and regulations governing its business, operations and disclosures to investors;

(b) The adherence of FirstEnergy and its executives to the Company's internal policies and Code of Conduct;

(c) The nature of FirstEnergy's business and operations, including its external and regulatory affairs;

(d) FirstEnergy's transition from the competitive generation business to a fully regulated utility company;

(e) The extent and nature of the Company's political contributions and political activities;

(f) FirstEnergy's efforts to pass HB6 and to separate from FES;

- 30 –

(g)     FirstEnergy's maintenance of effective internal control over its financial reporting; and

(h)     The material risks applicable to FirstEnergy's business, operations and prospects.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

95.     The Class Period begins on February 21, 2017.  On that date, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K").  Jones, Pearson and Taylor signed the 2016 10-K on behalf of FirstEnergy.  Schneider also signed the 2016 10-K on behalf of FES.  In its 2016 10-K, FirstEnergy indicated that the Company was pursuing "*[l]egislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits* . . . [a]dditional asset sales and/or plant deactivations . . . [r]estructuring FES debt with its creditors, and/or . . . [s]eeking protection under U.S. bankruptcy laws for FES and possibly FENOC."  The 2016 10-K also stated, with respect to FirstEnergy's subsidiary, FES, that "management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow *as well as continuing with legislative efforts to explore a regulatory type solution*."

96.     Substantively similar statements were included in the annual report the Company filed with the SEC on Form 10-K on February 20, 2018 for the fiscal year ended December 31, 2017 ("2017 10-K"), in quarterly reports the Company filed with the SEC on Form 10-Q on April 27, 2017, on July 27, 2017 and on October 26, 2017 (the "2017 10-Qs"), respectively, and in preliminary and definitive proxy statements the Company filed with the SEC on Forms PRE 14A and DEF 14A on March 3, 2017 and March 30, 2017 (the "2017 Proxy Statements"), respectively.  The 2017 10-K was signed by Jones, Pearson and Taylor on behalf of FirstEnergy.  Schneider also signed the 2017 10-K on behalf of FES.  Each of the 2017 10-Qs was signed by Taylor on behalf of FirstEnergy.

- 31 –

97. The 2016 10-K (dated February 21, 2017) also stated that FirstEnergy and its subsidiaries "comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC, and the NJBPU" and that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities."

98. The Company included substantively similar statements in each of the other Form 10-Ks and Form 10-Qs filed by the Company during the Class Period. The Company filed the other Form 10-Ks, in addition to the above-referenced 2017 10-K, on February 19, 2019 (the "2018 10-K")[17] and on February 10, 2020 (the "2019 10-K"). The 2018 Form 10-K was signed by Jones and Strah while the 2019 10-K was signed by Jones and Strah. The Company filed the other Form 10-Qs, in addition to the above-referenced 2017 10-Qs, on April 23, 2018, on July 31, 2018, and on October 25, 2018 (together, the Company's "2018 10-Qs"); on April 23, 2019, on July 23, 2019, and on November 4, 2019 (together, the Company's "2019 10-Qs"); and on April 23, 2020 (the Company's "2020 Q1 10-Q"), respectively.

99. The Company's 2016 10-K (dated February 21, 2017) further represented that FirstEnergy's and FES's internal controls over financial reporting and disclosures were effective, stating in pertinent part as follows:

> The respective management of FirstEnergy and FES, with the participation of each respective registrant's chief executive officer and chief financial officer, have reviewed and evaluated the effectiveness of their registrant's disclosure controls and procedures, as defined in the Securities Exchange Act of 1934, as amended, Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this report. Based on that evaluation, the chief executive officer and chief financial officer of each

---

[17] On March 6, 2019, FirstEnergy filed a Form 10K/A with the SEC to replace the Exhibit 23 - Consent of Independent Registered Public Accounting Firm that was filed with the original 2018 10-K. In connection therewith, Jones and Strah filed certifications that the annual report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

registrant have concluded that each respective registrant's disclosure controls and procedures were effective as of the end of the period covered by this report.

<p style="text-align:center">*     *     *</p>

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the Securities Exchange Act of 1934. Using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control – Integrated Framework* published in 2013, the respective management of each registrant conducted an evaluation of the effectiveness of their registrant's internal control over financial reporting under the supervision of each respective registrant's Chief Executive Officer and Chief Financial Officer. Based on that evaluation, the respective management of each registrant concluded that their registrant's internal control over financial reporting was effective as of December 31, 2016.

This statement was also made in the Company's 2017 10-K, and the same substantive statement regarding the effectiveness of FirstEnergy's internal controls was included in FirstEnergy's 2018 10-K and 2019 10-K. The Company included substantially similar statements regarding the effectiveness of its and/or FES's internal controls in its 2017 10-Qs, 2018 10-Qs, 2019 10-Qs and 2020 Q1 10-Q.

100. The Company's 2016 10-K also stated that "there were no changes in internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, FirstEnergy's or FES['s] internal control over financial reporting." This statement was also made in the Company's 2017 10-K, and the same substantive statement regarding the absence of changes to FirstEnergy's internal controls was included in the Company's 2018 10-K and 2019 10-K. The Company included similar statements regarding the absence of changes to FirstEnergy's and/or FES's internal controls in its 2017 10-Qs, 2018 10-Qs, 2019 10-Qs and 2020 10-Q.

101. The Company's 2016 10-K also featured 20 pages of "Risk Factors" on a variety of subjects which purportedly included the most significant risks facing the Company, including, *inter alia*: (i) "Risks Related to the Transition to a Fully Regulated Utility"; (ii) risks related to FES, including the FES bankruptcy proceedings; (iii) risks related to the "deactivation of one or more of

the nuclear generating units"; (iv) the risk that a "Failure to Provide Safe and Reliable Service and Equipment Could Result in Serious Injury or Loss of Life That May Harm Our Business Reputation and Adversely Affect our Operating Results"; (v) risks from "Temperature Variations as well as Weather Conditions or other Natural Disasters"; (vi) the risk that "Cyber-Attacks, Data Security Breaches and Other Disruptions to Our Information Technology Systems Could Compromise Our Business Operations, Critical and Proprietary Information and Employee and Customer Data, Which Could Have a Material Adverse Effect on Our Business, Financial Condition and Reputation"; (vii) risks related to "Physical Acts of War, Terrorism or Other Attacks on any of Our Facilities or Other Infrastructure"; "Risks Associated With Regulation," including PUCO specifically; and (ix) "Risks Associated with Climate Change." None of the Company's SEC filings mentioned any risks in connection with the Bailout Scheme. The Company's Risk Factors in its Form 10-Ks for 2017-2019 were virtually identical to the foregoing, with minor differences primarily attributable to timing (*e.g.*, by the time of its 2018 10-K, FirstEnergy had already transitioned to a fully regulated utility company).

102. Jones and Pearson filed signed certifications with the SEC attesting that the 2016 10-K: "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Jones and Pearson also attested that they had "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision." Jones and Pearson further certified that FirstEnergy's disclosure controls had been designed to ensure that material information relating to the Company and its consolidated subsidiaries were made known to them. Jones, Pearson and/or Strah filed substantively identical certifications in connection with the other Form 10-Ks and Form 10-Qs the Company filed during

the Class Period. Schneider also filed substantively identical certifications on behalf of FES in connection with the 2016 10-K, the 2017 10-Qs and the 2017 10-K.

103. On February 22, 2017, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson, Taylor and Vespoli participated in the call. During the call, Jones stated: "[w]e continue to assess and evaluate a number of strategic alternatives for our companies for our competitive business, including asset sales, legislative or regulatory initiatives for generation that recognize its environmental or energy security benefits." Jones continued in pertinent part as follows:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security*. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. . . .
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [the Company] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds*.

104. In its 2017 Proxy Statements, FirstEnergy represented that the Company was committed to "good corporate governance," which was important to the success of its business and advancing shareholder interests, and identified "integrity," "openness" and "trust" as among the core "behaviors" through which "employees contribute [to FirstEnergy's] success." FirstEnergy expounded upon the foregoing terms in Corporate Responsibility Reports issued in 2019 and 2020, which included a message from Jones and the Chair of the Corporate Governance and Corporate Responsibility Committee that corporate responsibility includes "upholding high standard for corporate governance." FirstEnergy stated in pertinent part as follows:

- Integrity: We consistently demonstrate ethical behaviors, values, expectations and outcomes. We work to create an environment where ethical behaviors are expected. We have strength of character, strength of will and moral fiber.

- Openness: We are authentic, humble and true to ourselves. We communicate openly and honestly. We actively listen and respond with empathy. . . .

- Trust: We are honest, reliable, respectful, consistent, dependable and credible. We are committed to doing what's right. We respect and trust the capabilities, intention and performance of others.[18]

105. The 2017 Proxy Statements also stated that FirstEnergy's Code of Business Conduct (the "Code of Conduct") "applies to all employees, including the CEO, CFO, and Chief Accounting Officer," and that the Board had a Director Code of Ethics and Business Conduct ("Director Code of Conduct"). FirstEnergy repeated substantively identical statements to those referenced herein and above in preliminary and definitive proxies filed with the SEC on March 2, 2018, March 30, 2018 (together, the Company's "2018 Proxy Statements"), March 1, 2019, April 1, 2019 (together, the Company's "2019 Proxy Statements"), March 4, 2020 and April 1, 2020 (together, the Company's "2020 Proxy Statements").

106. In a version of FirstEnergy's Code of Conduct made available prior to the statements noted above (dated September 15, 2015),[19] Jones stated as follows:

> *Maintaining high ethical standards builds trust with our customers, shareholders, fellow employees, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job. . . . It applies equally to all employees of FirstEnergy Corp., including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.*
>
> *Everything we do reflects on us both personally and as a company.*

---

[18] FirstEnergy Corporate Responsibility Report, FirstEnergy_2018CorporateResponsibility Report.pdf. Substantially similar language remains posted on FirstEnergy's website, although it has been subsequently updated to include fallout from the Bailout Scheme, as discussed below. *See* FirstEnergy Corporate Responsibility, Mission, Core Values and Behaviors, https://fecorporateresponsibility.com/governance/mission-core-values-and-behaviors/ (last visited Feb. 26, 2021).

[19] FirstEnergy Corp. Policy 101, Code of Business Conduct (Sept. 15, 2015), https://web.archive.org/web/20151017035327/https://www.firstenergycorp.com/content/dam/investo r/files/policies-charters/code-of-business-conduct.pdf.

- 36 –

107.    This version of FirstEnergy's Code of Conduct also stated, among other things, as follows:

**Commitment to Maintaining the Highest Standards of Business Conduct**

*This Code of Business Conduct (the "Code") serves as a reminder of the high standards we must meet in our day-to-day business activities*.  It also helps to guide us when formulating and pursuing Company goals and objectives.

*As FirstEnergy employees, we are all responsible for complying with the principles included in this Code*.

\*      \*      \*

**Guiding Principles of Business Conduct**

*It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures.  This Code is designed to encourage you to lead by example with ethics and integrity* . . . .  In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and employees to fully comply with all applicable laws, regulations and policies.  The Program demonstrates that we intend to operate our business in accordance with sound business ethics.  It includes many guiding principles for specific standards of conduct.

"*Maintaining high ethical standard builds trust with customers, shareholders, fellow employees, and the communities we serve.  At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job*."

**Relationship with Others**

*Fair Dealing* – *We have built a reputation as a trustworthy and ethical member of our community and our industry.  We are committed to maintaining the highest levels of integrity and fairness within our Company*.  When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers.  You must conduct business, including dealings with the Company's customers, suppliers, competitors and other employees honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud or other unfair business practice.

\*      \*      \*

*Protection of Corporate Assets, Including Corporate Funds* –*We have a responsibility to use Company assets efficiently and to protect them from loss, theft, misuse or waste.  Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes*.  Do not keep

– 37 –

undisclosed funds nor establish any undisclosed accounts while conducting your work. ***Do not knowingly cause corporate funds to be used for unlawful purposes*** or for purposes other than those described by the documentation supporting payment.

<p style="text-align:center">*    *    *</p>

**Compliance with the Law** – Endeavor to comply with both the letter and spirit of all applicable U.S. and foreign laws, rules, and regulations. . . .  Do not knowingly take, or permit to be taken, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation.  Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments.

108.    The latest version of FirstEnergy's Code of Conduct (revised on May 26, 2020), contains substantially similar language as above, and also includes the additional highlighted language below:

You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, honestly and fairly and not take unfair advantage of anyone through any misrepresentations of material facts, manipulation, concealment, abuse of privileged information, fraud, ***bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees***.[20]

109.    A version of the FirstEnergy Director Code of Conduct made available prior to the statements discussed above (dated September 15, 2015), which contains language similar to that contained in the current version of the Director Code of Conduct, stated in pertinent part as follows:

The Board of Directors (the "Board") of FirstEnergy Corp. (the "Company") has adopted the following Code of Ethics and Business Conduct (the "Code") for directors of the Company.  This Code is intended to provide guidance to directors to help them recognize and deal with ethical issues, to help foster a culture of honesty and accountability, and to provide mechanisms to report unethical conduct.  Each director must comply with this Code.

<p style="text-align:center">*    *    *</p>

Directors shall protect the Company's assets from loss, theft, misuse and waste.  ***Directors shall also ensure that the Company's assets are being used efficiently and for legitimate business purposes***.

---

[20]    FirstEnergy Corp. Policy 101, Code of Business Conduct, https://www.firstenergycorp.com /content/dam/investor/files/policies-charters/code-of-business-conduct.pdf (May 26, 2020).

<p style="text-align:center">- 38 –</p>

\*        \*        \*

*Directors shall comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company*.

Directors shall not take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or through any other unfair-dealing practice.[21]

110.    The 2017 Proxy Statements were filed in connection with an annual shareholder meeting scheduled for May 16, 2017 where shareholders were asked to vote on, among other things, a shareholder proposal requesting an annual report on the Company's lobbying policies and payments.  In recommending that shareholders vote against the proposal, FirstEnergy stated in pertinent part as follows:

By engaging with elected officials, regulators, community and business leaders, and other decision makers, your Company strives to *conduct its business as transparently as possible to serve customers effectively and help build public trust*.

In addition to the existing extensive framework of laws and public disclosure, your Company adopted a Political Activity Policy, which was most recently updated in October 2016.

\*        \*        \*

The Political Activity Policy also provides links to access your Company's federal lobbying reports.  Your Company complies with all federal and state lobbying registration and disclosure requirements, which include filing all required reports with the U.S. Congress and applicable state agencies.

111.    The FirstEnergy Corporate Political Activity Policy (the "Political Activity Policy") asserted: "[The Company] has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy. . . .  Any corporate political contributions by FirstEnergy are

---

[21]    FirstEnergy Corp. Board of Directors Code of Ethics and Business Conduct https://web.archive.org/web/20151017064427/https://www.firstenergycorp.com/content/dam/ investor/files/policies-charters/Board-Code-of-Conduct.pdf (Sept. 15, 2015).

made in accordance with applicable laws, rules and regulations."[22]  This language also appears in the latest version of the Company's Political Activity Policy.[23]  An excerpt of this language also appears in the Company's Corporate Responsibility Reports.

112.    On April 7, 2017, *The News Messenger* published an article titled "Bill would help Davis-Besse – Proposal includes small rate hike."  In the article, Jones is quoted as stating: "'FirstEnergy applauds Ohio lawmakers for introducing a thoughtful program that recognizes the significant benefits Ohio's nuclear power plants bring to customers, communities and the state.'"

113.    On April 28, 2017, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson, Taylor and Vespoli participated in the call.  During the call, Pearson stated: "we are encouraged by recent energy policy discussions that could ultimately have a positive impact on the nation's electric system."  Jones provided additional details regarding those policy discussions, stating in pertinent part:

> [W]e are closely monitoring 2 important new developments at the state and federal level.  On the legislative front, bills were introduced in both the Ohio House and Senate this month that could help keep nuclear assets as part of Ohio's generation mix.
>
> The Zero Emission Nuclear Resource Program, or ZEN, is intended to recognize the critical energy security environmental attributes of nuclear power plants in Ohio by compensating them on a per megawatt hour basis. . . .  I had the opportunity to testify at the initial hearing on ZEN which was held in the Ohio House earlier this week.  Multiple hearings are expected in each chamber prior to summer recess, and ***we are working to get a bill on the governor's desk as quickly as possible.***

---

[22]    FirstEnergy Corporate Political Activity Policy (Feb. 19, 2015), https://web.archive.org/ web/20151022181658if_/https://www.firstenergycorp.com/investor/corporate_governance/policies_c harters/corporate_political_activity_policy.html#gsc.tab=0 (last visited Feb. 26, 2021).

[23]    FirstEnergy Corporate Political Activity Policy (May 12, 2020), https://firstenergycorp .com/investor/corporate_governance/responsibility/corporate_political_activity_policy.html (last visited Feb. 26, 2021).

114. On May 17, 2017, the *Akron Beacon Journal* published an article titled "FirstEnergy CEO Looks Ahead, Chuck Jones Says He Comes To Work Every Day with Goal of Keeping Company's Headquarters in Akron." In the article, Jones is reported as stating: "[R]egardless of whether FirstEnergy continues to own its generating plants by the time the ZEN legislation could pass, 'it needs to happen and it needs to happen regardless of when it happens,' and he will continue to fight for it."

115. On July 28, 2017, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson and Vespoli participated in the call. During the call, Pearson reaffirmed the Company's commitment to pursuing a legislative solution for the Nuclear Plants. In responding to an analyst's question about the connection between proposed legislation in Ohio and a possible FES bankruptcy, Pearson stated:

> I am going to continue to fight for this ZEN legislation because it is the right thing to do for the state of Ohio. It's the right thing to do for those assets. It gives those assets the best chance of running under new owners. I'm not sure those assets will run unless there is something done either federally or by the state of Ohio to ensure that they get a different financial return model, and that's bad. So we're going to continue to work on ZEN whether or not – irrespective of what happens with FES.

116. On September 7, 2017, Pearson participated in a Barclays CEO Energy-Power Conference. During the conference, Pearson, in response to questions about nuclear subsidy discussions in light of opposition from the then-Governor of Ohio, stated in pertinent part: "[w]e continue to advocate the benefits of having those plants running" and "we're going to continue to educate all the constituents in Ohio. And hopefully, we'll be able to get some type of legislation introduced in Ohio as well as supported by the [G]overnor."

117. On October 27, 2017, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson and Vespoli participated in the call. During the call, Jones stated: "[w]hile the Ohio legislature was on recess this summer, we continued working on a modified approach to help compensate the state's nuclear plants for the fuel diversity, environmental and other benefits that

- 41 –

they provide." Later in the call, Jones, in response to an analyst's question about why potential legislative solutions for the Nuclear Plants were progressing despite opposition from the then-Governor of Ohio, stated in pertinent part as follows:

> I think the fact that New York and Illinois have already taken measures to protect these fuel-secured nuclear facilities in particular. The DOE initiative on top of it, the fact that other states concurrently are looking at it all are creating an awareness about what's going on in our nation and the importance of these assets to not only physical security but also economic security. So I don't think it's a surprise that Ohio is willing to relook at it. I think we've got to deal with the legislature first. And then once we have the legislature passing the bill, then we'll see where the governor really is at that time.

118. On February 21, 2018, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson, Taylor and Vespoli participated in the call. During the call, Jones stated that FirstEnergy had been "very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets," but that he was disappointed those efforts had not yet resulted in "meaningful legislative or regulatory support" for the Company's nuclear facilities. Jones added that FES would "continue to look at all options regarding these units," including by "continu[ing] to support policy solutions."

119. On March 28, 2018, *PR Newswire* distributed an article titled "FirstEnergy Solutions Files Deactivation Notice for Three Competitive Nuclear Generating Plants in Ohio and Pennsylvania; - 4,048 Megawatts of Electricity Generating Capacity to Retire by 2021." The article stated that the plants would continue to operate as "FES seeks legislative policy solutions as an alternative to deactivation or sale." The article further quoted Don Moul ("Moul"), the President of FES Generation Companies and Chief Nuclear Officer, as stating:

> "We call on elected officials in Ohio and Pennsylvania to consider policy solutions that would recognize the importance of these facilities to the employees and local economies in which they operate, and the unique role they play in providing reliable, zero-emission electric power for consumers in both states. We stand ready to roll-up our sleeves and work with policy makers to find solutions that will make it feasible to continue to operate these plants in the future."

- 42 –

120. On March 31 2018, *PR Newswire* distributed an article titled "FirstEnergy Solutions and FirstEnergy Nuclear Operating Company File Voluntary Petitions for Chapter 11 Restructuring; – Operations Expected to Continue Normally During Restructuring." In the article, Schneider is quoted as stating: "'Given the prospective timing of federal and state review and our ongoing cash needs and debt service obligations, the FES and FENOC Boards of Directors determined that the Chapter 11 filing represents our best path forward *as we continue to pursue opportunities for restructuring, asset sales and legislative and regulatory relief*.'"

121. On April 23, 2018, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson and Strah participated in the call. During the call, Jones stated: "I will continue personally to advocate for regulatory or legislative solutions, including FES['s] application for an emergency order under the Federal Power Act that recognize the attributes of fuel-secure baseload generation and to ensure our customers continue to have a stable, reliable power supply."

122. On April 25, 2018, *PR Newswire* published an article titled "FirstEnergy Solutions Files Certification Letter with NRC Affirming Plans to Deactivate Three Nuclear Generating Plants." The article quoted Moul as stating: "'[w]e are actively seeking policy solutions at the state and federal level as an alternative.'"

123. On June 2, 2018, *The Plain Dealer* of Cleveland published an article titled "Trump moves to save nuclear, coal plants that can't compete Energy." In the article, Moul is quoted as stating: "'While this marks an important first step, until timing and details of the order are clear, additional support at the state level will be necessary to protect the jobs in Ohio and Pennsylvania.'" The article also quotes Jones as stating: "'The company has advocated for solutions that recognize the critical attributes coal and nuclear plants provide because preserving these vital facilities is the right thing to do for the industry, the electric grid and our customers.'"

124.    On August 1, 2018, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson, Vespoli and Strah participated in the call.  During the call, Jones, in response to an analyst's question about his thoughts on support for nuclear assets, stated in pertinent part as follows:

> So any thoughts around the future of those assets are now questions to be posed to FES.  I would say that, from my perspective, I continue to feel that the market policies in our countries have severe flaws that closing perfectly good nuclear plants in the long run is not going to be a good thing for our country.  In the long-run, it's not going to be a good thing for the 6 million customers that I'm paid to look out for.  Because I think having a diverse mix of generation provides the more secure future for those customers from both physical security, grid resiliency and an economic stability perspective.  So to the extent my voice matters in this process, I'm going to continue to be a loud advocate for it.  I do believe that the deferred (inaudible) is still very seriously looking at this issue.  And we are hopeful that they intend – that they will eventually step forward and do something to stabilize it.

125.    On December 17, 2018, *Crain's Cleveland Business* published an article titled "Newsmakers of the Year; FirstEnergy/Charles Jones."  In the article, Schneider, in connection with FES's bankruptcy, is quoted as stating: "'The Chapter 11 filing represents our best path forward as we continue to pursue opportunities for restructuring, asset sales and *legislative and regulatory relief*.'"  In the same article, Moul is quoted as stating: "'We call on elected officials in Ohio and Pennsylvania to consider policy solutions that would recognize the importance of these facilities to the employees and local economies in which they operate, and the unique role they play in providing reliable, zero-emission electric power for consumers in both states.'"

126.    On January 23, 2019, *PR Newswire* distributed an article titled "FirstEnergy Solutions Corp. Reaches Restructuring Support Agreement with Key Stakeholders; – Agreement Contemplates Continued Ownership and Operation of Retail and Wholesale Load-Serving Business Beyond Chapter."  In the article, Schneider is quoted as stating as follows:

> "It is important to note that nothing in this agreement provides for the Company to continue operating its fossil or nuclear generation assets beyond their currently contemplated deactivation dates.  Without legislative support and market reforms operating beyond those dates will be a significant challenge.  ***We remain optimistic***

- 44 –

*that such support may be forthcoming, will solidify the tax base and tremendous economic value these plants provide to the surrounding communities in Ohio and Pennsylvania*."

127.    On February 20, 2019, FirstEnergy held an earnings call with analysts and investors. Jones and Strah participated in the call.  During the earning call, Jones, in response to an analyst's question about whether there was "anything at all" that FirstEnergy was working on with respect to energy utility legislation in Ohio, stated in pertinent part as follows:

Obviously, if our new leaders of the states – we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission. *If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input*.  But it's too early in the process for me to talk about what that might mean.

128.    On July 23, 2019, FirstEnergy filed a Form 8-K with the SEC.  The Form 8-K attached a presentation titled "2Q 2019 Strategic & Financial Highlights."  In the presentation, FirstEnergy stated:

On July 23, House Bill 6 was approved by the Ohio legislature

– We believe this bill is good for customers

– Contributes to Ohio's economic success and the security and resiliency of the regional electric grid while mitigating the potential impact of uncertain electric markets on our customers electric bills

– Includes provisions that allow electric utilities to implement decoupling mechanisms . . .

129.    On July 24, 2019, FirstEnergy held an earnings call with analysts and investors. Jones and Strah participated in the call.  During the call, Jones stated in pertinent part as follows:

In other developments, House Bill 6 was approved by the Ohio legislature and signed by Governor DeWine yesterday.  As you know, the key issue of House Bill 6 is the support it provides to nuclear assets in the state.  While we no longer own this generation, we believe this legislation is good for our customers because it will contribute to the state's economic success and the security and resiliency of the regional electric grid, while mitigating the potential impact of uncertain electric markets on our customers' electric bills now and in the future.  House Bill 6 also include provisions that allow electrical utilities to implement a decoupling

– 45 –

4823-8789-7564.v3

mechanism, which further supports energy efficiency initiatives that benefit Ohio customers, while providing revenue certainty to utilities.

\* \* \*

But the bill was a clean energy bill at its heart. The decoupling is included in the bill to support Ohio's clean energy goals. It allows all of the utilities to continue to work with customers to drive further energy efficiencies without a concern for the impact on the revenues with the companies. In Ohio, we have a shared mechanism for lost distribution revenue that this now eliminates the need for us to worry about that. And its ultimately going to help reduce customer bills because that energy efficiency mandates on our bills, we're going to grow significantly over the next several years.

\* \* \*

I just want to take a moment to say how great it is in the State of Ohio to have leadership in Columbus who actually looks at issues and is willing to lead. I want to complement our Governor, Lieutenant Governor, Senate President, Speaker of the House, numerous members of the legislature and Senate and the Chairman of the Commission because they all worked together on a very complex bill here, with the goal I think of providing stable and transparent rates for customers going forward and keeping their Ohio utilities strong at the same time. And I think they came up with an approach that was very strong in terms of looking out for this industry and our customers in the State of Ohio.

130. On July 24, 2019, *PR Newswire* distributed an article titled "FirstEnergy Solutions Applauds Enactment of HB6 Legislation," in which Judge was quoted as stating in pertinent part as follows:

> "We are very pleased that Governor Mike DeWine signed HB6 following its successful bi-partisan passage in the General Assembly. . . . We're also thankful for the support and commitment by Speaker Householder and Senate President Obhof who understood the importance of protecting 90% of the state's zero-emissions electricity, substantial employment and the need to provide affordable rates from a diverse portfolio of generation sources for Ohioans."

131. In the Company's Form 10-Q for the quarter ending September 30, 2019 (dated November 4, 2019), FirstEnergy stated that on July 23, 2019, "Ohio enacted legislation establishing support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, the legislation included a provision implementing a decoupling mechanism for Ohio electric utilities." A substantively similar statement was included in the Company's 2020 Form 10-Q.

- 46 –

132.    On November 4, 2019, FirstEnergy held an earnings call with analysts and investors. Jones and Strah participated in the call.  During the call, Jones, in response to a question about 2020 guidance and decoupling in Ohio, stated: "We expect to file the decoupling rates and the commission has 60 days to approve them. . . .  As far as how I look at it, I think it establishes a fixed cost for the base distribution costs in Ohio. . . .  [I]t takes about 1/3 of our company and I think [it] makes it somewhat recession-proof."

133.    On March 5, 2020, *Energy News Network* published an article titled "Campaign contributions pay off for Ohio utilities and coal interests," which discussed the ties between public utilities and political contributions.  In the article, Mark Durbin, a FirstEnergy spokesperson, is quoted as stating: "'FirstEnergy Corp. makes and discloses all campaign contributions in accordance with applicable state and federal laws. . . .  In the meantime, FirstEnergy continues to focus on transforming into a fully regulated utility that is making investments that will strengthen the electric system, boost reliability for customers and prepare the grid for smart technologies.'"

134.    On April 24, 2020, FirstEnergy held an earnings call with analysts and investors. Jones and Strah participated in the call.  In his opening remarks, Strah stated: "Before I turn the call over to your questions, I'd like to reiterate FirstEnergy's overall value proposition, which is very simple, but also very unique, especially in periods of extreme volatility and uncertainty like we're facing today.  FirstEnergy is a low-risk, fully regulated, stable and predictable wires utility that spans 5 states. . . .  We have very good regulatory relationships in our jurisdictions."

135.    Defendants' 2017 and 2018 statements referenced in ¶¶95-125 above were materially false and misleading when made.  The true facts, which defendants knew or recklessly disregarded, as detailed herein, including in ¶¶64-94, 137-138, were as follows:

(a)     that FirstEnergy, its officers, employees, and other representatives and affiliates had launched an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the Company and its affiliates;

(b)     that FirstEnergy and its most senior executives had knowingly violated numerous state and federal laws and regulations and internal Company policies and the Company Code of Conduct in furtherance of the Bailout Scheme;

(c)     that FirstEnergy had misrepresented the extent and nature of the Company's political contributions and regulatory and external affairs activities;

(d)     that FirstEnergy had failed to maintain effective internal control over its financial reporting; and

(e)     that, as a result of (a)-(d) above, FirstEnergy was subject to an extreme risk of reputational, legal and financial harm.

136.    Defendants' 2019 and 2020 statements referenced in ¶¶95-111, 126-134 above were materially false and misleading when made.  The true facts, which defendants knew or recklessly disregarded, as detailed herein, including in ¶¶64-94, 137-138, were as follows:

(a)     that FirstEnergy, its officers, employees and other representatives and affiliates had executed an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the Company and its affiliates, including to secure the passage and preservation of HB6;

(b)     that FirstEnergy and its most senior executives had knowingly violated numerous state and federal laws and regulations and internal Company policies and the Company Code of Conduct in furtherance of the Bailout Scheme;

(c)     that FirstEnergy had misrepresented the extent and nature of its political contributions and regulatory and external affairs activities;

- 48 –

(d)     that FirstEnergy had failed to maintain effective internal control over its financial reporting;

(e)     that FirstEnergy and its senior executive had disguised a $4 million payment made in April 2019 for the benefit of the incoming PUCO Chairman as being made "in connection with the termination of a purported consulting agreement" to curry regulatory favors, including to cancel a PUCO review of FirstEnergy's revenues and expenses to avoid a possible rate cut and to garner support for HB6;

(f)     that FirstEnergy and its representatives and affiliates had subverted a citizens' ballot initiative to repeal HB6 by, among other unscrupulous tactics detailed herein, hiring more than 15 signature gathering firms (and thus conflicting them out of supporting the initiative) and bribing ballot initiative insiders and signature collectors; and

(g)     that, as a result of (a)-(f) above, FirstEnergy was subject to an extreme undisclosed risk of reputational, legal and financial harm.

137.    FirstEnergy's political action committee, the FirstEnergy PAC, disclosed political contributions during the Class Period, including approximately $39,000 to the committee "Friends of Larry Householder" from July 2017 to November 2019.  Relative to legal donors, these reported contributions were substantial, as FirstEnergy PAC's disclosed spending in 2018 alone was enough to place FirstEnergy among the largest 25 donors to Ohio campaigns that year.  But, despite topping state contribution lists, FirstEnergy's disclosed contributions represented only a fraction of the Company's overall political spending and were in fact dwarfed by the size of the Company's actual (but concealed) political contributions as follows:

|  | FirstEnergy's Disclosed Contributions | FirstEnergy's Concealed Contributions |
|---|---|---|
| 2017 | $231,091 | $1,000,000 |
| 2018 | $577,720 | $1,400,000 |

- 49 –

|  | **FirstEnergy's Disclosed Contributions** | **FirstEnergy's Concealed Contributions** |
|---|---|---|
| 2019 | $311,757 | $55,596,836 |
| 2020 | $174,000 | $2,000,000 |
| *Total* | *$1,294,568* | *$59,996,836* |

138.    After news of the Bailout Scheme was revealed, on July 21, 2020, Ohio Secretary of State Frank LaRose referred FirstEnergy to the Ohio Elections Commission for numerous apparent or alleged violations of Ohio law based upon its role in the Bailout Scheme, including for, among other things, knowingly concealing or misrepresenting the Company's political contributions. LaRose submitted a formal complaint to the Commission on August 27, 2020.

### a.    Item 303 Requirements

139.    In addition to the materially false and misleading statements identified above, defendants also violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC rules and regulations.   Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable and unfavorable impact on the sales or revenues or income from continuing operations."

140.    In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *                *                *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

- 50 –

141. Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

142. Item 303 required FirstEnergy's quarterly and annual financial reports issued during the Class Period to disclose the involvement of the Company and its senior executives in the Bailout Scheme. Defendants' failure to disclose their involvement in the largest bribery and corruption scheme in Ohio history and the corrupt underpinnings of HB6 and FirstEnergy's separation from FES violated Item 303 because these activities represented known trends and uncertainties that were likely to and did have a material negative impact on the Company's business and financial results.

**DEFENDANTS' FRAUDULENT SCHEME UNRAVELS**

143. On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio issued a press release stating, in part:

**Ohio House Speaker, former chair of Ohio Republican Party, 3 other individuals & 501(c)(4) entity charged in federal public corruption racketeering conspiracy involving $60 million**

The Ohio Speaker of the House was arrested this morning and charged in a federal racketeering conspiracy involving approximately $60 million paid to a 501(c)(4) entity to pass and uphold a billion-dollar nuclear plant bailout.

It is alleged that **Larry Householder**, 61, of Glenford, Ohio, and the enterprise conspired to violate the racketeering statute through honest services wire fraud, receipt of millions of dollars in bribes and money laundering.

Four other individuals were also arrested and charged. They include:

- **Mathew Borges**, 48, of Bexley, a lobbyist who previously served as chair of the Ohio Republican Party;

- **Jeffrey Longstreth**, 44, of Columbus, Householder's longtime campaign and political strategist;

- **Neil Clark**, 67, of Columbus, a lobbyist who owns and operates Grant Street Consultants and previously served as budget director for the Ohio Republican Caucus; and

- **Juan Cespedes**, 40, of Columbus, a multi-client lobbyist.

\*      \*      \*

The affidavit filed in support of the criminal complaint also alleges:

- In 2018, the enterprise spent energy company-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election. The Enterprise spent more than one million in fall 2018 alone to flood the airways with negative ads against enterprise opponents. Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker.

- Money passed from the energy company through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.

- Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.

- The enterprise paid $15,000 to an individual to provide insider information about the ballot initiative and offered to pay signature collectors for the ballot initiative $2,500 cash and plane fare to stop gathering signatures.

144.   On July 21, 2020, FirstEnergy issued a statement announcing that it had received subpoenas in connection with the government's investigation into HB6. On this news and the public disclosure of criminal charges, several analysts downgraded their ratings recommendations for FirstEnergy. For example, on July 21, 2020, Wolfe Research issued a report titled "Ohi-uh-oh," which downgraded its rating recommendation of FirstEnergy because of the bribery scandal and

- 52 –

lowered its price target to "reflect[] a 20% discount given the risks," which included "fines, B/S and credit, mgmt. risk, and political/regulatory [risk]."

145.    On July 22, 2020, a number of media outlets reported on the federal criminal charges. For example, *Cleveland.com* posted an article titled "FirstEnergy was relentless in quest to have Ohio legislature bail out the utility's nuclear plants" providing the following additional details regarding FirstEnergy's long-running efforts to rid itself of liabilities arising from the Nuclear Plants:

> FirstEnergy Corp. tried and failed more than once to convince state lawmakers to subsidize the company's two Ohio nuclear power plants, but was unable to achieve its goal until Larry Householder became speaker of the Ohio House of Representatives in 2019.
>
> As speaker, Householder wasted little time pushing through House Bill 6, legislation that included the $1 billion nuclear plant bailout at the center of racketeering charges leveled against Householder and four others on Tuesday.
>
> *        *        *
>
> **Early calls for help**
>
> FirstEnergy let it be known as far back as 2016 that it wanted relief for Perry nuclear plant in Lake County and Davis-Besse nuclear plant east of Toledo.
>
> During an annual energy conference in early 2017, Rep. Bill Seitz, a Cincinnati Republican, revealed that FirstEnergy was in "substantial financial trouble." FirstEnergy proposed something called "zero emission credits," which would allow the utility to charge extra on electric bills because it was generating carbon-free nuclear power.
>
> The credits would allow FirstEnergy to collect $300 million a year in perpetuity.
>
> *        *        *
>
> **A legislative failure**
>
> Testifying before the same committee, Ned Hill, a professor in the John Glenn College of Public Affairs at Ohio State University, referred to FirstEnergy financial engineering as "fanciful."
>
> *        *        *

- 53 –

The House bill and the companion Senate bill never made it out of the committee. Changes were made and a new bill was introduced in the House in October of 2017, but it too languished in committee.

The Ohio Consumers' Counsel and the Ohio Manufacturers' Association were among those who opposed idea as did then-House Speaker Cliff Rosenberger.

**A new plan of attack**

FirstEnergy wasn't about to give up. In March of 2018, First Energy announced plans to get out of the nuclear power business within three years by closing Davis-Besse in 2020, and the Perry and Beaver Valley plant near Pittsburgh in 2021.

Shortly after the announcement, FirstEnergy Solutions Corp, which was the nuclear division of First Energy, filed for bankruptcy protection. It now operates under the name Energy Harbor.

The company set about lobbying the state legislature for the nuclear subsidies it had failed to obtain. That strategy, according to the federal prosecutors, included funneling millions of dollars to an organization, Generation Now, controlled by Householder.

146. On July 22, 2020, Barclays issued an analyst report downgrading its rating of

FirstEnergy. The Barclays analyst report explained in pertinent part as follows:

Following a deeper read of the 81-page criminal complaint filed by the FBI, we are downgrading FE to Equal Weight: *We see the details of evidence discussed in the complaint as concerning on many levels for FE (although it is not named in the report) and expect the ongoing investigation to focus on the company*. A key component of FE's investment thesis is a re-rating opportunity toward regional peers, which we now view as unlikely as negative headlines and investigation updates could continue to weigh on the stock.

*We update our price target to $37 and our valuation framework to assume FE trades at a 20% discount to the group average multiple (previously assumed 5% premium)* while maintaining all financial estimates: We reiterate our initial reaction outlined in *FE: Initial Reaction to Ohio Probe* (published 7/21/20), that the immediate financial impacts appear minimal, however after reading through evidence in greater detail – we believe the nature of the allegations and the investigation will weigh on sentiment and limit the re-rating opportunity. The investigation also presents a new risk of any activity that may have occurred in prior years and calls HB 6 into question (HB 6 included decoupling provisions in OH). All allegations in the criminal complaint are just allegation, but raise the overall risk profile for FE as the investigation enters its broader public phase and FE faces intense scrutiny.

147. On July 22, 2020, Scotiabank also issued an analyst report titled "RICO Charges Are Tough to Look Through – Downgrading to Sector Perform," which stated in pertinent part as follows:

> **OUR TAKE**: *Negative. We are downgrading FE to Sector Perform (from Sector Outperform) as we can no longer recommend the stock after the DOJ/FBI arrests and investigations announced yesterday. Though FE wasn't named explicitly, it's unambiguous to us that FE is the "Company A" referred to in the affidavit.* The FBI has outlined probable cause to believe that "Company A" and several OH politicians and lobbyists were engaged in an elaborate "pattern of racketeering activity" related to "bribery" and money laundering, among other crimes. Based on the affidavit and the DOJ/FBI press conference yesterday, we struggle to see a scenario in which shares outperform peers over the next 12 months. Instead, it seems quite likely to us that things will get worse for FE before they get better. We continue to see only modest risk to the company's LT financial outlook and await more details before drawing any concrete conclusions, but we don't expect any anytime soon. As the FBI said yesterday, "this is the end of the beginning", and additional search warrants and subpoenas will be served in the coming days. We have reduced our TP to $39 (from $53), as we now apply a 25% discount to our sector anchor multiple of 19x (from parity previously).

148. The price of FirstEnergy stock plummeted on this news, falling to a low of $22.85 per share on July 22, 2020 before "recovering" to close at $27.09, *34% below* the stock's closing price on July 20, 2020 of $41.26 per share, on abnormally high trading volume.

149. On July 23, 2020, Standard & Poor's ("S&P") announced that it was placing FirstEnergy and its subsidiaries on CreditWatch with negative implications. In the announcement, S&P stated in pertinent part as follows:

> Although FirstEnergy is not named as a defendant in the criminal complaint, we believe the severity of the charges outlined in the criminal complaint and the allegation that the bribery payments began as early as March 2017, prior to Energy Harbor Corp.'s emergence from bankruptcy under its new ownership, could possibly implicate FirstEnergy Corp. in some manner.
>
> If subsequent investigations directly implicate FirstEnergy, we believe it could reflect a material deficiency in the company's governance, insufficient internal controls, or could result in a weakening of the company's management of regulatory risk.

- 55 –

150.    On July 24, 2020, Moody's announced it was downgrading its outlook for FirstEnergy. In the announcement, a Moody's analyst stated, "'We see the criminal complaint as a potential sign of higher corporate governance risk and we expect more information will become available over the next few months.'" The announcement continued, "The possible corporate governance failure is directly related to the board's organizational structure, compliance and reporting standards, policies and procedures. The complaint also raises questions around management's credibility and track record. However, the level of uncertainty around the complaint remains very high."

151.    On July 23, 2020, FirstEnergy filed a Form 8-K with the SEC. The Form 8-K attached, among other things, a press release that announced the Company's financial results for the second quarter of 2020 and commented on the DOJ investigation. In the press release, Jones stated: "'I believe that FirstEnergy acted ethically in this matter. At no time did our support for Ohio's nuclear plants interfere with or supersede our ethical obligations to conduct our business properly. I believe the facts will become clear as the investigation progresses.'"

152.    On July 24, 2020, FirstEnergy held an earnings call with analysts and investors. Jones, Strah and Taylor participated in the call. During the call, Jones sought to quell investor concerns and distance FirstEnergy from FES. Jones opened the call by discussing the federal criminal charges filed in connection with HB6. Jones stated, in pertinent part as follows:

> I believe that FirstEnergy acted properly in this matter.
>
> This is a serious and disturbing situation. Ethical behavior and upholding the highest standards of conduct are foundational values for the entire FirstEnergy family and me personally. ***These high standards have fostered the trust of our employees, our customers and the financial community***. We strive to apply these standards in all business dealings, including our participation in the political process. As you know, we have supported keeping Ohio's 2 nuclear plants in operation. . . . So as we discussed on previous earnings calls, we supported legislative solutions for the nuclear plants even after we stopped operating them. We were strong supporters of House Bill 6 and opposed the referendum effort to repeal it.

- 56 –

> *But let me be clear, at no time does our support for nuclear plants in Ohio interfere or supersede our ethical obligations to conduct our business properly*.

153.    After delivering these opening remarks, Jones responded to an analyst's question about the Company's political contributions, in pertinent part, as follows:

> Well, first, let me take the second half first. And as of November of '16, when we essentially made the competitive generation business noncore, FES separated fiduciarily, financially and operationally from being a part of FirstEnergy. They put in place an independent board. And from November '16, I've had no input into any of the decisions they've made. Obviously, we've had a lot of discussions between the 2 companies as it relates to transition and shared services and so forth. But in terms of decision-making authority, mine ended in November of 2016. On your specific question, as I've said, I'm not going to get into the details of the case, but I will say this, that of the funds that are referenced in the Department of Justice affidavit, FirstEnergy's share of that is 25%. . . . [W]e do make prudent decisions to spend corporate funds on issues that we believe are important to our customers and shareholders. Beyond that, we intend to provide the details on what we spent, how we spend it to the Department of Justice in the coming weeks.

154.    Jones continued to attest to his innocence throughout the call, claiming that at all times he acted "transparently, ethically, professionally." Jones stated in pertinent part as follows:

> I can tell you this, in every meeting, every phone call, every text message that I participate in, I've talked about our obligations to conduct our business transparently, ethically, professionally. I have no worries that I did anything that wasn't that way. And we let the merits of our arguments carry the day when we are operating in the political environment.

155.    Later during the call, Jones, responded to an analyst's question regarding lobbyists referenced in the Criminal Complaint, in pertinent part, as follows:

> Well, let me say this. We do employ lobbyists. When we do, we expect them to act in the same ethical manner that we hold ourselves accountable for. The lobbyists named in the affidavit and subsequently arrested, did not work for FirstEnergy on House Bill 6. And to my knowledge, they have never worked for FirstEnergy. Who they work for, I'm not sure, but I know they did not work for us.

156.    Jones also doubled down on his statements regarding the propriety of the Company's conduct, stating in pertinent part as follows:

> I would just say that – so first of all, our statement was that we believe that FirstEnergy acted properly in our dealings on House Bill 6. We can't speak to what happened by anybody other than FirstEnergy. The financial support we provided to

– 57 –

House Bill 6 isn't complicated.  We know what we did.  We know why we did it.
We're looking forward to sharing that with the Department of Justice.  That's what
gives me the confidence to be able to say that we acted properly.

157.    As analysts continued to inquire about his knowledge of and role in the events

revealed in the Criminal Complaint, Jones repeatedly claimed he had done nothing wrong, stating in

pertinent part as follows:

I would just say this.  I think that the CEO reference in some of that affidavit wasn't
me.  I don't know who it was, but it was not me.  And I made – I've never made a
payment directly to a lobbyist in my life nor asked any lobbyists to I've never made a
payment directly to a lobbyist in my life nor asked any lobbyists to make a payment
to anyone else on behalf of our company in my life.

158.    When asked about the impact of a repeal of HB6 on the decoupling provision and

FirstEnergy financially, Jones responded in pertinent part as follows:

All right.  So the first question is, if House Bill 6 is repealed, what else happens.  I
mentioned it in my prepared remarks that House Bill 6 went into law actually
resulted in a rate reduction for our customers despite the surcharges related to the
nuclear plants.  And that was as a result of some of the previous payments that were
being made for customers for renewable energy charges.  It would depend how it's
repealed, how it's replaced, if at all, on what happens with those renewable energy
surcharges on the decoupling piece.  The decoupling provisions in House Bill 6 can
have many benefits, it provides rate certainty for both customers and shareholders
until our next base rate case. In the case of shareholders, it could provide a benefit
depending on weather during a normal economic downturn but right now, as I've
said, with loads up due to workers being at home from – as a result of the pandemic,
combined with hot weather, last month and this month, decoupling is actually
providing a benefit to the customers.  So if decoupling goes away, those are the types
of benefits that are going to go away.

*      *      *

Not anything that's significant nor that we could accommodate within our
plan.  It's a few pennies a share, probably maximum that it would benefit us.  And as
I said, if it's not there, the real risk is also shared by customers because they'd be
paying a whole lot higher electric bills this summer than they're paying.

159.    On July 27, 2020, FirstEnergy issued a statement on behalf of Jones, purporting to

"clarify" his recent comments.  The release stated, "[l]eaders at FirstEnergy, me included, had

frequent discussions with FES leadership and its board about the strategic review and, as it

- 58 –

progressed, numerous matters related to FES, including employee impacts and shared services." Jones further "clarified" FES in fact did receive "support from FirstEnergy's External Affairs team to varying degrees" during the Class Period.

160. On July 28, 2020, Fitch Ratings ("Fitch") announced it was revising its outlook for FirstEnergy to negative. In the announcement, Fitch stated:

> The rating actions reflect credit concerns regarding potential illicit activity at FE in connection with an ongoing federal bribery/racketeering investigation. The investigation has resulted in criminal charges against Ohio Assembly Speaker Larry Householder, four associates and a non-profit organization, Generation Now. Among other things, the affidavit alleges that Householder and his associates engaged in bribery and other illegal actions designed to ensure House Bill (H.B.) 6 was enacted and remained in effect (in light of a referendum effort to repeal the legislation).
>
> While the indictment does not explicitly name FE or its affiliates, pseudonyms referred to in the affidavit are widely-believed to refer to FE, its corporate services subsidiary, FirstEnergy Service Company (FESC), and former subsidiary, Energy Harbor.

161. On August 10, 2020, FirstEnergy filed a Notification of Late Filing with the SEC on Form 12b-25. In the notice, FirstEnergy advised the SEC that the Company would not file its quarterly report for the period ending June 30, 2020 within the prescribed period and required additional time because of the DOJ investigation and pending and threatened litigation.

162. On September 18, 2020, *Utilitydive.com* posted a story titled "Ohio regulators launch probe into FirstEnergy's political and charitable contributions" reporting that PUCO had opened an investigation into FirstEnergy's political and charitable contributions in response to a request from the Ohio Consumers' Counsel.

163. On September 19, 2020, the *Athens Messenger* published an article titled "Ohio regulators decline to force FirstEnergy to hire an independent auditor," which stated that PUCO was requiring FirstEnergy to show that ratepayer funds were not directly or indirectly used to fund political or charitable support for HB6. In the article, Mark Durbin, a spokesperson for FirstEnergy,

- 59 –

is quoted as stating: "'there were no expenses for political activity and lobbying for the years 2017-2020 included in customers' rates at CEI, Toledo Edison, and Ohio Edison.'" The article also quotes Jennifer Young, a FirstEnergy spokesperson, as stating: "FirstEnergy's PAC contributions are legal and reported consistent with established federal, state and legal requirements."

164. On September 23, 2020, the Ohio AG filed a lawsuit against FirstEnergy and other entities and individuals alleging "corrupt activit[ies]" in violation of Ohio law and seeking, among other things, to enjoin the implementation of HB6. The lawsuit alleged that FirstEnergy and its affiliates knew that nuclear asset-saving legislation "would require a special combination of political experience, name identification and the willingness to play rough. FirstEnergy Corp. and its affiliates needed a legislative general to lead the charge. They found Larry Householder." The complaint also alleged in pertinent part as follows:

> Over three years, corporate interests with more than a billion dollars to gain spent tens of millions of dollars disguised as independent expenditures by so called "Social Interest Organizations" buying influence, aggregating power and deceiving voters. An aspiring House Speaker used political influence, campaign contributions, threats to committee assignments and a team of henchmen to reach the dais and pass a sweetheart deal for his sponsor. And a gang of political operatives and corporate insiders used a web of dark money groups, political action committees and for-profit corporations to buy their way out of facing a referendum that threatened the legislation that lay at the heart of all of these efforts.

165. On this news, the price of FirstEnergy stock declined by 3.5% to close at $27.58 per share on September 23, 2020 as compared to $28.57 per share on September 22, 2020.

166. Analysts and media outlets attributed this decline to the Ohio AG's lawsuit. On September 23, 2020, an RBC Capital Markets analyst report commented: "The most obvious takeaway from the Ohio AG's complaint is that it formally ties FE and its subsidiaries to the HB6 scandal," and thus "should put further pressure on the stock." Similarly, investor news site, *TheFly.com*, reported: "FirstEnergy down 3% after report of lawsuit from Ohio's Attorney General."

167. On September 25, 2020, *Radio.Wosu.org*, an Ohio public media station, posted an article regarding the Ohio AG's lawsuit against FirstEnergy. In the article, Jennifer Young, a FirstEnergy spokesperson, is quoted as stating: "The [C]ompany has followed the law when it comes to political contributions." Young is also quoted as stating: "'The attorney general's lawsuit unjustly targets the [company] for lawfully participating in the political process and advocating for policy that is consistent with our interests.'"

168. On October 14, 2020, *The Wall Street Journal* reported that Energy Harbor, the successor to FES, had been subpoenaed in connection with the federal investigation.

169. On October 26, 2020, the *Akron Beacon Journal* published an article titled "FirstEnergy – What happened with the checks?; Some candidates did not receive money from the group." The article stated that "the company had been holding onto the checks, which were issued July 16, since federal investigators arrested former Ohio House Speaker Larry Householder and four others July 21." The article quoted a FirstEnergy spokesperson as stating: "'Holding the July 16 checks allowed the company more time to investigate and assess the situation, and we decided to cancel the un-mailed checks in September out of an abundance of caution.'"

170. On October 27, 2020, the Columbus City Attorney announced that the cities of Cincinnati and Columbus had jointly filed a lawsuit in Franklin County Court of Common Pleas against FirstEnergy. In the press release titled "Columbus and Cincinnati File Suit to Halt Payments of HB 6 Fees to Save Taxpayers Millions of Dollars," the Columbus City Attorney, Zach Klein, is quoted as stating: "'Because of HB 6, the people of Ohio are required to pay a $900 million corporate bailout to FirstEnergy that was created through corruption, bribery and deception. In the City of Columbus alone, our residents are on the hook for $25 million of their own money. . . .'" The article also quotes the Mayor of Cincinnati, John Cranley, as stating in pertinent part as follows:

> "We are filing suit to protect ratepayers from being taken advantage of in one of the largest political corruption scandals in state history. . . . We will aggressively work

to seek an injunction from the courts to stop the unconstitutional corrupt statute from taking effect in January 2021. Ohio utility ratepayer should not have to pay into a corporate bailout fund that was secured through fraud, deceit and intimidation."

171. On October 29, 2020, Longstreth and Cespedes pled guilty to the charged Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy. Cespedes, a lobbyist retained by FES, like Longstreth, admitted that he committed his criminal acts "to conceal the nature, source, ownership, and control of the payments" into Generation Now "in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation that would go into effect and save the operation[s] of [the Nuclear Plants]."

172. Also on October 29, 2020, after the close of the market, FirstEnergy issued a press release announcing the termination of Jones and two other executives: (i) Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding; and (ii) Michael J. Dowling, Senior Vice President of External Affairs. In the release, FirstEnergy disclosed that the Internal Review Committee of the Board had determined that the "executives [had] violated certain Company policies and its code of conduct." Donald Misheff, Chairman of the Board, also stated: "'I look forward to working with Chris[topher D. Pappas] in his role as Executive Director to oversee the management team's execution of FirstEnergy's strategic initiatives, engage with the Company's external stakeholders, and *support the development of enhanced controls and governance policies and procedures*.'"

173. The market viewed these terminations as confirmation of wrongdoing. For example, on October 29, 2020, Guggenheim issued an analyst report titled "FE: CEO and Two Other Executives Terminated over Internal Investigation," which observed that the dismissals "all but confirm[] some degree of impropriety at FE corporate."

174. On October 30, 2020, FirstEnergy filed a Form 8-K with the SEC. The release stated, "Following the Committee's determination regarding these violations of certain Company policies

and its code of conduct, the Company is re-evaluating its controls framework, which could include identifying one or more material weaknesses."

175. On October 23, 2020, S&P downgraded FirstEnergy. In connection with its downgrade, S&P stated in pertinent part as follows:

> We view the severity of these violations at the highest level within the company as demonstrative of insufficient internal controls and a cultural weakness. We view these violations as significantly outside of industry norms and, in our view, represent a material deficiency in the company's governance. To account for these deficiencies, we revised our assessment of the company's Management & Governance score downward to weak from fair, which lowers the issuer credit rating by two notches.

176. On October 30, 2020, Fitch downgraded the long-term issuer default rating for FirstEnergy and its subsidiaries and revised its ratings outlook. Fitch explained: "[t]he rating actions reflect the termination of three senior executives including former FE CEO Charles E. Jones and two other senior executives and ongoing credit concerns regarding potential illicit activity at FE in connection with an ongoing federal bribery/racketeering investigation."

177. On this news, the price of FirstEnergy stock declined by 6.6% to close at $29.72 per share on October 30, 2020 as compared to $31.81 per share on October 29, 2020.

178. On November 2, 2020, FirstEnergy filed a Form 8-K with the SEC. In the Form 8-K, FirstEnergy disclosed that on August 10, 2020 the SEC had informed FirstEnergy that it had opened an investigation into possible securities laws violations by the Company and, on September 1, 2020, the SEC had issued a subpoena to FirstEnergy and certain of its officers. The Form 8-K attached a presentation titled "3Q 2020 Strategic & Financial Highlights." The presentation included a leadership transaction update, supplied by Christopher Pappas, Executive Director, which stated: "During the course of our internal review related to the ongoing government investigation regarding House Bill 6, the Independent Review Committee of the Board determined that three executives violated certain FirstEnergy policies and its code of conduct. . . . On October 29, 2020, FirstEnergy

- 63 –

announced that the three executives were all terminated effective immediately." Pappas made a substantively similar statement during the earnings call FirstEnergy held on the same day.

179.    During the call, Taylor stated: "as we noted in Friday's 8-K, the violations of certain company policy and code of conduct by the terminated executives has caused us to reevaluate our controls framework, and that could lead to identifying 1 or more material weaknesses."

180.    During the call, Taylor, in response to an analyst question about how the Company intended to finance a potential fine or penalty, stated:

> I think that's why we're taking the steps that we're taking now to provide additional balance sheet flexibility. When we cut back CapEx, when we think about operating expense reductions, that doesn't necessarily max out your balance sheet over the next 2 years to fund that growth. In fact, it improves your balance sheet. So that's why we're taking the steps that we're taking to just kind of make sure that we address this uncertainty because we don't know where we're going to be in a year or so with the Department of Justice and whether or not there's going to be a fine or penalty. So we're just slowing back on growth for the near term. We can take additional actions if necessary. And I think that will provide plenty of balance sheet flexibility.

181.    On the same call, Taylor was asked about the impact of a repeal of HB6 and stated:

> So I think you would go back – the assumption would be we would go back to the rate construct that we had in 2018. So you would remove the decoupling mechanism, but then you would reestablish your energy efficiency rider under the Rider DSE. So that would be the construct. So it would be about a $0.05 hit to earnings. And then you would no longer – going forward, depending on how they repealed and replaced, if decoupling was no longer part of the rate structure going forward, then you would have those – that mechanism that Rider DSE in place going forward.

182.    On November 4, 2020, PUCO initiated an audit of FirstEnergy's compliance with corporate separation laws and regulations. PUCO issued a request for proposal seeking an independent third-party auditor to conduct a review of FirstEnergy's corporate separation from Energy Harbor during the time period leading up to the passage of HB6 and the subsequent ballot referendum efforts. In its announcement of the audit, PUCO stated: "information recently filed by FirstEnergy Corp. with the Securities and Exchange Commission indicating an internal investigation

- 64 –

by FirstEnergy Corp. warranted further examination of compliance with corporate separation regulations by FirstEnergy's electric distribution utilities and its affiliates."

183. On this news, the price of FirstEnergy stock declined by 3.5% to close at $29.06 per share on November 4, 2020 as compared to $30.12 per share on November 3, 2020.

184. On November 9, 2020, FirstEnergy filed a Form 8-K with the SEC. In the Form 8-K, FirstEnergy disclosed that Reffner, the Senior Vice President and Chief Legal Officer of FirstEnergy, and Ebony Yeboah-Amankwah ("Yeboah-Amankwah"), the Vice President, General Counsel and Chief Ethics Officer of FirstEnergy, were terminated by the Company effective November 8, 2020.

185. On November 13, 2020, the Ohio AG filed a lawsuit in the Court of Common Pleas, Franklin County, seeking to enjoin Energy Harbor from collecting subsidies pursuant to HB6.

186. On November 16, 2020, media outlets reported that FBI agents had raided the home of PUCO Chairman Randazzo.

187. On this news, the price of FirstEnergy stock declined by 3.4% to close at $28.50 per share on November 16, 2020, as compared to $29.51 per share on November 13, 2020.

188. On November 17, 2020, FirstEnergy announced, after the close of the market, that the Company had received notice from the NYSE that it was not in compliance with continued listing requirements due to the Company's failure to file the quarterly report for the quarter ended September 30, 2020, which had been due November 16, 2020.

189. On November 19, 2020, FirstEnergy filed with the SEC an amendment to its annual report for fiscal year 2019 on Form 10-K/A and belatedly filed with the SEC its quarterly report on Form 10-Q for the quarter ending September 30, 2020. In the Form 10-Q, FirstEnergy stated that it was "considering reductions to its Regulated Distribution and Regulated Transmission capital investment plans and reductions to operating expenses, as well as changes to its planned equity

- 65 –

issuances, to allow for flexibility should a fine be imposed as a result of the government investigation." In the Form 10-K/A, FirstEnergy stated that management was restating its report on the maintenance of effective internal controls for the fiscal year 2019 in light of its subsequent conclusion that "material weakness[es]" existed as of December 31, 2019.

190.     In both filings, FirstEnergy disclosed additional details surrounding the Company's termination of Jones and other executives. Specifically, the filings stated in pertinent part as follows:

> *These executives were terminated as of October 29, 2020. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor*. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates.

191.     Both filings also stated that Reffner and Yeboah-Amankwah were terminated by the Company because of "inaction and conduct that the Board determined was influenced by the improper tone at the top."

192.     Both filings also admitted that FirstEnergy's internal controls had not been effective and that the Company's senior executives had "failed to set an appropriate tone at the top" and that its employees had violated the "Company's policies and code of conduct." The filings stated in pertinent part as follows:

> The management of FirstEnergy, with the participation of the acting chief executive officer and chief financial officer, have reviewed and evaluated the effectiveness of its disclosure controls and procedures, as defined under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in Rules 13a-

15(e) and 15d-15(e), as of September 30, 2020. *Based on that evaluation, the acting chief executive officer and chief financial officer of FirstEnergy have concluded that its disclosure controls and procedures were not effective as of September 30, 2020, solely as a result of the material weakness in FirstEnergy's internal control over financial reporting described below.*

\* \* \*

*Material Weakness in Internal Control Over Financial Reporting Existing as of September 30, 2020*

\* \* \*

We did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct. . . . [T]his control deficiency could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected. Accordingly, our management has concluded that this control deficiency constitutes a material weakness.

193. On November 19, 2020, the *WFMJ* website posted a story titled "FirstEnergy: Ohio regulator's firm got $4 million consulting fee," which reported that PUCO Chairman Randazzo was the recipient of the $4 million payment cited by FirstEnergy in connection with its termination of Jones and other executives. The article stated in pertinent part as follows:

Public Utilities Commission of Ohio Chairman Sam Randazzo was not mentioned by name in the company's tardy quarterly report with the in [sic] a U.S. Securities and Exchange Commission. However, Randazzo fits the description of someone who "subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating" FirstEnergy. Randazzo was appointed chairman by Republican Ohio Gov. Mike DeWine on Feb. 4, 2019. FBI agents searched Randazzo's Columbus home Monday. The agency has declined to comment on what they are investigating.

194. On November 20, 2020, Randazzo announced his resignation as PUCO Chairman. On the same day, Fitch announced it was again downgrading the ratings of FirstEnergy and FirstEnergy Transmissions LLC, stating in pertinent part as follows:

The rating action reflects recent disclosures of a $4.3 million payment from FE [FirstEnergy] to an individual who is now a government official involved in

– 67 –

regulating FE's Ohio-based utility distribution subsidiaries.  Fitch believes the disclosure significantly deepens regulatory, political, legal and liquidity risks already heighted by investigations underway at the Department of Justice (DOJ) and SEC.

195.    On this news, the price of FirstEnergy stock declined by 3.6% to close at $28.00 per share on November 20, 2020, as compared to $29.04 per share on November 19, 2020.

196.    On November 24, 2020, FirstEnergy announced that it and its subsidiary, FirstEnergy Transmission, LLC, had drawn down nearly $2 billion under their respective credit facilities to proactively "preserve financial flexibility."  The drawdown was widely viewed as FirstEnergy's preparation for a large fine or monetary penalty.  Notably, during FirstEnergy's November 2, 2020 earnings call, Taylor had responded to an analyst's question about financing a potential fine or penalty from a balance sheet perspective by stating, "I think that's why we're taking the steps that we are taking now to provide additional balance sheet flexibility."

197.    On this news, rating agencies downgraded FirstEnergy's rating to junk status.  On November 24, 2020, Moody's issued an announcement titled "Approximately $10 billion of debt securities downgraded," which downgraded FirstEnergy.  Moody's explained that "[t]he rating actions reflect our view that regulatory scrutiny in Ohio is likely to increase, potentially resulting [in] negative financial implications for both FirstEnergy and its Ohio utility subsidiaries.  The rating actions reflect higher corporate governance risk, resulting from FirstEnergy's lack of oversight of internal controls."  A Moody's analyst continued in pertinent part as follows:

> "The disclosure of a payment by FirstEnergy to a government official who directly regulated the company's Ohio utilities is likely to increase both regulatory risk and financial uncertainty for both FirstEnergy and its Ohio utility subsidiaries. . . . Furthermore, FirstEnergy's decision to draw down $2 billion on its credit facilities is viewed as unusual behavior for an investment grade utility holding company.  It was done to preserve liquidity but could be a sign that additional negative developments related to corporate governance may occur, possibly limiting access to these credit facilities of the capital markets."

198.    The next day, S&P Global Market Intelligence issued an announcement titled "S&P downgrades FirstEnergy following $1.95B draw on revolving credit facility," which downgraded

– 68 –

FirstEnergy. S&P explained: "'Although we believe the company's decision to significantly increase its borrowings under its revolving credit facility demonstrates prudent risk management given the unique challenges the company is facing, in our view, it is also an acknowledgment that the company may not have consistent access to the capital markets.'"

199.     Analysts also viewed FirstEnergy's drawdown as foreshadowing further bad news. For example, a November 24, 2020 Bank of America analyst report stated, "We perceive this as an indication of higher likelihood of further negative announcements to come associated with the federal investigation, including heightened risk of ultimate penalty/settlement with DoJ." Similarly, a December 1, 2020 Wells Fargo analyst report stated, "[R]ecent revelations related to former PUCO Chair Sam Randazzo raise further questions around FE's historical relationship with OH regulators – and raises concerns that heightened scrutiny in other jurisdictions could potentially uncover additional malfeasance."

200.     On this news, over the four-day trading period from November 19, 2020 to November 24, 2020, the price of FirstEnergy stock declined by 8.2% to close at $26.66 per share on November 24, 2020, compared to $29.04 per share on November 19, 2020.

201.     On December 28, 2020, *The Courier* website posted a story titled, "Nuclear plant subsidy stopped," which reported that the Ohio Supreme Court had ordered a temporary stay of the collection of fees pursuant to HB6. The order had come a week after Common Pleas Judge Chris Brown had granted a preliminarily injunction to stop the collection of fees. In the article, Judge Brown was quoted as stating, "[t]o not impose an injunction would be to allow certain parties to prevail. It would give the OK that bribery is allowed in the state of Ohio and that any ill-gotten gains can be received."

202.     On January 14, 2021, the Ohio AG announced that it had filed a motion in the Court of Common Pleas, Franklin County, to enjoin FirstEnergy from collecting the fees tied to a PUCO-

approved rider and the decoupling provisions in HB6.  In the announcement, the Ohio AG stated:

"'First we had to stop the collection of the fee created to line the pockets of Energy Harbor and now

we are trying to stop the guaranteed profits for FirstEnergy and inappropriate rate increases to

Ohioans.'"  In the motion, the Ohio AG stated that "[g]ranting this preliminary relief restores the

*status quo anti* by enjoining the effectiveness of this criminally offensive portion of H.B. 6."  The

motion continued in pertinent part as follows:

> Despite discovery being stayed, additional facts continue to come to light cementing the connections between FirstEnergy and H.B. 6.  The most recent revelations begin to shed light on FirstEnergy's use of Sam Randazzo, who Hs resigned as chair of PUCO after a H.B.6 related FBI raid on his house.  FirstEnergy admitted to clearing its C-suites because of a $4 million payment to an entity linked to Randazzo made immediately prior to Randazzo becoming chair of PUCO.  The entity is believed to be Sustain Funding Alliance of Ohio.  In its SEC filing, FirstEnergy itself questions the validity of the payments through a significant use of the word "purported."  FirstEnergy stated that the payment was "in connection with the termination of a purported consulting agreement."  FirstEnergy admits the payment happened, but implies that the 'purported' basis is invalid. . . .  This, of course, begs the question of what the $4 million Randazzo payment actually paid for.

> It appears to have purchased Randazzo's ongoing effort – even while chair of the PUCO – to craft the language of H.B.6 for FirstEnergy's benefit. . . .

> H.B. 6 enacted a new decoupling mechanism targeted to benefit FirstEnergy codified at R.C. 4928.471.

> \*      \*      \*

> The H.B.6 decoupling provision was odd, and especially beneficial to FirstEnergy because rather than allowing PUCO to determine an appropriate profit level, H.B.6 required the PUCO to approve an application that requested a decoupling mechanism "designed to recover the electric distribution utility's 2018 annual revenues." R.C. 4928.471(B).  In short, the PUCO must allow the applicant to match its 2018 annual revenues in perpetuity.  Of course, 2018 was FirstEnergy's largest annual revenues ever.

203.    On February 1, 2021, FirstEnergy filed a Form 8-K with the SEC announcing it had

reached a settlement with the Ohio AG and the cities of Cincinnati and Columbus.  In the Form 8-K,

FirstEnergy stated in pertinent part as follows:

On January 31, 2021, FirstEnergy reached a settlement with the [the Ohio AG and the cities of Cincinnati and Columbus] with respect to the temporary restraining order and preliminary injunction request and related issues. In connection with the settlement, [FirstEnergy and FirstEnergy's Ohio utilities (the "Ohio Companies")] filed an application on February 1, 2021, with the Public Utilities Commission of Ohio ("PUCO") to set their respective decoupling riders (Rider CSR) to zero. Within five business days of any PUCO order approving the application, the Ohio Companies will ensure that no additional customer bills will include will ensure that no additional customer bills will include new decoupling rider charges. FirstEnergy expects to set the Ohio Companies remaining Rider CSR regulatory asset balance of approximately $110 million to $0.

In the absence of the decoupling riders permitted under Ohio House Bill 6, the Ohio Companies believe they would have collected lost distribution revenue estimated at $85 million for the year ended December 31, 2020.

204. On the same day, *Reuters* published an article titled "Ohio AG, FirstEnergy agree to end $102 million surcharge in nuclear bailout scandal." In the article, the Ohio AG was quoted as stating, "'This agreement recognizes the corrupt influence used to guarantee a for-profit company above-market returns for years to come by operation of law.'"

205. On February 5, 2021, Generation Now pled guilty to the charged RICO conspiracy. In the statement of facts attached to the plea agreement, Generation Now admitted to "receiv[ing] money from Company A (as defined in the Indictment [*i.e.*, FirstEnergy]) for the benefit of the [d]efendants and others in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio; and [to engaging] in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by Company A to GENERATION NOW."

206. On February 16, 2021, FirstEnergy filed a current report on Form 8-K with the SEC which, among other things, revealed: (i) that the Company was subject to an audit by The Federal Energy Regulatory Commission's ("FERC") in connection with its governmental and lobbying activities; (ii) that the Company had determined the prior $4 million payment to PUCO Chairman

Randazzo "may have been for purposes other than those represented within the consulting agreement"; (iii) that the loss of HB6 coupling revenues would reduce the revenues to be received by FirstEnergy's Ohio subsidiaries by $115 million in 2021 alone; and (iv) that the Company would be recognizing a $108 million pre-tax charge in the fourth quarter of 2020 in connection with lost distribution revenues. The filing also provided the following new risk disclosure, which acknowledged the importance to FirstEnergy investors of the severe risks and potential harm faced by the Company as a result of its participation in the Bailout Scheme:

> Any appearance of non-compliance with anti-corruption laws, as well as any alleged failures to comply with anti-corruption laws, could have an adverse impact on our reputation or relationships with regulatory authorities, and result in a material inquiry or investigation by such federal, state and local regulatory agencies, and result in adverse rulings against us, which could have a material adverse impact on our financial condition, operating results and operations.

207. On February 18, 2021, FirstEnergy announced the Company's fourth quarter and full year 2020 financial results. During the quarter, FirstEnergy suffered a $0.15 per share hit to earnings due to the Company's settlement with the Ohio AG and the cities of Cincinnati and Columbus. In addition, FirstEnergy disclosed that the $4 million payment to Randazzo was part of a pattern of improper transactions by the Company that had not been properly reported to investors and that had negatively impacted ratepayers stretching back more than a decade. In a separate release issued that same day, FirstEnergy announced the continued overhaul of key leadership positions at the Company, including the appointment of a new Vice Chairman of the Board, steps FirstEnergy stated were necessary to "rebuild trust with FirstEnergy's external stakeholders, including regulators and the financial community."

## ADDITIONAL SCIENTER ALLEGATIONS

208. As alleged herein, defendants acted with scienter in that: (i) they knew or recklessly disregarded that their public documents and statements issued or disseminated were materially false and misleading; (ii) they knew or recklessly disregarded that such statements or documents would be

issued or disseminated to the investing public; and (iii) they participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding FirstEnergy, their control over and/or receipt and/or modification of FirstEnergy's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FirstEnergy, participated in the fraudulent scheme and knew of the materially adverse facts alleged herein.

209. The affidavit and complaint filed in the Criminal Proceedings make clear that FirstEnergy's most senior executives directly facilitated and oversaw the illicit activities alleged therein. For example, Jones had 84 personal phone contacts with Householder during the Class Period at the exact time that FirstEnergy was funneling tens of millions of dollars to the enterprise and it was taking part in overt acts in furtherance of the illicit activities detailed herein. The Officer Defendants' scienter is also established by the breadth and magnitude of the alleged activities, which involved the largest money-laundering and bribery scheme in Ohio history, and the massive disparity between what FirstEnergy paid versus the benefits it received. If the recipients of FirstEnergy's $60 million payments were the only ones acting with unlawful intent, they would not have simply gifted a $2 billion return to FirstEnergy and the individuals comprising it, such as Jones.

210. In addition, FirstEnergy's extensive contacts with Householder were well known within the organization and covered by outside media organizations. Beyond Householder's January 2017 ride on a FirstEnergy airplane and the regular contact by FirstEnergy employees with members of the Bailout Scheme, the Company's support for Householder was well documented in the media (who nonetheless did not report on the illicit nature of this relationship), including news organizations such as *Cleveland.com* and the *Energy and Policy Institute*.

- 73 –

211.    Jones' efforts to conceal his personal involvement following news of Householder's arrest further confirms that he was knowingly complicit in the corrupt enterprise.  For example, during the earnings call following the arrest of Householder, Jones stated that, "I've never made a payment directly to a lobbyist in my life nor asked any lobbyists to make a payment to anyone else on behalf of our company in my life."  Yet, only a few months later, FirstEnergy fired him for his role in disguising a $4 million payment to Randazzo.  Jones also confirmed his personal involvement during the Company's earnings call conducted for the first quarter of 2018, stating, "I will continue **personally** to advocate for regulatory or legislative solutions."

212.    FirstEnergy's termination of Jones and four other top executives further strengthens an already-compelling inference of scienter.  It is implausible that the individuals who comprise FirstEnergy unwittingly financed the largest political corruption scheme in Ohio state history and in doing so accidentally obtained the precise legislatively "fix" for the Nuclear Plants that they had been discussing for years.  It is similarly unlikely that the Company would fire Jones and multiple other senior officers for having dumb luck, especially because the Company expressly acknowledged that the firings were due to these executives' failure to adhere to Company policies and the Code of Conduct, setting an inappropriate tone at the top, and withholding information required to be disclosed.  The timing of these firings and the Company's express explanations for them is only compatible with a determination that Jones and the others acted with culpable states of mind.

213.    The Officer Defendants managing FirstEnergy also had the motive and opportunity to commit fraud.  For example, these executives received tens of millions of dollars in performance-based compensation substantially due to the Bailout Scheme, and several engaged in insider sales that were highly suspicious in both timing and amount.  Jones alone reaped $10 million in insider trading proceeds during the Class Period.  The Officer Defendants also took advantage of the inflated prices for FirstEnergy securities to conduct $5 billion worth of debt and equity sales.

- 74 –

Securing HB6 provided the Company with $2 billion in expected value and allowed the Officer Defendants to deliver on their highest strategic priority – finding a "solution" for the Nuclear Plants – for which they and FirstEnergy were richly rewarded.

214. In addition to their orchestration of the fraudulent scheme, defendants' scienter is evidenced by: (i) admissions of wrongdoing by the perpetrators of the Bailout Scheme; (ii) defendants' direct participation in the Bailout Scheme; (iii) defendants' efforts to conceal the Bailout Scheme; (iv) the multitude of lawsuits, investigations and other proceedings brought against defendants in connection with the Bailout Scheme; (v) the magnitude of the Bailout Scheme; (vi) defendants' sale of $5 billion of debt and equity securities during the Class Period; (vii) defendants' desire to boost FirstEnergy's credit rating and reduce the cost of acquiring capital; and (viii) the Officer Defendants' receipt of tens of millions of dollars in performance-based compensation and insider sale proceeds.

## A. Admissions of Wrongdoing by Bailout Scheme Members

215. Defendants' scienter is demonstrated by direct admissions of wrongdoing by the perpetrators of the Bailout Scheme, including certain of the defendants themselves. For example, in connection with its agreement to plead criminally guilty to RICO conspiracy violations, Generation Now admitted that the Bailout Scheme was established in coordination with FirstEnergy and that the Company knowingly took steps to conceal its involvement in criminal wrongdoing. Specifically, Generation Now admitted that it "received money from [FirstEnergy] for the benefit of the Defendants and others in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio." Generation Now further admitted that it "engaged in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by [FirstEnergy]." Similarly, Longstreth – described as FirstEnergy's "point of contact" with

Householder – admitted in connection with his criminal plea agreement that he, together with other members of the Bailout Scheme, "engag[ed] in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by [FirstEnergy]."

216.    FirstEnergy has likewise conceded that its executives engaged in the wrongdoing that forms the subject of this complaint.  In October and November 2020, FirstEnergy fired several high ranking officers for their role in perpetrating the Bailout Scheme.  In explaining these executive terminations, the Company admitted that defendants Jones, Chack and Dowling were terminated for personally "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business."  FirstEnergy specified that these violations concerned the Company's improper influence campaign, providing the examples, "[a]mong" others, of their making an illicit $4 million payment in April 2019 to an entity controlled by Randazzo just prior to his assumption of the PUCO Chairmanship and of their attempts to improperly conceal their activities.  FirstEnergy has subsequently acknowledged "that payments under the consulting agreement may have been for purposes other than those represented within the consulting agreement."  Randazzo would go on to write key pieces of HB6 and publicly testify in support of the bill without disclosing these payments.  Similarly, FirstEnergy admitted that it terminated defendant Reffner and another senior legal officer for their failure to prevent wrongdoing (as their jobs required) and because of their personal, affirmative "conduct that the Board determined was influenced by the improper tone at the top."  FirstEnergy has confirmed that all five terminations "relat[e] to *United States v. Larry Householder, et al.*" and associated internal and governmental investigations.  In addition, FirstEnergy has announced a wide-ranging overhaul of its senior leadership positions and compliance and anti-corruption policies, practices and procedures, thereby acknowledging their material inadequacy during the Class Period.

- 76 –

217. In addition, FirstEnergy has admitted that it failed to "maintain an effective control environment as [its] senior management failed to set an appropriate tone at the top." FirstEnergy has further admitted that "certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct." As a result, FirstEnergy suffered from a material weakness in its internal control over financial reporting that "could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected."

218. Jones also made numerous statements attesting to the knowledge of FirstEnergy and its executives, including his own personal knowledge, regarding the Bailout Scheme. For example, in response to an analyst question about what FirstEnergy knew regarding the facts alleged in the Criminal Proceedings, Jones responded, "The financial support we provided to House Bill 6 isn't complicated. We know what we did. We know why we did it." Jones also admitted that FirstEnergy knowingly contributed at least $15 million to the Bailout Scheme, although he misrepresented the extent and nature of the Company's involvement. As discussed below, the false and misleading nature of Jones' statements, in which he admitted knowing the details of FirstEnergy's payments in support of HB6 but denied culpability, provide further indicia of scienter.

**B.      Defendants' Direct Participation in the Bailout Scheme**

219. Defendants' own, direct roles in the Bailout Scheme further confirm their scienter of the adverse facts detailed herein. The Officer Defendants directly oversaw and participated in material aspects of the Bailout Scheme, and FirstEnergy served as its corporate kingpin. Each of the Officer Defendants held a senior position at FirstEnergy and/or FES with responsibility for directing and managing the Company's business, political operations, regulatory and compliance activities, nuclear operations and/or financial reporting, among other aspects of FirstEnergy operations directly

– 77 –

implicated in the Bailout Scheme.  The Officer Defendants held themselves out as the persons most knowledgeable about these subjects and regularly presented on them to investors during the Class Period.  FirstEnergy was so central to the Bailout Scheme that perpetrators described the Company as its "Bank" and the "single largest client" of the corrupt lobbyists pushing for the passage and preservation of HB6.  The Officer Defendants' job responsibilities, certifications, actions, statements and participation in FirstEnergy's extensive reporting and information distribution network and efforts to facilitate the Bailout Scheme during the Class Period confirm that each of the Officer Defendants knew or recklessly disregarded the Bailout Scheme, FirstEnergy's "unholy alliance" with corrupt political actors and the surrounding circumstances set forth herein.

220.  **Jones**.  As FirstEnergy's CEO, Jones was the ultimate head of the Company's lobbying activities, efforts to pass HB6 and pursuit of illicit "solutions" to deal with the problems posed by the Nuclear Plants.  In these roles, Jones orchestrated the payment of tens of millions of dollars from the corporate treasury of FirstEnergy to finance the Bailout Scheme.  Key members of the scheme, including the other Officer Defendants, reported to him.  During the Class Period, Jones also repeatedly emphasized his direct and personal involvement in the Company operations implicated in the Bailout Scheme.  For example, Jones described solving FirstEnergy's nuclear problems as his "top priority" and stated that he "personally" met with legislators regarding the Nuclear Plants.  During a February 2018 earnings call, Jones acknowledged, "It is common knowledge that we were very actively involved in a multitude of efforts at both the state and federal levels to support" the Nuclear Plants, and later, during an April 2018 earnings call, proclaimed he would "continue personally to advocate for regulatory or legislative solutions."  Similarly, in August 2018, Jones stated that he was "going to continue to be a loud advocate for" a government solution to the Nuclear Plants.  After HB6 was signed into law, Jones personally thanked Householder and other Ohio politicians for their "willing[ness] to lead" in passing the bill.

- 78 –

221.    Jones backed up these words with overt acts in support of the Bailout Scheme.  He held at least 84 phone calls with Householder during the Class Period.  This included 30 calls in the short seven-month span from January 2019 to July 2019 – the period between when Householder became Speaker and when HB6 was signed into law.  Jones also participated in in-person meetings regarding the Bailout Scheme with other senior FirstEnergy executives, including a September 2019 meeting with an FES lobbyist to discuss the anti-repeal efforts being covertly funded by the Company.  In addition, Jones certified that he had personal "knowledge" that FirstEnergy's quarterly financial filings were accurate, complete and fairly presented in all material respects the Company's financial position.  He also certified that he was personally responsible for establishing and maintaining FirstEnergy's internal controls and procedures and that such internal controls and procedures were free from any material weaknesses, properly designed and effective to ensure accurate financial reporting and internal fraud detection.  In October 2020, FirstEnergy fired Jones because of his involvement in the Bailout Scheme and for making millions of dollars in illicit payments to an Ohio regulator.  Moreover, the Company has subsequently admitted that its internal controls were deficient in direct contradiction of Jones' Class Period statements.

222.    **Dowling**.  Dowling served as FirstEnergy's SVP of External Affairs during the Class Period.  In this role, he was responsible for FirstEnergy's governmental and regulatory affairs (including with the state of Ohio), energy policies, community outreach and political action committees.  Dowling was an instrumental participant in the Bailout Scheme, holding at least 14 phone contacts with Householder and several additional phone calls with other co-conspirators regarding the Bailout Scheme.  Many of these calls occurred in conjunction with payments from FirstEnergy to fund the Bailout Scheme.  For example, on March 12 and 13, 2018, Dowling had five telephone communications with Householder.  Two days later, FirstEnergy wired $300,000 to the corrupt enterprise through a pass-through vehicle.  Similarly, between April 27 and April 30, 2018,

- 79 –

Dowling had seven telephone communications with Longstreth, followed shortly thereafter by a $100,000 payment by FirstEnergy to members of the Bailout Scheme on May 4, 2018. FirstEnergy fired Dowling because of his direct involvement in the Bailout Scheme, including for facilitating an illicit $4 million payment to Randazzo in advance of Randazzo's assumption of the PUCO Chairmanship and HB6 advocacy.

223. **Pine**. Pine served as a FirstEnergy lobbyist and its Ohio Director of State Affairs during the Class Period. In this role, Pine was a central liaison between FirstEnergy and corrupt Ohio politicians and regulators, including members of the Bailout Scheme. During the Class Period, Pine had at least 188 phone contacts with Householder and his co-conspirators regarding the Bailout Scheme. Several of these calls occurred in conjunction with payments from FirstEnergy to fund the Bailout Scheme. For example, on March 12 and 13, 2018, Pine had four telephone communications with Householder. Two days later, FirstEnergy wired $300,000 to the corrupt enterprise through a pass-through vehicle. Similarly, between May 1 and May 4, 2018, Pine had five telephone contacts with Longstreth, immediately after which FirstEnergy made a $100,000 payment to members of the Bailout Scheme. Pine also worked closely with Ohio state legislators to draft HB6 on behalf of FirstEnergy and possessed intimate knowledge about the Company's efforts to shepherd the legislation through the Ohio legislature.

224. **Chack**. Chack served as FirstEnergy's SVP of Product Development, Marketing and Branding. He was responsible for FirstEnergy's corporate branding, corporate communications and marketing programs, including the Company's extensive media efforts in support of HB6 and efforts to oppose the repeal of the legislation. These marketing efforts espoused false and misleading information regarding the purported benefits of HB6 and the public harms that would occur if HB6 were repealed. Chack, along with other FirstEnergy executives, worked to obscure the Company's role in funding this media campaign. Because of his job responsibilities, Chack worked directly with

- 80 –

Jones and other FirstEnergy executives to shape the Company's misleading HB6 messaging strategy and almost certainly attended a September 2019 meeting between FirstEnergy executives and an FES lobbyist to discuss anti-repeal efforts being covertly funded by the Company. FirstEnergy fired Chack in October 2020 because of his direct involvement in the Bailout Scheme, including for facilitating an illicit $4 million payment to Randazzo in advance of his assumption of the PUCO Chairmanship and HB6 advocacy.

225. **Pearson**. Pearson served as FirstEnergy's CFO until March 2018, at which time he transitioned to its VP of Finance in order to focus "his utmost attention" on dealing with the Nuclear Plants until his retirement in April 2019. Pearson was a member of the Restructuring Working Group overseeing the Company's restructuring of FES. In these roles, he had direct oversight and responsibility for FirstEnergy's accounting, financial planning, internal auditing, corporate risk, investor disclosures and efforts to eliminate the Company's liability exposure to the Nuclear Plants. As a result, Pearson was directly involved in and intimately familiar with key aspects of the Bailout Scheme. Pearson reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme. During the Class Period, Pearson also certified that he had personal "knowledge" that FirstEnergy's quarterly financial filings were accurate, complete and fairly presented in all material respects the Company's financial position. He also certified that he was personally responsible for establishing and maintaining FirstEnergy's internal controls and procedures and that such internal controls and procedures were free from any material weaknesses, properly designed and effective to ensure accurate financial reporting and internal fraud detection. FirstEnergy would later admit that its internal controls were deficient in direct contradiction of defendant Pearson's Class Period statements.

226.  **Strah**.  Strah served as VP of FirstEnergy's Utilities Operations until March 2018, at which time he transitioned to CFO before assuming the role of President of FirstEnergy in May 2020.  In these roles, he had direct oversight and responsibility for FirstEnergy's accounting, financial planning, internal auditing, corporate risk and investor disclosures.  Strah reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme.  During the Class Period, Strah certified that he had personal "knowledge" that FirstEnergy's quarterly financial filings were accurate, complete and fairly presented in all material respects the Company's financial position.  He also certified that he was personally responsible for establishing and maintaining FirstEnergy's internal controls and procedures and that such internal controls and procedures were free from any material weaknesses, properly designed and effective to ensure accurate financial reporting and internal fraud detection.  FirstEnergy would later admit that its internal controls were deficient in direct contradiction of defendant Strah's Class Period statements.

227.  **Reffner**.  At the start of the Class Period, Reffner served as FirstEnergy's VP Legal, and he was promoted to FirstEnergy's VP General Counsel in 2018 and its SVP Chief Legal Officer in May 2020.  In these roles, Reffner was responsible for FirstEnergy's legal, ethics, internal auditing, risk management and related affairs during the Class Period.  He oversaw the Company's fulfillment of its legal and ethical obligations, internal control policies and procedures and adherence to internal control, risk management and compliance guidelines.  As a result, Reffner was directly involved in and intimately familiar with FirstEnergy's extensive efforts to facilitate the Bailout Scheme and prevent its detection.  FirstEnergy fired Reffner in November 2020 because of his "conduct" in support of the Bailout Scheme and failure to prevent its occurrence.

228.  **Vespoli**.  Vespoli served as FirstEnergy's Executive VP of Corporate Strategy and Regulatory Affairs and Chief Legal Officer until her retirement in April 2019.  Vespoli was also part

of the FirstEnergy Restructuring Working Group overseeing the restructuring of FirstEnergy's nuclear subsidiaries and the efforts to achieve a legislative "solution," which ultimately culminated with the passage of HB6. In these roles, she had direct oversight and responsibility for the Company's lobbying activities and political contributions, interaction with regulators and state representatives, legal and regulatory compliance activities and efforts to eliminate the Company's liability exposure to the Nuclear Plants. Jones described Company professionals overseen by Vespoli as a "fully-engaged team of financial and legal advisors" seeking solutions for FES and stated that the regulatory affairs team overseen by Vespoli were "closely monitoring the status of initiatives at both the state and federal levels." Vespoli was directly involved in and intimately familiar with key aspects of the Bailout Scheme. Although Vespoli retired before she could be fired by FirstEnergy for her role in the Bailout Scheme, her responsibilities mirrored those of her successor, Reffner, who was ultimately terminated by the Company for his misconduct and complicity in connection with the Bailout Scheme.

229. **Schneider**. Schneider served as CEO and Chairman of FES at the start of the Class Period. He remained CEO of FES until Judge assumed that position in March 2019 and remained FES Chairman until FES completed its bankruptcy restructuring. In these roles, Schneider facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find "solutions" for the Nuclear Plants. As part of Jones' plan to create the appearance of FES independently supporting Householder (captured in a recorded phone conversation involving Cespedes), Schneider directed FES to retain one of the Bailout Scheme's most important lobbyists: Mathew Borges. Schneider retained Borges in close consultation with FirstEnergy and the Company's other senior executives involved in the Bailout Scheme, including Jones. As a result, Schneider was directly involved in the Bailout Scheme and intimately familiar with its operations.

- 83 –

230.    **Judge**.  Judge is the CEO and President of FES (now Energy Harbor).  He assumed this position in February 2019, prior to which he served as the Chief Risk Officer of FirstEnergy.  In these roles, Judge facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find "solutions" for the Nuclear Plants.  Judge personally met with Householder to discuss the Bailout Scheme, including in a March 2019 meeting at Vern Riffe State Office Tower ("Riffe Tower") in Columbus.  As part of Jones' plan to create the appearance of FES independently supporting Householder (captured in a recorded phone conversation involving Cespedes), Judge directed FES to retain one of the Bailout Scheme's most important lobbyists: Cespedes.  Judge retained Cespedes in close consultation with FirstEnergy and the Company's other senior executives involved in the Bailout Scheme, including Jones.  Judge periodically met with Cespedes to receive updates on the Bailout Scheme, including during the aforementioned March 2019 Riffe Tower meeting, which Cespedes attended, and also during a November 2019 dinner attended by Judge, Cespedes and other Bailout Scheme members.  Judge also directed and oversaw the use of FES employees in commercials opposing the repeal of HB6, as part of the misleading ad campaign opposing the repeal effort.  Following the passage of HB6, Judge personally thanked Householder, stating, "We're also thankful for the support and commitment by Speaker Householder."

## C.    Defendants' Efforts to Conceal the Bailout Scheme

231.    Defendants' extensive efforts to cover up their wrongdoing further bolster a compelling inference of scienter.  These efforts demonstrate that defendants both: (i) knew of the adverse facts alleged herein; and (ii) knew that their activities were unlawful and improper and risked material damage to the Company and its investors if ever revealed.

232.    Defendants in the Criminal Proceedings have admitted that members of the Bailout Scheme "engaged in financial transactions that were designed to conceal the nature, source,

4823-8789-7564.v3

ownership, and control of the payments made by [FirstEnergy]." FirstEnergy itself has likewise admitted that members of senior management, including Jones, Chack and Dowling, failed to "reasonably ensure that relevant information was communicated . . . and not withheld" in connection with the Bailout Scheme.

233. Moreover, FirstEnergy employed an elaborate dark money network for the express purpose of concealing its illicit payments in support of the Bailout Scheme, including, *inter alia*: (i) Generation Now, Inc.; (ii) JPL & Associates LLC; (iii) Friends of Larry Householder; (iv) Constant Content Co.; (v) 17 Consulting Group LLC; (vi) Partners for Progress, Inc.; (vii) Coalition for Growth & Opportunity, Inc.; (viii) Hardworking Ohioans, Inc.; (ix) Growth & Opportunity PAC, Inc.; (x) Ohioans for Energy Security, LLC; and (xi) FirstEnergy PAC FSL. The use of this dark money network allowed FirstEnergy to obscure the source of its payments to fund the Bailout Scheme and to conceal the Company and the Officer Defendants' role in it. As an example of the ways in which FirstEnergy used this complex web to conceal its support for the Bailout Scheme, in October 2019 FirstEnergy funneled $3.5 million to pay for a direct mailer campaign opposing the repeal of HB6 first through Generation Now and then through three different bank accounts, making the source of the funds almost impossible to trace. Lobbyist Neil Clark described the appeal of using 501(c)(4) organizations to further the Bailout Scheme as follows: "it's a secret, a (c)(4) is secret. Nobody knows the money goes to the Speaker's account . . . it's not recorded."

234. Tellingly, even after Householder was arrested and the fraudulent scheme perpetrated by FirstEnergy and the Officer Defendants began to unravel, Jones told a series of brazen lies to perpetuate the cover-up. During an investor call immediately after the arrests, Jones claimed, "I don't know who" is the "CEO [of Company A]" referred to in the Criminal Complaint, "but it was not me." This claim of ignorance was belied by the Criminal Complaint's direct quotes of Jones' past statements, attributed to the "Company A Corp.'s CEO," which left no doubt about the CEO's

- 85 -

identity. As prosecutors noted when announcing Householder's arrest, "Everyone in this room knows who Company A is."

235. During the call, Jones also strongly disavowed any wrongdoing. However, almost immediately after issuing these falsehoods, Jones had to walk them back. The very next business day, Jones issued a series of "clarifications," conceding that he did not in fact "literally" emphasize ethics in all interactions with politicians. Jones also acknowledged that FirstEnergy continued to provide FES external affairs support during the Class Period, notwithstanding his prior claim that the Company was "virtually out of the external affairs business for FES very shortly after November of 2016." The extent of Jones' attempt to cover-up defendants' roles in the Bailout Scheme would be further revealed when FirstEnergy announced his termination in October 2020. The reasons FirstEnergy provided for firing Jones and other executives included their failure to act transparently, ethically and professionally and their illicit payment of millions of dollars to a top Ohio regulator.

**D.      The Historic Magnitude of the Bailout Scheme**

236. The historic magnitude of defendants' fraudulent scheme further confirms that defendants possessed scienter of the undisclosed, adverse facts detailed herein. The Bailout Scheme involved one of the largest bribery and corruption schemes in U.S. history, and it was perpetrated through an extensive network of FirstEnergy and FES employees, politicians, lobbyists, regulators, political action committees, front companies and dark money vehicles. FirstEnergy funneled more than $60 million over a multi-year period to Householder and his corrupt affiliates to ensure the passage and defense of HB6, one of the most consequential pieces of energy regulation impacting Ohio citizens in recent history. FirstEnergy's financial commitment to the criminal enterprise was so vast that conspirators internally referred to the Company as the "Bank" and its willingness to spend "unlimited" cash to further its corrupt ends as "Monopoly money." In return for these lavish contributions, FirstEnergy secured a $1.3 billion rate payer-funded bailout of the Nuclear Plants,

lucrative decoupling provisions that locked-in an estimated $700 million in guaranteed revenues, an amiable exit to the FES bankruptcy proceedings, and a much-needed "fix" for the Company's nuclear problems.

237.    Bribery and corruption were at the core of FirstEnergy's business model and used to navigate the Company's most pressing operational and financial challenges.  The Bailout Scheme was FirstEnergy's "top priority" and directly overseen and implemented by the Company's most senior management, including the Officer Defendants.  FirstEnergy's efforts to deal with its failing nuclear subsidiaries was a central topic of concern for investors and analysts and featured prominently during almost every Company earnings call during the Class Period.  When the Bailout Scheme was finally revealed, the repercussions were enormous, resulting in, *inter alia*: (i) at least five arrests and three guilty pleas by co-conspirators; (ii) more than a dozen lawsuits, investigations and compulsory audits of FirstEnergy; (iii) the termination of several high-ranking FirstEnergy executives, including four of the Officer Defendants; (iv) a collapse in the price of FirstEnergy securities; (v) multiple rating agency downgrades; and (vi) the need for FirstEnergy to take a nearly $2 billion credit drawdown to ensure sufficient liquidity to pay expected fines and penalties.

**E.    Defendants Are Sued and Investigated for Their Riles in the Bailout Scheme**

238.    FirstEnergy and many of the Officer Defendants are now subject to a host of lawsuits, investigations, regulatory reviews and other proceedings as a result of their participation in the Bailout Scheme.

239.    In addition to being identified as "Company A" in the Criminal Proceedings, FirstEnergy has been named as a defendant in more than a dozen shareholder lawsuits, customer and ratepayer class actions, and state and municipal proceedings.  Many of these lawsuits have already found early success in attempting to hold FirstEnergy and its officers accountable for their violations of law in connection with the Bailout Scheme.  For example, in December 2020, the Ohio AG and

the cities of Cincinnati and Columbus successfully secured a preliminary injunction before Franklin County Judge Chris Brown which blocked the HB6 nuclear subsidies. *See Ohio v. FirstEnergy et al.*, No. 20-CV-06281, Or. (Ct. C.P. Franklin Cnty. Dec. 21, 2020). Then, in January 2021, the parties reached a settlement in which FirstEnergy agreed to forego the fees associated with HB6's decoupling provisions. Similarly, on February 10, 2021, Judge Edmund A. Sargus, Jr. denied in their entirety motions to dismiss a rate payer class action alleging RICO conspiracy and other violations against defendants FirstEnergy, Jones, Pearson, Strah, Taylor and Dowling. *See* Opinion & Order Denying Defendants' Motion to Dismiss, *Smith v. FirstEnergy Corp., et al.*, No. 2:20-cv-03755, ECF No. 43 (S.D. Ohio Feb. 10, 2021).

240.    FirstEnergy, FES and certain officers have also received subpoenas from the U.S. Attorney's Office for the Southern District of Ohio and the SEC in connection with investigations into the Bailout Scheme. In addition, FirstEnergy's primary regulator, PUCO, has launched a series of audits to examine the Company's support for HB6, use of customer funds, compliance with applicable laws and regulations, and separation from FES, among other issues. The FERC Division of Investigations has also launched an audit in connection with the Company's lobbying and governmental affairs activities.

**F.    Defendants Issued $5 Billion in Equity and Debt at Artificially Inflated Prices**

241.    FirstEnergy's Form 10-K filings repeatedly acknowledged that the Company's "business is capital intensive, requiring significant resources to fund operating expenses, construction expenditures, scheduled debt maturities and interest payments, dividend payments and contributions to pension plan." To meet these capital requirements during the Class Period, defendants took advantage of the artificially inflated price of FirstEnergy securities and the investment grade credit ratings generated by their fraudulent conduct and issued $2.5 billion in common and preferred stock and another $2.5 billion in debt securities.

242. On January 22, 2018, when FirstEnergy common stock was trading at the artificially inflated price of $32.45 per share, FirstEnergy announced that it had issued $1.62 million in mandatorily convertible preferred shares and $850 million in common stock. Defendants hailed the private placement as "transformational" and, in FirstEnergy's 2019 Form 10-K, claimed it "supported the company's transition to a fully regulated utility company and positions FirstEnergy for sustained investment-grade credit metrics."

243. In February 2020, while FirstEnergy stock was trading above $53 per share and the Company had received investment-grade corporate credit ratings from S&P, Moody's and Fitch as a result of the Bailout Scheme, defendants issued $1.75 billion in debt securities. Specifically, defendants issued $300 million of 2.050% notes due in 2025, $600 million of 2.650% notes due in 2030, and $850 million of 3.400% notes due in 2050. According to the prospectus for the sale of these securities, FirstEnergy needed the $1.75 billion to repay the Company's term loan credit agreement that was expiring in September 2021, to fund cash payments pursuant to the FES bankruptcy settlement agreement, and to fund working capital needs.

244. Less than four months later, in June 2020, defendants issued another $750 million in debt securities while the Company's credit rating continued to be investment-grade and its common stock traded above $43 per share as a result of defendants' misstatements and material omissions. Specifically, defendants issued $300 million of 1.600% notes due in 2026 and $450 million of 2.250% notes due in 2030. According to the prospectus for these securities, FirstEnergy intended to use the money to repay $750 million borrowed under a term loan credit agreement that was due to expire in September 2020.

I.  **Defendants' Fraud Boosted FirstEnergy's Credit Rating and Reduced Its Cost of Acquiring Capital**

245. In late 2016, PUCO approved a "Distribution Modernization Rider" increasing FirstEnergy customers' rates to provide "credit support" for FirstEnergy as it faced mounting

- 89 –

problems with the Nuclear Plants. At the time, a Moody's credit opinion and an S&P research update both noted that there was a serious risk of FirstEnergy's credit rating being downgraded. According to FirstEnergy, any downgrade would hinder access to capital markets and make the cost of borrowing money higher. FirstEnergy's SEC filings during the Class Period also acknowledged that "[a] downgrade in [FirstEnergy] credit ratings from the nationally recognized credit rating agencies, particularly to a level below investment grade, could negatively affect our ability to access the bank and capital markets" and "a downgrade could increase the cost of . . . capital," "increase our interest expense on certain of FirstEnergy's long-term debt," and "impact our ability to grow our regulated business or execute on our business strategies." But if defendants could preserve and improve FirstEnergy investment grade credit ratings, it would reduce the cost of acquiring capital, including interest rates on debt offerings and loan terms, which would directly benefit the Company's reported financial results. As Jones stated during a conference call with analysts and investors at the beginning of the Class Period on February 22, 2017: "[w]e are committed to investment grade credit metrics at FE Corp."

246. Based significantly on the Bailout Scheme and the claimed resolution of the financial problems posed by the Nuclear Plants, defendants were able to increase FirstEnergy's credit ratings with all three major rating agencies: S&P, Moody's and Fitch. Indeed, during a February 20, 2019 conference call discussing FirstEnergy's settlement with FES creditors, which was achieved due to the promise of a legislative solution for the Nuclear Plants, Jones assured investors that, "[t]he settlement and our improved risk profile as a utility with stable, predictable earnings and cash flow cleared the way for an across-the-board upgraded S&P, including an upgraded issuer credit rating at FE Corp. and a positive credit outlook with Fitch." As a result of the improved credit ratings, FirstEnergy was able to accomplish the sale of $2.5 billion in debt securities in the first half of 2020 as detailed above and to substantially reduce its cost of raising capital.

247. But when the truth about defendants' fraudulent scheme came to light, FirstEnergy's credit ratings collapsed. On July 24, 2020, Moody's revised FirstEnergy's credit rating to negative from stable as a result of the illegal activity identified in the July 21, 2020 Criminal Complaint. Over the next few months, as a result of the truth emerging about defendants' fraudulent scheme, all three of the major ratings agencies downgraded FirstEnergy, and, by November 2020, the Company's credit rating had been reduced to junk status across the board.

## J. Defendants' Fraud Allowed Them to Reap $90 Million in Salary and Bonus Compensation and $14 Million in Insider Trading Proceeds

248. The Officer Defendants were incentivized to conceal their criminal Bailout Scheme in order to keep their executive positions at FirstEnergy and continue collecting lucrative salaries and incentive-based compensation. According to FirstEnergy's 2020 Proxy Statements, the Officer Defendants were eligible for performance-based compensation that far exceeded what they received in the form of earned salaries. This performance-based compensation largely based on FirstEnergy's reported financial results. The Proxy Statements reported the compensation for Jones, Pearson, Strah, Reffner and Vespoli as follows:

| Defendant[24] | 2017 Compensation | 2018 Compensation | 2019 Compensation |
|---|---|---|---|
| Charles Jones | $15,281,885 92.6% Perf. Based | $11,123,128 89.8% Perf. Based | $14,684,659 92.3% Perf. Based |
| James Pearson[25] | $5,977,966 83.9% Perf. Based | $3,895,599 83.0% Perf. Based | $7,258,952 97.7% Perf. Based |
| Steven Strah | $3,976,975 85.9% Perf. Based | $3,495,512 83.0% Perf. Based | $6,034,128 89.3% Perf. Based |
| Robert Reffner[26] | | | $2,467,891 |

---

[24] FirstEnergy did not report compensation figures for Chack, Dowling, Pine, Reffner or Taylor, but as FirstEnergy executives, each of these defendants were eligible for performance-based compensation during the Class Period that was significantly larger than their annual salaries.

[25] As reported in FirstEnergy's 2020 Proxy Statements, Pearson's 2019 compensation included $1.6 million he received upon departing the Company effective April 1, 2019, $1.3 million of which was a lump-sum payment "equivalent to what [he] would have received under the FirstEnergy Executive Severance Benefits Plan."

[26] FirstEnergy did not report Reffner's compensation for 2017 or 2018.

| Defendant[24] | 2017 Compensation | 2018 Compensation | 2019 Compensation |
|---|---|---|---|
| | | | 78.2% Perf. Based |
| Leila Vespoli[27] | $5,117,611<br>85.1% Perf. Based | $4,123,650<br>81.5% Perf. Based | $7,022,512<br>97.4% Perf. Based |

249.    In total, Jones, Pearson, Strah, Reffner and Vespoli collected over $90.4 million in compensation in the three years before their fraudulent scheme was disclosed. Nearly 90% of that compensation was in the form of performance-based bonuses that were largely predicated on FirstEnergy's reported financial performance.

250.    In addition to their collection of tens of millions of dollars in compensation, Jones, Pearson, Vespoli and Chack also reaped nearly $14 million in insider trading proceeds. As reflected below, Jones, Pearson, Vespoli and Chack sold their stock while the price of FirstEnergy stock was artificially inflated as a result of their fraudulent scheme:

| Defendant | Date | # of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|---|
| Charles Jones | March 1, 2018<br>March 1, 2019 | 116,045<br>148,302 | $32.48<br>$40.73 | $3,769,142<br>$6,040,340 |
| James Pearson | January 9, 2019 | 40,000 | $37.87 | $1,514,800 |
| Dennis Chack | March 1, 2019 | 10,145 | $40.73 | $ 413,206 |
| Leila Vespoli | March 1, 2018<br>March 1, 2019 | 36,367<br>24,400 | $32.48<br>$41.33 | $1,181,200<br>$1,008,452 |

251.    These sales were highly suspicious in both timing and amount. Based on the Form 4s that were filed in conjunction with the stock sales, each of these defendants sold a substantial portion of their FirstEnergy holdings and their insider trading during the Class Period was unusual in timing compared to their pre-Class Period transactions. In comparison to the nearly 265,000 shares of FirstEnergy stock he sold during the Class Period, Jones did not make any stock sales in the 18 months before the Class Period began. In addition, Jones' Class Period sales were more than 700%

---

[27]    As reported in FirstEnergy's 2020 Proxy Statements, Vespoli's 2019 compensation included $1.7 million she received upon departing the Company effective April 1, 2019, $1.5 million of which was a lump-sum payment "equivalent to what [she] would have received under the FirstEnergy Executive Severance Benefits Plan."

4823-8789-7564.v3

greater in terms of volume than his sales during the 45 months before the Class Period began and nearly double the number of FirstEnergy shares he sold in the ten years prior to the Class Period. In total, Jones sold 39% of his FirstEnergy stock holdings during the Class Period. Similarly, Pearson and Chack did not engage in any sales of FirstEnergy stock and Vespoli sold only 16,631 FirstEnergy shares in the 45 months before the beginning of the Class Period, but these defendants sold 28%, 24% and 26% of their holdings, respectively, in 2018 and 2019 when the price of FirstEnergy stock was artificially inflated by defendants' misstatements and omissions. These sales occurred at the height of the fraud, as FirstEnergy was shepherding FES through bankruptcy and secretly bankrolling the Bailout Scheme to ensure the passage of HB6. Defendants' sales of a significant amount of their personal FirstEnergy shareholdings at artificially inflated prices while they were actively engaged in the fraudulent scheme detailed herein further bolsters an already compelling inference of scienter.

## NO SAFE HARBOR

252. FirstEnergy's purported "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. The specific statements pled herein were not FLS or identified as such, but rather statements of present and historical fact. To the extent any statements can properly be considered FLS, such statements were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly FLS. For example, none of defendants' statements during the Class Period identified the participation of FirstEnergy and its senior executives in the Bailout Scheme, which posed an extreme, undisclosed risk of reputational, legal and financial harm to the Company and its investors.

253. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and/or the FLS was

- 93 –

authorized and approved by an executive officer of FirstEnergy who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET**

254.    At all relevant times, FirstEnergy securities traded in an efficient market for the following reasons, among others:

(a)    FirstEnergy stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's Form 10-K for the fiscal year ended December 31, 2019, FirstEnergy had more than 540 million shares outstanding as of January 31, 2020;

(c)    as of September 30, 2020, FirstEnergy had over $22 billion in long-term debt and other long-term obligations outstanding, including billions of dollars in senior notes that were actively traded by investors throughout the Class Period;

(d)    as a regulated issuer, FirstEnergy filed periodic public reports with the SEC;

(e)    FirstEnergy regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(f)    unexpected material news about FirstEnergy was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

- 94 –

255. As a result of the foregoing, the markets for FirstEnergy securities promptly digested current information regarding FirstEnergy from publicly available sources and reflected such information in the price of FirstEnergy securities. Under these circumstances, all purchasers of FirstEnergy securities during the Class Period suffered similar injury through their purchases of FirstEnergy securities at artificially inflated prices, and a presumption of reliance applies.

256. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding FirstEnergy's business, operations and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

257. The markets for FirstEnergy securities were open, well-developed and efficient at all relevant times. During the Class Period, as detailed herein, defendants engaged in a fraudulent scheme and wrongful course of business that artificially inflated the price of FirstEnergy securities by making false and misleading statements, and omitting material information, about FirstEnergy's business and operations. As defendants' misleading statements and material omissions became apparent to the market, beginning on July 21, 2020, the price of FirstEnergy securities fell, as the prior artificial inflation came out. As a result of their purchase or acquisition of FirstEnergy securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss.

258. As a direct result of the July 21 and 22, 2020 disclosures described above, FirstEnergy common stock plummeted, dropping 17% on July 21, 2020 and another 21% on July 22,

2020. From a close of $41.26 per share on July 20, 2020, FirstEnergy common stock price dropped $14.17 to $27.09 per share by the end of the day on July 22, 2020, resulting in a market capitalization loss of over $7.68 billion. These losses were suffered as FirstEnergy common stock traded on extremely high volume of over 41 million shares traded on July 21, 2020 and nearly 136 million shares traded on July 22, 2020.

259. As reflected in the chart below, while the price of FirstEnergy stock fell nearly 35%, the S&P 500 Index and the S&P Utilities Index both increased on July 21, 2020 and July 22, 2020:



260. The price of FirstEnergy's debt securities also traded at artificially inflated prices during the Class Period and declined as a result of the July 21 and July 22, 2020 disclosures about defendants' fraudulent conduct. For example, several FirstEnergy senior notes declined as follows:

| | 3.40% due 2050 | 4.85% due 2047 | 2.65% due 2030 | 2.25% due 2030 | 3.90% Due 2027 |
|---|---|---|---|---|---|

|  | 3.40%<br>due 2050 | 4.85%<br>due 2047 | 2.65%<br>due 2030 | 2.25%<br>due 2030 | 3.90%<br>Due 2027 |
|---|---|---|---|---|---|
| July 20, 2020<br>Closing Price | $1136.51 | $1380.84 | $1069.07 | $1033.37 | $1157.39 |
| July 22, 2020<br>Closing Price | $1004.85 | $1269.54 | $1008.27 | $975.69 | $1087.23 |
| % Change | -11.6% | -8.1% | -5.7% | -5.6% | -6.1% |
| $ Change | -$131.66 | -$111.30 | -$60.80 | -$57.68 | -$70.16 |

261. As a direct result of the October 29, 2020 disclosures and developments described above, FirstEnergy common stock fell another 6.6% on high trading volume, from $31.81 on October 29, 2020, to a closing price of $29.72 on October 30, 2020, resulting in a market capitalization loss of over $1.1 billion.

262. As reflected in the chart below, while the price of FirstEnergy stock fell 6.6% on October 30, 2020, the S&P 500 Index and the S&P Utilities Index declined only 1.20% and 0.92%, respectively:



263.    The price of FirstEnergy's debt securities also declined as a result of the October 29, 2020 disclosures about defendants' fraudulent conduct.  For example, several FirstEnergy senior notes declined as follows:

|  | 3.40% due 2050 | 4.85% due 2047 | 7.37% due 2031 | 2.65% due 2030 | 2.25% due 2030 |
|---|---|---|---|---|---|
| Oct. 29, 2020 Closing Price | $965.77 | $1172.30 | $1398.70 | $1012.69 | $983.86 |
| Oct. 30, 2020 Closing Price | $915.97 | $1089.53 | $1344.53 | $975.11 | $938.81 |
| % Change | -5.2% | -7.1% | -3.9% | -3.7% | -4.5% |
| $ Change | -$49.80 | -$82.77 | $54.17 | -$37.58 | -$44.55 |

264.    As a direct result of the November 19 and November 24, 2020 disclosures described above, over the three trading days following November 19, 2020, FirstEnergy common stock fell

another 8.2% on high trading volume, from $29.04 on November 19, 2020 to a closing price of $26.66 on November 24, 2020, resulting in a further market capitalization loss of nearly $1.3 billion.

265.    As reflected in the chart below, while the price of FirstEnergy stock fell 8.2%, the S&P 500 Index and the S&P Utilities Index both increased from November 19 to November 24, 2020:



266.    The price of FirstEnergy's debt securities also declined as a result of the November 2020 disclosures about defendants' fraudulent conduct. For example, several FirstEnergy senior notes declined as follows:

|  | 3.40% due 2050 | 7.37% due 2031 | 2.65% due 2030 | 2.25% due 2030 | 2.05% due 2025 |
|---|---|---|---|---|---|
| Nov. 19, 2020 Closing Price | $954.09 | $1370.69 | $996.44 | $964.92 | $1008.80 |
| Nov. 24, 2020 Closing Price | $943.90 | $1353.50 | $984.39 | $952.99 | $1001.41 |

|  | 3.40%<br>due 2050 | 7.37%<br>due 2031 | 2.65%<br>due 2030 | 2.25%<br>due 2030 | 2.05%<br>due 2025 |
|---|---|---|---|---|---|
| % Change | -1.1% | -1.3% | -1.2% | -1.2% | -.73% |
| $ Change | -$10.19 | $17.19 | -$12.05 | -$11.93 | -$7.39 |

267.     The economic loss suffered by Plaintiffs and other members of the Class was a direct result of defendants' wrongful conduct, which inflated the prices of FirstEnergy securities and resulted in the subsequent decline in the value of those securities when defendants' prior false and misleading statements and omissions were revealed.  The declines in the price of FirstEnergy securities pled herein were a direct result of the nature, extent and impact of defendants' prior false and misleading statements and omissions being revealed to investors and the market.  The timing and magnitude of the price declines of FirstEnergy securities negates any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to defendants' wrongful conduct.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against the Exchange Act Defendants

268.     Plaintiffs incorporate all paragraphs above by reference.

269.     During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and/or engaged in a fraudulent scheme in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Exchange Act Defendants also engaged in a fraudulent

scheme and course of business by participating in and facilitating the Bailout Scheme as detailed herein.

270.    The Exchange Act Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FirstEnergy securities during the Class Period.

271.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FirstEnergy securities.  Plaintiffs and the Class would not have purchased FirstEnergy securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### Against the Exchange Act Defendants

272.    Plaintiffs incorporate all paragraphs above by reference.

273.    Each of the Officer Defendants were control persons of FirstEnergy within the meaning of §20(a) of the Exchange Act by virtue of their positions as directors, senior executives and/or major stockholders of the Company and exercised actual control over the Company during the Class Period and possessed the power to control FirstEnergy in connection with the wrongful activities alleged herein.  The Officer Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of FirstEnergy.  The Officer Defendants were also each critical to the implementation of the Bailout

- 101 –

Scheme by having taken actions to ensure that the Bailout Scheme was carried out on behalf of FirstEnergy. By reason of their positions with the Company and their ownership of Company securities, the Officer Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

274. FirstEnergy was a control person of the Officer Defendants and all of its employees, as well as other key members of the Bailout Scheme, within the meaning of §20(a) of the Exchange Act. Specifically, FirstEnergy exercised actual control over, *inter alia*, the Officer Defendants, FES (now known as Energy Harbor), Generation Now, Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes and Samuel Randazzo during the Class Period and possessed the power to control these individuals and entities in connection with the wrongful activities alleged herein.

275. By reason of such wrongful conduct, for which various individuals and entities are primarily liable, as set forth above, the Officer Defendants and FirstEnergy are jointly and severally liable with and to the same extent as these primary violators pursuant to §20(a) of the Exchange Act.

## SECURITIES ACT ALLEGATIONS

276. This section incorporates solely ¶¶1-6, 14-26 and expressly disavows all averments of fraud contained herein for the purposes of pleading claims under the Securities Act as such claims do not require a showing of fraud or scienter.

**Securities Act Defendants**

277. Defendant FirstEnergy is the issuer of the notes sold in the Offerings (defined herein).

278. Defendant Jones served as FirstEnergy's CEO at the time of the Offerings and signed the registration statements for the Offerings.

279. Defendant Strah served as FirstEnergy's CFO at the time of the Offerings and signed the registration statements for the Offerings.

- 102 –

280. Defendant Jason J. Lisowski ("Lisowski") served as FirstEnergy's VP Controller and Chief Accounting Officer at the time of the Offerings. Lisowski signed the registration statements for the Offerings.

281. Defendants George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton and Leslie Turner are referred to as the "Director Defendants." Each of the Director Defendants signed the registration statement for the Offerings, and/or were named as directors in the registration statements for the Offerings.

282. Defendants Jones, Strah, Lisowski and Director Defendants are referred to collectively as the "Individual Defendants."

283. Defendants Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc. and MUFG Securities Americas Inc. are collectively referred to herein as the "Underwriter Defendants." Each of the Underwriter Defendants served as underwriters and/or underwriter representatives for the Offerings.

284. FirstEnergy, the Individual Defendants, and the Underwriter Defendants are referred to collectively as the "Securities Act Defendants."

## BACKGROUND OF THE OFFERINGS

285.    On March 6, 2018, FirstEnergy filed a shelf registration statement with the SEC on Form 3-ASR, pursuant to which the Company could conduct multiple securities offerings (the "Shelf Registration Statement").

286.    On February 19, 2020, FirstEnergy filed a prospectus supplement that incorporated and formed part of the Shelf Registration Statement (the "February Registration Statement"). Pursuant to the February Registration Statement, FirstEnergy registered for issuance over $1.7 billion of FirstEnergy notes as follows: (i) approximately $300 million of 2.05% Series A Notes due 2025; (ii) approximately $600 million of 2.65% Series B Notes due 2030; and (iii) approximately $850 million of 3.40% Series C Notes due 2050 (the "February 2020 Offering"). Defendants successfully solicited investors for the February 2020 Offering, issuing and selling over $1.7 billion of FirstEnergy notes near par.

287.    The Underwriter Defendants served as underwriters and underwriter representatives for the February 2020 Offering as follows:

| Underwriters | Principal Amount of Series A Notes | Principal Amount of Series B Notes | Principal Amount of Series C Notes |
|---|---|---|---|
| Barclays Capital Inc. | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| BofA Securities, Inc. | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| Citigroup Global Markets Inc. | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| J.P. Morgan Securities LLC | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| Morgan Stanley & Co. LLC | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| Mizuho Securities USA LLC | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| PNC Capital Markets LLC | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| RBC Capital Markets, LLC | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| Santander Investment Securities Inc. | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| Scotia Capital (USA) Inc. | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| SMBC Nikko Securities America, Inc. | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| CIBC World Markets Corp. | $ 6,728,000 | $ 13,454,000 | $ 19,060,000 |
| KeyBanc Capital Markets Inc. | $ 6,727,000 | $ 13,455,000 | $ 19,060,000 |
| MUFG Securities Americas Inc. | $ 6,727,000 | $ 13,455,000 | $ 19,060,000 |
| TD Securities (USA) LLC | $ 6,727,000 | $ 13,454,000 | $ 19,061,000 |
| U.S. Bancorp Investments, Inc. | $ 6,727,000 | $ 13,454,000 | $ 19,061,000 |
| **Total** | $ 300,000,000 | $ 600,000,000 | $ 850,000,000 |

288.    On June 4, 2020, FirstEnergy filed a second prospectus supplement that incorporated and formed part of the Shelf Registration Statement (the "June Registration Statement"). Pursuant to

the June Registration Statement, FirstEnergy registered for issuance $750 million of FirstEnergy

notes as follows: (i) $300 million of 1.60% Series A Notes due 2026; and (ii) $450 million of 2.25%

Series B Notes due 2030 (the "June 2020 Offering"). Defendants successfully solicited investors for

the June 2020 Offering, selling $750 million of FirstEnergy notes near par.

289.    The Underwriter Defendants served as underwriters and underwriter representatives

for the June 2020 Offering as follows:

| Underwriters | Principal Amount of Series A Notes | Principal Amount of Series B Notes |
|---|---|---|
| Mizuho Securities USA LLC | $ 63,600,000 | $ 95,400,000 |
| Morgan Stanley & Co. LLC | 63,600,000 | 95,400,000 |
| Scotia Capital (USA) Inc. | 63,600,000 | 95,400,000 |
| CIBC World Markets Corp. | 23,700,000 | 35,550,000 |
| KeyBanc Capital Markets Inc. | 23,700,000 | 35,550,000 |
| TD Securities (USA) LLC | 23,700,000 | 35,550,000 |
| U.S. Bancorp Investments, Inc. | 23,700,000 | 35,550,000 |
| Citizens Capital Markets, Inc. | 4,800,000 | 7,200,000 |
| Fifth Third Securities, Inc. | 4,800,000 | 7,200,000 |
| Huntington Securities, Inc. | 4,800,000 | 7,200,000 |
| **Total** | $ 300,000,000 | $ 450,000,000 |

290.    The February 2020 Offering and the June 2020 Offering are collectively referred to

herein as the "Offerings," and the February Registration Statement and the June Registration

Statement are referred to collectively as the "Registration Statements." The Registration Statements

expressly incorporated and thereby repeated and restated FirstEnergy's Form 10-K annual report for

the year ended December 31, 2019. The June Registration Statement further incorporated by

reference FirstEnergy's Form 10-Q quarterly report for the three months ended March 31, 2020.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENTS

291.    The Registration Statements contained untrue statements of material fact, omitted to

state other facts necessary to make the statements made not misleading, and were not prepared in

accordance with SEC rules and regulations governing the preparation of such documents.

292.    Specifically, the Registration Statements failed to disclose that FirstEnergy and

several of the Company's most senior executives had carried out an illegal bribery scheme that

– 105 –

involved the funneling of tens of millions of dollars to state politicians, lobbyists and at least one senior Ohio regulator to promote favorable legislation and regulatory treatment in violation of state and federal law, numerous regulations applicable to FirstEnergy, and the Company's own internal policies.  These undisclosed adverse facts exposed FirstEnergy to extraordinary risk of financial, legal and reputational loss and materially diminished the value of the notes sold in the Offerings.

293.    Similarly, the Registration Statements represented that FirstEnergy and its subsidiaries "comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU."  These statements were materially false and misleading because the participation of FirstEnergy and its top executives in the Bailout Scheme violated numerous laws, violations, orders policies and practices applicable to FirstEnergy and its business.

294.    With respect to the Company's internal control over financial reporting, the Registration Statements stated that the "financial statements and management's assessment of the effectiveness of internal control over financial reporting . . . incorporated in this prospectus supplement by reference to our Annual Report on Form 10-K for the year ended December 31, 2019."  The referenced Annual Report, which formed part of the Registration Statements by express incorporation, in turn stated in pertinent part as follows:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the Securities Exchange Act of 1934.  Using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework published in 2013, management conducted an evaluation of the effectiveness of their internal control over financial reporting under the supervision of the chief executive officer and chief financial officer.  ***Based on that evaluation, management concluded that FirstEnergy's internal control over financial reporting was effective as of December 31, 2019***.

295.    The statements identified in ¶294 were materially false and misleading when made because as of December 31, 2019 and at the time of the Offerings, FirstEnergy did not maintain

effective internal control over financial reporting. Indeed, FirstEnergy later admitted that the Company suffered from material weaknesses in its internal controls, stating in pertinent part as follows:

> The management of FirstEnergy, with the participation of the acting chief executive officer and chief financial officer, have reviewed and evaluated the effectiveness of its disclosure controls and procedures, as defined under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in Rules 13a-15(e) and 15d-15(e), as of September 30, 2020. **Based on that evaluation, the acting chief executive officer and chief financial officer of FirstEnergy have concluded that its disclosure controls and procedures were not effective as of September 30, 2020, solely as a result of the material weakness in FirstEnergy's internal control over financial reporting described below.**

> \*  \*  \*

> **Material Weakness in Internal Control Over Financial Reporting Existing as of September 30, 2020**

> \*  \*  \*

> **We did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct.**

> **[T]his control deficiency could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected. Accordingly, our management has concluded that this control deficiency constitutes a material weakness.**

296.    The issues identified by FirstEnergy that caused it to conclude that the Company suffered from a material weakness predated the Offerings, and thus should have been disclosed in the Registration Statements, but were not. For example, FirstEnergy has subsequently admitted to the illicit payment of $4 million to a top Ohio energy regulator by Jones and other Company executives on FirstEnergy's behalf in April 2019. As FirstEnergy has belatedly acknowledged, these executives "did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce

adherence to certain FirstEnergy policies and its code of conduct."  In addition, since at least February 2017, FirstEnergy and its most senior executives spent tens of millions of dollars and engaged in other illicit activities to corruptly influence Ohio politicians, lobbyists and political operatives in order to secure favored legislation and regulatory actions, including the passage and preservation of HB6, which provided decoupling provisions for the Company and a bailout of the Company's failing nuclear subsidiaries worth an estimated $2 billion over the life of the bill.  These actions subjected FirstEnergy to an extreme undisclosed risk of reputational, legal and financial harm.

297.    In addition to the materially false and misleading statements in the Registration Statements identified above, the Securities Act Defendants also violated their affirmative obligations to provide certain material information in the Registration Statements as required by applicable SEC rules and regulations.

298.    Item 303 required the Registration Statements to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable and unfavorable impact on the sales or revenues or income from continuing operations."

299.    The failure of the Registration Statement to disclose the participation by FirstEnergy and the Company's senior executives in the Bailout Scheme, carried out in order to promote favorable legislation and regulatory treatment for the Company worth billions of dollars, violated Item 303 because these undisclosed facts, trends and uncertainties were known and would and did have an unfavorable impact on the Company's sales, revenues and income from continuing operations.

300.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of the Registration Statements, a discussion of the most significant factors that made the Offerings risky or speculative and that each risk factor adequately

describe the risk. Because the omitted material facts alleged in ¶¶1-6, 292-296 were not disclosed, as well as the consequent material adverse effects on the Company's results and prospects, the Securities Act Defendants violated Item 105. Indeed, the Bailout Scheme was of the most significant risks facing the Company at the time of the Offerings, and thus was required to be disclosed to investors pursuant to Item 105 but was not.

301. After the Offerings closed, the price of the securities sold therein declined substantially as a result of the Securities Act Defendants' violations of law complained of herein, falling nearly 10% below par in some cases.

### COUNT III

### For Violation of §11 of the Securities Act
### Against the Securities Act Defendants

302. Plaintiffs incorporate ¶¶1-6, 14-26, 276-301 by reference.

303. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Securities Act Defendants.

304. The Securities Act Defendants are liable under theories of strict liability for their violations of §11 of the Securities Act. Plaintiffs do not allege that the Securities Act Defendants had scienter or fraudulent intent in connection with Count III.

305. The Registration Statements used to complete the Offerings contained untrue statements of material fact, omitted to state material facts required to be stated therein and/or omitted to state other facts necessary to make the statements made therein not misleading.

306. By reason of the conduct herein alleged, each defendant named herein violated §11 of the Securities Act.

307. Plaintiffs acquired FirstEnergy notes in and traceable to the Offerings. Specifically: (i) Lead Plaintiff LACERA purchased FirstEnergy notes directly in and traceable to the February 2020 Notes Offering and the June 2020 Notes Offering; (ii) Plaintiff Amalgamated Bank purchased

- 109 –

FirstEnergy notes directly in and traceable to the June 2020 Notes Offering; (iii) Plaintiff Wisconsin Laborers' Pension Fund purchased FirstEnergy notes directly in and traceable to the February 2020 Notes Offering; and (iv) City of Irving Supplemental Benefit Plan purchased FirstEnergy notes traceable to the June 2020 Notes Offering.

308.    Plaintiffs and the Class have sustained damages as the value of the notes issued in the Offerings have declined due to the Securities Act Defendants' violations.

309.    At the time of their purchases of the FirstEnergy notes issued in the Offerings, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action. Less than three years have elapsed between the time that the notes upon which this Count is brought was offered to the public and the time Plaintiffs commenced this action.

<div align="center">

**COUNT IV**

**For Violations of §12(a)(2) of the Securities Act**
**Against the Securities Act Defendants**

</div>

310.    Plaintiffs incorporate ¶¶1-6, 14-26, 276-309 by reference.

311.    This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against the Securities Act Defendants.

312.    The Securities Act Defendants are liable under theories of strict liability for their violations of §12(a)(2) of the Securities Act. Plaintiffs do not allege that the Securities Act Defendants had scienter or fraudulent intent in connection with Count IV.

313.    By means of the defective prospectuses used to complete the Offerings (the "Prospectuses"), the Securities Act Defendants issued, promoted and sold FirstEnergy notes to

Plaintiffs and other members of the Class for their own benefit and the benefit of those associated with them. The Underwriter Defendants additionally solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase FirstEnergy notes in the Offerings.

314. The Prospectuses used to complete the Offerings contained untrue statements of material fact, omitted to state material facts required to be stated therein and/or omitted to state other facts necessary to make the statements made therein not misleading.

315. The Securities Act Defendants owed Plaintiffs and the other members of the Class who purchased FirstEnergy notes pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Securities Act Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

316. By reason of the conduct alleged herein, the Securities Act Defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, the Plaintiffs and the other members of the Class who purchased FirstEnergy notes pursuant to the Prospectuses sustained substantial damages in connection with their purchases. The Plaintiffs and the other members of the Class who purchased the FirstEnergy notes issued pursuant to the Prospectuses seek damages to the extent permitted by law or seek to rescind and recover the consideration paid for the FirstEnergy notes so purchased, and hereby tender such FirstEnergy notes to the Securities Act Defendants.

317. At the time of their purchases of the FirstEnergy notes issued in the Offerings, Plaintiffs and other members of the Class were without knowledge of the facts concerning the

wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action. Less than three years have elapsed between the time that the notes upon which this Count is brought was offered to the public and the time Plaintiffs commenced this action.

## COUNT V
### For Violation of §15 of the Securities Act
### Against FirstEnergy and the Individual Defendants

318.    Plaintiffs incorporate ¶¶1-6, 14-26, 276-317 by reference.

319.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77, on behalf of the Class, against FirstEnergy and the Individual Defendants.

320.    Each of the Individual Defendants were control persons of FirstEnergy within the meaning of §15 of the Securities Act by virtue of their positions as directors, senior executives and/or major stockholders of the Company and exercised actual control over the Company at the time of the Offerings and possessed the power to control FirstEnergy in connection with the Offerings. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of FirstEnergy. The Individual Defendants were also each critical to effecting the Offerings, based on their involvement in preparing and signing the Registration Statements, soliciting investors to invest in the Offerings, and by having taken actions to ensure that the Offerings were successfully completed.

321.    FirstEnergy was a control person of the Individual Defendants and all of its employees within the meaning of §15 of the Securities Act. FirstEnergy exercised actual control over the Individual Defendants at the time of the Offerings and possessed the power to control the Individual Defendants in connection with the Offerings.

322.    By reason of such wrongful conduct, for which the Company and the Individual

Defendants are primarily liable, as set forth above, the Individual Defendants and FirstEnergy are

jointly and severally liable with and to the same extent as these primary violators pursuant to §15 of

the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as class

representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead

Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding rescission or a rescissory measure of damages;

D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the

Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  February 26, 2021                     ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                              DARREN J. ROBBINS
                                              MARK SOLOMON
                                              JASON A. FORGE
                                              TOR GRONBORG
                                              BRIAN E. COCHRAN
                                              SARA B. POLYCHRON
                                              TING H. LIU
                                              FRANCISCO J. MEJIA

- 113 –

s/ Brian E. Cochran

BRIAN E. COCHRAN

655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
jforge@rgrdlaw.com
torg@rgrdlaw.com
bcochran@rgrdlaw.com
spolychron@rgrdlaw.com
tliu@rgrdlaw.com
fmejia@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIEL J. PFEFFERBAUM
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dpfefferbaum@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
CHAD JOHNSON
DESIREE CUMMINGS
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/693-1058
chadj@rgrdlaw.com
dcummings@rgrdlaw.com

*Lead Counsel for Plaintiffs*
MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com

*Liaison Counsel*

- 114 –

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund ("Amalgamated Bank") declares:

1.  Amalgamated Bank has reviewed a complaint and authorizes its filing.

2.  Amalgamated Bank did not acquire the security that is the subject of this action at the direction of counsel or to participate in this private action or any other litigation under the federal securities laws.

3.  Amalgamated Bank is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Amalgamated Bank has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  (a)  Amalgamated Bank has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Yuan v. Facebook, Inc.*, No. 5:18-cv-01725 (N.D. Cal.)

(b)  Amalgamated Bank initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*St. Clair County Employees' Ret. Sys. v. Acadia Healthcare Company, Inc.*, No. 3:18-cv-00988 (M.D. Tenn.)
*Heavy & General Laborers' Locals 472 & 172 Welfare Fund v. 3M Company*, No. 2:19-cv-15982 (D.N.J.)

6.  Amalgamated Bank will not accept any payment for serving as a representative party on behalf of the class beyond Amalgamated Bank's pro rata share of

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of February, 2021.

Amalgamated Bank, as Trustee for the
LongView LargeCap 500 Index Fund,
LongView Quantitative LargeCap Fund,
LongView Broad Market 3000 Index Fund,
LongView LargeCap 500 Index Fund VEBA,
LV LargeCap 1000 Value Index Fund,
LongView Quantitative MidCap Fund,
LongView Quant LargeCap Equity VEBA Fund
and LongView Core Plus Fixed Income Fund

By: _____
Eleanor Innes
Digitally signed by Eleanor Innes
Date: 2021.02.24 10:16:30 -05'00'

Eleanor Innes, Senior Vice President &
Director of Equities, Investment
Management Division

- 2 -

FIRSTENERGY

## SCHEDULE A

## SECURITIES TRANSACTIONS

**LongView Broad Market 3000 Index Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 04/27/2017 | 2,148 | $30.52 |
| 05/03/2017 | 128 | $28.95 |
| 05/09/2017 | 452 | $28.76 |
| 06/14/2017 | 105 | $29.59 |
| 06/23/2017 | 570 | $28.91 |
| 08/17/2017 | 154 | $32.65 |
| 11/16/2017 | 4,150 | $34.64 |
| 12/18/2017 | 95 | $31.51 |
| 03/19/2018 | 13 | $33.79 |
| 03/29/2018 | 294 | $34.01 |
| 06/01/2018 | 1,971 | $34.20 |
| 06/19/2018 | 2,155 | $34.92 |
| 06/22/2018 | 1,528 | $35.09 |
| 07/18/2018 | 181 | $35.67 |
| 09/21/2018 | 560 | $36.90 |
| 11/23/2018 | 327 | $37.51 |
| 03/26/2019 | 2,521 | $42.00 |
| 04/01/2019 | 751 | $41.45 |
| 04/02/2019 | 2,927 | $41.34 |
| 04/04/2019 | 1,141 | $39.44 |
| 05/31/2019 | 2,442 | $41.24 |
| 06/26/2019 | 751 | $42.53 |
| 06/28/2019 | 3,170 | $42.81 |
| 12/20/2019 | 737 | $48.83 |
| 05/01/2020 | 2,348 | $40.85 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 09/18/2017 | 13 | $31.25 |
| 01/30/2018 | 290 | $32.32 |
| 02/20/2018 | 1,000 | $32.80 |
| 08/16/2018 | 865 | $37.06 |
| 10/02/2018 | 1,687 | $37.42 |

*Opening position of 12,124 shares.

**LongView LargeCap 500 Index Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/17/2017 | 2,200 | $31.36 |
| 08/03/2017 | 500 | $32.06 |
| 09/21/2017 | 2,900 | $31.15 |
| 10/02/2017 | 400 | $30.85 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 12/29/2017 | 300 | $30.62 |
| 01/23/2018 | 400 | $32.00 |
| 09/21/2018 | 4,900 | $36.90 |
| 02/19/2019 | 400 | $39.60 |
| 03/15/2019 | 2,400 | $41.23 |
| 04/10/2019 | 250 | $40.83 |
| 05/09/2019 | 200 | $41.36 |
| 06/25/2019 | 550 | $43.46 |
| 07/22/2019 | 200 | $43.60 |
| 07/31/2019 | 200 | $43.97 |
| 09/20/2019 | 3,800 | $47.39 |
| 11/06/2019 | 9,350 | $47.11 |
| 12/03/2019 | 200 | $47.81 |
| 12/18/2019 | 400 | $48.52 |
| 01/10/2020 | 200 | $47.99 |
| 03/06/2020 | 300 | $46.48 |
| 03/27/2020 | 1,550 | $38.60 |
| 04/20/2020 | 2,182 | $44.50 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 02/24/2017 | 400 | $32.32 |
| 05/09/2017 | 400 | $28.76 |
| 08/28/2017 | 1,600 | $32.80 |
| 10/25/2017 | 300 | $31.85 |
| 12/18/2017 | 900 | $31.51 |
| 12/21/2017 | 300 | $30.59 |
| 01/16/2018 | 300 | $29.92 |
| 01/29/2018 | 300 | $32.17 |
| 06/04/2018 | 300 | $33.82 |
| 06/28/2018 | 300 | $36.19 |
| 09/14/2018 | 300 | $37.83 |
| 09/26/2018 | 1,100 | $35.91 |
| 09/28/2018 | 300 | $37.17 |
| 10/25/2018 | 3,300 | $37.89 |
| 11/01/2018 | 300 | $37.17 |
| 02/04/2019 | 300 | $38.54 |
| 02/07/2019 | 300 | $39.31 |
| 03/22/2019 | 3,000 | $41.77 |
| 03/25/2019 | 1,450 | $41.86 |
| 10/21/2019 | 200 | $48.50 |
| 12/16/2019 | 200 | $48.51 |
| 02/05/2020 | 250 | $51.91 |
| 03/09/2020 | 2,200 | $42.93 |
| 04/24/2020 | 1,930 | $42.32 |
| 05/22/2020 | 125 | $40.63 |

*Opening position of 50,833 shares.

**LongView LargeCap 500 Index Fund VEBA**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/17/2017 | 1,000 | $31.36 |
| 10/02/2017 | 300 | $30.85 |
| 12/27/2017 | 300 | $30.38 |
| 04/04/2018 | 700 | $34.18 |
| 09/21/2018 | 1,500 | $36.90 |
| 01/30/2019 | 500 | $38.75 |
| 03/15/2019 | 900 | $41.23 |
| 04/01/2019 | 600 | $41.45 |
| 06/03/2019 | 600 | $41.68 |
| 09/20/2019 | 1,500 | $47.39 |
| 10/01/2019 | 200 | $47.89 |
| 12/03/2019 | 200 | $47.81 |
| 12/31/2019 | 1,500 | $48.60 |
| 01/31/2020 | 250 | $50.79 |
| 03/02/2020 | 200 | $46.79 |
| 04/16/2020 | 938 | $44.87 |
| 05/20/2020 | 316 | $40.29 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 03/31/2017 | 900 | $31.82 |
| 02/27/2018 | 1,700 | $32.90 |
| 04/04/2018 | 300 | $34.18 |
| 06/01/2018 | 2,300 | $34.20 |
| 07/16/2018 | 300 | $36.15 |
| 01/03/2020 | 250 | $47.46 |
| 05/22/2020 | 17 | $40.63 |

*Opening position of 17,465 shares.

**LongView Quant LargeCap Equity VEBA Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/21/2017 | 300 | $31.32 |
| 03/09/2017 | 1,200 | $31.30 |
| 09/04/2019 | 500 | $47.07 |
| 09/25/2019 | 1,700 | $48.56 |
| 01/29/2020 | 300 | $50.97 |
| 02/24/2020 | 600 | $51.35 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 04/19/2017 | 200 | $30.85 |
| 07/17/2017 | 2,900 | $30.33 |
| 08/04/2017 | 1,600 | $31.95 |
| 12/05/2019 | 200 | $48.26 |

| 01/31/2020 | 1,110 | $50.79 |
| 03/30/2020 | 200 | $40.33 |
| 04/08/2020 | 500 | $43.23 |
| 04/09/2020 | 700 | $45.10 |
| 04/24/2020 | 390 | $41.82 |

*Opening position of 3,200 shares.

**LongView Quantitative LargeCap Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/21/2017 | 7,100 | $31.32 |
| 03/09/2017 | 32,400 | $31.30 |
| 03/21/2017 | 100 | $31.01 |
| 09/04/2019 | 13,100 | $47.07 |
| 09/25/2019 | 50,600 | $48.56 |
| 11/11/2019 | 700 | $46.22 |
| 01/29/2020 | 3,300 | $50.97 |
| 02/24/2020 | 9,500 | $51.35 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 04/19/2017 | 400 | $30.94 |
| 04/25/2017 | 900 | $30.61 |
| 05/03/2017 | 700 | $28.74 |
| 07/17/2017 | 80,400 | $30.33 |
| 08/04/2017 | 42,800 | $31.95 |
| 09/18/2019 | 300 | $48.11 |
| 10/25/2019 | 2,100 | $48.01 |
| 11/06/2019 | 38,600 | $47.11 |
| 12/05/2019 | 2,400 | $48.26 |
| 01/07/2020 | 200 | $47.65 |
| 03/19/2020 | 1,700 | $35.99 |
| 03/27/2020 | 19,300 | $38.60 |
| 03/30/2020 | 300 | $40.33 |
| 03/31/2020 | 1,000 | $40.07 |
| 04/09/2020 | 7,300 | $45.10 |
| 04/16/2020 | 300 | $44.86 |
| 04/24/2020 | 3,700 | $41.82 |

*Opening position of 85,600 shares.

**LongView Quantitative MidCap Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/02/2017 | 9,000 | $31.87 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 07/25/2017 | 9,000 | $30.97 |

**LV LargeCap 1000 Value Index Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/31/2017 | 1,126 | $31.83 |
| 04/03/2017 | 267 | $31.47 |
| 05/01/2017 | 628 | $29.47 |
| 07/05/2017 | 189 | $29.22 |
| 09/18/2017 | 22 | $31.26 |
| 12/18/2017 | 62 | $31.52 |
| 12/29/2017 | 788 | $30.63 |
| 02/28/2018 | 122 | $32.34 |
| 03/20/2018 | 52 | $33.83 |
| 09/21/2018 | 189 | $36.91 |
| 12/21/2018 | 30 | $37.20 |
| 06/28/2019 | 844 | $42.82 |
| 11/13/2019 | 935 | $46.93 |
| 12/20/2019 | 188 | $48.83 |
| 04/20/2020 | 651 | $44.50 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 06/23/2017 | 63 | $28.90 |
| 08/15/2017 | 190 | $32.69 |
| 06/21/2018 | 146 | $35.14 |
| 06/22/2018 | 6 | $35.08 |
| 09/28/2018 | 131 | $37.16 |
| 01/18/2019 | 129 | $38.86 |
| 02/13/2019 | 378 | $39.50 |
| 06/26/2020 | 1,946 | $36.85 |
| 07/13/2020 | 371 | $40.83 |

*Opening position of 6,163 shares.

**Bond**

**LongView Core Plus Fixed Income Fund**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 06/03/2020 | 1.6% due 01/15/2026 | 84,000 | $99.85 |

Prices listed are rounded up to two decimal places.

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

WISCONSIN LABORERS' PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Cambridge Retirement System v. JELD-WEN Holding, Inc.*, No. 3:20-cv-00112 (E.D. Va.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __8th__ day of February, 2021.

WISCONSIN LABORERS' PENSION FUND

By: _____

John J. Schmitt, Chairman

FIRSTENERY

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Common Stock**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/21/2018 | 15,308 | $36.96 |
| 09/27/2018 | 412 | $36.45 |
| 10/05/2018 | 426 | $37.69 |
| 11/09/2018 | 437 | $37.98 |
| 07/01/2020 | 21 | $39.65 |
| 07/01/2020 | 336 | $39.57 |
| 07/01/2020 | 3,570 | $39.90 |
| 07/02/2020 | 266 | $39.93 |
| 07/02/2020 | 120 | $40.06 |
| 07/02/2020 | 713 | $40.03 |
| 07/02/2020 | 744 | $40.18 |
| 07/07/2020 | 1,036 | $40.30 |
| 07/08/2020 | 545 | $40.46 |
| 07/09/2020 | 409 | $40.31 |
| 07/10/2020 | 481 | $40.64 |

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 10/15/2018 | 538 | $37.48 |
| 10/16/2018 | 344 | $37.63 |
| 10/22/2018 | 429 | $38.59 |
| 10/24/2018 | 366 | $38.82 |
| 10/26/2018 | 394 | $36.75 |
| 10/26/2018 | 518 | $36.48 |
| 10/26/2018 | 1,545 | $36.72 |
| 10/29/2018 | 362 | $37.24 |
| 10/30/2018 | 2,927 | $37.26 |
| 11/13/2018 | 374 | $38.54 |
| 12/07/2018 | 371 | $39.16 |
| 12/10/2018 | 255 | $39.64 |
| 12/12/2018 | 2,761 | $39.37 |
| 12/17/2018 | 4,627 | $37.80 |
| 12/18/2018 | 772 | $37.68 |

**Bonds**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 02/18/2020 | 3.4% due 03/01/2050 | 310,000 | $99.85 |

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF IRVING SUPPLEMENTAL BENEFIT PLAN ("Plaintiff")
declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at
the direction of plaintiff's counsel or in order to participate in this private action or
any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period
in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a
class action that was filed under the federal securities laws within the three-year
period prior to the date of this Certification except as detailed below:

None.

6.  Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

FIRSTENERGY

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of February, 2021.

<div style="margin-left:40%">

CITY OF IRVING SUPPLEMENTAL
BENEFIT PLAN

By: _____
Brad Duff, Chairman

</div>

FIRSTENERGY

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Bond**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 06/23/2020 | 2.25% due 09/01/2030 | 30,000 | $100.08 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on February 26, 2021, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Brian E. Cochran
BRIAN E. COCHRAN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  bcochran@rgrdlaw.com

1 –

# Mailing Information for a Case 2:20-cv-03785-ALM-KAJ Owens v. FirstEnergy Corp. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Daniel E. Barenbaum**
  dbarenbaum@bermantabacco.com,sfservice@bermantabacco.com

- **Jordan M. Baumann**
  jbaumann@jonesday.com

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **Peter Borkon**
  pborkon@bfalaw.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James Rubin Cummins**
  jcummins@cumminslaw.us,hpoindexter@cumminslaw.us,docket@cumminslaw.us

- **Justin Robert Donoho**
  jdonoho@bakerlaw.com

- **Marjorie P Duffy**
  mpduffy@jonesday.com,epalmer@jonesday.com,rfargabrite@jonesday.com

- **Robert Stephen Faxon**
  rfaxon@jonesday.com

- **Jason A. Forge**
  JForge@rgrdlaw.com

- **Sarah V. Geiger**
  sgeiger@kmklaw.com,mtrue@kmklaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,cbarrett@rgrdlaw.com,e_file_sd@rgrdlaw.com,christina@rgrdlaw.com

- **Daniel Richard Karon**
  dkaron@karonllc.com,cgood@karonllc.com,bhollowell@karonllc.com

- **Nicole Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com

- **Albert Grant Lin**
  alin@bakerlaw.com,phubbard@bakerlaw.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,murray@ecf.courtdrive.com

- **Danielle S. Myers**
  DMyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Carole Schwartz Rendon**
  crendon@bakerlaw.com

- **Geoffrey J. Ritts**
  gjritts@jonesday.com

- **Darren J Robbins**
  tedp@rgrdlaw.com

- **William Scherman**
  wscherman@gibsondunn.com

- **Victoria Lynn Serrani**
  vlserrani@bmdllc.com

- **Christopher W.H. Sullivan**
  csullivan@gibsondunn.com

- **Joseph J. Tabacco, Jr.**
  jtabacco@bermantabacco.com

- **Robert J Wagoner**
  Lainie@wagonerlawoffice.com,bob@wagonerlawoffice.com

- **F. Joseph Warin**
  fwarin@gibsondunn.com

- **Daniel Rubin Warren**
  dwarren@bakerlaw.com

- **Lesley Weaver**
  lweaver@bfalaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)