# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE FIRSTENERGY CORP. SECURITIES LITIGATION, <br><br> This document relates to: <br><br>     ALL ACTIONS. | Case No. 2:20-cv-03785-ALM-KAJ <br><br> Chief Judge Algenon L. Marbley <br><br> Magistrate Judge Kimberly A. Jolson |

## MEMORANDUM OF LAW IN SUPPORT OF THE FIRSTENERGY DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

Geoffrey J. Ritts, Trial Attorney (0062603)
Robert S. Faxon (0059678)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Email:  gjritts@jonesday.com
Email:  rfaxon@jonesday.com

Marjorie P. Duffy (0083452)
Jordan M. Baumann (0093844)
JONES DAY
325 John H. McConnell Boulevard, Suite 600
Columbus, OH  43215-2673
Telephone:  (614) 469-3939
Facsimile:  (614) 461-4198
Email:  mpduffy@jonesday.com
Email:  jbaumann@jonesday.com

*Attorneys for Defendants FirstEnergy Corp., James F. Pearson, Steven E. Strah, K. Jon Taylor, Jason J. Lisowski, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, and Leslie M. Turner*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ vi

STATEMENT REQUESTING ORAL ARGUMENT ........................................ xviii

INTRODUCTION ................................................................................................ 1

RELEVANT BACKGROUND ............................................................................ 2

    A.    FirstEnergy And Its Exercise Of First Amendment Rights In 2017 And 2018 ........................................................................................................ 2

    B.    2019 Objections To Bankruptcy Plan Of Reorganization ..................... 4

    C.    HB6's Introduction In 2019 And Its Subsequent Enactment ................. 4

    D.    The Government's Complaint In 2020 Against Others For Their Alleged Misuse of Generation Now's Funds ...................................................... 5

    E.    Shareholders And Consumers Sue ........................................................ 6

    F.    This Lawsuit ............................................................................................ 6

LEGAL STANDARDS ........................................................................................ 7

Demanding pleading standards apply here.  Plaintiffs must satisfy Rule 9(b) for the claims under Rule 10b-5.  *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 2006 WL 469468, at *21 (S.D. Ohio Feb. 27, 2006) ("*Nat'l Century I*").  The PSLRA imposes additional requirements to plead misstatements,  *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009) ("*Omnicare I*"), and "[e]xacting pleading requirements for pleading scienter."  *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008).  Because the Complaint's claims under the Securities Act are based on fraudulent conduct, they too are subject to Rule 9(b).  *Omnicare I*, 583 F.3d at 948.

ARGUMENT ........................................................................................................ 9

I.    The Complaint Fails To Plead Any False Statement Or Deceptive Act With Particularity ...................................................................................................... 9

    A.    The Complaint Fails To Plead With Particularity Any Underlying Illegal Acts ............................................................................................ 9

The Complaint alleges (1) FirstEnergy's statements about legal compliance and internal controls were misleading because they did not disclose the "Bailout Scheme," and (2) the "Bailout Scheme" was a scheme to defraud investors in violation of Rule 10b-5(a) and (c). But the Complaint fails to plead underlying illegal acts with particularity as required by the PSLRA.  *Gamm v. Sanderson Farms Inc.*, 944 F.3d 455, 465 (2d Cir. 2019).

1.      The Complaint Never Identifies Any Law Or Regulation
        Supposedly Violated By Any Defendant.............................................. 11

At a minimum, pleading an underlying illegal act with particularity requires identifying a law or regulation that the underlying conduct violated. *Dailey v. Medlock*, 551 F. App'x 841, 849 (6th Cir. 2014). The Complaint does not.

2.      The Factual Allegations Do Not Support Any Legal Theory To
        Which The Complaint Even Alludes..................................................... 12

Even if the Complaint had identified a statute or regulation that Defendants supposedly violated, the theories one might read into it—bribery, campaign-finance violations, RICO violations, or conspiracy—are not supported by particularized facts.

A political contribution is a "bribe" only if payments are made in return for an ***explicit*** promise by the official to perform or not to perform a ***specific*** official act. *McCormick v. United States*, 500 U.S. 257, 273 (1991); *Evans v. United States*, 504 U.S. 255, 269 (1992); *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013); *Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1034 (N.D. Ohio 2013). The Complaint pleads no specific facts about any such agreement.

Plaintiffs allege "[i]llegally large and concealed campaign contributions," but do not identify any specific "contribution," explain how it violated a law or regulation as to size or disclosure, or connect specific individuals to it. Anonymous contributions to Section 501(c)(4) organizations are legal. *NorCal Tea Party Patriots v. Internal Revenue Serv.*, 2016 WL 8202966, at *3 (S.D. Ohio Nov. 22, 2016).

There are no particularized facts regarding any Defendant's participation in racketeering activity as defined by the statute, let alone a pattern of racketeering activity. *Huff*, 972 F. Supp. 2d at 1034-35. Conspiracy requires "an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). The Complaint has no particularized facts about any such agreement.

II.   The Failure To State A Claim With Respect To Statements Or Actions In
      2017 and 2018 Is Especially Glaring ............................................................ 24

      A.     The Complaint Fails To Plead Contemporaneous Falsity As To
             Statements In 2017 And 2018 ......................................................... 24

             1.      There Is No Liability For "Fraud By Hindsight." .............................. 24

There is no "fraud by hindsight." *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1042 (6th Cir. 1991); *Dailey*, 551 F. App'x at 846. A statement is actionable only if it was false or misleading at the time it was made. *Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1025 (S.D. Ohio 2004) (Marbley, C.J.).

2.      The Complaint Lacks Particularized Facts Showing That Any
        Statement In 2017 Or 2018 Was False When Made ........................... 25

Many of the purportedly misleading statements cannot possibly serve as predicates for liability because they were made in 2017 and 2018—well before the alleged misconduct relating to the introduction and adoption of HB6 in 2019. *Dailey*, 551 F. App'x at 846; *Albert Fadem Tr.*, 334 F. Supp. 2d at 1025.

**B.**      **The Complaint Lacks Particularized Facts Showing The Existence Of A Deceptive "Scheme" In 2017 Or 2018 ........................................................... 29**

Just as there can be no "fraud-by-hindsight" for misstatements, conduct cannot form the basis of a scheme liability claim unless it is inherently deceptive when performed and directly connected to specific securities transactions. *In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 909 (S.D. Ohio 2008) ("*Nat'l Century II*"). The alleged conduct in 2017 and 2018—a flight on a corporate jet, a newspaper article, campaign or political contributions, and contacts with Householder or his associates—is not "market activity" that was directly connected to the sale of securities. *Nat'l Century I*, 2006 WL 469468, at *21. Nor is any of that conduct "in itself deceptive." *Nat'l Century II*, 553 F. Supp. 2d at 909.

**III.**    **The Complaint Fails To Plead A Strong Inference Of Scienter As To The Exchange Act Claims ..................................................................................... 30**

     **A.**      **Plaintiffs Must Plead Particularized Facts Showing Actual Knowledge ...... 30**

Scienter is an element of both a misrepresentation claim under Rule 10b-5(b) and a scheme liability claim under parts (a) and (c). *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th Cir. 2009); *Nat'l Century I*, 2006 WL 469468, at *21. Where, as here, an alleged misstatement or omission concerns "soft information," a plaintiff must plead facts showing the statement was "made with knowledge of its falsity." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014). Actual knowledge is also required for a scheme liability claim because Rule 10b-5(a) and (c) prohibits employing a "device," "scheme" or "artifice to defraud." *See Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490, at *13 (S.D. Ohio May 11, 2021).

     **B.**      **Plaintiffs' Failure To Plead Any Underlying Illegal Act With Particularity Precludes A Strong Inference Of Scienter ................................ 33**

The failure to plead illegal underlying acts with particularity precludes a strong scienter inference under even a recklessness standard, far less the applicable standard of actual knowledge. *Das v. Rio Tinto, PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018); *Albert Fadem Tr.*, 334 F. Supp. 2d at 1026; *Zaluski*, 527 F.3d at 574.

     **C.**      **The Complaint's Allegations Purportedly Showing Scienter Fall Short ...... 36**

Scienter must be pleaded, with particularity, as to each Exchange Act Defendant. *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 986 (S.D. Ohio 2008). As to some Defendants, Plaintiffs do not even try; as to the others, they offer insufficient allegations.

         **1.**      **Allegations About After-The-Fact "Admissions," Employment Actions, And Lawsuits Do Not Plead Scienter ..................................... 37**

The after-the-fact actions identified in the Complaint cannot show scienter. The purported "admissions" do not discuss illegal conduct, but instead indicate that violations of internal policies occurred, which does not suffice. *Das*, 332 F. Supp. 3d at 815. Guilty pleas by third parties cannot raise a scienter inference as to any Defendant. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008); *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003). Nor can employment actions. *Das*, 332 F. Supp. 3d at 814-15; *Fla. Carpenters Reg'l Council*

*Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 889 (N.D. Ohio 2013), a*ff'd sub nom. In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356 (6th Cir. 2014).

**2.     Allegations About A "Direct Participation" And A "Cover Up" Do Not Plead Scienter** ........................................................... 40

The assertions of "direct participation" in the supposed scheme attempt to impute scienter based on employment title in the face of binding precedent foreclosing that inference. *PR Diamonds*, 364 F.3d at 688; *Konkol*, 590 F.3d at 397.

**3.     Allegations About "Magnitude" Of Contributions To Generation Now Do Not Plead Scienter** ................................................ 43

Plaintiffs' attempt to plead scienter based on "magnitude" ignores Sixth Circuit precedent. *Fidel v. Farley*, 392 F.3d 220, 231 (6th Cir. 2004); *La. Sch. Emp's. Ret. Sys.*, 622 F.3d at 483-84.

**4.     Allegations About Capital, Credit Ratings, And Performance-Based Compensation Do Not Plead Scienter** ....................................... 45

Allegations about debt-and-equity issuances, a desire to maintain a good credit rating, and performance-based compensation concern generic motives that do not support an inference of scienter. *PR Diamonds*, 364 F.3d at 690; *In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 859 (S.D. Ohio 2016) (Marbley, C.J.).

**5.     Allegations About Stock Trading Do Not Plead Scienter** .................. 46

The mere sale of stock does not support an inference of scienter. *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc*., 537 F.3d 527, 543 (5th Cir. 2008). Several Officer Defendants *increased* their holdings during the class period, which undermines any inference of scienter. *Smallen v. Western Union Co.*, 950 F.3d 1297, 1310-11 (10th Cir. 2020); *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015).

**IV.   The Complaint Fails To State A Claim For Scheme Liability** .................................... 49

**A.     The Complaint Fails To Plead That The Alleged Scheme Occurred "In Connection With" The Purchase Or Sale Of Any Security** .................... 49

To be actionable, a "scheme" must have occurred "in connection with the purchase or sale of securities." *Nat'l Century I*, 2006 WL 469468, at *21; *Hawaii Ironworkers Annuity Tr. Fund v. Cole*, 296 F.R.D. 549, 553-54 (N.D. Ohio 2013). 10b-5(a) and (c) concern "market manipulation," which requires market activity, such as wash sales, matched orders, or rigged prices. *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 249 (S.D.N.Y. 2018). The Complaint alleges no facts about any market activity by any Defendant, and never ties any of its allegations about "bribery" or campaign contributions to any securities transaction. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017)

**B.     The Complaint Fails To Plead Reliance On Any Allegedly Deceptive Conduct** ............................................................... 52

A scheme-liability claim fails without reliance on the deceptive acts that constitute the scheme. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008); *Nat'l*

*Century II*, 553 F. Supp. 2d at 911. If the alleged scheme is not disclosed until after the class period, as here, there is no reliance. *Hawaii Ironworkers*, 296 F.R.D. at 555.

**C.** **The Complaint Fails To Plead With Particularity That The Alleged Underlying Acts Were Inherently Deceptive**................................................... **55**

To state a scheme-liability claim, Plaintiffs must allege that Defendants engaged in conduct that is "in itself deceptive." *Nat'l Century II*, 553 F. Supp. 2d at 909. Contributing to a 501(c)(4) organization is not inherently deceptive, so this claim fails.

**D.** **The Complaint Fails To Plead With Particularity That Every Exchange Act Defendant Engaged In An Inherently Deceptive Act**............. **58**

The Complaint fails to state a claim under Rule 10b-5(a) and (c) as to those Defendants who are not alleged with particularity to have participated in the alleged scheme. *Nat'l Century II*, 553 F. Supp. 2d at 911; *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 986 (8th Cir. 2012). This includes at least Taylor, Strah, and Pearson.

**V.** **The Complaint Fails To State A Claim For Misstatement Liability For Additional Reasons** ...................................................... **59**

**A.** **The Complaint Fails To Plead Falsity As To Statements Of Opinion** .......... **60**

Opinions can give rise to liability only if the speaker did not hold the belief professed or had specific contradictory information. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-97 (2015). The statements about assessments of compliance efforts and the efficacy of internal controls, the merits of HB6, and corporate aims and policies all are opinions, but the Complaint has no specific facts showing that any Defendant did not believe them. *Id.* at 179-80; *Sofamor Danek*, 123 F.3d at 402.

**B.** **The Complaint Fails To Plead An Actionable Omission**................................ **63**

Because Plaintiffs fail to plead illegal conduct with particularity, they cannot allege that Defendants violated the securities laws by not disclosing those purported acts. *Dailey*, 551 F. App'x at 846; *Zaluski*, 527 F.3d at 575. Statements about codes of conduct were not misleading because a "declaration of corporate aspirations" is "not actionable" as a matter of law. *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015). The generalized statements of compliance were not rendered misleading by the nondisclosure of the underlying allegedly illegal acts. *Dailey*, 551 F. App'x at 849.

**VI.** **The Section 12(a)(2) Claim Against The Non-Management Directors Must Be Dismissed Because They Are Not Statutory Sellers**.................................................... **66**

The Section 12(a)(2) claims against the outside directors fail because the Complaint does not allege they were "statutory sellers." *EveryWare*, 175 F. Supp. 3d at 868-69.

**VII.** **The Complaint Fails To State A Claim For Control Liability**.................................... **67**

The Complaint's failure to state a claim for primary liability requires dismissal of the claims under § 20(a) of the Exchange Act and § 15 of the Securities Act. *IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325, 328 (6th Cir. 2017).

**CONCLUSION** ...................................................................................... **67**

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008) ................................................................................8

*Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*,
  625 F.3d 185 (5th Cir. 2010) ............................................................................54

*Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*,
  334 F. Supp. 2d 985 (S.D. Ohio 2004) ...................................................... *passim*

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ......................................................................48

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................................15

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) .........................................................11, 64, 65

*Borsellino v. Goldman Sachs Grp., Inc.*,
  477 F.3d 502 (7th Cir. 2007) ..............................................................................8

*Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004).................................................................................8

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ........................................................................65

*Citizens United v. FEC*,
  558 U.S. 310 (2010).....................................................................................13, 35

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ............................................................................60

*City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*,
  865 F. Supp. 2d 811 (W.D. Mich. 2012) .....................................................32, 62

*Conley v. Gibson*,
  355 U.S. 41 (1957)..............................................................................................15

*Corsair Capital Partners, L.P. v. Wedbush Morgan Secs., Inc.*,
　24 F. App'x 795 (9th Cir. 2001) ............................................................50

*Cosby v. KPMG, LLP*,
　2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) .......................................54

*Cozzarelli v. Inspire Pharm. Inc.*,
　549 F.3d 618 (4th Cir. 2008) ...................................................................8

*Craftmatic Sec. Litig. v. Kraftsow*,
　890 F.2d 628 (3d Cir. 1989)....................................................................66

*D.E. & J Ltd. P'ship v. Conaway*,
　284 F. Supp. 2d 719 (E.D. Mich. 2003)..................................................61

*Dailey v. Medlock*,
　551 F. App'x 841 (6th Cir. 2014) ................................................. *passim*

*Das v. Rio Tinto, PLC*,
　332 F. Supp. 3d 786 (S.D.N.Y. 2018).......................................... *passim*

*Davisson v. Ford Motor Co.*,
　2014 WL 4377792 (S.D. Ohio Sept. 3, 2014) ..........................................8

*Dimora v. United States*,
　973 F.3d 496 (6th Cir. 2020) .................................................................28

*Dobina v. Weatherford Int'l Ltd.*,
　909 F. Supp. 2d 228 (S.D.N.Y. 2012)....................................................61

*Emps. Ret. Sys. of the City of St. Louis v. Jones*,
　2021 WL 1890490 (S.D. Ohio May 11, 2021) ......................................33

*Evans v. United States*,
　504 U.S. 255 (1992)..........................................................................14, 15

*Evanston Ins. Co. v. Desert State Life Mgmt.*,
　484 F. Supp. 3d 987 (D.N.M. 2020) .......................................................20

*Ferron v. SubscriberBase Holdings, Inc.*,
　2009 WL 650731 (S.D. Ohio Mar. 11, 2009)...........................................8

*Fidel v. Farley*,
　392 F.3d 220 (6th Cir. 2004) .................................................................43

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) ................................................................48

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978) ..................................................................13, 18

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
    964 F. Supp. 2d 875 (N.D. Ohio 2013),
    aff'd sub nom. *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356 (6th Cir. 2014) ....................39

*Forman v. Meridian Bioscience, Inc.*,
    367 F. Supp. 3d 674 (S.D. Ohio 2019) ................................................................65

*Frank v. Dana Corp.*,
    547 F.3d 564 (6th Cir. 2008) ................................................................7, 9

*Friedman v. Endo Int'l PLC*,
    2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ................................................................30, 35

*FTC v. Super. Ct. Trial Lawyers Ass'n*,
    493 U.S. 411 (1990) ................................................................13

*Gamm v. Sanderson Farms Inc.*,
    944 F.3d 455 (2d Cir. 2019) ................................................................ *passim*

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................48

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ................................................................38

*Gordon v. Elite Consulting Grp. L.L.C.*,
    2009 WL 4042911 (E.D. Mich. Nov. 19, 2009) ................................................................53

*Gordon v. Royal Palm Real Est. Inv. Fund I*,
    2020 WL 2836312 (E.D. Mich. May 31, 2020) ................................................................57

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ................................................................22

*Halbert v. Credit Suisse AG*,
    402 F. Supp. 3d 1288 (N.D. Ala. 2019) ................................................................33

*Hampton v. root9B Techs., Inc.*,
  897 F.3d 1291 (10th Cir. 2018) ............................................................60

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*,
  296 F.R.D. 549 (N.D. Ohio 2013) ....................................................49, 54

*Hogan v. Pilgrim's Pride Corp.*,
  2018 WL 1316979 (D. Colo. Mar. 14, 2018) ........................................10

*Huff v. FirstEnergy Corp.*,
  972 F. Supp. 2d 1018 (N.D. Ohio 2013).......................................... *passim*

*Iannelli v. United States*,
  420 U.S. 770 (1975)................................................................................23

*In re Alstom SA*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)............................................30, 56, 58

*In re AT&T/DirecTV Now Sec. Litig.*,
  480 F. Supp. 3d 507 (S.D.N.Y. 2020).....................................................56

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006).............................................10, 21, 35

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)............................................29, 64, 65

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017)................................................63, 64

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)..................................................................47

*In re Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018)................................................50, 52

*In re Century Bus. Servs. Sec. Litig.*,
  2002 WL 32254513 (N.D. Ohio Jun. 27, 2002) ....................................25

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ..................................................................40

*In re Comshare Inc. Sec. Litig.*,
  183 F.3d 542 (6th Cir. 1999) .......................................................31, 34, 46

*In re Diebold Sec. Litig.*,
    2008 WL 3927467 (N.D. Ohio Aug. 22, 2008) ........................................................43

*In re DNTW Chartered Accountants Sec. Litig.*,
    172 F. Supp. 3d 675 (S.D.N.Y. 2016) ...................................................................38

*In re DVI, Inc. Sec. Litig.*,
    919 F. Supp. 2d 498 (E.D. Pa. 2013) ....................................................................54

*In re Dynagas LNG Partners LP Sec. Litig.*,
    2020 WL 6947521 (S.D.N.Y. Nov. 25, 2020) ........................................................60

*In re EveryWare Global, Inc. Sec. Litig.*,
    175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom. IBEW Loc. No. 58*
    *Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) ......................... *passim*

*In re Extreme Networks, Inc. Secs. Litig.*,
    2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ........................................................39

*In re First Union Corp. Sec. Litig.*,
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ..................................................................48

*In re Ford Motor Co., Sec. Litig.*,
    381 F.3d 563 (6th Cir. 2004) ..............................................................................62

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
    436 F. Supp. 2d 873 (N.D. Ohio 2006) .................................................................46

*In re Huffy Corp. Sec. Litig.*,
    577 F. Supp. 2d 968 (S.D. Ohio 2008) .................................................................36

*In re Huntington Bancshares Inc. Sec. Litig.*,
    674 F. Supp. 2d 951 (S.D. Ohio 2009) ......................................................... *passim*

*In re Immucor, Inc., Sec. Litig.*,
    2011 WL 2619092 (N.D. Ga. Jun. 30, 2011) ....................................................10, 17

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ...................................................................17

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ....................................................................25

*In re Mirant Corp. Sec. Litig.*,
    2009 WL 48188 (N.D. Ga. Jan. 7, 2009) ........................................................................11, 12

*In re Nat'l Auto Credit, Inc. Sec. Litig.*,
    1999 WL 33919791 (N.D. Ohio Oct. 12, 1999) ....................................................................27

*In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*,
    553 F. Supp. 2d 902 (S.D. Ohio 2008) ....................................................................... *passim*

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
    2006 WL 469468 (S.D. Ohio Feb. 27, 2006) ............................................................... *passim*

*In re NationsMart Corp. Sec. Litig.*,
    130 F.3d 309 (8th Cir. 1997) ..............................................................................................8

*In re Nature's Sunshine Prod. Sec. Litig.*,
    2008 WL 4442150 (D. Utah Sept. 23, 2008) ......................................................................53

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ...........................................................................................65

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) .......................................................................................31, 32

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) ...........................................................................30, 56

*In re Parmalat Sec. Litig.*,
    414 F. Supp. 2d 428 (S.D.N.Y. 2006) .................................................................................31

*In re Refco, Inc. Sec. Litig.*,
    609 F. Supp. 2d 304 (S.D.N.Y. 2009) .................................................................................54

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ..............................................................................................8

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012) .................................................................................53

*In re Sofamor Danek Grp., Inc.*,
    123 F.3d 394 (6th Cir. 1997) .......................................................................................32, 61

*In re Sun Healthcare Group, Inc. Sec. Litig.*,
    181 F. Supp. 2d 1283 (D.N.M. 2002) .................................................................................48

*In re TransDigm Grp., Inc. Sec. Litig.*,
 440 F. Supp. 3d 740 (N.D. Ohio 2020)....................................................................64

*In re Tupperware Brands Corp. Secs. Litig.*,
 2021 WL 247870 (M.D. Fla. Jan. 25, 2021)..........................................................33

*In re Tyson Foods, Inc. Sec. Litig.*,
 275 F. Supp. 3d 970 (W.D. Ark. 2017)......................................................10, 35, 48

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
 537 F.3d 527 (5th Cir. 2008) ....................................................................................47

*Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v.
 Omnicare, Inc.*,
 583 F.3d 935 (6th Cir. 2009) ..........................................................................7, 8, 32

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) .......................................................50

*Katz v. Image Innovations Holdings, Inc.*,
 542 F. Supp. 2d 269 (S.D.N.Y. 2008).....................................................................53

*Konkol v. Diebold, Inc.*,
 590 F.3d 390 (6th Cir. 2009) ............................................................................*passim*

*Kushner v. Beverly Enters., Inc.*,
 317 F.3d 820 (8th Cir. 2003) .............................................................................34, 38

*La. Mun. Police Emps. Ret. Sys. v. KPMG, LLP*,
 2012 WL 3903335 (N.D. Ohio Aug. 31, 2012) .....................................................49

*La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*,
 622 F.3d 471 (6th Cir. 2010) .............................................................................37, 43

*Lentell v. Merrill Lynch & Co., Inc.*,
 396 F.3d 161 (2d Cir. 2005).....................................................................................50

*Ley v. Visteon Corp.*,
 543 F.3d 801 (6th Cir. 2008), *abrogated on other grounds by
 Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) .......................42, 44, 46

*Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v.
 Fifth Third Bancorp*,
 731 F. Supp. 2d 689 (S.D. Ohio 2010) ...........................................................8, 9, 45

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)............................................................................................63

*McCormick v. United States*,
  500 U.S. 257 (1991)....................................................................................14, 18

*McCutcheon v. FEC*,
  572 U.S. 185 (2014)............................................................................................13

*McDonnell v. United States*,
  136 S. Ct. 2355 (2016)....................................................................................14, 28

*Melder v. Morris*,
  27 F.3d 1097 (5th Cir. 1994) ..............................................................................8

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017)..............................................49, 50, 51, 55

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)......................................................... *passim*

*Mierzwa v. Safe & Secure Self Storage, LLC*,
  493 F. App'x 273 (3d Cir. 2012) ........................................................................24

*Moon v. Harrison Piping Supply*,
  465 F.3d 719 (6th Cir. 2006) ..............................................................................22

*NAACP v. Alabama*,
  357 U.S. 449 (1958)............................................................................................13

*Nardy v. Chipotle Mexican Grill, Inc.*,
  2019 WL 3297467 (D. Colo. Mar. 29, 2019) .......................................................65

*NorCal Tea Party Patriots v. Internal Revenue Serv.*,
  2016 WL 8202966 (S.D. Ohio Nov. 22, 2016)..........................................3, 21, 34

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)................................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..............................................................................60, 61, 62

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000)................................................................................65

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) ................................................................................53

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ...............................................................31, 40, 45

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) ...........................................................................10, 58

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ...........................................................................47, 55

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987) ...............................................................................63

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...............................................................................8, 9

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ...............................................................................66

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011) ..................................................................45

*S.E.C. v. Goldstone*,
    952 F. Supp. 2d 1060 (D.N.M. 2013) ..................................................................56

*S.E.C. v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ..............................................................30, 59

*S.E.C. v. Lucent Techs., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ..................................................................56, 57

*S.E.C. v. Narayan*,
    2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) ...........................................51, 56, 57

*S.E.C. v. Sierra Brokerage Servs., Inc.*,
    608 F. Supp. 2d 923 (S.D. Ohio 2009), *aff'd*, 712 F.3d 321 (6th Cir. 2013) ...........................50

*S.E.C. v. St. Anselm Expl. Co.*,
    936 F. Supp. 2d 1281 (D. Colo. 2013) ..................................................................56

*Salinas v. United States*,
    522 U.S. 52 (1997) ...........................................................................22, 23, 29

*Schiro v. Cemex, S.A.B. de C.V.*,
　　438 F. Supp. 3d 194 (S.D.N.Y. 2020) ............................................................... *passim*

*Sears v. Likens*,
　　912 F.2d 889 (7th Cir. 1990) ......................................................................................8

*Shaw v. Digital Equip. Corp.*,
　　82 F.3d 1194 (1st Cir. 1996), *superseded by statute on other grounds*,
　　15 U.S.C. § 78u-4(b)(1)(2) ........................................................................................66

*Shoemaker v. Cardiovascular Sys., Inc.*,
　　2017 WL 1180444 (D. Minn. Mar. 29, 2017) ................................................10, 12

*Siegmund v. Xuelian Bian*,
　　2018 WL 1611197 (S.D. Fla. Apr. 2, 2018) .............................................................53

*Sinay v. Lamson & Sessions Co.*,
　　948 F.2d 1037 (6th Cir. 1991) ...................................................................................24

*Smallen v. Western Union Co.*,
　　950 F.3d 1297 (10th Cir. 2020) .................................................................................47

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
　　365 F.3d 353 (5th Cir. 2004) .....................................................................................40

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
　　552 U.S. 148 (2008) .........................................................................................52, 53, 54

*Tadros v. Celladon Corp.*,
　　2016 WL 5870002 (S.D. Cal. Oct. 7, 2016) ...........................................................39

*Teamsters Local 456 Pens. Fund v. Universal Health Servs.*,
　　2020 WL 2063474 (E.D. Pa. Apr. 29, 2020) ..........................................................38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007) ........................................................................................... *passim*

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*,
　　612 F. Supp. 2d 267 (S.D.N.Y. 2009) ......................................................................54

*Tongue v. Sanofi*,
　　816 F.3d 199 (2d Cir. 2016) ......................................................................................60

*Ulbricht v. Ternium S.A.*,
    2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020) .........................................................42, 64, 65

*United States v. Siegelman*,
    640 F.3d 1159 (11th Cir. 2011) ...............................................................................15, 17, 18

*United States v. Sittenfeld*,
    -- F. Supp. 3d --, 2021 WL 779136 (S.D. Ohio Mar. 1, 2021) .........................................14, 15

*United States v. Terry*,
    707 F.3d 607 (6th Cir. 2013) ..............................................................................14, 15, 16, 27

*Wagner v. First Horizon Pharm. Corp.*,
    464 F.3d 1273 (11th Cir. 2006) ................................................................................................8

*West Palm Beach Firefighters Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020) ...............................................................................20, 60

*Zaluski v. United Am. Healthcare Corp.*,
    527 F.3d 564 (6th Cir. 2008) (Cole, J.)........................................................................ *passim*

*Zamir v. Bridgepoint Educ., Inc.*,
    2016 WL 3971400 (S.D. Cal. July 25, 2016) .........................................................................48

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................................................................42

## Rules

Rule 9(b) .................................................................................................................... *passim*

Rule 10b-5..................................................................................................................... *passim*

Rule 10b-5(a) ................................................................................................................ *passim*

Rule 10b-5(b) ................................................................................................................ *passim*

Rule 10b-5(c) ................................................................................................................ *passim*

## Statutes

17 C.F.R. § 229.04 ..................................................................................................................65

17 C.F.R. § 229.105 ................................................................................................................65

17 C.F.R. § 240.10b-5 ............................................................................................49

17 C.F.R. § 240.10b-5(a) ........................................................................................32

17 C.F.R. § 240.10b-5(c) ........................................................................................32

15 U.S.C. § 77l(a)(2) ..............................................................................................66

15 U.S.C. § 78u-4(b) ..............................................................................................66

15 U.S.C. § 78u-4(b)(1) ..........................................................................................10

15 U.S.C. § 78u-4(b)(2) ..........................................................................................31

18 U.S.C. 1961(1) ...................................................................................................22

18 U.S.C. § 1962(c) ................................................................................................22

18 U.S.C. § 1962(d) ................................................................................................23

## <u>STATEMENT REQUESTING ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(b), the FirstEnergy Defendants respectfully request oral argument on this motion.  The FirstEnergy Defendants submit that, given the complexity of the legal issues presented in this matter, oral argument may aid the Court's consideration of this motion.

## INTRODUCTION

At its core, the Complaint trades on guilt-by-association, instead of pleading particularized facts as required.  It alleges that certain people who are not parties to this case (former Ohio House Speaker Larry Householder and some of his associates) engaged in unlawful conduct and that a few Defendants here interacted with those wrongdoers.[1]  Based on the nature of the alleged or admitted wrongdoing by others, Plaintiffs ask the Court to conclude that certain of the Defendants here also engaged in misconduct.  But the Complaint lacks the requisite details to support that conclusion, under the high pleading standards that apply to securities claims.

The crux of the Complaint is its assertion that the Defendants violated the securities laws by committing illegal acts relating to Ohio House Bill 6 and/or not disclosing them to investors.  But no underlying "illegal" act is pleaded with anything near the degree of particularity required by the Private Securities Litigation Reform Act or Rule 9(b).  The Complaint does not plead specific facts about:

- Any law or regulation that any Defendant supposedly violated;

- Any act by a Defendant that was not protected by the First Amendment;

- Any explicit *quid pro quo* agreement that converted a political contribution into a "bribe" or any specific "official act";

- Any legal requirement that contributions to social-welfare organizations be disclosed or any legal limitation on the amounts that may be contributed; or

- Any agreement between Householder or his associates and any Defendant to commit any unlawful act.

---

[1] Unless otherwise noted, "Defendants" refers to all individuals and entities named as defendants in the Complaint.  "Exchange Act Defendants" refers to FirstEnergy and the Officer Defendants, as defined in the Complaint, against whom Plaintiffs have filed claims under the Securities Exchange Act of 1934 ("Exchange Act").

The First Energy Defendants (FirstEnergy Corp., James F. Pearson, Steven E. Strah, K. Jon Taylor, Jason J. Lisowski, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, and Leslie M. Turner) hereby join in the arguments set forth in the motions of the other defendants.

The Complaint's failure to plead scienter independently requires dismissal of the Exchange Act claims. The Complaint must plead specific facts showing that every alleged misstatement was made with knowledge of its falsity or that each Defendant knowingly engaged in a deceptive scheme. The Complaint does not do this, and it never confronts the opposing, compelling inference that the Exchange Act Defendants at all times believed they were engaging in the political process by legal means. There are other reasons, too, why the Complaint should be dismissed in its entirety, as its pleading failures pervade every claim.

As this Court has acknowledged and as the Sixth Circuit has affirmed, allegations of wrongdoing do not suffice to state a claim for violation of the securities laws. *See, e.g.*, *Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1010, 1028 (S.D. Ohio 2004) (Marbley, C.J.) (dismissing complaint, while "acknowledging that some wrongdoing has been alleged in the [complaint]"); *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 568 (6th Cir. 2008) (Cole, J.) (affirming dismissal of securities complaint involving illegal payments by defendant corporation to state senator). So it is here. The Complaint should be dismissed.

## RELEVANT BACKGROUND[2]

### A.     FirstEnergy And Its Exercise Of First Amendment Rights In 2017 And 2018

Defendant FirstEnergy Corp. ("FirstEnergy" or the "Company") is an Ohio corporation based in Akron. (¶ 27.) FirstEnergy and its subsidiaries transmit, distribute, and generate electricity, serving more than six million customers in the Midwest and Mid-Atlantic regions.

---

[2] Paragraph references are to the Complaint, the well-pled allegations of which are taken as true solely for purposes of this motion. Internal quotations and citations are omitted and emphases added unless otherwise noted.

On this motion, the Court may consider documents incorporated into the Complaint by reference and matters of which the Court may take judicial notice, including filings with the Securities and Exchange Commission. *In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 850 (S.D. Ohio 2016) (Marbley, C.J.), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017). Documents properly considered here are being submitted as exhibits to the Declaration of Geoffrey J. Ritts and are referred to as "Ex. __."

(*Id.*) Like other energy companies, FirstEnergy monitors legislative developments and participates in the legislative process to further the interests of the Company and its shareholders. (*E.g.*, Ex. A, 2021 10-K at 3-4.)

FirstEnergy has long advocated for policies supportive of Ohio's nuclear-power resources, which supply carbon-free and reliable electricity to the grid. In 2017, FirstEnergy disclosed its efforts to obtain legislative aid in preserving two nuclear power plants controlled by its then-nuclear-energy affiliate. (¶ 103.) Also in 2017, the Company announced its hope for "legislation for a zero-emission nuclear program" to "preserve valuable nuclear generation" assets and thousands of jobs at the two plants. (*Id.*)

After the zero-emission nuclear legislation failed to pass, FirstEnergy continued to search for a path forward on nuclear-power legislation. Beginning in 2017, FirstEnergy allegedly began contributing to tax-exempt entities called Generation Now and Partners for Progress to promote legislation to create an Ohio Clean Air Program to support nuclear and other renewable resources. Partners for Progress and Generation Now, like other 501(c)(4) social welfare organizations, can engage in issue advocacy and lobbying activities and can make political contributions. *See NorCal Tea Party Patriots v. Internal Revenue Serv.*, 2016 WL 8202966, at *3 (S.D. Ohio Nov. 22, 2016) ("501(c)(4) organizations can engage in limited political activity, but political activity cannot be the primary activity of the organization.").

Over the course of several years, the Complaint alleges that $60 million of contributions were made to 501(c)(4) organizations in support of legislation to promote nuclear power. (*See* ¶ 8.) Of that, the Complaint alleges that approximately 25% of those contributions were made by FirstEnergy, as opposed to other entities such as Energy Harbor Corp. (formerly FirstEnergy Solutions Corp.), which, as the Complaint admits, is a separate corporation that has been under

separate management with a separate board since 2016.  (*See* ¶¶ 45, 153; p. 12 n.1.)

FirstEnergy's total contributions in 2017 and 2018 were only $2.4 million.  (¶ 137.)

FirstEnergy's advocacy for nuclear power was an exercise of its constitutionally protected rights.

*See infra* at 13-14.

The Complaint alleges only a small handful of other events in 2017 and 2018.  The

Complaint alleges that Householder and his sons flew on the Company's plane to the January

2017 presidential inauguration, but provides no details.  (¶ 65.)  The Complaint alleges that two

of the Exchange Act Defendants had phone contacts with Householder or his associates in 2017

and 2018 (before Householder was Speaker), but provides no details.  (¶¶ 222-23.)  Finally, the

Complaint notes that a March 2017 article in a Pennsylvania newspaper stated that FirstEnergy

favored legislation to support nuclear power generation.  (¶ 66.)  *See also infra* at 25-30

(discussing these allegations).

### B.  2019 Objections To Bankruptcy Plan Of Reorganization

In March 2018, FirstEnergy Solutions Corp. ("FES") and FirstEnergy Nuclear Operating

Company, two then-subsidiaries of FirstEnergy, filed for Chapter 11 bankruptcy.  (¶ 45.)  The

Complaint alleges that the proposed plan of reorganization began to draw criticism in early 2019.

(¶¶ 52-57.)  In April 2019, the bankruptcy court "effectively halt[ed] the bankruptcy process."

(¶ 62.)  According to the Complaint, it was only then, after the bankruptcy court declined to grant

FirstEnergy "an express release of liability for the decommissioning expenses," that FirstEnergy

supposedly turned to "a corrupt scheme that would ultimately result in the passage of HB6."

(¶ 63.)

### C.  HB6's Introduction In 2019 And Its Subsequent Enactment

Householder was elected Speaker of the Ohio House of Representatives in 2019.  (¶ 71.)

In February 2019, Samuel Randazzo was appointed chairman of the Public Utilities Commission

of Ohio ("PUCO"), and assumed that role in April 2019.  (¶¶ 193; 216.)  Randazzo allegedly

helped to draft, and supported, HB6.  (¶ 72.)

It was not until April 2019 that Householder introduced HB6 in the Ohio House.  (¶ 73.)

In May 2019, the Ohio House passed HB6.  (¶ 74.)  In July 2019, the Ohio Senate passed an

amended version of the bill.  (¶ 78.)  On July 23, 2019, the House voted to approve the amended

bill, and the Governor signed it into law that same day.  (*Id.*)  At the time HB6 was enacted,

FirstEnergy did not own or operate the Davis-Besse or Perry nuclear plants.  (¶¶ 42, 46, 78.)

Those plants were (and are) owned by Energy Harbor Corp., a separate, publicly traded company

(formerly known as FES).  (¶¶ 42, 45, 46.)

Following HB6's enactment, a campaign to repeal HB6 began.  (¶ 81.)  The Complaint

alleges that FirstEnergy and an "affiliate" made contributions in unstated amounts to

organizations that opposed the repeal campaign, which failed to collect enough signatures to

place a repeal issue on the ballot for the November 2019 election.  (*See* ¶¶ 83, 86, 137)

### D.    The Government's Complaint Against Others For Their Alleged Misuse of Generation Now's Funds

In July 2020, federal prosecutors filed a criminal complaint against Householder,

Generation Now, and four of Householder's associates, alleging that they used Generation

Now's funds for improper purposes to benefit themselves in violation of federal law.  (¶ 143.)

Jeffrey Longstreth and Juan Cespedes, two of Householder's associates, entered guilty pleas in

October 2020.  (¶¶ 69, 171.)  In February 2021, Generation Now entered a guilty plea.  (¶ 205.)

The plea agreements referenced in the Complaint do not identify any individual Defendant in this

action or charge any of them with violations of law.  Nor do they attribute any action to any

Defendant or identify FirstEnergy or any other Defendant as a party to any agreement with

Householder or anyone else. Neither FirstEnergy nor any of its employees have been charged with any crime.

### E. Shareholders And Consumers Sue

Shortly after the government filed the criminal complaint against Householder, several lawsuits were filed. These include shareholder lawsuits, ratepayer class actions, and state and municipal proceedings. (¶ 239.) For example, the Ohio Attorney General filed a civil action in connection with certain charges that were to be imposed under HB6, and a consolidated civil RICO action on behalf of putative classes of ratepayers is pending in this Court. (*Id*.) In addition, the U.S. Attorney's Office for the Southern District of Ohio and the SEC are conducting related investigations. (¶ 240.)

### F. This Lawsuit

Plaintiffs allege that FirstEnergy and certain of its top executives engaged in a "scheme" to enact HB6 "at ratepayers' expense." (¶¶ 3, 8, 75; *see also* ¶ 5 ("ratepayer-funded $1.3 billion bailout" and "ratepayer-funded 'decoupling' provision"); ¶ 74 ("subsidies . . . funded by Ohio ratepayers"); ¶ 81 ("negative impact HB6 would have on Ohio ratepayers").) But this lawsuit is not brought on behalf of ratepayers; it is brought on behalf of "purchasers of FirstEnergy securities." (¶ 1.)

The Complaint alleges that the Exchange Act Defendants made materially false and misleading statements relating to the supposed "scheme" in FirstEnergy's SEC filings and public statements, and that those misstatements, and the supposed underlying "scheme," violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. (¶¶ 268-71.) The Complaint also asserts claims under the Securities Act of 1933 relating to the issuance of two series of notes by FirstEnergy in February and June 2020. (¶¶ 302-09.) "Control person"

claims are alleged against the individuals named as defendants, based upon the asserted substantive violations of the Exchange Act and the Securities Act.  (¶¶ 318-22.)

## LEGAL STANDARDS

Securities complaints must comply with strict pleading standards. To start, Plaintiffs must satisfy Rule 9(b) and its heightened pleading requirements.  As to their claim under Rule 10b-5(a) and (c), Plaintiffs "must specify, with particularity, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue.'"  *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 2006 WL 469468, at *21 (S.D. Ohio Feb. 27, 2006) ("*Nat'l Century I*").  As to their claim under Rule 10b-5(b) for misstatement liability, Rule 9(b) requires "a plaintiff to specify the fraudulent statements, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent."  *In re EveryWare*, 175 F. Supp. 3d at 850.  Further "[b]olstering this rule of specificity," the PSLRA mandates that a complaint alleging violation of Rule 10b-5(b) "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) ("*Omnicare I*").

Then, on top of Rule 9(b), "the PSLRA imposes additional and more '[e]xacting pleading requirements' for pleading scienter in a securities fraud case."  *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008).  Omissions, ambiguities, and gaps in the factual allegations of a complaint count against the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

Because the Complaint's claims under the Securities Act of 1933 are based on fraudulent conduct—the supposed "scheme"—they too are subject to Rule 9(b).  *See, e.g., Omnicare I*, 583 F.3d at 948 (applying Rule 9(b) where Securities Act claims were based on the same factual

allegations as Exchange Act claims).[3]  That is because "Rule 9(b) is not limited to claims of common law fraud or claims which include fraud as one of the elements.  Rather, the heightened pleading requirements apply to 'averments of fraud' or 'claim[s] that sound[] in fraud—in other words, one[s] that [are] premised upon a course of fraudulent conduct.'" *Ferron v. SubscriberBase Holdings, Inc.*, 2009 WL 650731, at *5 (S.D. Ohio Mar. 11, 2009) (quoting *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)); *see also Davisson v. Ford Motor Co.*, 2014 WL 4377792, at *8 (S.D. Ohio Sept. 3, 2014) (Marbley, C.J.) ("It is well-settled that any claim sounding in fraud—not just those alleging a claim of fraud—must meet Rule 9(b)'s pleading standard.").

Though Plaintiffs attempt to disclaim fraud with respect to the Securities Act claims (¶ 304), courts in this Circuit reject such disclaimers where, as here, the substantive allegations sound in fraud.  *See, e.g.*, *Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 709 (S.D. Ohio 2010) ("A blanket disavowal in the complaint that the claims do not allege fraud, however, is insufficient to rescue them from the requirements of Rule 9(b).").  Rather than simply crediting the generalized disclaimer Plaintiffs offer here, courts look to "the wording and imputations of the complaint" and apply Rule 9(b) to

---

[3] Like the Sixth Circuit in *Omnicare I*, courts elsewhere have concluded that the reasons Rule 9(b) applies to fraud claims brought under § 10(b) "apply with equal force" to §§ 11 and 12(a)(2) claims that sound in fraud.  *E.g.*, *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004).  That is why, with the lone exception of the Eighth Circuit, "every circuit court to examine the issue has held, Rule 9(b) applies to allegations under the Securities Act where those allegations sound in fraud." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008).  *See, e.g.*, *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012); *Cozzarelli*, 549 F.3d at 629 (Fourth Circuit); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 68 (1st Cir. 2008); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1275 (11th Cir. 2006); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004); *Rombach*, 355 F.3d at 170-71 (Second Circuit); *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (affirming dismissal of Securities Act and Exchange Act claims for failing to satisfy Rule 9(b)).  *But see In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314-19 (8th Cir. 1997).

allegations of "misleading," "false," and "untrue" statements, because such allegations are those "classically associated with fraud." *Rombach*, 355 F.3d at 172. The Complaint makes those exact allegations as to the Securities Act claims. (*E.g.*, ¶¶ 291, 293, 295, 297 (all regarding allegedly "materially false" and "misleading" and "untrue" statements in the registration statements); ¶ 292 (alleging failure to disclose "illegal bribery scheme").) The Court should give no credence to Plaintiffs' disavowal, which is inconsistent with their allegations. *See Local 295/Local 851*, 731 F. Supp. 2d at 709 ("Plaintiffs' allegation that their Securities Act claims do not sound in fraud is a legal conclusion that the Court does not have to accept as being true.").

## ARGUMENT

### I. THE COMPLAINT FAILS TO PLEAD ANY FALSE STATEMENT OR DECEPTIVE ACT WITH PARTICULARITY.

#### A. The Complaint Fails To Plead With Particularity Any Underlying Illegal Act.

The gravamen of the Complaint is two-fold. First, Plaintiffs assert a claim for misstatement liability under Rule 10b-5(b), based on allegations that statements about FirstEnergy's legal compliance and internal controls were false and misleading because they did not disclose the "illegal," "corrupt" "Bailout Scheme" (¶ 94; *see also* ¶¶ 269, 292), which allegedly included "bribery" (¶¶ 3, 142, 144, 209, 236-37, 292), and "illegally large and illegally concealed" contributions (¶¶ 70, 93).[4] Second, Plaintiffs assert a claim for scheme liability under Rule 10b-5(a) and (c), based on the theory that the supposedly illegal "Bailout Scheme" itself was a scheme to defraud investors. (¶ 270.)[5] The allegedly illegal underlying acts are not

---

[4] The elements of a claim for misstatement liability under § 10(b) of the Exchange Act and Rule 10b-5(b) are: (1) a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages. *Frank*, 547 F.3d at 569.

[5] The elements of a claim for so-called "scheme liability" under § 10(b) of the Exchange Act and Rule 10b-5(a) or (c) are that "the defendant: (1) committed a deceptive or manipulative act (2) with scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants'

pleaded with particularity, however, and so the Complaint fails to state an actionable claim under Rule 10b-5 either for misstatement liability or for scheme liability.

Because the PSLRA requires a plaintiff to specify the "the reason or reasons" why a statement is misleading and "state with particularity *all facts* on which [a] belief is formed," 15 U.S.C. § 78u-4(b)(1), the caselaw uniformly holds that, where a securities claim is predicated on "the non-disclosure of illegal activity, ***the facts of the underlying illegal acts must also be pleaded with particularity***, in accordance with the heightened pleading requirement of Rule 9(b) and the PSLRA." *Gamm v. Sanderson Farms Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (dismissing complaint alleging misstatement and scheme liability); *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 199 (S.D.N.Y. 2020) (dismissing complaint alleging scheme and misstatement liability where "Plaintiffs have failed to plead with particularity the existence of an underlying bribery scheme").[6]

To plead an underlying illegal act with particularity, a complaint "must plead particular facts that, if true, would constitute illegal conduct," *Shoemaker*, 2017 WL 1180444, at *8, and that establish "the essential elements of th[e] underlying conduct," *Sanderson Farms*, 944 F.3d at 464. "In order adequately to allege an underlying illegal act, such as bribery, Plaintiffs must

---

actions caused the plaintiffs' injuries." *Nat'l Century I*, 2006 WL 469468, at *21. Courts describe claims under Rule 10b-5(a) and (c) as "scheme liability" claims because they relate to deceptive conduct, not deceptive statements. *E.g.*, *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 986 (8th Cir. 2012).

[6] Many cases are in accord. *See also Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *9 (D. Colo. Mar. 14, 2018) (dismissing complaint alleging misstatement and scheme liability in for failure to "plead the underlying antitrust conspiracy with sufficient particularity"); *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 984-95 (W.D. Ark. 2017) (dismissing complaint alleging misstatement and scheme liability for failure to plead underlying illegal acts with particularity); *Shoemaker v. Cardiovascular Sys., Inc.*, 2017 WL 1180444, at *10 (D. Minn. Mar. 29, 2017) (dismissing complaint alleging misstatement and scheme liability for failure to allege elements of violation of underlying anti-kickback statute with particularity); *In re Immucor, Inc., Sec. Litig.*, 2011 WL 2619092, at *5 (N.D. Ga. Jun. 30, 2011) (dismissing complaint alleging misstatements and an "illegal price-fixing scheme" where plaintiff did not "even attempt to allege facts showing an explicit agreement . . . to fix prices"); *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 581, 586 (S.D.N.Y. 2006) (dismissing complaint alleging misstatements and scheme liability where complaint did not specify how alleged illegal "'hidden pay-to-play' scheme" actually violated the law).

plead the 'who, what, when, where, and how' of the alleged improper transaction." *Schiro*, 438 F. Supp. 3d at 198; *see also Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 488-89 (6th Cir. 2015 (particularity requires facts showing "who, what, when, where, and how"). Mere assertions of illegality do not suffice. *E.g.*, *In re Mirant Corp. Sec. Litig.*, 2009 WL 48188, at *18 (N.D. Ga. Jan. 7, 2009) ("The blanket characterization of business transactions as illegal does not make them so."); *Sanderson Farms*, 944 F.3d at 465 (affirming dismissal where plaintiffs "merely use[d] stock phases such as 'worked in concert' and 'coordinated'" when alleging underlying conspiracy); *see also Albert Fadem Tr.*, 334 F. Supp. 2d at 1010 ("[C]laims of securities fraud cannot rest on speculation and conclusory allegations.").

The Complaint falls short of these requirements. It does not even attempt to specify any law or regulation that any Defendant purportedly violated, let alone specify the facts of the violation with particularity. Because the Complaint fails to plead with particularity the cornerstone of the claims asserted here—the underlying "illegal" actions—it must be dismissed.

> **1. The Complaint Never Identifies Any Law Or Regulation Supposedly Violated By Any Defendant.**

At a minimum, pleading an illegal act with particularity requires identifying the law or regulation that the underlying conduct purportedly violated. The Complaint does not do this. It does not identify a single law or regulation that any Defendant supposedly violated. It relies instead on vague assertions of "bribery and corruption" (*e.g.*, ¶ 142), allusions to "campaign finance limits" (¶ 70), and "numerous" but unspecified "state and federal laws and regulations" (¶ 135(b)). This failure warrants dismissal.

As the Sixth Circuit has held, a complaint that merely references an investigation but fails to "plead what, if any, laws or regulations defendants violated such that a statement of legal compliance . . . would have been false or misleading" must be dismissed. *Dailey v. Medlock*,

551 F. App'x 841, 849 (6th Cir. 2014) (affirming dismissal of Rule 10b-5 claim); *cf. Zaluski*, 527 F.3d at 575 (affirming dismissal even where payments to state senator were identified as prohibited by contract with the state).  Numerous federal courts have held that a complaint that merely "contend[s] in conclusive fashion" that "Defendants' underlying business activity was illegal, but provide[s] no explanation of its theory of illegality" does not satisfy the particularity standard.  *Mirant*, 2009 WL 48188, at *18 (dismissing for failure to explain "how any of the purportedly improper trading practices violated state or federal law"); *see also Shoemaker*, 2017 WL 1180444, at *10 (dismissing for "nakedly alleg[ing] the FDA limitations" defendants purportedly exceeded without identifying those limitations with particularity and explaining how they were violated); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578-79 (S.D.N.Y. 2016) ("*Menaldi I*") (dismissing for failure to "present a plausible theory of how" an executive order allegedly violated by defendants "applies to the facts of this case").  This rule makes sense:  a complaint cannot plead facts establishing that compliance statements were false because of underlying illegal conduct if it ***never says which laws the defendants violated***.  *See, e.g.*, *Dailey*, 551 F. App'x at 849 (affirming dismissal where complaint failed to identify laws or regulations defendants purportedly violated).

### 2. The Factual Allegations Do Not Support Any Legal Theory To Which The Complaint Even Alludes.

Even if the Complaint identified a specific statute or regulation that Defendants supposedly violated, it would still come up short.  The theories one might read into the Complaint on Plaintiffs' behalf—bribery, campaign-finance violations, RICO violations, or conspiracy—are not supported by particularized facts.  So even if this Court were willing to interpolate statutes or regulations that any Defendant supposedly violated but that Plaintiffs did not identify, it still should dismiss the Complaint.

-12-

Because this case deals with speech about matters of public interest, political activity, and petitioning of government officials, the issue of legality is necessarily viewed against a backdrop of First Amendment protections. The Supreme Court has long held that "[t]he right to participate in democracy through political contributions" is protected by the Constitution," *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014), and that all citizens, including corporations, have the fundamental right to speak on issues of public importance, *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 789-92 (1978). That right extends to spending money on speech advocating for or against the election of candidates for office or on controversial policy issues, *see Citizens United v. FEC*, 558 U.S. 310, 364 (2010), and it encompasses the right to hire lobbyists and consultants to petition the government, including to "enact favorable legislation," *e.g.*, *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990). Of particular importance here, the First Amendment also protects the right to contribute anonymously to groups that speak or advocate on matters of public concern. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

Insofar as the Complaint alleges that FirstEnergy indirectly helped to elect "friendly" candidates, advocated for favorable legislation, or contributed to groups that took positions on policy issues, the Complaint describes the exercise of rights that the First Amendment guarantees to everyone. The Complaint's theme that FirstEnergy's conduct is actionable because its views were wrong or HB6 was bad policy is incompatible with the First Amendment.[7] To establish underlying illegal conduct, the Complaint needs particularized facts showing Defendants committed an unprotected act, and those particularized facts are absent.

---

[7] *See, e.g.*, ¶¶ 3 (characterizing political ads as "false and misleading"), 75-77 (arguing that HB 6 "undermin[ed] society's environmental interests"), 83 ("offensive and misleading" "mailers and ads").

#### (a)    **Bribery**

The Complaint fails to plead bribery with particularity because its factual allegations do not establish an explicit *quid pro quo* agreement. A political contribution is a "bribe" only if "payments are made in return for an ***explicit*** promise or undertaking by the official to perform or not to perform an official act" and the official agrees that "his official conduct will be controlled by the terms of the promise or the undertaking." *McCormick v. United States*, 500 U.S. 257, 273 (1991); *see also United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013). The agreement must be "'a *quid pro quo*'—that 'the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take.'" *Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1034 (N.D. Ohio 2013).

"Where, as here, the alleged bribe is a campaign contribution, the facts must show that the contribution was given 'in return for a ***specific official action*** . . . No generalized expectation of some future action will do.'" *Huff*, 972 F. Supp. 2d at 1034; *Evans v. United States*, 504 U.S. 255, 268 (1992) (requiring an "agreement to perform ***specific*** official acts"); *United States v. Sittenfeld*, -- F. Supp. 3d --, 2021 WL 779136, at *15 (S.D. Ohio Mar. 1, 2021) (same). As the Supreme Court has defined the term, "an 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy'" involving "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination by an agency, or a hearing before a committee." *McDonnell v. United States*, 136 S. Ct. 2355, 2371-73 (2016).

"In order adequately to allege an underlying illegal act, such as bribery, Plaintiffs must plead the 'who, what, when, where, and how' of the alleged improper transaction," which requires "factual allegations of exactly who made the payments, to whom the payments were made, when the payments were made, [and] how the payments were made." *Schiro*, 438 F. Supp. 3d at 198-99; *Menaldi I*, 164 F. Supp. 3d at 578-79, 582 (dismissing Rule 10b-5 claim

premised on bribery where complaint failed to plead "how, when, and whether" defendant offered anything of value to officials).  Though "[m]otives and consequences . . . are the keys for determining whether a public official entered an agreement to accept a bribe," this means only that "an explicit agreement may be 'implied from [the official's] ***words and actions***.'"  *Terry*, 707 F.3d at 613 (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring)); *Evans*, 504 U.S. at 274 (explaining that motive and intent are inferred from "words [which] were spoken or actions taken").  "What is needed is an agreement, full stop."  *Terry*, 707 F.3d at 613.  Bare allegations of motive and speculation that conduct was carried out pursuant to an agreement does not suffice.  *See United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) ("In the absence of such an agreement on a specific action, even a close-in-time relationship between the donation and the act will not suffice.").[8]

Applying these principles, the Complaint cannot plead an underlying act of bribery unless it states particularized facts of (1) an explicit *quid pro quo* agreement between Householder/his affiliates and a Defendant which (2) Householder promised he would perform a specific official action and that his performance would be controlled by the terms of the promise (3) in exchange for the return promise of political contributions.  The Complaint does not do this.

It never alleges that Householder or anyone else promised to any Defendant that he would deliver an official action in exchange for contributions or that any Defendant promised Householder contributions conditioned on specific official action.  Nor does the Complaint

---

[8] Allegations of motive and consequences are not enough, even under the dramatically weaker pleading standard applicable to criminal indictments, which is a far cry from the pleading required under the PSRLA.  *See Sittenfeld*, 2021 WL 779136, at *10 (holding "that something like the outdated *Conley v. Gibson*, 355 U.S. 41 (1957), standard from the civil context applies to criminal complaints.").  *Cf. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (holding that under the ordinary plausibility pleading standard, "lawful parallel conduct fails to bespeak unlawful agreement" and "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *Sanderson Farms*, 944 F.3d at 466 ("[T]he law is clear that the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.").

allege anything about any specific contribution tied to any specific agreement between specific persons (Householder/his associates and any Defendant) at a particular time that amounted to an improper *quid pro quo*. The Complaint makes no attempt to articulate the terms of any such purported agreement or the circumstances of its formation. It contains no facts about the contents of any meetings, conversations, or other communications between Householder or his associates and any Defendant. *See, e.g.*, *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 965 (S.D. Ohio 2009) (dismissing for failure to plead falsity with particularity where complaint did not "allege any specific facts that Huntington's disclosures were incompatible with any reports, data, or signs"); *Sanderson Farms*, 944 F.3d at 466 (affirming dismissal where plaintiffs pled "no facts regarding Sanderson Farms' communications with the Georgia Dock such as what information Sanderson Farms provided to [it]" or "on what occasions"). That omission is fatal.

At most, the Complaint alleges that Householder received contributions, but it is not bribery to support politicians who favor policies that align with one's interests. *See Terry*, 707 F.3d at 613 ("A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions. No bribe thus occurs if the elected official later does something that benefits the donor."). The Complaint fails to plead an express *quid pro quo* even in conclusory terms, far less with particularity. *See Menaldi I*, 164 F. Supp. 3d at 579 (dismissing complaint premised on allegations of bribery for failure to allege any actual "promises to any Libyan government officials"); *Schiro*, 438 F. Supp. 3d at 199 (rejecting "conclusory" allegations of bribery scheme premised on admission of "irregular payments" where company "did not characterize the payments as bribes" and no particularized facts supported that description).

-16-

Those few allegations in the Complaint that relate to FirstEnergy or any Defendant fail to plead bribery with particularity.

Contributions to Generation Now. Allegations that contributions were made (*e.g.*, ¶¶ 67-68, 75, 80, 82) and that HB6 passed and the referendum was defeated (¶¶ 78, 86) do not support any inference of illegality, as they are not accompanied by particularized supporting allegations about the content of any agreement or the circumstances of its formation. *See, e.g.*, *Siegelman*, 640 F.3d at 1170 (bribery requires more than "merely proof of a campaign donation followed by an act favorable to the donor"). That FirstEnergy made contributions to Generation Now does not establish a return promise from Householder or anyone else as to any specific official act. *See, e.g.*, *Sanderson Farms*, 944 F.3d at 465 (affirming dismissal for failure to show purported coordinated action was "the result of an agreement"); *Immucor*, 2011 WL 2619092, at *5 (dismissing claim premised on underlying conspiracy where "[a]n inference of innocent parallelism" was equally plausible); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) (dismissing where there were "no particular factual allegations that support the conclusory assertion that these investment opportunities were provided as 'kickbacks,' let alone that these opportunities were offered with fraudulent intent"). Likewise, the assertion that one contribution from a FirstEnergy "affiliate" occurred after the failure of the repeal campaign (¶ 86) cannot suffice to establish the existence of an explicit agreement. *Huff*, 972 F. Supp. 2d at 1305 ("Close-in-time contributions, standing alone, will not suffice to establish a *quid pro quo* agreement); *Siegelman*, 640 F.3d at 1171 (same). And as the Supreme Court has explained, "[r]eferenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue." *Bellotti*, 435 U.S. at 790; *Siegelman*, 640 F.3d at 1169 n.13 (similar).

-17-

Communications with Householder.  The Complaint alleges communications with Householder by Jones, Dowling, and Pine (¶¶ 221-23), but it alleges nothing about the contents of any discussions.  There are no particularized facts about an ***explicit*** *quid pro quo* agreement by which Householder promised a specific official act in return for contributions and that his official conduct would be "controlled by the terms of the promise or the undertaking," *McCormick*, 500 U.S. at 273.  *See, e.g.*, *Sanderson Farms*, 944 F.3d at 465-66 (affirming dismissal where complaint failed to plead anything beyond "opportunities to conspire"); *Huff*, 972 F. Supp. 2d at 1034-35 (dismissing RICO claim premised on bribery allegations; holding "the existence of campaign contributions" and subsequent favorable official action cannot support conclusory allegations of *quid pro quo* agreement); *EveryWare*, 175 F. Supp. 3d at 871 (dismissing "flimsy allegation" of accounting inaccuracies where complaint "put forth no allegations about the nature of the 'inaccurate financial disclosures' or the content of the reports" purportedly showing their existence).

Randazzo.  The allegations about Randazzo are likewise insufficient.  FirstEnergy disclosed a payment in 2019 in connection with the termination of a consulting agreement with "an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating [certain FirstEnergy subsidiaries]," (Ex. B, Form 10-Q at 86), and the Complaint alleges that Randazzo was the recipient of the payment (*e.g.* ¶ 193) (the "Randazzo payment").  At the time of the Randazzo payment, Randazzo had not been appointed to any office, and Plaintiffs allege that the payment was for a pre-existing contract (¶ 190).  Plaintiffs mischaracterize the disclosures about Randazzo payment (¶ 207), as FirstEnergy disclosed only that the payment "may have been for purposes other than those represented within the consulting agreement" (¶ 206).  Plaintiffs, however, make the inferential

leap that, because Randazzo purportedly "would go on to write key pieces of HB6 and publicly testify in support of bill" (¶ 216), he presumably must have done so to fulfill his end of an explicit *quid pro quo* bargain in exchange for the purportedly "illicit" payment (¶ 216). But there are no specific facts to show that the Randazzo payment was illegal or that unidentified "FirstEnergy executives" ever reached a *quid pro quo* agreement in which the payment was offered in return for specific official action. (¶¶ 72, 186, 194, 206, 207, 211, 216, 222, 224.) The Complaint offers only speculation—and it does not even attempt to spell out a factual basis for concluding that an agreement was struck or a payment was otherwise illegal. (¶¶ 193, 199, 202.) *See Schiro*, 438 F. Supp. 3d at 199 n.3 (rejecting attempt "to plead the existence of a bribery scheme" based on media article because complaint "fail[ed] to explain the basis for the article's conclusory allegation and, in any event, [did] not allege that the article asserted that *bribery* occurred"). "[C]laims of fraud" cannot be based "on speculation and conclusory allegations." *See EveryWare*, 175 F. Supp. 3d at 849. The Complaint offers nothing more.

Plea Agreements by Third Parties. The Complaint's allegations about plea agreements (¶¶ 69, 171, 205, 215) do not suffice to plead bribery by any Defendant with particularity, either. None of the plea agreements identifies any individual Defendant, and none attributes any action to any specific Defendant. *United States v. Cespedes*, No. 1:20-CR-77, ECF No. 63, Plea Agreement (S.D. Ohio Oct. 29, 2020); *United States v. Longstreth*, No. 1:20-CR-77, ECF No. 64, Plea Agreement (S.D. Ohio Oct. 29, 2020); *United States v. Generation Now*, No. 1:20-CR-77, ECF No. 78, Plea Agreement (S.D. Ohio Feb. 5, 2021).

The Complaint's allegations about the plea agreements say nothing about the content of any promises purportedly exchanged between any Defendant and anybody else, the circumstances of any agreement, who was involved, or the "specific official action" purportedly

given in exchange for a contribution. That is because the plea agreements are silent in this regard. They lack facts to establish "the essential elements of the alleged bribery" by any Defendant—far less with particularity, as none of the admissions detail the "'who, what, when, where, and how' of the alleged improper transaction[s]." *Schiro*, 438 F. Supp. 3d at 198. *See also West Palm Beach Firefighters Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 642 (N.D. Ill. 2020) ("[C]onclusions in external sources cannot substitute for allegations about the underlying facts.").

The allegations about Cespedes and Longstreth (¶¶ 69, 171) face additional problems. The portion of the Cespedes plea agreement cited by the Complaint does not specify ***to whom*** Householder purportedly offered to deliver "specific official action" (¶ 171), and the part of the Longstreth agreement referenced does not mention contributions for specific official action (¶ 69). *See United States v. Cespedes*, No. 1:20-CR-77, ECF No. 63, Plea Agreement at 6 (S.D. Ohio Oct. 29, 2020); *United States v. Longstreth*, No. 1:20-CR-77, ECF No. 64, Plea Agreement at 6 (S.D. Ohio Oct. 29, 2020).[9]

### (b) Campaign Finance

The Complaint alleges the existence of "[i]llegally large and illegally concealed campaign contributions" (¶ 70), but it never identifies any specific "contribution," describes how that "contribution" violated a specific law or regulation, explains how that "contribution" or its "conceal[ment]" violated a specific law or regulation that required its disclosure, or connects specific individuals to that "contribution." The Complaint instead simply asserts that

---

[9] Courts acknowledge that "[p]lea agreements between the United States and defendants do not represent judicial findings of fact. They are, rather, contracts between the parties, and their wording is carefully weighed and negotiated." *Evanston Ins. Co. v. Desert State Life Mgmt.*, 484 F. Supp. 3d 987, 1009 n.6 (D.N.M. 2020) (refusing to admit factual statements in plea agreement for truth against parties other than the person against whom conviction was entered). A party pleading guilty has relatively "less incentive to accurately state why he met each statutory element" of a crime. *Id.*

FirstEnergy and its top executives "[v]iolated numerous state and federal laws and regulations" (¶¶ 135(b), 136(b), 293), without citing any law or regulation establishing a relevant contribution limitation or disclosure requirement.

The Complaint trades on the intuition that "large" and anonymous contributions simply must be (or maybe that they should be) illegal. But that is not correct. Social welfare organizations established under Section 501(c)(4) of the Internal Revenue Code—such as Generation Now (¶ 65)—are permitted to engage in issue advocacy and lobbying activities and may make political contributions. *NorCal Tea Party Patriots v. Internal Revenue Serv.*, 2016 WL 8202966, at *3 (S.D. Ohio Nov. 22, 2016) ("501(c)(4) organizations can engage in limited political activity, but political activity cannot be the primary activity of the organization."). And "unlike Super PACs, 501(c)(4) organizations are not legally obligated to publicly disclose the names of their donors or the amounts of the donations" except to the IRS with respect to donations in excess of $5,000. *Id.* There are no limits to the amounts that a person may contribute to a 501(c)(4). *Id.* at *4 (noting that, under the tax code, a 501(c)(4) organization can accept unlimited contributions from all types of donors, including individuals).

Because anonymous contributions in any amount to a 501(c)(4) organization are legal, the Complaint cannot plead an underlying violation of law by asserting that the contributions to Generation Now or other 501(c)(4)s were "large" or "concealed." (¶ 70; ¶¶ 67, 80, 82, 93(b).) To avoid dismissal, the Complaint would need to explain how the challenged contributions actually violated a specific law or regulation, but it does not do so. *See AXIS*, 456 F. Supp. 2d at 585-86 (dismissing for failure to explain how practices that were not *per se* illegal "would actually violate state or federal antitrust laws"); *Menaldi I*, 164 F. Supp. 3d at 579 (dismissing for failure to explain how FCPA prohibited challenged transactions).

-21-

### (c)     RICO

The Complaint also fails to allege specific facts as to each element of a RICO violation, 18 U.S.C. § 1962(c): "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). "Racketeering activity" is defined as any state or federal predicate act enumerated in 18 U.S.C. § 1961(1). "To establish . . . a 'pattern of racketeering activity,'" "a plaintiff must allege . . . at least two predicate acts of racketeering activity occurring within a ten-year period," *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006), and "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity," *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).

Here, no particularized facts establish that any Defendant participated in racketeering activity as defined by the statute, let alone a pattern of racketeering activity. Specified forms of bribery qualify as predicate acts, 18 U.S.C. § 1961(1)(A-B), but, as explained above, the Complaint does not plead bribery with particularity, *supra* at 14-20, and it never identifies any other putative predicate act even in conclusory terms. *See, e.g.*, *Huff*, 972 F. Supp. 2d at 1034-35 (dismissing RICO claim for failure to plead underlying act of bribery with particularity). On top of that, the Complaint does not attempt to specify any facts that might establish that any purported predicates "amount to or pose a threat of continued criminal activity," *H.J. Inc.*, 492 U.S. at 239. It is not enough to point to case documents from the federal prosecution of Householder and his alleged affiliates, because those documents do not charge FirstEnergy or any other Defendant here with any wrongdoing, much less with particularity, *see supra* at 19-20. (¶¶ 69, 146-47, 171, 205, 215.) The Complaint does nothing more.

-22-

### (d)  Conspiracy

To the extent the Complaint could be read to assert an underlying conspiracy offense, it does not plead the elements of that crime as to any Defendant, far less with particularity. Conspiracy requires "an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975).  "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas*, 522 U.S. at 65. Here, the Complaint alleges no particularized facts showing the existence of an agreement between any Defendant and Householder or any member of his purported enterprise to commit any underlying illegal act.  Nor, as addressed above, does it plead facts establishing bribery and/or campaign-finance predicate acts.  And though the Complaint notes that the federal criminal complaint charges Householder and his affiliates with misappropriating funds from Generation Now (¶ 143) and charges Borges with bribing signature collectors (¶ 85), the federal criminal complaint does not allege that anyone at FirstEnergy was involved in those acts or made an agreement to carry out those acts, nor are there particularized facts in the Complaint to that effect.

For analogous reasons, the Complaint does not plead a RICO conspiracy, 18 U.S.C. § 1962(d).  To allege a RICO conspiracy, a complaint "must successfully allege all the elements of a RICO violation, as well as alleg[e] 'the existence of an illicit agreement to violate the substantive RICO provisions.'"  *Huff*, 972 F. Supp. 2d at 1039.  The Complaint does not allege a substantive RICO violation, *supra* at 22, and it never pleads particularized facts regarding any agreement to engage in a pattern of racketeering activity between any Defendant and any member of Householder's purported enterprise.  *See Huff*, 972 F. Supp. 2d at 1040 (dismissing "conclusory allegation" of RICO conspiracy based on campaign contributions and favorable official action for failure "to allege 'when, where, or between whom any alleged illicit agreement

-23-

was made"); *Mierzwa v. Safe & Secure Self Storage, LLC*, 493 F. App'x 273, 276 (3d Cir. 2012) ("[C]onclusory allegations that defendants conspired for the purpose of defrauding him are simply inadequate to plead a valid [RICO conspiracy] claim.").

*       *       *

Because the Complaint fails to plead with particularity any underlying "illegal" acts by any Defendant, it must be dismissed in its entirety.

## II.  THE FAILURE TO STATE A CLAIM WITH RESPECT TO STATEMENTS OR ACTIONS IN 2017 AND 2018 IS ESPECIALLY GLARING.

While the Complaint fails to allege with particularity that any Defendant *ever* joined an illegal "scheme" or committed underlying illegal acts, as addressed above, that failure is particularly stark as to 2017 and 2018. As to the 2017-2018 period, the Complaint merely asserts that which needs to be pled with particularity: the existence of the "scheme" and the violation of unidentified requirements purportedly governing disclosure of contributions. Such assertions fail to plead with particularity the contemporaneous falsity of any statement or the deceptiveness of any conduct in 2017 or 2018.

### A.  The Complaint Fails To Plead Contemporaneous Falsity As To Statements In 2017 And 2018.

#### 1.  There Is No Liability For "Fraud By Hindsight."

A touchstone of securities law is that there is no such thing as "fraud by hindsight." *E.g.*, *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1042 (6th Cir. 1991); *Dailey*, 551 F. App'x at 847 (affirming dismissal of securities claim where it was "hard to imagine a clearer example of alleging 'fraud by hindsight'"). A statement is actionable only if it was false or misleading at the time it was made. *E.g.*, *Albert Fadem Tr.*, 334 F. Supp. 2d at 1024 (securities plaintiffs must plead particularized facts showing "why the disputed statement was untrue or misleading *when*

*made*"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("[W]ithout contemporaneous falsity, there can be no fraud.").

The rationale for the rule against fraud-by-hindsight is straightforward. As this Court explained, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Huntington*, 674 F. Supp. 2d at 959 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). So to adequately plead falsity, a securities plaintiff must identify particularized facts that existed *at the time of a challenged statement* and contradicted the statement. *See, e.g.*, *Dailey*, 551 F. App'x at 846 ("One cannot disclose an event which has not yet occurred."); *In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *15 (N.D. Ohio Jun. 27, 2002) ("[P]laintiffs cannot show falsity merely by demonstrating that a statement by a company officer later turned out to be wrong. Rather, . . . plaintiffs must allege the existence of contemporaneous information inconsistent with the defendants' statements.").

### 2. The Complaint Lacks Particularized Facts Showing That Any Statement In 2017 Or 2018 Was False When Made.

Many of the purportedly false or misleading statements cannot possibly serve as predicates for liability because they were made in 2017 and 2018—well *before* the alleged misconduct relating to the introduction and adoption of HB6 in 2019.

#### (a) Allegations About Events In 2017 And 2018

The Complaint alleges that a number of statements in 2017 and 2018 (¶¶ 95-125) were misleading because they: (i) did not disclose the "scheme" or violations of "numerous" unidentified "state and federal laws and regulations and internal Company policies" in furtherance of the supposed "scheme" (¶ 135(a)-(b)); (ii) misrepresented the "extent and nature" of FirstEnergy's political activities and contributions (¶ 135(c)); and (iii) did not disclose FirstEnergy's supposed failure "to maintain effective internal control over its financial reporting"

-25-

(¶ 135(d)). Paragraph 135 of the Complaint says that the "true facts" contradicting those alleged misstatements are set forth at paragraphs 64-94 and 137-138, but those paragraphs deal almost entirely with events that did not occur until 2019 or 2020. Those events cannot retroactively render statements made years earlier false or misleading.

Of the allegations at ¶¶ 64-94 and ¶¶ 137-138 that supposedly show the falsity of the 2017-2018 challenged statements, the only assertions about facts purportedly existing in 2017 or 2018 are these:

- Householder flew on the Company's plane to the January 2017 presidential inauguration. (¶ 65.)

- Partners for Progress and Generation Now were formed in early 2017 and FirstEnergy allegedly contributed unspecified sums to them "in the months that followed." (¶ 65.)

- An article in a Pennsylvania newspaper stated that FirstEnergy favored legislation to support nuclear power generation. (¶ 66.)

- FirstEnergy PAC made $464,204 in campaign contributions in 2017 and 2018, of which "about $149,000" was to the campaigns of Householder and his "allies." (¶ 67.)

- "In 2017 and 2018, FirstEnergy contributed $2.9 million to the Bailout Scheme, which defendants concealed throughout the Class Period." (¶ 67.)

- FirstEnergy PAC contributed $39,000 to "Friends of Larry Householder" between July 2017 and November 2019. (¶ 137.)

- A table lists "FirstEnergy's Concealed Contributions" as $1,000,000 in 2017 and $1,400,000 in 2018, without any details about who the recipients were, when the contributions occurred, whether or why they were illegal, or why they supposedly should have been disclosed. (*See* ¶ 137.)

### (b)    No Falsity In 2017 Or 2018 Due To HB6

None of these allegations shows with particularity that any statement in 2017 or 2018 was false or misleading at the time it was made. They do not show that any contribution by FirstEnergy to a campaign or to a 501(c)(4) during those years violated any law or regulation (nor does the Complaint identify any such law or regulation), and they do not demonstrate any

-26-

violation of a specific disclosure requirement with regards to any specific contribution. Neither do these allegations plead with particularity that there was any failure to maintain effective controls over financial reporting that could have been disclosed in 2017 or 2018.[10]

As the Complaint admits, HB6 *was not even introduced* until April 2019 (¶ 73), *was not enacted* until July 2019 (¶ 78), and the *referendum campaign did not fail* until October 2019 (¶ 86). *See Dailey*, 551 F. App'x at 846 ("One cannot disclose an event which has not yet occurred."). Allegations about those events or others in 2019 or 2020 cannot show that a statement in 2017 or 2018 was false or misleading when made. *See, e.g.*, *Huntington*, 674 F. Supp. 2d at 964 (dismissing claims where allegations did "not demonstrate that when the public statements were made, such statements were false"); *Albert Fadem Tr.*, 334 F. Supp. 2d at 1026 (dismissing where plaintiffs did not allege the challenged statements "were false . . . *when Defendants made them*"); *In re Nat'l Auto Credit, Inc. Sec. Litig.*, 1999 WL 33919791, at *13 (N.D. Ohio Oct. 12, 1999) (dismissing where plaintiffs were unable to show that allegedly non-disclosed conditions "existed earlier than disclosed").

### (c) No Falsity Due To "Illegal" Act In 2017 Or 2018

Nor does the Complaint plead any facts showing any "illegal" act in 2017 or 2018. Allegations about the formation of Partners for Progress and Generation Now or alleged contributions to those organizations lack any particularized facts about an explicit agreement to exchange contributions to those organizations for specific official action. *See Terry*, 707 F.3d at 613 ("A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions."). None of the few allegations about events in 2017 and 2018

---

[10] According to the Complaint, the "weakness" in internal controls that the Company identified in its November 2020 amendment to FirstEnergy's annual report for 2019 was related to the Randazzo payment "in early 2019." (¶¶ 189-90; ¶¶ 191-94.) This payment did not even occur until *after* 2018; its omission could not possibly have rendered any statement in 2018 or 2017 false or misleading when made.

show an explicit *quid pro quo* agreement. As for the flight with Householder in 2017, the Complaint alleges only the fact of the flight and speculative characterization ("FirstEnergy was already courting him") (¶ 65), but securities claims "cannot rest on speculation." *See Albert Fadem Tr.*, 334 F. Supp. 2d at 1028.

Even if the Complaint had particularized facts showing the existence of an agreement of some kind as of 2017 or 2018 (it does not), there are no factual allegations of a promise of ***specific official action*** in 2017 or 2018. The purported official acts identified in the Complaint—drafting, introducing, passing, and defending HB6 (¶ 64)—all occurred in 2019 and, as the Complaint concedes, Householder was not even elected Speaker until January 2019 (¶ 71). Before then, he was no in no position to offer anything beyond speculative assistance if his supporters prevailed in primary contests and if he ultimately became Speaker. That is not enough. *See McDonnell*, 136 S. Ct. at 2371-73. Likewise, distributing funds to promote candidates for public office does not constitute official action, *see supra* at 14-15 (citing *McDonnell*, 136 S. Ct. at 2371-73; *Dimora v. United States*, 973 F.3d 496, 504 (6th Cir. 2020)), so the allegations about the FirstEnergy PAC expenditures in 2017 and 2018 (¶ 67), cannot contribute to a showing of the requisite agreement. The Complaint's allegations could suggest, at most, some "'generalized expectation of some future action," but that is not enough; they must establish an explicit promise of "specific official action.'" *Huff*, 972 F. Supp. 2d at 1034.

The Complaint also lacks particularized facts showing that campaign-finance violations, RICO offenses, or conspiracy occurred in 2017 or 2018. Absent allegations showing that a predicate act of bribery occurred then, the Complaint has no basis on which to assert a substantive RICO offense at that time. *See Huff*, 972 F. Supp. 2d at 1034-35. The Complaint also never asserts that any contribution to Generation Now or other entities before 2019 (¶ 67(a))

-28-

violated any law or regulation governing the size of contributions to 501(c)(4) organizations or their disclosure. *See supra* at 20-29. And with no particularized facts that any Defendant entered into an agreement with Householder and his affiliates to commit bribery or campaign-finance violations in 2017 or 2018, the Complaint fails to allege that any conspiratorial agreement existed then. *Salinas*, 522 U.S. at 65; *Huff*, 972 F. Supp. 2d at 1040; *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 632-35 (S.D.N.Y. 2017) (concluding complaint failed to allege that purported bribery scheme existed in the first two years of the class period, before communications explicitly mentioning a "bribe percentage" occurred).

### B. The Complaint Lacks Particularized Facts Showing The Existence Of A Deceptive "Scheme" In 2017 Or 2018.

As with the misstatement theory, the Complaint's pleading failures for scheme liability are particularly glaring as to the 2017-2018 time period. Just as there can be no "fraud-by-hindsight" for alleged misstatements, conduct cannot form the basis of a scheme liability claim unless it is inherently deceptive when performed and is directly connected to specific securities transactions. *In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 909 (S.D. Ohio 2008) ("*Nat'l Century II*"). (*See also infra* at 49-52, 55-59.)

The conduct allegedly occurring in 2017 and 2018—a flight on a corporate jet, a newspaper article, 501(c)(4) contributions, PAC expenditures, and communications with Householder or his associates (*see supra* at 25-26; ¶¶ 65-67, 137, 222-23)—is not "market activity" that bore upon any specific securities transaction or was directly connected to the sale of securities. *See Nat'l Century I*, 2006 WL 469468, at *21 (to be actionable under Rule 10b-5(a) or (c), an alleged "scheme" must have occurred "in connection with the purchase or sale of securities"). Nor is any of that conduct "in itself deceptive." *Nat'l Century II*, 553 F. Supp. 2d at 909. It is not enough to allege that defendants "simply engag[ed] in non-deceptive conduct that

supports an overall deceptive scheme." *Id.* Because the Complaint fails to plead particularized facts of any illegal "scheme" in 2017 or 2018, *see also supra* at 25-29, there can be no scheme liability claim for that period. *Cf. In re Alstom SA*, 406 F. Supp. 2d 433, 476-77 (S.D.N.Y. 2005) (holding that plaintiffs failed to allege that a scheme was "undertaken in 1999" because "[n]owhere in the Complaint is it alleged that [the defendant] underbid the [] contract in 1999 with the intention of understating costs").

The Complaint purports to sweep the bankruptcy proceedings within the alleged "scheme." (¶ 93(a).) But the bankruptcy proceedings and the relief sought there—even if unpopular, controversial, or ultimately unsuccessful—cannot give rise to scheme liability because those are not deceptive acts, *see infra* at 55-58. *See, e.g.*, *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005) (finding that loan transactions were not a deceptive device because "there is no suggestion that the transactions were something other than what they appeared to be"); *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (no scheme liability where "nothing inherently deceptive" about structure of transaction with counterparty).

## III. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER.

Plaintiffs' failure to plead with particularity any underlying illegal act is fatal as to all of their claims, but their Exchange Act claims also must be dismissed for the independent reason that the Complaint does not plead particularized facts creating a strong inference of scienter.

### A. Plaintiffs Must Plead Particularized Facts Showing Actual Knowledge.

Scienter—"a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 319—is an element of both a misrepresentation claim under Rule 10b-5(b) and a scheme liability claim under parts (a) and (c). *E.g.*, *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th Cir. 2009); *Nat'l Century I*, 2006 WL 469468, at *21; *see also Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *3 (S.D.N.Y. Jan. 16, 2018) (scheme liability claims "are subject to the

PSLRA pleading standards with respect to scienter"); *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 438 (S.D.N.Y. 2006) (cited and quoted in *Nat'l Century I*) (addressing scienter for scheme liability under PSLRA).

The PSLRA erects a high bar to pleading scienter, requiring a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The inference "must be more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 309. It must be "***strong***" and "***cogent*** and ***at least as compelling*** as any opposing inference of nonfraudulent intent." *Id.*; *see also Huntington*, 674 F. Supp. 2d at 975 ("[S]ome inference of scienter . . . is not enough. The PSLRA requires the Complaint to establish a strong inference [of scienter].") That means that, "speculative reasoning—however persuasive its logic" is not enough to plead scienter. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 482 (6th Cir. 2014) ("*Omnicare II*").

Scienter requires particularized facts establishing that the defendants knew about or recklessly disregarded the falsity of the alleged statements. *Konkol*, 590 F.3d 396. Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004). In the securities-fraud context, recklessness is a state "far from negligence" and "akin to conscious disregard." *Id.*; *see also In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 & n.7 (6th Cir. 1999) (same).

In some circumstances, however, only actual knowledge will suffice. That is the case here. In 2014, the Sixth Circuit provided clarification, to avoid "a theory of scienter at odds with the PSLRA" that "could expose corporations to liability far beyond what Congress has

authorized." *Omnicare II*, 769 F.3d at 475-76. Under *Omnicare II*, where, as here, an alleged misstatement concerns "soft information" about compliance matters, a plaintiff must plead facts showing that the statement was "made with ***knowledge of its falsity***." *Id.* at 470. Soft information "includes predictions and matters of opinion," and Sixth Circuit caselaw holds that the legality of a corporate practice constitutes soft information. *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 402 (6th Cir. 1997) ("The legality of Sofamor Danek's support for the non-profit foundation . . . was a matter of opinion."); *Omnicare I*, 583 F.3d at 945 (defendants' views "about the legality of their own actions" constitute "soft" information); *City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 822 (W.D. Mich. 2012) ("[A] company's statements of 'legal compliance' constitute 'soft' information."). The same is true of inherently speculative predictions about the possible legal consequences of corporate actions. *See Zaluski*, 527 F.3d at 575-76 (holding company had no duty to disclose that payments to legislator created a voidable contract because "consequences" and "predictions" are "soft information"). It follows that, to state a claim under Rule 10b-5(b) here, Plaintiffs must plead particularized facts showing that each Exchange Act Defendant ***actually knew*** that the contributions at issue in the Complaint were unlawful. As the Sixth Circuit made clear, a complaint does not plead actual knowledge by making "general statements and heap[ing] inference upon inference." *Omnicare II*, 769 F.3d at 482.

Actual knowledge is likewise required to plead scienter for a scheme liability claim. As discussed in section XX, Rule 10b-5(a) and (c) prohibits employing a "device," "scheme" or "artifice to defraud," in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(a), (c). As this Court recently acknowledged, "the Supreme Court has noted, terms like 'device,' 'scheme,' and 'artifice,' ***all connote knowing and intentional practices*.**" *Emps. Ret.*

*Sys. of the City of St. Louis v. Jones*, 2021 WL 1890490, at *13 (S.D. Ohio May 11, 2021).

Thus, to state a claim for scheme liability, a plaintiff must allege that a defendant ***knowingly*** or

***intentionally*** engaged in fraudulent conduct.  *See Halbert v. Credit Suisse AG,* 402 F. Supp. 3d

1288, 1306 (N.D. Ala. 2019) ("Scheme liability claims, on the other hand, require . . . plaintiffs

[to] allege intentional or willful conduct designed to deceive or defraud investors by controlling

or artificially affecting the price of securities."); *In re Tupperware Brands Corp. Secs. Litig.*,

2021 WL 247870, at *5 (M.D. Fla. Jan. 25, 2021) ("To plead scheme liability, a plaintiff must

allege intentional or willful conduct designed to deceive or defraud investors by controlling or

artificially affecting the price of securities.").

### B.  Plaintiffs' Failure To Plead Any Underlying Illegal Act With Particularity Precludes A Strong Inference Of Scienter.

The Complaint's failure to plead the allegedly illegal underlying acts with particularity,

*see supra* at 12-24, precludes the requisite scienter inference under even a recklessness standard,

far less the applicable standard of actual knowledge.  The Exchange Act Defendants could not

have wrongfully concealed an explicit *quid pro quo* agreement that did not exist and could not

have improperly "schemed" to engage in legally permissible political speech.  The Complaint's

particularized facts do not give rise to the inference that any Defendant knew the contributions to

Generation Now were illegal.  That inference "is simply not cogent and at least as compelling as

the opposing inference," that the Exchange Act Defendants believed they were engaging in the

political process by legal means.

As demonstrated above, the Complaint alleges no particularized facts regarding any

explicit *quid pro quo* agreement to exchange contributions for specific official action.  *See supra*

at 14-20.  Nor does it provide any specific facts suggesting that any Defendant knew or believed

that the contributions were illegal.  The Complaint identifies no law or regulation that any

-33-

Defendant purportedly violated, and it does not allege that any Defendant knew that any contribution to Generation Now was being improperly used by others. And even if allegations of recklessness sufficed here (they do not), the Complaint is devoid of "specific facts that illustrate 'red flags,'" *Comshare*, 183 F.3d at 553, indicating "obvious signs of fraud," *Albert Fadem Tr.*, 334 F. Supp. 2d at 1011. These omissions preclude a strong inference of scienter. *See Tellabs*, 551 U.S. at 326 (omissions, ambiguities, and gaps in the factual allegations of a complaint count against inferring scienter).

The mere fact of the contributions cannot establish scienter, as it is legal for corporations to contribute to 501(c)(4)s, *see NorCal*, 2016 WL 8202966, at *4 (noting that 501(c)(4) organizations can accept unlimited contributions from all types of donors, including businesses). The Complaint must plead specific facts showing that the Exchange Act Defendants knew that the contributions were unlawful. *Das v. Rio Tinto, PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018) (dismissing for failure to plead facts showing "that Defendants had any indication that the [alleged bribery] payment was unlawful"); *see also Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (affirming dismissal where no "clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law").

But the Complaint pleads no such facts. Instead, it asserts that the Exchange Act Defendants must have known the contributions were "illegal" based on their positions in the Company and alleged "receipt of information reflecting the true facts" (¶ 208), phone contacts of unspecified content (¶ 209), and media articles that never suggested any illegality (¶ 210).[11] But

---

[11] "[L]obbying and corporate communications with elected officials occur on a regular basis . . . . Ingratiation and access . . . are not corruption." *Citizens United*, 558 U.S. at 355, 360. Moreover, the Complaint pleads no facts about what was discussed during the alleged contacts.

-34-

"[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Albert Fadem Tr.*, 334 F. Supp. 2d at 1026; *see also Zaluski*, 527 F.3d at 574 (requiring allegations of "internal investigations and reports" attesting to defendants' knowledge); *EveryWare*, 175 F. Supp. 3d at 860 (dismissing where complaint failed to identify any "internal reports, memoranda or the like" or "alleged that any conversation took place . . . regarding other relevant factual information that would bear on scienter"); *Friedman*, 2018 WL 446189, at *4 (generic allegations that "the Individual Defendants held powerful positions at the company" are insufficient to show scienter for scheme liability claim).

Plaintiffs never identify anything—much less specific statements or communications— that purports to show that the Exchange Act Defendants knew of (or even recklessly disregarded) any explicit agreement to exchange contributions for specific official action, or otherwise knew or believed the contributions were illegal. At most, Plaintiffs "allege[] that Defendants knew about . . . *payment*[*s*] related to the project" of securing legislative support, "not that they knew about . . . *unlawful* payment[s]." *Das*, 332 F. Supp. 3d at 817. Without particularized facts of illegality, there can be no inference drawn that is cogent and more compelling than a non-fraudulent one. *See, e.g.*, *Tyson*, 275 F. Supp. 3d at 1004 (no scienter where, among other things, "the more glaring omission is the lack of facts tying the individual Defendants to the wrongdoing"); *AXIS*, 456 F. Supp. 2d at 592 (no scienter where the defendant abandoned the use of contingent arrangements because it was "equally if not more plausible to infer that [the defendant] was acting in its own economic self interest in terminating agreements that had increased its cost of doing business").

-35-

**C.    The Complaint's Allegations Purportedly Showing Scienter Fall Short.**

Scienter must be pleaded, with particularity, as to each Exchange Act Defendant. *See, e.g.*, *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 986 (S.D. Ohio 2008) (adopting rationale of Third, Fifth, and Seventh Circuits and concluding "[t]the group pleading doctrine is antithetical to the pleading requirement for scienter set forth in . . . the PSLRA").  Nevertheless, as to some Defendants, Plaintiffs do not even try.  For example, as to Taylor, the Complaint is silent as to his supposed intent to deceive and, for that reason alone, the Complaint must be dismissed as to him.  (*See* ¶¶ 220-230 (no allegations about Taylor).)  As to the other Exchange Act Defendants, the Complaint offers nothing more than legally insufficient allegations.

Plaintiffs assert that scienter is shown by:  (i) purported "admissions of wrongdoing" (¶¶ 215-18) and lawsuits (¶¶ 238-40); (ii) supposed "participation" in the "Bailout Scheme" (¶¶ 208-209, 219-30) and alleged efforts to conceal it (¶¶ 211, 231-33); (iii) the "magnitude" of the alleged scheme (¶¶ 236-37); and (iv) allegations about debt and equity offerings (¶¶ 241-44), the corporate credit rating (¶¶ 245-47), and performance-based compensation (¶¶ 213, 248); and (v) supposed improper insider trading (¶¶ 213, 250-51).  (*See also* ¶ 214.)  These allegations amount to an attempt to plead scienter based on hindsight, generally held business goals, and generic motives, and do not establish an inference of knowledge or reckless indifference as to the purported illegality of the contributions that is "cogent and at least as compelling as the opposing inference" that the Exchange Act Defendants viewed the contributions as a lawful exercise of First Amendment rights.  *See EveryWare*, 175 F. Supp. 3d at 857.

**1.    Allegations About After-The-Fact "Admissions," Employment
Actions, And Lawsuits Do Not Plead Scienter.**

The after-the-fact events identified in the Complaint (¶¶ 215-218, 238-40) cannot show scienter, which requires "specific allegations showing that the Defendants either knew of or

recklessly disregarded the falsity of their own statements *at the time the statements were made*." *Konkol*, 590 F.3d at 403; *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 485 (6th Cir. 2010); *EveryWare*, 175 F. Supp. 3d at 858-59; *Albert Fadem Tr.*, 334 F. Supp. 2d at 1017-18; *see also Nat'l Century II*, 553 F. Supp. 2d at 911 (a deceptive act must be committed with scienter).

The purported "admissions" of FirstEnergy identified in the Complaint (¶¶ 215-218) do not admit any illegality, but instead indicate that violations of aspirational internal policies occurred (¶ 216), which does not suffice for scienter. *Das*, 332 F. Supp. 3d at 815 (rejecting sufficiency of allegations of purported admissions because defendants "admitted violations of ethical obligations, not legal ones"). Plaintiffs mischaracterize what FirstEnergy said by implying that FirstEnergy disclosed that the Randazzo payment and consulting agreement was an "illicit" part of an "improper influence campaign" (¶ 216), when, in reality, the Company said the payment "violated certain FirstEnergy policies and its code of conduct" (Ex. B, Form 10-Q at 86). *See Schiro*, 438 F. Supp. 3d at 198-99 (dismissing where plaintiffs mischaracterized company as having "announc[ed] that an internal probe had uncovered that two senior executives had improperly paid $20 million *in bribes*," when company had only admitted that payments were made "in violation of . . . internal policies"). The statements from Jones (¶ 218) at most show that he knew the contributions were made, not that they were illegal.

What Generation Now and Longstreth said in their plea agreements (¶ 215) also does not show with particularity that any Defendant knew about their purportedly illicit acts. Those admissions show only that Generation Now and Longstreth thought it would be in their own self-interest to make the admissions sought by the government in exchange for favorable treatment. That fact is entirely consistent with the inference that the Exchange Act Defendants here

believed at all times that the contributions were legal exercises of the right to make contributions to a 501(c)(4) entity. *See EveryWare*, 175 F. Supp. 3d at 859 (dismissing based on scienter because it was "simply more likely that the . . . Defendants' actions indicated an intent for the Company to succeed"); *Kushner*, 317 F.3d at 829 ("[T]he guilty plea cannot be used to demonstrate knowledge by hindsight.").

This is illustrated by a decision by the Ninth Circuit. In considering settlement agreements with the DOJ and SEC in which a company "accepted responsibility" for illegal payments in violation of the Foreign Corrupt Practices Act, the court found that the agreements failed to give rise to a strong inference of scienter as to the CEO of the company. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008). The court's reasoning is instructive:

> First, the admissions in these settlement agreements were largely legal conclusions, rather than particularized facts giving rise to a strong inference of scienter. More importantly, even if [the company] accepted the SEC's and DOJ's statements of fact, there is nothing in either settlement agreement that would support the conclusion that [the CEO] had actual knowledge of the violations. As discussed earlier, the mere fact that someone at [the company] had knowledge of the illegal transactions is not sufficient to satisfy the scienter pleading requirements of the PSLRA, given the context and limited nature of the misrepresentations at issue.

*Id.* at 748-49 (affirming dismissal). Those same factors apply with even greater force here because the plea agreements in question do not involve either FirstEnergy or any Defendant. *See also Teamsters Local 456 Pens. Fund v. Universal Health Servs.*, 2020 WL 2063474, at *15 (E.D. Pa. Apr. 29, 2020) ("Settlement agreements are not enough to meet the pleading requirements of the PSLRA."); *In re DNTW Chartered Accountants Sec. Litig.*, 172 F. Supp. 3d 675, 690 (S.D.N.Y. 2016) ("The fact that this Court can consider information drawn from the SEC's cease and desist order does not mean, of course, that such information will necessarily be sufficient to establish scienter.").

-38-

The late-2020 employment actions identified in the Complaint (¶¶ 216-17) also cannot show scienter as to statements or actions occurring months or years earlier. The *Das* court, for example, held that the termination of company executives could "not give rise to a cogent inference of scienter," even though "the terminations were linked to the alleged fraud." 332 F. Supp. 3d at 814-15. As the court explained ,"the fact that Rio Tinto fired [the executive] says nothing of [the executive's] state of mind" and concluded that the fact that "Rio Tinto took disciplinary action . . . does not lead to a cogent inference that the Company was aware of, or consciously disregarded, any fraud at the time it was committed." *Id.* at 815 (noting that "[e]ven if the terminations could give rise to an inference of scienter . . . terminations alone are insufficient to satisfy this element"); *see also In re Extreme Networks, Inc. Secs. Litig.*, 2018 WL 1411129, at *31 (N.D. Cal. Mar. 21, 2018) (concluding that an executive's departure that was "linked . . . to integration problems" did not support a strong inference of scienter because "the securities laws cannot be used to punish and deter companies from making leadership changes"); *Tadros v. Celladon Corp.*, 2016 WL 5870002, at *13 (S.D. Cal. Oct. 7, 2016) (finding that "whether [the former CEO] was terminated or resigned after Mydicar failed to pass CUPID 2 testing is not evidence of scienter on its own" because most major stock losses are accompanied by management departures); *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 889 (N.D. Ohio 2013) ("the fact that Eaton terminated these [employees] does not support a plausible inference that Eaton intended to defraud investors in any way"), a*ff'd sub nom. In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356 (6th Cir. 2014). Furthermore, those actions were based on violations of internal policies (¶ 216), and thus do not show any prior awareness of illegality. *Das*, 332 F. Supp. 3d at 815 (holding terminations for violations of internal policies

did not support "the inference that Rio Tinto knew that the executives violated the law, which of course is narrower than a company's ethics code").

The lawsuits and investigations that followed the criminal complaint against Householder and his associates (¶¶ 238-40) also do not show via 20/20 hindsight that the Exchange Act Defendants knew of or recklessly disregarded the purported illegality of the contributions. As the Sixth Circuit has held, "[t]he mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false . . . [,] nor does it add an inference of scienter." *Konkol*, 590 F.3d at 402; *see also In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248-29 (8th Cir. 2008) (similar); *Albert Fadem Tr.*, 334 F. Supp. 2d at 1009 (rejecting allegation that later investigation implied scienter at an earlier time). Lawsuits likewise do not contribute to a showing of scienter. *See, e.g.*, *Southland*, 365 F.3d at 383 ("[B]ecause fraud cannot be proved by hindsight, subsequent lawsuits are unpersuasive of scienter, as they do not show what any particular individual knew, or was severely reckless in not knowing, at the time the [alleged illegal agreements] were entered into.").

## 2. Allegations About A "Direct Participation" And A "Cover Up" Do Not Plead Scienter.

Plaintiffs' assertions of "direct participation" by the Exchange Act Defendants in the supposed scheme (¶¶ 208-09, 219-30) amount to an attempt to impute scienter based on employment titles in the face of binding precedent foreclosing that inference. *PR Diamonds*, 364 F.3d at 688 ("[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."); *Konkol*, 590 F.3d at 397 (same); *Huntington*, 674 F. Supp. 2d at 971 (same). In this circumstance, "[t]he standard from *Tellabs* requires *specific* facts" showing information was presented to Defendants "in such a way that it would have been obvious" that the contributions were made pursuant to an explicit *quid pro quo*

-40-

agreement in exchange for specific official action (or were obviously illegal). *Konkol*, 590 F.3d at 398.

Likewise, Plaintiffs' attempt to establish scienter because the Exchange Act Defendants "held themselves out as the persons most knowledgeable about [political activities and nuclear operations, among other subjects] and regularly presented on them to investors" (¶ 219) ignores precedent holding that such allegations can be probative of scienter only in conjunction with "contemporaneous facts showing that the Defendants knew . . . that [their] statements were false." *Konkol*, 590 F.3d at 402. The Complaint is devoid of facts showing the Exchange Act Defendants knew that the contributions were illegal, so the fact that some Defendants may have been aware of the Company's promotion of nuclear-power legislation shows nothing. *Das*, 332 F. Supp. 3d at 814 (knowledge of putatively legitimate practices does not support scienter.).

The allegations about Pearson and Strah fit this mold, in particular.[12] The Complaint identifies Pearson's and Strah's titles and "responsibilit[ies]" (¶¶ 225-26), but never alleges facts connecting either of them with the contributions to Generation Now, much less facts showing they knew of (or even recklessly disregarded) the existence of a *quid pro quo* agreement or other basis of illegality. Plaintiffs offer the unsupported assertion that they "reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme." (*Id*.) But the Complaint never identifies any specific report or document that Pearson or Strah examined, or pleads any facts about what they saw or did not see in their purported review of the Company's political contributions or what conclusions they did or did not draw from that information, or identifies any supposed

---

[12] Plaintiffs make no allegations about purported "participation" by Taylor, implicitly conceding their inability to plead scienter as to Taylor. *See, e.g.*, *Huntington*, 674 F. Supp. 2d at 972 n.10 ("the signatures on the Sarbanes-Oxley certifications are not probative of scienter" where the complaint fails to plead facts showing or suggesting knowledge of any falsity "at the time they signed the certifications").

"accounting" errors. *Albert Fadem Tr.*, 334 F. Supp. 2d at 1026; *see also Ulbricht v. Ternium S.A.*, 2020 WL 5517313, at *11 n.8 (E.D.N.Y. Sept. 14, 2020) (dismissing for failure to plead allegations tying individual defendants to alleged bribery scheme).

The Complaint's assertion that "FirstEnergy would later admit that its internal controls were deficient in direct contradiction of" statements certified by Pearson and Strah gets Plaintiffs nowhere (¶¶ 225-26), because the Complaint has no allegations that either of them was alerted to any facts at the time the certifications were made suggesting that they were false. *See Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008) (holding allegations about SOX certifications not probative of scienter because "[p]laintiffs fail[ed] to allege facts to suggest that [defendants] had reason to know or should have suspected accounting irregularities or other 'red flags' at the time they signed the certifications"), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48-49 (2011)); *Das*, 332 F. Supp. 3d at 816 (holding that where complaint fails to allege "actual knowledge that the payment was unlawful, it undermines the allegations that they knew that the SOX certifications were false"); *see also Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1003-04 (9th Cir. 2009) ("Boilerplate language in a corporation's 10–K form, or required certifications under Sarbanes-Oxley section 302(a), however, add nothing substantial to the scienter calculus.") (collecting cases).

Apart from the insufficient allegations about plea agreements and terminations (*see supra* at 19-20, 39-40), all Plaintiffs offer to support their assertion that the Exchange Act Defendants "cover[ed] up" the supposed "Bailout Scheme" is the fact that contributions were made through 501(c)(4) organizations (¶ 233). But exercising the legal right to donate anonymously to a 501(c)(4) organization does nothing to support an inference of scienter, whether recklessness or

actual knowledge is required. *Das*, 332 F. Supp. 3d at 814 (presumptively legal activities do not imply scienter).

### 3. Allegations About "Magnitude" Of Contributions To Generation Now Do Not Plead Scienter.

The Complaint's attempt to plead scienter based on "magnitude" (¶¶ 236-37) ignores Sixth Circuit precedent holding that the magnitude of an alleged fraud does not contribute to an inference of scienter. *See, e.g.*, *Fidel v. Farley*, 392 F.3d 220, 231 (6th Cir. 2004) ("Allowing an inference of scienter based on the magnitude of fraud would eviscerate the principle that accounting errors alone cannot justify a finding of scienter . . . . It would also allow the court to engage in speculation and hindsight, both of which are counter to the PSLRA's mandates."); *La. Sch. Emp's. Ret. Sys.*, 622 F.3d at 483-84 ("to infer scienter solely from the magnitude of the fraud would require hindsight, speculation, and conjecture"); *In re Diebold Sec. Litig.*, 2008 WL 3927467, at *10 (N.D. Ohio Aug. 22, 2008) ("In the Sixth Circuit, however, the magnitude of the financial fraud is not a factor in determining defendants' scienter.").

Beyond that, the Complaint vaguely asserts that the Generation Now contributions came from FirstEnergy "affiliates" or "entities" (¶¶ 64, 67, 82, 93(d), 135(a), 136(a), 137, 164), without specifying how much came from FirstEnergy versus, for example, Energy Harbor Corp. (formerly FirstEnergy Solutions Corp.), a separate corporation that has been under separate management with a separate board since 2016. Absent such details, the Complaint's allegations make it impossible to ascertain what contributions were actually made by FirstEnergy. (*See, e.g.*, ¶ 153 (alleging that Jones said that only 25% of the Generation Now contributions referenced in the federal criminal complaint were from FirstEnergy, and not disputing the truth of his statement).) That, too, undercuts any inference of scienter based on the supposed "magnitude" of the contributions.

Nevertheless, the "magnitude" allegations effectively ask the Court to infer that Defendants must have known that the contributions were illegal because they totaled, from various sources, "more than $60 million."  (¶ 236.)  But assertions that certain Defendants "must have known" do not suffice, because particularized facts of actual knowledge are required. Furthermore, as the Complaint concedes, the total contributions occurred in installments over the course of three years (¶¶ 67, 236), and even the entire $60 million figure was a miniscule fraction (less than 0.25%) of the Company's $33 billion revenue over the three-year period during which the contributions were made; this is hardly the kind of "in your face fact[] that cr[ies] out scienter."  *Konkol*, 590 F.3d at 400 (affirming dismissal and explaining that for "a multi-billion-dollar company . . . the amount of improperly recognized revenue would have to be significant" in order to support a finding of scienter); *Huntington*, 674 F. Supp. 2d at 970 (rejecting assertion of scienter where business "was just 3.9 percent of Huntington's total loans and leases and just 2.8 percent of Huntington's total assets"); *Ley*, 543 F.3d at 812 (describing overstatement of revenues by 5.68% as "such a low percentage" that it "does not strike us as the type of 'in your face facts' that 'cry out' scienter").

Moreover, a bribery scheme "is not the type of conduct from which scienter can be strongly inferred by the magnitude of" the contributions "alone."  *Konkol*, 590 F.3d at 400 (holding same held for revenue-recognition scheme because "it would have been spread out among . . . different sources and therefore would not likely have served to put the Defendants on notice of the misstated revenue.").  To know that contributions constituted bribes, it would not be enough to know of their existence and amounts.  One would have to know that the contributions were being made pursuant to an explicit *quid pro quo* agreement in which a public official promised specific official action in exchange for the contributions.  To anyone not a party to

such agreement (or who was not otherwise informed of it), it certainly would not be "obvious" that the contributions were being made pursuant to such an agreement. *PR Diamonds*, 364 F.3d at 681. But the Complaint has no details concerning the formation or terms of any such agreement, no explanation of how any supposed illegality could have been detected from an examination of a paper record of the contributions, or any specific facts connecting any Defendant with any meeting, memorandum, or other communication that disclosed the existence of such agreement. *Konkol*, 590 F.3d at 401 (affirming dismissal where "[n]owhere in the complaint . . . are any specific facts alleged that connect the Defendants to the revenue-recognition scheme"). This lack of details precludes any inference of recklessness, far less actual knowledge.

### 4. Allegations About Capital, Credit Ratings, And Performance-Based Compensation Do Not Plead Scienter.

Plaintiffs attempt to establish scienter by pointing to (i) the issuance of debt and equity by FirstEnergy (¶¶ 241-44), (ii) the Company's desire to maintain a good credit rating (¶¶ 245-47), and (iii) the existence of performance-based compensation (¶¶ 248-51). The Sixth Circuit, however, has held that allegations of "motives common to corporations and executives generally" do "not comprise a motive for fraud." *PR Diamonds*, 364 F.3d at 690; *EveryWare*, 175 F. Supp. 3d at 859 (same). These generic motives are as general as they come, and do not support a strong inference of scienter. *See, e.g.*, *Russo v. Bruce*, 777 F. Supp. 2d 505, 520 (S.D.N.Y. 2011) (collecting cases) ("The bald allegation that defendants committed fraud out of a desire to raise capital for the corporation does not give rise to a strong inference of fraudulent intent."); *Local 295/Local 851*, 731 F. Supp. 2d at 720-21 (rejecting allegations of motive to reduce borrowing costs and explaining that the "desire to maintain [a] company's credit rating [is] universal to all corporate executives"); *EveryWare*, 175 F. Supp. 3d at 859 (holding

-45-

"executive's desire for the company to appear successful and . . . to protect his position in the company and increase his compensation" is a generic motive); *id.* (dismissing based on scienter because it was "simply more likely that the . . . Defendants' actions indicated an intent for the Company to succeed"). If allegations like these sufficed for scienter, the PSLRA's heightened pleading requirement would be meaningless.[13]

Plaintiffs attempt to tie certain Officer Defendants' performance compensation to the improvement of credit ratings by asserting that compensation was "largely based on FirstEnergy's reported financial results" (¶¶ 248-49), but the Complaint has no particularized facts to back up this assertion. *See Comshare*, 183 F.3d at 553 ("[A]llegations rest[ing] on mere information and belief . . . cannot support a strong inference of scienter."). And, even if this connection were substantiated with specific facts, the desire to improve reported results and obtain performance compensation are too generic to show even recklessness, far less actual acknowledge. *EveryWare*, 175 F. Supp. 3d at 859. Finally, Plaintiffs do not allege that any of FirstEnergy's "reported financial results" were misstated.

### 5. Allegations About Stock Trading Do Not Plead Scienter.

The allegations of insider trading (¶¶ 250-51) are equally inadequate to establish scienter. "Because corporate executives are often paid in stock and stock options, they will naturally trade those securities in the normal course of events, and courts will not infer fraudulent intent from the mere fact that some officers sold stock." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 543 (5th Cir. 2008). But that is all the Complaint offers;

---

[13] The Complaint obliquely notes that FirstEnergy used capital from debt offerings to service loans (¶¶ 242-43), but "no specific facts have been plead . . . to show that Defendants were motivated to commit fraud based on the fear of defaulting on certain loan covenants and credit agreements," so this assertion fails to establish scienter. *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 899 (N.D. Ohio 2006); *see also Ley*, 543 F.3d at 813-14 ("Plaintiffs fail to allege any particularized facts or details related to the notes offering that support an inference of scienter.").

Plaintiffs allege that certain Officer Defendants—and, at that, only four of eleven—sold stock during the three-year-plus period. (¶ 250.) That so few Officer Defendants sold stock during the lengthy class period, despite their supposed knowledge that the stock price was artificially inflated (*e.g.*, *id.*), is inconsistent with scienter. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) (no inference of scienter where only three of the five defendants sold stock); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) ("*Tellabs* instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of [the company's] stock fell.").

Furthermore, though the Complaint does not acknowledge it, several Officer Defendants *increased* their shareholdings during the class period. The Complaint alleges no sales by Taylor or Strah. In fact, they both substantially increased their shareholdings during the class period: Strah ended the period with holdings around *ten times* larger than at the start of the class period, and Taylor's holdings approximately doubled. (*Compare* Ex. C, Form 4 (Feb. 22, 2017) (reflecting Strah's ownership of 6,318 direct shares), *with* Ex. D, Form 4 (Mar. 3, 2020) (reflecting Strah's ownership of 64,223 direct shares); *compare* Ex. E, Form 4 (Feb. 22, 2017) (reflecting Taylor's ownership of 7,632 direct shares); *with* Ex. F, Form 4 (Mar. 5, 2018) (reflecting Taylor's ownership of 15,290 direct shares).)

Importantly, the four Defendants identified as having sold shares during the class period were all *net acquirers* of FirstEnergy stock, which undermines any inference of scienter. *See, e.g.*, *Smallen v. Western Union Co.*, 950 F.3d 1297, 1310-11 (10th Cir. 2020) ("Both [defendants] increased their aggregate holdings during the Class Period, and their respective sales yield from the identified transactions constituted only a fraction of their respective

-47-

holdings. These factors militate against an inference of scienter."); *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) (9.2% increase in class-period holdings "negate[d] any inference that [the defendant] had a motive to artificially inflate Abiomed's stock"); *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (no scienter where "[t]hree of the four individual defendants increased their net holdings of GSK stock during the class period").[14] *See also Tyson*, 275 F. Supp. 3d at 1001 ("[T]he Court does not believe that stock sold by defendants for tax purposes following the vesting of performance shares is at all probative of scienter.").

As Pearson's trading history exemplifies, the allegations in the Complaint preclude, not support, a scienter inference. Plaintiffs note that he sold 40,000 shares on January 9, 2019, which they claim amounted to a 28% sell off (¶ 250), but they neglect to mention that he ***acquired*** an additional 50,312 shares on March 1, 2019, ending the class period with nearly 150% of his January 9 direct holdings and 250% of his holdings at the start of the Class Period. (*Compare* Ex. G, Form 4 (Feb. 22, 2017) (reporting 62,911 direct common shares and 37,005 indirect), *with* Ex. H, Form 4 (Mar. 5, 2019) (reflecting ownership of 155,624 direct and 40,737 indirect shares).) Pearson thus was a net acquirer of FirstEnergy stock. The same is true of the other Defendants identified as having made sales during the class period. As a result, there is no basis for inferring scienter based on the sales. *See EveryWare*, 175 F. Supp. 3d at 857 (rejecting inference of scienter as to net acquirer of stock).

---

[14] *See also Zamir v. Bridgepoint Educ., Inc.,* 2016 WL 3971400, at *10 (S.D. Cal. July 25, 2016) ("That [the defendants] increased their holdings gives rise to an inference of good faith, not scienter."); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (holding that insider trading allegations failed to support an inference of scienter, in part, because "even if [the defendant] realized some proceeds (and profit) from stock sales during the Class Period, his holdings of The9 ADS actually increased during that period from 6.6 million shares to 7 million shares"); *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1296 (D.N.M. 2002) (insider trading allegations insufficient to plead scienter where insiders collectively purchased more shares than they sold during the class period); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 898–99 (W.D.N.C. 2001) (increase in holdings by two insiders during the class period demonstrated the absence of scienter).

## IV.     THE COMPLAINT FAILS TO STATE A CLAIM FOR SCHEME LIABILITY.

As discussed in sections I-III, *supra* at 9-48, the Complaint fails to plead the underlying "illegal acts" with particularity and fails to plead scienter. Each independently requires dismissal of the scheme liability claim (as well as the misstatement claim). The scheme liability claim should be dismissed for at least three additional reasons as well: (1) the purported scheme did not occur "in connection with" any securities transaction; (2) Plaintiffs have not sufficiently alleged reliance on any scheme; and (3) the alleged conduct is not inherently "deceptive."

### A.     The Complaint Fails To Plead That The Alleged Scheme Occurred "In Connection With" The Purchase Or Sale Of Any Security.

By its plain language, Rule 10b-5 prohibits only fraudulent conduct "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To be actionable under Rule 10b-5(a) or (c), then, an alleged "scheme" must have occurred "in connection with the purchase or sale of securities." *Nat'l Century I*, 2006 WL 469468, at *21; *see also Hawaii Ironworkers Annuity Tr. Fund v. Cole*, 296 F.R.D. 549, 553-54 (N.D. Ohio 2013) (Rule 10b-5(a) and (c) claims require "a connection between the deceptive act and the purchase or sale of a security"); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017) ("*Menaldi II*") (a scheme is actionable only if "the fraud itself [is] integral to the purchase and sale of the securities in question").

In practice, this requirement means that a purported scheme must involve a defendant's activity in the securities market. *See, e.g.*, *La. Mun. Police Emps. Ret. Sys. v. KPMG, LLP*, 2012 WL 3903335, at *3 (N.D. Ohio Aug. 31, 2012) (Rule 10b-5(a) and (c) prohibit "activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand"); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 249 (S.D.N.Y. 2018) ("requir[ing] a showing that" defendants "engaged in *market activity* aimed at

-49-

deceiving investors as to how other market participants have valued a security") (emphasis in original). As this Court has recognized, appellate courts "have characterized Rule 10b-5(a) and (c) as concerning 'market manipulation.'" *Nat'l Century I*, 2006 WL 469468, at *21 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177-78 (2d Cir. 2005); *Corsair Capital Partners, L.P. v. Wedbush Morgan Secs., Inc.*, 24 F. App'x 795, 798 (9th Cir. 2001)). Market manipulation requires "some market activity, such as 'wash sales, matched orders, or rigged prices.'" *Cannavest*, 307 F. Supp. 3d at 249; *see also Albert Fadem Tr.*, 334 F. Supp. 2d at 992. Mere allegations that a supposed scheme inflated the market price of a publicly traded stock do not suffice. *E.g.*, *Nat'l Century I*, 2006 WL 469468, at *21 (rejecting allegations "that the [defendants] employed a scheme to inflate the market price of [the company's] common stock"); *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, 2010 WL 1287058, at *24 (E.D. Wis. Mar. 30, 2010) (dismissing market manipulation claim where plaintiff alleged that defendants "artificially inflate[d] the market price of [the company's] common stock"); *Menaldi II*, 277 F. Supp. 3d at 518 ("Not all conduct that negatively affects a company's stock price is actionable as federal securities fraud."). Thus, when this Court has upheld scheme liability claims, the cases have involved acts that bore upon specific securities transactions or were directly connected to the sale of securities. *See, e.g.*, *S.E.C. v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 960 (S.D. Ohio 2009) ("market manipulation counts" alleged defendants engaged "in a 'pump-and-dump' scheme which artificially inflated the market price"), *aff'd*, 712 F.3d 321 (6th Cir. 2013).

Plaintiffs here do not contend that any Defendant engaged in market manipulation, and the Complaint alleges no facts about any market activity by any Defendant, such as wash sales, matched orders, or rigged prices. The Complaint instead asserts that certain Defendants

"participat[ed] in and facilitat[ed] the Bailout Scheme," which purportedly entailed contributing money to promote the enactment of HB6 and to defeat the subsequent repeal effort. (¶¶ 67, 70, 81, 93, 269.) But Plaintiffs never tie their allegations about "bribery" or campaign contributions to any securities transaction. (*See, e.g.*, ¶¶ 3, 70, 93, 142, 144, 209, 233, 236-37, 292.) Without particularized allegations showing that the purported bribery at the heart of the "scheme" was undertaken in connection with a securities transaction, the scheme liability claim fails. *See Menaldi II*, 277 F. Supp. 3d at 518 (holding allegations that defendant "engaged in extensive bribery" failed to state a scheme liability claim because there was no "necessary link between his deceptive acts and the purchase or sale of securities" and the complaint "fail[ed] to explain how the proscribed schemes or acts were done in connection with the purchase or sale of any security").

Nor does the Complaint allege that any action taken in connection with the alleged scheme was "done to affect [FirstEnergy's] stock price, such as schemes to manipulate stock prices or to disseminate false information about the quality of an investment." *S.E.C. v. Narayan*, 2017 WL 4652063, at *3, *10 (N.D. Tex. Aug. 28, 2017) (no scheme liability where defendants allegedly "engag[ed] in an illegal kickback scheme" because there were "no allegations that their actions were done to affect [the company's] stock price . . . [or] to deceive investors"); *see also Nat'l Century I*, 2006 WL 469468, at *22 (rejecting scheme liability theory when complaint did not allege "how [the] scheme affected the value of [company]'s stock or otherwise manipulated the market" and there were thus "no allegations that the fraud was in connection with Plaintiffs' purchase of securities"). Rather than manipulate the stock price, the Complaint alleges that the purpose of the purported scheme was to win passage of HB6. (¶ 64.) Because allegations of the requisite "manipulative market activity" by the Exchange Act

Defendants are absent here, the scheme liability claim must be dismissed. *Cannavest*, 307 F.

Supp. 3d at 251-52 ("insist[ing] on proof of market activity" by defendants and rejecting Rule

10b-5(a) and (c) claims "[b]ecause Plaintiffs have not pled facts demonstrating manipulative

market activity").

### B.     The Complaint Fails To Plead Reliance On Any Allegedly Deceptive Conduct.

The scheme liability claim fails for another reason:  the Complaint fails to plead reliance.

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the

§ 10(b) private cause of action." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148,

159 (2008).  Reliance ensures that, for liability to arise, the requisite causal connection exists

between a defendant's actions and a plaintiff's injury.  *Id.*  In other words, reliance is tied to

causation, "leading to the inquiry whether respondents' acts were immediate or remote to the

injury."  *Id.* at 160.  In *Stoneridge*, the Supreme Court rejected plaintiffs' scheme liability

argument for lack of reliance, concluding that the respondents' "deceptive acts, which were not

disclosed to the investing public [were] too remote to satisfy the requirement of reliance."  *Id.* at

161.  The Court rejected the petitioner's argument that, in an efficient market, investors rely not

only upon the public statements relating to a security but also upon the underlying activities

those statements reflect, holding that "[w]ere this concept of reliance to be adopted, the implied

cause of action would reach the whole marketplace in which the issuing company does business;

and there is no authority for this rule."  *Id.* at 160.

In the wake of *Stoneridge*, courts in this Circuit—including this Court—reject scheme

liability claims where reliance is lacking.  *See Nat'l Century II*, 553 F. Supp. 2d at 911

(dismissing claims under Rule 10b-5(a) & (c) "because the complaints do not allege that the

moving Defendants engaged in deceptive conduct on which Plaintiffs relied in purchasing

[company's] stock"); *Gordon v. Elite Consulting Grp. L.L.C.*, 2009 WL 4042911, at *6 (E.D. Mich. Nov. 19, 2009) (holding defendant was entitled to dismissal of scheme liability claims "absent factual allegations that plausibly support the requisite element[] of reliance"). Courts across the country routinely do the same. *See, e.g.*, *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 159 (2d Cir. 2010) (rejecting scheme liability where "plaintiffs did not rely on any of [defendant's] work on the fraudulent loan transactions"); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 162 (S.D.N.Y. 2012) ("Plaintiffs do not allege that any plaintiff bought or sold shares based on . . . specific deceptive conduct. And as the requisite reliance cannot be shown, Defendants have no liability to Plaintiffs"); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 272 (S.D.N.Y. 2008) (dismissing scheme liability claim where "Complaint does not explain how the alleged actions of these defendants were relied upon by purchasers of Image stock during the relevant period"); *Siegmund v. Xuelian Bian*, 2018 WL 1611197, at *9 (S.D. Fla. Apr. 2, 2018) (plaintiff did not "carr[y] his heavy burden in showing that [he] in fact relied upon [defendant's] own deceptive conduct").

Where the alleged scheme is not publicly disclosed, there can be no reliance. *See, e.g.*, *In re Nature's Sunshine Prod. Sec. Litig.*, 2008 WL 4442150, at *4 (D. Utah Sept. 23, 2008) (rejecting scheme liability claims where defendants "were alleged to have been involved in the fraudulent activity" but "because their conduct was not publicly disclosed, there could be no reliance"). That is because, "[a]bsent disclosure of [a defendant's deceptive] conduct to the public, there is no basis . . . to . . . conclude that the market took the deceptive conduct into account in pricing a security" or that plaintiffs "relied on that conduct when buying or selling the security." *Hawaii Ironworkers*, 296 F.R.D. at 555. Courts therefore dismiss scheme liability claims for failure to plead reliance where, as here, the alleged scheme was not disclosed to the

public. *See, e.g.*, *Cosby v. KPMG, LLP*, 2018 WL 3723712, at *9 (E.D. Tenn. Aug. 2, 2018) (agreeing that "plaintiff had no knowledge of defendant's conduct and thus cannot show that they relied on defendant's actions"); *In re DVI, Inc. Sec. Litig.*, 919 F. Supp. 2d 498, 507–08 (E.D. Pa. 2013) ("The record does not establish that the Plaintiff investors knew about or otherwise relied on any conduct or statements made by [defendant] at the time that they purchased or sold DVI's securities. The record shows the opposite—that none of the alleged conduct was publicly disclosed and attributed to [defendant]."); *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 317-18 (S.D.N.Y. 2009) (holding plaintiffs could not "show reliance upon any of respondents' actions" where those "acts were not communicated to the public"); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 279 (S.D.N.Y. 2009) ("[N]o liability can attach because plaintiffs could not have relied on their conduct, just as the plaintiffs in *Stoneridge* did not know of, and thus could not have relied on, the transactions in that case."); *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 195 (5th Cir. 2010) (affirming dismissal where reliance for scheme liability not pleaded).

Here, it is undisputed that there was no public disclosure of the alleged deceptive conduct until after the class period. Not a single one of the allegedly false and misleading statements Plaintiffs point to mention anything about purported bribery. (*See* ¶¶ 95-138.) Indeed, the gravamen of Plaintiffs' 10b-5(b) claim is that the scheme was *not* disclosed to the public. The Complaint is replete with allegations that the scheme was "secret" and "concealed." (*E.g.*, ¶ 3 ("*Unbeknownst to investors*, FirstEnergy spent tens of millions of dollars on an unprecedented multi-year scheme"); ¶ 64 ("FirstEnegy . . . *secretly* poured millions into the Bailout Scheme"); ¶ 67 (listing various contributions FirstEnergy allegedly made and "*concealed throughout the Class Period*"); ¶ 70 (alleging FirstEnergy "illegally *concealed* contributions"); ¶ 82 (alleging

-54-

FirstEnergy paid millions "into the Bailout Scheme (*which defendants concealed throughout the Class Period*)").)  According to Plaintiffs, the supposed scheme was not "revealed" until July 2020, after the end of the putative class period.  (¶¶ 8, 138.)

Plaintiffs do not, and cannot, allege that they knew about or relied upon any actions by any Defendant in connection with the purported bribery scheme.  Allegations that defendants covered up any such scheme or intended any of their actions to result in financial benefit are insufficient to show reliance.  *See Menaldi II*, 277 F. Supp. 3d at 518-19 (rejecting scheme liability when complaint "fail[ed] to allege that investors knew of, or relied upon, [defendant's] attempt to cover up his alleged self-dealing.  The mere fact that [defendant] tried to avoid detection by the authorities does not transform bribery into securities fraud."); *Pugh*, 521 F.3d at 697 (affirming dismissal where there was "no allegation that . . . investors were ever informed of" defendants' actions; defendants "may have foreseen (or even intended) that the . . . scheme would result in improper revenue . . ., which would eventually be reflected in Tribune's revenues and finally published in its financial statements" but that is "too remote to establish primary liability").  Because Plaintiffs could not have relied upon the undisclosed actions of the Exchange Act Defendants, the scheme liability claims must be dismissed.

### C.    The Complaint Fails To Plead With Particularity That The Alleged Underlying Acts Were Inherently Deceptive.

As discussed above, *see supra* at 29-30, to state a claim for scheme liability, Plaintiffs must allege that the Exchange Act Defendants engaged in conduct that was "in itself deceptive." *Nat'l Century II*, 553 F. Supp. 2d at 909.  It is not enough to allege that defendants "simply engag[ed] in non-deceptive conduct that supports an overall deceptive scheme."  *Id.*  Put another way, "scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of

creating a false appearance." *S.E.C. v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1299 (D. Colo. 2013).

Where a complaint does not allege with particularity that defendants engaged in any inherently deceptive acts, a claim for scheme liability fails. *See, e.g.*, *Nat'l Century II*, 553 F. Supp. 2d at 909 (dismissing claim against defendant "because he is not alleged to have engaged in any deceptive conduct"); *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1236 (D.N.M. 2013) ("The fatal problem with the SEC's allegations of scheme liability is that . . . none of the conduct the SEC references in furtherance of the scheme is inherently deceptive"); *Alstom*, 406 F. Supp. 2d at 476–77 (rejecting scheme liability claim because "intentional underbidding of a contract is not, in and of itself, fraudulent"); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 534 (S.D.N.Y. 2020) (no scheme liability where "the only relevant conduct is the setting of aggressive sales goals, which is not inherently deceptive"); *Parmalat*, 376 F. Supp. 2d at 505 (no scheme liability where the transactions at issue "were not shams" and did not "depend on any fictions"); *S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360-61 (D.N.J. 2009) (no scheme liability where defendants gave "oral assurances of rights of return or pricing concessions in connection with the sales," because such conduct is "not inherently deceptive").

*Narayan* illustrates this. There, the SEC sued a company, TTR, and its CEO and CFO, as well as an investment advisor, Narayan, who allegedly directed his clients to make high-risk investments in TTR in return for millions of dollars in finder's fees. 2017 WL 4652063, at *1. As part of the "illegal kickback scheme," the CEO and CFO allegedly paid Narayan "millions in secret finder's fees"; made "Ponzi-like" payments to investors; backdated documents; and disguised payments to Narayan as "sham loans." *Id.* at *7-9. The court held that those allegations were not sufficient to state a claim for scheme liability against the CEO and the CFO,

because the acts were not "***independently deceptive to investors***," and instead, "appear[ed] to have been intended to keep Narayan's misconduct covered up." *Id.* at *10. Because the SEC did not sufficiently allege that the CEO and CFO performed any act that deceived investors, the scheme liability claims against the CEO and CFO failed.

The scheme liability claim here likewise fails, because none of the Defendants' alleged acts were inherently deceptive. The Complaint contains numerous allegations about the conduct of non-parties, but the primary alleged conduct by the Exchange Act Defendants here was contributing money to 501(c)(4) organizations such as Partners for Progress and Generation Now. (¶ 65.) Those actions, "are not, standing alone, fraudulent or indicative of improper actions." *Narayan*, 2017 WL 4652063, at *10, as there is nothing inherently deceptive about contributing to a 501(c)(4) organization. As discussed in section XX, corporations have a right, protected by the First Amendment, to participate in public debate, including by underwriting speech by a 501(c)(4).

Plaintiffs' allegations that the Exchange Act Defendants' contributions were secret, undisclosed, or "covered up" do not save their scheme lability claim. Even if it could be considered "deceptive" not to have disclosed the contributions, those are the same allegations that form the basis of the misstatement claim under 10b-5(b), and thus cannot support the scheme liability claim. *See Gordon v. Royal Palm Real Est. Inv. Fund I*, 2020 WL 2836312, at *1 (E.D. Mich. May 31, 2020); *Narayan*, 2017 WL 4652063, at *8 ("a scheme to cover up an omission is simply an omission"); *Lucent Techs., Inc.*, 610 F. Supp. 2d at 360–61 (no scheme liability when the alleged "deception . . . case arose from the failure to disclose the 'real terms' of the deal, which is nothing more than a reiteration of the misrepresentations and omissions that underlie

plaintiffs [sic] disclosure claim").  Because Plaintiffs fail to plead a deceptive act, separate from the alleged misstatements, their scheme liability claim must be dismissed.

### D. The Complaint Fails To Plead With Particularity That Every Exchange Act Defendant Engaged In An Inherently Deceptive Act

The Complaint also fails to state a claim under Rule 10b-5(a) and (c) as to those Exchange Act Defendants who are not alleged with particularity to have participated in the alleged scheme.  *Nat'l Century II*, 553 F. Supp. 2d at 911 ("Plaintiffs' claims under Rule 10b-5(a) & (c) are dismissed because the complaints do not allege that the moving Defendants engaged in deceptive conduct on which Plaintiffs relied in purchasing e-MedSoft stock."); *KV Pharm. Co.*, 679 F.3d at 986 (agreeing with the district court that "plaintiffs fail[ed] to allege with sufficient particularity" how certain individuals defendants "were actually involved" and thus "fail[ed] to state claims under Rule 10b-5(a) and (c)"); *Alstom*, 406 F. Supp. 2d at 474 (dismissing scheme liability claims against certain defendants as to whom the complaint failed to plead misstatement liability).  This includes defendants Taylor, Strah and Pearson.

> Taylor:  There are no allegations about Taylor's supposed participation in a scheme.  He is not mentioned in the "Defendants' Direct Participation in the Bailout Scheme" section of the Complaint.  (¶¶ 219-30.)  The only allegation about his activity is the signing of SEC filings that supposedly contained misstatements.  (¶¶ 95-96.)  That is not enough. *See, e.g.*, *Nat'l Century II*, 553 F. Supp. 2d at 910 (finding plaintiff's allegations insufficient under Rule 10b-5(a) and (c) to state a claim against the company's founder because it was someone else "who allegedly committed the deceptive acts").[15]

---

[15] It also is insufficient to plead scienter as to Taylor with respect to any alleged misstatement liability under Rule 10b-5(b).  *See supra* at 41 n.12.  Furthermore, as to Pearson, the Complaint acknowledges that he retired in April 2019 (¶ 29), after which point he could face no liability and the Complaint could plead no facts showing scienter as to him.

<u>Strah and Pearson</u>:  The allegations are likewise insufficient as to Pearson and Strah, each of whom is also alleged to have signed SEC filings and the requisite SOX certification. (*E.g.*, ¶¶ 225-26.)  *See, e.g.*, *Nat'l Century II*, 553 F. Supp. 2d at 910; *see also Kelly*, 817 F. Supp. 2d at 344 (holding that a company's "typical" business practice is not "inherently deceptive" as is required to sufficiently allege scheme liability).  The Complaint also alleges in conclusory fashion that Pearson was "directly involved and intimately familiar with key aspects of the Bailout Scheme" (¶ 225), and that Pearson and Strah "reviewed and determined the Company's accounting for its payment and political contributions" (¶¶ 225-26), but pleading participation in a scheme requires particularized facts.  *See Nat'l Century I*, 2006 WL 469468, at *21 (holding that Rule 9(b)'s particularity requirement applies to Rule 10b-5(a) and (c) claims).

## V.  THE COMPLAINT FAILS TO STATE A CLAIM FOR MISSTATEMENT LIABILITY.

As discussed in sections I-III, *supra* at 9-48, the Complaint fails to plead the falsity of any statement because it fails to plead the underlying "illegal acts" with particularity and because it fails to plead scienter.  The Complaint further fails to state a claim for misstatement liability because it fails to plead falsity as to statements of opinion, fails to plead an actionable omission, and because statements about codes of conduct are not actionable.

### A.  The Complaint Fails To Plead Falsity As To Statements Of Opinion.

Most of the alleged misstatements were opinions and therefore cannot serve as the basis for any of Plaintiffs' claims under §§ 10(b), 11 or 12(a)(2).  An opinion can give rise to liability under the securities laws only if the speaker did not hold the belief she professed or if she had in her possession a specific item of contradictory information that a reasonable person would have thought undercut the opinion so strongly that the speaker knew it was misleading not to disclose

that information. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-97 (2015) ("*Omnicare III*").[16] "That is no small task for an investor" to plead, *id.* at 194, and the Complaint falls short.

An opinion statement expresses "a belief[,] a view, or a sentiment which the mind forms of persons or things." *Id.* at 183. Although adding qualifiers like "I believe" or "I think" can transform a factual statement into an opinion, such qualifiers are not necessary for a statement to be an expression of opinion, and the form of the statement is not determinative of whether it is an opinion. *See, e.g.*, *In re Dynagas LNG Partners LP Sec. Litig.*, 2020 WL 6947521, at *13 (S.D.N.Y. Nov. 25, 2020) ("[T]he inclusion or exclusion of such language is never dispositive; the statements must be analyzed in context."). Instead, the "[m]ost important" feature of an opinion is that it does not "express[] certainty," but rather "rest[s] on grounds insufficient for complete demonstration." *Omnicare III*, 575 U.S. at 183; *Conagra Brands*, 495 F. Supp. 3d at 649 (rejecting argument that statements were not opinions because they did "not contain qualifiers such as 'I think' or 'I believe'" and explaining that a statement is an opinion if its "content" does not "express certainty"). The Complaint attacks a wide range of opinion statements, including:

- Assessments of Compliance Efforts, like the statement that FirstEnergy "[e]ndeavor[s] to comply with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations." (¶ 107, *see also, e.g.*, ¶¶ 97-98 (similar); ¶ 111 ("political contributions and expenditures . . . are legally permissible and in the best

---

[16] The two circuits to have expressly considered the question have concluded that *Omnicare III* applies to § 10(b) claims as well as to § 11 claims, which *Omnicare III* addressed. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 614-15 (9th Cir. 2017); *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016). Many other courts have applied *Omnicare III* to § 10(b) claims. *E.g.*, *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018).

interests of FirstEnergy"); ¶ 134 ("we have very good regulatory relationships in our jurisdiction")). *See Omnicare III*, 575 U.S. at 179-80; *Sofamor Danek Grp.*, 123 F.3d at 402 ("The legality of [the company's] support for the non-profit foundation . . . was a matter of opinion[.]").

- Assessments of the Efficacy of Internal Controls, like management's view that FirstEnergy's "internal control over financial reporting was effective." (¶ 99; *see also, e.g.*, ¶ 100 (no changes that "are reasonably likely to materially affect" internal control over financial reporting); ¶ 102 (disclosure controls were "designed to ensure that material information" reached management).) *See D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 736 (E.D. Mich. 2003) (statement that "we maintain comprehensive systems of internal controls" was opinion); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 245-46 (S.D.N.Y. 2012) (statement that internal controls provided "reasonable assurance" about the reliability of financial reporting was a "statement of opinion").

- Statements About the Merits of HB6, like the statements that "Ohio's nuclear power plants" have "significant benefits" (¶ 112), that zero-emission nuclear legislation "is the right thing to do" (¶ 115), and that HB6 "is good for customers" (¶ 128, *see also, e.g.*, ¶ 113 (legislation could "have a positive impact on the nation's electrical system"), ¶¶ 116-19, 123-26, 129-30 (nuclear facilities were important to employees, communities, the economy, and state and national energy systems); ¶ 121 (intent to "ensure" customers "have a stable, reliable power supply")). *See In re Ford Motor Co., Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004) (statements about interests of customers and corporate social responsibility were opinions).

- Aspirational Statements, such as those expressing commitments to "good corporate governance" (¶¶ 104, 106-07), and the ambition to conduct business "transparently" (¶ 110). *See Ford*, 381 F.3d at 570-71; *City of Pontiac*, 865 F. Supp. 2d at 829 (statements of commitments to quality, safety, and compliance were opinions).

Under *Omnicare III*, a "statement of opinion is not misleading just because external facts [later] show[ed] the opinion to be incorrect," even assuming the opinions here could be deemed "incorrect" in hindsight. 575 U.S. at 188. Instead, opinions are actionable only if not honestly believed when made. The Complaint, however, pleads no specific facts showing that any Defendant believed that any particular contribution was illegal, that FirstEnergy was not complying with applicable laws and regulations, that FirstEnergy was not committed to "good" corporate governance, that HB6 was bad public policy, or that internal controls were ineffective at the time of the challenged statement. Likewise, the Complaint fails to allege particularized facts showing that any Defendant committed bribery or any other underlying illegal act (or knew about any such act), *supra* at 9-49, and thus cannot show that the challenged opinions lacked a reasonable basis. Without that showing, the opinions are not actionable. *Omnicare III*, 575 U.S. at 194 ("[A]n investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion.").

### B. The Complaint Fails To Plead An Actionable Omission.

Because Plaintiffs fail to plead with particularity that any Defendant engaged in bribery (or other illegal conduct), *supra* at 9-24, they cannot allege that Defendants violated § 10(b) of the Exchange Act, or §§ 11 or 12(a)(2) of the Securities Act, by not disclosing any underlying illegal acts. (¶¶ 269, 292; ¶¶ 95-142.) A defendant cannot violate the securities laws by "omitting" to disclose a fact that does not exist. *See, e.g.*, *Dailey*, 551 F. App'x at 846 ("One cannot disclose an event which has not . . . occurred."); *Zaluski*, 527 F.3d at 575 (company "had

no duty to disclose what it had not yet discovered or concluded"); *see also Sanderson Farms*, 944 F.3d at 465-66, *Schiro*, 438 F. Supp. 3d at 199; *Menaldi I*, 164 F. Supp. 3d at 578 (all cited *supra* at 9-12).

Moreover, the securities laws do not impose any "freestanding legal duty" to disclose uncharged wrongdoing. *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 28 (1st Cir. 1987) (concluding that there was no "duty to disclose the alleged illegal payments"); *Zaluski*, 527 F.3d at 574 (no duty to disclose potential consequences of illegal payments in the absence of specific allegations of "internal investigations and reports" attesting to knowledge). Rather, "[d]isclosure is required . . . only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). The Complaint, however, fails to identify any statement that was rendered misleading by the nondisclosure of the purported "scheme."

FirstEnergy's generalized statements of compliance with regulations and policies (¶¶ 97-98, 111, 133-34) are not rendered misleading by the nondisclosure of the supposed underlying illegal acts. "[T]his Circuit's precedent holds that a generic claim of legal compliance, absent any specifics, does not form the basis for a misrepresentation actionable under Rule 10b-5 and does not require the disclosure of allegedly illegal activities." *Dailey*, 551 F. App'x at 849. Moreover, because "aspirational statements concerning compliance with the law do not guarantee that compliance will occur in every instance," such statements are not rendered misleading by the occurrence of illegal conduct. *Banco Bradesco*, 277 F. Supp. 3d at 658; *see also Bonaldi*, 620 F. App'x at 489 (instances of noncompliance do not render statements of corporate standards misleading because it is "not reasonable to interpret" such "statements as a

guarantee" that corporate affiliates "would, in all instances, abide by the corporate standards and protocols").

For the same reasons, FirstEnergy's statements concerning its codes of conduct (¶¶ 104-11), were not misleading. The Sixth Circuit has held that because "a code of conduct is not a guarantee that a corporation will adhere to everything set forth in its code of conduct" or "an assertion of objective fact," but instead a "declaration of corporate aspirations," statements in such codes are "not actionable" as a matter of law. *Bondali*, 620 F. App'x at 490; *see also In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 766 (N.D. Ohio 2020) (same). This makes sense: "There is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct." *Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d at 756 (code of conduct was not actionable); *see also Ulbricht*, 2020 WL 5517313, at *10 (same); *Banco Bradesco*, 277 F. Supp. 3d at 658 (same; citing *Bonaldi*).

The statements about internal controls over financial reporting and disclosures (¶¶ 99-100, 102) were not misleading, either. The Complaint never identifies any reporting deficiency apart from the one FirstEnergy later uncovered and disclosed concerning the Randazzo payment. (¶¶ 189-90.) But a single issue cannot show that representations of general effectiveness were misleading. "Allegations that . . . controls must have been deficient because they may have failed to detect some weaknesses in . . . financial reports or disclosures in some instances are not sufficient." *Ulbricht*, 2020 WL 5517313, at *10; *see also Bonaldi*, 620 F. App'x at 490 ("To the extent the plaintiffs take issue with the efficiency or effectiveness of Yum's monitoring system, the plaintiffs raise a claim of corporate mismanagement, not investor deception."); *Banco*

-64-

*Bradesco*, 277 F. Supp. 3d at 648 (statements about effectiveness of controls are nonactionable absent "guarantee" that the "controls will perform perfectly in every instance").

In addition, because the Randazzo payment was allegedly made "in early 2019" (¶ 190), it cannot show that any prior statement about controls was misleading at the time it was made (or that any Defendant knew that it was), *see supra* at 18-19. The Complaint has no facts showing that before 2019 any Defendant had reason to believe that FirstEnergy's internal controls were deficient. *See Forman v. Meridian Bioscience, Inc.*, 367 F. Supp. 3d 674, 693 (S.D. Ohio 2019) ("The mere fact that Meridian disclosed a known deficiency in November 2017 does not, without more, suggest that it knew about the deficiency prior to that disclosure.").

Having failed to specify affirmative statements allegedly rendered false by the non-disclosure of alleged underlying acts, Plaintiffs attempt to establish a standalone duty to disclose. But the putative source for a disclosure obligation—Items 303 of Regulation S-K, 17 C.F.R. § 229.04 (¶¶ 139-42, 298; *see also* ¶¶ 101-02) and Item 105, 17 C.F.R. § 229.105 (¶ 300)—gets Plaintiffs nowhere. As courts across the country hold, "violations of Item 303 and Item 503 do not create an independent duty to disclose that may give rise to liability under Rule 10b-5." *Nardy v. Chipotle Mexican Grill, Inc.*, 2019 WL 3297467, at *9 (D. Colo. Mar. 29, 2019).[17]

## VI. THE SECTION 12(A)(2) CLAIM AGAINST THE NON-MANAGEMENT DIRECTORS MUST BE DISMISSED BECAUSE THEY ARE NOT STATUTORY SELLERS.

In addition to the lack of false statements or material omissions described above, Plaintiffs' claim under Section 12(a)(2) of the Securities Act against the current and former non-management directors fails for an additional, independent reason: those directors are not proper

---

[17] *See also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5."); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1331 (11th Cir. 2019) (rejecting argument that "a violation of Item 303 automatically gives rise to 10b-5 liability"); *Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000) (same).

defendants for that claim.[18]  Section 12(a)(2) provides a right of action against a statutory

seller—*i.e.*, a person who "offers or sells a security . . . by means of a prospectus" containing

misrepresentations.  15 U.S.C. § 77l(a)(2).  Here, Plaintiffs have failed to allege that the outside

directors are "statutory sellers" sufficient to state a claim against them for violation of Section

12(a)(2).  The sole allegation as to the non-management directors is that "[e]ach of the Director

Defendants signed the registration statement for the Offerings, and/or were named as directors in

the registration statements for the Offerings."  (¶ 281.)  That is not enough, as this Court recently

concluded in a decision, later affirmed by the Sixth Circuit, that was consistent with three other

circuits' decisions.[19]  *EveryWare*, 175 F. Supp. 3d at 868-69 (holding that "Plaintiffs lack

standing to bring a Section 12(a)(2) claim against the Non-Management Director Defendants

because they have not alleged any facts to indicate that the Directors' roles were 'not the usual

one.'"), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325

(6th Cir. 2017).

## VII.   THE COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL LIABILITY.

Because the Complaint fails to state a claim for primary liability under § 10(b) of the

Exchange Act or §§ 11 or 12(a)(2) of the Securities Act, the secondary claims—under § 20(a) of

the Exchange Act (Count II) and § 15 of the Securities Act (Count V)—must be dismissed.

Without primary liability, there can be no secondary liability.  *IBEW Loc. No. 58 Annuity Fund*,

849 F.3d at 328 (affirming dismissal).

---

[18] These Defendants are:  George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, and Leslie M. Turner.

[19] Other Circuits to have considered this issue have also rejected the assertion that the mere signing of a registration statement suffices for statutory-seller status under Section 12(a)(2).  *E.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996), *superseded by statute on other grounds*, 15 U.S.C. § 78u-4(b)(1, 2); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) (all cited and discussed at *EveryWare*, 175 F. Supp. 3d at 868-69).

## **CONCLUSION**

For the foregoing reasons, the FirstEnergy Defendants respectfully submit that the

Complaint must be dismissed.

Dated: May 18, 2021                                  Respectfully submitted,

s/ Geoffrey J. Ritts
Geoffrey J. Ritts, Trial Attorney (0062603)
Robert S. Faxon (0059678)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114.1190
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: gjritts@jonesday.com
Email: rfaxon@jonesday.com

Marjorie P. Duffy (0083452)
Jordan M. Baumann (0093844)
JONES DAY
325 John H. McConnell Boulevard, Suite 600
Columbus, OH 43215-2673
Telephone: (614) 469-3939
Facsimile: (614) 461-4198
Email: mpduffy@jonesday.com
Email: jbaumann@jonesday.com

*Attorneys for Defendants*
*FirstEnergy Corp., James F. Pearson,*
*Steven E. Strah, K. Jon Taylor, Jason J.*
*Lisowski, George M. Smart, Paul T. Addison,*
*Michael J. Anderson, Steven J. Demetriou,*
*Julia L. Johnson, Donald T. Misheff, Thomas*
*N. Mitchell, James F. O'Neil III, Christopher*
*D. Pappas, Sandra Pianalto, Luis A. Reyes,*
*Jerry Sue Thornton, and Leslie M. Turner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2021, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will notify all counsel of record.

s/ Geoffrey J. Ritts
_____
Geoffrey J. Ritts, Trial Attorney (0062603)

*One of the Attorneys for Defendants*
*FirstEnergy Corp., James F. Pearson,*
*Steven E. Strah, K. Jon Taylor, Jason J.*
*Lisowski, George M. Smart, Paul T. Addison,*
*Michael J. Anderson, Steven J. Demetriou,*
*Julia L. Johnson, Donald T. Misheff, Thomas*
*N. Mitchell, James F. O'Neil III, Christopher*
*D. Pappas, Sandra Pianalto, Luis A. Reyes,*
*Jerry Sue Thornton, and Leslie M. Turner*