UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
  murray@mmmb.com
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS (darrenr@rgrdlaw.com)
MARK SOLOMON (marks@rgrdlaw.com)
JASON A. FORGE (jforge@rgrdlaw.com)
TOR GRONBORG (torg@rgrdlaw.com)
BRIAN E. COCHRAN (bcochran@rgrdlaw.com)
SARA B. POLYCHRON (spolychron@rgrdlaw.com)
TING H. LIU (tliu@rgrdlaw.com)
FRANCISCO J. MEJIA (fmejia@rgrdlaw.com)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)

Liaison Counsel

Lead Counsel for Lead Plaintiff Los Angeles County
Employees Retirement Association

[Additional counsel appear on signature page.]

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND ...................................................................................................2

  A.  This Case Is Based on Unequivocal and Unambiguous Allegations of
      Defendants' Corruption – Factual Allegations Defendants Improperly
      Refuse to Accept .........................................................................................3

  B.  Investors Had No Idea FirstEnergy Had Become a Publicly Traded
      Criminal Enterprise.....................................................................................5

  C.  The Bailout Scheme.....................................................................................6

      1.  Genesis of the Bailout Scheme ........................................................6

      2.  Execution of the Bailout Scheme.....................................................7

      3.  Preservation of the Fruits of the Bailout Scheme ...........................9

      4.  Obfuscation of the Bailout Scheme ...............................................11

      5.  Revelation of the Bailout Scheme..................................................13

III.  LEGAL STANDARD..........................................................................................15

Federal Rule 12(b)(6) requires a court to "consider the complaint in its entirety," "accept all factual allegations . . . as true" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). "It is settled law that a court may not grant a defendant's Rule 12(b)(6) motion to dismiss unless it appears beyond doubt that the claimant can prove no set of facts supporting its claim which would entitle it to relief." *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 711 (S.D. Ohio 2006).

IV.  THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE
     EXCHANGE ACT..............................................................................................16

The only elements that Defendants challenge are the deceit and scienter elements.  Both are sufficiently pled.

  A.  The Complaint Abounds with Confirmed Allegations of Defendants'
      Deceit ........................................................................................................17

      1.  Defendants Assured Investors Their Political Expenditures Were
          Above Board .....................................................................................17

      2.  FirstEnergy Corrupted the Regulatory and Political Process ...................18

      3.  FirstEnergy Has Admitted the Falsity of Its Class Period
          Statements .......................................................................................19

      4.  Defendants Deceived Investors..............................................................20

Defendants perpetrated a coordinated scheme to convince investors that their pursuit of a legislative fix was entirely legitimate and that the many risks facing FirstEnergy did not include those corresponding to their bankrolling the largest corruption scheme in U.S. history.

      5.  Defendants Repeatedly Spoke About Their Compliance with
          Internal and External Policies and Laws in Pursuit of Vital
          Legislation, but Never Provided Accurate and Fulsome
          Information .............................................................................21

4847-3041-0736.v2

The Exchange Act prohibits "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Corporate actors must "'provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001). FirstEnergy has already admitted its statements were misleading by admitting that its CEO (Jones) and other senior officers promoted violations of "Company policies and its code of conduct"; the employees responsible for its "decision-making and oversight processes in place for political contributions and expenditures" did not do their jobs; and that it had falsely represented an effective control environment.

6.       Defendants Do Not Acknowledge, or Challenge, the Complaint's Bailout Scheme Allegations.........................................................................25

Defendants engaged in a course of conduct that operated as a fraud on investors, known as "scheme liability." *Lorenzo v. SEC*, _U.S._, 139 S. Ct. 1094, 1101 (2019). It violates Rule 10b-5 to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[] in connection with the purchase or sale of any security." 17 C.F.R. §240.10b 5(a), (c). Defendants' scheme included nine specific methods and means that Defendants neither challenge nor acknowledge.

B.     Defendants' Scienter Cannot Be Credibly Contested.............................................27

"[S]cienter consists of knowledge or recklessness." *Cardinal,* 426 F. Supp. 2d at 717.

1.       There Is No Other Rational, Let Alone More Compelling, Inference than the Inference of Defendants' Scienter................................31

Scienter is the only cogent inference. Here, several of the Officer Defendants were in direct contact with co-conspirators to the Bailout scheme. Jones admitted that "[t]he financial support we provided to House Bill 6 isn't complicated. We know what we did. We know why we did it." Further, the sheer magnitude of Defendants' Bailout Scheme, one of the largest in U.S. history, has led to multiple arrests, guilty pleas, lawsuits, and other severe and wide-ranging consequences. These are the kinds of in "'your face facts,' that cry out, 'how could [defendants] not have known[.]'" *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 685 (6th Cir. 2004). Multiple terminations of FirstEnergy's top executives also support scienter.

2.       Charles E. Jones ..................................................................................37

Jones: (1) was in charge of FirstEnergy; (2) admitted that securing legislative and regulatory solutions for FirstEnergy's nuclear problems was his "top priority"; and (3) assured investors of FirstEnergy's commitment to "upholding [a] high standard for corporate governance" and compliance with all applicable "laws, rules, and regulations." He gave these assurances in response to shareholder concerns about FirstEnergy's "lobbying policies and payments." FirstEnergy fired Jones for not promoting adherence to FirstEnergy's policies and code of conduct.

3.       Robert Reffner ....................................................................................39

Reffner was directly involved in FirstEnergy's efforts to facilitate the Bailout Scheme and prevent its detection through three increasingly senior legal officer positions during the Class Period, where he was responsible for FirstEnergy's legal, ethics, internal auditing, risk management and related affairs. FirstEnerergy terminated Reffner for his failure to prevent wrongdoing and for succumbing to "the improper tone at the top."

4.       John Judge............................................................................................41

In his roles as FirstEnergy's Chief Risk Officer and FirstEnergy Solutions CEO, Judge actively facilitated FES's role in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find "solutions" for the Nuclear Plants. This conduct is sufficient to allege that Judge knowingly furthered the bailout scheme.

5. Michael Dowling ....................................................................................42

Dowling was responsible for FirstEnergy's governmental and regulatory affairs, energy policies, community outreach and political action committees. He had many contacts with Householder and other co-conspirators, helped facilitate the $4 million payment to Randazzo, and was fired for violating FirstEnergy's code of conduct and failing to maintain a tone of compliance.

6. Ty R. Pine ..............................................................................................44

As FirstEnergy's lobbyist and its Ohio Director of State Affairs, Pine had 188 phone contacts with Householder and his co-conspirators regarding the Bailout Scheme, some of which coincided with payments from FirstEnergy to the Bailout Scheme.

7. Dennis M. Chack ...................................................................................45

Chack was responsible for the Company's misleading campaign to preserve HB6, facilitated a $4 million payment to Randazzo, and was fired for violating FirstEnergy's code of conduct.

8. Donald R. Schneider ..............................................................................46

Schneider personally directed FES to retain Matt Borges to facilitate the Bailout Scheme and misled the market with a series of statements obscuring the corrupt passage and defense of HB6.

9. Leila L. Vespoli ....................................................................................48

As FirstEnergy's Executive VP of Corporate Strategy and Regulatory Affairs and Chief Legal Officer, Vespoli was key member of FES Restructuring Working Group and oversaw the Company's efforts to reduce its liabilities in connection with the Nuclear Plants. Vespoli's suspicious stock sales during the Class Period further support an inference of scienter.

10. James F. Pearson ...................................................................................49

Pearson was directly involved in restructuring the Company's nuclear plant liabilities, was a key member of the FES Restructuring Working Group, and certified multiple Class Period SEC filings. He acknowledged personal involvement in securing HB6 Scheme.

11. Steven E. Strah .....................................................................................52

Strah held numerous high-ranking positions at FirstEnergy when its "top priority" involved over $60 million in corrupt payouts and its executives were providing an "improper tone at the top" and failed to maintain or promote an "appropriate tone of compliance." At a minimum, Strah would have had to have been recklessly indifferent to all the wrongdoing around him.

12. K. Jon Taylor .......................................................................................53

Taylor served as FirstEnergy's Controller and Chief Accounting Officer, President of Ohio Operations, VP of Utilities Operations, and ultimately CFO, certified multiple Class Period SEC filings, admitted that "violations of certain company policy and code of conduct" by the terminated executives caused FirstEnergy to reevaluate their internal controls, and acknowledged the potential impact of "a fine or penalty" in connection with the DOJ investigation.

C. Defendants' Arguments Are Legally and Factually Wrong ..................................54

Defendants defy the fundamental requirement that they must "accept all factual allegations . . . as true" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Defendants also rely on inapt cases.

1. FirstEnergy ............................................................................................... 55

FirstEnergy's arguments are irreconcilable with the law and alleged facts. Plaintiffs do not have to prove Defendants committed any crimes, but FirstEnergy's contention that it cannot discern any crimes Defendants committed is incredible, as the Complaint expressly connects its activities to "bribery," "honest services fraud," "RICO conspiracy," an FBI affidavit, a federal indictment, and multiple guilty pleas and plea agreements.

2. Charles E. Jones ....................................................................................... 61

Jones' principal argument attacks the Complaint's allegations of scienter, which are closer to overwhelming than merely sufficient. His argument under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1326-27, 1333 (2015) is misplaced because most of his statements were not opinions and under *Omnicare*, liability attaches where, as here, omitted information shows that the speaker "lacked the basis for making those statements that a reasonable investor would expect."

3. Robert Reffner ........................................................................................... 65

Reffner falsely claims the Complaint "focuses not on the existence of the bribery scheme, but on the failure to disclose it." In truth, the "Methods and Means of Defendants' Bailout Scheme" "focus" on both the execution and concealment of the bribery scheme.

4. John Judge ................................................................................................ 68

Judge's control is sufficiently alleged as to Judge for purposes of §20(a) liability based upon his duties and responsibilities as Chief Risk Officer for FirstEnergy from the start of Class Period until March 2019. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 416 (S.D.N.Y. 2010).

5. Michael Dowling ...................................................................................... 70

Dowling's misunderstands our bribery laws, which do not require "explicit agreement" (and the Complaint abounds with *quid pro quo* allegations anyway). Also, as SVP of external affairs, he controlled the Company's statements and actions in furtherance of the Bailout Scheme.

6. Ty R. Pine ................................................................................................. 71

Pine's argument depends on non-culpable inferences that are improper and incredible in the face of overwhelming allegations of his central role in the fraudulent bailout scheme.

7. Dennis M. Chack ...................................................................................... 72

Chack disseminated misleading statements and acted to further the Bailout Scheme. Also, his positions enabled him to control statements and conduct in furtherance of the Bailout Scheme.

8. Donald R. Schneider ................................................................................. 74

Schneider's employment by FES does not defeat his control because FirstEnergy was operationally and financially intertwined with FES, he worked beside Jones and others involved in the Bailout Scheme, and directed FES to hire Borges to help the Bailout Scheme to succeed.

9. Leila L. Vespoli ........................................................................................ 74

As Executive VP of Corporate Strategy and Regulatory Affairs, Chief Legal Officer, a member of the FirstEnergy Restructuring Working Group, and an attendee on the Company's conference calls, Vespoli had more than "'some indirect means of discipline or influence . . . over the corporation.'" *Pullins v. Klimley*, 2008 WL 85871, at *28 (S.D. Ohio Jan. 7, 2018).

V.     THE COMPLAINT SUFFICIENTLY ALLEGES NON-FRAUDULENT
       VIOLATIONS OF THE SECURITIES ACT ..................................................................75

       A.     The Securities Act Was Designed to Promote Full and Accurate
              Disclosure and Imposes a Minimal Pleading Burden ..........................................77

Plaintiffs' Securities claims do not sound in fraud and have been carefully segregated from the fraud claims.  Thus, they are subject to Fed. R. Civ. P. 8(a)'s pleading standing.

       B.     The Securities Act Defendants Made Material Misrepresentations of Fact
              in Connection with the Offerings ..........................................................................79

FirstEnergy has admitted that the registration statement and prospectuses for the Offerings contained misleading statements.

       C.     Plaintiffs Have Standing to Assert Claims Under Section 12(a)(2) .....................80

Plaintiffs have §12(a)(2) standing for the Note Offerings, as they purchased FirstEnergy notes "directly in" the Offerings, on the date of the Offerings and at the Offerings' price.  Plaintiffs need not allege from which underwriter they purchased the notes.

       D.     The Securities Act Defendants Are Statutory Sellers Under Section
              12(a)(2) ..............................................................................................................83

The Individual Defendants are statutory sellers under §12(a)(2), as they "successfully solicit[ed] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner."  *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).

       E.     The Complaint Adequately Alleges Control Person Claims Under Section
              15..........................................................................................................................85

The Complaint adequately pleads primary violations of the Securities Act and defendants have not challenged Section 15 "control person" liability on any other grounds.

VI.    CONCLUSION..............................................................................................................85

# TABLE OF AUTHORITIES

Page

## CASES

*Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*,
 334 F. Supp. 2d 985 (S.D. Ohio 2004) ...........................................................24, 28

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)....................................................................................15

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)....................................................................................15

*Bondali v. Yum! Brands, Inc.*,
 620 F. App'x 483 (6th Cir. 2015) ........................................................................24

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ..........................................................63

*Brownback v. King*,
 __ U.S. __, 141 S. Ct. 740 (2021) (Feb. 25, 2021) ....................................................2

*Burges v. BancorpSouth, Inc.*,
 2015 WL 4198795 (M.D. Tenn. July 10, 2015) ........................................................28

*CadleRock Joint Venture, L.P. v. Royal Indem. Co.*,
 872 F. Supp. 2d 592 (N.D. Ohio 2012)...................................................................60

*Chamberlain v. Reddy Ice Holdings, Inc.*,
 757 F. Supp. 2d 683 (E.D. Mich. 2010)..................................................36, 40, 52, 65

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
 399 F.3d 651 (6th Cir. 2005) ................................................................... *passim*

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
 450 F. Supp. 3d 379 (S.D.N.Y. 2020)..............................................................82, 83

*City of Providence, R.I. v. Bats Glob. Mkts., Inc.*,
 878 F.3d 36 (2d Cir. 2017)................................................................................73

*Das v. Rio Tinto PLC*,
 332 F. Supp. 3d 786 (S.D.N.Y. 2018)...................................................................30

*Degulis v. LXR Biotechnology, Inc.*,
 928 F. Supp. 1301 (S.D.N.Y. 1996)......................................................................84

*Dougherty v. Esperion Therapeutics, Inc.*,
 905 F.3d 971 (6th Cir. 2018) .......................................................................28, 39

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...................................................................................21, 63, 64, 65

*Emps. Ret. Sys. of City of St. Louis v. Jones*,
2021 WL 1890490 (S.D. Ohio May 11, 2021) ............................................... *passim*

*Emps. Ret. Sys. of the City of St. Louis v. Jones*,
2021 WL 2156215 (May 11, 2021) ...................................................................43

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976).......................................................................................77

*Fidel v. Farley*,
392 F.3d 220 (6th Cir. 2004),
abrogated by *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)....................................34

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ...................................................40

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ..........................................................................79

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) .............................................................27, 28, 32, 40

*Freeland v. Iridium World Commc'ns, Ltd.*,
233 F.R.D. 40 (D.D.C. 2006)..........................................................................64

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019)............................................................................55

*Gaynor v. Miller*,
273 F. Supp. 3d 848 (E.D. Tenn. 2017).............................................................81

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ..........................................................................35

*Gordon v. Elite Consulting Grp. L.L.C.*,
2009 WL 4042911 (E.D. Mich. Nov. 19, 2009)..................................................71

*Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*,
320 F. Supp. 3d 910 (E.D. Mich. 2018)............................................................25

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)..................................................16

*Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*,
2005 WL 1563206 (N.D. Ill. June 30, 2005) .....................................................64

**Page**

*Haw. Ironworkers Annuity Tr. Fund v. Cole*,
2011 WL 1257756 (N.D. Ohio Mar. 31, 2011) ................................................................41, 69

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)....................................................................................81

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ...............................................................................22, 28, 32, 39

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)........................................................................................................76, 77

*In re AES Corp. Sec. Litig.*,
825 F. Supp. 578 (S.D.N.Y. 1993)........................................................................................80

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000).....................................................................................81

*In re Am. Int'l Grp., Inc.*,
965 A.2d 763 (Del. Ch. 2009), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v.
PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).........................................................40

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ...............................................................35, 40

*In re AXIS Cap. Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)....................................................................................24

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)................................................................................62, 82

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) ..................................................................................63, 64

*In re Bristol–Myers Squibb Sec. Litig.*,
2005 WL 2007004 (D.N.J. Aug. 17, 2005) .............................................................................63

*In re Cardinal Health Inc. Sec. Litigs.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ........................................................................ *passim*

*In re CMS Energy Sec. Litig.*,
2005 WL 8154422 (E.D. Mich. Jan. 7, 2005).........................................................................70

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020),
*motion to certify appeal denied*, 2021 WL 1016111
(D.N.J. Mar. 17, 2021).............................................................................................45, 68, 72

- viii -

*In re Consumers Power Co. Sec. Litig.*,
   105 F.R.D. 583 (E.D. Mich. 1985) .................................................................78

*In re Direct Gen. Corp. Sec. Litig.*,
   398 F. Supp. 2d 888 (M.D. Tenn. 2005) ..........................................................80

*In re Dura Pharms., Inc. Sec. Litig.*,
   452 F. Supp. 2d 1005 (S.D. Cal. 2006) ...........................................................64

*In re EveryWare Glob., Inc. Sec. Litig.*,
   175 F. Supp. 3d 837 (S.D. Ohio 2016),
   *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*,
   849 F.3d 325 (6th Cir. 2017) ...........................................................28, 78, 81

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010).............................................................70

*In re FirstEnergy Corp. Sec. Litig.*,
   316 F. Supp. 2d 581 (N.D. Ohio 2004)................................................4, 32, 33, 78

*In re ForceField Energy Inc. Sec. Litig.*,
   2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ....................................................72

*In re Hayes Lemmerz Int'l, Inc.*,
   271 F. Supp. 2d 1007 (E.D. Mich. 2003)..........................................................35

*In re Immucor, Inc. Sec. Litig.*,
   2011 WL 2619092 (N.D. Ga. June 30, 2011) ....................................................24

*In re LendingClub Sec. Litig.*,
   254 F. Supp. 3d 1107 (N.D. Cal. 2017) ...........................................................79

*In re Merck & Co., Inc. Sec. Litig.*,
   432 F.3d 261 (3d Cir. 2005).........................................................................40

*In re Miller Energy Res. Sec. Litig.*,
   2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) .....................................................63

*In re Mirant Corp. Sec. Litig.*,
   2009 WL 48188 (N.D. Ga. Jan. 7, 2009)..........................................................24

*In re Motorola Sec. Litig.*,
   505 F. Supp. 2d 501 (N.D. Ill. 2007) ..............................................................64

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
   541 F. Supp. 2d 986 (S.D. Ohio 2007) ............................................................47

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ...........................................................29, 61, 62

*In re OPUS360 Corp. Sec. Litig.*,
2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) ........................................................84

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013)...................................................................83

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000) .........................................................78, 85

*In re Proquest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007)....................................................... *passim*

*In re Regions Morgan Keegan Sec., Derivative, & Erisa Litig.*,
743 F. Supp. 2d 744 (W.D. Tenn. 2010)........................................................79, 85

*In re Sirrom Cap. Corp. Sec. Litig.*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999)..................................................................84

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
124 F. Supp. 2d 527 (S.D. Ohio 2000) .................................................................32

*In re Tenaris S.A. Sec. Litig.*,
493 F. Supp. 3d 143 (E.D.N.Y. 2020) ...................................................................43

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)....................................................................84

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................................................................82

*Ind. State Dist. Council of Laborers & Hod Carriers Pension*
*& Welfare Fund v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ................................................................................29

*JAC Holding Enters., Inc. v. Atrium Cap. Partners, LLC*,
997 F. Supp. 2d 710 (E.D. Mich. 2014)...........................................................46, 74

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ................................................................................34

*Kushner v. Beverly Enterprises, Inc.*,
317 F.3d 820 (8th Cir. 2003) ...........................................................................30, 35

*La. Mun. Police Emps. Ret. Sys. v. KPMG LLP*,
822 F. Supp. 2d 711 (N.D. Ohio 2011)..................................................................27

*Lorenzo v. Sec. & Exch. Comm'n*,
_U.S._, 139 S. Ct. 1094 (2019).......................................................... *passim*

4847-3041-0736.v2

Page

*Matrixx Initiatives Inc. v. Siracusano*,
    563 U.S. 27 (2011)..........................................................................................28

*McCormick v. United States*,
    500 U.S. 257 (1991)........................................................................................58

*Mixon v. Trott L., P.C.*,
    2019 WL 4943761 (6th Cir. Aug. 28, 2019)..........................................................77

*N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*,
    929 F. Supp. 2d 740 (M.D. Tenn. 2013)......................................29, 34, 35, 67

*NorCal Tea Party Patriots v. Internal Revenue Serv.*,
    2016 WL 8202966 (S.D. Ohio Nov. 22, 2016).........................................................58

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) ...............................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)........................................................................................61

*Palazzolo v. Fiat Chrysler Autos. N.V.*,
    2017 WL 6389573 (E.D. Mich. Dec. 14, 2017) ....................................................31

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)..................................................................................80

*Perry v. Duoyuan Printing, Inc.*,
    2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013) .......................................................82

*Pinter v. Dahl*,
    486 U.S. 622 (1988)........................................................................77, 82, 83

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) .............................................................40

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004),
        *abrogated in part on other grounds by Frank*, 646 F.3d .......................32, 33, 40

*Puddu v. 6D Glob. Techs., Inc.*,
    2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ................................................66, 73

*Pullins v. Klimley*,
    2008 WL 85871 (S.D. Ohio Jan. 7, 2018) .......................................................67, 75

*Ret. Sys. v. Acadia Healthcare Co., Inc.*,
    2021 WL 195370 (M.D. Tenn. Jan. 20, 2021)................................................29, 36

4847-3041-0736.v2

*Ret. Sys. v. Energy Transfer LP*,
__ F. Supp. 3d __, 2021 WL 1264027 (E.D. Pa. Apr. 6, 2021)................................................63

*Ret. Sys. v. Ernst & Young, LLP*,
622 F.3d 471 (6th Cir. 2010) ..........................................................................................21, 34

*Ret. Sys. v. Ghosn*,
2020 WL 7711378 (M.D. Tenn. Dec. 29, 2020)............................................................ *passim*

*Ret. Sys. v. Psychiatric Sols., Inc*.,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ....................................................................25

*Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) ..............................................................................29

*Ross v. Abercrombie & Fitch Co.*,
501 F. Supp. 2d 1102 (S.D. Ohio 2007) ...............................................................................45

*SBAV, LP v. Porter Bancorp, Inc.*,
2014 WL 1257018 (W.D. Ky. Mar. 26, 2014) ...............................................................35, 36

*Schiro v. Cemex, S.A.B. de C.V.*,
438 F. Supp. 3d 194 (S.D.N.Y. 2020)...................................................................................24

*Schuh v. HCA Holdings, Inc.*,
947 F. Supp. 2d 882 (M.D. Tenn. 2013)...............................................................................80

*Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*,
375 U.S. 180 (1963)..............................................................................................................77

*Snellink v. Gulf Res.*,
870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) ..........................................................................64

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
552 U.S. 148 (2008)................................................................................................26, 66, 67

*Tackett v. M & G Polymers USA, LLC*,
561 F.3d 478 (6th Cir. 2009) ..................................................................................................2

*Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*,
396 F. Supp. 3d 413 (E.D. Pa. 2019)....................................................................................62

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................... *passim*

*United States v. Canale*,
2015 WL 3767147 (S.D.N.Y. June 17, 2015) .......................................................................61

*United States v. Hernandez*,
218 F.3d 58 (1st Cir. 2000)................................................................................42

*United States v. Perry*,
438 F.3d 642 (6th Cir. 2006) ............................................................................60

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
845 F.3d 384 (8th Cir. 2016) ............................................................................27

*Williams v. Duke Energy Int'l, Inc.*,
681 F.3d 788 (6th Cir. 2012) ............................................................................16

*Willis v. Big Lots, Inc.*,
2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ........................................... *passim*

*Willis v. Big Lots, Inc.*,
2017 WL 2608690 (S.D. Ohio 2017)...........................................................39, 43

*Winslow v. BancorpSouth, Inc.*,
2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011)................................................32

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ............................................................................81

*Yuhasz v. Brush Wellman, Inc.*,
341 F.3d 559 (6th Cir. 2003) ............................................................................16

*Zaluski v. United Am. Healthcare Corp.*,
527 F.3d 564 (6th Cir. 2008) ............................................................................24

*Zwick Partners, LP v. Quorum Health Corp.*,
2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018).....................................44, 45, 62

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b)............................................................................................................16, 21
§77k........................................................................................................... *passim*
§77l ..............................................................................................................78, 83
§77l(a)(2) ..................................................................................................... *passim*
§78o.......................................................................................................77, 78, 85
§78t(a)......................................................................................................... *passim*
§78u-4(b)(1), (2)(A).............................................................................................16

18 U.S.C.
§201(b)........................................................................................................43, 60

26 U.S.C.
§501(c)(4)(A)......................................................................................................58

Federal Rule of Civil Procedure
    Rule 8(a) ..................................................................................................................78
    Rule 9(b) ............................................................................................................16, 78
    Rule 10(b)-5(a) .................................................................................................. *passim*
    Rule 10b-5(b) ...........................................................................................................16
    Rule 10b-5(c) .................................................................................................... *passim*
    Rule 12(b)(6) ................................................................................................15, 78, 85

Ohio Rev. Code Ann.
    §1701.641 ................................................................................................................20

Ohio Revised Code
    §2921.02 ............................................................................................................43, 60

17 C.F.R.
    §240.10b-5(a), (c) ....................................................................................................25

26 C.F.R.
    §1.501(c)(4)-1(a)(2)(i) ............................................................................................58
    §1.501(c)(4)-1(a)(2)(ii). Section 501(c)(4) ...........................................................58

## I. INTRODUCTION

FirstEnergy has conceded Defendants' participation in a massive corruption scheme that they used to defraud investors. FirstEnergy has fired executives, forfeited billions of dollars in ill-gotten subsidies, acknowledged its pursuit of a deferred prosecution agreement (which would necessarily include an admission of guilt), and warned investors that significant monetary damages and fines could lead to a credit default. These admissions were made after Defendants' culpability was laid bare by a detailed FBI declaration (describing recorded conversations, captured text messages, and other extensive evidence), leading to guilty pleas, and a recent injunction. Nevertheless, with no good faith basis for doing so, Defendants moved to dismiss the entire Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 72).

FirstEnergy's motion is so unreasonable, it drew the ire of completely independent legal and industry professionals. Noting the contradiction between FirstEnergy's public admissions and its motion here, Lewis Katz, a professor emeritus at the Case Western Reserve University School of Law, stated, "The inconsistency in those positions is so glaring that it is insulting."[1] As for FirstEnergy's ostrich defense, Professor Katz explained that the guilty pleas "show[] the absurdity of the argument." *Id.* Catherine Turcer of watchdog group Common Cause Ohio similarly observed that, "It doesn't pass the smell test that [they] were giving money to Generation Now out [of] the goodness of their hearts." *Id.*

In addition to defying common sense, Defendants' motions ignore the bedrock legal standard for motions to dismiss by refusing to accept as true the Complaint's factual allegations. Once the Complaint's allegations are credited and the law applied, Defendants' motions must be denied.

---

[1]     John Caniglia, *FirstEnergy's push to defend House Bill 6 payments as 'contributions' appears to veer from corporate strategy*, Cleveland.com, May 22, 2021, *available at* https://www.cleveland.com/ohio-utilities/2021/05/firstenergys-push-to-defend-house-bill-6-payments-as-contributions-appears-to-veer-from-corporate-strategy.html.

4847-3041-0736.v2

## II.     BACKGROUND

Rather than file a joint motion to dismiss or even coordinated motions, multiple law firms have filed multiple motions for multiple defendants with largely overlapping arguments (despite multiple joinders).  By design, this makes litigating these motions more tedious on the Court, but it does not make the motions any more meritorious.  Because most of the relevant facts and applicable law apply to all Defendants, Plaintiffs file this omnibus opposition that first demonstrates the overwhelming sufficiency of the Complaint's allegations and then addresses remaining arguments raised by different law firms on behalf of different defendants.  Because the law firm representing FirstEnergy represents the greatest number of defendants and other defendants have filed joinders in FirstEnergy's motion (ECF Nos. 160, 161), this opposition will first establish why FirstEnergy's motion is not well taken and then will show that the other motions are likewise lacking.

In considering this motion to dismiss, this Court views the Complaint in the light most favorable to Plaintiffs and takes all well-pled factual allegations as true.  *Tackett v. M & G Polymers USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009).[2]  The Complaint's factual allegations are not repeated in their entirety here.  Instead, Plaintiffs hereby incorporate the Complaint's factual allegations with this reference and will summarize them below.

### A.     This Case Is Based on Unequivocal and Unambiguous Allegations of Defendants' Corruption – Factual Allegations Defendants Improperly Refuse to Accept

The Complaint charges violations of §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

---

[2]     All citations and footnotes are omitted and emphasis is added unless otherwise indicated. This brief uses "(cleaned up)" to indicate that internal quotation marks, alterations, and/or citations have been omitted from quotations.  For an example of its use in a published opinion, *see Brownback v. King*, __ U.S. __, 141 S. Ct. 740, 748 (2021) (Feb. 25, 2021).  Unless otherwise noted, all "¶" and "¶¶" citations throughout are to the Complaint.  Capitalized terms not otherwise defined herein have the same meanings ascribed to them in the Complaint.  "Defendants" refers collectively to the FirstEnergy and Officer Defendants.

Act"), as well as SEC Rule 10b-5 promulgated thereunder, against FirstEnergy, certain current and former senior Company insiders, and the investment banks that underwrote two FirstEnergy debt offerings. ¶1. These violations concern a plan to defraud investors through an underlying and "unprecedented multi-year scheme to corrupt legislators and regulators, who FirstEnergy used to draft and pass legislation" to provide billions of dollars in benefits to FirstEnergy – all at ratepayers' expense – and which extended to the highest offices of the Ohio legislature, such as the Speaker of the House, and to the top energy regulator in the state, the Chairman of the Public Utilities Commission of Ohio ("PUCO"). ¶3.

The well-pled nature of FirstEnergy's payments bears elaboration because it exposes the insincerity of Defendants' primary argument: "At most, the Complaint alleges that [Larry] Householder received contributions, but it is not bribery to support politicians who favor policies that align with one's interests." ECF No. 161 at 16. This is not an honest argument. The Complaint does not allege that FirstEnergy's payments were mere contributions. Rather, it expressly alleges that Defendants' purpose for making these payments was to corrupt legislators, regulators, and the legislative process, including, *inter alia*, the following facts:

- "FirstEnergy spent tens of millions of dollars on an unprecedented multi-year scheme *to corrupt legislators and regulators*, who FirstEnergy used to draft and pass legislation designed to provide $2 billion in benefits to FirstEnergy – all at ratepayers' expense." ¶3.

- "FirstEnergy's illegally large and illegally concealed contributions and payoffs enabled it to do exactly what campaign finance limits are designed to prevent: *unfairly and clandestinely influence elections by buying the loyalty of Householder and other public officials to get HB6 written, considered and passed into law*." ¶70.

- "FirstEnergy executives broadened the reach of the Bailout Scheme *by buying the support of soon-to-be PUCO Chairman Randazzo* with an illicit $4 million payment. Shortly after receiving FirstEnergy's money, Randazzo performed his part, using his position as PUCO Commissioner to help write and support HB6." ¶72.

- "On May 29, 2019, *Ohio's corrupted House members* gathered enough votes to pass HB6." ¶74.

- 3 -

- "'It is alleged that Larry Householder, 61, of Glenford, Ohio, and the enterprise conspired to violate the racketeering statute through **honest services wire fraud**, receipt of millions of dollars in **bribes** and **money laundering**.'" ¶143 (quoting DOJ press release).

- "'**Money passed from [FirstEnergy] through Generation Now was used to pay for Householder campaign staff**, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.'" *Id.* (quoting FBI affidavit in support of criminal complaint).

- "'**Householder received more than $400,000 in personal benefits** as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.'" *Id.* (quoting FBI affidavit in support of criminal complaint).

- "'[FirstEnergy's] strategy, according to the federal prosecutors, included **funneling millions of dollars to an organization, Generation Now, controlled by Householder**.'" ¶145.

- "On February 5, 2021, Generation Now pled guilty to the charged RICO conspiracy. In the statement of facts attached to the plea agreement, Generation Now admitted to 'receiv[ing] money from Company A (as defined in the Indictment [i.e., FirstEnergy]) for the benefit of the [d]efendants and others **in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation** that would go into effect and save the operation of two nuclear power plants in Ohio; and [to engaging] in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by Company A to GENERATION NOW.'" ¶205.

These factual allegations must be accepted as true, yet Defendants refuse to do so.

Adding to the Complaint's detailed factual allegations, the Complaint expressly alleges that the "**scheme to corrupt the political process** and suborn the regulatory framework was . . . **personally overseen and facilitated by the senior echelon of Company management**, including FirstEnergy's then-Chief Executive Officer . . . Charles E. Jones and numerous other executives responsible for FirstEnergy's regulatory affairs, legal compliance, financial reporting and investor disclosures." ¶4.  Again, these factual allegations must be accepted as true, despite Defendants' refusal to do so.

- 4 -

**B.**     **Investors Had No Idea FirstEnergy Had Become a Publicly Traded Criminal Enterprise**

Eventually, corruption became one of the most important drivers of the Company's business model, as it was the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing financial challenges. *Id.* As part of the Bailout Scheme, however, FirstEnergy claimed that it ethically and legally pursued and ultimately secured a "solution" for the bailout of its two failing nuclear plants, the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station (the "Nuclear Plants"), through the passage of Ohio House Bill 6 ("HB6"). ¶5. In truth, FirstEnergy illegally fixed the creation and passage of HB6 through an elaborate network of lobbyists, shell companies, and political action committees; saturated media markets with a false and misleading advertising campaigns funded through difficult-to-trace dark money networks; and subverted the free and fair operation of Ohio elections. ¶3. An affidavit and federal criminal complaint described in great detail how FirstEnergy and its top executives illegally funneled $60 million into the hands of corrupt politicians to get HB6 passed into law and avoid its repeal. ¶8. The return on investment for this $60 million corrupt investment promised to be extraordinary: $2 billion, all at the expense of Ohio ratepayers. *Id.*

FirstEnergy's corruption-based business model exposed it to catastrophic risks (and now the reality) of financial, regulatory, legal, and reputational loss, which FirstEnergy and its senior insiders went to great lengths during the Class Period to conceal from investors. ¶6. Throughout the Class Period, FirstEnergy and its executives repeatedly assured investors that the Company was not engaged in any illicit activities and "complied" with all laws and regulations applicable to its regulatory affairs and investor disclosure obligations. *Id.* Defendants' misrepresentations and misleadingly incomplete statements about these corrupt activities were important parts of the Bailout Scheme, which Defendants designed to generate billions of dollars in illicit proceeds for the Company. ¶¶6, 8. The fallout when Defendants' corrupt activities were eventually revealed proved

- 5 -

devastating for the Company's investors. On the news of FirstEnergy's central role in the Bailout Scheme, the price of FirstEnergy stock plummeted, falling below $23 per share on July 22, 2020, down 45% from its closing price of more than $41 per share on July 20, 2020, inflicting billions of dollars of losses on FirstEnergy investors. ¶9.

### C. The Bailout Scheme

#### 1. Genesis of the Bailout Scheme

FirstEnergy is an Ohio-based utility company and one of the nation's largest investor-owned electric systems. ¶27. During the Class Period, FirstEnergy owned and operated the Nuclear Plants through its wholly owned subsidiaries, FirstEnergy Solutions Corp. ("FES") and FirstEnergy Nuclear Operating Company ("FENOC"). ¶42. In January 2006, FENOC admitted to making a series of false statements to the Nuclear Regulatory Commission ("NRC"), which concealed the damage from its failure to properly maintain the Davis-Besse nuclear plant, resulting in the worst corrosion ever found at a U.S. reactor and leading to over $100 million in fines and civil damages. *Id.* In the wake of the Davis-Besse incident, the maintenance costs at the Nuclear Plants continued to climb as demand for nuclear power declined due to less expensive alternatives, such as natural gas. ¶43.

FirstEnergy was losing money on its Nuclear Plants, but shutting them down would have resulted in hundreds of millions in additional losses. ¶44. The Company's financial situation also impacted each of the Officer Defendants, since they received tens of millions of dollars in performance-based compensation. ¶213. This problem grew to dominate FirstEnergy earnings calls and analyst coverage, as investors became increasingly concerned about the potential liabilities stemming from the Nuclear Plants. In response, Defendants reassured investors that FirstEnergy was pursuing a legislative fix. ¶44. For example, during the Company's 2017 annual earnings call held with investors, FirstEnergy's CEO, Jones, assured investors that FirstEnergy was seeking

- 6 -

"legislative or regulatory initiatives for [nuclear power] generation that recognize its environmental or energy security benefits." *Id.*

Despite being ostensibly a separate company with its own board of directors, FES was deeply intertwined with, and dependent upon, FirstEnergy. ¶45. To escape the potentially limitless expenses associated with decommissioning the Nuclear Plants, as well as environmental liabilities from closing its fossil fuel sites (such as coal-burning sites), FirstEnergy needed to free itself of FES and the Nuclear Plants in particular. ¶45. Towards this end, on March 28, 2018, FirstEnergy announced its intention to shut down the Nuclear Plants. *Id.* Then, on March 31, 2018, FES, FENOC, and related entities (collectively referred to as "FES") filed for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio. *Id.* But because FirstEnergy was operationally and financially intertwined with FES, FES's creditors were prepared to commence litigation against FirstEnergy over FES's inability to pay its debts. ¶50. For all practical purposes, any actual or potential FES liabilities were also potential liabilities for FirstEnergy, including the billions of dollars needed to decommission the Nuclear Plants. *Id.* Meanwhile, Larry Householder, who finished his prior term as a state representative in 2004 under a cloud of corruption while under federal investigation, was in FirstEnergy's sights as a legislative agent. ¶65.

### 2. Execution of the Bailout Scheme

In January 2017, soon after Householder returned to office, FirstEnergy began courting him, including taking Householder (and his sons) on a trip aboard FirstEnergy's private jet to President Trump's inauguration ceremony in January of that year. *Id.* In the months that followed, FirstEnergy further solidified its relationship with Householder by initiating payments to two newly minted 501(c)(4) organizations and launching additional entities to facilitate the Bailout Scheme: (i)

Partners for Progress (formed January 26, 2017); and (ii) Generation Now (formed February 6, 2017).  ¶65.

One of Householder's co-conspirators, Neil Clark, described the appeal of using 501(c)(4) organizations to further the Bailout Scheme as follows: "it's a secret, a (c)(4) is secret.  Nobody knows the money goes to the Speaker's account . . . it's not recorded."  ¶233.  In 2017 and 2018, FirstEnergy contributed *$2.9 million* to the Bailout Scheme, which Defendants concealed throughout the Class Period.  ¶67.  On a single day in 2019, April 30, 2019 – about two weeks after HB6 was officially introduced – FirstEnergy made a $1.5 million payment to the Bailout Scheme.  *Id.*  In May 2019, FirstEnergy contributed *$8 million* to the Bailout Scheme.  *Id.*  These payments were concealed throughout the Class Period.

FirstEnergy routed most of its payments through Generation Now, whose bank accounts Jeff Longstreth, Householder's strategist, had opened.  Almost immediately after its formation, FirstEnergy began making $250,000 quarterly payments to Generation Now, while also seeding a dark money group, Partners for Progress, with $5 million soon after its launch. ¶68.  Longstreth has since pled guilty, admitting his involvement in the criminal conspiracy "to conceal the nature, source, ownership, and control of payments made by [FirstEnergy] to GENERATION NOW" for the benefit of Householder and other politicians and lobbyists "relating to the passage and preservation of [HB6] that would go into effect and save the operation of [the Nuclear Plants]."  ¶69.

With FirstEnergy's illicit backing, Householder was elected to serve as Speaker of the House for Ohio's 133rd General Assembly on January 7, 2019.  ¶71.  Soon thereafter, FirstEnergy executives broadened the reach of the Bailout Scheme with an illicit *$4 million* payment to soon-to-be PUCO Chairman Samuel Randazzo.  ¶72.  Shortly after receiving FirstEnergy's money, Randazzo used his position as PUCO Commissioner to help write and support HB6.  *Id.*  On April 12, 2019, Householder introduced HB6 in the Ohio House.  *Id.*  On May 29, 2019, Ohio's corrupted

- 8 -

House members gathered enough votes to pass HB6. ¶74. The bill provided the "fix" for FirstEnergy's nuclear problems, including $1.3 billion in subsidies for the Nuclear Plants funded by Ohio ratepayers. *Id.*

### 3. Preservation of the Fruits of the Bailout Scheme

In the months that followed passage of HB6 in the Ohio House, FirstEnergy paid over $7 million more for support in the Ohio Senate. ¶75. In exchange, a lucrative "decoupling" provision was added to HB6, providing another $100 million of benefits in benefits to FirstEnergy annually, again at ratepayers' expense. *Id.* Regulators (*i.e.*, PUCO, led by Randazzo) would later extended this annual "decoupling" benefit to 2030. *Id.* The Ohio Senate passed this amended version of HB6. ¶78. On July 23, 2019, the Ohio House voted to approve the amended bill, and Ohio's governor signed it into law the same day. *Id.*

Due to the negative impact HB6 would have on Ohio ratepayers and environmental efficiency efforts, a referendum movement to repeal HB6 developed immediately. ¶81. In order to appear on the upcoming ballot, supporters of the referendum had to collect approximately 265,000 signatures. *Id.* FirstEnergy, Householder, and the other members of the Bailout Scheme jumped into action to prevent the referendum from making it to the ballot. *Id.* From July 2019 to October 2019, FirstEnergy paid over $38 million into the Bailout Scheme (which Defendants concealed throughout the Class Period). ¶82. Among other things, this money financed offensive and misleading tactics to discourage Ohioans from the signing the referendum petition, such as ads falsely tying the repeal effort to the communist Chinese government, including the following:

- 9 -





¶83.

Lobbyist and co-conspirator Matt Borges employed additional illicit means to attempt to defeat the proposed referendum, receiving and spending over $1 million for the effort from Bailout Scheme participants through his company, 17 Consulting Group. ¶84. To that end, Borges used accounts he controlled to transfer $600,000 from Generation Now to Juan Cespedes (a lobbyist also working on behalf of FirstEnergy in furtherance of the Bailout Scheme), who used this money to disrupt signature collection efforts, engage others in anti-referendum efforts, and enrich himself. *Id.*

FirstEnergy also provided a half-million dollars to 15 separate signature collection operations in exchange for doing nothing, which prevented them from working for the repeal side. ¶85. The Bailout Scheme also hired "blockers," meant to disrupt signature-gathering efforts by intimidating

those who may consider signing in support of the referendum. *Id.* Borges even bribed those working for the repeal campaign for inside information or to stop collecting signatures. *Id.*

Despite widespread public support, the repeal campaign could not overcome the Bailout Scheme's unscrupulous tactics and did not meet the October 21, 2019 signature deadline. ¶86. The next day, FirstEnergy used an affiliate to send an additional $3 million to Generation Now. *Id.*

### 4. Obfuscation of the Bailout Scheme

All told, FirstEnergy funneled more than $60 million over a multi-year period to Householder and his corrupt affiliates to ensure the passage and defense of HB6, one of the most consequential pieces of energy regulation impacting Ohio citizens in recent history. ¶¶137, 236. FirstEnergy's financial commitment to the criminal enterprise was so vast that conspirators internally referred to the Company as the "Bank" and its willingness to spend "unlimited" cash to further its corrupt ends as "Monopoly money." ¶236. In return, FirstEnergy secured a $1.3 billion rate payer-funded bailout of the Nuclear Plants, lucrative decoupling provisions that locked-in an estimated $700 million in guaranteed revenues, a successful conclusion of the FES bankruptcy proceedings, and a much-needed "fix" for the Company's nuclear problems. *Id.* FirstEnergy executives publicly touted these results. For example, defendant Jones boasted during a November 4, 2019 investor call that the decoupling provision "essentially it takes about 1/3 of our company and I think makes it somewhat recession-proof." ¶87.

Throughout the Class Period, Defendants repeatedly concealed, misrepresented, and failed to disclose FirstEnergy's involvement in the Bailout Scheme. For example, FirstEnergy and its executives represented that they were pursuing "legislative or regulatory solutions" to their nuclear problem, but reassured investors that FirstEnergy and its personnel and subsidiaries were doing so in a manner that complied with all related "regulations, orders, policies and practices prescribed by the SEC" and many other agencies and offices. ¶¶96-98. When discussing the Company's pursuit of

- 11 -

such solutions, FirstEnergy and its executives also specifically referenced Ohio's "new speaker of the house" and "new Chairman of the Public Utilities Commission" as two of the three leaders (the other being the Governor) who would determine whether "the time is right to really put energy policy for the state back on the table." ¶127. Defendants also championed the virtues of HB6 and its purported benefits for FirstEnergy and the Company's investors. ¶¶128-130.

The Company's annual Proxy Statements reinforced Defendants' false assurances regarding FirstEnergy's purportedly legitimate pursuit of legislative solutions and supposed adherence to high legal and ethical standards, stating, *inter alia*: "We consistently demonstrate ethical behaviors, values, expectations and outcomes. We work to create an environment where ethical behaviors are expected. We have strength of character, strength of will and moral fiber. . . . We communicate openly and honestly . . . . We are honest, reliable, respectful, consistent, dependable and credible. We are committed to doing what's right. We respect and trust the capabilities, intention and performance of others." ¶¶104-105. Another oft-repeated assurance Defendants made to investors during the Class Period was that FirstEnergy had effective internal control over financial reporting and disclosures. ¶¶99-100.

The Company's code of conduct, in effect throughout the Bailout Scheme's execution, provided additional specificity regarding the purportedly above-board nature of FirstEnergy's operations. The code of conduct declared that "Directors shall also ensure that the Company's assets are being used efficiently and for legitimate business purposes." ¶109. When a shareholder proposed an annual reporting of the Company's lobbying policies and payments, the Company and its Directors assured shareholders the Company's existing "decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy. . . . Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations." ¶¶110-111.

- 12 -

Through these statements and many others, Defendants concealed from investors every aspect of the wide-ranging Bailout Scheme. ¶¶93-94.

### 5. Revelation of the Bailout Scheme

On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio exposed the corruption at the core of Defendants' Bailout Scheme with a publicly-filed criminal complaint accompanied by a detailed affidavit. ¶¶143-144. The affidavit made it clear that FirstEnergy and Jones were essential participants in the conspiracy. ¶¶145-147. For their part, FirstEnergy and Jones denied any wrongdoing, continued to defend HB6, and claimed that Jones had acted at all times "transparently, ethically, professionally." ¶¶151-158. Jones's attempts to distance himself and FirstEnergy from the corruption were so outlandish, that he was forced to "clarify" them two days later by admitting his and FirstEnergy's extensive discussions and involvement with FES, including "shared services" and "support from FirstEnergy's External Affairs team" involved with lobbying efforts. ¶159.

Despite FirstEnergy's and Jones's false denials, the market slashed 34% off the Company's market capitalization in one day – a loss of more than $7.6 billion dollars. ¶¶13, 148, 259. Ratings agencies also placed FirstEnergy on CreditWatch and downgraded their outlook for the Company, expressly noting that the criminal "complaint also raises questions around management's credibility and track record." ¶¶150, 160, 175. Other investigations and lawsuits soon followed, as did guilty pleas by co-conspirators Longstreth and Cespedes. ¶¶164, 170, 171. With the falsity of FirstEnergy's and Jones's initial denials becoming increasingly apparent, the price of FirstEnergy's stock again fell. ¶165.

FirstEnergy subsequently admitted that it had falsely represented the effectiveness of its internal control over financial reporting during the Class Period and amended its 2019 Form 10-K to reflect the "material weakness" in FirstEnergy's critical internal control over financial reporting.

- 13 -

¶189. FirstEnergy also fired Jones and two other executives involved in the Bailout Scheme (Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding, and Michael J. Dowling, Senior Vice President of External Affairs) for having "violated certain Company policies and its code of conduct" related to HB6. ¶¶172, 178. Two weeks later, on November 8, 2020, FirstEnergy fired its Chief Legal Officer, Reffner, as well as its General Counsel and Chief Ethics Officer for their inaction in response to the "improper tone at the top" (*i.e.*, Jones's tone). ¶¶184, 191. A week after that, the FBI searched Randazzo's home and two days later, FirstEnergy admitted that its illicit $4 million payment to Randazzo had been the product of its senior management's violations of FirstEnergy's policies and code of conduct, and that it would have to restate its 2019 Form 10-K, which had misrepresented FirstEnergy's internal control over financial reporting and concealed material weaknesses. ¶¶186, 190. By this time, ratings agencies had downgraded FirstEnergy to junk status. ¶¶196-197.

On December 28, 2020, the Ohio Supreme Court ordered a stay of the HB6 subsidy fees, and by February 1, 2021, FirstEnergy's reversal from its earlier denials was nearly complete with an announcement that it had reached a settlement with the Ohio Attorney General and others, relinquishing the hundreds of millions of dollars it had stood to gain from HB6's decoupling provision. ¶¶201, 203-204. Generation Now confirmed FirstEnergy's central role in the wrongdoing with its guilty plea, including an admission that Generation Now had:

> receiv[ed] money from Company A (as defined in the Indictment [*i.e.*, FirstEnergy]) for the benefit of the [d]efendants and others in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio; and [to engaging] in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by [FirstEnergy] to GENERATION NOW.

¶205.

Less than two weeks later, on February 16 and 18, 2021, FirstEnergy continued to recant its prior denials and previously professed above-board behavior with admissions that its $4 million payment to Randazzo was part of a pattern of improper transactions that the Company had not properly reported to investors, and that had negatively impacted ratepayers stretching back more than a decade. ¶207. FirstEnergy also announced its continued overhaul of key leadership positions, including the appointment of a new Vice Chairman of the Board, which was just one of several steps FirstEnergy admitted were necessary to "rebuild trust with FirstEnergy's external stakeholders, including regulators and the financial community." ¶¶206-207. Although it post-dates the Complaint, the Court may also take judicial notice of the fact that FirstEnergy's April 22, 2021 Form 10-Q admits that the Company is pursuing a deferred prosecution agreement with the government.[3]

## III.    LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires a court to "consider the complaint in its entirety," "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007); *see also Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490, at *1, *6 (S.D. Ohio May 11, 2021). A complaint "does not need detailed factual allegations" but only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Jones*, 2021 WL 1890490, at *6. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus,

---

[3]     *See* Declaration of Jason A. Forge in Support of Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss, Exhibit A, filed herewith. *In re Cardinal Health Inc. Sec. Litigs*., 426 F. Supp. 2d 688, 712 (S.D. Ohio 2006) ("courts may consider the full text of SEC filings, prospectuses, and analysts' reports regardless of whether they are attached to a plaintiff's complaint (in part or in whole) as long as they are ***integral*** to statements within the complaint") (emphasis in original).

"[i]t is settled law that a court may not grant a defendant's Rule 12(b)(6) motion to dismiss unless it appears beyond doubt that the claimant can prove no set of facts supporting its claim which would entitle it to relief." *Cardinal Health*, 426 F. Supp. 2d at 711.

## IV. THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE EXCHANGE ACT

As this Court has observed, to state a claim for statement liability under §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, a plaintiff must allege: "(1) that defendants made a false statement or omission of material fact; (2) in connection with a purchase or sale of securities; (3) scienter; (4) reliance; and (5) damages." *Id.* at 715-16.

A securities fraud complaint must satisfy the additional pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016). "'Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.'" *Williams v. Duke Energy Int'l, Inc*., 681 F.3d 788, 803 (6th Cir. 2012). The PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §78u-4(b)(1), (2)(A). The Sixth Circuit has interpreted Rule 9(b)'s heightened pleading standard as requiring a plaintiff to "'"allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."'" *Willis v. Big Lots, Inc*., 2016 WL 8199124, at *10 (S.D. Ohio Jan. 21, 2016) (citing *Yuhasz v. Brush Wellman, Inc*., 341 F.3d 559, 563 (6th Cir. 2003)). "'Where a complaint alleges "a complex and far-reaching fraudulent scheme,"'" "'the complaint must . . . "provide examples of specific" fraudulent conduct that are "representative

samples" of the scheme.'" *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *12 (M.D. Tenn. Dec. 18, 2017) ("*CCA*").

Rather than inefficiently recite the myriad ways the Complaint supposedly is "not insufficient," Plaintiffs will focus on what matters: why the Complaint is irrefutably sufficient. To begin, Defendants do not challenge the sufficiency of the Complaint for Plaintiffs' Exchange Act claims as to most of the requisite elements. Specifically, Defendants challenge only the elements of deceit and scienter. All other elements are uncontested. Even as to this limited scope, there is no room for honest debate regarding the Complaint's sufficiency. As a result, Defendants resort to ignoring and contradicting the Complaint's allegations rather than accepting them as true, as required. Defendants' securities violations, resulting from their repeated failures to tell the truth about FirstEnergy's role in the Bailout Scheme, were straightforward, even though they were based on a corruption scheme that was massive in scope and duration.

### A. The Complaint Abounds with Confirmed Allegations of Defendants' Deceit

#### 1. Defendants Assured Investors Their Political Expenditures Were Above Board

As FirstEnergy's CEO, Jones himself admitted that solving FirstEnergy's nuclear problem was his "top priority" and he boasted that he was not only "personally" involved in meeting with legislators and advocating for "regulatory or legislative solutions," but that he was a "loud advocate" for such solutions. ¶¶66, 103, 121, 124, 220. Still, Jones and FirstEnergy repeatedly assured investors that FirstEnergy was "upholding [a] high standard for corporate governance" (¶104) and complying with all "laws, rules and regulations applicable to the Company." ¶109. These assurances did not occur in a vacuum, but rather were offered in response to direct questions and in response to shareholder concerns about FirstEnergy's "lobbying policies and payments," including a corresponding proposal for an annual report on such policies and payments. ¶110. Jones was among

- 17 -

the Company directors who assured investors that "your Company strives to conduct its business as transparently as possible to serve customers effectively and help build public trust," including a political activity policy that assured investors that, "[The Company] has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy. . . . Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations." ¶¶110-111.

### 2. FirstEnergy Corrupted the Regulatory and Political Process

As alleged, and therefore as a matter of fact at this stage:

> Throughout the Class Period, FirstEnergy and its most senior executives bankrolled one of the largest corruption and bribery schemes in U.S. history. Unbeknownst to investors, FirstEnergy spent tens of millions of dollars on an unprecedented multi-year scheme to corrupt legislators and regulators, who FirstEnergy used to draft and pass legislation designed to provide $2 billion in benefits to FirstEnergy – all at ratepayers' expense. FirstEnergy's scheme extended to the highest offices of the Ohio legislature, including the office of the Speaker of the House, and to the top energy regulator in the state, the Chairman of the Public Utilities Commission of Ohio ("PUCO"). FirstEnergy employed an elaborate network of lobbyists, shell companies and political action committees; saturated media markets with a false and misleading advertising campaign funded through difficult-to-trace dark money networks; and directly subverted the free and fair operation of Ohio elections.

¶3.

> Corruption became a fundamental aspect of the Company's business model as the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges.

¶4.

> This corruption-based business model exposed FirstEnergy to catastrophic risks (and now the reality) of financial, regulatory, legal and reputational loss, and FirstEnergy and its senior insiders went to great lengths during the Class Period to conceal these risks from investors. In fact, FirstEnergy and its executives repeatedly affirmatively reassured investors that the Company was not engaged in any illicit activities and "compl[ied]" with all laws and regulations applicable to its regulatory affairs and investor disclosure obligations. FirstEnergy also provided investors with pages of "Risk Factors" purporting to detail the most significant risks facing the

- 18 -

Company, while concealing any mention of the monumental risks stemming from the political corruption scheme then being spearheaded by the Company and its executives. FirstEnergy's misrepresentations of material facts about these corrupt activities was part of an overarching "Bailout Scheme" designed to generate billions of dollars in illicit proceeds for the Company.

¶6. The Complaint repeatedly refers to Defendants' bankrolling and facilitating "one of the largest corruption and bribery schemes in U.S. history." ¶¶3, 85, 142, 144, 147, 149, 160, 170, 176, 201, 209, 236, 237. At bottom, Defendants deceived investors with a façade of integrity and compliance such that investors had no idea that they were investing in what amounted to a publicly-traded criminal enterprise dependent upon the success of FirstEnergy's corruption-based business model.

The U.S. Attorney's Office for the Southern District of Ohio's filing of a criminal complaint was the beginning of the end of Defendants' fraud, as it "described how FirstEnergy and its top executives had illegally funneled $60 million into the hands of corrupt politicians to get HB6 passed into law and avoid its repeal." ¶8. What had seemed like a profitable, albeit corrupt, investment – "$2 billion at the expense of Ohio ratepayers" (*id.*) – collapsed and triggered the very risks that Defendants had fraudulently concealed from investors. As detailed in the Complaint:

> [T]he Company, *inter alia*: (i) is now the subject of dozens of lawsuits and regulatory and governmental investigations; (ii) has lost an estimated $2 billion in purported benefits promised by HB6; (iii) admitted to internal control deficiencies and wrongdoing by its most senior executives; (iv) drew down nearly $2 billion from credit facilities to cover expected costs associated with fallout over its role in the Bailout Scheme; and (v) and suffered credit downgrades to junk status for its corporate debt by all three major credit rating agencies.

¶12.

### 3. FirstEnergy Has Admitted the Falsity of Its Class Period Statements

In sharp contrast to Defendants' Class Period assurances of FirstEnergy's legal compliance in connection with the Company's political activities, FirstEnergy has subsequently admitted that its own CEO, Jones, and other officers violated its "Company policies and its code of conduct" related to HB6. ¶¶172, 178. Likewise, FirstEnergy fired its Chief Legal Officer, Reffner, as well as its

- 19 -

General Counsel and Chief Ethics Officer, admitting to these senior executive's inaction in response to the "improper tone" coming from Jones ("the top"). ¶¶184, 191. FirstEnergy further admitted that its illicit $4 million payment to incoming-regulator Randazzo had been the product of violations of FirstEnergy's policies and code of conduct by senior management, including Jones, Dowling, and Chack,. ¶190. Likewise, despite claiming that FirstEnergy maintained effective internal controls over financial reporting during the Class Period, the Company has subsequently admitted that it did not, and that these controls in fact suffered from "material weakness[es]." ¶189. But FirstEnergy's costliest concession to date of wrongdoing is its willingness to forfeit its ill-gotten gains from HB6, including the nuclear subsidy and decoupling surcharges worth over $2 billion. ¶¶201-204. The Judge presiding over the halt to the nuclear subsidy aptly stated that enjoining it was imperative because to allow it "would give the OK that bribery is allowed in the state of Ohio and that any ill-gotten gains can be received." ¶201. To this day, FirstEnergy has not contested Judge Brown's characterization in any way. As a publicly-traded company, FirstEnergy would be obligated to fight for over $2 billion in ***legitimately*** obtained benefits, so the Company's willingness to forgo this money is also a concession of its illegitimacy. Ohio Rev. Code Ann. §1701.641.

### 4.    Defendants Deceived Investors

All these machinations epitomize the very deception of investors our securities laws are designed to prevent and redress. In fact, one would be hard-pressed to find any case in which the deceit element is more clearly pled and supported than it is here. Defendants perpetrated a coordinated scheme to convince investors that their pursuit of a legislative fix was entirely legitimate and that the many risks facing FirstEnergy did not include those corresponding to the Company bankrolling the largest corruption scheme in U.S. history. Indeed, the detailed allegations of Defendants' misrepresented and concealed corruption campaign is likely unprecedented at the pleading stage, spanning from FirstEnergy's own admissions, executive and officer firings,

forfeitures of *billions* in ill-gotten gains, and pursuit of a deferred prosecution agreement to Defendants' direct implication in the Bailout Scheme as set forth in a detailed FBI affidavit supporting a criminal complaint, recorded conversations, recovered text messages, a criminal indictment, and multiple guilty pleas. The market promptly understood the varied indicia of Defendants' deceit, as the artificial inflation present in the price of FirstEnergy securities during the Class Period quickly dissipated "inflicting billions of dollars of losses on FirstEnergy investors." ¶¶9, 144. Essentially every market observer and analyst attributed FirstEnergy's precipitous stock price declines to the misconduct at issue in this case. ¶¶144-150, 160, 166, 175, 176. All these facts are indisputable at this stage.

There is simply no other case that measures up to this level of proof of deceit at the pleading stage – and very few even after discovery. Despite filing 10 separate motion to dismiss briefs, Defendants failed to find a single court that has dismissed a complaint with allegations resembling the quality and quantity of the allegations of Defendants' deceit here. Nor have Defendants found a single court that dismissed a securities case, despite a company's own admissions of wrongdoing, officer firings, forfeitures of *billions* of dollars in ill-gotten gains, and pursuit of a deferred prosecution agreement – all directly related to the wrongdoing at issue in the case, whose exposure caused the price of the issuer's securities to crash.

> **5.** **Defendants Repeatedly Spoke About Their Compliance with Internal and External Policies and Laws in Pursuit of Vital Legislation, but Never Provided Accurate and Fulsome Information**

The Exchange Act prohibits "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005); *see also La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) ("Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in

- 21 -

connection with the sale or purchase of a security.'").  Corporate actors must "'provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001); *abrogated by Tellabs*, 551 U.S. 308.  "[A] company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths.  *Id.*; *see also Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 2020 WL 7711378, at *14 (M.D. Tenn. Dec. 29, 2020) ("'once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading'").

Here, Defendants repeatedly made statements, including answers to direct questions, about the importance of their pursuit of legislative solutions to their massive nuclear problem, including statements expressly concerning HB6.  *See, e.g.*, ¶¶44, 91, 95, 103, 113, 115, 117-122, 125-127. Moreover, to assuage investor concerns about political spending and contributions, Defendants repeatedly assured investors of FirstEnergy's transparency and its "decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy. . . .  Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations."  ¶¶110-111.

None of these statements so much as suggested that the most important aspect of Defendants' pursuit of legislative solutions depended on (or had been achieved by), a "scheme to corrupt the political process and suborn the regulatory framework" (¶4) into which FirstEnergy had poured tens of millions of dollars.  Likewise, Defendants regularly warned of a host of risks FirstEnergy faced, including wildly remote risks that conveyed a sense of exhaustiveness, yet they never provided a hint of the greatest and most imminent risk facing FirstEnergy during the Class Period:  the exposure of their unprecedented corruption scheme and the extreme legal, financial, and managerial

- 22 -

consequences that would result from such exposure. The immediate share-price collapse resulting from the initial revelations of Defendants' scheme confirmed that Defendants had, in fact, deceived the market. Defendants cannot credibly argue otherwise.

FirstEnergy has already admitted the falsity, or at least the misleading incompleteness, of its assurances by admitting that its CEO and other senior officers violated "Company policies and its code of conduct" (¶172); that Jones and others did not promote adherence to the Company's code of conduct (¶190); that the employees responsible for its "decision-making and oversight processes in place for political contributions and expenditures" did not do their jobs (¶¶111, 191); and that the Company had falsely represented in its SEC Form 10-K filings that it was maintaining an effective control environment, including effective internal control over financial reporting, when in fact, "[w]e did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top" and it suffered from a "material weakness" in internal control over financial reporting. ¶192. These omitted facts alone render Defendants' statements misleadingly incomplete.

Despite scouring decades of cases from across the country, Defendants failed to find a single court that dismissed a securities case notwithstanding any, let alone the many, allegations of deceit here, including:

- A detailed FBI affidavit supporting a criminal complaint, recorded conversations, recovered text messages, a criminal indictment, and multiple guilty pleas – all directly implicating Defendants in the very wrongdoing to which every single market observer and analyst attributed a precipitous price drop; and

- A company's own admissions of violations of company policies, admissions of false statements in SEC filings, executive and officer firings, forfeitures of, and injunctions staying, ***billions*** of dollars in ill-gotten gains, and pursuit of a deferred prosecution agreement – all directly related to the wrongdoing whose exposure caused a price crash.

¶¶144-150, 160, 166, 175, 176, 189, 190, 201, 204.

- 23 -

Instead, Defendants cite one inapplicable case after another, and the volume of this futile effort confirms the sufficiency of the allegations here, as Defendants' cases are not close to measuring up. For example, Defendants rely heavily on *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564 (6th Cir. 2008). *See* ECF No. 161 at 2, 12, 32, 35, 62-63. But, in *Zaluski* there were mere allegations that the defendants had made 42 payments to a state senator. 527 F.3d at 568. There were no affidavits, criminal charges, or guilty pleas implicating the defendants' corruption. There were no admissions of violations of company policies, admissions of false statements in SEC filings, no massive officer firings (including all the way up to CEO), no forfeitures of funds from the allegedly related state contracts, and no pursuit of a deferred prosecution agreement. This means that one of the cases on which Defendants rely most heavily bears no resemblance to the strength of the allegations here.[4] With no authority supporting their attack on the sufficiency of Plaintiffs' allegations regarding the deceit element, this aspect of Defendants' motion must be denied.

---

[4] The same holds true for the other cases on which Defendants rely. Not one involved FBI affidavits, criminal charges, or guilty pleas implicating the defendants' corruption. Nor admissions of violations of company policies, admissions of false statements in SEC filings, massive executive and officer firings, forfeitures of funds from the allegedly corrupt transactions, and none of the defendants were pursuing a deferred prosecution agreement. *See, e.g.*, ECF No. 161 at 2, 11, 27, 28, 34, 35, 37, 40, 42, 50 (citing *Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1028 (S.D. Ohio 2004) (alleged wrongdoing limited low-level traders); ECF No. 161 at 10, 14, 16, 19, 37, 63 (citing *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 199 (S.D.N.Y. 2020) (defendants *self-reported* their discovery of irregular payments to the legal representative of a Colombian company from whom they were in the process of purchasing property); ECF No. 161 at 10, 17 (citing *In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *5 (N.D. Ga. June 30, 2011) (mere FTC and DOJ *investigations* into possible price fixing); ECF No. 161 at 10, 21, 35 (citing *In re AXIS Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 581, 586 (S.D.N.Y. 2006) (mere allegations of anticompetitive insurance practices); ECF No. 161 at 11, 64 (citing *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 488-89 (6th Cir. 2015) (the defendants' products sourced from third-party suppliers allegedly tested positive for prohibited drug and antibiotic residues); ECF No. 161 at 11, 12 (citing *In re Mirant Corp. Sec. Litig.*, 2009 WL 48188, at *18 (N.D. Ga. Jan. 7, 2009) (mere allegations of "illegal" energy trading activities to reap "illegal" profits).

**6.      Defendants Do Not Acknowledge, or Challenge, the Complaint's Bailout Scheme Allegations**

Plaintiffs allege facts showing that Defendants engaged in a course of conduct that operated as a fraud on investors, known as "'scheme liability.'" *Lorenzo v. Sec. & Exch. Comm'n*, _U.S._, 139 S. Ct. 1094, 1101 (2019). Rule 10b-5 makes it unlawful for any person to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[] in connection with the purchase or sale of any security." 17 C.F.R. §240.10b-5(a), (c). "These provisions capture a wide range of conduct." *Lorenzo*, 139 S. Ct. at 1101; *see also Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *45 (M.D. Tenn. Mar. 31, 2011) ("The securities laws reach misleading conduct as well as misleading statements . . . ."). To state a scheme claim, "'[a] plaintiff must allege that a defendant[:] (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries.'" *Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 320 F. Supp. 3d 910, 923 (E.D. Mich. 2018). A plaintiff need only "'"provide examples of specific" fraudulent conduct that are "representative samples" of the scheme.'" *CCA*, 2017 WL 6442145, at *12.

The Complaint provides detailed allegations of Defendants' scheme in support of Plaintiffs' claims under Rule 10b-5 (a) and (c), including the following methods and means:

(a)      Using bankruptcy proceedings to try to evade liability for the Nuclear Plants;

(b)      Concealing the Bailout Scheme from the investing public and the bankruptcy court presiding over proceedings related to the Nuclear Plants;

(c)      Paying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6;

(d)      Creating and using a web of pass-through entities to transfer and conceal the money to finance the Bailout Scheme;

- 25 -

(e)     Making personal payments to corrupt politicians and at least one regulator;

(f)     Financing and supporting political campaigns with undisclosed contributions far greater than legally permitted;

(g)     Using corrupted politicians to advance HB6 for consideration, to amend HB6 for FirstEnergy's additional benefit, and ultimately to pass the bill;

(h)     Using a corrupted regulator to help write and support HB6; and

(i)     Corruptly preventing a referendum to repeal HB6.

¶93.

Tellingly, Defendants' 11 pages of arguments detached from the Complaint's actual scheme allegations fail to cite a single case that post-dates the Supreme Court's watershed decision in *Lorenzo*, which rejected efforts to limit the reach of scheme liability under 10b-5(a) and (c). *Compare* ECF No. 161 at 68-78 (citing no case after 2017) *with Lorenzo*, 139 S. Ct. at 1101 (decided in 2019 and expressly rejecting arguments to limit the reach of the "expansive" "provisions [10b-5(a) and (c), which] capture a wide range of conduct").  In effect, Defendants improperly seek to rewrite Rules 10b-5(a) and (c) because, as alleged, they clearly engaged in what the plain language of these rules proscribes:  "A 'device,' we have observed, is simply 'that which is devised, or formed by design'; a 'scheme' is a 'project,' 'plan, or program of something to be done'; and an 'artifice' is 'an artful stratagem or trick.'"  *Lorenzo*, 139 S. Ct. at 1101 (cleaned up).

Defendants' avoidance of *Lorenzo* is even more glaring in light of their heavy reliance on *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148 (2008), which bears no resemblance to the facts of this case.  First and foremost, the defendants at issue in *Stonebridge* did **not** include the company whose stock price was allegedly artificially inflated, its employees, or any employees of its subsidiaries.  *Id.* at 153.  Instead, the defendants at issue were third-party suppliers and customers of the company whose stock was at issue.  And second, these third-party defendants did nothing that directly or inevitably deceived the public.  *Id.* at 153-55.  As such, the Supreme

- 26 -

Court concluded that the third-parties' actions were too attenuated to support an allegation that the market had relied on them to the extent necessary to support the *Basic* presumption of reliance. *Id.* 158-59.

The fact that Defendants would rely so heavily on such a thoroughly inapt case confirms that Defendants have no analogous cases to support their arguments. The Defendants here are the company whose price was allegedly inflated and its employees and its subsidiaries' employees whose acts and statements directly led to the price inflation. The entire scheme was directed at a prominently public-facing goal: deceiving investors about how Defendants secured and preserved HB6 to generate billions in taxpayer funded subsidies and guarantees for FirstEnergy. *See W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 394 (8th Cir. 2016)(affirming scheme liability allegations where defendants' "deceptive conduct directly caused the production of the information on which the market relied."). It was fundamentally impossible for Defendants' scheme to succeed without investors being deceived because the objectives of the scheme's methods and means were as public-facing as is possible. This may explain why no defendant acknowledges these methods and means or challenges their sufficiency.[5] Without any such challenge, Plaintiffs' scheme liability allegations are not subject to a motion to dismiss. *Willis*, 2016 WL 8199124, at *37 (finding that issues that are "unaccompanied by some effort at developed argumentation, are deemed waived").

## B. Defendants' Scienter Cannot Be Credibly Contested

"[S]cienter consists of knowledge or recklessness." *Cardinal Health*, 426 F. Supp. 2d 688 at 717 (emphasis omitted). The Sixth Circuit has defined recklessness as "'highly unreasonable

---

[5] Although FirstEnergy acknowledges the existence of a claim under Rule 10b-5(a) and (c), it does not acknowledge the allegations themselves. Instead, it makes the same "absurd" argument to dismiss everything based on inapt cases and improper defiance of the facts, as set forth above and below.

conduct which is an extreme departure from the standards of ordinary care'" and "'akin to conscious disregard.'" *La. Mun. Police Emps. Ret. Sys. v. KPMG LLP*, 822 F. Supp. 2d 711, 719 (N.D. Ohio 2011) (citing *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011)).

When analyzing allegations of scienter, courts consider the totality of circumstances. *Tellabs*, 551 U.S. at 321-22. Treating each allegation separately "risks losing the forest for the trees." *Frank*, 646 F.3d at 961. Echoing *Frank* and nodding to the Supreme Court's directive in *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) to review scienter pleadings "holistically," in *Frank*, the Sixth Circuit ended the piecemeal approach Defendants argue here, holding that District Courts should not "sort[] through each allegation individually before concluding with a collective approach." *Frank*, 646 F.3d at 961 (reversing the district court's dismissal of an action alleging securities fraud for the second time). Instead, the "only appropriate approach" is to "address[] the allegations collectively, [to do] so quickly, and, importantly . . . not parse out the allegations for individual analysis." *Id.*[6]

---

[6]     When determining whether a complaint's scienter allegations, "taken collectively," are sufficient, courts in the Sixth Circuit consider nine non-exhaustive factors: "'(1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.'" *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018) (finding a strong inference of scienter where only three of the nine factors were present) (quoting *Helwig*, 251 F.3d at 552). Remarkably, nearly ***all*** of these factors are present in this case. *E.g.*, ¶¶208-251. *Cf.*, *Albert Fadem Tr.*, 334 F. Supp. 2d at 1008 (where ***none*** of the *Helwig* factors were present, where standards "were the same through the industry" and "practically all the traders within the companies were doing [the same activities as defendants]," scienter was not adequately alleged); *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 860 (S.D. Ohio 2016), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) ("the absence of allegations under the *Helwig* factors" failed to support an inference of scienter).

- 28 -

As described in detail below, Defendants' arguments that Plaintiffs fail to plead "actual knowledge" as to "soft" information fall flat.  ECF No. 161 at 31-33.  *See Burges v. BancorpSouth, Inc.*, 2015 WL 4198795, at *6 (M.D. Tenn. July 10, 2015) (finding scienter adequately alleged with regard to legal compliance where plaintiffs set forth facts showing that defendants "knew or should have known or, at a minimum were reckless in ignoring the fact that, they were not in compliance with these banking laws").[7]  Defendants wholly ignore that the Complaint is replete with factual allegations of actual knowledge.  *See, e.g.*, ¶¶219-230 (actual knowledge from direct participation in the scheme); ¶¶231-235 (actual knowledge as Defendants actively attempted to conceal the scheme); ¶¶215-218 (Defendants admitting to actual knowledge of the scheme).  *See also St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2021 WL 195370, at *7 (M.D. Tenn. Jan. 20, 2021) (finding that defendants "acted with actual knowledge" of the scheme upon allegations that "Defendants had intimate knowledge of patient admissions, staffing levels, and quality control issues and monitored those metrics on a daily basis; before the misconduct was revealed the Individual Defendants and one of Acadia's founders unloaded more than $600 million in Acadia stock while its price was inflated by fraud; Defendants installed compensation structures designed solely to reward short-term profit at the expense of patient care; and shortly after Defendants' fraud was revealed, Acadia's CEO and President were abruptly fired or resigned with no notice under highly unusual circumstances").[8]  Similarly, Defendants' argument that Plaintiffs failed to plead any "illegal

---

[7]     *See also N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 780-81 (M.D. Tenn. 2013) (explaining that, unlike "hard information" such as compliance statements, "soft information" relates to "such statements describing a product in terms of 'quality' or 'best' or benefitting from 'aggressive marketing' [that] are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision"); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 675 (6th Cir. 2005) (finding that "the protections for soft information end where speech begins").

[8]     Plaintiffs' Complaint does not suffer from the same infirmities as *Omnicare*, contrary to Defendants' suggestion.  *See, e.g.,* ECF No. 161 at 31-32.  In *Omnicare*, the Sixth Circuit found that

underlying acts" in order to satisfy scienter is baseless. ECF No. 161 at 33-36. As described in detail in §IV.A.1.-6., the Complaint describes a vast array of criminal activity tied to Defendants' activities.[9] The argument also ignores the central question in this case, namely whether Defendants accurately disclosed their lobbying efforts and conduct in connection with HB6 and the Bailout Scheme. The Complaint more than adequately alleges that they fraudulently failed to do so. Moreover, the Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions." *Tellabs*, 551 U.S. at 313.

---

the complaint insufficiently tied the individual defendants to audits that purportedly showed that their public statements to investors were false, failed to provide "any specifics" about when the individual defendants knew the statements were false, and employed "speculative reasoning" to illustrate the individual defendants' actual knowledge. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 482 (6th Cir. 2014); *see also Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945-46 (6th Cir. 2009) ("Although Plaintiffs claim that Omnicare's 'legal compliance' claim was made with knowledge of its falsity, few factual allegations support this claim."); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 822 (W.D. Mich. 2012) ("a defendant's 'general statements that it complied with state law and regulations and had a policy of complying with the law' are not actionable in absence of sufficient allegations demonstrating that the statement was 'made with knowledge of its falsity'"). In contrast, Plaintiffs' Complaint relies on the wealth of *facts* supported by an 80-page affidavit, arrests, and guilty pleas (¶¶8, 69, 143, 171, 205), amongst numerous other factual allegations, to demonstrate the Officer Defendants' statements were knowingly false when made. Moreover, the Complaint's scheme liability allegations are supported by a raft of facts supporting "'intentional or willful conduct designed to deceive'" investors. ECF No. 161 at 33; *see, e.g.*, ¶¶64-80 (describing how FirstEnergy secretly funneled millions of dollars to corrupt the legislative and regulatory process to pass HB6 and reap $1.3 billion in subsidies and another $100 million annually via a decoupling provision); ¶¶81-87 (describing how FirstEnergy used shell entities to defeat the referendum to repeal HB6 through deceptive advertising, disrupting signature collection, and other unscrupulous tactics); ¶93 (describing the methods and means of the bailout scheme).

[9]     Notably, Defendants' cited authority lacks the detailed factual allegations regarding the scheme that are present here in abundance. *See, e.g., Kushner v. Beverly Enterprises, Inc*., 317 F.3d 820, 827 (8th Cir. 2003) (scienter not inferred where plaintiff failed to make *any* "assertion of which defendant was responsible for which statement or omission, or how any defendant participated in the alleged scheme."); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018) (scienter not adequately alleged where plaintiff failed to plead that defendants "knew, or should have known, that Combret was a foreign official " or *any* "facts suggesting that Combret even *was* a foreign official" in violation of the Foreign Corrupt Practices Act).

The bottom line is that scienter is sufficiently pled "if a reasonable person would deem the inference of scienter cogent and *at least as* compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Where two equally compelling inferences can be drawn, a motion to dismiss must be denied. *Id.*

### 1. There Is No Other Rational, Let Alone More Compelling, Inference than the Inference of Defendants' Scienter

Here, there is no tie. The inference of scienter is the only cogent inference that can be drawn from the facts alleged. It is impossible for all this corruption to occur by happenstance. FirstEnergy may be a legal entity, but none of this would have been possible without the individuals who run the Company. Again, as a matter of fact, "FirstEnergy's scheme to corrupt the political process and suborn the regulatory framework was not the work of rogue employees, but personally overseen and facilitated by the senior echelon of Company management, including FirstEnergy's then-Chief Executive Officer . . . Charles E. Jones and numerous other executives responsible for FirstEnergy's regulatory affairs, legal compliance, financial reporting and investor disclosures." ¶4.[10] As likewise alleged:

---

[10] Defendants claim that the Complaint fails to allege a *quid pro quo* and is "devoid" of allegations indicating signs of fraud or """red flags""" is wrong. ECF No. 161 at 33-35, 41-42. The Complaint plainly alleges what Defendants claim is missing. *See, e.g.*, ¶¶72, 171, 205 (describing payments from FirstEnergy to Generation Now and Randazzo in exchange for legislative and regulatory actions benefitting the Company and its nuclear plants); ¶¶65, 208-210, 221-223, 229-30 (describing FirstEnergy's interactions with members of the bailout scheme, including during a ride on a corporate jet and dozens of phone calls); ¶¶236-240 (describing the historic magnitude of the bailout scheme, leading to arrests, guilty pleas, lawsuits, investigations, and terminations of senior executives); ¶¶241-247 (describing FirstEnergy's debt issuance and efforts to boost its credit ratings via the bailout scheme in order to access capital markets at favorable rates); ¶¶248-251 (describing insider sales). Allegations of this breadth easily satisfy the scienter standard. *See, e.g.*, *Cardinal Health*, 426 F. Supp. 2d at 740 (finding red flags where, *inter alia*, the magnitude of "the alleged divergence between the Company's reported and actual financials resulting from the misstatements implies scienter"); *Jones*, 2021 WL 1890490, at *13 (describing the alleged "dark-money" campaigns in support of HB6 as "'red flags'" putting FirstEnergy defendants "on notice of the bribery scandal" under a negligence standard); *Palazzolo v. Fiat Chrysler Autos. N.V.*, 2017 WL 6389573, at *9 (E.D. Mich. Dec. 14, 2017) (finding a strong inference of scienter where plaintiffs

- 31 -

Company insiders were also richly rewarded, receiving tens of millions of dollars in excess compensation tied to FirstEnergy's apparent success. For example, in 2019 alone, FirstEnergy paid Jones over $20 million, which included $18 million in performance-based stock units. Numerous Company insiders also took advantage of FirstEnergy's inflated stock price to sell millions of dollars of their own personal FirstEnergy shareholdings. Jones alone sold nearly 265,000 FirstEnergy shares for $10 million at artificially inflated prices during the Class Period – more than double the number of shares he sold in the preceding ten years.

¶7. It is well established that "'[P]ersonal financial gain may weigh heavily in favor of a scienter inference.'" *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 738 (E.D. Mich. 2007) (quoting *Tellabs*, 551 U.S. at 325); *see also Frank*, 646 F.3d at 958 n.2 ("insider trading at a suspicious time[s] or in an unusual amount" is often relevant to the scienter analysis) (citing *Helwig*, 251 F.3d at 552); *Cardinal Health*, 426 F. Supp. 2d at 723 (plaintiffs' allegations, which included insider trading, were "'widespread and varied,'" and "point to a strong inference of scienter"); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 539 (S.D. Ohio 2000) (allegations of insider trading at "rather high levels and suspiciously timed in proximity to the false statements" coupled with other allegations "give rise to a strong inference of scienter"); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 598-99 (N.D. Ohio 2004) (finding that scienter allegations of "insider selling at an opportunistic time supports an inference of fraudulent intent to mislead the market for personal gain").

"Bribery and corruption" were also at the very core of FirstEnergy's business model as shown by the Officer Defendants' direct participation in the Bailout Scheme. ¶¶40, 219-235, 237. And when top executives admit "that they monitored portions of the company's [business]" it is a "factor[] in favor of inferring scienter." *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *23 (M.D. Tenn. Apr. 26, 2011). Here, several of the Officer Defendants, including Jones, Dowling, Pine, Schneider, and Judge, were in direct contact with co-conspirators to the Bailout Scheme via a

---

alleged "several red flags and suspicious facts that should have caused Defendants to become aware of the alleged fraudulent scheme").

multitude of phone calls and other contacts, and when defendant Jones was asked about the Bailout Scheme, he specifically admitted that "[t]he financial support we provided to House Bill 6 isn't complicated. *We know what we did. We know why we did it*." ¶¶218, 221-223, 229-230. Indeed, even without these admissions, "high-level executives can be presumed to be aware of matters central to their business's operation." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004), *abrogated in part on other grounds by Frank*, 646 F.3d at 961; *see also Cardinal Health*, 426 F. Supp. 2d at 724 ("Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations or omissions pertain to 'central, day-to-day operational matters.'").

Moreover, Defendants purposefully concealed the illicit Bailout Scheme payments through elaborate and secretive dark money groups designed to hide FirstEnergy's involvement, and continued to try to cover up this involvement after the scheme was revealed. ¶¶233-235. FirstEnergy admitted that Jones, Chack, and Dowling withheld information about the Bailout Scheme, leading to terminations of Company executives. ¶¶232, 235. Defendants ignore these facts and argue that the allegations of a cover-up are just "an attempt to impute scienter based on employment titles." ECF No. 161 at 40-42. However, substantially identical allegations of the alleged cover-up have already been upheld in related litigation before this Court. *See Jones*, 2021 WL 1890490, at *10 (upholding allegations that FirstEnergy "cover[ed] up the [bribery and pay-to-play] scheme illegally"). Defendants' efforts to conceal the fraud further support a finding of scienter.

As has been widely reported, and repeated at length in the Complaint, the sheer magnitude of Defendants' $2 billion rate payer-funded Bailout Scheme, one of the largest in U.S. history, has led to multiple arrests, guilty pleas, lawsuits, investigations, terminations, and other severe and wide-ranging consequences. ¶¶236-237. These are the kinds of "'in your face facts,' that cry out, 'how

- 33 -

could [defendants] not have known.'" *PR Diamonds*, 364 F.3d at 685 (stating that "'common sense and logic dictate that the greater the magnitude" of the violation "'the more likely it is that such . . . violation was made consciously or recklessly'"); *see also Cardinal Health*, 426 F. Supp. 2d at 723 ("the sheer magnitude of the actual fraud point[s] to a strong inference of scienter"); *FirstEnergy*, 316 F. Supp. 2d at 598 ("suspicious" accounting improprieties leading to "enormous overstatements of revenue for several years further supports an inference of scienter.'"); *N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc*., 929 F. Supp. 2d 740, 786 (M.D. Tenn. 2013) ("the serious magnitude of the Defendants' accounting mistreatment" gave rise to a strong inference of scienter). Defendants characterize the $60 million funneled throughout the Bailout Scheme as "miniscule" in comparison to the Company's revenues over the same period of time. ECF No. 161 at 44. But this ignores the magnitude of the years-long scheme, and the $2 billion that FirstEnergy stood to gain from concealing it.[11] Indeed, FirstEnergy was subsequently forced to restate its 2019 Form 10-K, which had admittedly misrepresented FirstEnergy's internal controls over financial reporting and concealed material weaknesses. ¶¶189, 190.

Defendants' many admissions, FirstEnergy's terminations of high-level executives, and the ensuing litigation related to the Bailout Scheme all further support a finding of scienter, including: (i) FirstEnergy's admission of making a $4 million payment "for purposes other than those represented" to PUCO Chairman Randazzo; (ii) FirstEnergy's admission of ineffective controls; (iii) Jones's admission that FirstEnergy knowingly contributed at least $15 million to the Bailout Scheme; (iv) FirstEnergy's admission that the terminations of Jones, Chack, and Dowling related to

---

[11]     Indeed, Defendants' authority merely states that accounting claims standing alone are insufficient to allege scienter. *E.g.*, *Fidel v. Farley*, 392 F.3d 220, 231 (6th Cir. 2004), abrogated by *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (magnitude of "'accounting errors alone cannot justify a finding of scienter.'"); *Louisiana Sch. Employees' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) (same); *Konkol v. Diebold, Inc*., 590 F.3d 390, 400 (6th Cir. 2009) (noting that "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim.").

the criminal proceedings and investigations; (v) the terminations of Reffner and another senior executive for failure to prevent wrongdoing; and (vi) the multitude of litigation and investigations spawned by the Bailout Scheme, including the fact that FirstEnergy has been identified as "Company A" in the criminal proceedings. ¶¶216-218, 238-240.[12]

Defendants' argument that later guilty pleas, settlements, investigations, terminations, or admissions "at most" show that "contributions were made, not that they were illegal" and indicate "violations of aspirational internal policies" insufficient to establish scienter is not persuasive. ECF No. 161 at 37-40. Defendants' "public statements or admissions" as summarized above are clearly relevant to the scienter analysis. ¶¶215-218; *see also, In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009) ("*ASG*"); *Fushi Copperweld*, 929 F. Supp. 2d at 785-86 (defendants' later admissions about improper accounting treatment "raise[d] an inference of scienter about the Defendants' prior statements on these issues"); *Proquest*, 527 F. Supp. 2d at 745 (defendants admissions supported plaintiffs' scienter allegations showing "a compelling inference of fraud"). Even without "'a flat-out admission,'" events occurring after the fraud can allow a court to find "the inference of scienter is at least as likely as its opposite." *SBAV, LP v. Porter Bancorp, Inc.*, 2014 WL 1257018, at *8 (W.D. Ky. Mar. 26, 2014); *see also In re Hayes Lemmerz Int'l, Inc.*, 271 F. Supp. 2d 1007, 1018 (E.D. Mich. 2003) (finding that defendants' admission that the "'expected and required proper financial reporting,'" was not "'properly reflected in the attitudes and actions of

---

[12]    In contrast, Defendants offer cases where the defendants were not alleged to have been aware of the illegal activities of its lower level employees. *E.g., Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) ("Although the SEC and DOJ concluded that certain illegal payments were approved by InVision's regional sales manager and senior vice president for sales and marketing, Glazer has not pled any facts to demonstrate that Magistri was personally aware of the illegal payments or that he was actively involved in the details of InVision's Asian sales."); *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 829 (8th Cir. 2003) ("The guilty plea of the California subsidiary was limited in scope to wrongful conduct by a handful of employees and does not indicate a company-wide scheme of which the defendants should have known.").

certain former managers'" was "tantamount to an admission that management knew or should have known that proper accounting was not taking place").

The multiple terminations of FirstEnergy's top executives are also indicative of scienter. ¶¶212, 216; *see also Acadia Healthcare*, 2021 WL 195370, at *7 (finding an inference of scienter where the CEO and President were "abruptly fired" after defendants' fraud was revealed "with no notice under highly unusual circumstances"); *Willis*, 2016 WL 8199124, at *34 (finding scienter supported by "noteworthy" timing of top executives' resignations "in the wake of the DOJ investigation"). The numerous cases and investigations occurring in the fallout of the Bailout Scheme further bolster an already compelling inference of scienter. ¶¶238-240; *see also, Chamberlain v. Reddy Ice Holdings, Inc*., 757 F. Supp. 2d 683, 713-14 (E.D. Mich. 2010) (finding that DOJ investigations of the packaged ice industry contributed to a "strong inference" of scienter); *SBAV*, 2014 WL 1257018, at *8 (government investigations supported an inference of scienter).

To top it all off, this Court has already upheld allegations relating to FirstEnergy's financial motives, including as to its debt and credit ratings, noting that the subsequent downgrade of FirstEnergy debt to "below investment grade" by rating agencies had severe financial consequences for the Company, and thus supported the inference that Defendants "knew the Company could no longer deactivate its failing plants, restructure its debt, or declare bankruptcy." *Jones*, 2021 WL 1890490, at *20 (finding the financial allegations added to the "clear and convincing evidence that Defendants' 'knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation' and took affirmative steps to conceal the scheme"). Defendants' argument that these allegations are "generic" and cannot support an inference of scienter has thus already been rejected. ECF No. 161 at 45-46.

2.     **Charles E. Jones**

The Complaint's factual allegation that defendant Jones personally oversaw and facilitated FirstEnergy's Bailout Scheme is indisputable at this stage, notwithstanding Defendants' efforts to ignore it out of existence, and more than sufficiently alleges his scienter. Jones himself admitted that solving FirstEnergy's nuclear problem was his "top priority" and he boasted that he was not only "personally" involved in meeting with legislators and advocating for "regulatory or legislative solutions," but that he was a "loud advocate" for such solutions. ¶¶66, 103, 121, 124, 220. Moreover, Jones, who signed a number of the Company's certifications (¶¶98, 102), attempted to perpetuate the cover-up of the scheme even after its initial exposure, but was forced to walk back his false defense and soon thereafter was fired for, *inter alia*, "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business." ¶¶216, 235; *see Proquest*, 527 F. Supp. 2d at 743 (signed certifications by CEO gave rise to an inference of scienter "because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate").

To recap, the following examples illustrate some of the overwhelming facts pled in the Complaint as to Jones's scienter: (i) Jones was in charge of FirstEnergy and responsible for securing legislative and regulatory solutions for FirstEnergy's nuclear problems, which he called his "top priority." (¶103); (ii) Jones boasted about his personal involvement in passing HB6 and being a "loud advocate" for the legislation (¶124); and (iii) Jones repeatedly assured investors of FirstEnergy's "upholding [a] high standard for corporate governance" (¶104) and compliance with all applicable "laws, rules, and regulations" (¶109). These assurances did not occur in a vacuum, but rather were offered by Jones to allay shareholder concerns about FirstEnergy's "lobbying policies and payments." After receiving a shareholder proposal for an annual report on FirstEnergy's

- 37 -

lobbying activities, Jones and the Company's other directors assured investors the proposal was unnecessary because "your Company strives to conduct its business as transparently as possible to serve customers effectively and help build public trust," including a political activity policy with "decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy. . . . Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations." ¶¶110-111.

FirstEnergy itself has already admitted that Jones's assurances were false and since his assurances were personal to him – he boasted about his own personal involvement, and that HB6 was *his* "top priority" – it is not reasonably possible Jones was unaware of the false and misleadingly incomplete nature of these assurances. *See Jones*, 2021 WL 1890490, at *19 n.17 (noting the "unique facts of this case, which include the Company's own admissions about having made previously-undisclosed payments forming the basis of the Criminal Action"). Similarly, FirstEnergy has admitted that Jones set an improper tone by ***not*** promoting adherence to FirstEnergy's own policies and code of conduct (¶190), it is simply implausible that Jones was unaware of the improper tone he himself was setting. Moreover, Jones's self-proclaimed personal involvement in FirstEnergy's pursuit of what wound up being HB6, and his admission that this pursuit was his "top priority," mean that he had "access to information central to the Company's business operations[, which] creates a strong inference of scienter because Plaintiffs allege that Defendants made false statements about significant portions of the Company's operations." *Willis*, 2016 WL 8199124, at *32.

In response to the mountain of evidence regarding his many misleading statements and his scienter, Jones filed a boilerplate opposition that defies the facts set forth in the Complaint. Because

Plaintiffs have established the overwhelming sufficiency of the Complaint's allegations as to Jones, there is no need to belabor the point. Jones's arguments in favor of dismissal are meritless.

### 3.    Robert Reffner

Scienter is adequately plead as to Reffner, who is alleged to have been "directly involved in and intimately familiar with FirstEnergy's extensive efforts to facilitate the Bailout Scheme and prevent its detection." ¶227. These allegations are supported by Reffner's role in three increasingly-senior legal officer positions throughout the Class Period, for which he received millions of dollars in compensation.[13] ¶¶35, 248. These roles place Reffner at the heart of the fraudulent Bailout Scheme as he "was responsible for FirstEnergy's legal, ethics, internal auditing, risk management and related affairs" and "oversaw the Company's fulfillment of its legal and ethical obligations, internal control policies and procedures and adherence to internal control, risk management and compliance guidelines." ¶227. Confirming his intimate involvement in the Bailout Scheme, Reffner was terminated for his failure to prevent wrongdoing at the Company and because of his personal "conduct that the Board determined was influenced by the improper tone at the top." ¶216. *Willis v. Big Lots, Inc.*, 2017 WL 2608690, at *3 (S.D. Ohio 2017) ("[H]igh-ranking executives' departures from [the issuer] are relevant to scienter."). Reffner's termination and the Company's explanation for it are only compatible with a determination that Reffner acted with a culpable state of mind. ¶221.

The non-culpable inferences sought by Reffner are improper and refuted by the facts as alleged. *Dougherty*, 905 F.3d at 982 (finding scienter adequately alleged where defendant "offered no innocent inference stronger than Plaintiffs' inference" that defendant "knowingly or recklessly made material misstatements or omissions"). First, Reffner argues that the timing of his termination,

---

[13]    Reffner argues that his desire to protect his job and millions of dollars in compensation does not support his scienter or involvement in the fraud (ECF No. 163 at 14-15) but *Helwig* identifies precisely such facts as supporting scienter. *See* §§4.B., 4.B.1.

which occurred after defendants Jones and others, somehow suggests a comparative lack of culpability. ECF No. 163 at 11. The fundamental flaw in this argument is that where, as here, multiple people are involved in wrongdoing, there will always be different levels of *relative* culpability. The bank robber who pistol whips a teller is more culpable than his accomplice who grabs the money, but they are both bank robbers. Reffner may prove to be less culpable than Jones, but he is still culpable. After all, FirstEnergy has confirmed that all five terminations "relat[e] to *United States v. Larry Householder, et al.*" and associated internal and governmental investigations. ¶216. This is sufficient to infer that Reffner's termination was due to his involvement in the Bailout Scheme.[14] "'[H]ouse-cleaning and reforms do not follow innocent mistakes.'" *ASG*, 2009 WL 1348163, at *58. "'Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls.'" *Id.*; *Frank*, 646 F.3d at 960; *Chamberlain*, 757 F. Supp. 2d at 712.

Second, Reffner contends his lack of stock sales supports a lack of scienter. But this argument is soundly rejected by courts. *PR Diamonds*, 364 F.3d at 691 ("we have never held that the absence of insider trading defeats an inference of scienter"); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) ("[t]here are any number of reasons why they might have chosen to keep their insider trading to a limit, not least of which is that they wanted to avoid getting caught"), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not . . . infer from the fact that they did not sell their . . . stock that they lacked motive to defraud investors."); *Flynn v.*

---

[14] Reffner argues that his termination in November 2020 does not shed light on his knowledge of undisclosed facts as of May 2020. ECF No. 163 at 12-13. This argument deserves short shrift. FirstEnergy has already connected his termination to the Class Period events. ¶216. Second, it is well established that post-Class Period disclosures can be probative of a defendant's class period knowledge. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (recognizing that "post-class-period data . . . could be used to 'confirm what a defendant should have known during the class period.'").

- 40 -

*Sientra, Inc.*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) ("Defendants' suggestion that the lack of insider stock sales by Zeini and Pigeon negates scienter is contrary to controlling case law.").

### 4.     John Judge

Scienter is adequately alleged as to Judge.  During the Class Period, Judge served as FirstEnergy's Chief Risk Officer and then, beginning in March 2019, as FES's CEO.  ¶38.  As alleged, Judge was an active participant in the Bailout Scheme because he facilitated FES's role in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy, and efforts to find "solutions" for the Nuclear Plants.  ¶230.  As detailed in the Complaint, Judge's conduct during the Class Period included: (i) meeting with Householder to discuss the Bailout Scheme, including a March 2019 meeting at Riffe Tower in Columbus; (ii) directing FES to retain Cespedes in furtherance of Jones's plan to create the appearance of FES independently supporting Householder; (iii) retaining Cespedes in close consultation with FirstEnergy and the Company's other senior executives involved in the Bailout Scheme, including Jones; (iv) periodically meeting with Cespedes to receive updates on the Bailout Scheme, including in the March 2019 Riffe Tower meeting and a November 2019 dinner attended by Judge, Cespedes, and other Bailout Scheme members; and (v) directing and overseeing the use of FES employees in a misleading ad campaign opposing the repeal of HB6.  *Id.*

This conduct is more than sufficient to allege that Judge knowingly furthered the bailout scheme.  *Haw. Ironworkers Annuity Tr. Fund v. Cole*, 2011 WL 1257756, at *10 (N.D. Ohio Mar. 31, 2011) (finding of scienter where "[t]he complaint alleges each defendant's personal participation and knowledge of" fraudulent scheme).  Judge's primary argument against scienter is that he was innocently engaging in free speech or other protective activity when he enlisted Cespedes and worked in support of passage (and against repeal) of HB6 completely unaware of the massive corruption scheme he was directing and facilitating.  ECF No. 164 at 9-11.  Contrary to Judge's

argument, there is no free speech right to commit securities fraud. The inference that Judge asks the Court to draw also improperly defies the facts as alleged in the Complaint and is certainly not nearly as compelling as the commonsense inference that Judge knew what he was doing as a central figure in the Bailout Scheme. Here, the Complaint alleges with particularity how Judge's activities furthered the Bailout Scheme and thus establishes a strong inference of scienter. Simply put, without Judge's involvement, the Bailout Scheme could not have been successfully carried out. *Cf. United States v. Hernandez*, 218 F.3d 58, 70 (1st Cir. 2000) (affirming district court's admission of drugs' street value because "'it certainly would be proper for the jury to infer that such a shipment of such a worth certainly would not be left to be handled by persons who did not know what was in there'"). Judge's effort to separate himself from FirstEnergy based on his employment by FES (ECF No. 164 at 11) contradicts the allegations in the Complaint, as well as the findings of the Bankruptcy Court, which held that the two entities were fully intertwined and that FES was "utterly incapable" of operating without FirstEnergy. ¶¶45-48.

### 5. Michael Dowling

Scienter is adequately pled as to Dowling who is alleged to have been an "instrumental participant" in the Bailout Scheme in his former position as FirstEnergy's SVP of External Affairs. In this position, Dowling was personally responsible for FirstEnergy's governmental and regulatory affairs, energy policies, community outreach, and political action committees. ¶¶32, 222. During the Class Period, Dowling had at least 14 phone contacts with Householder and several additional phone calls with other co-conspirators, many of which occurred in conjunction with payments from FirstEnergy to fund the Bailout Scheme: On March 12 and 13, 2018, Dowling had five telephone communications with Householder; two days later, FirstEnergy wired $300,000 to the corrupt enterprise through a pass-through vehicle. ¶222. Between April 27 and April 30, 2018, Dowling had seven telephone communications with Longstreth, followed shortly thereafter by a $100,000

- 42 -

payment by FirstEnergy to members of the Bailout Scheme on May 4, 2018.  *Id.*  Dowling also facilitated an illicit $4 million payment to Randazzo in advance of Randazzo's assumption of the PUCO Chairmanship and HB6 advocacy.  On October 29, 2020, the Company announced that Dowling had been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business."  ¶¶172; 216; *Willis*, 2017 WL 2608690, at *3 ("[H]igh-ranking executives' departures from [the issuer] are relevant to scienter.").

Dowling's arguments against scienter (ECF No. 165-1 at 5-6) are premised on his refusal to accept the Complaint's allegations, which expressly allege that FirstEnergy paid millions of dollars "to corrupt" the legislative process and "in return" for official acts that corrupted the legislative process.  *See, e.g.*, ¶¶3, 4, 93, 135, 136, 171, 205, 215, 216, 296.  These allegations provide the facts Dowling wrongly argues are missing.  *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 157 (E.D.N.Y. 2020) (requiring only that claims be pled with particularity).  Dowling does not seem to realize that bribery in Ohio, and federally, does not require a public official's "explicit agreement" to deliver an "official act" – the crime is complete when something of value is ***offered*** or ***promised*** with intent to influence an official act.  *See* Ohio Revised Code §2921.02 (referring to corrupt "promise" or "offer"); 18 U.S.C. §201(b); *see also Emps. Ret. Sys. of the City of St. Louis v. Jones*, 2021 WL 2156215 (May 11, 2021) ("Bribery occurs when 'a public official agrees that payments will influence an official act.'").  He also ignores the fact that, regardless of its illegality, the passage of HB6 was specifically designed to bolster the fortunes of FirstEnergy, and thus the price of FirstEnergy securities, but Dowling's deceptive acts in support of the legislation were never disclosed to FirstEnergy investors.  The purportedly innocent inferences that Dowling seeks the Court to draw in his favor are impermissible at this stage and conflict with Plaintiffs' well-pled and particularized allegations.

### 6. Ty R. Pine

Scienter is sufficiently pled as to Pine, FirstEnergy lobbyist and the Company's Ohio Director of State Affairs during the Class Period. Pine is alleged to have been the "central liaison" between FirstEnergy and corrupt Ohio politicians. ¶223. Pine argues that he was merely doing his job, but this argument – and his effort to have the Court ignore the Complaint's allegations – simply raises factual issues inappropriate for resolution on a motion to dismiss. ECF No. 167 at 7-9; *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *9 (M.D. Tenn. Apr. 19, 2018) (rejecting argument that Defendants "made a good faith, but mistaken" goodwill assessment in favor of inference of scienter). The allegations concerning Pine's Class Period actions support both his fraudulent conduct and scienter. As alleged, Pine worked closely with Ohio state legislators to draft HB6 on behalf of FirstEnergy and possessed intimate knowledge about the Company's efforts to shepherd the legislation through the Ohio legislature. ¶223. Pine had at least 188 phone contacts with Householder and his co-conspirators regarding the Bailout Scheme, including several which occurred in conjunction with payments from FirstEnergy to fund the Bailout Scheme. ¶223. For example, on March 12 and 13, 2018, Pine had four telephone communications with Householder; two days later, FirstEnergy wired $300,000 to the corrupt enterprise through a pass-through vehicle. *Id.* Similarly, between May 1 and May 4, 2018, Pine had five telephone contacts with Longstreth, immediately after which FirstEnergy made a $100,000 payment to members of the Bailout Scheme. *Id.* To accept Pine's argument that he was doing his job honestly and with integrity would require ignoring overwhelming allegations that his actions were key to facilitating the bribery of corrupt politicians for FirstEnergy's gain, and that these deceptive acts artificially inflated the price of FirstEnergy securities. *See, e.g.*, ¶¶3, 4, 93, 135, 136, 137, 138, 171, 205, 215, 216, 223.

### 7. Dennis M. Chack

Scienter is sufficiently pled as to Chack. Chack is alleged to have worked directly with Jones and other FirstEnergy executives to shape the Company's misleading HB6 messaging strategy and was responsible for the Company's false and misleading media efforts in support of HB6 and in opposition to its repeal. ¶224. Chack also took personal actions to further the Bailout Scheme, including: (i) working to obscure the Company's role in funding the media campaign in support of HB6; (ii) almost certainly attending a September 2019 meeting between FirstEnergy executives and an FES lobbyist to discuss anti-repeal efforts covertly funded by the Company; and (iii) *facilitating an illicit $4 million payment to Randazzo* in advance of his assumption of the PUCO Chairmanship and HB6 advocacy. *Id.* Chack also publicly disseminated false and misleading statements regarding HB6 in his role as FirstEnergy's SVP of Product Development, Marketing and Branding. ¶¶33, 39-40, 224. These actions also support liability under Rule 10b-5(a) and (c). *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *21 (D.N.J. June 5, 2020) (Scienter established where complaint, *inter alia*, alleged defendant's "specific involvement in devising and implementing the alleged bribery scheme"), *motion to certify appeal denied*, 2021 WL 1016111 (D.N.J. Mar. 17, 2021).

Scienter is further supported by Chack's termination. *Willis*, 2016 WL 8199124, at *34. On October 29, 2020, FirstEnergy announced that Chack "violated certain Company policies and its code of conduct" and was fired as a result. ¶172. Chack's termination and the Company's explanation for it are only compatible with a determination that he acted with a culpable state of mind. ¶224. In addition, contrary to his arguments, Chack's stock sales further support scienter. *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (allegations of suspicious insider sales support strong inference of despite Defendants "plausible explanations" that they "retained the majority of their holdings"). Chack disputes that his sales are accurately

represented in the Complaint, but, if anything, his arguments indicate that the Complaint *understates* the extent to which he capitalized on the Company's inflated stock price.  ECF No. 169 at 26-27. The Complaint accurately presents Chack's sales as set forth by Thompson Reuters reporting service *i.e.*, Chack made significant sales of his FirstEnergy stock during the Class Period after having sold none of his FirstEnergy stock in the 45 months prior to the Class Period.  ¶251.  Chack argues that certain non-open market dispositions should be consider sales as well.  ECF No. 168 at 26-27. However, under this approach, Chack's Class Period sales of FirstEnergy stock would dramatically *increase* from $413,206 (¶250) to *$1.04 million* (ECF No. 168-2) supporting the inference that he capitalized to a greater extent on the fraud than even alleged in the Complaint.  *See* §IV.B.1., *supra*. Thus, the non-culpable inferences which Chack seeks based upon his insider trading history are baseless.

### 8.    Donald R. Schneider

Scienter is sufficiently pled as to Schneider who, as alleged in the Complaint, was a vital participant in the unlawful Bailout Scheme.  Schneider was CEO and Chairman of FES for much of the Class Period and personally directed FES to retain one of the Bailout Scheme's key lobbyists, Matt Borges.  ¶229.  Schneider retained Borges in close consultation with FirstEnergy and Jones, and the Company's other senior executives involved in the Bailout Scheme.  *Id.*  As a result, Schneider was a central member of and intimately familiar with the operations of the Bailout Scheme.  *Id.*  Without Borges' involvement, repealing HB6 would have been far more likely.  ¶84. For instance, Borges (after being hired by Schneider) transferred $600,000 from Generation Now to Cespedes, who then used this money to disrupt signature collection efforts and engage others in anti-referendum efforts.  *Id.*  The fact that Schneider "retained Borges in close consultation with FirstEnergy and the Company's other senior executives involved in the Bailout Scheme, including Jones" (¶229) is indicative of knowing conduct more than sufficient to establish scienter.  *JAC*

*Holding Enters., Inc. v. Atrium Cap. Partners, LLC*, 997 F. Supp. 2d 710, 737 (E.D. Mich. 2014) (scienter for individual defendant established based on allegations that he "discussed with other members of the conspiracy that he was preparing a budget that did not reflect JAC's true financial state"). At the very least, the fact that Jones and others at FirstEnergy conspired with Schneider to have FES hire Borges to work for FirstEnergy was a glaring red flag that put Schneider on notice of suspicious conduct by Jones and others at FirstEnergy.[15] *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1003 (S.D. Ohio 2007) (specific allegations of red flags support finding of scienter). It simply makes no sense that the members of a massive corruption scheme would entrust critical aspects of the scheme to some innocent bystander. The implausibility of this alternative explanation is further confirmed by the fact that Schneider – as CEO and Chairman of FES – was personally and directly invested in securing a nuclear bailout for his company. Schneider's request that the Court construe the allegations in a light favorable to him – and conclude that hiring Borges to work for FirstEnergy was an innocent act – should be rejected.

While actively assisting the Bailout Scheme as described above, Schneider also made a series of false and misleading statements to the market obscuring the fact that Defendants were corrupting the legislative process to secure the passage and defense of HB6. ¶¶120, 125-126. These include statements Schneider made in a March 31, 2018 *PR Newswire* release stating that "we continue to pursue opportunities for restructuring, asset sales and legislative and regulatory relief." ¶120; *see also* ¶125 (nearly identical statement by Schneider reported in a December 17, 2018 Crain's Cleveland Business article) and ¶126 (similar statement by Schneider in a January 23, 2019 *PR*

---

[15]     Schneider impermissibly requests that the Court take judicial notice of certain documents, from those documents accept certain purported facts – concerning Borges' professional history and political roles – and from those purported facts draw impermissible inferences concerning Schneider's knowledge and intent that conflict with plaintiff's well plead allegations. ECF No. 170-1 at 13. This request should be denied. *Bridgestone*, 399 F.3d at 655 (judicially noticed fact "must be one not subject to reasonable dispute").

*Newswire* release).  These statements by Schneider were false and misleading because they obscured the reality that Defendants were using the Bailout Scheme to corrupt the legislative process in order to unlawfully benefit FirstEnergy.  Thus, in addition to sufficiently alleging Schneider's scheme liability in connection with the Bailout Scheme, the Complaint sufficiently alleges that Schneider is liable under Rule 10(b)-5(b) for knowingly making false and misleading statements that affected the price of FirstEnergy securities during the Class Period.  §§IV.A.3.-5.

### 9.    Leila L. Vespoli

Scienter is sufficiently alleged as to Vespoli, FirstEnergy's former Executive VP of Corporate Strategy and Regulatory Affairs and Chief Legal Officer.  Vespoli is alleged to have been a knowing participant in the unlawful Bailout Scheme.  ¶36.  Vespoli was "a key member of the FES Restructuring Working Group, which oversaw the Company's efforts to reduce its liabilities in connection with the Nuclear Plants" and ultimately took the form of the fraudulent Bailout Scheme. *Id.*  Thus, Vespoli is alleged to have been personally involved and overseen the aspects of FirstEnergy's business and operations implicated in the Bailout Scheme.

Furthermore, Vespoli's presence on investor conference calls and her approval of the political contributions and related steps suggested to the investing public that the Company was acting in compliance with applicable laws and regulations.  Vespoli's presence on and participation in calls with analysts and investors – including on February 22, 2017, April 28, 2017, July 28, 2017, February 21, 2018, and August 1, 2018 – provided a veneer of legitimacy to the steps taken by the Company to seek a solution for its Nuclear Plants liabilities.  ¶¶103, 113, 115, 118, 124.  In fact, Jones himself touted Vespoli and the group she led at FirstEnergy as a "fully engaged team of financial and legal advisors" who were "closely monitoring the status of initiatives at both the state and federal levels."  ¶228.  In other words, all was supposedly blessed by a hands-on team led by Vespoli.

- 48 -

Vespoli improperly asks the Court to construe the Complaint in a light favorable to her and in a manner at odds with the Complaint's detailed allegations. In particular, Vespoli asks the Court to read the Complaint to indicate that she could not have been involved in the Bailout Scheme because she left the Company in March 2019, only days before the Bankruptcy Court denied FirstEnergy's request for a release of its decommissioning expense liabilities. ECF No. 173 at 2. But, as the Complaint explains, by that time "[t]he Company had been laying the groundwork [for the Bailout Scheme] . . . for two years. . . ." ¶63. Indeed, the Complaint alleges that the Bailout Scheme was hatched in *January 2017* and goes on to detail the numerous steps taken by Defendants, including Vespoli, to see it through to fruition. ¶65. As explained in the Complaint, Defendants used the "facade of legitimate corporate contributions" to "subvert Ohio's political process for [the Company's] own gain." ¶64.

Regarding her suspicious stock sales during the Class Period, Vespoli again asks the Court to read the Complaint in a light favorable to her. However, the facts as alleged are that Vespoli sold 16,631 shares of her FirstEnergy shares in the 45 months prior to the Class Period, but then sold nearly *four times* as many shares in 2018 and 2019 when the stock price was at the height of its artificial inflation caused by Defendants' fraudulent conduct. ¶250. Particularly when considered holistically with other facts alleged in the Complaint, Vespoli's insider sales only support and strengthen the inference of Vespoli's scienter.

### 10. James F. Pearson

Defendants' argument that the Complaint "never alleges facts" supporting a finding of scienter as to Pearson willfully ignores the allegations. ECF No. 161 at 41-42. Pearson, who served as the CFO of FirstEnergy from the beginning of the Class Period until March 2018, and thereafter served as the VP of Finance until April 2019, was one of the highest-ranking executives at the Company. Pearson was directly involved in restructuring the Company's nuclear power plant

- 49 -

liabilities, was a key member of the "FES Restructuring Working Group" (¶29), and also certified multiple SEC filings during the Class Period. *See* ¶¶95-96 (stating that management was exploring its options, including "continuing with legislative efforts to explore a regulatory type solution" for FES's "generation assets"); *see also* ¶102 (certifying that FirstEnergy's Form 10-K and 10-Q filings "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"). Throughout 2017, Pearson also spoke directly to investors about "recent energy policy discussions" in the Ohio House and Senate that would benefit the Company's nuclear assets (¶113), at one point stating "***I am going to continue to fight***" for legislation and admitting "I'm not sure those assets will run unless there is something done either federally or by the state of Ohio to ensure that they get a different financial return model." ¶115. Pearson similarly stated: "hopefully, we'll be able to get some type of legislation introduced in Ohio as well as supported by the [G]overnor" ¶116.

As VP of Finance, Pearson continued to focus "his utmost attention" on fighting for legislation benefitting FirstEnergy's Nuclear Plants. ¶225. Pearson's control and oversight of FirstEnergy's finances as CFO and VP of Finance, his senior role on the FES restructuring team, his certifications that the Company's statements were "not misleading," (¶102) when in fact the Company's internal controls were deficient (¶¶189-192), and his direct acknowledgment that he personally was "fight[ing]" for legislation to "ensure [the nuclear plants] get a different financial return model" (¶115) are all facts strongly supporting a finding of scienter. *See Proquest*, 527 F. Supp. 2d at 743 (signed certifications by the CFO gave rise to an inference of scienter as "evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate"). Again, it is simply implausible that the members of the Bailout

Scheme would entrust Pearson to assume a role so critical to achieving their corrupt ends without his knowing involvement.

A legislative solution was clearly vital to FirstEnergy, and high-level executives such as Pearson are "'presumed to be aware of matters central to their business's operation.'" *Ghosn*, 2020 WL 7711378, at *20 (rejecting CFO's claim of ignorance of matters central to company operations where there was "a duty to monitor [the company's] finance's controls and compliance with corporate governance practices"). It is inconceivable that Pearson, whose job it was to oversee FirstEnergy's finances and the restructuring of FES and who was admittedly involved in the Company's legislative solution efforts, was unaware of the millions of dollars in illicit payments taking place right under his nose and within his direct spheres of responsibility. *See Jones*, 2021 WL 1890490, at *11 (FirstEnergy's payments described by the U.S. Attorney as "'likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio . . . bribery, pure and simple. This was a *quid pro quo*.'").

Bolstering an already compelling inference of scienter as to Pearson, it is undisputed that during the Class Period Pearson was rewarded with over $17 million in bonuses and compensation and pocketed over $1.5 million in insider trading proceeds. ¶¶248-251, *see also* §IV.B.1, *supra*.[16] The Complaint adequately alleges scienter as to Pearson.

---

[16]     Defendants argue that Pearson's later "acqui[sition]" of shares negates scienter. ECF No. 161 at 48; ECF No. 161-1, Exs. G-H. But those acquired shares did not cost Pearson anything as he simply received them as part of his compensation for working with the Company and, as this Court has recognized, even where a Defendant really "was a net acquirer of shares by the end of the Class Period" it did "not wholly negate, a strong inference of [the defendant's] scienter." *See Cardinal Health*, 426 F. Supp. 2d at 735. Defendants make similar unconvincing arguments regarding the acquisition of shares by Strah and Taylor. *See* ECF No. 161 at 47; ECF No. 161-1, Exs. C-F. But those shares were also acquired as compensation from the Company.

11.     **Steven E. Strah**

Defendants' argument claiming a lack of "facts" supporting a finding of scienter as to Strah fails. ECF No. 161 at 41-42. Strah held numerous positions at FirstEnergy, including Senior VP of Utility Operations until March 2018, CFO from March 2018 to May 2020, President from May 2020 to October 2020, and was elevated to CEO in October 2020. ¶¶30, 226. During the Class Period Strah certified that FirstEnergy's SEC filings were accurate and its internal controls were effective. *See* ¶¶98, 102, 226. Thus, Strah played a variety of central roles at FirstEnergy throughout the time it was perpetrating the Bailout Scheme and was personally responsible for overseeing the Company's operations and financial reporting. As CFO, Strah also spoke directly to investors on April 24, 2020, reassuring them that "FirstEnergy is a low-risk, fully regulated, stable and predictable wires utility" and has "very good regulatory relationships in our jurisdictions." ¶134. These representations were directly contrary to the truth. In July 2020, FirstEnergy's corruption was exposed when it was revealed as "Company A" in the criminal complaint and supporting affidavit. ¶8. Then, only four months after investors learned that FirstEnergy orchestrated the criminal scheme by funneling millions of dollars through shadowy pass-through entities to corrupt the legislative process, the Company was forced to admit its internal controls were deficient. ¶¶189-192 (stating that FirstEnergy "did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top. . . . Accordingly, our management has concluded that this control deficiency constitutes a material weakness."). The Complaint sufficiently alleges Strah was in a position to and did in fact know the true facts about the Bailout Scheme. ¶226; *Chamberlain*, 757 F. Supp. 2d at 712 (contradictory disclosures "just six months after their steadfast public statements regarding the Company's strict adherence to laws prohibiting market allocation supports, an inference of scienter"). Indeed, Strah, like Pearson, is ***presumed*** to know about matters central to FirstEnergy's business operations. *See Ghosn*, 2020 WL 7711378, at *20. Adding to the inference

- 52 -

of scienter, Strah was rewarded with over $13 million in bonuses and compensation during the Class Period.  ¶¶248-251.  As CFO at a time when FirstEnergy's "top priority" involved over $60 million in corrupt payouts and its senior executives maintained an "improper tone at the top" (¶191) and failed to maintain or promote an "appropriate tone of compliance" (¶216), Strah knew or was reckless in not knowing of FirstEnergy's involvement in the Bailout Scheme.  Accordingly, the Complaint adequately alleges scienter as to Strah.

### 12.    K. Jon Taylor

The Complaint also adequately alleges scienter as to Taylor.  Taylor has also served as FirstEnergy's CFO since May 2020, prior to which time he served as FirstEnergy's Controller and Chief Accounting Officer, President of Ohio Operations and its VP of Utilities Operations.  ¶31.  During the Class Period and at a time when FirstEnergy was perpetrating the Bailout Scheme, Taylor oversaw FirstEnergy's Ohio operations and its financial disclosures to investors.  Just as Strah and Pearson are **_presumed_** to have known about matters central to FirstEnergy's business operation at the time, and filings that they certified, so too is Taylor.  *See Ghosn*, 2020 WL 7711378, at *20.

Furthermore, Taylor certified multiple SEC filings during the Class Period.  *See* ¶¶95-96.  FirstEnergy admitted these controls were deficient shortly thereafter.  ¶¶189-192.  On November 2, 2020, Taylor also admitted that "violations of certain company policy and code of conduct by the terminated executives has caused us to reevaluate our controls framework, and that could lead to identifying 1 or more material weaknesses" and acknowledged the potential impact of "a fine or penalty" in connection with the DOJ investigation.  ¶¶179-180.

*        *        *

In sum, there is simply no rational inference of innocence that can be drawn from these facts as alleged.  If Defendants believed what they were doing was innocent, why go to such great lengths to conceal from investors their "investment" in obtaining the vital legislative solutions they regularly

- 53 -

discussed?  Why create and unlawfully use a shell 501(c)(4) entity to funnel tens of millions into a "scheme to corrupt the political process and suborn the regulatory framework" and to provide personal benefits for a man (Householder) whose name was synonymous with corruption?  Why spend tens of millions of dollars without any assurances that the recipients would deliver?  Why would multiple participants in the Bailout Scheme commit crimes – and admit to committing crimes – if FirstEnergy would have given them the same amounts of money to break no laws?  Why would FirstEnergy forfeit over $2 billion in subsidies and decoupling benefits if they had not been obtained unlawfully?  Why would FirstEnergy fire its CEO and multiple other key officers for cause if they were innocent of wrongdoing?  Why would FirstEnergy pursue a deferred prosecution agreement, which would require an admission of wrongdoing and substantial financial penalties?  Why would Bailout Scheme participants invite the exponentially greater risk of exposure by involving innocent and completely oblivious parties to oversee critical aspects of the operation?

These are all rhetorical questions because the inference of scienter is the only rational inference here.  Any opposing inference defies logic and reality, rendering it far less compelling than the inference of scienter.  The inference of scienter need only be "cogent and at least as compelling" as an opposing inference that can be drawn from the allegations.  *Tellabs, Inc.*, 551 U.S. at 324. However, there is no plausible opposing inference here, let alone one that is ***more*** compelling.

### C.  Defendants' Arguments Are Legally and Factually Wrong

With the sufficiency of the Complaint as to the only two challenged elements firmly established and Defendants' cases thoroughly distinguished, there is no need to get mired in Defendants' spurious arguments, in favor of dismissal, which treat the Complaint like a menu, choosing to accept some facts while passing over others.  This is an approach the law does not allow, dooming Defendants' joint motion (ECF No. 160-161), as well as each of the eight separate motions to dismiss the Exchange Act claims filed on behalf of individual defendants (ECF Nos. 162-170,

- 54 -

172-174). There can be no sincere debate as to the sufficiency of the allegations of securities law violations pled in the Complaint, and none of Defendants' arguments is well-taken. The following sections rebut each of the Defendants' remaining arguments.

### 1. FirstEnergy

FirstEnergy's brief (on behalf of the Company and 19 individual defendants) is so consistently off the mark, it is as if it was written by someone who did not read the Complaint or the cases on which the brief relies for sound bites, often parsed for misleading effect. ECF No. 161. For example, FirstEnergy cites *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) from the Second Circuit, yet fails to acknowledge that the fundamental problem with the complaint there reveals that it bears no resemblance to the Complaint here: "Although appellants do allege that Sanderson engaged in 'anticompetitive' conduct, there is virtually no explanation as to how that collusive conduct occurred, and whether and how it affected trade." In what could not be a sharper contrast, Plaintiffs' Complaint here devotes page after page to explaining how Defendants' corruption occurred. The Complaint expressly invokes and quotes at length from a DOJ press release, plea agreements, and a detailed FBI affidavit in support of a criminal complaint, charging the individuals who Defendants bribed and those who helped facilitate the Bailout Scheme with having "conspired to violate the racketeering statute through honest services wire fraud, receipt of millions of dollars in bribes and money laundering." ¶¶8, 143, 209. And, while that is far more than enough, the Complaint goes even further by alleging actual guilty pleas – individuals and entities who admitted that FirstEnergy financed and coordinated their criminal conduct. ¶¶205, 215, 237. FirstEnergy's contention that it cannot discern any actual crimes from a complaint that expressly connects its activities to "bribery," "honest services fraud," "RICO conspiracy," an FBI affidavit in support of a criminal complaint, a federal indictment, and multiple guilty pleas and plea agreements, is not credible. In any event, this is a civil complaint, not a criminal indictment, which is a reality

- 55 -

FirstEnergy would have undoubtedly invoked had the Complaint charged criminal offenses instead of civil claims.  Furthermore, the central issue in this case is whether Defendants misrepresented FirstEnergy's lobbying activities and efforts in support of HB6 in violation of the federal securities laws – which the Complaint more than adequately alleges.

### a. Defying Facts It Must Accept

Time and again, FirstEnergy makes arguments that are irreconcilable with the law and the facts established by the Complaint's allegations.  Consider the following examples drawn from FirstEnergy's brief contrasted with the facts established by the Complaint's allegations:

| Defendants' Arguments | Facts |
|---|---|
| "The Complaint fails to plead bribery with particularity because its factual allegations do not establish an explicit *quid pro quo* agreement."  ECF No. 161 at 14. | "Generation Now admitted to 'receiv[ing] money from Company A (as defined in the Indictment [*i.e.*, FirstEnergy]) for the benefit of the [d]efendants and others ***in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation*** that would go into effect and save the operation of two nuclear power plants in Ohio; and [to engaging] in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by Company A to GENERATION NOW.'" ¶205.<br><br>"Cespedes, a lobbyist retained by FES, like Longstreth, admitted that he committed his criminal acts 'to conceal the nature, source, ownership, and control of the payments' [from FirstEnergy] into Generation Now '***in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation*** that would go into effect and save the operation[s] of [the Nuclear Plants].'" ¶171. |
| "Insofar as the Complaint alleges that FirstEnergy indirectly helped to elect 'friendly' candidates, advocated for favorable legislation, or contributed to groups that took positions on policy issues, the Complaint describes the exercise of rights that the First Amendment | "FirstEnergy (identified as "Company A") had ***served as the criminal enterprise's corrupt corporate kingpin, financing its illegal operations and closely coordinating with the criminal defendants to ensure the passage of HB6 and, later, thwart a democratic*** |

| Defendants' Arguments | Facts |
|---|---|
| guarantees to everyone." ECF No. 161 at 13.<br><br>"At most, the Complaint alleges that Householder received contributions, but it is not bribery to support politicians who favor policies that align with one's interests." ECF No. 161 at 16. | *referendum to repeal the bill*. The Criminal Complaint documented how the Company was dubbed the "Bank" by conspirators for its willingness to spend "unlimited" money to further its corrupt ends, a partnership which FirstEnergy's own lobbyist referred to as the "unholy alliance." In short, the ***Criminal Complaint described how FirstEnergy and its top executives illegally funneled $60 million into the hands of corrupt politicians to get HB6 passed into law and avoid its repeal***." ¶8<br><br>"On May 29, 2019, ***Ohio's corrupted [by FirstEnergy] House members gathered enough votes to pass HB6***." ¶74. |
| "But there are no specific facts to show that the Randazzo payment was illegal or that unidentified 'FirstEnergy executives' ever reached a quid pro quo agreement in which the payment was offered in return for specific official action." ECF No. 161 at 19. | "FirstEnergy executives broadened the reach of the Bailout Scheme ***by buying the support of soon-to-be PUCO Chairman Randazzo with an illicit $4 million payment***. Shortly ***after receiving FirstEnergy's money, Randazzo performed his part, using his position as PUCO Commissioner to help write and support HB6***." ¶72. |
| "Because anonymous contributions in any amount to a 501(c)(4) organization are legal, the Complaint cannot plead an underlying violation of law by asserting that the contributions to Generation Now or other 501(c)(4)s were 'large' or 'concealed.' (¶70; ¶¶67, 80, 82, 93(b).) To avoid dismissal, the Complaint would need to explain how the challenged contributions actually violated a specific law or regulation, but it does not do so." ECF No. 161 at 21. | "'[FirstEnergy's] strategy, according to the federal prosecutors, included funneling millions of dollars to an organization, Generation Now, ***controlled by Householder***.'" ¶145.<br><br>"'Money passed from [FirstEnergy] through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.'" ¶143 (quoting FBI affidavit in support of criminal complaint).<br><br>"'Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.'" *Id.* (quoting FBI affidavit in support of criminal |

| Defendants' Arguments | Facts |
|---|---|
| | complaint). |
| | "'In 2018, the enterprise spent [FirstEnergy]-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election.  The Enterprise spent more than one million in fall 2018 alone to flood the airways with negative ads against enterprise opponents.'"  *Id.* |

The last example in the chart above illustrates the way in which FirstEnergy's perversion of

fact intersects with its perversion of law because FirstEnergy's use of Generation Now in connection

with the Bailout Scheme was clearly unlawful:

> The Internal Revenue Code allows tax-exempt status to be provided to "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare." 26 U.S.C. §501(c)(4)(A).  An organization is operated exclusively for the promotion of social welfare if it is "primarily engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. §1.501(c)(4)-1(a)(2)(i).  ***The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office***." 26 C.F.R. §1.501(c)(4)-1(a)(2)(ii).  Section 501(c)(4) organizations can engage in limited political activity, but political activity cannot be the primary activity of the organization.

*NorCal Tea Party Patriots v. Internal Revenue Serv.*, 2016 WL 8202966, at *3 (S.D. Ohio Nov. 22,

2016).[17]

---

[17]     FirstEnergy's unlawful use of Generation Now to funnel the money that was the lifeblood of Defendants' scheme exposes the fallacy of Defendants' invocation of cases involving actual campaign contributions.  *See* ECF No. 161 at 33-34.  These cases, such as *McCormick v. United States*, 500 U.S. 257, 275 (1991), involved what were (or were not proved not to be) actual campaign contributions that would have been legitimate but-for the alleged intent in giving and receiving them.  Here, however, it is a fact (because it is so alleged) that FirstEnergy's payments to Generation Now were not otherwise legitimate campaign contributions.  The Defendants unlawfully made and facilitated these payments to a 501(c)(4) that (1) Householder controlled (¶145); (2) personally benefitted Householder (¶143); and (3) paid Householder's ordinary campaign expenses (*id.*); and (4) was solely used to corrupt the legislative and regulatory process (*id.*).  Accordingly, the "campaign contribution" cases and arguments that Defendants cite are inapt (and even if a *quid pro*

No wonder FirstEnergy's arguments have been condemned by independent academics and industry watchdogs as "insulting" and "absurd." They are not just insulting to this Court, but also to Common Pleas Judge Chris Brown and Ohio Attorney General Dave Yost. Judge Brown enjoined FirstEnergy from collecting the fees its corruption had secured, explaining that, "[t]o not impose an injunction would be to allow certain parties to prevail. *It would give the OK that bribery is allowed in the state of Ohio and that any ill-gotten gains can be received*." ¶201. Judge Brown held that FirstEnergy used "bribery" to obtain these fees, which rendered them "ill-gotten gains." Likewise, after Attorney General Yost insisted, FirstEnergy buckled under the weight of the evidence against it, agreeing to forfeit the $102 million annual surcharge it had corruptly obtained. Defendants' arguments improperly defy these *facts*.

### b. FirstEnergy's Timing Arguments Fare No Better than Its Others

The Complaint alleges that "Householder's name was synonymous with public corruption," that FirstEnergy "was already courting him" in January of 2017, and that in January and February of 2017, FirstEnergy formed the two shell 501(c)(4) entities it unlawfully used to funnel tens of millions of dollars into the corruption scheme, which "enabled it to do exactly what campaign finance limits are designed to prevent: unfairly and clandestinely influence elections by buying the loyalty of Householder and other public officials to get HB6 written, considered and passed into law." ¶¶65, 68-70. Similarly, the Complaint alleges that "[i]n 2017 and 2018, FirstEnergy contributed $2.9 million *to the Bailout Scheme*, which Defendants concealed throughout the Class Period." ¶¶67(a), 137. Moreover, throughout 2017 and 2018, Defendants made identical or nearly identical statements about the importance to FirstEnergy of a legislative solution to the Nuclear Plants, their purported transparency regarding political payments, their purported compliance with

---

*quo* were required, the Complaint alleges a *quid pro quo* arrangement (*see, e.g.*, ¶¶3, 4, 93, 135, 136, 171, 205, 215, 216, 296)).

all related laws and regulations, and the most important risks purportedly being faced by FirstEnergy. ¶¶101-102, 105. The facts regarding this chronology are indisputable at this stage, yet Defendants refuse to accept them. Instead, Defendants argue that no fraud could have occurred in 2017 or 2018. ECF No. 161 at 24-30.

Defendants' argument amounts to no more than a baseless contention that a securities fraud scheme, including the corruption on which it is based, does not begin until the scheme actually achieves its corrupt ends. All the intent and acts to advance the scheme are non-actionable, under Defendants' theory, if they predate a corrupted official act. But Defendants fail to cite a single case supporting this position and they ignore the legions of cases refuting it. At the most basic level, Defendants misconstrue the nature of anti-corruption laws. Bribery in Ohio, and federally, does not require the public official to ever deliver an "official act" – the crime is complete when something of value is **offered** or **promised** with intent to influence an official act. *See* Ohio Revised Code §2921.02; 18 U.S.C. §201(b). To be sure, Defendants' corruption grew in scope and brazenness over time. But it is alleged to have begun in 2017 and, as alleged with particularity, Defendants committed multiple acts in furtherance of their corruption and securities fraud schemes in 2017 and 2018, including by forming and funding Generation Now, providing benefits to Householder, and making misleading statements about the pursuit of a legislative fix and transparency regarding political payments. None of these acts were disclosed to investors.

Moreover, Defendants' acts in subsequent years are unquestionably relevant to their conduct in 2017 and 2018. *See, e.g.*, *United States v. Perry*, 438 F.3d 642, 648–49 (6th Cir. 2006) (affirming probative value and admission of *subsequent* act evidence); *CadleRock Joint Venture, L.P. v. Royal Indem. Co.*, 872 F. Supp. 2d 592, 608 (N.D. Ohio 2012) (holding that subsequent fraudulent acts, "even in unrelated fraud schemes," is admissible to show fraudulent intent). Likewise, these early stages of the scheme – for example, forming Generation Now and unlawfully using it to funnel

- 60 -

money for political favors – were not merely preparatory; "they were part and parcel of the charged [scheme]." *United States v. Canale*, 2015 WL 3767147, at *3 (S.D.N.Y. June 17, 2015) (overt acts comprising meetings to discuss the establishment and maintenance of undeclared Swiss accounts "were not 'preparatory'; they were part and parcel of the charged conspiracy").  While Defendants dispute the Complaint's chronology, their proposed alternative timeline simply raises factual issues inappropriate for resolution on a motion to dismiss.

### 2.      Charles E. Jones

Jones's principal argument attacks the Complaint's allegations of scienter (ECF No. 174 at 6-14), which are far closer to being overwhelming than merely sufficient, as set forth above.  *See* §IV.B.2.

### a.      Jones's *Omnicare* Argument Fails

Jones's *Omnicare* argument fares no better.  ECF No. 174 at 22-25.  First, the vast majority of his statements were not qualified as opinions, so *Omnicare* does not apply.[18]  Second, statements of opinion are actionable where: (a) the speaker does not "actually hold[] the stated belief"; (b) the opinion contains a materially false "embedded statement[] of fact"; *or* (c) the omitted information shows that the speaker "lacked the basis for making those statements that a reasonable investor would expect."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-85, 196 (2015).  As courts have recognized:

> *Omnicare* . . . stand[s] for the proposition that a legal compliance statement may be deemed misleading if, although sincerely held, it is formed on the basis of an omitted fact, not disclosed by the speaker, that would likely conflict with a reasonable investor's own understanding of the facts conveyed by that statement.

---

[18]      Other Defendants also make *Omnicare*-opinion arguments (*e.g.*, ECF No. 161 at 59-62), but because Jones's motion seems to rely most heavily on these arguments, they are addressed here to avoid duplication.  To be clear, all *Omnicare*-opinion arguments fail for the reasons set forth herein.

*In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 729 (S.D.N.Y. 2015); *Quorum Health*, 2018 WL 2933406, at *5 ("In *Omnicare*, the Court explained that a reasonable investor expects not just that the company believes the opinion, but that 'it fairly aligns with the information in the company's possession at the time.'").

Moreover, when shareholders specifically raised concerns about FirstEnergy's "lobbying policies and payments" and proposed an annual report on such policies and payments, Jones and the Company's other directors assured investors it was unnecessary because "your Company strives to conduct its business as transparently as possible to serve customers effectively and help build public trust," including a political activity policy with "'decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy. . . . Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations.'" ¶¶110-111. Whether responding to shareholders, analysts, or initiated himself when touting the importance of finding regulatory and legislative solutions to FirstEnergy's significant nuclear problem, Jones's statements were not mere "opinions," nor were they merely "aspirational" or "generic." They were direct assurances about a vitally important issue that investors and analysts had expressly sought. *Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 462 (E.D. Pa. 2019) ("objective statement of fact" not considered opinion even though couched in terms of belief).

Even if any of Jones's statements are viewed as opinions, they would still be actionable because it simply is not possible Jones actually believed his statements or had a reasonable basis for them given: (1) his admitted personal involvement in the pursuit of HB6; (2) his admission that HB6 was his "top priority"; (3) FirstEnergy's admission that Jones violated its "policies and its code of conduct" related to HB6 and the incoming PUCO Commissioner, Randazzo; (4) FirstEnergy's admission that Jones failed to "maintain and promote a control environment with an appropriate tone

- 62 -

of compliance in certain areas of FirstEnergy's business" related to HB6 and the incoming PUCO

Commissioner, Randazzo; and (5) FirstEnergy's admission that it and Jones had falsely represented

that it had in place effective internal control over financial report when, in fact, it had material

weakness in its internal control, as confirmed by virtue of the violations Jones was able to commit.

¶¶216, 235; *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, __ F. Supp. 3d __, 2021 WL

1264027, at *7 (E.D. Pa. Apr. 6, 2021) (statements of opinion were actionable where plaintiffs

"present[ed] numerous facts . . . that directly contradicted the statements" that they alleged "were

known to the speakers and could not be reconciled with the assurances offered to investors"); *Bos.

Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (statements

actionable where plaintiff "pled the underlying facts of which it allege[d] defendants had knowledge,

when and in what context those facts arose, and why they rendered the opinion misleading").

### b.    Jones's Loss-Causation Argument Fails

Jones also argues that there can be no loss causation for the post-Class Period revelation of

his termination-worthy involvement in the Randazzo payoff.  ECF No. 174 at 26-27.  This argument

asserts a "rigid and dogmatic interpretation of *Dura*" that other courts have rejected.  *In re Bradley

Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006).[19]  Indeed, as the district court in

*Dura* explained on remand:

> When presented with this case, the Supreme Court could have held that as a matter of
> law Plaintiffs cannot establish loss causation because the corrective disclosures
> regarding Albuterol Spiros were made several months after the Class Period ended.

---

[19]    "Loss causation is not subject to heightened pleading standards; rather, allegations of loss causation must be supported only by a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *In re Miller Energy Res. Sec. Litig.*, 2014 WL 415730, at *20-*23 (E.D. Tenn. Feb. 4, 2014) (noting that "'to be corrective, the disclosure need not precisely mirror the earlier misrepresentation'" and "may be revealed through a series of disclosures"); *see also In re Bristol–Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *20, *22 (D.N.J. Aug. 17, 2005) (rejecting the argument that "an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud," and holding that a disclosure need only "'touch upon'" the alleged fraud to satisfy the loss causation pleading standard).

- 63 -

> The Supreme Court did not so hold, and instead only required the Plaintiffs to properly allege a causal connection between the economic losses suffered and the Defendants' misrepresentations.

*In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006); *See also In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 561 (N.D. Ill. 2007) ("Defendants articulate no rationale, and the court can see none, for requiring that any 'corrective disclosure' be within the Class Period. *Dura* does not so mandate, and the court is aware of no authority that imposes such a rule."); *Snellink v. Gulf Res.*, Inc., 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) (Defendants' "suggestion that Plaintiffs cannot suffer any loss as a result of fraud that was not disclosed until after the close of the class period is incorrect").

Here, as in *Bradley*, the revelation of the "truth" about Defendants' scheme "did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events." 421 F. Supp. 2d at 828-29 (citing *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, 2005 WL 1563206 (N.D. Ill. June 30, 2005) (crediting as "partial disclosures of prior misrepresentations and omissions" the company's issuance of a press release announcing a lawsuit, a SEC and a DOJ investigation against the defendants)). There is no legal or logical reason to require that every detail of Defendants' fraud scheme be revealed on the same day. *See, e.g.*, *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("[R]eading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures."); *Cardinal Health,* 426 F. Supp. 2d at 761 ("[T]his issue of [post-class period revelations] alone is not enough to defeat Plaintiffs' allegations of loss causation where they have clearly specified causal connections between . . . Defendants' misstatements . . . and their resulting damages."). More importantly, both law and logic support Plaintiffs' allegation that the revelation of Jones's involvement in the Randazzo payoff caused the market to realize that Defendants' scheme was even farther reaching and further confirmed the falsity of Jones's and others' earlier

- 64 -

protestations of innocence.  These are exactly the types of disclosures that "[t]he market would not consider . . . in a vacuum and neither [should] the Court."  *Chamberlain*, 757 F. Supp. 2d at 718 ("the import of this disclosure is that the company suspended one of its top executives for likely doing exactly what the [complaint] alleges [defendant] lied about").  These latter revelations were clearly part of a "series of disclosing events" and, as such, the alleged responsive stock price drop fully satisfies the *Dura* standard for pleading loss causation.

### 3.    Robert Reffner

Reffner separately moves to the dismiss the Complaint.  His arguments lack merit and his separate motion should also be denied.  ECF Nos. 162, 163.  As discussed above, the Complaint sufficiently pleads a claim of scheme liability under Rule 10(b)-5(a) and (c) against each of the defendants and the arguments advanced by Reffner have already been refuted above.[20]  *See* §§IV.A., IV.B.3., *supra*; ECF No. 163 at 15-17.  Reffner curiously argues that "Plaintiffs' Complaint focuses not on the existence of the bribery scheme, but on the failure to disclose it."  ECF No. 163 at 16.  This is a particularly flagrant manifestation of Defendants' universal failure to accept (or even acknowledge) the expressly pled "Methods and Means of Defendants' Bailout Scheme," which explicitly and separately "focuses" on both the execution of the Bailout Scheme and its concealment, which caused the price of FirstEnergy stock to be artificially inflated.  *See, e.g.,* ¶¶93(c) ("Paying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6"); 93(e) ("Making personal payments to corrupt politicians and at least one regulator"); 93(g) ("Using corrupted politicians to advance HB6 for consideration, to amend HB6 for FirstEnergy's additional benefit, and ultimately to pass the bill"); 93(b) ("Concealing the Bailout Scheme from the investing

---

[20]    Defendants Reffner, Dowling, Pine, Chack, and Vespoli dedicate significant space in their separate motions to dismiss arguing that they were not the makers of any misstatements.  But the Complaint does not allege that these individuals made any actionable statements and Plaintiffs are pursuing claims against these individual defendants under Count 1 pursuant to Rule 10b-5(a) and (c) scheme liability.

public and the bankruptcy court presiding over proceedings related to the Nuclear Plants"); 93(d) ("Creating and using a web of pass-through entities to transfer and conceal the money to finance the Bailout Scheme").

Both the corruption itself *and* its concealment defrauded investors. For example, getting HB6 passed required public deceptive acts and defrauded investors because it gave the grossly misleading impression that FirstEnergy was the *legitimate* beneficiary of billions in subsidies, which artificially inflated the price of FirstEnergy securities. Likewise, Defendants defrauded investors by repeatedly assuring them of the importance of both a legislative solution and an above-board pursuit of such a solution while concealing the corruption that resulted in the passage of HB6. Each of these methods and means constitutes an actionable scheme under 10(b)-5(a) and (c). *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *11 (S.D.N.Y. Mar. 30, 2021) (holding "[i]n line with the reasoning in *Lorenzo*, the Court sees no basis to conclude that a plaintiff may not establish, in a scheme liability claim, the existence of a 'manipulative . . . act' by pointing to alleged misrepresentations *or omissions*"). Defendants' deceptive conduct was by its very nature public facing and thus designed to *directly* impact the price of FirstEnergy securities, and included corruptly drafting and passing legislation, influencing public testimony, overseeing a misleading advertising campaign regarding HB6 designed to sway public opinion, and subverting a public referendum. *Cf. Stoneridge*, 552 U.S. at 159 (finding no scheme liability where "the[] deceptive acts were not communicated to the public").

As discussed above in connection with Reffner's scienter, the Complaint alleges that Reffner served in three senior legal officer positions and "was directly involved in and intimately familiar with FirstEnergy's extensive efforts to facilitate the Bailout Scheme and prevent its detection." ¶227. In these roles, "Reffner was responsible for FirstEnergy's legal, ethics, internal auditing, risk management and related affairs" and "oversaw the Company's fulfillment of its legal and ethical

- 66 -

obligations, internal control policies and procedures and adherence to internal control, risk management and compliance guidelines." *Id.* Further supporting the allegations of Reffner's involvement in the scheme, Reffner was terminated on November 9, 2020 for his failure to prevent wrongdoing and because of his personal "'conduct that the Board determined was influenced by the improper tone at the top.'" ¶216. Reffner's attempt to distinguish his termination as "crisis management" and not due to his personal conduct is both counter-factual and constitutes a request for an impermissible inference at this stage – he is certainly free to argue this to a jury, but it cannot serve to sustain his motion to dismiss. ECF No. 163 at 1. Reffner's attempt to rely on *Stoneridge*, 552 U.S. 148, which addresses scheme liability in the context of suppliers that aided and abetted the fraudulent misstatements of an issuer but did not themselves take any public facing actions, is baseless. Reffner Motion at 16. As head of FirstEnergy's legal department, Reffner served as an officer at FirstEnergy and ***directly*** and personally facilitated the Bailout Scheme, including its public facing aspects upon which FirstEnergy investors relied, "conduct" for which he was ultimately terminated by the Company. ¶¶216, 227.

Control is sufficiently alleged as to Reffner for purposes of §20(a) liability. Section 20(a) establishes liability for anyone who "directly or indirectly, controls any person liable" under the 1934 Act. 15 U.S.C. §78t(a). Control includes "'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *Bridgestone*, 399 F.3d at 667; *Pullins v. Klimley*, 2008 WL 85871, at *28 (S.D. Ohio Jan. 7, 2018) (control is established if "'defendant had some indirect means of discipline or influence, even if short of actual directions, over the corporation'"). A plaintiff need only allege "'power to control the specific transaction or activity upon which the violation is predicated' and 'actual[] participat[ion] in (i.e. exercise control) the operations of the [primary violator] in general.'" *Fushi Copperweld*, 929 F. Supp. 2d at 788. Here,

- 67 -

Reffner does not dispute that he was a control person following his promotion in May 2020 until the end of the Class Period, during which time the Bailout Scheme was concealed from investors.  ECF No. 163 at 18.  During the earlier period, from February 2017 to May 2020, Reffner's role as a senior legal officer is sufficient to establish control over the substance of FirstEnergy's disclosures and the deceptive acts taken by the Company in support of the Bailout Scheme.  *See, e.g.*, *Cognizant Tech.*, 2020 WL 3026564, at *33; *Proquest*, 527 F. Supp. 2d at 741.

### 4.      John Judge

Judge separately moves to dismiss the complaint but his arguments add nothing to those already advanced by FirstEnergy, and his motion should be denied for the same reasons.  ECF No. 164.  As discussed above, the Complaint sufficiently pleads a claim of scheme liability under Rule 10(b)-5(a) and (c) against each of the Defendants.  *See* §IV.A.6., *supra*.  Judge's argument that the Complaint does not sufficiently tie his conduct to the bribery scandal or explain how his acts were "[m]anipulative or [d]eceptive" is an exercise in deliberate blindness and should be given short shrift.  ECF No. 164 at 14-16.  Judge served as FirstEnergy's Chief Risk Officer and then, beginning in March 2019, as CEO of FES.  In these roles, Judge was an active participant in the Bailout Scheme including by facilitating FES's role in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy, and efforts to find "solutions" for the Nuclear Plants.[21]  ¶230.  As detailed above, Judge's conduct during the Class Period included: (i) meeting with Householder in March 2019; (ii) directing FES to retain Cespedes to create the appearance of FES independently supporting Householder; (iii) retaining Cespedes in close consultation with FirstEnergy and the Company's other senior executives involved in the

---

[21]      Notably, the Complaint alleges that the purported independence between FirstEnergy and FES was a fiction and thus cannot support Judge's arguments.  ECF No. 164 at 11.  Indeed the Bankruptcy Court referred to FirstEnergy and FES as "joined at the hip" and stated that FES was "utterly incapable" of operating without FirstEnergy.  ¶47.

Bailout Scheme; (iv) periodically meeting with Cespedes to receive updates on the Bailout Scheme; and (v) directing and overseeing the use of FES employees in a misleading ad campaign opposing the repeal of HB6.  *See* §IV.B.4; ¶230.  This conduct is more than sufficient to allege that Judge knowingly engaged in deceptive and manipulative conduct in furtherance of the Bailout Scheme. Any claim to the contrary willfully ignores the admitted facts alleged in the Complaint.  *Haw. Ironworkers*, 2011 WL 1257756, at *10 (scienter adequately alleged where "[t]he complaint alleges each defendant's personal participation and knowledge of" fraudulent scheme); ECF No. 164 at 15.

Judge is also liable under Rule 10(b)-5(b) for his false and misleading statements and omissions in a July 24, 2019 press release by FES in which, among other things, he described HB6 as "a monumental step in helping to avoid the premature closure of the company's two nuclear plants . . .", commended Ohio's legislature for 'drafting a bill that preserves the state's nuclear assets, reduces the customers' electric bills and provides rigorous oversight to protect customers if market conditions change,'" and praised Householder "for the support and commitment.'"  ¶130 (quoting Judge).  As discussed above, these statements were both affirmatively false and misleading by omission.  *See* §IV.A., *supra*.  Having chosen to speak on the matter, Judge had an obligation to do so fully and truthfully.  *Ghosn*, 2020 WL 7711378, at *14.  Judge's effort to portray these statements as puffery is meritless in light of the tremendous consequences of the revelation of Defendants' fraud, not to mention premature because it simply raises factual issues.  ECF No. 164 at 7; *Bridgestone*, 399 F.3d at 672 (rejecting statements as mere puffery because a "reasonable juror could also conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation").[22]

---

[22]    None of the additional arguments, as asserted in the separate motions of Judge and others, relating to a connection with a purchase or sale of a security, reliance or loss causation support a dismissal of Plaintiffs' claims.  ECF No. 164 at 12-14.  First, none of these arguments address Judge's conduct in furtherance of the Bailout Scheme, but instead address only the false statement directly attributed to him.  ¶230.  Second, these arguments rely on the false assertion that FES was

In addition, control is sufficiently alleged as to Judge for purposes of §20(a) liability based upon his duties and responsibilities as Chief Risk Officer for FirstEnergy from the start of Class Period until March 2019. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 416 (S.D.N.Y. 2010). His control continued in his role at FES, which was fully intertwined with FirstEnergy. As an active participant in the Bailout Scheme, Judge exercised control for purposes of §20(a), including by meeting with Householder about the Bailout Scheme, directing FES to retain Cespedes as part of the Scheme, and directing FES employees as part of the fraudulent Scheme to support HB6. ¶230; *In re CMS Energy Sec. Litig.*, 2005 WL 8154422, at *14 (E.D. Mich. Jan. 7, 2005).

### 5. Michael Dowling

Dowling filed a six-page brief in support of his separate motion to dismiss (ECF No. 165), which only serves to confirm that the allegations against him are more than sufficient. As set forth above, the Complaint sufficiently pleads a claim of scheme liability under Rule 10(b)-5(a) and (c) against each of the defendants, including Dowling, and the arguments he separately advances have already been refuted above. *See* §IV.A.6., *supra*, ECF No. 165 at 3-6. Contrary to Dowling's assertion that he did not act fraudulently (*id.* at 3-5) Dowling is alleged to have been an "instrumental participant" in the Bailout Scheme having had multiple contacts with Householder and other co-conspirators, in conjunction with several payments from FirstEnergy to fund the Bailout Scheme. ¶222. Dowling also facilitated the illicit $4 million payment to Randazzo. ¶¶72, 193, 206, 216, 222. On October 29, 2020, the Company announced that Dowling had been terminated for violating the code of conduct and Company policy. ¶¶172, 216.

---

meaningfully distinct from its parent company, FirstEnergy, when in fact they were completely intertwined financially and functionally. ¶¶44-51. Third, Judge's arguments would require the Court to find that the fraudulent scheme and misrepresentations were immaterial to investors, which cannot be reconciled with the monumental consequences of their disclosure. Finally, Judge's loss causation arguments (which again address only his statements, not conduct) are based on the wrong pleading standard and demand a mirror image disclosure – a requirement that has been rejected. *See* §IV.C.2.b.

Dowling's argument that the allegations are somehow insufficient would require the Court to draw wholly implausible inferences in his favor. That, of course, is both improper and in conflict with the well-pled and particularized allegations of Dowling's role in the fraudulent scheme. Furthermore, as set forth above, Dowling's argument is premised on a misunderstanding of the law of bribery, demanding, among other things, the pleading of an "explicit agreement" (ECF No. 165 at 5), when nothing of the sort is required and the Complaint abounds with *quid pro quo* allegations. *See, e.g.*, ¶¶3, 4, 93, 135, 136, 171, 205, 215, 216, 296.

As to §20(a) control person liability, it too is sufficiently alleged. As discussed above, Dowling served as SVP of external affairs and controlled the Company's statements and actions in furtherance of the bailout scheme and in opposition to the repeal effort. This is sufficient. *Gordon v. Elite Consulting Grp. L.L.C.*, 2009 WL 4042911, at *8 (E.D. Mich. Nov. 19, 2009) ("[a]ll that is required are factual allegations indicating" that defendant " indirectly or directly, possessed the power to control the predicate activities").

### 6. Ty R. Pine

The Complaint sufficiently pleads a claim of scheme liability under Rule 10(b)-5(a) and (c) against Pine and his separate motion to dismiss (ECF Nos. 166, 167) should be denied.[23] *See* §§IV.A., IV.B.6., *supra*. In the face of overwhelming allegations that he was a "central liaison" between FirstEnergy and corrupt Ohio politicians, Pine argues that he was merely doing his job as a FirstEnergy lobbyist and its Ohio Director of State Affairs. ECF No. 167. But endorsement of this argument would require the Court to make absurd abstractions that separate Pine's acts (*e.g.*, making phone calls or lobbying legislators) from the well-pled allegations that Pine committed these acts to advance the Bailout Scheme, which was intended to and did defraud the Company's investors. *Id.* at

---

[23] Pine was included in the definition of Officer Defendants for ease of reference in the Complaint. ¶¶34, 39. However, Pine's position as a FirstEnergy lobbyist is accurately described in ¶¶34 and 223, and Plaintiffs are not pursuing control person claims against him.

7-9; *see In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *8 (S.D.N.Y. Mar. 29, 2017) (scheme liability adequately pled where inference that Defendant "authorized and knew of [wire] transfers" was "just as plausible and compelling" as non-culpable inference). As alleged, Pine had at least 188 phone contacts with Householder and his co-conspirators regarding the Bailout Scheme, including several which occurred in conjunction with payments from FirstEnergy to fund the Bailout Scheme. ¶223. For example, on March 12 and 13, 2018, Pine had four telephone communications with Householder; two days later, FirstEnergy wired $300,000 to the corrupt enterprise through a pass-through vehicle. *Id.* Similarly, between May 1 and May 4, 2018, Pine had five telephone contacts with Longstreth, immediately after which FirstEnergy made a $100,000 payment to members of the Bailout Scheme. *Id.* Pine also worked closely with Ohio state legislators to draft HB6 on behalf of FirstEnergy and possessed intimate knowledge about the Company's efforts to shepherd the legislation through the Ohio legislature. *Id.* The non-culpable inferences that Pine seeks are not just improper but strain credibility in the face of overwhelming allegations of his central role in FirstEnergy's fraudulent bailout scheme. *See, e.g.*, ¶¶3, 4, 93, 135, 136, 137, 138, 171, 205, 215, 216, 223; *Cognizant*, 2020 WL 3026564, at *12 (rejecting Defendants' "attempt[] to debunk plaintiffs' theory" because it "defie[d] logic at the pleading stage"). The allegations concerning Pine's Class Period conduct are more than sufficient to support both his fraudulent conduct and scienter.

### 7. Dennis M. Chack

The Complaint sufficiently pleads a claim of scheme liability under Rule 10(b)-5(a) and (c) against Chack and the arguments he separately advances have already been refuted above. Accordingly, his motion to dismiss (ECF Nos. 168, 169) should be denied. *See* §IV.A.6., *supra*. In his role as FirstEnergy's former SVP of Product Development, Marketing and Branding, Chack is alleged to have worked directly with Jones and other FirstEnergy executives to shape the Company's

misleading HB6 messaging strategy and was responsible for disseminating the Company's false and misleading statements in support of HB6 and in opposition to repeal. ¶¶33, 39-40, 224. Chack took additional actions to further the fraudulent scheme, including: (i) working to obscure the Company's role in funding this media campaign; (ii) facilitating an illicit $4 million payment to Randazzo in advance of his assumption of the PUCO Chairmanship and HB6 advocacy; and (iii) almost certainly attending a September 2019 meeting between FirstEnergy executives and an FES lobbyist to discuss anti-repeal efforts covertly funded by the Company.[24] ¶224. Chack was terminated as a result of his role in the Bailout Scheme. ¶¶172, 216. Contrary to Chack's arguments, these actions support liability under 10b-5(a) and (c), as Chack both disseminated the false and misleading statements and took direct and personal actions furthering the fraudulent Bailout Scheme, which was intended to and did defraud FirstEnergy investors. *Puddu*, 2021 WL 1198566, at *11 (holding "[i]n line with the reasoning in *Lorenzo*, the Court sees no basis to conclude that a plaintiff may not establish, in a scheme liability claim, the existence of a 'manipulative . . . act' by pointing to alleged misrepresentations or omissions").[25]

Similarly, control for purposes of §20(a) liability is sufficiently alleged as to Chack. Here, Chack served as FirstEnergy's SVP of Product Development, Marketing and Branding during the

---

[24] Chack's arguments seeking to recast the illegal payment to Randazzo, and his other attacks on falsity, (ECF No. 169 at 20-22) are baseless and would require that the Court disregard well-pled allegations based on admitted facts and draw improper inferences in defendants' favor. *See* ¶¶72, 193, 206, 216, 222.

[25] The argument that Defendants' actionable conduct was not made in connection with a purchase of sale of a security or that Plaintiffs fail to plead reliance, as asserted by Chack and others in their separate motions to dismiss, should be rejected. ECF No. 169 at 27-28. The Bailout Scheme, including Chack's conduct and actions in furtherance of it, were viewed as critical to FirstEnergy's financial viability and thus were closely monitored by investors and analysts and indisputably impacted the price of FirstEnergy securities during the Class Period. *See City of Providence, R.I. v. Bats Glob. Mkts., Inc.*, 878 F.3d 36, 49 (2d Cir. 2017) (claim for scheme liability upheld where "the complaint specifie[d] what manipulative acts were performed, when they took place, which defendants performed them, and their effect on the market").

- 73 -

Class Period.  ¶33.  In this position he had the ability to and did control the statements and conduct of FirstEnergy made in furtherance of the bailout scheme, including the determination of what information to disclose to investors.  ¶40.  This is sufficient for control under §20(a).  *Proquest*, 527 F. Supp. 2d at 741.

### 8.    Donald R. Schneider

The Complaint sufficiently pleads a claim of securities fraud against defendant Schneider based upon both his conduct and participation in the Bailout Scheme, as well as his false statements and omissions to investors.  Schneider separately moves to dismiss the claims against him on the bases of scienter and control.  ECF No. 170.  As set forth above, Schneider's scienter is well-pled. *See* §IV.B.8.  Control is also sufficiently alleged for purposes of §20(a) liability.  As detailed in the Complaint, Schneider's employment by FES does not defeat his control as "FirstEnergy was operationally and financially intertwined with FES." ¶50.  Furthermore, Schneider is alleged to have worked shoulder-to-shoulder with Jones and others involved in the Bailout Scheme, and to have directed FES to hire Borges to help the Bailout Scheme to succeed.  ¶229.  As such, Schneider's role in the Bailout Scheme amounts to a controlling role of FirstEnergy for purposes of §20(a).  *JAC*, 997 F. Supp. 2d at 738 (control person liability found where defendants "instructed" others "in carrying out specific elements of the plan, and in several cases . . . came up with elements of the scheme themselves.").

### 9.    Leila L. Vespoli

Vespoli separately seeks dismissal of the Complaint (ECF Nos. 172, 173) but she relies on the same flawed arguments as the Company, based on a shared refusal to accept the Complaint's well-pled allegations.  As discussed above, those arguments do not support dismissal of Vespoli or any of the other Defendants.

Control for purposes of §20(a) liability is sufficiently alleged as to Vespoli. In her role as Executive VP of Corporate Strategy and Regulatory Affairs, Chief Legal Officer, a member of the FirstEnergy Restructuring Working Group, and an attendee on the Company's conference calls, Vespoli had more than "'some indirect means of discipline or influence . . . over the corporation.'" *Pullins*, 2008 WL 85871, at *28. Indeed, the Complaint alleges that Vespoli "had direct oversight and responsibility for the Company's lobbying activities and political contributions, interaction with regulators and state representatives, legal and regulatory compliance activities and efforts to eliminate the Company's liability exposure to the Nuclear Plants." ¶228. This is sufficient to allege control during the time of Vespoli's employment by FirstEnergy. *Bridgestone*, 399 F.3d at 667.

## V.  THE COMPLAINT SUFFICIENTLY ALLEGES NON-FRAUDULENT VIOLATIONS OF THE SECURITIES ACT

In 2020, while FirstEnergy's illicit efforts to achieve its legislative and regulatory priorities were in full swing, the Securities Act Defendants conducted two public offerings, selling $2.5 billion worth of FirstEnergy senior notes to investors (the "Offerings"). Nowhere did the corresponding offering documents disclose the Company's unprecedented efforts to corruptly influence the passage of HB6, stymy a democratic referendum, and pay off crooked government officials such as Householder and Randazzo. To the contrary, offering materials highlighted FirstEnergy's purported compliance with all "regulations, orders, policies and practices prescribed by the SEC, FERC [and] PUCO," among other agencies, and the Company's purported maintenance of "effective" internal controls over financial reporting and disclosure controls and procedures. Soon after the second offering, these representations were revealed to be materially false and misleading. Among other shocking developments, FirstEnergy: (i) became embroiled in Ohio's largest ever bribery case; (ii) implicated in a vast network of criminal wrongdoing; (iii) was (and continues to be) subjected to multiple governmental investigations – including by the SEC, FERC and PUCO – into whether the Company had violated relevant regulations, orders, policies and practices; (iv) was forced to admit

- 75 -

that it had in fact failed to maintain effective controls over financial reporting; and (v) was compelled to oust many of its top executives. Consequently, the price of notes sold in the Offerings plummeted, damaging investors.

The Complaint adequately alleges violations of the Securities Act. The Securities Act created a non-fraud statute to ensure full and fair disclosure in the offering of securities to the public that "places a relatively minimal burden on a plaintiff," with a *prima facie* case merely requiring allegations that offering documents contained a materially false and misleading statement. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Despite this low hurdle, which Plaintiffs have more than cleared, the extraordinary nature of FirstEnergy's undisclosed campaign to corrupt government officials and subvert democratic processes, which damaged investors, and FirstEnergy's subsequent admissions, which directly contracted the statements made in connection with the Offerings, the Securities Act Defendants move to dismiss the claims against them. Defendants' motions are based on erroneous legal arguments, a mischaracterization of the Complaint, and the raising of factual issues inappropriate for resolution on a motion to dismiss.

*First*, the Complaint adequately pleads actionable misstatements were made in the registration statement and prospectuses for the Offerings, as FirstEnergy itself has subsequently admitted. *See* ¶¶291-296.

*Second*, the Complaint adequately pleads Plaintiffs' standing to assert claims under §12(a)(2), including by alleging that Plaintiffs purchased FirstEnergy notes "directly in" the Offerings, on the date of the Offerings and at the Offerings' price. *See* ¶¶307, 313-317. The Underwriter Defendants' contention that Plaintiffs must also allege from which underwriter they purchased the notes misstates the law and has been overwhelmingly rejected by courts.

*Third*, the Complaint adequately pleads that the Individual Defendants are statutory sellers under §12(a)(2). As the Supreme Court has held, anyone who "successfully solicits the purchase,

- 76 -

motivated at least in part by a desire to serve his own financial interests or those of the securities owner" is liable under the statute. *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).

**Finally**, the Complaint adequately pleads control person claims under §15. The only arguments offered to the contrary rest on the erroneous premise that Plaintiffs have not alleged primary violations of the Securities Act. As detailed herein, these arguments fail.

Defendants' motions to dismiss the Securities Act claims should be denied.

### A.    The Securities Act Was Designed to Promote Full and Accurate Disclosure and Imposes a Minimal Pleading Burden

The Securities Act was enacted "to promote full and fair disclosure of information to the public in the sales of securities." *Id.* at 646; *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) ("The Securities Act . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."); *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963) ("A fundamental purpose [of the Securities Act] was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.").

Toward this end, the Securities Act "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Herman & MacLean*, 459 U.S. at 381. The Securities Act does not require Plaintiffs to plead scienter, loss causation or reliance. Rather, under §11, a plaintiff who purchased the security "need only show a material misstatement or omission to establish his *prima facie* case." *Id.* at 382. "Liability against the issuer of a security is virtually absolute, even for innocent misstatements" and "[o]ther defendants bear the burden of demonstrating due diligence," *id.*, which raise factual issues generally inappropriate for resolution on a motion to dismiss. *See Mixon v. Trott*

- 77 -

*L., P.C.*, 2019 WL 4943761, at *2 (6th Cir. Aug. 28, 2019) ("[A] motion to dismiss under Rule 12(b)(6) is generally not the appropriate vehicle to dismiss a claim based on an affirmative defense."). "Similarly, to establish a claim under §12, once he established privity with a seller, a plaintiff need prove only that there was a material misstatement or omission in the prospectus or oral communication." *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 688 (M.D. Tenn. 2000) (collecting cases).

As non-fraud claims, alleged violations of the Securities Act are subject to the pleading standard articulated in Rule 8(a), and a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see, e.g.*, *FirstEnergy*, 316 F. Supp. 2d at 602 ("Since fraud is not an element or requisite to a claim under §11 or §15, the claims are not subject to Rule 9(b) heightened pleading requirement."). While the Securities Act Defendants contend that Plaintiffs' non-fraud Securities Act claims are subject to a heightened pleading standard as they nonetheless "sound in fraud," (ECF No. 161 at 8) this is factually incorrect. The Complaint's Securities Act claims "do not mention fraud, except to expressly exclude any allegations which might sound in fraud," and therefore "the Court cannot read it into the statute, it need not be pled pursuant to Rule 9(b) in Plaintiffs' §11 or §12 claims." *Prison Realty*, 117 F. Supp. 2d at 688-89; *see* ¶¶276-322. "Because Plaintiffs' claims 'carefully segregate[ ] [their] allegations of negligence against [certain defendants] from [their] allegations of fraud against those defendants,' thereby creating 'a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud,'. . . the Section 11 and 12(a)(2) claims here do not sound in fraud. . . ." *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 869-70 (S.D. Ohio 2016), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017); *see also Prison Realty*, 117 F. Supp. 2d at 688 (quoting *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 594 (E.D. Mich. 1985) (holding that "because the plaintiffs specifically

- 78 -

separated out their §11 claims into distinct counts at the end of the complaint, the allegations of
fraud did not 'convert or contaminate the separate §11 claims'")).

Regardless, Plaintiffs have sufficiently alleged violations of the Securities Act under any
pleading standard, because the Complaint details the precise "time, place and contents of the
misrepresentations" made in connection with the Offerings.  *In re Regions Morgan Keegan Sec.,
Derivative, & Erisa Litig.*, 743 F. Supp. 2d 744, 759-60 (W.D. Tenn. 2010) (citing *Frank v. Dana
Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (finding Securities Act claims had been pled with
particularity because the plaintiff identified the material misrepresentations, stated when they were
made and explained why the statements were misleading)).

### B.   The Securities Act Defendants Made Material Misrepresentations of Fact in Connection with the Offerings

For the reasons detailed in §IV.A., *supra*, the Securities Act Defendants made material
misrepresentations of fact in the registration statement and prospectus for the Offerings ("Offering
Materials").  For example, although the Offering Materials represented that FirstEnergy maintained
"effective" internal controls over financial reporting and disclosure controls and procedures, the
Company subsequently admitted that it "'did not maintain an effective control environment'" and
that its internal controls suffered from a "'material weakness'" and "control deficiency" based on
conduct that predated the Offerings.  ¶¶294-295; *see, e.g.*, *In re LendingClub Sec. Litig.*, 254 F.
Supp. 3d 1107, 1117 (N.D. Cal. 2017) (finding that plaintiff had adequately alleged material
misrepresentations under Securities Act based on issuer's "own admissions that its internal controls
were inadequate" and "specific facts warranting the inference that the same circumstances existed"
at the time of the offering).  Similarly, the Offering Materials stated that FirstEnergy had complied
with all "regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable
. . . PUCO," but soon after the Offerings FirstEnergy became subject to a multitude of investigations
– including by the SEC, FERC, and PUCO – for violations of law and failures to comply with those

- 79 -

agencies' regulations, orders, policies and practices.  ¶¶292-293; *see In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 895-96 (M.D. Tenn. 2005) (finding materially false and misleading statements regarding increased liabilities had been adequately pled under Securities Act, because "Court cannot determine, on a motion to dismiss, the veracity of the alleged misstatements"); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 588-89 (S.D.N.Y. 1993) (finding statements regarding power company's purported maintenance of high industry standards and regulatory compliance actionable when employees alleged to have operated contrary to those representations).

The Securities Act Defendants also violated their affirmative duty to disclose FirstEnergy's participation in the Bailout Scheme under Items 303 and 105, which required these defendants to disclose the known risks, trends and uncertainties related to the Bailout Scheme in the Offering Materials.  ¶¶297-300; *see Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("One of the potential bases for liability under §§11 and 12(a)(2) is an omission in contravention of an affirmative legal disclosure obligation."); *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 888 (M.D. Tenn. 2013) ("'[A]n offeror is duty-bound to disclose all material information required to be disclosed by statute.'").  The illicit involvement by FirstEnergy and Company insiders in the Bailout Scheme was one of the most significant factors making an investment in FirstEnergy securities highly risky at the time of the Offerings, and thus was required to be disclosed to investors.  *See Schuh*, 947 F. Supp. 2d at 890 (holding that failure to disclose change in "key metric" two months before offering sufficiently alleged to have violated Item 303 and thus triggered liability under Securities Act).

C.      **Plaintiffs Have Standing to Assert Claims Under Section 12(a)(2)**

Plaintiffs have sufficiently alleged standing under §12(a)(2).  Specifically, Plaintiffs have pled that they purchased FirstEnergy notes "directly in" both Offerings (*i.e.*, on the primary market), "pursuant to" the Prospectuses for the Offerings, on the date of the Offerings, and at the Offerings'

- 80 -

price – facts confirmed by Plaintiffs' certifications, which were expressly incorporated into the Complaint. ¶¶23-26, 307, 315-316; ECF No. 33-4 at 4 (showing LACERA purchased FirstEnergy notes "directly in" both the February Offering and the June Offering on the date of the Offerings at Offering prices); ECF No. 72 at 122 (showing Amalgamated Bank purchased FirstEnergy notes "directly in" the June Offering on date of the Offering at Offering price); ECF No. 72 at 124 (showing Wisconsin Laborers' Pension Fund purchased FirstEnergy notes "directly in" the February Offering on the date of the Offering at Offering price). Nothing more is required. *See, e.g.*, *EveryWare Glob.*, 175 F. Supp. 3d at 867-68 (finding §12(a)(2) standing adequately alleged where plaintiffs pled purchase through broker on date of offering near offering price); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 856 (S.D.N.Y. 2019) (finding allegation that plaintiff purchased "pursuant to" the relevant offering sufficient to allege §12(a)(2) standing); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 436 (S.D.N.Y. 2000) (holding that because some "plaintiffs purchased their shares directly in the IPO . . . the Plaintiff class has standing" under §12(a)(2)).

No defendants, other than the Underwriter Defendants, challenge Plaintiffs' standing to assert §12(a)(2) claims. *See* ECF No. 171 at 4-6. The Underwriter Defendants' argument is based on a mischaracterization of the Complaint and fails to acknowledge that Plaintiffs alleged purchases "directly in" and "pursuant to" the Offerings and specified the exact dates and prices of the purchases, which exactly match the dates and prices of the Offerings. *See* ¶¶23-26, 307, 315-316; ECF No. 33-4 at 4; ECF No. 72 at 122, 124. The Underwriter Defendants' own case citations stand for the proposition that alleging purchases directly in the primary market for an offering is sufficient for §12(a)(2) standing. *See, e.g.*, *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 899 (4th Cir. 2014) ("[P]laintiffs should plead that they directly purchased securities in the relevant offering."); *Gaynor v. Miller*, 273 F. Supp. 3d 848, 862 (E.D. Tenn. 2017) (finding no §12(a)(2) standing

- 81 -

because plaintiffs had not alleged they purchased "directly from the relevant offerings"). Thus, the Underwriter Defendants' own purported authority supports denying their motion to dismiss and they provide no cases in which a court found a lack of §12(a)(2) standing on comparable facts.

The Underwriter Defendants' alternative argument, that in addition to adequately alleging purchases directly in the Offerings, Plaintiffs must also specify from which Underwriter Defendant they purchased the notes (ECF No. 171 at 6-7), conflicts with controlling Supreme Court authority that "the range of persons potentially liable under [Section 12(a)(2)] is not limited to persons who pass title." *Pinter*, 486 U.S. at 643. Since *Pinter*, attempts to graft the Underwriter Defendants' proposed extralegal requirement onto §12(a)(2) have been rejected by a multitude of courts. *See, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 404 (S.D.N.Y. 2020) ("[T]he fact that Plaintiffs did not identify which Underwriter Defendant they purchased shares from does not defeat their claim at this stage."); *BioScrip*, 95 F. Supp. 3d at 745 ("[C]ourts do 'not require that the putative class representative identify the specific underwriter from which it purchased shares as long as the allegations are sufficient.'"); *Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at *12 (S.D.N.Y. Aug. 22, 2013) (same); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374 (S.D.N.Y. 2011) (finding "no authority for the proposition that the immediate seller requirement demands such particularity in the pleadings").

There simply is no requirement that Plaintiffs specify from which underwriter they purchased the notes, nor would such a requirement be consistent with the Supreme Court's holding that §12(a)(2) liability extends beyond those who pass title and includes "those who solicit securities purchases." *Pinter*, 486 U.S. at 647. Each of the Underwriter Defendants indisputably served as an underwriter for the Offerings and thus solicited members of the Class – including Plaintiffs – to invest in the Offerings, including by preparing the materially false and misleading Offering Materials, and directly sold them the notes for their own financial benefit and the benefit of

FirstEnergy. *See* ¶¶286-289, 313.  As a result, all the Underwriter Defendants are liable to Plaintiffs and the Class under §12(a)(2).  *See Evoqua*, 450 F. Supp. 3d at 404 (finding §12(a)(2) standing sufficiently alleged against "Underwriter Defendants [who] solicited the purchase of securities for their own and the securities owners' interests").  The Underwriter Defendants' motion to dismiss Plaintiffs' §12(a)(2) claims on standing grounds should be denied.

### D. The Securities Act Defendants Are Statutory Sellers Under Section 12(a)(2)

The Complaint sufficiently alleges that each of the Securities Act Defendants served as a statutory "seller" within the meaning of §12(a)(2).  The only Defendants to dispute their statutory seller status are former CEO Jones, ECF No. 174 at 27-29, and FirstEnergy's outside directors, ECF No. 161 at 65-66.  They are wrong.

In its seminal *Pinter* decision, the Supreme Court held that §12(a)(2) liability extends to those who either: (i) pass title to the plaintiff; or (ii) successfully solicit the purchase based on a financial motivation.  486 U.S. at 647.  The Court reasoned that "solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information."  *Id.* at 646-47.  Importantly, the financial motivation needed to establish statutory seller liability includes not only the solicitor-seller's own financial motivation but also "those of the securities owner" (*i.e.*, the issuer in a new offering), even if just "in part."  *Id.* at 647; *see also id.* at 654-55 ("But a person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under [Section 12] without showing that he expects to participate in the benefits the owner enjoys.").

The Complaint has satisfied the *Pinter* standard as to former CEO Jones and each of FirstEnergy's non-management directors.  First, these individuals served as directors, and in the case of Jones also as the Company's most senior executive, at the time of the Offerings and authorized the Offerings to raise $2.5 billion for FirstEnergy.  ¶¶278, 281, 285-289; *see In re OSG Sec. Litig.*,

- 83 -

971 F. Supp. 2d 387, 404-05 (S.D.N.Y. 2013) ("Given their positions as officers and directors of the Company, the Individual Defendants likely participated in the Offering in order to benefit [the issuer] – if not themselves. Therefore, Plaintiffs have adequately alleged that the Individual Defendants were motivated by either their own financial interests or those of the securities owner."). Jones is the only Securities Act Defendant who served as a FirstEnergy executive at the time of the Offerings to contest his statutory seller status, as the rest effectively concede that they have been properly designated §12(a)(2) defendants by not moving to dismiss on this ground. And for good reason, as the Complaint alleges that Jones and FirstEnergy's other senior most executives "personally over[saw]" the Bailout Scheme and were responsible for the Company's "investor disclosures" at the time of the Offerings (¶4), which, coupled with the Complaint's other allegations, are more than enough to allege §12(a)(2) liability against them. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (upholding §12(a)(2) claims against executive who "participated in the preparation of the allegedly misleading or false registration statement," received compensation from the issuer as a result of their positions, "and regularly appeared before investors and financial news agencies to tout the financial vitality of [the issuer] and thereby encourage investors to purchase [the issuer's] securities").

Jones and each of the outside director defendants also signed the registration statement and/or were named as directors in Offering Materials used to solicit purchasers in the Offerings. ¶¶278, 281; *see In re Sirrom Cap. Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999) ("A Prospectus itself is considered a solicitation document. Thus, the Defendants who actually signed the Registration Statements may be said to have solicited the public to purchase the stock."); *In re OPUS360 Corp. Sec. Litig.*, 2002 WL 31190157, at *10 (S.D.N.Y. Oct. 2, 2002) ("It is significant that the officers and directors of [the issuer] signed the registration statement that is the basis of the plaintiffs' claim."); *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996)

(holding that the defendants' "signatures [on offering documents] constituted active solicitation"). But the Complaint alleges more than these defendants' positions and roles in the Offerings and their signing of the registration statement. The Complaint also alleges that they "promoted and sold FirstEnergy notes to Plaintiffs and other members of the Class for their own benefit and the benefit of those associated with them." ¶313; *see Prison Realty*, 117 F. Supp. 2d at 691 (holding that that defendants who allegedly prepared and/or signed a solicitation document and were motivated by desire to raise money for the issuer were properly considered statutory sellers).

While Jones and the non-management director defendants dispute these factual allegations, such disputes are inappropriate to resolve on a motion to dismiss. *See Regions Morgan Keegan*, 743 F. Supp. 2d at 760 ("As the test suggests, whether someone 'solicits' a purchase is a fact-bound inquiry unsuited for a Rule 12(b)(6) motion."). Their bid to have the Court prematurely determine these factual inquiries on a motion to dismiss should be rejected.

### E. The Complaint Adequately Alleges Control Person Claims Under Section 15

The only argument raised by the Securities Act Defendants regarding Plaintiffs' §15 control person claims is that no primary violation of the Securities Act has been adequately alleged. *See* ECF No. 161 at 66; ECF No. 174 at 29. This effectively concedes that the Complaint's §15 claim is sufficient so long as Plaintiffs' §§11 and/or 12(a)(2) claims are sufficient. Accordingly, because Plaintiffs have shown that their §§11 and/or 12(a)(2) claims are sufficient, the Securities Act Defendants' motions to dismiss Plaintiffs' §15 claims should be denied. *See Prison Realty*, 117 F. Supp. 2d at 691-92 (denying motion to dismiss §15 claims based on claim of no primary liability because the plaintiff had adequately alleged primary violations).

## VI. CONCLUSION

The Complaint lays out in painstaking detail how during the Class Period Defendants perpetrated, and then failed to disclose to FirstEnergy investors, one of the most far-reaching bribery

- 85 -

schemes in U.S. history.  The Complaint more than adequately alleges violations of the federal

securities laws as to each Defendant, and Defendants' motions to dismiss should be denied in their

entirety.

DATED:  July 2, 2021                             Respectfully submitted,

                                                 MURRAY MURPHY MOUL + BASIL LLP


                                                        s/ Joseph F. Murray
                                                 JOSEPH F. MURRAY, Trial Attorney (0063373)
                                                 1114 Dublin Road
                                                 Columbus, OH 43215
                                                 Telephone: 614/488-0400
                                                 614/488-0401 (fax)
                                                 murray@mmmb.com

                                                 Liaison Counsel

                                                 ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                                                 DARREN J. ROBBINS
                                                 MARK SOLOMON
                                                 JASON A. FORGE
                                                 TOR GRONBORG
                                                 BRIAN E. COCHRAN
                                                 SARA B. POLYCHRON
                                                 TING H. LIU
                                                 FRANCISCO J. MEJIA
                                                 655 West Broadway, Suite 1900
                                                 San Diego, CA  92101-8498
                                                 Telephone:  619/231-1058
                                                 619/231-7423 (fax)
                                                 darrenr@rgrdlaw.com
                                                 marks@rgrdlaw.com
                                                 jforge@rgrdlaw.com
                                                 torg@rgrdlaw.com
                                                 bcochran@rgrdlaw.com
                                                 spolychron@rgrdlaw.com
                                                 tliu@rgrdlaw.com
                                                 fmejia@rgrdlaw.com

4847-3041-0736.v2

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL J. PFEFFERBAUM
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dpfefferbaum@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
DESIREE CUMMINGS
420 Lexington Avenue
New YORK, NY 10170
Telephone: 212/693-1058
chadj@rgrdlaw.com
dcummings@rgrdlaw.com

Lead Counsel for Lead Plaintiff Los Angeles
County Employees Retirement Association

4847-3041-0736.v2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 2, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Joseph F. Murray
JOSEPH F. MURRAY

MURRAY MURPHY MOUL + BASIL LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)

E-mail:  murray@mmmb.com

4847-3041-0736.v2

# Mailing Information for a Case 2:20-cv-03785-ALM-KAJ Owens v. FirstEnergy Corp. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Daniel E. Barenbaum**
  dbarenbaum@bermantabacco.com,sfservice@bermantabacco.com

- **Jordan M. Baumann**
  jbaumann@jonesday.com

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **Kip T Bollin**
  kip.bollin@thompsonhine.com,donna.mitchell@thompsonhine.com,ECFDocket@Thompsonhine.com

- **Peter Borkon**
  pborkon@bfalaw.com

- **Joseph Michael Brunner**
  jmbrunner@vorys.com,tlschwarz@vorys.com

- **Preston Burton**
  pburton@buckleyfirm.com,jwinter@buckleyfirm.com,jbunton@buckleyfirm.com

- **Veronica E. Callahan**
  veronica.callahan@arnoldporter.com,edocketscalendaring@arnoldporter.com,veronica-callahan-1417@ecf.pacerpro.com,maosdoh@arnoldporter.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Desiree Cummings**
  dcummings@rgrdlaw.com

- **James Rubin Cummins**
  jcummins@cumminslaw.us,hpoindexter@cumminslaw.us,docket@cumminslaw.us

- **Lisa S Del Grosso**
  ldelgrosso@brouse.com

- **Justin Robert Donoho**
  jdonoho@bakerlaw.com

- **Marjorie P Duffy**
  mpduffy@jonesday.com,epalmer@jonesday.com,rfargabrite@jonesday.com

- **John C Fairweather**
  jcf@brouse.com,sgibson@brouse.com

- **John A Favret , III**
  jfavret@tuckerellis.com,darlene.hudeck@tuckerellis.com,Chelsea.croy@tuckerellis.com

- **Robert Stephen Faxon**
  rfaxon@jonesday.com

- **Wendy West Feinstein**
  wendy.feinstein@morganlewis.com,tammy.miller@morganlewis.com,PICalendarDepartment@morganlewis.com,tamara.giulianelli@morganlewis.com

- **Jason A. Forge**
  JForge@rgrdlaw.com

- **Kirsten R. Fraser**
  kfraser@porterwright.com,akerlee@porterwright.com,mjohnson@porterwright.com,aporter@porterwright.com

- **Tor Gronborg**
  torg@rgrdlaw.com,cbarrett@rgrdlaw.com,e_file_sd@rgrdlaw.com,christina@rgrdlaw.com

- **Andrew Paul Guran**
  apguran@vorys.com

- **Christine M Haaker**
  Christine.Haaker@ThompsonHine.com,diana.davis@thompsonhine.com,ECFDocket@Thompsonhine.com,Diane.MacLeod@ThompsonHine.com

- **Kari Kathleen Hall**
  khall@buckleyfirm.com,nreeber@buckleyfirm.com,autodocket@buckleyfirm.com,docket@buckleyfirm.com

- **Zheng (Jane) He**
  Jane.He@arnoldporter.com

- **Paul Helms**
  phelms@mwe.com

- **C. Chad Johnson**
  chadj@rgrdlaw.com

- **Daniel Richard Karon**
  dkaron@karonllc.com,cgood@karonllc.com,bhollowell@karonllc.com

- **Michael L. Kichline**
  michael.kichline@morganlewis.com

- **Nicole Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com

- **Albert Grant Lin**
  alin@bakerlaw.com,phubbard@bakerlaw.com

- **Ting H. Liu**
  tliu@rgrdlaw.com

- **Douglas M Mansfield**
  dmansfield@lmng-law.com

- **John F McCaffrey**
  john.mccaffrey@tuckerellis.com,linda.karohl@tuckerellis.com

- **Laura Hughes McNally**
  laura.mcnally@morganlewis.com,carole.griffin@morganlewis.com

- **Francisco J Mejia**
  FMejia@rgrdlaw.com

- **Jason J Mendro**
  JMendro@gibsondunn.com

- **Adam B. Miller**
  amiller@buckleyfirm.com,testad@buckleyfirm.com,autodocket@buckleyfirm.com,docket@buckleyfirm.com

- **Aaron F. Miner**
  aaron.miner@arnoldporter.com

- **John R Mitchell**
  john.mitchell@thompsonhine.com,ECFDocket@Thompsonhine.com

- **Thomas N Mitchell**
  mpduffy@jonesday.com

- **Bree Murphy**
  bmurphy@buckleyfirm.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,murray@ecf.courtdrive.com

- **Danielle S. Myers**
  DMyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Daniel J. Pfefferbaum**
  dpfefferbaum@rgrdlaw.com

- **Sara B. Polychron**
  spolychron@rgrdlaw.com

- **Carole Schwartz Rendon**
  crendon@bakerlaw.com

- **Geoffrey J. Ritts**
  gjritts@jonesday.com

- **Darren J Robbins**
  tedp@rgrdlaw.com

- **David S. Rosenbloom**
  drosenbloom@mwe.com

- **William Scherman**
  wscherman@gibsondunn.com

- **Steven S. Scholes**
  sscholes@mwe.com

- **Victoria Lynn Serrani**
  vlserrani@bmdllc.com

- **Mark Soloman**
  marks@rgrdlaw.com

- **Christopher W.H. Sullivan**
  csullivan@gibsondunn.com

- **Joseph J. Tabacco, Jr.**
  jtabacco@bermantabacco.com

- **Robert Ward Trafford**
  rtrafford@porterwright.com,tmagley@porterwright.com

- **Sofia A. Vitiello**
  sofia.vitiello@davispolk.com

- **Robert J Wagoner**
  Lainie@wagonerlawoffice.com,bob@wagonerlawoffice.com

- **David H Wallace**
  dwallace@taftlaw.com,esleva@taftlaw.com,CLE_Docket_Assist@taftlaw.com

- **Victor A Walton , Jr**
  vawalton@vorys.com,kjwooldridge@vorys.com

- **F. Joseph Warin**
  fwarin@gibsondunn.com

- **Daniel Rubin Warren**
  dwarren@bakerlaw.com

- **Lesley Weaver**
  lweaver@bfalaw.com

- **Brian S. Weinstein**
  brian.weinstein@davispolk.com

- **Jay A Yurkiw**
  jyurkiw@porterwright.com,crose@porterwright.com,aporter@porterwright.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`