# EXHIBIT A

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**
**(Mark One)**
☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2021**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**FirstEnergy**

| Commission File Number | Registrant; State of Incorporation; Address; and Telephone Number | I.R.S. Employer Identification No. |
|---|---|---|
| 333-21011 | **FIRSTENERGY CORP** (An Ohio Corporation) **76 South Main Street Akron OH 44308** Telephone (800) 736-3402 | 34-1843785 |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, $0.10 par value | FE | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

Yes ☑    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large Accelerated Filer | ☑ |
|---|---|
| Accelerated Filer | ☐ |
| Non-accelerated Filer | ☐ |
| Smaller Reporting Company | ☐ |
| Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standard provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐    No ☑

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

| CLASS | OUTSTANDING AS OF MARCH 31, 2021 |
|---|---|
| Common Stock, $0.10 par value | 543,900,432 |

**FirstEnergy Website and Other Social Media Sites and Applications**

FirstEnergy's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, amendments to those reports, and all other documents filed with or furnished to the SEC pursuant to Section 13(a) of the Securities Exchange Act of 1934 are made available free of charge on or through the "Investors" page of FirstEnergy's website at www.firstenergycorp.com. These documents are also available to the public from commercial document retrieval services and the website maintained by the SEC at www.sec.gov.

These SEC filings are posted on the website as soon as reasonably practicable after they are electronically filed with or furnished to the SEC. Additionally, FirstEnergy routinely posts additional important information, including press releases, investor presentations, investor factbook, and notices of upcoming events under the "Investors" section of FirstEnergy's website and recognizes FirstEnergy's website as a channel of distribution to reach public investors and as a means of disclosing material non-public information for complying with its disclosure obligations under Regulation FD. Investors may be notified of postings to the website by signing up for email alerts and Rich Site Summary feeds on the "Investors" page of FirstEnergy's website. FirstEnergy also uses Twitter® and Facebook® as additional channels of distribution to reach public investors and as a supplemental means of disclosing material non-public information for complying with its disclosure obligations under Regulation FD. Information contained on FirstEnergy's website, Twitter® handle or Facebook® page, and any corresponding applications of those sites, shall not be deemed incorporated into, or to be part of, this report.

"

Forward-Looking Statements: This Form 10-Q includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 based on information currently available to management. Such statements are subject to certain risks and uncertainties and readers are cautioned not to place undue reliance on these forward-looking statements. These statements include declarations regarding management's intents, beliefs and current expectations. These statements typically contain, but are not limited to, the terms "anticipate," "potential," "expect," "forecast," "target," "will," "intend," "believe," "project," "estimate," "plan" and similar words. Forward-looking statements involve estimates, assumptions, known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements, which may include the following (see Glossary of Terms for definitions of capitalized terms):

- The effectiveness of our ongoing discussions with the U.S. Attorney's Office of the S.D. Ohio to resolve its investigation with respect to us.
- The results of the internal investigation and evaluation of our controls framework and remediation of our material weakness in internal control over financial reporting.
- The risks and uncertainties associated with government investigations regarding HB 6 and related matters including potential adverse impacts on federal or state regulatory matters including, but not limited to, matters relating to rates.
- The potential of non-compliance with debt covenants in our credit facilities due to matters associated with the government investigations regarding HB 6 and related matters.
- The risks and uncertainties associated with litigation, arbitration, mediation and similar proceedings.
- Legislative and regulatory developments, including, but not limited to, matters related to rates, compliance and enforcement activity.
- The ability to accomplish or realize anticipated benefits from strategic and financial goals, including, but not limited to, maintaining financial flexibility, overcoming current uncertainties and challenges associated with the ongoing government investigations, executing our transmission and distribution investment plans, greenhouse gas reduction goals, controlling costs, improving our credit metrics, strengthening our balance sheet and growing earnings.
- Economic and weather conditions affecting future operating results, such as a recession, significant weather events and other natural disasters, and associated regulatory events or actions in response to such conditions.
- Mitigating exposure for remedial activities associated with retired and formerly owned electric generation assets.
- The ability to access the public securities and other capital and credit markets in accordance with our financial plans, the cost of such capital and overall condition of the capital and credit markets affecting us, including the increasing number of financial institutions evaluating the impact of climate change on their investment decisions.
- The extent and duration of COVID-19 and the impacts to our business, operations and financial condition resulting from the outbreak of COVID-19 including, but not limited to, disruption of businesses in our territories, volatile capital and credit markets, legislative and regulatory actions, including the vaccine's efficacy and the effectiveness of its distribution.
- The effectiveness of our pandemic and business continuity plans, the precautionary measures we are taking on behalf of our customers, contractors and employees, our customers' ability to make their utility payment and the potential for supply-chain disruptions.
- Actions that may be taken by credit rating agencies that could negatively affect either our access to or terms of financing or our financial

condition and liquidity.
- Changes in assumptions regarding economic conditions within our territories, the reliability of our transmission and distribution system, or the availability of capital or other resources supporting identified transmission and distribution investment opportunities.
- Changes in customers' demand for power, including, but not limited to, the impact of climate change or energy efficiency and peak demand reduction mandates.
- Changes in national and regional economic conditions affecting us and/or our major industrial and commercial customers or others with which we do business.
- The risks associated with cyber-attacks and other disruptions to our information technology system, which may compromise our operations, and data security breaches of sensitive data, intellectual property and proprietary or personally identifiable information.
- The ability to comply with applicable reliability standards and energy efficiency and peak demand reduction mandates.
- Changes to environmental laws and regulations, including, but not limited to, those related to climate change.
- Changing market conditions affecting the measurement of certain liabilities and the value of assets held in our pension trusts and other trust funds, or causing us to make contributions sooner, or in amounts that are larger, than currently anticipated.
- Labor disruptions by our unionized workforce.
- Changes to significant accounting policies.
- Any changes in tax laws or regulations, or adverse tax audit results or rulings.
- The risks and other factors discussed from time to time in our SEC filings.

Dividends declared from time to time on our common stock during any period may in the aggregate vary from prior periods due to circumstances considered by our Board of Directors at the time of the actual declarations. A security rating is not a recommendation to buy or hold securities and is subject to revision or withdrawal at any time by the assigning rating agency. Each rating should be evaluated independently of any other rating.

"

These forward-looking statements are also qualified by, and should be read together with, the risk factors included in FirstEnergy's filings with the SEC, including but not limited to the most recent Annual Report on Form 10-K and subsequent Current Reports on Form 8-K. The foregoing review of factors also should not be construed as exhaustive. New factors emerge from time to time, and it is not possible for management to predict all such factors, nor assess the impact of any such factor on FirstEnergy's business or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statements. FirstEnergy expressly disclaims any obligation to update or revise, except as required by law, any forward-looking statements contained herein or in the information incorporated by reference as a result of new information, future events or otherwise.

"

## TABLE OF CONTENTS

| | Page |
|---|---|
| **Part I. Financial Information** | |
| **Glossary of Terms** | ii |
| **Item 1. Financial Statements** | |
| **FirstEnergy Corp.** | |
| Consolidated Statements of Income | 1 |
| Consolidated Statements of Comprehensive Income | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Stockholders' Equity | 4 |
| Consolidated Statements of Cash Flows | 5 |
| **Notes To Consolidated Financial Statements** | 6 |

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations    34

Item 3. Quantitative and Qualitative Disclosures About Market Risk    70

Item 4. Controls and Procedures    70

**Part II. Other Information**

Item 1. Legal Proceedings    71

Item 1A. Risk Factors    71

Item 2. Unregistered Sales of Equity Securities and Use of Proceeds    72

Item 3. Defaults Upon Senior Securities    72

Item 4. Mine Safety Disclosures    72

Item 5. Other Information    72

Item 6. Exhibits    72

i

## GLOSSARY OF TERMS

The following abbreviations and acronyms are used in this report to identify FirstEnergy Corp. and its current and former subsidiaries:

| | |
|---|---|
| AE Supply | Allegheny Energy Supply Company, LLC, an unregulated generation subsidiary |
| AGC | Allegheny Generating Company, a generation subsidiary of MP |
| ATSI | American Transmission Systems, Incorporated, a subsidiary of FET, which owns and operates transmission facilities |
| CEI | The Cleveland Electric Illuminating Company, an Ohio electric utility operating subsidiary |
| FE | FirstEnergy Corp., a public utility holding company |
| FENOC | Energy Harbor Nuclear Corp. (formerly known as FirstEnergy Nuclear Operating Company), a subsidiary of EH, which operates NG's nuclear generating facilities |
| FES | Energy Harbor LLC. (formerly known as FirstEnergy Solutions Corp.), a subsidiary of EH, which provides energy-related products and services |
| FES Debtors | FES, FENOC, FG, NG, FE Aircraft Leasing Corp., Norton Energy Storage LLC, and FGMUC |
| FESC | FirstEnergy Service Company, which provides legal, financial and other corporate support services |
| FET | FirstEnergy Transmission, LLC, the parent company of ATSI, KATCo, MAIT and TrAIL, and has a joint venture in PATH |
| FEV | FirstEnergy Ventures Corp., which invests in certain unregulated enterprises and business ventures |
| FG | Energy Harbor Generation LLC (formerly known as FirstEnergy Generation, LLC), a subsidiary of EH, which owns and operates fossil generating facilities |
| FGMUC | FirstEnergy Generation Mansfield Unit 1 Corp., a subsidiary of FG |
| FirstEnergy | FirstEnergy Corp., together with its consolidated subsidiaries |
| Global Holding | Global Mining Holding Company, LLC, a joint venture between FEV, WMB Marketing Ventures, LLC and Pinesdale LLC |
| Global Rail | Global Rail Group, LLC, a subsidiary of Global Holding that owns coal transportation operations near Roundup, Montana |
| GPUN | GPU Nuclear, Inc., a subsidiary of FE, which operates TMI-2 |
| JCP&L | Jersey Central Power & Light Company, a New Jersey electric utility operating subsidiary |
| KATCo | Keystone Appalachian Transmission Company, a subsidiary of FET |
| MAIT | Mid-Atlantic Interstate Transmission, LLC, a subsidiary of FET, which owns and operates transmission facilities |
| ME | Metropolitan Edison Company, a Pennsylvania electric utility operating subsidiary |
| MP | Monongahela Power Company, a West Virginia electric utility operating subsidiary |
| NG | Energy Harbor Nuclear Generation LLC (formerly known as FirstEnergy Nuclear Generation, LLC), a subsidiary of EH, which owns the nuclear generating facilities |
| OE | Ohio Edison Company, an Ohio electric utility operating subsidiary |
| Ohio Companies | CEI, OE and TE |
| PATH | Potomac-Appalachian Transmission Highline, LLC, a joint venture between FE and a subsidiary of AEP |
| PE | The Potomac Edison Company, a Maryland and West Virginia electric utility operating subsidiary |
| Penn | Pennsylvania Power Company, a Pennsylvania electric utility operating subsidiary of OE |
| Pennsylvania Companies | ME, PN, Penn and WP |
| PN | Pennsylvania Electric Company, a Pennsylvania electric utility operating subsidiary |
| Signal Peak | Signal Peak Energy, LLC, an indirect subsidiary of Global Holding that owns mining operations near Roundup, Montana |
| TE | The Toledo Edison Company, an Ohio electric utility operating subsidiary |
| TrAIL | Trans-Allegheny Interstate Line Company, a subsidiary of FET, which owns and operates transmission facilities |
| Transmission Companies | ATSI, MAIT and TrAIL |
| Utilities | OE, CEI, TE, Penn, JCP&L, ME, PN, MP, PE and WP |
| WP | West Penn Power Company, a Pennsylvania electric utility operating subsidiary |

ii

The following abbreviations and acronyms are used to identify frequently used terms in this report:

| | | | |
|---|---|---|---|
| ACE | Affordable Clean Energy | ENEC | Expanded Net Energy Cost |
| ADIT | Accumulated Deferred Income Taxes | EPA | United States Environmental Protection Agency |
| AEP | American Electric Power Company, Inc. | EPS | Earnings per Share |
| AFS | Available-for-sale | ERO | Electric Reliability Organization |
| AFUDC | Allowance for Funds Used During Construction | ESP IV | Electric Security Plan IV |
| AMI | Advance Metering Infrastructure | Facebook® | Facebook is a registered trademark of Facebook, Inc. |
| AMT | Alternative Minimum Tax | FASB | Financial Accounting Standards Board |
| AOCI | Accumulated Other Comprehensive Income (Loss) | FERC | Federal Energy Regulatory Commission |
| ARO | Asset Retirement Obligation | FES Bankruptcy | FES Debtors' voluntary petitions for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code with the Bankruptcy Court |
| ARP | Alternative Revenue Program | Fitch | Fitch Ratings Service |
| ASC | Accounting Standard Codification | FPA | Federal Power Act |
| ASU | Accounting Standards Update | FTR | Financial Transmission Right |
| Bankruptcy Court | U.S. Bankruptcy Court in the Northern District of Ohio in Akron | GAAP | Accounting Principles Generally Accepted in the United States of America |
| BGS | Basic Generation Service | GHG | Greenhouse Gases |
| CAA | Clean Air Act | HB 6 | House Bill 6, as passed by Ohio's 133rd General Assembly |
| CARES Act | Coronavirus Aid, Relief and Economic Security Act of 2020 | HB 128 | House Bill 128, as passed by Ohio's 134th General Assembly |
| CCR | Coal Combustion Residuals | LIBOR | London Inter-Bank Offered Rate |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 | LOC | Letter of Credit |
| CFR | Code of Federal Regulations | LTIIPs | Long-Term Infrastructure Improvement Plans |
| $CO_2$ | Carbon Dioxide | MDPSC | Maryland Public Service Commission |
| COVID-19 | Coronavirus disease | MGP | Manufactured Gas Plants |
| CPP | EPA's Clean Power Plan | MISO | Midcontinent Independent System Operator, Inc. |
| CSAPR | Cross-State Air Pollution Rule | Moody's | Moody's Investors Service, Inc. |
| CSR | Conservation Support Rider | MW | Megawatt |
| CTA | Consolidated Tax Adjustment | MWH | Megawatt-hour |
| CWA | Clean Water Act | NAAQS | National Ambient Air Quality Standards |

| | | | |
|---|---|---|---|
| D.C. Circuit | United States Court of Appeals for the District of Columbia Circuit | NDT | Nuclear Decommissioning Trust |
| DCR | Delivery Capital Recovery | NERC | North American Electric Reliability Corporation |
| DMR | Distribution Modernization Rider | NJ Rate Counsel | New Jersey Division of Rate Counsel |
| DOE | United States Department of Energy | NJBPU | New Jersey Board of Public Utilities |
| DSIC | Distribution System Improvement Charge | NOx | Nitrogen Oxide |
| DSP | Default Service Plan | NPDES | National Pollutant Discharge Elimination System |
| EDC | Electric Distribution Company | NRC | Nuclear Regulatory Commission |
| EDIS | Electric Distribution Investment Surcharge | NUG | Non-Utility Generation |
| EE&C | Energy Efficiency and Conservation | NYPSC | New York State Public Service Commission |
| EEI | Edison Electric Institute | OCA | Office of Consumer Advocate |
| EGS | Electric Generation Supplier | OCC | Ohio Consumers' Counsel |
| EGU | Electric Generation Units | OH AG | Ohio Attorney General |
| EH | Energy Harbor Corp. | OPEB | Other Post-Employment Benefits |
| EmPOWER Maryland | EmPOWER Maryland Energy Efficiency Act | OPIC | Other Paid-in Capital |

iii

| | | | |
|---|---|---|---|
| OVEC | Ohio Valley Electric Corporation | S.D. Ohio | Southern District of Ohio |
| PA DEP | Pennsylvania Department of Environmental Protection | SBC | Societal Benefits Charge |
| PJM | PJM Interconnection, LLC | SCOH | Supreme Court of Ohio |
| PJM Tariff | PJM Open Access Transmission Tariff | SEC | United States Securities and Exchange Commission |
| POLR | Provider of Last Resort | SEET | Significantly Excessive Earnings Test |
| PPA | Purchase Power Agreement | SIP | State Implementation Plan(s) Under the Clean Air Act |
| PPB | Parts per Billion | SO₂ | Sulfur Dioxide |
| PPUC | Pennsylvania Public Utility Commission | SOS | Standard Offer Service |
| PUCO | Public Utilities Commission of Ohio | SREC | Solar Renewable Energy Credit |
| PURPA | Public Utility Regulatory Policies Act of 1978 | SSO | Standard Service Offer |
| RCRA | Resource Conservation and Recovery Act | Tax Act | Tax Cuts and Jobs Act adopted December 22, 2017 |
| Regulation FD | Regulation Fair Disclosure promulgated by the SEC | TMI-1 | Three Mile Island Unit 1 |
| RFC | ReliabilityFirst Corporation | TMI-2 | Three Mile Island Unit 2 |
| RFP | Request for Proposal | Twitter® | Twitter is a registered trademark of Twitter, Inc. |
| RGGI | Regional Greenhouse Gas Initiative | VIE | Variable Interest Entity |
| ROE | Return on Equity | VSCC | Virginia State Corporation Commission |
| RTO | Regional Transmission Organization | WVPSC | Public Service Commission of West Virginia |
| S&P | Standard & Poor's Ratings Service | ZEC | Zero Emissions Certificate |

iv
n

# PART I. FINANCIAL INFORMATION

**ITEM I.    Financial Statements**

## FIRSTENERGY CORP.
## CONSOLIDATED STATEMENTS OF INCOME
### (Unaudited)

| *(In millions, except per share amounts)* | For the Three Months Ended March 31, | |
|---|---|---|
| | **2021** | **2020** |
| **REVENUES:** | | |
| Distribution services and retail generation | $ 2,236 | $ 2,124 |
| Transmission | 401 | 397 |
| Other | 89 | 188 |
| Total revenues[1] | 2,726 | 2,709 |
| **OPERATING EXPENSES:** | | |
| Fuel | 118 | 98 |
| Purchased power | 718 | 694 |
| Other operating expenses | 752 | 749 |
| Provision for depreciation | 323 | 317 |
| Amortization of regulatory assets, net | 92 | 52 |
| General taxes | 273 | 267 |
| Gain on sale of Yards Creek (Note 8) | (109) | — |
| Total operating expenses | 2,167 | 2,177 |
| **OPERATING INCOME** | 559 | 532 |
| **OTHER INCOME (EXPENSE):** | | |
| Miscellaneous income, net | 135 | 100 |
| Pension and OPEB mark-to-market adjustment (Note 5) | — | (423) |
| Interest expense | (285) | (263) |
| Capitalized financing costs | 13 | 18 |
| Total other expense | (137) | (568) |
| **INCOME (LOSS) BEFORE INCOME TAXES (BENEFITS)** | 422 | (36) |
| **INCOME TAXES (BENEFITS)** | 87 | (60) |
| **INCOME FROM CONTINUING OPERATIONS** | 335 | 24 |
| Discontinued operations (Note 3)[2] | — | 50 |
| **NET INCOME** | $ 335 | $ 74 |
| **EARNINGS PER SHARE OF COMMON STOCK (Note 4):** | | |
| Basic - Continuing Operations | $ 0.62 | $ 0.05 |
| Basic - Discontinued Operations | — | 0.09 |
| Basic - Net Income Attributable to Common Stockholders | $ 0.62 | $ 0.14 |
| Diluted - Continuing Operations | $ 0.62 | $ 0.05 |
| Diluted - Discontinued Operations | — | 0.09 |
| Diluted - Net Income Attributable to Common Stockholders | $ 0.62 | $ 0.14 |
| **WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING:** | | |
| Basic | 543 | 541 |
| Diluted | 544 | 543 |

(1) Includes excise and gross receipts tax collections of $95 million and $92 million during the three months ended March 31, 2021 and 2020, respectively.

(2) Net of income tax benefits of $36 million for the three months ended March 31, 2020.

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

1

**FIRSTENERGY CORP.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(Unaudited)**

|  | For the Three Months Ended March 31, | |
|---|---|---|
| **(In millions)** | **2021** | **2020** |
| **NET INCOME** | $ 335 | $ 74 |
| **OTHER COMPREHENSIVE LOSS:** | | |
| Pension and OPEB prior service costs | (3) | (23) |
| Other comprehensive loss | (3) | (23) |
| Income tax benefits on other comprehensive loss | (1) | (5) |
| Other comprehensive loss, net of tax | (2) | (18) |
| **COMPREHENSIVE INCOME** | $ 333 | $ 56 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

2

**FIRSTENERGY CORP.**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

|  | March 31, | December 31, |
|---|---|---|
| **(In millions, except share amounts)** | **2021** | **2020** |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 1,281 | $ 1,734 |
| Restricted cash | 45 | 67 |
| Receivables- | | |
| Customers | 1,192 | 1,367 |
| Less — Allowance for uncollectible customer receivables | 161 | 164 |
|  | 1,031 | 1,203 |
| Other, net of allowance for uncollectible accounts of $15 in 2021 and $26 in 2020 | 247 | 236 |
| Materials and supplies, at average cost | 303 | 317 |
| Prepaid taxes and other | 281 | 157 |
|  | 3,188 | 3,714 |
| **PROPERTY, PLANT AND EQUIPMENT:** | | |
| In service | 44,143 | 43,654 |

| | | | |
|---|---|---:|---:|
| Less — Accumulated provision for depreciation | | 12,143 | 11,938 |
| | | 32,000 | 31,716 |
| Construction work in progress | | 1,640 | 1,578 |
| | | 33,640 | 33,294 |
| | | | |
| **PROPERTY, PLANT AND EQUIPMENT, NET - HELD FOR SALE (NOTE 8)** | | — | 45 |
| | | | |
| **INVESTMENTS AND OTHER NONCURRENT ASSETS:** | | | |
| Goodwill | | 5,618 | 5,618 |
| Investments (Note 7) | | 606 | 605 |
| Regulatory assets | | 91 | 82 |
| Other | | 974 | 1,106 |
| | | 7,289 | 7,411 |
| | | $ 44,117 | $ 44,464 |
| **LIABILITIES AND CAPITALIZATION** | | | |
| **CURRENT LIABILITIES:** | | | |
| Currently payable long-term debt | | $ 539 | $ 146 |
| Short-term borrowings | | 1,450 | 2,200 |
| Accounts payable | | 870 | 827 |
| Accrued interest | | 289 | 282 |
| Accrued taxes | | 637 | 640 |
| Accrued compensation and benefits | | 284 | 349 |
| Other | | 555 | 560 |
| | | 4,624 | 5,004 |
| **CAPITALIZATION:** | | | |
| Stockholders' equity- | | | |
| Common stock, $0.10 par value, authorized 700,000,000 shares - 543,900,432 and 543,117,533 shares outstanding as of March 31, 2021 and December 31, 2020, respectively | | 54 | 54 |
| Other paid-in capital | | 9,866 | 10,076 |
| Accumulated other comprehensive loss | | (7) | (5) |
| Accumulated deficit | | (2,553) | (2,888) |
| Total stockholders' equity | | 7,360 | 7,237 |
| Long-term debt and other long-term obligations | | 22,204 | 22,131 |
| | | 29,564 | 29,368 |
| **NONCURRENT LIABILITIES:** | | | |
| Accumulated deferred income taxes | | 3,203 | 3,095 |
| Retirement benefits | | 3,274 | 3,345 |
| Regulatory liabilities | | 1,959 | 1,826 |
| Other | | 1,493 | 1,826 |
| | | 9,929 | 10,092 |
| **COMMITMENTS, GUARANTEES AND CONTINGENCIES (Note 9)** | | | |
| | | $ 44,117 | $ 44,464 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

3

**FIRSTENERGY CORP.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**

| | Three Months Ended March 31, 2021 | | | | | |
|---|---|---|---|---|---|---|
| | Common Stock | | | | | Total |
| (In millions) | Shares | Amount | OPIC | AOCI | Accumulated Deficit | Stockholders' Equity |
| Balance, January 1, 2021 | 543 | $ 54 | $10,076 | $ (5) | $ (2,888) | $ 7,237 |
| Net income | | | | | 335 | 335 |
| Other comprehensive loss, net of tax | | | | (2) | | (2) |
| Share-based benefit plans | 1 | | 2 | | | 2 |
| Cash dividends declared on common stock ($0.39 per share in March) | | | (212) | | | (212) |
| Balance, March 31, 2021 | 544 | $ 54 | $ 9,866 | $ (7) | $ (2,553) | $ 7,360 |

| (In millions) | Three Months Ended March 31, 2020 | | | | | |
| | Common Stock | | OPIC | AOCI | Accumulated Deficit | Total Stockholders' Equity |
| | Shares | Amount | | | | |
|---|---|---|---|---|---|---|
| Balance, January 1, 2020 | 541 | $ 54 | $10,868 | $ 20 | $ (3,967) | $ 6,975 |
| Net income | | | | | 74 | 74 |
| Other comprehensive loss, net of tax | | | | (18) | | (18) |
| Stock Investment Plan and share-based benefit plans | 1 | | (6) | | | (6) |
| Cash dividends declared on common stock ($0.39 per share in March) | | | (211) | | | (211) |
| Balance, March 31, 2020 | 542 | $ 54 | $10,651 | $ 2 | $ (3,893) | $ 6,814 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

42

**FIRSTENERGY CORP.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| (In millions) | For the Three Months Ended March 31, | |
| | 2021 | 2020 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income | $ 335 | $ 74 |
| Adjustments to reconcile net income to net cash from operating activities- | | |
| Depreciation and amortization | 454 | 295 |
| Deferred income taxes and investment tax credits, net | 82 | (78) |
| Retirement benefits, net of payments | (105) | (66) |
| Pension and OPEB mark-to-market adjustment | — | 423 |
| Settlement agreement and tax sharing payments to the FES Debtors | — | (978) |
| Gain on sale of Yards Creek | (109) | — |
| Gain on disposal, net of tax (Note 3) | — | (50) |
| Changes in current assets and liabilities- | | |
| Receivables | 161 | 51 |
| Materials and supplies | 14 | — |
| Prepaid taxes and other | (121) | (125) |
| Accounts payable | 43 | (66) |
| Accrued taxes | (127) | (37) |
| Accrued interest | 7 | 29 |
| Accrued compensation and benefits | (129) | (61) |
| Other current liabilities | (7) | 1 |
| Other | 35 | 28 |
| Net cash provided from (used for) operating activities | 533 | (560) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| New financing- | | |
| Long-term debt | 500 | 2,000 |
| Redemptions and repayments- | | |
| Long-term debt | (29) | (778) |
| Short-term borrowings, net | (750) | (250) |
| Common stock dividend payments | (212) | (211) |
| Other | (18) | (36) |
| Net cash provided from (used for) financing activities | (509) | 725 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Property additions | (604) | (616) |
| Proceeds from sale of Yards Creek | 155 | — |
| Sales of investment securities held in trusts | 5 | 13 |
| Purchases of investment securities held in trusts | (7) | (18) |

| | | | |
|---|---|---|---|
| Asset removal costs | (47) | | (43) |
| Other | (1) | | 5 |
| Net cash used for investing activities | (499) | | (659) |
| | | | |
| Net change in cash, cash equivalents, and restricted cash | (475) | | (494) |
| Cash, cash equivalents, and restricted cash at beginning of period | 1,801 | | 679 |
| Cash, cash equivalents, and restricted cash at end of period | $ 1,326 | $ | 185 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

5

**FIRSTENERGY CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

| Note Number | | Page Number |
|---|---|---|
| 1 | Organization and Basis of Presentation | 7 |
| 2 | Revenue | 9 |
| 3 | Discontinued Operations | 12 |
| 4 | Earnings Per Share of Common Stock | 13 |
| 5 | Pension and Other Post-Employment Benefits | 15 |
| 6 | Income Taxes | 15 |
| 7 | Fair Value Measurements | 16 |
| 8 | Regulatory Matters | 19 |
| 9 | Commitments, Guarantees and Contingencies | 26 |
| 10 | Segment Information | 32 |

6

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)**

**1. ORGANIZATION AND BASIS OF PRESENTATION**

Unless otherwise indicated, defined terms and abbreviations used herein have the meanings set forth in the accompanying Glossary of Terms.

FE was incorporated under Ohio law in 1996. FE's principal business is the holding, directly or indirectly, of all of the outstanding equity of its principal subsidiaries: OE, CEI, TE, Penn (a wholly owned subsidiary of OE), JCP&L, ME, PN, FESC, MP, AGC (a wholly owned subsidiary of MP), PE, WP, and FET and its principal subsidiaries (ATSI, MAIT and TrAIL). In addition, FE holds all of the outstanding equity of other direct subsidiaries including: AE Supply, FirstEnergy Properties, Inc., FEV, FirstEnergy License Holding Company, GPUN, Allegheny Ventures, Inc., and Suvon, LLC doing business as both FirstEnergy Home and FirstEnergy Advisors.

FE and its subsidiaries are principally involved in the transmission, distribution and generation of electricity. FirstEnergy's ten utility operating companies comprise one of the nation's largest investor-owned electric systems, based on serving over six million customers in the Midwest and Mid-Atlantic regions. FirstEnergy's transmission operations include approximately 24,000 miles of lines and two regional transmission operation centers. AGC and MP control 3,580 MWs of total capacity.

PN, as lessee of the property of its subsidiary, the Waverly Electric Light & Power Company, serves approximately 4,000 customers in the Waverly, New York vicinity. On February 10, 2021, PN entered into an agreement to transfer its customers and the related assets in Waverly, New York to Tri-County Rural Electric Cooperative; the completion of such transfer is subject to several closing conditions including regulatory approval.

These interim financial statements have been prepared pursuant to the rules and regulations of the SEC for Quarterly Reports on Form 10-Q. Certain information and disclosures normally included in financial statements and notes prepared in accordance with GAAP have been condensed or omitted pursuant to such rules and regulations. These interim financial statements should be read in conjunction with the financial statements and notes included in the Annual Report on Form 10-K for the year ended December 31, 2020.

FE and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU. The accompanying interim financial statements are unaudited, but reflect all adjustments, consisting of normal recurring adjustments, that, in the opinion of management, are necessary for a fair statement of the financial statements. The preparation of financial statements in conformity with GAAP requires management to make periodic estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and disclosure of contingent assets and liabilities. Actual results could differ from these estimates. The reported results of operations are not necessarily indicative of results of operations for any future period. FE and its subsidiaries have evaluated events and transactions for potential recognition or disclosure through the date the financial statements were issued.

FE and its subsidiaries consolidate all majority-owned subsidiaries over which they exercise control and, when applicable, entities for which they have a controlling financial interest. Intercompany transactions and balances are eliminated in consolidation as appropriate and permitted pursuant to GAAP. FE and its subsidiaries consolidate a VIE when it is determined that it is the primary beneficiary. Investments in affiliates over which FE and its subsidiaries have the ability to exercise significant influence, but do not have a controlling financial interest, follow the equity method of accounting. Under the equity method, the interest in the entity is reported as an investment in the Consolidated Balance Sheets and the percentage of FE's ownership share of the entity's earnings is reported in the Consolidated Statements of Income and Comprehensive Income.

Certain prior year amounts have been reclassified to conform to the current year presentation.

*Capitalized Financing Costs*

For each of the three months ended March 31, 2021 and 2020, capitalized financing costs on FirstEnergy's Consolidated Statements of Income include $7 million and $11 million, respectively, of allowance for equity funds used during construction and $6 million and $7 million, respectively, of capitalized interest.

*COVID-19*

The outbreak of COVID-19 is a global pandemic. FirstEnergy is continuously evaluating the global pandemic and taking steps to mitigate known risks. FirstEnergy is actively monitoring the continued impact COVID-19 is having on its customers' receivable balances, which include increasing arrears balances since the pandemic has begun. FirstEnergy has incurred, and it is expected to incur for the foreseeable future, COVID-19 pandemic related expenses. COVID-19 related expenses consist of additional costs that FirstEnergy is incurring to protect its employees, contractors and customers, and to support social distancing requirements. These costs include, but are not limited to, new or added benefits provided to employees, the purchase of additional personal protection equipment and disinfecting supplies, additional facility cleaning services, initiated programs and communications to customers on utility response, and increased technology expenses to support remote working, where

possible. The full impact on FirstEnergy's business from the COVID-19 pandemic, including the governmental and regulatory responses, is unknown at this time and difficult to predict. FirstEnergy provides a critical and essential service to its customers and the health and safety of its employees, contractors and customers is its first priority. FirstEnergy is continuously monitoring its supply chain and is working closely with essential vendors to understand the continued impact the COVID-19 pandemic is having on its business, however, FirstEnergy does not currently expect disruptions in its ability to deliver service to customers or any material impact on its capital spending plan.

FirstEnergy continues to effectively manage operations during the pandemic in order to provide critical service to customers and believes it is well positioned to manage through the economic slowdown. FirstEnergy Distribution and Transmission revenues benefit from geographic and economic diversity across a five-state service territory, which also allows for flexibility with capital investments and measures to maintain sufficient liquidity over the next twelve months. However, the situation remains fluid and future impacts to FirstEnergy that are presently unknown or unanticipated may occur. Furthermore, the likelihood of an impact to FirstEnergy, and the severity of any impact that does occur, could increase the longer the global pandemic persists.

*Customer Receivables*

Receivables from customers include distribution services and retail generation sales to residential, commercial and industrial customers of the Utilities. The allowance for uncollectible customer receivables is based on historical loss information comprised of a rolling 36-month average net write-off percentage of revenues, in conjunction with a qualitative assessment of elements that impact the collectability of receivables to determine if allowances for uncollectible accounts should be further adjusted in accordance with the accounting guidance for credit losses.

FirstEnergy reviews its allowance for uncollectible customer receivables utilizing a quantitative and qualitative assessment. Management contemplates available current information such as changes in economic factors, regulatory matters, industry trends, customer credit factors, amount of receivable balances that are past-due, payment options and programs available to customers, and the methods that the Utilities are able to utilize to ensure payment. This analysis includes consideration of the outbreak of COVID-19 and the impact on customer receivable balances outstanding and the ability of customers to continue payment since the pandemic began.

Beginning March 13, 2020, FirstEnergy temporarily suspended customer disconnections for nonpayment and ceased collection activities as a result of the ongoing pandemic and in accordance with state regulatory requirements. The temporary suspension of disconnections for nonpayment and ceasing of collection activities extended into the fourth quarter of 2020, but resumed for most customers before the end of 2020. Customers are subject to each state's applicable regulations on winter moratoriums for residential customers, which begin as early as November 1, 2020, and were in effect until April 15, 2021. During the first quarter of 2021, FirstEnergy reviewed its allowance for uncollectible customer receivables based on this qualitative assessment and has experienced a reduction in customer accounts that are past due by greater than 30 days since the end of 2020. Additionally, customer accounts in arrears grew at a slower percentage in the first quarter of 2021, than quarters subsequent to the start of the COVID-19 pandemic in 2020. Furthermore, other factors were also considered in the quarterly analysis, such as the federal and certain state funding being made available to customers to assist with past due utility bills, additional federal economic stimulus package and the beginning of vaccine distribution. As a result of this analysis, FirstEnergy recognized no significant incremental uncollectibles expense in the first quarter of 2021.

Receivables from customers also include PJM receivables resulting from transmission and wholesale sales. FirstEnergy's credit risk on PJM receivables is reduced due to the nature of PJM's settlement process whereby members of PJM legally agree to share the cost of defaults and as a result there is no allowance for doubtful accounts.

Activity in the allowance for uncollectible accounts on customer receivables for the three months ended March 31, 2021 and for the year ended December 31, 2020 are as follows:

|  | (In millions) |
|---|---|
| **Balance, January 1, 2020** | $ 46 |
| Charged to income [1] | 174 |

|  |  |  |
|---|---|---|
| Charged to other accounts [1] |  | 46 |
| Write-offs |  | (102) |
| **Balance, December 31, 2020** | $ | 164 |
| Charged to income |  | 5 |
| Charged to other accounts [2] |  | 11 |
| Write-offs |  | (19) |
| **Balance, March 31, 2021** | $ | 161 |

[1] $103 million of which was deferred for future recovery in the twelve months ended December 31, 2020.
[2] Represents recoveries and reinstatements of accounts written off for uncollectible accounts.

*Restricted Cash*

Restricted cash primarily relates to cash collected from JCP&L, MP, PE and the Ohio Companies' customers that is specifically used to service debt of their respective funding companies.

*New Accounting Pronouncements*

**Recently Adopted Pronouncements**

ASU 2019-12, "*Simplifying the Accounting for Income Taxes*" (Issued in December 2019): ASU 2019-12 enhances and simplifies various aspects of the income tax accounting guidance, including the elimination of certain exceptions related to the approach for intra-period tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. The new guidance also simplifies aspects of the accounting for franchise taxes and enacted changes in tax laws or rates and clarifies the accounting for transactions that result in a step-up in the tax basis of goodwill. FirstEnergy adopted the guidance as of January 1, 2021, with no material impact to the financial statements.

**Recently Issued Pronouncements -** FirstEnergy has assessed new authoritative accounting guidance issued by the FASB that has not yet been adopted and none are currently expected to have a material impact to the financial statements.

**2. REVENUE**

FirstEnergy accounts for revenues from contracts with customers under ASC 606, "*Revenue from Contracts with Customers.*" Revenue from leases, financial instruments, other contractual rights or obligations and other revenues that are not from contracts with customers are outside the scope of the standard and accounted for under other existing GAAP.

FirstEnergy has elected to exclude sales taxes and other similar taxes collected on behalf of third parties from revenue as prescribed in the standard. As a result, tax collections and remittances are excluded from recognition in the income statement and instead recorded through the balance sheet. Excise and gross receipts taxes that are assessed on FirstEnergy are not subject to the election and are included in revenue. FirstEnergy has elected the optional invoice practical expedient for most of its revenues and utilizes the optional short-term contract exemption for transmission revenues due to the annual establishment of revenue requirements, which eliminates the need to provide certain revenue disclosures regarding unsatisfied performance obligations.

FirstEnergy's revenues are primarily derived from electric service provided by the Utilities and Transmission Companies.

The following tables represent a disaggregation of revenue from contracts with customers for the three months ended March 31, 2021 and 2020, by type of service from each reportable segment:

| Revenues by Type of Service | Regulated Distribution | | Regulated Transmission | | Corporate/Other and Reconciling Adjustments [1] | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | *(In millions)* | | | | |
| Distribution services | $ | 1,339 | $ | — | $ | (26) | $ | 1,313 |
| Retail generation | | 935 | | — | | (12) | | 923 |
| Wholesale sales | | 69 | | — | | 4 | | 73 |
| Transmission | | — | | 401 | | — | | 401 |
| Other | | 33 | | — | | — | | 33 |
| Total revenues from contracts with customers | $ | 2,376 | $ | 401 | $ | (34) | $ | 2,743 |
| ARP [2] | | (27) | | — | | — | | (27) |
| Other non-customer revenue | | 21 | | 4 | | (15) | | 10 |
| Total revenues | $ | 2,370 | $ | 405 | $ | (49) | $ | 2,726 |

[1] Includes eliminations and reconciling adjustments of inter-segment revenues.
[2] Reflects amount the Ohio Companies will collectively refund to customers that was previously collected under decoupling mechanisms, with interest. See Note 8, "Regulatory Matters," for further discussion on Ohio decoupling rates.

| | For the Three Months Ended March 31, 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Revenues by Type of Service | Regulated Distribution | | Regulated Transmission | | Corporate/Other and Reconciling Adjustments [1] | | Total | |
| | | | | *(In millions)* | | | | |
| Distribution services | $ | 1,256 | $ | — | $ | (21) | $ | 1,235 |
| Retail generation | | 904 | | — | | (15) | | 889 |
| Wholesale sales | | 71 | | — | | 1 | | 72 |
| Transmission | | — | | 397 | | — | | 397 |
| Other | | 36 | | — | | — | | 36 |
| Total revenues from contracts with customers | $ | 2,267 | $ | 397 | $ | (35) | $ | 2,629 |
| ARP [2] | | 68 | | — | | — | | 68 |
| Other non-customer revenue | | 23 | | 4 | | (15) | | 12 |
| Total revenues | $ | 2,358 | $ | 401 | $ | (50) | $ | 2,709 |

[1] Includes eliminations and reconciling adjustments of inter-segment revenues.
[2] Reflects Ohio decoupling rates that became effective on February 1, 2020. See Note 8, "Regulatory Matters," for further discussion on Ohio decoupling rates.

Other non-customer revenue includes revenue from late payment charges of $9 million and $10 million for the three months ended March 31, 2021 and 2020, respectively.

*Regulated Distribution*

The **Regulated Distribution** segment distributes electricity through FirstEnergy's ten utility operating companies and also controls 3,580 MWs of regulated electric generation capacity located primarily in West Virginia and Virginia. Each of the Utilities earns revenue from state-regulated rate tariffs under which it provides distribution services to residential, commercial and industrial customers in its service territory. The Utilities are obligated under the regulated construct to deliver power to customers reliably, as it is needed, which creates an implied monthly contract with the end-use customer. See Note 8, "Regulatory Matters," for additional information on rate recovery mechanisms. Distribution and electric revenues are recognized over time as electricity is distributed and delivered to the customer and the customers consume the electricity immediately as delivery occurs.

**Retail generation sales** relate to POLR, SOS, SSO and default service requirements in Ohio, Pennsylvania, New Jersey and Maryland, as well as generation sales in West Virginia that are regulated by the WVPSC. Certain of the Utilities have default service obligations to provide power to non-shopping customers who have elected to continue to receive service under regulated retail tariffs. The volume of these sales varies depending on the level of shopping that occurs. Supply plans vary by state and by

service territory. Default service for the Ohio Companies, Pennsylvania Companies, JCP&L and PE's Maryland jurisdiction are provided through a competitive procurement process approved by each state's respective commission. Retail generation revenues are recognized over time as electricity is delivered and consumed immediately by the customer.

The following table represents a disaggregation of the Regulated Distribution segment revenue from contracts with **distribution service and retail generation** customers for the three months ended March 31, 2021 and 2020, by class:

| Revenues by Customer Class | For the Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2021** | | **2020** | |
| | *(In millions)* | | | |
| Residential | $ | 1,457 | $ | 1,319 |
| Commercial | | 541 | | 544 |
| Industrial | | 258 | | 277 |
| Other | | 18 | | 20 |
| Total Revenues | $ | 2,274 | $ | 2,160 |

**Wholesale sales** primarily consist of generation and capacity sales into the PJM market from FirstEnergy's regulated electric generation capacity and NUGs. Certain of the Utilities may also purchase power in the PJM markets to supply power to their customers. Generally, these power sales from generation and purchases to serve load are netted hourly and reported as either revenues or purchased power on the Consolidated Statements of Income based on whether the entity was a net seller or buyer each hour. Capacity revenues are recognized ratably over the PJM planning year at prices cleared in the annual PJM Reliability Pricing Model Base Residual Auction and Incremental Auctions. Capacity purchases and sales through PJM capacity auctions are reported within revenues on the Consolidated Statements of Income. Certain capacity income (bonuses) and charges (penalties) related to the availability of units that have cleared in the auctions are unknown and not recorded in revenue until, and unless, they occur.

The Utilities' distribution customers are metered on a cycle basis. An estimate of unbilled revenues is calculated to recognize electric service provided from the last meter reading through the end of the month. This estimate includes many factors, among which are historical customer usage, load profiles, estimated weather impacts, customer shopping activity and prices in effect for each class of customer. In each accounting period, the Utilities accrue the estimated unbilled amount as revenue and reverse the related prior period estimate. Customer payments vary by state but are generally due within 30 days.

ASC 606 excludes industry-specific accounting guidance for recognizing revenue from ARPs as these programs represent contracts between the utility and its regulators, as opposed to customers. Therefore, revenue from these programs are not within the scope of ASC 606 and regulated utilities are permitted to continue to recognize such revenues in accordance with existing practice but are presented separately from revenue arising from contracts with customers. FirstEnergy had ARPs in Ohio primarily for decoupling revenue in 2020, and has reflected refunds of decoupling revenue owed to customers as reductions to ARPs in 2021. Please see Note 8, "Regulatory Matters," for further discussion on decoupling revenues in Ohio.

### Regulated Transmission

The **Regulated Transmission** segment provides transmission infrastructure owned and operated by the Transmission Companies and certain of FirstEnergy's utilities (JCP&L, MP, PE and WP) to transmit electricity from generation sources to distribution facilities. The segment's revenues are primarily derived from forward-looking formula rates at the Transmission Companies and JCP&L, as well as stated transmission rates at, MP, PE and WP, although as further discussed in Note 8, "Regulatory Matters," MP, PE and WP filed with FERC on October 29, 2020, to convert their existing stated transmission rates to forward-looking formula rates. These transmission rate filings were accepted by FERC on December 31, 2020, effective January 1, 2021, subject to refund, pending further hearing and settlement procedures, and were consolidated with a related formula rate filing submitted by KATCo into a single proceeding. MP, PE, WP, and KATCo are engaged in settlement negotiations with the other parties to the formula rate proceedings.

Both the forward-looking formula and stated rates recover costs that the regulatory agencies determine are permitted to be recovered and provide a return on transmission capital investment. Under forward-looking formula rates, the revenue requirement is updated annually based on a projected rate base and projected costs, which is subject to an annual true-up based on actual costs. Revenue requirements under stated rates are calculated annually by multiplying the highest one-hour peak load in each respective transmission zone by the approved, stated rate in that zone. Revenues and cash receipts for the stand-ready obligation of providing transmission service are recognized ratably over time.

The following table represents a disaggregation of revenue from contracts with regulated transmission customers for the three months ended March 31, 2021 and 2020, by transmission owner:

| Transmission Owner | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| | *(In millions)* | |
| ATSI | $ 207 | $ 204 |
| TrAIL | 59 | 63 |
| MAIT | 68 | 57 |
| JCP&L | 40 | 40 |
| Other | 27 | 33 |
| Total Revenues | $ 401 | $ 397 |

## 3. DISCONTINUED OPERATIONS

### FES and FENOC Chapter 11 Bankruptcy Filing

On March 31, 2018, the FES Debtors announced that, in order to facilitate an orderly financial restructuring, they filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code with the Bankruptcy Court. On February 27, 2020, the FES Debtors effectuated their plan, emerged from bankruptcy and FirstEnergy tendered the bankruptcy court approved settlement payments totaling $853 million and a $125 million tax sharing payment to the FES Debtors.

By eliminating a significant portion of its competitive generation fleet with the deconsolidation of the FES Debtors, FirstEnergy has concluded the FES Debtors meet the criteria for discontinued operations, as this represents a significant event in management's strategic review to exit commodity-exposed generation and transition to a fully regulated company.

### Income Taxes

For U.S. federal income taxes, the FES Debtors were included in FirstEnergy's consolidated tax return until emergence from bankruptcy on February 27, 2020. As a result of the FES Debtors' deconsolidation, FirstEnergy recognized a worthless stock deduction for the remaining tax basis in the FES Debtors of approximately $4.9 billion, net of unrecognized tax benefits of $316 million. Tax-effected, the worthless stock deduction is approximately $1.1 billion, net of valuation allowances recorded against the state tax benefit ($80 million) and the aforementioned unrecognized tax benefits ($72 million).

Additionally, the Tax Act amended Section 163(j) of the Internal Revenue Code of 1986, as amended, limiting interest expense deductions for corporations but with exemption for certain regulated utilities. Based on interpretation of subsequently issued proposed regulations, and based on the FES Debtors' emergence from bankruptcy in 2020, FirstEnergy expects all interest expense for 2020 and future years to be fully deductible. See Note 6, "Income Taxes" for further information.

### Competitive Generation Asset Sales

As contemplated under the FES Bankruptcy settlement agreement, on January 1, 2019, FG acquired from AE Supply, the economic interests in the 1,300 MW Pleasants Power Station, and AE Supply operated Pleasants until ownership was transferred on January 30, 2020. AE Supply continues to provide access to the McElroy's Run CCR Impoundment Facility, which was not transferred, and FE will provide guarantees for certain retained environmental liabilities of AE Supply, including the McElroy's Run CCR Impoundment Facility. During the first quarter of 2020, FG paid AE Supply approximately $65 million of cash for related materials and supplies (at book value) and the settlement of FG's economic interest in Pleasants.

### Summarized Results of Discontinued Operations

Summarized results of discontinued operations for the three months ended March 31, 2021 and 2020, were as follows:

| (In millions) | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Revenues | $ — | $ 7 |
| Fuel | — | (6) |
| Other operating expenses | — | (6) |
| Other income | — | 5 |
| **Income from discontinued operations, before tax** | — | — |
| Income tax expense | — | — |
| **Income from discontinued operations, net of tax** | — | — |
| Settlement Consideration | — | (4) |
| Accelerated net pension and OPEB prior service credits | — | 18 |
| Gain on Disposal of FES and FENOC, before tax | — | 14 |
| Income tax benefits including worthless stock deduction | — | (36) |
| **Gain on disposal of FES and FENOC, net of tax** | — | 50 |
| **Income from discontinued operations** | $ — | $ 50 |

FirstEnergy's Consolidated Statement of Cash Flows combines cash flows from discontinued operations with cash flows from continuing operations within each cash flow category. For the three months ended March 31, 2020, cash flows from operating activities includes income from discontinued operations of $50 million.

## 4. EARNINGS PER SHARE OF COMMON STOCK

Basic EPS available to common stockholders is computed using the weighted average number of common shares outstanding during the relevant period as the denominator. The denominator for diluted EPS of common stock reflects the weighted average of common shares outstanding plus the potential additional common shares that could result if dilutive securities and other agreements to issue common stock were exercised.

Diluted EPS reflects the dilutive effect of potential common shares from share-based awards The dilutive effect of outstanding share-based awards was computed using the treasury stock method, which assumes any proceeds that could be obtained upon the exercise of the award would be used to purchase common stock at the average market price for the period.

13

The following table reconciles basic and diluted EPS of common stock:

| Reconciliation of Basic and Diluted EPS of Common Stock | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| *(In millions, except per share amounts)* | | |
| **EPS of Common Stock** | | |
| Income from continuing operations | $ 335 | $ 24 |
| Discontinued operations, net of tax | — | 50 |
| **Income available to common stockholders** | $ 335 | $ 74 |
| **Share count information:** | | |
| Weighted average number of basic shares outstanding | 543 | 541 |
| Assumed exercise of dilutive stock options and awards | 1 | 2 |
| Weighted average number of diluted shares outstanding | 544 | 543 |
| **Income available to common stockholders, per common share:** | | |
| Income from continuing operations, basic | $ 0.62 | $ 0.05 |

| | | | |
|---|---|---|---|
| Discontinued operations, basic | | — | 0.09 |
| Income available to common stockholders, basic | $ | 0.62 | $ 0.14 |
| | | | |
| Income from continuing operations, diluted | $ | 0.62 | $ 0.05 |
| Discontinued operations, diluted | | — | 0.09 |
| Income available to common stockholders, diluted | $ | 0.62 | $ 0.14 |

For the three months ended March 31, 2021 and March 31, 2020, no shares from stock options and awards were excluded from the calculation of diluted shares outstanding.

14

## 5. PENSION AND OTHER POST-EMPLOYMENT BENEFITS

The components of the consolidated net periodic costs (credits) for pension and OPEB were as follows:

| Components of Net Periodic Benefit Costs (Credits) | | Pension | | OPEB | |
|---|---|---|---|---|---|
| For the Three Months Ended March 31, | | 2021 | 2020 | 2021 | 2020 |
| | | | (In millions) | | |
| Service costs | $ | 49 | $ 52 | $ 1 | $ 1 |
| Interest costs | | 56 | 75 | 3 | 4 |
| Expected return on plan assets | | (163) | (153) | (10) | (8) |
| Amortization of prior service costs (credits)[1] [2] | | 1 | 10 | (4) | (33) |
| One-time termination benefit [3] | | — | 8 | — | — |
| Pension and OPEB mark-to-market adjustment | | — | 386 | — | 37 |
| Net periodic costs (credits), including amounts capitalized | $ | (57) | $ 378 | $ (10) | $ 1 |
| Net periodic costs (credits), recognized in earnings | $ | (78) | $ 358 | $ (10) | $ 1 |

[1] 2020 includes the acceleration of $18 million in net credits as a result of the FES Debtors' emergence during the first quarter of 2020 and is a component of discontinued operations in FirstEnergy's Consolidated Statements of Income.
[2] The income tax benefits associated with pension and OPEB prior service costs amortized out of AOCI were $1 million and $5 million as of March 31, 2021 and 2020, respectively.
[3] Costs represent additional benefits provided to FES and FENOC employees under the approved settlement agreement and are a component of discontinued operations in FirstEnergy's Consolidated Statements of Income.

FirstEnergy recognizes a pension and OPEB mark-to-market adjustment for the change in fair value of plan assets and net actuarial gains and losses annually in the fourth quarter of each fiscal year and whenever a plan is determined to qualify for remeasurement. Under the approved bankruptcy settlement agreement discussed above, upon emergence, FES and FENOC employees ceased earning years of service under the FirstEnergy pension and OPEB plans. The emergence on February 27, 2020, triggered a remeasurement of the affected pension and OPEB plans and as a result, FirstEnergy recognized a non-cash, pre-tax pension and OPEB mark-to-market adjustment of approximately $423 million in the first quarter of 2020.

On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021, which among other things, extended shortfall amortization periods and modification of the interest rate stabilization rules for single-employer plans thereby impacting funding requirements. As a result, under current assumptions, including an expected rate of return of 7.50%, FirstEnergy does not currently expect to have a required contribution to the pension plan. However, FirstEnergy may elect to contribute to the pension plan voluntarily.

Service costs, net of capitalization, are reported within Other operating expenses on FirstEnergy's Consolidated Statements of Income. Non-service costs, other than the pension and OPEB mark-to-market adjustment, which is separately shown, are reported within Miscellaneous income, net, within Other Income (Expense) on FirstEnergy's Consolidated Statements of Income.

## 6. INCOME TAXES
FirstEnergy's interim effective tax rates reflect the estimated annual effective tax rates for 2021 and 2020. These tax rates are affected by estimated annual permanent items, such as AFUDC equity and other flow-through items, as well as discrete items that may occur in any given period but are not consistent from period to period.

FirstEnergy's effective tax rate on continuing operations for the three months ended March 31, 2021 and 2020, was 20.6% and 166.7%, respectively. The change in effective tax rate was primarily due to the absence of a $52 million reduction in valuation allowances in the first quarter of 2020 from the recognition of deferred gains on prior intercompany generation asset transfers triggered by the FES Debtors'

emergence from bankruptcy and deconsolidation from FirstEnergy's consolidated federal income tax group. See Note 3, "Discontinued Operations," for other tax matters relating to the FES Bankruptcy that were recognized in discontinued operations.

During the three months ended March 31, 2021, FirstEnergy recorded a $11 million increase in its reserve for uncertain tax positions for benefits related to certain federal tax credits. As of March 31, 2021, it is reasonably possible that within the next twelve months FirstEnergy could record a net decrease of approximately $57 million to its reserve for uncertain tax positions due to the expiration of the statute of limitations or resolution with taxing authorities, of which approximately $55 million would impact FirstEnergy's effective tax rate.

On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021. While the Act is primarily an economic stimulus package, it also, among other changes, expanded the scope of Section 162(m) of the Internal Revenue Code that limits deductions on certain executive officer compensation. FirstEnergy does not currently expect these changes to have a

15

material impact. During January 2021, the IRS issued additional regulations on interest expense deductibility under Section 163(j) of the Internal Revenue Code, however, is not expected to have a significant tax impact to FirstEnergy.

## 7. FAIR VALUE MEASUREMENTS

### RECURRING FAIR VALUE MEASUREMENTS

Authoritative accounting guidance establishes a fair value hierarchy that prioritizes the inputs used to measure fair value. This hierarchy gives the highest priority to Level 1 measurements and the lowest priority to Level 3 measurements. The three levels of the fair value hierarchy and a description of the valuation techniques are as follows:

Level 1    - Quoted prices for identical instruments in active market.

Level 2    - Quoted prices for similar instruments in active market.
               - Quoted prices for identical or similar instruments in markets that are not active.
               - Model-derived valuations for which all significant inputs are observable market data.

             Models are primarily industry-standard models that consider various assumptions, including quoted forward prices for commodities, time value, volatility factors and current market and contractual prices for the underlying instruments, as well as other relevant economic measures.

Level 3    - Valuation inputs are unobservable and significant to the fair value measurement.

             FirstEnergy produces a long-term power and capacity price forecast annually with periodic updates as market conditions change. When underlying prices are not observable, prices from the long-term price forecast are used to measure fair value.

             FTRs are financial instruments that entitle the holder to a stream of revenues (or charges) based on the hourly day-ahead congestion price differences across transmission paths. FTRs are acquired by FirstEnergy in the annual, monthly and long-term PJM auctions and are initially recorded using the auction clearing price less cost. After initial recognition, FTRs' carrying values are periodically adjusted to fair value using a mark-to-model methodology, which approximates market. The primary inputs into the model, which are generally less observable than objective sources, are the most recent PJM auction clearing prices and the FTRs' remaining hours. The model calculates the fair value by multiplying the most recent auction clearing price by the remaining FTR hours less the prorated FTR cost. Significant increases or decreases in inputs in isolation may have resulted in a higher or lower fair value measurement.

             NUG contracts represent PPAs with third-party non-utility generators that are transacted to satisfy certain obligations under PURPA. NUG contract carrying values are recorded at fair value and adjusted periodically using a mark-to-model methodology, which approximates market. The primary unobservable inputs into the model are regional power prices and generation MWH. Pricing for the NUG contracts is a combination of market prices for the current year and next two years based on observable data and internal models using historical trends and market data for the remaining years under contract. The internal models use forecasted energy purchase prices as an input when prices are not defined by the contract. Forecasted market prices are based on Intercontinental Exchange, Inc. quotes and management assumptions. Generation MWH reflects data provided by contractual arrangements and historical trends. The model calculates the fair value by multiplying the prices by the generation MWH. Significant increases or decreases in inputs in isolation may have resulted in a higher or lower fair value measurement.

FirstEnergy primarily applies the market approach for recurring fair value measurements using the best information available. Accordingly, FirstEnergy maximizes the use of observable inputs and minimizes the use of unobservable inputs. There were no changes in valuation methodologies used as of March 31, 2021, from those used as of December 31, 2020. The determination of the fair value measures takes into consideration various factors, including but not limited to, nonperformance risk, counterparty credit risk and the impact of credit enhancements (such as cash deposits, LOCs and priority interests). The impact of these forms of risk was not significant to the fair value measurements.

16

The following tables set forth the recurring assets and liabilities that are accounted for at fair value by level within the fair value hierarchy:

| | March 31, 2021 | | | | December 31, 2020 | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| | (In millions) | | | | | | | |
| **Assets** | | | | | | | | |
| Derivative assets FTRs[1] | $ — | $ — | $ — | $ — | $ — | $ — | 3 | $ 3 |
| Equity securities | 2 | — | — | 2 | 2 | — | — | 2 |
| U.S. state debt securities | — | 276 | — | 276 | — | 276 | — | 276 |
| Cash and cash equivalents | 1,281 | — | — | 1,281 | 1,734 | — | — | 1,734 |
| Other[2] | — | 37 | — | 37 | — | 41 | — | 41 |
| **Total assets** | $ 1,283 | $ 313 | $ — | $ 1,596 | $ 1,736 | $ 317 | $ 3 | $ 2,056 |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Derivative liabilities FTRs[1] | $ — | $ — | $ (1) | $ (1) | $ — | $ — | $ — | $ — |
| **Total liabilities** | $ — | $ — | $ (1) | $ (1) | $ — | $ — | $ — | $ — |
| | | | | | | | | |
| **Net assets (liabilities)[3]** | $ 1,283 | $ 313 | $ (1) | $ 1,595 | $ 1,736 | $ 317 | $ 3 | $ 2,056 |

[1] Contracts are subject to regulatory accounting treatment and changes in market values do not impact earnings.
[2] Primarily consists of short-term investments.
[3] Excludes $1 million each as of March 31, 2021 and December 31, 2020, respectively, of net receivables, payables, taxes and accrued income associated with financial instruments reflected within the fair value table.


*Rollforward of Level 3 Measurements*


The following table provides a reconciliation of changes in the fair value of NUG contracts and FTRs that are classified as Level 3 in the fair value hierarchy for the periods ended March 31, 2021, and December 31, 2020:

| | NUG Contracts[1] | FTRs[1] | | |
|---|---|---|---|---|
| | Derivative Liabilities | Derivative Assets | Derivative Liabilities | Net |
| | (In millions) | | | |
| **January 1, 2020 Balance** | $ (16) | $ 4 | $ (1) | $ 3 |
| Unrealized loss | (3) | (3) | — | (3) |
| Purchases | — | 7 | (2) | 5 |
| Settlements | 19 | (5) | 3 | (2) |
| **December 31, 2020 Balance** | $ — | $ 3 | $ — | $ 3 |
| Unrealized loss | — | — | (1) | (1) |
| Settlements | — | (3) | — | (3) |
| **March 31, 2021 Balance** | $ — | $ — | $ (1) | $ (1) |

[1] Contracts are subject to regulatory accounting treatment and changes in market values do not impact earnings.


*Level 3 Quantitative Information*


The following table provides quantitative information for FTRs contracts that are classified as Level 3 in the fair value hierarchy for the period ended March 31, 2021:

| Fair Value, Net (In millions) | Valuation Technique | Significant Input | Range | Weighted Average | Units |
|---|---|---|---|---|---|

| FTRs | $ | (1) | Model | RTO auction clearing prices | $0.20 to $1.90 | $0.60 | Dollars/MWH |

## INVESTMENTS

All temporary cash investments purchased with an initial maturity of three months or less are reported as cash equivalents on the Consolidated Balance Sheets at cost, which approximates their fair market value. Investments other than cash and cash equivalents include equity securities, AFS debt securities and other investments. FirstEnergy has no debt securities held for trading purposes.

Generally, unrealized gains and losses on equity securities are recognized in income whereas unrealized gains and losses on AFS debt securities are recognized in AOCI. However, the spent nuclear fuel disposal trusts and NDTs of JCP&L, ME and PN

17

are subject to regulatory accounting with all gains and losses on equity and AFS debt securities offset against regulatory assets. On October 15, 2019, JCP&L, ME, PN and GPUN executed an asset purchase and sale agreement with TMI-2 Solutions, LLC, a subsidiary of EnergySolutions, LLC, concerning the transfer and dismantlement of TMI-2. With the receipt of all required regulatory approvals, the transaction was consummated, including the transfer of external trusts for the decommissioning and environmental remediation of TMI-2, on December 18, 2020. Please see Note 9, "Commitments, Guarantees and Contingencies," for further information.

*Spent Nuclear Fuel Disposal Trusts*

JCP&L holds debt securities within the spent nuclear fuel disposal trust, which are classified as AFS securities, recognized at fair market value. The trust is intended for funding spent nuclear fuel disposal fees to the DOE associated with previously owned nuclear plants.

The following table summarizes the amortized cost basis, unrealized gains, unrealized losses and fair values of investments held in spent nuclear fuel disposal trusts as of March 31, 2021, and December 31, 2020:

| | March 31, 2021[1] | | | | | December 31, 2020[2] | | | |
| | Cost Basis | Unrealized Gains | Unrealized Losses | Fair Value | | Cost Basis | Unrealized Gains | Unrealized Losses | Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| | | | (In millions) | | | | | | |
| Debt securities | $ 276 | $ 4 | $ (7) | $ 273 | $ | 275 | $ 7 | $ (6) | $ 276 |

[1] Excludes short-term cash investments of $8 million.
[2] Excludes short-term cash investments of $9 million.

Proceeds from the sale of investments in AFS debt securities, realized gains and losses on those sales and interest and dividend income for the three months ended March 31, 2021 and 2020, were as follows:

| | For the Three Months Ended March 31, | |
| | 2021 | 2020[1] |
|---|---|---|
| | (In millions) | |
| Sale proceeds | $ 5 | $ 13 |
| Realized gains | — | 4 |
| Realized losses | — | (5) |
| Interest and dividend income | 3 | 5 |

[1] Includes amounts associated with NDTs that were previously held by JCP&L, ME, and PN. See above for additional information.

*Other Investments*

Other investments include employee benefit trusts, which are primarily invested in corporate-owned life insurance policies and equity method investments. Other investments were $325 million and $322 million as of March 31, 2021, and December 31, 2020, respectively, and are excluded from the amounts reported above.

### LONG-TERM DEBT AND OTHER LONG-TERM OBLIGATIONS

All borrowings with initial maturities of less than one year are defined as short-term financial instruments under GAAP and are reported as Short-term borrowings on the Consolidated Balance Sheets at cost. Since these borrowings are short-term in nature, FirstEnergy believes that their costs approximate their fair market value. The following table provides the approximate fair value and related carrying amounts of long-term debt, which excludes finance lease obligations and net unamortized debt issuance costs, unamortized fair value adjustments, premiums and discounts as of March 31, 2021 and December 31, 2020:

|  | March 31, 2021 | December 31, 2020 |
|---|---|---|
|  | (In millions) | |
| Carrying value [1] | $ 22,848 | $ 22,377 |
| Fair value | $ 24,914 | $ 25,465 |

[1] The carrying value as of March 31, 2021, includes $500 million of debt issuances and $29 million of redemptions that occurred in the first quarter of 2021.

The fair values of long-term debt and other long-term obligations reflect the present value of the cash outflows relating to those securities based on the current call price, the yield to maturity or the yield to call, as deemed appropriate at the end of each respective period. The yields assumed were based on securities with similar characteristics offered by corporations with credit

18

ratings similar to those of FirstEnergy. FirstEnergy classified short-term borrowings, long-term debt and other long-term obligations as Level 2 in the fair value hierarchy as of March 31, 2021, and December 31, 2020.

### 8. REGULATORY MATTERS

#### STATE REGULATION

Each of the Utilities' retail rates, conditions of service, issuance of securities and other matters are subject to regulation in the states in which it operates - in Maryland by the MDPSC, in New Jersey by the NJBPU, in Ohio by the PUCO, in Pennsylvania by the PPUC, in West Virginia by the WVPSC and in New York by the NYPSC. The transmission operations of PE in Virginia, ATSI in Ohio, and the Transmission Companies in Pennsylvania are subject to certain regulations of the VSCC, PUCO and PPUC, respectively. In addition, under Ohio law, municipalities may regulate rates of a public utility, subject to appeal to the PUCO if not acceptable to the utility. Further, if any of the FirstEnergy affiliates were to engage in the construction of significant new transmission facilities, depending on the state, they may be required to obtain state regulatory authorization to site, construct and operate the new transmission facility.

*MARYLAND*

PE operates under MDPSC approved base rates that were effective as of March 23, 2019. PE also provides SOS pursuant to a combination of settlement agreements, MDPSC orders and regulations, and statutory provisions. SOS supply is competitively procured in the form of rolling contracts of varying lengths through periodic auctions that are overseen by the MDPSC and a third-party monitor. Although settlements with respect to SOS supply for PE customers have expired, service continues in the same manner until changed by order of the MDPSC. PE recovers its costs plus a return for providing SOS.

The EmPOWER Maryland program requires each electric utility to file a plan to reduce electric consumption and demand 0.2% per year, up to the ultimate goal of 2% annual savings, for the duration of the 2018-2020 and 2021-2023 EmPOWER Maryland program cycles, to the extent the MDPSC determines that cost-effective programs and services are available. PE's approved 2018-2020 EmPOWER Maryland plan continues and expands upon prior years' programs, and adds new programs, for a projected total cost of $116 million over the three-year period. PE recovers

program costs through an annually reconciled surcharge, with most costs subject to a five-year amortization. Maryland law only allows for the utility to recover lost distribution revenue attributable to energy efficiency or demand reduction programs through a base rate case proceeding, and to date, such recovery has not been sought or obtained by PE. On September 1, 2020, PE filed its proposed plan for the 2021-2023 EmPOWER Maryland program cycle. The new plan largely continues PE's existing programs and is estimated to cost approximately $148 million over the three-year period. The MDPSC approved the plan on December 18, 2020.

On March 22, 2019, MDPSC issued an order approving PE's 2018 base rate case filing, which among other things, approved an annual rate increase of $6.2 million, approved three of the four EDIS programs for four years to fund enhanced service reliability programs, directed PE to file a new depreciation study within 18 months, and ordered the filing of a new base rate case in four years to correspond to the ending of the approved EDIS programs. On September 22, 2020, PE filed its depreciation study reflecting a slight increase in expense and is seeking the difference to be deferred for future recovery in PE's next base rate case. On January 29, 2021, the Maryland Office of People's Counsel filed testimony recommending an annual reduction in depreciation expense of $10.8 million, and the staff of the MDPSC filed testimony recommending an annual reduction of $9.6 million. PE's rebuttal testimony was filed on March 2, 2021, and the Public Utility Law Judge conducted a hearing on the matter on April 12, 2021.

Maryland's Governor issued an order on March 16, 2020, forbidding utilities from terminating residential service or charging late fees for non-payment for the duration of the COVID-19 pandemic. On April 9, 2020, the MDPSC issued an order allowing utilities to track and create a regulatory asset for future recovery of all prudently incurred incremental costs arising from the COVID-19 pandemic, including incremental uncollectible expense, incurred from the date of the Governor's order (or earlier if the utility could show that the expenses related to suspension of service terminations). In July 2020, the MDPSC subsequently issued orders allowing Maryland electric and gas utilities to resume residential service terminations for non-payment on November 15, 2020, subject to various restrictions, and clarifying that utilities could resume charging late fees on October 1, 2020. On April 9, 2021, PE provided the MDPSC additional information related to customer arrearages, which will be used, to determine the distribution of at least $30 million of COVID-19 relief that was allocated by the Maryland General Assembly.

*NEW JERSEY*

JCP&L operates under NJBPU approved rates that were effective as of January 1, 2017. JCP&L provides BGS for retail customers who do not choose a third-party EGS and for customers of third-party EGSs that fail to provide the contracted service. All New Jersey EDCs participate in this competitive BGS procurement process and recover BGS costs directly from customers as a charge separate from base rates.

In December 2017, the NJBPU issued proposed rules to modify its current CTA policy in base rate cases to: (i) calculate savings using a five-year look back from the beginning of the test year; (ii) allocate savings with 75% retained by the company and 25%

19

allocated to ratepayers; and (iii) exclude transmission assets of electric distribution companies in the savings calculation, which were published in the NJ Register in the first quarter of 2018. JCP&L filed comments supporting the proposed rulemaking. On January 17, 2019, the NJBPU approved the proposed CTA rules with no changes. On May 17, 2019, the NJ Rate Counsel filed an appeal with the Appellate Division of the Superior Court of New Jersey. Oral Argument was held on March 10, 2021, which JCP&L participated in. JCP&L is contesting this appeal but is unable to predict the outcome of this matter.

On February 18, 2020, JCP&L submitted a filing with the NJBPU requesting a distribution base rate increase. On October 28, 2020, the NJBPU approved a stipulated settlement between JCP&L and various parties, providing for, among other things, a $94 million annual base distribution revenues increase for JCP&L based on an ROE of 9.6%, which will become effective for customers on November 1, 2021. Until the rates become effective, and starting on January 1, 2021, JCP&L began to amortize an existing regulatory liability totaling approximately $86 million to offset the base rate increase that otherwise would have occurred in this period. The parties also agreed that the actual net gain from the sale of JCP&L's interest in the Yards Creek pumped-storage hydro generation facility in New Jersey (210 MWs), as further discussed below, be applied to reduce JCP&L's existing regulatory asset for previously deferred storm costs. Lastly, the parties agreed that approximately $95 million of Reliability Plus capital investment for projects through December 31, 2020 is included in rate base effective December 31, 2020, with a final prudence review of only those capital investment projects from July 1, 2020 through December 31, 2020 to occur in January 2021. During the first quarter of 2021, JCP&L submitted its review of storm costs, filed a written report for its Reliability Plus projects placed in service from July 1, 2020 through December 31, 2020, and submitted the vegetation management report, all required under the stipulation of settlement. On March 24, 2021, JCP&L, NJ Rate Counsel and the NJBPU Staff submitted a stipulation of settlement to the NJBPU, which was approved on April 7, 2021, providing that the Reliability Plus projects placed into service from July 1, 2020 through December 31, 2020 were reasonable and prudent. On April 6, 2020, JCP&L signed an asset purchase agreement with Yards Creek Energy, LLC, a subsidiary of LS Power to sell its 50% interest in the Yards Creek pumped-storage hydro generation facility. Subject to terms and conditions of the agreement, the base purchase price is $155 million. As of December 31, 2020, assets held for sale on FirstEnergy's Consolidated Balance Sheets associated with the transaction

consist of property, plant and equipment of $45 million, which is included in the regulated distribution segment. On July 31, 2020, FERC approved the transfer of JCP&L's interest in the hydroelectric operating license. On October 8, 2020, FERC issued an order authorizing the transfer of JCP&L's ownership interest in the hydroelectric facilities. On October 28, 2020, the NJBPU approved the sale of Yards Creek. With the receipt of all required regulatory approvals, the transaction was consummated on March 5, 2021 and resulted in a $109 million gain within the regulated distribution segment. As further discussed above, the gain from the transaction was applied against and reduced JCP&L's existing regulatory asset for previously deferred storm costs and, as a result, was offset by expense in the "Amortization of regulatory assets, net," line on the Consolidated Statements of Income, resulting in no earnings impact to FirstEnergy or JCP&L.

On August 27, 2020, JCP&L filed an AMI Program with the NJBPU, which proposes the deployment of approximately 1.2 million advanced meters over a three-year period beginning on January 1, 2023, at a total cost of approximately $418 million, including the pre-deployment phase. The 3-year deployment is part of the 20-year AMI Program that is expected to cost a total of approximately $732 million and proposes a cost recovery mechanism through a separate AMI tariff rider. On January 13, 2021, a procedural schedule was established, which includes evidentiary hearings the week of May 24, 2021. On February 26, 2021, JCP&L filed a letter requesting a suspension of the procedural schedule to allow for settlement discussions, which was granted on March 5, 2021.

On June 10, 2020, the NJBPU issued an order establishing a framework for the filing of utility-run energy efficiency and peak demand reduction programs in accordance with the New Jersey Clean Energy Act. Under the established framework, JCP&L will recover its program investments over a ten-year amortization period and its operations and maintenance expenses on an annual basis, be eligible to receive lost revenues on energy savings that resulted from its programs and be eligible for incentives or subject to penalties based on its annual program performance, beginning in the fifth year of its program offerings. On September 25, 2020, JCP&L filed its energy efficiency and peak demand reduction program. JCP&L's program consists of 11 energy efficiency and peak demand reduction programs and subprograms to be run from July 1, 2021 through June 30, 2024. The program also seeks approval of cost recovery totaling approximately $230 million as well as lost revenues associated with the energy savings resulting from the programs. While a procedural order has been established in this matter, on January 20, 2021, JCP&L filed a letter requesting a suspension of the procedural schedule to allow for settlement discussions. The Clean Energy Act contemplates a final order from the NJBPU by May 2, 2021.

On July 2, 2020, the NJBPU issued an order allowing New Jersey utilities to track and create a regulatory asset for future recovery of all prudently incurred incremental costs arising from the COVID-19 pandemic beginning March 9, 2020 through September 30, 2021, or until the Governor issues an order stating that the COVID-19 pandemic is no longer in effect. New Jersey utilities can request recovery of such regulatory asset in a stand-alone COVID-19 regulatory asset filing or future base rate case. On October 28, 2020, the NJBPU issued an order expanding the scope of the proceeding to examine all pandemic issues, including recovery of the COVID-19 regulatory assets, by way of a generic proceeding. Through various Executive Orders issued by Governor Murphy, the moratorium period is extended to June 30, 2021.

The recent credit rating actions taken on October 28, 2020, by S&P and Fitch triggered a requirement from various NJBPU orders that JCP&L file a mitigation plan, which was filed on November 5, 2020, to demonstrate that JCP&L has sufficient liquidity

to meet its BGS obligations. On December 11, 2020, the NJBPU held a public hearing on the mitigation plan. Written comments on JCP&L's mitigation plan were submitted on January 8, 2021.

On September 23, 2020, the NJBPU issued an Order requiring all New Jersey electric distribution companies to file electric vehicle programs. JCP&L filed its electric vehicle program on March 1, 2021, which consists of six sub-programs, including a consumer education and outreach initiative that would begin on January 1, 2022, and continue over a four-year period. The total proposed budget for the electric vehicle program is approximately $50 million, of which $16 million is capital expenditures and $34 million is for operations and maintenance expenses. JCP&L is proposing to recover the electric vehicle program costs via a non-bypassable rate clause applicable to all distribution customer rate classes, which would become effective on January 1, 2022.

*OHIO*

The Ohio Companies operate under base distribution rates approved by the PUCO effective in 2009. The Ohio Companies' residential and commercial base distribution revenues were decoupled, through a mechanism that took effect on February 1, 2020 and under which the Ohio Companies billed customers until February 9, 2021, to the base distribution revenue and lost distribution revenue associated with energy efficiency and peak demand reduction programs recovered as of the twelve-month period ending on December 31, 2018. The Ohio Companies currently operate under ESP IV effective June 1, 2016, and continuing through May 31, 2024, that continues the supply of power to non-shopping customers at a market-based price set through an auction process. ESP IV also continues the Rider DCR, which supports continued investment related to the distribution system for the benefit of customers, with increased revenue caps of $20 million per year from June 1, 2019 through May 31, 2022; and $15 million per year from June 1, 2022 through May 31, 2024. In addition, ESP IV includes: (1) continuation of a base

distribution rate freeze through May 31, 2024; (2) the collection of lost distribution revenue associated with energy efficiency and peak demand reduction programs, which is discussed further below; (3) a goal across FirstEnergy to reduce $CO_2$ emissions by 90% below 2005 levels by 2045; and (4) contributions, totaling $51 million to: (a) fund energy conservation programs, economic development and job retention in the Ohio Companies' service territories; (b) establish a fuel-fund in each of the Ohio Companies' service territories to assist low-income customers; and (c) establish a Customer Advisory Council to ensure preservation and growth of the competitive market in Ohio.

ESP IV further provided for the Ohio Companies to collect through the DMR $132.5 million annually for three years beginning in 2017, grossed up for federal income taxes, resulting in an approved amount of approximately $168 million annually in 2018 and 2019. On appeal, the SCOH, on June 19, 2019, reversed the PUCO's determination that the DMR is lawful, and remanded the matter to the PUCO with instructions to remove the DMR from ESP IV. The PUCO entered an order directing the Ohio Companies to cease further collection through the DMR, credit back to customers a refund of the DMR funds collected since July 2, 2019 and remove the DMR from ESP IV. On July 15, 2019, OCC filed a Notice of Appeal with the SCOH, challenging the PUCO's exclusion of the DMR revenues from the determination of the existence of significantly excessive earnings under ESP IV for calendar year 2017 for OE and claiming a $42 million refund is due to OE customers. On December 1, 2020, the SCOH reversed the PUCO's exclusion of the DMR revenues from the determination of the existence of significantly excessive earnings under ESP IV for OE for calendar year 2017, and remanded the case to the PUCO with instructions to conduct new proceedings which includes the DMR revenues in the analysis, determines the threshold against which the earned return is measured, and makes other necessary determinations. FirstEnergy is unable to predict the outcome of these proceedings but has not deemed a liability probable as of March 31, 2021.

On July 23, 2019, Ohio enacted HB 6, which established support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, HB 6 included provisions implementing a decoupling mechanism for Ohio electric utilities and ending current energy efficiency program mandates on December 31, 2020, provided that statewide energy efficiency mandates are achieved as determined by the PUCO. On February 26, 2020, the PUCO ordered a wind-down of statutorily required energy efficiency programs to commence on September 30, 2020, that the programs terminate on December 31, 2020, with the Ohio Companies' existing portfolio plans extended through 2020 without changes. On February 24, 2021, the PUCO found that statewide energy efficiency mandates had been achieved, and ordered that Ohio electric utilities' energy efficiency and peak demand reduction cost recovery riders terminate.

On November 21, 2019, the Ohio Companies applied to the PUCO for approval of a decoupling mechanism, which would set residential and commercial base distribution related revenues at the levels collected in 2018. As such, those base distribution revenues would no longer be based on electric consumption, which allows continued support of energy efficiency initiatives while also providing revenue certainty to the Ohio Companies. On January 15, 2020, the PUCO approved the Ohio Companies' decoupling application, and the decoupling mechanism took effect on February 1, 2020. On March 31, 2021, Governor DeWine signed HB 128, which, among other things, would repeal parts of HB 6, the legislation that established support for nuclear energy supply in Ohio, provided for a decoupling mechanism, and provided for the ending of current energy efficiency program mandates. HB 128 is effective June 29, 2021. As further discussed below, in connection with a partial settlement with the OAG and other parties, the Ohio Companies filed an application with the PUCO on February 1, 2021, to set the respective decoupling riders (CSR) to zero. On February 2, 2021, the PUCO approved the application. While the partial settlement with the OAG focused specifically on decoupling, the Ohio Companies will of their own accord not seek to recover lost distribution revenue from residential and commercial customers. FirstEnergy is committed to pursuing an open dialogue with stakeholders in an appropriate manner with respect to the numerous regulatory proceedings currently underway as further

discussed herein. As a result of the partial settlement, and the decision to not seek lost distribution revenue, FirstEnergy recognized a $108 million pre-tax charge ($84 million after-tax) in the fourth quarter of 2020, and $77 million (pre-tax) of which is associated with forgoing collection of lost distribution revenue. On March 31, 2021, FirstEnergy announced that the Ohio Companies will proactively refund to customers amounts previously collected under decoupling, with interest, which total approximately $27 million. On April 22, 2021, the Ohio Companies filed an application with the PUCO to modify CSR to return such amounts. Furthermore, as FirstEnergy would not have financially benefited from the Clean Air Fund included in HB 6, which is the mechanism to provide support to nuclear energy in Ohio, there is no expected additional impact to FirstEnergy due to any repeal of that provision of HB 6.

On July 17, 2019, the PUCO approved, with no material modifications, a settlement agreement that provides for the implementation of the Ohio Companies' first phase of grid modernization plans, including the investment of $516 million over three years to modernize the Ohio Companies' electric distribution system, and for all tax savings associated with the Tax Act to flow back to customers. The settlement had broad support, including PUCO staff, the OCC, representatives of industrial and commercial customers, a low-income advocate, environmental advocates, hospitals, competitive generation suppliers and other parties.

In March 2020, the PUCO issued entries directing utilities to review their service disconnection and restoration policies and suspend, for the duration of the COVID-19 pandemic, otherwise applicable requirements that may impose a service continuity hardship or service restoration hardship on customers. The Ohio Companies are utilizing their existing approved cost recovery mechanisms where applicable to address the financial impacts of these directives. On July 31, 2020, the Ohio Companies filed with the PUCO their transition plan and requests for waivers to

allow for the safe resumption of normal business operations, including service disconnections for non-payment. On September 23, 2020, the PUCO approved the Ohio Companies' transition plan, including approval of the resumption of service disconnections for non-payment, which the Ohio Companies began on October 5, 2020.

On July 29, 2020, the PUCO consolidated the Ohio Companies' Applications for determination of the existence of significantly excessive earnings, or SEET, under ESP IV for calendar years 2018 and 2019, which had been previously filed on July 15, 2019, and May 15, 2020, respectively, and set a procedural schedule with evidentiary hearings. On September 4, 2020, the PUCO opened its quadrennial review of ESP IV, consolidated it with the Ohio Companies' 2018 and 2019 SEET Applications, and set a procedural schedule for the consolidated matters. On October 29, 2020, the PUCO issued an entry extending the deadline for the Ohio Companies to file quadrennial review of ESP IV testimony and supplemental SEET testimony to March 1, 2021, with the evidentiary hearings to commence no sooner than May 3, 2021. On January 12, 2021, the PUCO consolidated these matters with the determination of the existence of significantly excessive earnings under ESP IV for calendar year 2017, which the SCOH had remanded to the PUCO. On March 1, 2021, the Ohio Companies filed testimony in the quadrennial review and supplemental SEET testimony in the SEET cases for calendar years 2017 through 2019. The calculations included in the quadrennial review for 2020 through 2024 demonstrate that the prospective effect of ESP IV is not substantially likely to provide the Ohio Companies with significantly excessive earnings during the balance of ESP IV. In addition, the Ohio Companies' quadrennial review testimony demonstrates that ESP IV continues to be more favorable in the aggregate and during the remaining term of ESP IV as compared to the expected results of a market rate offer. Further, the revised calculations included in the Ohio Companies' supplemental SEET testimony for calendar years 2017 through 2019 demonstrated that the Ohio Companies did not have significantly excessive earnings, on an individual company basis or on a consolidated basis. However, on March 31, 2021, Governor DeWine signed House Bill 128, which repeals legislation passed in 2019 that permitted the Ohio Companies to file their SEET results on a consolidated basis instead of on an individual company basis. HB 128 is effective June 29, 2021. Further, the OCC and another party filed testimony on April 5, 2021, recommending refunds for one or more of the Ohio Companies for calendar years 2017 through 2019. On April 20, 2021, the Ohio Companies filed supplemental testimony in the quadrennial review providing prospective SEET values on an individual company basis, which demonstrate that the Ohio Companies are not projected to have significantly excessive earnings, on an individual company basis, during the balance of ESP IV.

On September 8, 2020, the OCC filed motions in the Ohio Companies' corporate separation audit and DMR audit dockets, requesting the PUCO to open an investigation and management audit, hire an independent auditor, and require FirstEnergy to show it did not improperly use money collected from consumers or violate any utility regulatory laws, rules or orders in its activities regarding HB 6. The Ohio Companies' filed a response in opposition to the OCC's motions on September 23, 2020. On December 30, 2020, in response to the OCC's motion, the PUCO reopened the DMR audit docket, and directed PUCO staff to solicit a third-party auditor and conduct a full review of the DMR to ensure funds collected from ratepayers through the DMR were only used for the purposes established in ESP IV. On April 7, 2021, the PUCO set deadlines for selection of an auditor and the filing of the final audit report, by June 2, 2021 and October 29, 2021, respectively. Initial discovery is ongoing.

On September 15, 2020, the PUCO opened a new proceeding to review the political and charitable spending by the Ohio Companies in support of HB 6 and the subsequent referendum effort, directing the Ohio Companies to show cause, demonstrating that the costs of any political or charitable spending in support of HB 6, or the subsequent referendum effort, were not included, directly or indirectly, in any rates or charges paid by ratepayers. The Ohio Companies filed a response on September 30, 2020, stating that any political and charitable spending in support of HB 6 or the subsequent referendum were not included in rates or charges paid for by its customers. Several parties requested that the PUCO broaden the scope of the review of political and charitable spending. Discovery is ongoing.

22

In connection with an ongoing audit of the Ohio Companies' policies and procedures relating to the code of conduct rules between affiliates, on November 4, 2020, the PUCO initiated an additional corporate separation audit as a result of the FirstEnergy leadership transition announcement made on October 29, 2020, as further discussed below. The additional audit is to ensure compliance by the Ohio Companies and their affiliates with corporate separation laws and the Ohio Companies' corporate separation plan. The additional audit is for the period from November 2016 through October 2020, with a final audit report to be filed in June 2021. On January 27, 2021, the PUCO selected an auditor, and the auditor's investigation and discovery are ongoing.

On November 24, 2020, the Environmental Law and Policy Center filed motions to vacate the PUCO's orders in proceedings related to the Ohio Companies' settlement that provides for the implementation of the first phase of grid modernization plans and for all tax savings associated with the Tax Act to flow back to customers, the Ohio Companies' energy efficiency portfolio plans for the period from 2013 through 2016, and the Ohio Companies' application for a two-year extension of the DMR, on the grounds that the former Chairman of the PUCO should have recused himself in these matters. On December 30, 2020, the PUCO denied the motions, and reinstated the requirement under ESP IV that the Ohio Companies file a base distribution rate case by May 31, 2024, the end of ESP IV, which the Ohio Companies had indicated they would not oppose.

In the fourth quarter of 2020, motions were filed with the PUCO requesting that the PUCO amend the Ohio Companies' riders for collecting charges required by HB 6, which the Ohio Companies are further required to remit to other Ohio electric distribution utilities or to the State Treasurer, to provide for refunds in the event HB 6 is repealed. The Ohio Companies contested the motions, which are pending before the PUCO.

On December 7, 2020, the Citizens' Utility Board of Ohio filed a complaint with the PUCO against the Ohio Companies. The complaint alleges that the Ohio Companies' new charges resulting from HB 6, and any increased rates resulting from proceedings over which the former PUCO Chairman presided, are unjust and unreasonable, and that the Ohio Companies violated Ohio corporate separation laws by failing to operate separately from unregulated affiliates. The complaint requests, among other things, that any rates authorized by HB 6 or authorized by the PUCO in a proceeding over which the former Chairman presided be made refundable; that the Ohio Companies be required to file a new distribution rate case at the earliest possible date; and that the Ohio Companies' corporate separation plans be modified to introduce institutional controls. The Ohio Companies are contesting the complaint.

In connection with an ongoing annual audit of the Ohio Companies' Rider DCR for 2020, on March 10, 2021, the PUCO expanded the scope of the audit to include a review of certain transactions that were either improperly classified, misallocated, or lacked supporting documentation, which were disclosed in FirstEnergy's Form 10-K for the year ended 2020, filed on February 18, 2021, and determine whether funds collected from ratepayers were used to pay the vendors and if so, whether or not the funds associated with those payments should be returned to ratepayers through Rider DCR or through an alternative proceeding.

See Note 9, "Commitments, Guarantees and Contingencies" for additional details on the government investigations and subsequent litigation surrounding the investigation of HB 6.

*PENNSYLVANIA*

The Pennsylvania Companies operate under rates approved by the PPUC, effective as of January 27, 2017. These rates were adjusted for the net impact of the Tax Act, effective March 15, 2018. The net impact of the Tax Act for the period January 1, 2018 through March 14, 2018 was separately tracked and its treatment will be addressed in a future rate proceeding. The Pennsylvania Companies operate under DSPs for the June 1, 2019 through May 31, 2023 delivery period, which provide for the competitive procurement of generation supply for customers who do not choose an alternative EGS or for customers of alternative EGSs that fail to provide the contracted service. Under the 2019-2023 DSPs, supply will be provided by wholesale suppliers through a mix of 3, 12 and 24-month energy contracts, as well as two RFPs for 2-year SREC contracts for ME, PN and Penn.

Pursuant to Pennsylvania Act 129 of 2008 and PPUC orders, Pennsylvania EDCs implement energy efficiency and peak demand reduction programs. The Pennsylvania Companies' Phase III EE&C plans for the June 2016 through May 2021 period, which were approved in March 2016, with expected costs up to $390 million, are designed to achieve the targets established in the PPUC's Phase III Final Implementation Order with full recovery through the reconcilable EE&C riders. On June 18, 2020, the PPUC entered a Final Implementation Order for a Phase IV EE&C Plan, operating from June 2021 through May 2026. The Final Implementation Order set demand reduction targets, relative to 2007 to 2008 peak demands, at 2.9% MW for ME, 3.3% MW for PN, 2.0% MW for Penn, and 2.5% MW for WP; and energy consumption reduction targets, as a percentage of the Pennsylvania Companies' historic 2009 to 2010 reference load at 3.1% MWH for ME, 3.0% MWH for PN, 2.7% MWH for Penn, and 2.4% MWH for WP. The Pennsylvania Companies' Phase IV plans were filed November 30, 2020. A settlement has been reached in this matter, and a joint petition seeking approval of that settlement by the parties was filed on February 16, 2021. On March 25, 2021, the PPUC issued an order approving the settlement without modification.

Pennsylvania EDCs are permitted to seek PPUC approval of an LTIIP for infrastructure improvements and costs related to highway relocation projects, after which a DSIC may be approved to recover LTIIP costs. On January 16, 2020, the PPUC

approved the Pennsylvania Companies' LTIIPs for the five-year period beginning January 1, 2020 and ending December 31, 2024 for a total capital investment of approximately $572 million for certain infrastructure improvement initiatives.

Following the Pennsylvania Companies' 2016 base rate proceedings, the PPUC ruled in a separate proceeding related to the DSIC mechanisms that the Pennsylvania Companies were not required to reflect federal and state income tax deductions related to DSIC-eligible

property in DSIC rates, which decision was appealed by the Pennsylvania OCA to the Pennsylvania Commonwealth Court. The Commonwealth Court reversed the PPUC's decision and remanded the matter to require the Pennsylvania Companies to revise their tariffs and DSIC calculations to include ADIT and state income taxes. On April 7, 2020, the Pennsylvania Supreme Court issued an order granting Petitions for Allowance of Appeal by both the PPUC and the Pennsylvania Companies of the Commonwealth Court's Opinion and Order. Briefs and Reply Briefs of the parties were filed, and oral argument before the Supreme Court was held on October 21, 2020. An adverse ruling by the Pennsylvania Supreme Court is not expected to result in a material impact to FirstEnergy.

The PPUC issued an order on March 13, 2020, forbidding utilities from terminating service for non-payment for the duration of the COVID-19 pandemic. On May 13, 2020, the PPUC issued a Secretarial letter directing utilities to track all prudently incurred incremental costs arising from the COVID-19 pandemic, and to create a regulatory asset for future recovery of incremental uncollectibles incurred as a result of the COVID-19 pandemic and termination moratorium. On October 13, 2020, the PPUC entered an order lifting the service termination moratorium effective November 9, 2020, subject to certain additional notification, payment procedures and exceptions, and permits the Pennsylvania Companies to create a regulatory asset for all incremental expenses associated with their compliance with the order. On March 19, 2021, the PPUC entered an order lifting the moratorium in total effective March 31, 2021, subject to certain additional guidelines regarding the duration of payment arrangements and reporting obligations.

*WEST VIRGINIA*

MP and PE provide electric service to all customers through traditional cost-based, regulated utility ratemaking and operate under rates approved by the WVPSC effective February 2015. MP and PE recover net power supply costs, including fuel costs, purchased power costs and related expenses, net of related market sales revenue through the ENEC. MP's and PE's ENEC rate is updated annually.

On March 13, 2020, the WVPSC urged all utilities to suspend utility service terminations except where necessary as a matter of safety or where requested by the customer. On May 15, 2020, the WVPSC issued an order to authorize MP and PE to record a deferral of additional, extraordinary costs directly related to complying with the various COVID-19 government shut-down orders and operational precautions, including impacts on uncollectible expense and cash flow related to temporary discontinuance of service terminations for non-payment and any credits to minimum demand charges associated with business customers adversely impacted by shut-downs or temporary closures related to the pandemic. MP and PE resumed disconnection activity for commercial and industrial customers on September 15, 2020, and for residential customers on November 4, 2020.

On August 28, 2020, MP and PE filed with the WVPSC their annual ENEC case requesting a decrease in ENEC rates of $55 million beginning January 1, 2021, representing a 4% decrease in rates compared to those in effect on August 28, 2020. The decrease in the ENEC rates is net of recovering approximately $10.5 million in previously deferred, incremental uncollectible and other related costs resulting from the COVID-19 pandemic. The WVPSC approved a unanimous settlement by the parties on December 16, 2020 with rates effective January 1, 2021.

Also, on August 28, 2020, MP and PE filed with the WVPSC for recovery of costs associated with modernization and improvement program for their coal-fired boilers. The proposed annual revenue increase for these environmental compliance projects is $5 million beginning January 1, 2021. The WVPSC approved a unanimous settlement by the parties on December 16, 2020 approving the recovery of those costs.

On December 30, 2020, MP and PE filed an integrated resource plan with the WVPSC. The plan projects a small capacity deficit but an energy surplus in MP's and PE's supply resources when compared with current WV load demand and projects the capacity deficit growing over the next 15 years. The plan does not recommend additional supply-side resources with a possible exception for small utility-scale solar resources and recommends that the capacity deficit be met through the PJM capacity market. MP currently expects to seek approval in 2021 to construct solar generation sources of up to 50 MWs. The WVPSC issued a procedural order on February 26, 2021, allowing informational filing comments to be filed by April 28, 2021.

On December 30, 2020, MP and PE filed with the WVPSC a determination of the rate impact of the Tax Act with respect to ADIT. The filing proposes an annual revenue reduction of $2.6 million annually, effective January 1, 2022, with reconciliation and any resulting adjustments incorporated into the annual ENEC proceedings. A hearing is set for August 18, 2021.

**FERC REGULATORY MATTERS**

Under the FPA, FERC regulates rates for interstate wholesale sales, transmission of electric power, accounting and other matters, including construction and operation of hydroelectric projects. With respect to their wholesale services and rates, the Utilities, AE Supply and the Transmission Companies are subject to regulation by FERC. FERC regulations require JCP&L, MP,

PE, WP and the Transmission Companies to provide open access transmission service at FERC-approved rates, terms and conditions. Transmission facilities of JCP&L, MP, PE, WP and the Transmission Companies are subject to functional control by PJM and transmission service using their transmission facilities is provided by PJM under the PJM Tariff.

FERC regulates the sale of power for resale in interstate commerce in part by granting authority to public utilities to sell wholesale power at market-based rates upon showing that the seller cannot exert market power in generation or transmission or erect barriers to entry into markets. The Utilities and AE Supply each have been authorized by FERC to sell wholesale power in interstate commerce at market-based rates and have a market-based rate tariff on file with FERC, although in the case of the Utilities major wholesale purchases remain subject to review and regulation by the relevant state commissions.

Federally enforceable mandatory reliability standards apply to the bulk electric system and impose certain operating, record-keeping and reporting requirements on the Utilities, AE Supply, and the Transmission Companies. NERC is the ERO designated by FERC to establish and enforce these reliability standards, although NERC has delegated day-to-day implementation and enforcement of these reliability standards to six regional entities, including RFC. All of the facilities that FirstEnergy operates are located within the RFC region. FirstEnergy actively participates in the NERC and RFC stakeholder processes, and otherwise monitors and manages its companies in response to the ongoing development, implementation and enforcement of the reliability standards implemented and enforced by RFC.

FirstEnergy believes that it is in material compliance with all currently effective and enforceable reliability standards. Nevertheless, in the course of operating its extensive electric utility systems and facilities, FirstEnergy occasionally learns of isolated facts or circumstances that could be interpreted as excursions from the reliability standards. If and when such occurrences are found, FirstEnergy develops information about the occurrence and develops a remedial response to the specific circumstances, including in appropriate cases "self-reporting" an occurrence to RFC. Moreover, it is clear that NERC, RFC and FERC will continue to refine existing reliability standards as well as to develop and adopt new reliability standards. Any inability on FirstEnergy's part to comply with the reliability standards for its bulk electric system could result in the imposition of financial penalties, or obligations to upgrade or build transmission facilities, that could have a material adverse effect on its financial condition, results of operations and cash flows.

*ATSI Transmission Formula Rate*

On May 1, 2020, ATSI filed amendments to its formula rate to recover regulatory assets for certain costs that ATSI incurred as a result of its 2011 move from MISO to PJM, certain costs allocated to ATSI by FERC for transmission projects that were constructed by other MISO transmission owners, and certain costs for transmission-related vegetation management programs. Additionally, ATSI proposed certain income tax-related adjustments and certain tariff changes addressing the revenue credit components of the formula rate template. In its filing, ATSI requested recovery of approximately $85 million related to ATSI's costs to move to PJM, and the MISO transmission project costs that are allocated to ATSI through December 31, 2020; and recovery of future costs associated with the MISO transmission projects. Per prior FERC orders, ATSI included a "cost-benefit study" to support recovery of ATSI's costs to move to PJM, and the MISO transmission project costs that are allocated to ATSI. Finally, ATSI proposed recovery of approximately $19 million in costs for transmission-related vegetation management programs. Certain intervenors filed protests of the formula rate amendments on May 29, 2020, and ATSI filed a reply on June 15, 2020. On June 30, 2020, FERC issued an initial order accepting the tariff amendments subject to refund, suspending the effective date for five months to be effective December 1, 2020, and setting the matter for hearing and settlement proceedings. ATSI is engaged in settlement negotiations with the other parties to this proceeding.

*FERC Actions on Tax Act*

On March 15, 2018, FERC initiated proceedings on the question of how to address possible changes to ADIT and bonus depreciation as a result of the Tax Act. Such possible changes could impact FERC-jurisdictional rates, including transmission rates. On November 21, 2019, FERC issued a final rule (Order No. 864). Order No. 864 requires utilities with transmission formula rates to update their formula rate templates to include mechanisms to: (i) deduct any excess ADIT from or add any deficient ADIT to their rate base; (ii) raise or lower their income tax allowances by any amortized excess or deficient ADIT; and (iii) incorporate a new permanent worksheet into their rates that will annually track information related to excess or deficient ADIT. Per FERC directives, ATSI submitted its compliance filing on May 1, 2020. MAIT submitted its compliance filing on June 1, 2020. Certain intervenors filed protests of the compliance filings, to which ATSI and MAIT responded. On October 28, 2020, FERC staff requested additional information about ATSI's proposed rate base adjustment mechanism, and ATSI submitted the requested information on November 25, 2020. On May 15, 2020, TrAIL submitted its compliance filing and on June 1, 2020, PATH submitted its required compliance filing. These compliance filings each remain pending before FERC. MP, WP and PE (as holders of a "stated" transmission

rate) are addressing these requirements in the transmission formula rates amendments that were filed on October 29, 2020, and which have been accepted by FERC effective January 1, 2021, subject to refund, pending further hearing and settlement procedures. JCP&L is addressing these requirements as part of its pending transmission formula rate case. JCP&L and the active parties to the pending FERC transmission formula rate case filed an offer of settlement with FERC on February 2, 2021. On April 15, 2021, FERC approved the settlement agreement as filed, with no changes.

*Transmission ROE Methodology*

FERC's methodology for calculating electric transmission utility ROE has been in transition as a result of an April 14, 2017 ruling by the D.C. Circuit that vacated FERC's then-effective methodology. On May 21, 2020, FERC issued Opinion No. 569-A that changed FERC's ROE methodology. Under FERC's revised methodology, ROE is based on three financial models – discounted cash flow, capital-asset pricing, and risk premium – which are used to calculate a composite zone of reasonableness. FERC noted that utilities could, in utility-specific proceedings, also ask to have the expected earnings methodology included in calculating the utility's authorized ROE. FERC also noted that, going forward, it will divide that zone into three equal parts, to be used for high risk, normal risk, and low risk utilities. A given utility will be assigned to one of these three parts of the zone of reasonableness, and its ROE will be set at the median or midpoint of the other utilities that are in the applicable third of the zone. FirstEnergy filed a request for rehearing, which FERC denied on July 22, 2020. On November 19, 2020, FERC issued Opinion No. 569-B, which affirmed the Opinion No. 569-A rulings. FirstEnergy initiated, but subsequently withdrew, appeals of these orders. Appeals of Opinion Nos. 569, 569-A and 569-B were filed by other parties, and are pending before the D.C. Circuit. Any changes to FERC's transmission rate ROE and incentive policies for the Utilities would be applied on a prospective basis.

On March 20, 2020, FERC initiated a rulemaking proceeding on the transmission rate incentives provisions of Section 219 of the 2005 Energy Policy Act. Initial comments were submitted July 1, 2020, and reply comments were filed on July 16, 2020. FirstEnergy participated through EEI and through a consortium of PJM Transmission Owners. In a supplemental rulemaking proceeding on April 15, 2021, FERC is seeking comments on, among other things, whether to require utilities that have been members of an RTO for three years or more and that have been collecting an "RTO membership" ROE incentive adder to file tariff updates that would terminate collection of the incentive adder. Initial comments are due 30 days after the supplement is published in the Federal Register, and reply comments are due 15 days later. FirstEnergy is a member of PJM and could be affected by the supplemental proposed rule and is currently evaluating the potential impacts this rule would have on certain of its subsidiaries.

*JCP&L Transmission Formula Rate*

On October 30, 2019, JCP&L filed tariff amendments with FERC to convert JCP&L's existing stated transmission rate to a forward-looking formula transmission rate. JCP&L requested that the tariff amendments become effective January 1, 2020. On December 19, 2019, FERC issued its initial order in the case, allowing JCP&L to transition to a forward-looking formula rate as of January 1, 2020 as requested, subject to refund, pending further hearing and settlement proceedings. JCP&L and the parties to the FERC proceeding subsequently were able to reach settlement, and on February 2, 2021, JCP&L filed an offer of settlement, pending FERC approval. On April 15, 2021, FERC approved the settlement agreement as filed, with no changes.

*Allegheny Power Zone Transmission Formula Rate Filings*

On October 29, 2020, MP, PE and WP filed tariff amendments with FERC to convert their existing stated transmission rate to a forward-looking formula transmission rate, effective January 1, 2021. In addition, on October 30, 2020, KATCo filed a proposed new tariff to establish a forward-looking formula rate and requested that the new rate become effective January 1, 2021. In its filing, KATCo explained that while it currently owns no transmission assets, it may build new transmission facilities in the Allegheny zone, and that it may seek required state and federal authorizations to acquire transmission assets from PE and WP by January 1, 2022. These transmission rate filings were approved by FERC on December 31, 2020, subject to refund, pending further hearing and settlement procedures and were consolidated into a single proceeding. MP, PE and WP, and KATCo are engaged in settlement negotiations with the other parties to the formula rate proceedings. KATCo will be included in the Regulated Transmission reportable segment.

**9. COMMITMENTS, GUARANTEES AND CONTINGENCIES**

**GUARANTEES AND OTHER ASSURANCES**

FirstEnergy has various financial and performance guarantees and indemnifications, which are issued in the normal course of business. These contracts include performance guarantees, stand-by letters of credit, debt guarantees, surety bonds and indemnifications. FirstEnergy enters into these arrangements to facilitate commercial transactions with third parties by enhancing the value of the transaction to the third party.

As of March 31, 2021, outstanding guarantees and other assurances aggregated approximately $1.7 billion, consisting of parental guarantees on behalf of its consolidated subsidiaries ($1.1 billion), other guarantees ($108 million) and other assurances ($474 million).

26

**COLLATERAL AND CONTINGENT-RELATED FEATURES**

In the normal course of business, FE and its subsidiaries may enter into physical or financially settled contracts for the sale and purchase of electric capacity, energy, fuel and emission allowances. Certain agreements contain provisions that require FE or its subsidiaries to post collateral. This collateral may be posted in the form of cash or credit support with thresholds contingent upon FE's or its subsidiaries' credit rating from each of the major credit rating agencies. The collateral and credit support requirements vary by contract and by counterparty.

As of March 31, 2021, $26 million of collateral has been posted by FE or its subsidiaries, of which, $25 million was posted as a result of the credit rating downgrades in the fourth quarter of 2020, as further discussed below.

These credit-risk-related contingent features stipulate that if the subsidiary were to be downgraded or lose its investment grade credit rating (based on its senior unsecured debt rating), it would be required to provide additional collateral. The following table discloses the potential additional credit rating contingent contractual collateral obligations as of March 31, 2021:

| Potential Collateral Obligations | Utilities and FET | | FE | | Total | |
|---|---|---|---|---|---|---|
| | | | *(In millions)* | | | |
| Contractual Obligations for Additional Collateral | | | | | | |
| Upon Further Downgrade | $ | 28 | $ | — | $ | 28 |
| Surety Bonds (Collateralized Amount) [1] | | 56 | | 258 | | 314 |
| Total Exposure from Contractual Obligations | $ | 84 | $ | 258 | $ | 342 |

[1] Surety Bonds are not tied to a credit rating. Surety Bonds' impact assumes maximum contractual obligations, which is ordinarily 100% of the face amount of the surety bond except with the respect to $39 million of surety bond obligations for which the collateral obligation is capped at 60% of the face amount, and typical obligations require 30 days to cure.

**OTHER COMMITMENTS AND CONTINGENCIES**

FE is a guarantor under a $120 million syndicated senior secured term loan facility due November 12, 2024, under which Global Holding's outstanding principal balance is $108 million as of March 31, 2021. Signal Peak, Global Rail, Global Mining Group, LLC and Global Coal Sales Group, LLC, each being a direct or indirect subsidiary of Global Holding, and FE continue to provide their joint and several guaranties of the obligations of Global Holding under the facility.

In connection with the facility, 69.99% of Global Holding's direct and indirect membership interests in Signal Peak, Global Rail and their affiliates along with FEV's and WMB Marketing Ventures, LLC's respective 33-1/3% membership interests in Global Holding, are pledged to the lenders under the current facility as collateral.

Various federal, state and local authorities regulate FirstEnergy with regard to air and water quality, hazardous and solid waste disposal, and other environmental matters. While FirstEnergy's environmental policies and procedures are designed to achieve compliance with applicable environmental laws and regulations, such laws and regulations are subject to periodic review and potential revision by the implementing agencies. FirstEnergy cannot predict the timing or ultimate outcome of any of these reviews or how any future actions taken as a result thereof may materially impact its business, results of operations, cash flows and financial condition.

### Clean Air Act

FirstEnergy complies with $SO_2$ and NOx emission reduction requirements under the CAA and SIP(s) by burning lower-sulfur fuel, utilizing combustion controls and post-combustion controls and/or using emission allowances.

CSAPR requires reductions of NOx and $SO_2$ emissions in two phases (2015 and 2017), ultimately capping $SO_2$ emissions in affected states to 2.4 million tons annually and NOx emissions to 1.2 million tons annually. CSAPR allows trading of NOx and $SO_2$ emission allowances between power plants located in the same state and interstate trading of NOx and $SO_2$ emission allowances with some restrictions. The D.C. Circuit ordered the EPA on July 28, 2015, to reconsider the CSAPR caps on NOx and $SO_2$ emissions from power plants in 13 states, including West Virginia. This follows the 2014 U.S. Supreme Court ruling generally upholding the EPA's regulatory approach under CSAPR but questioning whether the EPA required upwind states to reduce emissions by more than their contribution to air pollution in downwind states. The EPA issued a CSAPR update rule on September 7, 2016, reducing summertime NOx emissions from power plants in 22 states in the eastern U.S., including West Virginia, beginning in 2017. Various states and other stakeholders appealed the CSAPR update rule to the D.C. Circuit in November and December 2016. On September 13, 2019, the D.C. Circuit remanded the CSAPR update rule to the EPA citing that the rule did not eliminate upwind states' significant contributions to downwind states' air quality attainment requirements within applicable attainment deadlines.

Also during this time, in March 2018, the State of New York filed a CAA Section 126 petition with the EPA alleging that NOx emissions from nine states (including West Virginia) significantly contribute to New York's inability to attain the ozone NAAQS. The petition sought suitable emission rate limits for large stationary sources that are allegedly affecting New York's air quality within the three years allowed by CAA Section 126. On September 20, 2019, the EPA denied New York's CAA Section 126 petition. On October 29, 2019, the State of New York appealed the denial of its petition to the D.C. Circuit. On July 14, 2020, the D.C. Circuit reversed and remanded the New York petition to the EPA for further consideration. On March 15, 2021, EPA issued a revised CSAPR Rule that addresses, among other things, the remand of the CSAPR Update Rule and the New York Section 126 Petition. Depending on the outcome of any appeals and how the EPA and the states ultimately implement the revised CSAPR Rule, the future cost of compliance may materially impact FirstEnergy's operations, cash flows and financial condition.

In February 2019, the EPA announced its final decision to retain without changes the NAAQS for $SO_2$, specifically retaining the 2010 primary (health-based) 1-hour standard of 75 PPB. As of March 31, 2020, FirstEnergy has no power plants operating in areas designated as non-attainment by the EPA.

### Climate Change

There are several initiatives to reduce GHG emissions at the state, federal and international level. Certain northeastern states are participating in the RGGI and western states led by California, have implemented programs, primarily cap and trade mechanisms, to control emissions of certain GHGs. Additional policies reducing GHG emissions, such as demand reduction programs, renewable portfolio standards and renewable subsidies have been implemented across the nation.

In September 2016, the U.S. joined in adopting the agreement reached on December 12, 2015, at the United Nations Framework Convention on Climate Change meetings in Paris to reduce GHG. The Paris Agreement's non-binding obligations to limit global warming to below two degrees Celsius became effective on November 4, 2016. On June 1, 2017, the Trump Administration announced that the U.S. would cease all participation in the Paris Agreement. On January 20, 2021, President Biden signed an executive order re-adopting the agreement on behalf of

the U.S. In November 2020, FirstEnergy published its "Climate Story" which includes its climate position and strategy, as well as a new comprehensive and ambitious GHG emission goal. FirstEnergy pledged to achieve carbon neutrality by 2050 and set an interim goal for a 30% reduction in GHG within the company's direct operational control by 2030, based on 2019 levels. FirstEnergy cannot currently estimate the financial impact of climate change policies, although potential legislative or regulatory programs restricting $CO_2$ emissions, or litigation alleging damages from GHG emissions, could require material capital and other expenditures or result in changes to its operations.

In December 2009, the EPA released its final "Endangerment and Cause or Contribute Findings for GHG under the Clean Air Act," concluding that concentrations of several key GHG constitutes an "endangerment" and may be regulated as "air pollutants" under the CAA and mandated measurement and reporting of GHG emissions from certain sources, including electric generating plants. Subsequently, the EPA released its final CPP regulations in August 2015 to reduce $CO_2$ emissions from existing fossil fuel-fired EGUs and finalized separate regulations imposing $CO_2$ emission limits for new, modified, and reconstructed fossil fuel-fired EGUs. Numerous states and private parties filed appeals and motions to stay the CPP with the D.C. Circuit in October 2015. On February 9, 2016, the U.S. Supreme Court stayed the rule during the pendency of the challenges to the D.C. Circuit and U.S. Supreme Court. On March 28, 2017, an executive order, entitled "Promoting Energy Independence and Economic Growth," instructed the EPA to review the CPP and related rules addressing GHG emissions and suspend, revise or rescind the rules if appropriate. On June 19, 2019, the EPA repealed the CPP and replaced it with the ACE rule that establishes guidelines for states to develop standards of performance to address GHG emissions from existing coal-fired power plants. On January 19, 2021, the D.C. Circuit vacated and remanded the ACE rule declaring that the EPA was "arbitrary and capricious" in its rule making and, as such, the ACE rule is no longer in effect and all actions thus far taken by states to implement the federally mandated rule are now null and void. The D.C. Circuit decision is subject to legal challenge. Depending on the outcomes of further appeals and how any final rules are ultimately implemented, the future cost of compliance may be material.

*Clean Water Act*

Various water quality regulations, the majority of which are the result of the federal CWA and its amendments, apply to FirstEnergy's facilities. In addition, the states in which FirstEnergy operates have water quality standards applicable to FirstEnergy's operations.

The EPA finalized CWA Section 316(b) regulations in May 2014, requiring cooling water intake structures with an intake velocity greater than 0.5 feet per second to reduce fish impingement when aquatic organisms are pinned against screens or other parts of a cooling water intake system to a 12% annual average and requiring cooling water intake structures exceeding 125 million gallons per day to conduct studies to determine site-specific controls, if any, to reduce entrainment, which occurs when aquatic life is drawn into a facility's cooling water system. Depending on any final action taken by the states with respect to impingement and entrainment, the future capital costs of compliance with these standards may be material.

On September 30, 2015, the EPA finalized new, more stringent effluent limits for the Steam Electric Power Generating category (40 CFR Part 423) for arsenic, mercury, selenium and nitrogen for wastewater from wet scrubber systems and zero discharge of pollutants in ash transport water. The treatment obligations were to phase-in as permits are renewed on a five-year cycle from 2018 to 2023. However, on April 13, 2017, the EPA granted a Petition for Reconsideration and on September 18, 2017, the EPA

28

postponed certain compliance deadlines for two years. On August 31, 2020, the EPA issued a final rule revising the effluent limits for discharges from wet scrubber systems, retaining the zero-discharge standard for ash transport water, (with some limited discharge allowances), and extending the deadline for compliance to December 31, 2025 for both. In addition, the EPA allows for less stringent limits for sub-categories of generating units based on capacity utilization, flow volume from the scrubber system, and unit retirement date. Depending on the outcome of appeals, how final rules are ultimately implemented and the compliance options MP elects to take with the new rules, the compliance with these standards, which could include capital expenditures at the Ft. Martin and Harrison power stations, may be substantial and changes to MP's operations at those power stations may also result.

On September 29, 2016, FirstEnergy received a request from the EPA for information pursuant to CWA Section 308(a) for information concerning boron exceedances of effluent limitations established in the NPDES Permit for the former Mitchell Power Station's Mingo landfill, owned by WP. On November 1, 2016, WP provided an initial response that contained information related to a similar boron issue at the former Springdale Power Station's landfill. The EPA requested additional information regarding the Springdale landfill and on November 15, 2016, WP provided a response and intends to fully comply with the Section 308(a) information request. On March 3, 2017, WP proposed to the PA DEP a re-route of its wastewater discharge to eliminate potential boron exceedances at the Springdale landfill. On January 29, 2018, WP submitted an NPDES permit renewal application to PA DEP proposing to re-route its wastewater discharge to eliminate potential boron exceedances at the Mingo landfill. On February 20, 2018, the DOJ issued a letter and tolling agreement on behalf of the EPA alleging violations of the CWA at the Springdale and Mingo landfills while seeking to enter settlement negotiations in lieu of filing a complaint. The EPA has proposed a penalty of

$610,000 to settle alleged past boron exceedances at both facilities. Negotiations are continuing and WP is unable to predict the outcome of this matter.

*Regulation of Waste Disposal*

Federal and state hazardous waste regulations have been promulgated as a result of the RCRA, as amended, and the Toxic Substances Control Act. Certain CCRs, such as coal ash, were exempted from hazardous waste disposal requirements pending the EPA's evaluation of the need for future regulation.

In April 2015, the EPA finalized regulations for the disposal of CCRs (non-hazardous), establishing national standards for landfill design, structural integrity design and assessment criteria for surface impoundments, groundwater monitoring and protection procedures and other operational and reporting procedures to assure the safe disposal of CCRs from electric generating plants. On September 13, 2017, the EPA announced that it would reconsider certain provisions of the final regulations. On July 17, 2018, the EPA Administrator signed a final rule extending the deadline for certain CCR facilities to cease disposal and commence closure activities, as well as, establishing less stringent groundwater monitoring and protection requirements. On August 21, 2018, the D.C. Circuit remanded sections of the CCR Rule to the EPA to provide additional safeguards for unlined CCR impoundments that are more protective of human health and the environment. On December 2, 2019, the EPA published a proposed rule accelerating the date that certain CCR impoundments must cease accepting waste and initiate closure to August 31, 2020. The proposed rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria. On July 29, 2020, the EPA published a final rule revising the date that certain CCR impoundments must cease accepting waste and initiate closure to April 11, 2021. The final rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria. On November 30, 2020, AE Supply submitted a closure deadline extension request to the EPA seeking to extend the closure date until 2024 of McElroy's Run CCR impoundment facility, for which AE Supply continues to provide access to FG.

FE or its subsidiaries have been named as potentially responsible parties at waste disposal sites, which may require cleanup under the CERCLA. Allegations of disposal of hazardous substances at historical sites and the liability involved are often unsubstantiated and subject to dispute; however, federal law provides that all potentially responsible parties for a particular site may be liable on a joint and several basis. Environmental liabilities that are considered probable have been recognized on the Consolidated Balance Sheets as of March 31, 2021, based on estimates of the total costs of cleanup, FirstEnergy's proportionate responsibility for such costs and the financial ability of other unaffiliated entities to pay. Total liabilities of approximately $102 million have been accrued through March 31, 2021, of which, approximately $67 million are for environmental remediation of former MGP and gas holder facilities in New Jersey, which are being recovered by JCP&L through a non-bypassable SBC. FE or its subsidiaries could be found potentially responsible for additional amounts or additional sites, but the loss or range of losses cannot be determined or reasonably estimated at this time.

**OTHER LEGAL PROCEEDINGS**

*United States v. Larry Householder, et al.*

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020.

As previously disclosed, FirstEnergy has been cooperating with the U.S. Attorney's Office regarding the ongoing investigation and discussions have begun with the U.S. Attorney's Office regarding the resolution of this matter, including the possibility of FirstEnergy entering into a deferred prosecution agreement. As these discussions are preliminary, FirstEnergy cannot currently predict the timing, the outcome, or the impact of a possible resolution of this ongoing investigation.
While no contingency has been reflected in its consolidated financial statements, FirstEnergy believes that it is probable that it will incur a loss in connection with the resolution of this investigation. Given the ongoing nature and complexity of the review, inquiries and investigations, FirstEnergy cannot yet reasonably estimate a loss or range of loss that may arise from the resolutions of this investigation, but such resolution could have a material adverse effect on FirstEnergy's reputation, business, financial condition, results of operations, liquidity, or cash flows.

*Legal Proceedings Relating to United States v. Larry Householder, et al.*

In addition to the subpoenas referenced above under "—United States v. Larry Householder, et. al.", certain FE stockholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, and the complaints in each of these suits is related to allegations in the complaint and supporting affidavit relating to HB 6 and the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder.

- *Owens v. FirstEnergy Corp. et al. and Frand v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 28, 2020 and August 21, 2020, purported stockholders of FE filed putative class action lawsuits alleging violations of the federal securities laws. Those actions have been consolidated and a lead plaintiff, the Los Angeles County Employees Retirement Association, has been appointed by the court. A consolidated complaint was filed on February 26, 2021. The consolidated complaint alleges, on behalf of a proposed class of persons who purchased FE securities between February 21, 2017 and July 21, 2020, that FE and certain current or former FE officers violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by issuing misrepresentations or omissions concerning FE's business and results of operations. The consolidated complaint also alleges that FE, certain current or former FE officers and directors, and a group of underwriters violated Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 as a result of alleged misrepresentations or omissions in connection with offerings of senior notes by FE in February and June 2020.
- *Gendrich v. Anderson, et al. and Sloan v. Anderson, et al.* (Common Pleas Court, Summit County, OH); on July 26, 2020 and July 31, 2020, respectively, purported stockholders of FE filed shareholder derivative action lawsuits against certain FE directors and officers, alleging, among other things, breaches of fiduciary duty. These actions have been consolidated.
- *Miller v. Anderson, et al.* (Federal District Court, N.D. Ohio); *Bloom, et al. v. Anderson, et al.; Employees Retirement System of the City of St. Louis v. Jones, et al.; Electrical Workers Pension Fund, Local 103, I.B.E.W. v. Anderson et al.; Massachusetts Laborers Pension Fund v. Anderson et al.; The City of Philadelphia Board of Pensions and Retirement v. Anderson et al.; Atherton v. Dowling et al; Behar v. Anderson, et al.* (U.S. District Court, S.D. Ohio, all actions have been consolidated); beginning on August 7, 2020, purported stockholders of FE filed shareholder derivative actions alleging the board and officers breached their fiduciary duties and committed violations of Section 14(a) of the Securities Exchange Act of 1934. The cases in the Southern District of Ohio have been consolidated and co-lead plaintiffs have been appointed by the court.
- *Smith v. FirstEnergy Corp. et al., Buldas v. FirstEnergy Corp. et al., and Hudock and Cameo Countertops, Inc. v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 27, 2020, July 31, 2020, and August 5, 2020, respectively, purported customers of FirstEnergy filed putative class action lawsuits against FE and FESC, as well as certain current and former FirstEnergy officers, alleging civil Racketeer Influenced and Corrupt Organizations Act violations and related state law claims. These actions have been consolidated, and the court denied FirstEnergy's motions to dismiss and stay discovery on February 10 and 11, 2021, respectively. Class certification discovery is proceeding.
- *State of Ohio ex rel. Dave Yost, Ohio Attorney General v. FirstEnergy Corp., et al. and City of Cincinnati and City of Columbus v. FirstEnergy Corp.* (Common Pleas Court, Franklin County, OH); on September 23, 2020 and October 27, 2020, the OAG and the cities of Cincinnati and Columbus, respectively, filed complaints against several parties including FE, each alleging civil violations of the Ohio Corrupt Activity Act in connection with the passage of HB 6. On January 13, 2021, the OAG filed a motion for a temporary restraining order and preliminary injunction against FirstEnergy seeking to enjoin FirstEnergy from collecting the Ohio Companies' decoupling rider. On January 31, 2021, FE reached a partial settlement with the OAG and the cities of Cincinnati and Columbus with respect to the temporary restraining order and preliminary injunction request and related issues. In connection with the partial settlement, the

Ohio Companies filed an application on February 1, 2021, with the PUCO to set their respective decoupling riders (CSR) to zero. On February 2, 2021, the PUCO approved the application of the Ohio Companies setting the rider to zero and no additional customer bills will include new decoupling rider charges after February 8, 2021. The cities of Dayton and Toledo have also been added as plaintiffs to the action. These actions have been consolidated. The cases are stayed pending final resolution of the United States v. Larry Householder, et al criminal proceeding described above.
- *Emmons v. FirstEnergy Corp. et al.* (Common Pleas Court, Cuyahoga County, OH); on August 4, 2020, a purported customer of FirstEnergy filed a putative class action lawsuit against FE, FESC, OE, TE and CEI, along with FES, alleging several causes of action, including negligence and/or gross negligence, breach of contract, unjust enrichment, and unfair or deceptive consumer acts or practices. On October 1, 2020, plaintiffs filed a First Amended Complaint, adding as a plaintiff a purported customer of FirstEnergy and alleging a civil violation of the Ohio Corrupt Activity Act and civil conspiracy against FE, FESC and FES. Motions to dismiss remain pending.

The plaintiffs in each of the above cases, seek, among other things, to recover an unspecified amount of damages (unless otherwise noted). In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE officers. Further, in letters dated January 26, and February 22, 2021, staff of FERC's Division of Investigations notified FirstEnergy that the Division is conducting an investigation of FirstEnergy's lobbying and governmental affairs activities concerning HB 6, and staff directed FirstEnergy to preserve and maintain all documents and information related to the same as such have been developed as part of an ongoing audit being conducted by FERC's Division of Audits and

Accounting. The outcome of any of these lawsuits, investigations and audit are uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. No contingency has been reflected in FirstEnergy's consolidated financial statements as a loss is neither probable, nor is a loss or range of a loss reasonably estimable.

*Internal Investigation Relating to United States v. Larry Householder, et al.*

As previously disclosed, a committee of independent members of the Board of Directors has been directing an internal investigation related to ongoing government investigations. In connection with FirstEnergy's internal investigation, such committee determined on October 29, 2020, to terminate FirstEnergy's Chief Executive Officer, Charles E. Jones, together with two other executives: Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding; and Michael J. Dowling, Senior Vice President of External Affairs. Each of these terminated executives violated certain FirstEnergy policies and its code of conduct. These executives were terminated as of October 29, 2020. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates. FirstEnergy believes that payments under the consulting agreement may have been for purposes other than those represented within the consulting agreement. Additionally, on November 8, 2020, Robert P. Reffner, Senior Vice President and Chief Legal Officer, and Ebony L. Yeboah-Amankwah, Vice President, General Counsel, and Chief Ethics Officer, were separated from FirstEnergy due to inaction and conduct that the Board determined was influenced by the improper tone at the top.

Additionally, on February 17, 2021, the Board appointed Mr. John W. Somerhalder II to the positions of Vice Chairperson of the Board and Executive Director of FE, each effective as of March 1, 2021. Mr. Donald T. Misheff will continue to serve as Non-Executive Chairman of the Board. Mr. Somerhalder will help lead efforts to enhance FirstEnergy's reputation. On March 7, 2021, the Board appointed Mr. Steven E. Strah to the position of Chief Executive Officer of FirstEnergy, effective as of March 8, 2021. On March 7, 2021, at the recommendation of the FirstEnergy Corporate Governance and Corporate Responsibility Committee, the Board also elected Mr. Strah as a Director of FirstEnergy, effective as of March 8, 2021, increasing the size of the Board from 11 to 12 members. Mr. Strah has been elected to the Board to serve for a term expiring at the FirstEnergy's 2021 Annual Meeting of Shareholders and until his successor shall have been elected.

Also, in connection with the internal investigation, FirstEnergy identified certain transactions, which, in some instances, extended back ten years of more, including vendor service, that were either improperly classified, misallocated to certain of the Utilities and Transmission Companies, or lacked proper supporting documentation. These transactions resulted in amounts collected from customers that were immaterial to FirstEnergy. The Utilities and Transmission Companies are working with the appropriate regulatory agencies to address these amounts.

31

The internal investigation has revealed no new material issues since FirstEnergy's Form 10-K was filed on February 18, 2021. The focus of the internal investigation has transitioned from a proactive investigation to continued cooperation with the ongoing government investigations.

*Nuclear Plant Matters*

On October 15, 2019, JCP&L, ME, PN and GPUN executed an asset purchase and sale agreement with TMI-2 Solutions, LLC, a subsidiary of EnergySolutions, LLC, concerning the transfer and dismantlement of TMI-2. This transfer of TMI-2 to TMI-2 Solutions, LLC will include the: (i) transfer of the ownership and operating NRC licenses for TMI-2; (ii) transfer of the external trusts for the decommissioning and environmental remediation of TMI-2; and (iii) assumption by TMI-2 Solutions, LLC, of certain liabilities, including all responsibility for the TMI-2 site, full decommissioning of TMI-2 and ongoing management of core debris material not previously transferred to the DOE. On August 10, 2020, JCP&L, ME, PN, GPUN, TMI-2 Solutions, LLC, and the PA DEP reached a settlement agreement regarding the decommissioning of TMI-2. On December 2, 2020, the NJBPU issued an order approving the transfer and sale under the conditions requested by NJ Rate Counsel and agreed to by JCP&L. Those conditions will restrict JCP&L from seeking recovery from its ratepayers for any future liabilities JCP&L could incur with respect to TMI-2. Also, on December 2, 2020, the NRC issued its order approving the license transfer as requested. With the receipt of all

required regulatory approvals, the transaction was consummated on December 18, 2020.

*FES Bankruptcy*

On March 31, 2018, FES, including its consolidated subsidiaries, FG, NG, FE Aircraft Leasing Corp., Norton Energy Storage L.L.C. and FGMUC, and FENOC filed voluntary petitions for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court and emerged on February 27, 2020. See Note 3, "Discontinued Operations," for additional discussion.

*Other Legal Matters*

There are various lawsuits, claims (including claims for asbestos exposure) and proceedings related to FirstEnergy's normal business operations pending against FE or its subsidiaries. The loss or range of loss in these matters is not expected to be material to FE or its subsidiaries. The other potentially material items not otherwise discussed above are described under Note 8, "Regulatory Matters."

FirstEnergy accrues legal liabilities only when it concludes that it is probable that it has an obligation for such costs and can reasonably estimate the amount of such costs. In cases where FirstEnergy determines that it is not probable, but reasonably possible that it has a material obligation, it discloses such obligations and the possible loss or range of loss if such estimate can be made. If it were ultimately determined that FE or its subsidiaries have legal liability or are otherwise made subject to liability based on any of the matters referenced above, it could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows.

## 10. SEGMENT INFORMATION

FE and its subsidiaries are principally involved in the transmission, distribution and generation of electricity through its reportable segments, Regulated Distribution and Regulated Transmission.

The **Regulated Distribution** segment distributes electricity through FirstEnergy's ten utility operating companies, serving approximately six million customers within 65,000 square miles of Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York, and purchases power for its POLR, SOS, SSO and default service requirements in Ohio, Pennsylvania, New Jersey and Maryland. This segment also controls 3,580 MWs of regulated electric generation capacity located primarily in West Virginia and Virginia. The segment's results reflect the costs of securing and delivering electric generation from transmission facilities to customers, including the deferral and amortization of certain related costs. Included within the segment is $45 million of assets classified as held for sale as of December 31, 2020, associated with the asset purchase agreement with Yards Creek; see Note 8, "Regulatory Matters," for additional information.

The **Regulated Transmission** segment provides transmission infrastructure owned and operated by the Transmission Companies and certain of FirstEnergy's utilities (JCP&L, MP, PE and WP) to transmit electricity from generation sources to distribution facilities. The segment's revenues are primarily derived from forward-looking formula rates at the Transmission Companies and JCP&L as well as stated transmission rates at MP, PE and WP; although as explained in Note 8, "Regulatory Matters," effective January 1, 2021, subject to refund, MP's, PE's and WP's existing stated rates became forward-looking formula rates. JCP&L previously had stated transmission rates, however, effective January 1, 2020, JCP&L implemented forward-looking formula rates, which were approved by FERC on April 15, 2021. Both forward-looking formula and stated rates recover costs that FERC determines are permitted to be recovered and provide a return on transmission capital investment. Under forward-looking formula rates, the revenue requirement is updated annually based on a projected rate base and projected costs, which is subject to an annual true-up based on actual costs. Revenue requirements under stated rates are calculated annually by multiplying the highest one-hour peak load in each respective transmission zone by the approved, stated rate in that zone. The segment's results also reflect the net transmission expenses related to the delivery of electricity on FirstEnergy's transmission facilities.

**Corporate/Other** reflects corporate support costs not charged to FE's subsidiaries, including FE's retained Pension and OPEB assets and liabilities of the FES Debtors, interest expense on FE's holding company debt and other businesses that do not constitute an operating segment. Reconciling adjustments for the elimination of inter-segment transactions and discontinued operations are shown separately in the following table of Segment Financial Information. See Note 3, "Discontinued Operations," for additional discussion. As of March 31, 2021, 67 MWs of electric generating capacity, representing AE Supply's OVEC capacity entitlement, was included in continuing operations of

Corporate/Other- As of March 31, 2021, Corporate/Other had approximately $8 billion of FE holding company debt.

Financial information for each of FirstEnergy's reportable segments is presented in the tables below:

**Segment Financial Information**

| For the Three Months Ended | Regulated Distribution | Regulated Transmission | Corporate/ Other | Reconciling Adjustments | FirstEnergy Consolidated |
|---|---|---|---|---|---|
| | | | *(In millions)* | | |
| **March 31, 2021** | | | | | |
| External revenues | $ 2,321 | $ 401 | $ 4 | $ — | $ 2,726 |
| Internal revenues | 49 | 4 | — | (53) | — |
| Total revenues | $ 2,370 | $ 405 | $ 4 | $ (53) | $ 2,726 |
| Depreciation | 226 | 81 | 1 | 15 | 323 |
| Amortization of regulatory assets, net | 87 | 5 | — | — | 92 |
| Miscellaneous income (expense), net | 107 | 11 | 22 | (5) | 135 |
| Interest expense | 128 | 61 | 101 | (5) | 285 |
| Income taxes (benefits) | 82 | 33 | (28) | — | 87 |
| Income (loss) from continuing operations | 313 | 109 | (87) | — | 335 |
| Property additions | $ 321 | $ 273 | $ 10 | $ — | $ 604 |
| **March 31, 2020** | | | | | |
| External revenues | $ 2,311 | $ 397 | $ 1 | $ — | $ 2,709 |
| Internal revenues | 47 | 4 | — | (51) | — |
| Total revenues | $ 2,358 | $ 401 | $ 1 | $ (51) | $ 2,709 |
| Depreciation | 223 | 76 | 2 | 16 | 317 |
| Amortization of regulatory assets, net | 49 | 3 | — | — | 52 |
| Miscellaneous income (expense), net | 75 | 6 | 25 | (6) | 100 |
| Interest expense | 127 | 52 | 90 | (6) | 263 |
| Income taxes (benefits) | (32) | 34 | (62) | — | (60) |
| Income (loss) from continuing operations | 136 | 117 | (229) | — | 24 |
| Property additions | $ 338 | $ 269 | $ 9 | $ — | $ 616 |
| **As of March 31, 2021** | | | | | |
| Total assets | $ 30,331 | $ 12,753 | $ 1,033 | $ — | $ 44,117 |
| Total goodwill | $ 5,004 | $ 614 | $ — | $ — | $ 5,618 |
| **As of December 31, 2020** | | | | | |
| Total assets | $ 30,855 | $ 12,592 | $ 1,017 | $ — | $ 44,464 |
| Total goodwill | $ 5,004 | $ 614 | $ — | $ — | $ 5,618 |

33

**ITEM 2.     Management's Discussion and Analysis of Financial Condition and Results of Operations**

**FIRSTENERGY CORP.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**FIRSTENERGY'S BUSINESS**

FE and its subsidiaries are principally involved in the transmission, distribution and generation of electricity through its reportable segments, Regulated Distribution and Regulated Transmission.

The **Regulated Distribution** segment distributes electricity through FirstEnergy's ten utility operating companies, serving approximately six million customers within 65,000 square miles of Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York, and purchases power for its POLR, SOS, SSO and default service requirements in Ohio, Pennsylvania, New Jersey and Maryland. This segment also controls 3,580 MWs of regulated electric generation capacity located primarily in West Virginia and Virginia. The segment's results reflect the costs of securing and delivering electric generation from transmission facilities to customers, including the deferral and amortization of certain related costs.

The **Regulated Transmission** segment provides transmission infrastructure owned and operated by the Transmission Companies and certain of FirstEnergy's utilities (JCP&L, MP, PE and WP) to transmit electricity from generation sources to distribution facilities. The segment's revenues are primarily derived from forward-looking formula rates at the Transmission Companies and JCP&L as well as stated transmission rates at MP, PE and WP; although as explained in Note 8, "Regulatory Matters", effective January 1, 2021, subject to refund, MP's, PE's and WP's existing stated rates became forward-looking formula rates. JCP&L previously had stated transmission rates, however, effective January 1, 2020, JCP&L implemented forward-looking formula rates, which were approved by FERC on April 15, 2021. Both forward-looking formula and stated rates recover costs that FERC determines are permitted to be recovered and provide a return on transmission capital investment. Under forward-looking formula rates, the revenue requirement is updated annually based on a projected rate base and projected costs, which is subject to an annual true-up based on actual costs. Revenue requirements under stated rates are calculated annually by multiplying the highest one-hour peak load in each respective transmission zone by the approved, stated rate in that zone. The segment's results also reflect the net transmission expenses related to the delivery of electricity on FirstEnergy's transmission facilities.

**Corporate/Other** reflects corporate support costs not charged to FE's subsidiaries, including FE's retained Pension and OPEB assets and liabilities of the FES Debtors, interest expense on FE's holding company debt and other businesses that do not constitute an operating segment. Additionally, reconciling adjustments for the elimination of inter-segment transactions and discontinued operations are included in Corporate/Other. As of March 31, 2021, 67 MWs of electric generating capacity, representing AE Supply's OVEC capacity entitlement, was included in continuing operations of Corporate/Other. As of March 31, 2021, Corporate/Other had approximately $8 billion of FE holding company debt.

34

**EXECUTIVE SUMMARY**

FirstEnergy is a forward-thinking fully regulated electric utility focused on stable and predictable earnings and cash flow from its regulated business units - Regulated Distribution and Regulated Transmission - through delivering enhanced customer service and reliability that supports FE's dividend.

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020. In addition to the subpoenas referenced above, the OAG, certain FE shareholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, each relating to the allegations against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE officers. Further, in a letter dated February 22, 2021, staff of FERC's Division of Investigations notified FirstEnergy that the Division is conducting an investigation of FirstEnergy's lobbying and governmental affairs activities concerning HB 6.

A committee of independent members of the FE Board of Directors was put in place to direct an internal investigation related to the ongoing government investigations. In addition, the Board formed a sub-committee of the Audit Committee to, together with the Board, assess FirstEnergy's compliance program and implement potential changes, as appropriate. FirstEnergy has taken the following steps to address current challenges and improve its compliance culture:

- Certain members of senior management, including the former Chief Executive Officer, were terminated for violating certain FirstEnergy policies and code of conduct.

- Immediately following these terminations, the independent members of its Board appointed Mr. Steven E. Strah to the position of Acting Chief Executive Officer and Mr. Christopher D. Pappas, a current member of the Board, to the temporary position of Executive Director. In March 2021, Mr. Strah was elected to the position of Chief Executive Officer and a Director of the Board.

- FirstEnergy's Chief Legal Officer and Chief Ethics Officer, were separated from FirstEnergy due to inaction and conduct that the Board determined was influenced by the improper tone at the top.

- The Board appointed Mr. John W. Somerhalder II to the positions of Vice Chairperson of the Board and Executive Director, replacing Mr. Pappas, who will continue to serve on the Board as an independent director. The Board also appointed Mr. Hyun Park to the position of Senior Vice President & Chief Legal Counsel and Mr. Antonio Fernández, to the position of Vice President and Chief Ethics and Compliance Officer. These executives will help play a critical role in enhancing FirstEnergy's culture of compliance, ethics, integrity and accountability.

- In March 2021, in connection with an agreement with Icahn Capital, the Board appointed Andrew Teno and Jesse Lynn as Directors to the Board, increasing the size from 12 directors to 14. However, until such time as all regulatory approvals are obtained, neither Mr. Teno nor Mr. Lynn will have the right to vote at any meeting of the Board or any committee thereof.

- FirstEnergy is making significant changes in its approach to political and legislative engagement and advocacy, through stopping all contributions to 501(c)(4) organizations, the pause of other political disbursements, including from the FirstEnergy Political Action Committee, limiting participation in the political process, suspending or terminating various political consulting relationships, and adding additional oversight and significantly more robust disclosure around political spending to provide increased transparency.

Also, in connection with the internal investigation, FirstEnergy identified certain transactions, which, in some instances, extended back ten years or more, including vendor service, that were either improperly classified, misallocated to certain of the Utilities and Transmission Companies, or lacked proper supporting documentation. These transactions resulted in amounts collected from customers that were immaterial to FirstEnergy. The Utilities and Transmission Companies are working with the appropriate regulatory agencies to address these amounts.

FirstEnergy has also taken proactive steps to reduce regulatory uncertainty affecting the Ohio Companies;

- On January 31, 2021, FirstEnergy reached a partial settlement with the OAG and other parties regarding decoupling. While the partial settlement with the OAG focused specifically on decoupling, the Ohio Companies will of their own accord not seek to recover lost distribution revenue from residential and commercial customers.

- On March 31, 2021, FirstEnergy announced that the Ohio Companies will proactively refund to customers amounts previously collected under the decoupling mechanism authorized under Ohio law, which totals approximately $27

35

million, with interest. Also on March 31, 2021, Governor DeWine signed HB 128, which, among other things, would repeal parts of HB 6, the legislation that established support for nuclear energy supply in Ohio, provided for a decoupling mechanism for electric utilities, and provided for the ending of current energy efficiency program mandates. These decisions meet or exceed the requirements in HB 128, fully address the rate impact of HB 6 on customers, and are another important step for FirstEnergy to move forward.

- FirstEnergy is committed to pursuing an open dialogue in an appropriate manner with the several regulatory proceedings currently underway, including several state management audits, and multi-year SEET and ESP quadrennial review, among other matters. FirstEnergy believes a holistic, transparent discussion with the PUCO staff, and interested stakeholders in the regulatory process, is an important step towards removing uncertainties about regulatory concerns in Ohio and critical to re-establishing trust in FirstEnergy and restoring its reputation.

Despite the many disruptions FirstEnergy is currently facing, the leadership team remains committed and focused on executing its strategy and running the business. See "Outlook - Other Legal Proceedings" below for additional details on the government investigation and subsequent litigation surrounding the investigation of HB 6. See also "Outlook - State Regulation - Ohio" below for details on the PUCO proceeding reviewing political and charitable spending and legislative activity in response to the investigation of HB 6. The outcome of the government investigations, PUCO proceedings, legislative activity, and any of these lawsuits is uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. As discussed below, FirstEnergy has made reductions to its Regulated Distribution and Regulated Transmission capital investment plans and is considering reductions to operating expenses, as well as changes to its planned equity issuances, to allow for flexibility should a fine, settlement payment or other regulatory actions be imposed as a result of the government investigations.

FirstEnergy is also working to improve how it conducts business and serve its customers. In February 2021, FirstEnergy announced a new initiative to build upon the company's strong operations and business fundamentals and deliver immediate value and resilience, with substantial operating and capital efficiencies ramping up through 2024. Called "FE Forward," the initiative will play a critical first step in FirstEnergy's transformation journey as it looks to optimize processes and procedures through range of opportunities, including:

- Optimizing operations by expanding capabilities in areas such as strategic sourcing, inventory optimization and commercial contract terms, and by standardizing best-in-class work management policies across the company;

- accelerating the company's digital transformation by revamping customers' online experience, automating sourcing data collection and management, and deploying advanced analytics in asset health decisions as well as vegetation management programs; and

- productivity improvements through system integration that puts advanced technology tools, such as mobile dashboards and remote access to asset management information, in the hands of frontline employees.

During the initial phase of FE Forward, FirstEnergy reviewed existing policies and practices, as well as the structure and processes around how decisions are made. In the second phase of FE Forward, FirstEnergy is diving deeper into the improvement opportunities uncovered and developing detailed, executable plans focusing on who, when, how and at what cost opportunities can be realized. By 2024, FE Forward is projected to generate approximately $300 million in annualized capital expenditure efficiencies while continuing to hold operating expenses flat by absorbing approximately $100 million in projected increases. In addition, FirstEnergy expects to generate approximately $250 million in working capital improvements by 2022. This program includes an estimated $150 million of costs to achieve through 2023, which are expected to be self-funded through these efficiencies. FE Forward is not a downsizing effort and there will not be any involuntary employee reductions in connection with this program. FirstEnergy expects that FE Forward will be a significant catalyst to augment the company's growth potential by

taking a more strategic approach to operating expenditures and reinvesting in a more diverse capital program that over the long-term continues to support a smarter and cleaner electric grid. As part of these efforts, FirstEnergy will evaluate the appropriate cadence to initiate rates cases on a state-by-state basis to best support the company's customer-focused strategic priorities.

| FE Forward Expected Capital Efficiencies and Working Capital Improvements | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2022 | 2023 |
| | *(In millions)* | | |
| Gross Capital Expenditure Efficiencies | $ 180 | $ 210 | $ 300 |
| Cost to Achieve (+/- 10%) | (40) | (60) | (50) |
| **Net Capital Expenditure Efficiencies** | **$ 140** | **$ 150** | **$ 250** |
| Working Capital Improvements | 100 | 150 | — |
| **Total Free Cash Flow Improvements** | **$ 240** | **$ 300** | **$ 250** |

As part of moving forward, FirstEnergy is continuously monitoring its supply chain and is working closely with essential vendors to understand the continued impact of COVID-19 to its business and does not currently expect disruptions in its ability to deliver service to customers or any material impact to its capital spending plan. FirstEnergy's Distribution and Transmission revenues benefit from geographic and economic diversity across a five-state service territory. Approximately two-thirds of the Utilities' base distribution revenues come from the residential customer class, and commercial and industrial revenues are primarily fixed and demand-based, rather than volume-based. As a result of this, FirstEnergy's Distribution and Transmission investments provide stable and predictable earnings. However, due to the actions taken by state governments in the company's service territories limiting certain commercial and industrial activities, FirstEnergy's residential load has increased, while commercial and industrial loads have declined, however, the magnitude of future load trends are currently unknown and difficult to predict. FirstEnergy believes it is well positioned to manage the economic slowdown resulting from the COVID-19 pandemic. However, the situation remains fluid and future impacts to FirstEnergy, that are presently unknown or unanticipated, may occur.

With an operating territory of 65,000 square miles, the scale and diversity of the ten Utilities that comprise the Regulated Distribution business uniquely position this business for growth through opportunities for additional investment, with plans to invest up to $6.6 billion in capital from 2020 to 2023. Over the past several years, Regulated Distribution has experienced rate base growth through investments that have improved reliability and added operating flexibility to the distribution infrastructure, which provide benefits to the customers and communities those Utilities serve. Additionally, this business is exploring other opportunities for growth, including investments in electric system improvement and modernization projects to increase reliability and improve service to customers, as well as exploring opportunities in customer engagement that focus on the electrification of customers' homes and businesses by providing a full range of products and services.

With approximately 24,000 miles of transmission lines in operation, the Regulated Transmission business is the centerpiece of FirstEnergy's regulated investment strategy with, 100% of its capital investments recovered under forward-looking formula rates at the Transmission Companies effective January 1, 2021. Regulated Transmission has also experienced significant growth as part of its Energizing the Future transmission plan with plans to invest up to $5.15 billion in capital from 2020 to 2023.

FirstEnergy believes there are incremental investment opportunities for its existing transmission infrastructure of over $20 billion beyond those identified through 2023, which are expected to strengthen grid and cyber-security and make the transmission system more reliable, robust, secure and resistant to extreme weather events, with improved operational flexibility.

While FirstEnergy continues to have customer-focused investment opportunities across its distribution and transmission businesses of up to $3 billion annually, it has discontinued providing a long-term earnings compound annual growth rate until there is further clarity regarding Ohio regulatory matters and the ongoing government investigations.

FE and the Utilities and FET and certain of its subsidiaries participate in two separate five-year syndicated revolving credit facilities providing for aggregate commitments of $3.5 billion, which are available until December 6, 2022. On November 17, 2020, FE and the Utilities and FET and certain of its subsidiaries entered into amendments to the FE credit facility and the FET credit facility, respectively. The amendment to the FE credit facility, among other things, reduces the sublimit applicable to FE to $1.5 billion, and the amendments increased certain tiers of pricing applicable to borrowings under the credit facilities.

On November 23, 2020, FE and JCP&L, ME, Penn, TE and WP, borrowed $950 million in the aggregate under the FE Revolving Facility, and FET and ATSI, borrowed $1 billion in the aggregate under the FET Revolving Facility. FE, FET and certain of their respective subsidiaries increased their borrowings under the Revolving Facilities as a proactive measure to increase their respective cash positions and preserve financial flexibility.

On March 19, 2021, FET issued $500 million of approximately 2.87% senior unsecured notes due 2028. Proceeds from the issuance were used to repay short-term borrowings on March 23, 2021, under the FET Revolving Credit Facility, bringing the outstanding principal balance under the FET Revolving Facility to $500 million with $500 million of remaining availability.

FE repaid $250 million in short-term borrowings under the FE Revolving Facility on March 23, 2021.

On April 9, 2021, MP issued $200 million in first mortgage bonds due 2027 at an effective interest rate of approximately 2.06%. Proceeds from the issuance were used to fund MP's ongoing capital expenditures, for working capital needs and for other general corporate purposes.

FirstEnergy does not currently anticipate the need to issue additional equity through 2021 and expects to issue, subject to, among other things, market conditions, pricing terms and business operations, up to $600 million of equity annually in 2022 and 2023, including up to $100 million in equity for its regular stock investment and employee benefit plans. FirstEnergy is also exploring various alternatives to raise equity capital in a manner that could be more value-enhancing to all stakeholders. FirstEnergy's expectations regarding the amount and timing of any potential equity issuances are subject to, among other matters, the ongoing government investigations and related lawsuits.

FirstEnergy has established new goals for key areas of its business that support the mission to be a forward-thinking electric utility powered by a diverse team of employees committed to making customers' lives brighter, the environment better, and our communities stronger.

In November 2020, FirstEnergy published its Climate Story which includes its climate position and strategy, as well as a new comprehensive and ambitious GHG emission goal. FirstEnergy pledged to achieve carbon neutrality by 2050 and set an interim goal for a 30% reduction in GHG within the company's direct operational control by 2030, based on 2019 levels. In addition, FirstEnergy has also set a fleet electrification goal in which beginning in 2021, FirstEnergy plans for 100% of new purchases for its light duty and aerial truck fleet to be electric or hybrid vehicles, creating a path to 30% fleet electrification by 2030. Also, later in 2021, FirstEnergy will seek approval to construct a solar generation source of at least 50 MWs in West Virginia. Future resource plans to achieve carbon reductions, including any determination of retirement dates of the regulated coal-fired generating facilities, will be developed by working collaboratively with regulators in West Virginia. Determination of the useful life of the regulated coal-fired generating facilities could result in changes in depreciation, and/or continued collection of net plant in rates after retirement, securitization, sale, impairment or regulatory disallowances. If MP is unable to recover these costs, it could have a material adverse effect on FirstEnergy's and/or MP's financial condition, results of operations, and cash flow.

In January 2021, the updated "Strategic Plan – Powered by our Core Values & Behaviors" was published. This comprehensive update provides a vision of the company's path forward in an evolving electric industry. It also articulates significant new goals that will help achieve our long-term strategic commitments in a transparent, sustainable and responsible manner. The Strategic Plan includes specific targets related to:

- Enhancing a culture of compliance through transparency and accountability;

- Enabling a smarter, more resilient electric system;

- Embracing innovation across the organization;

- Meeting the challenges of climate change;

- Developing a diverse and inclusive workforce, including 2025 goals to increase the number of employees and leaders from underrepresented racial and ethnic groups by 30% each and targeting 20% of supply chain spend to be with diverse suppliers;

- Building collaborative relationships, marked by trust and respect, with all stakeholders;

- Strengthening FirstEnergy's safety-first culture; and

- Delivering strong and predictable financial results.

38

**FINANCIAL OVERVIEW AND RESULTS OF OPERATIONS**

| *(In millions)* | For the Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | **Change** | |
| Revenues | $ 2,726 | $ 2,709 | $ 17 | 1 % |
| Operating expenses | 2,167 | 2,177 | (10) | — % |
| **Operating income** | 559 | 532 | 27 | 5 % |
| Other expenses, net | (137) | (568) | 431 | 76 % |
| **Income (loss) before income taxes (benefits)** | 422 | (36) | 458 | NM |
| **Income taxes (benefits)** | 87 | (60) | 147 | 245 % |
| **Income from continuing operations** | 335 | 24 | 311 | NM |
| Discontinued operations, net of tax | — | 50 | (50) | NM |
| **Net income** | $ 335 | $ 74 | $ 261 | 353 % |

*NM= not meaningful

The financial results discussed below include revenues and expenses from transactions among FirstEnergy's business segments. A reconciliation of segment financial results is provided in Note 10, "Segment Information," of the Notes to Consolidated Financial Statements.

39

***Summary of Results of Operations — First Quarter 2021 Compared with First Quarter 2020***

Financial results for FirstEnergy's business segments in the first quarter of 2021 and 2020 were as follows:

| | Regulated | Regulated | Corporate/Other and Reconciling | FirstEnergy |

| First Quarter 2021 Financial Results | Distribution | Transmission | Adjustments | Consolidated |
|---|---|---|---|---|
| | *(In millions)* | | | |
| **Revenues:** | | | | |
| Electric | $ 2,316 | $ 401 | $ (34) | $ 2,683 |
| Other | 54 | 4 | (15) | 43 |
| Total Revenues | 2,370 | 405 | (49) | 2,726 |
| | | | | |
| **Operating Expenses:** | | | | |
| Fuel | 118 | — | — | 118 |
| Purchased power | 714 | — | 4 | 718 |
| Other operating expenses | 728 | 67 | (43) | 752 |
| Provision for depreciation | 226 | 81 | 16 | 323 |
| Amortization of regulatory assets, net | 87 | 5 | — | 92 |
| General taxes | 201 | 62 | 10 | 273 |
| Gain on sale of Yards Creek | (109) | — | — | (109) |
| Total Operating Expenses | 1,965 | 215 | (13) | 2,167 |
| | | | | |
| Operating Income (Loss) | 405 | 190 | (36) | 559 |
| | | | | |
| **Other Income (Expense):** | | | | |
| Miscellaneous income, net | 107 | 11 | 17 | 135 |
| Interest expense | (128) | (61) | (96) | (285) |
| Capitalized financing costs | 11 | 2 | — | 13 |
| Total Other Expense | (10) | (48) | (79) | (137) |
| | | | | |
| Income (Loss) Before Income Taxes (Benefits) | 395 | 142 | (115) | 422 |
| Income taxes (benefits) | 82 | 33 | (28) | 87 |
| Net Income (Loss) | $ 313 | $ 109 | $ (87) | $ 335 |

| First Quarter 2020 Financial Results | Regulated Distribution | Regulated Transmission | Corporate/Other and Reconciling Adjustments | FirstEnergy Consolidated |
|---|---|---|---|---|
| | *(In millions)* | | | |
| **Revenues:** | | | | |
| Electric | $ 2,299 | $ 397 | $ (35) | $ 2,661 |
| Other | 59 | 4 | (15) | 48 |
| Total Revenues | 2,358 | 401 | (50) | 2,709 |
| | | | | |
| **Operating Expenses:** | | | | |
| Fuel | 98 | — | — | 98 |
| Purchased power | 690 | — | 4 | 694 |
| Other operating expenses | 699 | 53 | (3) | 749 |
| Provision for depreciation | 223 | 76 | 18 | 317 |
| Amortization of regulatory assets, net | 49 | 3 | — | 52 |
| General taxes | 195 | 62 | 10 | 267 |
| Total Operating Expenses | 1,954 | 194 | 29 | 2,177 |
| | | | | |
| Operating Income (Loss) | 404 | 207 | (79) | 532 |
| | | | | |
| **Other Income (Expense):** | | | | |
| Miscellaneous income, net | 75 | 6 | 19 | 100 |
| Pension and OPEB mark-to-market adjustment | (257) | (19) | (147) | (423) |
| Interest expense | (127) | (52) | (84) | (263) |
| Capitalized financing costs | 9 | 9 | — | 18 |
| Total Other Expense | (300) | (56) | (212) | (568) |
| | | | | |
| Income (Loss) Before Income Taxes (Benefits) | 104 | 151 | (291) | (36) |
| Income taxes (benefits) | (32) | 34 | (62) | (60) |
| Income (Loss) From Continuing Operations | 136 | 117 | (229) | 24 |
| Discontinued operations, net of tax | — | — | 50 | 50 |
| Net Income (Loss) | $ 136 | $ 117 | $ (179) | $ 74 |

41

| Changes Between First Quarter 2021 and First Quarter 2020 Financial Results | Regulated Distribution | Regulated Transmission | Corporate/Other and Reconciling Adjustments | FirstEnergy Consolidated |
|---|---|---|---|---|
| | *(In millions)* | | | |
| Revenues: | | | | |
| Electric | $ 17 | $ 4 | $ 1 | $ 22 |
| Other | (5) | — | — | (5) |
| Total Revenues | 12 | 4 | 1 | 17 |
| | | | | |
| Operating Expenses: | | | | |
| Fuel | 20 | — | — | 20 |
| Purchased power | 24 | — | — | 24 |
| Other operating expenses | 29 | 14 | (40) | 3 |
| Provision for depreciation | 3 | 5 | (2) | 6 |
| Amortization of regulatory assets, net | 38 | 2 | — | 40 |
| General taxes | 6 | — | — | 6 |
| Gain on sale of Yards Creek | (109) | — | — | (109) |
| Total Operating Expenses | 11 | 21 | (42) | (10) |
| | | | | |
| Operating Income (Loss) | 1 | (17) | 43 | 27 |
| | | | | |
| Other Income (Expense): | | | | |
| Miscellaneous income, net | 32 | 5 | (2) | 35 |
| Pension and OPEB mark-to-market adjustment | 257 | 19 | 147 | 423 |
| Interest expense | (1) | (9) | (12) | (22) |
| Capitalized financing costs | 2 | (7) | — | (5) |
| Total Other Expense | 290 | 8 | 133 | 431 |
| | | | | |
| Income (Loss) Before Income Taxes (Benefits) | 291 | (9) | 176 | 458 |
| Income taxes (benefits) | 114 | (1) | 34 | 147 |
| Income (Loss) From Continuing Operations | 177 | (8) | 142 | 311 |
| Discontinued operations, net of tax | — | — | (50) | (50) |
| Net Income (Loss) | $ 177 | $ (8) | $ 92 | $ 261 |

42

### Regulated Distribution — First Quarter 2021 Compared with First Quarter 2020

Regulated Distribution's net income increased $177 million in the first quarter of 2021, as compared to the same period of 2020, primarily resulting from the absence of the pension and OPEB mark-to-market adjustment in 2020, increased residential sales, including higher weather-related demand, earnings benefits from investment-related riders and the implementation of the base distribution rate case in New Jersey, partially offset by the absence of Ohio decoupling and lost distribution revenues.

*Revenues* —

The $12 million increase in total revenues resulted from the following sources:

| Revenues by Type of Service | For the Three Months Ended March 31, | | Increase (Decrease) |
|---|---|---|---|
| | 2021 | 2020 | |
| | *(In millions)* | | |
| Distribution[1] | $ 1,312 | $ 1,324 | $ (12) |

| Generation sales: | | | |
|---|---|---|---|
| Retail | 935 | 904 | 31 |
| Wholesale | 69 | 71 | (2) |
| Total generation sales | 1,004 | 975 | 29 |
| Other | 54 | 59 | (5) |
| **Total Revenues** | $ 2,370 | $ 2,358 | $ 12 |

(1) Includes $(27) million and $68 million of ARP revenues for the three months ended March 31, 2021 and 2020. The $27 million reduction in ARP revenues in the three months ended March 31, 2021, reflects the Ohio Companies decision to collectively refund to customers amounts previously collected under decoupling, with interest. See "Outlook," below for further discussion on Ohio decoupling rates.

Distribution revenues decreased $12 million in the first quarter of 2021, as compared to the same period of 2020, primarily resulting from the absence of decoupling and lost distribution revenues, including the decision to refund $27 million for previously collected decoupling revenues, lower revenues from energy efficiency programs in Ohio, the expiration of a NUG contract, and lower commercial and industrial sales due to the impact of COVID-19, partially offset by higher weather-related demands, higher rates associated with incremental riders in Ohio and Pennsylvania, including the recovery of capital investment programs and transmission expenses, and increased weather-adjusted residential sales due to the continued impact of COVID-19. Distribution services by customer class are summarized in the following table:

| | | **For the Three Months Ended March 31,** | | | | |
|---|---|---|---|---|---|---|
| | | **Actual** | | | **Weather-Adjusted and Leap Year-Adjusted** | |
| (in thousands) | | | | | | |
| **Electric Distribution MWH Deliveries** | **2021** | **2020** | **Increase (Decrease)** | **2021** | **2020** | **Increase (Decrease)** |
| Residential | 14,890 | 13,204 | 12.8 % | 15,397 | 14,899 | 3.3 % |
| Commercial(1) | 8,631 | 8,901 | (3.0) % | 8,853 | 9,399 | (5.8) % |
| Industrial | 13,257 | 13,548 | (2.1) % | 13,258 | 13,499 | (1.8) % |
| Total Electric Distribution MWH Deliveries | 36,778 | 35,653 | 3.2 % | 37,508 | 37,797 | (0.8) % |

(1) Includes street lighting.

Distribution deliveries to residential customers primarily reflects an increase in customer load due to the continued impact of COVID-19 and higher weather-related customer usage. Deliveries to commercial customers were lower due to the continued impact of COVID-19, partially offset by higher weather-related usage. Heating degree days were 14% above 2020 and 5% below normal. Deliveries to industrial customers were also negatively impacted due to the continued impact of COVID-19 contributing to lower steel, fabricated metals, chemical and educational services customer usage, partially offset by higher shale, and plastics and rubber manufacturing customer usage.

The following table summarizes the price and volume factors contributing to the $29 million increase in generation revenues for the first quarter of 2021, as compared to the same period of 2020:

| **Source of Change in Generation Revenues** | **Increase (Decrease)** |
|---|---|
| | **(In millions)** |
| Retail: | |
| Change in sales volumes | $ 113 |
| Change in prices | (82) |
| | 31 |
| Wholesale: | |
| Change in sales volumes | (5) |
| Change in prices | 15 |
| Capacity revenue | (12) |

| | (2) |
|---|---|
| Change in Generation Revenues | $ 29 |

The increase in retail generation sales volumes was primarily due to higher weather-related usage and decreased customer shopping in New Jersey and Pennsylvania. Total generation provided by alternative suppliers as a percentage of total MWH deliveries in the first quarter of 2021, as compared to the same period of 2020, decreased to 46% from 51% in New Jersey and to 61% from 66% in Pennsylvania. The decrease in retail generation prices primarily resulted from lower non-shopping generation auction rates.

Wholesale generation revenues decreased $2 million in the first quarter of 2021, as compared to the same period in 2020, primarily due to lower capacity revenue and sales volumes, partially offset by an increase in spot market energy prices. The difference between current wholesale generation revenues and certain energy costs incurred are deferred for future recovery or refund, with no material impact to earnings.

*Operating Expenses —*

Total operating expenses increased $11 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to the following:

- Fuel expense increased $20 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to higher unit costs and increased generation output.

- Purchased power costs increased $24 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to increased volumes as described above, partially offset by lower unit costs and the expiration of a NUG contract.

| Source of Change in Purchased Power | Increase (Decrease) |
|---|---|
| | *(In millions)* |
| Purchases | |
|   Change due to unit costs | $ (41) |
|   Change due to volumes | 64 |
| | 23 |
| Capacity expense | 1 |
| Increase in Purchased Power Costs | $ 24 |

- Other operating expenses increased $29 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to the following:

  - Higher network transmission expenses of $30 million, which were mostly deferred for future recovery, resulting in no material impact on current period earnings.
  - Increased storm restoration costs of $20 million, which were mostly deferred for future recovery, resulting in no material impact on current period earnings.
  - Higher incremental COVID-19 related expenses of $8 million, of which $2 million was deferred for future recovery.
  - Higher other operating and maintenance expenses of $8 million primarily associated with increased corporate support costs, partially offset by fewer planned outages at the regulated generation facilities.

- Higher pension and OPEB service costs of $6 million.
  - Lower energy efficiency program costs of $23 million. These costs are deferred for future recovery, resulting in no material impact on earnings.
  - Lower uncollectible expense of $20 million, of which $7 million was deferred for future recovery.

- Depreciation expense increased $3 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to a higher asset base, partially offset by a reduction in accretion expense as a result of the TMI-2 transfer, which has no impact to earnings.

- Amortization of regulatory assets, net increased $38 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to the reduction of the New Jersey deferred storm cost regulatory asset as a result of the Yards Creek sale and the amortization of a regulatory liability as part of the New Jersey base rate case implementation in 2021, higher rates associated with the Ohio uncollectible rider, lower energy efficiency related costs, decrease in deferral of accretion expense as a result of the TMI-2 transfer and recovery of distribution investment programs, partially offset by higher generation and transmission deferrals, storm restoration costs and lower Pennsylvania smart meter amortization.

- General taxes increased $6 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to higher payroll and sales-related taxes.

- Gain on sale of the Yards Creek Generating Facility of $109 million was netted against the New Jersey storm deferral, as described above, resulting in no impact to earnings.

*Other Expenses —*

Other expense decreased $290 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to the absence of the $257 million pension and OPEB mark-to-market adjustment in 2020 and higher net miscellaneous income resulting from lower pension non-service costs, partially offset by higher interest expense from increased borrowings under the revolving credit facilities to increase cash position and preserve financial flexibility.

*Income Taxes —*

Regulated Distribution's effective tax rate was 20.8% and (30.8)% for the three months ended March 31, 2021 and 2020, respectively. The change in the effective tax rate was primarily due to the absence of $52 million in deferred gains relating to prior intercompany transfers of generation assets that were triggered by the deconsolidation of the FES Debtors from FirstEnergy's consolidated federal income tax group as a result of their emergence from bankruptcy in the first quarter of 2020.

**Regulated Transmission — First Quarter 2021 Compared with First Quarter 2020**

Regulated Transmission's net income decreased $8 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to higher net financing costs, partially offset by a higher rate base at MAIT and ATSI.

*Revenues —*

Total revenues increased $4 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to recovery of incremental operating expenses and a higher rate base at MAIT and ATSI, partially offset by a lower rate base at TrAIL.

The following table shows revenues by transmission asset owner:

| Revenues by Transmission Asset Owner | For the Three Months Ended March 31, | | Increase (Decrease) |
|---|---|---|---|
| | 2021 | 2020 | |
| | *(In millions)* | | |
| ATSI | $ 208 | $ 205 | $ 3 |
| TrAIL | 61 | 65 | (4) |
| MAIT | 69 | 58 | 11 |
| JCP&L | 40 | 40 | — |
| Other | 27 | 33 | (6) |
| Total Revenues | $ 405 | $ 401 | $ 4 |

*Operating Expenses —*

Total operating expenses increased $21 million in the first quarter of 2021, as compared to the same period of 2020, primarily due to higher operating and maintenance expenses and depreciation due to a higher asset base. The majority of operating expenses are recovered through formula rates, resulting in no material impact on current period earnings.

*Other Expense —*

Other expenses decreased $8 million due to the absence of the $19 million pension and OPEB mark-to-market adjustment in 2020, partially offset by the impact of higher net financing costs from increased short-term borrowings under the revolving credit facilities at FET and ATSI, and an adjustment to previously capitalized interest at MAIT.

*Income Taxes —*

Regulated Transmission's effective tax rate was 23.2% and 22.5% for the three months ended March 31, 2021 and 2020, respectively.

**Corporate / Other — First Quarter 2021 Compared with First Quarter 2020**

Financial results at Corporate/Other resulted in a $92 million decrease in net loss in the first quarter of 2021, as compared to the same period of 2020, primarily due to the absence of a pension and OPEB mark-to-market adjustment and lower other operating expenses, partially offset by higher interest expense due to increased long-term debt, and the absence of a gain from discontinued operations, net of tax.

For the three months ended March 31, 2020, FirstEnergy recorded a gain from discontinued operations, net of tax, of $50 million. The gain primarily related to settlement expense of $4 million, accelerated net pension and OPEB prior service credits of $18 million and income tax benefits (including the estimated worthless stock deduction and adjustments from the tax sharing agreement with the FES Debtors) of $36 million.

**REGULATORY ASSETS AND LIABILITIES**

Regulatory assets represent incurred costs that have been deferred because of their probable future recovery from customers through regulated rates. Regulatory liabilities represent amounts that are expected to be credited to customers through future regulated rates or amounts collected from customers for costs not yet incurred. FirstEnergy, the Utilities and the Transmission Companies net their regulatory assets and liabilities based on federal and state jurisdictions.

Management assesses the probability of recovery of regulatory assets at each balance sheet date and whenever new events occur. Factors that may affect probability include changes in the regulatory environment, issuance of a regulatory commission order or passage of new legislation. Management applies judgment in evaluating the evidence available to assess the probability of recovery of regulatory assets from customers, including, but not limited to evaluating evidence related to precedent for similar items at FirstEnergy and information on comparable companies within similar jurisdictions, as well as assessing progress of communications between FirstEnergy and regulators. Certain of these regulatory assets, totaling approximately $117 million as of March 31, 2021 and December 31, 2020, are recorded based on prior precedent or anticipated recovery based on rate making premises without a specific order, of which, $78 million and $79 million as of March 31, 2021 and December 31, 2020, respectively, are being sought for recovery in a formula rate amendment filing at ATSI that is pending before FERC. See Note 8, "Regulatory Matters" for additional information.

The following table provides information about the composition of net regulatory assets and liabilities as of March 31, 2021, and December 31, 2020, and the changes during the three months ended March 31, 2021:

| Net Regulatory Assets (Liabilities) by Source | March 31, 2021 | | December 31, 2020 | | Change | |
|---|---:|---|---:|---|---:|---|
| | | | *(In millions)* | | | |
| Customer payables for future income taxes | $ | (2,336) | $ | (2,369) | $ | 33 |
| Spent nuclear fuel disposal costs | | (99) | | (102) | | 3 |
| Asset removal costs | | (707) | | (721) | | 14 |
| Deferred transmission costs | | 285 | | 319 | | (34) |
| Deferred generation costs | | 43 | | 17 | | 26 |
| Deferred distribution costs | | 51 | | 79 | | (28) |
| Contract valuations | | 37 | | 41 | | (4) |
| Storm-related costs | | 649 | | 748 | | (99) |
| Uncollectible and COVID-19 related costs | | 67 | | 97 | | (30) |
| Energy efficiency program costs | | 42 | | 42 | | — |
| New Jersey societal benefit costs | | 112 | | 112 | | — |
| Regulatory transition costs | | (24) | | (20) | | (4) |
| Other | | 12 | | 13 | | (1) |
| Net Regulatory Liabilities included on the Consolidated Balance Sheets | $ | (1,868) | $ | (1,744) | $ | (124) |

The following is a description of the regulatory assets and liabilities described above:

**Customer payables for future income taxes** - Reflects amounts to be recovered or refunded through future rates to pay income taxes that become payable when rate revenue is provided to recover items such as AFUDC-equity and depreciation of property, plant and equipment for which deferred income taxes were not recognized for ratemaking purposes, including amounts attributable to tax rate changes such as tax reform. These amounts are being amortized over the period in which the related deferred tax assets reverse, which is generally over the expected life of the underlying asset.

**Spent nuclear fuel disposal costs** - Reflects amounts collected from customers, and the investment income, losses and changes in fair value of the trusts for spent nuclear fuel disposal costs related to the former nuclear generating facilities, Oyster Creek and TMI-1.

**Asset removal costs** - Primarily represents the rates charged to customers that include a provision for the cost of future activities to remove assets, including obligations for which an ARO has been recognized, that are expected to be incurred at the time of retirement.

**Deferred transmission costs** - Primarily represents differences between revenues earned based on actual costs for the formula-rate Transmission Companies and the amounts billed. Amounts are recorded as a regulatory asset or liability and recovered or refunded, respectively, in subsequent periods.

**Deferred generation costs** - Primarily relates to regulatory assets associated with the securitized recovery of certain electric customer

heating discounts, fuel and purchased power regulatory assets at the Ohio Companies (amortized through 2034) as well as the ENEC at MP and PE. MP and PE recover net power supply costs, including fuel, purchased power costs and related expenses, net of related market sales revenue through the ENEC. The ENEC rate is updated annually.

**Deferred distribution costs** - Primarily relates to the Ohio Companies' deferral of certain expenses resulting from distribution and reliability related expenditures, including interest (amortized through 2036), as well as the Ohio Companies' deferrals related to the decoupling mechanism which are recorded as a regulatory asset or liability and recovered or refunded, respectively, in subsequent periods.

**Contract valuations** - Includes the amortization of purchase accounting adjustments at PE which were recorded in connection with the Allegheny Energy, Inc. merger representing the fair value of NUG purchased power contracts (amortized over the life of the contracts through 2030).

**Storm-related costs** - Relates to the deferral of storm costs, net of recovery, which vary by jurisdiction. Approximately $160 million and $167 million are currently being recovered through rates as of March 31, 2021 and December 31, 2020, respectively.

**Uncollectible and COVID-19 related costs** - Includes the deferral of prudently incurred incremental costs arising from COVID-19, including uncollectible expenses under new and existing riders prior to the pandemic.

**Energy efficiency program costs** - Relates to the recovery of costs in excess of revenues associated with energy efficiency programs including the Pennsylvania Companies' EE&C programs, the Ohio Companies' Demand Side Management and Energy Efficiency Rider, and PE's EmPOWER Maryland Surcharge.

**New Jersey societal benefit costs** - Primarily relates to regulatory assets associated with manufactured gas plant remediation, energy efficiency and renewable energy programs, universal service and lifeline funds, and consumer education in New Jersey.

**Regulatory transition costs** - Includes the recovery of PN above-market NUG costs; JCP&L costs incurred during the transition to a competitive retail market and under-recovery during the period from August 1, 1999 through July 31, 2003; and JCP&L costs associated with BGS, capacity and ancillary services, net of revenues from the sale of the committed supply in the wholesale market.

The following table provides information about the composition of net regulatory assets that do not earn a current return as of March 31, 2021 and December 31, 2020, of which approximately $185 million and $195 million, respectively, are currently being recovered through rates over varying periods, through 2068, depending on the nature of the deferral and the jurisdiction.

| Regulatory Assets by Source Not Earning a Current Return | March 31, 2021 | December 31, 2020 | Change |
|---|---|---|---|
| | *(In millions)* | | |
| Spent nuclear fuel disposal costs | $ 1 | $ 1 | $ — |
| Deferred transmission costs | 6 | 17 | (11) |
| Deferred generation costs | 5 | 5 | — |
| Deferred distribution costs | 1 | 1 | — |
| Storm-related costs | 551 | 654 | (103) |
| COVID-19 related costs | 70 | 66 | 4 |
| Energy efficiency costs | 1 | 1 | — |
| Regulatory transition costs | 15 | 16 | (1) |
| Other | 24 | 28 | (4) |
| Regulatory Assets Not Earning a Current Return | $ 674 | $ 789 | $ (115) |

**CAPITAL RESOURCES AND LIQUIDITY**

FirstEnergy's business is capital intensive, requiring significant resources to fund operating expenses, construction expenditures, scheduled debt maturities and interest payments, dividend payments, and potential contributions to its pension plan.

FirstEnergy does not currently anticipate the need to issue additional equity through 2021 and expects to issue, subject to, among other things, market conditions, pricing terms and business operations, up to $600 million of equity annually in 2022 and 2023, including up to $100 million in equity for its regular stock investment and employee benefit plans. FirstEnergy is also exploring various alternatives to raise equity capital in a manner that could be more value-enhancing to all stakeholders. FirstEnergy's expectations regarding the amount and timing of any potential equity issuances are subject to, among other matters, the ongoing government investigations and related lawsuits.

In addition to this equity investment, FE and its distribution and transmission subsidiaries expect their existing sources of liquidity to remain sufficient to meet their respective anticipated obligations. In addition to internal sources to fund liquidity and capital requirements for 2021 and beyond, FE and its distribution and transmission subsidiaries expect to rely on external sources of funds. Short-term cash requirements not met by cash provided from operations are generally satisfied through short-term borrowings. Long-term cash needs may be met through the issuance of long-term debt by FE and certain of its distribution and transmission subsidiaries to, among other things, fund capital expenditures and refinance short-term and maturing long-term debt, subject to market conditions and other factors.

With an operating territory of 65,000 square miles, the scale and diversity of the ten Utilities that comprise the Regulated Distribution business uniquely position this business for growth through opportunities for additional investment, with plans to invest up to $6.6 billion in capital from 2020 to 2023. Over the past several years, Regulated Distribution has experienced rate base growth through investments that have improved reliability and added operating flexibility to the distribution infrastructure, which provide benefits to the customers and communities those Utilities serve. Additionally, this business is exploring other opportunities for growth, including investments in electric system improvement and modernization projects to increase reliability and improve service to customers, as well as exploring opportunities in customer engagement that focus on the electrification of customers' homes and businesses by providing a full range of products and services.

FirstEnergy believes there are incremental investment opportunities for its existing transmission infrastructure of over $20 billion beyond those identified through 2023, which are expected to strengthen grid and cyber-security and make the transmission system more reliable, robust, secure and resistant to extreme weather events, with improved operational flexibility.

In alignment with FirstEnergy's strategy to invest in its Regulated Transmission and Regulated Distribution segments as a fully regulated company, FirstEnergy is focused on maintaining balance sheet strength and flexibility. Specifically, at the regulated businesses, regulatory authority has been obtained for various regulated distribution and transmission subsidiaries to issue and/or refinance debt.

Any financing plans by FE or any of its consolidated subsidiaries, including the issuance of equity and debt, and the refinancing of short-term and maturing long-term debt are subject to market conditions and other factors. No assurance can be given that any such issuances, financing or refinancing, as the case may be, will be completed as anticipated or at all. Any delay in the completion of financing plans could require FE or any of its consolidated subsidiaries to utilize short-term borrowing capacity, which could impact available liquidity. In addition, FE and its consolidated subsidiaries expect to continually evaluate any planned financings, which may result in changes from time to time.

On March 31, 2018, the FES Debtors announced that, in order to facilitate an orderly financial restructuring, they filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code with the Bankruptcy Court. On February 27, 2020, the FES Debtors effectuated their plan, emerged from bankruptcy and FirstEnergy tendered the bankruptcy court approved settlement payments totaling $853 million and a $125 million tax sharing payment to the FES Debtors.

The outbreak of COVID-19 is a global pandemic. FirstEnergy is continuously evaluating the global pandemic and taking steps to mitigate known risks. FirstEnergy is actively monitoring the continued impact COVID-19 is having on its customers' receivable balances, which include increasing arrears balances since the pandemic has begun. FirstEnergy has incurred, and it is expected to incur for the foreseeable future, COVID-19 pandemic related expenses. COVID-19 related expenses consist of additional costs that FirstEnergy is incurring to protect its employees, contractors and customers, and to support social distancing requirements. These costs include, but are not limited to, new or added benefits provided to employees, the purchase of additional personal protection equipment and disinfecting supplies, additional facility cleaning services, initiated programs and communications to customers on utility response, and increased technology expenses to support remote working, where possible. The full impact on FirstEnergy's business from the COVID-19 pandemic, including the governmental and regulatory responses, is unknown at this time and difficult to predict. FirstEnergy provides a critical and essential service to its customers and the health and safety of its employees, contractors and customers is its first priority. FirstEnergy is continuously monitoring its supply chain and is working closely with essential vendors to understand the continued impact the COVID-19 pandemic is having on its business, however, FirstEnergy does not currently expect disruptions in its ability to deliver service to customers or any material impact on its capital spending plan.

FirstEnergy continues to effectively manage operations during the pandemic in order to provide critical service to customers and believes it is well positioned to manage through the economic slowdown. FirstEnergy Distribution and Transmission revenues benefit from geographic and economic diversity across a five-state service territory, which also allows for flexibility with capital investments and measures to maintain sufficient liquidity over the next twelve months. However, the situation remains fluid and future impacts to FirstEnergy that are presently unknown or unanticipated may occur. Furthermore, the likelihood of an impact to FirstEnergy, and the severity of any impact that does occur, could increase the longer the global pandemic persists.

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020. In addition to the subpoenas referenced above, the OAG, certain FE shareholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, each relating to the allegations against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE officers. Further, in a letter dated February 22, 2021, staff of FERC's Division of Investigations notified FirstEnergy that the Division is conducting an investigation of FirstEnergy's lobbying and governmental affairs activities concerning HB 6.

Despite the many disruptions FirstEnergy is currently facing, the leadership team remains committed and focused on executing its strategy and running the business. See "Outlook - Other Legal Proceedings" below for additional details on the government investigation and subsequent litigation surrounding the investigation of HB 6. See also "Outlook - State Regulation - Ohio" below for details on the PUCO proceeding reviewing political and charitable spending and legislative activity in response to the investigation of HB 6. The outcome of the government investigations, PUCO proceedings, legislative activity, and any of these lawsuits is uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. As discussed below, FirstEnergy has made reductions to its Regulated Distribution and Regulated Transmission capital investment plans and is considering reductions to operating expenses, as well as changes to its planned equity issuances, to allow for flexibility should a fine, settlement payment or other regulatory actions be imposed as a result of the government investigations.

As further discussed below, in connection with a partial settlement with the OAG and other parties, the Ohio Companies filed an application with the PUCO on February 1, 2021, to set the respective decoupling riders (CSR) to zero. On February 2, 2021, the PUCO approved the application. While the partial settlement with the OAG focused specifically on decoupling, the Ohio Companies will of their own accord not seek to recover lost distribution revenue from residential and commercial customers. FirstEnergy is committed to pursuing an open dialogue with stakeholders in an appropriate manner with respect to the numerous regulatory proceedings currently underway as further discussed herein. On March 31, 2021, FirstEnergy announced that the Ohio Companies will collectively refund to customers amounts previously collected under decoupling, including interest, which total approximately $27 million.

As of March 31, 2021, FirstEnergy's net deficit in working capital (current assets less current liabilities) was primarily due to accounts payable, short-term borrowings, current portions of long-term debt, and accrued interest, taxes, and compensation and benefits. FirstEnergy believes its cash from operations and available liquidity will be sufficient to meet its current working capital needs.

### *Short-Term Borrowings / Revolving Credit Facilities*

FE and the Utilities and FET and certain of its subsidiaries participate in two separate five-year syndicated revolving credit facilities providing for aggregate commitments of $3.5 billion, which are available until December 6, 2022. Under the FE credit facility, an aggregate amount of $2.5 billion is available to be borrowed, repaid and reborrowed, subject to separate borrowing sublimits for each borrower including FE and its regulated distribution subsidiaries. Under the FET credit facility, an aggregate amount of $1.0 billion is available to be borrowed, repaid and reborrowed under a syndicated credit facility, subject to separate borrowing sublimits for each borrower including FE's transmission subsidiaries.

Borrowings under the credit facilities may be used for working capital and other general corporate purposes, including intercompany loans and advances by a borrower to any of its subsidiaries. Generally, borrowings under each of the credit facilities are available to each borrower separately and mature on the earlier of 364 days from the date of borrowing or the commitment termination date, as the same may be extended.

Each of the credit facilities contains financial covenants requiring each borrower to maintain a consolidated debt-to-total-capitalization ratio (as defined under each of the credit facilities) of no more than 65%, and 75% for FET, measured at the end of each fiscal quarter.

FirstEnergy's revolving credit facilities bear interest at fluctuating interest rates, primarily based on LIBOR. LIBOR tends to fluctuate based on general interest rates, rates set by the U.S. Federal Reserve and other central banks, the supply of and demand for credit in the London interbank market and general economic conditions. FirstEnergy has not hedged its interest rate exposure with respect to its floating rate debt. Accordingly, FirstEnergy's interest expense for any particular period will fluctuate based on LIBOR and other variable interest rates. On July 27, 2017, the Financial Conduct Authority (the authority that regulates LIBOR), or FCA, announced that it intends to stop compelling banks to submit rates for the calculation of LIBOR after 2021.

50

Subsequently, on March 5, 2021, ICE Benchmark Administration Limited (the entity that calculates and publishes LIBOR), or IBA, and FCA made public statements regarding the future cessation of LIBOR. According to the FCA, IBA will permanently cease to publish each of the LIBOR settings on either December 31, 2021 or June 30, 2023. IBA did not identify any successor administrator in its announcement. The announced final publication date for 1-week and 2-month LIBOR settings and all settings for non-USD LIBOR is December 31, 2021. The announced final publication date for overnight, 1-month, 3-month, 6-month and 12-month LIBOR settings is June 30, 2023. It is unclear whether new methods of calculating LIBOR will be established such that it continues to exist after such end dates, and there is considerable uncertainty regarding the publication or representativeness of LIBOR beyond such end dates. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, is seeking to replace U.S. dollar LIBOR with a newly created index (the secured overnight financing rate or SOFR), calculated based on repurchase agreements backed by treasury securities. It is not possible to predict the effect of these changes, other reforms or the establishment of alternative reference rates in the United Kingdom, the United States or elsewhere. To the extent these interest rates increase, interest expense will increase. If sources of capital for us are reduced, capital costs could increase materially. Restricted access to capital markets and/or increased borrowing costs could have an adverse effect on FirstEnergy's results of operations, cash flows, financial condition and liquidity.

On November 17, 2020, FE and the Utilities and FET and certain of its subsidiaries entered into amendments to the FE credit facility and the FET credit facility, respectively. The amendments provide for modifications and/or waivers of: (i) certain representations and warranties and (ii) certain affirmative and negative covenants, contained therein, which allowed FirstEnergy to regain compliance with such provisions. In addition, among other things, the amendment to the FE credit facility reduces the sublimit applicable to FE to $1.5 billion, and the amendments increased certain tiers of pricing applicable to borrowings under the credit facilities.

On November 23, 2020, JCP&L, ME, Penn, TE and WP, borrowed $950 million in the aggregate under the FE Revolving Facility, bringing the outstanding principal balance under the FE Revolving Facility to $1.2 billion, with $1.3 billion of remaining availability under the FE Revolving Facility. On November 23, 2020, FET and ATSI, borrowed $1 billion in the aggregate under the FET Revolving Facility, bringing the outstanding principal balance under the FET Revolving Facility to $1 billion, with no remaining availability under the FET Revolving Facility. FE, FET and certain of their respective subsidiaries increased their borrowings under the Revolving Facilities as a proactive measure to increase their respective cash positions and preserve financial flexibility.

On March 19, 2021, FET issued $500 million of approximately 2.87% senior unsecured notes due 2028. Proceeds from the issuance were used to repay short-term borrowings on March 23, 2021, under the FET Revolving Credit Facility, bringing the outstanding principal balance under the FET Revolving Facility to $500 million with $500 million of remaining availability.

FE repaid $250 million in short-term borrowings under the FE Revolving Facility on March 23, 2021.

On April 9, 2021, MP issued $200 million in first mortgage bonds due 2027 at an effective interest rate of approximately 2.06%. Proceeds from the issuance were used to fund MP's ongoing capital expenditures, for working capital needs and for other general corporate purposes.

FirstEnergy had $1,450 million and $2,200 million of short-term borrowings as of March 31, 2021 and December 31, 2020, respectively. FirstEnergy's available liquidity from external sources as of April 19, 2021, was as follows:

| Borrower(s) | Type | Maturity | Commitment | | Available Liquidity |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| FirstEnergy[1] | Revolving | December 2022 | $ | 2,500 | $ 1,546 |
| FET[2] | Revolving | December 2022 | | 1,000 | 500 |

| | | | |
|---|---|---|---|
| Subtotal | $ 3,500 | $ | 2,046 |
| Cash and cash equivalents | — | | 1,603 |
| Total | $ 3,500 | $ | 3,649 |

(1) FE and the Utilities. Available liquidity includes impact of $4 million of LOCs issued under various terms.
(2) Includes FET and the Transmission Companies.

51

The following table summarizes the borrowing sublimits for each borrower under the facilities, the limitations on short-term indebtedness applicable to each borrower under current regulatory approvals and applicable statutory and/or charter limitations as of March 31, 2021:

| Borrower | FirstEnergy Revolving Credit Facility Sublimit | FET Revolving Credit Facility Sublimit | Regulatory and Other Short-Term Debt Limitations | |
|---|---|---|---|---|
| | *(In millions)* | | | |
| FE | $ 1,500 | $ — | $ — | (1) |
| FET | — | 1,000 | — | (1) |
| OE | 500 | — | 500 | (2) |
| CEI | 500 | — | 500 | (2) |
| TE | 300 | — | 300 | (2) |
| JCP&L | 500 | — | 500 | (2) |
| ME | 500 | — | 500 | (2) |
| PN | 300 | — | 300 | (2) |
| WP | 200 | — | 200 | (2) |
| MP | 500 | — | 500 | (2) |
| PE | 150 | — | 150 | (2) |
| ATSI | — | 500 | 500 | (2) |
| Penn | 100 | — | 100 | (2) |
| TrAIL | — | 400 | 400 | (2) |
| MAIT | — | 400 | 400 | (2) |

(1) No limitations.
(2) Includes amounts which may be borrowed under the regulated companies' money pool.

Subject to each borrower's sublimit, $250 million of the FE credit facility and $100 million of the FET credit facility, is available for the issuance of LOCs (subject to borrowings drawn under the Facilities) expiring up to one year from the date of issuance. The stated amount of outstanding LOCs will count against total commitments available under each of the Facilities and against the applicable borrower's borrowing sublimit.

The Facilities do not contain provisions that restrict the ability to borrow or accelerate payment of outstanding advances in the event of any change in credit ratings of the borrowers. Pricing is defined in "pricing grids," whereby the cost of funds borrowed under the Facilities is related to the credit ratings of the company borrowing the funds. Additionally, borrowings under each of the Facilities are subject to the usual and customary provisions for acceleration upon the occurrence of events of default, including a cross-default for other indebtedness in excess of $100 million.

As of March 31, 2021, the borrowers were in compliance with the applicable debt-to-total-capitalization ratio covenants in each case as defined under the respective Facilities.

***FirstEnergy Money Pools***

FirstEnergy's utility operating subsidiary companies also have the ability to borrow from each other and FE to meet their short-term working

capital requirements. Similar but separate arrangements exist among FirstEnergy's unregulated companies with AE Supply, FE, FET, FEV and certain other unregulated subsidiaries. FESC administers these money pools and tracks surplus funds of FE and the respective regulated and unregulated subsidiaries, as the case may be, as well as proceeds available from bank borrowings. Companies receiving a loan under the money pool agreements must repay the principal amount of the loan, together with accrued interest, within 364 days of borrowing the funds. The rate of interest is the same for each company receiving a loan from their respective pool and is based on the average cost of funds available through the pool. The average interest rate for borrowings in the first quarter of 2021 was 1.87% per annum for the regulated companies' money pool and 1.28% per annum for the unregulated companies' money pool.

52

### Long-Term Debt Capacity

FE's and its subsidiaries' access to capital markets and costs of financing are influenced by the credit ratings of their securities. The following table displays FE's and its subsidiaries' credit ratings as of April 19, 2021:

| Issuer | Corporate Credit Rating | | | Senior Secured | | | Senior Unsecured | | | Outlook/Watch [1] | | |
|--------|-----|---------|-------|------|---------|-------|------|---------|-------|------|---------|-------|
| | S&P | Moody's | Fitch | S&P | Moody's | Fitch | S&P | Moody's | Fitch | S&P | Moody's | Fitch |
| FE | BB | Ba1 | BB+ | — | — | — | BB | Ba1 | BB+ | CW-N | N | N |
| AGC | BB | Baa2 | BBB- | — | — | — | — | — | — | CW-N | S | N |
| ATSI | BB | A3 | BBB- | — | — | — | BB+ | A3 | BBB | CW-N | S | N |
| CEI | BB | Baa2 | BBB- | BBB | A3 | BBB+ | BB+ | Baa2 | BBB | CW-N | N | N |
| FET | BB | Baa2 | BB+ | — | — | — | BB | Baa2 | BB+ | CW-N | N | N |
| JCP&L | BB | A3 | BBB- | — | — | — | BB+ | A3 | BBB | CW-N | S | N |
| ME | BB | A3 | BBB- | — | — | — | BB+ | A3 | BBB | CW-N | S | N |
| MAIT | BB | A3 | BBB- | — | — | — | BB+ | A3 | BBB | CW-N | S | N |
| MP | BB | Baa2 | BBB- | BBB | A3 | BBB+ | BB+ | Baa2 | — | CW-N | S | N |
| OE | BB | A3 | BBB- | BBB | A1 | BBB+ | BB+ | A3 | BBB | CW-N | S | N |
| PN | BB | Baa1 | BBB- | — | — | — | BB+ | Baa1 | BBB | CW-N | S | N |
| Penn | BB | A3 | BBB- | BBB | A1 | BBB+ | — | — | — | CW-N | S | N |
| PE | BB | Baa2 | BBB- | BBB | A3 | BBB+ | — | — | — | CW-N | S | N |
| TE | BB | Baa1 | BBB- | BBB | A2 | BBB+ | — | — | — | CW-N | N | N |
| TrAIL | BB | A3 | BBB- | — | — | — | BB+ | A3 | BBB | CW-N | S | N |
| WP | BB | A3 | BBB- | BBB | A1 | BBB+ | — | — | — | CW-N | S | N |

[1] S = Stable, P = Positive, N = Negative, CW-N = CreditWatch with Negative implications

The applicable undrawn and drawn margin on the FE and FET credit facilities are subject to ratings based pricing grids. The applicable fee paid on the undrawn commitments under the FE and FET credit facilities are based on FE and FET's senior unsecured non-credit enhanced debt ratings as determined by S&P and Moody's. The fee paid on actual borrowings are determined based on each borrower's senior unsecured non-credit enhanced debt ratings as determined by S&P and Moody's.

The interest rate payable on approximately $3.85 billion in FE's senior unsecured notes are subject to adjustments from time to time if the ratings on the notes from any one or more of S&P, Moody's and Fitch decreases to a rating set forth in the applicable documents. Generally a one-notch downgrade by the applicable rating agency may result in a 25 bps coupon rate increase beginning at BB, Ba1, and BB+ for S&P, Moody's and Fitch, respectively, to the extent such rating is applicable to the series of outstanding senior unsecured notes, during the next interest period, subject to an aggregate cap of 2% from issuance interest rate.

Debt capacity is subject to the consolidated debt-to-total-capitalization limits in the credit facilities previously discussed. As of March 31, 2021, FE and its subsidiaries could issue additional debt of approximately $5.3 billion, or incur a $2.8 billion reduction to equity, and remain within the limitations of the financial covenants required by the FE credit facility.

### Changes in Cash Position

As of March 31, 2021, FirstEnergy had $1,281 million of cash and cash equivalents and $45 million of restricted cash compared to $1,734

million of cash and cash equivalents and $67 million of restricted cash as of December 31, 2020, on the Consolidated Balance Sheets.

### Cash Flows From Operating Activities

FirstEnergy's most significant sources of cash are derived from electric service provided by its distribution and transmission operating subsidiaries. Beyond the cash settlement and tax sharing payments to the FES Debtors in the first quarter of 2020, the most significant use of cash from operating activities is buying electricity to serve non-shopping customers and paying fuel suppliers, employees, tax authorities, lenders and others for a wide range of materials and services.

FirstEnergy's Consolidated Statement of Cash Flows combines cash flows from discontinued operations with cash flows from continuing operations within each cash flow category. For the three months ended March 31, 2020, cash flows from operating activities includes income from discontinued operations of $50 million.

In the first quarter of 2021, cash provided from (used for) operating activities was $533 million compared to $(560) million in the same period of 2020. The increase in cash provided from (used for) operating activities is primarily due to the absence of a $978

53

million cash settlement and tax sharing payment made to the FES Debtors upon their emergence in February 2020, increased sales, the impact of distribution rider and transmission investment recovery, and increased collections of customer account receivable balances.

### Cash Flows From Financing Activities

In the first quarter of 2021, cash provided from (used for) financing activities was $(509) million compared to $725 million during the same period of 2020. The following table summarizes new debt financing, redemptions, repayments, short-term borrowings and dividends:

| Securities Issued or Redeemed / Repaid | For the Three Months Ended March 31, | |
|---|---|---|
| | 2021 | 2020 |
| | (In millions) | |
| New Issues - Unsecured notes | $ 500 | $ 2,000 |
| Redemptions / Repayments | | |
| Term loan | $ — | $ (750) |
| Senior secured notes | (29) | (28) |
| | $ (29) | $ (778) |
| Short-term redemptions, net | $ (750) | $ (250) |
| Common stock dividend payments | $ (212) | $ (211) |

On March 19, 2021, FET issued $500 million of approximately 2.87% senior unsecured notes due 2028. Proceeds from the issuance were used to repay short-term borrowings under the FET Revolving Credit Facility.

On April 9, 2021, MP issued $200 million in first mortgage bonds due 2027 at an effective interest rate of approximately 2.06%. Proceeds from the issuance were used to fund MP's ongoing capital expenditures, for working capital needs and for other general corporate purposes.

### Cash Flows From Investing Activities

Cash used for investing activities in the first quarter of 2021 principally represented cash used for property additions. The following table summarizes investing activities for the first quarter of 2021 and 2020:

| Cash Used for Investing Activities | For the Three Months Ended March 31, | | Increase (Decrease) |
|---|---|---|---|
| | 2021 | 2020 | |
| | (In millions) | | |
| Property Additions: | | | |
| Regulated Distribution | $ 321 | $ 338 | $ (17) |
| Regulated Transmission | 273 | 269 | 4 |
| Corporate / Other | 10 | 9 | 1 |
| Proceeds from sale of Yards Creek | (155) | — | (155) |
| Investments | 2 | 5 | (3) |
| Asset removal costs | 47 | 43 | 4 |
| Other | 1 | (5) | 6 |
| | $ 499 | $ 659 | $ (160) |

Cash used for investing activities for the first quarter of 2021 decreased $160 million, compared to the same period of 2020, primarily due to the proceeds from the sale of Yards Creek.

54

**GUARANTEES AND OTHER ASSURANCES**

FirstEnergy has various financial and performance guarantees and indemnifications, which are issued in the normal course of business. These contracts include performance guarantees, stand-by letters of credit, debt guarantees, surety bonds and indemnifications. FirstEnergy enters into these arrangements to facilitate commercial transactions with third parties by enhancing the value of the transaction to the third party. The maximum potential amount of future payments FirstEnergy and its subsidiaries could be required to make under these guarantees as of March 31, 2021, was approximately $1.7 billion, as summarized below:

| Guarantees and Other Assurances | Maximum Exposure |
|---|---|
| | (In millions) |
| **FE's Guarantees on Behalf of its Consolidated Subsidiaries** | |
| AE Supply asset sales[1] | $ 570 |
| Deferred compensation arrangements | 493 |
| Fuel related contracts and other | 8 |
| | 1,071 |
| **FE's Guarantees on Other Assurances** | |
| Global holding facility | 108 |
| Deferred compensation arrangements | 134 |
| Surety Bonds | 329 |
| LOCs and other | 11 |
| | 582 |
| **Total Guarantees and Other Assurances** | $ 1,653 |

[1] As a condition to closing AE Supply's sale of four natural gas generating plants and an approximate 59% portion of AGC's interest in the Bath Power Station, FE provided the purchaser two limited three-year guarantees totaling $555 million of certain obligations of AE Supply and AGC, which by their terms expire in May 2021. In addition, as a condition to closing AE Supply's transfer of Pleasants Power Station and as contemplated under the FES Bankruptcy settlement agreement, FE has provided two additional guarantees for certain retained liabilities of AE Supply, the first totaling up to $15 million for certain environmental liabilities associated with Pleasants Power Station, and the second being limited solely to environmental liabilities for the McElroy's Run CCR Impoundment Facility, for which an ARO of $47 million is reflected on FirstEnergy's Consolidated Balance Sheet, and which is not reflected on the table above.

*Collateral and Contingent-Related Features*

In the normal course of business, FE and its subsidiaries may enter into physical or financially settled contracts for the sale and purchase of electric capacity, energy, fuel and emission allowances. Certain agreements contain provisions that require FE or its subsidiaries to post collateral. This collateral may be posted in the form of cash or credit support with thresholds contingent upon FE's or its subsidiaries' credit rating from each of the major credit rating agencies. The collateral and credit support requirements vary by contract and by counterparty.

As of March 31, 2021, $26 million of collateral has been posted by FE or its subsidiaries, of which, $25 million was posted as a result of the credit rating downgrades in the fourth quarter of 2020, as further discussed above.

These credit-risk-related contingent features stipulate that if the subsidiary were to be downgraded or lose its investment grade credit rating (based on its senior unsecured debt rating), it would be required to provide additional collateral. The following table discloses the potential additional credit rating contingent contractual collateral obligations as of March 31, 2021:

| Potential Collateral Obligations | Utilities and FET | | FE | | Total | |
|---|---|---|---|---|---|---|
| | | | *(In millions)* | | | |
| Contractual Obligations for Additional Collateral | | | | | | |
| Upon further downgrade | $ | 28 | $ | — | $ | 28 |
| Surety Bonds (collateralized amount)[1] | | 56 | | 258 | | 314 |
| Total Exposure from Contractual Obligations | $ | 84 | $ | 258 | $ | 342 |

[1] Surety bonds are not tied to a credit rating. Surety Bonds' impact assumes maximum contractual obligations, which is ordinarily 100% of the face amount of the surety bond except with the respect to $39 million of surety bond obligations for which the collateral obligation is capped at 60% of the face amount, and typical obligations require 30 days to cure.

### Other Commitments and Contingencies

FE is a guarantor under a $120 million syndicated senior secured term loan facility due November 12, 2024, under which Global Holding's outstanding principal balance is $108 million as of March 31, 2021. Signal Peak, Global Rail, Global Mining Group,

55

LLC and Global Coal Sales Group, LLC, each being a direct or indirect subsidiary of Global Holding, and FE continue to provide their joint and several guaranties of the obligations of Global Holding under the facility.

In connection with the facility, 69.99% of Global Holding's direct and indirect membership interests in Signal Peak, Global Rail and their affiliates along with FEV's and WMB Marketing Ventures, LLC's respective 33-1/3% membership interests in Global Holding, are pledged to the lenders under the current facility as collateral.

## MARKET RISK INFORMATION

FirstEnergy uses various market risk sensitive instruments, including derivative contracts, primarily to manage the risk of price and interest rate fluctuations. FirstEnergy's Risk Policy Committee, comprised of members of senior management, provides general oversight for risk management activities throughout the company.

### Commodity Price Risk

FirstEnergy has limited exposure to financial risks resulting from fluctuating commodity prices, such as prices for electricity, natural gas, coal and energy transmission. FirstEnergy's Risk Management and Risk Policy Committees are responsible for promoting the effective design and implementation of sound risk management programs and oversees compliance with corporate risk management policies and established risk management practice.

The valuation of derivative contracts is based on observable market information. As of March 31, 2021, FirstEnergy has a net liability of $1 million in non-hedge derivative contracts that are related to FTRs at certain of the Utilities. FTRs are subject to regulatory accounting and do not impact earnings.

### Equity Price Risk

As of March 31, 2021, the FirstEnergy pension plan assets were allocated approximately as follows: 30% in equity securities, 35% in fixed income securities, 9% in absolute return strategies, 10% in real estate, 6% in private equity, 1% in derivatives and 9% in cash and short-term securities. A decline in the value of pension plan assets could result in additional funding requirements. As further discussed below, due to the American Rescue Plan Act of 2021, FirstEnergy does not currently expect to have a required contribution to the pension plan. However, FirstEnergy may elect to contribute to the pension plan voluntarily. As of March 31, 2021, FirstEnergy's OPEB plan assets were allocated approximately 53% in equity securities, 44% in fixed income securities and 3% in cash and short-term securities. Investment markets experienced elevated marked volatility during 2020 as a result of the U.S. national election and the COVID-19 pandemic. In order to reduce the effect of market volatility on the plan's funded status and to preserve capital gains experienced during 2020, approximately $1.4 billion of return-seeking assets were sold (including approximately $800 million of equity securities) during the third quarter of 2020. These assets are expected to be reinvested in return-seeking investments (including equity securities) during 2021, which will more consistently align the pension trust portfolios to FirstEnergy's target asset allocations. See Note 5, "Pension and Other Post-Employment Benefits," of the Notes to Consolidated Financial Statements for additional details on FirstEnergy's pension and OPEB plans.

In the three months ended March 31, 2021, FirstEnergy's pension and OPEB plan assets have gained (lost) approximately (3.1)% and 3.0%, respectively, as compared to an annual expected return on plan assets of 7.5%.

*Interest Rate Risk*

FirstEnergy recognizes net actuarial gains or losses for its pension and OPEB plans in the fourth quarter of each fiscal year and whenever a plan is determined to qualify for a remeasurement. A primary factor contributing to these actuarial gains and losses are changes in the discount rates used to value pension and OPEB obligations as of the measurement date and the difference between expected and actual returns on the plans' assets. At this time, FirstEnergy is unable to determine or project the mark-to-market adjustment that may be recorded as of December 31, 2021.

**CREDIT RISK**

Credit risk is the risk that FirstEnergy would incur a loss as a result of nonperformance by counterparties of their contractual obligations. FirstEnergy maintains credit policies and procedures with respect to counterparty credit (including requirement that counterparties maintain specified credit ratings) and require other assurances in the form of credit support or collateral in certain circumstance in order to limit counterparty credit risk. In addition, in response to the COVID-19 pandemic, FirstEnergy has increased reviews of counterparties, customers and industries that have been negatively impacted, which could affect meeting contractual obligations with FirstEnergy. FirstEnergy has concentrations of suppliers and customers among electric utilities, financial institutions and energy marketing and trading companies. These concentrations may impact FirstEnergy's overall exposure to credit risk, positively or negatively, as counterparties may be similarly affected by changes in economic, regulatory or other conditions. In the event an energy supplier of the Ohio Companies, Pennsylvania Companies, JCP&L or PE defaults on its obligation, the affected company would be required to seek replacement power in the market. In general, subject to regulatory review or other processes, it is expected that appropriate incremental costs incurred by these entities would be recoverable from

customers through applicable rate mechanisms, thereby mitigating the financial risk for these entities. FirstEnergy's credit policies to manage credit risk include the use of an established credit approval process, daily credit mitigation provisions, such as margin, prepayment or collateral requirements, and surveys to determine negative impacts to essential vendors as a result of the COVID-19 pandemic. FE and its subsidiaries may request additional credit assurance, in certain circumstances, in the event that the counterparties' credit ratings fall below investment grade, their tangible net worth falls below specified percentages or their exposures exceed an established credit limit.

**OUTLOOK**

**AMERICAN RESCUE PLAN ACT OF 2021**

On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021. While the Act is primarily an economic stimulus package, it also, among other changes, expanded the scope of Section 162(m) of the Internal Revenue Code that limits deductions on certain executive officer compensation. FirstEnergy does not currently expect these changes to have a material impact. During January 2021, the IRS issued additional regulations on interest expense deductibility under Section 163(j) of the Internal Revenue Code, however, is not expected to have a significant tax impact to FirstEnergy.

**STATE REGULATION**

Each of the Utilities' retail rates, conditions of service, issuance of securities and other matters are subject to regulation in the states in which it operates - in Maryland by the MDPSC, in New Jersey by the NJBPU, in Ohio by the PUCO, in Pennsylvania by the PPUC, in West Virginia by the WVPSC and in New York by the NYPSC. The transmission operations of PE in Virginia, ATSI in Ohio, and the Transmission Companies in Pennsylvania are subject to certain regulations of the VSCC, PUCO and PPUC, respectively. In addition, under Ohio law, municipalities may regulate rates of a public utility, subject to appeal to the PUCO if not acceptable to the utility. Further, if any of the FirstEnergy affiliates were to engage in the construction of significant new transmission facilities, depending on the state, they may be required to obtain state regulatory authorization to site, construct and operate the new transmission facility.

*MARYLAND*

PE operates under MDPSC approved base rates that were effective as of March 23, 2019. PE also provides SOS pursuant to a combination of settlement agreements, MDPSC orders and regulations, and statutory provisions. SOS supply is competitively procured in the form of rolling contracts of varying lengths through periodic auctions that are overseen by the MDPSC and a third-party monitor. Although settlements with respect to SOS supply for PE customers have expired, service continues in the same manner until changed by order of the MDPSC. PE recovers its costs plus a return for providing SOS.

The EmPOWER Maryland program requires each electric utility to file a plan to reduce electric consumption and demand 0.2% per year, up to the ultimate goal of 2% annual savings, for the duration of the 2018-2020 and 2021-2023 EmPOWER Maryland program cycles, to the extent the MDPSC determines that cost-effective programs and services are available. PE's approved 2018-2020 EmPOWER Maryland plan continues and expands upon prior years' programs, and adds new programs, for a projected total cost of $116 million over the three-year period. PE recovers program costs through an annually reconciled surcharge, with most costs subject to a five-year amortization. Maryland law only allows for the utility to recover lost distribution revenue attributable to energy efficiency or demand reduction programs through a base rate case proceeding, and to date, such recovery has not been sought or obtained by PE. On September 1, 2020, PE filed its proposed plan for the 2021-2023 EmPOWER Maryland program cycle. The new plan largely continues PE's existing programs and is estimated to cost approximately $148 million over the three-year period. The MDPSC approved the plan on December 18, 2020.

On March 22, 2019, MDPSC issued an order approving PE's 2018 base rate case filing, which among other things, approved an annual rate increase of $6.2 million, approved three of the four EDIS programs for four years to fund enhanced service reliability programs, directed PE to file a new depreciation study within 18 months, and ordered the filing of a new base rate case in four years to correspond to the ending of the approved EDIS programs. On September 22, 2020, PE filed its depreciation study reflecting a slight increase in expense and is seeking the difference to be deferred for future recovery in PE's next base rate case. On January 29, 2021, the Maryland Office of People's Counsel filed testimony recommending an annual reduction in depreciation expense of $10.8 million, and the staff of the MDPSC filed testimony recommending an annual reduction of $9.6 million. PE's rebuttal testimony was filed on March 2, 2021, and the Public Utility Law Judge conducted a hearing on the matter on April 12, 2021.

Maryland's Governor issued an order on March 16, 2020, forbidding utilities from terminating residential service or charging late fees for non-payment for the duration of the COVID-19 pandemic. On April 9, 2020, the MDPSC issued an order allowing utilities to track and create a regulatory asset for future recovery of all prudently incurred incremental costs arising from the COVID-19 pandemic, including incremental uncollectible expense, incurred from the date of the Governor's order (or earlier if the utility could show that the expenses related to suspension of service terminations). In July 2020, the MDPSC subsequently issued orders allowing Maryland electric and gas utilities to resume residential service terminations for non-payment on November 15, 2020, subject to various restrictions, and clarifying that utilities could resume charging late fees on October 1, 2020. On April 9,

2021, PE provided the MDPSC additional information related to customer arrearages, which will be used, to determine the distribution of at least $30 million of COVID-19 relief that was allocated by the Maryland General Assembly.

*NEW JERSEY*

JCP&L operates under NJBPU approved rates that were effective as of January 1, 2017. JCP&L provides BGS for retail customers who do not choose a third-party EGS and for customers of third-party EGSs that fail to provide the contracted service. All New Jersey EDCs participate in this competitive BGS procurement process and recover BGS costs directly from customers as a charge separate from base rates.

In December 2017, the NJBPU issued proposed rules to modify its current CTA policy in base rate cases to: (i) calculate savings using a five-year look back from the beginning of the test year; (ii) allocate savings with 75% retained by the company and 25% allocated to ratepayers; and (iii) exclude transmission assets of electric distribution companies in the savings calculation, which were published in the NJ Register in the first quarter of 2018. JCP&L filed comments supporting the proposed rulemaking. On January 17, 2019, the NJBPU approved the proposed CTA rules with no changes. On May 17, 2019, the NJ Rate Counsel filed an appeal with the Appellate Division of the Superior Court of New Jersey. Oral Argument was held on March 10, 2021, which JCP&L participated in. JCP&L is contesting this appeal but is unable to predict the outcome of this matter.

On February 18, 2020, JCP&L submitted a filing with the NJBPU requesting a distribution base rate increase. On October 28, 2020, the NJBPU approved a stipulated settlement between JCP&L and various parties, providing for, among other things, a $94 million annual base distribution revenues increase for JCP&L based on an ROE of 9.6%, which will become effective for customers on November 1, 2021. Until the rates become effective, and starting on January 1, 2021, JCP&L began to amortize an existing regulatory liability totaling approximately $86 million to offset the base rate increase that otherwise would have occurred in this period. The parties also agreed that the actual net gain from the sale of JCP&L's interest in the Yards Creek pumped-storage hydro generation facility in New Jersey (210 MWs), as further discussed below, be applied to reduce JCP&L's existing regulatory asset for previously deferred storm costs. Lastly, the parties agreed that approximately $95 million of Reliability Plus capital investment for projects through December 31, 2020 is included in rate base effective December 31, 2020, with a final prudence review of only those capital investment projects from July 1, 2020 through December 31, 2020 to occur in January 2021. During the first quarter of 2021, JCP&L submitted its review of storm costs, filed a written report for its Reliability Plus projects placed in service from July 1, 2020 through December 31, 2020, and submitted the vegetation management report, all required under the stipulation of settlement. On March 24, 2021, JCP&L, NJ Rate Counsel and the NJBPU Staff submitted a stipulation of settlement to the NJBPU, which was approved on April 7, 2021, providing that the Reliability Plus projects placed into service from July 1, 2020 through December 31, 2020 were reasonable and prudent.

On April 6, 2020, JCP&L signed an asset purchase agreement with Yards Creek Energy, LLC, a subsidiary of LS Power to sell its 50% interest in the Yards Creek pumped-storage hydro generation facility. Subject to terms and conditions of the agreement, the base purchase price is $155 million. As of December 31, 2020, assets held for sale on FirstEnergy's Consolidated Balance Sheets associated with the transaction consist of property, plant and equipment of $45 million, which is included in the regulated distribution segment. On July 31, 2020, FERC approved the transfer of JCP&L's interest in the hydroelectric operating license. On October 8, 2020, FERC issued an order authorizing the transfer of JCP&L's ownership interest in the hydroelectric facilities. On October 28, 2020, the NJBPU approved the sale of Yards Creek. With the receipt of all required regulatory approvals, the transaction was consummated on March 5, 2021 and resulted in a $109 million gain within the regulated distribution segment. As further discussed above, the gain from the transaction was applied against and reduced JCP&L's existing regulatory asset for previously deferred storm costs and, as a result, was offset by expense in the "Amortization of regulatory assets, net", line on the Consolidated Statements of Income, resulting in no earnings impact to FirstEnergy or JCP&L.

On August 27, 2020, JCP&L filed an AMI Program with the NJBPU, which proposes the deployment of approximately 1.2 million advanced meters over a three-year period beginning on January 1, 2023, at a total cost of approximately $418 million, including the pre-deployment phase. The 3-year deployment is part of the 20-year AMI Program that is expected to cost a total of approximately $732 million and proposes a cost recovery mechanism through a separate AMI tariff rider. On January 13, 2021, a procedural schedule was established, which includes evidentiary hearings the week of May 24, 2021. On February 26, 2021, JCP&L filed a letter requesting a suspension of the procedural schedule to allow for settlement discussions, which was granted on March 5, 2021.

On June 10, 2020, the NJBPU issued an order establishing a framework for the filing of utility-run energy efficiency and peak demand reduction programs in accordance with the New Jersey Clean Energy Act. Under the established framework, JCP&L will recover its program investments over a ten-year amortization period and its operations and maintenance expenses on an annual basis, be eligible to receive lost revenues on energy savings that resulted from its programs and be eligible for incentives or subject to penalties based on its annual program performance, beginning in the fifth year of its program offerings. On September 25, 2020, JCP&L filed its energy efficiency and peak demand reduction program. JCP&L's program consists of 11 energy efficiency and peak demand reduction programs and subprograms to be run from July 1, 2021 through June 30, 2024. The program also seeks approval of cost recovery totaling approximately $230 million as well as lost revenues associated with the energy savings resulting from the programs. While a procedural order has been established in this matter, on January 20, 2021, JCP&L filed a letter requesting a suspension of the procedural schedule to allow for settlement discussions. The Clean Energy Act contemplates a final order from the NJBPU by May 2, 2021.

On July 2, 2020, the NJBPU issued an order allowing New Jersey utilities to track and create a regulatory asset for future recovery of all prudently incurred incremental costs arising from the COVID-19 pandemic beginning March 9, 2020 through September 30, 2021, or until the Governor issues an order stating that the COVID-19 pandemic is no longer in effect. New Jersey utilities can request recovery of such regulatory asset in a stand-alone COVID-19 regulatory asset filing or future base rate case. On October 28, 2020, the NJBPU issued an order expanding the scope of the proceeding to examine all pandemic issues, including recovery of the COVID-19 regulatory assets, by way of a generic proceeding. Through various Executive Orders issued by Governor Murphy, the moratorium period is extended to June 30, 2021.

The recent credit rating actions taken on October 28, 2020, by S&P and Fitch triggered a requirement from various NJBPU orders that JCP&L file a mitigation plan, which was filed on November 5, 2020, to demonstrate that JCP&L has sufficient liquidity to meet its BGS obligations. On December 11, 2020, the NJBPU held a public hearing on the mitigation plan. Written comments on JCP&L's mitigation plan were submitted on January 8, 2021.

On September 23, 2020, the NJBPU issued an Order requiring all New Jersey electric distribution companies to file electric vehicle programs. JCP&L filed its electric vehicle program on March 1, 2021, which consists of six sub-programs, including a consumer education and outreach initiative that would begin on January 1, 2022, and continue over a four-year period. The total proposed budget for the electric vehicle program is approximately $50 million, of which $16 million is capital expenditures and $34 million is for operations and maintenance expenses. JCP&L is proposing to recover the electric vehicle program costs via a non-bypassable rate clause applicable to all distribution customer rate classes, which would become effective on January 1, 2022.

*OHIO*

The Ohio Companies operate under base distribution rates approved by the PUCO effective in 2009. The Ohio Companies' residential and commercial base distribution revenues were decoupled, through a mechanism that took effect on February 1, 2020 and under which the Ohio Companies billed customers until February 9, 2021, to the base distribution revenue and lost distribution revenue associated with energy efficiency and peak demand reduction programs recovered as of the twelve-month period ending on December 31, 2018. The Ohio Companies currently operate under ESP IV effective June 1, 2016, and continuing through May 31, 2024, that continues the supply of power to non-shopping customers at a market-based price set through an auction process. ESP IV also continues the Rider DCR, which supports continued investment related to the distribution system for the benefit of customers, with increased revenue caps of $20 million per year from June 1, 2019 through May 31, 2022; and $15 million per year from June 1, 2022 through May 31, 2024. In addition, ESP IV includes: (1) continuation of a base distribution rate freeze through May 31, 2024; (2) the collection of lost distribution revenue associated with energy efficiency and peak demand reduction programs, which is discussed further below; (3) a goal across FirstEnergy to reduce $CO_2$ emissions by 90% below 2005 levels by 2045; and (4) contributions, totaling $51 million to: (a) fund energy conservation programs, economic development and job retention in the Ohio Companies' service territories; (b) establish a fuel-fund in each of the Ohio Companies' service territories to assist low-income customers; and (c) establish a Customer Advisory Council to ensure preservation and growth of the competitive market in Ohio.

ESP IV further provided for the Ohio Companies to collect through the DMR $132.5 million annually for three years beginning in 2017, grossed up for federal income taxes, resulting in an approved amount of approximately $168 million annually in 2018 and 2019. On appeal, the SCOH, on June 19, 2019, reversed the PUCO's determination that the DMR is lawful, and remanded the matter to the PUCO with instructions to remove the DMR from ESP IV. The PUCO entered an order directing the Ohio Companies to cease further collection through the DMR, credit back to customers a refund of the DMR funds collected since July 2, 2019 and remove the DMR from ESP IV. On July 15, 2019, OCC filed a Notice of Appeal with the SCOH, challenging the PUCO's exclusion of the DMR revenues from the determination of the existence of significantly excessive earnings under ESP IV for calendar year 2017 for OE and claiming a $42 million refund is due to OE customers. On December 1, 2020, the SCOH reversed the PUCO's exclusion of the DMR revenues from the determination of the existence of significantly excessive earnings under ESP IV for OE for calendar year 2017, and remanded the case to the PUCO with instructions to conduct new proceedings which includes the DMR revenues in the analysis, determines the threshold against which the earned return is measured, and makes other necessary determinations. FirstEnergy is unable to predict the outcome of these proceedings but has not deemed a liability probable as of March 31, 2021.

On July 23, 2019, Ohio enacted HB 6, which established support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, HB 6 included provisions implementing a decoupling mechanism for Ohio electric utilities and ending current energy efficiency program mandates on December 31, 2020, provided that statewide energy efficiency mandates are achieved as determined by the PUCO. On February 26, 2020, the PUCO ordered a wind-down of statutorily required energy efficiency programs to commence on September 30, 2020, that the programs terminate under December 31, 2020, with the Ohio Companies' existing portfolio plans extended through 2020 without changes. On February 24, 2021, the PUCO found that statewide energy efficiency mandates had been achieved, and ordered that Ohio electric utilities' energy efficiency and peak demand reduction cost recovery riders terminate.

On November 21, 2019, the Ohio Companies applied to the PUCO for approval of a decoupling mechanism, which would set residential and commercial base distribution related revenues at the levels collected in 2018. As such, those base distribution

revenues would no longer be based on electric consumption, which allows continued support of energy efficiency initiatives while also providing revenue certainty to the Ohio Companies. On January 15, 2020, the PUCO approved the Ohio Companies' decoupling application, and the decoupling mechanism took effect on February 1, 2020. On March 31, 2021, Governor DeWine signed HB 128, which, among other things, would repeal parts of HB 6, the legislation that established support for nuclear energy supply in Ohio, provided for a decoupling mechanism for Ohio electric utilities, and provided for the ending of current energy efficiency program mandates. HB 128 is effective June 29, 2021. As further discussed below, in connection with a partial settlement with the OAG and other parties, the Ohio Companies filed an application with the PUCO on February 1, 2021, to set the respective decoupling riders (CSR) to zero. On February 2, 2021, the PUCO approved the application. While the partial settlement with the OAG focused specifically on decoupling, the Ohio Companies will of their own accord not seek to recover lost distribution revenue from residential and commercial customers. FirstEnergy is committed to pursuing an open dialogue with stakeholders in an appropriate manner with respect to the numerous regulatory proceedings currently underway as further discussed herein. As a result of the partial settlement, and the decision to not seek lost distribution revenue, FirstEnergy recognized a $108 million pre-tax charge ($84 million after-tax) in the fourth quarter of 2020, and $77 million (pre-tax) of which is associated with forgoing collection of lost distribution revenue. On March 31, 2021, FirstEnergy announced that the Ohio Companies will proactively refund to customers amounts previously collected under decoupling, with interest, which total approximately $27 million. On April 22, 2021, the Ohio Companies filed an application with the PUCO to modify CSR to return such amounts. Furthermore, as FirstEnergy would not have financially benefited from the Clean Air Fund included in HB 6, which is the mechanism to provide support to nuclear energy in Ohio, there is no expected additional impact to FirstEnergy due to any repeal of that provision of HB 6.

On July 17, 2019, the PUCO approved, with no material modifications, a settlement agreement that provides for the implementation of the Ohio Companies' first phase of grid modernization plans, including the investment of $516 million over three years to modernize the Ohio Companies' electric distribution system, and for all tax savings associated with the Tax Act to flow back to customers. The settlement had broad support, including PUCO staff, the OCC, representatives of industrial and commercial customers, a low-income advocate, environmental advocates, hospitals, competitive generation suppliers and other parties.

In March 2020, the PUCO issued entries directing utilities to review their service disconnection and restoration policies and suspend, for the duration of the COVID-19 pandemic, otherwise applicable requirements that may impose a service continuity hardship or service restoration hardship on customers. The Ohio Companies are utilizing their existing approved cost recovery mechanisms where applicable to address the financial impacts of these directives. On July 31, 2020, the Ohio Companies filed with the PUCO their transition plan and requests for waivers to allow for the safe resumption of normal business operations, including service disconnections for non-payment. On September 23, 2020, the PUCO approved the Ohio Companies' transition plan, including approval of the resumption of service disconnections for non-payment, which the Ohio Companies began on October 5, 2020.

On July 29, 2020, the PUCO consolidated the Ohio Companies' Applications for determination of the existence of significantly excessive earnings, or SEET, under ESP IV for calendar years 2018 and 2019, which had been previously filed on July 15, 2019, and May 15, 2020, respectively, and set a procedural schedule with evidentiary hearings. On September 4, 2020, the PUCO opened its quadrennial review of ESP IV, consolidated it with the Ohio Companies' 2018 and 2019 SEET Applications, and set a procedural schedule for the consolidated matters. On October 29, 2020, the PUCO issued an entry extending the deadline for the Ohio Companies to file quadrennial review of ESP IV testimony and supplemental SEET testimony to March 1, 2021, with the evidentiary hearings to commence no sooner than May 3, 2021. On January 12, 2021, the PUCO consolidated these matters with the determination of the existence of significantly excessive earnings under ESP IV for calendar year 2017, which the SCOH had remanded to the PUCO. On March 1, 2021, the Ohio Companies filed testimony in the quadrennial review and supplemental testimony in the SEET cases for calendar years 2017 through 2019. The calculations included in the quadrennial review for 2020 through 2024 demonstrate that the prospective effect of ESP IV is not substantially likely to provide the Ohio Companies with significantly excessive earnings during the balance of ESP IV. In addition, the Ohio Companies' quadrennial review testimony demonstrates that ESP IV continues to be more favorable in the aggregate and during the remaining term of ESP IV as compared to the expected results of a market rate offer. Further, the revised calculations included in the Ohio Companies' supplemental SEET testimony for calendar years 2017 through 2019 demonstrated that the Ohio Companies did not have significantly excessive earnings, on an individual company basis or on a consolidated basis. However, on March 31, 2021, Governor DeWine signed House Bill 128, which repeals legislation passed in 2019 that permitted the Ohio Companies to file their SEET results on a consolidated basis instead of on an individual company basis. HB 128 is effective June 29, 2021. Further, the OCC and another party filed testimony on April 5, 2021, recommending refunds for one or more of the Ohio Companies for calendar years 2017 through 2019. On April 20, 2021, the Ohio Companies filed supplemental testimony in the quadrennial review providing prospective SEET values on an individual company basis, which demonstrate that the Ohio Companies are not projected to have significantly excessive earnings, on an individual company basis, during the balance of ESP IV.

On September 8, 2020, the OCC filed motions in the Ohio Companies' corporate separation audit and DMR audit dockets, requesting the PUCO to open an investigation and management audit, hire an independent auditor, and require FirstEnergy to show it did not improperly use money collected from consumers or violate any utility regulatory laws, rules or orders in its activities regarding HB 6. The Ohio Companies' filed a response in opposition to the OCC's motions on September 23, 2020. On December 30, 2020, in response to the OCC's motion, the PUCO reopened the DMR audit docket, and directed PUCO staff to solicit a third-party auditor and conduct a full review of the DMR to ensure funds collected from ratepayers through the DMR

were only used for the purposes established in ESP IV. On April 7, 2021, the PUCO set deadlines for selection of an auditor and the filing of the final audit report, by June 2, 2021 and October 29, 2021, respectively. Initial discovery is ongoing.

On September 15, 2020, the PUCO opened a new proceeding to review the political and charitable spending by the Ohio Companies in support of HB 6 and the subsequent referendum effort, directing the Ohio Companies to show cause, demonstrating that the costs of any political or charitable spending in support of HB 6, or the subsequent referendum effort, were not included, directly or indirectly, in any rates or charges paid by ratepayers. The Ohio Companies filed a response on September 30, 2020, stating that any political and charitable spending in support of HB 6 or the subsequent referendum were not included in rates or charges paid for by its customers. Several parties requested that the PUCO broaden the scope of the review of political and charitable spending. Discovery is ongoing.

In connection with an ongoing audit of the Ohio Companies' policies and procedures relating to the code of conduct rules between affiliates, on November 4, 2020, the PUCO initiated an additional corporate separation audit as a result of the FirstEnergy leadership transition announcement made on October 29, 2020, as further discussed below. The additional audit is to ensure compliance by the Ohio Companies and their affiliates with corporate separation laws and the Ohio Companies' corporate separation plan. The additional audit is for the period from November 2016 through October 2020, with a final audit report to be filed in June 2021. On January 27, 2021, the PUCO selected an auditor, and the auditor's investigation and discovery are ongoing.

On November 24, 2020, the Environmental Law and Policy Center filed motions to vacate the PUCO's orders in proceedings related to the Ohio Companies' settlement that provides for the implementation of the first phase of grid modernization plans and for all tax savings associated with the Tax Act to flow back to customers, the Ohio Companies' energy efficiency portfolio plans for the period from 2013 through 2016, and the Ohio Companies' application for a two-year extension of the DMR, on the grounds that the former Chairman of the PUCO should have recused himself in these matters. On December 30, 2020, the PUCO denied the motions, and reinstated the requirement under ESP IV that the Ohio Companies file a base distribution rate case by May 31, 2024, the end of ESP IV, which the Ohio Companies had indicated they would not oppose.

In the fourth quarter of 2020, motions were filed with the PUCO requesting that the PUCO amend the Ohio Companies' riders for collecting charges required by HB 6, which the Ohio Companies are further required to remit to other Ohio electric distribution utilities or to the State Treasurer, to provide for refunds in the event HB 6 is repealed. The Ohio Companies contested the motions, which are pending before the PUCO.

On December 7, 2020, the Citizens' Utility Board of Ohio filed a complaint with the PUCO against the Ohio Companies. The complaint alleges that the Ohio Companies' new charges resulting from HB 6, and any increased rates resulting from proceedings over which the former PUCO Chairman presided, are unjust and unreasonable, and that the Ohio Companies violated Ohio corporate separation laws by failing to operate separately from unregulated affiliates. The complaint requests, among other things, that any rates authorized by HB 6 or authorized by the PUCO in a proceeding over which the former Chairman presided be made refundable; that the Ohio Companies be required to file a new distribution rate case at the earliest possible date; and that the Ohio Companies' corporate separation plans be modified to introduce institutional controls. The Ohio Companies are contesting the complaint.

In connection with an ongoing annual audit of the Ohio Companies' Rider DCR for 2020, on March 10, 2021, the PUCO expanded the scope of the audit to include a review of certain transactions that were either improperly classified, misallocated, or lacked supporting documentation, which were disclosed in FirstEnergy's Form 10-K for the year ended 2020, filed on February 18, 2021, and determine whether funds collected from ratepayers were used to pay the vendors and if so, whether or not the funds associated with those payments should be returned to ratepayers through Rider DCR or through an alternative proceeding.

See "Outlook - Other Legal Proceedings" below for additional details on the government investigation and subsequent litigation surrounding the investigation of HB 6.

*PENNSYLVANIA*

The Pennsylvania Companies operate under rates approved by the PPUC, effective as of January 27, 2017. These rates were adjusted for the

net impact of the Tax Act, effective March 15, 2018. The net impact of the Tax Act for the period January 1, 2018 through March 14, 2018 was separately tracked and its treatment will be addressed in a future rate proceeding. The Pennsylvania Companies operate under DSPs for the June 1, 2019 through May 31, 2023 delivery period, which provide for the competitive procurement of generation supply for customers who do not choose an alternative EGS or for customers of alternative EGSs that fail to provide the contracted service. Under the 2019-2023 DSPs, supply will be provided by wholesale suppliers through a mix of 3, 12 and 24-month energy contracts, as well as two RFPs for 2-year SREC contracts for ME, PN and Penn.

Pursuant to Pennsylvania Act 129 of 2008 and PPUC orders, Pennsylvania EDCs implement energy efficiency and peak demand reduction programs. The Pennsylvania Companies' Phase III EE&C plans for the June 2016 through May 2021 period, which were approved in March 2016, with expected costs up to $390 million, are designed to achieve the targets established in the

PPUC's Phase III Final Implementation Order with full recovery through the reconcilable EE&C riders. On June 18, 2020, the PPUC entered a Final Implementation Order for a Phase IV EE&C Plan, operating from June 2021 through May 2026. The Final Implementation Order set demand reduction targets, relative to 2007 to 2008 peak demands, at 2.9% MW for ME, 3.3% MW for PN, 2.0% MW for Penn, and 2.5% MW for WP; and energy consumption reduction targets, as a percentage of the Pennsylvania Companies' historic 2009 to 2010 reference load at 3.1% MWH for ME, 3.0% MWH for PN, 2.7% MWH for Penn, and 2.4% MWH for WP. The Pennsylvania Companies' Phase IV plans were filed November 30, 2020. A settlement has been reached in this matter, and a joint petition seeking approval of that settlement by the parties was filed on February 16, 2021. On March 25, 2021, the PPUC issued an order approving the settlement without modification.

Pennsylvania EDCs are permitted to seek PPUC approval of an LTIIP for infrastructure improvements and costs related to highway relocation projects, after which a DSIC may be approved to recover LTIIP costs. On January 16, 2020, the PPUC approved the Pennsylvania Companies' LTIIPs for the five-year period beginning January 1, 2020 and ending December 31, 2024 for a total capital investment of approximately $572 million for certain infrastructure improvement initiatives.

Following the Pennsylvania Companies' 2016 base rate proceedings, the PPUC ruled in a separate proceeding related to the DSIC mechanisms that the Pennsylvania Companies were not required to reflect federal and state income tax deductions related to DSIC-eligible property in DSIC rates, which decision was appealed by the Pennsylvania OCA to the Pennsylvania Commonwealth Court. The Commonwealth Court reversed the PPUC's decision and remanded the matter to require the Pennsylvania Companies to revise their tariffs and DSIC calculations to include ADIT and state income taxes. On April 7, 2020, the Pennsylvania Supreme Court issued an order granting Petitions for Allowance of Appeal by both the PPUC and the Pennsylvania Companies of the Commonwealth Court's Opinion and Order. Briefs and Reply Briefs of the parties were filed, and oral argument before the Supreme Court was held on October 21, 2020. An adverse ruling by the Pennsylvania Supreme Court is not expected to result in a material impact to FirstEnergy.

The PPUC issued an order on March 13, 2020, forbidding utilities from terminating service for non-payment for the duration of the COVID-19 pandemic. On May 13, 2020, the PPUC issued a Secretarial letter directing utilities to track all prudently incurred incremental costs arising from the COVID-19 pandemic, and to create a regulatory asset for future recovery of incremental uncollectibles incurred as a result of the COVID-19 pandemic and termination moratorium. On October 13, 2020, the PPUC entered an order lifting the service termination moratorium effective November 9, 2020, subject to certain additional notification, payment procedures and exceptions, and permits the Pennsylvania Companies to create a regulatory asset for all incremental expenses associated with their compliance with the order. On March 19, 2021, the PPUC entered an order lifting the moratorium in total effective March 31, 2021, subject to certain additional guidelines regarding the duration of payment arrangements and reporting obligations.

*WEST VIRGINIA*

MP and PE provide electric service to all customers through traditional cost-based, regulated utility ratemaking and operate under rates approved by the WVPSC effective February 2015. MP and PE recover net power supply costs, including fuel costs, purchased power costs and related expenses, net of related market sales revenue through the ENEC. MP's and PE's ENEC rate is updated annually.

On March 13, 2020, the WVPSC urged all utilities to suspend utility service terminations except where necessary as a matter of safety or where requested by the customer. On May 15, 2020, the WVPSC issued an order to authorize MP and PE to record a deferral of additional, extraordinary costs directly related to complying with the various COVID-19 government shut-down orders and operational precautions, including impacts on uncollectible expense and cash flow related to temporary discontinuance of service terminations for non-payment and any credits to minimum demand charges associated with business customers adversely impacted by shut-downs or temporary closures related to the pandemic. MP

and PE resumed disconnection activity for commercial and industrial customers on September 15, 2020, and for residential customers on November 4, 2020.

On August 28, 2020, MP and PE filed with the WVPSC their annual ENEC case requesting a decrease in ENEC rates of $55 million beginning January 1, 2021, representing a 4% decrease in rates compared to those in effect on August 28, 2020. The decrease in the ENEC rates is net of recovering approximately $10.5 million in previously deferred, incremental uncollectible and other related costs resulting from the COVID-19 pandemic. The WVPSC approved a unanimous settlement by the parties on December 16, 2020 with rates effective January 1, 2021.

Also, on August 28, 2020, MP and PE filed with the WVPSC for recovery of costs associated with modernization and improvement program for their coal-fired boilers. The proposed annual revenue increase for these environmental compliance projects is $5 million beginning January 1, 2021. The WVPSC approved a unanimous settlement by the parties on December 16, 2020 approving the recovery of those costs.

On December 30, 2020, MP and PE filed an integrated resource plan with the WVPSC. The plan projects a small capacity deficit but an energy surplus in MP's and PE's supply resources when compared with current WV load demand and projects the capacity deficit growing over the next 15 years. The plan does not recommend additional supply-side resources with a possible exception for small utility-scale solar resources and recommends that the capacity deficit be met through the PJM capacity

62

market. MP currently expects to seek approval in 2021 to construct solar generation sources of up to 50 MWs. The WVPSC issued a procedural order on February 26, 2021, allowing informational filing comments to be filed by April 28, 2021.

On December 30, 2020, MP and PE filed with the WVPSC a determination of the rate impact of the Tax Act with respect to ADIT. The filing proposes an annual revenue reduction of $2.6 million annually, effective January 1, 2022, with reconciliation and any resulting adjustments incorporated into the annual ENEC proceedings. A hearing is set for August 18, 2021.

### FERC REGULATORY MATTERS

Under the FPA, FERC regulates rates for interstate wholesale sales, transmission of electric power, accounting and other matters, including construction and operation of hydroelectric projects. With respect to their wholesale services and rates, the Utilities, AE Supply and the Transmission Companies are subject to regulation by FERC. FERC regulations require JCP&L, MP, PE, WP and the Transmission Companies to provide open access transmission service at FERC-approved rates, terms and conditions. Transmission facilities of JCP&L, MP, PE, WP and the Transmission Companies are subject to functional control by PJM and transmission service using their transmission facilities is provided by PJM under the PJM Tariff.

FERC regulates the sale of power for resale in interstate commerce in part by granting authority to public utilities to sell wholesale power at market-based rates upon showing that the seller cannot exert market power in generation or transmission or erect barriers to entry into markets. The Utilities and AE Supply each have been authorized by FERC to sell wholesale power in interstate commerce at market-based rates and have a market-based rate tariff on file with FERC, although in the case of the Utilities major wholesale purchases remain subject to review and regulation by the relevant state commissions.

Federally enforceable mandatory reliability standards apply to the bulk electric system and impose certain operating, record-keeping and reporting requirements on the Utilities, AE Supply, and the Transmission Companies. NERC is the ERO designated by FERC to establish and enforce these reliability standards, although NERC has delegated day-to-day implementation and enforcement of these reliability standards to six regional entities, including RFC. All of the facilities that FirstEnergy operates are located within the RFC region. FirstEnergy actively participates in the NERC and RFC stakeholder processes, and otherwise monitors and manages its companies in response to the ongoing development, implementation and enforcement of the reliability standards implemented and enforced by RFC.

FirstEnergy believes that it is in material compliance with all currently effective and enforceable reliability standards. Nevertheless, in the course of operating its extensive electric utility systems and facilities, FirstEnergy occasionally learns of isolated facts or circumstances that could be interpreted as excursions from the reliability standards. If and when such occurrences are found, FirstEnergy develops information about the occurrence and develops a remedial response to the specific circumstances, including in appropriate cases "self-reporting" an occurrence to

RFC. Moreover, it is clear that NERC, RFC and FERC will continue to refine existing reliability standards as well as to develop and adopt new reliability standards. Any inability on FirstEnergy's part to comply with the reliability standards for its bulk electric system could result in the imposition of financial penalties, or obligations to upgrade or build transmission facilities, that could have a material adverse effect on its financial condition, results of operations and cash flows.

*ATSI Transmission Formula Rate*

On May 1, 2020, ATSI filed amendments to its formula rate to recover regulatory assets for certain costs that ATSI incurred as a result of its 2011 move from MISO to PJM, certain costs allocated to ATSI by FERC for transmission projects that were constructed by other MISO transmission owners, and certain costs for transmission-related vegetation management programs. Additionally, ATSI proposed certain income tax-related adjustments and certain tariff changes addressing the revenue credit components of the formula rate template. In its filing, ATSI requested recovery of approximately $85 million related to ATSI's costs to move to PJM, and the MISO transmission project costs that are allocated to ATSI through December 31, 2020; and recovery of future costs associated with the MISO transmission projects. Per prior FERC orders, ATSI included a "cost-benefit study" to support recovery of ATSI's costs to move to PJM, and the MISO transmission project costs that are allocated to ATSI. Finally, ATSI proposed recovery of approximately $19 million in costs for transmission-related vegetation management programs. Certain intervenors filed protests of the formula rate amendments on May 29, 2020, and ATSI filed a reply on June 15, 2020. On June 30, 2020, FERC issued an initial order accepting the tariff amendments subject to refund, suspending the effective date for five months to be effective December 1, 2020, and setting the matter for hearing and settlement proceedings. ATSI is engaged in settlement negotiations with the other parties to this proceeding.

63

*FERC Actions on Tax Act*

On March 15, 2018, FERC initiated proceedings on the question of how to address possible changes to ADIT and bonus depreciation as a result of the Tax Act. Such possible changes could impact FERC-jurisdictional rates, including transmission rates. On November 21, 2019, FERC issued a final rule (Order No. 864). Order No. 864 requires utilities with transmission formula rates to update their formula rate templates to include mechanisms to: (i) deduct any excess ADIT from or add any deficient ADIT to their rate base; (ii) raise or lower their income tax allowances by any amortized excess or deficient ADIT; and (iii) incorporate a new permanent worksheet into their rates that will annually track information related to excess or deficient ADIT. Per FERC directives, ATSI submitted its compliance filing on May 1, 2020. MAIT submitted its compliance filing on June 1, 2020. Certain intervenors filed protests of the compliance filings, to which ATSI and MAIT responded. On October 28, 2020, FERC staff requested additional information about ATSI's proposed rate base adjustment mechanism, and ATSI submitted the requested information on November 25, 2020. On May 15, 2020, TrAIL submitted its compliance filing and on June 1, 2020, PATH submitted its required compliance filing. These compliance filings each remain pending before FERC. MP, WP and PE (as holders of a "stated" transmission rate) are addressing these requirements in the transmission formula rates amendments that were filed on October 29, 2020, and which have been accepted by FERC effective January 1, 2021, subject to refund, pending further hearing and settlement procedures. JCP&L is addressing these requirements as part of its pending transmission formula rate case. JCP&L and the active parties to the pending FERC transmission formula rate case filed an offer of settlement with FERC on February 2, 2021. On April 15, 2021, FERC approved the settlement agreement as filed, with no changes.

*Transmission ROE Methodology*

FERC's methodology for calculating electric transmission utility ROE has been in transition as a result of an April 14, 2017 ruling by the D.C. Circuit that vacated FERC's then-effective methodology. On May 21, 2020, FERC issued Opinion No. 569-A that changed FERC's ROE methodology. Under FERC's revised methodology, ROE is based on three financial models – discounted cash flow, capital-asset pricing, and risk premium – which are used to calculate a composite zone of reasonableness. FERC noted that utilities could, in utility-specific proceedings, also ask to have the expected earnings methodology included in calculating the utility's authorized ROE. FERC also noted that, going forward, it will divide that zone into three equal parts, to be used for high risk, normal risk, and low risk utilities. A given utility will be assigned to one of these three parts of the zone of reasonableness, and its ROE will be set at the median or midpoint of the other utilities that are in the applicable third of the zone. FirstEnergy filed a request for rehearing, which FERC denied on July 22, 2020. On November 19, 2020, FERC issued Opinion No. 569-B, which affirmed the Opinion No. 569-A rulings. FirstEnergy initiated, but subsequently withdrew, appeals of these orders. Appeals of Opinion Nos. 569, 569-A and 569-B were filed by other parties, and are pending before the D.C. Circuit. Any changes to FERC's transmission rate ROE and incentive policies for the Utilities would be applied on a prospective basis.

On March 20, 2020, FERC initiated a rulemaking proceeding on the transmission rate incentives provisions of Section 219 of the 2005 Energy Policy Act. Initial comments were submitted July 1, 2020, and reply comments were filed on July 16, 2020. FirstEnergy participated through EEI and through a consortium of PJM Transmission Owners. In a supplemental rulemaking proceeding on April 15, 2021, FERC is seeking comments on, among other things, whether to require utilities that have been members of an RTO for three years or more and that have been collecting an "RTO membership" ROE incentive adder to file tariff updates that would terminate collection of the incentive adder. Initial comments are due 30 days after the supplement is published in the Federal Register, and reply comments are due 15 days later. FirstEnergy is a member of PJM and could be affected by the supplemental proposed rule and is currently evaluating the potential impacts this rule would have on certain of its subsidiaries.

*JCP&L Transmission Formula Rate*

On October 30, 2019, JCP&L filed tariff amendments with FERC to convert JCP&L's existing stated transmission rate to a forward-looking formula transmission rate. JCP&L requested that the tariff amendments become effective January 1, 2020. On December 19, 2019, FERC issued its initial order in the case, allowing JCP&L to transition to a forward-looking formula rate as of January 1, 2020 as requested, subject to refund, pending further hearing and settlement proceedings. JCP&L and the parties to the FERC proceeding subsequently were able to reach settlement, and on February 2, 2021, JCP&L filed an offer of settlement, pending FERC approval. On April 15, 2021, FERC approved the settlement agreement as filed, with no changes.

*Allegheny Power Zone Transmission Formula Rate Filings*

On October 29, 2020, MP, PE and WP filed tariff amendments with FERC to convert their existing stated transmission rate to a forward-looking formula transmission rate, effective January 1, 2021. In addition, on October 30, 2020, KATCo filed a proposed new tariff to establish a forward-looking formula rate and requested that the new rate become effective January 1, 2021. In its filing, KATCo explained that while it currently owns no transmission assets, it may build new transmission facilities in the Allegheny zone, and that it may seek required state and federal authorizations to acquire transmission assets from PE and WP by January 1, 2022. These transmission rate filings were approved by FERC on December 31, 2020, subject to refund, pending further hearing and settlement procedures and were consolidated into a single proceeding. MP, PE and WP, and KATCo are engaged in settlement negotiations with the other parties to the formula rate proceedings. KATCo will be included in the Regulated Transmission reportable segment.

64

## ENVIRONMENTAL MATTERS

Various federal, state and local authorities regulate FirstEnergy with regard to air and water quality, hazardous and solid waste disposal, and other environmental matters. While FirstEnergy's environmental policies and procedures are designed to achieve compliance with applicable environmental laws and regulations, such laws and regulations are subject to periodic review and potential revision by the implementing agencies. FirstEnergy cannot predict the timing or ultimate outcome of any of these reviews or how any future actions taken as a result thereof may materially impact its business, results of operations, cash flows and financial condition.

*Clean Air Act*

FirstEnergy complies with $SO_2$ and NOx emission reduction requirements under the CAA and SIP(s) by burning lower-sulfur fuel, utilizing combustion controls and post-combustion controls and/or using emission allowances.

CSAPR requires reductions of NOx and $SO_2$ emissions in two phases (2015 and 2017), ultimately capping $SO_2$ emissions in affected states to 2.4 million tons annually and NOx emissions to 1.2 million tons annually. CSAPR allows trading of NOx and $SO_2$ emission allowances between power plants located in the same state and interstate trading of NOx and $SO_2$ emission allowances with some restrictions. The D.C. Circuit ordered the EPA on July 28, 2015, to reconsider the CSAPR caps on NOx and $SO_2$ emissions from power plants in 13 states, including West Virginia. This follows the 2014 U.S. Supreme Court ruling generally upholding the EPA's regulatory approach under CSAPR but questioning whether the EPA required upwind states to reduce emissions by more than their contribution to air pollution in downwind states. The EPA issued a CSAPR update rule on September 7, 2016, reducing summertime NOx emissions from power plants in 22 states in the eastern U.S.,

including West Virginia, beginning in 2017. Various states and other stakeholders appealed the CSAPR update rule to the D.C. Circuit in November and December 2016. On September 13, 2019, the D.C. Circuit remanded the CSAPR update rule to the EPA citing that the rule did not eliminate upwind states' significant contributions to downwind states' air quality attainment requirements within applicable attainment deadlines.

Also during this time, in March 2018, the State of New York filed a CAA Section 126 petition with the EPA alleging that NOx emissions from nine states (including West Virginia) significantly contribute to New York's inability to attain the ozone NAAQS. The petition sought suitable emission rate limits for large stationary sources that are allegedly affecting New York's air quality within the three years allowed by CAA Section 126. On September 20, 2019, the EPA denied New York's CAA Section 126 petition. On October 29, 2019, the State of New York appealed the denial of its petition to the D.C. Circuit. On July 14, 2020, the D.C. Circuit reversed and remanded the New York petition to the EPA for further consideration. On March 15, 2021, EPA issued a revised CSAPR Rule that addresses, among other things, the remand of the CSAPR Update Rule and the New York Section 126 Petition. Depending on the outcome of any appeals and how the EPA and the states ultimately implement the revised CSAPR Rule, the future cost of compliance may materially impact FirstEnergy's operations, cash flows and financial condition.

In February 2019, the EPA announced its final decision to retain without changes the NAAQS for $SO_2$, specifically retaining the 2010 primary (health-based) 1-hour standard of 75 PPB. As of March 31, 2020, FirstEnergy has no power plants operating in areas designated as non-attainment by the EPA.

### Climate Change

There are several initiatives to reduce GHG emissions at the state, federal and international level. Certain northeastern states are participating in the RGGI and western states led by California, have implemented programs, primarily cap and trade mechanisms, to control emissions of certain GHGs. Additional policies reducing GHG emissions, such as demand reduction programs, renewable portfolio standards and renewable subsidies have been implemented across the nation.

In September 2016, the U.S. joined in adopting the agreement reached on December 12, 2015, at the United Nations Framework Convention on Climate Change meetings in Paris to reduce GHG. The Paris Agreement's non-binding obligations to limit global warming to below two degrees Celsius became effective on November 4, 2016. On June 1, 2017, the Trump Administration announced that the U.S. would cease all participation in the Paris Agreement. On January 20, 2021, President Biden signed an executive order re-adopting the agreement on behalf of the U.S. In November 2020, FirstEnergy published its Climate Story which includes its climate position and strategy, as well as a new comprehensive and ambitious GHG emission goal. FirstEnergy pledged to achieve carbon neutrality by 2050 and set an interim goal for a 30% reduction in GHG within the company's direct operational control by 2030, based on 2019 levels. FirstEnergy cannot currently estimate the financial impact of climate change policies, although potential legislative or regulatory programs restricting $CO_2$ emissions, or litigation alleging damages from GHG emissions, could require material capital and other expenditures or result in changes to its operations.

In December 2009, the EPA released its final "Endangerment and Cause or Contribute Findings for GHG under the Clean Air Act," concluding that concentrations of several key GHG constitutes an "endangerment" and may be regulated as "air pollutants" under the CAA and mandated measurement and reporting of GHG emissions from certain sources, including electric generating plants. Subsequently, the EPA released its final CPP regulations in August 2015 to reduce $CO_2$ emissions from existing fossil fuel-fired EGUs and finalized separate regulations imposing $CO_2$ emission limits for new, modified, and reconstructed fossil fuel-fired EGUs. Numerous states and private parties filed appeals and motions to stay the CPP with the D.C. Circuit in October

2015. On February 9, 2016, the U.S. Supreme Court stayed the rule during the pendency of the challenges to the D.C. Circuit and U.S. Supreme Court. On March 28, 2017, an executive order, entitled "Promoting Energy Independence and Economic Growth," instructed the EPA to review the CPP and related rules addressing GHG emissions and suspend, revise or rescind the rules if appropriate. On June 19, 2019, the EPA repealed the CPP and replaced it with the ACE rule that establishes guidelines for states to develop standards of performance to address GHG emissions from existing coal-fired power plants. On January 19, 2021, the D.C. Circuit vacated and remanded the ACE rule declaring that the EPA was "arbitrary and capricious" in its rule making and, as such, the ACE rule is no longer in effect and all actions thus far taken by states to implement the federally mandated rule are now null and void. The D.C. Circuit decision is subject to legal challenge. Depending on the outcomes of further appeals and how any final rules are ultimately implemented, the future cost of compliance may be material.

### Clean Water Act

Various water quality regulations, the majority of which are the result of the federal CWA and its amendments, apply to FirstEnergy's facilities. In addition, the states in which FirstEnergy operates have water quality standards applicable to FirstEnergy's operations.

The EPA finalized CWA Section 316(b) regulations in May 2014, requiring cooling water intake structures with an intake velocity greater than 0.5 feet per second to reduce fish impingement when aquatic organisms are pinned against screens or other parts of a cooling water intake system to a 12% annual average and requiring cooling water intake structures exceeding 125 million gallons per day to conduct studies to determine site-specific controls, if any, to reduce entrainment, which occurs when aquatic life is drawn into a facility's cooling water system. Depending on any final action taken by the states with respect to impingement and entrainment, the future capital costs of compliance with these standards may be material.

On September 30, 2015, the EPA finalized new, more stringent effluent limits for the Steam Electric Power Generating category (40 CFR Part 423) for arsenic, mercury, selenium and nitrogen for wastewater from wet scrubber systems and zero discharge of pollutants in ash transport water. The treatment obligations were to phase-in as permits are renewed on a five-year cycle from 2018 to 2023. However, on April 13, 2017, the EPA granted a Petition for Reconsideration and on September 18, 2017, the EPA postponed certain compliance deadlines for two years. On August 31, 2020, the EPA issued a final rule revising the effluent limits for discharges from wet scrubber systems, retaining the zero-discharge standard for ash transport water, (with some limited discharge allowances), and extending the deadline for compliance to December 31, 2025 for both. In addition, the EPA allows for less stringent limits for sub-categories of generating units based on capacity utilization, flow volume from the scrubber system, and unit retirement date. Depending on the outcome of appeals, how final rules are ultimately implemented and the compliance options MP elects to take with the new rules, the compliance with these standards, which could include capital expenditures at the Ft. Martin and Harrison power stations, may be substantial and changes to MP's operations at those power stations may also result.

On September 29, 2016, FirstEnergy received a request from the EPA for information pursuant to CWA Section 308(a) for information concerning boron exceedances of effluent limitations established in the NPDES Permit for the former Mitchell Power Station's Mingo landfill, owned by WP. On November 1, 2016, WP provided an initial response that contained information related to a similar boron issue at the former Springdale Power Station's landfill. The EPA requested additional information regarding the Springdale landfill and on November 15, 2016, WP provided a response and intends to fully comply with the Section 308(a) information request. On March 3, 2017, WP proposed to the PA DEP a re-route of its wastewater discharge to eliminate potential boron exceedances at the Springdale landfill. On January 29, 2018, WP submitted an NPDES permit renewal application to PA DEP proposing to re-route its wastewater discharge to eliminate potential boron exceedances at the Mingo landfill. On February 20, 2018, the DOJ issued a letter and tolling agreement on behalf of the EPA alleging violations of the CWA at the Springdale and Mingo landfills while seeking to enter settlement negotiations in lieu of filing a complaint. The EPA has proposed a penalty of $610,000 to settle alleged past boron exceedances at both facilities. Negotiations are continuing and WP is unable to predict the outcome of this matter.

*Regulation of Waste Disposal*

Federal and state hazardous waste regulations have been promulgated as a result of the RCRA, as amended, and the Toxic Substances Control Act. Certain CCRs, such as coal ash, were exempted from hazardous waste disposal requirements pending the EPA's evaluation of the need for future regulation.

In April 2015, the EPA finalized regulations for the disposal of CCRs (non-hazardous), establishing national standards for landfill design, structural integrity design and assessment criteria for surface impoundments, groundwater monitoring and protection procedures and other operational and reporting procedures to assure the safe disposal of CCRs from electric generating plants. On September 13, 2017, the EPA announced that it would reconsider certain provisions of the final regulations. On July 17, 2018, the EPA Administrator signed a final rule extending the deadline for certain CCR facilities to cease disposal and commence closure activities, as well as, establishing less stringent groundwater monitoring and protection requirements. On August 21, 2018, the D.C. Circuit remanded sections of the CCR Rule to the EPA to provide additional safeguards for unlined CCR impoundments that are more protective of human health and the environment. On December 2, 2019, the EPA published a proposed rule accelerating the date that certain CCR impoundments must cease accepting waste and initiate closure to August 31, 2020. The proposed rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria.

On July 29, 2020, the EPA published a final rule revising the date that certain CCR impoundments must cease accepting waste and initiate closure to April 11, 2021. The final rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria. On November 30, 2020, AE Supply submitted a closure deadline extension request to the EPA seeking to extend the closure date until 2024 of McElroy's Run CCR impoundment facility, for which AE Supply continues to provide access to FG.

FE or its subsidiaries have been named as potentially responsible parties at waste disposal sites, which may require cleanup under the CERCLA. Allegations of disposal of hazardous substances at historical sites and the liability involved are often unsubstantiated and subject to dispute; however, federal law provides that all potentially responsible parties for a particular site may be liable on a joint and several basis. Environmental liabilities that are considered probable have been recognized on the Consolidated Balance Sheets as of March 31, 2021, based on estimates of the total costs of cleanup, FirstEnergy's proportionate responsibility for such costs and the financial ability of other unaffiliated entities to pay. Total liabilities of approximately $102 million have been accrued through March 31, 2021, of which, approximately $67 million are for environmental remediation of former MGP and gas holder facilities in New Jersey, which are being recovered by JCP&L through a non-bypassable SBC. FE or its subsidiaries could be found potentially responsible for additional amounts or additional sites, but the loss or range of losses cannot be determined or reasonably estimated at this time.

### OTHER LEGAL PROCEEDINGS

*United States v. Larry Householder, et al.*

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020.

As previously disclosed, FirstEnergy has been cooperating with the U.S. Attorney's Office regarding the ongoing investigation and discussions have begun with the U.S. Attorney's Office regarding the resolution of this matter, including the possibility of FirstEnergy entering into a deferred prosecution agreement. As these discussions are preliminary, FirstEnergy cannot currently predict the timing, the outcome, or the impact of a possible resolution of this ongoing investigation.

While no contingency has been reflected in its consolidated financial statements, FirstEnergy believes that it is probable that it will incur a loss in connection with the resolution of this investigation. Given the ongoing nature and complexity of the review, inquiries and investigations, FirstEnergy cannot yet reasonably estimate a loss or range of loss that may arise from the resolutions of this investigation, but such resolution could have a material adverse effect on FirstEnergy's reputation, business, financial condition, results of operations, liquidity, or cash flows.

*Legal Proceedings Relating to United States v. Larry Householder, et al.*

In addition to the subpoenas referenced above under "—United States v. Larry Householder, et. al.", certain FE stockholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, and the complaints in each of these suits is related to allegations in the complaint and supporting affidavit relating to HB 6 and the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder.

- *Owens v. FirstEnergy Corp. et al. and Frand v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 28, 2020 and August 21, 2020, purported stockholders of FE filed putative class action lawsuits alleging violations of the federal securities laws. Those actions have been consolidated and a lead plaintiff, the Los Angeles County Employees Retirement Association, has been appointed by the court. A consolidated complaint was filed on February 26, 2021. The consolidated complaint alleges, on behalf of a proposed class of persons who purchased FE securities between February 21, 2017 and July 21, 2020, that FE and certain current or former FE officers violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by issuing misrepresentations or omissions concerning FE's business and results of operations. The consolidated complaint also alleges that FE, certain current or former FE officers and directors, and a group of underwriters violated Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 as a result of alleged misrepresentations or omissions in connection with offerings of senior notes by FE in February and June 2020.
- *Gendrich v. Anderson, et al. and Sloan v. Anderson, et al.* (Common Pleas Court, Summit County, OH); on July 26, 2020 and July 31, 2020, respectively, purported stockholders of FE filed shareholder derivative action lawsuits against certain FE directors and officers, alleging, among other things, breaches of fiduciary duty. These actions have been consolidated.
- *Miller v. Anderson, et al.* (Federal District Court, N.D. Ohio); *Bloom, et al. v. Anderson, et al.; Employees Retirement System of the City of St. Louis v. Jones, et al.; Electrical Workers Pension Fund, Local 103, I.B.E.W. v. Anderson et al.; Massachusetts Laborers Pension Fund v. Anderson et al.; The City of Philadelphia Board of Pensions and Retirement v. Anderson et al.; Atherton v. Dowling et al; Behar v. Anderson, et. al.* (U.S. District Court, S.D. Ohio, all actions have been consolidated); beginning on August 7, 2020, purported stockholders of FE filed shareholder derivative actions alleging the board and officers breached their fiduciary duties and committed violations of Section 14(a) of the

Securities Exchange Act of 1934. The cases in the Southern District of Ohio have been consolidated and co-lead plaintiffs have been appointed by the court.

- *Smith v. FirstEnergy Corp. et al., Buldas v. FirstEnergy Corp. et al., and Hudock and Cameo Countertops, Inc. v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 27, 2020, July 31, 2020, and August 5, 2020, respectively, purported customers of FirstEnergy filed putative class action lawsuits against FE and FESC, as well as certain current and former FirstEnergy officers, alleging civil Racketeer Influenced and Corrupt Organizations Act violations and related state law claims. These actions have been consolidated, and the court denied FirstEnergy's motions to dismiss and stay discovery on February 10 and 11, 2021, respectively. Class certification discovery is proceeding.

- *State of Ohio ex rel. Dave Yost, Ohio Attorney General v. FirstEnergy Corp., et al. and City of Cincinnati and City of Columbus v. FirstEnergy Corp.* (Common Pleas Court, Franklin County, OH); on September 23, 2020 and October 27, 2020, the OAG and the cities of Cincinnati and Columbus, respectively, filed complaints against several parties including FE, each alleging civil violations of the Ohio Corrupt Activity Act in connection with the passage of HB 6. On January 13, 2021, the OAG filed a motion for a temporary restraining order and preliminary injunction against FirstEnergy seeking to enjoin FirstEnergy from collecting the Ohio Companies' decoupling rider. On January 31, 2021, FE reached a partial settlement with the OAG and the cities of Cincinnati and Columbus with respect to the temporary restraining order and preliminary injunction request and related issues. In connection with the partial settlement, the Ohio Companies filed an application on February 1, 2021, with the PUCO to set their respective decoupling riders (CSR) to zero. On February 2, 2021, the PUCO approved the application of the Ohio Companies setting the rider to zero and no additional customer bills will include new decoupling rider charges after February 8, 2021. The cities of Dayton and Toledo have also been added as plaintiffs to the action. These actions have been consolidated. The cases are stayed pending final resolution of the United States v. Larry Householder, et al criminal proceeding described above.

- *Emmons v. FirstEnergy Corp. et al.* (Common Pleas Court, Cuyahoga County, OH); on August 4, 2020, a purported customer of FirstEnergy filed a putative class action lawsuit against FE, FESC, OE, TE and CEI, along with FES, alleging several causes of action, including negligence and/or gross negligence, breach of contract, unjust enrichment, and unfair or deceptive consumer acts or practices. On October 1, 2020, plaintiffs filed a First Amended Complaint, adding as a plaintiff a purported customer of FirstEnergy and alleging a civil violation of the Ohio Corrupt Activity Act and civil conspiracy against FE, FESC and FES. Motions to dismiss remain pending.

The plaintiffs in each of the above cases, seek, among other things, to recover an unspecified amount of damages (unless otherwise noted). In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE officers. Further, in letters dated January 26, and February 22, 2021, staff of FERC's Division of Investigations notified FirstEnergy that the Division is conducting an investigation of FirstEnergy's lobbying and governmental affairs activities concerning HB 6, and staff directed FirstEnergy to preserve and maintain all documents and information related to the same as such have been developed as part of an ongoing audit being conducted by FERC's Division of Audits and Accounting. The outcome of any of these lawsuits, investigations and audit are uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. No contingency has been reflected in FirstEnergy's consolidated financial statements as a loss is neither probable, nor is a loss or range of a loss reasonably estimable.

*Internal Investigation Relating to United States v. Larry Householder, et al.*

As previously disclosed, a committee of independent members of the Board of Directors has been directing an internal investigation related to ongoing government investigations. In connection with FirstEnergy's internal investigation, such committee determined on October 29, 2020, to terminate FirstEnergy's Chief Executive Officer, Charles E. Jones, together with two other executives: Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding; and Michael J. Dowling, Senior Vice President of External Affairs. Each of these terminated executives violated certain FirstEnergy policies and its code of conduct. These executives were terminated as of October 29, 2020. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates. FirstEnergy believes that payments under the consulting agreement may have been for purposes other than those represented within the consulting agreement. Additionally, on November 8, 2020, Robert P. Reffner, Senior Vice President and Chief Legal Officer, and Ebony L. Yeboah-Amankwah, Vice President, General Counsel, and Chief Ethics Officer, were separated from FirstEnergy due to inaction and conduct that the Board determined was influenced by the improper tone at the top.

Additionally, on February 17, 2021, the Board appointed Mr. John W. Somerhalder II to the positions of Vice Chairperson of the Board and Executive Director of FE, each effective as of March 1, 2021. Mr. Donald T. Misheff will continue to serve as Non-

Executive Chairman of the Board. Mr. Somerhalder will help lead efforts to enhance FirstEnergy's reputation. On March 7, 2021, the Board appointed Mr. Steven E. Strah to the position of Chief Executive Officer of FirstEnergy, effective as of March 8, 2021. On March 7, 2021, at the recommendation of the FirstEnergy Corporate Governance and Corporate Responsibility Committee, the Board also elected Mr. Strah as a Director of FirstEnergy, effective as of March 8, 2021, increasing the size of the Board from 11 to 12 members. Mr. Strah has been elected to the Board to serve for a term expiring at the FirstEnergy's 2021 Annual Meeting of Shareholders and until his successor shall have been elected.

Also, in connection with the internal investigation, FirstEnergy identified certain transactions, which, in some instances, extended back ten years of more, including vendor service, that were either improperly classified, misallocated to certain of the Utilities and Transmission Companies, or lacked proper supporting documentation. These transactions resulted in amounts collected from customers that were immaterial to FirstEnergy. The Utilities and Transmission Companies are working with the appropriate regulatory agencies to address these amounts.

The internal investigation has revealed no new material issues since FirstEnergy's Form 10-K was filed on February 18, 2021. The focus of the internal investigation has transitioned from a proactive investigation to continued cooperation with the ongoing government investigations.

*Nuclear Plant Matters*

On October 15, 2019, JCP&L, ME, PN and GPUN executed an asset purchase and sale agreement with TMI-2 Solutions, LLC, a subsidiary of EnergySolutions, LLC, concerning the transfer and dismantlement of TMI-2. This transfer of TMI-2 to TMI-2 Solutions, LLC will include the: (i) transfer of the ownership and operating NRC licenses for TMI-2; (ii) transfer of the external trusts for the decommissioning and environmental remediation of TMI-2; and (iii) assumption by TMI-2 Solutions, LLC, of certain liabilities, including all responsibility for the TMI-2 site, full decommissioning of TMI-2 and ongoing management of core debris material not previously transferred to the DOE. On August 10, 2020, JCP&L, ME, PN, GPUN, TMI-2 Solutions, LLC, and the PA DEP reached a settlement agreement regarding the decommissioning of TMI-2. On December 2, 2020, the NJBPU issued an order approving the transfer and sale under the conditions requested by NJ Rate Counsel and agreed to by JCP&L. Those conditions will restrict JCP&L from seeking recovery from its ratepayers for any future liabilities JCP&L could incur with respect to TMI-2. Also, on December 2, 2020, the NRC issued its order approving the license transfer as requested. With the receipt of all required regulatory approvals, the transaction was consummated on December 18, 2020.

*FES Bankruptcy*

On March 31, 2018, FES, including its consolidated subsidiaries, FG, NG, FE Aircraft Leasing Corp., Norton Energy Storage L.L.C. and FGMUC, and FENOC filed voluntary petitions for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court and emerged on February 27, 2020. See Note 3, "Discontinued Operations," for additional discussion.

*Other Legal Matters*

There are various lawsuits, claims (including claims for asbestos exposure) and proceedings related to FirstEnergy's normal business operations pending against FE or its subsidiaries. The loss or range of loss in these matters is not expected to be material to FE or its subsidiaries. The other potentially material items not otherwise discussed above are described under Note 8, "Regulatory Matters."

FirstEnergy accrues legal liabilities only when it concludes that it is probable that it has an obligation for such costs and can reasonably estimate the amount of such costs. In cases where FirstEnergy determines that it is not probable, but reasonably possible that it has a material obligation, it discloses such obligations and the possible loss or range of loss if such estimate can be made. If it were ultimately determined that FE or its subsidiaries have legal liability or are otherwise made subject to liability based on any of the matters referenced above, it could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows.

**NEW ACCOUNTING PRONOUNCEMENTS**

See Note 1, "Organization and Basis of Presentation," for a discussion of new accounting pronouncements.

**ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

See "FirstEnergy Corp. Management's Discussion and Analysis of Financial Condition and Results of Operations — Market Risk Information" in Item 2 above.

**ITEM 4.    CONTROLS AND PROCEDURES**

**(a) Evaluation of Disclosure Controls and Procedures**

The management of FirstEnergy, with the participation of our chief executive officer and chief financial officer, have evaluated the effectiveness of its disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of March 31, 2021. Based on that evaluation, the chief executive officer and chief financial officer of FirstEnergy have concluded that our disclosure controls and procedures were not effective as of March 31, 2021, due to the material weakness in internal control over financial reporting described below.

Notwithstanding the material weakness described below, management has concluded that its consolidated financial statements included in the current and prior period filings were not materially misstated and presented fairly, in all material respects, FirstEnergy's consolidated financial statements as of March 31, 2021 and 2020.

**Material Weakness in Internal Control Over Financial Reporting Existing as of March 31, 2021**

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of FirstEnergy's annual or interim financial statements will not be prevented or detected on a timely basis.

We did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with the company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the company's policies and code of conduct.

This control deficiency did not result in a material misstatement of our annual or interim consolidated financial statements. However, this control deficiency could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected. Accordingly, our management has concluded that this control deficiency constitutes a material weakness.

**Remediation Plans**

Management and the Board of Directors take FirstEnergy's internal control over financial reporting and the integrity of its financial statements seriously. Management, the Board of Directors, along with the Audit Committee, and its subcommittee, are currently working to remediate the material weakness identified above. The remedial activities include the following:

- the appointment of a new Chief Executive Officer to improve the tone at the top;

- the termination of certain members of senior management, including FirstEnergy's former Chief Executive Officer, for violations of

certain Company policies and its code of conduct;

- the separation of two senior members of the legal department, due to inaction and conduct that the Board of Directors determined was influenced by the improper tone at the top;

- the establishment of a subcommittee of FirstEnergy's Audit Committee, who, with the Board of Directors, is overseeing the assessment and implementation of potential changes (as appropriate) in FirstEnergy's compliance program;

- the appointment of a new Chief Legal Officer;

- the appointment of a new Vice Chairperson of the Board and Executive Director to help lead efforts to enhance the company's reputation with external stakeholders;

- the appointment of new independent directors to the Board;

- the appointment of a new Chief Ethics & Compliance Officer to oversee the ethics and compliance program and enhance the existing compliance structure and role;

- the Board of Directors' reinforcement of and executive team's recommitment to the importance of setting appropriate tone at the top and the expectation to demonstrate the company's core values and behaviors which support an ethical and compliant culture, as well as adherence to internal control over financial reporting; and

70

- increased communication and training of employees with respect to:

  - our commitment to ethical standards and integrity of our business procedures,
  - compliance requirements,
  - our code of conduct and other company policies, and
  - availability of and the process for reporting suspected violations of law or code of conduct.

Management and the Board of Directors are committed to maintaining a strong internal control environment and believes the above efforts will effectively remediate the material weakness; however, the material weakness cannot be considered remediated until the applicable remedial actions are implemented and operating for a sufficient period of time to allow management to conclude, through testing, that a remediation plan is implemented and the controls are operating effectively. Management, under the oversight of the Board of Directors, has developed and is continuing to refine a comprehensive remediation plan, which includes defined responsibilities and measurable milestones to evaluate the progress of the remediation activities. Management and the Board of Directors are monitoring the progress of these activities on an ongoing basis.

**(b) Changes in Internal Control over Financial Reporting**

During the quarter ended March 31, 2021, there were no changes in internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934) that have materially affected, or are reasonably likely to materially affect, FirstEnergy's internal control over financial reporting.

**PART II. OTHER INFORMATION**

**ITEM 1.     LEGAL PROCEEDINGS**

Information required for Part II, Item 1 is incorporated by reference to the discussions in Note 8, "Regulatory Matters," and Note 9, "Commitments, Guarantees and Contingencies," of the Notes to Consolidated Financial Statements in Part I, Item 1 of this Form 10-Q.

**ITEM 1A.   RISK FACTORS**

You should carefully consider the risk factors discussed in "Item 1A. Risk Factors" in the Registrant's Annual Report on Form 10-K for the year ended December 31, 2020, which could materially affect the Registrants' business, financial condition or future results. The information set forth in this report, including without limitation, the risk factor presented below, updates and should be read in conjunction with, the risk factors and information disclosed in the Registrant's Annual Report on Form 10-K.

*We Have Received Requests for Information Related to Government Investigations. The Investigations and Related Litigation Could Have a Material Adverse Effect on our Reputation, Business, Financial Condition, Results of Operations, Liquidity or Cash Flows.*

On July 21, 2020, we received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio requesting the production of information concerning an investigation surrounding HB 6 involving the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Following the announcement of the investigation surrounding HB 6, certain of our stockholders and customers filed several lawsuits against us and certain current and former directors, officers and other employees. In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FirstEnergy, and on September 1, 2020, issued subpoenas to FirstEnergy and certain of its officers. We are cooperating with the U.S. Attorney's Office and the SEC in their ongoing investigations. See Note 9, "Commitments, Guarantees and Contingencies," of the Notes to Consolidated Financial Statements, for additional details on the government investigations and subsequent litigation surrounding HB 6.

We have begun discussions with the U.S. Attorney's Office regarding the resolution of this matter, including the possibility of us entering into a deferred prosecution agreement. As these discussions are preliminary, we cannot currently predict the timing, the outcome or the impact of a possible resolution of this ongoing investigation.

While no contingency has been reflected in its consolidated financial statements, we believe that it is probable that it will incur a loss in connection with the resolution of the U.S. Attorney's investigation. Given the ongoing nature and complexity of the review, inquiries and investigations, we cannot yet reasonably estimate a loss or range of loss that may arise from the resolutions of this investigation but such resolution could have a material adverse effect on our reputation, business, financial condition, results of operations, liquidity or cash flows.

The investigations, the discussions with the U.S. Attorney's Office, and related litigation could divert management's focus and have resulted in, and could continue to result in substantial investigation expenses, and the commitment of substantial corporate resources. The outcome of the government investigations and related litigation is inherently uncertain. If one or more legal matters, including the ongoing investigations, were resolved against us, our reputation, business, financial condition, results of operations, liquidity or cash flows may be adversely affected. Further, such an outcome could result in criminal liabilities, deferred

prosecution agreements, significant monetary damages and fines, remedial corporate measures or other relief against us that could adversely impact our operations. In addition, certain of those outcomes could adversely impact our ability to maintain compliance with the covenants under our credit facilities or result in an event of default thereunder. These matters are likely to continue to have an adverse impact on the trading prices of our securities.

We are unable to predict the outcome, duration, scope, result or related costs of the investigations and related litigation and, therefore, any of these risks could impact us significantly beyond expectations. Moreover, we are unable to predict the outcome of the discussions with the U.S. Attorney's Office, the potential for any additional investigations or litigation, any of which could exacerbate these risks or expose us to potential criminal or civil liabilities, sanctions or other remedial measures, and could have a material adverse effect on our reputation, business, financial condition, results of operations, liquidity or cash flows.

**ITEM 2.    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

None.

**ITEM 3.    DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4.    MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5.    OTHER INFORMATION**

None.

**ITEM 6.    EXHIBITS**

| Exhibit Number | | Description |
|---|---|---|
| (A) | 3 | Amended and Restated Code of Regulations of FirstEnergy Corp., as Amended. |
|  | 10.1 | Director Appointment and Nomination Agreement, dated March 16, 2021, by and among the Icahn Group and FirstEnergy (incorporated by reference to FE's Form 8-K filed March 16, 2021, Exhibit 10.1, File No. 333-21011). |
| (A) | 31.1 | Certification of chief executive officer, as adopted pursuant to Rule 13a-14(a). |
| (A) | 31.2 | Certification of chief financial officer, as adopted pursuant to Rule 13a-14(a). |
| (A) | 32 | Certification of chief executive officer and chief financial officer, pursuant to 18 U.S.C. Section 1350. |
|  | 101 | The following materials from the Quarterly Report on Form 10-Q of FirstEnergy Corp. for the period ended March 31, 2021, formatted in iXBRL (Inline Extensible Business Reporting Language): (i) Consolidated Statements of Income, (ii) Consolidated Statements of Comprehensive Income, (iii) Consolidated Balance Sheets, (iv) Consolidated Statements of Cash Flows, (v) related notes to these financial statements and (vi) document and entity information. |
|  | 104 | Cover Page Interactive Data File (the cover page XBRL tags are embedded within the Inline XBRL document contained in Exhibit 101). |

(A) Provided herein in electronic format as an exhibit.

Pursuant to paragraph (b)(4)(iii)(A) of Item 601 of Regulation S-K, FirstEnergy has not filed as an exhibit to this Form 10-Q any instrument with respect to long-term debt if the respective total amount of securities authorized thereunder does not exceed 10% of its respective total assets, but hereby agrees to furnish to the SEC on request any such documents.

72

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

April 22, 2021

**FIRSTENERGY CORP.**
Registrant

/s/ Jason J. Lisowski

Jason J. Lisowski
Vice President, Controller

and Chief Accounting Officer

73

**FirstEnergy Corp.**

**AMENDED AND RESTATED**
**CODE OF REGULATIONS**

**Effective July 16, 2019**

**SHAREHOLDER MEETINGS**

1.　　**Time and Place of Meetings. All meetings of the shareholders for the election of directors or for any other purpose will be held at such time and place, within or without the State of Ohio, as may be designated by the Board of Directors or, in the absence of a designation by the Board of Directors, the Chairman of the Board of Directors, if any (the "Chairman"), the President, or the Secretary, and stated in the notice of meeting. The Board of Directors may postpone and reschedule any previously scheduled annual or special meeting of the shareholders.**

2.　　**Annual Meeting. An annual meeting of the shareholders will be held at such date and time as may be designated from time to time by the Board of Directors, at which meeting the shareholders will elect directors to succeed those directors whose terms expire at such meeting and will transact such other business as may be brought properly before the meeting in accordance with Regulation 9.**

3.　　**Special Meetings. (a) Special meetings of shareholders may be called by the Chairman or the President or by a majority of the Board of Directors acting with or without a meeting or by any person or persons who hold not less than 25% of all the shares outstanding and entitled to be voted on any proposal to be submitted at said meeting. Special meetings of the holders of shares that are entitled to call a special meeting by virtue of any Preferred Stock Designation may call such meetings in the manner and for the purposes provided in the applicable terms of such Preferred Stock Designation. For purposes of this Code of Regulations, "Preferred Stock Designation" has the meaning ascribed to such term in the Articles of Incorporation of the Corporation, as may be amended from time to time.**

(b)  Upon written request by any person or persons entitled to call a meeting of shareholders delivered in person or by certified mail to the Chairman, the President or the Secretary, such officer shall forthwith cause notice of the meeting to be given to the shareholders entitled to notice of such meeting in accordance with Regulation 4. If such notice shall not be given within 60 days after the delivery or mailing of such request, the person or persons requesting the meeting may fix the time of the meeting and give, or cause to be given, notice in the manner provided in Regulation 4.

4.  Notice of Meetings. Except to the full extent that notice is legally permitted (now or hereafter) to be given by any other form of media, including any form of electronic or other communications, written notice of every meeting of the shareholders called in accordance with these Regulations, stating the time, place and purposes for which the meeting is called, will be given by or at the direction of the Chairman, the President, a Vice President, the Secretary or an Assistant Secretary (or in case of their refusal, by the person or persons entitled to call the meeting under Regulation 3). Such notice will be given not less than 7 nor more than 60 calendar days before the date of the meeting to each shareholder of record entitled to notice of such meeting. If such notice is mailed, it shall be addressed to the shareholders at their respective addresses as they appear on the records of the Corporation, and notice shall be deemed to have been given on the day so mailed. Notice of adjournment of a meeting need not be given if the time and place to which it is adjourned are fixed and announced at such meeting.

5.  Inspectors. Inspectors of election may be appointed to act at any meeting of shareholders in accordance with Ohio law.

6.  Quorum. To constitute a quorum at any meeting of shareholders, there shall be present in person or by proxy shareholders of record entitled to exercise not less than a majority of the voting power of the Corporation in respect of any one of the purposes for which the meeting is called, unless a greater or lesser number is expressly provided for with respect to a particular class or series of capital stock by the terms of any applicable Preferred Stock Designation. Except as may be otherwise provided in any Preferred Stock Designation, the holders of a majority of the voting power of the Corporation represented

2

in person or by proxy at a meeting of shareholders, whether or not a quorum be present, may adjourn the meeting from time to time. For purposes of this Code of Regulations, "voting power of the Corporation" has the meaning ascribed to such term in the Articles of Incorporation of the Corporation, as may be amended from time to time.

7. **Voting.** Except as otherwise expressly provided by law, the Articles of Incorporation or this Code of Regulations, at any meeting of shareholders at which a quorum is present, a majority of the votes cast, whether in person or by proxy, on any matter properly brought before such meeting in accordance with Regulation 9 will be the act of the shareholders. An abstention shall not represent a vote cast. Every proxy must be duly executed and filed with the Secretary. A shareholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by filing with the Secretary written notice of revocation or a later appointment. The vote upon any question brought before a meeting of the shareholders may be by voice vote, unless otherwise required by law, the Articles of Incorporation or this Code of Regulations or unless the presiding officer otherwise determines.

8. **Record Dates.** In order that the Corporation may determine the shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, the Board of Directors may fix a record date, which will not be less than 7 nor more than 60 calendar days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders will be the date next preceding the day on which notice is given, or, if notice is waived, at the date next preceding the day on which the meeting is held.

9. **Order of Business.** (a) The Chairman, or such other officer of the Corporation designated by a majority of the total number of directors that the Corporation would have if there were no vacancies on the Board of Directors (such number being referred to as the "Whole Board"), will call meetings of shareholders to order and will act as presiding officer thereof. Unless otherwise determined by the Board of Directors prior to the meeting, the presiding officer of the meeting of shareholders will also determine the

3

order of business and have the authority in his or her sole discretion to regulate the conduct of any such meeting including, without limitation, by imposing restrictions on the persons (other than shareholders of the Corporation or their duly appointed proxies) who may attend any such shareholders' meeting, by ascertaining whether any shareholder or his proxy may be excluded from any meeting of shareholders based upon any determination by the presiding officer, in his sole discretion, that any such person has unduly disrupted or is likely to disrupt the proceedings of the meeting, and by determining the circumstances in which any person may make a statement or ask questions at any meeting of shareholders.

(b) At an annual meeting of the shareholders, only such business will be conducted or considered as is properly brought before the meeting. To be properly brought before an annual meeting, business must be (i) specified

in the notice of meeting (or any supplement thereto) given by or at the direction of the Chairman, the President, a Vice President, the Secretary or an Assistant Secretary in accordance with Regulation 4, (ii) otherwise properly brought before the meeting by the presiding officer or by or at the direction of a majority of the Whole Board, or (iii) otherwise properly requested to be brought before the meeting by a shareholder of the Corporation in accordance with Regulation 9(c).

(c) For business to be properly requested by a shareholder to be brought before an annual meeting, the shareholder must (i) be a shareholder of the Corporation of record at the time of the giving of the notice for such annual meeting provided for in this Code of Regulations, (ii) be entitled to vote at such meeting, and (iii) have given timely notice thereof in writing to the Secretary. To be timely, a shareholder's notice must be delivered to or mailed and received at the principal executive offices of the Corporation not less than 30 nor more than 60 calendar days prior to the annual meeting; provided, however, that in the event public announcement of the date of the annual meeting is not made at least 70 calendar days prior to the date of the annual meeting, notice by the shareholder to be timely must be so received not later than the close of business on the 10th calendar day following the day on which public announcement is first made of the date of the annual meeting. A shareholder's notice to the Secretary must set forth as to each matter the

4

shareholder proposes to bring before the annual meeting (A) a description in reasonable detail of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (B) the name and address, as they appear on the Corporation's books, of the shareholder proposing such business and of the beneficial owner, if any, on whose behalf the proposal is made, (C) the class and number of shares of the Corporation that are owned beneficially and of record by the shareholder proposing such business and by the beneficial owner, if any, on whose behalf the proposal is made, and (D) any material interest of such shareholder proposing such business and the beneficial owner, if any, on whose behalf the proposal is made in such business. Notwithstanding the foregoing provisions of this Code of Regulations, a shareholder must also comply with all applicable requirements of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder with respect to the matters set forth in this Regulation 9(c). For purposes of this Regulation 9(c) and Regulation 14, "public announcement" means disclosure in a press release reported by the Dow Jones News Service, Associated Press, or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14, or 15(d) of the Securities Exchange Act of 1934, as amended, or publicly filed by the Corporation with any national securities exchange or quotation service through which the Corporation's stock is listed

or traded, or furnished by the Corporation to its shareholders. Nothing in this Regulation 9(c) will be deemed to affect any rights of shareholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended.

(d)   At a special meeting of shareholders, only such business may be conducted or considered as is properly brought before the meeting. To be properly brought before a special meeting, business must be (i) specified in the notice of the meeting (or any supplement thereto) given by or at the direction of the Chairman, the President, a Vice President, the Secretary or an Assistant Secretary (or in case of their failure to give any required notice, the other persons entitled to give notice) in accordance with Regulation 4 or (ii) otherwise brought before the meeting by the presiding officer or by or at the direction of a majority of the Whole Board.

5

(e)   The determination of whether any business sought to be brought before any annual or special meeting of the shareholders is properly brought before such meeting in accordance with this Regulation 9 will be made by the presiding officer of such meeting. If the presiding officer determines that any business is not properly brought before such meeting, he or she will so declare to the meeting and any such business will not be conducted or considered.

## DIRECTORS

10.   **Function and Qualification.** (a) Except where the law, the Articles of Incorporation, or this Code of Regulations requires action to be authorized or taken by the shareholders, all of the authority of the Corporation shall be exercised by or under the direction of the Board of Directors.

(b)   In order to qualify for service as a director of the Corporation, within 90 days following election to the Board of Directors in accordance with Regulations 11, 12 and 14, each director will become and will remain the beneficial owner of not less than 100 shares of Common Stock of the Corporation, except where such ownership would be inconsistent with or prohibited by (i) any applicable law, rule, regulation, order or decree of any governmental authority or (ii) any policy, contract, commitment or arrangement authorized by the Corporation.

11.   **Number, Election and Terms of Directors.** Except as may be otherwise provided in any Preferred Stock Designation, the number of the directors of the Corporation will not be less than nine nor more than 16 as may be determined from time to time only (i) by a vote of a majority of the Whole Board, or (ii) by the affirmative vote of the holders of a majority of the voting power of the Corporation, voting together as a single class. Directors shall hold office for a term expiring at the following annual meeting of shareholders and until their successors shall have been

elected. Except as may be otherwise provided in any Preferred Stock Designation, directors may be elected by the shareholders only at an annual meeting of shareholders. No decrease in the number of directors constituting the Board of Directors may shorten the term of any incumbent director. Election of directors of the Corporation need not be by written ballot unless requested by

6

the presiding officer or by the holders of a majority of the voting power of the Corporation present in person or represented by proxy at a meeting of the shareholders at which directors are to be elected.

12.     **Newly Created Directorships and Vacancies.** Except as may be otherwise provided in any Preferred Stock Designation, any vacancy (including newly created directorships resulting from any increase in the number of directors and any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause) may be filled only (i) by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum of the Board of Directors, or by a sole remaining director or (ii) by the affirmative vote of the shareholders after a vote to increase the number of directors at a meeting called for that purpose in accordance with this Code of Regulations. Any director elected in accordance with the preceding sentence to fill a vacancy that does not result from a newly created directorship will hold office for the remainder of the full term of the director that he or she is replacing. Any director elected in accordance with the first sentence of Regulation 12 will hold office until such director's successor has been elected.

13.     **Removal.** Except as may be otherwise provided in any Preferred Stock Designation, any director or the entire Board of Directors may be removed only upon the affirmative vote of the holders of a majority of the voting power of the Corporation, voting together as a single class.

14.     **Nominations of Directors; Election.** (a) Except as may be otherwise provided in any Preferred Stock Designation, only persons who are nominated in accordance with this Regulation 14 will be eligible for election at a meeting of shareholders to be members of the Board of Directors of the Corporation.

(b)     Nominations of persons for election as directors of the Corporation may be made only for elections to be held at an annual meeting of shareholders and only (i) by or at the direction of the Board of Directors or a committee thereof, (ii) by any shareholder who is a shareholder of record at the time of giving of notice provided for in this Regulation 14, who is entitled to vote for the election of directors at such meeting, and who complies

with the procedures set forth in this Regulation 14 or (iii) by one or more Eligible Shareholders (as defined below) pursuant to and in accordance with Regulation 14(d). All nominations by shareholders must be made pursuant to timely notice in proper written form to the Secretary.

(c)    For nominations of persons for election as directors of the Corporation (other than a nomination for director pursuant to Regulation 14(d)) to be timely, notice delivered by a shareholder who intends to appear in person or by proxy and nominate a person for election as a director of the Corporation at an annual meeting of shareholders (such notice, the "Nomination Notice") containing the Required Information (as defined below) must be delivered to or mailed and received at the principal executive offices of the Corporation not less than 30 nor more than 60 calendar days prior to the annual meeting of shareholders; provided, however, that in the event that public announcement of the date of the annual meeting is not made at least 70 calendar days prior to the date of the annual meeting, notice by the shareholder to be timely must be so received not later than the close of business on the 10th calendar day following the day on which public announcement is first made of the date of the annual meeting by the Corporation. In no event shall any adjournment or postponement of a shareholders' meeting, or the public announcement thereof, commence a new time period for the giving of a Nomination Notice as described above, except as required by law.

(d)    The Corporation shall include in its proxy statement and proxy for any annual meeting of shareholders (collectively, the "Proxy Materials"), together with any information required to be included in a proxy statement filed pursuant to the rules and regulations of the Securities and Exchange Commission and, if the Eligible Shareholder so elects, a Statement (as defined below), the name of any person nominated for election to the Board of Directors (the "Shareholder Nominee") by a shareholder, or a group of no more than 20 shareholders, who satisfies the requirements of this Regulation 14(d) (an "Eligible Shareholder") and who expressly elects at the time of providing the written notice required by this Regulation 14(d) to have its nominee included in the Proxy Materials pursuant to this Regulation 14(d). For purposes of any representation, agreement or other undertaking required by this Regulation 14(d), the term "Eligible Shareholder" shall include each

member of any group forming an Eligible Shareholder. Such written notice shall consist of a copy of Schedule 14N filed with the Securities and Exchange Commission in accordance with Rule 14a-18 of the Securities Exchange Act of 1934, as amended, or any successor schedule or form filed with the Securities and Exchange Commission in accordance with Rule 14a-18 of the Securities Exchange Act of 1934, as amended, or any successor provision, the Required Information and the other information required by this Regulation 14(d) (all such information collectively referred to as the "Proxy Notice"), and such Proxy Notice shall be delivered to the Corporation in accordance with the procedures and at the times set forth in this Regulation 14(d).

(i)   To be timely, the Proxy Notice must be delivered to or mailed and received at the principal executive offices of the Corporation no earlier than 150 calendar days and no later than 120 calendar days prior to the first anniversary of the date that the Corporation issued its Proxy Materials for the previous year's annual meeting of shareholders; provided, however, that in the event that the date of the annual meeting is more than 30 calendar days before or more than 60 calendar days after the first anniversary of the previous year's annual meeting of shareholders, the Proxy Notice, to be timely, must be delivered to or mailed and received at the principal executive offices of the Corporation not later than (A) 150 calendar days prior to the date of such annual meeting or (B) if the first public announcement of the date of such annual meeting is less than 150 calendar days prior to the date of such annual meeting, 10 calendar days following the day on which public announcement is first made by the Corporation of the date of such meeting.

(ii)   The Corporation shall not be required to include, pursuant to this Regulation 14(d), any Shareholder Nominee in the Proxy Materials (A) for which the Secretary of the Corporation receives a Nomination Notice (whether or not subsequently withdrawn) pursuant to which the nominating shareholder has nominated a person for election to the Board of Directors pursuant to the advance notice requirements for shareholder nominees for director set forth in Regulation 14(c), (B) whose election as a member of the Board of Directors would cause the Corporation to be in violation of these Regulations, the Articles of Incorporation of the Corporation, the rules and listing standards of the principal U.S. exchange upon which the Common Stock of the Corporation is listed, any applicable state

or federal law, rule or regulation, or the Corporation's publicly disclosed policies and procedures, (C) who is or has been within the past three years, an officer or director of a competitor, as defined in Section 8 of the Clayton Antitrust Act of 1914, as amended, (D) who is a named subject of a pending criminal proceeding or has been convicted in such a criminal proceeding within the past 10 years (excluding traffic violations and other minor offenses) or (E) who is subject to any order of the type specified in Rule 506(d) of Regulation D promulgated under the Securities Act of

1933, as amended, or any successor provision.

(iii)   The maximum number of Shareholder Nominees appearing in the Proxy Materials with respect to an annual meeting of shareholders shall not exceed 20% of the number of directors in office as of the last day on which the Proxy Notice may be delivered or received or, if such amount is not a whole number, the closest whole number below 20%, and in any event, not less than two Shareholder Nominees. In the event that one or more vacancies for any reason occurs on the Board of Directors after the last day on which the Proxy Notice may be delivered or received but before or as of the annual meeting of shareholders and the Board of Directors resolves to reduce the size of the Board of Directors in connection therewith, the maximum number of Shareholder Nominees included in the Proxy Materials shall be calculated based on the number of directors in office as so reduced. Shareholder Nominees that were submitted by an Eligible Shareholder for inclusion in Proxy Materials pursuant to this Regulation 14(d) but either are subsequently withdrawn after the last day on which the Proxy Notice may be delivered or received or whom the Board of Directors itself determines to nominate for election shall, for the purposes of this Regulation 14(d)(iii), count as Shareholder Nominees appearing in the Proxy Materials. Each Eligible Shareholder shall rank each Shareholder Nominee it submitted for inclusion in the Proxy Materials and in the event that the number of Shareholder Nominees submitted by Eligible Shareholders pursuant to this Regulation 14(d) exceeds this maximum number, the highest ranked Shareholder Nominee from the Eligible Shareholder owning the greatest number of shares of stock of the Corporation will be selected for inclusion in the Proxy Materials first, followed by the highest ranked Shareholder Nominee of the Eligible Shareholder holding the next greatest number of

10

shares of stock of the Corporation, and continuing on in that manner until the maximum number of Shareholder Nominees is reached.

(iv)   For purposes of this Regulation 14(d), an Eligible Shareholder shall be deemed to own only those outstanding shares of Common Stock of the Corporation as to which the shareholder possesses both (A) the full voting and investment rights pertaining to the shares and (B) the full economic interest in (including the opportunity for profit and risk of loss on) such shares; provided that the number of shares calculated in accordance with clauses (A) and (B) shall not include any shares (1) sold by such shareholder or any of its affiliates in any transaction that has not been settled or closed, (2) borrowed by such shareholder or any of its affiliates for any purposes or purchased by such shareholder or any of its affiliates pursuant to an agreement to resell, or (3) subject to any option, warrant, forward contract, swap, contract of sale, other derivative or similar agreement entered into by such shareholder or any of its affiliates, whether any such instrument or agreement is to be settled with shares or with cash based on the notional

amount or value of shares of outstanding Common Stock of the Corporation, in any such case which instrument or agreement has, or is intended to have, or if exercised would have, the purpose or effect of (x) reducing in any manner, to any extent or at any time in the future, such shareholder's or its affiliates' full right to vote or direct the voting of any such shares, or (y) hedging, offsetting or altering to any degree gain or loss arising from the full economic ownership of such shares by such shareholder or affiliate. Further, for purposes of this Regulation 14(d), an Eligible Shareholder shall be deemed to own shares held in the name of a nominee or other intermediary so long as the shareholder retains the right to recall the shares for voting purposes on no less than five business days' notice, represents that they will vote such shares at the applicable shareholder meeting and possesses the full economic interest in the shares. An Eligible Shareholder's ownership of shares shall be deemed to continue during any period in which the shareholder has delegated any voting power by means of a proxy, power of attorney or other instrument or arrangement that is revocable at any time by the shareholder. The terms "owned," "owning" and other variations of the word "own" shall have correlative meanings. Whether outstanding shares of the Common Stock of the Corporation are owned for purposes of this Regulation 14(d) shall be determined by the

11

Board of Directors or a committee thereof, in its reasonable discretion. For the purposes of this Regulation 14(d)(iv), the term "affiliate" or "affiliates" shall have the meaning ascribed thereto under the rules and regulations of the Securities Exchange Act of 1934, as amended. No shares of stock of the Corporation may be attributed to more than one group constituting an Eligible Shareholder and no shareholder or beneficial owner, alone or together with any of its affiliates, may be a member of more than one group constituting an Eligible Shareholder. Furthermore, two or more funds that are (A) under common management and investment control, (B) under common management and funded primarily by the same employer or (C) a "group of investment companies," as such term is defined in the Investment Company Act of 1940, as amended, shall be treated as one shareholder for purposes of determining Eligible Shareholder status.

(v)   An Eligible Shareholder must have owned 3% or more of the Corporation's issued and outstanding Common Stock continuously for at least three years (the "Required Shares") as of each of the date the Proxy Notice is delivered to or received by the Corporation, the date the Proxy Notice is required to be delivered to or received by the Corporation in accordance with this Regulation 14(d) and the record date for determining shareholders entitled to vote at the annual meeting, and must continue to hold the Required Shares through the date of the annual meeting. Within the time period specified in this Regulation 14(d) for delivery of the Proxy Notice, an Eligible Shareholder must provide the following information in writing to the Secretary of the Corporation: (A) one or more written statements

from the record holder of the shares (and from each intermediary through which the shares are or have been held during the requisite three-year holding period) verifying that, as of a date within three calendar days prior to the date the Proxy Notice is delivered to or received by the Corporation, the Eligible Shareholder owns, and has owned continuously for the preceding three years, the Required Shares, and the Eligible Shareholder's agreement to provide, within five business days after each of the date the Proxy Notice is required to be delivered to or received by the Corporation and the record date for the annual meeting, written statements from the record holder and intermediaries verifying the Eligible Shareholder's continuous ownership of the Required Shares through each of the date the Proxy Notice is required to be delivered to or received

12

by the Corporation and the record date, along with a written statement that the Eligible Shareholder will continue to hold the Required Shares through the date of the annual meeting; (B) the Required Information, together with the written consent of each Shareholder Nominee to being named in the Proxy Statement as a nominee; (C) a representation that (1) the Eligible Shareholder acquired the Required Shares in the ordinary course of business and did not acquire any of the Required Shares with the intent to change or influence control of the Corporation, and does not presently have such intent, (2) the Eligible Shareholder has not nominated and will not nominate for election to the Board of Directors at the annual meeting any person other than the Shareholder Nominee(s) being nominated pursuant to this Regulation 14(d), (3) the Eligible Shareholder has not engaged and will not engage in, and has not and will not be a "participant" in another person's, "solicitation" within the meaning of Rule 14a-1(l) under the Securities Exchange Act of 1934, as amended, or any successor provision, in support of the election of any individual as a director at the annual meeting other than its Shareholder Nominee or a nominee of the Board of Directors, (4) that the Shareholder Nominee(s) is or are eligible for inclusion in the Proxy Materials under Regulation 14(d)(ii) and (5) the Eligible Shareholder will not distribute to any shareholder any proxy for the annual meeting other than the form distributed by the Corporation, (D) an undertaking that the Eligible Shareholder agrees to (1) assume all liability stemming from any legal or regulatory violation arising out of the Eligible Shareholder's communications with the shareholders of the Corporation or out of the information that the Eligible Shareholder provided to the Corporation, (2) comply with all other laws and regulations applicable to any solicitation in connection with the annual meeting, and (3) provide to the Corporation prior to the election of directors such additional information as requested with respect thereto, including any other certifications, representations or undertakings as the Corporation may reasonably request, (E) in the case of a nomination by a group of shareholders that together is an Eligible Shareholder, the designation by all group members of one group member that is authorized to act on behalf of all such members with respect to the nomination, (F) an undertaking that the Eligible Shareholder agrees to immediately notify the

**Corporation if the Eligible Shareholder ceases to own any of the Required Shares prior to the date of the applicable annual meeting and (G) in the case of a nomination by an Eligible Shareholder**

13

that includes a group of funds whose shares are aggregated for purposes of constituting an Eligible Shareholder, an undertaking that the Eligible Shareholder agrees to provide all documentation and other information reasonably requested by the Corporation to demonstrate that the funds satisfy Regulation 14(d)(iv). If the Eligible Shareholder does not comply with each of the applicable representation, agreements and undertakings set forth in this Regulation 14(d)(v), or the Eligible Shareholder provides information to the Corporation regarding a nomination that is untrue in any material respect or omitted to state a material fact necessary in order to make a statement made, in light of the circumstances under which it was made, not misleading, the Shareholder Nominee(s) nominated by such Eligible Shareholder shall be deemed to have been withdrawn and will not be included in the Proxy Materials.

(vi)   The Eligible Shareholder may provide to the Secretary of the Corporation, at the time the information required by this Regulation 14(d) is first provided, a written statement (the "Statement") for inclusion in the Proxy Materials, not to exceed 500 words, in support of the Shareholder Nominee's candidacy. Notwithstanding anything to the contrary contained in this Regulation 14(d), the Corporation may omit from the Proxy Materials any information or Statement that it, in good faith, believes is materially false or misleading, omits to state any material fact or would violate any applicable law or regulation. If multiple members of a shareholder group submit a statement for inclusion, the statement received by the Eligible Shareholder owning the greatest number of shares will be selected.

(vii)   On or prior to the date the Proxy Notice is required to be delivered or received by the Corporation as specified in this Regulation 14(d), a Shareholder Nominee must deliver to the Secretary of the Corporation the written questionnaire required of directors and officers. The Shareholder Nominee must also deliver to the Corporation such additional information as the Corporation may request to permit the Board of Directors to determine if the Shareholder Nominee is independent under the rules and listing standards of the principal U.S. exchange upon which the Corporation's Common Stock is listed, any applicable rules of the Securities and Exchange Commission, any publicly disclosed standards used by the Board of Directors in determining and disclosing the independence

of its directors. If the Board of Directors determines in good faith that the Shareholder Nominee is not independent under any of these standards, the Shareholder Nominee will be deemed to have been withdrawn and will not be included in the Proxy Materials. If a Shareholder Nominee or an Eligible Shareholder fails to continue to meet the requirements of this Regulation 14(d) or if the Eligible Shareholder fails to meet the all of the requirements of the notice provisions set forth in Regulation 14(d)(v) or if a Shareholder Nominee dies, becomes disabled or is otherwise disqualified from being nominated for election or serving as a director prior to the annual meeting of shareholders: (A) the Corporation may, to the extent feasible, remove the name of the Shareholder Nominee and the Statement from its proxy statement, remove the name of the Shareholder Nominee from its form of proxy and/or otherwise communicate to its shareholders that the Shareholder Nominee will not be eligible for nomination at the annual meeting of Shareholders; and (B) the Eligible Shareholder may not name another Shareholder Nominee or, subsequent to the date on which the Proxy Notice is required to be delivered to or received by the Corporation, otherwise cure in any way any defect preventing the nomination of the Shareholder Nominee at the annual meeting of Shareholders. On or prior to the date the Proxy Notice is required to be delivered to or received by the Corporation as specified in this Regulation 14(d), a Shareholder Nominee must deliver to the Secretary of the Corporation a written representation and agreement that such person (i) is not and will not become a party to any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question that has not been disclosed to the Corporation, (ii) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed to the Corporation, and (iii) will comply with all the Corporation corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines, and any other the Corporation policies and guidelines applicable to directors. If the Shareholder Nominee fails to comply with any of the requirements

15

included in this paragraph or this Regulation 14(d), the Shareholder Nominee will be deemed to have withdrawn and will not be included in the Proxy Materials.

(viii)   Notwithstanding the provisions of this Regulation 14(d), unless otherwise required by law or otherwise determined by the Board of Directors, if (A) the Eligible Shareholder or (B) a qualified representative of the Eligible

Shareholder does not appear at the applicable annual meeting to present its Shareholder Nominee or Shareholder Nominees, such nomination or nominations shall be disregarded, and no vote on such Shareholder Nominee or Shareholder Nominees will occur, notwithstanding that proxies in respect of such vote may have been received by the Corporation. For purposes of this Regulation 14(d)(viii), to be considered a qualified representative of an Eligible Shareholder, a person must be authorized by a writing executed by such Eligible Shareholder or an electronic transmission delivered by such Eligible Shareholder to act for such Eligible Shareholder as proxy at the applicable annual meeting and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the applicable annual meeting.

(ix)  Notwithstanding anything in this Regulation 14(d) to the contrary, in the event that the number of directors to be elected to the Board of Directors is increased by the Board of Directors, and there is no public announcement by the Corporation naming all of the nominees for director or specifying the size of the increased Board of Directors at least 130 calendar days prior to the first anniversary of the preceding year's annual meeting, a Proxy Notice shall also be considered timely, but only with respect to nominees for any new positions created by such increase and only to the extent the increase in the size of the board increases the number of nominees permitted under Regulation 14(d)(v), if it shall be delivered to or received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the tenth calendar day following the day on which such public announcement is first made by the Corporation.

(x)  This Regulation 14(d) shall be the exclusive method for shareholders to include nominees for director in the Corporation's proxy materials.

16

(e)  In addition to other information required to be provided pursuant to this Regulation 14, to be in proper written form, each Nomination Notice and Proxy Notice must set forth or include (the following, collectively referred to as the "Required Information"): (i) the name and address, as they appear on the Corporation's books, of the shareholder or group of shareholders giving such notice and of the beneficial owner, if any, on whose behalf the nomination is made; (ii) a representation that the shareholder or group of shareholders giving such notice is a holder of record of stock of the Corporation entitled to vote at such annual meeting and intends to appear in person or by proxy at the annual meeting to nominate the person or persons specified in such notice; (iii) the class and number of shares of stock of the Corporation owned beneficially and of record by the shareholder or group of shareholders giving such notice and by the beneficial owner, if any, on whose behalf the nomination is made; (iv) a description of all arrangements or understandings between or among any of (A) the shareholder or group of shareholders giving such

notice, (B) the beneficial owner on whose behalf such notice is given, (C) each nominee, and (D) any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the shareholder or group of shareholders giving such notice; (v) such other information regarding each nominee proposed by the shareholder or group of shareholders giving such notice as would be required to be included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission had the nominee been nominated, or intended to be nominated, by the Board of Directors; (vi) the signed consent of each nominee to serve as a director of the Corporation if so elected; and (vii) in the case of a Proxy Notice, if the Eligible Shareholder so elects, a Statement.

(f)    The presiding officer of any annual meeting shall have the power to determine and declare to the meeting whether a nomination was made in accordance with the procedures prescribed by the Code of Regulations, and if the presiding officer should so determine that such nomination was not made in compliance with the Code of Regulations, declare to the meeting that no action shall be taken on such nomination and such defective nomination shall be disregarded. Notwithstanding the foregoing provisions of this Regulation 14, a shareholder must also comply with all applicable requirements of the

17

Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder with respect to the matters set forth in this Regulation 14.

15.    Resignation. Any director may resign at any time by giving written notice of his resignation to the Chairman or the Secretary. Any resignation will be effective upon actual receipt by any such person or, if later, as of the date and time specified in such written notice.

16.    Regular Meetings. Regular meetings of the Board of Directors may be held immediately after the annual meeting of the shareholders and at such other time and place either within or without the State of Ohio as may from time to time be determined by a majority of the Whole Board. Notice of regular meetings of the Board of Directors need not be given.

17.    Special Meetings. Special meetings of the Board of Directors may be called by the Chairman or the President on one day's notice to each director by whom such notice is not waived, given either personally or by mail, telephone, telegram, telex, facsimile or similar medium of communication, and will be called by the Chairman or the President, in like manner and on like notice, on the written request of not less than one-third of the Whole Board.

Special meetings of the Board of Directors may be held at such time and place either within or without the State of Ohio as is determined by a majority of the Whole Board or specified in the notice of any such meeting.

18.     **Quorum and Vote.** At all meetings of the Board of Directors, one-third of the total number of directors then in office will constitute a quorum for the transaction of business. Except for the designation of committees as hereinafter provided and except for actions required by this Code of Regulations to be taken by a majority of the Whole Board, the act of a majority of the directors present at any meeting at which a quorum is present will be the act of the Board of Directors. If a quorum is not present at any meeting of the Board of Directors, the directors present threat may adjourn the meeting from time to time to another time or place, without notice other than announcement at the meeting, until a quorum is present.

18

19.     **Participation in Meetings by Communications Equipment.** Meetings of the Board of Directors or of any committee of the Board of Directors may be held through any means of communications equipment if all persons participating can hear each other, and such participation will constitute presence in person at such meeting.

20.     **Committees.** The Board of Directors may from time to time create an executive committee or any other committee or committees of directors to act in the intervals between meetings of the Board of Directors and may delegate to such committee or committees any of its authority other than that of filling vacancies among the Board of Directors or in any committee of the Board of Directors. No committee shall consist of less than three directors. The Board of Directors may appoint one or more directors as alternate members of any such committee to take the place of absent committee members at meetings of such committee. Unless otherwise ordered by the Board of Directors, a majority of the members of any committee appointed by the Board of Directors pursuant to this Regulation 20 shall constitute a quorum at any meeting thereof, and the act of a majority of the members present at a meeting at which a quorum is present shall be the act of such committee. Action may be taken by any such committee without a meeting by a writing or writings signed by all of its members. Any such committee may prescribe its own rules for calling and holding meetings and its method of procedure, subject to any rules prescribed by the Board of Directors, and will keep a written record of all action taken by it.

21.     **Compensation.** The Board of Directors may establish the compensation and expense reimbursement policies for directors in exchange for membership on the Board of Directors and on committees of the Board of Directors, attendance at meetings of the Board of Directors or committees of the Board of Directors, and for other services by directors to the Corporation or any of its subsidiaries. No director that is also an officer or employee of

the Corporation shall receive compensation as a director.

22.     **Bylaws.** The Board of Directors may adopt Bylaws for the conduct of its meetings and those of any committees of the Board of Directors that are not inconsistent with the Articles of Incorporation or this Code of Regulations.

19

**OFFICERS**

23.     **Generally.** The Corporation may have a Chairman, elected by the directors from among their number, and shall have a President, a Secretary and a Treasurer. The Corporation may also have one or more Vice Chairmen and Vice Presidents and such other officers and assistant officers as the Board of Directors may deem appropriate. If the Board of Directors so desires, it may elect a Chief Executive Officer to manage the affairs of the Corporation, subject to the direction and control of the Board of Directors. All of the officers shall be elected by the Board of Directors. Notwithstanding the foregoing, by specific action, the Board of Directors may authorize the Chairman or the President to appoint any person to any office other than Chairman, President, Secretary, or Treasurer. Any number of offices may be held by the same person, and no two offices must be held by the same person. Any of the offices may be left vacant from time to time as the Board of Directors may determine. In case of the absence or disability of any officer of the Corporation or for any other reason deemed sufficient by a majority of the Board of Directors, the Board of Directors may delegate the absent or disabled officer's powers or duties to any other officer or to any director.

24.     **Authority and Duties of Officers.** The officers of the Corporation shall have such authority and shall perform such duties as are customarily incident to their respective offices, or as may be specified from time to time by the Board of Directors, the Chairman or the President regardless of whether such authority and duties are customarily incident to such office.

25.     **Compensation.** The compensation of all officers and agents of the Corporation who are also members of the Board of Directors of the Corporation will be fixed by the Board of Directors or by a committee of the Board of Directors. The Board of Directors may fix, or delegate the power to fix, the compensation of the other officers and agents of the Corporation to the Chief Executive Officer or any other officer of the Corporation.

26.     **Succession.** The officers of the Corporation will hold office until their successors are elected. Any officer may be removed at any time by the affirmative vote of a

majority of the Whole Board. Any vacancy occurring in any office of the Corporation may be filled by the Board of Directors or by the Chairman or President as provided in Regulation 23.

## STOCK

27.  **Transfer and Registration of Shares. The Board of Directors shall have authority to make such rules and regulations as they deem expedient concerning the issuance, transfer and registration of shares and may appoint transfer agents and registrars thereof.**

28.  **Substituted Certificates. Any person claiming a certificate for shares to have been lost, stolen or destroyed shall make an affidavit or affirmation of that fact, shall give the Corporation and its transfer agent or agents a bond of indemnity or other assurance satisfactory to the Board of Directors or a committee thereof or to the President or a Vice President and the Secretary or the Treasurer, whereupon a new certificate may be executed and delivered of the same class and series or type and for the same number of shares as the one alleged to have been lost, stolen or destroyed.**

29.  **Voting Of Shares Held by the Corporation. Unless otherwise ordered by the Board of Directors, the President in person or by proxy or proxies appointed by him will have full power and authority on behalf of the Corporation to vote, act and consent with respect to any shares issued by other corporations that the Corporation may own.**

30.  **Owners of Shares. The Corporation will be entitled to treat the person in whose name shares are registered on the books of the Corporation as the absolute owner thereof, and will not be bound to recognize any equitable or other claim to, or interest in, such share on the part of any other person, whether or not the Corporation has knowledge or notice thereof, except as expressly provided by applicable law.**

## INDEMNIFICATION AND INSURANCE

31.  **Indemnification. The Corporation shall indemnify, to the full extent then permitted by law, any person who was or is a party or is threatened to be made a party to**

any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a member of the Board of Directors or an officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise. The Corporation shall pay, to the full extent then required by law, expenses, including attorney's fees, incurred by a member of the Board of Directors in defending any such action, suit or proceeding as they are incurred, in advance of the final disposition thereof, and may pay, in the same manner and to the full extent then permitted by law, such expenses incurred by any other person. The indemnification and payment of expenses provided hereby shall not be exclusive of, and shall be in addition to, any other rights granted to those seeking indemnification under any law, the Articles of Incorporation, any agreement, vote of shareholders or disinterested members of the Board of Directors, or otherwise, both as to action in official capacities and as to action in another capacity while he or she is a member of the Board of Directors, or an officer, employee or agent of the Corporation, and shall continue as to a person who has ceased to be a member of the Board of Directors, trustee, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

32.    Insurance. The Corporation may, to the full extent then permitted by law and authorized by the Board of Directors, purchase and maintain insurance or furnish similar protection, including but not limited to trust funds, letters of credit or self-insurance, on behalf of or for any persons described in Regulation 31 against any liability asserted against and incurred by any such person in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify such person against such liability. Insurance may be purchased from or maintained with a person in which the Corporation has a financial interest.

33.    Agreements. The Corporation, upon approval by the Board of Directors, may enter into agreements with any persons whom the Corporation may indemnify under this Code of Regulations or under law and undertake thereby to indemnify such persons and to pay the expenses incurred by them in defending any action, suit or proceeding

against them, whether or not the Corporation would have the power under law or this Code of Regulations to indemnify any such person.

## GENERAL

34.     **Fiscal Year.** The fiscal year of the Corporation will end on the thirty-first day of December in each calendar year or such other date as may be fixed from time to time by the Board of Directors.

35.     **Seal.** The Board of Directors may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

36.     **Amendments.** Except as otherwise provided by law or by the Articles of Incorporation or this Code of Regulations, these Regulations or any of them may be amended in any respect or repealed at any time at any meeting of shareholders or otherwise by the affirmative vote of the holders of shares entitling them to exercise a majority of the voting power of the Corporation voting together as a single class, provided that any amendment or supplement proposed to be acted upon at any such meeting has been described or referred to in the notice of such meeting. Notwithstanding the foregoing provisions of this Regulation 36, no amendment to Regulations 31, 32, or 33 will be effective to eliminate or diminish the rights of persons specified in those Regulations existing at the time immediately preceding such amendment.

23

**AMENDMENT
TO THE FIRSTENERGY CORP.
AMENDED AND RESTATED CODE OF REGULATIONS**

**Effective May 19, 2020**

Regulation 36 shall be amended as follows:

36.   **Amendments.** Except as otherwise provided by law or by the Articles of Incorporation or this Code of Regulations, these Regulations or any of them may be amended (i) in any respect or repealed at any time at any meeting of shareholders or otherwise by the affirmative vote of the holders of shares entitling them to exercise a majority of the voting power of the Corporation voting together as a single class, provided that any amendment or supplement proposed to be acted upon at any such meeting has been described or referred to in the notice of such

meeting or (ii) to the extent permitted by Chapter 1701 of the Ohio Revised Code, by the Board of Directors. Notwithstanding the foregoing provisions of this Regulation 36, no amendment to Regulations 31, 32, or 33 will be effective to eliminate or diminish the rights of persons specified in those Regulations existing at the time immediately preceding such amendment.

**EXHIBIT 31.1**

## Certification

I, Steven E. Strah, certify that:

1. I have reviewed this report on Form 10-Q of FirstEnergy Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 22, 2021

/s/ Steven E. Strah

Steven E. Strah
President and
Chief Executive Officer

**EXHIBIT 31.2**

**Certification**

I, K. Jon Taylor, certify that:

1. I have reviewed this report on Form 10-Q of FirstEnergy Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 22, 2021

/s/ K. Jon Taylor
K. Jon Taylor
Senior Vice President and
Chief Financial Officer

**EXHIBIT 32**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**

In connection with the Report of FirstEnergy Corp. ("Company") on Form 10-Q for the period ended March 31, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each undersigned officer of the Company does hereby certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Steven E. Strah
Steven E. Strah
President and
Chief Executive Officer

/s/ K. Jon Taylor
K. Jon Taylor
Senior Vice President and
Chief Financial Officer

Date: April 22, 2021