# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
|  | : **Case Nos. 2:20-cv-3785 & 2:20-cv-4287** |
|  | : |
| *In re* **FIRSTENERGY CORP.** | : **Chief Judge Algenon L. Marbley** |
| **SECURITIES LITIGATION** | : |
|  | : **Magistrate Judge Kimberly A. Jolson** |

## OPINION & ORDER

This case is a consolidated action[1] for securities fraud brought by Lead Plaintiff Los Angeles County Employees Retirement Association ("LACERA") on behalf of a putative class of investors in the Ohio-based electrical utility company FirstEnergy Corp. ("FirstEnergy" or the "Company"). Plaintiffs allege violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act") by FirstEnergy, 25 named officers and directors, and 16 underwriters, in relation to the Ohio House Bill 6 ("HB6") scandal. (ECF No. 72). The case is before the Court on Defendants' 10 separate Motions to Dismiss.[2] The Court determines that Plaintiffs' claims may proceed as pled, with some exceptions in Counts II and IV.

---

[1] The cases *Owens, et al. v. FirstEnergy Corp., et al.* (No. 2:20-cv-3785) and *Frand, et al. v. FirstEnergy Corp., et al.* (No. 2:20-cv-4287) were consolidated in November 2020 under the *Owens* case number by order of this Court. (ECF No. 65). All of the Motions to Dismiss were docketed in *Owens*; some also were cross-filed in *Frand*. Throughout this Opinion, ECF numbers refer to the *Owens* docket unless otherwise indicated.

[2] The main Motion to Dismiss is brought jointly by FirstEnergy and 17 officers and directors: James Pearson, Steven Strah, K. Jon Taylor, Jason Lisowski, George Smart, Paul Addison, Michael Anderson, Steven Demetriou, Julia Johnson, Donald Misheff, Thomas Mitchell, James O'Neil, Christopher Pappas, Sandra Pianalto, Luis Reyes, Jerry Thornton, and Leslie Turner. (ECF No. 160; *Frand* ECF No. 58). When this Opinion refers to arguments made by FirstEnergy, they are drawn from the brief in support (ECF No. 161). Individual Motions are brought by Robert Reffner (ECF No. 162), John Judge (ECF No. 164; *Frand* ECF No. 60), Michael Dowling (ECF No. 165; *Frand* ECF No. 61), Ty Pine (ECF No. 166), Dennis Chack (ECF No. 168; *Frand* ECF No. 62), Donald Schneider (ECF No. 170), Leila Vespoli (ECF No. 172), and Charles Jones (ECF No. 174; *Frand* ECF No. 64). A final joint Motion is brought by the 16 underwriters (ECF No. 171). Each of these Defendants also joins in the arguments advanced by FirstEnergy in the main Motion.

# I. BACKGROUND

## A. Factual Allegations

The following is drawn from Plaintiffs' well-pled allegations, which are assumed true at this stage; the Court implies no findings of fact. Plaintiffs' Complaint details a large corruption and bribery scheme perpetrated by FirstEnergy and its senior executives between February 21, 2017, and July 21, 2020, inclusive (the "Class Period"). (ECF No. 72 ¶¶ 1, 3). Specifically, FirstEnergy is alleged to have paid approximately $60 million to Ohio's former Speaker of the House Larry Householder, the former Chairman of the Public Utilities Commission of Ohio ("PUCO") Sam Randazzo, and others, via a web of lobbyists, shell companies, and political action committees. (*Id.* ¶¶ 3–5, 8). In exchange, FirstEnergy received a bailout of its failing nuclear power plants, in the form of HB6. (*Id.* ¶ 5). HB6 delivered approximately $2 billion to FirstEnergy: $1.3 billion in a ratepayer-funded subsidy and $700 million in a "decoupling" provision that would allow FirstEnergy to charge artificially high rates. (*Id.*). The scheme unraveled on July 21, 2020, when Householder and his associates were arrested and charged in connection with the bribery scheme. (*Id.* ¶ 8).

According to Plaintiffs, HB6 was the culmination of a years-long effort to solve FirstEnergy's "nuclear problems." The Company's two aging nuclear plants had incurred climbing maintenance and repair costs since at least the early 2000s, and the lost profits only grew as nuclear power became less cost competitive. (*Id.* ¶¶ 42–43). By 2016, forecasts projected losses in the hundreds of millions of dollars, which stood in the way of FirstEnergy's strategic decision to exit the competitive energy-generation market and focus solely on transmission. (*Id.* ¶ 44). Investors grew increasingly concerned about FirstEnergy's nuclear liabilities, and the topic came to "dominate" earnings calls and analyst coverage. (*Id.*).

In 2018, FirstEnergy announced plans to decommission the two nuclear power plants—which would entail billions of dollars in direct expenses and future environmental liabilities. (*Id.* ¶¶ 45, 50). In an effort to shed these costs, FirstEnergy Solutions ("FES," now Energy Harbor LLC) and FirstEnergy Nuclear Operating Company ("FENOC," now Energy Harbor Nuclear Corp.), the two subsidiaries through which FirstEnergy operated the nuclear plants, filed for bankruptcy. (*Id.* ¶¶ 42, 45).[3] FirstEnergy proposed a "settlement" to the bankruptcy court, whereby FirstEnergy would gain "sweeping releases" from future claims against FES and FENOC. (*Id.* ¶ 51). After the Department of Justice, the Ohio Consumer Council, and others objected to the plan, the bankruptcy court halted the case. (*Id.* ¶¶ 52–57, 62).[4]

All the while, Plaintiffs allege that FirstEnergy "had been laying the groundwork for [a] backup plan" to delay decommissioning of the nuclear plants and seek "legislative or regulatory solutions"—ultimately in the form of HB6. (*Id.* ¶¶ 44, 63). Early in 2017, FirstEnergy began courting State Representative and Speaker-hopeful Larry Householder by flying him and his sons aboard the corporate jet to former President Trump's inauguration. (*Id.* ¶ 65). Shortly thereafter, FirstEnergy established two 501(c)(4) organizations, Partners for Progress and Generation Now, that would serve as the covert vehicles for funneling money to Householder and affiliates. (*Id.*). FirstEnergy made sizable contributions to Householder in 2017 and 2018 but concealed the true magnitude of its spending ($2.9 million). (*Id.* ¶ 67).

While FirstEnergy was making these clandestine contributions, it allegedly misled its

---

[3]  FES and FENOC were renamed and reorganized as part of the bankruptcy proceedings. The Complaint at times refers to them, together, as "Energy Harbor." (*Id.* ¶¶ 17, 42 n.1).

[4]  Less than one week after HB6 was introduced, FirstEnergy would file an amended plan that jettisoned the sweeping releases. (*Id.* ¶ 88). The bankruptcy court then approved the amended plan. (*Id.* ¶ 92). Plaintiffs allege that the success of FirstEnergy's legislative tactics obviated its earlier strategy of obtaining releases via bankruptcy. (*Id.* ¶ 88).

shareholders about the nature of its political activity. One of the more notable instances involved the Company's proxy statements issued in connection with a May 16, 2017 shareholder meeting, where one item of business was a shareholder proposal to require an annual report on lobbying policies and payments. (*Id.* ¶ 110). In urging shareholders to vote against the proposal, FirstEnergy referred shareholders to its Political Activity Policy, which represented that the Company "complies with all federal and state lobbying registration and disclosure requirements" and "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy." (*Id.* ¶¶ 110–11). Additionally, FirstEnergy's SEC filings disclosed the Company's pursuit of "[l]egislative or regulatory solutions," but made no mention of the legal, financial, and reputational risks involved in *how* the Company was pursuing those solutions. (*Id.* ¶¶ 95–102).[5]

Householder, bolstered by the election of FirstEnergy-funded supporters, became Speaker of the Ohio House of Representatives in January 2019. (*Id.* ¶¶ 70–71). Having secured one powerful ally, FirstEnergy expanded its scheme with a $4.3 million payment to incoming PUCO Chairman Sam Randazzo, who in turn helped to write and support HB6. (*Id.* ¶ 72). Householder introduced the bill in April 2019, and it passed the House of Representatives in May. (*Id.* ¶¶ 73–74). In these two months alone, FirstEnergy contributed at least $9.5 million to the scheme in concealed payments. (*Id.* ¶ 67). The Senate added the valuable decoupling provision and passed the bill, after FirstEnergy contributed another $7 million. (*Id.* ¶¶ 75, 78). Ohio's Governor signed HB6 into law on July 23, 2019. (*Id.*).

Public opposition to HB6 quickly arose in the form of a referendum movement, and the

---

[5] Similar statements and omissions throughout the Class Period are discussed more fully at Section III.A.1.a, *infra*.

scheme shifted to defending the new law. (*Id.* ¶ 81). FirstEnergy funneled over $38 million through groups such as Ohioans for Energy Security (funded by Generation Now) and Partners for Progress in defense of HB6. (*Id.* ¶ 82). The funds were spent on an advertising campaign urging Ohioans not to sign the referendum petition—which the groups baselessly linked to the Chinese government—and also to bribe, disrupt, or disqualify signature collectors. (*Id.* ¶¶ 83–85). The referendum effort failed when its organizers could not produce the required number of signatures by the deadline. (*Id.* ¶ 86). The next day, FirstEnergy sent $3 million to Generation Now through an affiliate. (*Id.*).

Buoyed by the concealment of risk and by the seemingly guaranteed revenue from HB6, FirstEnergy stock traded at artificially high prices, and its credit ratings improved with S&P, Moody's, and Fitch. (*Id.* ¶¶ 242–46). FirstEnergy used the inflated prices to issue $2.5 billion in stock and $2.5 billion in debt securities. (*Id.* ¶ 241). FirstEnergy officers prospered as well: Defendants Jones, Pearson, Strah, Reffner, and Vespoli earned between 78% and 98% of their total compensation as performance-based pay. (*Id.* ¶ 248). Defendants Jones, Pearson, Chack, and Vespoli all sold a combined $14 million of FirstEnergy stock at the inflated prices. (*Id.* ¶ 250).

The scheme crumbled, however, when criminal charges were brought on July 21, 2020, against Householder, his political strategist Jeffrey Longstreth, three lobbyists (Mathew Borges, Neil Clark, and Juan Cespedes), and Generation Now. (*Id.* ¶ 143).[6] The criminal complaint alleged a federal racketeering conspiracy involving honest services wire fraud, receipt of bribes, and money laundering. (*Id.*). The criminal complaint did not identify FirstEnergy by name—it referred to the financier as "Company A"—but prosecutors announced that "[e]veryone in this room knows who Company A is." (*Id.* ¶ 234). While Defendant Jones was claiming ignorance and denying

---

[6] The criminal case is *United States v. Householder*, No. 1:20-cr-0077-TSB (S.D. Ohio).

wrongdoing (*Id.* ¶¶ 234–35), FirstEnergy stock plunged almost 35% on July 21 and 22, 2020, representing a loss of over $7.68 billion in market value. (*Id.* ¶¶ 258–59). As further developments became known, FirstEnergy stock fell again: by $1.1 billion on October 29, 2020, and by $1.3 billion between November 19 and 24, 2020. (*Id.* ¶¶ 261, 264). In each of these windows, the price of debt securities declined as well. (*Id.* ¶¶ 260, 263, 266). By November 2020, the major ratings agencies had downgraded FirstEnergy's credit ratings to "junk status." (*Id.* ¶ 247). Investors, including Plaintiffs, lost billions of dollars collectively. (*Id.* ¶ 13).

Longstreth and Cespedes each pleaded guilty to the racketeering conspiracy, admitting that they committed criminal acts to conceal the nature and source of payments that were made to Generation Now in return for specific official action by Householder. (*Id.* ¶ 171). Generation Now later followed suit and admitted to receiving money from "Company A" to be used in return for specific official action by Householder, and to concealing the nature and source of the payments. (*Id.* ¶ 205). On the same day that Longstreth and Cespedes pled guilty, FirstEnergy announced the firing of Defendants Jones, Chack, and Dowling for having "violated certain Company policies and its code of conduct." (*Id.* ¶ 172). Shortly thereafter, FirstEnergy terminated Defendant Reffner and another legal officer for "inaction and conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶¶ 184, 191). FirstEnergy's SEC filings following the terminations admitted to "material weakness in [its] internal control over financial reporting" that "could have resulted in material misstatements" in its financial statements. (*Id.* ¶ 192).

### B.  Subsequent Developments

Other fallout of the criminal complaint included lawsuits by the Ohio Attorney General and the Cities of Cincinnati and Columbus against FirstEnergy and others, seeking to enjoin implementation of HB6 (*Id.* ¶¶ 164, 170, 185); a PUCO audit (*Id.* ¶ 182); a ratepayer class action

filed in this District, alleging racketeering;[7] shareholder derivative actions before this Court[8] and the Northern District of Ohio;[9] and a federal criminal case against FirstEnergy.[10] That criminal case ended with a deferred prosecution agreement in July 2021, under which FirstEnergy paid a $230 million penalty and "admit[ted], accept[ed], and acknowledge[d] that it is responsible under United States law for the acts as charged in the Information and as set forth in the Statement of Facts"—including that it "conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit."[11] *See* DPA at 1, 4, 17.

---

[7] *Smith v. FirstEnergy Corp.*, No. 2:20-cv-3755-EAS-KAJ (S.D. Ohio). The Court takes judicial notice of this case and those mentioned next, as "such materials are public records [and] are otherwise appropriate for the taking of judicial notice." *New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

[8] *Emps. Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-4813-ALM-KAJ (S.D. Ohio).

[9] *Miller v. Anderson*, No. 5:20-cv-1743-JRA (N.D. Ohio).

[10] *United States v. FirstEnergy Corp.*, No. 1:21-cr-0086-TSB (S.D. Ohio).

[11] The deferred prosecution agreement, hereinafter the "DPA," is ECF No. 3 in *United States v. FirstEnergy Corp.* The Statement of Facts is Attachment A to the DPA. The Court takes judicial notice of the DPA, as it is "public record[]" and its contents are not subject to reasonable dispute. *New Eng. Health Care Emps. Pension Fund*, 336 F.3d at 501; Fed. R. Evid. 201. It appropriately may be considered at this stage without converting the Motions to Dismiss into ones for summary judgment. *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) ("'In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although *matters of public record*, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.'" (emphasis added) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990))). The Court is cautious not to use the DPA for broad truths. Of the Defendants in this matter, only FirstEnergy was a party to the DPA, so the admissions therein are of lesser value against the Individual Defendants. Moreover, the DPA postdates the Complaint, so Plaintiffs have not rested their allegations on it. Though the DPA (or FirstEnergy's pursuit thereof) is discussed in the briefing (ECF No. 176 at 15; No. 193 at 1–2), it does not relieve the necessity of a well-pled Complaint. Yet, to ignore the DPA when it is so plainly relevant to the claims and arguments at issue would be an exercise in artificial blindness. Accordingly, the Court views FirstEnergy's willingness to sign the DPA as reinforcing allegations and inferences in the Complaint that were compelling even without it.

### C. Procedural History

Plaintiff Owens filed her original Complaint on July 28, 2020. (ECF No. 1). On October 23, 2020, the Court ordered Owens's case consolidated with other related class actions (including that by Plaintiff Frand) and appointed LACERA as Lead Plaintiff. (ECF No. 65). LACERA filed its Amended Consolidated Complaint (hereinafter, the "Complaint") on February 26, 2021. (ECF No. 72). The Complaint contains five counts:

- Count I for violation of Section 10(b) of the Exchange Act and SEC Rule 10b–5 thereunder, against FirstEnergy and the "Officer Defendants"[12] (together, the "Exchange Act Defendants");

- Count II for violation of Section 20(a) of the Exchange Act, against the Exchange Act Defendants;

- Count III for violation of Section 11 of the Securities Act, against FirstEnergy; Defendants Jones, Strah, and Lisowski; the "Director Defendants";[13] and the "Underwriter Defendants"[14] (together, the "Securities Act Defendants");

- Count IV for violation of Section 12(a)(2) of the Securities Act, against the Securities Act Defendants; and

---

[12] The "Officer Defendants" are Jones, Pearson, Strah, Taylor, Dowling, Chack, Pine, Reffner, Vespoli, Judge, and Schneider. (*Id.* ¶¶ 28–39). Plaintiffs clarify in their response brief that Defendant Pine, a FirstEnergy lobbyist, was not in fact an "officer" of the Company but was included in this definition "for ease of reference." (ECF No. 176 at 71 n.23).

[13] The "Director Defendants" are Addison, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Smart, Thornton, and Turner. (ECF No. 72 ¶ 281).

[14] The "Underwriter Defendants" are Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets, LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc., and MUFG Securities Americas Inc. (*Id.* ¶ 283).

- Count V for violation of Section 15 of the Securities Act, against the Securities Act
  Defendants other than the Underwriter Defendants.

All Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). *See supra* note 2.

## II.  STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). When evaluating a motion to dismiss under Rule 12(b)(6), "[a]ll factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). But the court "need not . . . accept unwarranted factual inferences." *Id.* Complaints must state "more than a bare assertion of legal conclusions to survive a motion to dismiss." *Horn v. Husqvarna Consumer Outdoor Products N.A., Inc.*, 2013 WL 693119, at *1 (S.D. Ohio Feb. 26, 2013) (citing *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The claim to relief must be "'plausible on its face,'" with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

When a plaintiff's claim sounds in fraud, the plaintiff also must satisfy Federal Rule of Civil Procedure 9(b). Rule 9(b) reads: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The requirement "reflects the

rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted). The Sixth Circuit has explained that to satisfy Rule 9(b), a plaintiff must at a minimum "allege the time, place, and content of the alleged misrepresentation," as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal quotation marks omitted). In the analysis that follows, the Court will specify which claims sound in fraud and thus are subject to the more stringent pleading requirements of Rule 9(b).

In a securities fraud case, the Private Securities Litigation Reform Act ("PSLRA") also requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, . . . [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). In other words, the PSLRA requires plaintiffs "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). Failure to meet these pleading requirements subjects the case to dismissal upon a defendant's motion. 15 U.S.C. § 78u–4(b)(3)(A). Here too, the Court will specify which claims are subject to the PSLRA requirements.

For claims to which heightened pleading requirements (Rule 9(b) and/or the PSLRA) do not apply, the pleading standard defaults to that of Rule 8: "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

### III. LAW AND ANALYSIS

Before delving into the Motions to Dismiss, it is worth setting forth several recurrent principles and themes in the Court's analysis. First, heightened pleading requirements exist for specific policy reasons, and overextending them to filter meritorious lawsuits would frustrate, not further, the purposes of federal securities laws. "Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim," *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (internal quotation marks omitted), such that they may "draft a responsive pleading." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted).

The PSLRA, meanwhile, is intended "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (internal quotation marks omitted) (citing H.R. Conf. Rep. No. 104-369, at 31 (1995)). The statute was Congress's response to "abuse of the securities laws by private litigants," *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 682 (6th Cir. 2005) (internal quotation marks omitted), which "'presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general.'" *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975)). However, the PSLRA "would hardly serve its purpose to protect investors and to maintain confidence in the securities markets, were it to become a choke-point for meritorious claims." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (internal quotation marks and citation omitted), *abrogated in part on other grounds by*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). As stated in *Tellabs*, the PSLRA contains "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." 551 U.S. at 322.

Second, context matters to Plaintiffs' narrative and is critical to understanding the alleged fraud. Plaintiffs emphasize that nuclear decommissioning was a matter of great importance to the Company, closely monitored by its shareholders. "The Nuclear Plants grew to dominate FirstEnergy earnings calls and analyst coverage, as investors grew increasingly concerned about the potential liabilities stemming from the Nuclear Plants." (ECF No. 72 ¶ 44). As will be discussed, this fact bolsters a fraudulent motive and blunts the plausibility of unwitting participation. Shareholders also were attuned to the Company's political spending. They brought to the May 2017 shareholder meeting a proposal for increased oversight of lobbying policies and payments, which the Company's leadership recommended against. (*Id.* ¶¶ 110–11). Representations about the Company's lobbying activities and legal compliance—which in other cases might be bland and innocuous—take on a different character when, as alleged, they were proffered in response to specific shareholder concerns and served to further the scheme through distraction and concealment.

Third, as detailed above in Section I.B, the HB6 scandal has prompted a deluge of lawsuits, including shareholder derivative actions, criminal prosecutions, a racketeering case, and more. That this Court and others have sustained similar allegations adds to the cogency of Plaintiffs' narrative—and dulls the competing theory that Defendants "believed they were engaging in the political process by legal means." (ECF No. 161 at 2). But nor does it displace Plaintiffs' obligation to demonstrate that the federal securities laws, specifically, are an appropriate avenue of redress. With these ideas in mind, the Court turns to Count I.

## A. Exchange Act Section 10(b) and Rule 10b–5 (Count I)

Section 10(b) of the Exchange Act prohibits "directly or indirectly . . . us[ing] or employ[ing], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). The Supreme Court "has found a [private] right of action implied in the words of the statute and its implementing regulation," Rule 10b–5. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Rule 10b–5 gives three categories of prohibited conduct:

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 240.10b–5.

Plaintiffs advance theories under each of the three subparts. The Court will follow FirstEnergy's brief in denoting subpart (b) "misstatement liability" and subparts (a) and (c), together, "scheme liability." (ECF No. 161 at 9 nn. 4, 5). The categories are not mutually exclusive, and Plaintiffs' decision to plead both theories under the same Count is consistent with a complementary view.[15] Scheme liability may rest in part on the same statements or omissions that

---

[15] *See also* ECF No. 72 ¶ 94 ("[D]efendants also executed the Bailout Scheme through a series of materially false and misleading public statements"); *Id.* ¶¶ 135–36 (alleged misstatements "were materially false and misleading when made" because "defendants knew or recklessly disregarded . . . that FirstEnergy, its officers, employees, and other representatives and affiliates had launched [or "had executed"] an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the Company and its affiliates"); No. 176 at 22 ("None of these statements so much as suggested that the most important aspect of Defendants' pursuit of legislative solutions depended on (or had been achieved by) a scheme to corrupt the political process and suborn the regulatory framework into which FirstEnergy had poured tens of millions of dollars." (internal quotation marks and citation omitted)).

13

trigger misstatement liability, or it may embrace separate statements or conduct. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019) ("[T]his Court and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws.").[16] Though misstatement liability is more defined, the "expansive language" of subsections (a) and (c) "capture[s] a wide range of conduct." *Id.* at 1101–02.

As interpreted by the courts, the required elements for a claim under Section 10(b) and Rule 10b–5 are:

> (1) a material misrepresentation or omission [or, in the case of scheme liability, a "deceptive or manipulative act"]; (2) scienter, that is, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, a causal connection between the misrepresentation and the loss.

*In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 851 (S.D. Ohio 2016) (Marbley, J.) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *see also Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 320 F. Supp. 3d 910, 923 (E.D. Mich. 2018) (adapting misstatement test to scheme liability). Defendants challenge every element of this test except the fifth (economic loss).

As a threshold matter, Plaintiffs' claims under Section 10(b) are subject to the heightened pleading standards of the PSLRA. The misstatement liability theory rests on statements and omissions alleged to be misleading, and the scheme liability theory embraces these statements and

---

[16] Defendants' attempt to segregate the allegations supporting the misstatement theory from those supporting the scheme theory (ECF No. 161 at 57–58) is irreconcilable with this passage of *Lorenzo*. For instance, the passage Defendants cite from *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360–61 (D.N.J. 2009) has been acknowledged by another court as "no longer viable following the Supreme Court's decision in *Lorenzo*." *SEC v. Winemaster*, 529 F. Supp. 3d 880, 919 (N.D. Ill. 2021). In another case cited by Defendants, the court distinguished *Lorenzo* on the grounds that—unlike here—all misstatements were alleged to have occurred *after*, and not in connection with, the sale of securities. *Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 2020 WL 2836312, at *5 (E.D. Mich. May 31, 2020).

omissions as part of the fraudulent scheme. *See* 15 U.S.C. § 78u–4(b)(1). Both theories also demand a "particular state of mind," *i.e.*, scienter. *See id.* §78u–4(b)(2). Rule 9(b) applies as well because the statements and omissions are alleged to be fraudulent, as is the overarching scheme. Even against these heightened standards, however, Plaintiffs have established the necessary elements for their Section 10(b) claims, which the Court now will analyze in turn.

### 1. Misrepresentation or Deceptive Act

All Defendants contend that Plaintiffs have not pled false statements or omissions, or deceptive or manipulative acts, with the requisite particularity. (ECF No. 161 at 9). The Court will consider first the false statements or omissions necessary for Plaintiffs' misstatement theory, then the deceptive or manipulative acts necessary for Plaintiffs' scheme theory.

### a. Misstatement Liability

Under the heightened pleading standards of the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Similarly, because the statements and omissions are alleged to be fraudulent, Rule 9(b) demands that Plaintiffs "allege the time, place, and content of the alleged misrepresentation." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal quotation marks omitted).

"A misrepresentation is an affirmative statement that is misleading or false." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014) ("*Omnicare II*"). "When an alleged misrepresentation concerns hard information—typically historical information or other factual information that is objectively verifiable—it is actionable if a plaintiff pleads facts showing that

the statement concerned a material fact and that it was objectively false or misleading." *Id.* (internal quotation marks and citations omitted). "When an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity." *Id.* (internal quotation marks and citations omitted).

An omission, on the other hand, is a "failure to disclose information when [the defendant] had a duty to do so." *Id.* at 471. As relevant here, there is an important distinction between total and partial silence. Once a company "chooses to speak on a subject," the company is "obligated . . . to do so fairly and fully." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 700 (E.D. Mich. 2010); *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) ("Our securities laws therefore require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." (internal quotation marks omitted)). Stated differently, "a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001).

In either case—misrepresentation or omission—the information must be material. A "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," or as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988) (internal quotation marks omitted). "Immaterial statements include vague, soft, puffing statements or obvious hyperbole upon which a reasonable investor would not rely." *Omnicare II*, 769 F.3d at 472 (internal quotation marks omitted).

Plaintiffs raise the following statements and omissions in their Complaint:

16

- Statements in the quarterly ("Form 10-Q") and annual ("Form 10-K") reports filed with the SEC in which the Company indicated it was pursuing "legislative or regulatory solutions" and represented that its internal controls were "effective," but omitted the bribery scheme from that discussion and from the lengthy disclosure of "risk factors" facing the Company. (ECF No. 72 ¶¶ 95–101, 131).

- Defendants Jones's, Pearson's, and Schneider's certifications of one or more of these SEC reports, in which they attested that the form "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." (*Id.* ¶ 102).

- Statements on investor calls describing the Company's pursuit of legislative or regulatory solutions but omitting or misrepresenting the corrupt means of that pursuit. (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132, 134).

- Proxy statements representing that the Company was committed to "good corporate governance," "integrity," "openness," and "trust." (*Id.* ¶¶ 104–105)

- The Political Activity Policy—which the 2017 proxy statements cited as its rationale to vote against the shareholders' lobbying transparency proposal—representing that the Company "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy." (*Id.* ¶¶ 110–11).

- The Company's Code of Conduct and Director Code of Conduct, espousing "high ethical standards," "fair dealing," and "compliance with the law." (*Id.* ¶¶ 106–09).

- A statement by Defendant Pearson at an energy conference, concerning the Company's pursuit of nuclear subsidy legislation. (*Id.* ¶ 116).

- Statements in a 2019 "current report" ("Form 8-K"), filed with the SEC, reporting the passage of HB6 and hailing its benefits. (*Id.* ¶ 128).

- Newspaper quotes of senior FirstEnergy executives that gave incomplete accounts of HB6 and misrepresented the risk associated with those ill-gotten gains. (*Id.* ¶¶ 112, 114, 119–20, 122–23, 125–26, 130, 133).

The Court will begin by addressing Defendants' overarching objections, then it will analyze the specific misstatements. *See Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (directing "a statement-by-statement analysis").

Defendants first contend that these statements are unactionable opinions. (ECF No. 161 at 59–62; No. 174 at 22–25). In *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund* ("*Omnicare III*"), the Supreme Court instructed that opinion statements—those expressing a "belief" or "view," as opposed to "certainty about a thing"—generally will not count as an "untrue statement of material fact," unless the statement (a) expresses an opinion the speaker did not "actually hold[]," (b) contains "embedded statements of fact" that are untrue, or (c) "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" such that the statement as a whole is misleading to a reasonable investor. 575 U.S. 175, 183–86, 189 (2015) (internal quotation marks omitted).[17]

---

[17] Though *Omnicare III* concerned liability under Section 11 of the Securities Act, many courts have extended its reasoning to Section 10(b) of the Exchange Act. *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016); *EveryWare*, 175 F. Supp. 3d at 852 (Marbley, J.).

In addressing the *Omnicare* argument, this Court is not writing on a blank slate. In the shareholder derivative action, this Court sustained allegations that the same proxy solicitation statements at issue here contained material misrepresentations or omissions. It deemed FirstEnergy's *Omnicare* argument "inapposite" for two reasons: "First, Plaintiffs allege that the Director Defendants made numerous specific statements about their legal compliance and risk management actions with respect to lobbying and political spending. Second . . . Plaintiffs make extensive allegations about the FirstEnergy Defendants' state of mind." *Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490, at *9 (S.D. Ohio May 11, 2021).

Here too, the Court is not persuaded that *Omnicare* bars any of the statements to which Defendants object. The statements comprising "[a]ssessments of compliance efforts" and of "the efficacy of internal controls" (ECF No. 161 at 61; No. 174 at 24) are irreconcilable with the Complaint's well-pled allegations of a fraudulent scheme, which notably were absent in *Omnicare III*. *See* 575 U.S. at 186 ("their complaint explicitly 'exclude[s] and disclaim[s]' any allegation sounding in fraud or deception"). If Defendants in fact made "[c]orruption . . . a fundamental aspect of the Company's business model" (ECF No. 72 ¶ 4), then their assessments of internal controls either were not honestly held or were not based on the diligence a reasonable investor would expect them to convey. So too with "[s]tatements about the merits of HB6." (ECF No. 161 at 61; No. 174 at 22–23). If HB6 was the ill-gotten gain of an intentional corrupt scheme, then Defendants had no honest basis to hail the benefits of the legislation; on net, it was a grave risk to the Company. Moreover, the omission of that risk from otherwise thorough disclosures (*Id.* at 24–25) was misleading if the risk was known, or if it would have been known through the reasonable diligence that such disclosures imply.[18]

---

[18] Defendants argue that Plaintiffs could not reasonably have interpreted their compliance

Next, Defendants argue that they were under no legal duty to disclose the purported scheme in statements of "soft information." As discussed above, "rosy affirmation" and "loosely optimistic statements" generally are not actionable. *City of Monroe Emps. Ret. Sys.*, 399 F.3d at 669 (internal quotation marks omitted). "If a company 'chooses to volunteer such information,' though, 'its disclosure must be full and fair' . . . [and] 'provide complete and non-misleading information with respect to the subjects on which [it] undertakes to speak.'" *Id.* at 670 (quoting *Helwig*, 251 F.3d at 561).

The "legal duty" argument likewise failed in the shareholder derivative action, where this Court wrote: "Even absent a per se rule requiring disclosure of unproven criminal conduct, 'corporations are [nevertheless] obligated to disclose facts necessary to ensure that their statements are not misleading. This duty applies to the disclosure of [uncharged, unadjudicated conduct] to the same extent it applies to the disclosure of any other material information.'" *Emps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at *9 (alterations in original) (quoting *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 323 (S.D.N.Y. 2007)). Once again, when the Court accepts Plaintiffs' well-pled scheme liability claims, Defendants' "[a]spirational statements" and "[g]eneric statements of legal compliance" (ECF No. 161 at 62; No. 174 at 25–26) would be less than a full and fair disclosure of the facts actually known to the Company.[19]

_____

statements and risk disclosures as "guarantees." (ECF No. 161 at 63–64; No. 174 at 24–25). This is precisely the argument that the Supreme Court rejected as "too far" in *Omnicare III*. 575 U.S. at 188. "Reasonable investors do not understand such statements as guarantees," but they *do* expect opinion statements to convey "that the issuer believes the opinion" and that "it fairly aligns with the information in the issuer's possession at the time." *Id.* at 188–89. Plaintiffs' well-pled scheme liability claims and scienter allegations, discussed in the next Sections, leave this an untenable position.

[19] Defendants' reliance on *Dailey v. Medlock*, 551 F. App'x 841 (6th Cir. 2014), therefore is misplaced. Defendants cite *Dailey* for its proposition that "this Circuit's precedent holds that a generic claim of legal compliance, absent any specifics, does not form the basis for a misrepresentation actionable under Rule 10b–5 and does not require the disclosure of allegedly

Furthermore, several of these compliance statements were offered as reasons to vote against a shareholder proposal for increased oversight of lobbying policies and payments. (ECF No. 72 ¶¶ 110–11). Context changes the meaning of those statements from aspiration to assurance; the speakers are claiming that increased oversight is not necessary *because* the Company is compliant and has effective controls. *Cf. Omnicare III*, 575 U.S. at 190 ("The reasonable investor understands a statement of opinion in its full context"). That assurance—which, importantly, helped to shield the scheme from detection—was misleading and more than mere "puffery" or "corporate cheerleading." (ECF No. 174 at 23, 26).

Applying these principles to the specific statements at issue, it is clear that Plaintiffs have alleged actionable misrepresentations and omissions under Count I:

- Statements in the 10-Q and 10-K reports filed with the SEC (ECF No. 72 ¶¶ 95–101, 131), signed by Defendants Jones, Pearson, Strah, Taylor, and Schneider were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, falsely

---

illegal activities." *Id.* at 849. (citing *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945–47 (6th Cir. 2009) ("*Omnicare I*"); and *Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 826–27 (8th Cir. 2003)). In its citation to *Kushner*, the *Dailey* court included this parenthetical: "statement that company was in 'substantial compliance' with Medicare regulations did not support Rule 10b–5 claim *where plaintiffs failed to allege* particular facts demonstrating that defendants *then knew of scheme* which violated those regulations." *Id.* (emphasis added). The Sixth Circuit's *Omnicare I* decision highlighted the same fact: "[T]he Eighth Circuit assumed that liability *could* attach to a company's general assertion of legal compliance, but only where the complaint 'adequately pleaded that the defendants *knew the statements were untruthful.'*" *Omnicare I*, 583 F.3d at 945 (emphasis added) (quoting *Kushner*, 317 F.3d at 831). Here, Defendants are alleged to have known of a scheme that rendered their compliance statements untruthful, which makes those statements actionable even if they amount to soft information.

claimed the Company was legally compliant, and falsely claimed the Company's internal controls were effective.

- Certifications of these SEC reports by Defendants Jones, Pearson, Strah, and Schneider (*Id.* ¶¶ 98, 102) were false or misleading for the same reasons, and for the additional reason that they are alleged to have known of the scheme but still vouched for the completeness and accuracy of the information contained in the reports.

- Statements on investor calls by Defendants Jones, Pearson, and Strah (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132, 134) were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, and misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

- Proxy statements (*Id.* ¶¶ 104–105) were false or misleading in that they staved off shareholder proposals for increased political oversight based on the faulty premise that the Company was responsible and compliant in its contributions and lobbying activity.

- The Political Activity Policy (*Id.* ¶¶ 110–11) similarly was false or misleading in that it was presented as a reason to defeat a shareholder proposal for increased political oversight but was not then being followed by the Company or its senior management.

- The Company's Code of Conduct and Director Code of Conduct (*Id.* ¶¶ 106–09) were false or misleading in that they were presented to shareholders in proxy statements but allegedly were being disregarded intentionally by the Company and its senior management. The Company later would admit to violations of these policies in a series of executive firings. (*Id.* ¶¶ 172, 178, 190–92).

- Defendant Pearson's statement at the energy conference (*Id.* ¶ 116) was false or misleading in that it misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions and omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity.

- Statements in the 8-K report (*Id.* ¶ 128) were false or misleading in that they misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

- Newspaper quotes of Defendants Jones, Schneider, Judge, and others (*Id.* ¶¶ 112, 114, 119–20, 122–23, 125–26, 130, 133) were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, and misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

Insofar as any of the above statements were soft information or opinions (*e.g.*, the profession of corporate values and personal assessments of compliance, internal controls, or the merits of HB6), Plaintiffs have alleged actual knowledge of falsity, as will be discussed under the scienter analysis. Moreover, all of the information that was misrepresented or omitted would be considered important to a reasonable investor as they closely monitored the Company's nuclear liabilities and determined how to vote on the shareholder proposal for increased political oversight.

Lastly, Defendants Reffner, Dowling, Pine, Chack, and Vespoli argue that they cannot be held responsible for statements they personally did not make or control. (ECF No. 163 at 5–6, No. 165-1 at 2, No. 167 at 10, No. 169 at 9, No. 173 at 5–6). *See also Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content

and whether and how to communicate it."). In response, Plaintiffs clarify that their Section 10(b) claims against these five Officer Defendants rest *only* on scheme liability, not on misstatement liability. (ECF No. 176 at 65 n.20). That concession does not require the dismissal of any claims, however, since misstatement liability and scheme liability are complementary theories in the same count. These Defendants still are implicated in Count I via scheme liability.

b.  Scheme Liability

For Plaintiffs' scheme liability theory, fraud must be alleged with particularity per Rule 9(b). *See, e.g.*, *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 2006 WL 469468, at *21 (S.D. Ohio Feb. 27, 2006) ("*Nat'l Century I*") (applying Rule 9(b) to scheme liability claims). "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide [] examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444–45 (6th Cir. 2008) (alteration in original) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007)).

The scheme as alleged by Plaintiffs was "to corrupt legislators and regulators" in order to "generate billions of dollars in illicit proceeds for the Company" while "overcoming the Company's most pressing operational challenges." (ECF No. 72 ¶¶ 3, 4, 6). FirstEnergy allegedly pursued this scheme through a variety of means, including by initiating bankruptcy proceedings "to try to evade liability for the Nuclear Plants," "[p]aying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6," "[m]aking personal payments to corrupt politicians and at least one regulator," "[u]sing" those politicians and regulators to "write" and "advance HB6 for consideration," "[c]orruptly preventing a referendum to repeal HB6," "[c]reating and using a web of pass-through entities to transfer and conceal the money to finance"

the scheme, making "materially false and misleading public statements," and "[c]oncealing" the scheme "from the investing public." (*Id.* ¶¶ 93–94).

FirstEnergy vigorously contests the existence of any illegal scheme. It notes specifically that corporations have a First Amendment right to speak on issues of public importance, including anonymously through 501(c)(4) groups. (ECF No. 161 at 13). This argument strains credibility. FirstEnergy is not before this Court simply for having contributed to 501(c)(4) entities; it is here for allegedly having used those entities to facilitate payments in exchange for official government action (*i.e.*, bribery) while deceiving and misleading investors. Bribery is not legal. 18 U.S.C. § 201; O.R.C. § 2921.02. And it is not protected speech. *See, e.g.*, *Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d 1118, 1134–35 (S.D. Ohio Feb. 10, 2021). For essentially the same reasons, FirstEnergy's argument that there were no "inherently deceptive" acts must be rejected. (ECF No. 161 at 55, citing *In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 909 (S.D. Ohio 2008) ("*Nat'l Century III*")). The Complaint alleges that Defendants carried out their scheme by way of bribery, corruption, and concealment. (*See, e.g.*, ECF No. 72 ¶ 93). While it might be true that "there is nothing inherently deceptive about contributing to a 501(c)(4) organization" (ECF No. 161 at 57), this framing by Defendants woefully miscasts the issue. Covertly funneling bribes through a 501(c)(4) organization, as Defendants are alleged to have done, is not an innocent act of political participation. It is illegal, deceptive, and offensive to democracy.

Defendants further claim that, insofar as Plaintiffs have alleged any unlawful conduct, they have not pled it with particularity. (ECF No. 161 at 11–12). Yet, Plaintiffs do plead "what, if any, laws or regulations defendants violated," *Dailey*, 551 F. App'x at 849, by referencing specific criminal charges actually brought against Defendants' alleged co-conspirators. The Complaint

details the "federal racketeering conspiracy" charged against Householder, Borges, Longstreth, Clark, Cespedes, and Generation Now, which involved "honest services wire fraud, receipt of millions of dollars in bribes and money laundering." (ECF No. 72 ¶ 143). The indictment filed with those charges explicitly acknowledged the role of "Company A," which is alleged without doubt to have been FirstEnergy. (*Id.* ¶ 234). The Court need not "interpolate" (ECF No. 161 at 12) to identify the unlawful conduct alleged against Defendants.

Moreover, as to bribery, the Complaint is replete with allegations of the "explicit *quid pro quo* agreement" Defendants claim is lacking. (ECF No. 161 at 15). The Complaint identifies specific actors, dollar amounts, phone contacts, meetings, and methods of concealment. (*See, e.g.*, ECF No. 72 ¶¶ 3, 4, 8, 67–75, 93, 135–36, 171, 205, 215–16, 221–24, 230). *Cf. Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) ("In order adequately to allege an underlying illegal act, such as bribery, Plaintiffs must plead the 'who, what, when, where, and how' of the alleged improper transaction."). Defendants' apparent expectation that Plaintiffs should be required, pre-discovery, to plead the "terms" of an agreement and the "contents" of communications to which Plaintiffs were not a party (ECF No. 161 at 16, 18) is an attempt to graft omniscience into Rule 9(b). That is not the standard. *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012). In combination with the timing of contributions and the guilty pleas of Longstreth, Cespedes, and Generation Now (and later, the admissions of FirstEnergy itself), Plaintiffs' facts as pled are more than sufficient to support a plausible and cogent inference that a bribery scheme occurred. The alternate inference of "innocent parallelism" (ECF No. 161 at 17) would rest on fantastical coincidence.

Next, Defendants attempt to call out the insufficiency of allegations in the first half of the Class Period (2017 to 2018). (*Id.* at 24–30). In so doing, they fail to engage with the scheme *as*

*pled*. During the first half of the Class Period, Plaintiffs allege that FirstEnergy was executing its first-choice plan—jettisoning liability through bankruptcy proceedings—while simultaneously "laying the groundwork for [their] backup plan . . . that would ultimately result in the passage of HB6." (ECF No. 72 ¶ 63). The introduction of HB6 marked the transition from planning to execution, not the origin of the alleged scheme. Plaintiffs describe several specific datapoints in the planning process that occurred in the first half of the Class Period: courting Householder at the presidential inauguration (*Id.* ¶ 65), establishing the 501(c)(4) organizations that later would serve as the vehicles for covertly transferring funds to Householder (*Id.*), financing Householder and allies in the spring 2018 primaries while obscuring the scale of contributions (*Id.* ¶¶ 67, 137), and defeating through misleading means a shareholder proposal that likely would have shed light on the entire operation (*Id.* ¶¶ 110–11). Again, these datapoints are stated with particularity, including specific dates, locations, actors, and dollar amounts. Moreover, Plaintiffs are not required to narrate the planning stages exhaustively before discovery has been exchanged; they need only show "representative samples" of "a complex and far-reaching fraudulent scheme." *Marlar*, 525 F.3d at 445 (internal quotation marks omitted). This is not, as Defendants claim, a case of "'fraud by hindsight.'" (ECF No. 161 at 24, quoting *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1042 (6th Cir. 1991)). Rather, Defendants' acts and statements in the first half of the Class Period are alleged to have been in furtherance of an intentional and corrupt scheme then underway. In arguing that these earlier acts and statements were neither false nor deceptive at the time, Defendants would have this Court misread the Complaint and ignore the scheme's planning stage.[20]

---

[20] Defendants' sub-argument about bribery can be dispatched swiftly, as it rests on a nonexistent contemporaneousness element. (ECF No. 161 at 27–29). The crime of bribery is complete when a person "promise[s], offer[s], or give[s] any valuable thing or valuable benefit" "with purpose to corrupt . . . or improperly to influence a public servant or party official . . . *whether before or after the public servant or party official is elected*." O.R.C. § 2921.02(A) (emphasis added).

Last are the arguments by the Officer Defendants that the Complaint fails to plead with particularity their individual involvement in the scheme. Their protests aside, the Court finds that the scheme allegations are sufficient to implicate each of them:

- Defendant Jones, who served as FirstEnergy's CEO throughout the Class Period, is alleged to have overseen the Company's pursuit of legislative and regulatory solutions, to have spoken many of the misstatements at issue, to have signed and certified FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity and which the Company later had to correct to disclose deficient internal controls, to have participated in in-person meetings regarding the scheme, to have made 84 phone contacts with Householder during the Class Period, and to have been terminated for his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (ECF No. 72 ¶¶ 95–96, 98, 102–104, 106, 112–14, 117–18, 121, 123–24, 127, 129, 132, 189, 220–21).

- Defendant Pearson, who served as FirstEnergy's CFO and later its Vice President of Finance, is alleged to have overseen the Company's approach to its nuclear liabilities through his participation in the "Restructuring Working Group," to have "reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme," to have made false or

---

The fact that money was exchanged before Householder's election does not prohibit the formation of an explicit *quid pro quo* agreement, and it does not mean that Defendants held "at most, some 'generalized expectation of some future action.'" (ECF No. 161 at 28, quoting *Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1034 (N.D. Ohio 2013)). The other case on which Defendants rely, *McDonnell v. United States*, discusses what constitutes an "official act" under the federal bribery statute, but it does not require or even suggest that the official must have a present ability to deliver that act. 136 S. Ct. 2355, 2372 (2016) ("It must also be something specific and focused that is 'pending' *or 'may by law be brought'* before a public official." (emphasis added) (quoting 18 U.S.C. § 201(a)(3))).

misleading statements on investor calls and at an energy conference, and to have signed and certified FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity. (*Id.* ¶¶ 95–96, 102, 113, 115–16, 225). Defendant Pearson's retirement in 2019 does not preclude his involvement during the earlier part of the Class Period, which encompassed the scheme's planning stages.

- Defendant Strah, who served as FirstEnergy's Vice President of Utilities Operations, then its CFO, and later its President, is alleged to have "reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme," to have made false or misleading statements on an investor call, and to have signed and certified FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity and which the Company later had to correct to disclose deficient internal controls. (*Id.* ¶¶ 98, 102, 134, 189, 226).

- Defendant Taylor, who served FirstEnergy in a series of senior financial and operational roles (first as Controller and Chief Accounting Officer, then President of Ohio Operations, then Vice President of Utilities Operations, and finally CFO) (*Id.* ¶ 31), is alleged to have signed FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity. (*Id.* ¶¶ 95–96).

- Defendant Dowling, who served as FirstEnergy's Senior Vice President of External Affairs, is alleged to have overseen the Company's governmental and regulatory affairs, to have made at least 14 phone contacts with Householder and several more with other co-conspirators, many in close conjunction with wire payments, and to have

been terminated his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (*Id.* ¶ 222).

- Defendant Chack, who served as FirstEnergy's Senior Vice President of Product Development, Marketing and Branding, is alleged to have overseen the Company's "extensive media efforts in support of HB6 and efforts to oppose the repeal of the legislation," to have "worked to obscure the Company's role in funding this media campaign," to have attended at least one in-person meeting regarding the scheme in September 2019, and to have been terminated for his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (*Id.* ¶ 224).

- Defendant Pine, who served as a First Energy lobbyist and its Ohio Director of State Affairs, is alleged to have been "a central liaison between FirstEnergy and corrupt Ohio politicians and regulators," to have made "at least 188 phone contacts with Householder and his co-conspirators," including several in close conjunction with wire payments, and to have worked with state legislators in drafting HB6. (*Id.* ¶ 223).

- Defendant Reffner, who served as a Vice President in FirstEnergy's Legal Department, then its General Counsel, and later its Chief Legal Officer, is alleged to have overseen "the Company's fulfillment of its legal and ethical obligations, internal control policies and procedures and adherence to internal control, risk management and compliance guidelines," and to have been terminated for "conduct" in support of the scheme as well as his failure to prevent it. (*Id.* ¶ 227).

- Defendant Vespoli, who served as FirstEnergy's Executive Vice President of Corporate Strategy and Regulatory Affairs and Chief Legal Officer, is alleged to have overseen "the Company's lobbying activities and political contributions, interaction with

regulators and state representatives, legal and regulatory compliance activities and efforts to eliminate the Company's liability exposure to the Nuclear Plants," including through her participation in the "Restructuring Working Group." (*Id.* ¶ 228). Defendant Vespoli's retirement in 2019 does not preclude her involvement during the earlier part of the Class Period, which encompassed the scheme's planning stages.

- Defendant Judge, who served as FirstEnergy's Chief Risk Officer and later as Energy Harbor's CEO and President, is alleged to have "facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find 'solutions' for the Nuclear Plants," to have met in-person with Householder in March 2019 and with other scheme participants in November 2019, to have directed the retention of lobbyist Juan Cespedes "in close consultation with" other scheme participants, to have made false or misleading statements in a July 2019 press release, and to have "directed and overs[een] the use of FES employees in commercials opposing the repeal of HB6, as part of the misleading ad campaign opposing the repeal effort." (*Id.* ¶¶ 79, 130, 230). Defendant Judge's employment by FES (Energy Harbor) during part of the Class Period does not preclude his participation in the scheme, given that FES is alleged to have been "operationally and financially intertwined" with FirstEnergy, "joined at the hip," and "utterly incapable" of operating independently. (*Id.* ¶¶ 47, 50).

- Defendant Schneider, who served as CEO and Chairman of FES, is alleged to have "facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find 'solutions' for the Nuclear Plants," to have directed the retention of lobbyist Mathew

Borges "in close consultation with" other scheme participants, to have signed and certified FES's portion of the SEC filings at issue, and to have made other misstatements in news articles. (*Id.* ¶¶ 95–96, 102, 120, 125–26, 229). As with Defendant Judge, Defendant Schneider's employment by FES does not preclude his participation in the scheme.

\* \* \*

The role of each participant is pled with particularity and "with enough specificity to put defendants on notice as to the nature of the claim." *Williams*, 681 F.3d at 803 (internal quotation marks omitted). In summary, Plaintiffs have pled the requisite misrepresentations and fraudulent acts to proceed with their misstatement and scheme liability theories, in tandem.

### 2. Scienter

The second element of Plaintiffs' Section 10(b) claim is scienter, "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted). The PSLRA requires that Plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). While the inference of scienter need not be the "most plausible of competing inferences," it "must be more than merely reasonable or permissible." *Tellabs*, 551 U.S. at 324 (internal quotation marks omitted). Rather, it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Precedent cautions against "reviewing each allegation individually before reviewing them holistically," which "risks losing the forest for the trees." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011). The proper test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets

that standard." *Tellabs*, 551 U.S. at 322–23 (emphasis in original). The Court first will address the parties' disputes on applicable legal standards, then turn to a comparison of inferences.

a.   <u>Threshold Disputes</u>

First, the parties dispute whether and when scienter requires actual knowledge, as opposed to recklessness. Where misstatement claims are "based on statements of present or historical fact . . . scienter consists of knowledge *or* recklessness." *In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 717 (S.D. Ohio 2006) (emphasis added and removed) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004); and *Helwig*, 251 F.3d at 552). "Recklessness" in this context is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care" and "akin to conscious disregard." *Id.* (quoting *PR Diamonds*, 364 F.3d at 681). By contrast, where misstatement claims are based on "soft information," recklessness does not suffice, and "plaintiffs must plead facts showing that the defendants knowingly misrepresented or omitted facts to deceive, manipulate, or defraud the public." *Omnicare II*, 769 F.3d at 472. Finally, in the case of scheme liability, this Court follows *Aaron v. SEC* in concluding that "'device,' 'scheme,' and 'artifice,' all connote knowing and intentional practices." 446 U.S. 680, 696 (1980). *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) ("The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that [Section] 10(b) was intended to proscribe knowing or intentional misconduct.").

Additionally, Defendants contend that Plaintiffs have taken a shortcut by relying on the "group pleading doctrine," rather than pleading scienter as to each individual. (ECF No. 161 at 36). The group pleading doctrine allows a plaintiff to "'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday

business of the company.'" *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 984 (S.D. Ohio 2008) (quoting *In re Solv–Ex Corp. Sec. Litig.*, 210 F. Supp. 2d 276, 283 (S.D.N.Y. 2000)). Courts in this Circuit are split as to whether the group pleading doctrine survived the passage of the PSLRA, and the Sixth Circuit has declined to reach the issue. *See id.* at 986 (discussing the split among district courts and taking the position that group pleading is incompatible with the PSLRA); *City of Monroe Emps. Ret. Sys.*, 399 F.3d at 690 ("This court [the Sixth Circuit] has not taken a position on whether such an exception exists . . . . We need not decide here [its] current viability"). This ultimately is a sideshow because Plaintiffs do not purport to rely on group pleading. As detailed in the next subsection, there are allegations specific to each Exchange Act Defendant.

A third dispute emerges over whether Plaintiffs may invoke *PR Diamonds* for its proposition that "high-level executives can be presumed to be aware of matters central to their business's operation." 364 F.3d at 688, *abrogated in part on other grounds by Frank*, 646 F.3d at 961. Defendants argue that such a presumption would amount to pleading based on position alone. (ECF No. 193 at 30–31, 35). In fact, *PR Diamonds* harmonizes these ideas; before stating the central-matters presumption, it gives the caveat that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." 364 F.3d at 688. Rather, "the Complaint must allege specific facts or circumstances suggestive of their knowledge." *Id.*

This Court views the *PR Diamonds* presumption as aiding, but not alone determining, an inference of scienter. *Cf. Cardinal Health*, 426 F. Supp. 2d at 723–26 (allegations of "access to information" deemed conclusory; but other factors did raise strong inference of scienter, such as the fact that manipulation occurred in "analysts' and investors' primary area of focus"); *Jackson Cty. Emps. Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 617–18 (M.D. Tenn. 2020) (applying *PR*

*Diamonds* presumption and also finding that the competing inference of "ignorance" actually "supports [plaintiff's] allegation of recklessness"). Like in *Cardinal Health*, Plaintiffs have alleged that FirstEnergy's nuclear liabilities and political activity were "analysts' and investors' primary area[s] of focus," 426 F. Supp. 2d at 726, which supports scienter for the executives charged with overseeing said operations. *See* ECF No. 72 ¶¶ 44, 110. As Plaintiffs state in their briefing: "It simply makes no sense that the members of a massive corruption scheme would entrust critical aspects of the scheme to some innocent bystander." (ECF No. 176 at 47). Thus, where Plaintiffs engage the central-matters presumption, it is not based on mere titles and positions, but rather on the intersection between the executive's responsibilities and the scheme's critical aspects. In this way, the allegations about executive roles join the set of facts that, "taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.

b.  <u>Inferences Compared</u>

In *Helwig*, the Sixth Circuit laid out a non-exhaustive list of nine factors relevant to a court's scienter determination:

> (1) insider trading at a suspicious time or in an unusual amount;
> (2) divergence between internal reports and external statements on the same subject;
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
> (4) evidence of bribery by a top company official;
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
> (6) disregard of the most current factual information before making statements;
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)). These factors merely assist the Court's scienter analysis; they are not a checklist of required showings. *See, e.g.*, *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018) (scienter inferred where only three *Helwig* factors shown).

Mindful of *Frank* and *Tellabs*, the Court must begin with a holistic view and evaluate each *Helwig* factor in that context. Plaintiffs' overarching case for scienter is that Defendants "bankrolled one of the largest corruption and bribery schemes in U.S. history" (ECF No. 72 ¶ 3), "personally overseen and facilitated by the senior echelon of Company management" (*Id.* ¶ 4), "as the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges . . . [*i.e.*,] its two failing nuclear plants" (*Id.* ¶¶ 4–5), while "concealing any mention of the monumental risks" from investors (*Id.* ¶ 6). To borrow more succinctly from their opposition brief: "It is impossible for all this corruption to occur by happenstance." (ECF No. 176 at 31). Defendants, and FirstEnergy especially, counter with the opposing inference that "the Exchange Act Defendants at all times believed they were engaging in the political process by legal means." (ECF No. 161 at 2). The *Helwig* factors will be assessed for their consistency with either of these narratives.

The first factor, insider trading, favors Plaintiffs' narrative, albeit slightly. Defendants Jones, Pearson, Vespoli, and Chack are alleged to have "reaped nearly $14 million in insider trading proceeds" through the sale of over 375,000 shares of stock "while the price . . . was artificially inflated as a result of their fraudulent scheme." (ECF No. 72 ¶ 250). Plaintiffs allege that each of these Defendants traded in substantially higher volumes than their pre-Class Period baseline: Defendants Pearson and Chack sold no shares in the preceding 45 months, and Defendants Vespoli and Jones increased their sales by approximately 350% and 700%,

respectively. (*Id.* ¶ 251). Defendants raise some valid countervailing points. Despite their sales, Defendants Jones, Pearson, Vespoli, and Chack all ended the Class Period as net acquirers; and Defendants Taylor and Strah, for whom no sales are alleged, each "substantially increased their shareholdings." (ECF No. 161 at 47). What tips this factor, ultimately, is the difference between Class Period and pre-Class Period trading. Defendant Jones avers that his Class Period sales "coincided with his equity awards vesting" (ECF No. 174 at 11), as does Defendant Vespoli for hers (ECF No. 173 at 8); but the drastic increase in volume is unaddressed. Defendant Chack raises conflicting evidence about the regularity of his trading, which at most creates an evidentiary dispute.[21] Defendant Pearson cites his impending retirement as plausibly explaining the timing of his sale (ECF No. 194 at 14–15); but that opposing theory is no *more* compelling than scienter, which could have been a dual consideration in how much to sell. Though this factor would be stronger if more Defendants had sold shares and ended the Class Period as net sellers,[22] the change in trading volume by several senior executives is consistent with scienter.

The second *Helwig* factor, "divergence between internal reports and external statements on the same subject," is premature. Plaintiffs would need discovery to discern the contents of internal

---

[21] *Compare* ECF No. 169 at 6, 27 (Defendant Chack claims his SEC forms show a "pattern" of sales every year on March 1), *with* ECF No. 176 at 46 (Plaintiffs counter that Thompson Reuters reporting shows "significant" Class Period sales, but "none . . . in the 45 months prior").

[22] The incompleteness or absence of suspicious stock sales by other Officer Defendants does not negate their scienter. *See PR Diamonds*, 364 F.3d at 691 ("[W]e have never held that the absence of insider trading defeats an inference of scienter. . . . We also reject the Individual Defendants' contention that their purchase of shares during the class period refutes any inference that they knowingly or recklessly misled the market to increase the stock's price."); *see also Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (suspicious stock sales "substantiate[d] a strong inference of scienter" even where "Defendants retained the majority of their holdings"); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) ("There are any number of reasons why they might have chosen to keep their insider trading to a limit, not least of which is that they wanted to avoid getting caught or tipping off the market as to the fraud that prompted them to sell their stock.").

reports as compared to external statements. The absence of this element certainly is not fatal. To have knowledge of internal documents at this pre-discovery stage, Plaintiffs would need either a whistleblower or omniscience, and the pleading standards demand neither. Because the Company's internal reports remain an unknown, this factor favors neither party.

The third factor, "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," favors Plaintiffs. In particular, Defendant Jones is alleged to have made a series of statements falsely claiming ignorance after the criminal complaint was filed, which prompted "clarifications" "the very next business day." (ECF No. 72 ¶¶ 234–35).

The fourth factor, "evidence of bribery by a top company official," favors Plaintiffs.[23] As is discussed in the preceding Section, Plaintiffs convincingly have alleged a wide-reaching bribery scheme, overseen personally by the upper echelon of Company management. FirstEnergy terminated several top executives for their roles in the scheme (ECF No. 72 ¶ 216) and also admitted in the DPA that, "through the acts of its officers, employees, and agents," the Company "conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit." DPA at 17.[24] The DPA's statement of facts discusses extensive meetings and contacts

---

[23] Defendant Reffner argues that the "bribery" in this factor is specific to "efforts by an official to bribe *another employee* to conceal improper accounting or other undisclosed conduct, when the act of bribing reflects an official's recognition of the problem." (ECF No. 163 at 14 n.3 (emphasis added)). *Helwig* did not include such a qualifier, and Defendant Reffner's cited authority only shows that the factor *can* apply to bribery by another employee, not that it *must*. *See In re Ferro Corp.*, 2007 WL 1691358, at *17 (N.D. Ohio June 11, 2007). The Court sees no reason why the evidence of external bribery in this case would be excluded from a scienter analysis, given that bribery is an intentional act.

[24] *See supra* note 11 for discussion of judicial notice and the role the DPA plays in the Court's analysis. *See also Tellabs*, 551 U.S. at 322 (in analyzing scienter, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule

between two FirstEnergy executives, "Public Official A" (implied to be Householder), and "Public Official B" (implied to be Randazzo). *Id.* at 15–17, 20–34, 34–43. Bribery and conspiracy necessarily involve knowledge, so the Company's willingness to make such admissions reinforces an inference of scienter.

The fifth factor, "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit," favors Plaintiffs. The case *United States v. FirstEnergy Corp.*, filed on July 22, 2021, alleged conspiracy to commit honest services wire fraud. FirstEnergy promptly settled that suit by entering the DPA and agreeing to pay a $230 million monetary penalty. Reason dictates that the Company would not enter such a quick and expensive settlement were there not a substantial likelihood of liability.[25]

The sixth factor, "disregard of the most current factual information before making statements," favors Plaintiffs. Plaintiffs allege that Defendants "knew or recklessly disregarded" the "true facts" of their scheme when making external statements (ECF No. 72 ¶¶ 135–36), which resembles allegations upheld by this Court in the shareholder derivative action. *See Emps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at *20 ("This Court finds Plaintiffs have alleged by clear and convincing evidence that Defendants[] knew or recklessly disregarded reports and red flags that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public

---

12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, *and matters of which a court may take judicial notice*" (emphasis added)).

[25] Additionally, FirstEnergy and many of the Individual Defendants in this case recently announced their intention to enter a global settlement of the shareholder derivative suits. *Emps. Ret. Sys. of City of St. Louis v. Jones*, ECF No. 166. The preliminary terms include a $180 million payment, departures by six Directors, and adoption of governance reforms related to political spending and lobbying. *Id.* ¶¶ 4, 6. The Court gives minimal (but nonzero) consideration to this settlement announcement, as it is not final, comes less quickly in the case than the DPA did, and includes no express admissions. Defendants' willingness to agree to such terms does have some tendency, however, to corroborate the scienter inference in this case. Judicial notice is appropriate for the same reasons discussed *supra* note 11.

officials to ensure passage of legislation and took affirmative steps to conceal the scheme." (internal quotation marks omitted)). Here, the withholding of current factual information is alleged to have furthered the scheme, which relied on shareholders and the public being misled about the nature of the Company's political activity. (ECF No. 72 ¶ 6).

The seventh and eighth factors are inapplicable. The seventh assumes a complete but convoluted accounting disclosure, whereas Plaintiffs allege that information about the bribery scheme was withheld entirely. The eighth assumes a scheme perpetrated by certain directors and concealed from others, whereas Plaintiffs allege a widespread scheme implicating nearly all the Company's senior management. These factors favor neither party.

The ninth factor, "the self-interested motivation of defendants in the form of saving their salaries or jobs," favors Plaintiffs. Defendants argue that the Complaint alleges nothing more than "motives common to corporations and executives generally," which "do[] not comprise a motive for fraud." *PR Diamonds*, 364 F.3d at 690; *see also EveryWare*, 175 F. Supp. 3d at 859–60. Yet, the Complaint alleges that Defendants had unusually strong incentives to perpetrate the alleged scheme. Defendants Jones, Pearson, Strah, Reffner, and Vespoli each earned the vast majority of their total compensation—between 78% and 98%—as performance-based pay. (*Id.* ¶ 248). Additionally, the nuclear liabilities were a subject of intense scrutiny by shareholders and analysts, being among "the Company's most pressing operational challenges." (*Id.* ¶¶ 4, 44). The passage of HB6, with its $2 billion in direct bailouts, provided "concrete benefits that could be realized" through bribery and concealment. *PR Diamonds*, 364 F.3d at 690. These facts distance Plaintiffs' allegations from motives of generally applicability, and instead demonstrate a motive to commit fraud. The unique confluence of need and greed tips this factor in favor of scienter.

A related factor raised in the Complaint is the series of executive terminations in October and November 2020, following the criminal complaint. FirstEnergy terminated Defendants Jones, Chack, and Dowling for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business." (ECF No. 72 ¶ 216). Defendant Reffner was terminated for "inaction and conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶ 191). Moreover, the Company confirmed that these terminations related to the criminal complaint and ensuing investigations—even making specific reference to the Randazzo payment. (*Id*. ¶ 216). Defendants counter that these stated reasons suggest merely "violations of aspirational internal policies," and do not indicate knowledge of illegality. (ECF No. 161 at 37). Yet, terminations need not include a direct confession of scienter to be relevant. Addressing a similar executive reprimand (a "suspension for likely violating company policy"), the court in *Chamberlain* agreed "that the import of this disclosure is that the company suspended one of its top executives for likely doing exactly what the [complaint] alleges [the company] lied about." 757 F. Supp. 2d at 718. *See also In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009) ("'Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls.'" (quoting *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005))). This Court concurs with *Chamberlain* and *America Service Group* and tallies the executive terminations on the side of scienter.[26]

---

[26] Defendants' chief case on this issue is *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018). *Das* declined to infer scienter from "abrupt" executive terminations because it found "[t]he more plausible inference is that Rio Tinto became aware of misconduct around 2016 and subsequently initiated appropriate disciplinary action." *Id.* at 815. No other factor analyzed by the court supported scienter, and "terminations *alone* are insufficient." *Id.* (emphasis added).

Returning from the trees to the forest, the Court must consider these *Helwig* factors in the context of an alleged scheme that reached the core of FirstEnergy's business model, providing "the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges." (ECF No. 72 ¶ 4). It is difficult to imagine such a scheme emerging without scienter; indeed, Plaintiffs argue that the magnitude of the fraud and the direct and personal involvement of senior leadership are even more reason to find scienter. (*Id.* ¶¶ 219, 236–37).[27] The theory permeating the Complaint is that Defendants intentionally concocted the bailout scheme to solve their nuclear liabilities. The *Helwig* factors fit that overarching narrative by adding motive (factors one and nine), cover-up (factor three), and corroboration (factors four, five, and six). Accordingly, the Court finds that a "reasonable person," taking these allegations "collectively," would "deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326. The competing inference of innocent political participation pales in comparison.

Finally, and contrary to the Officer Defendants' objections, the discussion in this subsection implicates each of them.[28] To summarize by Defendant:

---

Thus, *Das* states no categorical rule against the relevance of executive discipline when paired with other facts.

[27] Plaintiffs' cited authorities confirm that these elements can support an inference of scienter when in combination with other factors. *See PR Diamonds*, 364 F.3d at 684–86 (discussing *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000), for the proposition that "the 'magnitude,' 'pervasiveness,' and 'repetitiveness'" of violations can "'amplify,'" but cannot alone create, a strong inference of scienter); *Cardinal Health*, 426 F. Supp. 2d at 723 n.49 ("magnitude of fraud," "when combined with Plaintiffs' other allegations," may be considered in scienter analysis of company's own officers); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *23 (M.D. Tenn. Apr. 26, 2011) (executives' repeated assurances that "they had their eyes on" allegedly problematic loans counseled in favor of scienter), *report and recommendation approved*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012). Defendants' cases on the probative value of "magnitude" follow from *Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004), which is discussed and distinguished in *Cardinal Health* as concerning "scienter on the part of an outside auditor, not the company or the company's executive officers." 426 F. Supp. 2d at 723 n.49 (emphasis removed).

[28] "Because Plaintiffs have adequately pleaded scienter as to [corporate officers,] they have also

- <u>Defendant Jones</u> is alleged to have engaged in suspicious stock trading (ECF No. 72 ¶¶ 250–51), to have made false statements in the wake of the criminal complaint that were retracted almost immediately by the Company (*Id.* ¶¶ 234–35), to have been implicated in bribery via the criminal complaint (*Id.* ¶ 234), to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment (*Id.* ¶¶ 216, 221). Additionally, Defendant Jones's act of certifying FirstEnergy's SEC filings (*Id.* ¶¶ 98, 102) "provide[s] evidence either that he knew about the [improprieties] or, alternatively, knew that the controls he attested to were inadequate." *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007).[29] All of these allegations are viewed against a backdrop of Defendant Jones's significant personal involvement in the scheme and the fact that it occurred in an area of FirstEnergy's business that was not only of keen interest to investors, but also Defendant Jones's stated "top priority." (ECF No. 72 ¶ 220).

---

pleaded scienter as to [the company]." *Frank*, 646 U.S. at 963; *see also City of Monroe Emps. Ret. Sys.*, 399 F.3d at 688 ("knowledge of a corporate officer or agent acting within the scope of his authority is attributable to the corporation" (internal quotation marks omitted)).

[29] Certifications are probative at least when in combination with other facts suggestive of scienter. *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 972 n.10 (S.D. Ohio 2009) (citing *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008)). Signers are not, however, "strictly liable" for their certifications. *Ley*, 543 F.3d at 812 (internal quotation marks omitted), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–50 (2011).

- <u>Defendant Pearson</u> is alleged to have engaged in suspicious stock trading (ECF No. 72 ¶¶ 250–51), to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have certified SEC filings that served to deceive shareholders. (*Id.* ¶ 102). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and to which Defendant Pearson had devoted his "utmost attention." (*Id.* ¶ 225).

- <u>Defendant Strah</u> is alleged to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49) and to have certified SEC filings that served to deceive shareholders and which the Company later had to correct to disclose deficient internal controls. (*Id.* ¶¶ 98, 102, 189). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Strah had direct responsibility in his senior financial and operational roles. (*Id.* ¶ 226).

- <u>Defendant Taylor</u> is alleged to have signed SEC filings that served to deceive shareholders. (*Id.* ¶¶ 95–96). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Taylor had direct responsibility. Defendant Taylor's progression of senior financial and operational roles stands out in that it gave him oversight, at some point or another, of multiple business units involved in different aspects of the scheme. (*Id.* ¶ 31).

- <u>Defendant Dowling</u> is alleged to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote

a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment. (*Id.* ¶¶ 216, 222). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Dowling had direct responsibility in his senior external affairs role. (*Id.* ¶ 222). Moreover, Defendant Dowling's alleged conduct in furtherance of the scheme—which includes contacts with Householder and Longstreth in close proximity to wire payments—is more suggestive of knowing participation than of unwitting coincidence. (*Id.*).

- <u>Defendant Chack</u> is alleged to have engaged in suspicious stock trading (*Id.* ¶¶ 250–51), and to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment (*Id.* ¶¶ 216, 224).

- <u>Defendant Pine</u> contests scienter on the ground that he "merely check[ed] the boxes for the duties of a lobbyist[] consistent with Ohio law." (ECF No. 167 at 11). However, Defendant Pine's alleged conduct in furtherance of the scheme—which includes contacts with Householder and Longstreth in close proximity to wire payments, as well as extensive work with corrupt lawmakers to draft HB6—is more suggestive of knowing participation than of unwitting coincidence. (ECF No. 72 ¶ 223). These actions support Plaintiffs' positioning of Defendant Pine as a "central liaison" to Householder, Longstreth, and other public officials. (*Id.*).

- Defendant <u>Reffner</u> is alleged to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have been terminated, in connection with the criminal case and ensuing investigations, for failure to prevent wrongdoing and for "conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶ 216). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and which Defendant Reffner had a duty to monitor in his senior legal roles. (*Id.* ¶ 227).

- Defendant <u>Vespoli</u> is alleged to have engaged in suspicious stock trading (*Id.* ¶¶ 250–51) and to have possessed an unusually strong financial motive through her lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and which Defendant Vespoli had a duty to monitor in her senior legal roles. (*Id.* ¶ 228). Defendant Vespoli's arguments against scienter rest heavily on her retirement from the Company before key stages of the scheme (ECF No. 173 at 7–9); but Defendant Vespoli's retirement does not preclude knowing participation in the planning stages.

- Defendant <u>Judge</u> contests scienter chiefly on the basis of free-speech arguments that this Court has debunked. (ECF No. 164 at 10–12). Defendant Judge's alleged conduct in furtherance of the scheme—which includes meetings and phone contacts with Householder and Cespedes, a leading role on the Energy Harbor side, and close coordination with other scheme participants—is more suggestive of knowing participation than of innocent First Amendment activity. (ECF No. 72 ¶ 230). The

inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's and FES's business, of keen interest to FirstEnergy investors and over which Defendant Judge had direct responsibility in his senior compliance and Energy Harbor leadership roles. (*Id.*).

- Defendant Schneider is alleged to have played a leading role on the FES side, including through the retention of Borges "in close consultation" with other scheme participants (*Id.* ¶ 229), and to have certified SEC filings that served to deceive shareholders (*Id.* ¶ 102). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FES's business, of keen interest to FirstEnergy investors and over which Defendant Schneider had direct responsibility in his FES leadership role. (*Id.* ¶ 229).

Viewing these allegations collectively and holistically, the Court finds that Plaintiffs have supported a strong inference of scienter as to each Exchange Act Defendant. The strength of that inference varies with the extensiveness of the allegations against each Defendant, as would be expected for non-omniscient parties at an early stage of litigation. In each case, however, the inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Plaintiffs have made a sufficient threshold showing to warrant discovery, wherein they may attempt to verify their inferences. The scienter element therefore is satisfied.

### 3. Connection with Purchase or Sale of Securities

The third element of Plaintiffs' Section 10(b) claim is that the misleading statements or fraudulent acts occur in "connection with the purchase or sale of a security." *EveryWare*, 175 F.

Supp. 3d at 851. Most Defendants do not challenge this element under the misstatement theory;[30] but they do argue that the purported scheme did not involve "market activity" and therefore was too attenuated from the purchase or sale of a security. (ECF No. 161 at 49–52).

This Court does not take such a constrained view of market activity. "Deception related to the value or merit of the securities in question has sufficient connection to securities transactions to bring the fraud within the scope of § 10(b)." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999). The Complaint abounds with allegations of precisely how FirstEnergy's nuclear liabilities, and the scheme to address them, related directly to investors' valuations and purchases of securities. Plaintiffs plead that "[t]he Nuclear Plants grew to dominate FirstEnergy earnings calls and analyst coverage, as investors grew increasingly concerned about the potential liabilities" (ECF No. 72 ¶ 44, 237), that the legislative effort culminating in HB6 continued to feature prominently in investor calls (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132), that the passage of HB6 "allowed the Officer Defendants to deliver on their highest strategic priority" (*Id.* ¶ 213), that Defendants thus avoided "a serious risk of FirstEnergy's credit rating being downgraded" and in fact significantly improved the Company's credit rating and cost of capital (*Id.* ¶¶ 245–46), and that the Officer Defendants "took advantage of the inflated prices for FirstEnergy securities to conduct $5 billion worth of debt and equity sales" hailed as

---

[30] Defendant Judge does assert that the statements in his press release, made on behalf of Energy Harbor, could not have been in connection with investors' purchase or sale of FirstEnergy securities. (ECF No. 164 at 12). Again, this argument rests on corporate separateness that is alleged to be fiction. (ECF No. 72 ¶¶ 47–50). FirstEnergy investors paid close attention to the nuclear liabilities (*Id.* ¶ 44) because FirstEnergy never obtained its "sweeping releases from any and all future claims asserted against FES" (*Id.* ¶¶ 51, 62), and thus, "any actual or potential FES liabilities were also potential liabilities for FirstEnergy, including the billions of dollars needed to decommission the Nuclear Plants" (*Id.* ¶ 50). Reasonable investors *would*, therefore, view statements by Energy Harbor on the topic of its nuclear plants as "material to a decision . . . to buy or sell a covered security," which satisfies the connection element. *SEC v. Crowe*, 216 F. Supp. 3d 852, 863 (S.D. Ohio 2016) (internal quotation marks omitted).

48

"'transformational'" (*Id.* ¶¶ 7, 213). Under this narrative arc, Plaintiffs have pled that the Exchange Act Defendants' fraudulent acts in furtherance of the scheme were sufficiently connected to the purchase or sale of FirstEnergy securities.

Defendants' authorities differ noticeably from this case, as they describe scheme allegations in search of any acts. In *Menaldi*, the Southern District of New York viewed bribery that had "occurred *years before* the class period" as "far too remote to be in connection with the purchase or sale of any security." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017) (emphasis added) (internal quotation marks omitted). In *National Century I*, when the court rejected allegations of "a scheme to inflate the market price of [the company's] common stock," it was because the "*sole* basis" for scheme liability was "alleged misrepresentations or omissions," which the plaintiffs had "merely repeat[ed]" from their misstatement theory. 2006 WL 469468, at *21 (emphasis added) (internal quotation marks omitted).[31] Here, Plaintiffs' alleged scheme involves bribery and deceit pervading the Class Period, accomplished through fraudulent acts in addition to the alleged misstatements and omissions. The cases cited by Defendants stand more for the necessity of fraudulent acts to support a scheme theory than for the narrow definition of market activity that they urge upon the Court.

Defendants cite no authority to support the dismissal of a scheme liability claim for lack of market activity where there are well-pled allegations of fraudulent acts in the Class Period,

---

[31] The same defect also controlled in three other cited cases: *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 250 (S.D.N.Y. 2018) (court concluded that plaintiffs "have not pled a market manipulation claim" because they "have not pled facts demonstrating misconduct *beyond* misstatements and omissions" (emphasis added)); *SEC v. Narayan*, 2017 WL 4652063, at *10 (N.D. Tex. Aug. 28, 2017) (court found no "independently actionable activity outside of the context of [defendant's] misrepresentations and omissions"); *La. Mun. Police Emps. Ret. Sys. v. KPMG, LLP*, 2012 WL 3903335, at *4 (N.D. Ohio Aug. 31, 2012) ("Plaintiffs do not sufficiently allege [defendant] engaged in conduct other than falsifying statements").

designed to affect securities offerings and valuations. Their arguments therefore are rejected, and element three is satisfied.

### 4. Reliance

The fourth factor requires Plaintiffs to show reliance on Defendants' deceptive acts or statements. *Stoneridge*, 552 U.S. at 159. Scheme liability claims fail on reliance where the deceptive acts are "too remote" to the injury and have only an "attenuated" effect on the price of a security. *Id.* at 161–62. The reliance element is "tied to causation," and thus related to the requirement that the deceptive act or statement be "in connection with the purchase or sale of any security." *Id.* at 160 (internal quotation marks omitted). Resting on the *Stoneridge* line of cases, Defendants argue that the scheme liability theory lacks reliance and therefore cannot proceed. (ECF No. 161 at 52–55).[32] Plaintiffs contend that reliance should be presumed at this stage. (ECF No. 72 ¶¶ 254–56).

### a. Applicability of Presumptions

An initial flaw is Defendants' neglect for the role of misstatements and omissions in the scheme. Importantly, "a rebuttable presumption of reliance" arises "in two different circumstances": first, when "there is an omission of a material fact by one with a duty to disclose," and second, "when the statements at issue become public [and] [t]he public information is reflected in the market price of the security." *Stoneridge*, 552 U.S. at 159. The former derives from *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and the latter from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Both are pled in the Complaint. (ECF No. 72 ¶¶ 254–56).

---

[32] Aside from the argument by Defendant Judge discussed *supra* note 30, Defendants do not challenge reliance under the misstatement theory. As will be discussed, *Stoneridge* creates a presumption of reliance on the types of misstatements Plaintiffs have alleged. *See* 552 U.S. at 159.

As the Supreme Court recognized in *Lorenzo*, scheme liability is "sufficiently broad to include within [its] scope the dissemination of false or misleading information with the intent to defraud." *Lorenzo*, 139 S. Ct. at 1101; *see also id.* at 1102 (recognizing "considerable overlap among the subsections" of Rule 10b–5). Consequently, Defendants' misrepresentations and omissions—and the presumptions that attach to them—are relevant for scheme liability.

*Basic*'s "fraud-on-the-market theory," 485 U.S. at 241, applies here because the Court has found that Defendants made material misrepresentations in their public statements. Efficient markets rapidly factor public information into pricing; thus, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Id.* at 246–47. Moreover, those misrepresentations had a purposeful role in the alleged scheme: they sold the "cover" that Defendants were lobbying for, and eventually obtained, the HB6 bailout through legitimate political advocacy. For years the market factored that material information into its pricing of FirstEnergy securities, and Plaintiffs purchased securities under that inflated pricing.

The *Affiliated Ute* presumption likewise appears appropriate because the Court has found that Defendants made omissions of material fact. Under these circumstances, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision [to purchase or sell]." 406 U.S. at 153–54.[33]

---

[33] It is unsettled whether a plaintiff alleging both misrepresentations and omissions can engage the *Basic* and *Affiliated Ute* presumptions simultaneously. *Compare Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017) (applying *Basic* to misrepresentations and *Affiliated Ute* to omissions in mixed case); *with Grae v. Corrs. Corp. of Am.*, 329 F.R.D. 570, 583–85 (M.D. Tenn. Jan. 18, 2019) (*Affiliated Ute* inapplicable where case was "primarily about" misleading statements, as opposed to nondisclosures; thus, only *Basic* was analyzed). Both cases were at the class certification stage, which implies that this

The *Basic* and *Affiliated Ute* presumptions resolve this element for all Exchange Act Defendants who are alleged to have made misrepresentations or omissions as part of the scheme: Defendants Jones, Pearson, Strah, Taylor, Judge, and Schneider (and through them, FirstEnergy). Five other Defendants, however, have no misstatements or omissions alleged and are proceeding on scheme liability independently: Defendants Reffner, Dowling, Pine, Chack, and Vespoli. (ECF No. 176 at 65 n.20). For these Defendants, additional analysis is required.

b.  Necessity of Public Knowledge

Each of these remaining Defendants joins or expands upon FirstEnergy's contention that "[w]here the alleged scheme is not publicly disclosed, there can be no reliance." (ECF No. 161 at 53). Yet, for the scheme to succeed, it had to be concealed from the shareholders; otherwise, it would have unraveled, and "Plaintiffs and the Class would not have purchased FirstEnergy securities at the prices they paid, or at all." (ECF No. 72 ¶ 271). The illogical import of Defendants' stance is that FirstEnergy could be liable for securities fraud only if it willingly put its fraud into broad daylight. *See* ECF No. 161 at 54 (arguing no reliance because "[n]ot a single one of the allegedly false and misleading statements Plaintiffs point to mention anything about *purported bribery*." (emphasis added)).

A more apt inquiry is whether Defendants presented a deceptive public-facing "cover" that would be reflected in share prices and relied on by investors.[34] Such was the case in *Medtronic*, where the company's "deceptive conduct directly caused the production of the information on which the market relied." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 394 (8th Cir. 2016). The court did not require the defendants to have disclosed their scheme

---

issue is premature on a motion to dismiss.

[34] This is analogous to typical misstatement liability, where the investor hears or knows of the statement but does not know its falsehood at the time.

to falsify clinical trials, nor their fraudulent payments to the trials' physician-authors. *See id.* Reliance could be had on the public-facing product of Medtronic's scheme—the clinical trial results that investors presumed to be valid. Here too, HB6 was a public-facing product of Defendants' scheme, and its pursuit and passage factored prominently into FirstEnergy's share price. FirstEnergy's support for HB6 was no secret, but its fraudulent means necessarily were. As in *Medtronic*, Defendants "cannot instruct individuals"—here, Householder and associates—"to take a certain action"—here, pass HB6—"pay to induce them to do it, and then claim any causal connection is too remote when they follow through." *Id.* When a scheme has no public-facing cover, and there is no information for the market to digest, *then* it fairly can be said that the scheme fails to engender any reliance by investors.[35]

In reaching their overinclusive disclosure theory, Defendants have attributed too great a meaning to *Stoneridge* and other authorities, which speak to the concerns about presuming reliance upon remote and indirect actors. In *Stoneridge*, the respondents were suppliers and customers external to the company, who "had no duty to disclose; and their deceptive acts were not communicated to the public." 552 U.S. at 152, 159. The Supreme Court found reliance lacking because these external parties were connected to the company's fraudulent financial statements only by "an indirect chain that we find too remote for liability." *Id.* The theme of delineating

---

[35] Continuing the analogy to misstatement liability, see *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("A plaintiff unaware of the relevant statement, on the other hand, could not establish reliance on that basis."). *Compare id. with Menaldi*, 277 F. Supp. 3d at 519 (reliance rejected in scheme liability case where the "Complaint fails to allege that investors *knew of*, or relied upon, [defendant's] *attempt to cover up* his alleged self-dealing" (emphasis added)).

liability for parties with only remote involvement is one that recurs in Defendants' cited authorities.[36]

Some courts have applied *Stoneridge* against internal executives, including in *Hawaii Ironworkers Annuity Trust Fund v. Cole*, 296 F.R.D. 549 (N.D. Ohio 2013).[37] The court acknowledged the difference between internal and external actors but ultimately concluded that, "absent public disclosure of a defendant['s] own deceptive conduct, the market cannot have taken that conduct into account when pricing the company's securities." *Id.* at 558. In that case, however, "[t]he only evidence the [plaintiff] cite[d] to show public disclosure of these acts [were] three [company] press releases," which reported high-level profits and gave no indication of underlying transactions. *Id.* at 557. The analogy to this case would be if investors suddenly saw additional revenue in FirstEnergy's bottom line but never knew of the source (HB6) or that the Company had lobbied for it. Furthermore, the *Hawaii Ironworkers* decision came on a motion for class

---

[36] *See, e.g.*, *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 148–49, 159 (2d Cir. 2010), (no scheme liability for "a secondary actor," specifically a law firm that facilitated the company's allegedly fraudulent loan transactions, where plaintiffs "'did not rely on [] any of [the firm's] work'" (quoting and affirming *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 315 (S.D.N.Y. 2009))); *Cosby v. KPMG, LLP*, 2018 WL 3723712, at *10 (E.D. Tenn. Aug. 2, 2018) (independent auditor was "only [a] secondary actor[]" and could not be considered the "'maker'" of statements in the auditee's public filings on which "the shareholders claimed to have relied" (quoting *Janus*, 564 U.S. at 142)); *Siegmund v. Xuelian Bian*, 2018 WL 1611197, at *9 (S.D. Fla. Apr. 2, 2018) (outside law firm sued under scheme theory for its involvement in company's merger).

[37] Several other cited authorities concerning internal executives continued the theme of limiting liability for remote actors. *See, e.g.*, *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 192 (5th Cir. 2010) ("Without direct attribution to [defendant] of its role in the tax scheme, reliance on [defendant's] participation in the scheme is too indirect for liability."); *Pugh v. Trib. Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (reliance lacking because "*Stoneridge* indicates that an indirect chain to the contents of false public statements is too remote to establish primary liability"); *Gordon v. Elite Consulting Grp. L.L.C.*, 2009 WL 4042911, at *5–6 (E.D. Mich. Nov. 19, 2009) (no fraudulent statements or deceptive acts alleged by moving defendant; at most, defendant aided and abetted others). By contrast, all Defendants here are alleged to have engaged directly and substantially in the scheme. *See supra* Section III.A.1.b.

certification, not a motion to dismiss. The claims survived a motion to dismiss, with the court reasoning as follows:

> The information defendants gave to [the company] played a major role in falsely inflating public reports of the company's overall and (remarkable) financial success during a very challenging period. These circumstances, and the direct nexus they show between the defendants' fraudulent conduct and the publication of false information to the investing public differentiates this case from *Stoneridge*.

*Id.* at 556 (quoting prior decision, 2011 WL 1257756, at *8).

As is discussed more fully in the preceding Sections, the Complaint alleges that FirstEnergy's own officers committed fraudulent acts that created misleading information about the nature and propriety of the Company's political activity, and later culminated in HB6. That information was publicized by the Company and factored efficiently into share prices. Defendants have raised no controlling authority that would compel the dismissal of such claims. The Court finds that this direct causal chain supports reliance, even for the non-speaking Defendants.

### 5. Economic Loss

The fifth element, economic loss, is not contested by any Defendant. Plaintiffs satisfy this element by pleading that they purchased securities at prices "artificially inflated" by Defendants, which "plummeted" once the scheme was unveiled. (ECF No. 72 ¶¶ 257–67). FirstEnergy investors collectively suffered billions of dollars in losses. (*Id.* ¶ 9, 13). Clearly, Plaintiffs have alleged an economic loss.

### 6. Loss Causation

The final element in Plaintiffs' Section 10(b) claim is loss causation, meaning "a causal connection between the material misrepresentation [or deceptive act] and the loss." *Dura Pharms.*, 544 U.S. at 342. The main challenge to this element is brought by Defendant Jones, who contests

it as to the $4.3 million payment made to ex-PUCO Chairman Sam Randazzo. (ECF No. 174 at 26–27).[38]

Jones reasons that the Randazzo payment, which was revealed approximately four months after the Class Period ended, "cannot retroactively cause class period losses." (*Id.* at 27). Perhaps that would be true if the Randazzo revelation had been the inflection point at which the market first learned of Defendants' fraudulent scheme. Details of the payment were not known, however, when the Department of Justice filed its criminal complaint; those facts emerged later, in the course of ensuing investigations.

In a scheme of this breadth, it is illogical to expect that the truth would emerge in "a singular, unitary disclosure," as opposed to "a series of disclosing events." *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828–29 (D.N.J. 2006) (finding loss causation satisfied where a corrective disclosure occurred one month after the close of the class period, and rejecting "Defendants' rigid and dogmatic interpretation of *Dura*"). To adopt Jones's argument, the Court would need to analyze the Randazzo payment in isolation. "The market would not consider these [disclosures] in a vacuum and neither does the Court." *Chamberlain*, 757 F. Supp. 2d at 718. Upon

---

[38] Defendant Judge adds a short loss causation argument concerning the lack of a corrective disclosure on his own statements. (ECF No. 164 at 13–14). Corrective disclosures are one way to show loss causation, but they are not exclusive. *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) ("Put more simply, proof of loss causation requires demonstrating that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered. If the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct, loss causation is established." (internal quotation marks and citations omitted) (emphasis in original)); *Omnicare I*, 583 F.3d at 944 (loss causation lacking where no allegations "explain[ed] how the statements were revealed to be false and thereby caused a drop in the stock price"). Here, the largest single drop in share value came in response to the criminal complaint filing, which allegedly revealed the falsehood of most, if not all, of Defendants' statements about HB6.

learning of the criminal complaint, any reasonable investor would anticipate a series of revelations

as the case progressed and would factor that expectation into their appraisals.

The Court therefore rejects Jones's loss causation logic, which "'would allow wrongdoers

to immunize themselves with a protracted series of partial disclosures.'" *Cardinal Health*, 426 F.

Supp. 2d at 761 n.75 (compiling cases and quoting *Parker Freeland v. Iridium World Commc'ns,

Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006)). Tellingly, Jones's cited authorities find loss causation

lacking where plaintiffs' *first* concrete knowledge of the scheme or misstatement postdates the

class period.[39] Where, as here, details of wrongdoing emerge in the Class Period and a series of

disclosures continues beyond it, no rule prohibits loss causation as to the later events. *See In re

Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (district court, on

remand from *Dura*, explained "the Supreme Court could have held that as a matter of law Plaintiffs

cannot establish loss causation because the corrective disclosures . . . were made several months

after the Class Period," but it "did not so hold"). Loss causation is established, even as to the

Randazzo payment.

* * *

In summary, Plaintiffs have pled every element of their Section 10(b) claims adequately

and have satisfied heightened pleading standards where applicable. Their extensive and detailed

---

[39] *See Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013) ("Plaintiffs only allege that the truth about [defendant's] exposure to subprime securities came out in [defendant's] 2008 annual report," released "more than a month after the close of the proposed class period," and "do not allege that the market became aware [of the scheme] at any previous point" (emphasis removed)); *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883517, at *26 (C.D. Cal. Aug. 21, 2012) (class period disclosure revealed "the mere risk of future loss," and "clearly did not reveal the existence of fraud, or expose [defendant's] alleged misrepresentations to the public"); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 243 (S.D.N.Y. 2006) (complaint "does not allege facts showing that, during the class period, the market became aware" of the scheme; "[o]n the contrary, plaintiffs acknowledge that [defendants' wrongdoing] did not become public knowledge during the class period").

allegations set out a plausible, persuasive case for securities fraud under theories of both misstatement liability and scheme liability. Count I stands as pled.

### B. Exchange Act Section 20(a) (Count II)

Section 20(a) of the Exchange Act provides joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder," including Section 10(b) and Rule 10b–5. 15 U.S.C. § 78t(a). Defendants' chief argument against this Count is premised on a dismissal of Count I. *See* ECF No. 161 at 66 (reasoning no secondary liability absent primary liability); No. 165-1 at 6 (same); No. 174 at 29 (same). Because the Court has sustained Plaintiffs' allegations in Count I that Defendants committed primary violations of Section 10(b) and Rule 10b–5, Defendants' corollary arguments must fail. The only issue to resolve in Count II is the control element.

The standard for control under Section 20(a) is the subject of considerable debate. In *National Century III*, the court summarized several competing approaches as follows:

> The most rigorous standard is that the controlling person "was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). Other courts have declined to impose a requirement of culpability, but do require allegations that the controlling person both had the capacity to control the primary violator and actually exercised that control. *See Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 85 (1st Cir.2002); *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985). Finally, other courts apply a more lenient standard yet, requiring only that the controlling person be alleged to have had the capacity to control the primary violator; the "actual exercise of that control need not be alleged." *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 258 F.Supp.2d 576, 642 (S.D.Tex.2003) (citing Fifth Circuit cases) . . . .

*Nat'l Century III*, 553 F. Supp. 2d 902, 911 (S.D. Ohio 2008).

The Sixth Circuit in *PR Diamonds* made no mention of a culpability requirement and defined control as "'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities,

by contract, or otherwise.'" 364 F.3d 671, 696–97 (6th Cir. 2004) (quoting 17 C.F.R. § 230.405).[40]

Stated differently, it is "the practical ability to direct the actions of the people who committed the

violation." *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 300 (S.D. Ohio 2007)

("*Nat'l Century II*") (internal quotation marks omitted). "Position as an officer or director . . . and

the direction of employees within the scope of their duties, although not dispositive of the question,

is evidence that may establish the exercise of 'control.'" *JAC Holding Enters., Inc. v. Atrium Cap.

Partners, LLC*, 997 F. Supp. 2d 710, 738 (E.D. Mich. 2014) (finding control where principals

"instructed [others] in carrying out specific elements of the plan, and in several cases . . . came up

with elements of the scheme themselves"). *But see Lansing Automakers' Fed. Credit Union v.

MCF Portfolio Mgmt. Corp.*, 1991 WL 238974, at *3 (W.D. Mich. Sept. 12, 1991) ("A director or

officer is not, simply by virtue of his position, a 'controlling person' under the federal securities

laws." (citing *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981))).

This Court need not resolve the control standard. If a culpability requirement applies, the

scienter findings are sufficient to meet it. Those allegations were tested against the PSLRA's

heightened pleading standards, and the requirements for Count II are lower. *See Nat'l Century II*,

504 F. Supp. 2d at 300 ("'Allegations of control are not averments of fraud and therefore need not

be pleaded with particularity. They need satisfy only the less stringent requirements of

Fed.R.Civ.P. 8.'" (quoting *In re Parmalat Sec. Litig.,* 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006))).

Only six Defendants contest the control element on grounds other than culpability or the

absence of primary liability—those being Defendants Reffner, Judge, Pine, Chack, Schneider, and

---

[40] In a prior decision, *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, the Sixth Circuit observed that the standard of control is an open question. 973 F.2d 474, 486 (6th Cir. 1992) ("Our circuit has not adopted a test for liability as a 'controlling person' under the securities laws"). *PR Diamonds* did not claim to settle the law of the Circuit. Because the court found no primary violation, it did not need to analyze the control allegations. 364 F.3d at 697–98.

Vespoli. As to each, except for Defendant Pine, the Court finds that Plaintiffs have satisfied their burden under basic pleading standards.

- Defendant Reffner rests his argument on his less-senior role in the Legal Department, at least until his May 2020 promotion to Chief Legal Officer. (ECF No. 163 at 18). Defendant Reffner does not contest that he had direct or indirect control for the portion of the Class Period after he became Chief Legal Officer, nor does he contest that the scheme was underway at that time. The Complaint also supports an inference that, during his preceding term as General Counsel, Defendant Reffner influenced and participated in the deficient operation of internal controls. (ECF No. 72 ¶ 227).

- Defendant Judge rests his argument on the corporate separateness of Energy Harbor (ECF No. 164 at 18), which avoids the allegations of FES's functional intertwinement with FirstEnergy (ECF No. 72 ¶ 45) and of his control over FES employees involved in the media campaign against HB6's repeal (*Id.* ¶ 230). Moreover, Defendant Judge's argument on corporate separateness does not suggest a lack of control during his preceding term as FirstEnergy's Chief Risk Officer. The Complaint supports an inference that Defendant Judge possessed power, direct or indirect, to control predicate acts on both sides of the purported corporate divide.

- Defendant Pine prompted Plaintiffs to clarify in their response brief that they are *not* pursuing control person claims against him. (ECF No. 176 at 71 n.23). This is not apparent from the Complaint; Count II is styled against "the Exchange Act Defendants," which definitionally includes Defendant Pine. (ECF No. 72 ¶¶ 34, 39, 272–75). Defendant Pine therefore will be dismissed from Count II. He is not terminated from the litigation, however, as he remains implicated in Count I.

- <u>Defendant Chack</u> rests his argument on the lack of attributed misstatements (ECF No. 169 at 19–20), but he overlooks the allegations about his leading role in the media campaign against HB6's repeal (ECF No. 72 ¶ 224). Furthermore, Defendant Chack's termination reportedly related to his failure to "maintain and promote a control environment with an appropriate tone of compliance" and to his role in the Randazzo payment. (*Id.* ¶ 216). The Complaint supports an inference that Defendant Chack possessed power, direct or indirect, to control predicate acts, including the media campaign and the Randazzo payment.

- <u>Defendant Schneider</u>, like Defendant Judge, rests his argument on the purported corporate separateness of FES. (ECF No. 170-1 at 14–15). Again, this neglects the allegations of FES's functional intertwinement with FirstEnergy (ECF No. 72 ¶ 45) and of his acts to facilitate FES's part in the scheme (*Id.* ¶ 229). The Complaint supports an inference that Defendant Schneider possessed power, direct or indirect, to control predicate acts, even from the FES side of the purported corporate divide.

- <u>Defendant Vespoli</u> rests her argument on her retirement from FirstEnergy in April 2019 and on a mistakenly heightened pleading standard of "particularity." (ECF No. 173 at 10–11). As stated above in the scienter analysis, Defendant Vespoli's retirement does not preclude her involvement in the scheme's planning stages. Defendant Vespoli's participation on the "Restructuring Working Group" and her "direct oversight and responsibility for the Company's lobbying activities and political contributions" support an inference of power, direct or indirect, to control predicate acts. (ECF No. 72 ¶ 228).

Defendant Vespoli raises a separate argument deserving of brief discussion: that she cannot be liable simultaneously as a primary actor under Section 10(b) and a control person under Section 20(a). (ECF No. 173 at 11 n.6). Defendant Vespoli refers to a footnote in *PR Diamonds*, where the Sixth Circuit stated:

> Without deciding the question, we note that some [out-of-Circuit] authority suggests that a plaintiff may not be able simultaneously to assert both Section 10(b) and Rule 10b–5 claims and Section 20(a) claims against the same defendant. "Arguably, a § 20(a) claim cannot be asserted against a defendant who is also charged with primary violation of § 10(b) and Rule 10b–5; that is, secondary liability under § 20(a) is an alternative, not a supplement, to primary liability under § 10(b) and Rule 10b–5."

364 F. 3d at 697 n.4 (quoting *Lemmer v. Nu–Kote Holding, Inc.*, 2001 WL 1112577, at *12 (N.D. Tex. Sept. 6, 2001)). It might become necessary to resolve this issue later in the case, but the Court will leave it open at this juncture for two reasons. First, the *PR Diamonds* dicta is, as it says, arguable. To state the counterpoint, nothing in the plain text of Section 20(a) makes it mutually exclusive with other theories of liability, and nothing logically prevents a person from violating Section 10(b) themselves while controlling others who also violate it. Second, even if Plaintiffs ultimately can prevail against each Exchange Act Defendant on only one theory, a motion to dismiss is not the correct time to determine which. At the pleadings stage, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). *See also Nat'l Century I*, 2006 WL 469468, at *24 (S.D. Ohio Feb. 27, 2006) (on a motion to dismiss, citing the same principle and "allow[ing] [plaintiffs] to pursue both their § 10(b) and their § 20(a) claims against [defendant] at this time").

Apart from Defendant Pine, who is dismissed from this Count only, Count II stands as pled.

## C.  Securities Act Section 11 (Count III)

Plaintiffs' remaining claims are brought under a separate statute, the Securities Act, and against a different set of Defendants.[41] They relate to FirstEnergy's bond offerings in February and June 2020, which raised a combined $2.5 billion. (ECF No. 72 ¶¶ 285–90).

Count III sounds under Section 11 of the Securities Act, which provides a cause of action to "any person acquiring [a] security" when it is shown that "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). As relevant here, the cause of action runs against:

> (1) every person who signed the registration statement;
> (2) every person who was a director of . . . the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
> (3) every person who, with his consent, is named in the registration statement as being or about to become a director . . . [and]
> (5) every underwriter with respect to such security.

*Id.* Plaintiffs' required showing under Section 11 is as follows:

> (1) he purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

> *Loc. 295/Loc. 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*,

731 F. Supp. 2d 689, 704 (S.D. Ohio 2010) ("*Local 295*").

---

[41] The "Securities Act Defendants" are FirstEnergy's non-management directors, three FirstEnergy officers (Defendants Jones, Strah, and Lisowski), and 16 banking and finance firms that served as underwriters for FirstEnergy's bond offerings. *See supra* notes 13–14 and accompanying text.

Compared with Section 10(b) of the Exchange Act, "Section 11 [of the Securities Act] places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Id.* at 381–82.

The Securities Act Defendants contest the third element (a misstatement or omission) by reference to the briefing on misstatement liability reviewed under Count I. (ECF No. 161 at 59, 62; No. 171 at 4; No. 174 at 27). They implicitly concede that their arguments rise or fall with the Court's determination on Count I. As discussed above, the Court has found the misstatement allegations sufficient and allowed Count I to proceed as pled.

The only other argument raised as to Count III concerns the appropriate pleading standard. The Securities Act Defendants aver that Plaintiffs' allegations "sound in fraud" and therefore must satisfy the heightened pleading standards of Rule 9(b). (ECF No. 161 at 8 n.3). As a general principle, "fraud is not an element or requisite to a claim under § 11," meaning "the claims are not subject to Rule 9(b)." *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004). An exception occurs "[a]s to claims that sound in fraud," where "Plaintiffs must also satisfy the particularity requirements of Rule 9(b)." *In re EveryWare, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 869 (S.D. Ohio 2016) (citing *Omnicare I*, 583 F.3d 935, 948 (6th Cir. 2009)). Plaintiffs contend that they carefully have separated their Securities Act claims from any allegations of fraud elsewhere in the Complaint. (ECF No. 176 at 78). To that end, the Complaint declines to incorporate Exchange Act allegations into the Securities Act section and "expressly disavows all

averments of fraud contained [t]herein for the purposes of pleading claims under the Securities Act as such claims do not require a showing of fraud or scienter." (ECF No. 72 ¶ 276).

The Court finds that Plaintiffs have not separated their claims against the Securities Act Defendants who served in management roles (Defendants Jones, Strah, and Lisowski), nor against FirstEnergy. The Complaint pleads that the registration statements were false or misleading because they "failed to disclose that FirstEnergy and several of the Company's most senior executives had carried out an illegal bribery scheme" (*Id.* ¶ 292), which ties the Securities Act claims to the fraud allegations against "the senior echelon of Company management, including [Defendant] Jones and numerous other executives" (*Id.* ¶ 4). The quoted passage from paragraph 276 is a "blanket disavowal . . . insufficient to rescue [Plaintiffs] from the requirements of Rule 9(b)." *Local 295*, 731 F. Supp. 2d at 709 (noting also that "Plaintiffs' allegation that their Securities Act claims do not sound in fraud is a legal conclusion that the Court does not have to accept as being true").[42]

The non-management Director Defendants[43] and the Underwriter Defendants are different. No allegations in the Complaint suggest that they knew of or participated in the scheme in a way that would be fraudulent, as opposed to reckless or negligent.[44] *Cf. EveryWare*, 175 F. Supp. 3d at 869 ("Defendants' argument [for applying heightened pleading standards] mainly relies on

---

[42] Furthermore, the scheme allegations in paragraphs 3–6 *are* incorporated by reference into the Securities Act claims. (ECF No. 72 ¶ 276 ("This section incorporates solely ¶¶1-6, 14-26")).

[43] The "non-management" qualifier is added to exclude Defendant Jones. As CEO, Defendant Jones was both an officer and a director. (ECF No. 72 ¶ 28).

[44] This Court did allow the derivative action to proceed against the same directors on allegations that "Defendants[] knew or recklessly disregarded reports and red flags . . . and took affirmative steps to conceal the scheme." *Emps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at *20 (S.D. Ohio May 11, 2021) (internal quotation marks omitted). There are not, however, sufficient allegations in *this* Complaint to support a finding of knowledge or participation, largely due to Plaintiffs' efforts to avoid averments of fraud in their Securities Act claims.

Plaintiffs' allegations of fraud against *other* Defendants, and therefore . . . fails." (emphasis in original)). For that reason, the Court finds that the allegations against the non-management Director Defendants and the Underwriter Defendants are separated properly from averments of fraud. The pleading standard therefore is a hybrid: basic pleading under Rule 8(a) for allegations concerning the non-management Director Defendants and the Underwriter Defendants, and heightened pleading under Rule 9(b) for allegations concerning FirstEnergy and Defendants Jones, Strah, and Lisowski.

Even against heightened pleading standards, as applicable, Plaintiffs' allegations suffice. The SEC Form 10-K for Fiscal Year 2019 and Form 10-Q for Q1 2020, which were incorporated into the registration statements at issue (ECF No. 72 ¶ 290), are among the same forms alleged to be misleading in Count I; and the Court found those allegations to withstand Rule 9(b). As was true in Count I, Plaintiffs have pled the "'time, place and contents of the misrepresentations upon which they relied.'" *In re Regions Morgan Keegan Sec., Derivative, & Erisa Litig.*, 743 F. Supp. 2d 744, 759–60 (W.D. Tenn. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)). Plaintiffs quote specific passages from the registration statements concerning the Company's compliance and internal controls, highlight omissions about the extraordinary risks associated with HB6, explain how and why those statements and omissions were materially false and misleading, and juxtapose them against the Company's own subsequent admissions. (ECF No. 72 ¶¶ 291–301). Count III stands as pled.

### D. Securities Act Section 12(a)(2) (Count IV)

Section 12(a)(2) of the Securities Act creates civil liability for "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the

statements, in the light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. § 77*l*(a)(2). It is "similar to Section 11," but it "only imposes liability on 'statutory sellers' of securities." *Local 295*, 731 F. Supp. 2d 689, 704–05 (S.D. Ohio 2010).

Plaintiffs' required showing under Section 12(a)(2) can be summarized as follows:

> (1) the defendant is a "statutory seller"; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

*Id.* at 705 (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)).

The Underwriter Defendants bring a standing challenge (ECF No. 171 at 4–7); the non-management Director Defendants and Defendant Jones challenge their "statutory seller" status (ECF No. 161 at 65–66; No. 174 at 27–28); and all Securities Act Defendants extend their challenges from Count III about misstatements and heightened pleading standards. (ECF No. 161 at 8 n.3, 65; No. 171 at 4; No. 174 at 27). These latter arguments can be dispensed with swiftly. They concern the same underlying misstatements discussed in Count I, which were restated in the registration statements and prospectuses at issue in Counts III and IV. (ECF No. 72 ¶¶ 286, 88, 90). In Count I, and again in Count III, the Court found those allegations well-pled and sufficient for Rule 9(b); there is no need to belabor the point a third time. This leaves only two arguments for discussion: standing and the "statutory seller" element.

### 1. Standing

The Underwriter Defendants challenge Plaintiffs' standing to pursue their Section 12(a)(2) claims "because Plaintiffs have not alleged that they purchased FirstEnergy securities in the Offerings from any of the Underwriter Defendants," "as opposed to the secondary market." (ECF No. 171 at 4). Since "Section 12(a)(2) applies only to purchases made through initial offerings and

not to aftermarket trading," most courts hold "that purchasers who buy their shares on the secondary market lack standing to assert Section 12(a)(2) claims." *Local 295*, 731 F. Supp. 2d at 713 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)).[45]

To indulge the Underwriter Defendants' argument, however, requires the Court to draw reasonable inferences *against* Plaintiffs, which is backwards on a motion to dismiss. Plaintiffs allege that they "purchased FirstEnergy notes *directly in* and traceable to" the Offerings (ECF No. 72 ¶ 307 (emphasis added)); and that "the Securities Act Defendants issued, promoted, and sold FirstEnergy notes *to Plaintiffs*" (*Id.* ¶ 313 (emphasis added)). The Complaint also refers to Plaintiffs' "purchases of the FirstEnergy notes *issued in* the Offerings." (*Id.* ¶ 317 (emphasis added)). This is hardly the "coy choice of words" that gave "pause" to the court in *Yates*, one of the Underwriter Defendants' main authorities. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 900 (4th Cir. 2014). *Yates* considered purchases alleged to be "'pursuant *and/or* traceable to'" an offering. *Id.* (emphasis added). Ambiguous slash-mark aside, the court held that if "coupled with sufficient supporting facts," such claims "can give rise to a plausible inference of standing in certain circumstances." *Id.* (discussing *Plumbers' Union Loc. No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011)).[46]

Furthermore, Plaintiffs do couple their comparatively firm pleading with supporting certifications, incorporated into the Complaint (ECF No. 72 ¶¶ 23–26), that show large bond

---

[45] Purchasers through aftermarket trading may have claims under Section 11, but not Section 12. *See id.* at 704 (first element of a Section 11 claim is that the plaintiff "purchased a registered security, either directly from the issuer or in the aftermarket following the offering").

[46] The pleading in the other case cited by the Underwriter Defendants was weaker still. *See In re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*, 166 F. Supp. 3d 948, 968 (W.D. Tenn. 2014) (plaintiffs alleged they had "'purchased shares issued pursuant *or* traceable to the misleading registration statements'" (emphasis added)). That formulation was deemed insufficient to plead direct purchases, at least where aftermarket trading remained a possibility. *Id.* at 968–69.

purchases by each Plaintiff aligned in timing and series with either or both Offerings.[47] The certifications also align with each other. Plaintiffs LACERA and Wisconsin Laborers' Pension Fund each made large purchases on February 18, 2020. *See supra* note 47. Likewise, Plaintiffs LACERA and Amalgamated Bank each made large purchases on June 3, 2020. These latter purchases were of the same series of notes (1.6% due 2026), which allows for a unit-price comparison that matches to the penny: $99.85. *Id.*; *compare* ECF No. 33-4 *with* ECF No. 72 PAGEID # 1666. The Underwriter Defendants propose no explanation for how the various named Plaintiffs, who had no affiliation prior to this case, could have synchronized in so many respects. A reasonable explanation is that they independently purchased from the same initial offerings. At this stage of the litigation, reasonable inferences go to Plaintiffs.

The Court also rejects the corollary argument that Plaintiffs should be required to allege purchases from "particular Underwriter Defendant[s]." (ECF No. 171 at 6). The Underwriter Defendants cite two cases for this proposition, but neither dismissed any claims over a failure to identify particular underwriters. *Regions Morgan Keegan* rebuffed an attempt to import the aftermarket purchaser standing from Section 11; thus, when the court wrote that plaintiffs "d[id] not allege with particularity that [they] purchased their shares from [defendant fund] directly," the operative word was "directly." 166 F. Supp. 3d at 968–69. The second case, *In re China Intelligent*

---

[47] Plaintiff LACERA reports acquisitions on February 18 and 26, 2020, of 2.65% notes due 2030 (ECF No. 33-4), which align with Series B notes in the February Offering (ECF No. 72 ¶ 286). LACERA further reports acquisitions on June 3, 2020, of 1.6% notes due 2026 (ECF No. 33-4), which align with Series A notes in the June Offering (ECF No. 72 ¶ 288). Plaintiff Amalgamated Bank reports acquisitions on June 3, 2020, of 1.6% notes due 2026 (*Id.* PAGEID # 1666), which align with Series A notes in the June Offering (*Id.* ¶ 288). Plaintiff Wisconsin Laborers' Pension Fund reports acquisitions on February 18, 2020, of 3.4% notes due 2050 (*Id.* PAGEID # 1668), which align with Series C notes in the February Offering (*Id.* ¶ 286). Plaintiff City of Irving Supplemental Benefit Plan reports acquisitions on June 23, 2020, of 2.25% notes due 2030 (*Id.* PAGEID # 1671), which align with Series B notes in the June Offering (*Id.* ¶ 288).

*Lighting & Elecs., Inc. Sec. Litig.*, considered lead plaintiffs who "concede[d]" that none of them alleged purchases from a group of individual defendants and attempted to rest their standing on other purchases by "potential members of the proposed class." 2012 WL 12893520, at *5 (C.D. Cal. Feb. 16, 2012). The court rejected that attempt because the lead plaintiffs suffered no injury and no class had been certified. *Id.* Meanwhile, Plaintiffs direct the Court's attention to multiple cases from the Southern District of New York that found Section 12(a)(2) allegations well-pled despite not identifying particular underwriters. *See, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 404 (S.D.N.Y. 2020) ("[T]he fact that Plaintiffs did not identify which Underwriter Defendant they purchased shares from does not defeat their claim at this stage."); *Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at *12 (S.D.N.Y. Aug. 22, 2013) ("courts within the Second Circuit do not require that the putative class representative identify the specific underwriter from which it purchased shares as long as the allegations are sufficient"). This Court will decline to impose such a requirement in the first instance and against the weight of the cited authority. Plaintiffs' standing allegations are sufficient, as measured against basic pleading standards, to obtain discovery.

### 2. Statutory Seller

For purposes of Section 12(a)(2), statutory sellers are those who have "(1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'" *Morgan Stanley*, 592 F.3d at 359 (alterations in original) (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)). The non-management Director Defendants and Defendant Jones urge the Court to dismiss Count IV because "the mere signing of a registration statement" is insufficient to establish "statutory-seller status." (ECF No. 161 at 66 n.19; No. 174 at 28).

This Court considered the same question in *EveryWare*. After surveying the First, Third, and Fifth Circuits, this Court dismissed Section 12(a)(2) claims against director defendants who merely had signed the registration statement:

> In *Shaw v. Digital Equipment Corp.*, the First Circuit dismissed for lack of standing the plaintiffs' Section 12(a)(2) claims against individual directors, applying the Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622, 651 n. 27, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), to conclude that "neither involvement in preparation of a registration statement or prospectus..., standing alone, demonstrates the kind of *relationship between defendant and plaintiff* that could establish statutory seller status." 82 F.3d 1194, 1216 (1st Cir.1996), *superseded on other grounds by* 15 U.S.C. 78u–4(b)(2). The First Circuit held that a "bald assertion" that the individual officers "solicited" the purchases by signing and participating in the preparation of the registration statement was insufficient to confer standing. *Id*. In *Rosenzweig v. Azurix Corp.*, also applying *Pinter*, the Fifth Circuit found that signing the registration statement was insufficient in itself to constitute solicitation, asserting that "[t]o count as 'solicitation,' the seller must, at a minimum directly communicate with the buyer," and that an issuer, rather than an underwriter, "may only be liable under § 12(a)(2) if the plaintiff alleges 'that an issuer's role was not the usual one; that it went farther and became a vendor's agent.' " 332 F.3d 854, 871 (5th Cir.2003) (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir.1989) and *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 370 (5th Cir.2001)). *See also Pinter*, 486 U.S. at 648–49, 108 S.Ct. 2063 (rejecting the "substantial factor" test, which would impose liability on a non-transferor seller "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place."). In *Craftmatic*, the Third Circuit found that an issuer was not liable "solely on the basis of his involvement in preparing the prospectus." 890 F.2d at 636. The Sixth Circuit has not yet considered this issue, but the Court finds the reasoning of the other three circuits persuasive and holds that Plaintiffs lack standing to bring a Section 12(a)(2) claim against the Non-Management Director Defendants because they have not alleged any facts to indicate that the Directors' roles were "not the usual one." *Rosenzweig*, 332 F.3d at 871.

*In re EveryWare, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 868–69 (S.D. Ohio 2016) (Marbley, J.) (footnotes omitted) (emphasis in original), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017).[48]

---

[48] The Sixth Circuit did not state an opinion on the quoted passage. *See id.* at 328 n.3 ("We need not, and accordingly do not, address the district court's discussions of the statute of limitations and standing."). It affirmed only on the absence of plausibly pleaded material misrepresentations. *Id.* at 328. The question of whether the mere signing of a registration

Despite appearing multiple times in Plaintiffs' briefing (ECF No. 176 at 28, 78, 81), *EveryWare* is conspicuously absent in their discussion of the statutory-seller element (*Id.* at 83–85). This Court sees no occasion to reconsider its holding in *EveryWare* that directors are not liable under Section 12(a)(2) merely for having signed the registration statements.

As to the non-management Director Defendants in Count IV, the Complaint states no other specific allegations of solicitation; Plaintiffs appear to rest on the signatures. *See* ECF No. 72 ¶ 281 ("Each of the Director Defendants signed the registration statement for the Offerings, and/or were named as directors in the registration statements for the Offerings"). Absent other allegations of how the non-management Director Defendants solicited the purchase of securities, the statutory-seller element is not met.

By contrast, Count IV states many allegations about Defendant Jones's soliciting role. Defendant Jones was among the "senior echelon of Company management . . . responsible for FirstEnergy's . . . investor disclosures," who are alleged to have "personally overseen and facilitated" the scheme, including by "repeatedly affirmatively reassur[ing] investors that the Company was not engaged in any illicit activities and 'compl[ied]' with all laws and regulations applicable to its regulatory affairs and investor disclosure obligations." (*Id.* ¶¶ 3–6 (emphasis removed) (incorporated by reference in ¶ 310); *see also id.* ¶¶ 291–301 (connecting misstatements to scheme)). From these allegations, it cannot fairly be said that Defendant Jones "merely signed the registration statement" (ECF No. 174 at 28); rather, he is alleged to have reassured and deceived investors, actively and intentionally, into purchasing the securities at issue. The Court must take these allegations as pled and find that Defendant Jones was a "person who successfully

---

statement suffices for statutory-seller status remains an open one in the Sixth Circuit.

solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647.[49]

In conclusion, the Complaint does not state a claim under Section 12(a)(2) against the non-management Director Defendants in this Count (Defendants Addison, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Smart, Thornton, and Turner). These Defendants are not released from the litigation, however, as they remain implicated in Counts III and V. Count IV may proceed against the other Securities Act Defendants: FirstEnergy, Jones, Lisowski, Strah, and the Underwriter Defendants.

### E. Securities Act Section 15 (Count V)

Section 15 of the Securities Act establishes joint and several liability for "[e]very person who . . . controls any person liable under" Sections 11 or 12. 15 U.S.C. §77o(a). Control under Section 15 is analyzed "using the same legal standards" as under Section 20(a). *Pullins v. Klimley*, 2008 WL 85871, at *27 (S.D. Ohio Jan. 7, 2008).

The only basis on which Defendants move to dismiss this Count is the absence of a primary violation. *See* ECF No. 161 at 66 (reasoning no secondary liability absent primary liability); No. 174 at 29 (same). Because the Court has found primary violations in Counts III and IV, the premise of Defendants' argument is defeated, and no further analysis is required. Count V stands as pled.

---

[49] Defendant Jones also states a corollary argument on "privity," *i.e.*, whether Plaintiffs purchased securities "'from him.'" (ECF No. 174 at 28–29 (quoting 15 U.S.C. § 77*l*(a)(2))). Defendant Jones cites no cases from this Circuit and seemingly overlooks an important passage in *Pinter*: "Congress' express definition of 'sells' in the original Securities Act to include solicitation suggests that the class of those from whom the buyer 'purchases' extended to persons who solicit him." 486 U.S. at 645 (noting also that subsequent amendments "intended to preserve existing law" and not "to narrow the meaning of 'purchased from'").

### F. Whether *Nickerson v. AEP* Controls

In a final effort, Defendants ask the Court to take notice of the recent decision in *Nickerson v. American Electric Power Co.*, Case No. 2:20-cv-4243-SDM-EPD (S.D. Ohio), dismissing securities fraud claims related to AEP's involvement in HB6. (ECF No. 209). That case only underscores the reasons why Plaintiffs' claims here should proceed. The *Nickerson* complaint presented no coherent scheme theory; only at oral argument did any bribery allegations emerge. 2021 WL 5998536, at *12–13 (S.D. Ohio Dec. 20, 2021). Nor were there shareholder proposals for lobbying transparency that would make the "vague, generic, and innocuous" misstatements at issue, *Id.* at *16, material to reasonable investors.[50] The roles of the companies differed in kind: AEP was alleged to have contributed $900,000 to Householder's enterprise, *Id.* at *5, which FirstEnergy outmatched *67-to-1*. FirstEnergy undoubtedly played the dominant role in passing HB6 and stood to gain the bulk of the benefits, valued at $2 billion. Unlike FirstEnergy, AEP has not been charged with any criminal wrongdoing. The market, too, recognized the difference: the AEP lawsuit was precipitated by a 5% drop in share price, *Id.* at *12, while FirstEnergy's losses reached 35% in the first of three major selloffs. (ECF No. 72 ¶ 259). Simply stated, if there is a strike suit between the two, this is not it.

### IV. CONCLUSION

The Court finds Plaintiffs' allegations meritorious and compelling and determines that the Complaint may proceed as pled, with minor exceptions as noted. To dismiss this Complaint, as Defendants urge, would be to adopt a severely strained view of bribery laws, pleading requirements, and the facts of the case. Absent literal omniscience, it is difficult to envision a

---

[50] Because the *Nickerson* plaintiffs did not state actionable misstatements, the court never reached their allegations on scienter, connection, reliance, or loss causation. *Id.* at *14. Nor did the court analyze any Securities Act claims, as none were not brought.

securities fraud complaint that would *not* falter on the unrealistic expectations Defendants seek to impose as law. This Court will not do such a great disservice to the statutory rights of shareholders and investors to recover against those who defraud them.

For the reasons stated above, the Motion to Dismiss filed by Defendant FirstEnergy Corp. (ECF No. 160) is **GRANTED IN PART** as to the non-management Director Defendants in Count IV only and is **DENIED** in all other respects. Defendant Pine's Motion to Dismiss (ECF No. 166) is **GRANTED IN PART** as to Count II and is **DENIED IN PART** as to Count I. The remaining Motions to Dismiss filed by Defendant Reffner (ECF No. 162), Defendant Judge (ECF No. 164), Defendant Dowling (ECF No. 165), Defendant Chack (ECF No. 168), Defendant Schneider (ECF No. 170), the Underwriter Defendants (ECF No. 171), Defendant Vespoli (ECF No. 172), and Defendant Jones (ECF No. 174) each are **DENIED**. The partial dismissals are without prejudice.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: March 7, 2022**