UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | Judge Algenon L. Marbley |
| ALL ACTIONS. | ) ) ) | Magistrate Judge Kimberly A. Jolson |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

MURRAY MURPHY MOUL
  + BASIL LLP
JOSEPH F. MURRAY (0063373)
  murray@mmmb.com
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)




Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
MARK SOLOMON
HILLARY B. STAKEM
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
hstakem@rgrdlaw.com

Lead Counsel for Lead Plaintiff Los Angeles County
Employees Retirement Association and Plaintiffs
Amalgamated Bank, City of Irving Supplemental
Benefit Plan, and Wisconsin Laborers' Pension
Fund

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. STATEMENT OF FACTS .......................................................................................3

    A. Summary of the Allegations ........................................................................3

    B. The Proposed Class Representatives ...........................................................6

III. THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS
    CERTIFICATION UNDER RULE 23 ....................................................................8

A class action is appropriate where the movant establishes that the prerequisites of Rule 23(a) and that the action also falls within one of the categories set forth in Rule 23(b)(3). *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850-51 (6th Cir. 2013). It is well recognized that actions like this one that involve securities fraud claims are particularly appropriate for treatment as class actions.

    A. The Proposed Class Satisfies the Requirements of Rule 23(a)................................8

Plaintiffs satisfy the four requirements of Rule 23(a) for class certification: (1) there are sufficient class members that joinder is impracticable; (2) all class members' claims involve common questions of law and fact; (3) Plaintiffs' claims are typical of absent class members' claims; and (4) Plaintiffs will adequately and fairly represent the class. Fed. R. Civ. P. 23(a).

    1. The Class is Sufficiently Numerous ...........................................................8

"There is no particular number necessary to meet Rule 23(a)'s numerosity requirement, but numerosity 'is generally assumed to have been met in class action suits involving nationally traded securities.'" *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 3481322, at *5 (E.D. Mich. June 19, 2020), *adopted by* 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020); *accord Ross*, 257 F.R.D. at 442. FirstEnergy stock actively traded on the New York Stock Exchange during the Class Period, and there were 540 million shares outstanding. Similarly, the FirstEnergy bonds at issue had an outstanding par value of more than $6.5 billion during the Class Period. Numerosity is therefore satisfied.

    2. There are Numerous Common Questions of Law and Fact.........................9

Rule 23(a)(2)'s inquiry "focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit." *Whirlpool*, 722 F.3d at 852. It is satisfied where ***even one*** question central to the claims at issue is common to the class. *Id.* at 853. "[C]ourts have repeatedly found [the commonality] requirement satisfied in securities actions." *Big Lots I*, 242 F. Supp. 3d at 645. Here, there are many questions of law and fact common to the class, including whether: (1) Defendants made materially false or misleading statements or material omissions to investors, or engaged in a fraudulent scheme; (2) Defendants' misstatements and omissions and fraudulent scheme caused the putative Class damages; and (3) FirstEnergy violated the federal securities laws. The commonality requirement is therefore satisfied.

3.     The Proposed Class Representatives' Claims are Typical.........................10

"Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *Whirlpool*, 722 F.3d at 852. "A plaintiff's claim is typical 'if it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members, and if his or her claims are based on the same legal theory.'" *Ross*, 257 F.R.D. at 443. Plaintiffs' and the proposed Class's claims stem from Defendants' concealment of FirstEnergy's reliance on a scheme to bribe Ohio public officials in order to obtain billions of dollars in illicit benefits for the Company. Like other members of the Class, Plaintiffs allege that Defendants' false or misleading statements artificially inflated the trading prices of FirstEnergy Securities throughout the Class Period, causing injury to investors when the truth was revealed and the artificial inflation left the securities' prices. Accordingly, Plaintiffs' claims are typical of absent Class members' claims.

4.     The Proposed Class Representatives Will Adequately and Fairly Protect the Interests of the Class................................................................11

Plaintiffs readily meet Rule 23(a)(4)'s requirement that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet this requirement, (i) "'the representative must have common interests with unnamed members of the class;'" and (ii) "'it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996). Plaintiffs have the same interests as the Class in vigorously prosecuting this action and maximizing recovery. They have actively participated in the litigation and obtained and monitored dedicated legal counsel to represent the Class. Accordingly, Plaintiffs are more than adequate Class Representatives.

B.     The Proposed Class Satisfies the Requirements of Rule 23(b)(3).........................14

In addition to Rule 23(a)'s requirements, this action also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law and fact predominate over individual questions; and (2) a class action is the superior method to adjudicate this dispute. Fed. R. Civ. P. 23(b)(3).

1.     Common Factual and Legal Questions Predominate.................................14

"Predominance is a test readily met in certain cases alleging . . . securities" law claims and exists where the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623, 625 (1997); *Ross*, 257 F.R.D. at 455. To satisfy Rule 23(b)(3)'s predominance requirement, a plaintiff must demonstrate that "issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Bridging Cmtys. Inc. v. Top Flite Fin.Inc.*, 843 F.3d 1119, 1124-25 (6th Cir. 2016).

Here, common questions predominate with respect to the Class's Securities Act claims because whether the Registration Statement and offering materials for the Note Offerings contained materially misleading misrepresentations and omissions will be subject to common proof, and damages will be determined pursuant to statutory formula. Common questions also predominate with respect to the Class's Exchange Act claims, as whether the Exchange Act Defendants engaged in a fraudulent scheme, whether they made materially false misstatements

**Page**

and omissions, whether they acted with the requisite scienter, and whether they caused the Class's losses will all be subject to common proof, and damages will be measured using well-established and classwide methodologies. Lastly, individual issues of reliance will not predominate because Plaintiffs are entitled to a classwide presumption of reliance under *Affiliated Ute*, 406 U.S. 128 and/or the fraud-on-the-market theory of reliance set forth in *Basic*, 485 U.S. 224.

a.      Plaintiffs are Entitled to a Presumption of Reliance
          Pursuant to *Affiliated Ute* ................................................................17

Plaintiffs are entitled to a classwide presumption of reliance under *Affiliated Ute* because they have predominantly pled claims based on material omissions, and *Affiliated Ute* applies to claims "involving primarily a failure to disclose." 406 U.S. at 153. In such cases, "positive proof of reliance is not a prerequisite to recovery." *Id.* at 153-54. The thrust of Plaintiffs' scheme liability and misstatement claims are material omissions - namely, that the Exchange Act Defendants were engaged in what was later revealed to be the largest corruption scheme Ohio had ever seen. Accordingly, the *Affiliated Ute* presumption applies.

b.      Plaintiffs are Entitled to *Basic*'s Presumption of Reliance ............20

In the alternative, Plaintiffs are also entitled to the *Basic's* fraud-on-the-market presumption of reliance. 485 U.S. 224. First, during the Class Period, Defendants made material misrepresentations and omissions publicly, in earnings calls, media articles, and documents filed with the SEC. Second, although materiality must ultimately be proved at trial to invoke the *Basic* presumption, such "proof is not a prerequisite to class certification." *Amgen*, 568 U.S. at 459. Third, Plaintiffs purchased FirstEnergy Securities between the time when these material misrepresentations and omissions were made, *i.e.*, between February 21, 2017 and July 21, 2020 (the end of the Class Period). Finally, as shown below and in the accompanying expert reports of W. Scott Dalrymple and Cynthia L. Jones, the markets for FirstEnergy's common stock and notes were efficient at all relevant times.

2.      A Class Action is Superior to Other Available Methods for the Fair
          and Efficient Adjudication of this Action ................................................27

Courts consistently recognize that a class action is superior to other available methods for the fair and efficient resolution of securities class actions. *See, e.g.*, *Ross*, 257 F.R.D. at 455. Here, each factor set forth under Rule 23(b)(3)'s superiority requirement supports certification. Fed. R. Civ. P. 23(b)(3). First, the vast majority of class members have minimal interests in individually prosecuting separate actions, as the trouble and expense of doing so would be prohibitive when weighed against the potential recoveries. Second, the maintenance of a class action in this District ensures an efficient expenditure of resources and consistent rulings on the Class's claims. Third, this District is a desirable forum for this class action: individual class members are most likely located in geographically dispersed areas, FirstEnergy conducts business in this District, and other civil and criminal litigation relating to Defendants' alleged misconduct is also being conducted in this district, including in front of this Court. Finally, Plaintiffs do not foresee any management difficulties that preclude this action from proceeding as a class action.

C.      The Court Should Appoint Plaintiffs' Choice of Counsel as Class Counsel
          Under Rule 23(g) ................................................................................28

**Page**

Plaintiffs request that Lead Counsel Robbins Geller Rudman & Dowd LLP be appointed as Class Counsel and Murray Murphy, Moul + Basil LLP be appointed Liaison Counsel. In appointing class counsel under Rule 23(g), the Court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's relevant experience and knowledge of applicable law; and (iii) the resources that counsel will commit to representing the class. Fed R. Civ. P. 23(g)(1)(A). Robbins Geller and Murray Murphy are well-qualified to prosecute this case on behalf of Plaintiffs and the Class, and have already undertaken a vigorous prosecution of this action, including conducting an extensive investigation of the claims, defeating Defendants' motions to dismiss, and diligently pursuing discovery. Further, Lead Counsel's substantial experience and respective knowledge of applicable law are evidenced by the fact that they have either served or are serving as lead counsel in many significant securities class actions, including several of the largest recoveries in the Sixth Circuit.

IV. CONCLUSION................................................................................................................28

As all of the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(3) and 23(g) are established, the Court should certify the proposed Class, appoint Plaintiffs as Class Representatives, and appoint Robbins Geller as Class Counsel and Murray Murphy as Liaison Counsel.

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)............................................................................ *passim*

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...........................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)............................................................15, 17, 18, 21

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)............................................................3, 17, 20, 21

*Bennett v. Sprint Nextel Corp.*,
298 F.R.D. 498 (D. Kan. 2014)...........................................................23

*Bovee v. Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003) ...................................................1, 10

*Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*,
843 F.3d 1119 (6th Cir. 2016) ............................................................15

*Burges v. Bancorpsouth, Inc.*,
2017 WL 2772122 (M.D. Tenn. June 26, 2017).............................20, 22

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .......................................21, 22, 24, 27

*Castillo v. Envoy Corp.*,
206 F.R.D. 464 (M.D. Tenn. 2002) .......................................................8

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..............................................................................17

*Cosby v. KPMG, LLP*,
2020 WL 3548379 (E.D. Tenn. June 29, 2020).....................................26

*Cosby v. KPMG, LLP*,
2021 WL 1828114 (E.D. Tenn. May 7, 2021)..........................16, 20, 21, 22

*Dougherty v. Esperion Therapeutics, Inc.*,
2020 WL 3481322, at *5 (E.D. Mich. June 19, 2020),
*adopted by* 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ...............9, 14, 26, 27

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)............................................................................17

**Page**

*Freeman v. Laventhol & Horwath*,
915 F.2d 193 (6th Cir. 1990) ....................................................................21, 22, 25

*Gaynor v. Miller*,
2018 WL 3751606 (E.D. Tenn. Aug. 6, 2018) .........................................................15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)................................................................................18, 21, 25

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ..............................................................................12

*In re Cardinal Health Inc. Sec. Litig.*,
528 F. Supp. 2d 752 (S.D. Ohio 2007) ...........................................................14, 29

*In re Direct General Corp.*,
2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006) ................................................10, 12

*In re NII Holdings, Inc. Sec. Litig*,
311 F.R.D. 401 (E.D. Va. 2015) .......................................................................23, 26

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) ........................................................8, 10, 11, 17

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ...................................................................9, 23, 26

*Kasper v. AAC Holdings, Inc.*,
2017 WL 3008510 (M.D. Tenn. July 14, 2017) .....................................................17

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................25, 26, 27

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
332 F.R.D. 556 (M.D. Tenn. 2019) ............................................................8, 19, 27

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
967 F. Supp. 2d 1143 (N.D. Ohio 2013)..................................................... *passim*

*Ret. Sys. v. Acadia Healthcare Co., Inc.*,
2019 WL 494129 (M.D. Tenn. Jan. 9, 2019).........................................................14

*Ret. Sys. v. Psychiatric Sols., Inc.*,
2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) .............................................25, 29

*Ross v. Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009) ............................................................... *passim*

*Schuh v. HCA Holdings, Inc.*,
2014 WL 4716231 (M.D. Tenn. Sept. 22, 2014).............................................16, 29

**Page**

*Stein v. U.S. Xpress Enters., Inc.*,
   2021 WL 1410035 (E.D. Tenn. Feb. 12, 2021) ............................................................9, 13, 16

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
   552 U.S. 148 (2008)...........................................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).............................................................................................................8

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   325 F.R.D. 280 (D. Minn. 2018)....................................................................................19, 20

*Weiner v. Tivity Health, Inc.*,
   334 F.R.D. 123 (M.D. Tenn. 2020) ...............................................................................11, 17

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
   280 F.R.D. 332 (E.D. Mich. 2012) ...................................................................................23

*Willis v. Big Lots*,
   2017 WL 1074048 (S.D. Ohio Mar. 17, 2017).................................................................21, 25

*Willis v. Big Lots, Inc.*,
   242 F. Supp. 3d 634 (S.D. Ohio 2017) ...................................................................... *passim*

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §77k......................................................................................................................3, 11, 15, 16
   §77o..........................................................................................................................3, 11, 15
   §77l(a)(2) .................................................................................................................3, 11, 15
   §78j(b).................................................................................................................... *passim*
   §78t(a) ...............................................................................................................................3, 11

Federal Rules of Civil Procedure Rule
   Rule 23 .................................................................................................................................8
   Rule 23(a) ................................................................................................................. *passim*
   Rule 23(a)(2).......................................................................................................................10
   Rule 23(a)(3).......................................................................................................................11
   Rule 23(a)(4).......................................................................................................................12
   Rule 23(b)(3)............................................................................................................. *passim*
   Rule 23(g)......................................................................................................................14, 28
   Rule 23(g)(1).......................................................................................................................28
   Rule 23(g)(1)(A).................................................................................................................28

17 C.F.R.
   §240.10b-5 .............................................................................................................3, 5, 10, 19
   §240.10b-5(a).......................................................................................................................19
   §240.10b-5(c).......................................................................................................................19

Lead Plaintiff Los Angeles County Employees Retirement Association ("LACERA"), together with Plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund ("Amalgamated Bank"), City of Irving Supplemental Benefit Plan ("SBP"), and Wisconsin Laborers' Pension Fund ("Wisconsin Laborers") (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of Plaintiffs' Motion for Class Certification and request that the Court: (i) certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3); (ii) appoint Plaintiffs as the Class Representatives; and (iii) appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel and Murray Murphy Moul + Basil LLP ("Murray Murphy") as Liaison Counsel.

## I.    INTRODUCTION

Courts within this Circuit routinely recognize that "'class actions are a particularly appropriate means for resolving securities fraud actions.'" *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 607 (S.D. Ohio 2003); *accord Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 455 (S.D. Ohio 2009).[1] This action is no exception and is ideally suited to class treatment. Plaintiffs seek certification of a Class consisting of:

> All Persons who purchased or otherwise acquired FirstEnergy Securities during the period from February 21, 2017 through July 21, 2020, inclusive (the "Class Period").[2] Excluded from the Class are: (i) Defendants; (ii) the officers and directors of FirstEnergy, FirstEnergy Solutions Corp. ("FES"), FirstEnergy Nuclear Operating Company ("FENOC") and Energy Harbor LLC, Energy Harbor Corp., and Energy Harbor Nuclear Corp. (collectively, "Energy Harbor") at all relevant

---

[1]    Unless otherwise noted, citations are omitted and emphasis is added throughout.

[2]    "FirstEnergy Securities" are defined as FirstEnergy common stock and the FirstEnergy corporate debt notes trading pursuant to CUSIP numbers 337932AG2, 337932AF4, 337932AN7, 337932AH0, 337932AL1, 337932AP2, 337932AJ6, and 337932AM9 (the "Notes").

times; and (iii) members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.[3]

Certification of this action as a class action is appropriate under Rule 23(a) of the Federal Rules of Civil Procedure, as each of its requirements is readily satisfied:

- **Numerosity** – Thousands of investors acquired and sold the millions of shares of FirstEnergy common stock and Notes during the Class Period;

- **Commonality and Typicality** – Defendants' alleged violations of the federal securities laws injured the proposed Class Representatives and absent Class members in the same manner, and stem from the same scheme to corrupt and bribe Ohio legislators and regulators. ¶¶41-247, 291-301[4]; and

- **Adequacy** – The proposed Class Representatives have participated in discovery in this action, engaged qualified counsel, and are committed to prosecuting this action on behalf of the Class.

The prerequisites for certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure are also met. Questions central to all of Plaintiffs' securities fraud claims – including whether Defendants made untrue statements of material facts or omitted material facts necessary

---

[3] "Defendants" are (i) FirstEnergy Corp.; (ii) Charles E. Jones, James F. Pearson, Steven E. Strah, K. Jon Taylor, Michael Dowling, Dennis M. Chack, Ty R. Pine, Robert Reffner, Leila L. Vespoli; John Judge; and Donald R. Schneider (collectively the "Officer Defendants"); (iii) George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, and Leslie M. Turner (collectively the "Director Defendants"); and (iv) Barclays Capital, Inc., BofA Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets, Inc., TD Securities (USA) LLC, US Bancorp Investments, Inc., and MUFG Securities Americas Inc. (collectively the "Underwriter Defendants"). FirstEnergy and the Officer Defendants are referenced collectively as the "Exchange Act Defendants." The Director Defendants, defendants Jones, Strah, and Jason J. Lisowski, and Underwriter Defendants are referenced collectively as the "Securities Act Defendants."

[4] All "¶" or "¶¶" references herein are to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 72) ("Complaint"), unless otherwise specified. Additionally, all capitalized terms used in this Memorandum that are not otherwise defined herein have the same meaning as set forth in the Complaint.

to make their statements not misleading and/or committed acts in furtherance of a fraudulent scheme – will be answered on a classwide basis.  Further, Plaintiffs' and the Class's §10(b) claims involve common questions of scienter and reliance, which can be presumed for all Class members under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) and/or the fraud-on-the-market theory of reliance set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  Accordingly, common questions will predominate over individual ones.  Finally, because Defendants' alleged conduct damaged thousands of geographically-dispersed investors, a class action is plainly the superior method for vindicating both the claims and defenses in this action and for promoting judicial economy.

Accordingly, Plaintiffs' Motion for Class Certification should be granted.

## II.    STATEMENT OF FACTS

### A.    Summary of the Allegations

This action is brought on behalf of investors in FirstEnergy, who were damaged in connection with their purchase of FirstEnergy Securities during the Class Period at prices artificially inflated by the Defendants' conduct.  Plaintiffs and the putative Class allege that the Securities Act Defendants violated §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, and that the Exchange Act Defendants violated §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

FirstEnergy is an electric utility company headquartered in Ohio, that serves much of the Midwest and Mid-Atlantic regions through a family of ten operating companies.  ¶2.  It is one of the nation's largest investor-owned electric systems, historically generating electricity for approximately six million customers.  ¶41.

FirstEnergy owned and operated a handful of failing nuclear plants, including the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station (the "Nuclear Plants"),

through wholly owned subsidiaries FES and FENOC. ¶¶5, 42. These Nuclear Plants were a massive liability and strategic stumbling block for FirstEnergy. ¶¶42-44. As an initial matter, FirstEnergy's failure to properly maintain the Nuclear Plants led to $28 million in fines and an $85 million settlement with investors in 2006. ¶¶42-43. Moreover, the Nuclear Plants were not profitable on an ongoing basis – maintenance costs continued to climb while demand for nuclear power declined in favor of less expensive alternatives like natural gas. ¶¶42-43. By 2016, FirstEnergy was forecasting that the Nuclear Plants would result in hundreds of millions of dollars in losses. ¶44.

As investors grew increasingly concerned about FirstEnergy's liabilities from the Nuclear Plants, the topic grew to dominate FirstEnergy earnings calls and analyst coverage. ¶44. On February 21, 2017, the first day of the Class Period, FirstEnergy and its senior management began reassuring investors that the company was pursuing "[l]egislative or regulatory solutions" to address its potential losses from the Nuclear Plants. ¶¶95-96. Unbeknownst to investors, FirstEnergy management's real plan for the Nuclear Plants was to obtain favorable legislation passed via a scheme involving an extensive web of lobbyists, dark money groups, and political action committees and more than $60 million in bribes paid to Ohio's House Speaker Larry Householder ("Householder"), and the Chairman of the Public Utilities Commission of Ohio, Sam Randazzo. ¶¶64-94, 143-145. That legislation, HB6, not only included a ratepayer-funded $1.3 billion bailout of the Nuclear Plants, it also provided $700 million in what was effectively ratepayer-subsidized revenue for FirstEnergy via a "decoupling" provision. ¶¶5, 74-78. The decoupling provision propped up FirstEnergy's revenue, allowing it to charge higher rates for electricity than supply-and-demand principles would otherwise justify and ensured that FirstEnergy would make significant profits regardless of how much electricity ratepayers actually used. *Id.*

This scheme to suborn the legislative process exposed FirstEnergy to catastrophic risks of financial, regulatory, legal, and reputational loss – risks that FirstEnergy and its senior management went to great lengths to conceal from investors during the Class Period. ¶¶6, 12, 95-138, 237. For example, not only did FirstEnergy conceal the HB6 scheme from the pages of lengthy "Risk Factors" that it provided investors in SEC filings, purporting to detail the most significant risks the Company faced, but FirstEnergy and its management also made statements assuring investors of their adherence to political contribution laws and to a code of corporate conduct mandating ethical business practices. ¶¶95-138.

During the Class Period, the concealed bailout scheme was a resounding success. The price of FirstEnergy stock topped over $50 per share, and the Company was able to raise more than $5 billion in two public debt offerings, the February 2020 Offering and the June 2020 Offering, and an equity raise. ¶¶7, 241-247. Company insiders received tens of millions of dollars in excess compensation tied to FirstEnergy's purported performance, and profited from sales of millions of dollars of their own FirstEnergy Securities at artificially inflated prices. ¶¶248-251.

Then, on July 21, 2020, Defendants' scheme came crashing down. The U.S. Attorney's Office for the Southern District of Ohio and the Federal Bureau of Investigation announced the arrests of Householder and several accomplices, and publicly filed the Criminal Complaint (with supporting 80-page affidavit) revealing aspects of FirstEnergy's bailout scheme. ¶143. The Criminal Complaint described how FirstEnergy and its top executives illegally funneled $60 million into the hands of corrupt politicians to get HB6 passed into law and thwart a referendum to repeal the bill. ¶¶9, 143-144.

On the news of FirstEnergy's central role in the bailout scheme, its stock price plummeted 45% – dropping to below $23 per share on July 22, 2020 from its closing price of more than $41 per share on July 20, 2020 – and its corporate bonds also suffered substantial declines. ¶¶9, 257-

260.     Further corrective disclosures in October and November 2020 revealed additional information about Defendants' fraudulent conduct and caused further declines in the price of FirstEnergy securities.  ¶¶172-177, 186-187, 194-200.  In total, FirstEnergy investors suffered billions of dollars of losses as a result of Defendants' flagrant violations of the federal securities laws.

        **B.**    **The Proposed Class Representatives**

The entities described below are the proposed Class Representatives, each of which has already expended substantial time and effort in informing themselves about and monitoring this case, working with counsel to vigorously prosecute this action on behalf of the Class, and responding to discovery requests.  Each has expressed an understanding of and willingness to accept the responsibilities of a Class Representative.  *See* Exs. A-D.  The proposed Class Representatives are:

**Los Angeles County Employees Retirement Association**.  LACERA is the largest county retirement system in the United States, administering defined retirement benefits for employees of Los Angeles County and participating agencies.  ¶23.  As of December 3, 2021, LACERA had over 185,000 active members and in year ending June 30, 2021, maintained assets of more than $73 billion.  *See* Ex. A.  During the Class Period, LACERA purchased FirstEnergy Securities at artificially inflated prices, including common stock and FirstEnergy Notes purchased directly in and/or traceable to the February 2020 Offering and June 2020 Offering.  ¶307; ECF 33-4, PAGEID 779-84 (LACERA Certification); *see also* Ex. A.[5]

**Amalgamated Bank**.  Amalgamated Bank is a New York City based bank serving thousands of labor unions, nonprofits, social impact enterprises, political organizations,

---

[5]     All "Ex. __" citations herein are to the Declaration of Hillary B. Stakem in Support of Plaintiffs' Motion for Class Certification, concurrently filed herewith.

foundations, and individuals. Amalgamated Bank has nearly $60 billion in assets under management and custody. During the Class Period, Amalgamated Bank purchased FirstEnergy Securities at artificially inflated prices, including common stock and Notes purchased directly in and/or traceable to the June 2020 Offering. ¶307; ECF 72, PAGEID 1660-66 (Amalgamated certification); Ex. B.

**City of Irving Supplemental Benefit Plan**. SBP is a defined benefits plan established in 1984 to provide supplemental retirement, disability, and death income benefits for government and police employees for the City of Irving, Texas who participate in the Texas Municipal Retirement System. During the Class Period, SBP purchased FirstEnergy Notes traceable to the June 2020 Offering at artificially inflated prices. ¶307; ECF 72, PAGEID 1669-71 (SBP Certification); *see also* Ex. C.

**Wisconsin Laborers' Pension Fund**. Wisconsin Laborers is a multi-employer defined benefit plan operated for the benefit of nearly 9,000 active and retired construction craft laborers in Wisconsin. During the Class Period, Wisconsin Laborers purchased Securities at artificially inflated prices, including common stock and Notes purchased directly in and/or traceable to the February 2020 Offering. ¶307; ECF 72, PAGEID 1667-68 (Wisconsin Laborers Certification); Ex. D.

## III. THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23

Class actions are widely considered to be the most favorable means of adjudicating federal securities claims. *Ross*, 257 F.R.D. at 455; *accord Castillo v. Envoy Corp.*, 206 F.R.D. 464, 474 (M.D. Tenn. 2002); *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556, 576 (M.D. Tenn. 2019) ("'Numerous courts have found the class action device to be a superior method of proceeding in a securities law fraud case.'"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14, 320 (2007) ("This Court has long recognized that meritorious private actions

to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions . . . .").  A class action is appropriate where the movant has established the prerequisites of Rule 23(a) and that the action also falls within one of the categories set forth in Rule 23(b)(3).  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850-51 (6th Cir. 2013).  For the reasons discussed below, Plaintiffs have made the requisite showing and the Court should certify the Class.

### A.     The Proposed Class Satisfies the Requirements of Rule 23(a)

Rule 23(a) establishes four requirements for class certification: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of those of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy).  Fed. R. Civ. P. 23(a); *Whirlpool*, 722 F.3d at 850.  Here, the proposed Class easily satisfies each requirement.

### 1.     The Class Is Sufficiently Numerous

Numerosity is satisfied because the Class is so numerous that joinder is impracticable.  "There is no particular number necessary to meet Rule 23(a)'s numerosity requirement, but numerosity 'is generally assumed to have been met in class action suits involving nationally traded securities.'"  *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 3481322, at *5 (E.D. Mich. June 19, 2020) ("*Esperion I*"), *adopted by* 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ("*Esperion II*"); *accord Ross*, 257 F.R.D. at 442.

Throughout the Class Period, FirstEnergy's stock was listed and actively traded on the NYSE – one of the most liquid and efficient forums for securities trading in the world – with more than 540 million shares outstanding as of January 31, 2020.  ¶254; Expert Report of Scott W. Dalrymple, CFA ("Dalrymple Rpt."), ¶¶14, 40 (attached hereto as Ex. E).  The average weekly trading volume of FirstEnergy's stock was approximately 21.7 million shares, or 4.4% of the 496.4

million shares outstanding. *See* Dalrymple Rpt., ¶¶44-45. The FirstEnergy Notes also totaled over $6.5 billion and were actively traded by investors during the Class Period. *See* Expert Report of Cynthia L. Jones, CFA ("Jones Rpt."), ¶¶25, 41, 43-44 (attached hereto as Ex. F).

Based on this volume of trading, it is reasonable to conclude that thousands of geographically-dispersed individuals purchased or otherwise acquired FirstEnergy Securities during the Class Period, and that joinder of all Class members is impracticable. *See Ross*, 257 F.R.D. at 442 (numerosity satisfied where average daily trading volume was 1.8 million shares); *See also Willis v. Big Lots*, *Inc*., 242 F. Supp. 3d 634, 644 (S.D. Ohio 2017) ("*Big Lots I*") (numerosity established where defendant's stock had an average daily trading volume in excess of 1.5 million shares); *Stein v. U.S. Xpress Enters., Inc.*, 2021 WL 1410035, at *4 (E.D. Tenn. Feb. 12, 2021) (numerosity satisfied where more than 16.6 million shares traded); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (numerosity satisfied where company had nearly $1.9 billion bonds outstanding). Indeed, at least 1,400 large institutional investors reported owning FirstEnergy Securities during the Class Period. Dalrymple Rpt., ¶58; Jones Rpt., ¶¶63-65.

## 2. There Are Numerous Common Questions of Law and Fact

This case also readily satisfies Rule 23(a)(2)'s requirement that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Rule 23(a)(2)'s inquiry "focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit." *Whirlpool*, 722 F.3d at 852. Commonality is satisfied where ***even one*** question central to the claims at issue is common to the class. *Id.* at 853. The "mere fact that questions peculiar to individual class members could remain does not necessarily defeat a finding of commonality." *Ross*, 257 F.R.D. at 442. "[C]ourts have repeatedly found [the commonality] requirement satisfied in securities actions." *Big Lots I*, 242 F. Supp. 3d at 645.

Here, Plaintiffs' allegations easily clear the low threshold for commonality, as their claims raise "paradigmatic common questions of law in a securities fraud class action." *Id.* (cleaned up).[6] Questions subject to common answers include whether: (1) Defendants made materially false or misleading statements or material omissions to investors, or engaged in a fraudulent scheme; (2) Defendants' misstatements and omissions and fraudulent scheme caused the putative Class damages; and (3) FirstEnergy violated the federal securities laws. Because the Class will depend on common proof in answering these critical questions and establishing the claims, commonality is established. *See Big Lots I*, 242 F. Supp. 3d at 645 (commonality satisfied by allegations that "[d]efendants made the same misrepresentations and omissions to the investing public"); *Bovee*, 216 F.R.D. at 608 (whether defendants "violate[d] Section 10(b) of the Exchange Act and Rule 10b-5" was a question common to class and satisfied commonality); *In re Direct General Corp.*, 2006 WL 2265472, at *2-*3 (M.D. Tenn. Aug. 8, 2006) (commonality established as to both Exchange Act and Securities Act claims).

### 3. The Proposed Class Representatives' Claims Are Typical

Rule 23(a)(3)'s typicality requirement is also satisfied, as Plaintiffs and the Class were injured in the same way by Defendants' misconduct during the Class Period. ¶¶257, 267-275, 302-322. "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *Whirlpool*, 722 F.3d at 852. "A plaintiff's claim is typical 'if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Ross*, 257 F.R.D. at 443. For the purposes of typicality, all Plaintiffs and all members of the putative Class need not necessarily assert the same legal claims or be entitled to the same damages, as "individual differences

---

[6] This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and/or citations have been omitted from quotations. For an example of its use in a published opinion, *see Brownback v. King*, __ U.S. __, 141 S. Ct. 740, 748 (2021) (Feb. 25, 2021).

regarding the purchasing and selling of securities during the proposed class period does not destroy the typicality requirement." *Id*. at 456 (cleaned up).

Plaintiffs' and the proposed Class's claims stem from Defendants' concealment of FirstEnergy's reliance on a scheme to bribe Ohio public officials in order to obtain billions of dollars in illicit benefits for the Company. ¶¶93-142. Like other members of the Class, Plaintiffs allege that Defendants' false or misleading statements artificially inflated the trading prices of FirstEnergy Securities throughout the Class Period, causing injury to investors when the truth was revealed and the artificial inflation left the securities' prices. ¶¶257-267. Thus, proving Plaintiffs' claims – including those for alleged violations of §§10(b) and 20(a) of the Exchange Act and §§11, 12(a)(2), and 15 of the Securities Act – will simultaneously prove the Class's claims. They will rise or fall together. *See Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 128 (M.D. Tenn. 2020) (typicality established where "[i]n short, 'as go the claim of the named plaintiff, so go the claims of the class'"); *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1163-64 (N.D. Ohio 2013) (typicality satisfied where class of bondholders and stockholders brought claims based on "the misrepresentations defendants allegedly made throughout the class period"); *Direct General*, 2006 WL 2265472, at *3-*4 (typicality satisfied where plaintiffs brought both Securities Act and Exchange Act claims based on same course of conduct as class). Because Plaintiffs and the putative Class advance the same claims and share identical interests in holding Defendants accountable and maximizing the recovery, typicality is satisfied.

### 4. The Proposed Class Representatives Will Adequately and Fairly Protect the Interests of the Class

The proposed Class Representatives readily meet Rule 23(a)'s final requirement, that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet this requirement: (i) "'the representative must have common interests with unnamed members of the class;'" and (ii) "'it must appear that the representatives will vigorously

prosecute the interests of the class through qualified counsel.'" *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996). "The first requirement overlaps with the commonality and typicality requirements and acts to ensure that the representative[s] have interests co-extensive with, rather than antagonistic to, the interests of the other class members." *Ross*, 257 F.R.D. at 447. The second factor requires that representatives have sufficient financial and personal involvement to encourage them to prosecute the action vigorously and adequate legal representation to meet the demands of maintaining the action. *See Big Lots I*, 242 F. Supp. 3d at 648. Both factors are met here.

First, the proposed Class Representatives' interests are neither antagonistic to nor in conflict with the interests of the other Class members. As demonstrated above, the typicality of the proposed Class Representatives' claims and the commonality of interest presented by the common questions of law and fact ensure the proposed Class Representatives' adequate representation of the proposed Class. *See* §§III.A.2-3. The proposed Class Representatives consist of entities that purchased FirstEnergy Securities in the open market and/or in Note Offerings in this case. Each of the proposed Class Representatives is alleged to have been damaged by the purchase or acquisition of FirstEnergy Securities at prices that were inflated due to the misstatements and omissions made by the Defendants, and each shares the Class's incentives to maximize any recovery in this case. LACERA, for example, suffered millions of dollars in losses on its purchases of FirstEnergy stock. *See* ECF 33-1, PAGEID 762. Accordingly, the proposed Class Representatives' interests are aligned with those of the absent Class members who also purchased or acquired FirstEnergy Securities during the Class Period and now seek redress for Defendants' violations of the federal securities laws. *See Stein*, 2021 WL 1410035, at *8 (proposed class representatives were adequate where they "plainly intend to see defendants' alleged wrongs righted and have already expended considerable time and energy in service of that end").

Further, the proposed Class Representatives have already demonstrated an ability to successfully represent the interests of the Class and each has willingly taken an active role in zealously prosecuting this action on the Class's behalf. *See* Exs. A-D. Since the Court appointed LACERA as Lead Plaintiff on November 23, 2020, LACERA has overseen the litigation and vigorously protected the Class's interests together with the named plaintiffs. *See generally* ECF 65; Ex. A. LACERA and the other proposed Class Representatives have successfully represented the interests of the Class and demonstrated their adequacy to prosecute this action by, among other things, filing the Complaint with a comprehensive set of claims, defending those claims against numerous motions to dismiss, and seeking and obtaining critical discovery from Defendants and third parties. Each proposed Class Representative: (i) understands the requirements and responsibilities of serving as a Class Representative; (ii) intends to continue to monitor and review the progress of this litigation; and (iii) intends to work with counsel to maximize the recovery to the Class.

The proposed Class Representatives have also demonstrated their adequacy by retaining attorneys with considerable experience in securities class actions. *See Esperion II*, 2020 WL 6793326, at *7 (rejecting objection as to adequacy of proposed class representatives where they had "vigorously prosecute[d] the interests of the class" through Robbins Geller). Robbins Geller, a 200-attorney law firm, regularly represents investors in nationwide securities litigation, including within the Sixth Circuit and this District. *See* Ex. G. District courts throughout the country, including the judges of this Court, have noted Robbins Geller's reputation for excellence. *See, e.g.*, *Big Lots I*, 242 F. Supp. 3d at 650 ("[T]here can be no serious dispute that Robbins Geller is qualified, experienced, and generally able to conduct the litigation."); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) ("The quality of representation in this case was superb."); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2019 WL 494129,

at *6 (M.D. Tenn. Jan. 9, 2019) ("[T]his Court has previously found Robbins Geller to be 'well qualified' for the task of representing a class in a securities action."); *Esperion II*, 2020 WL 6793326, at *8 (Robbins Geller "satisf[ies]" Rule 23(g)).    Additionally, as this Court acknowledged in appointing Robbins Geller as Lead Counsel, the firm's lawyers have achieved the largest securities class action recovery in the Sixth Circuit and in the Southern District of Ohio, *Cardinal Health*, 528 F. Supp. 2d at 764-65 ($600 million recovery), and has previously – and successfully – litigated a securities action against FirstEnergy, *In re FirstEnergy Sec. Litig.*, No. 5:03-cv-01684 (N.D. Ohio) ($85 million recovery).  ECF 65, PAGEID 1517.  Since 2015, Robbins Geller has recovered $7.7 billion for investors and consumers while acting as sole lead counsel. *See* Ex. G.  In short, Robbins Geller is qualified, experienced and able to prosecute this action with the proposed Class Representatives on behalf of the Class.

### B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

In addition to Rule 23(a)'s requirements, this action also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law and fact predominate over individual questions; and (2) a class action is the superior method to adjudicate this dispute.  Fed. R. Civ. P. 23(b)(3).

#### 1.    Common Factual and Legal Questions Predominate

"Predominance is a test readily met in certain cases alleging . . . securities" law claims and exists where the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 625 (1997); *Ross*, 257 F.R.D. at 455 ("[S]ecurities fraud actions are particularly well suited for class certification due to the predominance of common issues . . . and the impracticability of bringing individual actions.").  To satisfy Rule 23(b)(3)'s predominance requirement, a plaintiff must demonstrate that "issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124-25 (6th Cir. 2016) (cleaned up).  Importantly, however, the predominance test does

*not* require Plaintiffs to prove that "***questions*** common to the class . . . will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis in original).

With respect to the Class's Securities Act claims, the Securities Act Defendants' liability will be established through evidence common to the Class. To establish its Securities Act claims, for example, the Class must prove that FirstEnergy's Registration Statements (their February 19, 2020 and June 4, 2020 prospectus supplements to its shelf registration statement), contained untrue statements and omissions of material fact. 15 U.S.C. §§77k, 77o, 77l(a)(2). Because these claims depend on the contents of the Registration Statements – with no requirement to prove reliance, scienter, or loss causation – they are plainly appropriate for class treatment. *See Gaynor v. Miller*, 2018 WL 3751606, at *14 (E.D. Tenn. Aug. 6, 2018) ("At the heart of Plaintiffs' Securities Act claim is that the Registration Statement contained misstatements and/or omissions of material fact this issue will predominate over any secondary issues.") (cleaned up); *Stein*, 2021 WL 1410035, at *8 (Common questions predominated in §11 action where: "(1) liability to all proposed class members turns on whether the Offering Documents contained material misrepresentations and omissions, (2) the method for calculating damages is statutorily prescribed, and (3) even if damages or affirmative defenses differ among class members, class-wide questions still outweigh individualized inquiries."); *Schuh v. HCA Holdings, Inc.*, 2014 WL 4716231, at *7-*8 (M.D. Tenn. Sept. 22, 2014) (common questions predominated in putative Securities Act class action). And, as described in the Jones Report, damages for the Class's Securities Act claims are capable of being calculated using a statutory methodology applicable to the entire Class. Jones Rpt. ¶¶107-113; *see also Cosby v. KPMG, LLP*, 2021 WL 1828114, at *12 (E.D. Tenn. May 7, 2021) (individual damages questions would not predominate where §11 claims would be calculated pursuant to statutory methodology).

The Class's Exchange Act claims also depend on answering common questions. The Class's §10(b) claims require proof of:

> (1) a material misrepresentation or omission or, in the case of scheme liability, a deceptive or manipulative act; (2) scienter, that is a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, a causal connection between the misrepresentation and the loss.

ECF 219, PAGEID 4730 (cleaned up). As the commonality analysis in §III.A.2, *supra*, demonstrates, the primary questions of law and fact at the heart of this case are common to the proposed Class Representatives and the Class. Issues such as whether the Exchange Act Defendants knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity, and materiality elements) and whether the revelation(s) of the alleged fraud proximately caused the prices of FirstEnergy Securities to decline (*i.e.*, loss causation) involve common questions that predominate over individualized ones. *See Amgen*, 568 U.S. at 467-70, 474-76; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*"); *see also Kasper v. AAC Holdings, Inc.*, 2017 WL 3008510, at *11 (M.D. Tenn. July 14, 2017).

With respect to the damages element of the Class's §10(b) claims, "'recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal.'" *Whirlpool*, 722 F.3d at 861 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 42 (2013)). Regardless, it is well-established that damages for the Exchange Act claims can be calculated using a classwide methodology. Dalrymple Rpt., ¶¶103-110; Jones Rpt., ¶¶100-106 (setting forth proposed damages methodology for Exchange Act Claims); *Tivity Health*, 334 F.R.D. at 137 ("Use of the out-of-pocket damages model in securities case[s] is hardly new or novel – it 'is the standard measurement of damages in Section 10(b) securities cases.'"); *Big Lots I*, 242 F. Supp. 3d at 652 n.5 (noting multiple courts' acceptance of event study methodology for

calculation of §10(b) damages); *Kasper*, 2017 WL 3008510, at *14 (individual damages issues would not predominate in §10(b) case because damages were calculable using classwide event study methodology).

Finally, individual issues of reliance will not predominate, because Plaintiffs are entitled to a presumption of classwide reliance. As the Court acknowledged in its motion to dismiss order, a presumption of reliance arises:

> In two different circumstances: first, when there is an omission of a material fact by one with a duty to disclose, and second, when the statements at issue become public and the public information is reflected in the market price of the security. The former derives from *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and the latter from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

ECF 219, PAGEID 4766 (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008)) (cleaned up). Here, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute*, because their claims primarily concern a failure to disclose; in the alternative, Plaintiffs are also entitled to *Basic*'s fraud-on-the-market presumption of reliance.

### a. Plaintiffs Are Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute*

Plaintiffs are entitled to a classwide presumption of reliance under *Affiliated Ute* because they have predominantly pled claims based on material omissions, and *Affiliated Ute* applies to claims "involving primarily a failure to disclose." 406 U.S. at 153; ECF 219, PAGEID 4767 ("The *Affiliated Ute* presumption likewise appears appropriate because the Court has found that Defendants made omissions of material fact."). In such cases, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54. Instead, "[a]ll that is necessary [to invoke a classwide presumption of reliance] is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [his] decision." *Id.* at 131. But, as discussed above, Plaintiffs need not prove materiality at the class certification stage. *Amgen*, 568 U.S. at 465; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281-

83 (2014) ("*Halliburton II*").  What Plaintiffs need to show to invoke *Affiliated Ute*'s presumption

of reliance at class certification is that Plaintiffs' claims primarily involve a failure to disclose.

They do.

Plaintiffs' §10(b) claims revolve around allegations that for years, the Exchange Act

Defendants engaged in a widespread, $60-million-dollar scheme to bribe Ohio's House Speaker,

the state's top energy regulator, and other public officials to pass favorable legislation, and that

they failed to disclose that scheme or the risks that the scheme posed to FirstEnergy.  *E.g.*, ¶¶93-

94.  As the Court previously determined, Plaintiffs have pled misstatement liability claims based

on numerous materially false statements that the Exchange Act Defendants made, including

statements that were made materially misleading by omission.  ¶¶95-142; *see also* ECF 219,

PAGEID 4737-39 (describing statements made misleading by omission of the alleged scheme).

Even the alleged misstatements that were made in the form of affirmative

misrepresentations can be properly characterized as primarily based on a failure to disclose since,

at bottom, their falsity was due to the concealed scheme.  For example, while the Exchange Act

Defendants made affirmative statements regarding their compliance with a code of conduct and

with relevant laws and regulations, they were false and misleading because, in view of the scheme

pled, those "'[a]spirational statements'" and "'[g]eneric statements of legal compliance'" were

"less than a full and fair disclosure of the facts actually known to the Company."  *See* ECF 219,

PAGEID 4736; *Cmty. Health*, 332 F.R.D. at 564, 576 (holding *Affiliated Ute* presumption of

reliance applied where claims were based on: (i) omissions failing to disclose that hospital

system's revenue growth resulted from improper practices that exposed it to Medicare fraud

enforcement action; and (ii) misrepresentations that hospital system complied with relevant

regulations and standards).  Thus, Plaintiffs' Rule 10b-5(b) claims are primarily based on a failure

to disclose, and so trigger the *Affiliated Ute* presumption of reliance.

With respect to the application of *Affiliated Ute* to Plaintiffs' Rule 10b-5(a) and (c) scheme liability claims, *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 289-90 (D. Minn. 2018), is instructive.  In *Medtronic*, the court was required to determine whether the plaintiffs' §10(b) scheme liability claims were primarily based on affirmative false statements or omissions in order to determine whether *Affiliated Ute* applied to the claims.  *Id.* at 288-89.  The plaintiffs alleged that Medtronic had engaged in a scheme to artificially inflate its revenues by paying the authors of medical journal articles to make false representations about the efficacy of certain MiMedx products.  *Id.*  The defendants argued that the *Affiliated Ute* presumption did not apply because plaintiffs had alleged that certain affirmative statements in the medical journals were false.  The court, however, reasoned that "[y]es, the authors made false statements within their articles.  But the relevant omission in this case is 'Medtronic's' own *quid pro quo* arrangements' with the authors of the journal articles," and so found that "the thrust of the scheme liability claim is omissions, not affirmative statements."  *Id.* at 289.[7]

As in *Medtronic,* the thrust of Plaintiffs' scheme liability claims are omissions throughout the Class Period: that Defendants were engaged in what was later revealed to be the largest corruption scheme Ohio had ever seen.  ¶¶64-94, 143-145.  The *Affiliated Ute* presumption therefore applies.

---

[7]    As this Court recognized in its Order on Defendants' motions to dismiss: "It is unsettled whether a plaintiff alleging both misrepresentations and omissions can engage the *Basic* and *Affiliated Ute* presumptions simultaneously."  ECF 219, PAGEID 4767 n.33.  While Plaintiffs assert that their claims are primarily based on omissions and *Affiliated Ute* provides a presumption of reliance as to all claims, to the extent the Court disagrees, Plaintiffs submit that the Court should follow the reasoning of *Burges v. Bancorpsouth*, *Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017), and apply *Basic* to the affirmative misstatements pled in the case and *Affiliated Ute* to the pled omissions and Plaintiffs' scheme liability claims.  *See also Cosby*, 2021 WL 1828114, at *7 (*Affiliated Ute* presumption applicable where both omissions and misrepresentations were alleged).

b.  **Plaintiffs are Entitled to *Basic*'s Presumption of Reliance**

In the alternative, Plaintiffs are also entitled to a fraud-on-the-market presumption of reliance. The fraud-on-the-market presumption is premised on the fact that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations" and that investors in such markets transact "in reliance on the integrity of that price." *Basic*, 485 U.S. at 246-47. Application of the fraud-on-the-market presumption dispenses with the requirement that each Class member prove individual reliance on Defendants' alleged misstatements or omissions. *Id.* at 241-42. The fraud-on-the-market presumption is available where, as here: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed (*i.e.*, during the Class Period); and (4) the stock traded in an efficient market. *Halliburton II*, 573 U.S. at 277-78.

First, during the Class Period, Defendants made material misrepresentations and omissions publicly, in earnings calls, media articles, and documents filed with the SEC. *E.g.*, ¶¶95-134. Second, although materiality must ultimately be proved at trial to invoke the *Basic* presumption, such "proof is not a prerequisite to class certification." *Amgen*, 568 U.S. at 459. Third, Plaintiffs purchased FirstEnergy Securities between the time when these material misrepresentations and omissions were made, *i.e.*, between February 21, 2017 and July 21, 2020 (the end of the Class Period). *See* ECF 33-4, PAGEID 779-84; ECF 72, PAGEID 1660-66. Finally, as shown below and in the accompanying Dalrymple and Jones Reports, the markets for FirstEnergy Securities were efficient at all relevant times.

(1)  **The *Cammer* Factors**

Courts in this Circuit and others rely principally on the five *Cammer* factors when assessing market efficiency. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *Freeman v.*

*Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990); *Willis v. Big Lots*, 2017 WL 1074048, at *4 (S.D. Ohio Mar. 17, 2017) ("*Big Lots II*") ("the *Cammer* factors . . . reflect the legal standard for market efficiency").  The *Cammer* factors examine whether: (1) there was large average weekly trading volume during the class period; (2) a significant number of securities analysts followed the company's stock during the class period; (3) the company's stock had market makers; (4) the company was entitled to file an S-3 registration statement; and (5) empirical facts showed a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the security price.  *Big Lots I*, 242 F. Supp. 3d at 654; *Cosby*, 2021 WL 1828114, at *2.  The *Cammer* factors are "'intended to be an analytical tool, not a checklist,'" and "no particular factor is essential to prove market efficiency."  *Cosby*, 2021 WL 1828114, at *2.

**FirstEnergy Securities Had a High Average Trading Volume**.  An average weekly trading volume in excess of 2% is widely recognized as a sign of an efficient market.  *Burns*, 967 F. Supp. 2d at 1149, 1161 (average weekly trading volume above 2% benchmark "warrants a strong presumption of an efficient market," while greater than 1% average "warrants a substantial presumption" (cleaned up)).  On average during the Class Period, the average weekly trading volume for FirstEnergy stock was  21.7 million shares, 4.4% of the shares outstanding, supporting a strong presumption of an efficient market for FirstEnergy common stock.  Dalrymple Rpt., ¶¶44-45.

FirstEnergy's common stock also traded on the highly liquid NYSE, which many courts, including the Sixth Circuit, have noted weighs in favor of market efficiency.  *See Freeman*, 915 F.2d at 199; *Burges*, 2017 WL 2772122, at *9 ("The Court finds that shares of the Bank's stock traded in an efficient market because they were traded on the NYSE."); *Big Lots I*, 242 F. Supp. 3d at 654 (courts regularly recognize that stocks traded on "national secondary markets such as the [NYSE] . . . are well suited for application of the fraud on the market theory"); *Ross*, 257

F.R.D. at 454 (stock's trading on NYSE supported applicability of fraud-on-the-market presumption).

Similarly, Notes were actively traded in over-the-counter markets. Jones Rpt., ¶¶20, 40-44. According to data collected and produced by FINRA, the Notes traded, on average, on 85.6% of the available trading days, which is significantly higher than the average for all corporate bonds. *Id.*, ¶41. The average weekly trading volume for the Notes ranged from 6.3 million Notes to 27.2 million Notes, and the average turnover for all of the Notes was 1.9% (with five of the Notes exceeding 2% turnover and only one Note below 1%). *Id.*, ¶¶43-44. *See also Burns*, 967 F. Supp. 2d at 1161 (1% to 2% weekly volume for nine bonds supported market efficiency); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 508 (D. Kan. 2014) (2.76% volume supported efficiency); *In re NII Holdings, Inc. Sec. Litig*, 311 F.R.D. 401, 410 (E.D. Va. 2015) (2.94% volume supported efficiency).

**A Substantial Number of Financial Analysts Closely Followed FirstEnergy**. Analysts facilitate the flow and digestion of information in the market. Dalrymple Rpt., ¶46; Jones Rpt., ¶47. In this case, approximately 20 analysts on average covered FirstEnergy during the Class Period, collectively publishing more than 400 reports on FirstEnergy. Dalrymple Rpt., ¶47; Jones Rpt., ¶46. In addition, all three of the major ratings agencies rated Notes during the Class Period. Jones Rpt., ¶48. These facts support a finding of market efficiency. *Burns*, 967 F. Supp. 2d at 1162 (coverage of 15 analysts with reports mostly about stock relevant to debt securities because the information "help[s] investors evaluate the riskiness" of the debt securities, as does rating agency coverage); *Winstar*, 290 F.R.D. at 446 (analyst coverage of the company as a whole was instructive to finding efficiency for both bonds and stock).

**Numerous Market Makers and Arbitrageurs Support a Finding of Efficiency**. FirstEnergy stock was traded on the NYSE, and so had access to a highly developed network of

brokers and an NYSE "Designated Market Maker." Dalrymple Rpt., ¶¶53-54; *Big Lots I*, 242 F. Supp. 3d at 654 ("Transactions on the NYSE . . . go through a designated market maker . . . which has been found to satisfy this factor."). Moreover, at least 11 market makers – financial intermediaries who trade in a company's stock, allowing investors to trade in a timely fashion and with reasonable transaction costs – made a market for FirstEnergy stock over the course of the Class Period. Dalrymple Rpt., ¶53; *Big Lots I*, 242 F. Supp. 3d at 654 (presence of 12 supplemental market makers in addition to NYSE designated market maker evidence of efficiency); *Wilkof v. Caraco Pharm. Labs., Ltd.*, 280 F.R.D. 332, 344 (E.D. Mich. 2012) (presence of more than ten market makers for company's stock justified "'substantial presumption'" that the market was efficient). The Notes also benefited from at least 16 underwriters and underwriter representatives – including major institutions, such as Barclays Capital Inc., BofA Securities, Inc., J.P. Morgan Securities LLC and Citigroup Global Markets Inc. – who served as market makers for the Notes and, based on FINRA data, the number of unique dealers for the Notes (the functional equivalent of market makers for corporate debt securities) ranged from 41 to 94. Jones Rpt., ¶52. The significant number of market makers and dealers contributes to a finding of efficiency in both FirstEnergy's stock and debt markets. *Burns*, 967 F. Supp. 2d at 1150 (finding *Cammer* factor satisfied with 2 to 15 underwriters per bond and large number of market makers trading in the bonds).

**FirstEnergy was Eligible to File S-3 Registration Statements**. Courts also consider eligibility to file a Form S-3 registration statement in assessing market efficiency. *Cammer*, 711 F. Supp. at 1284. "Given the likelihood that firms filing S-3 forms are actively traded and widely followed, courts consider this factor 'extremely important in market efficiency determinations.'" *Burns*, 967 F. Supp. 2d at 1163. FirstEnergy met the float and other requirements for Form S-3 registration throughout the Class Period, providing additional evidence of an efficient market for

the FirstEnergy Securities. Dalrymple Rpt., ¶¶60-63; Jones Rpt., ¶¶54-57; *Big Lots I*, 242 F. Supp. 3d at 654-55 (continuous S-3 eligibility through class period supported finding of efficient market).

**FirstEnergy Securities Reacted to New, Company-Specific Information**. The fifth *Cammer* factor focuses on whether the FirstEnergy Securities responded to new, Company-specific information. *Cammer*, 711 F. Supp. at 1287. To test whether FirstEnergy Securities responded to new information, Plaintiffs' experts performed event studies for FirstEnergy common stock and the Notes. Dalrymple Rpt., ¶¶64-82; Jones Rpt., ¶¶84-99. An event study is "'a generally accepted technique for measuring how a security's price reacts to new, unexpected information about the issuing company.'" *Big Lots II*, 2017 WL 1074048, at *4 n.4; *see also Halliburton II*, 573 U.S. at 280 (event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events"); *Burns*, 967 F. Supp. 2d at 1156-60 (detailing how event study supported bond market's efficiency). As detailed in Plaintiffs' experts' reports, the event studies conducted identified a cause-and-effect relationship between the release of new, FirstEnergy-specific information and the movement in FirstEnergy Securities price, as well as trading volume. Dalrymple Rpt., ¶¶79-82; Jones Rpt., ¶¶97-99.

### (2) The *Krogman* Factors

Courts have also considered the *Krogman* factors in analyzing market efficiency, which include: (1) the company's market capitalization; (2) the security's bid-ask spread; and (3) the security's float. *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001); *Freeman*, 915 F.2d at 199. Each of these factors also supports a finding that the markets for FirstEnergy Securities were efficient throughout the Class Period.

**FirstEnergy Had an Extremely Large Market Capitalization**. Market capitalization is an indicator of market efficiency because investors have greater incentive to invest in more highly

capitalized corporations, and such companies tend to be more well-known and closely followed. *Krogman*, 202 F.R.D. at 478. FirstEnergy's common stock market capitalization ranged from $12.5 billion to $28.3 billion, and exceeded $12 billion on every day of the Class Period, making it larger than at least 80% of all companies trading on the NYSE and Nasdaq markets during Class Period and – greatly exceeding the market capitalization found by other courts to support market efficiency. Dalrymple Rpt., ¶85; Jones Rpt., ¶¶58-59. *See, e.g.*, *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2012 WL 1071281, at *32 (M.D. Tenn. Mar. 29, 2012) (market capitalization between $600 million and $1.2 billion evidence of efficiency); *Esperion II*, 2020 WL 6793326, at *4 (average market capitalization of $1.08 billion evidence of efficiency).

For the Notes, the total outstanding par value was $6.5 billion – which alone was larger than the total market capitalization of at least 60% of all companies trading on the NYSE and Nasdaq markets during the Class Period. *See* Jones Rpt., ¶59. This far exceeds the outstanding par values of bonds that courts have found to be trading in efficient markets. *See, e.g.*, *Winstar*, 290 F.R.D. at 449 (total par value of $1.88 billion in bonds outstanding); *NII Holdings*, 311 F.R.D. at 412 (total par value of $1.45 billion in bonds outstanding).

**There Was a Narrow Bid-Ask Spread for FirstEnergy Securities**. The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares, with a low bid-ask spread indicating a more efficient market. *See Krogman*, 202 F.R.D. at 478 (identifying bid-ask spread of 5.6% as high). FirstEnergy's common stock had a narrow bid-ask spread, averaging 0.03% during the Class Period. Dalrymple Rpt., ¶89. Similarly, the bid-ask spread for the FirstEnergy Notes was only 0.23% to 0.51%. Jones Rpt., ¶¶68-79. *See Cosby v. KPMG, LLP*, 2020 WL 3548379, at *19 (E.D. Tenn. June 29, 2020) (average bid-ask spread of 0.1535% and 1.7477% supported a finding of efficiency); *Esperion II*,

2020 WL 6793326, at *4 (bid-ask spread between 0.22% and 0.29% supported a finding of efficiency).

**High Percentage of Market Float Supports Market Efficiency**. A security's "float" is the number of shares or units outstanding, excluding shares or units held by insiders and affiliated corporate entities. A higher float indicates greater market efficiency. *See Krogman*, 202 F.R.D. at 478. During the Class Period, the average float of FirstEnergy's common stock was over 99% of shares outstanding. Dalrymple Rpt., ¶85. This factor is less relevant to the Notes, as corporate bonds are almost always held by outsiders. But, as Plaintiffs' expert identifies, the Notes were widely held by a large number of sophisticated investors which supports a finding of efficiency. Jones Rpt., ¶¶62-65. *See, e.g.*, *Cmty. Health*, 332 F.R.D. at 576 (97.5% float supported market efficiency); *Esperion II*, 2020 WL 6793326, at *4 (97% float suggested efficient market).[8]

### 2. A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Courts consistently recognize that a class action is superior to other available methods for the fair and efficient resolution of securities class actions. *See, e.g.*, *Ross*, 257 F.R.D. at 455 ("'It is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions.'"); *Esperion I*, 2020 WL 3481322, at *9 ("In a securities fraud case involving nationally traded stock, where there are numerous individual potential plaintiffs, and where each individual's recovery might be relatively small, a class action is the preferred litigation model."). Under Rule 23(b)(3), consideration of the following factors determines whether the "superiority" requirement is met: (1) the class members' interests in individually controlling the prosecution of

---

[8] In addition to the *Cammer* factors and *Krogman* factors, courts occasionally consider the presence of autocorrelation (whether historic price returns are predictors of future price returns) and whether there are significant constraints to short selling in assessing the efficiency of the market for common stock (although not typically for corporate bonds). Plaintiff's expert did not identify any unique autocorrelation or constraints to short selling that would indicate the market for FirstEnergy common stock was not efficient. Dalrymple Rpt., ¶¶93-95.

separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (4) the likely difficulties in managing a class action.  Here, each factor weighs strongly in favor of class certification.

First, for the vast majority of class members, their interests in individually prosecuting separate actions is minimal, as the trouble and expense of doing so would be prohibitive when weighed against the potential recoveries.  Second, the maintenance of a class action in this District ensures an efficient expenditure of resources and consistent rulings on the Class's claims.  Third, this District is a desirable forum for this class action: individual Class members are most likely located in geographically dispersed areas, FirstEnergy conducts business in this District, and other civil and criminal litigation relating to Defendants' alleged misconduct is also being conducted in this District, including in front of this Court.[9]  *See Big Lots I*, 242 F. Supp. 3d at 659 (noting desirability of concentrating securities fraud litigation before court handling related shareholder derivative suit).  Finally, Plaintiffs do not foresee any management difficulties that preclude this action from proceeding as a class action.  Indeed, Plaintiffs have already efficiently undertaken extensive document discovery and motion briefing – further indicting that a class action is the most efficient method for litigating the Class's claims.  In sum, certification of this action as a class action would not only be superior to other available methods in accordance with Rule 23(b)(3), it appears to be the sole method for fairly and efficiently litigating Class members' claims.

---

[9]    *See Smith v. FirstEnergy Corp.*, No. 2:20-cv-03755 (S.D. Ohio); *United States v. Borges*, No. 1:20-mj-00526 (S.D. Ohio); *United States v. FirstEnergy Corp.*, No. 1:21-cr-00086 (S.D. Ohio); *Emps.' Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-04813 (S.D. Ohio).

- 27 -

### C. The Court Should Appoint Plaintiffs' Choice of Counsel as Class Counsel Under Rule 23(g)

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Plaintiffs respectfully request that the Court appoint its chosen Lead Counsel, Robbins Geller, as Class Counsel and Murray Murphy as Liaison Counsel.  In appointing class counsel under Rule 23(g), the Court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's relevant experience and knowledge of applicable law; and (iii) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).  The Court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.  *See id.*

As previously mentioned, Robbins Geller is well-qualified to prosecute this case on behalf of Plaintiffs and the Class, and have already undertaken a vigorous prosecution of this action, including conducting an extensive investigation of the claims, defeating Defendants' motions to dismiss, and diligently pursuing discovery.  Further, Lead Counsel's substantial experience and respective knowledge of applicable law are evidenced by the fact that they have either served or are serving as lead counsel in many significant securities class actions, including several of the largest recoveries in the Sixth Circuit.  *See* Ex. G; *see also Cardinal Health*, 528 F. Supp. 2d at 768; *HCA*, No. 3:11-cv-01033, ECF 565 (M.D. Tenn. Apr. 14, 2016); *Psychiatric Sols.*, No. 3:09-cv-00882, ECF 468 (M.D. Tenn. Jan. 16, 2015).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted, LACERA, Amalgamated Bank, SBP, and Wisconsin Laborers should be appointed Class

Representatives, Robbins Geller should be appointed Class Counsel, and Murray Murphy should be appointed Liaison Counsel.

DATED: June 6, 2022

Respectfully submitted,

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney
(0063373)

*s/ Joseph F. Murray*
JOSEPH F. MURRAY

1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
HILLARY B. STAKEM (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
hstakem@rgrdlaw.com

Lead Counsel for Lead Plaintiff Los Angeles
County Employees Retirement Association and
Plaintiffs Amalgamated Bank, City of Irving
Supplemental Benefit Plan, and Wisconsin
Laborers' Pension Fund

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 6, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ JOSEPH F. MURRAY
JOSEPH F. MURRAY

1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)

Email: murray@mmmb.com

- 1 -

# Mailing Information for a Case 2:20-cv-03785-ALM-KAJ Owens v. FirstEnergy Corp. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X. Jay Alvarez**
  jaya@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James Edward Arnold**
  jarnold@arnlaw.com,7489829420@filings.docketbird.com,tashby@arnlaw.com,ablosser@arnlaw.com

- **David L. Axelrod**
  axelrodd@ballardspahr.com,mangiaracinaj@ballardspahr.com

- **Daniel E. Barenbaum**
  dbarenbaum@bermantabacco.com,sfservice@bermantabacco.com

- **Jordan M. Baumann**
  jbaumann@jonesday.com

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **David S Bloomfield , Jr**
  dbloomfield@porterwright.com,mruyf@porterwright.com

- **Joseph Michael Brunner**
  jmbrunner@vorys.com,tlschwarz@vorys.com

- **Preston Burton**
  pburton@buckleyfirm.com,lschwartz@buckleyfirm.com

- **Veronica E. Callahan**
  veronica.callahan@arnoldporter.com,edocketscalendaring@arnoldporter.com,veronica-callahan-1417@ecf.pacerpro.com,maosdoh@arnoldporter.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com,mlydon@rgrdlaw.com,e_file_sd@rgrdlaw.com,kjohnson@rgrdlaw.com

- **Desiree Cummings**
  dcummings@rgrdlaw.com

- **James Rubin Cummins**
  jcummins@cumminslaw.us,hpoindexter@cumminslaw.us,docket@cumminslaw.us

- **Lisa S Del Grosso**
  ldelgrosso@brouse.com,sslabaugh@brouse.com

- **Marjorie P Duffy**
  mpduffy@jonesday.com,rfargabrite@jonesday.com,erector@jonesday.com

- **Jeremy Steven Dunnaback**
  jdunnaback@bakerlaw.com,jlazanich@bakerlaw.com

- **John C Fairweather**
  jcf@brouse.com,sgibson@brouse.com

- **John A Favret , III**
  jfavret@tuckerellis.com,darlene.hudeck@tuckerellis.com,Chelsea.croy@tuckerellis.com

- **Robert Stephen Faxon**
  rfaxon@jonesday.com

- **Jason A. Forge**
  JForge@rgrdlaw.com

- **Gerhardt A Gosnell , II**
  ggosnell@arnlaw.com,1524359420@filings.docketbird.com,tashby@arnlaw.com

- **Steven Grimes**
  SGrimes@winston.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com,ckopko@rgrdlaw.com

- **Andrew Paul Guran**
  apguran@vorys.com,ramurphy@vorys.com

- **Zheng (Jane) He**
  Jane.He@arnoldporter.com

- **Paul Helms**
  phelms@mwe.com

- **Kelsey Hughes-Blaum**
  khughesblaum@taftlaw.com

- **Robert K. Hur**
  rhur@gibsondunn.com

- **Steve Michael Jodlowski**
  sjodlowski@rgrdlaw.com,E_File_SD@rgrdlaw.com,SusanM@rgrdlaw.com

- **C. Chad Johnson**
  chadj@rgrdlaw.com

- **Daniel Richard Karon**
  dkaron@karonllc.com,cgood@karonllc.com,bhollowell@karonllc.com

- **Timothy D. Katsiff**
  katsifft@ballardspahr.com

- **Ashley M. Kelly**
  akelly@rgrdlaw.com,E_File_SD@rgrdlaw.com,AKellyRGRD@ecf.courtdrive.com

- **Michael L. Kichline**
  michael.kichline@morganlewis.com

- **Eric Kim**
  eric.kim@davispolk.com

- **Nicole Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com

- **Corey Anthony Lee**
  calee@jonesday.com

- **Albert Grant Lin**
  alin@bakerlaw.com,phubbard@bakerlaw.com

- **Ting H. Liu**
  tliu@rgrdlaw.com

- **Douglas M Mansfield**
  dmansfield@lmng-law.com

- **John F McCaffrey**
  John.McCaffrey@tuckerellis.com,christen.wilk@tuckerellis.com

- **Laura Hughes McNally**
  laura.mcnally@morganlewis.com,carole.griffin@morganlewis.com

- **Francisco J Mejia**
  FMejia@rgrdlaw.com

- **Jason R. Meltzer**
  jmeltzer@gibsondunn.com

- **Jason J Mendro**
  JMendro@gibsondunn.com

- **Adam B. Miller**
  amiller@buckleyfirm.com,testad@buckleyfirm.com,autodocket@buckleyfirm.com,docket@buckleyfirm.com

- **Aaron F. Miner**
  aaron.miner@arnoldporter.com

- **Jonathan P. Misny**
  misny@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,misny@ecf.courtdrive.com

- **David W Mitchell**
  davidm@rgrdlaw.com,slandry@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **John R Mitchell**
  jmitchell@taftlaw.com,LUdovicic@taftlaw.com,ewerner@taftlaw.com,CLE_Docket_Assist@taftlaw.com

- **Thomas N Mitchell**
  mpduffy@jonesday.com

- **Geoffrey J Moul**
  moul@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,moul@ecf.courtdrive.com

- **Bree Murphy**
  bmurphy@buckleyfirm.com,wbusch@buckleyfirm.com

- **Brian K Murphy**
  murphy@mmmb.com,tiffany@mmmb.com,murphy@ecf.courtdrive.com,tiffany@ecf.courtdrive.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,murray@ecf.courtdrive.com

- **Danielle S. Myers**
  DMyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brian Patrick O'Connor**
  bpo@santen-hughes.com,sla@santen-hughes.com

- **Lucas Freeman Olts**
  lolts@rgrdlaw.com,E_File_SD@rgrdlaw.com,lolts@ecf.courtdrive.com

- **Steven Wayne Pepich**
  stevep@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Daniel J. Pfefferbaum**
  dpfefferbaum@rgrdlaw.com

- **Sara B. Polychron**
  spolychron@rgrdlaw.com

- **Carole Schwartz Rendon**
  crendon@bakerlaw.com

- **Geoffrey J. Ritts**
  gjritts@jonesday.com

- **Darren J Robbins**
  tedp@rgrdlaw.com

- **William Scherman**
  wscherman@gibsondunn.com

- **Steven S. Scholes**
  sscholes@mwe.com

- **Kevin Shen Sciarani**
  ksciarani@rgrdlaw.com,KSciarani@ecf.courtdrive.com,E_File_SD@rgrdlaw.com,tdevries@rgrdlaw.com

- **Victoria Lynn Serrani**
  vlserrani@bmdllc.com

- **Joshua N. Shinbrot**
  joshua.shinbrot@davispolk.com

- **Jessica Tally Shinnefield**
  jshinnefield@rgrdlaw.com,E_File_SD@rgrdlaw.com,ChristC@rgrdlaw.com,JShinnefield@ecf.courtdrive.com

- **Douglas L. Shively**
  dshively@bakerlaw.com

- **Hannah M. Smith**
  hannah.smith@tuckerellis.com,christen.wilk@tuckerellis.com

- **Mark Soloman**
  marks@rgrdlaw.com

- **Stephen G Sozio**
  sgsozio@jonesday.com

- **Hillary Bryn Stakem**
  hstakem@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **George A. Stamboulidis**
  gstamboulidis@bakerlaw.com

- **Joseph J. Tabacco, Jr.**
  jtabacco@bermantabacco.com

- **Jeremy R Teaberry**
  teaberryj@ballardspahr.com

- **Robert Ward Trafford**
  rtrafford@porterwright.com,tmagley@porterwright.com

- **Emilia McKee Vassallo**
  mckeevassalloe@ballardspahr.com

- **Robert J. Wagoner**
  bob@dwslaw.com,bob@wagonerlawoffice.com

- **Victor A Walton , Jr**
  vawalton@vorys.com,kjwooldridge@vorys.com

- **Daniel Rubin Warren**
  dwarren@bakerlaw.com

- **Lesley Weaver**
  lweaver@bfalaw.com

- **Dan K Webb**
  dwebb@winston.com

- **Brian S. Weinstein**
  brian.weinstein@davispolk.com

- **Brittany Marie Wilson**
  wilsonbm@ballardspahr.com

- **Jill Winter**
  jwinter@buckleyfirm.com,wbusch@buckleyfirm.com

- **Michael J. Zbiegien , Jr**
  mzbiegien@taftlaw.com,aoverly@taftlaw.com,cle_docket_assist@taftlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)