# Exhibit C

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4     IN RE:  FIRSTENERGY CORP.       CIVIL ACTION NO.

            SECURITIES LITIGATION     2:20-CV-3785

5

6

      THIS DOCUMENT RELATES TO:

7     ALL ACTIONS.

8

               _____

9

10

                      CONFIDENTIAL

11              UNDER THE PROTECTIVE ORDER

           VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

12          DEPOSITION OF CYNTHIA JONES, CFA

13

14             TUESDAY, JULY 19, 2022

                  10:09 A.M. EDT

15

16

               TAKEN VIA VIDEOCONFERENCE

17                WITNESS LOCATION:

                SHREWSBURY, NEW JERSEY

18

19

20      REPORTER:  PAMELA S. GREENFIELD, CRR, RDR

21

22    JOB NO.  5297712

23

24

25

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 2

```
1         IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4
5   IN RE:  FIRSTENERGY CORP      CIVIL ACTION NO
        SECURITIES LITIGATION    2:20-CV-3785
6
7
        THIS DOCUMENT RELATES TO:
8   ALL ACTIONS
9
10              -  -  -  -
11   CONFIDENTIAL UNDER THE PROTECTIVE ORDER, VIRTUAL
12   VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
13   CYNTHIA JONES, CFA, TAKEN PURSUANT TO THE
14   STIPULATIONS OF COUNSEL THEREOF, REMOTELY
15   TESTIFYING FROM SHREWSBURY, NEW JERSEY, ON
16   TUESDAY, JULY 19, 2022, BEGINNING AT 10:09 A M ,
17   EASTERN DAYLIGHT TIME, AND ADJOURNING AT 4:48
18   P M , BEFORE PAMELA S  GREENFIELD, CRR, RDR
19
20
21
22
23
24
25
```

Page 3

```
1   REMOTE APPEARANCES OF COUNSEL:
2   For Plaintiffs Los Angeles County Employees
        Retirement Association:
3
        ROBBINS GELLER RUDMAN & DOWD LLP
4       BY:  TOR GRONBORG, ESQ
        BY:  HILLARY STAKEM, ESQ
5       BY:  ANDREW W HUTTON, ESQ
        BY:  LUCAS OLTS, ESQ
6       655 West Broadway
        San Diego, California 92101
7       tgronborg@rgrdlaw.com
        hstakem@rgrdlaw.com
8       ahutton@rgrdlaw.com
        lolts@rgrdlaw.com
9       -and-
        MURRAY MURPHY MOUL + BASIL LLP
10      BY:  JOSEPH F MURRAY, ESQ
        BY:  JIMMY STALEY, ESQ
11      1114 Dublin Road
        Columbus, Ohio 43215
12      murray@mmmb.com
        staley@mmmb.com
13
14
        For Defendants FirstEnergy Corp ; Steven Strah;
15      K Jon Taylor; Jason J  Lisowski; George M
        Smart; Paul T  Addison; Michael J  Anderson;
16      Steven J  Demetriou; Julia L  Johnson; Donald T
        Misheff; Thomas N  Mitchell; James F  O'Neil III;
17      Christopher D  Pappas; Sandra Pianalto; Luis A
        Reyes; Jerry Sue Thornton and Leslie M  Turner:
18
        JONES DAY
19      BY:  GEOFFREY J  RITTS, ESQ
        BY:  M  RYAN HARMANIS, ESQ
20      901 Lakeside Avenue
        Cleveland, Ohio 44114
21      gjritts@jonesday.com
        rharmanis@jonesday.com
22
23
24
25
```

Page 4

```
1   REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)
2   For Defendant Michael Dowling:
3
        TUCKER ELLIS LLP
4       BY:  JOHN A  FAVRET, III, ESQ
        950 Main Avenue, Suite 1100
5       Cleveland, Ohio 44113
        john favret@tuckerellis.com
6
7   For Defendant Charles E  Jones:
8       BAKER & HOSTETLER
        BY:  TAYLOR A  THOMPSON, ESQ
9       BY:  XAVIER THOMAS-HUGHES,ESQ
        Key Tower Suite 2000
10      127 Public Square
        Cleveland, Ohio 44114
11      tathompson@bakerlaw.com
        xthomashughes@bakerlaw.com
12      -and-
        GIBSON, DUNN & CRUTCHER LLP
13      BY:  JASON MELTZER, ESQ
        1050 Connecticut Ave, N W
14      Washington, D C  20036
        jmeltzer@gibsondunn.com
15
16  For Defendant Donald Schneider:
17      BUCKLEY LLP
        BY:  JILL WINTER, ESQ
18      2001 M Street N W , Suite 500
        Washington, D C  20036
19      jwinter@buckleyfirm.com
20
        For Defendant John Judge:
21
        VORYS, SATER, SEYMOUR AND PEASE LLP
22      BY:  ANDREW P  GURAN, ESQ
        BY:  VICTOR A  WALTON, ESQ
23      50 S  Main Street, Suite 1200
        Akron, Ohio 44308
24      apguran@vorys.com
        vwalton@vorys.com
25
```

Page 5

```
1   REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)
2   For Defendant Leila Vespoli:
3       ARNOLD & PORTER
        BY:  AARON F  MINER, ESQ
4       BY:  ANDREW JOHNSON, ESQ
        250 West 55th Street
5       New York, New York 10019-9710
        aaron miner@arnoldporter.com
6       andrew johnson@arnoldporter.com
7
        For Defendant James Pearson:
8
        BALLARD SPAHR LLP
9       BY:  TIMOTHY D  KATSIFF, ESQ
        BY:  EMILIA MCKEE-VASSALLO, ESQ
10      1735 Market Street, 51st Floor
        Philadelphia, Pennsylvania 19103
11      katsifft@ballardspahr.com
        mckeevassalloe@ballardspahr.com
12
13  For Defendant Dennis Chack:
14      MORGAN, LEWIS & BOCKIUS LLP
        BY:  KAREN POHLMANN, ESQ
15      1701 Market Street
        Philadelphia, Pennsylvania 19103
16      kpohlmann@morganlewis.com
17  For Defendant Ty Pine:
18      TAFT STETTINIUS & HOLLISTER, LLP
        BY:  MICHAEL ZBIEGIEN, ESQ
19      200 Public Square, Suite 3500
        Cleveland, Ohio 44118
20      mzbiegein@taftlaw.com
21  For Underwriter Defendants:
22      DAVIS POLK & WARDWELL LLP
        BY:  ERIC M  KIM, ESQ
23      BY:  JOSHUA N  SHINBROT, ESQ
        450 Lexington Avenue
24      New York, New York 10017
        eric kim@davispolk.com
25      joshua shinbrot@davispolk.com
```

2 (Pages 2 - 5)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 6

1  REMOTE APPEARANCES OF COUNSEL: (CONTINUED)
2  For Defendant Robert Reffner:
3      MCDERMOTT WILL & EMERY LLP
       BY: PAUL HELMS, ESQ.
4      444 West Lake Street, Suite 4000
       Chicago, Illinois 60606
5      phelms@mwe.com
6
7  ALSO PRESENT:
8      Michael Koslen, Esq., FirstEnergy
       Peter Hudson, Videographer
9      Karen Patterson, Veritext
       Steve Hager, Veritext
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          W I T N E S S   I N D E X
2                              PAGE
3  CROSS-EXAMINATION
   CYNTHIA JONES, CFA
4  BY MR. RITTS              8
5  CONTINUED CROSS-EXAMINATION
   CYNTHIA JONES, CFA
6  BY MR. RITTS              115
7
          E X H I B I T   I N D E X
8
   EXHIBIT                  PAGE
9
   Exhibit FE 1, Jones report      10
10
   Exhibit FE 2, Jones Exhibit 8
11 spreadsheet                99
12 Exhibit FE 3, Complaint       157
13 Exhibit FE 4, Jones AK3 spreadsheet  190
14 Exhibit FE 5, Jones AL1 spreadsheet  194
15
16
17
18
19
20
21
22
23
24
25

Page 8

1
2      THE VIDEOGRAPHER: We are on the
3  record at 10:01 a.m. Eastern Daylight Time
4  on July 19th, 2022 beginning the remote
5  video-recorded deposition of Cynthia Jones
6  taken in the matter of In Re: FirstEnergy
7  Corp. Securities Litigation in the United
8  States District Court for the Southern
9  District of Ohio, Eastern Division, Case
10 Number 2:20-CV-03785. All parties present
11 and appearing this morning will be
12 reflected on the stenographic record. The
13 court reporter will swear the witness and
14 you may then proceed.
15     CYNTHIA JONES, CFA, of lawful age, being by
16 me first duly sworn, as hereinafter certified,
17 deposed and said as follows:
18     CROSS-EXAMINATION OF CYNTHIA JONES, CFA
19 BY MR. RITTS:
20 Q. Good morning, Ms. Jones, let me introduce myself.
21 My name's Geoffrey Ritts. I represent Defendant
22 FirstEnergy Corp. in this case along with a
23 collection of individual defendants.
24     Would you please state your name and address
25 for the record.

Page 9

1  A. ███████████████████████████████████████
2  ███████████████████████████████████████
3  Q. Do you understand that the testimony you'll be
4     giving today is under oath?
5  A. I do.
6  Q. You understand that you have a legal obligation
7     to give accurate and complete testimony today?
8  A. I do.
9  Q. Is there anything preventing you from giving
10    accurate and complete testimony today?
11 A. No.
12 Q. Where are you located this morning?
13 A. I'm located in my office in Shrewsbury, New
14    Jersey.
15 Q. What devices do you have in the room with you?
16 A. I have my laptop. I have a landline telephone.
17 Q. Do you have a cell phone in the room with you?
18 A. I do not.
19 Q. Do you have any documents, notes or other papers
20    relating to the case with you?
21 A. I have one document which is my expert report and
22    it was recently printed this morning so it has no
23    notes or comments or anything on it.
24 Q. Do you have anything else with you to help you
25    testify today?

3 (Pages 6 - 9)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 10

1  A. I do not.
2  Q. Is anybody in the room with you?
3  A. No.
4         MR. RITTS: Could we go off the
5     record, court reporter?
6         THE VIDEOGRAPHER: We're off the
7     record at 10:04 a.m.
8         - - - -
9     (Thereupon, a recess was had.)
10        - - - -
11        THE VIDEOGRAPHER: We are back on
12    the record at 10:11 a.m.
13        - - - -
14    (Thereupon, Exhibit FE 1, Jones report, was
15    marked for purposes of identification.)
16        - - - -
17 Q. Ms. Jones, I'm having placed in front of you a
18    document that has been marked for identification
19    purposes as Exhibit 1. If you refresh your
20    Exhibit folder, you should see that document.
21 A. I'm looking for the exhibits folder.
22        MR. GRONBORG: Geoff, as she's
23    doing that, did we -- are you planning to
24    start with Defendants' Exhibit 1 and
25    Plaintiffs' Exhibit 1? I assume you used

Page 11

1     Exhibit 1 at the last deposition.
2         MR. RITTS: It's marked FE 1 and
3     it has the witness's name on the sticker so
4     it's distinct.
5  A. I'm having trouble finding the exhibits folder.
6         MS. PATTERSON: Ms. Jones, did
7     you open up your Egnyte Exhibit Share
8     account?
9  A. I did.
10        MR. RITTS: Why don't we go off
11    the record while she does this.
12        THE VIDEOGRAPHER: We're off the
13    record at 10:12 a.m.
14        - - - -
15    (Off the record.)
16        - - - -
17        THE VIDEOGRAPHER: We are back on
18    the record at 10:15 a.m.
19 Q. Ms. Jones, I've placed in front of you a document
20    that's been marked for identification purposes as
21    Exhibit FE 1. Is that a copy of your report in
22    this matter?
23 A. It is.
24 Q. If you look at the page numbered 48 in the lower
25    right-hand corner of the document, would you tell

Page 12

1     me if that's your signature?
2  A. Yes, it is.
3  Q. Is Exhibit FE 1 include all of the exhibits and
4     appendices to your report?
5  A. Yes, it does.
6  Q. Does this report contain a complete statement of
7     all of your opinions you formed in this matter?
8  A. Yes, it does.
9  Q. Does the report accurately describe all of the
10    work that you've done on this case?
11 A. Yes, it does.
12 Q. Are there any other opinions that you intend to
13    offer in this case that you have not included in
14    this report?
15 A. Not as I sit here today.
16 Q. Have you been asked to do any other work besides
17    developing the opinions that are set forth in
18    your report?
19 A. I have not.
20 Q. Are all of the bases for your opinions set forth
21    in your report?
22 A. I believe so.
23 Q. Does the report disclose all facts and data that
24    you considered in forming your opinion?
25 A. I believe it does.

Page 13

1  Q. Did anybody help you with your report?
2  A. Yes.
3  Q. Who?
4  A. Several staff members here at DLA assisted me
5     with some of the calculations and data
6     manipulation.
7  Q. Who are those people?
8  A. Scott Semaya. That's S-E-M-A-Y-A. Joshua
9     Shapiro and Andrew Kyriacou.
10 Q. What did each of them do?
11        MR. GRONBORG: Object to form.
12 A. Each of them had different tasks but Andrew, for
13    example, was asked to pull some research for me,
14    news articles. He may have been asked to pull
15    some data for me.
16    Scott and Joshua would have been asked to do
17    some data manipulation. For example a cleansing
18    procedure with the FINRA TRACE data and they
19    would have been asked to do some calculations and
20    also check some calculations.
21 Q. What are the qualifications of each of those
22    people to work on this report?
23        MR. GRONBORG: Object to form.
24 A. So Scott Semaya has a degree in accounting and
25    finance from University of Miami. He also has an

4 (Pages 10 - 13)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 14

1 MBA from Baruch College. Joshua Shapiro has a,
2 was a double majored in accounting and finance.
3 He graduated from the University of Maryland and
4 Andrew Kyriacou has an undergraduate degree in
5 accounting and he's got a Master's in accounting
6 and I believe that's from Loyola University.
7 Q. When were you engaged to offer expert opinions in
8 support of class certification here?
9 A. I believe it was in March of this year.
10 Q. Who engaged you?
11 A. The Robbins Geller firm.
12 Q. A particular person?
13 A. Tor Gronborg.
14 Q. Do you have an engagement letter?
15 A. I believe we do.
16 Q. What are the terms of your engagement?
17 A. Can you be more specific?
18 Q. Sure. What are the terms by which you or your
19 firm will be compensated for the work on this
20 engagement?
21 A. I believe they're set forth in my report and
22 there's a range of hourly rates for DLA staff
23 members and there's an hourly rate set forth for
24 my time as well.
25 Q. How many hours did you spend preparing your

Page 15

1 report?
2 A. From beginning to end including calculations,
3 research or just in writing the report?
4 Q. All in.
5 A. I don't know precisely but if I had to guess, I
6 would say somewhere between maybe 50 and 100
7 hours.
8 Q. And how many hours did your team spend working on
9 your report?
10 A. Probably combined maybe 20, 20 hours.
11 Q. How many hours have you worked on this case so
12 far since you were first engaged?
13 A. I don't know.
14 Q. Is your compensation or your firm's compensation
15 in this case contingent in any way?
16 A. It is not.
17 Q. Will it vary at all depending on the outcome of
18 the class certification motion or the outcome of
19 the case?
20 A. No, sir.
21 Q. You're a senior manager at DLA LLC; is that
22 correct?
23 A. Yes.
24 Q. You're part of the forensics valuation and
25 litigation services group?

Page 16

1 A. I am.
2 Q. What is DLA?
3 A. DLA is an accounting and corporate advisory firm.
4 Q. Who owns DLA?
5 A. David Landau.
6 Q. How many employees does DLA have?
7 A. Approximately 100.
8 Q. Are you an employee?
9 A. Yes.
10 Q. Where is DLA located?
11 A. DLA has several physical offices. Headquarters
12 are in Fairfield, New Jersey. We have an office
13 here in Shrewsbury, New Jersey. We have an
14 office in Boston, Massachusetts and we have some
15 employees that work remotely who are located in a
16 number of states.
17 Q. Where do you work?
18 A. My office is in Shrewsbury, New Jersey.
19 Q. What does it mean that you're a senior manager?
20 A. What does the title mean?
21 Q. Yes.
22 A. I'm not certain how to answer that.
23 I can tell you my, what my responsibilities
24 are.
25 Q. Okay.

Page 17

1 A. So we have a group of approximately 15 in the
2 FVLS group and we have some associates who, you
3 know, work on projects with us. They would be at
4 a more junior level and then we also have a
5 managing director and a partner and I would be
6 below the managing director.
7 Q. Do people report to you?
8 A. Yes.
9 Q. Who reports to you? How many people?
10 A. Approximately eight but some of those folks are
11 shared and some are paraprofessionals, not
12 necessarily research assistants.
13 Q. Who do you report to?
14 A. I report to the partner in charge of the FVLS
15 group who is Kevin Baldwin.
16 Q. Did Mr. Baldwin have any involvement with your
17 work on this engagement?
18 A. He did not.
19 Q. Did he review or work on your report at all?
20 A. He did not.
21 Q. Has DLA been paid in this case?
22 A. I know that we have received payment on some of
23 our invoices but I don't know whether there is
24 currently anything outstanding.
25 Q. What is the amount of the bills that DLA has

5 (Pages 14 - 17)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 18

1    submitted in this matter to date?
2  A.  I don't know the total amount.
3  Q.  When will DLA be paid?  At the end of the case or
4    before?
5         MR. GRONBORG:  Object to form.
6  A.  Our agreement is to be paid within 30 days of
7    issuing an invoice and thus far we have been paid
8    for the invoices that we issued within that
9    period of time.
10  Q.  Is all of your time billed through DLA or do you
11    separately submit bills for your time?
12  A.  No, sir.  Just through DLA.
13  Q.  If you would look at Exhibit 3 to your report.
14    It's Page 57 of 108 at the top?
15  A.  Okay.
16  Q.  Is this your current CV?
17  A.  It is.
18  Q.  Is it complete and accurate?
19  A.  I believe so.
20  Q.  What year did you receive your undergraduate
21    degree?
22  A.  1987.
23  Q.  What year did you receive your MBA?
24  A.  1994 I believe.
25  Q.  Was your MBA program a full-time MBA program or

Page 19

1    an evening MBA program?
2  A.  It was an executive MBA program in the evening
3    and weekends.
4  Q.  On your CV after the Master of Business
5    Administration degree there's a parenthetical
6    that says finance in parentheses.  What does that
7    parenthetical mean?
8  A.  It means that I concentrated in finance with my
9    Master's program.
10  Q.  Does your degree state that it is a finance
11    degree?
12  A.  I'm not certain.
13  Q.  What year did you obtain your Chartered Financial
14    Analyst designation?
15  A.  1992.
16  Q.  What did you have to do to obtain the CFA
17    designation?
18  A.  Complete a three-year study program and
19    successfully pass three levels of exams.
20  Q.  What did the study program consist of?
21  A.  The study program consists of a discipline that
22    is includes the valuation of fixed income
23    securities, equity securities.  Includes
24    accounting.  It includes economics.  It includes
25    ethics.  It includes the valuation of derivative

Page 20

1    securities.
2  Q.  You joined DLA in 2021; is that right?
3  A.  I did.
4  Q.  Do you know DLA's approximate revenues in 2021?
5  A.  I do not.
6  Q.  Over the past year, how much of your time per
7    week have you spent on litigation-related work?
8  A.  Approximately 60 to 70 percent.
9  Q.  How many hours did you bill clients in 2021?
10  A.  I don't know.
11  Q.  Did you bill any clients for work in 2021 that
12    was not litigation related?
13  A.  Yes.
14  Q.  Could you describe that work, please?
15  A.  Certainly.  Approximately 30 to 40 percent of my
16    time is spent doing business valuation work for
17    privately held companies.  I prepare what's known
18    as 409a valuations for privately held, usually
19    technology companies that are seeking to
20    distribute equity securities or warrants or
21    options to certain of their key employees and the
22    IRS requires that the company and those
23    securities be valued at the time that they are
24    issued so I spend quite a bit of time doing 409a
25    valuations.  I also prepare valuations of

Page 21

1    partnerships, family limited partnerships to
2    LLCs, other privately held entities for gift and
3    estate tax purposes.
4  Q.  At the bottom of the first page of your CV it
5    reflects work at Monument Economics Group from
6    2017 to 2021.  What was your role at Monument
7    Economics Group?
8  A.  At Monument I was a group leader primarily
9    responsible for the litigation related consulting
10    we did in securities matters.
11  Q.  Why did you move from Monument to DLA?
12  A.  Monument's located in Arlington, Virginia.  I had
13    a rather remote office in New York City and when
14    the pandemic hit, I felt very isolated from my
15    group in Arlington, so I was eager to join a
16    group that was much closer to home with more
17    personal contact.
18  Q.  The preceding item on your CV is Management
19    Planning, Inc., from 2015 to 2017.  Is that also
20    a litigation consulting group?
21  A.  It is not.
22  Q.  What did you do at Management Planning?
23  A.  Management Planning is one of the country's
24    oldest business valuation and advisory firms and
25    they had a small litigation group and I joined

6 (Pages 18 - 21)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 22

1 their litigation group and also worked with
2 others in the firm doing straight business
3 valuation and advisory work.
4 Q. Your role at Management Planning primarily
5 involved consulting for litigation; is that
6 right?
7      MR. GRONBORG:  Object to form.
8 A. I think I just, I think I just explained that
9 that was not correct, that I did both litigation
10 and non-litigation.
11 Q. Thank you. What percentage of your work at
12 Management Planning was litigation related?
13 A. Probably 60 percent.
14 Q. Why did you leave Management Planning, Inc.?
15 A. I left for personal reasons. My husband had a
16 very bad accident and was not able to walk for
17 several months and I needed to work remotely
18 which was not something that Management Planning
19 was set up to allow me to do so I found a
20 position with Monument Economics Group.
21 Q. The preceding item on your CV is Financial
22 Markets Analysis LLC from 2001 to 2015?
23 A. Yes.
24 Q. What is Financial, or what was Financial Market
25 Analysis LLC?

Page 23

1 A. Financial Markets Analysis or FMA was a capital
2 markets consulting group that was heavily a
3 litigation services firm.
4 Q. Did your role there primarily involve consulting
5 for litigation?
6 A. It did.
7 Q. What percentage of your work there was consulting
8 for litigation?
9 A. Probably 85 percent if I had to put a number on
10 it.
11 Q. Why did you leave Financial Markets Analysis?
12 A. The firm essentially dissolved.
13 Q. Over the last two decades or so is it correct
14 that your primary job has been to work as a
15 consultant for litigation?
16      MR. GRONBORG:  Object to form.
17 A. Yes.
18 Q. Next item on your CV is Trilogy Capital
19 Management from 2000 -- from 1998 to 2001.  What
20 was Trilogy?
21 A. Trilogy was an alternative asset manager and also
22 a hedge fund.
23 Q. Your role there was director of marketing and
24 client services; is that right?
25 A. Yes.

Page 24

1 Q. What did you do in that role?
2 A. It was a small firm so probably could have added
3 a number of roles to what's listed here but one
4 of the things that I did was performance
5 attribution which is simply breaking down the
6 source of returns to our clients and presented to
7 clients on a quarterly basis, you know, their
8 investment performance.
9    I also helped to develop compliance
10 procedures for the firm.  I also had a role in
11 working with the investment manager to test
12 certain investment strategies.
13 Q. Why did you leave Trilogy?
14 A. I had previously worked with the folks at FMA and
15 was asked to join them and that was very
16 attractive to me.
17 Q. Where had you previously worked with the people
18 at Financial Markets Analysis?
19 A. At Princeton Venture Research.
20 Q. And that's the next item on your or the preceding
21 item on your CV.  From 1989 to 1998 you worked at
22 Princeton Venture Research during that period; is
23 that correct?
24 A. I did.
25 Q. What did you do there?

Page 25

1 A. Princeton Venture Research was, had essentially
2 two separate divisions.  One was a venture
3 capital side of the business where we raised
4 money and made our own investment in small
5 technology startup companies, so on that side of
6 the business I prepared discounted cash flow
7 analyses and projections and valuations for tech
8 companies and they also had a litigation
9 consulting side of the business where I was an
10 analyst, research analyst supporting the work
11 that the folks did there.
12 Q. So your work at Princeton Venture Research
13 primarily related to providing expert consulting
14 services for (connection interruption) plaintiffs
15 in securities litigation; is that correct?
16      MR. GRONBORG:  Object to form.
17 A. No.
18      THE NOTARY:  One moment.
19      Mr. Ritts, I missed a word in your
20      question.  Could you repeat it?
21      - - - -
22      (Thereupon, a portion of the record
23      was read by the Notary.)
24      - - - -
25      MR. RITTS:  I'll withdraw the

7 (Pages 22 - 25)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 26

1      question.
2  Q.  What percentage of your work at Princeton Venture
3      Research related to providing litigation
4      consulting work?
5  A.  Maybe 50 percent.
6  Q.  At Princeton Venture Research did you assist
7      testifying experts in securities cases?
8  A.  When you say assist, I would have done some
9      analytical work or research, yes.
10 Q.  And were the experts who you assisted at
11     Princeton Venture Research primarily serving as
12     experts for plaintiffs in securities litigation?
13 A.  Yes.
14 Q.  Was Princeton Venture Research the first job you
15     had where you were involved in litigation
16     consulting?
17 A.  Yes.
18 Q.  Is Princeton Venture Research where you learned
19     how to do litigation consulting in securities
20     cases?
21 A.  It would have been where I learned how to apply
22     fundamental valuation principles to
23     litigation-related problems or issues.
24 Q.  Who were the testifying experts that you worked
25     with at Princeton Venture Research?

Page 27

1  A.  Primarily Candace Preston.
2  Q.  Anybody else?
3  A.  John Torkelsen.
4  Q.  He was the founder of the firm?
5  A.  He was.
6  Q.  Why did you leave Princeton Venture Research?
7  A.  I left Princeton Venture Research because I
8      wanted to apply my skills and experience to
9      investment management as opposed to consulting so
10     there was an opportunity to join Trilogy Capital
11     Management and I left.
12 Q.  Did you leave Princeton Venture Research around
13     the time that it went out of business?
14 A.  So Princeton Venture Research, I believe
15     Princeton Venture Research went out of business
16     sometime in the early, maybe the early 2000s or
17     mid 2000s and I left in 1998.
18 Q.  Okay.  What happened to Princeton Venture
19     Research?
20 A.  Princeton Venture Research became a investment
21     advisor to SBA funds after I left the firm.
22 Q.  Is it correct that Mr. Torkelsen, the founder of
23     Princeton Venture Research, pleaded guilty to
24     perjury for submitting false testimony in
25     securities cases?

Page 28

1          MR. GRONBORG:  Object to form.
2  A.  I don't know what he pleaded guilty to or not.
3  Q.  You're aware, though, that he pleaded guilty to
4      criminal charges relating to expert work in
5      securities cases?
6          MR. GRONBORG:  Object to form.
7  A.  Again I'm not aware specifically what he pleaded
8      guilty to.
9  Q.  Financial Markets Analysis was founded by
10     Mr. Torkelsen's former partners; is that right?
11 A.  Yes.
12 Q.  The --
13 A.  Excuse me.  I'm sorry.  Let me correct that.
14     Mr. Torkelsen didn't have any partners so it was
15     founded by folks that worked for Princeton
16     Venture Research but they were not partners
17     there.
18 Q.  The previous item on your CV is Prudential
19     Securities from 1988 to 1989.  What was your role
20     there?
21 A.  I was assisting an investment manager.  It was a
22     job that was early in my career.  I was a Series
23     7 registered rep and a Series 3 registered rep
24     and I did some trading and reporting for two
25     investment managers there.

Page 29

1  Q.  Fair to say you had a very junior position at
2      Prudential?
3          MR. GRONBORG:  Object to form.
4  A.  Yes.
5  Q.  The previous item is Merrill Lynch 1987 to 1988.
6      What did you do there?
7  A.  I handled accounts that were ESOP accounts where
8      investors would call in if they had questions
9      about their company's stock or if they wanted to
10     buy or sell shares of their company stock.
11 Q.  Fair to say --
12 A.  Or if they had inquiries.
13 Q.  Is it fair to say that you had a very junior
14     position at Merrill Lynch?
15         MR. GRONBORG:  Object to form.
16 A.  I would call it an entry-level position.
17 Q.  Turn to the next page of Exhibit FE 1, please.
18 A.  Sure.
19 Q.  Page 59 of 108, at the top.  Is this a list of
20     cases in which you submitted expert reports or
21     testified during the past four years?
22 A.  It is.
23 Q.  Is this list complete?
24 A.  I believe so.
25 Q.  Are there any other --

8 (Pages 26 - 29)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 30

1  A.  It was complete at the time it was submitted.
2  Q.  Is it complete today?
3  A.  No, because it doesn't reflect the report that
4      was submitted in this matter and I believe there
5      may have been one additional report that was
6      submitted since this was submitted in connection
7      with this litigation.
8  Q.  What is that other matter?
9  A.  It is, I submitted an expert report in an ERISA
10     matter involving MGM resorts.
11 Q.  Are there any arbitration matters in the last
12     four years in which you've submitted reports or
13     provided testimony?
14 A.  No.
15 Q.  Have you done litigation consulting over the past
16     four years in matters where you have not either
17     testified or submitted an expert report?
18 A.  Yes.
19 Q.  So Exhibit 4 does not represent your entire
20     litigation consulting work over the last four
21     years; is that right?
22 A.  It represents exactly what it says, which is
23     prior reports and testimony, not every matter
24     that I may have consulted on.
25 Q.  Is it correct that in every one of the matters

Page 31

1      listed in Exhibit 4 to your report you testified
2      or submitted a report on behalf of the
3      plaintiffs?
4  A.  Yes.
5  Q.  Is it fair to say that the majority of your
6      litigation consulting work over the past four
7      years has been on behalf of plaintiffs?
8  A.  Yes.
9  Q.  What percentage of your litigation consulting
10     work over the last four years has been in matters
11     that relate to the securities law?
12 A.  I would say approximately 60 percent if I had to
13     put a number on it.
14 Q.  In all of your time working in litigation
15     consulting, how many occasions have you testified
16     or submitted a report on behalf of a defendant?
17 A.  I have not.
18 Q.  Exhibit 4 to your report only purports to list
19     reports and testimony over the past four years.
20     How many times in total over your entire career
21     have you submitted an expert report or testified
22     as an expert?
23 A.  I would say approximately 20 to 25.
24 Q.  How much money did you earn in 2021 serving as an
25     expert for plaintiffs?

Page 32

1  A.  Are you asking me to multiply my salary
2      compensation by the percentage of time that I
3      spent on this type of litigation?
4  Q.  Sure.
5  A.  I really haven't given that much thought.  Maybe
6      somewhere in the vicinity of 100,000.
7  Q.  Have you ever been engaged by the Robbins Geller
8      firm before?
9  A.  Yes.
10        MR. GRONBORG:  Objection.  You're
11     asking her in her role as a testifying
12     expert?
13        MR. RITTS:  Yes.
14        MR. GRONBORG:  Thank you.
15 A.  I was engaged in the Valeant Pharmaceuticals case
16     which appears on this list.  I was engaged in
17     another matter where I have not been disclosed as
18     an expert and have not submitted a report so that
19     would not appear on this list so, I have, I was
20     engaged in the Luckin Coffee matter and I believe
21     that's it.
22 Q.  Are there any other matters whether or not within
23     the prior four years in which you've been engaged
24     by Robbins Geller as an expert witness?
25 A.  As a consulting witness or a consultant, yes; but

Page 33

1      not as a named expert.
2  Q.  In any matter in which you were engaged by
3      Robbins Geller have you or your firm ever agreed
4      to reduce or forego any compensation?
5  A.  No.
6  Q.  In any matter where you've been engaged by
7      Robbins Geller have you ever agreed to any
8      reduction or write-off of your fees?
9  A.  No.
10 Q.  In any matter in which you were engaged by
11     Robbins Geller have you ever agreed not to submit
12     a bill?
13 A.  No.
14 Q.  For the matters that are listed on Exhibit 4 of
15     your expert report, in any of those matters have
16     you ever agreed to reduce or forego any of you or
17     your firm's compensation?
18 A.  Only to the extent, there is one matter that I
19     can think of where there was an agreed-upon
20     budget in the engagement agreement and I may have
21     spent an hour or two over that budget and in that
22     case my firm would have agreed to essentially
23     write off the excess.
24 Q.  Which matter was that?
25 A.  I believe it was the Magna matter, Magna

9 (Pages 30 - 33)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 34

1    International.
2  Q. Has any court ever excluded your opinion or found
3     that it was not admissible into evidence either
4     in whole or in part?
5  A. Not that I'm aware.
6  Q. Have you ever, not just in the last four years
7     but ever, have you ever been retained to offer
8     opinions on behalf of a plaintiff in support of a
9     motion for class certification as you're doing
10    here?
11 A. Can you repeat that? I'm sorry.
12 Q. Yes. Have you ever been retained to offer an
13    opinion on behalf of a plaintiff in support of a
14    motion for class certification?
15 A. Yes.
16 Q. How many times?
17 A. Maybe two or three.
18 Q. And what were those cases?
19 A. You said not on this list?
20 Q. Ever whether on this list or not.
21 A. I was retained to offer an opinion on class
22    certification in the Amyris, Inc. securities
23    litigation, in the Valeant Pharmaceuticals
24    securities litigation. In the UTi Worldwide
25    litigation. In the Barrick Gold litigation and

Page 35

1     something that comes to mind that's not on this
2     list is the China Media Express litigation.
3  Q. In any of those cases, did the court deny the
4     plaintiffs motion for class certification whether
5     in whole or in part?
6  A. Not that I know of.
7  Q. Do you have an understanding of the plaintiffs
8     claims in this case?
9  A. I do.
10 Q. What is your understanding?
11 A. Plaintiffs allege that the prices of
12    FirstEnergy's securities were inflated during the
13    class period as a result of false or misleading
14    information in the market regarding the bribery
15    scheme.
16 Q. Have you ever written any peer-reviewed articles
17    or publications?
18 A. No.
19 Q. Have you ever written any articles or
20    publications that were not peer-reviewed?
21 A. No.
22 Q. Did you write a dissertation or thesis for your
23    MBA?
24 A. No.
25 Q. Have you ever taught any university courses

Page 36

1     related to the matters addressed in your report?
2  A. I taught economics at a local community college
3     for a few semesters.
4  Q. Anything else?
5  A. No.
6  Q. Have you ever been invited to give any academic
7     or professional lectures or speeches?
8  A. Yes.
9  Q. What were those?
10 A. I've been invited to essentially give
11    presentations or teach at Rutgers Business School
12    on matters involving valuation and I have also
13    been asked to give a, you know, a one-time
14    course, class for Rutgers Law on securities
15    litigation damages.
16 Q. Tell me more about the lecture you gave at
17    Rutgers Law School. What was that?
18       MR. GRONBORG:  Object to form.
19 A. I was a guest lecturer for, giving a presentation
20    on securities damages in 10(b)(5) cases.
21 Q. Did you talk about what expert witnesses do in
22    10(b)(5) cases on damages issues?
23 A. No. I --
24 Q. What --
25 A. I more or less described how damages are

Page 37

1     generally calculated, you know, given the
2     parameters of the law and also the financial
3     parameters.
4  Q. And when did you give that lecture?
5  A. Oh, it was a number of years ago. I would say
6     probably five years ago.
7  Q. Your CV at the bottom of Page 2 of the CV, which
8     is Page 58 of 108 at the top, indicates that
9     you're a member of the CFA Institute. Are you a
10    current member of that?
11 A. I am.
12 Q. What did you have to do to become a member of the
13    CFA Institute?
14 A. As I described earlier, you, in order to obtain a
15    CFA designation you have to complete the course
16    of study and three consecutive exams in order to
17    earn the designation and you are also, then you
18    are a member of the CFA Institute.
19 Q. Okay. That automatically happens if you pass the
20    CFA exam?
21 A. I believe so. You apply for it but that's the
22    credential, so.
23 Q. Your CV lists the National Association of
24    Forensic Economists.
25    Are you a current member of that?

10 (Pages 34 - 37)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 38

1 A. I am.
2 Q. What did you have to do to become a member of the
3    National Association of Forensic Economists?
4 A. I don't believe that there is a, there's no
5    testing requirement. You submit an application.
6    They review your background to see that you're
7    essentially working in the field and would have
8    something to contribute to the membership and you
9    pay a fee and they accept you.
10 Q. Would you please turn to Exhibit 2 of your
11    report? It's Page 53 of 108 on the top.
12 A. Sure.
13 Q. These are materials that you reviewed or relied
14    upon in preparing your report?
15 A. Yes.
16 Q. Are there any other materials upon which you
17    relied?
18 A. I don't believe so.
19 Q. What do you mean when you say you relied on these
20    materials?
21 A. Well, I either reviewed or relied upon them so
22    some of them, you know, I may have quoted from a
23    document to support an opinion in my report and
24    those documents would be listed here. Other
25    documents such as, you know, the voluminous set

Page 39

1    of analyst reports, I may have reviewed them. I
2    certainly didn't read them all and there may have
3    been several that I do rely upon for some of my
4    opinions.
5 Q. Did you review any materials in the course of
6    preparing your report that aren't listed in
7    Exhibit 2?
8 A. I may have looked at a textbook on investments to
9    refresh my memory about something but it wasn't
10    necessarily instrumental to my opinions here,
11    forming my opinions here.
12 Q. Anything else?
13 A. Not that I can recall.
14 Q. The first category of items listed on Exhibit 2
15    are legal materials and underneath that there is
16    a list of court cases.
17    Did you read each one of these court opinions
18    in the course of preparing your report?
19 A. No. I have read them in the course of my career
20    but I did not reread them to prepare this report.
21 Q. Did you read any of them in the course of
22    preparing this report?
23 A. I did not read --
24    MR. GRONBORG: Object to form.
25 A. I did not read any of them from first to last

Page 40

1    word but there may have been parts of them that I
2    re-reviewed.
3 Q. So which ones?
4 A. I believe I reviewed parts of the Petrobras
5    Securities Litigation opinion and possibly
6    Plumbers & Pipefitters.
7 Q. For what purpose did you review parts of those
8    opinions?
9 A. Those two opinions are cited for, in different
10    sections of my report and I just wanted to
11    familiarize myself with them again.
12 Q. Okay. For what purpose did you rely on those
13    court opinions?
14 A. All of them?
15    MR. GRONBORG: Object to form.
16 Q. The two you just mentioned, the Petrobras and
17    Plumbers & Pipefitters.
18 A. So in each of those opinions there's a discussion
19    of a certain posture towards corporate debt
20    securities and so to the extent that that was
21    confirmatory of some of my opinions, they were
22    included or cited in my report.
23 Q. Exhibit 2 under the heading "Legal," lists the
24    consolidated complaint in this action.
25    Did you read the entire complaint?

Page 41

1 A. I did.
2 Q. Exhibit 2 also lists "Opinion and Order dated
3    March 7, 2022."
4    Did you read that entire opinion and order?
5 A. I did not.
6 Q. Did you review any other documents filed in this
7    case?
8 A. I did not.
9 Q. Did you review the plaintiffs class certification
10    brief?
11 A. I did not.
12 Q. Did you review either a draft or the final
13    version of Scott Dalrymple's expert report here?
14 A. I did not.
15 Q. Exhibit 2 also has a heading that says:
16    "Academic Research, Articles and Reference
17    Manuals."
18    Do you see that?
19 A. I do.
20 Q. Did you read each of these in the course of
21    preparing your report here?
22 A. No.
23 Q. Did you read any of them in the course of
24    preparing your report here?
25 A. Some of them are textbooks which of course I did

11 (Pages 38 - 41)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 42

1  not read the entire textbook.
2      I believe I reviewed the Bessembinder Hendrik
3  article regarding bid-ask spreads.  I believe I
4  reread the Hotchkiss Gergana article,
5  "Determinants of Corporate Bond Trading:  A
6  Comprehensive Analysis," and I believe I reread
7  the James Park article, "Bondholders and Security
8  Class Actions," and everything else listed here I
9  have previously read but did not reread in
10  connection with forming my opinions that are set
11  forth in the Jones report.
12 Q.  Why did you read the three articles that you just
13  mentioned and not the other articles and research
14  listed on Exhibit 2?
15          MR. GRONBORG:  Object to form.
16 A.  I don't recall.
17 Q.  Exhibit 2 indicates on Page 55 of 108 that you
18  relied on an article by Ronen and Zhou.
19      What did you rely upon that for?
20 A.  I believe that article discusses the
21  responsiveness of prices in the corporate bond
22  market to new information.
23 Q.  Exhibit 2 reflects that you relied upon several
24  articles by Eugene Fama.
25      What did you rely on them for?

Page 43

1 A.  Eugene Fama is essentially the godfather of the
2  efficient market hypothesis so he wrote
3  extensively on why the markets are efficient and
4  his theory is the Nobel prize winning theory on
5  the efficient market hypothesis.
6 Q.  Exhibit 2 indicates that you relied on an article
7  by Burton Malkiel.  What did you rely on that
8  for?
9 A.  Burton Malkiel has done research which
10  essentially shows that prices are generally a
11  random walk which means you would do no better in
12  terms of earning a return by, you know, doing
13  extensive analysis as you would by throwing darts
14  on a dart board because he says there's no
15  information in past prices.
16 Q.  Do you consider all of the academic papers, books
17  and articles that you list in Exhibit 2 as being
18  reliable and authoritative?
19 A.  Yes.
20          MR. GRONBORG:  Object to form.
21 Q.  Do you consider the authors of all of the
22  academic papers, books and articles in Exhibit 2
23  as being experts in the field of economics and
24  finance?
25 A.  I don't know that.

Page 44

1 Q.  Are there any authors listed in the Exhibit 2
2  whom you do not regard as expert in the field of
3  economics and finance?
4 A.  I don't know that.  I haven't given that thought.
5 Q.  Would you say that all of the authors of the
6  works listed on Exhibit 2 are well respected in
7  the field of economics and finance?
8          MR. GRONBORG:  Object to form.
9 A.  I don't care to generalize about whether or not
10  they're well respected.  I did review the
11  articles and the research contained in the
12  articles and I felt like they were a reliable
13  reflection of the work that they did.
14 Q.  Exhibit 2 on Page 55 of 108 lists FirstEnergy
15  Corporation SEC filings among your reliance
16  materials?
17 A.  Yes.
18 Q.  You list forms 10-K and 10-Q filed from February
19  21st, 2017 through December 31st, 2020.
20      Did you actually read every 10-K --
21 A.  I did not.  Sorry.  I did not.
22      I didn't mean to interrupt you.  I'm sorry.
23 Q.  That's fine.  I understand.
24      Did you actually read every 10-Q that
25  FirstEnergy Corp. filed?

Page 45

1 A.  I did not.  I reviewed parts of the 10-Ks and the
2  10-Qs that are listed here.
3 Q.  What parts did you review?
4 A.  Generally if there was a new development in the
5  management discussion section of a filing, I took
6  a look at that and I would also briefly look at
7  the financial disclosure section.
8 Q.  How did you decide to read those sections and not
9  other sections of the SEC filings?
10 A.  The information contained in the forms 10-K and
11  10-Q helped me to get an overview, if you will,
12  of the company in general but there wasn't any
13  information that was very relevant to my opinions
14  expressed here so I didn't feel the need to
15  review or read each of those documents from
16  beginning to end.
17 Q.  Exhibit 2 also lists Form S-3ASR dated August 16,
18  2019 and March 6th, 2018 and March 7th, 2018.
19      Did you read those documents?
20 A.  Only to the extent that I wanted to know which
21  securities were being registered pursuant to
22  those forms.
23 Q.  Did you read any other FirstEnergy SEC filings?
24 A.  I did not.
25 Q.  The next item on Exhibit 2 or actually farther

12 (Pages 42 - 45)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 46

1    down on Page 55 of 108 in Exhibit 2 is
2    "FirstEnergy Corporation News Articles" and it
3    lists news articles obtained through a search of
4    Dow Jones Factiva.
5        What articles are those?
6  A. That is a compendium of news articles that was
7    provided to me by counsel and my understanding is
8    that it was a comprehensive search of the Dow
9    Jones Factiva database for all news articles
10   during the class period which mentioned
11   FirstEnergy.
12 Q. Counsel selected the news articles that you
13   reviewed; is that correct?
14       MR. GRONBORG:   Object to form.
15 A. I asked for all of the news articles, not a
16   selection of the news articles.
17 Q. How many news articles did you review?
18 A. At least a hundred.
19 Q. Are the articles you reviewed listed anywhere in
20   your report?
21 A. They are not.  I believe they were provided to
22   you, though.
23 Q. Going up one item on Exhibit 2, Page 55 of 108
24   there's a reference to "FirstEnergy Corporation
25   Analyst Reports" and a cross-reference to Exhibit

Page 47

1    9 of your report for a list of analyst reports.
2        If you'd turn to Exhibit 9 please, it begins
3    on Page 89 of 108?
4  A. Okay.  Thank you.  Okay.
5  Q. What does Exhibit 9 reflect?
6  A. Exhibit 9 reflects a list of all of the
7    FirstEnergy analyst reports that have been
8    archived by Refinitiv during the period February
9    2017 through November of 2020.
10 Q. So these are all of the analyst reports about
11   FirstEnergy published during the class period?
12       MR. GRONBORG:   Object to form.
13 A. I didn't say that.  I said that this was a list
14   of all of the analyst reports on FirstEnergy that
15   have been archived by Refinitiv during this
16   period of time.
17     I don't know that there were other -- there
18   may have been other analyst reports published
19   that Refinitiv does not archive.
20 Q. Okay.  So what's Refinitiv?
21 A. Refinitiv is the former Thomson Reuters.
22 Q. And how did you obtain or did you obtain each of
23   the analyst reports that's, that are listed on
24   Exhibit 9?
25 A. I did not obtain -- I obtained the list of

Page 48

1    analyst reports from Refinitiv and I obtained the
2    compendium of analyst reports from counsel.
3  Q. So did you obtain all of the analyst reports that
4    are listed in Exhibit 9 or not?
5  A. I believe so.
6  Q. Did you review them all?
7  A. I did not.
8  Q. Did you review any of them?
9  A. I reviewed a substantial number of them.
10 Q. How did you decide which ones to review?
11 A. To the extent that they were helpful in
12   identifying events of interest in my event study,
13   I reviewed them.
14 Q. And how did you determine which analyst reports
15   were helpful in identifying events of interest in
16   your event study?
17 A. My event study focuses on events of interest
18   towards the end of the class period so I
19   essentially reviewed every analyst report issued
20   during that time period.
21 Q. Okay.  So you --
22 A. To --
23 Q. I'm sorry.  Go ahead, finish your answer.
24 A. That's okay.  To identify events that may have
25   had credit-relevant information entering the

Page 49

1    market.
2  Q. So the analyst reports that you reviewed were
3    around the four event dates that you looked at in
4    your event study.  Is that fair?
5  A. Yes, but I also reviewed some analyst reports
6    from earlier points in time to essentially verify
7    some of the events throughout the class period
8    that were mentioned in the complaint.
9  Q. Which analyst reports from earlier points in time
10   did you review?
11 A. I don't recall.  I didn't pick one analyst firm
12   for example and say I'm going to review every
13   JPMorgan report or I'm only going to look at the
14   BFA reports.  I looked at certain things that
15   were happening throughout the class period and
16   sort of randomly reviewed some analyst reports
17   from earlier points in time.
18 Q. Okay.  And what were the earlier points in time
19   that you focused on when you reviewed analyst
20   reports during the class period?
21 A. I was focusing on some issues regarding the FES
22   bankruptcy and the posture of investors towards
23   FirstEnergy, you know, trying to essentially spin
24   off FES.  That's one event that comes to mind.
25 Q. Are there any others?

13 (Pages 46 - 49)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 50

1  A.  Not that I can recall.
2  Q.  And what was your purpose in reviewing analyst
3     reports issued at earlier points in time that
4     touched upon the FES bankruptcy?
5  A.  To get an understanding of what investors were
6     concerned about throughout the class period.
7  Q.  Are there any particular analyst reports on that
8     topic that you regarded as particularly useful or
9     instructive for that purpose?
10  A.  Not specifically.
11  Q.  Who are the plaintiffs in this case?
12  A.  The plaintiffs, one of the named plaintiffs is
13     LACERA which is one of the largest public pension
14     funds.  I believe another named plaintiff is a
15     Wisconsin pension fund and another is Amalgamated
16     Bank which had a number of fixed income funds
17     where they invested in FirstEnergy's Senior
18     Notes.
19  Q.  Have you ever worked for any of the plaintiffs
20     before?
21  A.  No.
22  Q.  Have you ever been engaged to do litigation
23     related work on behalf of any of the plaintiffs
24     before?
25  A.  I don't believe so.

Page 51

1  Q.  Have you ever spoken with anybody from any of the
2     plaintiffs about this case?
3  A.  No.
4  Q.  Have you ever talked with anyone who worked at
5     FirstEnergy about this case?
6  A.  No.
7  Q.  Have you ever talked with any other experts in
8     the course of developing your opinions here?
9  A.  No.
10  Q.  Have you ever consulted for FirstEnergy?
11  A.  No.
12  Q.  Have you ever consulted for any utility company?
13  A.  No.
14  Q.  Have you ever owned any FirstEnergy securities?
15  A.  Not, not as an individual investment but it may
16     have been in a mutual fund.  Not sure.
17  Q.  Do you know whether you owned any FirstEnergy
18     securities during the proposed class period here?
19  A.  Not, again, not outside of the possibility that a
20     mutual fund that I own may have had some
21     securities in their portfolio.
22  Q.  Do you know if you own any FirstEnergy securities
23     today?
24  A.  I do not.  Again unless it, unless the securities
25     may be held by a mutual fund.  Other than that,

Page 52

1     no.
2  Q.  Before you signed your report did you check to
3     see if you owned any FirstEnergy securities
4     during the proposed class period?
5  A.  I knew that I did not.
6  Q.  Do you have any investments in other utility
7     companies?
8  A.  Not individually.
9  Q.  Did you hold any investments in other utility
10     companies during the proposed class period?
11  A.  Not individually.
12  Q.  Have you ever followed the utilities industry as
13     an individual investor?
14  A.  No.
15  Q.  Do you hold yourself out as an expert in the
16     utility industry?
17  A.  Not specifically.
18  Q.  Other than your CFA have you ever held any other
19     professional certificates or licenses?
20  A.  Yes.
21  Q.  What, what are those?
22  A.  I was a FINRA registered Series 7 and Series 3
23     representative.
24  Q.  During what period of time?
25  A.  In the 1987 to '95 or so time period.

Page 53

1  Q.  And what does it mean to be a Series 7 and Series
2     3 representative?
3  A.  A Series 7 is a securities representative.  You
4     are essentially allowed to buy and sell equity
5     securities, fixed income securities and
6     derivative securities on behalf of clients.
7        And a Series 3 is a registered commodities
8     rep.
9  Q.  Have you held any other professional certificates
10     or licenses beyond what you've mentioned?
11  A.  No.
12  Q.  Do you regard yourself as an expert in the
13     corporate bond market?
14  A.  That's pretty broad.  I regard myself as an
15     expert in the valuation of fixed income
16     securities which would include corporate bonds.
17  Q.  How did you acquire that expertise?
18  A.  I acquired the expertise through my training for
19     the CFA designation and in the period of time
20     prior to becoming an analyst when I was working
21     for investment managers in the equity and fixed
22     income markets.
23  Q.  You're referring to your work with Merrill Lynch
24     and Prudential?
25  A.  Yes.

14 (Pages 50 - 53)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 54

1 Q. Have you ever been a recognized by a court as an
2    expert in the corporate bond market?
3 A. No, not specifically.
4 Q. Do you regard yourself as an expert in event
5    studies?
6 A. Yes.
7 Q. How did you acquire that expertise?
8 A. Over the last 25 years I have been conducting
9    event studies in conjunction with consulting and
10   expert work in securities litigation and I have
11   also utilized event studies in business valuation
12   modeling.
13 Q. When have you utilized event studies in business
14   valuation modeling?
15 A. Event studies are useful to determine, you know,
16   starting with a regression analysis is to
17   determine cause and effect with certain
18   advertising dollars spent and revenues earned and
19   so in making forecasts or projections the
20   regression analyses which underlie event studies
21   would be useful there.
22 Q. Have you conducted event studies as part of
23   business valuation engagements for paying
24   clients?
25 A. Yes. Yes. It -- my business valuation clients

Page 55

1    would not pay me specifically for an event study
2    but I would use the regression analysis to inform
3    projections that would then be useful or utilized
4    in coming to my conclusions in a business
5    valuation engagement.
6 Q. How many times have you performed event studies
7    that weren't part of a litigation consulting
8    engagement?
9 A. I really couldn't say. I've been doing this for
10   a long time.
11      MR. RITTS: We've been going for a
12      little more than an hour. Why don't we
13      take a break. Let's go off the record.
14      THE VIDEOGRAPHER: We're off the
15      record at 11:21 a.m.
16         - - - -
17      (Thereupon, a recess was had.)
18         - - - -
19      THE VIDEOGRAPHER: We are back on
20      the record at 11:31 a.m.
21 Q. Ms. Jones, do you have any devices or documents
22   now that you didn't have with you when you were
23   testifying before the break?
24 A. I do not.
25 Q. In prior cases where you acted as an expert have

Page 56

1    you ever offered an opinion as to whether a
2    security traded in an efficient market?
3 A. Yes.
4 Q. How many times have you done that?
5 A. Well, it would have been in the same number of
6    cases where I provided an opinion on class
7    certification; so I think we said maybe 10 or 12?
8    I don't recall exactly but it would be in the
9    ballpark.
10 Q. If you look at Exhibit 4 to your report, the list
11   of cases over the last four years, did you offer
12   an opinion about market efficiency in any of
13   these cases?
14 A. Yes. Exhibit 4?
15 Q. Yes. In which of these cases did you offer an
16   opinion about market efficiency?
17 A. Sure. In the UTi Worldwide case. I'm trying,
18   I'm looking at the Barrick Gold Corporation case.
19      I don't believe it is required in Ontario but
20   I may have included it nevertheless.
21      The Valeant Pharmaceuticals case. And the
22   Amyris Securities Litigation case.
23 Q. Have you ever opined that a security did not
24   trade in an efficient market?
25 A. I have declined engagements or declined to

Page 57

1    provide an opinion on market efficiency if I did
2    not feel comfortable that the security
3    demonstrably traded in an efficient market so I
4    would not have provided an opinion but I have,
5    you know, at a consulting level provided the
6    opinion to counsel that I thought it would be
7    difficult to establish that the market was
8    efficient.
9 Q. You have never opined in an expert report or
10   expert testimony that a security did not trade in
11   an efficient market; is that correct?
12 A. That is correct.
13 Q. In any of the cases on Exhibit 4 did you offer an
14   opinion about whether a bond traded in an
15   efficient market?
16 A. Yes. In the Valeant Pharmaceuticals case.
17 Q. Going back before the last four years, have you
18   ever offered an expert opinion on whether a bond
19   traded in an efficient market?
20 A. I don't recall. I do recall having supported a
21   testifying expert that was not myself in a case
22   that involved analyzing the market for debt
23   securities.
24 Q. In the Valeant case that you referred to did you
25   follow the same analysis that you did here?

15 (Pages 54 - 57)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 58

1 A. When you say follow the same analysis, did I
2 apply the, you know, essentially modified Cammer
3 and Krogman factors to the specific trading data
4 for the Valeant Pharmaceutical notes? Yes.
5 Q. Did your methodology differ in any way between
6 the Valeant case and this case?
7 A. It likely did as the facts and circumstances
8 surrounding each case are unique. It wouldn't
9 have deviated greatly but, you know, we are
10 essentially guided by the data that we have and
11 the class period, you know, that is set forth in
12 the complaint, the time period for which the
13 FirstEnergy Senior Notes were issued and
14 outstanding so there are nuances in each case
15 that sort of dictate or give you parameters
16 around the type of analyses that you're able to
17 do.
18 Q. Of course the facts are different in every case;
19 but in considering whether bonds traded in an
20 efficient market was there anything different
21 about the methodology that you applied in the
22 Valeant case versus the one you applied here?
23 A. Again, not the overall set of criteria that I've
24 looked at. There may have been, you know,
25 differences in the application of a particular

Page 59

1 Cammer factor, for example, due to different
2 facts and circumstances in the Valeant case. I
3 just don't recall.
4 Q. Did you do an event study in the Valeant case?
5 A. I did.
6 Q. Did the event study there differ in any way from
7 the event study here?
8 A. Did it differ in any way? I'm sure it did. I'm
9 sure there were a different -- for example, I'm
10 sure there were a different set of events that
11 were identified as events of interest. That
12 would be one difference.
13 Q. What else was different between the event study
14 you conducted in the Valeant case and the event
15 study you conducted here?
16 A. I really -- I don't recall. I haven't looked at
17 it in quite a while.
18 Q. Did you identify events of interest in a
19 different way in the Valeant case than you did
20 here?
21 A. I think it was similar if I recall in that the
22 events of interest were events that were
23 described in the Valeant Pharmaceuticals
24 complaint.
25 Q. In your event study here as I understand it, you

Page 60

1 selected the events of interest by reference to
2 whether they were credit-relevant or not.
3 Did you do the same thing in the Valeant
4 case?
5 A. Well, in the event study here, I am aware through
6 reading the complaint that there were a number of
7 events that plaintiffs allege may have had an
8 impact on the price of FirstEnergy's common
9 stock; however being tasked with identifying
10 events that may have impacted the price of the
11 Senior Notes, I reviewed the news articles and
12 analyst reports to identify events that may have
13 changed the credit posture of FirstEnergy.
14 In addition, given that FirstEnergy is a
15 Fortune 500 company with very little credit risk
16 at the time, I did not expect that there would be
17 numerous company-specific events that would have
18 a meaningful impact on the price of the Senior
19 Notes and I identified four events of interest
20 here.
21 Q. How is that different than what you did in the
22 Valeant case?
23 A. I think the selection or identification process
24 was similar in that it was, in both cases it was
25 informed by events that were outlined in the

Page 61

1 complaint where plaintiffs allege that the events
2 may have had an impact on the price of the common
3 stock and not every company-specific event that
4 affects the common stock is going to have any
5 influence or impact on the price of the debt
6 securities; so I can tell you that I read the
7 news articles and the analyst reports here to see
8 whether there was any, anything that sort of
9 changed investors' perception of the credit
10 profile of the company in FirstEnergy.
11 Q. Do you agree that the primary indicator of market
12 efficiencies for a security is the rapid
13 inclusion of relevant new information in the
14 press of the security?
15 MR. GRONBORG: Object to form.
16 A. I believe that overall you have to look at a
17 number of criteria and that if you look at a
18 comprehensive set of criteria, you essentially
19 arrive at evidence that weighs in favor of a
20 finding of efficiency or against a finding of
21 efficiency but that there's no bright line test.
22 So for example if, if there was a common
23 stock that reacted or had a significant change in
24 price upon an earning surprise but other than
25 that one indicator of market efficiency there was

16 (Pages 58 - 61)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 62

1    very little trading or turnover in the common
2    stock, there were no analysts writing about the
3    company during the class period, there were very
4    few market makers, I think that the price impact
5    alone wouldn't necessarily allow you to conclude
6    that there was evidence of market efficiency.
7  Q. When considering whether a security trades in an
8    efficient market, is there any, are there any
9    criteria that are more or less important than
10    others in reaching that conclusion?
11 A. So the, something that comes to mind is the
12    market maker criteria that's set forth in Cammer
13    and if you look at, if you read through that, it
14    essentially says well, if there's no volume
15    reporting for a security, then looking at the
16    number of market makers is very important. So
17    when you have volume reporting like we do here, I
18    think that the number of market makers may be
19    less relevant so I think it depends on the
20    circumstances and the characteristics of the
21    market that you're examining.
22 Q. Is the rapid inclusion of new relevant
23    information in the price of the security more
24    important or more relevant than other factors in
25    determining market efficiency?

Page 63

1  A. Not necessarily.
2  Q. Is it ever?
3  A. Is it ever more important?
4  Q. Yes.
5  A. I don't know that I could speak to that.
6  Q. What type of information affects corporate bond
7    prices?
8  A. There's external information that affects
9    corporate bond prices such as what the yield on
10    the underlying risk-free rate and the spread
11    between risk-free securities and the corporate,
12    you know, the risk of the corporate bond itself,
13    so there are different yield spreads that affect
14    the price of the corporate bond and then there
15    are internal or company-specific types of
16    information that affect bond prices including
17    investors' perception of the default risk of a
18    company or the risk profile of a company or
19    whether the company has sound internal controls;
20    so there are external and internal or
21    company-specific factors that affect the price of
22    bonds.
23 Q. Please turn to Page 34 of your report. It's Page
24    37 of 108 at the top of Exhibit 1.
25 A. What paragraph number does it start with?

Page 64

1  Q. I am looking at Paragraph 84 right now and the
2    last two sentences of that paragraph read:
3    "Particularly, bond prices tend to react to
4    information that affects the probability or
5    likelihood of default. This information may
6    include earnings announcements, changes in
7    ratings by the credit rating agencies, and other
8    information impacting the risk of insolvency."
9        You mentioned earnings announcements in this
10    package here. Positive earnings announcements
11    would tend to lower the probability of default;
12    is that right?
13 A. Not necessarily. When I'm talking about earnings
14    announcements, I also in, at least in my mind am
15    including information about the financial
16    condition of the company so that, I wouldn't
17    expect, for example, a positive or a negative
18    earnings announcement in and of itself if it has
19    no impact on the financial condition of the
20    company to change the price of a bond.
21 Q. All else being equal, would you expect a bond
22    price to increase upon a positive earnings
23    announcement?
24        MR. GRONBORG:  Object to form.
25 A. No.

Page 65

1  Q. You mentioned changes in ratings by the credit
2    rating agencies in Paragraph 84. Would you
3    expect an increase in a credit rating to be
4    associated with an increase in the bond price?
5  A. Not necessarily and I will, I will give an
6    example.
7        To the extent that a credit rating boosts the
8    company from being a high yield bond or to an
9    investment grade bond, it may increase the price
10    because of reduced risk and it may also increase
11    the price because there are a number of investors
12    that cannot hold a high yield bond by virtue of
13    their investment mandate so it may increase
14    demand for that security.
15 Q. Do you agree that changes in credit ratings can
16    affect bond prices?
17 A. Yes, they can.
18 Q. Do you agree that earnings announcements can
19    affect bond prices?
20 A. To the extent that the earnings announcement
21    informs a major change in financial condition,
22    it's possible.
23 Q. In Paragraph 84 you say other information
24    impacting the risk of insolvency can affect bond
25    prices.

17 (Pages 62 - 65)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 66

1    What other information?
2 A. Oftentimes you'll see bond prices decline if a
3    firm takes on a substantial amount of new debt so
4    that would be another event that may impact or
5    inform the risk of insolvency.
6 Q. Okay. Other things that come to mind?
7 A. In certain cases the risk of a potential fine or
8    additional obligation may increase insolvency
9    risk.
10 Q. Can disclosure of a going concern qualification
11    affect bond prices?
12       MR. GRONBORG:  Object to form.
13 A. It wouldn't impact the, it would generally not
14    impact the price if it was not unexpected.
15    If it was a sudden going concern because of
16    some other heightened risk, then I think that
17    information would be relevant and would show up
18    in other ways as well.
19 Q. Can disclosure of breach of a debt agreement
20    affect bond price?
21       MR. GRONBORG:  Object to form.
22 A. Generally there's an event that precedes that so
23    there's something, some event that occurs that
24    puts the company in breach of a covenant and it's
25    fairly common that, you know, the event itself

Page 67

1    may cause a change to the bond price and then the
2    subsequent -- okay, breach, you know, you're in
3    breach of a covenant would sort of, it would sort
4    of come after or, you know, be as a result of the
5    event.
6 Q. You mentioned that incurring new debt could
7    affect bond price. By the same token can
8    retiring existing debt affect a bond price or be
9    relevant to probability or likelihood of default?
10 A. Generally the retirement of debt is expected so I
11    wouldn't think so; but in my experience a
12    similar, a similar event that may affect the
13    price of the bonds would be, let's use your prior
14    example:  So if there was a breach of a covenant
15    but the company is able to fix that breach fairly
16    quickly, then generally you might expect to see
17    the bond price recover.
18 Q. Can disclosure of an actual or potential
19    bankruptcy proceeding affect a bond price?
20 A. I would say not unless it's unknown or out of the
21    blue or not expected or hasn't previously been
22    disclosed where analysts looking at the company's
23    financial condition say:  This puts them in
24    breach of their debt covenants or this increases
25    the probability of bankruptcy or something like

Page 68

1    that.
2 Q. Okay. But events that give rise to an actual or
3    potential bankruptcy proceeding could affect the
4    bond price?
5 A. Perhaps.
6 Q. Is there any other information that affects bond
7    prices?
8 A. Company-specific?  There can be, you know,
9    interest rate shocks, et cetera, changes in yield
10    spreads, increases or decreases in the yields on
11    similar bonds relative to a particular issue and
12    I think, you know, we've essentially covered a
13    lot of the events of interest when you're looking
14    at doing an event study for corporate debt
15    securities.
16 Q. If a company's stock trades in an efficient
17    market does that necessarily mean that all of its
18    bonds also trade in an efficient market?
19 A. No.
20 Q. Why not?
21 A. So just as you apply criteria to examine the
22    market for a common stock, there are criteria to
23    examine the market for the same company's debt
24    securities.  A company might have a debt security
25    that is very small that is held by a few large

Page 69

1    institutions or that it doesn't trade very often.
2    You may not see the turnover.  You know, it
3    doesn't necessarily mean that the price isn't
4    incorporating all information but it's hard to
5    test that if there's little to no trading in the
6    bond but I wouldn't say that, you know, as a rule
7    if the company's common stock traded in a
8    efficient market all of its securities also
9    traded in an efficient market.
10 Q. Under what other circumstances might a market be
11    efficient for a company's stock but not for its
12    bonds?
13 A. I think primarily in the structure, in the
14    turnover, in the trading, in the number of
15    participants, the number of market participants
16    in those categories, I think they need to be
17    examined.
18 Q. Do all bonds trade in efficient markets?
19 A. No.
20 Q. Do bonds for all publicly traded companies trade
21    in efficient markets?
22 A. I don't know.  I haven't examined that.
23 Q. Do the bonds of all companies listed on the New
24    York Stock Exchange trade in efficient markets?
25 A. I couldn't make that general statement.

18 (Pages 66 - 69)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 70

1 Q. Do you need to analyze the market for a specific
2 security to determine whether the security trades
3 in an efficient market?
4 A. I believe so.
5 Q. Do you need to conduct an empirical analysis to
6 make a reliable determination about market
7 efficiency for a particular security?
8       MR. GRONBORG: Object to form.
9 A. Well, for any security? Are you saying for any
10 security do you have to conduct an empirical
11 analysis?
12 Q. Yes. For any given security do you have to
13 conduct an empirical analysis --
14 A. Well, for litigation --
15 Q. -- to make a determination --
16 A. Well, for litigation purposes, yes, but for
17 investing purposes, I don't think so. I think
18 that, you know, there's been a lot written about,
19 you know, stocks that trade on the New York Stock
20 Exchange, stocks that trade on the NASDAQ. You
21 know, certain size company stock, it is
22 essentially presumed that they trade in an
23 efficient market. But for litigation purposes,
24 yes, there's a requirement that you examine the
25 market for each security.

Page 71

1 Q. A security can trade in an efficient market at
2 one point in time but not at another point in
3 time; is that right?
4 A. Describe what you mean by that. I'm not sure
5 what you mean.
6 Q. That's fair.
7    So the fact that a security trades in an
8 efficient market today, does not mean that it
9 also traded in an efficient market five years
10 ago; is that right?
11 A. I think that that's fair. It may, may have --
12 that's, I would agree with that hypothetical that
13 it doesn't necessarily mean that five years ago
14 it traded in an efficient market.
15 Q. You'd need to evaluate the data for the relevant
16 time periods to know whether the market was
17 efficient or not; is that right?
18       MR. GRONBORG: Object to form.
19 A. Or you could evaluate the characteristics of the
20 market five years ago relative to today or
21 yesterday and say: Okay. Were all these things
22 in place. Was their volume being reported. Was
23 there fluid price discovery five years ago. What
24 was the market cap five years ago, et cetera.
25    So if the conditions in the market are

Page 72

1 essentially the same or have not changed
2 dramatically over time, then I think that if you
3 show that the security trades in an efficient
4 market today or yesterday, you can presume
5 without major changes that it traded in an
6 efficient market five years ago.
7 Q. But you need to evaluate the empirical data to
8 make that determination; is that right?
9       MR. GRONBORG: Object to form.
10 A. For what purpose? As an investor, no.
11 Q. No. For scientific purposes, for, from the
12 perspective of an expert in litigation, in
13 economics or finance who's trying to reach a
14 scientifically reliable conclusion about market
15 efficiency, you'd have to look at the data,
16 wouldn't you?
17       MR. GRONBORG: Object to form.
18 A. As I said, I think you'd have to look at the
19 underlying characteristics of the market and make
20 a, and make some determination.
21 Q. Can a bond's price sensitivity change over time?
22 A. Yes. In fact over the course of time as a bond
23 nears maturity, its price sensitivity essentially
24 automatically changes as duration changes.
25 Q. Can changes in credit ratings affect a bond's

Page 73

1 price sensitivity?
2 A. So generally, generally speaking a high yield
3 bond is thought to be more price sensitive than
4 an investment grade bond so if it's that much of
5 a change, it may have some impact on sensitivity.
6 Q. Is it true that different bonds of the same
7 corporate issuer have different price
8 sensitivities and will generally respond to
9 information differently?
10 A. Yes.
11 Q. Why is that so?
12 A. Because they have different coupon rates and
13 different maturity rates and that is
14 determinative of price sensitivity in something
15 called duration.
16 Q. Are there any other reasons why different bonds
17 from the same issuer will respond to information
18 differently?
19 A. There's also some research that shows that
20 there's more trading in the more recently issued
21 bonds of a particular corporation than the bonds
22 that have been outstanding for a longer period of
23 time and so to the extent that the level of
24 trading or turnover has an impact on price
25 sensitivity, that would be, that would manifest

19 (Pages 70 - 73)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 74

1  in the different, in the age of the issue if you
2  will.
3  Q. You analyzed each of the FirstEnergy notes that
4     you address in your report individually; is that
5     right?
6  A. Yes.
7  Q. Why did you do that?
8  A. Well, the primary reason is that they were issued
9     during different periods in time during the class
10    period so only one of the Senior Notes was
11    outstanding in February of 2017. There were
12    Senior Notes that were issued in June of '17, in
13    February of 2020 and in June of 2020, so they
14    didn't all have the same level of trading or you
15    know, data available throughout the class period.
16 Q. Could some bonds issued by a company trade in an
17    efficient market while others do not?
18       MR. GRONBORG:  Object to form.
19 A. I have not seen that in my studies but I'm not
20    going to, I'm not going to, I'm not going to rule
21    it out as a possibility. It's not something that
22    I have seen.
23 Q. In Paragraph 85 of your report which is on Page
24    38 of 108 you say that "larger issues tend to
25    trade more frequently, as do the most newly

Page 75

1  issued bonds in a series, leading to greater
2  price responsiveness to new information."
3     Is that a true statement?
4  A. I think so.
5  Q. So all else being equal, smaller or older bond
6     issues are less likely to trade in an efficient
7     market?
8       MR. GRONBORG:  Object to form.
9  A. I wouldn't characterize it that way. I think
10    you've mischaracterized what I've said here.
11    So we're talking about price responsiveness,
12    not market efficiency.
13 Q. Okay. Is it the case that all else being equal
14    smaller or older bond issues are less likely to
15    trade in an efficient market?
16 A. I wouldn't, I wouldn't make that statement
17    either. I would say that it depends on the level
18    of trading. It depends on the number of market
19    participants that are providing quotes. You look
20    at the cost of trading and the bid-ask spread, so
21    I think you need to look at a number of different
22    things.
23    However, generally speaking smaller and older
24    issues may be less price sensitive. That I would
25    agree with but that doesn't mean that they are

Page 76

1  less likely to trade in an efficient market.
2  Q. You need to look at all of the data to make that
3     determination, right?
4  A. I think so.
5  Q. In your report at Paragraph 34, which is on Page
6     16 of 108, you refer to the Cammer case?
7  A. I am not there yet. Yes.
8  Q. Is it correct that the Cammer factors are
9     applicable to common stock?
10 A. Yes.
11 Q. Why did you italicize the words "applicable to
12    common stock" in Paragraph 34 of your report?
13 A. To emphasize that the Cammer case applied certain
14    criteria to a particular common stock and not to
15    a fixed income security.
16 Q. Okay. The Krogman factors likewise are
17    applicable to common stock?
18 A. Yes.
19 Q. Is there any academic literature to support using
20    the Cammer or Krogman factors other than Cammer
21    factor number 5 to evaluate whether bonds trade
22    in an efficient market?
23       MR. GRONBORG:  Object to form.
24 A. One of the, one of the articles, actually I think
25    two of the articles that I referenced in Exhibit

Page 77

1  2 is it? There's an article by Mr. Hartzmark and
2  there's an article by James Park and I believe
3  they talk about -- and maybe not Park but
4  Hartzmark talks about the application of the
5  Cammer and Krogman factors with modifications are
6  reliable in making some determination as to the
7  efficiency of the market for corporate debt
8  securities.
9  Q. Okay. Are there any other articles or studies in
10    finance journals that support using the Cammer or
11    Krogman factors other than Cammer factor number 5
12    to evaluate whether bonds trade in efficient
13    markets?
14       MR. GRONBORG:  Object to form.
15 A. I'm not certain. I'm not certain.
16 Q. Are each and every one of the Cammer and Krogman
17    factors relevant to whether a bond trades in an
18    efficient market?
19 A. I believe if you take the approach that they need
20    slight modifications, that they are relevant to
21    determining market efficiency for bonds.
22 Q. Are there any Cammer or Krogman factors that are
23    not relevant to determining whether a bond trades
24    in an efficient market?
25 A. I wouldn't say not relevant. I would say they

20 (Pages 74 - 77)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 78

1  all have, they are all informative to some extent
2  but that you have to consider the differences in
3  the market and therefore you can't necessarily
4  apply the bright line tests of each of the
5  criteria and say, well I know this is, you know,
6  turnover has to be one to two percent for a
7  common stock and therefore it's got to be one to
8  two percent for a corporate debt security when
9  you know that in general almost 100 percent of
10  the time a stock is going to trade and have
11  volume every single available trading day while a
12  debt security may only trade on 60 percent of the
13  available trading days, so I think with
14  modifications and knowing the differences in the
15  structure of these markets, you can apply the
16  Cammer and Krogman factors to assess the
17  efficiency of the market for debt securities.
18  Q.  Are you aware of any peer-reviewed studies or
19  articles that identify any factors other than the
20  Cammer and Krogman factors to use when deciding
21  whether a bond trades in an efficient market?
22  A.  Nothing comes to mind.
23  Q.  After analyzing the various Cammer and Krogman
24  factors that you discuss in your report, how do
25  you decide whether the market for a security is

Page 79

1  or is not efficient?  Is it a matter of simply
2  counting up the number of factors on each side?
3  A.  I don't think so.  I think that I, at least my
4  process is to take each of the Cammer and Krogman
5  factors separately, make an analysis and then
6  decide does the evidence weigh in favor of a
7  finding of efficiency.
8       And if you do that and you go through all of
9  the factors, you can come to an informed
10  conclusion about whether or not there is evidence
11  for or against and which is more conclusive or
12  which is more powerful.
13  Q.  What if three Cammer factors favor efficiency but
14  two others don't?  How do you weigh them against
15  each other?
16  A.  I would need more information than that.
17  Q.  Are any of the Cammer factors --
18  A.  So for example.  So for example, if the company
19  didn't file an S-3 during the class period, in my
20  mind that doesn't weigh against a finding of
21  efficiency.  They just didn't register any
22  securities so it does depend on specifics.
23  Q.  So all the Cammer factors are not of equal
24  importance in every case; is that right?
25  A.  Again, to the extent that there is no data to be

Page 80

1  evaluated for a particular factor because it
2  didn't exist during the class period, then
3  certainly I would rely less on that particular
4  factor.
5  Q.  Turning again to your report, I'd like to direct
6  your attention to Exhibit Number 1 to your report
7  which is Page 52 of 108.
8  A.  Okay.
9  Q.  You analyzed eight FirstEnergy notes; is that
10  correct?
11  A.  Yes.
12  Q.  They're the notes listed here on Exhibit 1?
13  A.  Yes.
14  Q.  Did you analyze any other FirstEnergy notes?
15  A.  No.
16  Q.  Did you try to determine how many distinct
17  investors purchased each of the eight notes
18  during the class period?
19  A.  No.
20  Q.  Did you try to determine how many investors
21  purchased each note during the class period and
22  held it through to the end of the class period?
23  A.  No.
24  Q.  Are the bonds listed in Exhibit 1, were they high
25  yield bonds?

Page 81

1  A.  No.
2  Q.  One of the Cammer factors is whether an active
3  trading market exists for a security; is that
4  right?
5  A.  That's correct.
6  Q.  How does Cammer define an active market?
7  A.  Cammer sets forth certain parameters of turnover,
8  turnover being average weekly volume divided by
9  the number of shares outstanding for a particular
10  stock and that's how they define an active
11  market.
12  Q.  And at Paragraph 34 of your report, you state
13  that average weekly trading of two percent or
14  more of outstanding shares would justify a strong
15  presumption that the market for the security is
16  efficient and average trade, weekly trading of
17  one percent would justify a substantial
18  presumption of market efficiency for a stock; is
19  that right?
20  A.  Did you have that backwards?  This is Paragraph
21  34?
22  Q.  Yeah, I'm looking at --
23  A.  Two percent is a strong -- okay.
24  Q.  Two percent is a strong presumption that the
25  market for a stock is efficient and one percent

21 (Pages 78 - 81)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 82

1   is a substantial presumption that a market's
2   efficient under Cammer?
3  A.  Yes.
4  Q.  Are there any peer-reviewed articles or studies
5    in finance journals to support the two percent
6    and the one percent cutoffs in Cammer?
7  A.  Not that I know of.
8  Q.  What does a strong presumption of market
9    efficiency mean?
10  A.  I'm not here to interpret the court's criteria
11    set forth in Cammer.
12  Q.  So you don't have an understanding of what a
13    strong presumption of market efficiency means?
14  A.  Other than the plain meaning of the word
15    "strong," no.
16  Q.  Is the same true for a substantial presumption of
17    market efficiency?
18  A.  I'm sorry?
19  Q.  Is the same true for a, for what is a substantial
20    presumption of market efficiency?
21  A.  I have no other interpretation other than the
22    plain language meaning of the word "substantial."
23  Q.  Turning to Page 18 of your report, Paragraph 44.
24  A.  Okay.
25  Q.  Toward the bottom of Paragraph 44 you say that

Page 83

1    turnover tests were designed with common stock in
2    mind.
3       What do you mean by that?
4  A.  These tests were established in a securities
5    litigation where the subject security was a
6    common stock, and again given my earlier answer
7    that common stocks you would expect to trade
8    every available trading day, corporate debt
9    securities, as we've discussed, do not trade as
10    frequently, do not trade as often and may not
11    trade on every available trading day during a
12    particular period.
13  Q.  Are there any peer-reviewed articles or studies
14    in finance journals that show that turnover is
15    important for evaluating whether a bond trades in
16    an efficient market?
17  A.  I don't believe so.
18  Q.  Bonds trade differently than stocks; is that
19    right?
20  A.  Yes, generally.
21  Q.  Generally speaking, bond trades are bigger and
22    occur less frequently?
23  A.  I have not studied that bond trades in general
24    are larger than common stock trades but you may
25    make that inference given that corporate debt

Page 84

1    securities are generally being traded by large
2    banks and insurance companies and pension funds
3    and common stock is much more, you know, held by
4    individual retail investors as well as, you know,
5    institutional investors so that may be a
6    generality.  I have not studied that but they do
7    trade less frequently than common stock.
8  Q.  Would you turn to Page 15 of your report, please.
9    It's Page 18 of 108.
10  A.  Okay.
11  Q.  In Paragraph 38 you include a table and cite a
12    study about bond trading frequency?
13  A.  Yes.
14  Q.  That study covered the years 2000 to 2005; is
15    that correct?
16  A.  That's correct.
17  Q.  You excluded 2000 and 2001 from the table because
18    TRACE data was not available for those years?
19  A.  Yes.
20  Q.  Did you review any peer-reviewed articles or
21    studies about bond trading frequency that
22    analyzed more recent data than 2000 to 2005?
23  A.  I believe it may be discussed in the Hartzmark
24    article that's referenced in my report but I
25    don't recall seeing a numerical summary like the

Page 85

1    one set forth in the table here which provides a
2    nice breakdown of frequency of trading in the
3    number of days and percentages.
4  Q.  The Hartzmark article isn't peer reviewed, is it?
5  A.  I don't know.
6  Q.  It was published in a student-edited law journal,
7    wasn't it?
8  A.  I'm not certain.
9  Q.  Did you review any peer-reviewed articles or
10    studies that analyzed bond trading frequency
11    during the 2017 to 2020 time period?
12  A.  Not that I recall.
13  Q.  Do you know if bond trading changed at all from
14    the 2000 to 2005 time period as compared to the
15    2017 to 2020 time period?
16  A.  Can you be more specific?  Changed in what way?
17  Q.  Has technology for trading improved?
18  A.  There have been improvements in technology in
19    terms of automatic trading systems and, you know,
20    electronic trading but it has been not as
21    well-used as electronic trading in stocks so
22    there has been some change in electronic trading
23    in terms of the technology and the use of it but
24    not a dramatic shift.
25  Q.  Has the frequency of trading increased from the

22 (Pages 82 - 85)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 86

1  2000 to 2005 period to the 2017 to 2020 time
2  period?
3  A. I'm sure that there has been some change in the
4  frequency of trading.
5  Q. Are you aware of the magnitude or the direction
6  of that change?
7  A. I am not.
8  Q. Did you do anything to --
9  A. Well, excuse me. I'm sorry.
10     You said increase so that is directional.
11  Q. But you don't know about the magnitude?
12  A. I don't know the magnitude.
13  Q. Did you do anything to test whether bond trading
14  has changed since 2002 to 2005?
15  A. I believe that there are charts in my report that
16  show that there's been an increase in the dollar
17  volume of bonds traded over time.
18  Q. Where is that?
19  A. It would be early in the report. So there are
20  some charts on Page 11 of 108.
21  Q. And those charts reflect changes in the amount of
22  corporate debt outstanding and trading volume
23  between 2013 and 2021; is that right?
24  A. Correct.
25  Q. Did you do anything to compare the frequency of

Page 87

1  bond trading in the 2017 to 2020 time period to
2  the frequency of bond trading in the 2000 to 2005
3  time period?
4  A. No.
5  Q. If bond trading increased from the 2002 to 2005
6  period to the 2017 to 2020 period, then 2002 to
7  2005 data wouldn't be appropriate for analyzing
8  the trading of the notes here, would it?
9         MR. GRONBORG:  Object to form.
10  A. Can you repeat that, please?
11  Q. Sure. If bond trading increased from the 2002 to
12  2005 period to the 2017 to 2020 period, then the
13  2002 to 2005 data might not be appropriate for
14  analyzing the trading of the notes here; is that
15  right?
16         MR. GRONBORG:  Same objection.
17  A. I don't know that those data were used, the 2002
18  to 2005 data were used to analyze the Senior
19  Notes here.
20  Q. Why did you include the table on Page 15 of your
21  report then if it's, if you didn't use it as part
22  of your analysis?
23  A. It's not part of my analysis. It's part of the
24  support for the, for the proposition that
25  corporate debt securities in general trade less

Page 88

1  frequently than common stocks.
2  Q. Looking at Paragraph 41 of your report on Page
3  16, the next to last sentence on that page says:
4  "On average, the FirstEnergy Senior Notes traded
5  85.6 percent of the available trading days, which
6  is significantly greater than the trading
7  frequency of corporate bonds in general."
8     You based that sentence on a comparison to
9  the trading frequency of corporate bonds in the
10  2002 to 2005 period, didn't you?
11         MR. GRONBORG:  Object to form.
12  A. Yes.
13  Q. You didn't attempt to determine the general
14  trading frequency of bonds in the 2017 to 2020
15  period, did you?
16  A. I note from the chart that we just discussed on
17  average daily trading volume that there has not
18  been a dramatic increase at least over the time
19  period beginning in 2013 from that chart.
20     I also note that in previous studies of
21  corporate bond data I've observed that the bonds
22  do not trade every day during a particular time
23  period or during the class period.
24     I also note that in some of the prior cases
25  securities litigations where bonds were the

Page 89

1  subject of the securities litigation, the
2  frequency of trading for the debt securities
3  where the market was found to be efficient was
4  less than what I found here with FirstEnergy
5  Senior Notes but I did not attempt to update the
6  data from the table I'm relying on and I think
7  it's plainly stated that these data are from 2002
8  to 2005 and there may be an increase in the
9  frequency of trading since that time period.
10  Q. Looking at the table in Paragraph 38 of your
11  report, you don't know what the numbers would be
12  here for the period 2017 to 2020, do you?
13         MR. GRONBORG:  Object to form.
14  A. I do not know.
15  Q. You don't know whether the FirstEnergy notes
16  traded more or less frequently than other
17  corporate bonds in the 2017 to 2020 period, do
18  you?
19  A. I know that they traded more frequently than a
20  number of the debt securities in other securities
21  litigations where the market was found to be
22  efficient. I do not know whether if that table
23  was updated we would see an increase in the
24  frequency of trading of corporate bonds; however,
25  the difference between what was observed in 2005

23 (Pages 86 - 89)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 90

1 and what was observed over the 2017 to 2020
2 period for FirstEnergy was a very large
3 difference in frequency. It wasn't a small
4 difference in frequency.
5 Q. For any of the eight bonds that are listed in
6 Exhibit 1 of your report, you can't say that that
7 bond traded more frequently than 10 percent of
8 the outstanding bonds or 20 percent or 50 percent
9 or some other percentage of outstanding bonds
10 during the class period, can you?
11 A. I cannot.
12         MR. GRONBORG:  Object to form.
13 Q. Could we turn to Exhibit 8 of your report? It's
14 Page 88 of 108.
15   Each column is one of the notes that you
16 analyzed here; is that right?
17 A. Yes.
18 Q. And each row is a separate piece of information
19 about each of the notes. I'd just like to run
20 down and make sure I understand what each of the
21 rows represent so the first row says: "Possible
22 Days Count."
23   What does that indicate?
24 A. That is the number of days that the bond was
25 issued and outstanding during the class period

Page 91

1 through November 24th, 2020.
2 Q. The number of trading days; is that right?
3 A. Correct, the number of, the number of bond market
4 trading days, not stock market trading days.
5 Q. Thank you. Okay. And then the next row is:
6 "Days Traded."
7   What does that indicate?
8 A. That indicates the number of days where the
9 individual security had volume and, a volume and
10 price.
11 Q. Okay. So the number of --
12 A. Trading volume and price.
13 Q. The number of days during the class period it
14 actually traded?
15         MR. GRONBORG:  Object to form.
16 A. Correct.
17 Q. And then the third line is: "Days Traded
18 Percentage."
19   Is that just dividing line 2 by line 1?
20 A. Yes. So that would be the frequency measure.
21 Q. Okay. The next line is: "Average Daily Volume."
22   What is that?
23 A. Just as it says: It's the average daily volume
24 for a particular security over that time period.
25 Q. Okay. And volume of what? Is that expressed in

Page 92

1 terms of dollars or notes or what?
2 A. Notes.
3 Q. "Weeks Count." What does that mean?
4 A. That's the number of weeks in that particular
5 period.
6 Q. That the bond was outstanding?
7 A. Yep, yes.
8 Q. "Average Weekly Volume." What is that?
9 A. That is taking the daily volume essentially and
10 converting it into the average weekly volume.
11 Q. Did you do anything to adjust for weeks that had
12 fewer than five trading days?
13 A. No.
14 Q. The next line is: "Turnover Percentage."
15   What is that?
16 A. And that is the average weekly volume divided by
17 the issue amount.
18 Q. So for --
19 A. So that is essentially the measure that Cammer
20 sets forth for common stock.
21 Q. So for the note AK3 in the first column there,
22 you divide 10.1 million by 300 million to get the
23 turnover percentage; is that right?
24 A. Correct, yes.
25 Q. And then the last two lines: "Average Weekly

Page 93

1 Volume Asterisk."
2   What is that?
3 A. So if you look at the footnote for the notes that
4 are issued during the class period, the first
5 week of trading is unusually high volume and were
6 I to include that, it would bias the number
7 upward, the turnover upward, so I eliminated the
8 first week of trading, so for all but one of the
9 eight Senior Notes, the first week's volume after
10 they were issued is eliminated.
11 Q. And "Turnover Percentage Asterisk" is the same as
12 "Turnover Percentage" up above but you removed
13 the first week of trading; is that right?
14 A. That's correct.
15 Q. Did you examine how each of these bonds' trading
16 changed over time?
17 A. Well, to the extent that I observed very high
18 volume when they're initially offered, yes. Some
19 of the notes were issued towards the end of the
20 class period so there's not as much trading
21 volume data so I'm not, I'm not -- beyond that
22 I'm not sure what you're asking.
23 Q. Okay. For the third column here, the third bond
24 AH0, for example, you see that the average weekly
25 volume figure taking out the first week is 19.3

24 (Pages 90 - 93)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 94

1  million dollars.
2      Do you see that?
3  A. Yes.
4  Q. Do you know how many weeks out of the 179 weeks
5     that that bond was traded that the volume was
6     above 19.3 million?
7  A. I don't.
8  Q. Did you calculate the median trading volumes for
9     any of the note?
10 A. No.
11 Q. Did you compare the trading volume for this note
12    AH0 in 2017 to the trading volume in 2018 or 2019
13    or 2020?
14 A. No.
15 Q. For any of the notes did you do that exercise?
16 A. No.
17 Q. Why did you eliminate the first week of trading
18    for your analysis of turnover and frequency of
19    trading?
20 A. As I just explained, I observed that there was an
21    unusually high amount of trading volume
22    immediately following the issuance or offering of
23    the bonds and to include that would essentially
24    bias the results in favor of a finding of higher
25    turnover.

Page 95

1  Q. I see. How did you decide to use one week as the
2     cutoff?
3  A. Based on my observation of the volume being
4     unusually high for the first week, I used the
5     first week essentially as a cutoff.
6  Q. Is there any basis for that cutoff in
7     peer-reviewed papers or studies?
8  A. No.
9  Q. Did you run any sensitivities to validate your
10    choice of one week as the correct cutoff?
11 A. No.
12 Q. Did you consider a longer or shorter period?
13 A. No.
14 Q. Did you examine each bond individually to
15    determine that one week was the appropriate
16    cutoff for each one?
17 A. Again, I observed for each one of the notes that
18    was issued during the class period that the
19    volume was unusually high in the first week that
20    it was offered and I used one week to keep it
21    consistent for all the Senior Notes.
22 Q. I'm looking at the column for note AC1 now. Do
23    you see that, looking at Exhibit Number 8?
24 A. Yes.
25 Q. Do you see there the turnover percentage is 0.4

Page 96

1  percent?
2  A. Yes.
3  Q. That's below the Cammer benchmark even for a
4     stock, isn't it?
5  A. When you say "even for a stock," the Cammer
6     benchmark is for common stocks and, yes, it's
7     below the benchmark set forth by Cammer for
8     common stocks.
9  Q. Do you agree that the turnover percentage for
10    note AC1 tends to support the conclusion that
11    this bond did not trade in an efficient market?
12       MR. GRONBORG:  Object to form.
13 A. No, because I also examined frequency and AC1
14    traded on nearly 93 percent of the available
15    trading days throughout that time period.
16 Q. Does the turnover percentage for AC 1 cut against
17    a finding of market efficiency for that note?
18 A. Standing alone, I would say yes.
19 Q. Let's look at Page 18 of your report. Paragraph
20    44. This is Page 21 of 108 at the top.
21 A. Okay.
22 Q. Second sentence there says you calculated a
23    weighted average turnover for all eight bonds of
24    1.9 percent.
25       Is a weighted average turnover for all eight

Page 97

1  bonds combined relevant here?
2  A. I think it summarizes the data for all eight
3     securities. If you wanted to say, okay, there's
4     6.5 billion of these notes outstanding, let's
5     take a look at the combined volume and the
6     combined turnover, I think it summarizes it but
7     certainly you have to set all the data out for
8     each individual bond which I did set forth in the
9     exhibit we just spoke about so there's no,
10    there's no analyzing anything there.
11 Q. Okay. You need to analyze the data for each
12    security individually; is that right?
13 A. I believe so, which I did.
14 Q. Turn to the next page, please, Page 19. I'm
15    sorry. Page 19 of 108 at the top. I'm looking
16    at Paragraph 41 now. This is Page 16 on the
17    bottom right corner.
18 A. Okay.
19 Q. Okay? At the beginning of this paragraph you say
20    that the time period that you analyzed was from
21    the beginning of the class period through
22    November 24th, 2020.
23       Is that correct?
24 A. Yes.
25 Q. So the beginning of the class period is February

25 (Pages 94 - 97)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 98

1  21st, 2017 so you analyzed the period February
2  21, 2017 through November 24th, 2020 and Exhibit
3  8 to your report shows the results of your
4  analysis for that time; is that right?
5  A. So I analyzed the Senior Notes for the days that
6  they were outstanding during the class period.
7  It would have been impossible to analyze data
8  that don't exist for securities that haven't been
9  issued so that's why each of the Senior Notes
10  has, not each of them but depending on when they
11  are issued, there is a distinct period of the
12  number of available trading days.
13  Q. I understand, and that's fair.
14  A. Okay.
15  Q. But for all eight notes your analysis went up to
16  November 24th, 2020; is that right?
17  A. Yes.
18  Q. And that's what's reflected in the results in
19  Exhibit 8; is that right?
20  A. Yes.
21  Q. I'm going to have placed in front of you another
22  exhibit. This is a backup file that you produced
23  for Exhibit 8 and if you refresh your exhibits
24  folder --
25  A. Okay.

Page 99

1  Q. -- I hope you will be able to see it.
2  A. Okay.
3      MR. RITTS: Okay. We need to mark
4  this as an exhibit.
5      MR. HARMANIS: It's marked in the
6  folder.
7          - - - -
8  (Thereupon, Exhibit FE 2, Jones Exhibit 8
9  spreadsheet, was marked for purposes of
10  identification.)
11          - - - -
12  Q. Okay. I've placed in front of you a document
13  that will be marked for identification purposes
14  as Exhibit FE 2.
15  Is this the backup file that you produced for
16  Exhibit 8?
17  A. It looks like it, yes.
18  Q. Let's start with the first note here which is
19  AK3. In row 931 for the possible days count it
20  says 170; is that right?
21  A. That's what it says, yes.
22  Q. Moving down two rows it says the percentage of
23  days traded is 62.4 percent; is that right?
24  A. Yes.
25  Q. And then at the bottom of the table it says the

Page 100

1  turnover percentage, average turnover percentage
2  taking out the first week of trading is 2.2
3  percent; is that right?
4  A. Yes.
5  Q. Now let's go back to Exhibit 8 that's attached to
6  your report that's Page 88 of 108 of your report.
7  In Exhibit 8 of your report the possible days
8  count is 195; is that correct?
9  A. I am not there yet. I'm sorry.
10  Q. Okay. It may be easier to look at the --
11  A. I see it. I'm trying to click on it. I'm sorry.
12  Q. It may be easier to look at the paper version of
13  your report for comparison purposes.
14  A. Okay.
15  Q. Okay, so in Exhibit --
16  A. Yes, its --
17  Q. In Exhibit 8 of your report, the possible days
18  count for note AK3 is 195; is that correct?
19  A. Yes.
20  Q. The percentage of days traded for note AK3 is
21  65.6?
22  A. Yes.
23  Q. And the average weekly turnover taking out the
24  first week of trading is 2.6 percent; is that
25  right?

Page 101

1  A. Yes.
2  Q. If we look at the second note, which is AN7
3  looking at your backup file which is Exhibit FE
4  2, it says there that the possible days count is
5  96; is that right?
6  A. Yes.
7  Q. And Exhibit 8 of your report says the possible
8  days count is 121; is that right?
9  A. Yes.
10  Q. The backup file, Exhibit FE 2 for note AN7 says
11  the percentage of days traded is 77.1; is that
12  right?
13  A. Yes.
14  Q. And Exhibit 8 to your report says that the days
15  traded percentage for that note is 78.5 percent;
16  is that right?
17  A. Yes.
18  Q. The backup file for Exhibit 8 on the bottom line
19  the average turnover percentage taking out the
20  first week says it's 4.5 percent; is that right?
21  A. Yes.
22  Q. And it also says 4.5 percent in Exhibit 8; is
23  that right?
24  A. Yes. So it appears that you may, that I may have
25  sent you an old Excel file as a backup file.

26 (Pages 98 - 101)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 102

1 Q. And why is the backup file different from the,
2    from Exhibit 8 to your report?
3 A. It may have been an archived Excel file that was
4    inadvertently sent to you.
5 Q. How many different iterations of the turnover and
6    trading frequency analysis did you perform before
7    you finalized your report?
8 A. I don't know. It would have been, the
9    calculations would have been made, they would
10   have been checked. We may have looked at
11   different time periods and it appears that your
12   backup file that I sent that I provided was an
13   earlier version than what we adopted.
14 Q. Okay. So you tested out different periods before
15   you finalized what's set forth in Exhibit 8; is
16   that right?
17 A. We may have looked at the class period and then a
18   period of time post class period consistent with
19   events set forth in the complaint.
20 Q. If you look at the backup to Exhibit 8 for this
21   Exhibit FE 2 and you compare the bottom line
22   average turnover percentage taking out the first
23   week and you compare that to the final Exhibit 8,
24   is it correct that all of the numbers on that
25   line in the backup are either lower than or the

Page 103

1    same as what is in the final Exhibit 8?
2 A. Yes, either the same as or lower.
3 Q. And if you look at --
4 A. But not, it wouldn't make -- it doesn't change
5    whether or not they met the Cammer threshold or
6    didn't meet the Cammer threshold.
7 Q. If you look at the third line of the backup file
8    days traded percentage and you compare that to
9    the same line as Exhibit 8, is it correct that
10   for all eight of the notes in the backup file it
11   shows a lower days traded percentage than in the
12   final Exhibit 8?
13 A. Slightly so, yes.
14      Again nothing that would make a difference in
15   terms of reaching a conclusion that the frequency
16   with which these notes traded was high relative
17   to corporate bonds in general from the table that
18   we spoke about earlier.
19 Q. If we look at the backup file again, you see that
20   the lines from line 9 to 930 are all hidden?
21 A. Yes.
22 Q. Then let's --
23         MR. GRONBORG: Object to form.
24 Q. Let's -- can you unhide those lines?
25 A. I don't know that.

Page 104

1 Q. It's in native format so...
2 A. Is it functional?
3 Q. Yes, it's functional. You should be able to
4    unhide those lines.
5 A. Let's see. I don't think so. I'm not able to
6    open those rows from this version.
7       If I view an Excel online that's an option.
8    Can I do that? Does that work?
9 A. Yes, I'm sorry. Let me unmute myself. I think I
10   can have my colleague share his screen.
11 A. If I view in Excel online, can I make, can I open
12   the rows?
13 Q. You should be able to I think.
14 A. Okay. I don't want to mess anything up but we're
15   going to try it.
16 Q. Okay. My colleague is sharing his screen now and
17   he is able to --
18 A. Okay.
19 Q. So I'm looking now, this is Exhibit FE 2 in
20   native form.
21      If you unhide the lines between 9, row 9 and
22   row 930. Okay? And it looks --
23 A. Okay.
24 Q. -- like column C here does, those are the
25   dates --

Page 105

1 A. Okay.
2 Q. -- that you analyzed; is that correct?
3 A. Yes. I think those would be the available
4    trading days.
5 Q. Okay. And it starts on February 21st, 2017 which
6    is the first day of the class period, right?
7 A. Yes.
8 Q. And if we scroll all the way down to row 922, the
9    last day that appears is October 19th, 2020; is
10   that right?
11 A. Yes.
12 Q. That's the last day that's included in the
13   analysis on FE 2?
14 A. Yes. Although is there any data for that time
15   period?
16 Q. There doesn't appear to be.
17      Can you explain why you stopped the analysis
18   on this date?
19 A. No.
20         MR. GRONBORG: Object to form.
21 A. Again, this was an, obviously an archived version
22   of this Excel spreadsheet and I'm not sure who
23   performed the analysis or who stopped at a
24   particular date and time but it doesn't even look
25   like there's trading data for that time period so

27 (Pages 102 - 105)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 106

1    I'm not sure.
2  Q. Did you consider any other end dates for your
3    analysis besides November 24th and October 19th,
4    2020?
5  A. I recall that we may have considered the class
6    period end date as a date to end the analysis.
7  Q. And did you analyze the turnover and frequency of
8    trading for the period ending at the close of the
9    class period?
10 A. I believe we did.
11 Q. And what did that analysis show?
12 A. I don't recall.
13 Q. Was it the same as the results in Exhibit Number
14    8?
15 A. I'm sure it was different because there would be,
16    especially for the notes that were issued in June
17    and if we were, if we eliminate the first week of
18    trading, it gives us very little data to work
19    with so I'm sure the results would have been
20    different.
21 Q. I'd like to turn now to Paragraph 34b of your
22    report.
23    This is the top of Page 17 of 108.
24 A. Paragraph 34?
25 Q. Yes. 34b.

Page 107

1  A. Okay.
2  Q. You say that one of the factors for considering
3    market efficiency is whether a significant number
4    of securities analysts follow and report on the
5    subject security.
6    Could a market for security be efficient even
7    if a significant number of analysts do not report
8    on that security?
9  A. I think so.
10 Q. Could a market be inefficient even if a
11    significant number of analysts do report on that
12    security?
13 A. I think that would be unlikely but I wouldn't say
14    it could never be inefficient if there were a
15    large number of analysts.
16 Q. Does the peer-reviewed literature establish any
17    objective guidelines as to how many analysts
18    coverage shows that the market for a security is
19    efficient?
20 A. I think we established that there's really no
21    peer-reviewed literature that discusses the
22    Cammer actors and how they are applied to
23    different securities but I will say that it's my
24    understanding that in the Cammer case there were
25    15 analyst reports for coded sales of the subject

Page 108

1    company in that litigation.
2  Q. There isn't any peer-reviewed research that
3    validates that number of 15 in Cammer; is that
4    correct?
5  A. Not that I'm aware of.
6  Q. You mention in your report that there are around
7    400 research reports about FirstEnergy published
8    during the class period.
9    How many of those reports dealt specifically
10    with the notes that you analyzed in your report?
11 A. I don't know the number but I know that ViaVet
12    Global specifically had investment
13    recommendations on the Senior Notes and I believe
14    that JPMorgan also had specifically fixed income
15    focused reports but I don't recall a number.
16 Q. Okay. Are there any others that come to mind?
17 A. Not that come to mind.
18 Q. FirstEnergy had conference calls during the class
19    period for investors; is that right?
20 A. They did.
21 Q. And also could ask questions of FirstEnergy
22    during those calls; is that right?
23 A. Yes.
24 Q. Did you listen to any of those calls or read the
25    transcripts?

Page 109

1  A. I looked at transcripts for some of them.
2  Q. Did any of the calls where you read the
3    transcripts address the FirstEnergy notes that
4    you analyze in your report?
5  A. The -- well, the calls address information that
6    would be relevant to a fixed income investor but
7    I don't recall management discussing their
8    outstanding debt securities.
9  Q. Okay. Your opinion is that the number of
10    FirstEnergy research reports is consistent with
11    the finding of market efficiency for the notes;
12    is that right?
13 A. That's right. I, given not only the number of
14    reports but the consistency throughout the class
15    period, in other words there weren't months that
16    would go by during the class period when there
17    wasn't an analyst report and given the diversity
18    of the authors of the reports, you know, there
19    are many different opinions coming into the
20    market, I believe that lays in favor of a finding
21    of efficiency.
22 Q. How many reports need to exist for it to be
23    consistent with a finding of market efficiency?
24    MR. GRONBORG:  Object to form.
25 A. I think as I I, I think as I just mentioned it's

28 (Pages 106 - 109)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 110

1 not just the number. You may have a very short
2 class period where there's three analyst reports
3 because of the, you know, the time span; but in
4 general if you're looking at a long period of
5 time, you like to see that there's consistent
6 coverage, there's interest by the investment
7 community by way of Q and A in these quarterly
8 earnings calls and you like to see some diversity
9 in the firms that are issuing the reports to get
10 sort of a, you know, a mosaic of all different
11 opinions on the security so it's not just a
12 number and I don't think there's any bright line
13 test.
14 Q. Is there anything in the peer-reviewed literature
15 that would allow you to set a threshold for a
16 test?
17 A. I think we've established that there's no
18 peer-reviewed literature that I'm aware that goes
19 through each of the Cammer and Krogman factors
20 and sets forth a bright line test.
21 Q. I'd like to direct your attention now to
22 Paragraph 51 of your report. That's Page 23 of
23 108.
24 A. Five-one?
25 Q. Five-one, yes, 51.

Page 111

1 A. Five-one.
2      MR. GRONBORG:  Geoff, we've been
3      going about an hour-and-a-half so I don't
4      know if there's a convenient time for a
5      break, can we take one?
6      MR. RITTS:  Yeah, I think we can
7      break in five minutes or so.
8      THE VIDEOGRAPHER:  Now? Do you
9      wish to go off now?
10 Q. No. Five minutes or so we'll be ready.
11      So looking at Paragraph 51 you indicate that
12 a factor for considering efficiency for a
13 security that trades in the over-the-counter
14 markets is the number of market makers. Do you
15 agree that there are no market makers for
16 corporate debt securities?
17 A. Not as defined in Cammer but the MPIDs or market
18 participants or the broker dealers that are
19 essentially providing quotes and making, you
20 know, facilitating trading in debt securities are
21 akin to a market maker but I do agree there are
22 structural differences in the way stocks and
23 bonds are traded.
24 Q. In Paragraph 51 you say, starting on the fifth
25 line: "With a security reported to TRACE, for

Page 112

1 which price and volume discovery is readily
2 available, the quantum of market makers is less
3 relevant."
4 A. Yes.
5 Q. Is that a true statement?
6 A. I believe so.
7 Q. Is price and volume discovery readily available
8 for listed stocks?
9 A. Yes.
10 Q. And why do you think the Cammer factors include
11 the number of market makers?
12 A. Because as Cammer says for over-the-counter
13 markets without volume reporting, so Cammer was
14 looking at market makers in lieu of having
15 readily available price and volume reporting.
16 Q. Okay. You say that market participants are
17 tantamount to an established group of market
18 makers for equity securities.
19      What's your basis for that statement?
20 A. You said market participants? Aren't you saying
21 they are interchangeable with market makers for
22 an equity security?
23 Q. Well, I'm reading Paragraph 51 of your report.
24 You see where it says "these dealers" and that's
25 referring to market participants; is that right?

Page 113

1 A. Uh-huh.
2 Q. "Are tantamount to an established group of market
3 makers for equity securities."
4      And I'm asking:  What is your basis for that
5 statement?
6 A. If you go a little further down in that
7 paragraph, I reference The Handbook of Fixed
8 Income Securities which has the pretty fair
9 discussion of that dealers as market makers.
10 Q. Looking at the next page, you calculated the
11 number of unique market participants who reported
12 trades to FINRA for each of the eight bonds in
13 question; is that right?
14 A. I did.
15 Q. And are, is the number that appears on that table
16 in the middle of Page 24 of 108, is that the
17 aggregate number of market participants over the
18 entire portion of the class period for which
19 these bonds were trading?
20 A. Yes.
21 Q. Did you analyze how the number of market
22 participants changed over time?
23 A. I did not.
24 Q. What number of market participants is enough to
25 indicate that a bond traded in an efficient

29 (Pages 110 - 113)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 114

1 market?

2 A. I don't think there's any bright line.

3 Q. Okay. Is there any basis in the peer-reviewed

4   literature to say that a certain number is or

5   isn't enough to indicate market efficiency?

6 A. I think we've established that there's no

7   peer-reviewed literature that analyzes each of

8   the Cammer and Krogman factors and sets forth a

9   bright line test; but to the extent that we're

10   looking to the Cammer decision for some

11   guideline, the court there thought five to ten

12   market makers was sufficient.

13 Q. With respect to a common stock, right?

14 A. Correct.

15 Q. Up at the top of Page 21 of your report, the

16   first sentence reads: "There is also

17   considerable trading in the corporate debt market

18   directly between large banks."

19     Do you see that?

20 A. Yes.

21 Q. Was there considerable trading directly between

22   large banks for the eight FirstEnergy notes that

23   you considered?

24 A. I wouldn't have those data.

25 Q. Were there any arbitragers for the FirstEnergy

Page 115

1 notes that you analyzed?

2 A. Not that I'm aware

3     MR RITTS: Okay  We can go off

4   the record

5     THE VIDEOGRAPHER:  We are off the

6   record at 1:04 p m  Eastern

7     - - - -

8     (Thereupon, a recess was had )

9     - - - -

10     THE VIDEOGRAPHER:  We are back on

11   the record at 1:50 p m

12     AFTERNOON SESSION

13   (Tuesday, July 19, 2022, 1:50 p m )

14     - - - -

15 CONTINUED CROSS-EXAMINATION OF CYNTHIA JONES, CFA

16 BY MR RITTS:

17 Q  Good afternoon, Ms Jones

18 A  Good afternoon

19 Q  Do you have any documents or devices with you

20   that you did not have when you were testifying

21   earlier?

22 A  I do not

23 Q  Is market capitalization an indicator of market

24   efficiency for a bond?

25 A  It's one of the Cammer factors so I'm not sure

Page 116

1 any of the Cammer factors were specific to

2   analyzing the market for a debt security but it's

3   one of the Cammer factors.

4 Q. There weren't any peer-reviewed articles or

5   studies in the finance literature that say that

6   market capitalization is an indicator of market

7   efficiency for a bond, are there?

8 A. No, not that I'm aware.

9 Q. On Page 23 of your report, Paragraph 58 it's Page

10   26 of 108, you say at the top of Paragraph 58

11   that market capitalization can be an indicator of

12   market efficiency but that an objective threshold

13   has not been quantified.

14     So there is no objective number that supports

15   a finding of market efficiency for a bond; is

16   that right?

17 A. That's correct.

18 Q. How do you decide whether a company's market

19   capitalization is large enough to indicate market

20   efficiency for a bond?

21 A. One of the indicators that I like to look at,

22   first of all you can look at a company's market

23   cap relative to other publicly traded companies

24   and there are decile studies that break down all

25   of the publicly traded companies by size of

Page 117

1 market cap so there is some scale that you can

2   look at but it's my opinion that market cap is an

3   indicator of whether or not the company is able

4   to attract capital. Is it sizeable enough that

5   it can attract capital so in terms of looking at

6   if a company was, let's say it was a small cap

7   company and, you know, standing alone it would

8   not look like it would weigh in favor of a

9   finding of efficiency, I'd like to see has the

10   company been able to raise equity through a

11   public offering, has the company been able to

12   access a line of credit with a lending

13   institution, has the company been able to issue

14   debt securities to fund its operations or capital

15   expenditures.

16     So I think that you have to look sort of in

17   the context of is the company so small that it's

18   an impediment to attracting capital.

19 Q. FirstEnergy's market capitalization varied over

20   the class period here; is that right?

21 A. It did. Most companies do.

22 Q. Do you know what range it varied over?

23 A. I believe the low during the class period was

24   roughly 12 billion and the high was 30 plus

25   billion.

30 (Pages 114 - 117)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 118

1 Q. Are there any peer-reviewed articles or studies
2    that indicate that any particular threshold of
3    market capitalization is an indicator of market
4    efficiency for bonds?
5 A. Not that I'm aware.
6 Q. Can a company with a small market cap have
7    securities that trade in an efficient market?
8 A. Sure.
9 Q. And how could you tell?
10 A. I think I just described how, what other
11    indicators I would look at relative to market cap
12    which is: Is the market cap so small that it's
13    an impediment to attracting capital.
14 Q. Could a company with a large market cap have some
15    securities that do not trade in an efficient
16    market?
17 A. Something that's a, you know, a Fortune 500
18    company like FirstEnergy, I would find that hard
19    to believe that its securities don't trade in an
20    efficient market but I wouldn't rule it out as a
21    possibility.
22 Q. You'd have to look at the data to make a
23    determination?
24 A. Sure.
25 Q. You analyzed the bid-ask spread for the eight

Page 119

1    FirstEnergy notes; is that right?
2 A. I did.
3 Q. And I'm looking now at Paragraph 68 of your
4    report on Page 28. You used a study covering the
5    period July 2002 to February 2004 as a benchmark
6    for comparing the bid-ask spread for the
7    FirstEnergy notes; is that correct?
8 A. No. I performed my own study of contemporaneous
9    bid-ask spreads on certain actively traded
10    corporate notes.
11 Q. Okay. And in, as indicated in the last sentence
12    on Paragraph 68 you reviewed a study concerning
13    trading in corporate bonds over the period July
14    2002 through February 2004 to --
15 A. I did.
16 Q. -- get information about the bid-ask spreads
17    then?
18 A. Yes.
19 Q. Did you review any more recent studies on bid-ask
20    spreads?
21 A. No, not other than the one that I've prepared
22    here.
23 Q. Do you have any basis to conclude that bid-ask
24    spreads that prevailed in the July 2002 to
25    February 2004 period are representative of

Page 120

1    bid-ask spreads in the 2017 to 2020 time period?
2 A. I don't have evidence of that.
3 Q. Your analysis of the bid-ask spread for the
4    FirstEnergy notes only covered 2020; is that
5    right?
6 A. It covered one calendar year.
7 Q. And that was 2020; is that right?
8 A. Yes.
9 Q. You didn't analyze the bid-ask spread for the
10    FirstEnergy notes in 2017 or 2018 or 2019; is
11    that correct?
12 A. That's correct.
13 Q. Why didn't you do that?
14 A. I was trying to find the most common period of
15    time for the eight Senior Notes where they were
16    all trading and also I knew I was going to be
17    comparing the bid-ask spread over that period of
18    time not only to each of the notes amongst
19    themselves but I was going to make comparison of
20    the bid-ask spreads against a group of actively
21    traded corporate bonds. So for those reasons I
22    chose a one-year calendar period of 2020.
23      2020 was also as you know a period of extreme
24    volatility in the global securities markets so
25    standing alone without making some comparison to

Page 121

1    other corporate debt securities, it may have
2    appeared that the spreads on the FirstEnergy
3    Senior Notes were wide or, you know, widening or
4    wide during certain periods of time in 2020 but I
5    think comparing them against a group of peers, if
6    you will, eliminates any bias there.
7 Q. You analyzed 14 corporate bonds besides
8    FirstEnergy's; is that right? And they're listed
9    in Paragraph 70 of your report?
10 A. Yes.
11 Q. How did you pick those 14 bonds?
12 A. They were a random selection. I looked at
13    FINRA's Fact Book for, in 2017 which as you know
14    is the beginning of the class period. I selected
15    seven corporate debt securities companies that
16    some of them were household names, large
17    companies, different industry groups, different
18    maturities, different coupons.
19      I did the same thing for a set of actively
20    traded bonds identified by FINRA in 2020. I
21    selected seven again. In selecting the 14
22    overall I wanted to make sure that I wasn't
23    selecting duplicates from the 2017 actively
24    traded group and the 2020 actively traded group.
25 Q. How did you pick the seven from each list from

31 (Pages 118 - 121)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 122

1  the 2017 list and the 2020 list? You looked at
2  all of the 50 bonds on the list and you tried to
3  choose ones that represented different industry
4  groups, maturities and coupons? Is that -- am I
5  understanding that right?
6  A. Right. So in the group of 50 let's say there may
7  have been four Ford Motor Company issues. I
8  didn't want to pick duplicates so I think
9  there's no magic number to seven, but I picked
10  seven from each of the two groups of 50, again
11  looking at a diverse group of industries, not
12  duplicating the issuer, looking at maturity
13  lengths, you know, between closer maturities,
14  further maturities and coupons.
15  Q. You didn't select the 14 bonds randomly. You
16  used your judgment to select which 14 you were
17  going to use; is that right?
18  A. I wouldn't say judgment in that regard because I
19  didn't, I didn't collect data for any of the 14.
20  I didn't collect bid-ask data for anything other
21  than these 14 securities so I wasn't selecting
22  them based on any performance. I was selecting
23  them based on criteria.
24  Q. The selection wasn't random, though. You didn't
25  just draw numbers out of the hat or throw

Page 123

1  darts --
2  A. I didn't.
3  Q. -- or something like that?
4  A. I did not draw numbers out of a hat and had I
5  done that, it's likely I would have picked
6  duplicates.
7  Q. Why didn't you just use the entire list of 50
8  bonds for 2017 and 2020?
9  A. Well, if you look at the lists, you'll notice
10  that not all of the bonds are outstanding for the
11  entire period of time that I looked at.
12  Some of them aren't issued until later in
13  terms of the 2020 selection so I felt like 14 was
14  enough of a sample to get, and given that they
15  are all in diverse industries with different
16  maturities and different coupons, I felt like
17  that was a robust sample.
18  Q. Did you record your methodology for selecting
19  that sample anywhere?
20  A. I think I described it in my report.
21  Q. A sample's supposed to be representative of a
22  population that it represents; is that correct?
23           MR. GRONBORG: Object to form.
24  A. That's correct.
25  Q. Is what you did a scientifically valid way to

Page 124

1  select a sample?
2  A. To the extent that I'm trying to determine
3  whether or not the bid-ask spreads were
4  sufficiently small in terms of, you know, looking
5  at the cost of trading the FirstEnergy bonds, the
6  methodology where I'm first looking at the most
7  actively traded bonds, I'm putting the
8  FirstEnergy notes against not some random sample
9  of any corporate bonds but the most actively
10  traded which would by virtue of that definition
11  have the smallest bid-ask spreads. I believe
12  that it was a very fair comparison and
13  representation.
14  Q. Are there any peer-reviewed studies or papers in
15  the finance journals that would support your
16  methodology for selecting a sample here?
17  A. I don't believe so.
18  Q. You mentioned that, did you do anything to test
19  or to confirm that the sample that you selected
20  was representative of the population?
21  A. Other than look at the coupons, the maturities
22  and the industry group, I suppose I could have
23  selected a group of utility company bonds,
24  whether or not they were the most actively traded
25  but I believe that would have biased the results

Page 125

1  in favor of a finding of efficiency so I
2  essentially put the FirstEnergy Senior Notes
3  against the best of the best to see whether or
4  not the cost of trading the FirstEnergy notes
5  would have been greater than the cost of trading
6  any other actively traded security.
7  Q. You mention in your report that economists
8  sometimes use autocorrelation as a factor in
9  considering whether a security trades in an
10  efficient market; is that correct?
11  A. I think that it's most often used to look at
12  whether a stock trades in an efficient market. I
13  don't think that experts in looking at the
14  efficiency of the market for a debt security
15  would find it particularly helpful.
16  Q. What is autocorrelation?
17  A. Autocorrelation means that there's information in
18  successive prices so that today's price return is
19  not independent of yesterday's price return.
20  Q. Why is autocorrelation pertinent to market
21  efficiency?
22  A. In and of itself it's really not but if you had
23  an extreme level of autocorrelation in a security
24  and trading costs were low enough and you knew of
25  the type of autocorrelation you had ahead of time

32 (Pages 122 - 125)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 126

1 and you could develop a trading model that would
2 profit from the autocorrelation over time, it
3 would be indicative that the price was reflecting
4 something other than new information.
5 Q. Do you think that autocorrelation has any bearing
6 at all on whether a bond trades in an efficient
7 market?
8 A. No.
9 Q. Why not?
10 A. It is commonly expressed in the academic
11 literature that debt securities routinely show
12 autocorrelation.
13 Q. You agree that under certain circumstances
14 autocorrelation can indicate an inefficient
15 market for a security; is that right?
16 MR. GRONBORG: Object to form.
17 A. I believe I was referring to in a common stock.
18 Q. So autocorrelation never can be relevant under
19 any circumstances to market efficiency for a debt
20 instrument?
21 MR. GRONBORG: Object to form.
22 A. I have not seen a single study or an example of
23 autocorrelation in the context of price returns
24 for debt security that showed that the market was
25 inefficient. Autocorrelation is a common

Page 127

1 phenomenon in the pricing and treating of
2 corporate debt securities.
3 Q. With respect to a stock, what level of
4 autocorrelation suggests that the market for the
5 stock is not efficient?
6 A. It's not just the it, it's not just the level or the
7 existence of autocorrelation. It is: Is it
8 identifiable ahead of time. Can you develop a
9 trading model that would exploit the
10 autocorrelation such that you would make
11 risk-free profits and are trading costs low
12 enough that you would generate that profit after
13 all trading costs. Those are all factors.
14 Autocorrelation may be present during certain
15 time periods of let's say increased price
16 volatility.
17 It doesn't mean that you could have predicted
18 it. It doesn't mean that you could have
19 developed a trading model to capitalize on it.
20 It doesn't mean trading costs would be low enough
21 that it would be worth your while. So just the
22 presence of autocorrelation alone would not
23 indicate that it gives rise to a finding of
24 inefficiency.
25 Q. Are there any objective benchmarks that exist for

Page 128

1 stock as to how much autocorrelation suggests
2 market inefficiency?
3 A. Not in and of itself.
4 Q. Look at Paragraph 82 of your report, please.
5 It's Page 37 of 108.
6 You tested the Bloomberg U.S. Corporate Bond
7 Index for autocorrelations; is that right?
8 A. I did.
9 Q. And found statistically significant
10 autocorrelation in that index?
11 A. I did.
12 Q. What level of autocorrelation did you find?
13 A. When you say "level," what are you referring to?
14 Q. How did you measure it? You say that your
15 analysis found statistically significant
16 autocorrelation. What precisely did it find?
17 A. Well, there are different indicators you look at
18 in a regression analysis so I'm not sure which
19 one you're referring to but -- and in any case I
20 don't, I don't recall the exact level of
21 autocorrelation.
22 Q. Okay. Which indicator were you referring to in
23 Paragraph 82 when you wrote that your statistical
24 analysis found statistically significant
25 autocorrelation?

Page 129

1 A. Sure. I looked at the correlation coefficient
2 and I looked at the test statistic on the
3 coefficient.
4 Q. Thank you. What time period did you analyze?
5 A. I believe I looked at the entire class period
6 from February of 2021 through November of 2020.
7 Q. Did you document your study or analysis in your
8 report anywhere?
9 A. I don't have the results in my report.
10 Q. The bond index, the Bloomberg U.S. Corporate Bond
11 Index is an aggregate of thousands of bonds; is
12 that right?
13 A. It is.
14 Q. Does it include FirstEnergy's bonds?
15 A. I'm not certain if they're a constituent or not.
16 Q. Did you analyze whether any of the individual
17 bonds in this case exhibited autocorrelation?
18 A. I asked one of the members of my staff to start
19 preparing those regression analyses but I didn't
20 ultimately review the results and I'm not certain
21 that they completed the analysis for all eight of
22 FirstEnergy's Senior Notes because at the same
23 time I was doing my calculations for the
24 Bloomberg U.S. Corporate Bond Index and not
25 surprisingly found a significant level of

33 (Pages 126 - 129)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 130

1  autocorrelation and discontinued any analysis of
2  the individual securities.
3  Q. So you directed the members of your team to stop
4  analyzing possible autocorrelation in the
5  FirstEnergy bonds; is that right?
6       MR. GRONBORG: Object to form.
7  A. Yes.
8  Q. You don't know whether any of the individual
9  FirstEnergy bonds exhibited autocorrelation that
10  was higher than the bond index; is that right?
11  A. I do not know that.
12  Q. If one of the FirstEnergy bonds exhibited
13  autocorrelation that was far above the bond
14  index, that would tend to indicate an inefficient
15  market, wouldn't it?
16       MR. GRONBORG: Object to form.
17  A. Not in my opinion.
18  Q. But you could test --
19  A. Just as -- I was going to say just as if any of
20  the eight had exhibited no autocorrelation, I
21  would not have concluded that that said anything
22  about market efficiency in a positive way.
23  Q. You could have analyzed all eight of the
24  FirstEnergy bonds to see whether there was a
25  statistically significant difference between

Page 131

1  their autocorrelation and the Bloomberg index but
2  you chose not to; is that right?
3  A. It wouldn't have provided any information that
4  would have helped me to arrive at my conclusion;
5  so for example if three of the FirstEnergy Senior
6  Notes showed no correlation, I would not conclude
7  that they're any more efficient than the
8  thousands of bonds in the U.S. Corporate Bond
9  Index.
10  Q. So if you had found that some of the FirstEnergy
11  notes had no autocorrelation at all while other
12  notes had autocorrelation that was way above the
13  Bloomberg index, you would have considered that
14  completely irrelevant information?
15       MR. GRONBORG: Object to form.
16  A. Yes. I would, I would find -- the presence of
17  autocorrelation in corporate bond pricing is well
18  known, well documented and in my opinion has no
19  bearing on whether or not the bond is traded in
20  an efficient market.
21    So I wouldn't champion notes that are, show
22  no autocorrelation and I wouldn't penalize notes
23  that show autocorrelation.
24    I don't think it has any bearing or relevance
25  on the efficiency of the market for bonds.

Page 132

1  Q. An event study seeks to determine the reaction of
2  a security price to disclosure of new information
3  specific to the company in question; is that
4  right?
5       MR. GRONBORG: Object to form.
6  A. That's fair.
7  Q. The disclosure of new information is the event
8  that's being studied?
9       MR. GRONBORG: Object to form.
10  A. Yes.
11  Q. What happens if multiple events happen on the
12  same day? An event study can only identify the
13  cumulative impact of those events; is that right?
14       MR. GRONBORG: Object to form.
15  A. Generally speaking, yes.
16  Q. An event study can't isolate the price impact of
17  multiple events if they all occur on the same
18  day, correct?
19       MR. GRONBORG: Object to form.
20  A. Not standing alone.
21  Q. You'd need some other method to separate out the
22  individual impacts; is that correct?
23  A. Yes. There are numerous methods to parse out
24  confounding information.
25  Q. Hypothetically if a company disclosed three new

Page 133

1  items of information at the same time and the
2  abnormal price change was positive $1 an event
3  study could not by itself show that the first
4  disclosure caused 50 percent of the abnormal
5  change and that the second and third disclosures
6  each caused 25 cents of abnormal change; is that
7  right?
8  A. I would agree with that.
9  Q. An event study would just allow you to conclude
10  that the three disclosures altogether caused a $1
11  increase in price; is that right?
12       MR. GRONBORG: Object to form.
13  A. Not exactly. That's not exactly right because
14  you haven't established that the three
15  disclosures all contained material information.
16  Q. If a company had an unexpectedly poor earnings
17  announcement and a decrease in its credit rating
18  at the same time and its abnormal price change
19  was negative $1, an event study couldn't show
20  that the credit rating change caused 75 cents of
21  the abnormal change and that the earnings
22  announcement caused 25 cents of the abnormal
23  change, could it?
24       MR. GRONBORG: Object to form.
25  A. It's more likely that the earnings announcement

34 (Pages 130 - 133)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 134

1 coupled with other information caused the credit
2 rating change so in that case the credit rating
3 change could be 100 percent responsible for the
4 price change.
5 Q. But the event study wouldn't allow you to parse
6 the effects of the different events. You'd need
7 other tools; is that right?
8 A. If a parsing was necessary is what I'm saying.
9 It may not be necessary to parse in a case such
10 as that.
11 Q. In an event study what result is required to show
12 that the market for a particular security is
13 efficient?
14        MR. GRONBORG: Object to form.
15 A. I'm not sure I understand "what result," the term
16 "what result."
17 Q. If you test multiple days during a period, how
18 many days need to show statistically significant
19 residual price movement to indicate market
20 efficiency for a security?
21 A. I don't think there's any predefined threshold or
22 threshold in the academic literature. I think
23 it's on a case-by-case basis and you've got to
24 look at everything in context.
25 Q. Let's say you test ten event days over a

Page 135

1 four-year period, how many of those ten event
2 days would need to show statistically significant
3 abnormal price movement to support a conclusion
4 that the market for the security is efficient?
5        MR. GRONBORG: Object to form.
6 A. There's no threshold so when you are selecting
7 your events of interest you're making a
8 hypothesis that news entered the market that may
9 have impacted the price of the security. That
10 doesn't mean that you've accurately identified
11 only those dates upon which material news entered
12 the market; so in the context of your
13 hypothetical, I don't think that there's any
14 number that's the correct number out of ten.
15 Q. If you want to evaluate market efficiency for a
16 security over a period of one year, how many
17 event days during that period would you need to
18 test to reach a conclusion?
19        MR. GRONBORG: Object to form.
20 A. That's also difficult to answer because you may
21 have a security that doesn't have very many
22 relevant announcements over a one-year period so
23 you may have a very, very small sample of days to
24 test that are what you would consider to be news
25 days or days where relevant information entered

Page 136

1 the market that you hypothesized may have
2 impacted the price. So each event study is
3 unique in that it is, your control period may be
4 a different time period, your number of
5 observations are dictated by a number of factors
6 including how many announcements were made, how
7 many unexpected announcements were made. These
8 are all things that are unique to the
9 circumstances of the subject company.
10 Q. Is it fair to say that the more events that one
11 evaluates over a given period, the more robust
12 the conclusion about market efficiency or not
13 would be?
14        MR. GRONBORG: Object to form.
15 A. I guess what I'm trying to explain is: As an
16 analyst, you always want more. You want more
17 data. You want more events to analyze but that's
18 not what you always get so you have to construct
19 a test, you know, design the test for the data
20 that you are given. You know, as I said, you may
21 not have ten events to analyze over a particular
22 period of time. There may not be ten significant
23 days when you think significant information
24 entered the market.
25      So I mean as a general proposition, as an

Page 137

1 analyst I like to have more rather than less but
2 you design your test around the facts and
3 circumstances that you're, that are in front of
4 you.
5 Q. If you want to -- strike that.
6      Can you reach a conclusion about market
7 efficiency over a multiyear period without
8 studying any event days during that period?
9 A. Sure.
10 Q. How?
11 A. I think we talked about this before in looking at
12 the characteristics of the market so do you have
13 an active market over multi periods. Do you
14 have, are analysts issuing reports about the
15 company consistently over a multi, over multi
16 periods.
17      There are other indicators. You know, in
18 many cases that I've looked at you may have one
19 significant event and it's the end of the class
20 period disclosure and that's all that you have
21 during the class period. That doesn't mean that
22 at earlier points in time the market's not
23 efficient. It just means there's nothing
24 significant going on that's going to change the
25 price by a significant amount.

35 (Pages 134 - 137)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 138

1 Q. So you would have to look at the other Cammer and
2    Krogman factors of the event study to reach a
3    conclusion in that circumstance. Is that what
4    you're saying?
5 A. Sure. That's what we've been talking about which
6    is no one Cammer or Krogman factor is dispositive
7    with regard to market efficiency. You've got to
8    look at the whole kit and caboodle.
9 Q. When conducting an event study what's the
10   appropriate methodology to choose the events to
11   be evaluated?
12 A. There is no one appropriate methodology. There
13   are event studies that are done on a number of
14   different types of corporate events. There are
15   event studies done on earnings announcement days.
16   There are event studies that are done on dividend
17   announcement days. There are event studies that
18   are done on changes in credit ratings. There are
19   event studies that are done when mergers are
20   announced so there is no -- there are some event
21   studies done on any day the company issues a
22   press release. So there's no any one particular
23   appropriate way of identifying events and it's
24   very specific to the subject companies that
25   you're looking at.

Page 139

1 Q. Does the scholarly literature identify
2    methodologies that are appropriate for selecting
3    events for an event study?
4 A. Generally the scholarly articles don't speak to
5    an event study on a single company security.
6    They speak to an analysis of the types of
7    information that impact stock prices over 3,000
8    different companies' equity securities so there
9    is no scholarly literature on doing single study
10   -- single company event studies and selecting
11   events.
12 Q. Do you agree that it would be improper to pick
13   events to test by looking at whether the
14   securities price actually changed on that day?
15 A. You mean ahead of time?
16 Q. Yes.
17 A. It would not be something that I would do.
18 Q. It would bias the event study, wouldn't it?
19 A. It's not a methodology that I would ascribe to.
20 Q. You conducted an event study here, right?
21 A. Yes. And while we're talking about event studies
22   and my event study, I noticed I believe there's
23   a, in Paragraph 96 of my report it has the word
24   "rolling" regression and I did not conduct a
25   rolling regression analysis so the word rolling

Page 140

1    is not, should not be there.
2 Q. So we would need to take that word out to make
3    Paragraph 96 accurate; is that right?
4 A. Yes. Thank you.
5 Q. I'll X it out right now.
6       Does your report explain the specifications
7    and the steps you followed to conduct the event
8    study?
9 A. I believe so.
10 Q. Turn to Page 34, Paragraph 84 of your report,
11   please.
12 A. I'm there.
13 Q. So starting here, you lay out the steps that you
14   took in your event study and that explanation
15   goes through Page 41 Paragraph 98; is that right?
16 A. Let me look at all the pages.
17 Q. Does this section of your report accurately
18   summarize the steps you took in carrying out your
19   event study?
20 A. I believe so.
21 Q. Did you take any other steps that you did not
22   describe in this section of your report?
23 A. I don't think so.
24 Q. Your methodology is fully described in your
25   report?

Page 141

1 A. I believe so.
2 Q. The results of your event study are presented in
3    your Exhibit 13 --
4 A. Yes.
5 Q. -- of your report, that's Page 100 of 108; is
6    that correct?
7 A. I'm looking.
8       Yes.
9 Q. Your event study analyzed each of the eight
10   FirstEnergy notes individually; is that right?
11 A. Yes.
12 Q. You did not expect the notes to respond
13   uniformly; is that right?
14 A. Yes.
15 Q. And that's because bonds from the same company
16   can react to information differently; is that
17   right?
18 A. Yes.
19 Q. Different bonds from the same company can have
20   different price sensitivities, correct?
21 A. Yes.
22 Q. It's possible that the market for one bond for a
23   company could be efficient while the market for
24   another bond from a company is inefficient; is
25   that right?

36 (Pages 138 - 141)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 142

1 A. Generally speaking I think that's a possibility
2   and as I've mentioned, with a company as large as
3   FirstEnergy, I would not think that that's very
4   likely.
5 Q. In your event study, you sought to remove from
6   the daily price movements of each note the impact
7   of events that would have affected the economy or
8   the market as a whole; is that right?
9 A. Yes.
10 Q. How did you do that?
11 A. I used as the independent variable the price
12   returns to the Bloomberg U.S. Corporate Bond
13   Index.
14 Q. Did you seek to remove from the daily price
15   movements the affect of events that would have
16   affected the utility industry?
17 A. Do I seek to remove events that would have? To
18   the extent that the independent variable is a
19   broad-based index, I would expect that it would
20   eliminate market movements across broad industry
21   groups that were not company specific.
22 Q. Did you use an index of utility bonds to try to
23   control for events affecting the utility industry
24   as a whole?
25 A. I did not.

Page 143

1 Q. Have you used industry specific indexes in other
2   event studies to control for industrywide events?
3 A. I have.
4 Q. When?
5 A. I've used them when there may be changes in the
6   industry group that could potentially have
7   impacted the company's, subject company's,
8   security price but in this context I am looking
9   at credit-relevant events specific to
10   FirstEnergy. I did not think it was necessary
11   here to do that.
12 Q. Why didn't you think it was necessary or
13   desirable to use an industry specific index as a
14   control here?
15 A. Generally there were no trends in the utility
16   industry that I saw throughout the class period
17   that would have had a bearing on the credit
18   rating of FirstEnergy or the credit profile of
19   FirstEnergy during this period that I tested.
20 Q. How did you determine that?
21 A. Reviewing analyst reports that covered not only
22   FirstEnergy but covered the universe of utility
23   stocks.
24 Q. Your standard for selecting events for the event
25   study was to select what you called

Page 144

1   credit-relevant events; is that correct?
2 A. Yes.
3 Q. What is a credit-relevant event?
4 A. A credit-relevant event is a company-specific
5   event that would change investors' perception of
6   the riskiness of investing in FirstEnergy's debt
7   securities.
8 Q. Where does your definition of a credit-relevant
9   event that you used here come from?
10 A. I think I described what a credit-relevant event
11   is in several places in my report.
12 Q. Did you draw that definition from the
13   peer-reviewed literature?
14 A. No.
15 Q. Does the peer-reviewed literature discuss using
16   credit-relevant events for an event study?
17 A. The peer-reviewed literature in looking at the
18   impact of, for example, credit rating downgrades
19   on thousands of, you know, across thousands of
20   different debt securities certainly uses that
21   terminology.
22 Q. Is there a specific article or treatise that you
23   can point to that endorses the use of
24   credit-relevant events for an event study?
25 A. I believe there's a Fama and French academic

Page 145

1   paper where they're looking at different factors
2   that affect the price of debt securities and
3   default risk is one of those factors.
4 Q. Let's look at Exhibit 2 of your report here, Page
5   53 of 108 and let's flip over to Page 54 of 108.
6     Is the paper that you just referred to listed
7   on Page 53 or 54 or 55?
8 A. No.
9 Q. How precisely or how exactly did you determine
10   which events were credit-relevant for purposes of
11   your event study?
12 A. Well, beginning with the events that were
13   outlined in the complaint towards the end of the
14   class period, around that time period I reviewed
15   news articles and analyst reports to see when
16   there was commentary regarding a change in the
17   credit profile of FirstEnergy and I set those
18   forth in, beginning on Page 37 of my report
19   starting with the July 21st announcement which is
20   followed by or contemporaneously a UVS report
21   says, you know, as a result of those events we
22   believe there is a real possibility that, you
23   know, FirstEnergy could be downgraded so that was
24   the process was really through reading the news
25   articles and the analyst reports to see when the

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 146

1  major credit-relevant events occurred and then to
2  test those dates.
3  Q.  Did you look at anything other than news articles
4     and analyst reports to determine whether a given
5     event was credit-relevant or not?
6  A.  I looked at a, almost a chronology if you will of
7     the credit rating history of, that was provided
8     by S&P, Moody's and Fitch; but other than the
9     credit rating history, the news articles and the
10    analyst reports, there's nothing that comes to
11    mind in terms of how I identified those events.
12 Q.  Were there dates that you considered as possible
13    events for your event study that you concluded
14    that the events were not credit relevant?
15 A.  I believe I considered two subsequent dates in
16    November when the other, when Fitch and Moody's
17    downgraded FirstEnergy's credit below investment
18    grade but I did not test those because S&P was
19    sort of the frontrunner in terms of the credit
20    ratings for FirstEnergy in that they were the
21    first ones to put the company on credit watch and
22    then the other two followed later so that's not
23    really new information and then first -- S&P
24    rather was the first to downgrade FirstEnergy's
25    bonds to junk status from investment grade and so

Page 147

1  the follow-on if you will a month later by Fitch
2  and Moody's I didn't think would be new
3  information to the market.
4  Q.  Were there any other events that you considered
5     including in your event study but you decided
6     that the events weren't credit relevant?
7  A.  Not that I can recall.
8  Q.  Did you document that process for evaluating
9     potential event days and making a decision
10    whether or not they were credit relevant in your
11    report?
12 A.  No.
13 Q.  Is a credit upgrade or a credit downgrade a
14    credit-relevant event?
15        MR. GRONBORG:  Object to form.
16 A.  It can be but not necessarily.
17 Q.  Okay.  Well --
18 A.  In other words, it could --
19 Q.  No, go ahead.
20 A.  An upgrade doesn't change for a particular debt
21    security the payback if you will so if I'm
22    holding a particular debt security and it's
23    currently rated double A and it gets upgraded to
24    single A, it doesn't make much of a difference to
25    me and I don't think that there would be a change

Page 148

1  in the price of the security upon the upgrade.
2      The other reason why it may or may not be is
3  because oftentimes an upgrade or a downgrade are
4  expected; so for example in, I think it was in
5  the middle of October at some point S&P said
6  well, if there's any additional information that
7  comes out linking, you know, the executives to
8  the bribery scheme, it's likely that we're going
9  to downgrade to junk and so lo and behold after
10 the market closed on, you know, on the 29th of
11 October, additional information comes out October
12 30th, the price of some of the notes falls and
13 S&P downgrades.
14     So sometimes it's the tail wagging the dog
15 and you really have to determine is it
16 unexpected, is it expected?  So you can't as a
17 general premise say every upgrade that the bonds
18 are going to go up and every downgrade they're
19 going to go down.
20 Q.  What is your methodology for determining whether
21    a credit upgrade or downgrade is a
22    credit-relevant event?
23 A.  Investors' perception of whether or not the bonds
24    are going to be in this case downgraded and what
25    was particularly of note here is that they were

Page 149

1  on the low end of investment grade and it is a
2  big deal in the corporate bond market to go from
3  investment grade to junk.
4  Q.  Are there any objective criteria that apply to
5     your test of whether a credit upgrade or
6     downgrade is a credit-relevant event?
7  A.  There may be.
8  Q.  What is --
9  A.  I don't know in the whole universe of objective
10    criteria, there may be.
11 Q.  Did you apply any objective criteria in
12    determining whether a credit upgrade or downgrade
13    is a credit-relevant event?
14 A.  As I stated, my methodology was to review the
15    contemporaneous news and analyst reports to get
16    an understanding of what investors' perceptions
17    were regarding the credit posture of FirstEnergy
18    and from that review I was able to identify four
19    dates upon which I thought there may be a price
20    impact for the Senior Notes.
21 Q.  What was your source for your test for
22    determining whether a credit upgrade or downgrade
23    is a credit-relevant event?
24        MR. GRONBORG:  Object to form.
25 A.  I don't think I said I had a test of whether an

38 (Pages 146 - 149)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 150

1    upgrade or a downgrade was a relevant event.
2  Q. Did -- however it is that you determined whether
3    a credit upgrade or downgrade is a
4    credit-relevant event, did you draw that from the
5    peer-reviewed literature?
6  A. Well, I didn't do that here so I didn't look at
7    credit upgrades or downgrades here.
8  Q. Is a rating --
9  A. In isolation.
10  Q. Is a rating agency outlook change a
11    credit-relevant event?
12  A. It certainly can be.
13  Q. How do you tell whether it is or isn't?
14  A. Again in this instance since the FirstEnergy
15    Senior Notes were on the precipice between
16    investment grade and junk and S&P puts them on
17    credit watch negative, I think that's a
18    credit-relevant event. Certainly the market was
19    talking about it and investors were concerned
20    about it.
21  Q. And when would a rating agency outlook change not
22    be a credit-relevant event if ever?
23  A. Hypothetically if you had notes that were rated
24    double B plus and there was a potential that they
25    would go to double B minus it may not be a major

Page 151

1    event.
2  Q. Does the peer-reviewed literature tell you how to
3    determine whether a credit rating agency outlook
4    change is or is not a credit-relevant event?
5  A. I don't think there's any peer-reviewed
6    literature on such an event.
7  Q. Is the filing of a bankruptcy proceeding a
8    credit-relevant event?
9  A. I think we discussed this earlier and the, in and
10    of itself, a bankruptcy filing is a huge event
11    and especially if it's unexpected and if a rating
12    agency changes the debt rating the same day as a
13    bankruptcy is announced, I don't know that you
14    could isolate and say well the bonds went down
15    because of the credit rating change or the bonds
16    went down because a bankruptcy was announced.
17  Q. The filing of a bankruptcy proceeding could be a
18    credit-relevant event; is that right?
19  A. It could be.
20  Q. How do you tell whether it is or it isn't?
21  A. Again, is it unexpected new information.
22  Q. Is the disclosure of the possibility of the
23    filing of a bankruptcy a credit-relevant event?
24  A. Generally if it's the very first time anyone has
25    indicated that there's a possibility of a

Page 152

1    bankruptcy, I would think it would be a
2    credit-relevant event.
3  Q. Is there any objective standard that a person can
4    apply to determine what qualifies as a
5    credit-relevant event?
6  A. I think if you're examining price impact across a
7    thousand debt securities, you would necessarily
8    objectively define what you're going to consider
9    to be an event because you would not be able to
10    identify events of interest that were common
11    across an event study where you're looking at a
12    thousand securities. So I think in those cases
13    you would see generally earnings announcements if
14    you're looking at a common stock or you might see
15    dividend decreases as relevant events to study;
16    but when you're doing a single security event
17    study, you don't have the luxury if you will of
18    objectively defining I'm going to look at every
19    single earnings announcement over the class
20    period whether or not the earnings were
21    unexpected. So it just becomes more difficult
22    with a single security event study.
23  Q. So there isn't an objective standard that a
24    person could apply to determine what qualifies as
25    a credit-relevant event here?

Page 153

1  A. You could determine that you're going to look at
2    every single credit rating change or if it's, you
3    know, if the issues are being put on credit watch
4    negative or credit watch positive, you may be
5    able to do that but if I'm trying to identify
6    events where I think there may be price impact, I
7    don't think that's a reasonable way of doing it.
8  Q. So there is an objective standard that could be
9    applied here to determine what's credit-relevant
10    but you did not apply that standard; is that
11    right?
12        MR. GRONBORG:   Object to form.
13  A. That is not right. That's not right. It would
14    not be a reliable method for identifying events
15    that could potentially have changed the price of
16    the securities.
17  Q. Let's say somebody wanted to replicate what you
18    did here. What objective standard should they
19    use to select event days?
20  A. Well, I set forth the way that I identified the
21    event days so presumably they could review the
22    news articles and analyst reports to identify
23    credit-relevant events that were unexpected that
24    were significant enough that analysts were
25    concerned about them, talking about them.

39 (Pages 150 - 153)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 154

1 Q. In previous cases where you conducted event
2 studies, you split days into news days and no
3 news days; is that right?
4 A. In some of the previous cases where I've done
5 event studies, I conducted an analysis which
6 compares two samples. Sample news or, you know,
7 days when relevant news entered the market
8 against days when no news entered the market; and
9 comparing those two samples statistically, it
10 either supports or doesn't support that the price
11 of the security was more likely to respond on
12 days when news entered the market than didn't
13 enter the market.
14 Q. Why didn't you take a similar approach here?
15 A. Because my sample of news days was relatively
16 small and my sample of no news days would have
17 been enormous and it would have completely made
18 nonsensical results. It would bias the results
19 in favor of a finding of efficiency because you
20 would have such a different sample size that it
21 essentially wouldn't be fair to compare the news
22 days to the non news days.
23 Q. Have you ever submitted a --
24 A. It's a test, it's a test I like to conduct when
25 there's a robust sample of news days and non news

Page 155

1 days.
2 Q. Have you ever submitted an expert report where
3 you selected event study dates based on whether
4 the events were credit-relevant?
5 A. I believe, I believe I only have testified in one
6 other debt securities case and in that case there
7 were an ample number of potentially corrective
8 disclosures that I was able to come up with a
9 large enough sample of news days, so the answer
10 is: I've only been an expert in one other debt
11 securities case where I've conducted an event
12 study. Circumstances were different there and I
13 conducted a news/no news analysis.
14 Q. So you've never submitted an expert report where
15 you selected event study dates based on events
16 that were credit relevant; is that right?
17 A. That's fair.
18 Q. You selected four dates for your event study; is
19 that right? July 21st, July 22nd, July 23rd and
20 October 30th, 2020; is that right?
21 A. That's correct.
22 Q. Do you recall that the class period here runs
23 from February 21st, 2017 to July 21st, 2020; is
24 that right?
25 A. Yes.

Page 156

1 Q. So the only date from the class period that you
2 included in your event study was July 21st, 2020;
3 is that correct?
4 A. Yes, that is the announcement that essentially
5 ends the class period in terms of when you could
6 have purchased securities and potentially been
7 damaged.
8 Q. Why did you include July 22nd as an event date?
9 A. July 22nd additional information came out
10 regarding the identity of Company A and the
11 analyst from CreditSights, which is a credit
12 market research firm, said to his constituents
13 that the, this implicates the company to a much
14 further degree than was originally thought so it
15 was additional information regarding the
16 culpability or potential culpability of
17 FirstEnergy in the bribery scheme and I, there
18 was a credit analyst commenting on the importance
19 of that new information.
20 Q. Why didn't you include July 23rd as an event
21 date?
22 A. S&P put the company's credit rating on credit
23 watch negative that day.
24 Q. I'd like to put in front of you a document that's
25 been marked for identification purposes as FE 3.

Page 157

1 This is a copy of the complaint that the
2 plaintiffs filed in this case. If you would
3 refresh your exhibit folder, you will be able to
4 see it there.
5           - - - -
6      (Thereupon, Exhibit FE 3, Complaint, was
7      marked for purposes of identification.)
8           - - - -
9 A. There's a lot of screen shrinkage going on here.
10    Okay.
11 Q. If you would pull up Exhibit FE 3, this is the
12    complaint and I'd like to direct your attention
13    to Paragraph 150 of the complaint which is on
14    Page 56.
15 A. Okay.
16 Q. So Paragraph 150 alleges that on July 24, 2020
17    Moody's announced it was downgrading its outlook
18    for FirstEnergy.
19       Why did you not include July 24th as an event
20    date?
21 A. Because S&P had already put the company on credit
22    watch so Moody's was a follower if you will.
23 Q. Any other reason that you included July 20 and
24    not July 24th?
25 A. No.

40 (Pages 154 - 157)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 158

1 Q. If you'd turn back to your report, Page 37
2    Paragraph 89a?
3 A. Okay.
4 Q. You summarize the four events that you -- I'm
5    looking at Paragraphs 89a through d.
6       You summarize the four events that you
7    selected for your, for your event study. Do
8    these paragraphs explain why you chose these
9    events for your event study?
10 A. I think so. It sets forth a reference for the
11    contemporaneous commentary regarding whether or
12    not an event was important in terms of the credit
13    ratings or the credit profile of the company.
14 Q. Are there any other reasons --
15 A. And that was part of what I looked at which was:
16    What are the analysts saying? What's the, what
17    is the news? What are the analysts saying?
18 Q. Are there any other reasons you chose these four
19    event dates that are not set forth in Paragraph
20    89 of your report?
21    MR. GRONBORG: Object to form.
22 A. There may be but if there was additional
23    commentary it was confirmatory of what is set
24    forth here, so...
25 Q. Besides the four days listed in Exhibit 13 to

Page 159

1    your report, did any other events on any other
2    day during the class period qualify as a
3    credit-relevant event?
4 A. When you say during the class period, between the
5    defined class period there may have been.
6 Q. Yeah, when I refer to the class period I'm
7    referring to the period from February 21st, 2017
8    to July 20th, 2020 so let me restate the
9    question:
10    Besides the four days listed in Exhibit 13
11    were there any other events on any other day
12    during the class period that qualified as a
13    credit-relevant event?
14 A. There may have been.
15 Q. Which events during the class period were
16    credit-relevant events?
17 A. There were days when additional bonds were
18    issued. They may have been credit-relevant.
19    There was a day in August of 2018 I believe
20    when S&P may have upgraded the debt from triple B
21    minus to triple B. I wouldn't necessarily expect
22    any price change but it might be a
23    credit-relevant event so there may have been.
24 Q. Did you include any of those other
25    credit-relevant events in your event study?

Page 160

1 A. No, because they would not have been common to
2    all eight debt securities that I was examining.
3 Q. Why wouldn't they have been common to all eight
4    debt securities?
5 A. Because they weren't all outstanding during these
6    time periods.
7 Q. Why wouldn't you include those dates in your
8    event study to help you analyze the securities
9    that were outstanding at the time of those
10    events?
11 A. As I said, I was aware of the events of interest
12    for the common stock that was, that were
13    referenced in the complaint and I knew that for
14    example there were two issues of debt that were
15    very recently issued in June of 2020 and I wanted
16    to put all of the securities on equal footing, if
17    you will, in analyzing the impact of the news on
18    the prices of the securities so I didn't look
19    outside of a period prior to when they were all
20    issued and outstanding.
21 Q. Is that the only reason that you excluded other
22    credit-relevant events during the class period
23    from your event study?
24 A. Yes. That was outside of the range of news and
25    analyst reports essentially that I used for my

Page 161

1    analysis here.
2 Q. And did you make that determination yourself or
3    did someone else ask you to exclude those dates
4    from your event study?
5 A. I made that determination.
6 Q. Did you conduct any analysis of any of those
7    other credit-relevant dates that are, that is not
8    included in your report or its exhibits?
9 A. I did not.
10 Q. So you don't know whether any of the FirstEnergy
11    notes exhibited statistically significant
12    residual returns on any of the credit-relevant
13    dates during a class period prior to July 21st,
14    2020?
15 A. I do not.
16 Q. And you didn't try to figure that out; is that
17    right?
18 A. No, it wasn't part of my analysis.
19 Q. Did FirstEnergy's credit ratings change during
20    the class period?
21 A. I think I just had mentioned that I believe that
22    S&P upgraded from triple B minus to triple B
23    their credit rating in August of 2018 I believe.
24 Q. Let's look at Paragraph 31 of your report.
25    That's Page 11 and you see at the bottom of Page

41 (Pages 158 - 161)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 162

1  11 carrying over to Page 12 your report states
2  between August 2018 and November 2019, S&P
3  upgraded the credit rating for FirstEnergy from
4  triple B minus to triple B.
5      Would you expect a bonds price to increase
6  following an upgrade in its credit rating?
7  A.  No.
8  Q.  Never?
9  A.  You said in this instance.  Given this example,
10  no, I wouldn't.  From triple B minus to triple B,
11  probably not.  I would think it's unlikely.
12  Q.  When did S&P upgrade its credit rating for
13  FirstEnergy?
14  A.  It says in August of 2018.
15  Q.  Okay.  I just see where it says between August
16  2018 and 2019.  So August 2018 was when S&P did
17  it?
18  A.  Yes.
19  Q.  And November 2019 was when Fitch did it?
20  A.  Yes.
21  Q.  And you didn't include either of those events in
22  your event study, right?
23  A.  I did not.
24  Q.  Did you document the basis for that determination
25  in your report anywhere?

Page 163

1  A.  No.
2  Q.  Did FirstEnergy issue any earnings reports during
3  the class period?
4  A.  Yes.
5  Q.  Did you include any of those as events in your
6  event study?
7  A.  No.
8  Q.  Why not?
9  A.  Generally speaking bonds, a bond's prices do not
10  react to earnings in and of themselves unless it
11  is, indicates or signals a material change in the
12  financial condition of the company overall.
13  Q.  Did you document your analysis of whether to
14  include each earnings report date as an event in
15  your report anywhere?
16  A.  I documented what my criteria were, what steps I
17  took and what was the basis for the events I
18  chose.  I did not document why I didn't choose a
19  myriad of other events so I did not document why
20  I didn't select earnings announcement dates;
21  although if you look in my report, you will see
22  there's references to the fact that bond prices
23  in general are not going to be affected like
24  stock prices are by earnings and announcements.
25  Q.  Let's take as an example the first quarter 2017

Page 164

1  earnings announcement which would have occurred
2  shortly after the beginning of the class period.
3      How did you determine whether that earnings
4  announcement was a credit-relevant event?
5      MR. GRONBORG:  Object to form.
6  A.  I think we've been over my, how I selected the
7  events of interest, none of which includes
8  looking at earnings announcements from 2017 so
9  that was not part of the criteria for my event
10  study here.
11  Q.  Did you go back and review the analyst reports or
12  the news articles that were published following
13  that earnings announcement to determine whether
14  it was a credit-relevant event?
15  A.  It was outside of the observation period and the
16  event windows that I selected for my event study.
17  There was a single FirstEnergy note of the eight
18  that was issued and outstanding at that point in
19  time.  My objective was to find events that could
20  have potentially impacted the prices of all eight
21  of the Senior Notes that were the subject of my
22  study so I did not consider the earnings
23  announcement in February of 2017 to be a relevant
24  event in terms of my event study.
25  Q.  And you didn't go back and look at the news

Page 165

1  coverage or analyst commentary around the time of
2  that earnings announcement, correct?
3  A.  Correct.
4  Q.  And the same thing is true for all of the
5  earnings announcements in 2017, 2018, 2019 and
6  the first quarter of 2020; is that right?
7  A.  That's correct, yes.
8  Q.  During the proposed class period here there were
9  numerous disclosures about the possible
10  bankruptcy of FirstEnergy's nuclear subsidiary
11  and then eventually it did file for bankruptcy.
12  A.  Yes.
13  Q.  The possible bankruptcy was a credit-relevant
14  event, wasn't it?
15      MR. GRONBORG:  Object to form.
16  A.  It could have been but for the fact that
17  FirstEnergy essentially assured investors that it
18  would be immunized from such a bankruptcy filing.
19  Q.  Is that why you excluded the dates of the
20  disclosures about the bankruptcy from your event
21  study?
22  A.  Those disclosures were early, earlier in the
23  class period than the time period that I focused
24  on due to the fact that not all, not all eight of
25  the securities were issued and outstanding at

42 (Pages 162 - 165)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 166

1    that point in time.
2  Q.  So the fact that the eight securities were not
3       issued and outstanding, that's the reason that
4       you excluded the disclosures about the bankruptcy
5       from your event study; is that correct?
6  A.  It was not, it was not part of the selection
7       criteria for my event study.
8  Q.  Meaning that those disclosures --
9  A.  It fell outside, it fell outside of the date
10      range for my event study.
11 Q.  Okay.  And that date range was the range of dates
12      when all eight series of notes were outstanding;
13      is that right?
14 A.  That's right.
15 Q.  And that's the only reason you excluded those
16      disclosure dates from your event study; is that
17      correct?
18 A.  I constructed the event study to include all
19      eight of the Senior Notes so that I could analyze
20      across all of the issues, their potential price
21      impact upon credit-relevant events; so to the
22      extent that something may have been credit
23      relevant and had occurred before half of them
24      were issued and outstanding, it would not have
25      fallen under the umbrella of my construct.

Page 167

1  Q.  I think I understand.
2       So you didn't go back and look at each and
3       every disclosure about the possible bankruptcy or
4       the actual bankruptcy and make a separate
5       determination for each disclosure that you were
6       not going to include it in your event study; is
7       that right?
8  A.  Correct.
9  Q.  Let's look at the complaint that's Exhibit FE 3.
10      I want to direct your attention to Paragraph 45
11      which is on Page 13.  You see the last sentence
12      of Paragraph 45 states that on March 31st, 2018
13      FES, FENOC and their related entities,
14      collectively referred to as FES, filed for relief
15      under Chapter 11 of the United States Bankruptcy
16      Code in the United States Bankruptcy Court for
17      the Northern District of Ohio.
18      Is it correct that you did not make a
19      specific determination as to whether this was a
20      credit-relevant event?  Rather you excluded it
21      because it didn't occur in 2020; is that right?
22 A.  It was outside of the time period when all eight
23      of the Senior Notes were issued and outstanding
24      and therefore outside of the time period that I
25      was examining for my event study so I did not

Page 168

1       make a separate determination as to whether this
2       was a credit-relevant event for FirstEnergy.
3  Q.  Would you flip ahead a couple pages to Paragraph
4       54 of the complaint.  Paragraph 54 recites that
5       on March 12th, 2019 the justice department
6       objected to the plan of reorganization.
7       Did you exclude this from the event study for
8       the same reason that you excluded Paragraph 45
9       from your event study?
10 A.  It wasn't excluded because it was never
11      considered as a potential credit-relevant event
12      during the observation period of my event study.
13 Q.  And if you flip forward to Paragraph 62,
14      Paragraph 62 alleges that on April 4th, 2019 the
15      bankruptcy court rejected the reorganization
16      plan.
17      Was this excluded from your event study for
18      the same reasons as March 12th, 2019 and March
19      31st 2018?
20 A.  No.  It was never considered because it fell
21      outside of the boundaries of the period that I
22      considered.
23 Q.  Let's go back to your report and look at Exhibit
24      9 which is Page 89 of 108.  This was your list of
25      analyst reports and if you go down to the entry

Page 169

1       for June 19th, 2017, there's a report from
2       Barclays entitled "FirstEnergy Corp.:  Time to
3       Buy..."
4       Did you read this report?
5  A.  I don't remember reading it, no.
6  Q.  Would a report recommending purchases of
7       FirstEnergy securities qualify as a relevant,
8       credit-relevant event?
9  A.  Not necessarily, no.
10 Q.  Could it?
11 A.  I, if it, if it specifically mentioned that the
12      credit profile of the company was better or in
13      their opinion better than the market thought, it
14      may be relevant but generally speaking I wouldn't
15      think that that would be a credit-relevant event.
16      I have not read their report but I wouldn't think
17      so.
18 Q.  You'd have to study the report to know for sure,
19      right?
20 A.  It wouldn't have fallen in the purview of my
21      event study nevertheless.
22 Q.  So you did not consider this date as a possible
23      credit-relevant event because it didn't fall
24      within the time frame that you were evaluating;
25      is that right?

43 (Pages 166 - 169)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 170

1 A. I didn't read the report and it didn't fall
2     within the purview of my event study analysis
3     so...
4 Q. If you'd turn the page and look at the entry for
5     December 28th, 2017 from Morningstar titled
6     "FirstEnergy is One of Our Top Utility Picks."
7      That was not part of your event study for the
8     reasons you just described?
9 A. Yes.
10 Q. Did you read this report?
11 A. No.
12 Q. So in your report, and as you've stated in your
13     testimony, you selected events from July 2020 to
14     October 2020 because that was an adequate control
15     period for all of the notes.
16      Did you need to have the same control period
17     for all of the notes?
18         MR. GRONBORG: Object to form.
19 A. I needed to have the -- by the way, it's not a
20     control period. It's your event window or your
21     observation period; but I felt it was necessary
22     to have a common group of events or potential
23     events to evaluate each of the eight securities
24     on essentially the same scale if you will, so is
25     it necessary? I felt that it was important for

Page 171

1     my analysis to do it that way. Another analyst
2     might say, oh, well you don't have to do it that
3     way. You could have done it a different way and
4     you could have selected all different events for
5     different securities but then there wouldn't be
6     any common ground to evaluate price
7     responsiveness across the securities.
8 Q. Would you look at Paragraph 90 of your report
9     please on Page 41 of 108. The second sentence of
10     Paragraph 90 reads: "The events of interest in
11     my Event Study occurred during the period
12     beginning July 2020 and ending October 2020
13     allowing me to include all of the Senior Notes in
14     the analysis with an adequate control period, as
15     discussed below."
16      Is that an accurate statement?
17 A. Yes.
18 Q. Is there a basis in the scholarly literature for
19     you using the same period to assess all eight of
20     the notes?
21 A. Not specifically but certainly if you're making a
22     comparison, you would generally like to compare
23     on the same set of criteria so that's why I felt
24     it was important to do it this way.
25 Q. Did you consider looking at longer periods for

Page 172

1     the notes that had been outstanding for a longer
2     time?
3         MR. GRONBORG: Object to form.
4 A. No.
5 Q. Let's look at Exhibit 1 of your report. This is
6     Page 52 of 108. Looking at the third note here,
7     which is AH0, and it was issued in June 2017, you
8     only analyzed the price movement of this note on
9     the four event days from July 21st to October
10     30th, 2020, correct?
11 A. Correct.
12 Q. Do you agree that the price movement of this note
13     in response to information in the second half of
14     2020 does not demonstrate to a reasonable degree
15     of scientific certainty that this note traded in
16     an efficient market way back in 2017?
17         MR. GRONBORG: Object to form.
18 A. I disagree.
19 Q. Why do you disagree with that?
20 A. Because the criteria for the demonstration of an
21     efficient market extends beyond a test for price
22     responsiveness and as we've been discussing
23     today, the characteristics of the market for this
24     particular security did not exhibit material
25     change from 2017 to 2020 and I looked at a number

Page 173

1     of the factors including turnover for example
2     which is consistent and indicative of active
3     trading and actively traded market so I cannot
4     conclude nor would I conclude that price
5     responsiveness at any period of time during the
6     class period doesn't indicate efficiency during
7     an earlier period of time. I would have to find
8     evidence that there was a material change in the
9     structure of the market for this security and
10     then there may be an argument that one doesn't
11     necessarily demonstrate the other.
12 Q. Did you analyze the price response of note AH0 to
13     any events in 2017?
14 A. No.
15 Q. To any events in 2018?
16 A. No.
17 Q. To any events in 2019?
18 A. No.
19 Q. To any events in 2020 prior to July 21st, 2020?
20 A. No.
21 Q. How far back in time can you draw an inference of
22     market efficiency for a bond based on the
23     analysis of a four-month period?
24 A. I think that varies considerably depending on the
25     security.

44 (Pages 170 - 173)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 174

1 Q. What affects the length of time for which you can
2    infer market efficiency based on the analysis of
3    a four-month period?
4 A. So I would disagree with your characterization of
5    analysis that only extends for four months
6    essentially.
7       The other analyses that were performed extend
8    throughout the class period and for longer
9    periods of time and I saw no evidence that would
10   suggest that the market for these securities was
11   materially different or materially less active at
12   an earlier point in time.
13 Q. So the event study, and thank you for the
14   clarification there.
15      The event study that you conducted doesn't
16   tell you anything about the trading of the notes
17   in 2017, right?  You have to look at other
18   analyses that you conducted; is that correct?
19             MR. GRONBORG:  Object to form.
20 A. I would agree with that.
21 Q. And the same is true for 2018 and 2019 and for
22   the part of 2020 prior to July 21st, 2020,
23   correct?
24 A. Right.  So it examines a certain period in time.
25   It examines certain events and you draw

Page 175

1    conclusions based on the statistical analysis of
2    price impact on those event dates.  So in that
3    regard let's assume hypothetically that you have
4    a class period that extends for a one-year period
5    and there's a single event of interest which is
6    the corrective disclosure, alleged corrective
7    disclosure at the end of the class period.
8    Assuming there are no other material events
9    during that time period but the price responds to
10   the corrective disclosure, unless there's some
11   material difference in the trading of that
12   security throughout the class period, I don't
13   think you can assert that you haven't shown
14   market efficiency, you've only shown market
15   efficiency after the end of the class period.
16 Q. Focusing on the event study that you conducted as
17   to note AH0 which is column 3 on Exhibit 1, what
18   does your event study tell you about the trading
19   market for note AH0 in 2017?  Does it tell you
20   anything at all?
21 A. No.
22 Q. And the same is true of all eight of the notes,
23   the event study that you conducted doesn't tell
24   you anything at all about the trading market for
25   any of those notes in the period prior to July

Page 176

1    21st, 2020, correct?
2             MR. GRONBORG:  Object to form.
3 A. Correct.
4 Q. Let's turn back to the complaint which is
5    Exhibit --
6             MR. GRONBORG:  Geoff, we've been
7    going about an hour-and-a-half so if
8    there's a convenient break between topics
9    coming up pretty quick, I'd like to take a
10   break.
11            MR. RITTS:  This is as good a time
12   as any.  Why don't we take ten minutes.
13            THE VIDEOGRAPHER:  We are off the
14   record at 3:21 p.m.
15            - - - -
16    (Thereupon, a recess was had.)
17            - - - -
18            THE VIDEOGRAPHER:  We are back on
19   the record at 3:31 p.m.
20 Q. Okay.  Ms. Jones, do you have any devices or
21   documents with you now that you didn't have when
22   you were testifying before?
23 A. I don't.
24 Q. Let's turn our attention now to Exhibit FE 3
25   which is the complaint.

Page 177

1 A. Okay.
2 Q. And I would like us all to look at Paragraph 160
3    which is on Page 59.
4       Paragraph 160 recites that on July 28th, 2020
5    Fitch Ratings announced that it was revising its
6    outlook for FirstEnergy to negative and then it
7    quotes two paragraphs from the announcement
8    there.
9       You did not include July 28, 2020 as an event
10   date in your event study; is that right?
11 A. That's right.
12 Q. And on what basis did you exclude that date?
13 A. I had already included July 23rd when S&P put the
14   ratings on credit watch and so I didn't include a
15   subsequent credit watch from Moody's or Fitch.  I
16   didn't think it provided new relevant
17   information.
18 Q. And how did you make that determination?
19 A. It was essentially repetitive or follow-on from
20   S&P's rating action earlier.
21 Q. Did you document your analysis anywhere?
22 A. No.
23 Q. Let's turn then to Page or rather to Paragraph
24   164 which is on the next page, Page 60 of the
25   complaint, Paragraph 164 recites that on

45 (Pages 174 - 177)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 178

1  September 23rd, 2020 the Ohio Attorney General
2  filed a lawsuit against FirstEnergy and others
3  and Paragraph 165 goes on to allege that
4  FirstEnergy stock price declined by 3-and-a-half
5  percent after the disclosure of that news.
6     Did you include September 23rd, 2020 as an
7  event date for your event study?
8 A. I did not.
9 Q. Why not?
10 A. I didn't see any commentary in news articles or
11  analyst reports that would suggest that that
12  particular event changed the credit profile of
13  FirstEnergy.
14 Q. You didn't document that analysis anywhere,
15  though, is that right?
16 A. Correct.
17 Q. Turn to Paragraph 175 in the complaint, please.
18  That's on Page 63. Paragraph 175 alleges that on
19  October 23rd, 2020 S&P downgraded FirstEnergy and
20  it goes on to quote a portion of the S&P report
21  issued on that date.
22     You did not include October 23rd, 2020 as an
23  event date for your event study, correct?
24 A. Correct.
25 Q. What was the basis for that determination?

Page 179

1 A. I did not see an S&P downgrade on October 23rd,
2  2020. I don't believe one occurred.
3 Q. Okay. So you believe that the complaint
4  Paragraph 175 is incorrect?
5 A. I do.
6 Q. Did they just have the wrong date that, the S&P
7  downgrade occur on a different date?
8 A. I don't know who drafted the complaint. I can't
9  tell you what their thought process was but S&P
10  does downgrade on October 30th.
11 Q. Turn over to Paragraph 196 through 199 of the
12  complaint, please. That's on Pages 68 and 69 of
13  the complaint.
14     Those paragraphs allege that on November
15  24th, 2020 FirstEnergy announced a drawdown of
16  about 2 billion dollars from its credit
17  facilities, that Moody's downgraded FirstEnergy
18  securities on November 24th and that there was a
19  stock price drop of more than 8 percent related
20  to those disclosures.
21     Did you, you did not include November 24th,
22  2020 as an event date for your event study,
23  correct?
24 A. That's correct.
25 Q. What was the basis for not including it as an

Page 180

1  event?
2 A. It was essentially a follow-on downgrade and S&P
3  had already downgraded the issuer credit rating
4  to junk on October 30th; so again this would not
5  have been new or unexpected that Fitch and
6  Moody's would follow essentially.
7 Q. The drawdown of 2 billion dollars on the credit
8  line though was a new event independent of the
9  Moody's downgrade, wasn't it?
10 A. That was a, that was a new event that spooked the
11  stock market for sure because stock investors
12  were concerned that they would, that FirstEnergy
13  would issue more stock and it could potentially
14  be dilutive.
15 Q. The incurrence of an additional 2 billion dollars
16  of debt and the drawdown of the company's credit
17  lines was also a credit-relevant event, wasn't
18  it?
19     MR. GRONBORG: Object to form.
20 A. It could have been a credit-relevant event but
21  S&P had already downgraded the stock to junk so I
22  didn't perceive that as something that was new
23  and relevant particularly in terms of the credit
24  rating and I didn't see any commentary where
25  analysts were concerned that this created a

Page 181

1  problem in terms of a default risk for the
2  FirstEnergy securities.
3 Q. In Paragraph 198 the complaint cites an S&P
4  analyst by taking the view that the 2 billion
5  dollar credit downgrade or credit drawdown is an
6  acknowledgment that the company may not have
7  consistent access to the capital markets. Didn't
8  credit analysts actually comment on the fact that
9  the company had drawn down 2 billion dollars in
10  credit?
11 A. I think that there were concerns earlier than
12  that time period specifically when S&P downgraded
13  the bonds to junk, there were concerns in the
14  market that it would, could potentially be an
15  impediment to raising capital.
16 Q. You did not document in your report anywhere your
17  analysis behind your decision to not include
18  November 24th, 2020 in your event study; is that
19  correct?
20 A. Yes, not specifically.
21 Q. Let's turn to Exhibit 13 of your report which is
22  Page 100 of 108. This is the summary of the
23  event study result.
24     If we look at the first note listed on this
25  page, note AK3, it did not have a statistically

46 (Pages 178 - 181)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 182

1 significant price change on July 21st, 2020; is
2 that correct?
3 A. Correct.
4 Q. Or on July 22nd, 2020, correct?
5 A. Correct.
6 Q. Or on October 30th, 2020, correct?
7 A. Correct.
8 Q. Its only statistically significant change on the
9 four event days was on July 23rd, 2020, right?
10 A. Yes, at the 5 percent level.
11 Q. FirstEnergy had a credit, had its credit
12 downgraded on October 30th, 2020, correct?
13 A. Yes.
14 Q. Wouldn't the fact that note AK3 did not have an
15 abnormal pricing decrease on that day indicate
16 that it did not trade in an efficient market?
17 A. I don't think so. I don't think that you can
18 draw that conclusion from a single observation in
19 an event study.
20 Q. Okay. Well, wouldn't the fact that this note
21 showed statistically significant residual change
22 on just one of the four event days you studied
23 tend to suggest that it did not trade in an
24 efficient market?
25 A. On two of the event dates, July 21st and October

Page 183

1 30th, it exhibited a price change. It just
2 didn't meet the level of statistical significance
3 that I set as the threshold in this test so it's
4 not as if there was no reaction but I would agree
5 that I would have expected that there would have
6 been a statistically significant decrease in the
7 price following the downgrade on October 30th.
8 Q. And the fact that there was a statistically
9 significant change for this note on only one of
10 the four event dates you studied would tend to
11 indicate that this note did not trade in an
12 efficient market; isn't that right?
13         MR. GRONBORG: Object to form.
14 A. I'm not using the results of the event study
15 alone to indicate whether there was evidence that
16 these notes traded in an efficient market but I
17 would agree with you that the analysis for note 1
18 results in one of the four event days
19 demonstrating significant price movement on the
20 event days of interest.
21 Q. So you're weighing different factors in the
22 balance here and for note AK3 the results of the
23 event study would tend to weigh against market
24 efficiency, wouldn't they?
25         MR. GRONBORG: Object to form.

Page 184

1 A. In isolation if you were just looking at the
2 event study analysis, I would agree with you but
3 overall we've looked at a number of different
4 criteria and data and I think that needs to be
5 taken into account when you're assessing the
6 market for this particular security.
7 Q. There isn't any basis in the scholarly literature
8 that would allow you to say that a statistically
9 significant residual return on just one of the
10 four event dates studied supports market
11 efficiency, correct?
12         MR. GRONBORG: Object to form.
13 A. I don't believe there's any scholarly literature
14 on single company event studies, so you wouldn't
15 find --
16 Q. The next --
17 A. You wouldn't find a rejection or an acceptance of
18 something like that. I think you just wouldn't
19 find it.
20 Q. Let's look at the next note now which is AN7.
21 That note had statistically significant abnormal
22 returns on two of the four event dates. July
23 23rd and October 30th, correct?
24 A. Yes.
25 Q. It did not have statistically significant

Page 185

1 residual returns on July 21st or July 22nd,
2 right?
3 A. That's correct. Although July 22nd it had
4 certainly meaningful price movement but it didn't
5 rise to the level of the 5 percent.
6 Q. Why is two out of four days in your event study
7 showing statistically significant returns? Does
8 that indicate market efficiency or does that tend
9 to weigh against market efficiency when you
10 balance all the factors?
11         MR. GRONBORG: Object to form.
12 A. So again I'm not using this study alone to
13 demonstrate market efficiency. The study is
14 designed to show price responsiveness and in the
15 case of note 2, two out of the four events
16 demonstrated price responsiveness and two did not
17 and I would say that weighs neither for nor
18 against a finding of price responsiveness to new
19 credit-relevant information.
20 Q. Would you say the same thing about notes 5, 6 and
21 8 which also exhibited statistically significant
22 returns on just two of the four event dates?
23 A. Not necessarily because remember I'm looking
24 here, I look at October 30th as sort of the most
25 significant event and we've got statistically

47 (Pages 182 - 185)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 186

1  significant price movement for seven out of the
2  eight notes at a very high level of statistical
3  significance so again I think you've got to look
4  sort of more objectively at what the test was
5  designed to do.  You have to look at the events
6  of interest and this is one analysis that is
7  being considered in the opinion as to whether the
8  market for these securities was efficient.
9 Q. Did you perform any event studies for any
10  FirstEnergy bonds for any dates other than the
11  four dates in Exhibit 13?
12 A. No.
13 Q. You never did anything to see what happened to
14  the prices of any FirstEnergy bonds on any days
15  other than the four days in Exhibit 13; is that
16  right?
17 A. That's correct.
18 Q. Let's look at appendix 1 of your report that
19  begins on Page 102 of 108.  Appendix 1 describes
20  your data cleaning methodology for the TRACE
21  data.
22      What computer program did you use to clean
23  the data?  Was it Excel?
24 A. It was.
25 Q. When cleaning data and removing duplicates, how

Page 187

1  did you decide whether to eliminate the reported
2  buy side or the sell side of a duplicate
3  transaction?
4 A. I'm just trying to recall and I know I gave the
5  instructions on doing this.
6      So first of all it really wouldn't make a
7  difference because they were duplicative, but
8  what I did was I assigned a transaction ID to
9  every trade.  This was a way of, and the
10  transaction ID was a function of the trade date,
11  the price and the volume so there were trades
12  that would have essentially the same transaction
13  ID and I looked to see whether the reporting side
14  broker and the contra side broker were the same
15  but inverted for the second duplicate trade so
16  that both sides of the trade reported the trade
17  and I eliminated the second trade.
18      Does that make sense?
19 Q. Yeah.  You say you eliminated the second trade.
20  Was that the buy side or the sell side of the
21  trade?
22 A. It was probably the -- it was not regularly the
23  buy side or the sell side because these were
24  sorted, these were sorted by the ID that I
25  created to identify duplicate trades so it

Page 188

1  wouldn't consistently be the buy side or the sell
2  side.
3 Q. I see.
4      How did you account for instances where more
5  than two trades had the same trade date, quantity
6  and price as well as reporting in contra IDs?
7 A. There weren't any like that.
8 Q. You say on --
9 A. And let me just correct that.
10      There weren't any examples of when the ID
11  that I created was the same for trades that
12  didn't have the same reporting contra/contra
13  reporting, if that makes sense.
14 Q. Appendix 1 says that you used the execution date
15  to identify duplicate trades.  Is that what you
16  did?
17 A. Yes.
18 Q. That's the date on which the trade was actually
19  executed, right?
20 A. Right.  That would be the trade date.
21 Q. Your backup materials indicate that you used the
22  reported date and the reported time for the price
23  and volume data that you used in your analysis;
24  is that correct?
25 A. It may be one in the same.

Page 189

1 Q. Do you know whether reported date and time is the
2  same as the execution date and time?
3 A. I would have to look but I'm confident in the
4  date selection because the only other date that
5  is listed in the FINRA data are the settlement
6  dates which are not relevant for the analysis.
7 Q. Is there a reason why you used the execution date
8  and time for the cleaning but the reported date
9  and time for your event study analysis?
10 A. No.
11 Q. On Page 102 in Paragraph 1 there you mention that
12  the files contain, quote, "the MPID for the
13  reporting broker/dealer and the contra-side
14  broker/dealer."
15      It also says that you were provided with a
16  file showing trade data fields and definitions.
17      Is that file in your report at Pages 104 to
18  108?
19 A. Yes.
20      So I was provided with an Excel file and this
21  is the printout, if you will, of the Excel file.
22 Q. If we look at appendix 1, Paragraph 3,
23  Subparagraph D you mention reporting MPID and
24  contra MPID, correct?
25 A. Yes.

48 (Pages 186 - 189)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 190

1 Q. If we turn to Page 104 of your exhibit, the trade
2   data fields and definitions, contra MPID is not a
3   listed data field, is it?
4 A. Contra-side MPID is a listed data field.
5 Q. Is that what you were referring to in 3d when you
6   refer to contra MPID?
7 A. Yes.
8 Q. Okay. And reporting MPID is not listed in the
9   table that begins on Page 104 either. What were
10   you referring to in 3d when you referred to
11   reporting MPID?
12 A. The re-- so it says: "Report Side MPID. The
13   field displays the MPID of the firm that reported
14   the trade."
15 Q. I'm going to direct your attention to a new
16   exhibit. It's going to be marked for
17   identification purposes as FE 4. If you'll
18   refresh your Exhibit Share folder you should see
19   it momentarily.
20         - - - -
21   (Thereupon, Exhibit FE 4, Jones AK3
22   spreadsheet, was marked for purposes of
23   identification.)
24         - - - -
25 Q. Do you have it?

Page 191

1 A. I do.
2 Q. Okay. This is one of the backup files you
3   produced.
4       At the top left you see that it says: "AK
5   Clean - Volume & Price Summary."
6       Is it correct that this relates to bond AK3?
7 A. Yes.
8 Q. What is the purpose of the tab in this exhibit
9   that is titled sheet 1?
10 A. It looks to me to be all of the data in some
11   format of cleansing and then there's a clean tab
12   and a volume and price tab so the --
13 Q. What -- go ahead. I didn't mean to cut you off.
14 A. That's okay. The clean tab would be after
15   looking at all the transactions, performing this
16   cleansing process, and then the volume and price
17   tab is essentially a lookup if you will that sums
18   all of the transactions by trade date, it sums
19   the total volume and the last price.
20 Q. What is the purpose of the tab titled "Bond
21   Trading Dates"?
22 A. That would be the dates upon which the bond
23   market essentially is open.
24 Q. Would you go to sheet 1, please, and look at
25   column X. Is column X the transaction ID that

Page 192

1   you created as described in appendix 1?
2 A. It may be but I don't see any formula but it
3   looks like that's what it might be, yes.
4 Q. Column Z --
5 A. So this was in fact a process of, in the process
6   of cleansing the data.
7 Q. Column Z doesn't have a title. Do you know what
8   column Z is?
9 A. I don't.
10 Q. I'm going to ask my colleague to share his screen
11   again so that we can see the formulas behind some
12   of these cells.
13       So my colleague is now sharing the native
14   version of Exhibit FE 4 and we're looking at
15   column, I want to direct your attention to column
16   Z on sheet 1 here. You'll see that it's
17   highlighted right now.
18       What is column Z comparing? I see a formula
19   in the box at the top of the spreadsheet. What
20   does that relate to?
21 A. I can't see column R. It's referring to column
22   R.
23       So this would have been a worksheet that
24   Joshua Shapiro from my firm created to enable the
25   data to be cleansed from FINRA to remove

Page 193

1   duplicates, et cetera.
2 Q. Okay. And does the formula here mean that a cell
3   R-4 equals cell S-5, then the cell will show the
4   number 1 and if not it shows a zero?
5 A. That's what it shows but I don't know the thought
6   process there behind that.
7 Q. So what it means is that cell R-4 equals cell S-5
8   here?
9 A. Yes.
10 Q. What does column R show?
11 A. The MPID of the broker that reported the trade.
12 Q. And column S?
13 A. The contra side or the other side of the trade,
14   the MPID for the other side of the trade.
15 Q. Okay. So column Z is comparing whether the
16   report side report MPID is equal to the contra
17   side report MPID?
18 A. With a difference of one row.
19 Q. If we look at column A, it's headed "Report Side
20   MPID" and if we look at column H it's headed
21   "Contra Side MPID."
22       Why didn't you use these two columns to
23   compare rather than columns R and S?
24 A. The data that you are looking at in sheet 1 are
25   not necessarily the data as we received it from

49 (Pages 190 - 193)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 194

1 FINRA so I think that I was trying to explain
2 that this is an interim step where these data
3 were cleansed and I don't know for certain
4 whether this particular sheet had been worked on
5 in establishing the different steps to result in
6 the clean set of data; so I can't tell you
7 whether this is one of Josh's interim worksheets
8 or not.
9 Q. Do columns A and H refer to something different
10 than columns R and S?
11 A. Again I don't know whether these are the original
12 data as we received them from FINRA or an interim
13 step so I can't tell you more precisely than that
14 what they're, what they represent.
15 Q. We're going to mark another exhibit now, as
16 Exhibit FE 5, and if you refresh your exhibit
17 folder you should be able to see that
18 momentarily.
19 - - - -
20 (Thereupon, Exhibit FE 5, Jones AL1
21 spreadsheet, was marked for purposes of
22 identification.)
23 - - - -
24 Q. You should have that now.
25 MR. RITTS: Ryan, we're going to

Page 195

1 have to mark that Exhibit FE 5 later.
2 MR. HARMANIS: Okay.
3 A. There we go.
4 Q. If you open up Exhibit 5, this is another backup
5 file that you produced. Up at the top left it
6 the says: "AL Clean - Volume & Price Summary."
7 This data relates to bond AL1; is that
8 correct?
9 A. Yes.
10 Q. Let's look at sheet 1 on this, please. So if we
11 compare sheet 1 in this spreadsheet for note AL1
12 it has the same format and purpose as the tab
13 titled "Clean" for the note AK3 file; is that
14 right?
15 MR. GRONBORG: Object to form.
16 A. It would appear so.
17 Q. Staying with the, with Exhibit 5, the AL1
18 spreadsheet here, if we look at the volume and
19 price tab, is it has the same format and purpose
20 as the volume and price tab for the note AK3
21 file; is that right?
22 A. Yes.
23 Q. The AK3 file also had tabs titled "Sheet 1" and
24 "Bond Trading Date" so there were four tabs on
25 the note AK3 file but there are only two on the

Page 196

1 AL1 file here.
2 Can you explain why there aren't
3 corresponding tabs in the note AL1 file?
4 A. I think we produced these to show the results of
5 the cleansing process which is the volume and
6 price summary which appears in both files and it
7 looks like the AK file had some additional data
8 maybe from an earlier procedure of cleansing the
9 data but I can't tell you for certain, as I
10 directed this to be done but these are not my
11 spreadsheets per se.
12 Q. Okay. Do you know why the note AK3 file had two
13 extra tabs that don't appear in the backup for
14 any of the other bonds?
15 A. No.
16 Q. Staying here with the note AL1 file, looking at
17 the "Volume & Price" tab, this is the price
18 series that you used to calculate the returns for
19 the event study; is that right?
20 A. Yes.
21 Q. Can you explain how you generated each column in
22 this tab?
23 A. The volume would have been the total transaction
24 volume for the day, the day beginning at 5:16
25 p m. the prior day and going through 5:15 p m. of

Page 197

1 the current day, and the last price should be the
2 price closest to 5:15 p m. on that day.
3 Q. Okay. And the last price is pulled from sheet 1
4 column AB; is that correct?
5 A. I can't tell you for certain that that's correct.
6 Q. Okay. Well, if you want to toggle back and forth
7 to sheet 1 on Exhibit 5, you may.
8 A. I'm not seeing the, I'm not seeing the timestamps
9 that correspond with columns Y, Z, AA, AB and AC
10 in sheet 1.
11 Q. Yeah. Can you see column C?
12 A. Yes.
13 Q. Look at column C, okay.
14 A. I see column C. I'm just concerned that there is
15 some interim step that I'm unaware of for the
16 pulling of the last price as of a certain time.
17 Q. Okay. That's fair. I'm just trying to
18 understand --
19 A. Yeah, I --
20 Q. -- how these two things work together in this.
21 A. I think you are, I think you have the volume and
22 price for sure that was used for the event study
23 analysis but I think you have interim steps in
24 terms of other worksheets that it may be pulling
25 from and I don't know why some earlier work was

50 (Pages 194 - 197)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 198

1 produced and the end result is the clean volume
2 and price summary.
3 Q. So looking at the volume and price page, the
4 prices that appear in column D under "Last
5 Price," you don't know whether those come from
6 column AD on sheet 1 or from somewhere else?
7 A. I don't.
8 Q. On the volume and price tab would you go down to
9 row 161 please. That date is October 28, 2020.
10 Actually look on sheet 1 at row 161, please -- or
11 no, I take that back. Go back to the volume and
12 price one. My mistake. I'm looking at row 161
13 on the volume and price tab.
14 A. Okay.
15 Q. October 28th it reflects the last price for this,
16 for bond AL1 as being $101.72-and-a-half cents;
17 is that right?
18 A. Yes. That's what it shows here.
19 Q. The next row is 162, the date there is October
20 30th, 2020 and the last price you had for bond
21 AL1 on October 30th is $97.79.1 cents; is that
22 right?
23 A. Yes.
24 Q. These are the prices that you used to calculate
25 the return for October 30th, 2020 in your event

Page 199

1 study?
2 A. I believe so.
3 Q. And to confirm, if there is no trading for a note
4 on a particular trading day, do you calculate or
5 did you calculate the return using the price for
6 the most recent day for which there were trades
7 for that note?
8 A. I would, yes, I would.
9 Q. Do you know whether October 29th, 2020 was a
10 normal trading day?
11 A. I believe it was.
12 Q. Would you go down to row 920?
13 A. Okay.
14 Q. Look at sheet 1, I'm sorry. Go to row 920 on
15 sheet 1. Okay. Sheet 1. I'm sorry. Go to 912
16 on sheet 1, please.
17 A. Yes.
18 Q. There's -- 912, 913 and 914 all show trades on
19 October 29th, 2020; is that correct?
20 A. Yes.
21 Q. Okay. Looking still at sheet 1 for the note AL1
22 file, I want to focus on column Z through AD.
23 Column Z shows the date; is that correct?
24 A. Yes.
25 Q. Column AD is where the last price is identified;

Page 200

1 is that correct?
2 A. Yes.
3 Q. And you don't know whether that last price in
4 column AD is what was used to calculate returns
5 for the event study; is that right?
6 A. In AD?
7 Q. Yes.
8 A. Or in AB?
9 Q. AD. Is the last of the --
10 A. I do not know whether that was used -- yes. I do
11 not know whether that was used. It looks to me
12 like those trades are out of sequence and
13 potentially erroneous trades. There is a large
14 discrepancy between the price on the 28th, the
15 prices for trades on the 28th and the prices for
16 trades on the 29th and the prices for trades on
17 the 30th so I would have to go back, look at the
18 original data to see whether those were erroneous
19 trades.
20 Q. Okay, you're looking at rows 911 to, to what,
21 9 --
22 A. I am looking at rows 906 to 928.
23 Q. All right. And you don't know whether that
24 reflects, whether that reflects accurate data or
25 not? Is that what you're saying?

Page 201

1 A. What I'm saying is those trades may have been
2 reported out of sequence and therefore removed
3 from the, or cancelled trades and removed from
4 the final volume and price because the last price
5 shown here for 10/28 is 101.73 which is where
6 this note has traded almost as far back as I look
7 through these data, and on the 30th it only
8 declines to the first trade on the 30th, 98.20 so
9 to have three trades at 85 or below on the 29th
10 indicates to me that those are likely either
11 reported out of sequence or were cancelled trades
12 and should not have been part of and were not
13 part of the last price in the volume and price
14 shown on the other tab.
15 Q. If we look at tab or column AD row 914 "Last
16 Price" for October 29th, 2020 you see it shows
17 $82.90 there?
18 A. Yes.
19 Q. If we switch over to the volume and price tab,
20 there is no, if you look at rows 161 and 162 --
21 A. Right.
22 Q. -- there is no entry for October 29th, correct?
23 A. That's correct.
24 Q. Did you make a decision to leave out the October
25 29th last price from your analysis?

51 (Pages 198 - 201)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 202

1    MR. GRONBORG: Object to form.
2 A. I would, I would not have made such a decision to
3    ad hoc leave out a price or volume for any date
4    during my analysis.
5    What I'm saying is: The data in sheet 1 may
6    have been through some stage of the cleansing
7    process. It seems to me very strange that there,
8    that the price would decline from over, well over
9    par value to 82 in a day when there's seemingly
10   no information and for no reason. It looks like
11   it's an erroneous trade to me and I can go back
12   and look at the original data.
13 Q. But as you sit here right now, you don't know why
14   there isn't any volume or price data on the
15   volume and price spreadsheet for October 29th,
16   2020?
17   MR. GRONBORG: Object to form.
18 A. The inference that I'm making, given the unusual
19   prices on the 29th, is that those were erroneous
20   trades or reported out of sequence and therefore
21   should not have been reported for October 29th.
22 Q. But you don't as you sit here today know whether
23   either of those is actually the case?
24 A. I don't but looking at the data I can tell you
25   that that, those data look to be highly suspect

Page 203

1    to me on the 29th.
2 Q. Your report says that you used a 5:15 p.m.
3    Eastern Time cutoff for bond prices for any given
4    day because that is the end of the trading day
5    for corporate bonds; is that correct?
6 A. That's correct.
7 Q. What was your basis for concluding that the end
8    of the corporate bond trading day is 5:15?
9 A. The FINRA TRACE Fact Book.
10 Q. Elsewhere you used, you refer to the corporate,
11   the Bloomberg Corporate Bond Index. Do you know
12   when that is computed every day?
13 A. I don't.
14 Q. You're not aware that it's computed at 3:00 every
15   day?
16 A. I'm not.
17 Q. That index is the single factor in your
18   regression for the event study, correct?
19 A. Correct.
20 Q. Do you have any concerns about computing index
21   returns over a different time period from the
22   time period that you used for pricing the
23   FirstEnergy notes that you analyzed?
24 A. I don't, only because the last price is not
25   necessarily at 5:15 p.m. for the notes. It could

Page 204

1    be at 11:30 a.m. It could be at 1:30 a.m. It
2    depends on when the last trade occurred that was
3    closest to 5:15 so that is one of the issues, the
4    asynchronous pricing problem with corporate notes
5    and one of the reasons why autocorrelation is not
6    a meaningful indicator of inefficiencies in the
7    market because there's no official last price
8    where it's, you know, each of the notes, all of
9    the corporate bonds that are issued and
10   outstanding and trading end the day at a certain
11   time. It could be some earlier point in time.
12   It's another reason why we have some possible
13   less price sensitivity when you're doing an event
14   study analysis because the, you know, bond 1 may
15   have stopped trading or may have a last trade at
16   3:00 and bond 8 might have a last trade at 4:00
17   so we are, you know, comparing different end
18   periods or end times when we're looking at
19   day-to-day price returns so it doesn't cause me
20   any concern if the Bloomberg U.S. Corporate Bond
21   Index is computed at 3:00 and the Senior Notes
22   cutoff last trade closest to 5:15 is what we used
23   to calculate returns. There was a meaningful
24   correlation between each of the Senior Notes'
25   daily price returns and the price returns to the

Page 205

1    index.
2 Q. Would it have been a more precise comparison to
3    use a cutoff time of 3:00 for the FirstEnergy
4    notes, though, to --
5 A. I don't think so.
6    MR. GRONBORG: Object to form.
7 A. I don't think so.
8 Q. You don't --
9 A. You could potentially have the same issue so
10   there may not have been a last trade close to
11   3:00.
12 Q. In your analysis, you used the last available
13   price for a bond to compute returns; is that
14   right?
15 A. Yes.
16 Q. You didn't require that the returns be computed
17   based on prices from consecutive trading days,
18   correct?
19 A. I don't know what that means.
20 Q. Well, if there was a day where there wasn't any
21   trading, you would calculate returns for the next
22   day on which there was trading by looking back to
23   two days before if that was when the last trade
24   occurred; is that right?
25 A. That's right.

52 (Pages 202 - 205)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 206

1 Q. You didn't use a volume weighted average price?
2 A. I did not.
3 Q. Is there any reason why you used last price and
4    not a volume weighted average price?
5 A. Typically what is done is close-to-close or
6    last-to-last so if it was a, you know, we
7    wouldn't look at intraday trading for a common
8    stock and take a volume weighted average price.
9 Q. What date and time variables did you use to
10   identify the date and time for a given
11   transaction when you identified the last price?
12 A. What date and time? I think I just explained,
13   right? So the volume would, the volume for day 1
14   would -- the volume for day 2 would be, would
15   include volume from 5:16 p m. the prior day up
16   until 5:15 p.m. that day.
17 Q. Okay. But the specific field you used was trade
18   report date and trade report time?
19 A. For?
20 Q. To determine the last, the date and time of the,
21   for a given transaction?
22 A. I thought I said earlier I thought I used the
23   execution, the execution date and time.
24 Q. To measure damages in a case like this, you look
25   at artificial inflation; is that correct?

Page 207

1          MR. GRONBORG: Object to form.
2 A. To measure Exchange Act damages?
3 Q. Yes.
4 A. Yes.
5          MR. GRONBORG:  Objection.
6 Q. That and the inflation of the price of a security
7    at a given point in time that's attributable to
8    false or misleading statements or omissions?
9 A. Yes.
10 Q. You agree that the price that a security drops at
11   the end of the class period is not the same thing
12   as the damages that Exchange Act plaintiffs can
13   claim, correct?
14          MR. GRONBORG: Object to form.
15 A. Correct.
16 Q. You can't just say that the drop at the end of
17   the class period is the amount of artificial
18   inflation. It's more complicated than that,
19   right?
20          MR. GRONBORG: Object to form.
21 A. So I like to think of the price impact as being
22   sort of the starting point that you would look at
23   but that is not the same thing as the damage per
24   share or the inflation per share.
25 Q. Do you agree that inflation, if any, can vary

Page 208

1    over time?
2 A. I do.
3 Q. It depends on what false or misleading statements
4    have been made and when?
5          MR. GRONBORG: Object to form.
6 A. Not necessarily on what false statements have
7    been made and when but what is the economic
8    significance of the false or misleading
9    information that may have entered the market at
10   different points in time during the class period.
11 Q. And the economic significance of the false or
12   misleading information can vary at different
13   points in time; is that right?
14          MR. GRONBORG: Object to form.
15 A. Yes.
16 Q. How do you measure the change in inflation over
17   time?
18          MR. GRONBORG: Object to form.
19 A. It depends.
20 Q. Have you ever dealt with determining variations
21   in inflation over time in another case?
22 A. I have.
23 Q. How did you deal with it there?
24 A. In one particular case that I worked that I was
25   the expert for, the subject of the complaint was

Page 209

1    the implementation of a streamlining process if
2    you will or an integration process and the
3    integration process ultimately failed and there
4    was knowledge of the problems with the
5    implementation process early in the class period
6    but not to the extent of the knowledge that
7    defendants had about the failures later in the
8    class period so there was -- for lack of a better
9    term, there was creeping inflation during the
10   class period until a point in time when it was
11   apparent that there was full knowledge that the
12   integration had failed and would impact the
13   company's financial condition and for the earlier
14   points in time, there were internal records
15   regarding how much of the implementation had been
16   completed and percentage of the implementation
17   program had been completed and the percentage
18   that was failing so there was a quantitative
19   track record, if you will, of how to parse the
20   inflation or the damages.
21 Q. And you used that to measure the amount of
22   inflation at different points in the class
23   period?
24 A. That was one of the things that certainly that I
25   relied on to mirror, if you will, this creeping

53 (Pages 206 - 209)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 210

1  inflation.
2  Q. Do you agree that you would need to analyze
3     artificial inflation here on a bond-by-bond
4     basis?
5         MR. GRONBORG: Object to form.
6  A. Yes.
7  Q. In this case, when did the alleged misstatements
8     and omissions become severe enough that they
9     affected FirstEnergy's probability of default?
10        MR. GRONBORG: Object to form.
11 A. I haven't analyzed that. So at this stage of the
12    litigation I've reviewed the complaint and I'm
13    aware that plaintiffs allege that there was false
14    and misleading information or omitted information
15    as early as the beginning of the class period.
16    I have not been asked to do any analysis of
17    when inflation or when the misinformation rose to
18    a level where it would possibly impact the credit
19    profile of FirstEnergy.
20 Q. You mentioned the term "confounding information"
21    earlier in your testimony today.
22    Have you considered how you could go about
23    removing the effect of confounding information on
24    the prices of the notes that you analyzed here?
25 A. Well, I haven't considered whether there was

Page 211

1  confounding information so I also have not
2  considered how I would remove the impact of
3  potentially confounding information.
4  Q. Okay. You don't have a view one way or the other
5     as to whether or how it could be done?
6  A. I don't. I don't. I have not looked at that at
7     this point.
8  Q. Have you been retained to calculate any damages
9     in this case?
10 A. Not that I was asked to express an opinion on.
11    There were some calculations --
12        MR. GRONBORG: That's it. Stop.
13        Stop there. His question is limited to
14        what you were doing in your role as a
15        testifying expert.
16 A. No.
17        MR. GRONBORG: Is that right,
18        Geoff?
19        MR. RITTS: Yes.
20 BY MR. RITTS:
21 Q. Do you know if you will be retained to offer an
22    opinion about damages in this case?
23 A. I have not been asked to.
24 Q. Are you prepared to offer an opinion as to the
25    damages suffered by any of the bond purchasers or

Page 212

1  how to determine those damages?
2  A. At this point I'm not prepared as I have seen
3     no -- I haven't seen any discovery or had a
4     lengthy discussion with plaintiffs counsel about
5     the damages and the liability and evidence, et
6     cetera.
7  Q. Have you attempted to determine the amount of
8     inflation for any of these eight FirstEnergy
9     notes on any date?
10 A. No.
11 Q. Or any other FirstEnergy security?
12 A. No.
13 Q. Have you been retained to offer any opinions on
14    loss causation in this case?
15 A. I have not.
16 Q. Are you offering any opinion as to whether the
17    defendants actually made any false statements
18    here?
19 A. No.
20 Q. Have you ever been a party to a lawsuit before?
21 A. I was a witness in a car accident but other than
22    that, no.
23 Q. Have you ever been convicted of a criminal
24    offense?
25 A. No.

Page 213

1  Q. Has DLA ever been a party to a lawsuit?
2  A. I have no idea.
3  Q. Not that you've been involved in?
4  A. No.
5        MR. RITTS: Let's go off the
6        record for a few minutes here.
7        THE VIDEOGRAPHER: We're off the
8        record at 4:28 p.m.
9           - - - -
10       (Thereupon, a recess was had.)
11          - - - -
12       THE VIDEOGRAPHER: We are back on
13       the record at 4:38 p.m.
14       MR. RITTS: I don't have any
15       further questions for you, Ms. Jones.
16       Thank you for your time today.
17       THE WITNESS: Thank you.
18       MR. GRONBORG: No questions from
19       plaintiffs.
20       THE VIDEOGRAPHER: This then
21       concludes the deposition of Cynthia Jones
22       on July 19th, 2022.
23       The time is 4:38 Eastern Daylight
24       Time and we are off the record.
25          - - - -

54 (Pages 210 - 213)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**Page 214**

1    (Signature not waived.)
2    (Deposition concluded at 4:38 p.m.)
3    - - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 216**

1          Veritext Legal Solutions
          1100 Superior Ave
2          Suite 1820
          Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
   July 22, 2022
5
   To: TOR GRONBORG
6
   Case Name: In Re Firstenergy Corp Securities Litigation v
7
   Veritext Reference Number: 5297712
8
   Witness:  Cynthia Jones     Deposition Date:  7/19/2022
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext com
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

**Page 215**

1
2
3
4    C E R T I F I C A T E
5
   The State of Ohio, )   SS:
6    County of Cuyahoga )
7
      I, Pamela S  Greenfield, a Notary Public
8    within and for the State of Ohio, authorized to
   administer oaths and to take and certify
9    depositions, do hereby certify that the
   above-named witness was by me, before the giving
10   of their deposition, first duly sworn to testify
   the truth, the whole truth, and nothing but the
11   truth; that the deposition as above-set forth was
   reduced to writing by me by means of stenotypy,
12   and was later transcribed into typewriting under
   my direction; that this is a true record of the
13   testimony given by the witness; that the deponent
   or a party requested that the deposition be
14   reviewed by the deponent; that said deposition
   was taken at the aforementioned time, date and
15   place, pursuant to notice or stipulations of
   counsel; that I am not a relative or employee of
16   attorney of any of the parties, or a relative or
   employee of such attorney or financially
   interested in this action
18      IN WITNESS WHEREOF, I have hereunto set my
   hand and seal of office, at Cleveland, Ohio, this
19   July 21, 2022
20
21
22   Pamela S  Greenfield, CRR, RDR
23   Notary Public, State of Ohio
   My commission expires July 2, 2023
24
25

**Page 217**

1         DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 5297712
3    CASE NAME: In Re Firstenergy Corp Securities Litigation v
   DATE OF DEPOSITION: 7/19/2022
4    WITNESS' NAME: Cynthia Jones
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6    my testimony or it has been read to me
7      I have made no changes to the testimony
   as transcribed by the court reporter
8

9    Date          Cynthia Jones
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11   the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13   They signed the foregoing Sworn
       Statement; and
14   Their execution of this Statement is of
       their free act and deed
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____
17
18   Notary Public
19
   Commission Expiration Date
20
21
22
23
24
25

55 (Pages 214 - 217)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 218

1      DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 5297712
3      CASE NAME: In Re Firstenergy Corp Securities Litigation v
       DATE OF DEPOSITION: 7/19/2022
4      WITNESS' NAME: Cynthia Jones
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me
7         I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8      well as the reason(s) for the change(s)
9         I request that these changes be entered
       as part of the record of my testimony
10
          I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein
13     _____
       Date              Cynthia Jones
14
          Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18           in the appended Errata Sheet;
          They signed the foregoing Sworn
19           Statement; and
          Their execution of this Statement is of
20           their free act and deed
21     I have affixed my name and official seal
22     this _____ day of_____, 20____
23     _____
          Notary Public
24
25     Commission Expiration Date

Page 219

1              ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2             ASSIGNMENT NO: 5297712
3      PAGE/LINE(S) /      CHANGE      /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19
       _____    _____
20     Date              Cynthia Jones
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23     _____
          Notary Public
24
       _____
25     Commission Expiration Date

56 (Pages 218 - 219)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[& - 2]**

Page 1

| & | | | |
|---|---|---|---|

**&**   3:3 4:8,12 5:3
5:13,17,21 6:3
40:6,17 191:5
195:6 196:17

| 0 |
|---|

**0.4**   95:25
**03785**   8:10
**08723**   9:2

| 1 |
|---|

**1**   7:9 10:14,19,24
10:25 11:1,2,21
12:3 29:17
63:24 80:6,12,24
90:6 91:19
96:16 133:2,10
133:19 172:5
175:17 183:17
186:18,19
188:14 189:11
189:22 191:9,24
192:1,16 193:4
193:24 195:10
195:11,23 197:3
197:7,10 198:6
198:10 199:14
199:15,15,16,21
202:5 204:14
206:13
**1.9**   96:24
**10**   7:9 36:20,22
44:18,18,20,24
45:1,2,10,11
56:7 90:7
**10.1**   92:22
**10/28**   201:5

**100**   15:6 16:7
78:9 134:3
141:5 181:22
**100,000**   32:6
**10017**   5:23
**10019-9710**   5:5
**101**   9:1
**101.72**   198:16
**101.73**   201:5
**102**   186:19
189:11
**104**   189:17 190:1
190:9
**1050**   4:13
**108**   18:14 29:19
37:8 38:11
42:17 44:14
46:1,23 47:3
63:24 74:24
76:6 80:7 84:9
86:20 90:14
96:20 97:15
100:6 106:23
110:23 113:16
116:10 128:5
141:5 145:5,5
168:24 171:9
172:6 181:22
186:19 189:18
**10:01**   8:3
**10:04**   10:7
**10:09**   1:14 2:16
**10:11**   10:12
**10:12**   11:13
**10:15**   11:18
**11**   86:20 161:25
162:1 167:15

**1100**   4:4 216:1
**1114**   3:11
**115**   7:6
**11:21**   55:15
**11:30**   204:1
**11:31**   55:20
**12**   56:7 117:24
162:1
**1200**   4:23
**121**   101:8
**127**   4:10
**12th**   168:5,18
**13**   141:3 158:25
159:10 167:11
181:21 186:11
186:15
**14**   121:7,11,21
122:15,16,19,21
123:13
**15**   17:1 84:8
87:20 107:25
108:3
**150**   157:13,16
**157**   7:12
**16**   45:17 76:6
88:3 97:16
**160**   177:2,4
**161**   198:9,10,12
201:20
**162**   198:19
201:20
**164**   177:24,25
**165**   178:3
**17**   74:12 106:23
**170**   99:20
**1701**   5:14
**1735**   5:10

**175**   178:17,18
179:4
**179**   94:4
**18**   82:23 84:9
96:19
**1820**   216:2
**19**   1:14 2:16
97:14,15 115:13
**19.3**   93:25 94:6
**190**   7:13
**19103**   5:10,15
**194**   7:14
**195**   100:8,18
**196**   179:11
**198**   181:3
**1987**   18:22 29:5
52:25
**1988**   28:19 29:5
**1989**   24:21 28:19
**199**   179:11
**1992**   19:15
**1994**   18:24
**1998**   23:19 24:21
27:17
**19th**   8:4 105:9
106:3 169:1
213:22
**1:04**   115:6
**1:30**   204:1
**1:50**   115:11,13

| 2 |
|---|

**2**   7:10 37:7
38:10 39:7,14
40:23 41:2,15
42:14,17,23 43:6
43:17,22 44:1,6
44:14 45:17,25

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

46:1,23 77:1
91:19 99:8,14
101:4,10 102:21
104:19 105:13
145:4 179:16
180:7,15 181:4,9
185:15 206:14
215:23
**2.2**   100:2
**2.6**   100:24
**20**   15:10,10
31:23 90:8
157:23 217:16
218:22 219:22
**200**   5:18
**2000**   4:9 23:19
84:14,17,22
85:14 86:1 87:2
**2000s**   27:16,17
**2001**   4:18 22:22
23:19 84:17
**2002**   86:14 87:5
87:6,11,13,17
88:10 89:7
119:5,14,24
**20036**   4:14,18
**2004**   119:5,14,25
**2005**   84:14,22
85:14 86:1,14
87:2,5,7,12,13
87:18 88:10
89:8,25
**2013**   86:23 88:19
**2015**   21:19 22:22
**2017**   21:6,19
44:19 47:9
74:11 85:11,15
86:1 87:1,6,12

88:14 89:12,17
90:1 94:12 98:1
98:2 105:5
120:1,10 121:13
121:23 122:1
123:8 155:23
159:7 163:25
164:8,23 165:5
169:1 170:5
172:7,16,25
173:13 174:17
175:19
**2018**   45:18,18
94:12 120:10
159:19 161:23
162:2,14,16,16
165:5 167:12
168:19 173:15
174:21
**2019**   45:18 94:12
120:10 162:2,16
162:19 165:5
168:5,14,18
173:17 174:21
**2020**   44:19 47:9
74:13,13 85:11
85:15 86:1 87:1
87:6,12 88:14
89:12,17 90:1
91:1 94:13
97:22 98:2,16
105:9 106:4
120:1,4,7,22,23
121:4,20,24
122:1 123:8,13
129:6 155:20,23
156:2 157:16
159:8 160:15

161:14 165:6
167:21 170:13
170:14 171:12
171:12 172:10
172:14,25
173:19,19
174:22,22 176:1
177:4,9 178:1,6
178:19,22 179:2
179:15,22
181:18 182:1,4,6
182:9,12 198:9
198:20,25 199:9
199:19 201:16
202:16
**2021**   20:2,4,9,11
21:6 31:24
86:23 129:6
**2022**   1:14 2:16
8:4 41:3 115:13
213:22 215:19
216:4
**2023**   215:23
**20th**   159:8
**21**   96:20 98:2
114:15 215:19
**216-523-1313**
216:3
**21st**   44:19 98:1
105:5 145:19
155:19,23,23
156:2 159:7
161:13 172:9
173:19 174:22
176:1 182:1,25
185:1
**22**   216:4

**22nd**   155:19
156:8,9 182:4
185:1,3
**23**   110:22 116:9
**23rd**   155:19
156:20 177:13
178:1,6,19,22
179:1 182:9
184:23
**24**   113:16 157:16
**24th**   91:1 97:22
98:2,16 106:3
157:19,24
179:15,18,21
181:18
**25**   31:23 54:8
133:6,22
**250**   5:4
**25705**   215:22
**26**   116:10
**28**   119:4 177:9
198:9
**28th**   170:5 177:4
198:15 200:14
200:15
**29th**   148:10
199:9,19 200:16
201:9,16,22,25
202:15,19,21
203:1
**2:20**   1:4 2:5 8:10

**3**

**3**   7:12 18:13
28:23 52:22
53:2,7 79:19
156:25 157:6,11
167:9 175:17

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[3 - 89a]**                                                    Page 3

176:24 178:4
189:22
**3,000**   139:7
**30**   18:6 20:15
117:24
**300**   92:22
**30th**   148:12
155:20 172:10
179:10 180:4
182:6,12 183:1,7
184:23 185:24
198:20,21,25
200:17 201:7,8
**31**   161:24
**31st**   44:19
167:12 168:19
**34**   63:23 76:5,12
81:12,21 106:24
140:10
**34b**   106:21,25
**3500**   5:18
**37**   63:24 128:5
145:18 158:1
**3785**   1:4 2:5
**38**   74:24 84:11
89:10
**3:00**   203:14
204:16,21 205:3
205:11
**3:21**   176:14
**3:31**   176:19
**3asr**   45:17
**3d**   190:5,10

---
**4**
---

**4**   7:13 30:19
31:1,18 33:14
56:10,14 57:13

190:17,21
192:14 193:3,7
**4.5**   101:20,22
**40**   20:15
**400**   108:7
**4000**   6:4
**409a**   20:18,24
**41**   88:2 97:16
140:15 171:9
**43215**   3:11
**44**   82:23,25
96:20
**44113**   4:5
**44114**   3:20 4:10
216:2
**44118**   5:19
**44308**   4:23
**444**   6:4
**45**   167:10,12
168:8
**450**   5:23
**48**   11:24
**4:28**   213:8
**4:38**   213:13,23
214:2
**4th**   168:14

---
**5**
---

**5**   7:14 36:20,22
76:21 77:11
182:10 185:5,20
193:3,7 194:16
194:20 195:1,4
195:17 197:7
**50**   4:23 15:6
26:5 90:8 122:2
122:6,10 123:7
133:4

**500**   4:18 60:15
118:17
**51**   110:22,25
111:11,24
112:23
**51st**   5:10
**52**   80:7 172:6
**5297712**   1:22
216:7 217:2
218:2 219:2
**53**   38:11 145:5,7
**54**   145:5,7 168:4
168:4
**55**   42:17 44:14
46:1,23 145:7
**55th**   5:4
**56**   157:14
**57**   18:14
**58**   37:8 116:9,10
**59**   29:19 177:3
**5:15**   196:25
197:2 203:2,8,25
204:3,22 206:16

---
**6**
---

**6**   185:20
**6.5**   97:4
**60**   20:8 22:13
31:12 78:12
177:24
**60606**   6:4
**62**   168:13,14
**62.4**   99:23
**63**   178:18
**65.6**   100:21
**655**   3:6
**68**   119:3,12
179:12

**69**   179:12
**6th**   45:18

---
**7**
---

**7**   28:23 41:3
52:22 53:1,3
**7/19/2022**   216:8
217:3 218:3
**70**   20:8 121:9
**75**   133:20
**77.1**   101:11
**78.5**   101:15
**7th**   45:18

---
**8**
---

**8**   7:4,10 90:13
95:23 98:3,19,23
99:8,16 100:5,7
100:17 101:7,14
101:18,22 102:2
102:15,20,23
103:1,9,12
106:14 179:19
185:21 204:16
**82**   128:4,23
202:9
**82.90**   201:17
**84**   64:1 65:2,23
140:10
**85**   23:9 74:23
201:9
**85.6**   88:5
**88**   90:14 100:6
**89**   47:3 158:20
168:24
**89a**   158:2,5

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

[9 - aggregate]

**9**

**9** 47:1,2,5,6,24
48:4 103:20
104:21,21
168:24 200:21
**90** 171:8,10
**901** 3:20
**906** 200:22
**911** 200:20
**912** 199:15,18
**913** 199:18
**914** 199:18
201:15
**920** 199:12,14
**92101** 3:6
**922** 105:8
**928** 200:22
**93** 96:14
**930** 103:20
104:22
**931** 99:19
**95** 52:25
**950** 4:4
**96** 101:5 139:23
140:3
**97.79.1** 198:21
**98** 140:15
**98.20** 201:8
**99** 7:11

**a**

**a.m.** 1:14 2:16
8:3 10:7,12
11:13,18 55:15
55:20 204:1,1
**aa** 197:9
**aaron** 5:3

**aaron.miner** 5:5
**ab** 197:4,9 200:8
**able** 22:16 58:16
67:15 99:1
104:3,5,13,17
117:3,10,11,13
149:18 152:9
153:5 155:8
157:3 194:17
**abnormal** 133:2
133:4,6,18,21,22
135:3 182:15
184:21
**ac** 96:16 197:9
**ac1** 95:22 96:10
96:13
**academic** 36:6
41:16 43:16,22
76:19 126:10
134:22 144:25
**accept** 38:9
**acceptance**
184:17
**access** 117:12
181:7
**accident** 22:16
212:21
**account** 11:8
184:5 188:4
**accounting**
13:24 14:2,5,5
16:3 19:24
**accounts** 29:7,7
**accurate** 9:7,10
18:18 140:3
171:16 200:24
**accurately** 12:9
135:10 140:17

**acknowledge**
217:11 218:16
**acknowledgm...**
181:6
**acquire** 53:17
54:7
**acquired** 53:18
**act** 207:2,12
217:14 218:20
**acted** 55:25
**action** 1:4 2:5
40:24 177:20
215:17
**actions** 1:7 2:8
42:8
**active** 81:2,6,10
137:13 173:2
174:11
**actively** 119:9
120:20 121:19
121:23,24 124:7
124:9,24 125:6
173:3
**actors** 107:22
**actual** 67:18
68:2 167:4
**ad** 198:6 199:22
199:25 200:4,6,9
201:15 202:3
**added** 24:2
**addison** 3:15
**addition** 60:14
**additional** 30:5
66:8 148:6,11
156:9,15 158:22
159:17 180:15
196:7

**address** 8:24 9:1
74:4 109:3,5
216:15
**addressed** 36:1
**adequate** 170:14
171:14
**adjourning** 2:17
**adjust** 92:11
**administer**
215:8
**administration**
19:5
**admissible** 34:3
**adopted** 102:13
**advertising**
54:18
**advisor** 27:21
**advisory** 16:3
21:24 22:3
**affect** 63:13,16
63:21 65:16,19
65:24 66:11,20
67:7,8,12,19
68:3 72:25
142:15 145:2
**affixed** 217:15
218:21
**aforementioned**
215:14
**afternoon**
115:12,17,18
**age** 8:15 74:1
**agencies** 64:7
65:2
**agency** 150:10
150:21 151:3,12
**aggregate**
113:17 129:11

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[ago - andrew.johnson]**

**ago** 37:5,6 71:10
71:13,20,23,24
72:6
**agree** 61:11
65:15,18 71:12
75:25 96:9
111:15,21
126:13 133:8
139:12 172:12
174:20 183:4,17
184:2 207:10,25
210:2
**agreed** 33:3,7,11
33:16,19,22
**agreement** 18:6
33:20 66:19
**ah0** 93:24 94:12
172:7 173:12
175:17,19
**ahead** 48:23
125:25 127:8
139:15 147:19
168:3 191:13
**ahutton** 3:8
**ak** 191:4 196:7
**ak3** 7:13 92:21
99:19 100:18,20
181:25 182:14
183:22 190:21
191:6 195:13,20
195:23,25
196:12
**akin** 111:21
**akron** 4:23
**al** 195:6
**al1** 7:14 194:20
195:7,11,17
196:1,3,16

198:16,21
199:21
**allege** 35:11 60:7
61:1 178:3
179:14 210:13
**alleged** 175:6
210:7
**alleges** 157:16
168:14 178:18
**allow** 22:19 62:5
110:15 133:9
134:5 184:8
**allowed** 53:4
**allowing** 171:13
**alternative**
23:21
**altogether**
133:10
**amalgamated**
50:15
**amount** 17:25
18:2 66:3 86:21
92:17 94:21
137:25 207:17
209:21 212:7
**ample** 155:7
**amyris** 34:22
56:22
**an7** 101:2,10
184:20
**analyses** 25:7
54:20 58:16
129:19 174:7,18
**analysis** 22:22
22:25 23:1,11
24:18 28:9 42:6
43:13 54:16
55:2 57:25 58:1

70:5,11,13 79:5
87:22,23 94:18
98:4,15 102:6
105:13,17,23
106:3,6,11 120:3
128:15,18,24
129:7,21 130:1
139:6,25 154:5
155:13 161:1,6
161:18 163:13
170:2 171:1,14
173:23 174:2,5
175:1 177:21
178:14 181:17
183:17 184:2
186:6 188:23
189:6,9 197:23
201:25 202:4
204:14 205:12
210:16
**analyst** 19:14
25:10,10 39:1
46:25 47:1,7,10
47:14,18,23 48:1
48:2,3,14,19
49:2,5,9,11,16
49:19 50:2,7
53:20 60:12
61:7 107:25
109:17 110:2
136:16 137:1
143:21 145:15
145:25 146:4,10
149:15 153:22
156:11,18
160:25 164:11
165:1 168:25
171:1 178:11

181:4
**analysts** 62:2
67:22 107:4,7,11
107:15,17
137:14 153:24
158:16,17
180:25 181:8
**analytical** 26:9
**analyze** 70:1
80:14 87:18
97:11 98:7
106:7 109:4
113:21 120:9
129:4,16 136:17
136:21 160:8
166:19 173:12
210:2
**analyzed** 74:3
80:9 84:22
85:10 90:16
97:20 98:1,5
105:2 108:10
115:1 118:25
121:7 130:23
141:9 172:8
203:23 210:11
210:24
**analyzes** 114:7
**analyzing** 57:22
78:23 87:7,14
116:2 130:4
160:17
**anderson** 3:15
**andrew** 3:5 4:22
5:4 13:9,12 14:4
**andrew.johnson**
5:6

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **angeles** 3:2 | **appended** | **argument** | **asking** 32:1,11 |
| **announced** | 218:11,18 | 173:10 | 93:22 113:4 |
| 138:20 151:13 | **appendices** 12:4 | **arlington** 21:12 | **assert** 175:13 |
| 151:16 157:17 | **appendix** 186:18 | 21:15 | **assess** 78:16 |
| 177:5 179:15 | 186:19 188:14 | **arnold** 5:3 | 171:19 |
| **announcement** | 189:22 192:1 | **arnoldporter.c...** | **assessing** 184:5 |
| 64:18,23 65:20 | **applicable** 76:9 | 5:5,6 | **asset** 23:21 |
| 133:17,22,25 | 76:11,17 | **arrive** 61:19 | **assigned** 187:8 |
| 138:15,17 | **application** 38:5 | 131:4 | **assignment** |
| 145:19 152:19 | 58:25 77:4 | **article** 42:3,4,7 | 217:2 218:2 |
| 156:4 163:20 | **applied** 58:21,22 | 42:18,20 43:6 | 219:2 |
| 164:1,4,13,23 | 76:13 107:22 | 77:1,2 84:24 | **assist** 26:6,8 |
| 165:2 177:7 | 153:9 | 85:4 144:22 | **assistants** 17:12 |
| **announcements** | **apply** 26:21 27:8 | **articles** 13:14 | **assisted** 13:4 |
| 64:6,9,10,14 | 37:21 58:2 | 35:16,19 41:16 | 26:10 |
| 65:18 135:22 | 68:21 78:4,15 | 42:12,13,24 | **assisting** 28:21 |
| 136:6,7 152:13 | 149:4,11 152:4 | 43:17,22 44:11 | **associated** 65:4 |
| 163:24 164:8 | 152:24 153:10 | 44:12 46:2,3,5,6 | **associates** 17:2 |
| 165:5 | **approach** 77:19 | 46:9,12,15,16,17 | **association** 3:2 |
| **answer** 16:22 | 154:14 | 46:19 60:11 | 37:23 38:3 |
| 48:23 83:6 | **appropriate** | 61:7 76:24,25 | **assume** 10:25 |
| 135:20 155:9 | 87:7,13 95:15 | 77:9 78:19 82:4 | 175:3 |
| **anybody** 10:2 | 138:10,12,23 | 83:13 84:20 | **assuming** 175:8 |
| 13:1 27:2 51:1 | 139:2 | 85:9 116:4 | **assured** 165:17 |
| **apguran** 4:24 | **approximate** | 118:1 139:4 | **asterisk** 93:1,11 |
| **apparent** 209:11 | 20:4 | 145:15,25 146:3 | **asynchronous** |
| **appear** 32:19 | **approximately** | 146:9 153:22 | 204:4 |
| 105:16 195:16 | 16:7 17:1,10 | 164:12 178:10 | **attached** 100:5 |
| 196:13 198:4 | 20:8,15 31:12,23 | **artificial** 206:25 | 218:7 |
| 217:11 218:15 | **april** 168:14 | 207:17 210:3 | **attempt** 88:13 |
| **appearances** 3:1 | **arbitragers** | **ascribe** 139:19 | 89:5 |
| 4:1 5:1 6:1 | 114:25 | **asked** 12:16 | **attempted** 212:7 |
| **appeared** 121:2 | **arbitration** | 13:13,14,16,19 | **attention** 80:6 |
| **appearing** 8:11 | 30:11 | 24:15 36:13 | 110:21 157:12 |
| **appears** 32:16 | **archive** 47:19 | 46:15 129:18 | 167:10 176:24 |
| 101:24 102:11 | **archived** 47:8,15 | 210:16 211:10 | 190:15 192:15 |
| 105:9 113:15 | 102:3 105:21 | 211:23 | **attorney** 178:1 |
| 196:6 | | | 215:16,16 |

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

[attract - believe]

attract 117:4,5
attracting
  117:18 118:13
attractive 24:16
attributable
  207:7
attribution 24:5
august 45:17
  159:19 161:23
  162:2,14,15,16
authoritative
  43:18
authorize 218:11
authorized
  215:8
authors 43:21
  44:1,5 109:18
autocorrelation
  125:8,16,17,20
  125:23,25 126:2
  126:5,12,14,18
  126:23,25 127:4
  127:7,10,14,22
  128:1,10,12,16
  128:21,25
  129:17 130:1,4,9
  130:13,20 131:1
  131:11,12,17,22
  131:23 204:5
autocorrelations
  128:7
automatic 85:19
automatically
  37:19 72:24
available 74:15
  78:11,13 83:8,11
  84:18 88:5
  96:14 98:12

105:3 112:2,7,15
  205:12
ave 4:13 216:1
avenue 3:20 4:4
  5:23
average 81:8,13
  81:16 88:4,17
  91:21,23 92:8,10
  92:16,25 93:24
  96:23,25 100:1
  100:23 101:19
  102:22 206:1,4,8
aware 28:3,7
  34:5 60:5 78:18
  86:5 108:5
  110:18 115:2
  116:8 118:5
  160:11 203:14
  210:13

**b**

b 7:7 36:20,22
  150:24,25
  159:20,21
  161:22,22 162:4
  162:4,10,10
back 10:11
  11:17 55:19
  57:17 100:5
  115:10 158:1
  164:11,25 167:2
  168:23 172:16
  173:21 176:4,18
  197:6 198:11,11
  200:17 201:6
  202:11 205:22
  213:12 216:15

background
  38:6
backup 98:22
  99:15 101:3,10
  101:18,25 102:1
  102:12,20,25
  103:7,10,19
  188:21 191:2
  195:4 196:13
backwards
  81:20
bad 22:16
baker 4:8
bakerlaw.com
  4:11,11
balance 183:22
  185:10
baldwin 17:15
  17:16
ballard 5:8
ballardspahr.c...
  5:11,11
ballpark 56:9
bank 50:16
bankruptcy
  49:22 50:4
  67:19,25 68:3
  151:7,10,13,16
  151:17,23 152:1
  165:10,11,13,18
  165:20 166:4
  167:3,4,15,16
  168:15
banks 84:2
  114:18,22
barclays 169:2
barrick 34:25
  56:18

baruch 14:1
based 88:8 95:3
  122:22,23
  142:19 155:3,15
  173:22 174:2
  175:1 205:17
bases 12:20
basil 3:9
basis 24:7 95:6
  112:19 113:4
  114:3 119:23
  134:23 162:24
  163:17 171:18
  177:12 178:25
  179:25 184:7
  203:7 210:4
bearing 126:5
  131:19,24
  143:17
becoming 53:20
beginning 2:16
  8:4 15:2 45:16
  88:19 97:19,21
  97:25 121:14
  145:12,18 164:2
  171:12 196:24
  210:15
begins 47:2
  186:19 190:9
behalf 31:2,7,16
  34:8,13 50:23
  53:6
behold 148:9
believe 12:22,25
  14:6,9,15,21
  18:19,24 27:14
  29:24 30:4
  32:20 33:25

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

37:21 38:4,18
40:4 42:2,3,6,20
46:21 48:5
50:14,25 56:19
61:16 70:4 77:2
77:19 83:17
84:23 86:15
97:13 106:10
108:13 109:20
112:6 117:23
118:19 124:11
124:17,25
126:17 129:5
139:22 140:9,20
141:1 144:25
145:22 146:15
155:5,5 159:19
161:21,23 179:2
179:3 184:13
199:2,11
**benchmark** 96:3
96:6,7 119:5
**benchmarks**
127:25
**bessembinder**
42:2
**best** 125:3,3
**better** 43:11
169:12,13 209:8
**beyond** 53:10
93:21 172:21
**bfa** 49:14
**bias** 93:6 94:24
121:6 139:18
154:18
**biased** 124:25
**bid** 42:3 75:20
118:25 119:6,9

119:16,19,23
120:1,3,9,17,20
122:20 124:3,11
**big** 149:2
**bigger** 83:21
**bill** 20:9,11
33:12
**billed** 18:10
**billion** 97:4
117:24,25
179:16 180:7,15
181:4,9
**bills** 17:25 18:11
**bit** 20:24
**bloomberg**
128:6 129:10,24
131:1,13 142:12
203:11 204:20
**blue** 67:21
**board** 43:14
**bockius** 5:13
**bond** 42:5,21
53:13 54:2
57:14,18 63:6,9
63:12,14,16 64:3
64:20,21 65:4,8
65:9,12,16,19,24
66:2,11,20 67:1
67:7,8,17,19
68:4,6 69:6
72:22 73:3,4
75:5,14 77:17,23
78:21 83:15,21
83:23 84:12,21
85:10,13 86:13
87:1,2,5,11
88:21 90:7,24
91:3 92:6 93:23

94:5 95:14
96:11 97:8
113:25 115:24
116:7,15,20
126:6 128:6
129:10,10,24
130:10,13 131:8
131:17,19
141:22,24
142:12 149:2
163:22 173:22
191:6,20,22
195:7,24 198:16
198:20 203:3,8
203:11 204:14
204:16,20
205:13 210:3,3
211:25
**bond's** 72:21,25
163:9
**bondholders**
42:7
**bonds** 53:16
58:19 63:22
67:13 68:11,18
69:12,18,20,23
73:6,16,21,21
74:16 75:1
76:21 77:12,21
80:24,25 83:18
86:17 88:7,9,14
88:21,25 89:17
89:24 90:5,8,9
93:15 94:23
96:23 97:1
103:17 111:23
113:12,19 118:4
119:13 120:21

121:7,11,20
122:2,15 123:8
123:10 124:5,7,9
124:23 129:11
129:14,17 130:5
130:9,12,24
131:8,25 141:15
141:19 142:22
146:25 148:17
148:23 151:14
151:15 159:17
162:5 163:9
181:13 186:10
186:14 196:14
203:5 204:9
**book** 121:13
203:9
**books** 43:16,22
**boosts** 65:7
**boston** 16:14
**bottom** 21:4
37:7 82:25
97:17 99:25
101:18 102:21
161:25
**boundaries**
168:21
**box** 192:19
**breach** 66:19,24
67:2,3,14,15,24
**break** 55:13,23
111:5,7 116:24
176:8,10
**breakdown** 85:2
**breaking** 24:5
**bribery** 35:14
148:8 156:17

brick 9:2
brief 41:10
briefly 45:6
bright 61:21
  78:4 110:12,20
  114:2,9
broad 53:14
  142:19,20
broadway 3:6
broker 111:18
  187:14,14
  189:13,14
  193:11
buckley 4:17
buckleyfirm.c...
  4:19
budget 33:20,21
burton 43:7,9
business 19:4
  20:16 21:24
  22:2 25:3,6,9
  27:13,15 36:11
  54:11,13,23,25
  55:4
buy 29:10 53:4
  169:3 187:2,20
  187:23 188:1

**c**

c 104:24 197:11
  197:13,14 215:4
  215:4
ca 216:25
caboodle 138:8
calculate 94:8
  196:18 198:24
  199:4,5 200:4
  204:23 205:21

211:8
calculated 37:1
  96:22 113:10
calculations
  13:5,19,20 15:2
  102:9 129:23
  211:11
calendar 120:6
  120:22
california 3:6
call 29:8,16
called 73:15
  143:25
calls 108:18,22
  108:24 109:2,5
  110:8
cammer 58:2
  59:1 62:12 76:6
  76:8,13,20,20
  77:5,10,11,16,22
  78:16,20,23 79:4
  79:13,17,23 81:2
  81:6,7 82:2,6,11
  92:19 96:3,5,7
  103:5,6 107:22
  107:24 108:3
  110:19 111:17
  112:10,12,13
  114:8,10 115:25
  116:1,3 138:1,6
cancelled 201:3
  201:11
candace 27:1
cap 71:24 116:23
  117:1,2,6 118:6
  118:11,12,14
capital 23:1,18
  25:3 27:10

117:4,5,14,18
  118:13 181:7,15
capitalization
  115:23 116:6,11
  116:19 117:19
  118:3
capitalize
  127:19
car 212:21
care 44:9
career 28:22
  31:20 39:19
carrying 140:18
  162:1
case 8:9,22 9:20
  12:10,13 15:11
  15:15,19 17:21
  18:3 32:15
  33:22 35:8 41:7
  50:11 51:2,5
  56:17,18,21,22
  57:16,21,24 58:6
  58:6,8,14,18,22
  59:2,4,14,19
  60:4,22 75:13
  76:6,13 79:24
  107:24 128:19
  129:17 134:2,9
  134:23,23
  148:24 155:6,6
  155:11 157:2
  185:15 202:23
  206:24 208:21
  208:24 210:7
  211:9,22 212:14
  216:6 217:3
  218:3

cases 26:7,20
  27:25 28:5
  29:20 34:18
  35:3 36:20,22
  39:16 55:25
  56:6,11,13,15
  57:13 60:24
  66:7 88:24
  137:18 152:12
  154:1,4
cash 25:6
categories 69:16
category 39:14
causation
  212:14
cause 54:17 67:1
  204:19
caused 133:4,6
  133:10,20,22
  134:1
cell 9:17 193:2,3
  193:3,7,7
cells 192:12
cents 133:6,20
  133:22 198:16
  198:21
certain 16:22
  19:12 20:21
  24:12 40:19
  49:14 54:17
  66:7 70:21
  76:13 77:15,15
  81:7 85:8 114:4
  119:9 121:4
  126:13 127:14
  129:15,20
  174:24,25 194:3
  196:9 197:5,16

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

204:10
certainly  9:1
  20:15 39:2 80:3
  97:7 144:20
  150:12,18
  171:21 185:4
  209:24
certainty  172:15
certificate
  218:11
certificates
  52:19 53:9
certification
  14:8 15:18 34:9
  34:14,22 35:4
  41:9 56:7 217:1
  218:1
certified  8:16
certify  215:8,9
cetera  68:9
  71:24 193:1
  212:6
cfa  1:12 2:13 7:3
  7:5 8:15,18
  19:16 37:9,13,15
  37:18,20 52:18
  53:19 115:15
chack  5:12
champion
  131:21
change  61:23
  64:20 65:21
  67:1 72:21 73:5
  85:22 86:3,6
  103:4 133:2,5,6
  133:18,20,21,23
  134:2,3,4 137:24
  144:5 145:16

147:20,25
150:10,21 151:4
151:15 153:2
159:22 161:19
163:11 172:25
173:8 182:1,8,21
183:1,9 208:16
216:13,14 218:8
219:3
changed  60:13
  61:9 72:1 85:13
  85:16 86:14
  93:16 113:22
  139:14 153:15
  178:12
changes  64:6
  65:1,15 68:9
  72:5,24,24,25
  86:21 138:18
  143:5 151:12
  216:12 217:7
  218:7,9
chapter  167:15
characteristics
  62:20 71:19
  72:19 137:12
  172:23
characterization
  174:4
characterize
  75:9
charge  17:14
charges  28:4
charles  4:7
chart  88:16,19
chartered  19:13
charts  86:15,20
  86:21

check  13:20 52:2
checked  102:10
chicago  6:4
china  35:2
choice  95:10
choose  122:3
  138:10 163:18
chose  120:22
  131:2 158:8,18
  163:18
christopher  3:17
chronology
  146:6
circumstance
  138:3
circumstances
  58:7 59:2 62:20
  69:10 126:13,19
  136:9 137:3
  155:12
cite  84:11
cited  40:9,22
cites  181:3
city  21:13
civil  1:4 2:5
  217:5 218:5
claim  207:13
claims  35:8
clarification
  174:14
class  14:8 15:18
  34:9,14,21 35:4
  35:13 36:14
  41:9 42:8 46:10
  47:11 48:18
  49:7,15,20 50:6
  51:18 52:4,10
  56:6 58:11 62:3

74:9,15 79:19
80:2,18,21,22
88:23 90:10,25
91:13 93:4,20
95:18 97:21,25
98:6 102:17,18
105:6 106:5,9
108:8,18 109:14
109:16 110:2
113:18 117:20
117:23 121:14
129:5 137:19,21
143:16 145:14
152:19 155:22
156:1,5 159:2,4
159:5,6,12,15
160:22 161:13
161:20 163:3
164:2 165:8,23
173:6 174:8
175:4,7,12,15
207:11,17
208:10 209:5,8
209:10,22
210:15
clean  186:22
  191:5,11,14
  194:6 195:6,13
  198:1
cleaning  186:20
  186:25 189:8
cleansed  192:25
  194:3
cleansing  13:17
  191:11,16 192:6
  196:5,8 202:6
cleveland  3:20
  4:5,10 5:19

215:18 216:2
**click** 100:11
**client** 23:24
**clients** 20:9,11
  24:6,7 53:6
  54:24,25
**close** 106:8
  205:10 206:5,5
**closed** 148:10
**closer** 21:16
  122:13
**closest** 197:2
  204:3,22
**clubhouse** 9:2
**code** 167:16
**coded** 107:25
**coefficient** 129:1
  129:3
**coffee** 32:20
**colleague** 104:10
  104:16 192:10
  192:13
**collect** 122:19,20
**collection** 8:23
**collectively**
  167:14
**college** 14:1 36:2
**columbus** 3:11
**column** 90:15
  92:21 93:23
  95:22 104:24
  175:17 191:25
  191:25 192:4,7,8
  192:15,15,18,21
  192:21 193:10
  193:12,15,19,20
  196:21 197:4,11
  197:13,14 198:4

198:6 199:22,23
199:25 200:4
201:15
**columns** 193:22
  193:23 194:9,10
  197:9
**combined** 15:10
  97:1,5,6
**come** 66:6 67:4
  79:9 108:16,17
  144:9 155:8
  198:5
**comes** 35:1
  49:24 62:11
  78:22 146:10
  148:7,11
**comfortable**
  57:2
**coming** 55:4
  109:19 176:9
**comment** 181:8
**commentary**
  145:16 158:11
  158:23 165:1
  178:10 180:24
**commenting**
  156:18
**comments** 9:23
**commission**
  215:23 217:19
  218:25 219:25
**commodities**
  53:7
**common** 60:8
  61:2,4,22 62:1
  66:25 68:22
  69:7 76:9,12,14
  76:17 78:7 83:1

83:6,7,24 84:3,7
88:1 92:20 96:6
96:8 114:13
120:14 126:17
126:25 152:10
152:14 160:1,3
160:12 170:22
171:6 206:7
**commonly**
  126:10
**community** 36:2
  110:7
**companies** 20:17
  20:19 25:5,8
  52:7,10 69:20,23
  84:2 116:23,25
  117:21 121:15
  121:17 138:24
  139:8
**company** 20:22
  29:10 45:12
  51:12 60:15,17
  61:3,10 62:3
  63:15,18,18,19
  63:21 64:16,20
  65:8 66:24
  67:15 68:8,24
  70:21 74:16
  79:18 108:1
  117:3,6,7,10,11
  117:13,17 118:6
  118:14,18 122:7
  124:23 132:3,25
  133:16 136:9
  137:15 138:21
  139:5,10 141:15
  141:19,23,24
  142:2,21 144:4

146:21 156:10
156:13 157:21
158:13 163:12
169:12 181:6,9
184:14
**company's** 29:9
  67:22 68:16,23
  69:7,11 116:18
  116:22 143:7,7
  156:22 180:16
  209:13
**compare** 86:25
  94:11 102:21,23
  103:8 154:21
  171:22 193:23
  195:11
**compared** 85:14
**compares** 154:6
**comparing**
  119:6 120:17
  121:5 154:9
  192:18 193:15
  204:17
**comparison** 88:8
  100:13 120:19
  120:25 124:12
  171:22 205:2
**compendium**
  46:6 48:2
**compensated**
  14:19
**compensation**
  15:14,14 32:2
  33:4,17
**complaint** 7:12
  40:24,25 49:8
  58:12 59:24
  60:6 61:1

102:19 145:13
157:1,6,12,13
160:13 167:9
168:4 176:4,25
177:25 178:17
179:3,8,12,13
181:3 208:25
210:12
**complete** 9:7,10
12:6 18:18
19:18 29:23
30:1,2 37:15
**completed**
129:21 209:16
209:17 216:15
**completely**
131:14 154:17
**compliance** 24:9
**complicated**
207:18
**comprehensive**
42:6 46:8 61:18
**compute** 205:13
**computed**
203:12,14
204:21 205:16
**computer**
186:22
**computing**
203:20
**concentrated**
19:8
**concern** 66:10
66:15 204:20
**concerned** 50:6
150:19 153:25
180:12,25
197:14

**concerning**
119:12
**concerns** 181:11
181:13 203:20
**conclude** 62:5
119:23 131:6
133:9 173:4,4
**concluded**
130:21 146:13
214:2
**concludes**
213:21
**concluding**
203:7
**conclusion** 62:10
72:14 79:10
96:10 103:15
131:4 135:3,18
136:12 137:6
138:3 182:18
**conclusions** 55:4
175:1
**conclusive** 79:11
**condition** 64:16
64:19 65:21
67:23 163:12
209:13
**conditions** 71:25
**conduct** 70:5,10
70:13 139:24
140:7 154:24
161:6
**conducted** 54:22
59:14,15 139:20
154:1,5 155:11
155:13 174:15
174:18 175:16
175:23

**conducting** 54:8
138:9
**conference**
108:18
**confident** 189:3
**confidential** 1:10
2:11
**confirm** 124:19
199:3
**confirmatory**
40:21 158:23
**confounding**
132:24 210:20
210:23 211:1,3
**conjunction** 54:9
**connecticut** 4:13
**connection**
25:14 30:6
42:10
**consecutive**
37:16 205:17
**consider** 43:16
43:21 78:2
95:12 106:2
135:24 152:8
164:22 169:22
171:25
**considerable**
114:17,21
**considerably**
173:24
**considered**
12:24 106:5
114:23 131:13
146:12,15 147:4
168:11,20,22
186:7 210:22,25
211:2

**considering**
58:19 62:7
107:2 111:12
125:9
**consist** 19:20
**consistency**
109:14
**consistent** 95:21
102:18 109:10
109:23 110:5
173:2 181:7
**consistently**
137:15 188:1
**consists** 19:21
**consolidated**
40:24
**constituent**
129:15
**constituents**
156:12
**construct** 136:18
166:25
**constructed**
166:18
**consultant** 23:15
32:25
**consulted** 30:24
51:10,12
**consulting** 21:9
21:20 22:5 23:2
23:4,7 25:9,13
26:4,16,19 27:9
30:15,20 31:6,9
31:15 32:25
54:9 55:7 57:5
**contact** 21:17
**contain** 12:6
189:12

**contained** 44:11
45:10 133:15
**contemporane...**
119:8 149:15
158:11
**contemporane...**
145:20
**context** 117:17
126:23 134:24
135:12 143:8
**contingent** 15:15
**continued** 4:1
5:1 6:1 7:5
115:15
**contra** 187:14
188:6,12,12
189:13,24 190:2
190:4,6 193:13
193:16,21
**contribute** 38:8
**control** 136:3
142:23 143:2,14
170:14,16,20
171:14
**controls** 63:19
**convenient**
111:4 176:8
**converting** 92:10
**convicted** 212:23
**copy** 11:21 157:1
**corner** 11:25
97:17
**corp** 1:4 2:5 3:14
8:7,22 44:25
169:2 216:6
217:3 218:3
**corporate** 16:3
40:19 42:5,21

53:13,16 54:2
63:6,9,11,12,14
68:14 73:7 77:7
78:8 83:8,25
86:22 87:25
88:7,9,21 89:17
89:24 103:17
111:16 114:17
119:10,13
120:21 121:1,7
121:15 124:9
127:2 128:6
129:10,24 131:8
131:17 138:14
142:12 149:2
203:5,8,10,11
204:4,9,20
**corporation**
44:15 46:2,24
56:18 73:21
**correct** 15:22
22:9 23:13
24:23 25:15
27:22 28:13
30:25 46:13
57:11,12 76:8
80:10 81:5
84:15,16 86:24
91:3,16 92:24
93:14 95:10
97:23 100:8,18
102:24 103:9
105:2 108:4
114:14 116:17
119:7 120:11,12
123:22,24
125:10 132:18
132:22 135:14

141:6,20 144:1
155:21 156:3
165:2,3,7 166:5
166:17 167:8,18
172:10,11
174:18,23 176:1
176:3 178:16,23
178:24 179:23
179:24 181:19
182:2,3,4,5,6,7
182:12 184:11
184:23 185:3
186:17 188:9,24
189:24 191:6
195:8 197:4,5
199:19,23 200:1
201:22,23 203:5
203:6,18,19
205:18 206:25
207:13,15
**corrections**
216:12 218:17
**corrective** 155:7
175:6,6,10
**correlation**
129:1 131:6
204:24
**correspond**
197:9
**corresponding**
196:3
**cost** 75:20 124:5
125:4,5
**costs** 125:24
127:11,13,20
**counsel** 2:14 3:1
4:1 5:1 6:1 46:7
46:12 48:2 57:6

212:4 215:15
**count** 90:22 92:3
99:19 100:8,18
101:4,8
**counter** 111:13
112:12
**counting** 79:2
**country's** 21:23
**county** 3:2 215:6
217:10 218:15
**couple** 168:3
**coupled** 134:1
**coupon** 73:12
**coupons** 121:18
122:4,14 123:16
124:21
**course** 36:14
37:15 39:5,18,19
39:21 41:20,23
41:25 51:8
58:18 72:22
**courses** 35:25
**court** 1:1 2:1 8:8
8:13 10:5 34:2
35:3 39:16,17
40:13 54:1
114:11 167:16
168:15 217:7
**court's** 82:10
**covenant** 66:24
67:3,14
**covenants** 67:24
**coverage** 107:18
110:6 165:1
**covered** 68:12
84:14 120:4,6
143:21,22

**covering** 119:4
**created** 180:25
  187:25 188:11
  192:1,24
**credential** 37:22
**credit** 48:25 60:2
  60:13,15 61:9
  64:7 65:1,3,7,15
  72:25 117:12
  133:17,20 134:1
  134:2 138:18
  143:9,17,18
  144:1,3,4,8,10
  144:16,18,24
  145:10,17 146:1
  146:5,7,9,14,17
  146:19,21 147:6
  147:10,13,13,14
  148:21,22 149:5
  149:6,12,13,17
  149:22,23 150:3
  150:4,7,11,17,18
  150:22 151:3,4,8
  151:15,18,23
  152:2,5,25 153:2
  153:3,4,9,23
  155:4,16 156:11
  156:18,22,22
  157:21 158:12
  158:13 159:3,13
  159:16,18,23,25
  160:22 161:7,12
  161:19,23 162:3
  162:6,12 164:4
  164:14 165:13
  166:21,22
  167:20 168:2,11
  169:8,12,15,23

177:14,15
178:12 179:16
180:3,7,16,17,20
180:23 181:5,5,8
181:10 182:11
182:11 185:19
210:18
**creditsights**
  156:11
**creeping** 209:9
  209:25
**criminal** 28:4
  212:23
**criteria** 58:23
  61:17,18 62:9,12
  68:21,22 76:14
  78:5 82:10
  122:23 149:4,10
  149:11 163:16
  164:9 166:7
  171:23 172:20
  184:4
**cross** 7:3,5 8:18
  46:25 115:15
**crr** 1:20 2:18
  215:22
**crutcher** 4:12
**culpability**
  156:16,16
**cumulative**
  132:13
**current** 18:16
  37:10,25 197:1
**currently** 17:24
  147:23
**cut** 96:16 191:13
**cutoff** 95:2,5,6
  95:10,16 203:3

204:22 205:3
**cutoffs** 82:6
**cuyahoga** 215:6
**cv** 1:4 2:5 8:10
  18:16 19:4 21:4
  21:18 22:21
  23:18 24:21
  28:18 37:7,7,23
**cynthia** 1:12
  2:13 7:3,5 8:5
  8:15,18 9:1
  115:15 213:21
  216:8 217:4,9
  218:4,13 219:20

**d**

**d** 3:17 5:9 7:1,7
  158:5 189:23
  198:4
**d.c.** 4:14,18
**daily** 88:17
  91:21,23 92:9
  142:6,14 204:25
**dalrymple's**
  41:13
**damage** 207:23
**damaged** 156:7
**damages** 36:15
  36:20,22,25
  206:24 207:2,12
  209:20 211:8,22
  211:25 212:1,5
**dart** 43:14
**darts** 43:13
  123:1
**data** 12:23 13:5
  13:15,17,18 58:3
  58:10 71:15

72:7,15 74:15
76:2 79:25
84:18,22 87:7,13
87:17,18 88:21
89:6,7 93:21
97:2,7,11 98:7
105:14,25
106:18 114:24
118:22 122:19
122:20 136:17
136:19 184:4
186:20,21,23,25
188:23 189:5,16
190:2,3,4 191:10
192:6,25 193:24
193:25 194:2,6
194:12 195:7
196:7,9 200:18
200:24 201:7
202:5,12,14,24
202:25
**database** 46:9
**date** 18:1 105:18
  105:24 106:6,6
  156:1,8,21
  157:20 163:14
  166:9,11 169:22
  177:10,12 178:7
  178:21,23 179:6
  179:7,22 187:10
  188:5,14,18,20
  188:22 189:1,2,4
  189:4,7,8 191:18
  195:24 198:9,19
  199:23 202:3
  206:9,10,12,18
  206:20,23 212:9
  215:14 216:8

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

217:3,9,19 218:3
218:13,25
219:20,25
**dated** 41:2 45:17
**dates** 49:3
104:25 106:2
135:11 146:2,12
146:15 149:19
155:3,15,18
158:19 160:7
161:3,7,13
163:20 165:19
166:11,16 175:2
182:25 183:10
184:10,22
185:22 186:10
186:11 189:6
191:21,22
**david** 16:5
**davis** 5:21
**davispolk.com**
5:24,24
**day** 3:18 78:11
83:8,11 88:22
105:6,9,12
132:12,18
138:21 139:14
151:12 156:23
159:2,11,19
182:15 196:24
196:24,25 197:1
197:2 199:4,6,10
202:9 203:4,4,8
203:12,15
204:10,19,19
205:20,22
206:13,14,15,16
217:16 218:22

219:22
**daylight** 2:17 8:3
213:23
**days** 18:6 78:13
85:3 88:5 90:22
90:24 91:2,4,4,6
91:8,13,17 92:12
96:15 98:5,12
99:19,23 100:7
100:17,20 101:4
101:8,11,14
103:8,11 105:4
134:17,18,25
135:2,17,23,25
135:25 136:23
137:8 138:15,17
147:9 153:19,21
154:2,2,3,7,8,12
154:15,16,22,22
154:25 155:1,9
158:25 159:10
159:17 172:9
182:9,22 183:18
183:20 185:6
186:14,15
205:17,23
216:18
**deal** 149:2
208:23
**dealer** 189:13,14
**dealers** 111:18
112:24 113:9
**dealt** 108:9
208:20
**dear** 216:10
**debt** 40:19 57:22
61:5 66:3,19
67:6,8,10,24

68:14,23,24 77:7
78:8,12,17 83:8
83:25 86:22
87:25 89:2,20
109:8 111:16,20
114:17 116:2
117:14 121:1,15
125:14 126:11
126:19,24 127:2
144:6,20 145:2
147:20,22
151:12 152:7
155:6,10 159:20
160:2,4,14
180:16
**decades** 23:13
**december** 44:19
170:5
**decide** 45:8
48:10 78:25
79:6 95:1
116:18 187:1
**decided** 147:5
**deciding** 78:20
**decile** 116:24
**decision** 114:10
147:9 181:17
201:24 202:2
**decline** 66:2
202:8
**declined** 56:25
56:25 178:4
**declines** 201:8
**decrease** 133:17
182:15 183:6
**decreases** 68:10
152:15

**deed** 217:14
218:20
**deemed** 216:19
**default** 63:17
64:5,11 67:9
145:3 181:1
210:9
**defendant** 4:2,7
4:16,20 5:2,7,12
5:16 6:2 8:21
31:16
**defendants** 3:14
5:20 8:23 10:24
209:7 212:17
**define** 81:6,10
152:8
**defined** 111:17
159:5
**defining** 152:18
**definition**
124:10 144:8,12
**definitions**
189:16 190:2
**degree** 13:24
14:4 18:21 19:5
19:10,11 156:14
172:14
**demand** 65:14
**demetriou** 3:16
**demonstrably**
57:3
**demonstrate**
172:14 173:11
185:13
**demonstrated**
185:16
**demonstrating**
183:19

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

demonstration
  172:20
dennis  5:12
deny  35:3
department
  168:5 216:22
depend  79:22
depending  15:17
  98:10 173:24
depends  62:19
  75:17,18 204:2
  208:3,19
deponent  215:13
  215:14
deposed  8:17
deposition  1:12
  2:12 8:5 11:1
  213:21 214:2
  215:10,11,13,14
  216:8,11 217:1,3
  218:1,3
depositions
  215:9
derivative  19:25
  53:6
describe  12:9
  20:14 71:4
  140:22
described  36:25
  37:14 59:23
  118:10 123:20
  140:24 144:10
  170:8 192:1
describes  186:19
design  136:19
  137:2
designation
  19:14,17 37:15

37:17 53:19
designed  83:1
  185:14 186:5
desirable  143:13
determinants
  42:5
determination
  70:6,15 72:8,20
  76:3 77:6
  118:23 161:2,5
  162:24 167:5,19
  168:1 177:18
  178:25
determinative
  73:14
determine  48:14
  54:15,17 70:2
  80:16,20 88:13
  95:15 124:2
  132:1 143:20
  145:9 146:4
  148:15 151:3
  152:4,24 153:1,9
  164:3,13 206:20
  212:1,7
determined
  150:2
determining
  62:25 77:21,23
  148:20 149:12
  149:22 208:20
develop  24:9
  126:1 127:8
developed
  127:19
developing
  12:17 51:8

development
  45:4
deviated  58:9
devices  9:15
  55:21 115:19
  176:20
dictate  58:15
dictated  136:5
diego  3:6
differ  58:5 59:6
  59:8
difference  59:12
  89:25 90:3,4
  103:14 130:25
  147:24 175:11
  187:7 193:18
differences
  58:25 78:2,14
  111:22
different  13:12
  40:9 58:18,20
  59:1,9,10,13,19
  60:21 63:13
  73:6,7,12,13,16
  74:1,9 75:21
  102:1,5,11,14
  106:15,20
  107:23 109:19
  110:10 121:17
  121:17,18 122:3
  123:15,16
  128:17 134:6
  136:4 138:14
  139:8 141:19,20
  144:20 145:1
  154:20 155:12
  171:3,4,5 174:11
  179:7 183:21

184:3 194:5,9
  203:21 204:17
  208:10,12
  209:22
differently  73:9
  73:18 83:18
  141:16
difficult  57:7
  135:20 152:21
dilutive  180:14
direct  80:5
  110:21 157:12
  167:10 190:15
  192:15
directed  130:3
  196:10
direction  86:5
  215:12
directional
  86:10
directly  114:18
  114:21
director  17:5,6
  23:23
disagree  172:18
  172:19 174:4
discipline  19:21
disclose  12:23
disclosed  32:17
  67:22 132:25
disclosure  45:7
  66:10,19 67:18
  132:2,7 133:4
  137:20 151:22
  166:16 167:3,5
  175:6,7,10 178:5
disclosures
  133:5,10,15

155:8 165:9,20 165:22 166:4,8 179:20
**discontinued** 130:1
**discounted** 25:6
**discovery** 71:23 112:1,7 212:3
**discrepancy** 200:14
**discuss** 78:24 144:15
**discussed** 83:9 84:23 88:16 151:9 171:15
**discusses** 42:20 107:21
**discussing** 109:7 172:22
**discussion** 40:18 45:5 113:9 212:4
**displays** 190:13
**dispositive** 138:6
**dissertation** 35:22
**dissolved** 23:12
**distinct** 11:4 80:16 98:11
**distribute** 20:20
**district** 1:1,2 2:1 2:2 8:8,9 167:17
**diverse** 122:11 123:15
**diversity** 109:17 110:8
**divide** 92:22

**divided** 81:8 92:16
**dividend** 138:16 152:15
**dividing** 91:19
**division** 1:3 2:3 8:9
**divisions** 25:2
**dla** 13:4 14:22 15:21 16:2,3,4,6 16:10,11 17:21 17:25 18:3,10,12 20:2 21:11 213:1
**dla's** 20:4
**document** 1:6 2:7 9:21 10:18 10:20 11:19,25 38:23 99:12 129:7 147:8 156:24 162:24 163:13,18,19 177:21 178:14 181:16
**documented** 131:18 163:16
**documents** 9:19 38:24,25 41:6 45:15,19 55:21 115:19 176:21
**dog** 148:14
**doing** 10:23 20:16,24 22:2 34:9 43:12 55:9 68:14 129:23 139:9 152:16 153:7 187:5 204:13 211:14

**dollar** 86:16 181:5
**dollars** 54:18 92:1 94:1 179:16 180:7,15 181:9
**donald** 3:16 4:16
**double** 14:2 147:23 150:24 150:25
**dow** 46:4,8
**dowd** 3:3
**dowling** 4:2
**downgrade** 146:24 147:13 148:3,9,18,21 149:6,12,22 150:1,3 179:1,7 179:10 180:2,9 181:5 183:7
**downgraded** 145:23 146:17 148:24 178:19 179:17 180:3,21 181:12 182:12
**downgrades** 144:18 148:13 150:7
**downgrading** 157:17
**draft** 41:12
**drafted** 179:8
**dramatic** 85:24 88:18
**dramatically** 72:2
**draw** 122:25 123:4 144:12

150:4 173:21 174:25 182:18
**drawdown** 179:15 180:7,16 181:5
**drawn** 181:9
**drop** 179:19 207:16
**drops** 207:10
**dublin** 3:11
**due** 59:1 165:24
**duly** 8:16 215:10
**dunn** 4:12
**duplicate** 187:2 187:15,25 188:15
**duplicates** 121:23 122:8 123:6 186:25 193:1
**duplicating** 122:12
**duplicative** 187:7
**duration** 72:24 73:15

e

**e** 4:7 7:1,1,7,7 13:8 215:4,4
**eager** 21:15
**earlier** 37:14 49:6,9,17,18 50:3 83:6 102:13 103:18 115:21 137:22 151:9 165:22 173:7 174:12

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

177:20 181:11
196:8 197:25
204:11 206:22
209:13 210:21
**early** 27:16,16
28:22 86:19
165:22 209:5
210:15
**earn** 31:24 37:17
**earned** 54:18
**earning** 43:12
61:24
**earnings** 64:6,9
64:10,13,18,22
65:18,20 110:8
133:16,21,25
138:15 152:13
152:19,20 163:2
163:10,14,20,24
164:1,3,8,13,22
165:2,5
**easier** 100:10,12
**eastern** 1:3 2:3
2:17 8:3,9 115:6
203:3 213:23
**economic** 208:7
208:11
**economics** 19:24
21:5,7 22:20
36:2 43:23 44:3
44:7 72:13
**economists**
37:24 38:3
125:7
**economy** 142:7
**edited** 85:6
**edt** 1:14

**effect** 54:17
210:23
**effects** 134:6
**efficiencies**
61:12
**efficiency** 56:12
56:16 57:1
61:20,21,25 62:6
62:25 70:7
72:15 75:12
77:7,21 78:17
79:7,13,21 81:18
82:9,13,17,20
96:17 107:3
109:11,21,23
111:12 114:5
115:24 116:7,12
116:15,20 117:9
118:4 125:1,14
125:21 126:19
130:22 131:25
134:20 135:15
136:12 137:7
138:7 154:19
173:6,22 174:2
175:14,15
183:24 184:11
185:8,9,13
**efficient** 43:2,3,5
56:2,24 57:3,8
57:11,15,19
58:20 62:8
68:16,18 69:8,9
69:11,18,21,24
70:3,23 71:1,8,9
71:14,17 72:3,6
74:17 75:6,15
76:1,22 77:12,18

77:24 78:21
79:1 81:16,25
82:2 83:16 89:3
89:22 96:11
107:6,19 113:25
118:7,15,20
125:10,12 126:6
127:5 131:7,20
134:13 135:4
137:23 141:23
172:16,21
182:16,24
183:12,16 186:8
**egnyte** 11:7
**eight** 17:10 80:9
80:17 90:5 93:9
96:23,25 97:2
98:15 103:10
113:12 114:22
118:25 120:15
129:21 130:20
130:23 141:9
160:2,3 164:17
164:20 165:24
166:2,12,19
167:22 170:23
171:19 175:22
186:2 212:8
**either** 30:16 34:3
38:21 41:12
75:17 102:25
103:2 154:10
162:21 190:9
201:10 202:23
**electronic** 85:20
85:21,22
**eliminate** 94:17
106:17 142:20

187:1
**eliminated** 93:7
93:10 187:17,19
**eliminates** 121:6
**ellis** 4:3
**email** 216:17
**emery** 6:3
**emilia** 5:9
**emphasize** 76:13
**empirical** 70:5
70:10,13 72:7
**employee** 16:8
215:15,16
**employees** 3:2
16:6,15 20:21
**enable** 192:24
**enclosed** 216:11
**endorses** 144:23
**ends** 156:5
**engaged** 14:7,10
15:12 32:7,15,16
32:20,23 33:2,6
33:10 50:22
**engagement**
14:14,16,20
17:17 33:20
55:5,8
**engagements**
54:23 56:25
**enormous**
154:17
**enter** 154:13
**entered** 135:8,11
135:25 136:24
154:7,8,12 208:9
218:9
**entering** 48:25

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **entire** 30:19 | **essentially** 23:12 | **evaluates** 136:11 | 158:12,19 159:3 |
| 31:20 40:25 | 25:1 33:22 | **evaluating** 83:15 | 159:13,23,25 |
| 41:4 42:1 | 36:10 38:7 43:1 | 147:8 169:24 | 160:8,23 161:4 |
| 113:18 123:7,11 | 43:10 48:19 | **evening** 19:1,2 | 162:22 163:6,14 |
| 129:5 217:5 | 49:6,23 53:4 | **event** 48:12,16 | 164:4,9,14,16,16 |
| 218:5 | 58:2,10 61:18 | 48:17 49:3,4,24 | 164:24,24 |
| **entities** 21:2 | 62:14 68:12 | 54:4,9,11,13,15 | 165:14,20 166:5 |
| 167:13 | 70:22 72:1,23 | 54:20,22 55:1,6 | 166:7,10,16,18 |
| **entitled** 169:2 | 92:9,19 94:23 | 59:4,6,7,13,14 | 167:6,20,25 |
| **entry** 29:16 | 95:5 111:19 | 59:25 60:5 61:3 | 168:2,7,9,11,12 |
| 168:25 170:4 | 125:2 154:21 | 66:4,22,23,25 | 168:17 169:8,15 |
| 201:22 | 156:4 160:25 | 67:5,12 68:14 | 169:21,23 170:2 |
| **equal** 64:21 75:5 | 165:17 170:24 | 132:1,7,12,16 | 170:7,20 171:11 |
| 75:13 79:23 | 174:6 177:19 | 133:2,9,19 134:5 | 172:9 174:13,15 |
| 160:16 193:16 | 180:2,6 187:12 | 134:11,25 135:1 | 175:2,5,16,18,23 |
| **equals** 193:3,7 | 191:17,23 | 135:17 136:2 | 177:9,10 178:7,7 |
| **equity** 19:23 | **establish** 57:7 | 137:8,19 138:2,9 | 178:12,23,23 |
| 20:20 53:4,21 | 107:16 | 138:13,15,16,17 | 179:22,22 180:1 |
| 112:18,22 113:3 | **established** 83:4 | 138:19,20 139:3 | 180:8,10,17,20 |
| 117:10 139:8 | 107:20 110:17 | 139:5,10,18,20 | 181:18,23 182:9 |
| **eric** 5:22 | 112:17 113:2 | 139:21,22 140:7 | 182:19,22,25 |
| **eric.kim** 5:24 | 114:6 133:14 | 140:14,19 141:2 | 183:10,14,18,20 |
| **erisa** 30:9 | **establishing** | 141:9 142:5 | 183:23 184:2,10 |
| **errata** 216:13,18 | 194:5 | 143:2,24 144:3,4 | 184:14,22 185:6 |
| 218:7,10,18 | **estate** 21:3 | 144:5,9,10,16,24 | 185:22,25 186:9 |
| 219:1 | **et** 68:9 71:24 | 145:11 146:5,13 | 189:9 196:19 |
| **erroneous** | 193:1 212:5 | 147:5,9,14 | 197:22 198:25 |
| 200:13,18 | **ethics** 19:25 | 148:22 149:6,13 | 200:5 203:18 |
| 202:11,19 | **eugene** 42:24 | 149:23 150:1,4 | 204:13 |
| **esop** 29:7 | 43:1 | 150:11,18,22 | **events** 48:12,15 |
| **especially** | **evaluate** 71:15 | 151:1,4,6,8,10 | 48:17,24 49:7 |
| 106:16 151:11 | 71:19 72:7 | 151:18,23 152:2 | 59:10,11,18,22 |
| **esq** 3:4,4,5,5,10 | 76:21 77:12 | 152:5,9,11,16,22 | 59:22 60:1,7,10 |
| 3:10,19,19 4:4,8 | 135:15 170:23 | 152:25 153:19 | 60:12,17,19,25 |
| 4:9,13,17,22,22 | 171:6 | 153:21 154:1,5 | 61:1 68:2,13 |
| 5:3,4,9,9,14,18 | **evaluated** 80:1 | 155:3,11,15,18 | 102:19 132:11 |
| 5:22,22 6:3,8 | 138:11 | 156:2,8,20 | 132:13,17 134:6 |
| | | 157:19 158:7,9 | 135:7 136:10,17 |

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

[events - expert]

136:21 138:10
138:14,23 139:3
139:11,13 142:7
142:15,17,23
143:2,9,24 144:1
144:16,24
145:10,12,21
146:1,11,13,14
147:4,6 152:10
152:15 153:6,14
153:23 155:4,15
158:4,6,9 159:1
159:11,15,16,25
160:10,11,22
162:21 163:5,17
163:19 164:7,19
166:21 170:13
170:22,23 171:4
171:10 173:13
173:15,17,19
174:25 175:8
185:15 186:5
**eventually**
165:11
**evidence** 34:3
61:19 62:6 79:6
79:10 120:2
173:8 174:9
183:15 212:5
**exact** 128:20
**exactly** 30:22
56:8 133:13,13
145:9
**exam** 37:20
**examination** 7:3
7:5 8:18 115:15
**examine** 68:21
68:23 70:24

93:15 95:14
**examined** 69:17
69:22 96:13
**examines** 174:24
174:25
**examining** 62:21
152:6 160:2
167:25
**example** 13:13
13:17 49:12
59:1,9 61:22
64:17 65:6
67:14 79:18,18
93:24 126:22
131:5 144:18
148:4 160:14
162:9 163:25
173:1
**examples** 188:10
**exams** 19:19
37:16
**excel** 101:25
102:3 104:7,11
105:22 186:23
189:20,21
**excess** 33:23
**exchange** 69:24
70:20 207:2,12
**exclude** 161:3
168:7 177:12
**excluded** 34:2
84:17 160:21
165:19 166:4,15
167:20 168:8,10
168:17
**excuse** 28:13
86:9

**executed** 188:19
218:10
**execution** 188:14
189:2,7 206:23
206:23 217:14
218:19
**executive** 19:2
**executives** 148:7
**exercise** 94:15
**exhibit** 7:8,9,10
7:10,12,13,14
10:14,19,20,24
10:25 11:1,7,21
12:3 18:13
29:17 30:19
31:1,18 33:14
38:10 39:7,14
40:23 41:2,15
42:14,17,23 43:6
43:17,22 44:1,6
44:14 45:17,25
46:1,23,25 47:2
47:5,6,24 48:4
56:10,14 57:13
63:24 76:25
80:6,12,24 90:6
90:13 95:23
97:9 98:2,19,22
98:23 99:4,8,8
99:14,16 100:5,7
100:15,17 101:3
101:7,10,14,18
101:22 102:2,15
102:20,21,23
103:1,9,12
104:19 106:13
141:3 145:4
157:3,6,11

158:25 159:10
167:9 168:23
172:5,24 175:17
176:5,24 181:21
186:11,15 190:1
190:16,18,21
191:8 192:14
194:15,16,16,20
195:1,4,17 197:7
**exhibited** 129:17
130:9,12,20
161:11 183:1
185:21
**exhibits** 10:21
11:5 12:3 98:23
161:8
**exist** 80:2 98:8
109:22 127:25
**existence** 127:7
**existing** 67:8
**exists** 81:3
**expect** 60:16
64:17,21 65:3
67:16 83:7
141:12 142:19
159:21 162:5
**expected** 67:10
67:21 148:4,16
183:5
**expenditures**
117:15
**experience** 27:8
67:11
**expert** 9:21 14:7
25:13 28:4
29:20 30:9,17
31:21,22,25
32:12,18,24 33:1

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

[expert - field]

33:15 36:21
41:13 44:2
52:15 53:12,15
54:2,4,10 55:25
57:9,10,18,21
72:12 155:2,10
155:14 208:25
211:15
**expertise** 53:17
53:18 54:7
**experts** 26:7,10
26:12,24 43:23
51:7 125:13
**expiration**
217:19 218:25
219:25
**expires** 215:23
**explain** 105:17
136:15 140:6
158:8 194:1
196:2,21
**explained** 22:8
94:20 206:12
**explanation**
140:14
**exploit** 127:9
**express** 35:2
211:10
**expressed** 45:14
91:25 126:10
**extend** 174:7
**extends** 172:21
174:5 175:4
**extensive** 43:13
**extensively** 43:3
**extent** 33:18
40:20 45:20
48:11 65:7,20

73:23 78:1
79:25 93:17
114:9 124:2
142:18 166:22
209:6
**external** 63:8,20
**extra** 196:13
**extreme** 120:23
125:23

**f**

**f** 3:10,16 5:3
215:4
**facilitating**
111:20
**facilities** 179:17
**fact** 71:7 72:22
121:13 163:22
165:16,24 166:2
181:8 182:14,20
183:8 192:5
203:9
**factiva** 46:4,9
**factor** 59:1
76:21 77:11
80:1,4 111:12
125:8 138:6
203:17
**factors** 58:3
62:24 63:21
76:8,16,20 77:5
77:11,17,22
78:16,19,20,24
79:2,5,9,13,17
79:23 81:2
107:2 110:19
112:10 114:8
115:25 116:1,3

127:13 136:5
138:2 145:1,3
173:1 183:21
185:10
**facts** 12:23 58:7
58:18 59:2
137:2
**failed** 209:3,12
**failing** 209:18
**failures** 209:7
**fair** 29:1,11,13
31:5 49:4 71:6
71:11 98:13
113:8 124:12
132:6 136:10
154:21 155:17
197:17
**fairfield** 16:12
**fairly** 66:25
67:15
**fall** 169:23 170:1
**fallen** 166:25
169:20
**falls** 148:12
**false** 27:24 35:13
207:8 208:3,6,8
208:11 210:13
212:17
**fama** 42:24 43:1
144:25
**familiarize**
40:11
**family** 21:1
**far** 15:12 18:7
130:13 173:21
201:6
**farther** 45:25

**favor** 61:19 79:6
79:13 94:24
109:20 117:8
125:1 154:19
**favret** 4:4
**fe** 7:9,10,12,13
7:14 10:14 11:2
11:21 12:3
29:17 99:8,14
101:3,10 102:21
104:19 105:13
156:25 157:6,11
167:9 176:24
190:17,21
192:14 194:16
194:20 195:1
**february** 44:18
47:8 74:11,13
97:25 98:1
105:5 119:5,14
119:25 129:6
155:23 159:7
164:23
**fee** 38:9
**feel** 45:14 57:2
**fees** 33:8
**fell** 166:9,9
168:20
**felt** 21:14 44:12
123:13,16
170:21,25
171:23
**fenoc** 167:13
**fes** 49:21,24 50:4
167:13,14
**fewer** 92:12
**field** 38:7 43:23
44:2,7 190:3,4

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

190:13 206:17
**fields** 189:16
190:2
**fifth** 111:24
**figure** 93:25
161:16
**file** 79:19 98:22
99:15 101:3,10
101:18,25,25
102:1,3,12 103:7
103:10,19
165:11 189:16
189:17,20,21
195:5,13,21,23
195:25 196:1,3,7
196:12,16
199:22
**filed** 41:6 44:18
44:25 157:2
167:14 178:2
**files** 189:12
191:2 196:6
**filing** 45:5 151:7
151:10,17,23
165:18
**filings** 44:15
45:9,23
**final** 41:12
102:23 103:1,12
201:4
**finalized** 102:7
102:15
**finance** 13:25
14:2 19:6,8,10
43:24 44:3,7
72:13 77:10
82:5 83:14
116:5 124:15

**financial** 19:13
22:21,24,24 23:1
23:11 24:18
28:9 37:2 45:7
64:15,19 65:21
67:23 163:12
209:13
**financially**
215:16
**find** 118:18
120:14 125:15
128:12,16
131:16 164:19
173:7 184:15,17
184:19 216:11
**finding** 11:5
61:20,20 79:7,20
94:24 96:17
109:11,20,23
116:15 117:9
125:1 127:23
154:19 185:18
**fine** 44:23 66:7
**finish** 48:23
**finra** 13:18
52:22 113:12
121:20 189:5
192:25 194:1,12
203:9
**finra's** 121:13
**firm** 14:11,19
16:3 22:2 23:3
23:12 24:2,10
27:4,21 32:8
33:3,22 49:11
66:3 156:12
190:13 192:24

**firm's** 15:14
33:17
**firms** 21:24
110:9
**first** 8:16 15:12
21:4 26:14
39:14,25 90:21
92:21 93:4,8,9
93:13,25 94:17
95:4,5,19 99:18
100:2,24 101:20
102:22 105:6
106:17 114:16
116:22 124:6
133:3 146:21,23
146:24 151:24
163:25 165:6
181:24 187:6
201:8 215:10
**firstenergy** 1:4
2:5 3:14 6:8 8:6
8:22 44:14,25
45:23 46:2,11,24
47:7,11,14 49:23
51:5,10,14,17,22
52:3 58:13
60:13,14 61:10
74:3 80:9,14
88:4 89:4,15
90:2 108:7,18,21
109:3,10 114:22
114:25 118:18
119:1,7 120:4,10
121:2 124:5,8
125:2,4 130:5,9
130:12,24 131:5
131:10 141:10
142:3 143:10,18

143:19,22
145:17,23
146:20 149:17
150:14 156:17
157:18 161:10
162:3,13 163:2
164:17 165:17
168:2 169:2,7
170:6 177:6
178:2,4,13,19
179:15,17
180:12 181:2
182:11 186:10
186:14 203:23
205:3 210:19
212:8,11 216:6
217:3 218:3
**firstenergy's**
35:12 50:17
60:8 117:19
121:8 129:14,22
144:6 146:17,24
161:19 165:10
210:9
**fitch** 146:8,16
147:1 162:19
177:5,15 180:5
**five** 37:6 71:9,13
71:20,23,24 72:6
92:12 110:24,25
111:1,7,10
114:11
**fix** 67:15
**fixed** 19:22
50:16 53:5,15,21
76:15 108:14
109:6 113:7

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[flip - function]**                                    Page 23

| | | | |
|---|---|---|---|
| **flip** 145:5 168:3 168:13 | **forensic** 37:24 38:3 | 208:18 210:5,10 | 57:17 60:19 |
| **floor** 5:10 | **forensics** 15:24 | **format** 104:1 | 122:7 135:1 |
| **flow** 25:6 | **form** 13:11,23 | 191:11 195:12 | 149:18 155:18 |
| **fluid** 71:23 | 18:5 22:7 23:16 | 195:19 | 158:4,6,18,25 |
| **fma** 23:1 24:14 | 25:16 28:1,6 | **formed** 12:7 | 159:10 172:9 |
| **focus** 199:22 | 29:3,15 36:18 | **former** 28:10 | 173:23 174:3,5 |
| **focused** 49:19 | 39:24 40:15 | 47:21 | 182:9,22 183:10 |
| 108:15 165:23 | 42:15 43:20 | **forming** 12:24 | 183:18 184:10 |
| **focuses** 48:17 | 44:8 45:17 | 39:11 42:10 | 184:22 185:6,15 |
| **focusing** 49:21 | 46:14 47:12 | **forms** 44:18 | 185:22 186:11 |
| 175:16 | 61:15 64:24 | 45:10,22 | 186:15 195:24 |
| **folder** 10:20,21 | 66:12,21 70:8 | **formula** 192:2 | **frame** 169:24 |
| 11:5 98:24 99:6 | 71:18 72:9,17 | 192:18 193:2 | **free** 63:10,11 |
| 157:3 190:18 | 74:18 75:8 | **formulas** 192:11 | 127:11 217:14 |
| 194:17 | 76:23 77:14 | **forth** 12:17,20 | 218:20 |
| **folks** 17:10 | 87:9 88:11 | 14:21,23 42:11 | **french** 144:25 |
| 24:14 25:11 | 89:13 90:12 | 58:11 62:12 | **frequency** 84:12 |
| 28:15 | 91:15 96:12 | 81:7 82:11 85:1 | 84:21 85:2,10,25 |
| **follow** 57:25 | 103:23 104:20 | 92:20 96:7 97:8 | 86:4,25 87:2 |
| 58:1 107:4 | 105:20 109:24 | 102:15,19 | 88:7,9,14 89:2,9 |
| 147:1 177:19 | 123:23 126:16 | 110:20 114:8 | 89:24 90:3,4 |
| 180:2,6 | 126:21 130:6,16 | 145:18 153:20 | 91:20 94:18 |
| **followed** 52:12 | 131:15 132:5,9 | 158:10,19,24 | 96:13 102:6 |
| 140:7 145:20 | 132:14,19 | 197:6 215:11 | 103:15 106:7 |
| 146:22 | 133:12,24 | **fortune** 60:15 | **frequently** 74:25 |
| **follower** 157:22 | 134:14 135:5,19 | 118:17 | 83:10,22 84:7 |
| **following** 94:22 | 136:14 147:15 | **forward** 168:13 | 88:1 89:16,19 |
| 162:6 164:12 | 149:24 153:12 | 216:15 | 90:7 |
| 183:7 | 158:21 164:5 | **found** 22:19 34:2 | **front** 10:17 |
| **follows** 8:17 | 165:15 170:18 | 89:3,4,21 128:9 | 11:19 98:21 |
| **footing** 160:16 | 172:3,17 174:19 | 128:15,24 | 99:12 137:3 |
| **footnote** 93:3 | 176:2 180:19 | 129:25 131:10 | 156:24 |
| **ford** 122:7 | 183:13,25 | **founded** 28:9,15 | **frontrunner** |
| **forecasts** 54:19 | 184:12 185:11 | **founder** 27:4,22 | 146:19 |
| **forego** 33:4,16 | 195:15 202:1,17 | **four** 29:21 30:12 | **full** 18:25 209:11 |
| **foregoing** | 205:6 207:1,14 | 30:16,20 31:6,10 | **fully** 140:24 |
| 217:13 218:18 | 207:20 208:5,14 | 31:19 32:23 | **function** 187:10 |
| | | 34:6 49:3 56:11 | |

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

[functional - gronborg]                                              Page 24

functional   104:2
  104:3
fund   23:22 50:15
  51:16,20,25
  117:14
fundamental
  26:22
funds   27:21
  50:14,16 84:2
further   113:6
  122:14 156:14
  213:15
fvls   17:2,14

              g

geller   3:3 14:11
  32:7,24 33:3,7
  33:11
general   45:12
  69:25 78:9
  83:23 87:25
  88:7,13 103:17
  110:4 136:25
  148:17 163:23
  178:1
generality   84:6
generalize   44:9
generally   37:1
  43:10 45:4
  66:13,22 67:10
  67:16 73:2,2,8
  75:23 83:20,21
  84:1 132:15
  139:4 142:1
  143:15 151:24
  152:13 163:9
  169:14 171:22

generate   127:12
generated
  196:21
geoff   10:22
  111:2 176:6
  211:18
geoffrey   3:19
  8:21
george   3:15
gergana   42:4
gibson   4:12
gibsondunn.com
  4:14
gift   21:2
give   9:7 36:6,10
  36:13 37:4
  58:15 65:5 68:2
given   32:5 37:1
  44:4 60:14
  70:12 83:6,25
  109:13,17
  123:14 136:11
  136:20 146:4
  162:9 202:18
  203:3 206:10,21
  207:7 215:13
gives   106:18
  127:23
giving   9:4,9
  36:19 215:9
gjritts   3:21
global   108:12
  120:24
go   10:4 11:10
  48:23 55:13
  79:8 100:5
  109:16 111:9
  113:6 115:3

147:19 148:18
148:19 149:2
150:25 164:11
164:25 167:2
168:23,25
191:13,24 195:3
198:8,11 199:12
199:14,15
200:17 202:11
210:22 213:5
godfather   43:1
goes   110:18
  140:15 178:3,20
going   46:23
  49:12,13 55:11
  57:17 61:4
  66:10,15 74:20
  74:20,20 78:10
  98:21 104:15
  111:3 120:16,19
  122:17 130:19
  137:24,24 148:8
  148:18,19,24
  152:8,18 153:1
  157:9 163:23
  167:6 176:7
  190:15,16
  192:10 194:15
  194:25 196:25
gold   34:25 56:18
good   8:20
  115:17,18
  176:11
grade   65:9 73:4
  146:18,25 149:1
  149:3 150:16
graduated   14:3

greater   75:1
  88:6 125:5
greatly   58:9
greenfield   1:20
  2:18 215:7,22
gronborg   3:4
  10:22 13:11,23
  14:13 18:5 22:7
  23:16 25:16
  28:1,6 29:3,15
  32:10,14 36:18
  39:24 40:15
  42:15 43:20
  44:8 46:14
  47:12 61:15
  64:24 66:12,21
  70:8 71:18 72:9
  72:17 74:18
  75:8 76:23
  77:14 87:9,16
  88:11 89:13
  90:12 91:15
  96:12 103:23
  105:20 109:24
  111:2 123:23
  126:16,21 130:6
  130:16 131:15
  132:5,9,14,19
  133:12,24
  134:14 135:5,19
  136:14 147:15
  149:24 153:12
  158:21 164:5
  165:15 170:18
  172:3,17 174:19
  176:2,6 180:19
  183:13,25
  184:12 185:11

195:15 202:1,17
205:6 207:1,5,14
207:20 208:5,14
208:18 210:5,10
211:12,17
213:18 216:5
**ground** 171:6
**group** 15:25
17:1,2,15 21:5,7
21:8,15,16,20,25
22:1,20 23:2
112:17 113:2
120:20 121:5,24
121:24 122:6,11
124:22,23 143:6
170:22
**groups** 121:17
122:4,10 142:21
**guess** 15:5
136:15
**guest** 36:19
**guided** 58:10
**guideline** 114:11
**guidelines**
107:17
**guilty** 27:23 28:2
28:3,8
**guran** 4:22

**h**

**h** 7:7 193:20
194:9
**hager** 6:9
**half** 111:3
166:23 172:13
176:7 178:4
198:16

**hand** 11:25
215:18
**handbook** 113:7
**handled** 29:7
**happen** 132:11
**happened** 27:18
186:13
**happening** 49:15
**happens** 37:19
132:11
**hard** 69:4
118:18
**harmanis** 3:19
99:5 195:2
**hartzmark** 77:1
77:4 84:23 85:4
**hat** 122:25 123:4
**headed** 193:19
193:20
**heading** 40:23
41:15
**headquarters**
16:11
**heavily** 23:2
**hedge** 23:22
**heightened**
66:16
**held** 20:17,18
21:2 51:25
52:18 53:9
68:25 80:22
84:3
**helms** 6:3
**help** 9:24 13:1
160:8
**helped** 24:9
45:11 131:4

**helpful** 48:11,15
125:15
**hendrik** 42:2
**hereinafter** 8:16
**hereunto** 215:18
**hidden** 103:20
**high** 65:8,12
73:2 80:24 93:5
93:17 94:21
95:4,19 103:16
117:24 186:2
**higher** 94:24
130:10
**highlighted**
192:17
**highly** 202:25
**hillary** 3:4
**history** 146:7,9
**hit** 21:14
**hoc** 202:3
**hold** 52:9,15
65:12
**holding** 147:22
**hollister** 5:17
**home** 21:16
**hope** 99:1
**hostetler** 4:8
**hotchkiss** 42:4
**hour** 33:21
55:12 111:3
176:7
**hourly** 14:22,23
**hours** 14:25 15:7
15:8,10,11 20:9
**household**
121:16
**hstakem** 3:7

**hudson** 6:8
**huge** 151:10
**hughes** 4:9
**huh** 113:1
**hundred** 46:18
**husband** 22:15
**hutton** 3:5
**hypothesis** 43:2
43:5 135:8
**hypothesized**
136:1
**hypothetical**
71:12 135:13
**hypothetically**
132:25 150:23
175:3

**i**

**idea** 213:2
**identifiable**
127:8
**identification**
10:15,18 11:20
60:23 99:10,13
156:25 157:7
190:17,23
194:22
**identified** 59:11
60:19 121:20
135:10 146:11
153:20 199:25
206:11
**identify** 48:24
59:18 60:12
78:19 132:12
139:1 149:18
152:10 153:5,22
187:25 188:15

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

206:10
**identifying**
48:12,15 60:9
138:23 153:14
**identity** 156:10
**ids** 188:6
**iii** 3:16 4:4
**illinois** 6:4
**immediately**
94:22
**immunized**
165:18
**impact** 60:8,18
61:2,5 62:4
64:19 66:4,13,14
73:5,24 132:13
132:16 139:7
142:6 144:18
149:20 152:6
153:6 160:17
166:21 175:2
207:21 209:12
210:18 211:2
**impacted** 60:10
135:9 136:2
143:7 164:20
**impacting** 64:8
65:24
**impacts** 132:22
**impediment**
117:18 118:13
181:15
**implementation**
209:1,5,15,16
**implicates**
156:13
**importance**
79:24 156:18

**important** 62:9
62:16,24 63:3
83:15 158:12
170:25 171:24
**impossible** 98:7
**improper** 139:12
**improved** 85:17
**improvements**
85:18
**inadvertently**
102:4
**include** 12:3
53:16 64:6
84:11 87:20
93:6 94:23
112:10 129:14
156:8,20 157:19
159:24 160:7
162:21 163:5,14
166:18 167:6
171:13 177:9,14
178:6,22 179:21
181:17 206:15
**included** 12:13
40:22 56:20
105:12 156:2
157:23 161:8
177:13 216:13
**includes** 19:22
19:23,24,24,25
164:7
**including** 15:2
63:16 64:15
136:6 147:5
173:1 179:25
**inclusion** 61:13
62:22

**income** 19:22
50:16 53:5,15,22
76:15 108:14
109:6 113:8
**incorporated**
218:12
**incorporating**
69:4
**incorrect** 179:4
**increase** 64:22
65:3,4,9,10,13
66:8 86:10,16
88:18 89:8,23
133:11 162:5
**increased** 85:25
87:5,11 127:15
**increases** 67:24
68:10
**incurrence**
180:15
**incurring** 67:6
**independent**
125:19 142:11
142:18 180:8
**index** 128:7,10
129:10,11,24
130:10,14 131:1
131:9,13 142:13
142:19,22
143:13 203:11
203:17,20
204:21 205:1
**indexes** 143:1
**indicate** 90:23
91:7 111:11
113:25 114:5
116:19 118:2
126:14 127:23

130:14 134:19
173:6 182:15
183:11,15 185:8
188:21
**indicated** 119:11
151:25
**indicates** 37:8
42:17 43:6 91:8
163:11 201:10
**indicating**
216:13
**indicative** 126:3
173:2
**indicator** 61:11
61:25 115:23
116:6,11 117:3
118:3 128:22
204:6
**indicators**
116:21 118:11
128:17 137:17
**individual** 8:23
51:15 52:13
84:4 91:9 97:8
129:16 130:2,8
132:22
**individually**
52:8,11 74:4
95:14 97:12
141:10
**industries**
122:11 123:15
**industry** 52:12
52:16 121:17
122:3 124:22
142:16,20,23
143:1,6,13,16

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

industrywide
  143:2
inefficiencies
  204:6
inefficiency
  127:24 128:2
inefficient
  107:10,14
  126:14,25
  130:14 141:24
infer 174:2
inference 83:25
  173:21 202:18
inflated 35:12
inflation 206:25
  207:6,18,24,25
  208:16,21 209:9
  209:20,22 210:1
  210:3,17 212:8
influence 61:5
inform 55:2 66:5
information
  35:14 42:22
  43:15 45:10,13
  48:25 61:13
  62:23 63:6,8,16
  64:4,5,8,15
  65:23 66:1,17
  68:6 69:4 73:9
  73:17 75:2
  79:16 90:18
  109:5 119:16
  125:17 126:4
  131:3,14 132:2,7
  132:24 133:1,15
  134:1 135:25
  136:23 139:7
  141:16 146:23

147:3 148:6,11
151:21 156:9,15
156:19 172:13
177:17 185:19
202:10 208:9,12
210:14,14,20,23
211:1,3
informative 78:1
informed 60:25
  79:9
informs 65:21
initially 93:18
inquiries 29:12
insolvency 64:8
  65:24 66:5,8
instance 150:14
  162:9
instances 188:4
institute 37:9,13
  37:18
institution
  117:13
institutional
  84:5
institutions 69:1
instructions
  187:5
instructive 50:9
instrument
  126:20
instrumental
  39:10
insurance 84:2
integration
  209:2,3,12
intend 12:12
interchangeable
  112:21

interest 48:12,15
48:17 59:11,18
59:22 60:1,19
68:9,13 110:6
135:7 152:10
160:11 164:7
171:10 175:5
183:20 186:6
interested
  215:17
interim 194:2,7
  194:12 197:15
  197:23
internal 63:15
  63:19,20 209:14
international
  34:1
interpret 82:10
interpretation
  82:21
interrupt 44:22
interruption
  25:14
intraday 206:7
introduce 8:20
inverted 187:15
invested 50:17
investing 70:17
  144:6
investment 24:8
24:11,12 25:4
27:9,20 28:21,25
51:15 53:21
65:9,13 73:4
108:12 110:6
146:17,25 149:1
149:3 150:16

investments 39:8
52:6,9
investor 52:13
72:10 109:6
investors 29:8
49:22 50:5 61:9
63:17 65:11
80:17,20 84:4,5
108:19 144:5
148:23 149:16
150:19 165:17
180:11
invited 36:6,10
invoice 18:7
invoices 17:23
18:8
involve 23:4
involved 22:5
26:15 57:22
213:3
involvement
  17:16
involving 30:10
36:12
irrelevant
  131:14
irs 20:22
isolate 132:16
151:14
isolated 21:14
isolation 150:9
184:1
issuance 94:22
issue 68:11 74:1
92:17 117:13
163:2 180:13
205:9

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

issued  18:8
  20:24 48:19
  50:3 58:13
  73:20 74:8,12,16
  75:1 90:25 93:4
  93:10,19 95:18
  98:9,11 106:16
  123:12 159:18
  160:15,20
  164:18 165:25
  166:3,24 167:23
  172:7 178:21
  204:9
issuer  73:7,17
  122:12 180:3
issues  26:23
  36:22 49:21
  74:24 75:6,14,24
  122:7 138:21
  153:3 160:14
  166:20 204:3
issuing  18:7
  110:9 137:14
italicize  76:11
item  21:18 22:21
  23:18 24:20,21
  28:18 29:5
  45:25 46:23
items  39:14
  133:1
iterations  102:5

j

j  3:15,15,16,19
james  3:16 5:7
  42:7 77:2
jason  3:15 4:13

jerry  3:17
jersey  1:17 2:15
  9:2,14 16:12,13
  16:18
jill  4:17
jimmy  3:10
jmeltzer  4:14
job  1:22 23:14
  26:14 28:22
john  4:4,20 27:3
john.favret  4:5
johnson  3:16 5:4
join  21:15 24:15
  27:10
joined  20:2
  21:25
jon  3:15
jones  1:12 2:13
  3:18 4:7 7:3,5,9
  7:10,13,14 8:5
  8:15,18,20 9:1
  10:14,17 11:6,19
  42:11 46:4,9
  55:21 99:8
  115:15,17
  176:20 190:21
  194:20 213:15
  213:21 216:8
  217:4,9 218:4,13
  219:20
jonesday.com
  3:21,21
joseph  3:10
josh's  194:7
joshua  5:22 13:8
  13:16 14:1
  192:24

joshua.shinbrot
  5:24
journal  85:6
journals  77:10
  82:5 83:14
  124:15
jpmorgan  49:13
  108:14
judge  4:20
judgment
  122:16,18
julia  3:16
july  1:14 2:16
  8:4 115:13
  119:5,13,24
  145:19 155:19
  155:19,19,23
  156:2,8,9,20
  157:16,19,23,24
  159:8 161:13
  170:13 171:12
  172:9 173:19
  174:22 175:25
  177:4,9,13 182:1
  182:4,9,25
  184:22 185:1,1,3
  213:22 215:19
  215:23 216:4
june  74:12,13
  106:16 160:15
  169:1 172:7
junior  17:4 29:1
  29:13
junk  146:25
  148:9 149:3
  150:16 180:4,21
  181:13

justice  168:5
justify  81:14,17
jwinter  4:19

k

k  3:15 44:18,20
  45:10
karen  5:14 6:9
katsiff  5:9
katsifft  5:11
keep  95:20
kevin  17:15
key  4:9 20:21
kim  5:22
kit  138:8
knew  52:5
  120:16 125:24
  160:13
know  15:5,13
  17:3,22,23 18:2
  20:4,10 24:7
  28:2 35:6 36:13
  37:1 38:22,25
  43:12,25 44:4
  45:20 47:17
  49:23 51:17,22
  54:15 57:5 58:2
  58:9,11,24 63:5
  63:12 66:25
  67:2,4 68:8,12
  69:2,6,22 70:18
  70:19,21 71:16
  74:15 78:5,5,9
  82:7 84:3,4 85:5
  85:13,19 86:11
  86:12 87:17
  89:11,14,15,19
  89:22 94:4

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

102:8 103:25
108:11,11
109:18 110:3,10
111:4,20 117:7
117:22 118:17
120:23 121:3,13
122:13 124:4
130:8,11 136:19
136:20 137:17
144:19 145:21
145:23 148:7,10
149:9 151:13
153:3 154:6
161:10 169:18
179:8 187:4
189:1 192:7
193:5 194:3,11
196:12 197:25
198:5 199:9
200:3,10,11,23
202:13,22
203:11 204:8,14
204:17 205:19
206:6 211:21
**knowing**  78:14
**knowledge**  209:4
209:6,11
**known**  20:17
131:18
**koslen**  6:8
**kpohlmann**  5:15
**krogman**  58:3
76:16,20 77:5,11
77:16,22 78:16
78:20,23 79:4
110:19 114:8
138:2,6

**ks**  45:1
**kyriacou**  13:9
14:4

**l**

**l**  3:16 9:1
**lacera**  50:13
**lack**  209:8
**lake**  6:4
**lakeside**  3:20
**landau**  16:5
**landline**  9:16
**language**  82:22
**laptop**  9:16
**large**  68:25 84:1
90:2 107:15
114:18,22
116:19 118:14
121:16 142:2
155:9 200:13
**larger**  74:24
83:24
**largest**  50:13
**law**  31:11 36:14
36:17 37:2 85:6
**lawful**  8:15
**lawsuit**  178:2
212:20 213:1
**lay**  140:13
**lays**  109:20
**leader**  21:8
**leading**  75:1
**learned**  26:18,21
**leave**  22:14
23:11 24:13
27:6,12 201:24
202:3

**lecture**  36:16
37:4
**lecturer**  36:19
**lectures**  36:7
**left**  22:15 27:7
27:11,17,21
191:4 195:5
**legal**  9:6 39:15
40:23 216:1
219:1
**leila**  5:2
**lending**  117:12
**length**  174:1
**lengths**  122:13
**lengthy**  212:4
**leslie**  3:17
**letter**  14:14
216:19
**level**  17:4 29:16
57:5 73:23
74:14 75:17
125:23 127:3,6
128:12,13,20
129:25 182:10
183:2 185:5
186:2 210:18
**levels**  19:19
**lewis**  5:13
**lexington**  5:23
**liability**  212:5
**licenses**  52:19
53:10
**lieu**  112:14
**likelihood**  64:5
67:9
**likewise**  76:16
**limited**  21:1
211:13

**line**  61:21 78:4
91:17,19,19,21
92:14 101:18
102:21,25 103:7
103:9,20 110:12
110:20 111:25
114:2,9 117:12
180:8 216:13
218:7 219:3
**lines**  92:25
103:20,24 104:4
104:21 180:17
**linking**  148:7
**lisowski**  3:15
**list**  29:19,23
31:18 32:16,19
34:19,20 35:2
39:16 43:17
44:18 47:1,6,13
47:25 56:10
121:25 122:1,1,2
123:7 168:24
**listed**  24:3 31:1
33:14 38:24
39:6,14 42:8,14
44:1,6 45:2
46:19 47:23
48:4 69:23
80:12,24 90:5
112:8 121:8
145:6 158:25
159:10 181:24
189:5 190:3,4,8
218:7,17
**listen**  108:24
**listing**  218:7
**lists**  37:23 40:23
41:2 44:14

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[lists - main]**                                      Page 30

45:17 46:3
123:9
**literature**   76:19
107:16,21
110:14,18 114:4
114:7 116:5
126:11 134:22
139:1,9 144:13
144:15,17 150:5
151:2,6 171:18
184:7,13
**litigation**   1:4 2:5
8:7 15:25 20:7
20:12 21:9,20,25
22:1,5,9,10,12
23:3,5,8,15 25:8
25:15 26:3,12,15
26:19,23 30:7,15
30:20 31:6,9,14
32:3 34:23,24,25
34:25 35:2
36:15 40:5
50:22 54:10
55:7 56:22
70:14,16,23
72:12 83:5 89:1
108:1 210:12
216:6 217:3
218:3
**litigations**   88:25
89:21
**little**   55:12 60:15
62:1 69:5
106:18 113:6
**llc**   15:21 22:22
22:25
**llcs**   21:2

**llp**   3:3,9 4:3,12
4:17,21 5:8,13
5:17,21 6:3
**lo**   148:9
**local**   36:2
**located**   9:12,13
16:10,15 21:12
**location**   1:17
**lolts**   3:8
**long**   55:10 110:4
**longer**   73:22
95:12 171:25
172:1 174:8
**look**   11:24 18:13
45:6,8 49:13
56:10 61:16,17
62:13 72:15,18
75:19,21 76:2
93:3 96:19 97:5
100:10,12 101:2
102:20 103:3,7
103:19 105:24
116:21,22 117:2
117:8,16 118:11
118:22 123:9
124:21 125:11
128:4,17 134:24
138:1,8 140:16
145:4 146:3
150:6 152:18
153:1 160:18
161:24 163:21
164:25 167:2,9
168:23 170:4
171:8 172:5
174:17 177:2
181:24 184:20
185:24 186:3,5

186:18 189:3,22
191:24 193:19
193:20 195:10
195:18 197:13
198:10 199:14
200:17 201:6,15
201:20 202:12
202:25 206:7,24
207:22
**looked**   39:8 49:3
49:14 58:24
59:16 102:10,17
109:1 121:12
122:1 123:11
129:1,2,5 137:18
146:6 158:15
172:25 184:3
187:13 211:6
**looking**   10:21
56:18 62:15
64:1 67:22
68:13 81:22
88:2 89:10
95:22,23 97:15
101:3 104:19
110:4 111:11
112:14 113:10
114:10 117:5
119:3 122:11,12
124:4,6 125:13
137:11 138:25
139:13 141:7
143:8 144:17
145:1 152:11,14
158:5 164:8
171:25 172:6
184:1 185:23
191:15 192:14

193:24 196:16
198:3,12 199:21
200:20,22
202:24 204:18
205:22
**looks**   99:17
104:22 191:10
192:3 196:7
200:11 202:10
**lookup**   191:17
**los**   3:2
**loss**   212:14
**lot**   68:13 70:18
157:9
**low**   117:23
125:24 127:11
127:20 149:1
**lower**   11:24
64:11 102:25
103:2,11
**loyola**   14:6
**lucas**   3:5
**luckin**   32:20
**luis**   3:17
**luxury**   152:17
**lynch**   29:5,14
53:23

---

| m |
|---|

**m**   3:15,17,19
4:18 5:22 13:8
**madam**   216:10
**magic**   122:9
**magna**   33:25,25
**magnitude**   86:5
86:11,12
**main**   4:4,23

**major** 65:21
72:5 146:1
150:25
**majored** 14:2
**majority** 31:5
**maker** 62:12
111:21
**makers** 62:4,16
62:18 111:14,15
112:2,11,14,18
112:21 113:3,9
114:12
**making** 54:19
77:6 111:19
120:25 135:7
147:9 171:21
202:18
**malkiel** 43:7,9
**management**
21:18,22,23 22:4
22:12,14,18
23:19 27:9,11
45:5 109:7
**manager** 15:21
16:19 23:21
24:11 28:21
**managers** 28:25
53:21
**managing** 17:5,6
**mandate** 65:13
**manifest** 73:25
**manipulation**
13:6,17
**manuals** 41:17
**march** 14:9 41:3
45:18,18 167:12
168:5,18,18

**mark** 99:3
194:15 195:1
**marked** 10:15,18
11:2,20 99:5,9
99:13 156:25
157:7 190:16,22
194:21
**market** 5:10,14
22:24 35:14
42:22 43:2,5
49:1 53:13 54:2
56:2,12,16,24
57:1,3,7,11,15
57:19,22 58:20
61:11,25 62:4,6
62:8,12,16,18,21
62:25 68:17,18
68:22,23 69:8,9
69:10,15 70:1,3
70:6,23,25 71:1
71:8,9,14,16,20
71:24,25 72:4,6
72:14,19 74:17
75:7,12,15,18
76:1,22 77:7,18
77:21,24 78:3,17
78:21,25 81:3,6
81:11,15,18,25
82:8,13,17,20
83:16 89:3,21
91:3,4 96:11,17
107:3,6,10,18
109:11,20,23
111:14,15,17,21
112:2,11,14,16
112:17,20,21,25
113:2,9,11,17,21
113:24 114:1,5

114:12,17
115:23,23 116:2
116:6,6,11,12,15
116:18,19,22
117:1,2,19 118:3
118:3,6,7,11,12
118:14,16,20
125:10,12,14,20
126:7,15,19,24
127:4 128:2
130:15,22
131:20,25
134:12,19 135:4
135:8,12,15
136:1,12,24
137:6,12,13
138:7 141:22,23
142:8,20 147:3
148:10 149:2
150:18 154:7,8
154:12,13
156:12 169:13
172:16,21,23
173:3,9,22 174:2
174:10 175:14
175:14,19,24
180:11 181:14
182:16,24
183:12,16,23
184:6,10 185:8,9
185:13 186:8
191:23 204:7
208:9
**market's** 82:1
137:22
**marketing** 23:23
**markets** 22:22
23:1,2,11 24:18

28:9 43:3 53:22
69:18,21,24
77:13 78:15
111:14 112:13
120:24 181:7
**maryland** 14:3
**masking** 97:10
**massachusetts**
16:14
**master** 19:4
**master's** 14:5
19:9
**material** 133:15
135:11 163:11
172:24 173:8
175:8,11
**materially**
174:11,11
**materials** 38:13
38:16,20 39:5,15
44:16 188:21
**matter** 8:6 11:22
12:7 18:1 30:4,8
30:10,23 32:17
32:20 33:2,6,10
33:18,24,25 79:1
**matters** 21:10
30:11,16,25
31:10 32:22
33:14,15 36:1,12
**maturities**
121:18 122:4,13
122:14 123:16
124:21
**maturity** 72:23
73:13 122:12
**mba** 14:1 18:23
18:25,25 19:1,2

35:23

mcdermott 6:3

mckee 5:9

mckeevassalloe 5:11

mean 16:19,20 19:7 38:19 44:22 53:1 68:17 69:3 71:4 71:5,8,13 75:25 82:9 83:3 92:3 127:17,18,20 135:10 136:25 137:21 139:15 191:13 193:2

meaning 82:14 82:22 166:8

meaningful 60:18 185:4 204:6,23

means 19:8 43:11 82:13 125:17 137:23 193:7 205:19 215:11

measure 91:20 92:19 128:14 206:24 207:2 208:16 209:21

media 35:2

median 94:8

meet 103:6 183:2

meltzer 4:13

member 37:9,10 37:12,18,25 38:2

members 13:4 14:23 129:18

130:3

membership 38:8

memory 39:9

mention 108:6 125:7 189:11,23

mentioned 40:16 42:13 46:10 49:8 53:10 64:9 65:1 67:6 109:25 124:18 142:2 161:21 169:11 210:20

mergers 138:19

merrill 29:5,14 53:23

mess 104:14

met 103:5

method 132:21 153:14

methodologies 139:2

methodology 58:5,21 123:18 124:6,16 138:10 138:12 139:19 140:24 148:20 149:14 186:20

methods 132:23

mgm 30:10

miami 13:25

michael 3:15 4:2 5:18 6:8

mid 27:17

middle 113:16 148:5

midwest 216:17 219:1

million 92:22,22 94:1,6

mind 35:1 49:24 62:11 64:14 66:6 78:22 79:20 83:2 108:16,17 146:11

miner 5:3

minus 150:25 159:21 161:22 162:4,10

minutes 111:7 111:10 176:12 213:6

mirror 209:25

mischaracteriz... 75:10

misheff 3:16

misinformation 210:17

misleading 35:13 207:8 208:3,8,12 210:14

missed 25:19

misstatements 210:7

mistake 198:12

mitchell 3:16

mmmb.com 3:12 3:12

model 126:1 127:9,19

modeling 54:12 54:14

modifications 77:5,20 78:14

modified 58:2

moment 25:18

momentarily 190:19 194:18

money 25:4 31:24

month 147:1 173:23 174:3

months 22:17 109:15 174:5

monument 21:5 21:6,8,11 22:20

monument's 21:12

moody's 146:8 146:16 147:2 157:17,22 177:15 179:17 180:6,9

morgan 5:13

morganlewis.c... 5:15

morning 8:11,20 9:12,22

morningstar 170:5

mosaic 110:10

motion 15:18 34:9,14 35:4

motor 122:7

moul 3:9

move 21:11

movement 134:19 135:3 172:8,12 183:19 185:4 186:1

movements 142:6,15,20

**[moving - notes]**                                    Page 33

| | | | |
|---|---|---|---|
| **moving** 99:22 | **nearly** 96:14 | **nevertheless** | **northern** 167:17 |
| **mpid** 189:12,23 | **nears** 72:23 | 56:20 169:21 | **notarized** 216:14 |
| 189:24 190:2,4,6 | **necessarily** | **new** 1:17 2:15 | **notary** 25:18,23 |
| 190:8,11,12,13 | 17:12 39:10 | 5:5,5,23,23 9:2 | 215:7,23 216:25 |
| 193:11,14,16,17 | 62:5 63:1 64:13 | 9:13 16:12,13,18 | 217:10,18 |
| 193:20,21 | 65:5 68:17 69:3 | 21:13 42:22 | 218:15,23 |
| **mpids** 111:17 | 71:13 78:3 | 45:4 61:13 | 219:23 |
| **multi** 137:13,15 | 147:16 152:7 | 62:22 66:3 67:6 | **note** 80:21 88:16 |
| 137:15 | 159:21 169:9 | 69:23 70:19 | 88:20,24 92:21 |
| **multiple** 132:11 | 173:11 185:23 | 75:2 126:4 | 94:9,11 95:22 |
| 132:17 134:17 | 193:25 203:25 | 132:2,7,25 | 96:10,17 99:18 |
| **multiply** 32:1 | 208:6 | 146:23 147:2 | 100:18,20 101:2 |
| **multiyear** 137:7 | **necessary** 134:8 | 151:21 156:19 | 101:10,15 142:6 |
| **murphy** 3:9 | 134:9 143:10,12 | 177:16 180:5,8 | 148:25 164:17 |
| **murray** 3:9,10 | 170:21,25 | 180:10,22 | 172:6,8,12,15 |
| 3:12 | **need** 45:14 69:16 | 185:18 190:15 | 173:12 175:17 |
| **mutual** 51:16,20 | 70:1,5 71:15 | **newly** 74:25 | 175:19 181:24 |
| 51:25 | 72:7 75:21 76:2 | **news** 13:14 46:2 | 181:25 182:14 |
| **mwe.com** 6:5 | 77:19 79:16 | 46:3,6,9,12,15 | 182:20 183:9,11 |
| **myriad** 163:19 | 97:11 99:3 | 46:16,17 60:11 | 183:17,22 |
| **mzbiegein** 5:19 | 109:22 132:21 | 61:7 135:8,11,24 | 184:20,21 |
| | 134:6,18 135:2 | 145:15,24 146:3 | 185:15 195:11 |
| **n** | 135:17 140:2 | 146:9 149:15 | 195:13,20,25 |
| **n** 3:16 5:22 7:1,1 | 170:16 210:2 | 153:22 154:2,3,6 | 196:3,12,16 |
| 7:7 | **needed** 22:17 | 154:7,8,12,15,16 | 199:3,7,21 201:6 |
| **n.w.** 4:13,18 | 170:19 | 154:21,22,25,25 | 216:12 |
| **name** 8:24 11:3 | **needs** 184:4 | 155:9,13,13 | **notes** 9:19,23 |
| 216:6 217:3,4,15 | **negative** 64:17 | 158:17 160:17 | 50:18 58:4,13 |
| 218:3,4,21 | 133:19 150:17 | 160:24 164:12 | 60:11,19 74:3,10 |
| **name's** 8:21 | 153:4 156:23 | 164:25 178:5,10 | 74:12 80:9,12,14 |
| **named** 33:1 | 177:6 | **nice** 85:2 | 80:17 87:8,14,19 |
| 50:12,14 215:9 | **neither** 185:17 | **nobel** 43:4 | 88:4 89:5,15 |
| **names** 121:16 | **never** 57:9 | **non** 22:10 | 90:15,19 92:1,2 |
| **nasdaq** 70:20 | 107:14 126:18 | 154:22,25 | 93:3,9,19 94:15 |
| **national** 37:23 | 155:14 162:8 | **nonsensical** | 95:17,21 97:4 |
| 38:3 | 168:10,20 | 154:18 | 98:5,9,15 103:10 |
| **native** 104:1,20 | 186:13 | **normal** 199:10 | 103:16 106:16 |
| 192:13 | | | 108:10,13 109:3 |

109:11 114:22
115:1 119:1,7,10
120:4,10,15,18
121:3 124:8
125:2,4 129:22
131:6,11,12,21
131:22 141:10
141:12 148:12
149:20 150:15
150:23 161:11
164:21 166:12
166:19 167:23
170:15,17
171:13,20 172:1
174:16 175:22
175:25 183:16
185:20 186:2
203:23,25 204:4
204:8,21,24
205:4 210:24
212:9
**notice** 123:9
215:15
**noticed** 139:22
**november** 47:9
91:1 97:22 98:2
98:16 106:3
129:6 146:16
162:2,19 179:14
179:18,21
181:18
**nuances** 58:14
**nuclear** 165:10
**number** 8:10
16:16 23:9 24:3
31:13 37:5 48:9
50:16 56:5 60:6
61:17 62:16,18

63:25 65:11
69:14,15 75:18
75:21 76:21
77:11 79:2 80:6
81:9 85:3 89:20
90:24 91:2,3,3,8
91:11,13 92:4
93:6 95:23
98:12 106:13
107:3,7,11,15
108:3,11,15
109:9,13 110:1
110:12 111:14
112:11 113:11
113:15,17,21,24
114:4 116:14
122:9 135:14,14
136:4,5 138:13
155:7 172:25
184:3 193:4
216:7,13
**numbered** 11:24
**numbers** 89:11
102:24 122:25
123:4 218:7
**numerical** 84:25
**numerous** 60:17
132:23 165:9

**o**

**o'neil** 3:16
**oath** 9:4
**oaths** 215:8
**object** 13:11,23
18:5 22:7 23:16
25:16 28:1,6
29:3,15 36:18
39:24 40:15

42:15 43:20
44:8 46:14
47:12 61:15
64:24 66:12,21
70:8 71:18 72:9
72:17 74:18
75:8 76:23
77:14 87:9
88:11 89:13
90:12 91:15
96:12 103:23
105:20 109:24
123:23 126:16
126:21 130:6,16
131:15 132:5,9
132:14,19
133:12,24
134:14 135:5,19
136:14 147:15
149:24 153:12
158:21 164:5
165:15 170:18
172:3,17 174:19
176:2 180:19
183:13,25
184:12 185:11
195:15 202:1,17
205:6 207:1,14
207:20 208:5,14
208:18 210:5,10
**objected** 168:6
**objection** 32:10
87:16 207:5
**objective** 107:17
116:12,14
127:25 149:4,9
149:11 152:3,23
153:8,18 164:19

**objectively**
152:8,18 186:4
**obligation** 9:6
66:8
**observation** 95:3
164:15 168:12
170:21 182:18
**observations**
136:5
**observed** 88:21
89:25 90:1
93:17 94:20
95:17
**obtain** 19:13,16
37:14 47:22,22
47:25 48:3
**obtained** 46:3
47:25 48:1
**obviously**
105:21
**occasions** 31:15
**occur** 83:22
132:17 167:21
179:7
**occurred** 146:1
164:1 166:23
171:11 179:2
204:2 205:24
**occurs** 66:23
**october** 105:9
106:3 148:5,11
148:11 155:20
170:14 171:12
172:9 178:19,22
179:1,10 180:4
182:6,12,25
183:7 184:23
185:24 198:9,15

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

198:19,21,25
199:9,19 201:16
201:22,24
202:15,21
**offense** 212:24
**offer** 12:13 14:7
34:7,12,21 56:11
56:15 57:13
211:21,24
212:13
**offered** 56:1
57:18 93:18
95:20
**offering** 94:22
117:11 212:16
**office** 9:13 16:12
16:14,18 21:13
215:18
**offices** 16:11
**official** 204:7
217:15 218:21
**oftentimes** 66:2
148:3
**oh** 37:5 171:2
**ohio** 1:2 2:2 3:11
3:20 4:5,10,23
5:19 8:9 167:17
178:1 215:5,8,18
215:23 216:2
**okay** 16:25
18:15 27:18
37:19 40:12
47:4,4,20 48:21
48:24 49:18
66:6 67:2 68:2
71:21 75:13
76:16 77:9 80:8
81:23 82:24

84:10 91:5,11,21
91:25 93:23
96:21 97:3,11,18
97:19 98:14,25
99:2,3,12 100:10
100:14,15
102:14 104:14
104:16,18,22,23
105:1,5 107:1
108:16 109:9
112:16 114:3
115:3 119:11
128:22 147:17
157:10,15 158:3
162:15 166:11
176:20 177:1
179:3 182:20
190:8 191:2,14
193:2,15 195:2
196:12 197:3,6
197:13,17
198:14 199:13
199:15,21
200:20 206:17
211:4
**old** 101:25
**older** 75:5,14,23
**oldest** 21:24
**olts** 3:5
**omissions** 207:8
210:8
**omitted** 210:14
**ones** 40:3 48:10
122:3 146:21
**online** 104:7,11
**ontario** 56:19
**open** 11:7 104:6
104:11 191:23

195:4
**operations**
117:14
**opined** 56:23
57:9
**opinion** 12:24
34:2,13,21 38:23
40:5 41:2,4 56:1
56:6,12,16 57:1
57:4,6,14,18
109:9 117:2
130:17 131:18
169:13 186:7
211:10,22,24
212:16
**opinions** 12:7,12
12:17,20 14:7
34:8 39:4,10,11
39:17 40:8,9,13
40:18,21 42:10
45:13 51:8
109:19 110:11
212:13
**opportunity**
27:10
**opposed** 27:9
**option** 104:7
**options** 20:21
**order** 1:11 2:11
37:14,16 41:2,4
**original** 194:11
200:18 202:12
**originally**
156:14
**outcome** 15:17
15:18
**outlined** 60:25
145:13

**outlook** 150:10
150:21 151:3
157:17 177:6
**outside** 51:19
160:19,24
164:15 166:9,9
167:22,24
168:21
**outstanding**
17:24 58:14
73:22 74:11
81:9,14 86:22
90:8,9,25 92:6
97:4 98:6 109:8
123:10 160:5,9
160:20 164:18
165:25 166:3,12
166:24 167:23
172:1 204:10
**overall** 58:23
61:16 121:22
163:12 184:3
**overview** 45:11
**owned** 51:14,17
52:3
**owns** 16:4

**p**

**p** 4:22
**p.m.** 2:18 115:6
115:11,13
176:14,19
196:25,25 197:2
203:2,25 206:15
206:16 213:8,13
214:2
**package** 64:10

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[page - pension]**

**page** 7:2,8 11:24
18:14 21:4
29:17,19 37:7,8
38:11 42:17
44:14 46:1,23
47:3 63:23,23
74:23 76:5 80:7
82:23 84:8,9
86:20 87:20
88:2,3 90:14
96:19,20 97:14
97:14,15,16
100:6 106:23
110:22 113:10
113:16 114:15
116:9,9 119:4
128:5 140:10,15
141:5 145:4,5,7
145:18 157:14
158:1 161:25,25
162:1 167:11
168:24 170:4
171:9 172:6
177:3,23,24,24
178:18 181:22
181:25 186:19
189:11 190:1,9
198:3 216:13,15
218:7 219:3
**pages** 140:16
168:3 179:12
189:17
**paid** 17:21 18:3
18:6,7
**pamela** 1:20
2:18 215:7,22
**pandemic** 21:14

**paper** 100:12
145:1,6
**papers** 9:19
43:16,22 95:7
124:14
**pappas** 3:17
**par** 202:9
**paragraph** 63:25
64:1,2 65:2,23
74:23 76:5,12
81:12,20 82:23
82:25 84:11
88:2 89:10
96:19 97:16,19
106:21,24
110:22 111:11
111:24 112:23
113:7 116:9,10
119:3,12 121:9
128:4,23 139:23
140:3,10,15
157:13,16 158:2
158:19 161:24
167:10,12 168:3
168:4,8,13,14
171:8,10 177:2,4
177:23,25 178:3
178:17,18 179:4
179:11 181:3
189:11,22
**paragraphs**
158:5,8 177:7
179:14
**parameters** 37:2
37:3 58:15 81:7
**paraprofession...**
17:11

**parentheses** 19:6
**parenthetical**
19:5,7
**park** 42:7 77:2,3
**parse** 132:23
134:5,9 209:19
**parsing** 134:8
**part** 15:24 34:4
35:5 54:22 55:7
87:21,23,23
158:15 161:18
164:9 166:6
170:7 174:22
201:12,13 218:9
**participants**
69:15,15 75:19
111:18 112:16
112:20,25
113:11,17,22,24
**particular** 14:12
50:7 58:25
68:11 70:7
73:21 76:14
80:1,3 81:9
83:12 88:22
91:24 92:4
105:24 118:2
134:12 136:21
138:22 147:20
147:22 172:24
178:12 184:6
194:4 199:4
208:24
**particularly**
50:8 64:3
125:15 148:25
180:23

**parties** 8:10
215:16
**partner** 17:5,14
**partners** 28:10
28:14,16
**partnerships**
21:1,1
**parts** 40:1,4,7
45:1,3
**party** 212:20
213:1 215:13
**pass** 19:19 37:19
**patterson** 6:9
11:6
**paul** 3:15 6:3
**pay** 38:9 55:1
**payback** 147:21
**paying** 54:23
**payment** 17:22
**pearson** 5:7
**pease** 4:21
**peer** 35:16,20
78:18 82:4
83:13 84:20
85:4,9 95:7
107:16,21 108:2
110:14,18 114:3
114:7 116:4
118:1 124:14
144:13,15,17
150:5 151:2,5
**peers** 121:5
**penalize** 131:22
**pennsylvania**
5:10,15
**pension** 50:13,15
84:2

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

[people - plaintiff]

**people** 13:7,22
17:7,9 24:17
**perceive** 180:22
**percent** 20:8,15
22:13 23:9 26:5
31:12 78:6,8,9
78:12 81:13,17
81:23,24,25 82:5
82:6 88:5 90:7,8
90:8 96:1,14,24
99:23 100:3,24
101:15,20,22
133:4 134:3
178:5 179:19
182:10 185:5
**percentage**
22:11 23:7 26:2
31:9 32:2 90:9
91:18 92:14,23
93:11,12 95:25
96:9,16 99:22
100:1,1,20
101:11,15,19
102:22 103:8,11
209:16,17
**percentages** 85:3
**perception** 61:9
63:17 144:5
148:23
**perceptions**
149:16
**perform** 102:6
186:9
**performance**
24:4,8 122:22
**performed** 55:6
105:23 119:8
174:7

**performing**
191:15
**period** 18:9
24:22 35:13
46:10 47:8,11,16
48:18,20 49:7,15
49:20 50:6
51:18 52:4,10,24
52:25 53:19
58:11,12 62:3
73:22 74:10,15
79:19 80:2,18,21
80:22 83:12
85:11,14,15 86:1
86:2 87:1,3,6,6
87:12,12 88:10
88:15,19,23,23
89:9,12,17 90:2
90:10,25 91:13
91:24 92:5 93:4
93:20 95:12,18
96:15 97:20,21
97:25 98:1,6,11
102:17,18,18
105:6,15,25
106:6,8,9 108:8
108:19 109:15
109:16 110:2,4
113:18 117:20
117:23 119:5,13
119:25 120:1,14
120:17,22,23
121:14 123:11
129:4,5 134:17
135:1,16,17,22
136:3,4,11,22
137:7,8,20,21
143:16,19

145:14,14
152:20 155:22
156:1,5 159:2,4
159:5,6,7,12,15
160:19,22
161:13,20 163:3
164:2,15 165:8
165:23,23
167:22,24
168:12,21
170:15,16,20,21
171:11,14,19
173:5,6,7,23
174:3,8,24 175:4
175:4,7,9,12,15
175:25 181:12
203:21,22
207:11,17
208:10 209:5,8
209:10,23
210:15
**periods** 71:16
74:9 102:11,14
121:4 127:15
137:13,16 160:6
171:25 174:9
204:18
**perjury** 27:24
**person** 14:12
152:3,24
**personal** 21:17
22:15
**personally**
217:11 218:15
**perspective**
72:12
**pertinent** 125:20

**peter** 6:8
**petrobras** 40:4
40:16
**pharmaceutical**
58:4
**pharmaceuticals**
32:15 34:23
56:21 57:16
59:23
**phelms** 6:5
**phenomenon**
127:1
**philadelphia**
5:10,15
**phone** 9:17
216:3
**physical** 16:11
**pianalto** 3:17
**pick** 49:11
121:11,25 122:8
139:12
**picked** 122:8,9
123:5
**picks** 170:6
**piece** 90:18
**pine** 5:16
**pipefitters** 40:6
40:17
**place** 71:22
215:15
**placed** 10:17
11:19 98:21
99:12
**places** 144:11
**plain** 82:14,22
**plainly** 89:7
**plaintiff** 34:8,13
50:14

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**plaintiffs** 3:2
  10:25 25:14
  26:12 31:3,7,25
  35:4,7,11 41:9
  50:11,12,12,19
  50:23 51:2 60:7
  61:1 157:2
  207:12 210:13
  212:4 213:19
**plan** 168:6,16
**planning** 10:23
  21:19,22,23 22:4
  22:12,14,18
**pleaded** 27:23
  28:2,3,7
**please** 8:24
  20:14 29:17
  38:10 47:2
  63:23 84:8
  87:10 97:14
  128:4 140:11
  171:9 178:17
  179:12 191:24
  195:10 198:9,10
  199:16 216:11
  216:11
**plumbers** 40:6
  40:17
**plus** 117:24
  150:24
**pohlmann** 5:14
**point** 71:2,2
  144:23 148:5
  164:18 166:1
  174:12 204:11
  207:7,22 209:10
  211:7 212:2

**points** 49:6,9,17
  49:18 50:3
  137:22 208:10
  208:13 209:14
  209:22
**polk** 5:21
**poor** 133:16
**population**
  123:22 124:20
**porter** 5:3
**portfolio** 51:21
**portion** 25:22
  113:18 178:20
**position** 22:20
  29:1,14,16
**positive** 64:10,17
  64:22 130:22
  133:2 153:4
**possibility** 51:19
  74:21 118:21
  142:1 145:22
  151:22,25
**possible** 65:22
  90:21 99:19
  100:7,17 101:4,7
  130:4 141:22
  146:12 165:9,13
  167:3 169:22
  204:12
**possibly** 40:5
  210:18
**post** 102:18
**posture** 40:19
  49:22 60:13
  149:17
**potential** 66:7
  67:18 68:3
  147:9 150:24

  156:16 166:20
  168:11 170:22
**potentially**
  143:6 153:15
  155:7 156:6
  164:20 180:13
  181:14 200:13
  205:9 211:3
**powerful** 79:12
**precedes** 66:22
**preceding** 21:18
  22:21 24:20
**precipice** 150:15
**precise** 205:2
**precisely** 15:5
  128:16 145:9
  194:13
**predefined**
  134:21
**predicted** 127:17
**premise** 148:17
**prepare** 20:17
  20:25 39:20
**prepared** 25:6
  119:21 211:24
  212:2
**preparing** 14:25
  38:14 39:6,18,22
  41:21,24 129:19
**presence** 127:22
  131:16
**present** 6:7 8:10
  127:14
**presentation**
  36:19
**presentations**
  36:11

**presented** 24:6
  141:2
**press** 61:14
  138:22
**preston** 27:1
**presumably**
  153:21
**presume** 72:4
**presumed** 70:22
**presumption**
  81:15,18,24 82:1
  82:8,13,16,20
**pretty** 53:14
  113:8 176:9
**prevailed** 119:24
**preventing** 9:9
**previous** 28:18
  29:5 88:20
  154:1,4
**previously** 24:14
  24:17 42:9
  67:21
**price** 60:8,10,18
  61:2,5,24 62:4
  62:23 63:14,21
  64:20,22 65:4,9
  65:11 66:14,20
  67:1,7,8,13,17
  67:19 68:4 69:3
  71:23 72:21,23
  73:1,3,7,14,24
  75:2,11,24 91:10
  91:12 112:1,7,15
  125:18,19 126:3
  126:23 127:15
  132:2,16 133:2
  133:11,18 134:4
  134:19 135:3,9

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

136:2 137:25
139:14 141:20
142:6,11,14
143:8 145:2
148:1,12 149:19
152:6 153:6,15
154:10 159:22
162:5 166:20
171:6 172:8,12
172:21 173:4,12
175:2,9 178:4
179:19 182:1
183:1,7,19 185:4
185:14,16,18
186:1 187:11
188:6,22 191:5
191:12,16,19
195:6,19,20
196:6,17,17
197:1,2,3,16,22
198:2,3,5,8,12
198:13,15,20
199:5,25 200:3
200:14 201:4,4
201:13,13,16,19
201:25 202:3,8
202:14,15
203:24 204:7,13
204:19,25,25
205:13 206:1,3,4
206:8,11 207:6
207:10,21
**prices** 35:11
42:21 43:10,15
63:7,9,16 64:3
65:16,19,25 66:2
66:11 68:7
125:18 139:7

160:18 163:9,22
163:24 164:20
186:14 198:4,24
200:15,15,16
202:19 203:3
205:17 210:24
**pricing** 127:1
131:17 182:15
203:22 204:4
**primarily** 21:8
22:4 23:4 25:13
26:11 27:1
69:13
**primary** 23:14
61:11 74:8
**princeton** 24:19
24:22 25:1,12
26:2,6,11,14,18
26:25 27:6,7,12
27:14,15,18,20
27:23 28:15
**principles** 26:22
**printed** 9:22
**printout** 189:21
**prior** 30:23
32:23 53:20
55:25 67:13
88:24 160:19
161:13 173:19
174:22 175:25
196:25 206:15
**privately** 20:17
20:18 21:2
**prize** 43:4
**probability** 64:4
64:11 67:9,25
210:9

**probably** 15:10
22:13 23:9 24:2
37:6 162:11
187:22
**problem** 181:1
204:4
**problems** 26:23
209:4
**procedure** 13:18
196:8 217:5
218:5
**procedures**
24:10
**proceed** 8:14
**proceeding**
67:19 68:3
151:7,17
**process** 60:23
79:4 145:24
147:8 179:9
191:16 192:5,5
193:6 196:5
202:7 209:1,2,3
209:5
**produced** 98:22
99:15 191:3
195:5 196:4
198:1
**production**
216:15,17,22
**professional**
36:7 52:19 53:9
**profile** 61:10
63:18 143:18
145:17 158:13
169:12 178:12
210:19

**profit** 126:2
127:12
**profits** 127:11
**program** 18:25
18:25 19:1,2,9
19:18,20,21
186:22 209:17
**projections** 25:7
54:19 55:3
**projects** 17:3
**proposed** 51:18
52:4,10 165:8
**proposition**
87:24 136:25
**protective** 1:11
2:11
**provide** 57:1
**provided** 30:13
46:7,21 56:6
57:4,5 102:12
131:3 146:7
177:16 189:15
189:20
**provides** 85:1
**providing** 25:13
26:3 75:19
111:19
**prudential** 28:18
29:2 53:24
**public** 4:10 5:18
50:13 117:11
215:7,23 217:10
217:18 218:15
218:23 219:23
**publications**
35:17,20
**publicly** 69:20
116:23,25

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **published** 47:11 47:18 85:6 108:7 164:12 | **putting** 124:7 | **quotes** 75:19 111:19 177:7 | 138:18 146:20 158:13 161:19 177:5,14 |
| **pull** 13:13,14 157:11 | **q** | **r** | **rdr** 1:20 2:18 215:22 |
| **pulled** 197:3 | **qs** 45:2 | **r** 192:21,22 | **reach** 72:13 |

published 47:11
  47:18 85:6
  108:7 164:12
pull 13:13,14
  157:11
pulled 197:3
pulling 197:16
  197:24
purchased 80:17
  80:21 156:6
purchasers
  211:25
purchases 169:6
purports 31:18
purpose 40:7,12
  50:2,9 72:10
  191:8,20 195:12
  195:19
purposes 10:15
  10:19 11:20
  21:3 70:16,17,23
  72:11 99:9,13
  100:13 145:10
  156:25 157:7
  190:17,22
  194:21
pursuant 2:13
  45:21 215:15
purview 169:20
  170:2
put 23:9 31:13
  125:2 146:21
  153:3 156:22,24
  157:21 160:16
  177:13
puts 66:24 67:23
  150:16

putting 124:7

**q**

qs 45:2
qualification
  66:10
qualifications
  13:21
qualified 159:12
qualifies 152:4
  152:24
qualify 159:2
  169:7
quantified
  116:13
quantitative
  209:18
quantity 188:5
quantum 112:2
quarter 163:25
  165:6
quarterly 24:7
  110:7
question 25:20
  26:1 113:13
  132:3 159:9
  211:13
questions 29:8
  108:21 213:15
  213:18
quick 176:9
quickly 67:16
quite 20:24
  59:17
quote 178:20
  189:12
quoted 38:22

quotes 75:19
  111:19 177:7

**r**

r 192:21,22
  193:3,7,10,23
  194:10 215:4
raise 117:10
raised 25:3
raising 181:15
random 43:11
  121:12 122:24
  124:8
randomly 49:16
  122:15
range 14:22
  117:22 160:24
  166:10,11,11
rapid 61:12
  62:22
rate 14:23 63:10
  68:9
rated 147:23
  150:23
rates 14:22
  73:12,13
rating 64:7 65:2
  65:3,7 133:17,20
  134:2,2 143:18
  144:18 146:7,9
  150:8,10,21
  151:3,11,12,15
  153:2 156:22
  161:23 162:3,6
  162:12 177:20
  180:3,24
ratings 64:7 65:1
  65:15 72:25

138:18 146:20
  158:13 161:19
  177:5,14
rdr 1:20 2:18
  215:22
reach 72:13
  135:18 137:6
  138:2
reaching 62:10
  103:15
react 64:3
  141:16 163:10
reacted 61:23
reaction 132:1
  183:4
read 25:23 39:2
  39:17,19,21,23
  39:25 40:25
  41:4,20,23 42:1
  42:9,12 44:20,24
  45:8,15,19,23
  61:6 62:13 64:2
  108:24 109:2
  169:4,16 170:1
  170:10 217:5,6
  217:12 218:5,6
  218:17
readily 112:1,7
  112:15
reading 60:6
  112:23 145:24
  169:5 216:19
reads 114:16
  171:10
ready 111:10
real 145:22
really 32:5 55:9
  59:16 107:20

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[really - relevant]**

125:22 145:24
146:23 148:15
187:6
**reason** 74:8
148:2 157:23
160:21 166:3,15
168:8 189:7
202:10 204:12
206:3 216:14
218:8 219:3
**reasonable**
153:7 172:14
**reasons** 22:15
73:16 120:21
158:14,18
168:18 170:8
204:5
**recall** 39:13
42:16 49:11
50:1 56:8 57:20
57:20 59:3,16,21
84:25 85:12
106:5,12 108:15
109:7 128:20
147:7 155:22
187:4
**receipt** 216:18
**receive** 18:20,23
**received** 17:22
193:25 194:12
**recess** 10:9
55:17 115:8
176:16 213:10
**recites** 168:4
177:4,25
**recognized** 54:1
**recommendati...**
108:13

**recommending**
169:6
**record** 8:3,12,25
10:5,7,12 11:11
11:13,15,18
25:22 55:13,15
55:20 115:4,6,11
123:18 176:14
176:19 209:19
213:6,8,13,24
215:12 218:9
**recorded** 1:11
2:12 8:5
**records** 209:14
**recover** 67:17
**reduce** 33:4,16
**reduced** 65:10
215:11
**reduction** 33:8
**refer** 76:6 159:6
190:6 194:9
203:10
**reference** 41:16
46:24,25 60:1
113:7 158:10
216:7 217:2
218:2
**referenced** 76:25
84:24 160:13
217:11 218:15
**references**
163:22
**referred** 57:24
145:6 167:14
190:10
**referring** 53:23
112:25 126:17
128:13,19,22

159:7 190:5,10
192:21
**reffner** 6:2
**refinitiv** 47:8,15
47:19,20,21 48:1
**reflect** 30:3 47:5
86:21
**reflected** 8:12
98:18
**reflecting** 126:3
**reflection** 44:13
**reflects** 21:5
42:23 47:6
198:15 200:24
200:24
**refresh** 10:19
39:9 98:23
157:3 190:18
194:16
**regard** 44:2
53:12,14 54:4
122:18 138:7
175:3
**regarded** 50:8
**regarding** 35:14
42:3 49:21
145:16 149:17
156:10,15
158:11 209:15
**register** 79:21
**registered** 28:23
28:23 45:21
52:22 53:7
**regression** 54:16
54:20 55:2
128:18 129:19
139:24,25
203:18

**regularly** 187:22
**rejected** 168:15
**rejection** 184:17
**relate** 31:11
192:20
**related** 20:7,12
21:9 22:12
25:13 26:3,23
36:1 50:23
167:13 179:19
**relates** 1:6 2:7
191:6 195:7
**relating** 9:20
28:4
**relative** 68:11
71:20 103:16
116:23 118:11
215:15,16
**relatively** 154:15
**release** 138:22
**relevance** 131:24
**relevant** 45:13
48:25 60:2
61:13 62:19,22
62:24 66:17
67:9 71:15
77:17,20,23,25
97:1 109:6
112:3 126:18
135:22,25 143:9
144:1,3,4,8,10
144:16,24
145:10 146:1,5
146:14 147:6,10
147:14 148:22
149:6,13,23
150:1,4,11,18,22
151:4,8,18,23

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

[relevant - requested]                                               Page 42

152:2,5,15,25
153:9,23 154:7
155:4,16 159:3
159:13,16,18,23
159:25 160:22
161:7,12 164:4
164:14,23
165:13 166:21
166:23 167:20
168:2,11 169:7,8
169:14,15,23
177:16 180:17
180:20,23
185:19 189:6
**reliable**  43:18
44:12 70:6
72:14 77:6
153:14
**reliance**  44:15
**relied**  38:13,17
38:19,21 42:18
42:23 43:6
209:25
**relief**  167:14
**rely**  39:3 40:12
42:19,25 43:7
80:3
**relying**  89:6
**remember**  169:5
185:23
**remote**  3:1 4:1
5:1 6:1 8:4
21:13
**remotely**  2:14
16:15 22:17
**remove**  142:5,14
142:17 192:25
211:2

**removed**  93:12
201:2,3
**removing**  186:25
210:23
**reorganization**
168:6,15
**rep**  28:23,23
53:8
**repeat**  25:20
34:11 87:10
**repetitive**  177:19
**replicate**  153:17
**report**  7:9 9:21
10:14 11:21
12:4,6,9,14,18
12:21,23 13:1,22
14:21 15:1,3,9
17:7,13,14,19
18:13 30:3,5,9
30:17 31:1,2,16
31:18,21 32:18
33:15 36:1
38:11,14,23 39:6
39:18,20,22
40:10,22 41:13
41:21,24 42:11
46:20 47:1
48:19 49:13
52:2 56:10 57:9
63:23 74:4,23
76:5,12 78:24
80:5,6 81:12
82:23 84:8,24
86:15,19 87:21
88:2 89:11 90:6
90:13 96:19
98:3 100:6,6,7
100:13,17 101:7

101:14 102:2,7
106:22 107:4,7
107:11 108:6,10
109:4,17 110:22
112:23 114:15
116:9 119:4
121:9 123:20
125:7 128:4
129:8,9 139:23
140:6,10,17,22
140:25 141:5
144:11 145:4,18
145:20 147:11
155:2,14 158:1
158:20 159:1
161:8,24 162:1
162:25 163:14
163:15,21
168:23 169:1,4,6
169:16,18 170:1
170:10,12 171:8
172:5 178:20
181:16,21
186:18 189:17
190:12 193:16
193:16,17,19
203:2 206:18,18
**reported**  71:22
111:25 113:11
187:1,16 188:22
188:22 189:1,8
190:13 193:11
201:2,11 202:20
202:21
**reporter**  1:20
8:13 10:5 217:7
**reporting**  28:24
62:15,17 112:13

112:15 187:13
188:6,12,13
189:13,23 190:8
190:11
**reports**  17:9
29:20 30:12,23
31:19 39:1
46:25 47:1,7,10
47:14,18,23 48:1
48:2,3,14 49:2,5
49:9,14,16,20
50:3,7 60:12
61:7 107:25
108:7,9,15
109:10,14,18,22
110:2,9 137:14
143:21 145:15
145:25 146:4,10
149:15 153:22
160:25 163:2
164:11 168:25
178:11
**represent**  8:21
30:19 90:21
194:14
**representation**
124:13
**representative**
52:23 53:2,3
119:25 123:21
124:20
**represented**
122:3
**represents**  30:22
123:22
**request**  218:9,11
**requested**
215:13

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

require 205:16
required 56:19
  134:11 216:25
requirement
  38:5 70:24
requires 20:22
reread 39:20
  42:4,6,9
research 13:13
  15:3 17:12
  24:19,22 25:1,10
  25:12 26:3,6,9
  26:11,14,18,25
  27:6,7,12,14,15
  27:19,20,23
  28:16 41:16
  42:13 43:9
  44:11 73:19
  108:2,7 109:10
  156:12
residual 134:19
  161:12 182:21
  184:9 185:1
resorts 30:10
respect 114:13
  127:3
respected 44:6
  44:10
respond 73:8,17
  141:12 154:11
responds 175:9
response 172:13
  173:12
responsibilities
  16:23
responsible 21:9
  134:3

responsiveness
  42:21 75:2,11
  171:7 172:22
  173:5 185:14,16
  185:18
restate 159:8
result 35:13 67:4
  134:11,15,16
  145:21 181:23
  194:5 198:1
results 94:24
  98:3,18 106:13
  106:19 124:25
  129:9,20 141:2
  154:18,18
  183:14,18,22
  196:4
retail 84:4
retained 34:7,12
  34:21 211:8,21
  212:13
retirement 3:2
  67:10
retiring 67:8
return 43:12
  125:18,19 184:9
  198:25 199:5
returned 216:18
returns 24:6
  126:23 142:12
  161:12 184:22
  185:1,7,22
  196:18 200:4
  203:21 204:19
  204:23,25,25
  205:13,16,21
reuters 47:21

revenues 20:4
  54:18
review 17:19
  38:6 39:5 40:7
  41:6,9,12 44:10
  45:3,15 46:17
  48:6,8,10 49:10
  49:12 84:20
  85:9 119:19
  129:20 149:14
  149:18 153:21
  164:11 216:12
  217:1 218:1
reviewed 35:16
  35:20 38:13,21
  39:1 40:2,4 42:2
  45:1 46:13,19
  48:9,13,19 49:2
  49:5,16,19 60:11
  78:18 82:4
  83:13 84:20
  85:4,9 95:7
  107:16,21 108:2
  110:14,18 114:3
  114:7 116:4
  118:1 119:12
  124:14 144:13
  144:15,17
  145:14 150:5
  151:2,5 210:12
  215:14
reviewing 50:2
  143:21
revising 177:5
reyes 3:17
rgrdlaw.com 3:7
  3:7,8,8

rharmanis 3:21
right 11:25 20:2
  22:6 23:24
  28:10 30:21
  64:1,12 71:3,10
  71:17 72:8 74:5
  76:3 79:24 81:4
  81:19 83:19
  86:23 87:15
  90:16 91:2
  92:23 93:13
  97:12,17 98:4,16
  98:19 99:20,23
  100:3,25 101:5,8
  101:12,16,20,23
  102:16 105:6,10
  108:19,22
  109:12,13
  112:25 113:13
  114:13 116:16
  117:20 119:1
  120:5,7 121:8
  122:5,6,17
  126:15 128:7
  129:12 130:5,10
  131:2 132:4,13
  133:7,11,13
  134:7 139:20
  140:3,5,15
  141:10,13,17,25
  142:8 151:18
  153:11,13,13
  154:3 155:16,19
  155:20,24
  161:17 162:22
  165:6 166:13,14
  167:7,21 169:19
  169:25 174:17

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[right - second]**                                                                 Page 44

174:24 177:10
177:11 178:15
182:9 183:12
185:2 186:16
188:19,20
192:17 195:14
195:21 196:19
198:17,22 200:5
200:23 201:21
202:13 205:14
205:24,25
206:13 207:19
208:13 211:17
**rise** 68:2 127:23
185:5
**risk** 60:15 63:10
63:11,12,17,18
64:8 65:10,24
66:5,7,9,16
127:11 145:3
181:1
**riskiness** 144:6
**ritts** 3:19 7:4,6
8:19,21 10:4
11:2,10 25:19,25
32:13 55:11
99:3 111:6
115:3,16 176:11
194:25 211:19
211:20 213:5,14
**road** 3:11 9:2
**robbins** 3:3
14:11 32:7,24
33:3,7,11
**robert** 6:2
**robust** 123:17
136:11 154:25

**role** 21:6 22:4
23:4,23 24:1,10
28:19 32:11
211:14
**roles** 24:3
**rolling** 139:24
139:25,25
**ronen** 42:18
**room** 9:15,17
10:2
**rose** 210:17
**roughly** 117:24
**routinely** 126:11
**row** 90:18,21
91:5 99:19
104:21,22 105:8
193:18 198:9,10
198:12,19
199:12,14
201:15
**rows** 90:21
99:22 104:6,12
200:20,22
201:20
**rudman** 3:3
**rule** 69:6 74:20
118:20
**rules** 217:5
218:5
**run** 90:19 95:9
**runs** 155:22
**rutgers** 36:11,14
36:17
**ryan** 3:19 194:25

**s**

**s** 1:20 2:18 4:23
7:1,1 13:8 45:17

79:19 193:3,7,12
193:23 194:10
215:7,22 216:15
218:8,8 219:3
**s&p** 146:8,18,23
148:5,13 150:16
156:22 157:21
159:20 161:22
162:2,12,16
177:13 178:19
178:20 179:1,6,9
180:2,21 181:3
181:12
**s&p's** 177:20
**salary** 32:1
**sales** 107:25
**sample** 123:14
123:17,19 124:1
124:8,16,19
135:23 154:6,15
154:16,20,25
155:9
**sample's** 123:21
**samples** 154:6,9
**san** 3:6
**sandra** 3:17
**sater** 4:21
**saw** 143:16
174:9
**saying** 70:9
112:20 134:8
138:4 158:16,17
200:25 201:1
202:5
**says** 19:6 30:22
41:15 43:14
62:14 88:3
90:21 91:23

96:22 99:20,21
99:22,25 101:4,7
101:10,14,20,22
112:12,24
145:21 162:14
162:15 188:14
189:15 190:12
191:4 195:6
203:2
**sba** 27:21
**scale** 117:1
170:24
**scheme** 35:15
148:8 156:17
**schneider** 4:16
**scholarly** 139:1
139:4,9 171:18
184:7,13
**school** 36:11,17
**scientific** 72:11
172:15
**scientifically**
72:14 123:25
**scott** 13:8,16,24
41:13
**screen** 104:10,16
157:9 192:10
**scroll** 105:8
**se** 196:11
**seal** 215:18
217:15 218:21
**search** 46:3,8
**sec** 44:15 45:9
45:23
**second** 96:22
101:2 133:5
171:9 172:13
187:15,17,19

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**section** 45:5,7
140:17,22
**sections** 40:10
45:8,9
**securities** 1:4 2:5
8:7 19:23,23
20:1,20,23 21:10
25:15 26:7,12,19
27:25 28:5,19
31:11 34:22,24
35:12 36:14,20
40:5,20 45:21
51:14,18,21,22
51:24 52:3 53:3
53:5,5,6,16
54:10 56:22
57:23 61:6
63:11 68:15,24
69:8 77:8 78:17
79:22 83:4,9
84:1 87:25
88:25 89:1,2,20
89:20 97:3 98:8
107:4,23 109:8
111:16,20
112:18 113:3,8
117:14 118:7,15
118:19 120:24
121:1,15 122:21
126:11 127:2
130:2 139:8,14
144:7,20 145:2
152:7,12 153:16
155:6,11 156:6
160:2,4,8,16,18
165:25 166:2
169:7 170:23
171:5,7 174:10

179:18 181:2
186:8 216:6
217:3 218:3
**security** 42:7
56:2,23 57:2,10
61:12,14 62:7,15
62:23 65:14
68:24 70:2,2,7,9
70:10,12,25 71:1
71:7 72:3 76:15
78:8,12,25 81:3
81:15 83:5 91:9
91:24 97:12
107:5,6,8,12,18
110:11 111:13
111:25 112:22
116:2 125:6,9,14
125:23 126:15
126:24 132:2
134:12,20 135:4
135:9,16,21
139:5 143:8
147:21,22 148:1
152:16,22
154:11 172:24
173:9,25 175:12
184:6 207:6,10
212:11
**see** 10:20 38:6
41:18 52:3 61:7
66:2 67:16 69:2
89:23 93:24
94:2 95:1,23,25
99:1 100:11
103:19 104:5
110:5,8 112:24
114:19 117:9
125:3 130:24

145:15,25
152:13,14 157:4
161:25 162:15
163:21 167:11
178:10 179:1
180:24 186:13
187:13 188:3
190:18 191:4
192:2,11,16,18
192:21 194:17
197:11,14
200:18 201:16
**seeing** 84:25
197:8,8
**seek** 142:14,17
**seeking** 20:19
**seeks** 132:1
**seemingly** 202:9
**seen** 74:19,22
126:22 212:2,3
**select** 122:15,16
124:1 143:25
153:19 163:20
**selected** 46:12
60:1 121:14,21
124:19,23 155:3
155:15,18 158:7
164:6,16 170:13
171:4
**selecting** 121:21
121:23 122:21
122:22 123:18
124:16 135:6
139:2,10 143:24
**selection** 46:16
60:23 121:12
122:24 123:13
166:6 189:4

**sell** 29:10 53:4
187:2,20,23
188:1
**semaya** 13:8,24
**semesters** 36:3
**senior** 15:21
16:19 50:17
58:13 60:11,18
74:10,12 87:18
88:4 89:5 93:9
95:21 98:5,9
108:13 120:15
121:3 125:2
129:22 131:5
149:20 150:15
164:21 166:19
167:23 171:13
204:21,24
**sense** 187:18
188:13
**sensitive** 73:3
75:24
**sensitivities** 73:8
95:9 141:20
**sensitivity** 72:21
72:23 73:1,5,14
73:25 204:13
**sent** 101:25
102:4,12
**sentence** 88:3,8
96:22 114:16
119:11 167:11
171:9
**sentences** 64:2
**separate** 25:2
90:18 132:21
167:4 168:1

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **separately** 18:11 79:5 | **share** 11:7 104:10 190:18 | **shows** 43:10 73:19 98:3 | **significantly** 88:6 |
| **september** 178:1 178:6 | 192:10 207:24 207:24 | 103:11 107:18 193:4,5 198:18 | **signing** 216:19 |
| **sequence** 200:12 201:2,11 202:20 | **shared** 17:11 | 199:23 201:16 | **similar** 59:21 60:24 67:12,12 |
| **series** 28:22,23 | **shares** 29:10 81:9,14 | **shrewsbury** 1:17 2:15 9:13 16:13 | 68:11 154:14 |
| 52:22,22 53:1,1 | **sharing** 104:16 192:13 | 16:18 | **simply** 24:5 79:1 |
| 53:3,7 75:1 166:12 196:18 | **sheet** 191:9,24 192:16 193:24 | **shrinkage** 157:9 **side** 25:3,5,9 | **sincerely** 216:21 **single** 78:11 |
| **services** 15:25 23:3,24 25:14 | 194:4 195:10,11 195:23 197:3,7 | 79:2 187:2,2,13 187:14,20,20,23 | 126:22 139:5,9 139:10 147:24 |
| **serving** 26:11 31:24 | 197:10 198:6,10 199:14,15,15,16 | 187:23 188:1,2 189:13 190:4,12 | 152:16,19,22 153:2 164:17 |
| **session** 115:12 | 199:21 202:5 | 193:13,13,14,16 | 175:5 182:18 |
| **set** 12:17,20 14:21,23 22:19 | 216:13 218:7,10 218:18 219:1 | 193:17,19,21 **sides** 187:16 | 184:14 203:17 **sir** 15:20 18:12 |
| 38:25 42:10 | **shift** 85:24 | **signals** 163:11 | 216:10 |
| 58:11,23 59:10 | **shinbrot** 5:22 | **signature** 12:1 | **sit** 12:15 202:13 |
| 61:18 62:12 | **shocks** 68:9 | 214:1 215:22 | 202:22 |
| 82:11 85:1 96:7 | **short** 110:1 | 216:14 | **size** 70:21 |
| 97:7,8 102:15,19 | **shorter** 95:12 | **signed** 52:2 | 116:25 154:20 |
| 110:15 121:19 | **shortly** 164:2 | 217:13 218:18 | **sizeable** 117:4 |
| 145:17 153:20 | **show** 66:17 72:3 | **significance** | **skills** 27:8 |
| 158:19,23 | 83:14 86:16 | 183:2 186:3 | **slight** 77:20 |
| 171:23 183:3 | 106:11 126:11 | 208:8,11 | **slightly** 103:13 |
| 194:6 215:11,18 | 131:21,23 133:3 | **significant** 61:23 | **small** 21:25 24:2 |
| **sets** 81:7 92:20 | 133:19 134:11 | 107:3,7,11 128:9 | 25:4 68:25 90:3 |
| 110:20 114:8 | 134:18 135:2 | 128:15,24 | 117:6,17 118:6 |
| 158:10 | 185:14 193:3,10 | 129:25 130:25 | 118:12 124:4 |
| **settlement** 189:5 | 196:4 199:18 | 134:18 135:2 | 135:23 154:16 |
| **seven** 121:15,21 | **showed** 126:24 | 136:22,23 | **smaller** 75:5,14 |
| 121:25 122:9,10 | 131:6 182:21 | 137:19,24,25 | 75:23 |
| 186:1 | **showing** 185:7 | 153:24 161:11 | **smallest** 124:11 |
| **severe** 210:8 | 189:16 | 182:1,8,21 183:6 | **smart** 3:15 |
| **seymour** 4:21 | **shown** 175:13,14 | 183:9,19 184:9 | **solutions** 216:1 |
| **shapiro** 13:9 | 201:5,14 216:16 | 184:21,25 185:7 | 219:1 |
| 14:1 192:24 | | 185:21,25 186:1 | **somebody** 153:17 |

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **sorry** 28:13 | 108:12,14 | **stage** 202:6 | **statistically** |
| 34:11 44:21,22 | 169:11 171:21 | 210:11 | 128:9,15,24 |
| 48:23 82:18 | 181:12,20 | **stakem** 3:4 | 130:25 134:18 |
| 86:9 97:15 | **specifications** | **staley** 3:10,12 | 135:2 154:9 |
| 100:9,11 104:9 | 140:6 | **standard** 143:24 | 161:11 181:25 |
| 199:14,15 | **specifics** 79:22 | 152:3,23 153:8 | 182:8,21 183:6,8 |
| **sort** 49:16 58:15 | **speeches** 36:7 | 153:10,18 | 184:8,21,25 |
| 61:8 67:3,3 | **spend** 14:25 15:8 | **standing** 96:18 | 185:7,21,25 |
| 110:10 117:16 | 20:24 | 117:7 120:25 | **status** 146:25 |
| 146:19 185:24 | **spent** 20:7,16 | 132:20 | **staying** 195:17 |
| 186:4 207:22 | 32:3 33:21 | **start** 10:24 63:25 | 196:16 |
| **sorted** 187:24,24 | 54:18 | 99:18 129:18 | **stenographic** |
| **sought** 142:5 | **spin** 49:23 | **starting** 54:16 | 8:12 |
| **sound** 63:19 | **split** 154:2 | 111:24 140:13 | **stenotypy** |
| **source** 24:6 | **spoke** 97:9 | 145:19 207:22 | 215:11 |
| 149:21 | 103:18 | **starts** 105:5 | **step** 194:2,13 |
| **southern** 1:2 2:2 | **spoken** 51:1 | **startup** 25:5 | 197:15 |
| 8:8 | **spooked** 180:10 | **state** 8:24 19:10 | **steps** 140:7,13 |
| **spahr** 5:8 | **spread** 63:10 | 81:12 215:5,8,23 | 140:18,21 |
| **span** 110:3 | 75:20 118:25 | 217:10 218:15 | 163:16 194:5 |
| **speak** 63:5 139:4 | 119:6 120:3,9,17 | **stated** 89:7 | 197:23 |
| 139:6 | **spreads** 42:3 | 149:14 170:12 | **stettinius** 5:17 |
| **speaking** 73:2 | 63:13 68:10 | **statement** 12:6 | **steve** 6:9 |
| 75:23 83:21 | 119:9,16,20,24 | 69:25 75:3,16 | **steven** 3:14,16 |
| 132:15 142:1 | 120:1,20 121:2 | 112:5,19 113:5 | **sticker** 11:3 |
| 163:9 169:14 | 124:3,11 | 171:16 217:13 | **stipulations** 2:14 |
| **specific** 14:17 | **spreadsheet** 7:11 | 217:14 218:19 | 215:15 |
| 58:3 60:17 61:3 | 7:13,14 99:9 | 218:19 | **stock** 29:9,10 |
| 63:15,21 68:8 | 105:22 190:22 | **statements** 207:8 | 60:9 61:3,4,23 |
| 70:1 85:16 | 192:19 194:21 | 208:3,6 212:17 | 62:2 68:16,22 |
| 116:1 132:3 | 195:11,18 | **states** 1:1 2:1 8:8 | 69:7,11,24 70:19 |
| 138:24 142:21 | 202:15 | 16:16 162:1 | 70:21 76:9,12,14 |
| 143:1,9,13 144:4 | **spreadsheets** | 167:12,15,16 | 76:17 78:7,10 |
| 144:22 167:19 | 196:11 | **statistic** 129:2 | 81:10,18,25 83:1 |
| 206:17 | **square** 4:10 5:18 | **statistical** | 83:6,24 84:3,7 |
| **specifically** 28:7 | **ss** 215:5 | 128:23 175:1 | 91:4 92:20 96:4 |
| 50:10 52:17 | **staff** 13:4 14:22 | 183:2 186:2 | 96:5 114:13 |
| 54:3 55:1 108:9 | 129:18 | | 125:12 126:17 |

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 48

127:3,5 128:1
139:7 152:14
160:12 163:24
178:4 179:19
180:11,11,13,21
206:8
**stocks**  70:19,20
83:7,18 85:21
88:1 96:6,8
111:22 112:8
143:23
**stop**  130:3
211:12,13
**stopped**  105:17
105:23 204:15
**strah**  3:14
**straight**  22:2
**strange**  202:7
**strategies**  24:12
**streamlining**
209:1
**street**  4:18,23
5:4,10,14 6:4
**strike**  137:5
**strong**  81:14,23
81:24 82:8,13,15
**structural**
111:22
**structure**  69:13
78:15 173:9
**student**  85:6
**studied**  83:23
84:6 132:8
182:22 183:10
184:10
**studies**  54:5,9,11
54:13,15,20,22
55:6 74:19 77:9

78:18 82:4
83:13 84:21
85:10 88:20
95:7 116:5,24
118:1 119:19
124:14 138:13
138:15,16,17,19
138:21 139:10
139:21 143:2
154:2,5 184:14
186:9
**study**  19:18,20
19:21 37:16
48:12,16,17 49:4
55:1 59:4,6,7,13
59:15,25 60:5
68:14 84:12,14
119:4,8,12
126:22 129:7
132:1,12,16
133:3,9,19 134:5
134:11 136:2
138:2,9 139:3,5
139:9,18,20,22
140:8,14,19
141:2,9 142:5
143:25 144:16
144:24 145:11
146:13 147:5
152:11,15,17,22
155:3,12,15,18
156:2 158:7,9
159:25 160:8,23
161:4 162:22
163:6 164:10,16
164:22,24
165:21 166:5,7
166:10,16,18

167:6,25 168:7,9
168:12,17
169:18,21 170:2
170:7 171:11
174:13,15
175:16,18,23
177:10 178:7,23
179:22 181:18
181:23 182:19
183:14,23 184:2
185:6,12,13
189:9 196:19
197:22 199:1
200:5 203:18
204:14
**studying**  137:8
**subject**  83:5
89:1 107:5,25
136:9 138:24
143:7 164:21
208:25
**submit**  18:11
33:11 38:5
**submitted**  18:1
29:20 30:1,4,6,6
30:9,12,17 31:2
31:16,21 32:18
154:23 155:2,14
**submitting**
27:24
**subparagraph**
189:23
**subscribed**
217:10 218:14
219:21
**subsequent**  67:2
146:15 177:15

**subsidiary**
165:10
**substantial**  48:9
66:3 81:17 82:1
82:16,19,22
**successfully**
19:19
**successive**
125:18
**sudden**  66:15
**sue**  3:17
**suffered**  211:25
**sufficient**  114:12
**sufficiently**
124:4
**suggest**  174:10
178:11 182:23
**suggests**  127:4
128:1
**suite**  4:4,9,18,23
5:18 6:4 216:2
**summarize**
140:18 158:4,6
**summarizes**
97:2,6
**summary**  84:25
181:22 191:5
195:6 196:6
198:2
**sums**  191:17,18
**superior**  216:1
**support**  14:8
34:8,13 38:23
76:19 77:10
82:5 87:24
96:10 124:15
135:3 154:10

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[supported - testing]**                                                      Page 49

| | | | |
|---|---|---|---|
| **supported** 57:20 | **tab** 191:8,11,12 | **tasks** 13:12 | 124:4 146:11,19 |
| **supporting** | 191:14,17,20 | **tathompson** 4:11 | 156:5 158:12 |
| 25:10 | 195:12,19,20 | **taught** 35:25 | 164:24 180:23 |
| **supports** 116:14 | 196:17,22 198:8 | 36:2 | 181:1 197:24 |
| 154:10 184:10 | 198:13 201:14 | **tax** 21:3 | **test** 24:11 61:21 |
| **suppose** 124:22 | 201:15,19 | **taylor** 3:15 4:8 | 69:5 86:13 |
| **supposed** 123:21 | **table** 84:11,17 | **teach** 36:11 | 110:13,16,20 |
| **sure** 14:18 29:18 | 85:1 87:20 89:6 | **team** 15:8 130:3 | 114:9 124:18 |
| 32:4 38:12 | 89:10,22 99:25 | **tech** 25:7 | 129:2 130:18 |
| 51:16 56:17 | 103:17 113:15 | **technology** | 134:17,25 |
| 59:8,9,10 71:4 | 190:9 | 20:19 25:5 | 135:18,24 |
| 86:3 87:11 | **tabs** 195:23,24 | 85:17,18,23 | 136:19,19 137:2 |
| 90:20 93:22 | 196:3,13 | **telephone** 9:16 | 139:13 146:2,18 |
| 105:22 106:1,15 | **taft** 5:17 | **tell** 11:25 16:23 | 149:5,21,25 |
| 106:19 115:25 | **taftlaw.com** 5:19 | 36:16 61:6 | 154:24,24 |
| 118:8,24 121:22 | **tail** 148:14 | 118:9 150:13 | 172:21 183:3 |
| 128:18 129:1 | **take** 55:13 77:19 | 151:2,20 174:16 | 186:4 |
| 134:15 137:9 | 79:4 97:5 111:5 | 175:18,19,23 | **tested** 102:14 |
| 138:5 169:18 | 140:2,21 154:14 | 179:9 194:6,13 | 128:6 143:19 |
| 180:11 197:22 | 163:25 176:9,12 | 196:9 197:5 | **testified** 29:21 |
| **surprise** 61:24 | 198:11 206:8 | 202:24 | 30:17 31:1,15,21 |
| **surprisingly** | 215:8 | **ten** 114:11 | 155:5 |
| 129:25 | **taken** 1:16 2:13 | 134:25 135:1,14 | **testify** 9:25 |
| **surrounding** | 8:6 184:5 | 136:21,22 | 215:10 |
| 58:8 | 215:14 | 176:12 | **testifying** 2:15 |
| **suspect** 202:25 | **takes** 66:3 | **tend** 64:3,11 | 26:7,24 32:11 |
| **swear** 8:13 | **talk** 36:21 77:3 | 74:24 130:14 | 55:23 57:21 |
| **switch** 201:19 | **talked** 51:4,7 | 182:23 183:10 | 115:20 176:22 |
| **sworn** 8:16 | 137:11 | 183:23 185:8 | 211:15 |
| 215:10 217:10 | **talking** 64:13 | **tends** 96:10 | **testimony** 9:3,7 |
| 217:13 218:14 | 75:11 138:5 | **term** 134:15 | 9:10 27:24 |
| 218:18 219:21 | 139:21 150:19 | 209:9 210:20 | 30:13,23 31:19 |
| **systems** 85:19 | 153:25 | **terminology** | 57:10 170:13 |
| | **talks** 77:4 | 144:21 | 210:21 215:13 |
| **t** | **tantamount** | **terms** 14:16,18 | 217:6,7 218:6,9 |
| | 112:17 113:2 | 43:12 85:19,23 | 218:12 |
| **t** 3:15,16 7:1,7 | **tasked** 60:9 | 92:1 103:15 | **testing** 38:5 |
| 215:4,4 | | 117:5 123:13 | |

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[tests - titled]**

Page 50

| | | | |
|---|---|---|---|
| **tests** 78:4 83:1,4 | 117:16 118:10 | **thousand** 152:7 | 110:3,5 111:4 |
| **textbook** 39:8 | 121:5 123:20 | 152:12 | 113:22 120:1,15 |
| 42:1 | 125:11,13 126:5 | **thousands** | 120:18 121:4 |
| **textbooks** 41:25 | 131:24 134:21 | 129:11 131:8 | 123:11 125:25 |
| **tgronborg** 3:7 | 134:22 135:13 | 144:19,19 | 126:2 127:8,15 |
| **thank** 22:11 | 136:23 137:11 | **three** 19:18,19 | 129:4,23 133:1 |
| 32:14 47:4 91:5 | 140:23 142:1,3 | 34:17 37:16 | 133:18 136:4,22 |
| 129:4 140:4 | 143:10,12 | 42:12 79:13 | 137:22 139:15 |
| 174:13 213:16 | 144:10 147:2,25 | 110:2 131:5 | 145:14 151:24 |
| 213:17 | 148:4 149:25 | 132:25 133:10 | 160:6,9 164:19 |
| **theory** 43:4,4 | 150:17 151:5,9 | 133:14 201:9 | 165:1,23 166:1 |
| **thereof** 2:14 | 152:1,6,12 153:6 | **threshold** 103:5 | 167:22,24 169:2 |
| **thesis** 35:22 | 153:7 158:10 | 103:6 110:15 | 169:24 172:2 |
| **thing** 60:3 | 161:21 162:11 | 116:12 118:2 | 173:5,7,21 174:1 |
| 121:19 165:4 | 164:6 167:1 | 134:21,22 135:6 | 174:9,12,24 |
| 185:20 207:11 | 169:15,16 | 183:3 | 175:9 176:11 |
| 207:23 | 173:24 175:13 | **throw** 122:25 | 181:12 188:22 |
| **things** 24:4 | 177:16 181:11 | **throwing** 43:13 | 189:1,2,8,9 |
| 49:14 66:6 | 182:17,17 184:4 | **time** 2:17 8:3 | 197:16 203:3,21 |
| 71:21 75:22 | 184:18 186:3 | 14:24 18:9,10,11 | 203:22 204:11 |
| 136:8 197:20 | 194:1 196:4 | 18:25 20:6,16,23 | 204:11 205:3 |
| 209:24 | 197:21,21,23 | 20:24 27:13 | 206:9,10,12,18 |
| **think** 22:8,8 | 205:5,7 206:12 | 30:1 31:14 32:2 | 206:20,23 207:7 |
| 33:19 56:7 | 207:21 | 36:13 47:16 | 208:1,10,13,17 |
| 59:21 60:23 | **third** 91:17 | 48:20 49:6,9,17 | 208:21 209:10 |
| 62:4,18,19 66:16 | 93:23,23 103:7 | 49:18 50:3 | 209:14 213:16 |
| 67:11 68:12 | 133:5 172:6 | 52:24,25 53:19 | 213:23,24 |
| 69:13,16 70:17 | **thirty** 216:18 | 55:10 58:12 | 215:14 |
| 70:17 71:11 | **thomas** 3:16 4:9 | 60:16 71:2,3,16 | **times** 31:20 |
| 72:2,18 75:4,9 | **thompson** 4:8 | 72:2,21,22 73:23 | 34:16 55:6 56:4 |
| 75:21 76:4,24 | **thomson** 47:21 | 74:9 78:10 | 204:18 |
| 78:13 79:3,3 | **thornton** 3:17 | 85:11,14,15 86:1 | **timestamps** |
| 89:6 97:2,6 | **thought** 32:5 | 86:17 87:1,3 | 197:8 |
| 104:5,9,13 105:3 | 44:4 57:6 73:3 | 88:18,22 89:9 | **timothy** 5:9 |
| 107:9,13,20 | 114:11 149:19 | 91:24 93:16 | **title** 16:20 192:7 |
| 109:25,25 | 156:14 169:13 | 96:15 97:20 | **titled** 170:5 |
| 110:12,17 111:6 | 179:9 193:5 | 98:4 102:11,18 | 191:9,20 195:13 |
| 112:10 114:2,6 | 206:22,22 | 105:14,24,25 | 195:23 |

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[today - true]** Page 51

today   9:4,7,10
  9:25 12:15 30:2
  51:23 71:8,20
  72:4 172:23
  202:22 210:21
  213:16
today's   125:18
toggle   197:6
token   67:7
tools   134:7
top   18:14 29:19
  37:8 38:11
  63:24 96:20
  97:15 106:23
  114:15 116:10
  170:6 191:4
  192:19 195:5
topic   50:8
topics   176:8
tor   3:4 14:13
  216:5
torkelsen   27:3
  27:22 28:14
torkelsen's
  28:10
total   18:2 31:20
  191:19 196:23
touched   50:4
tower   4:9
trace   13:18
  84:18 111:25
  186:20 203:9
track   209:19
trade   56:24
  57:10 68:18
  69:1,18,20,24
  70:19,20,22 71:1
  74:16,25 75:6,15

76:1,21 77:12
78:10,12 81:16
83:7,9,10,11,18
84:7 87:25
88:22 96:11
118:7,15,19
182:16,23
183:11 187:9,10
187:15,16,16,17
187:19,21 188:5
188:18,20
189:16 190:1,14
191:18 193:11
193:13,14 201:8
202:11 204:2,15
204:16,22
205:10,23
206:17,18
traded   56:2 57:3
  57:14,19 58:19
  69:7,9,20 71:9
  71:14 72:5 84:1
  86:17 88:4
  89:16,19 90:7
  91:6,14,17 94:5
  96:14 99:23
  100:20 101:11
  101:15 103:8,11
  103:16 111:23
  113:25 116:23
  116:25 119:9
  120:21 121:20
  121:24,24 124:7
  124:10,24 125:6
  131:19 172:15
  173:3 183:16
  201:6

trades   62:7
  68:16 70:2 71:7
  72:3 77:17,23
  78:21 83:15,21
  83:23,24 111:13
  113:12 125:9,12
  126:6 187:11,25
  188:5,11,15
  199:6,18 200:12
  200:13,15,16,16
  200:19 201:1,3,9
  201:11 202:20
trading   28:24
  42:5 58:3 62:1
  69:5,14 73:20,24
  74:14 75:18,20
  78:11,13 81:3,13
  81:16 83:8,11
  84:12,21 85:2,10
  85:13,17,19,20
  85:21,22,25 86:4
  86:13,22 87:1,2
  87:5,8,11,14
  88:5,6,9,14,17
  89:2,9,24 91:2,4
  91:4,12 92:12
  93:5,8,13,15,20
  94:8,11,12,17,19
  94:21 96:15
  98:12 100:2,24
  102:6 105:4,25
  106:8,18 111:20
  113:19 114:17
  114:21 119:13
  120:16 124:5
  125:4,5,24 126:1
  127:9,11,13,19
  127:20 173:3

174:16 175:11
175:18,24
191:21 195:24
199:3,4,10 203:4
203:8 204:10,15
205:17,21,22
206:7
training   53:18
transaction
  187:3,8,10,12
  191:25 196:23
  206:11,21
transactions
  191:15,18
transcribed
  215:12 217:7
transcript
  216:11,12 217:5
  217:12 218:5,11
  218:17
transcripts
  108:25 109:1,3
treating   127:1
treatise   144:22
trends   143:15
tried   122:2
trilogy   23:18,20
  23:21 24:13
  27:10
triple   159:20,21
  161:22,22 162:4
  162:4,10,10
trouble   11:5
true   73:6 75:3
  82:16,19 112:5
  165:4 174:21
  175:22 215:12

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[truth - v]**                                                                 Page 52

**truth**  215:10,10
  215:11
**try**  80:16,20
  104:15 142:22
  161:16
**trying**  49:23
  56:17 72:13
  100:11 120:14
  124:2 136:15
  153:5 187:4
  194:1 197:17
**tucker**  4:3
**tuckerellis.com**
  4:5
**tuesday**  1:14
  2:16 115:13
**turn**  29:17 38:10
  47:2 63:23 84:8
  90:13 97:14
  106:21 140:10
  158:1 170:4
  176:4,24 177:23
  178:17 179:11
  181:21 190:1
**turner**  3:17
**turning**  80:5
  82:23
**turnover**  62:1
  69:2,14 73:24
  78:6 81:7,8 83:1
  83:14 92:14,23
  93:7,11,12 94:18
  94:25 95:25
  96:9,16,23,25
  97:6 100:1,1,23
  101:19 102:5,22
  106:7 173:1

**two**  23:13 25:2
  28:24 33:21
  34:17 40:9,16
  64:2 76:25 78:6
  78:8 79:14
  81:13,23,24 82:5
  92:25 99:22
  122:10 146:15
  146:22 154:6,9
  160:14 177:7
  182:25 184:22
  185:6,15,16,22
  188:5 193:22
  195:25 196:12
  197:20 205:23
**ty**  5:16
**type**  32:3 58:16
  63:6 125:25
**types**  63:15
  138:14 139:6
**typewriting**
  215:12
**typically**  206:5

**u**

**u.s.**  128:6 129:10
  129:24 131:8
  142:12 204:20
**uh**  113:1
**ultimately**
  129:20 209:3
**umbrella**  166:25
**unaware**  197:15
**undergraduate**
  14:4 18:20
**underlie**  54:20
**underlying**
  63:10 72:19

**underneath**
  39:15
**understand**  9:3
  9:6 44:23 59:25
  90:20 98:13
  134:15 167:1
  197:18
**understanding**
  35:7,10 46:7
  50:5 82:12
  107:24 122:5
  149:16
**underwriter**
  5:20
**unexpected**
  66:14 136:7
  148:16 151:11
  151:21 152:21
  153:23 180:5
**unexpectedly**
  133:16
**unhide**  103:24
  104:4,21
**uniformly**
  141:13
**unique**  58:8
  113:11 136:3,8
**united**  1:1 2:1
  8:7 167:15,16
**universe**  143:22
  149:9
**university**  13:25
  14:3,6 35:25
**unknown**  67:20
**unmute**  104:9
**unusual**  202:18
**unusually**  93:5
  94:21 95:4,19

**update**  89:5
**updated**  89:23
**upgrade**  147:13
  147:20 148:1,3
  148:17,21 149:5
  149:12,22 150:1
  150:3 162:6,12
**upgraded**
  147:23 159:20
  161:22 162:3
**upgrades**  150:7
**upward**  93:7,7
**use**  55:2 67:13
  78:20 85:23
  87:21 95:1
  122:17 123:7
  125:8 142:22
  143:13 144:23
  153:19 186:22
  193:22 205:3
  206:1,9
**useful**  50:8
  54:15,21 55:3
**uses**  144:20
**usually**  20:18
**uti**  34:24 56:17
**utilities**  52:12
**utility**  51:12
  52:6,9,16 124:23
  142:16,22,23
  143:15,22 170:6
**utilized**  54:11,13
  55:3
**uvs**  145:20

**v**

**v**  216:6 217:3
  218:3

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**valeant** 32:15
34:23 56:21
57:16,24 58:4,6
58:22 59:2,4,14
59:19,23 60:3,22
**valid** 123:25
**validate** 95:9
**validates** 108:3
**valuation** 15:24
19:22,25 20:16
21:24 22:3
26:22 36:12
53:15 54:11,14
54:23,25 55:5
**valuations** 20:18
20:25,25 25:7
**value** 202:9
**valued** 20:23
**variable** 142:11
142:18
**variables** 206:9
**variations**
208:20
**varied** 117:19,22
**varies** 173:24
**various** 78:23
**vary** 15:17
207:25 208:12
**vassallo** 5:9
**venture** 24:19,22
25:1,2,12 26:2,6
26:11,14,18,25
27:6,7,12,14,15
27:18,20,23
28:16
**verify** 49:6
**veritext** 6:9,9
216:1,7 219:1

**veritext.com.**
216:17
**version** 41:13
100:12 102:13
104:6 105:21
192:14
**versus** 58:22
**vespoli** 5:2
**viavet** 108:11
**vicinity** 32:6
**victor** 4:22
**video** 1:11 2:12
8:5
**videoconference**
1:11,16 2:12
**videographer**
6:8 8:2 10:6,11
11:12,17 55:14
55:19 111:8
115:5,10 176:13
176:18 213:7,12
213:20
**view** 104:7,11
181:4 211:4
**virginia** 21:12
**virtual** 1:11 2:11
**virtue** 65:12
124:10
**volatility** 120:24
127:16
**volume** 62:14,17
71:22 78:11
81:8 86:17,22
88:17 91:9,9,12
91:21,23,25 92:8
92:9,10,16 93:1
93:5,9,18,21,25
94:5,11,12,21

95:3,19 97:5
112:1,7,13,15
187:11 188:23
191:5,12,16,19
195:6,18,20
196:5,17,23,24
197:21 198:1,3,8
198:11,13 201:4
201:13,19 202:3
202:14,15 206:1
206:4,8,13,13,14
206:15
**volumes** 94:8
**voluminous**
38:25
**vorys** 4:21
**vorys.com** 4:24
4:24
**vwalton** 4:24

| w |
| --- |

**w** 3:5 7:1
**wagging** 148:14
**waived** 214:1
216:19
**walk** 22:16
43:11
**walton** 4:22
**want** 104:14
122:8 135:15
136:16,16,17
137:5 167:10
192:15 197:6
199:22
**wanted** 27:8
29:9 40:10
45:20 97:3
121:22 153:17

160:15
**wardwell** 5:21
**warrants** 20:20
**washington** 4:14
4:18
**watch** 146:21
150:17 153:3,4
156:23 157:22
177:14,15
**way** 15:15 58:5
59:6,8,19 75:9
85:16 105:8
110:7 111:22
123:25 130:22
131:12 138:23
153:7,20 170:19
171:1,3,3,24
172:16 187:9
211:4
**ways** 66:18
**we've** 55:11
68:12 83:9
110:17 111:2
114:6 138:5
164:6 172:22
176:6 184:3
185:25
**week** 20:7 93:5,8
93:13,25 94:17
95:1,4,5,10,15
95:19,20 100:2
100:24 101:20
102:23 106:17
**week's** 93:9
**weekends** 19:3
**weekly** 81:8,13
81:16 92:8,10,16
92:25 93:24

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

**[weekly - zhou]**

100:23
weeks 92:3,4,11
  94:4,4
weigh 79:6,14,20
  117:8 183:23
  185:9
weighing 183:21
weighs 61:19
  185:17
weighted 96:23
  96:25 206:1,4,8
went 27:13,15
  98:15 151:14,16
west 3:6 5:4 6:4
whereof 215:18
wide 121:3,4
widening 121:3
window 170:20
windows 164:16
winning 43:4
winter 4:17
wisconsin 50:15
wish 111:9
withdraw 25:25
witness 1:17
  8:13 32:24,25
  212:21 213:17
  215:9,13,18
  216:8,11 217:1,4
  217:11 218:1,4
  218:15
witness's 11:3
witnesses 36:21
witness' 216:14
word 25:19 40:1
  82:14,22 139:23
  139:25 140:2

words 76:11
  109:15 147:18
work 12:10,16
  13:22 14:19
  16:15,17 17:3,17
  17:19 20:7,11,14
  20:16 21:5 22:3
  22:11,17 23:7,14
  25:10,12 26:2,4
  26:9 28:4 30:20
  31:6,10 44:13
  50:23 53:23
  54:10 104:8
  106:18 197:20
  197:25
worked 15:11
  22:1 24:14,17,21
  26:24 28:15
  50:19 51:4
  194:4 208:24
working 15:8
  24:11 31:14
  38:7 53:20
works 44:6
worksheet
  192:23
worksheets
  194:7 197:24
worldwide 34:24
  56:17
worth 127:21
write 33:8,23
  35:22
writing 15:3
  62:2 215:11
written 35:16,19
  70:18

wrong 179:6
wrote 43:2
  128:23

**x**

x 7:1,7,7 140:5
  191:25,25
xavier 4:9
xthomashughes
  4:11

**y**

y 13:8 197:9
yeah 81:22 111:6
  159:6 187:19
  197:11,19
year 14:9 18:20
  18:23 19:13,18
  20:6 120:6,22
  135:1,16,22
  175:4
years 29:21
  30:12,16,21 31:7
  31:10,19 32:23
  34:6 37:5,6 54:8
  56:11 57:17
  71:9,13,20,23,24
  72:6 84:14,18
yep 92:7
yesterday 71:21
  72:4
yesterday's
  125:19
yield 63:9,13
  65:8,12 68:9
  73:2 80:25
yields 68:10
york 5:5,5,23,23
  21:13 69:24

70:19

**z**

z 192:4,7,8,16,18
  193:15 197:9
  199:22,23
zbiegien 5:18
zero 193:4
zhou 42:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.