# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| | **:** | |
| | **:** | **Case No. 2:20-cv-3785** |
| *In re* **FIRSTENERGY CORP** | **:** | |
| **SECURITIES LITIGATION** | **:** | **Chief Judge Algenon L. Marbley** |
| | **:** | **Magistrate Judge Kimberly A. Jolson** |
| **This document relates to:** | **:** | |
| | **:** | |
| **ALL ACTIONS.** | **:** | |
| | **:** | |
| | **:** | |

## OPINION & ORDER

This case is a consolidated action[1] for securities fraud brought by Lead Plaintiff Los Angeles County Employees Retirement Association ("LACERA") on behalf of a putative class of investors in the Ohio-based electrical utility company FirstEnergy Corporation ("FirstEnergy" or the "Company"). Plaintiffs allege violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act") by FirstEnergy, 25 named officers and directors, and 16 underwriters, in relation to the Ohio House Bill 6 ("HB6") scandal. (ECF No. 72). This matter is before the Court on Lead Plaintiffs' Motion for Class Certification. (ECF No. 293). For the following reasons, this Court **GRANTS** Plaintiffs' Motion (ECF No. 293) and certifies the class under subsection 23(b)(3) of the Federal Rules of Civil Procedure.

---

[1] The cases *Owens, et al. v. FirstEnergy Corp., et al.* (No. 2:20-cv-3785) and *Frand, et al. v. FirstEnergy Corp., et al.* (No. 2:20-cv-4287) were consolidated in November 2020 under the Owens case number by order of this Court. (ECF No. 65). Throughout this Opinion, ECF numbers refer to the Owens docket unless otherwise indicated.

## I.    BACKGROUND

### A.  THE PARTIES

#### 1.  The Proposed Class Representatives

Lead Plaintiff Los Angeles County Employees Retirement Association ("LACERA") joins with Plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund ("Amalgamated Bank"), City of Irving Supplemental Benefit Plan ("SBP"), and Wisconsin Laborers' Pension Fund ("Wisconsin Laborers") (collectively, "Plaintiffs") in this lawsuit against Defendants.

LACERA is described in Plaintiffs' Amended Complaint as a governmental pension plan administering defined retirement benefits for employees of Los Angeles County and participating agencies. (ECF No. 72 ¶ 23). As of December 3, 2021, LACERA boasted over 185,000 active members and maintained assets of over $73 billion. (ECF No. 293-1 at 6). During the Class Period, LACERA purchased FirstEnergy Securities[2] at artificially inflated prices, including common stock and FirstEnergy Notes, in transactions directly during and/or traceable to FirstEnergy's February 2020 and June 2020 Offerings. (*Id.*) (citing ECF No. 72 ¶¶ 3–7; ECF No. 33-4 at 2–7).

Amalgamated Bank is a New York City-based investment bank serving thousands of labor unions, nonprofits, social impact enterprises, political organizations, foundations, and individuals. (*Id.* at 6–7). Plaintiffs represent that Amalgamated Bank has nearly $60 billion in

---

[2] Plaintiffs define "FirstEnergy Securities" as FirstEnergy common stock and the FirstEnergy corporate debt notes trading under numbers 337932AG2, 337932AF4, 337932AN7, 337932AH0, 337932AL1, 337932AP2, 337932AJ6, and 337932AM9 (the "Notes").

assets under its management and custody as of the filing of their Motion for Class Certification. (*Id*. at 7). During the Class Period, Amalgamated Bank purchased FirstEnergy Securities at artificially inflated prices, including common stock and FirstEnergy Notes, in transactions directly during and/or traceable to FirstEnergy's June 2020 Offering. (*Id.*) (citing ECF No. 72 ¶¶ 3–7; *Id.* at 116–22).

City of Irving Supplemental Benefit Plan is a defined benefits plan providing supplemental retirement, disability, and death income benefits for government and police employees for the City of Irving, Texas. (*Id.* at 7). During the Class Period, SBP purchased FirstEnergy Notes at artificially inflated prices in transactions traceable to FirstEnergy's June 2020 Offering. (*Id.*) (citing ECF No. 72 ¶ 307; ECF No. 72 at 125–27).

Wisconsin Laborers' Pension Fund is a multi-employer defined benefit plan serving nearly 9,000 active and retired construction craft laborers in Wisconsin. (*Id.* at 7). During the Class Period, Wisconsin Laborers purchased FirstEnergy Securities at artificially inflated prices, including common stock and FirstEnergy Notes, in transactions directly during and/or traceable to FirstEnergy's February 2020 Offering. (*Id.*) (citing ECF No. 72 ¶ 307; ECF No. 72 at 123–24).

### 2. The Defendants

Defendants are the following: (i) FirstEnergy Corp.; (ii) Charles E. Jones, James F. Pearson, Steven E. Strah, K. Jon Taylor, Michael Dowling, Dennis M. Chack, Ty R. Pine, Robert Reffner, Leila L. Vespoli; John Judge; and Donald R. Schneider (referred to by Plaintiffs collectively as the "Officer Defendants"); (iii) George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton,

and Leslie M. Turner (referred to by Plaintiffs collectively as the "Director Defendants"); and (iv) Barclays Capital, Inc., BofA Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets, Inc., TD Securities (USA) LLC, US Bancorp Investments, Inc., and MUFG Securities Americas Inc. (referred to by Plaintiffs collectively as the "Underwriter Defendants"). FirstEnergy and the Officer Defendants are referred to by Plaintiffs collectively as the "Exchange Act Defendants." The Director Defendants, comprising Defendants Jones, Strah, and Jason J. Lisowski, and Underwriter Defendants, are referred to by Plaintiffs collectively as the "Securities Act Defendants."

The main opposition motion to Plaintiffs' Motion for Class Certification is brought jointly by all Defendants. (ECF No. 327). An additional opposition motion is brought by Defendants Michael Dowling, Dennis Chack, and Ty Pine (the "Dowling Defendants"). (ECF No. 328). The third and final opposition motion is brought by Defendants Robert Reffner and Leila Vespoli ("the Reffner Defendants").[3] (ECF No. 329).

This matter is ripe for this Court's review.

## B. FACTUAL BACKGROUND

This Court set out the facts in exhaustive fashion in its previous Order resolving ten Motions to Dismiss filed by various groupings of Defendants to this matter. (ECF No. 219). This Court restates its summarization of facts here, which are drawn from Plaintiffs' well-pled allegations.

---

[3] This Court has referred to the Dowling and Reffner Defendants collectively as the "Non-Speaking Defendants."

Plaintiffs' Complaint details a large corruption and bribery scheme perpetrated by FirstEnergy and its senior executives between February 21, 2017, and July 21, 2020, inclusive (the "Class Period"). (ECF No. 72 ¶¶ 1, 3). Specifically, the Complaint alleges that FirstEnergy paid approximately $60 million to Ohio's former Speaker of the House Larry Householder, the former Chairman of the Public Utilities Commission of Ohio ("PUCO") Sam Randazzo, and others, via a web of lobbyists, shell companies, and political action committees. (*Id.* ¶¶ 3–5, 8). In exchange, FirstEnergy received a bailout of its failing nuclear power plants, in the form of HB6. (*Id.* ¶ 5). HB6 delivered approximately $2 billion to FirstEnergy: $1.3 billion in a ratepayer-funded subsidy and $700 million in a "decoupling" provision that would allow FirstEnergy to charge artificially high rates. (*Id.*). The scheme unraveled on July 21, 2020, when Householder and his associates were arrested and charged in connection with the bribery scheme. (*Id.* ¶ 8).

According to Plaintiffs, HB6 was the culmination of a years-long effort to solve FirstEnergy's "nuclear problems." The Company's two aging nuclear plants had incurred climbing maintenance and repair costs since at least the early 2000s, and the lost profits only grew as nuclear power became less cost competitive. (*Id.* ¶¶ 42–43). By 2016, forecasts projected losses in the hundreds of millions of dollars, which stood in the way of FirstEnergy's strategic decision to exit the competitive energy-generation market and focus solely on transmission. (*Id.* ¶ 44). Investors grew increasingly concerned about FirstEnergy's nuclear liabilities, and the topic came to "dominate" earnings calls and analyst coverage. (*Id.*).

In 2018, FirstEnergy announced plans to decommission the two nuclear power plants— which would entail billions of dollars in direct expenses and future environmental liabilities. (*Id.* ¶¶ 45, 50). In an effort to shed these costs, FirstEnergy Solutions ("FES," now Energy Harbor

LLC) and FirstEnergy Nuclear Operating Company ("FENOC," now Energy Harbor Nuclear Corp.), the two subsidiaries through which FirstEnergy operated the nuclear plants, filed for bankruptcy. (*Id.* ¶¶ 42, 45). FirstEnergy proposed a "settlement" to the bankruptcy court, whereby FirstEnergy would gain "sweeping releases" from future claims against FES and FENOC. (*Id.* ¶ 51). After the Department of Justice, the Ohio Consumer Council, and others objected to the plan, the bankruptcy court halted the case. (*Id.* ¶¶ 52–57, 62). All the while, Plaintiffs allege that FirstEnergy "had been laying the groundwork for [a] backup plan" to delay decommissioning of the nuclear plants and seek "legislative or regulatory solutions"—ultimately in the form of HB6. (*Id.* ¶¶ 44, 63). Early in 2017, FirstEnergy began courting State Representative and Speaker-hopeful Larry Householder by flying him and his sons aboard the corporate jet to former President Trump's inauguration. (*Id.* ¶ 65). Shortly thereafter, FirstEnergy established two 501(c)(4) organizations, Partners for Progress and Generation Now, that would serve as the covert vehicles for funneling money to Householder and affiliates. (*Id.*).

FirstEnergy made sizable contributions to Householder in 2017 and 2018 but concealed the true magnitude of its spending ($2.9 million). (*Id.* ¶ 67). While FirstEnergy was making these clandestine contributions, it allegedly misled its shareholders about the nature of its political activity. One of the more notable instances involved the Company's proxy statements issued in connection with a May 16, 2017 shareholder meeting, where one item of business was a shareholder proposal to require an annual report on lobbying policies and payments. (*Id.* ¶ 110). In urging shareholders to vote against the proposal, FirstEnergy referred shareholders to its Political Activity Policy, which represented that the Company "complies with all federal and state lobbying registration and disclosure requirements" and "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or

expenditures are legally permissible and in the best interests of FirstEnergy." (*Id.* ¶¶ 110–11). Additionally, FirstEnergy's filings with the Securities and Exchange Commission ("SEC") disclosed the Company's pursuit of "[l]egislative or regulatory solutions," but made no mention of the legal, financial, and reputational risks involved in how the Company was pursuing those solutions. (*Id.* ¶¶ 95–102).

Householder, bolstered by the election of FirstEnergy-funded supporters, became Speaker of the Ohio House of Representatives in January 2019. (*Id.* ¶¶ 70–71). Having secured one powerful ally, FirstEnergy expanded its scheme with a $4.3 million payment to incoming PUCO Chairman Sam Randazzo, who in turn helped to write and support HB6. (*Id.* ¶ 72). Householder introduced the bill in April 2019, and it passed the House of Representatives in May. (*Id.* ¶¶ 73– 74). In these two months alone, FirstEnergy contributed at least $9.5 million to the scheme in concealed payments. (*Id.* ¶ 67). The Senate added the valuable decoupling provision and passed the bill, after FirstEnergy contributed another $7 million. (*Id.* ¶¶ 75, 78). Ohio Governor Mike Dewine signed HB6 into law on July 23, 2019. (*Id.*). Public opposition to HB6 quickly arose in the form of a referendum movement, and the scheme shifted to defending the new law. (*Id.* ¶ 81). FirstEnergy funneled over $38 million through groups such as Ohioans for Energy Security (funded by Generation Now) and Partners for Progress in defense of HB6. (*Id.* ¶ 82). The funds were spent on an advertising campaign urging Ohioans not to sign the referendum petition—which the groups baselessly linked to the Chinese government—and also to bribe, disrupt, or disqualify signature collectors. (*Id.* ¶¶ 83–85).

The referendum effort failed when its organizers could not produce the required number of signatures by the deadline. (*Id.* ¶ 86). The next day, FirstEnergy sent $3 million to Generation Now through an affiliate. (*Id.*). Buoyed by the concealment of risk and by the seemingly

guaranteed revenue from HB6, FirstEnergy stock traded at artificially high prices, and its credit ratings improved with S&P, Moody's, and Fitch. (*Id.* ¶¶ 242–46). FirstEnergy used the inflated prices to issue $2.5 billion in stock and $2.5 billion in debt securities. (*Id.* ¶ 241). FirstEnergy officers prospered as well: Defendants Jones, Pearson, Strah, Reffner, and Vespoli earned between 78% and 98% of their total compensation as performance-based pay. (*Id.* ¶ 248). Defendants Jones, Pearson, Chack, and Vespoli all sold a combined $14 million of FirstEnergy stock at the inflated prices. (*Id.* ¶ 250).

The scheme crumbled, however, when criminal charges were brought on July 21, 2020, against Householder, his political strategist Jeffrey Longstreth, three lobbyists (Mathew Borges, Neil Clark, and Juan Cespedes), and Generation Now. (*Id.* ¶ 143). The criminal complaint alleged a federal racketeering conspiracy involving honest services wire fraud, receipt of bribes, and money laundering. (*Id.*). The criminal complaint did not identify FirstEnergy by name—it referred to the financier as "Company A"—but prosecutors announced that "[e]veryone in this room knows who Company A is." (*Id.* ¶ 234). While Defendant Jones was claiming ignorance and denying wrongdoing (*Id.* ¶¶ 234–35), FirstEnergy stock plunged almost 35% on July 21 and 22, 2020, representing a loss of over $7.68 billion in market value. (*Id.* ¶¶ 258–59). As further developments about Defendants' fraudulent conduct became known, FirstEnergy stock fell again: by $1.1 billion on October 29, 2020, and by $1.3 billion between November 19 and 24, 2020. (*Id.* ¶¶ 261, 264). In each of these windows, the price of debt securities declined as well. (*Id.* ¶¶ 260, 263, 266). By November 2020, the major ratings agencies had downgraded FirstEnergy's credit ratings to "junk status." (*Id.* ¶ 247). Investors, including Plaintiffs, lost billions of dollars collectively. (*Id.* ¶ 13).

Longstreth and Cespedes each pleaded guilty to the racketeering conspiracy, admitting that they committed criminal acts to conceal the nature and source of payments that were made to Generation Now in return for specific official action by Householder. (*Id.* ¶ 171). Generation Now later followed suit and admitted to receiving money from "Company A" to be used in return for specific official action by Householder, and to concealing the nature and source of the payments. (*Id.* ¶ 205). On the same day that Longstreth and Cespedes pled guilty, FirstEnergy announced the firing of Defendants Jones, Chack, and Dowling for having "violated certain Company policies and its code of conduct." (*Id.* ¶ 172). Shortly thereafter, FirstEnergy terminated Defendant Reffner and another legal officer for "inaction and conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶¶ 184, 191). FirstEnergy's SEC filings following the terminations admitted to "material weakness in [its] internal control over financial reporting" that "could have resulted in material misstatements" in its financial statements. (*Id.* ¶ 192)

Other fallout of the criminal complaint included lawsuits by the Ohio Attorney General and the Cities of Cincinnati and Columbus against FirstEnergy and others, seeking to enjoin implementation of HB6 (*Id.* ¶¶ 164, 170, 185); a PUCO audit (*Id.* ¶ 182); a ratepayer class action filed in this District, alleging racketeering; shareholder derivative actions before this Court and the Northern District of Ohio; and a federal criminal case against FirstEnergy. That criminal case ended with a deferred prosecution agreement in July 2021, under which FirstEnergy paid a $230 million penalty and "admit[ted], accept[ed], and acknowledge[d] that it is responsible under United States law for the acts as charged in the Information and as set forth in the Statement of Facts"—including that it "conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official

action for FirstEnergy Corp.'s benefit." (*See United States v. FirstEnergy Corp.*, No. 1:21-cr-0086-TSB (S.D. Ohio), ECF No. 3 at 1, 4, 17).

### The Offerings

On March 6, 2018, FirstEnergy filed a shelf registration statement with the SEC on Form 3-ASR (the "Shelf Registration Statement") through which the Company could make multiple securities offerings. (ECF No. 72 ¶ 285).

On February 19, 2020, FirstEnergy filed a prospectus supplement (the "February Registration Statement") which incorporated and formed part of the Shelf Registration Statement. (*Id.* ¶ 286). Resulting from this statement, FirstEnergy in February 2020 registered for issuance of $1.7 billion of FirstEnergy Notes (the "February 2020 Offering"). (*Id.*). Defendants successfully solicited investors for the February 2020 Offering, issuing and selling over $1.7 billion of FirstEnergy notes near par. (*Id.*). The Underwriter Defendants served as underwriters for the February 2020 Offering. (*Id.* ¶ 287).

On June 4, 2020, FirstEnergy filed a second prospectus supplement (the "June Registration Statement") which incorporated and formed part of the Shelf Registration Statement. (*Id.* ¶ 288). Resulting from this statement, FirstEnergy in June 2020 registered for issuance of $750 million of FirstEnergy Notes (the "June 2020 Offering"). (*Id.*). Defendants successfully solicited investors for the June 2020 Offering, issuing and selling $750 million of FirstEnergy notes near par. (*Id.*). The Underwriter Defendants served as underwriters for the February 2020 Offering. (*Id.* ¶ 289).

Plaintiffs refer to the February 2020 Offering and the June 2020 Offering collectively as the "Offerings," and the February Registration Statement and the June Registration Statement collectively as the "Registration Statements." (*Id.* ¶ 290).

As alleged by Plaintiffs, the Registration Statements contained untrue assertions of material fact and material omissions of fact; they were also not prepared in accordance with SEC rules and regulations. (*Id.* ¶ 291). Plaintiffs allege that the Registration Statements specifically failed to disclose the fraudulent scheme that FirstEnergy was engaged in; these undisclosed facts thus exposed FirstEnergy to significant liability and diminished the actual value of the notes sold in the Offerings. (*Id.* ¶ 293).

Plaintiffs and the Class sustained damages as the values of the notes issued in the Offerings have declined due to the revelation of Defendants' wrongful conduct. (*Id.* ¶ 308). Plaintiffs and the Class also sustained damages as the value of stock fell from the artificially inflated highs at which they were selling due to the misstatements and omissions made by the Defendants. (ECF No. 293-1 at 3).

### C. PROCEDURAL BACKGROUND

Plaintiff Owens filed her original Complaint on July 28, 2020. (ECF No. 1). On October 23, 2020, the Court ordered Owens's case to be consolidated with other related class actions (including that by Plaintiff Frand) and appointed LACERA as Lead Plaintiff. (ECF No. 65). LACERA filed its Amended Consolidated Complaint (hereinafter, the "Complaint") on February 26, 2021. (ECF No. 72). Pursuant to the Complaint, Plaintiffs seek to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder, against FirstEnergy, certain current and former senior Company insiders, and the investment banks which underwrote two FirstEnergy debt offerings during the Class Period. (*Id.* ¶ 1).

As this Court recently summarized, Plaintiffs' Complaint contains five counts:

- Count I for violation of Section 10(b) of the Exchange Act and SEC Rule 10b–5 thereunder, against FirstEnergy and the "Officer Defendants"[4] (together, the "Exchange Act Defendants");
- Count II for violation of Section 20(a) of the Exchange Act, against the Exchange Act Defendants;
- Count III for violation of Section 11 of the Securities Act, against FirstEnergy; Defendants Jones, Strah, and Lisowski; the "Director Defendants"[5]; and the "Underwriter Defendants"[6] (together, the "Securities Act Defendants");
- Count IV for violation of Section 12(a)(2) of the Securities Act, against the Securities Act Defendants; and
- Count V for violation of Section 15 of the Securities Act, against the Securities Act Defendants other than the Underwriter Defendants.

(ECF No. 219 at 8–9).

On June 6, 2022, Plaintiffs filed their Motion for Class Certification. (ECF No. 293). In their Motion, Plaintiffs seek certification of a Class consisting of the following:

> All Persons who purchased or otherwise acquired FirstEnergy Securities during the period from February 21, 2017 through July 21, 2020, inclusive (the "Class Period"). Excluded from the Class are: (i) Defendants; (ii) the officers and directors of FirstEnergy, FirstEnergy Solutions Corp. ("FES"), FirstEnergy Nuclear Operating Company ("FENOC") and Energy Harbor LLC, Energy Harbor Corp., and Energy Harbor Nuclear Corp. (collectively, "Energy Harbor") at all relevant times; and (iii) members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

(ECF No. 293-1 at 1–2).

Within their Motion, Plaintiffs assert that certification of a class action is appropriate under Rule 23(a) of the Federal Rules of Civil Procedure and that the prerequisites for certification under Rule 23(b)(3) have also been met. Namely, Plaintiffs allege that thousands of

---

[4] The "Officer Defendants" are Jones, Pearson, Strah, Taylor, Dowling, Chack, Pine, Reffner, Vespoli, Judge, and Schneider. (Id. ¶¶ 28–39). Plaintiffs have clarified that Defendant Pine, a FirstEnergy lobbyist, was not in fact an "officer" of the Company but was included in this definition "for ease of reference." (ECF No. 176 at 71 n.23).
[5] The "Director Defendants" are Addison, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Smart, Thornton, and Turner. (ECF No. 72 ¶ 281)
[6] The "Underwriter Defendants" are Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc., and MUFG Securities Americas Inc. (Id. ¶ 283).

investors acquired and sold millions of shares of FirstEnergy common stock and Notes during the Class Period and were injured in the same way by Defendants' fraudulent scheme and violations of federal securities laws.

## II.     STANDARD OF REVIEW

Plaintiffs seek certification of the putative class under Federal Rules of Civil Procedure 23(a) and 23(b)(3). A plaintiff seeking class certification bears the burden of establishing compliance with all four requirements of Rule 23(a), referred to by the shorthand of "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy." Fed. R. Civ. P. 23(a); *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003). In ruling on a motion for class certification, a district court should not consider the merits of the plaintiffs' claims, but may consider evidence outside of the pleadings to determine whether the prerequisites of Rule 23 are met. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). That said, on occasion, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *see Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982), and "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims." *Wal-Mart Store, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). A court, however, should not conduct free-ranging merits inquiries at this stage, but may consider the merits only to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

In addition, under Rule 23(b)(3), class certification is appropriate if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (referred to by the shorthand of "predominance and superiority"). Additionally, even though Rule 23 has no express ascertainability requirement, many courts, including the Sixth Circuit, have held that it is implicitly required for class certification. *Cole v. Memphis*, 839 F.3d 530, 541 (6th Cir. 2016); *see also Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013). Ascertainability is met where the "class description [is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Cole*, 839 F.3d at 541 (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)).

## III. LAW AND ANALYSIS

### A. Class Certification – Rule 23(a)

A plaintiff seeking class certification bears the burden of establishing compliance with all four requirements of Rule 23(a): "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy." Fed. R. Civ. P. 23(a). This Court considers whether Plaintiffs satisfy each requirement in turn.

#### 1. *Numerosity*

##### a. *Plaintiffs' Arguments*

Plaintiffs argue that the putative class is sufficiently numerous to establish that joinder would be impracticable. Reasoning that numerosity is usually assumed to have been met in class action suits involving nationally-traded securities, Plaintiffs detail the expanse of FirstEnergy's trading activity to argue that they satisfy this factor. Plaintiffs argue that the following factors support numerosity: (1) FirstEnergy's stock was actively traded on the New York Stock Exchange (NYSE) to the tune of 540 million shares that were outstanding as of January 31, 2020; (2) FirstEnergy's average weekly trading volume of stock was approximately 21.7 million

shares, or 4.4% of the 496.4 million shares outstanding; and (3) FirstEnergy Notes totaled over $6.5 billion and were actively traded by investors during the Class Period. Given the volume of trading, Plaintiffs argue, this Court could conclude reasonably that thousands of geographically-dispersed individuals purchased or acquired securities during the Class Period and that joinder of all Class members is impracticable. Indeed, Plaintiffs argue, their expert reports reveal that at least 1,400 large institutional investors reported owning the securities during the class period.

Plaintiffs assert that Defendants only challenge the numerosity prong with respect to the Notes, conceding that numerosity is satisfied with respect to FirstEnergy stock. Plaintiffs argue that the Sixth Circuit typically holds a class of 40 or more members to be sufficient to meet numerosity; therefore, this Court should find numerosity satisfied based on the outstanding value of the Notes alone. According to Plaintiffs, none of the Defendants deny that the Notes were actively traded. Lastly, Plaintiffs maintain that Defendants' contention that Plaintiffs must show that numerosity exists for *each* Note at issue is incorrect.

### b. Defendants' Arguments

Defendants argue that Plaintiffs have not demonstrated numerosity as to the FirstEnergy Notes. Defendants contend that the proposed class groups improperly all purchasers of FirstEnergy common stock and of the eight separate Notes—but the securities are different, as are the claims, defendants, and defenses. Because the elements of the Securities Act claims brought by the Notes purchasers are distinct from those of the Exchange Act claims brought by the stock purchasers, Defendants argue, Plaintiffs should have presented subclasses of Notes purchasers to the Court. Defendants argue that Plaintiffs are required to demonstrate the existence of numerosity on a non-speculative basis, and that courts may not infer numerosity for the Notes simply from the number in the larger pool of securities holders. In sum, Defendants

argue, Plaintiffs contend impermissibly that the volume of trading justifies the inference that thousands of individuals purchased FirstEnergy bonds during the Class Period. Defendants also contest Plaintiffs' reliance on an expert report stating that "at least 1,400 large institutional investors reported owning FirstEnergy securities during the class period," because all of these investors were holders of common stock.

### c.   The Court's Analysis

To prove numerosity, Plaintiffs must demonstrate that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Whether numerosity is satisfied in each case is a fact-specific inquiry which "imposes no absolute limitations." *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 644 (S.D. Ohio 2017) (quoting *Gen. Tel. Co. of the Nw., Inc., v. EEOC*, 446 U.S. 318, 330 (1980)). "When class size reaches substantial proportions, however, the numerosity requirement is usually satisfied by the numbers alone." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 442 (S.D. Ohio 2009). "The numerosity requirement is generally assumed to have been met in class action suits involving nationally traded securities." *Id.* (collecting cases). However, the size of a proposed class may not be "purely speculative." *O'Neil v. Appel*, 165 F.R.D. 479, 489 (W.D. Mich. 1996).

Even assuming the validity of Defendants' contention that numerosity must be shown for *each* of the Notes and the common stock, this Court nonetheless finds that Plaintiffs have satisfied the numerosity requirement. Plaintiffs submit that FirstEnergy stock was listed and actively traded on the New York Stock Exchange ("NYSE"), with more than 540 million shares outstanding as of January 31, 2020. (ECF No. 72 ¶ 254) (citing Expert Report of Scott W. Dalrymple, hereinafter "Dalrymple Report," ECF No. 293-7 ¶ 14, 40). Plaintiffs attest that the average weekly trading volume of the FirstEnergy stock approximated 21.7 million shares. (ECF

No. 293-1 at 8–9) (citing Dalrymple Report ¶ 45). Plaintiffs also submit that the total outstanding par value of the Notes alone totaled over $6.5 billion and were actively traded during the Class Period. (ECF No. 293-1 at 9, 25) (citing Expert Report of Cynthia Jones, hereinafter "Jones Report," ECF No. 293-8 ¶¶ 25, 41–45, 59). Defendants do not contest the accuracy of Plaintiffs' submissions; they simply argue that Plaintiffs nonetheless fail to demonstrate numerosity. Considering Plaintiffs' evidence that the stock was owned by roughly 1,400 large institutional investors, had an average weekly trading value exceeding 21.7 million shares, and was traded on the NYSE during the Class Period, however, Plaintiffs demonstrate numerosity with respect to the stock. *See, e.g., Big Lots, Inc.*, 242 F. Supp. 3d at 644 (finding numerosity where the plaintiffs submitted evidence that, during the Class Period, the defendants' stock was traded on the NYSE during the Class Period, had an average daily trading volume in excess of 1.5 million shares, and was owned in part by about 450 large institutional investors); *Ross*, 257 F.R.D. at 442 (finding numerosity satisfied given that the defendants' stock traded on the NYSE, had a daily trading volume of roughly 1.8 million shares, and had roughly 86 million to 99 million shares outstanding as of the dates the company filed its annual reports with the SEC during relevant years).

With respect to the Notes, this Court likewise finds sufficient that the total outstanding par value of the Notes during the Class Period was $6.5 billion, with each outstanding Note issuance ranging from $300 million to $1.5 billion. (ECF No. 346 at 5). The Court thus finds Plaintiffs' evidence of nationally traded securities sufficient to satisfy numerosity. *See Ross*, 257 F.R.D. at 442.

## 2. Commonality

### a. Parties' Arguments

Plaintiffs assert that this case presents several common questions of law and fact sufficient to satisfy the commonality requirement of Rule 23(a)(2). Plaintiffs contend that the allegations in their Complaint raise several common questions, including whether: (1) Defendants made materially false or misleading statements or material omissions to investors, or engaged in a fraudulent scheme; (2) Defendants' misstatements and omissions and fraudulent scheme caused damages to the putative class members; and (3) FirstEnergy violated the relevant federal securities laws. Plaintiffs argue that the putative class will depend on common proof to answer these critical questions and establish the related claims. Defendants do not submit argument contesting the existence of commonality under Rule 23(a)(2).

### b. The Court's Analysis

The second criterion of Rule 23(a) requires that the case present issues of law or fact common to the class. "[T]here need only be one question common to the class, [but] that question must be a 'common issue the resolution of which will advance the litigation.'" *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003) (quoting *Sprague v. GMC*, 133 F.3d 388, 397 (6th Cir. 1998)). As explained by the Sixth Circuit, "named plaintiffs must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015). The interests and claims of the various plaintiffs need not be identical, however, because "the commonality test is met where at least one issue whose resolution will affect all or a significant number of the putative class members." *Amos v. PPG Indus., Inc.*, No. 2:05-cv-70, 2018 WL 5259579, at *5 (S.D. Ohio Jan. 5, 2018).

Plaintiffs' central allegation in this case is that Defendants made materially false or misleading statements and omissions to investors concerning the fraudulent scheme in violation of federal securities law. The misconduct, Plaintiffs allege, caused the putative class members to suffer harm. Within that allegation are numerous questions common to the class which must be resolved to give rise to liability, including whether Defendants indeed made material statements and omissions relating to the FirstEnergy scandal, whether Defendants violated federal securities laws, and whether Plaintiffs were injured because of the alleged misconduct. The resolution of any of these questions will advance the litigation by demonstrating the existence or absence of liability for Defendants. Given that the commonality prong of Rule 23(a) requires only that the resolution of just one issue will affect all or a substantial swath of the putative class, *see id.*, this Court finds that it is satisfied here by Plaintiffs.

### 3. *Typicality*

#### a. *Parties' Arguments*

Plaintiffs argue that both their and the putative class members' claims stem from the same course of conduct and rely on the same legal theory. Plaintiffs contend this "typical" claim is that Defendants concealed FirstEnergy's fraudulent scheme. This concealment allegedly caused the artificial inflation of the trading prices of FirstEnergy's securities during the Class Period, causing injury to investors when the truth of the scheme was revealed. In other words, Plaintiffs argue, proving their claims will simultaneously prove the putative class's claims. Defendants do not submit argument contesting the existence of typicality under Rule 23(a)(3).

#### b. *The Court's Analysis*

Under Rule 23(a)(3), the "claims or defenses of the representative parties" must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Although they are

separate and distinct requirements, commonality and typicality 'tend to merge' and are often discussed together." *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 185 (S.D. Ohio 2012) (quoting *Falcon*, 457 U.S. at 157 n.13). A class representative's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and the claims are based on the same legal theory." *Myers v. Marietta Mem'l Hosp.*, No. 2:15-CV-2956, 2017 WL 3977956, at *7 (S.D. Ohio Sept. 11, 2017) (Marbley, J.) (quoting *Swigart*, 288 F.R.D. at 185). "Typical does not mean identical, and the typicality requirement is liberally construed." *Id.*

Here, Plaintiffs argue that their claims and those of the putative class members derive from the same course of conduct and rely on the same legal theory alleged against Defendants. Plaintiffs allege that they were all similarly injured by purchasing securities impacted by artificial inflation caused by Defendants' concealment of FirstEnergy's fraud. In the same fashion that Plaintiffs satisfy the commonality requirement, they meet the typicality requirement. *See id.* at *7 (finding that the plaintiffs met the typicality requirement just as they met the commonality requirement where plaintiffs alleged that they were all subject to the same problematic policies and practices "of not receiving lunch breaks, of being told not to clock out no lunch, and of not being paid for all hours worked.").

### 4. Adequacy

#### a. Plaintiffs' Arguments

Plaintiffs argue that they satisfy both prongs necessary to demonstrate adequacy under Rule 23(a)(4), which requires: (1) that representatives have interests co-extensive with those of the unnamed class members; and (2) that it appears that the class representatives will vigorously prosecute the class's interests. Fed. R. Civ. P. 23(a)(4).

Concerning the first prong, Plaintiffs argue that its satisfaction of the typicality and commonality elements weigh in favor of showing the presence of co-extensive interests here. Further, Plaintiffs contend, each proposed class representative is an institutional investor that was damaged by acquiring FirstEnergy securities at artificially inflated prices. Plaintiffs thus argue that their interests are aligned with the absent class members who were injured similarly and likewise seek redress for Defendants' misdeeds.

Concerning the second prong, Plaintiffs argue that they have demonstrated their adequacy to prosecute the putative class's interests given their extensive involvement in this matter. Namely, Plaintiffs argue that they have engaged in the following, indicative of their vigorous prosecution of this matter: defeated Defendants' ten combined Motions to Dismiss; submitted sworn declarations to the Court attesting to their commitment to this case, reviewed extensive case documents; actively participated in discovery; and engaged in depositions.

Plaintiffs also submit that they have selected adequate counsel in Robbins Geller Rudman & Dowd LLP, noting the firm's successful representation of class actions in district courts throughout the country. According to Plaintiffs, the firm's successful representation includes a securities action that it litigated against FirstEnergy in the Northern District of Ohio.

Plaintiffs dispute Defendants' contentions that they are inadequate representatives for the putative class. First, Plaintiffs dismiss as out-of-context Defendants' citations to Plaintiffs' occasional scheduling issues throughout the litigation for the proposition that they are undevoted to the case. Further, Plaintiffs argue that Defendants improperly attack Plaintiffs using the Fifth Circuit's heightened adequacy standards, which courts in this circuit have refused to apply. Instead, Plaintiffs argue, courts in this circuit focus only on the "the adequacy of plaintiff's counsel and whether plaintiff has a conflicting interest, not the personal qualifications of the

21

named plaintiff." (ECF No. 346 at 10) (quoting *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *8 (E.D. Mich. Nov. 19, 2020).

Plaintiffs contest Defendants' key argument that they cannot represent purchasers of the 337932AC1 and 337932AK3 Notes because they did not purchase those Notes. Plaintiffs argue that the relevant test focuses not on the characteristics of the security at issue, but whether the securities holders have all suffered an injury from the same conduct committed by the Defendants. (*Id.* at 17) (citing *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1164 (N.D. Ohio 2013)). And here, Plaintiffs argue, the claims of purchasers of the 337932AC1 and 337932AK3 Notes are similarly based on the Exchange Act Defendants' alleged misconduct, omissions, and misrepresentations during the Class Period. According to Plaintiffs, Defendants do not suggest otherwise, nor specify any unique characteristic of the Notes that would distinguish Plaintiffs' §10(b) claims from those of the other §10(b) claimants.

### b. Defendants' Arguments

Defendants argue that Plaintiffs have not proven that they would be adequate class representatives. With respect to the first prong, Defendants argue that Plaintiffs cannot represent shareholders of the 337932AC1 and 337932AK3 Notes because they did not purchase those. Defendants contend that Plaintiffs must have purchased each of the eight Notes represented by the putative class. On the second prong, Defendants argue that Plaintiffs have failed vigorously to prosecute this litigation. Defendants point to Plaintiffs' alleged oversights in responding to interrogatories and lack of availability for a deposition, causing delays in the class certification briefing schedule. In essence, Defendants argue that the Plaintiffs have merely lent their names to class counsel and then abdicated responsibility for the prosecution.

*c.  The Court's Analysis*

To establish adequacy, Plaintiffs must show that they, as "the representative parties[,] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "calls for a two-pronged inquiry: (1) the representatives must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Swigart*, 288 F.R.D. at 185–86 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)). With respect to the first prong, the Court must be satisfied that "the class members have interests that are not antagonistic to one another." *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). With respect to the second prong, the Court must be satisfied that "class counsel are qualified, experienced and generally able to conduct the litigation." *Id.*

This Court finds that the first prong is satisfied for much the same reason that Plaintiffs demonstrated commonality and typicality: Plaintiffs allege that they have suffered and seek redress for the same injuries caused by the same alleged conduct as the putative class members. *See In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1083 (6th Cir. 1996) (explaining that "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members."). In other words, "both [Plaintiffs] and the other class members seek to recover their losses in connection with Defendants' alleged conduct"; as such, "[t]here is nothing to indicate that the class representative[s] would not vigorously prosecute the interests of the class." *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *7 (N.D. Ohio May 12, 2004). Defendants' contention that Plaintiffs cannot represent some of the

23

purchasers is unavailing in the absence of any argument that Plaintiffs' interests diverge from those of the putative class members. *See Stout*, 228 F.3d at 717.

This Court likewise finds that Plaintiffs have met their burden of showing that, under the second prong, class counsel are qualified and able to conduct the litigation. Plaintiffs have retained as lead counsel the firm Robbins Geller Rudman & Dowd LLP, which has been found sufficiently experienced by other courts in this circuit for the purposes of the adequacy analysis. *See e.g., Dougherty*, 2020 WL 6793326, at *8 (describing Robbins Geller as a firm of qualified counsel given its "significant collective experience in class action litigation."); *Big Lots, Inc.*, 242 F. Supp. 3d at 650 (describing Robbins Geller as "qualified, experienced, and generally able to conduct the litigation.").

The crux of Defendants' argument is not that counsel is unqualified, however, but that Plaintiffs have failed vigorously to prosecute this action. In support of their argument, Defendants trot out the following alleged missteps: Plaintiffs failed to verify their interrogatory responses until mere days before their depositions; a witness for Plaintiff Amalgamated Bank responded with uncertainty to defense counsel's inquiry as to whether the Bank understood fully the contours of this case; and Plaintiff Amalgamated Bank took a nearly a month to provide a date to Defendants for its deposition. Defendants also point to cherry-picked quotes from various 30(b)(6) witnesses provided by the Plaintiffs to support their argument. This Court notes that several of Defendants' examples lack proper context. Even assuming the accuracy of Defendants' accounts of Plaintiffs' alleged missteps, however, Plaintiffs' participation "is [not] so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Ross*, 257 F.R.D. at 451 (quoting *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 615 (S.D. Ohio 2003)). Even if Plaintiffs were deficient to some minor degree, this would not necessarily

preclude a finding of adequacy. *See, e.g., Dougherty*, 2020 WL 6793326, at *8 (finding the adequacy requirement satisfied given the plaintiffs' active involvement in reviewing case documents, communicating with class counsel, and participating in discovery, notwithstanding minor missteps such as being unaware of the name of their expert).

Put differently, "[t]o satisfy the adequacy test, the named representative of a class need only be adequate and need not be the best of all possible plaintiffs." *Ballan v. UpJohn, Co.*, 159 F.R.D. 473, 482 (E.D. Mich. 1994). In this case, Plaintiffs have reviewed case documents, consistently engaged in coordination with class counsel, moved to consolidate the cases, defended against ten motions to dismiss, engaged actively in the discovery process, and remained consistently involved throughout this complex matter. Considering these facts, this Court is satisfied that Plaintiffs satisfy the adequacy prong.

### 5. Ascertainability

Although the parties do not brief the element of ascertainability, this Court briefly passes on this element. While Rule 23(a) does not contain an express requirement of ascertainability, the Sixth Circuit has held it to be an "implicit requirement" of class certification. *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016). The determination that a class is ascertainable "requires only the existence of objective criteria upon which class membership is based." *McNamee v. Nationstar Mortg., LLC*, No. 2:14-cv-1948, 2018 WL 1557244, at *4 (S.D. Ohio, Mar. 30, 2018) (citing *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538–39 (6th Cir. 2012)). A previous ruling by this Court provides an instructive example:

> To illustrate the difference between ascertainability and susceptibility to individualized inquiry, consider, for example, a class defined as "all people in the State of Ohio who currently have a pint of mint chocolate chip ice cream in the freezer." Such a class is certainly ascertainable: every Ohioan either is a class member, or she is not. The inquiry is an objective one.

*McNamee*, 2018 WL 1557244, at *4. In essence, the ascertainability requirement necessitates "a class description [that is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Cole*, 839 F.3d at 541.

Given the record and Plaintiffs' representations at oral argument, this Court is satisfied that Plaintiffs' defined class is sufficiently definite. This Court finds it administratively feasible to determine objectively whether a person "purchased or otherwise acquired FirstEnergy Securities during the period from February 21, 2017[,] through July 21, 2020, inclusive." (ECF No. 293-1 at 9–10). As such, this Court deems the ascertainability requirement to be satisfied.

**B. Class Certification – Rule 23(b)(3)**

Because Plaintiffs seek to certify this class under Rule 23(b)(3), this Court must assess whether: (1) questions of law or fact common to members of the class predominate over questions affecting individual members; and (2) the class action is a superior method to others for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

*1. Predominance*

Plaintiffs bring claims under Sections 11, 12(a)(2), and 15 of the Securities Act, as well as claims under Sections 10(b) and 20(a) of the Exchange Act. To obtain class certification, Plaintiffs must show that common questions of fact or law predominate over individual questions. Fed. R. Civ. P. 23(b)(3). The Sixth Circuit has observed that, "[t]o satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124–25 (6th Cir. 2016) (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007). "In securities class action cases, the

crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014).

Here, Plaintiffs argue that common factual and legal questions subject to generalized proof and applicable to the class predominate over those issues subject only to individualized proof. Parties argue whether Plaintiffs establish predominance with respect to both their Securities Act claims and their Exchange Act claims. This Court thus considers each set of claims in turn.

### a. Securities Act Claims

Plaintiffs allege that Defendants violated §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), §§ 11, 12, 15 U.S.C. §§ 77k, 77l(a)(2). As explained by the Sixth Circuit, "Sections 11 and 12 both impose a duty to disclose additional facts when a statement of material fact made by the issuer is misleading, and they both impose liability for failing to fulfill that duty of disclosure, as well as for misstating a material fact." 15 U.S.C. § 77k; 15 U.S.C. § 77l(a)(2); *J & R Mktg., SEP v. General Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008). Section 15 of the Act "provides secondary liability for persons who control others and attaches only on the corporation being found liable under Section 11 or 12." 15 U.S.C. § 77o; *Franchi v. SmileDirectClub, Inc.*, No. 3:19-CV-00962, 2022 WL 4594575, at *5 (M.D. Tenn. Sept. 30, 2022) (internal quotations omitted).

### i. Plaintiffs' Arguments

Plaintiffs argue that the Securities Act Defendants' liability will be established through common evidence. For example, putative class members must demonstrate that FirstEnergy's registration statements contained untrue statements and omissions of material fact. Plaintiffs further argue that the per-share damages models used by their experts in calculating the

classwide Securities Act damages (the "Jones Report," ECF No. 293-8; the "Dalrymple Report," ECF No. 293-7) are generally applicable and consistent with the statutory formulas prescribed by §§11 and 12(a)(2) of the Securities Act of 1933, and standard in Securities Act cases. Plaintiffs rely chiefly upon two cases to contend that courts routinely hold that individual damages questions do not predominate in circumstances where statutory formulas are applicable: *Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2022 WL 4129703 (E.D. Tenn. July 12, 2022), and *Gaynor v. Miller*, No. 3:15-CV-545-TAV-DCP, 2018 WL 3751606 (E.D. Tenn. Aug. 6, 2018). Plaintiffs argue that they have demonstrated, through the damages models, that damages for the Notes are capable of measurement on a classwide basis—the only question Defendants contend could predominate over common questions with respect to these claims. Plaintiffs argue that Defendants' contention that the damages models must address "time-varying inflation" has been rejected by most courts to consider the issue. Further, Plaintiffs contend, Defendants' time-varying inflation argument fails because Plaintiffs' allegations merely concern artificial inflation in FirstEnergy's securities caused by the Defendants' failure to disclose—not that the artificial inflation varied over time.

In sum, Plaintiffs argue that they only need to show that damages can be measured on a classwide basis. Plaintiffs claim that they are not required to identify specifically the final valuation tools to be employed in connection with their event study methodologies. According to Plaintiffs, Defendants' primary authority for their position, *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ("OPERS"), has been repeatedly rejected or distinguished by federal courts around the country.

## ii. Defendants' arguments

Defendants argue that Plaintiffs' statutory formulas fail to comport with *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013), which requires that a purported damages model measure only the damages attributable to Plaintiffs' theory of liability. Defendants contend that Plaintiffs must prove that the existence of a scientifically valid method that can determine damages attributable to their theory of liability on a classwide basis. Defendants argue that Plaintiffs' burden is not satisfied by their reliance upon a statutory remedy. Defendants argue that nothing in the discussions of damages methodologies included in the Jones Report and the Dalrymple Report is tailored to the allegations in this case or to Plaintiffs' theory of liability. Defendants assert that this case is thus like *OPERS*, in which the court denied class certification because the plaintiff's expert's damages methodology was determined to be too "vague, indefinite, and unspecific" to warrant class certification. (ECF No. 327 at 24–26). Further, Defendants assert that Plaintiffs fail to identify whether they would use the model in the Jones Report or the Dalrymple Report to calculate damages. Defendants thus contend that Plaintiffs' suggested models cannot survive the rigorous analysis that Rule 23(b)(3) mandates. Defendants lastly contend that Plaintiffs' damages methodologies fail to show how they would provide a reliable estimate of inflation consistent with their theories of liability.[7]

## iii. The Court's Analysis

As the Supreme Court instructed, "[c]onsidering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804, 810 (2011).

---

[7] Defendants contend that the time-varying nature of inflation is crucial because, to calculate damages, one must determine the price "inflation" (if any) directly caused by the alleged misstatements on every single day of the proposed class period.

Claims under Sections 11 and 12(a)(2) have been described as "Securities Act siblings with roughly parallel elements." *Sohol v. Yan*, No. 1:15-CV-00393, 2016 WL 1704290, at *6 (N.D. Ohio Apr. 27, 2016) (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)). Therefore, "so long as a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, the general rule is that an issuer's liability . . . is absolute." *Id.* (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011)).

To state a claim for relief under Section 11, Plaintiffs must demonstrate that: "(1) [Plaintiffs] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 704 (S.D. Ohio 2010) (quoting *Morgan Stanley*, 592 F.3d at 360). Similarly, a claimant under Section 12(a)(2) must demonstrate that: "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." *Id.* (quoting *Morgan Stanley*, 592 F.3d at 359). "[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, plaintiffs bringing claims

under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." *Sohol v. Yan*, 2016 WL 1704290, at *6 (quoting *Morgan Stanley*, 592 F.3d at 359).

Defendants' liability with respect to Plaintiffs' Securities Act claims hinge on the common questions of whether FirstEnergy's registration statements contained untrue statements and omissions of material fact. The crux of Defendants' opposition, however, is that Plaintiffs failed to present evidence of a class-wide method to demonstrate damages consistent with their theory of liability. In essence, Defendants take issue with Plaintiffs' contention that they may use a statutory formula to prove classwide damages.

In the Jones Report, Plaintiffs submit the per-share damages model that they propose to use to calculate the classwide Securities Act damages. (Jones Report ¶¶ 107–113). Plaintiffs contend that the formula is consistent with the formulas prescribed by §§11 and 12(a)(2) and is standard in Securities Act cases. Namely, with respect to the §11 claims, Plaintiffs submit that the statutory method boils down to the following formula: (1) the price paid in the offering, minus either (2) the value of the security at the time of the lawsuit if still held; or (3) the sale price if the security is sold prior to the lawsuit; or (4) the sale price or the value of the security at the time of the lawsuit, whichever is greater. (Jones Report ¶ 109). Plaintiffs then apply the statutory measure to the case-specific manner in which they propose to calculate damages for purchasers of the Notes from the February 2020 and June 2020 Offerings. (*See id.* ¶¶ 110–111). Plaintiffs do the same with respect to the §12(a)(2) claims. (*See id.* ¶ 112). The Jones Report concludes that "damages sustained by purchasers of FirstEnergy's Senior Notes during the Class Period under §§ 10(b), 11, and 12(a)(2) can be calculated using a common damages methodology and can be applied on a classwide basis." (*Id.* ¶ 113). The Dalrymple Report also sets forth its complementary model based on the statutory formula. (*See* 293-7 ¶ 103–109).

Defendants do not identify any material issue with the damages models aside from their contention that the models, based upon a statutory formula, are too generic to prove classwide damages. Contrary to Defendants' contention, no caselaw binding upon this court holds that the application of a statutory formula is insufficient to demonstrate that common questions predominate here. *OPERS*, upon which Defendants rely, is readily distinguishable from this case because the defense expert there testified that a class-wide damages model could not be constructed at all. *Ohio Pub. Emps.*, 2018 WL 3861840, at *19. Further, the Court viewed with suspicion the fact that the plaintiff's expert there used only one event date. *Id.* at *3–4. In this case, Defendants' expert at most indicates disagreement with Plaintiffs' proposed models.

At any rate, Defendants' position that Plaintiffs cannot rely upon a statutory formula is contradicted by the decisions of fellow courts to consider the issue. As a fellow court within this circuit noted, "*Comcast* does not bar certification . . . where Section 11(e) of the Securities Act provides a statutory formula for damages." *Gaynor v. Miller*, No. 3:15-CV-545-TAV-DCP, 2018 WL 3751606, at *18 (E.D. Tenn. Aug. 6, 2018) (quoting *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015)). Instead, where "the statutory formula applies, the individual damages questions are sufficiently reduced that predominance of the common questions, answers, and fact remains." *Id.* (quoting *Facebook, Inc*., 312 F.R.D. at 350). Given that Plaintiffs also submit a damages model for § 12(a)(2) that aligns with the statute's remedies definition, this Court sees no reason why similar logic does not also apply to that set of claims. As the court in *New Jersey Carpenters Health Fund* recognized, "[w]hile *Comcast* requires that 'any model supporting a plaintiff's damages case must be consistent with its liability case,' . . . it is inapposite here, where damages reflect liability by statutory formula." *New Jersey Carpenters Health Fund v. Residential Cap., LLC*, No. 08 CV 5093 HB, 2013 WL 6839093, at

32

*5 (S.D.N.Y. Dec. 27, 2013) (citations omitted). Concerning Defendants' argument that Plaintiffs fail to identify which damages model they would use, this Court notes that the models are complementary.

Thus, predominance is satisfied with respect to Plaintiffs' Securities Act claims.

### b.  Exchange Act Claims

### i.  Plaintiffs' Arguments

Plaintiffs argue that the elements of liability, scienter, connection, and loss causation would be addressed for the putative class members by the resolution of such central issues as whether the Exchange Act Defendants knowingly and/or recklessly made public material misstatements and/or omissions and whether the exposure of FirstEnergy's fraudulent scheme proximately caused the FirstEnergy securities' decline in value. These inquiries, Plaintiffs argue, involve common questions which predominate over individualized ones. With respect to the element of economic loss, Plaintiffs contend that their expert reports set forth a proposed damages methodology that can calculate classwide damages. This Court's determination that Plaintiffs' proposed damages methodology is adequate with respect to Plaintiffs' Securities Act claims remains true for these claims. *See supra* Section III.B.1.iii.

Plaintiffs focus their argument on contending that they are entitled to a presumption of classwide reliance under either *Affiliated Ute Citizens of Utah v. United State*s, 406 U.S. 128 (1972), or *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Plaintiffs explain that *Affiliated Ute* applies a presumption of classwide reliance in cases involving an omission of material fact by one with a duty to disclose. On the other hand, Plaintiffs state, *Basic*[8] applies the presumption to cases in which the statements at issue become public and the public information is reflected in the market price of the security.

---

[8] Plaintiffs also refer to *Basic*'s presumption as the "fraud-on-the-market" presumption of reliance.

Plaintiffs first argue that they are entitled to a presumption of reliance under *Affiliated Ute* (the "*Affiliated Ute* presumption"). Plaintiffs argue that all that they must offer to invoke the *Affiliated Ute* presumption is to show that the facts which Defendants allegedly withheld are material such that a reasonable investor might have considered them important in making his decision. But, Plaintiffs qualify, materiality need not be proven at this stage. Plaintiffs assert that their §10(b) claims chiefly allege that Exchange Act Defendants omitted material information by failing to disclose the FirstEnergy scheme or its risks to investors. As such, Plaintiffs contend that both *Affiliated Ute* and *Basic* apply here.

Plaintiffs argue that Defendants' misstatements are closer to omissions than affirmatively misleading statements (to which *Basic* would apply). According to Plaintiffs, the harm of Exchange Act Defendants' assertions regarding their compliance with the relevant laws and regulations were that the problematic statements were "less than a full and fair disclosure of the facts actually known to the Company." (ECF No. 293-1 at 18). Nonetheless, Plaintiffs contend that most courts to consider the issue have found *Affiliated Ute* applicable even where the complaint alleges that *some* alleged misstatements were made.

Plaintiffs argue in the alternative that they are also entitled to *Basic*'s fraud-on-the-market presumption of reliance. Plaintiffs contend that Defendants concede their entitlement to the *Basic* presumption for FirstEnergy common stock. Plaintiffs argue that the four elements that must be met to invoke the *Basic* presumption are demonstrated here with respect to both the Notes as well. First, Plaintiffs contend, Defendants made public material misrepresentations in their omissions, earnings calls, media articles, and documents filed with the SEC. Second, Plaintiffs contend that materiality is not a prerequisite to class certification at this stage. Third, Plaintiffs contend that they purchased FirstEnergy securities during the Class Period and as such traded

stock between the time that the misrepresentations were made and when the fraud was revealed. Fourth, Plaintiffs argue that their evidence demonstrates that the stock at issue traded in an efficient market, as demonstrated by their satisfaction of the five-factor analysis articulated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989). Plaintiffs argue that courts in this circuit rely on *Cammer* to assess market efficiency. In the alternative, Plaintiffs argue that they also satisfy the factors articulated in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001), to assess market efficiency.

Under *Cammer*, Plaintiffs make the following arguments to demonstrate that FirstEnergy's securities traded in an efficient market during the Class Period: (1) the average weekly trading volume for FirstEnergy with respect to shares was 21.7 million, and with respect to Notes ranged from 6.3–27.2 million with an average 1.9% turnover, supporting a strong presumption of an efficient market for FirstEnergy securities; (2) 20 financial analysts published over 400 reports on FirstEnergy, with all three major ratings agencies rating the Notes; (3) FirstEnergy stock was traded on the New York Stock Exchange ("NYSE"), had access to a highly developed network of brokers and an NYSE "Designated Market Maker," and boasted 16 underwriters and at least 11 market makers who made a market for FirstEnergy stock; (4) FirstEnergy was eligible to file S-3 registration statement in assessing market efficiency; and (5) Plaintiffs' experts performed event studies for FirstEnergy's common stock and the Notes, identifying a cause-and-effect relationship between the release of new, company specific information and movement in FirstEnergy's securities prices and trading volume.

Under *Krogman*, Plaintiffs make the following arguments to demonstrate that the securities traded in an efficient market during the Class Period: (1) FirstEnergy had a large market capitalization ($12.5–28.3 billion) larger than more than 80% of all companies trading on

NYSE and Nasdaq, exceeding the market cap found by other courts to support market efficiency; (2) there was a narrow bid-ask spread for FirstEnergy securities of 0.03% for common stock and 0.23-0.51% for Notes; and (3) the average float of FirstEnergy's common stock was over 99% of shares outstanding, with the Notes being widely held by several sophisticated investors.

Specific to the Dowling and Reffner Defendants (collectively, the "Non-Speaking Defendants"), Plaintiffs argue that this Court's prior holding that the direct causal chain of FirstEnergy's fraud "supports reliance, even for the non-speaking Defendants" remains controlling. (ECF No. 346 at 49–50) (quoting ECF No. 219 at 53, 55).

### ii. Defendants' Arguments

Defendants argue that Plaintiffs failed to show their entitlement to a presumption of reliance under either *Affiliated Ute* or *Basic* because: (1) *Affiliated Ute* only creates the presumption for omissions-based allegations while Plaintiffs' allegations are grounded in affirmative misrepresentations; and (2) Plaintiffs' expert reports are unreliable for the purposes of showing, under *Basic*, that the FirstEnergy Notes traded in an efficient market. Defendants also contend that Plaintiffs cannot rely on both *Affiliated Ute* and *Basic*.

First, Defendants argue that Plaintiffs are not entitled to the *Affiliated Ute* presumption because this is not a primarily omissions-based case. Defendants contend that many circuit courts apply the *Affiliated Ute* presumption only to cases primarily or exclusively involving omissions. (ECF No. 327 at 32 –33) (quoting *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219 (D.C. Cir. 2010) (collecting cases)). Defendants argue that this Court should follow the Tenth Circuit's reasoning that, to find that the mere fact of concealment transforms an otherwise affirmative statement into an omission "would permit the *Affiliated Ute* presumption to swallow

the reliance requirement almost completely." (*Id.*) (citing *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000)).

Second, Defendants argue that Plaintiffs fail to demonstrate, under *Basic*, that the eight Notes at issue were traded in an efficient market. Defendants identify several alleged issues with Plaintiffs' attempt to invoke the *Basic* presumption. Defendants first argue that *Cammer* and *Krogman* apply only to common stock—not bonds. Defendants next argue that Plaintiffs must prove that *each* of the eight Notes traded in an efficient market, instead of treating the bonds as a single unit. Next, Defendants contend, Plaintiffs must, but do not, establish market efficiency across the *entire proposed class period* to certify a class spanning that whole period. Defendants argue that this is problematic for Plaintiffs because the period that the Jones Report analyzed varied on an *ad hoc* basis for the purposes of demonstrating the satisfaction of the *Cammer* and *Krogman* factors. Last, Defendants contend that Plaintiffs cannot show the existence of a cause-and-effect relationship between new information entering the market and price changes for FirstEnergy securities.

Defendants also identify a litany of concerns with Plaintiffs' evidence offered in support of the fourth *Basic* factor. These include arguments that the Jones Report failed to show market efficiency under *Cammer* for the following reasons: it used arbitrary dates for its event study; it failed to show that market analysts provided coverage of the Notes specifically; and it failed to show that there are market makers and arbitrageurs for the Notes. Defendants also argue that Plaintiffs fail to show market efficiency under *Krogman* for the following reasons: Market capitalization only applies to common stock, and the Jones Report says nothing about the impact of a bond's par value on the market-efficiency analysis; the Jones Report's analysis of bid-ask spreads for the bonds used arbitrary and subjective dates in its analysis; and public float is

37

irrelevant to bonds, with no authority showing that bond ownership by institutional investors establishes market efficiency.

The Dowling Defendants add that the *Affiliated Ute* presumption does not apply to them because: (1) it does not apply to claims for scheme liability; and (2) Plaintiffs never alleged that the Dowling Defendants owed Plaintiffs a duty to disclose. The Dowling Defendants argue that this Court previously based their potential liability on their purported *role* in affirmative statements made by FirstEnergy. As such, the Dowling Defendants argue, because *Affiliated Ute* only applies to *omissions*, it cannot apply to the claims against them. The Dowling Defendants also argue that Plaintiffs cannot rely upon *Basic* because they presented no allegations or evidence that the Dowling Defendants made any of the public statements at issue. Citing to *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008), the Dowling Defendants argue that there can be no presumption of reliance when they did not make any public statements.

The Reffner Defendants contend similarly that they were never accused of issuing a public statement upon which Plaintiffs relied. The Reffner Defendants also maintain that they did not owe Plaintiffs a duty to disclose. The Reffner Defendants argue that Plaintiffs' assertions are merely that Reffner and Vespoli's alleged undisclosed deceptive acts—which are never identified specifically—reached the market *indirectly* through FirstEnergy's deceptive public statements. The Reffner Defendants assert that *Stoneridge* expressly disallowed scheme liability claims based on the undisclosed conduct of a secondary actor.

### iii. The Court's Analysis

Plaintiffs' claims under §20(a) of the Exchange Act "require[] a predicate violation of the securities laws or the rules and regulations promulgated thereunder." *Ross v. Abercrombie &*

*Fitch Co.*, 501 F. Supp. 2d 1102, 1119 (S.D. Ohio 2007). As articulated by the Sixth Circuit, Plaintiffs must also prove the following six elements to succeed on their claims under §10(b) of the Exchange Act and SEC Rule 10b-5: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018). Where the Plaintiff alleges scheme liability, however, Defendants must have committed a "deceptive or manipulative act," rather than "a material misrepresentation or omission." *In re Firstenergy Corp.*, No. 2:20-CV-3785, 2022 WL 681320, at *8 (S.D. Ohio Mar. 7, 2022) (Marbley, J.).

"The reliance requirement ensures that there is a causal connection between the defendant's fraud and the plaintiff's injury." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir. 1990). In some circumstances, a plaintiff may satisfy this element by presenting a rebuttable presumption of reliance. *Id.* The Supreme Court in *Affiliated Ute* recognized the availability of a presumption of reliance in cases involving material omissions. 406 U.S. at 153–54. In *Basic*, the Supreme Court additionally recognized the availability of a presumption of reliance in cases in which there has been a fraud on the market. 485 U.S. at 243. More specifically, *Affiliated Ute* applies "when there is an omission of a material fact by one with a duty to disclose." *In re Firstenergy Corp.*, 2022 WL 681320, at *26 (internal quotations omitted). *Basic*, on the other hand, applies "when the statements at issue become public and the public information is reflected in the market price of the security." *Id.* (alterations adopted).

This Court concludes that predominance exists with respect to damages for the same reasons as articulated in the previous section. *See supra* Section III.B.1.a.iii. With respect to the

other §10(b) elements, the relevant inquiry involves common questions which predominate over individualized ones. Namely, this inquiry is whether Defendants knowingly and/or recklessly produced public misstatements and omissions causing an artificial inflation in the prices of FirstEnergy's securities and thus caused injury to Plaintiffs when the prices later declined. Plaintiffs and the putative class members will rely on the same evidence to establish liability with respect to Defendants' alleged fraud and the impact of said fraud upon the securities they purchased. Having found thus, this Court analyzes whether Plaintiffs are entitled to the presumption of reliance. The Non-Speaking Defendants present defenses particular to those parties. Hence, this Court considers separately each set of Defendants' arguments before concluding whether predominance is satisfied with respect to reliance.

### a. Defendants

Defendants at large contest only whether Plaintiffs demonstrate that they are entitled to a presumption of reliance under either *Affiliated Ute* or *Basic*. Defendants' argument that *Affiliated Ute* does not apply is undermined by this Court's prior finding in this case that "[t]he *Affiliated Ute* presumption . . . appears appropriate because the Court has found that Defendants made omissions of material fact." *In re Firstenergy Corp.*, No. 2:20-CV-3785, 2022 WL 681320, at *26 (S.D. Ohio Mar. 7, 2022). To this point, Defendants identify no binding authority which holds that *Affiliated Ute* may be applied only where Plaintiffs' allegations hinge upon mostly or exclusively omissions. To be sure, some courts have held that *Affiliated Ute* applies solely to cases primarily involving omissions. *See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017); *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219 (D.C. Cir. 2010) *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 490 (M.D. Tenn. 2019). At the very

40

least, a significant number of courts to consider the matter have found the *Affiliated Ute* presumption inapplicable to cases primarily involving affirmative misrepresentations. *See In re Interbank*, 629 F.3d at 219–20 (collecting cases).

This Court is persuaded by a fellow district court's reasoning that "the theory behind the *Affiliated Ute* presumption . . . is not undermined simply because a defendant makes misstatements at the same time it omits material information." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014). This Court also finds persuasive the approach of the Third Circuit, applying the *Affiliated Ute* presumption to matters involving "(1) failures to disclose, i.e., 'pure omissions'; and (2) failures to clarify 'true but misleading statements' . . . i.e., 'half-truths, which, although analytically closer to lies than to nondisclosure, are obviously closer to omissions than are pure misrepresentations.'" *See In re Interbank*, 629 F.3d at 219–20 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 202 (3d Cir.1990)).

Proceeding from similar reasoning, several courts within and outside of this circuit have applied *Affiliated Ute* to cases characterized as mixed cases of affirmative misstatements and omissions. *See, e.g., Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2021 WL 1828114, at *6 (E.D. Tenn. May 7, 2021); *Burges v. Bancorpsouth, Inc.*, No. 3:14-CV-1564, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017); *Dodona I, LLC*, 296 F.R.D. at 270. Thus, *Affiliated Ute* would not be necessarily inapplicable even if this case were a mixed case of omissions and misstatements.

This Court nonetheless concludes from a review of the relevant misstatements and omissions from Plaintiffs' Complaint, *see In re Firstenergy Corp.*, 2022 WL 681320, at *9, 12, that the communications at issue are primarily omissions-based. The statements at issue were injurious *because* they represented that FirstEnergy was pursuing various legislative and

regulatory solutions and operating on solid ethical and legal footing while omitting information necessary to qualify or to place into doubt those contentions. The problem with FirstEnergy's communications is that they painted an incomplete picture of the alleged truth of the situation— that the Company's pursuit of "legislative and regulatory solutions," for example, was tainted with *fraud*. Accordingly, the application of *Affiliated Ute* is appropriate here.

Given that the *Affiliated Ute* presumption is appropriate, "all that is necessary" to create a presumption of reliance "is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of th[e] decision to purchase or sell." *In re Firstenergy Corp.*, 2022 WL 681320, at *26 (quoting *Affiliated Ute*, 406 U.S. at 153– 54). As this Court has previously found, the facts that were withheld constitute "omissions of *material* fact." *Id.* (emphasis added). This Court maintains that conclusion for the purposes of the present analysis.

Even if this case involved primarily *misstatements*, Plaintiffs would be entitled to the *Basic* presumption. As a threshold consideration, Defendants cite to no binding precedent holding that Plaintiffs may not engage both the *Basic* and *Affiliated Ute* presumptions simultaneously. Instead, this Court has recognized that this is an unsettled inquiry. *Id*. As such, this Court applies the *Basic* presumption to the extent this case involves misstatements.

As explained by the Sixth Circuit, *Basic*'s fraud-on-the-market presumption "is based on the premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) (quoting *Halliburton Co.*, 573 U.S. at 272) (internal quotations omitted). Thus, "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . .

may be presumed for purposes of a Rule 10b–5 action." *Basic*, 485 U.S. at 247. To invoke the *Basic* presumption, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Big Lots, Inc.*, 242 F. Supp. 3d at 653 (quoting *Halliburton Co.*, 573 U.S. at 277–78).

With respect to the third factor—concerning whether the stock traded in an efficient market—the Sixth Circuit has recognized the usefulness of the five-factor inquiry articulated in *Cammer*:

> (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*Freeman*, 915 F.2d at 199 (citing *Cammer*, 711 F. Supp. at 1286–87).

The parties' debate centers on whether Plaintiffs demonstrate that the stock traded in an efficient market. Although this Court notes Defendants' arguments concerning the differences between the markets for stocks and the markets for bonds, several courts have nonetheless evaluated the efficiency of bond markets using the same factors as used for common stock. *See, e.g., Burns*, 967 F. Supp. 2d at 1155 (collecting cases). This Court accordingly does so here. This Court is satisfied that Plaintiffs demonstrate the presence of market efficiency during the Class Period based on the *Cammer* factors.

With respect to the first factor, Plaintiffs offer evidence that the Notes' average weekly trading volume ranged between 6.3 million to 27.2 million Notes, with a 1.9% average turnover throughout the relevant period. (Jones Report, ¶ 41, 43–44). Specifically, five of the Notes traded at a weekly volume exceeding 2%, two Notes traded at between 1–2%, and one Note traded at 0.4%. (Jones Report, Exhibit 5). The *Cammer* Court recognized a 2% threshold as creating a

presumption of an efficient market. *Cammer*, 711 F.Supp. at 1286. It also recognized, however, that "one percent would justify a strong presumption." *Id*. Here, only one Note fell below the 1% threshold. Given the high trading volumes of the other seven bonds, however, this Court finds that these figures warrant a justifiable presumption that this factor is satisfied with respect to them all. *See, e.g., Burns*, 967 Supp. at 1161–62 (finding that the bonds' average weekly trading volumes satisfied the first factor with respect to all nine bonds where eight of the bonds at issue had volumes of at least 2%, but one bond traded at only 1%).

Concerning the second factor, Plaintiffs produce evidence that the Notes were rated by S&P, Moody's, and Fitch—which they characterize as "the three primary credit rating agencies." (Jones Report, ¶¶ 46–48). Plaintiffs also indicate, via the Jones Report, that more than 19 different firms produced over 400 reports on FirstEnergy during the Class Period. (*Id.* ¶ 46). While Defendants are correct that the coverage contained in these reports is not limited to Notes, Defendants produce no authority that this is necessary. Instead, this Court finds that Plaintiffs' evidence adequately demonstrates that FirstEnergy enjoyed extensive coverage generally. *See, e.g., Big Lots, Inc.,* 242 F. Supp. 3d at 654 (finding this factor to be satisfied by noting that at least 16 different firms covered Big Lots generally during the Class Period).

With respect to the third factor, Plaintiffs' evidence is sufficient that 16 underwriters and underwriter representatives including leading investment banks served as market makers. (*See* Jones Report at ¶¶ 48, 51–59). This Court dismisses as unavailing Defendants' arguments that courts categorically reject a plaintiff's reliance on underwriter representation or require that plaintiffs must demonstrate the presence of arbitrage to satisfy this factor. *See, e.g., Big Lots, Inc*., 242 F. Supp. 3d at 654 (finding this factor satisfied without considering the presence of arbitrageurs); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 635 (N.D. Ala. 2009) (noting

generally that this factor considers "[t]he presence of a substantial number of professionals reporting on the security" generally, without respect to their specific roles as analysts).

Defendants do not contest Plaintiffs' satisfaction of the fourth factor considering Plaintiffs' evidence that FirstEnergy was eligible to file a Form S-3 Registration Statement. FirstEnergy indeed filed several Forms S-3ASR during the Class Period. (Jones Report, ¶ 57). Regarding the fifth factor, Plaintiffs demonstrate that the Notes reacted to new information with sufficient dispatch. (Jones Report, ¶¶ 98–99). Because the balancing of the *Cammer* factors weigh in favor of finding market efficiency, Plaintiffs would be entitled to the *Basic* presumption of reliance even if *Affiliated Ute* were inapplicable. *See Big Lots, Inc.*, 242 F. Supp. 3d 634, 655 (S.D. Ohio 2017) (finding *Basic*'s presumption of reliance proper because Plaintiffs adequately demonstrated that the *Cammer* factors weighed in favor of finding market efficiency).

### b.   The Non-Speaking Defendants[9]

At oral argument, the Non-Speaking Defendants argued that the *Affiliated Ute* presumption is inapplicable as concern them because, as the Sixth Circuit recognized, "[i]n order to be actionable, a misrepresentation or omission must pertain to material information that the defendant had a duty to disclose." *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 608 (6th Cir. 2005). Here, the Non-Speaking Defendants argue, Plaintiffs never alleged that they owed a duty to disclose or made any of the public statements at issue in this case.

The Sixth Circuit explained that a defendant "not liable under Rule 10b–5(b) for failure to disclose . . . may still be held liable under Rule 10b–5(a) and 10b–5(c) as a participant in [an] allegedly fraudulent scheme." *Id.* at 610. This Court previously noted that the Non-Speaking

---

[9] The Dowling Defendants are comprised of Defendants Michael Dowling, Dennis Chack, and Ty Pine. (ECF No. 328 at 1). The Reffner Defendants are comprised of Defendants Robert Reffner and Leslie Vespoli. (Id. n.1).

Defendants "have no misstatements or omissions alleged and are proceeding on scheme liability independently." *In re Firstenergy Corp.*, 2022 WL 681320, at *26.

Given Defendants' argument, this Court finds it necessary first to clarify that neither the *Affiliated Ute* nor *Basic* presumptions of reliance are categorically inapplicable to scheme liability cases. The Supreme Court in *Lorenzo* recognized that scheme liability is "sufficiently broad to include within its scope the dissemination of false or misleading information with the intent to defraud." *In re Firstenergy Corp.*, 2022 WL 681320, at *26 (quoting *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019)) (alterations adopted). After all, reliance can be demonstrated in cases where the plaintiffs demonstrate a "direct nexus . . . between the defendants' fraudulent conduct and the publication of false information to the investing public." *Hawaii Ironworkers Annuity Trust Fund v. Cole*, 296 F.R.D. 549, 556 (N.D. Ohio 2013). This Court found that such a direct causal chain exists here, reasoning as follows:

> [T]he Complaint alleges that FirstEnergy's own officers committed fraudulent acts that created misleading information about the nature and propriety of the Company's political activity, and later culminated in HB6. That information was publicized by the Company and factored efficiently into share prices . . . The Court finds that this direct causal chain supports reliance, even for the non-speaking Defendants.

*In re Firstenergy Corp.*, 2022 WL 681320, at *28.

In *Stoneridge*, the Supreme Court rejected the plaintiffs' attempt to demonstrate reliance based upon claims of scheme liability because "[i]n th[o]se circumstances, the investors cannot be said to have relied upon any of respondents' deceptive acts in the decision to purchase or sell securities." 552 U.S. at 166–67. The Eighth Circuit in *Medtronic* summarized the circumstances in *Stoneridge* as follows:

> In *Stoneridge*, Charter Communications and its suppliers engaged in sham transactions designed to enable Charter to falsify its financial statements . . . Investors sued the suppliers, asserting both a false statement claim and a scheme liability claim. While the investors argued that the suppliers' participation in the

46

sham transactions enabled Charter to falsify its statements, the Supreme Court held that the investors could not demonstrate that they relied on the suppliers' conduct . . . The suppliers' participation in sham transactions did not reach the public and "nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did." As a result, the causal link between the false financial statements and the suppliers' conduct was too remote to demonstrate reliance.

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393–94 (8th Cir. 2016).

This court is persuaded by the *Medtronic* Court's reasoning that a plaintiff may establish reliance concerning a scheme liability claim if the plaintiff can "demonstrate that the causal connection between the defendants' alleged deceptive act and the information on which the market relied is not too remote." *Medtronic*, 845 F.3d at 394 (citing *Stoneridge*, 552 U.S. at 166–67). Here, this Court would be hard-pressed to determine that the actions of any of the Non-Speaking Defendants were too remote to find a "causal connection between the defendants' alleged deceptive act and the information on which the market relied." *Medtronic, Inc.*, 845 F.3d at 394. All of the Non-Speaking Defendants enjoyed high-ranking positions within FirstEnergy, and all are alleged to have played substantial roles in the perpetuation of the scheme, either by affirmative misdeeds or dereliction of their duties to stop the fraudulent activity. Nonetheless, in *this* case, the Non-Speaking Defendants are not accused of owing Plaintiffs a duty to disclose nor of making a statement that reached the public.

Specific to this inquiry, then, are two questions before this Court. The first is whether *Affiliated Ute* applies where Plaintiffs fail to allege that the Non-Speaking Defendants owed them a prior duty to disclose. The second is whether, in the alternative, *Basic* applies where Plaintiffs never allege that the Non-Speaking Defendants *themselves* made a statement that reached the public. This Court considers both questions in turn.

The *Affiliated Ute* presumption applies "when there is an omission of a material fact by one with a duty to disclose." *In re Firstenergy Corp.*, 2022 WL 681320, at *26 (internal quotations omitted). It does not apply in the absence of a duty to disclose. Given the absence of any allegations or evidence that the Non-Speaking Defendants owed a duty to disclose to Plaintiffs, this Court finds *Affiliated Ute* inapplicable to the Non-Speaking Defendants.

The *Basic* presumption, on the other hand, applies "when the statements at issue become public and the public information is reflected in the market price of the security." *Id.* (alterations adopted). Plaintiffs fail to allege that the Non-Speaking Defendants made any statements that became public. Given that the *Basic* presumption does not pertain to *indirect* involvement in the making of the public statements at issue, this Court declines to find *Basic* applicable here.

As such, Plaintiffs and putative class members cannot rely on a presumption of reliance for the purpose of predominance with respect to the Non-Speaking Defendants. In the absence of such a presumption, at least some class members may be unable to demonstrate reliance on the Non-Speaking Defendants' alleged actions and inactions. Nonetheless, "[e]ven where defendants point to some evidence that a defense will indeed apply to some members . . . Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class." *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1126 (6th Cir. 2016). Notwithstanding the possibility that issues of reliance with respect to the Non-Speaking Defendants will lead to individual issues, "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Id.* Considering that Plaintiffs properly invoked a presumption of reliance against the multitude of other Defendants in this matter, individual issues do not predominate over common ones overall. As such, the element of predomination is satisfied.

### 2. Superiority

#### a. Parties' Arguments

Plaintiffs argue that the class action is a vehicle superior to other available methods for adjudicating this action, thus establishing superiority. Plaintiffs contend that they meet all four elements to satisfy the superiority requirement under Rule 23(b)(3). On the first element, Plaintiffs argue that most putative class members have minimal interest in individual prosecution here given the difficulty and expense of doing so. On the second element, Plaintiffs contend that maintaining a class action in this district ensures the efficient expenditure of resources in this matter and consistent rulings for the class. On the third element, Plaintiffs reason that this Court is a desirable forum for the litigation because Defendant FirstEnergy conducts business in this district and other related civil and criminal litigation is currently being conducted herein. On the last element, Plaintiffs argue that they do not anticipate having case management difficulties given that they have already undertaken extensive document discovery and motion briefing.

Defendants do not provide argument on this element of Plaintiff's Motion.

#### b. The Court's Analysis

This Court's consideration of superiority concerns whether a class action is the superior means of adjudication. *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 488 (S.D. Ohio 2004) (Marbley, J.). The superiority requirement "aims to achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) (internal quotations omitted). Rule 23(b)(3) lists four factors to be considered in determining the superiority of proceeding as a class action compared to other methods of adjudication: (1) the interests of the members of the

class in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in management of the class action. Fed. R. Civ. P. 23(b)(3); *Myers*, 2018 WL 4932087, at *9.

This Court finds that a class action is the superior method of litigating this matter. The complexity of this case provides minimal incentives to individuals to prosecute this matter. Several cases related to the alleged FirstEnergy scandal at issue here have been filed in this Court; even the instant proceeding is a consolidated case.[10] (ECF No. 65). Further, Defendants are centralized within the geographical reach of this district. The alleged misdeeds also took place within the jurisdiction of this district. This Court finds, in line with the rationale used to find adequacy, that Plaintiffs have adequately managed this case. There is little evidence that would indicate Plaintiffs are likely to experience difficulties in handling future case management responsibilities. For these reasons, the superiority factors weigh in favor of class certification.

### C.  Appointing Class Counsel – Rule 23(g)

Finally, Plaintiffs request that this Court appoint Lead Counsel Robbins Geller Rudman & Dowd LLP as class counsel and Murray Murphy Moul + Basil LLP as liaison counsel. In support of their request, Plaintiffs assert that proposed class counsel are well-qualified to prosecute this case and have already undertaken a vigorous prosecution of this action. Plaintiffs contend that proposed class counsel have extensively investigated the claims in this case, defeating Defendants' motions to dismiss and diligently pursuing discovery. Further, Plaintiffs argue, lead counsel's qualification to represent the proposed class is evidenced by the fact that the firm has either served or is serving as lead counsel in many significant securities class

---

[10] *See, e.g., Smith v. FirstEnergy Corp.*, No. 2:20-cv-03755 (S.D. Ohio); *United States v. Borges*, No. 1:20-mj-00526 (S.D. Ohio); *United States v. FirstEnergy Corp.*, No. 1:21-cr-00086 (S.D. Ohio); *Emps.' Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-04813 (S.D. Ohio).

actions, including several of the largest recoveries in the Sixth Circuit. Defendants do not contest Plaintiffs' request under Rule 23(g). This Court, however, considers Defendants' objections under the adequacy element of Rule 23(a) responsive to Plaintiffs' request here.

In appointing class counsel under Rule 23(g), the Court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's relevant experience and knowledge of applicable law; and (iii) the resources that counsel will commit to representing the class. Fed R. Civ. P. 23(g)(1)(A).

This Court finds that proposed class counsel have adequately demonstrated their efforts in prosecuting Plaintiffs' claims and have the requisite experience required by Rule 23(g)(A)(i) and (ii). For the reasons stated in this Court's adequacy analysis, it also finds that proposed class counsel have the requisite knowledge of the applicable law and the resources to litigate this matter effectively. Therefore, this Court finds that proposed class counsel are qualified under Rule 23(g) and hereby appoints Lead Counsel Robbins Geller Rudman & Dowd LLP as class counsel and Murray Murphy Moul + Basil LLP as liaison counsel.

## IV.  CONCLUSION

For the foregoing reasons, this Court **GRANTS** Plaintiffs' Motion for Class Certification (ECF No. 293) and certifies the class under subsection 23(b)(3) of the Federal Rules of Civil Procedure. In addition, this Court hereby appoints Lead Counsel Robbins Geller Rudman & Dowd LLP as class counsel and Murray Murphy Moul + Basil LLP as liaison counsel.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  March 30, 2023**