UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE FIRSTENERGY CORP.          )
SECURITIES LITIGATION            )
                                 )     CASE NO. 2:20-cv-3785
_____)
                                 )
THIS DOCUMENT RELATES TO:        )
                                 )
  ALL ACTIONS.                   )
_____)

TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
MARCH 17, 2023; 1:30 P.M.
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFFS:
        Robbins, Geller, Rudman & Dowd LLP
        By:  Jason A. Forge, Esq.
             Mark Soloman, Esq.
             Hillary B. Stakem, Esq.
             Tor Gronborg, Esq.
        655 West Broadway, Suite 1900
        San Diego, California  92101

FOR THE DEFENDANT FIRSTENERGY CORPORATION, ET AL.,:
        Sullivan & Cromwell LLP
        By:  Robert J. Giuffra, Jr., Esq.
             David M.J. Rein, Esq.
             Tasha N. Thompson, Esq.
        125 Broad Street
        New York, New York  10004

        Jones Day
        By:  Geoffrey J. Ritts, Esq.
        901 Lakeside Avenue
        Cleveland, Ohio  44114

APPEARANCES CONTINUED:

FOR DEFENDANT FIRSTENERGY CORPORATION:
        Jones Day
        By:  Marjorie P. Duffy, Esq.
        325 John H. McConnell Boulevard, Suite 600
        Columbus, Ohio  43215

FOR THE DEFENDANT LEILA VESPOLI:
        Arnold & Porter
        By:  Aaron F. Miner, Esq.
        250 West 55th Street
        New York, New York  10019

FOR THE DEFENDANT ROBERT REFFNER:
        McDermott, Will & Emery, LLP
        By:  Steven S. Scholes, Esq.
        444 West Lake Street, Suite 4000
        Chicago, Illinois  606060

- - -

     Proceedings recorded by mechanical stenography,
transcript produced by computer.

3

1          FRIDAY AFTERNOON SESSION

2              MARCH 17, 2023

3                   - - -

4          THE COURT:  Good afternoon.

5      Ms. Stash, would you please call the case.

6          THE DEPUTY CLERK:  Case No. 2:20-cv-3785, in re First

7   Energy Corp. Securities Litigation.

8          MR. FORGE:  Good afternoon, Your Honor.

9          THE COURT:  Would counsel please identify themselves

10  for the record beginning with counsel for the plaintiff.

11         MR. FORGE:  Jason Forge for the plaintiffs.  To my

12  right is Mark Soloman.  To his right is Hillary Stakem, and to

13  her right is Tor Gronborg.

14         THE COURT:  Counsel for the defense.

15         MR. GIUFFRA:  Good afternoon, Your Honor.  Robert

16  Giuffra with Sullivan and Cromwell.  I'm here for FirstEnergy.

17  It's a privilege to be here.

18         MR. REIN:  David Rein, Sullivan and Cromwell, also for

19  FirstEnergy.  We appreciate you admitting us pro hac for this

20  matter.

21         THE COURT:  You are admitted.

22         MR. REIN:  Thank you.

23         MS. THOMPSON:  Tasha Thompson, Sullivan and Cromwell,

24  also for FirstEnergy, and also appreciate being here.

25         MR. RITTS:  Good morning, Your Honor.  My name is

1    Geoffrey Ritts.  I'm here for FirstEnergy Corporation and a

2    group of 16 current and former officers and directors.

3            MS. DUFFY:  Good afternoon, Your Honor.  Marjorie

4    Duffy at Jones Day for FirstEnergy and that same group of

5    individual directors and officers.

6            MR. MINER:  Good afternoon, Your Honor.  Aaron Miner

7    for Defendant Leila Vespoli.

8            MR. SCHOLES:  Good afternoon, Your Honor.  Steve

9    Scholes of McDermott, Will and Emery for Defendant Robert

10   Reffner.

11           THE COURT:  We're here on the plaintiffs' motion for

12   class certification.  We've already agreed how it's going to be

13   divided up.  The plaintiff will have 30 minutes, 15 minutes on

14   23(a) and 15 minutes on 23(b)(3).

15           I believe that we're going to begin with Ms. Stakem; is

16   that correct?

17           MS. STAKEM:  Yes, Your Honor.

18           THE COURT:  Ms. Stakem, please proceed.

19           MS. STAKEM:  Thank you, Your Honor.

20           Your Honor, I will begin with adequacy, per your

21   request, unless the Court has specific questions about adequacy

22   you'd like me to address before kind of walking through our --

23   where we think things stand.

24           THE COURT:  No.  Please proceed beginning with

25   adequacy, and then I think you're going to pivot to commonality

5

1    and typicality.

2         Do you wish to reserve any time for rebuttal, any of

3    your 15 minutes for rebuttal on the 23(a) issues?

4         MS. STAKEM:  On the 23(a) issues, I do not, Your

5    Honor.  But I will just let you know --

6         THE COURT:  Do you concede whatever time you would

7    have to your partner who is going to argue predominance under

8    23(b)(3)?

9         MS. STAKEM:  Yes, Your Honor, although I will be

10   arguing just the scheme liability portion.

11        THE COURT:  That's fine.  Thank you.

12        MS. STAKEM:  So, Your Honor, adequacy in the Sixth

13   Circuit focuses on two things, whether the proposed class

14   representative has a conflict of interest with absent class

15   members, and whether class counsel is qualified and experienced

16   in the matters at issue to litigate the claims on behalf of the

17   class vigorously.  Both of those requirements are met here.

18        None of the four proposed class representatives have

19   conflicts with any of the absent class members.  They have all

20   expressed an understanding and willingness of the duties of

21   being a class representative, and they've testified that they

22   want to maximize the recovery for all of the class members.

23   They have actively participated in litigating this case so far,

24   from reviewing filings through participating in discovery

25   actively, providing written responses to discovery, working

1 with class counsel in preparing and sitting for depositions so

2 far, and --

3      THE COURT:  In that connection -- so your argument

4 makes sense, but here is one thing that troubles me, and that

5 is an issue raised by the defense that two of the notes that

6 are at issue in this case were not purchased by any of the

7 plaintiffs.  How can you be an adequate representative of

8 plaintiffs who didn't purchase notes, theoretically who didn't

9 suffer loss, at least, with respect to the purchase of those

10 notes?

11      MS. STAKEM:  That's a fair question.  I was going to

12 address it in typicality.  I think it's kind of a hybrid

13 argument, adequacy, typicality standing.  But you're right.

14 There are two notes, the AK3 note and AC1 note, that no

15 proposed class representative purchased.

16      But the thing is is that courts have looked at this

17 issue in a number of cases and regularly figure out that even

18 where a proposed class representative hasn't purchased all of

19 the securities at issue, so long as the claims that they are

20 bringing on behalf of the notes or the securities that they

21 have purchased share a core underlying set of facts and

22 allegations with the claims of the other security holders,

23 there's absolutely no problem with typicality or adequacy of

24 the proposed representatives.  And that makes sense because,

25 you know, when they share a core set of facts or allegations,

1    as the proposed class representatives will be litigating their

2    own claims, they're necessarily furthering the interest of the

3    holders of the other securities that share the identical

4    claims, right.

5        So with respect to the AK3 note in particular, that note

6    was issued in the February 2020 offering which is the same

7    offering that LACERA and Wisconsin purchased their notes in.

8    All of the notes were issued pursuant to the same set of

9    offering documents.  The claims that are advanced on behalf of

10   the AK3 note holders are essentially identical to those that

11   are being advanced on behalf of the holders of the notes in

12   that same offering.

13       With respect to the AC1 note, it's also true that the

14   Exchange Act claims that are being brought on behalf of holders

15   of that note are identical to those of all the other Exchange

16   Act claimants, including the other bondholders and stockholders

17   of FirstEnergy as well.

18       So if Your Honor does not have any other questions about

19   adequacy --

20           THE COURT:  No, I don't.

21           MS. STAKEM:  Excellent.

22       Commonality, defendants don't actually challenge and,

23   you know, that's to their credit.  Common questions are rampant

24   in securities litigation.  So unless Your Honor has questions,

25   I think I would move on to typicality which we have also

8

1   addressed with respect to bonds.  That was the only typicality

2   argument that any defendant has raised thus far.

3        So that's Rule 23(a), Your Honor.  All four requirements

4   are satisfied as to both the common stock and the bonds.  We

5   have four great plaintiffs here who are ready and willing to

6   serve as class representatives.  You know, although defendants

7   raise a few challenges as to those proposed representatives

8   based on selective quotations from deposition testimony, those

9   types of potshots really shouldn't undermine the adequacy.

10        THE COURT:  I agree.  That argument, while not

11  meritless, is specious.

12        Since we have more time, then, and since we're in the

13  Sixth Circuit, let me ask you a bit about ascertainability

14  because, as you know in *Cole*, I think it's *Cole v. City of

15  Memphis*, the Sixth Circuit has held that while there's no

16  expressed requirement for ascertainability in a Rule 23 class,

17  there is an implicit requirement for the class to be

18  ascertainable in this class certification context.

19        So I want you to tell me, for instance, why I should

20  find that the class, as you've defined it, is ascertainable.

21  That requirement is only the existence of objective criteria,

22  as you know, upon which class membership can be based.  But in

23  the interest of completion of the record, because I will have a

24  discussion on ascertainability in my opinion since we are

25  sitting in the Sixth Circuit, tell me why there is adequate

1    objective criteria to define this class such that the class

2    itself is ascertainable.

3        MS. STAKEM:  Absolutely, Your Honor.  As the Court

4    already mentioned, ascertainability does address whether there

5    are objective criteria by which the class can be identified,

6    essentially round fencing, if you will, the class definition.

7    Here, the class definition concerns a very specifically

8    identified subset of securities that are -- and it's further

9    limited to the time period of February 21st, 2017, through

10   July 21st, 2020.  So only purchasers of those specific

11   securities within that specific time period will be members of

12   the class.

13       THE COURT:  Is that description administratively

14   feasible?

15       MS. STAKEM:  Yes, Your Honor, it is.

16       THE COURT:  Why so?

17       MS. STAKEM:  It is administratively feasible because

18   of the trading records that are regularly kept.  Those

19   individuals will be identifiable by their trading records.  And

20   the traceability is not a concern here like it may be in other

21   securities cases because the offerings were very specific here.

22   All of the notes that are being traded were pursuant to very

23   specific offerings.  So there's no traceability concern.

24       THE COURT:  Thank you, Ms. Stakem.

25       MS. STAKEM:  Yes, Your Honor.  Before I yield the

1  floor to Mr. Gronborg, if it pleases the Court, I'd like to

2  speak just briefly as to some of the arguments that were

3  advanced by the nonspeaking defendants regarding scheme

4  liability, unless Your Honor would --

5      THE COURT:  Thank you, Ms. Stakem.  No.  Thank you,

6  Ms. Stakem.  You may be seated.

7      It was nothing that you said or failed to say.  You

8  answered my questions.

9      Mr. Gronborg.

10     MR. GRONBORG:  Good afternoon, Your Honor.  Tor

11  Gronborg.

12     Anticipating your first question, I'd like to reserve as

13  much time as possible.  I'm going to try -- I may go through

14  quick and then hopefully get there quickly.  So --

15     THE COURT:  I would like to -- I think that Ms. Stash

16  just stepped away.

17     How much time would you like to reserve, then?

18     MR. GRONBORG:  Ten minutes.  I'll try and go ten and

19  then we'll have ten in reserve.

20     THE COURT:  All right.

21     MR. GRONBORG:  So 23(b)(3), I appreciate you've seen

22  all the briefing.  I'm just going to cover the three items that

23  FirstEnergy's counsel mention as what they saw as the

24  highlights.  Like I said, all of this is covered in the paper.

25  Those are application of *Affiliated Ute*, presumption of

11

1  reliance, the market efficiency issue for the bond -- so that's

2  the application of the *Basic* presumption of reliance for the

3  bonds -- and then damages.

4          THE COURT:  Is this a case -- just to set the table,

5  Mr. Gronborg, is this a case of omission or commission?

6          MR. GRONBORG:  This is a case of omission, Your Honor.

7  This is a failure to disclose case.  That is underlying the

8  entire scheme.  It's the whole complaint.  It's the criminal

9  case that just took place.  This whole scheme was predicated on

10 not telling people things.  I don't think I've had a case where

11 that is more clear.

12         So *Affiliated Ute*, which is cases for primarily failure

13 to disclose, this one we go beyond primarily.  And that's the

14 Supreme Court language.  So that's it on *Affiliated*.  I'm happy

15 to go on, but I think that is very clear.  I think defendants

16 have suggested that in the motion to dismiss order because the

17 Court referenced statements, that therefore this case must be

18 about affirmative misstatements.  But, of course, statements

19 are necessary.  They trigger a duty to disclose.  So all cases

20 plead statements, but they don't all plead affirmative

21 misstatements where someone has actually -- they're lying about

22 something as opposed to keeping something concealed.  That is

23 exactly what happened here.

24         So if the Court determines that *Affiliated Ute* applies,

25 that applies to the stock, that applies to the bonds, that's

1    the presumption of reliance.

2         We did the boots and suspenders thing here, which

3    lawyers do.  So we showed how both the *Affiliated Ute*

4    presumption and the *Basic* presumption applies.  Defendants

5    concede that on the stock.  Frankly, I think it was strategic

6    because they're hoping you'll apply *Basic* and not *Affiliated*

7    *Ute*.  We think *Affiliated Ute* is the appropriate presumption to

8    apply, but we think the Court can apply both.  We think the

9    Sixth Circuit has had zero problem with courts applying both.

10   It can happen here.

11        That goes to the market efficiency and *Basic* -- the

12   *Basic* presumption for the bonds.  This is where, if you told me

13   I'm going to apply *Affiliated Ute*, I don't need to say

14   anything.  I don't anticipate you're going to say that.  So

15   just quickly on the subject that took up an inordinate amount

16   of the briefing and the expert reports which is:  If *Affiliated*

17   *Ute* doesn't apply, is there market efficiency for the bonds?

18        THE COURT:  I want to hear from the defense, but I'm

19   going to presume that *Affiliated Ute* applies.  I don't see a

20   lot of ways around it.

21        MR. GRONBORG:  The only time I'm going to spend on

22   *Basic* is you can apply both.  If the Court wants to have belts

23   and suspenders, it's just fine.  We think *Affiliated Ute* is as

24   well.  On *Basic*, it comes down to a preponderance of the

25   evidence.  Even if the Court went there, if there is a scale,

1   all the evidence is on the side of market efficiency.  The

2   other side is just arguments, taking potshots and saying your

3   expert hasn't done enough.  But nowhere do defendants say here

4   is the evidence that any of these bonds traded in an

5   inefficient market.

6       So that leaves damages.  Defendants call that their

7   *Comcast* argument, and they rely on it.  *Comcast* is an antitrust

8   case.  It involved four very distinct theories of liability.

9   By the time it got to the Supreme Court, the damages

10  methodology didn't match up with what the theories of liability

11  that existed are.

12      THE COURT:  Can I have you back up?  Now that you

13  mention damages, one of the questions that I had after reading

14  the papers was whether the damages model in the Jones and the

15  Dalrymple -- I didn't pronounce that correctly -- but Dalrymple

16  reports were different -- or the same but stated in different

17  terms.  Is it a distinction without a difference?

18      MR. GRONBORG:  They're effectively the same.  I'm

19  going to set aside the 1933 Act claims which have their own

20  statutory scheme, still similar, still based on inflation.

21  Ms. Jones sets both of those aside.  I don't think defendants

22  are challenging that one; certainly, their expert didn't.

23      For the stocks and the bonds, they're effectively the

24  same.  Honestly, Your Honor, one of the arguments defendants

25  make here is these experts, it's the same methodology they're

1    saying here as they did in a different case.  That makes

2    perfect sense because it's a statutory -- it's a very simple

3    statutory model.  So it makes -- from case to case to case,

4    there is a formula.  The question is is you plug in a purchase

5    price for the stock and then you plug in an inflation price.

6    The jury comes back, and they say this is what the artificial

7    inflation was during the class period, during different parts

8    of the class period.  That gets plugged in.  It's the same

9    formula for every single member of the class.

10        As much as *Comcast* -- the Sixth Circuit said it doesn't

11   apply.

12        THE COURT:  So plugging in a formula for each class

13   member, then, is not an individualized inquiry?

14        MR. GRONBORG:  Not at all, Your Honor.  As you can

15   imagine, anyone who buys stock, they buy it at different prices

16   on different days.  It's trading at a hundred here.  It's

17   trading at 95.

18        Now, the inflation that those people -- let's just say

19   for any given week, artificial inflation is the same.  Whether

20   I bought it at a hundred or 95, my inflation is the same.  I'm

21   going to have a hundred dollars minus the inflation.  That was

22   the true value of the stock.

23        So you have got one plug-in.  The plug-in for each

24   individual is just what they bought the stock at.  Again,

25   easily -- ascertainability, very easy.  Everyone has got the

1    stock record; this is what I bought at.  What you're plugging

2    in below that is what the inflation is.  That's the one that

3    will be constant for people.

4          THE COURT:  But what about -- isn't part of the

5    measurement what that individual investor bought the stock at,

6    when they bought the stock, when they sold it, what they sold

7    at?  Why are those not individualized inquiries?

8          MR. GRONBORG:  Because they're all still part of the

9    exact same formula.  So, again, here is what I bought at.  Here

10   is what I sold at.  There is inflation.  I bought it at a

11   hundred, and the jury says there's $20 inflation if I held it

12   out here past the disclosure.  I get that $20.  The person the

13   next day buys it at 95.  They plug in 95, they're still getting

14   $20.

15         Underlying that is what's the difference between what

16   you bought and sold it at.  That's part of the formula.  If the

17   person who bought it at a hundred sold it after the disclosures

18   for 90, the statute says you only get 10.  Even though your

19   inflation was 20, you get the lesser of buy and sell verse

20   inflation.  But all of them are being plugged into the same

21   formula.

22         At this point, there are thousands of cases that have

23   court approved -- a common plan of allocation.  I'm sure you

24   have seen them at the end of a case, which is -- and what

25   happens is everyone submits here is what I bought at, here is

1    what I sold at.  But they all get plugged into the exact same

2    formula so there's no issues there.

3         Now --

4         THE COURT:  So it really, then, doesn't matter when

5    the individual purchased the stock or what the stock price was

6    at the time of purchase because it's the same formula.

7         MR. GRONBORG:  Same formula, exactly.  It doesn't

8    matter if they bought in the class period.  There may be

9    someone who buys and their damages are a dollar because they

10   bought and sold at a different price, but they're using the

11   exact same formula to get there.

12        In a case like this, if it settles, that's what happens.

13   Everyone sends in their data.  It's run through a formula by a

14   claims administrator.  And this happens after trial too.  It's

15   run through and you come up with damages.  Of course, for

16   everybody, their damages are different.  This person bought a

17   thousand shares.  This person bought three shares.  The numbers

18   are different.  The formula is the exact same.

19        So the primary argument defendants have made is:  But

20   what if the inflation varies over time?  What if it's just not

21   the exact same?  Honestly, that would not be an atypical case.

22   That wouldn't be unusual.

23        In the first instance, it's not plaintiffs' theory of

24   liability.  All that matters here is that we present something

25   that is our theory, fits our theory of liability, not some

1   hypothetical that defendants come up with. And that's even if

2   you apply *Comcast*.

3        The second part is our experts in other cases have --

4   and they've explained there's very -- some of the same tools

5   that you're using to figure out what inflation is, at the end

6   of the class period, you can use those tools, use other tools,

7   figure out -- if you come to the conclusion that inflation is

8   different earlier than later, same tools. You've got to block

9   a time. It's all in the exact same formula.

10       Honestly, that's -- at the end of this case, a jury is

11  going to come back. And they might not pick what our expert

12  says. I'm sure their expert is going to say zero. It would be

13  an unusual securities case if it's something else. The jury is

14  going to come back and they're going to say this is what the

15  inflation is. What we determined, assuming we proved our case

16  what the inflation was, that number gets plugged into the

17  formula; same for every single class member.

18       Hopefully, I got in under my ten minutes.

19         THE COURT: Thank you.

20         MR. GRONBORG: Thank you very much.

21         MR. GIUFFRA: Your Honor, I have a handout I want to

22  give to Your Honor, and two other things. We'll get these

23  filed so they're in the record.

24       Your Honor, Robert Giuffra, again, with Sullivan and

25  Cromwell for the FirstEnergy defendants.

18

1      THE COURT:  You're addressing 23(a); is that right?

2      MR. GIUFFRA:  Yes.  I'm going to address three issues

3  as quickly as I can.  First, I'm going to discuss the

4  *Affiliated Ute* issue, then I'm going to discuss the *Comcast*

5  issue, and then I'm going to discuss the market efficiency

6  issue.

7      This is a very complicated securities case.  In the

8  typical securities case, Your Honor, a company will misstate

9  its revenues, the stock price will go up, and then over the

10  course of the class period, it's inflated, and then it goes

11  down when the truth comes out.  This is a much more complicated

12  case.

13      The plaintiffs, it sounded like --

14      THE COURT:  Why so?

15      MR. GIUFFRA:  Because in the typical case -- I'll

16  speed it up for you.  If you can turn to slide seven.  One of

17  the obligations of the plaintiff is to show that there's a

18  common damages theory that would apply for the entire case.

19  Our point is that unlike a case which is about, for example, a

20  company misstating its revenue, this is a case about a whole

21  series of qualitative, contingent events.  So the amount of

22  inflation that was in the company's stock price -- and the

23  damages are based on the inflation -- were different.

24      For example, at the beginning of the class period,

25  FirstEnergy was --

1          THE COURT:  Different but not not ascertainable,

2    right?

3          MR. GIUFFRA:  The amount of the inflation -- you need

4    to have a damages methodology under *Comcast* --

5          THE COURT:  But it can be ascertained.  I'm simply

6    asking:  Can the amount of inflation be ascertained?

7          MR. GIUFFRA:  I don't know.  In fact, the problem here

8    is that the plaintiffs' expert -- and that's the other document

9    I gave you -- he essentially has cut and pasted the damages

10   model that he used in another case where the Court struck it

11   down and said it was not sufficient.  Judge Pearson in a case

12   we cite throughout our papers, the *OPERS v. Freddie Mac* case,

13   said when the plaintiff presents a vague, indefinite and

14   unspecific damages model, that is not sufficient.  That's what

15   the plaintiff has done here.

16         The plaintiffs' expert said, Your Honor, that they did

17   not calculate whether the inflation was different over the

18   course of the entire period.  He said that he doesn't even know

19   what model he would use to measure damages.  Judge Pearson said

20   that's not enough under the *Comcast* case because you've got to

21   have a common damages model that can be applied across the

22   entire case.

23         The problem here, Your Honor -- and this is on slide

24   eight -- there were different events that happened at different

25   moments in time.  So, for example --

1          THE COURT:  I want to make sure that we're looking at

2    the same slide.  Plaintiffs' qualitative, contingent --

3          MR. GIUFFRA:  Correct.  That's the slide.

4          Basically, what happened was if you look at the events

5    that the plaintiffs are talking about in the case, they talk

6    about, for example, in the beginning of the class period,

7    FirstEnergy was trying to get regulatory relief in Washington.

8    That was actually lawful.  Then they made an agreement to have

9    Mr. Householder help them if he became speaker.  Whether he

10   would become speaker or not was a very contested question.

11   Whether he would be able to get a bill passed and what the bill

12   would be would be a very contested question.

13         At the same period of time, it was sort of operating on

14   multiple tracks -- the federal regulatory which was lawful.

15   They were also operating, trying to get bankruptcy relief.

16   When the bankruptcy court said, no, no, no, we're not going to

17   give you the release that you're looking for, then they went

18   and pushed forward on doing the HB 6 issue, and then down the

19   road, Your Honor, there was an effort made to repeal HB 6.

20         Now, at each one of these moments in time, the inflation

21   in the company's stock would have been completely different.

22         THE COURT:  But the company knew the steps that were

23   being taken to effectuate all of this, right?  They knew that

24   there was a movement afoot to get Householder as speaker so

25   that he could do what was necessary to enact HB 6, right?

1      MR. GIUFFRA:  Right.  But, Your Honor, if it had been

2  disclosed, and that's what -- they have to say, well, you

3  should have told the market that.  If you had told the market

4  that before he became speaker, the inflation and the stock

5  price would have been less than it would have been after he was

6  speaker, or it would have been different when they were --

7      THE COURT:  We just don't know.  That invites

8  speculation.

9      MR. GIUFFRA:  That's right.

10     The problem here, Your Honor, if you look at what the

11 plaintiffs' experts said in a deposition, on slide 11, he said:

12 I don't have an opinion as to whether or not it would be

13 appropriate to take into account the changes in the amount of

14 inflation in the company's stock price.  And he said, Well,

15 I'll use standard techniques in order to establish damages

16 which you have to establish across the class period.

17     Like Judge Pearson did in the *OPERS* case, Your Honor,

18 and like courts have in multiple cases, when the damages expert

19 does a cut-and-paste damages report -- and, again, like the one

20 I handed up from the *AAC* case where the Court said, no, doesn't

21 work, doesn't work, because all he -- all this damages expert

22 said is, I may have techniques that I'll use, but he did not

23 say what they would be.

24     They have an obligation to come forward with a damages

25 model that works, and they've got to tell the Court what it is,

1    and they haven't done that.  That's a complete failure.  We

2    cite multiple cases that are in the slide deck and in our

3    briefs where courts, like Judge Pearson, have said you can't do

4    that and certify a class.

5         Now, I'm not saying that they can't have a damages

6    expert come in here and maybe come forward with a model that

7    works.  But they haven't done it.

8         If Your Honor would like, you could call both experts

9    here in two or three weeks, and we can have a hearing, and you

10   could examine and I could examine and show you that their

11   expert has not done the work that is required to satisfy the

12   obligation to have a damages model that works for people who

13   bought in 2017, '18, '19 because the inflation was all

14   different.

15        If you had a stock, Your Honor --

16        THE COURT:  So is your broad-based, broad side of the

17   attack on the damages expert and the damages component of this

18   case designed to show me that this is -- that theirs is

19   inadequate under 23(a), and then there is an assault on the

20   typicality prong as well as the commonality prong?  That's a

21   broad-based attack.

22        MR. GIUFFRA:  Exactly, Your Honor.

23        THE COURT:  While that has some initial appeal, I can

24   afford to be more granular than that.  I don't want to just

25   look at the damages.  I want to look at all of the other

1    components that would determine whether there is a 23(b) class.

2    Because I don't think that that is sufficient, what you argue,

3    because you're right.  They can always modify it because --

4    you're talking about the precise measure of damages.  It's like

5    saying, look, I know that what they did was wrong and I know

6    that it harmed a lot of investors, but because their damages

7    expert didn't get it right, let's just leave them with no

8    recourse.  And that's not what's going to happen in this case.

9            MR. GIUFFRA:  Your Honor, I'm not saying that you need

10   to do that.  But what you need to do, under the *Comcast* case,

11   and as multiple judges including, as I mentioned, Judge Pearson

12   and others --

13           THE COURT:  Judge Pearson in the Northern District?

14           MR. GIUFFRA:  Correct.  -- saying if you don't have an

15   appropriate model, you can't say I may use this model, I may

16   use that model.  You have to tell the judge at class

17   certification what model you're going to use and explain why

18   it's going to work across the class because somebody bought in

19   2017 is not in the same position --

20           THE COURT:  Couldn't the model be modified?

21           MR. GIUFFRA:  You've got to present a model at class

22   certification that works.

23           THE COURT:  Yes.  But can it be modified?

24           MR. GIUFFRA:  Your Honor, they don't present --

25           THE COURT:  I haven't heard an answer yet, and we had

1   a meeting in the back room where we have the fundamental

2   precept is you answer the judge's question as asked.  I'm going

3   to give you an opportunity, even if it takes you beyond your

4   time, to explain your answer, but you're going to first answer

5   my question.

6           MR. GIUFFRA:  Your Honor, they have an obligation at

7   class certification to come forward with a model and explain to

8   the Court -- and it's their burden as to why the model is one

9   that works.  So they've got to do that at class certification.

10          THE COURT:  Thank you.  You told me that.

11          Can the model be modified?  That's my only question.

12          MR. GIUFFRA:  I don't believe you can modify the model

13  to fix a problem because you didn't come forward with any model

14  at class certification.  Again, cases like the Judge Pearson

15  case and multiple other ones have said you've got to do it at

16  class certification.  You can't say, I have multiple models in

17  my economic tool box, and I'll use one; I'll come up with the

18  right one later.  In fact, you can't do that.

19          What they've done, Your Honor, is they have given you a

20  model -- they haven't even given you a model.  They've

21  basically done a cut and paste for what was in a damages report

22  in another case where the Court said it was inadequate.  So

23  they have not come forward with a model in this case that

24  works, and they have an obligation to do so.

25          On the *Ute* question, Your Honor --

1          THE COURT:  And the model has been pressure tested by?

2          MR. GIUFFRA:  They have not come forward with a model.

3    He said there are multiple models I could use but does not say

4    which model he would use.  That's the problem.  We're not

5    saying --

6          THE COURT:  I understand.

7          MR. GIUFFRA:  On the *Affiliated Ute* issue, this is

8    something that we think is critical in the case.

9          THE COURT:  So let me ask you this.  Is it your

10   position and defense position that this is primarily a

11   misstatements-based case or that it is simply not based

12   exclusively or primarily on omissions?

13         MR. GIUFFRA:  There's no question this is primarily a

14   misstatement case.  There's no question about it.  They

15   identify 48 separate statements that were wrong.  Your Honor,

16   in your motion to dismiss at pages 17 and 18 and 21 to 23, goes

17   through all the misstatements.

18         I'm quoting right from Your Honor's opinion.  You say

19   statements involving the pursuit of legislation or regulatory

20   solutions and representing internal control effectiveness but

21   omitting the bribery scheme and not talking about the risk of

22   being caught from the risk factors is the misstatement.

23         So Your Honor's own motion to dismiss correctly says

24   this is a misstatement case.

25         I can tell you, Your Honor, I worked on the *Volkswagen*

1   emissions case where there was a huge fraud involving diesel

2   cars.  Judge Breyer, who is a great judge, said, oh, the big

3   fraud was not disclosing the fact that you were cheating the

4   EPA.  The case went to the Ninth Circuit, and the Ninth Circuit

5   reversed because the case was about all of these misstatements.

6   And every misstatement that one makes -- if you say -- there's

7   always a fact that's omitted.  If I say I'm going to do A, B,

8   and C, but really what I'm not telling you is I'm not going to

9   do -- not going to do it, it's still a misstatement case

10  because every case would be a misstatement case.

11          THE COURT:  Let me ask, as a matter of law, what's the

12  difference between a misstatement and an omission?

13          MR. GIUFFRA:  Typically, Your Honor, a pure omission

14  case would be if someone said nothing, and then they just --

15  and they were in a relationship of trust with someone else.

16          You were, say, a stockbroker and you knew the stock that

17  you were having your person invest in was a bad stock and you

18  didn't tell anybody about it, but you didn't say anything about

19  you thought it was a good stock.  Once you make a statement,

20  the whole concept of what's called a half-truth -- so the

21  statement is sort of true.  They were pursuing legislative and

22  regulatory solutions, but they weren't disclosing how they were

23  doing it.  That's a misstatement case.

24          I can tell you, Your Honor, in every big securities case

25  in the United States, including ones that I litigate with the

1   firm on the other side, they're always analyzed under *Basic*

2   because otherwise *Ute* would swallow the rule.

3       So, Your Honor, you correctly recognized that you didn't

4   need to decide on the motion to dismiss whether *Basic* or *Ute*

5   applied.  This is clearly a *Basic* case where there's 48

6   misstatements, and every one of the misstatements is a

7   half-truth.

8       All seven court of appeals that have addressed this

9   issue have repeatedly held that a case involving a half-truth

10  is something that you look at under *Basic*, and that's because

11  what reliance is about is:  Well, did I read the document?  Did

12  I read the -- did I hear the false statement where they told me

13  a half-truth?

14      You can look to the statement and you can prove, hey, I

15  got the stock, the 10K, or I heard the false statement that was

16  made by the defendant.  In an omission case, you have nothing

17  that you can rely upon to look at.  So that's one of the

18  reasons why *Ute* gets applied.  But in a case like this with a

19  big public company that's made many, many statements, that's

20  what this is, and they can't pick and choose and have both

21  apply.  Courts of repeatedly held you can have both apply.  So

22  they're inviting error.

23      They may come up here and say, well, the Sixth Circuit,

24  in a case called *BancorpSouth*, which was a 23(f) short opinion,

25  let one of these stand in 2007 where both were put forward by a

1   judge.  That case —— I went back and looked at the district

2   court opinion —— relied on a Southern District of New York case

3   where the Court said you could do both.  The Second Circuit has

4   held since that case you can't do both *Ute* and *Basic* in the

5   same case.

6        So there is not another big securities case in the

7   United States that I'm aware of where *Ute* and *Basic* have been

8   applied together.  They've got to choose.  And they can't —— in

9   this case it's got to be *Basic* because the case is about

10  misstatements.

11       Let me turn a little bit to the bond offerings.  I think

12  there is a very simple way to look at it.  Two slides, which is

13  slide 39 and slide 41, under the *Basic* presumption, the theory

14  is that —— and it's an economic theory —— that all the

15  information that's said about a company is reflected in the

16  bond price because the market for bonds is got to be efficient.

17  Now, oftentimes, Your Honor —— and we're not contesting that

18  the stock of FirstEnergy —— that was an efficient market, no

19  question about it.  But bonds are a completely different animal

20  and much harder to establish market efficiency with respect to

21  bonds.

22       In this case, their expert did not look at any dates —

23  and this is on slide 39 — within the class period.  She only

24  looked at —— she looked at the date in which there was a —— in

25  which Mr. —— which was the arrest of Mr. Householder occurred

1    which is July 21, and then she looked at dates after the class

2    period.

3         As a matter of common sense, it makes no sense to look

4    at market efficiency before the -- not during the class period

5    but after the class period.  But then, Your Honor, if you look

6    at slide 41 - and this is right out of their expert's Exhibit

7    No. 13 - there were eight bonds that are at issue here.  On the

8    day when the stock fell massively by 17 percent, only two of

9    the eight bonds went down in value by a statistically

10   significant amount.

11        How can someone say this was an efficient market for

12   these bonds?  Then, when you look at the other dates that they

13   looked at post the class period, which were the only dates that

14   this expert tested, Your Honor, it's quite clear that there is

15   not any market efficiency here.

16        Now, we're not saying --

17        THE COURT:  Let me ask you -- well, go ahead and

18   conclude that because either your co-counsel will give you more

19   time or you're going to be out of time.  I have a *Hoxworth*

20   question for you anyway.  But go ahead and summarize.

21        MR. GIUFFRA:  Your Honor, so the issue is we're not

22   saying they couldn't certify a class under the '33 Act, the

23   Securities Act claim where you don't need to prove reliance,

24   but what they want to do is certify a class under the '34 Act

25   where you do need to show reliance.  In order to establish

1    reliance at class certification, you've got to establish that

2    the market was efficient.  It goes back to what I said at the

3    beginning.

4         They haven't -- we're not questioning that there is a

5    class that will be certified here at some point, Your Honor,

6    but they haven't done the work.  Their expert hasn't done the

7    work he needed to do.  On these bonds, they're overreaching by

8    asking the Court to certify a '34 Act class.  They can do the

9    '33 Act class.  We are not fighting them about -- because you

10   don't have to establish reliance for a '33 Act class.  But on a

11   '34 Act class, they can't do it because they don't have an

12   efficient market.

13        You just -- this is their numbers, not our numbers.

14        THE COURT:  If there's one thing that will resonate

15   with me, it's your view of the paucity of damages calculations,

16   computations, and structure that has been the undoing of the

17   possibility of certifying this class, in your view.  I got it.

18        MR. GIUFFRA:  Thank you, Your Honor.

19        THE COURT:  But here is the other question what haunts

20   me about this.  You correctly pointed out I outlined the

21   misstatements or -- your misstatements, their omissions in my

22   previous order.  But one of the questions that you kind of run

23   into is whether, under *Affiliated Ute*, they have to be pure

24   omissions, just blanket failures to disclose, or whether they

25   can be hybrid.  You can consider them to be both omissions and

1    commissions.  Is that possible?

2         MR. GIUFFRA:  No, Your Honor.

3         THE COURT:  Tell me why.

4         MR. GIUFFRA:  Multiple courts have held that when

5    there is a case involving a half-truth, like in the *Volkswagen*

6    case where the company said it was complying with environmental

7    laws but really wasn't complying with environmental laws, which

8    is exactly the same fact pattern in this case where the company

9    said it was seeking regulatory and governmental solutions but

10   didn't say that it was engaging in fraud.

11        THE COURT:  You know what the Third Circuit said in

12   *Hoxworth* was that failures to clarify true but misleading

13   statements relating to investment research, i.e. half-truths,

14   which although analytically are closer to lies than to

15   nondisclosure, are obviously closer to omissions than are pure

16   misrepresentations.  You disagree with that?

17        MR. GIUFFRA:  Your Honor, that issue has been dealt

18   with by, as I said before, seven courts of appeals.  I'm

19   looking at my sheet --

20        THE COURT:  You cited those cases; so I don't need you

21   to tell me what you cited.  I need you to answer the question I

22   asked.

23        Would you read it back, please, Ms. Evans.

24        MR. GIUFFRA:  Your Honor, the law --

25        THE COURT:  Just a second.  I want to you answer my

32

1    question.

2         (Thereupon, the Court's question was read by the court

3    reporter.)

4              MR. GIUFFRA:  Your Honor, I think that case has been

5    superseded by all the law that since has come after it.  The

6    cases -- for example, we cited the case from the Second

7    Circuit, *Waggoner*, where the Court said at 875 F.2d at 96, it's

8    a 2017 case, the *Ute* presumption doesn't apply to half-truths.

9    And so if the plaintiffs were correct --

10             THE COURT:  Are there any Sixth Circuit cases that

11   have followed that?

12             MR. GIUFFRA:  The Sixth Circuit has not yet dealt with

13   this issue, whether *Ute* applies in a case involving

14   half-truths.  It has not dealt with it, but seven circuits

15   have.  The case that you referenced, Your Honor, is a 1990

16   case.

17             THE COURT:  I know.

18             MR. GIUFFRA:  So the law back in 1990 was less settled

19   than it is now.  So, for example, there is a case --

20             THE COURT:  You've given me -- see, I want you to

21   understand -- and I know that you do because you're a veteran

22   at this -- that you've given me the most recent case law.  But

23   unlike you, I'm tasked with the responsibility of fashioning

24   something that makes sense to the litigants and to reviewing

25   courts.  So I'm not going to disregard what would otherwise be

1    good law in the various circuits, and I'm not going to pick and

2    choose.

3          My statement to you wasn't a statement that you are

4    wrong and this 1990 case out of the Third Circuit is correct.

5    Instead, my question is why shouldn't I reject this commentary

6    by the Third Circuit when I look -- do kind of a historical

7    retrospective of the case law leading to this because we don't

8    have guidance from the Sixth Circuit yet?

9          So help me out.  Remember I told you in my conference

10   room that my questions are an opportunity to persuade, nothing

11   more, nothing less.  My question to you is an opportunity for

12   you to tell me why that's bad law.  So simply answer it,

13   please.

14         MR. GIUFFRA:  The *Ute* case goes back even before 1990.

15   In the first couple of years after the *Ute* case came down,

16   courts struggled and said, well, if it's just primarily

17   omissions, we'll rely upon that concept.  Then there is the

18   concept of *Basic* which is the -- really the key way that most

19   class actions are certified.  As the law has evolved -- and

20   certainly now the law has evolved that in a case that involves

21   half-truths that you rely upon *Basic*, not *Affiliated Ute*.

22         The Supreme Court decision in *Stoneridge* which came, I

23   believe, after 1990 when this case came down, there was a lot

24   of uncertainty about whether you could, for example, plead a

25   scheme and whether you could bring scheme liability.  The

1     Supreme Court said in a case involving prior right of action,

2     you couldn't rely upon a scheme.  You needed to focus on the

3     misstatements if it's a misstatement case.

4          There have been subsequent cases by the Supreme Court,

5     including the *Stoneridge* case and more recent cases across the

6     country that have held that in a case involving half-truths,

7     which is what this case is, that you apply *Basic*, not *Ute*.

8               THE COURT:  Thank you.

9               MR. GIUFFRA:  Thank you, Your Honor.

10              THE COURT:  You have ten minutes.

11              MR. SCHOLES:  Good afternoon.

12         Steve Scholes, and I have the pleasure of representing

13    Robert Reffner who is one of five defendants whom the papers

14    before the Court refer to as nonspeaking defendants.  I

15    represent Mr. Reffner.  The other nonspeaking defendants, Your

16    Honor, are Chack, Dowling, Pine, and Vespoli.

17         I would submit to the Court that there is a very, very

18    sharp distinction in this case between the defendants.  The

19    nonspeaking defendants adopt and stand by everything that

20    Mr. Giuffra has argued on behalf of FE and the other

21    defendants, the speaking defendants, if you will.  But there is

22    a very sharp distinction between that group of defendants on

23    the one hand and the nonspeaking defendants on the other

24    because, as to the nonspeaking defendants, there is not a

25    single allegation that -- and there's no evidence that's been

1    adduced for the Court that any of them ever made any statement

2    to the public at all, not one, much less a misstatement.

3         There's no allegation that any one of them at any time

4    ever made an omission of a material fact they had a duty to

5    disclose.  There's not a single allegation that any of them

6    engaged in conduct of which the public investing -- the

7    investing public was aware, no conduct that reached the

8    marketplace.  There's no allegation.  There's no arguments in

9    the brief.  There's not a shred of evidence of any of those

10   things as to the nonspeaking defendants.

11        What we have, Your Honor, before your court is a record

12   that is barren.  It is barren of any basis whatsoever, I would

13   respectfully submit, for this Court to certify a class as to

14   those nonspeaking defendants, the silent defendants.

15        The plaintiffs rely on *Affiliated Ute*, or attempt to

16   rely on *Affiliated Ute*, to have a class certified to take

17   advantage of the presumption in *Affiliated Ute*.

18        THE COURT:  What cases are there out there,

19   Mr. Scholes, that say that *Affiliated Ute* is inapplicable to

20   scheme liability claims?

21        MR. SCHOLES:  I don't think there is a case that says

22   *Affiliated Ute* would be inapplicable the scheme liability

23   claims per se, Your Honor.  The distinction is that *Affiliated*

24   *Ute* -- every case that has addressed it has said *Affiliated Ute*

25   doesn't apply unless there is an affirmative duty to disclose.

1    That is the critical point, Your Honor.  That's the single

2    point of demarcation as to the nonspeaking defendants that I

3    would respectfully submit to the Court turns this Court's

4    decision with respect to the potential certification of a class

5    as to the nonspeaking defendants.

6         There's not an allegation of a fact or circumstance.

7    There's not a conclusory allegation.  There is not an argument

8    in the papers that any one of them had a duty to speak, not an

9    allegation of a fact that gave rise to a duty.  There is

10   nothing, Your Honor.  So, for those reasons, we respectfully

11   submit to you there's no basis in this record to certify a

12   class as to the nonspeaking defendants.

13        Your Honor, we -- I don't want this to be lost.  Under

14   the law of Rule 10b-5, the law is crystal clear that silence

15   absent a duty to disclose is not misleading under Rule 10b-5.

16   And that is, Your Honor, if I may, that's period, end of

17   paragraph.  It's the *In re Ford* case we've cited to Your Honor,

18   and that's the *In re National Century* case as well.  That

19   principle is not contested by the plaintiffs, and neither do

20   the plaintiffs contest or argue in their briefs that there has

21   been no omission by the nonspeaking defendants that they had a

22   duty to disclose.

23        In the Sixth Circuit --

24        THE COURT:  Back to *Affiliated Ute* and the scheme

25   liability claim, *Stoneridge* doesn't seem to categorically

37

1    reject the application of a reliance presumption based on

2    scheme liability claims.  Do you agree with that?

3         MR. SCHOLES:  I agree with that, Your Honor.  If I may

4    expound briefly.  It does make crystal clear there has to be a

5    duty to disclose for the *Affiliated Ute*.  That's the pivot

6    point, if you will, Your Honor.

7         THE COURT:  Thank you, Mr. Scholes.  I appreciate

8    that.

9         MR. SCHOLES:  One more thing quickly if I may.  The

10   law in the Sixth Circuit is pretty clear as to when a duty to

11   disclose arises.  The argument I made really poses the

12   question:  Is there any basis for concluding that any of the

13   silent defendants, the nonspeaking defendants, had a duty to

14   disclose?

15        In the Sixth Circuit, that duty only arises if there's

16   some statutory or regulatory obligation, if there was a prior

17   statement that the particular defendant made that had to be

18   corrected.  We've cited those -- we've cited that -- those

19   cases to Your Honor.  There is a particular Sixth Circuit case

20   I think we actually left out.  It's *Plymouth County Retirement*

21   *Association*, 556 F.Supp.3d 772.

22        So the law is very clear of the circumstances under

23   which the duty to disclose arises, and there's no argument, no

24   allegation, no evidence that that duty applied to any of the

25   nonspeaking defendants.

38

1          THE COURT:  Thank you, Mr. Scholes.

2          MR. SCHOLES:  One other thing quickly.

3          THE COURT:  Mr. Scholes, you've exceeded your time and

4     you've answered my questions.

5          MR. SCHOLES:  It went quickly.

6          THE COURT:  It always does when you're having fun.

7          Mr. Gronborg, I'm assuming that you're going to begin

8     where Mr. Giuffra left off?

9          MR. GRONBORG:  I was going to begin there, and then if

10    there any questions --

11         THE COURT:  On the damages.

12         MR. GRONBORG:  If there were any on scheme liability,

13    I was going to say my colleague, Ms. Stakem, wrote that part of

14    the brief.  And given what you said, I might just defer to her.

15         Let's go in the order.  Damages.  I'm going to go

16    through my notes and what they said.  First off, we heard a lot

17    of:  Where is the model?  Where is the model?  Where is the

18    model?  That's not the question.  The question is have you

19    presented a methodology?  Is there a formula?

20         Model seems to imply you need to calculate what the

21    damages are.  You need to say what they were.  This is it.

22    That's not what happens at class certification.  There is not a

23    model of it.  You don't present that.  So they say plaintiffs'

24    expert didn't answer that.  No, plaintiffs' expert answered

25    exactly what is required under the law which is here is the

1  methodology by which damages would be calculated, and then it

2  gets plugged into the statutory formula. It's not a model. At

3  the end of the day, it's not a model. It's a number.

4      THE COURT: So my colleague in the Northern District,

5  then, wasn't confronted with the methodology which is why she

6  rejected it. She just didn't have a satisfactory model?

7      MR. GRONBORG: What a lot of courts of said since --

8  let's say the *OPERS* case with Judge Pearson is she had already

9  rejected the plaintiffs' theory of liability. She said, I

10 don't think you've got an appropriate theory of liability and

11 so, therefore, you can't have a model. You can't have a --

12     THE COURT: So the threshold consideration is not

13 neither the model nor the methodology but the appropriate

14 theory of liability?

15     MR. GRONBORG: If you don't have a theory of

16 liability, you can't have damages. There's no methodology.

17 Here, that's not an issue.

18     The other thing that happened in that case is the

19 defendants put up an expert, and the expert specifically said

20 sort of under this defeated, whatever is left of the

21 methodology, you cannot calculate damages. That's not what

22 happened here. Here the expert just said, I don't like what

23 you did, I don't think you accounted for time-varying

24 inflation; didn't say it's impossible to calculate damages

25 because it's clearly not.

1      THE COURT:  Tell me about -- we've heard a lot about

2   *Affiliated Ute* and its applicability, and *Basic* and its

3   applicability, and the fact that these many omissions upon

4   which you rely are really not omissions but misstatements which

5   basically would eviscerate *Affiliated Ute* and its

6   applicability.

7      MR. GRONBORG:  What I heard -- what defendants seem to

8   say is that if your complaint has any statements in it at all,

9   it is, therefore, a case about statements and, therefore, you

10  have to apply *Basic*.  It's important to remember *Affiliated Ute*

11  preceded *Basic*.  *Affiliated Ute* wasn't carved out as here is a

12  unique situation just in case *Basic* doesn't apply.  It's sort

13  of the other way around.  *Affiliated Ute* existed.  It was fine.

14  This -- again, this notion of if you have any statement you

15  move on over to the *Basic* side of things.

16      Well, the Supreme Court used the word primarily.  I know

17  one thing which is certain, which is none of the circuit court

18  cases, they're not overruling the Supreme Court and they're not

19  changing the language the Supreme Court used.  So there is a

20  lot of reference to seven different circuits have said

21  *Affiliated Ute* doesn't apply.  Yes, in the context of a case

22  that's not primarily about omissions.

23      What they haven't said is if you plea a statement, as

24  soon as you've got a statement, it doesn't matter if you're

25  just saying, look, this is a statement that triggered a duty to

1    disclose and the case is about omissions, they don't say it

2    doesn't matter.  The minute you put a statement down on paper,

3    you've moved into a case that is about half-truths.

4        THE COURT:  I'm going to ask you the same question I

5    asked Mr. Giuffra.  What is the legal distinction between a

6    misstatement and an omission?

7        MR. GRONBORG:  It's a tough -- you've seen courts

8    wrestle with what it is.

9        THE COURT:  Absolutely.

10        MR. GRONBORG:  I'd like to answer in the context of

11    *Affiliated Ute* and *Basic* which is probably where it matters the

12    most, is *Affiliated Ute* says failure to disclose.  Is your case

13    about failure to disclose as opposed to lying?  And *Basic*, it's

14    really this notion of an affirmative misstatement.

15        My colleague gave the example of a case that involved a

16    restatement.  They're going out and saying, our earnings are X

17    and they're really Y.  So, yeah, they may be covering up the

18    fact that they created some false accounting scheme underneath

19    it, but they've lied to you about what their earnings are.

20        Then there are cases like this one which is you're not

21    telling anybody anything.  You're keeping this quiet.  Now,

22    you've touched on the subject matter so you had to disclose all

23    the material information, but you're keeping this quiet from

24    everybody, failure to disclose.  The language that the Supreme

25    Court used is exactly what we plead here.  And, honestly, it's

1   what we plead.  I don't think a defense lawyer is going to come

2   in here and say, nah, I'm going to rewrite your complaint for

3   you, and I'm going to tell you it's different.

4       Defendants' counsel referred to the *Volkswagen* case he

5   was involved in.  The Ninth Circuit there said the plaintiffs

6   pled nine pages of affirmative misstatements.  Affirmative

7   misstatements, those are the ones where it's not even a -- it's

8   you're going out and saying X and it's Y.  That's why in that

9   case they said, all right, it makes sense to use *Basic*.

10      THE COURT:  Next, tell me about the duty of which

11  Mr. Scholes spoke, or the lack of a duty of which Mr. Scholes

12  spoke.

13      MR. GRONBORG:  Do you mind if Ms. Stakem comes up?

14  She wrote it.  I'm happy to do it.  We just talk a little bit

15  about how they fall under both *Affiliated Ute* and *Basic* as

16  well.  I assume that's the question.  How do these guys fall

17  under *Affiliated Ute*?

18      MS. STAKEM:  Thank you, Your Honor.

19      So, as Mr. Gronborg said, the nonspeaking defendants

20  really are liable under both the *Basic* and *Affiliated Ute*

21  presumptions of reliance.  I believe you were asking

22  specifically about the duty to disclose argument.

23      THE COURT:  Yes.

24      MS. STAKEM:  To be perfectly frank, Your Honor, the

25  law regarding the duty to disclose in the context we have here,

1   the Rule 10b-5(a) and (c) claims where the defendants are

2   individuals who were senior executives and were incredibly

3   involved in the fraud itself, it's not very settled.  There

4   aren't many terrific examples out there that I can point you

5   and say this is exactly analogous that speak about the duty to

6   disclose.

7        The *Medtronic* case, for example, that we discuss quite a

8   bit in our briefs -- I was actually an associate on that case a

9   while back.  I can tell you that there the Court focused

10  primarily on whether or not there was -- whether the scheme

11  itself was primarily omissions-based as opposed to the duty to

12  disclose.  I can tell you there that there were individual

13  defendants who I would say were almost identically situated to

14  the nonspeaking defendants here.  They were individuals who

15  were involved in approving the quid pro quo payments to the --

16       THE COURT:  Did they have an obligation to disclose,

17  those defendants?

18       MS. STAKEM:  They didn't make any statements, those

19  particular defendants.

20       THE COURT:  What we're talking about here, and what

21  Mr. Scholes talked about, was the fact that there is no duty.

22  There's neither a statutory duty nor any other type of duty

23  that arises at law that would require them -- that would impose

24  upon those nonspeaking defendants a duty, is there?

25       MS. STAKEM:  I would argue that there is.

44

1          THE COURT:  What's the source of that duty?

2          MS. STAKEM:  Sure.  The traditional duties that were

3     enumerated there, those were developed in the Rule 10b-5(b)

4     context.  In *U.S. v. Chiarella* where the duty to either

5     disclose or abstain from insider trading, what the Court said

6     there was these specific enumerated duties that the Supreme

7     Court has recognized, they're not supposed to be exclusive.

8     The idea is that if the person, the defendant, has -- is in a

9     position of trust with the shareholders such that one would

10    expect they have a duty to disclose, that's really the key

11    issue.  And --

12         THE COURT:  It's almost like a common law duty, a

13    court-made duty.

14         MS. STAKEM:  Exactly, Your Honor.

15         THE COURT:  What Sixth Circuit case or other Ohio

16    cases do you rely on to impose a duty upon these nonspeaking

17    defendants?

18         MS. STAKEM:  Well, Your Honor, to be frank, we don't

19    have a Sixth Circuit or Ohio case, but we do rely on the recent

20    Supreme Court -- relatively recent anyway, Supreme Court

21    opinion in *Lorenzo*.  If I may, I'd like to read a quote from

22    *Lorenzo* regarding -- they were discussing the duty to disclose

23    there.

24         THE COURT:  I'm familiar with *Lorenzo* because *Lorenzo*

25    set out how we should look at the purpose of the Congress in

1   enacting the securities law, et cetera.  Yes.  Go ahead,

2   though.

3           MS. STAKEM:  One other point that I would like to

4   correct with respect to the nonspeaking defendants, counsel

5   tried to draw what I believe he referred to as a sharp, sharp

6   distinction between the nonspeaking defendants and the other

7   Exchange Act defendants here, and that's inaccurate.  Four of

8   the five --

9           THE COURT:  You were going to talk about *Lorenzo*

10  because, there, what *Lorenzo* said was Congress enacted the

11  securities law to root out all manner of fraud in the

12  securities industry.  Now, that's painted with a really broad

13  brushing.  You can apply that dicta -- that's almost so broad

14  it would qualify as being *obiter dicta*, and you can apply that

15  almost anywhere to any particular case.  It's kind of like your

16  catch-all provision.

17          MS. STAKEM:  I believe that's true.  The specific

18  quote I was thinking of in *Lorenzo* was actually that the

19  purpose of the securities law is to substitute a philosophy of

20  full disclosure for that of *caveat emptor* and thus achieve a

21  high standard of business ethics in the securities industry

22  which I think is particularly relevant here where the

23  defendants are accused of acting absolutely without business

24  ethics in a public company.  So I think that the duty to

25  disclose here really --

1      THE COURT:  So I could attach, then, a duty to

2  disclose to *Lorenzo*?

3      MS. STAKEM:  I don't think you can -- I think in some

4  ways.  I think that the --

5      THE COURT:  In this case, I mean, I can say that these

6  nonspeaking defendants have a duty to disclose relying on

7  *Lorenzo*?

8      MS. STAKEM:  It's not explicit.  I think that the

9  philosophy is there, and I think that if you want to --

10      THE COURT:  Is there anything in the legislative

11  history that you can cite to of 10b or 10b-5 which would say or

12  even suggest that I could use that to make the leap to impose a

13  duty on these nonspeaking defendants?

14      MS. STAKEM:  Not that I'm aware of, Your Honor, at

15  this juncture.  But, Your Honor, if you'd like, I'm happy to

16  rereview the statutory history.

17      THE COURT:  We'll do that in-house.  I certainly don't

18  want -- I want all of the lawyers to hear that I don't want

19  supplemental briefs.

20      MS. STAKEM:  Fair enough.  Understood.

21      But, yes, Your Honor, I do want to just clarify also --

22  I know that nonspeaking defendants' counsel focused on

23  *Affiliated Ute*, but belt and suspenders, *Basic* does also apply

24  here.  They argue, again -- like Your Honor correctly rejected

25  the argument at motion to dismiss, that they didn't make --

1  that they don't satisfy the public requirement necessary for a

2  *Basic v. Levinson*, and they offer no reason that Your Honor

3  should reconsider the reasoning that you found at motion to

4  dismiss, that, in fact, *Stoneridge* is distinguishable.  And,

5  actually, the public cover story reasoning that Your Honor used

6  at motion to dismiss has very recently been adopted in the

7  class certification context by Judge Richardson in the Middle

8  District of Tennessee, and that was the *AAC Holdings* opinion

9  that FirstEnergy submitted, in its recent authority.

10        THE COURT:  I have it.

11        MS. STAKEM:  Yes.

12        THE COURT:  Thank you very much.  Do you have anything

13  further?

14        MR. GRONBORG:  It's only because I can hear

15  Mr. Dalrymple, our expert, whispering in my ear about *AAC*, and

16  I heard defense counsel say the Court there rejected his damage

17  methodology.  It's not only true with respect to the part of

18  the case that's like here, sort of a standard disclosure case

19  where the fraud is disclosed at the end, the Court found that

20  methodology was just fine and upheld it.  It only rejected the

21  methodology with respect to what it characterized as a

22  materialization of the risk case.  This isn't a materialization

23  of the risk case.

24        THE COURT:  Thank you very much, particularly all

25  counsel who argued.  I know all of you didn't get through your

48

1   remarks, but I can say that sometimes with a little prodding,

2   Mr. Giuffra, we got all of the answers. You've given me

3   everything that I need to make a decision in this case. I

4   really do appreciate the depth and breadth of the knowledge of

5   the four advocates because you understand this on a granular

6   level. It's always a pleasure to have those lawyers in my

7   court because good lawyers make for good law in every case.

8   That much I appreciate.

9        I wouldn't want any of the lawyers or any of the

10   speakers, in particular, to leave thinking that they hadn't

11   made a significant contribution because you did, and I

12   appreciate that.

13        That being said, I wish all of you a pleasant and safe

14   weekend.

15        With that, Ms. Stash, you may adjourn court.

16     (Proceedings concluded at 2:55 p.m.)

17                  – – –

18

19

20

21

22

23

24

25

49

1                  C E R T I F I C A T E

2

3          I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings

5    before the Honorable Algenon L. Marbley, Judge, in the United

6    States District Court, Southern District of Ohio, Eastern

7    Division, on the date indicated, reported by me in shorthand

8    and transcribed by me or under my supervision.

9

10

11                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
12                              Official Federal Court Reporter

13

14                              April 1, 2023

15

16

17

18

19

20

21

22

23

24

25