IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | Case No. 2:20-cv-03785-ALM-KAJ |
| This Document Relates To: | ) ) ) | Chief Judge Algenon L. Marbley |
| Case No. 2:20-cv-03785-ALM-KAJ | ) ) ) ) | Magistrate Judge Kimberly A. Jolson |

**NON-PARTY ENERGY HARBOR'S OPPOSITION
TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

ZIEGER TIGGES & LITTLE LLP
Marion H. Little, Jr.
The Huntington Center
41 S. High Street
Suite 3500
Columbus, Ohio 43215
(614) 365-9900

DECHERT LLP
Jonathan R. Streeter (*pro hac vice*)
Matthew L. Mazur (*pro hac vice* pending)
Tamer Mallat (*pro hac vice* pending)
Amy ElSayed (*pro hac vice* pending)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Attorneys for Non-Party Energy Harbor*

## SUMMARY OF POINTS AND AUTHORITIES IN SUPPORT OF
## ENERGY HARBOR'S OPPOSITION

Non-party Energy Harbor, pursuant to Local Civ. R. 7.2(3), hereby submits this combined table of contents and summary:

**Page**

TABLE OF AUTHORITIES ...................................................................................................II

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 4

I.        STATEMENT OF RELEVANT FACTS ...................................................................... 4

        A.    FES's Relationship with FirstEnergy in 2018 and 2019 .......................... 4

        B.    Energy Harbor's Response to the DOJ Investigation in 2020.................. 6

II.      PLAINTIFFS' RULE 45 SUBPOENA AND THE RELATED DISPUTES ................... 8

ARGUMENT ......................................................................................................................... 9

I.        THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR DISCOVERY
       FROM THE EXTENDED TIME PERIOD...................................................................... 9

        A.    Documents from the Extended Time Period Are Irrelevant.................... 10

Despite non-party Energy Harbor's production to Plaintiffs of hundreds of thousands of pages of documents from a nearly four-year period between September 1, 2016, to July 20, 2020, Plaintiffs now seek additional documents on all topics covered by their subpoena for an additional nearly six-month Extended Time Period from July 21, 2020, to December 31, 2020. Plaintiffs' request is unlikely to result in the discovery of any relevant non-privileged information because it seeks documents from a time more than a year after House Bill 6 became law, more than nine months after the referendum effort related to that bill ended, and more than five months after Energy Harbor completely separated from defendant FirstEnergy. In addition, it seeks documents after the date Energy Harbor received a subpoena from the DOJ, retained counsel in connection with that matter, and disseminated a litigation hold notice to all persons who may have had discoverable, non-privileged information related to House Bill 6. Accordingly, it is likely that virtually all responsive documents during the Extended Time Period will be privileged. *See* Fed. R. Civ. P. 26(b)(1); *see also In re CareSource Mgmt. Grp. Co.*, 289 F.R.D. 251, 253 (S.D. Ohio 2013).

        B.    Extending the Discovery Time Period Would be Unduly Burdensome.................. 12

Requiring non-party Energy Harbor to search for and review many thousands of irrelevant and privileged documents from the Extended Time Period based on speculation that there could be some relevant, non-privileged ones would impose an

undue burden on Energy Harbor. *American Elec. Power Co. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999).

C.    Plaintiffs Should Bear the Costs of Additional Discovery ..................................... 14

If the Court is inclined to compel the production of documents from the Extended Time Period, Plaintiffs should bear the cost of collection, review, and production. Fed. R. Civ. P. 45(d)(2)(B)(ii); *American Mun. Power, Inc. v. Voith Hydro, Inc.*, No. 2:17-CV-708, 2023 WL 3624783, at *2 (S.D. Ohio May 24, 2023).

II.    THERE IS NO BASIS TO DISCOVER ENERGY HARBOR'S PRIVILEGED MATERIAL ........................................................................................................... 16

A.    Crime-Fraud .......................................................................................................... 16

The party invoking the crime-fraud exception must satisfy two elements: "(1) that the client was engaged in or planning the misconduct when the attorney-client communications took place; and (2) that those communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." *Murray Energy Corp. v. Cassidy, Cogan, Chappell & Vogelin, L.C.*, 2019 WL 2240245, at *3 (S.D. Ohio May 24, 2019) (quotation marks and citations omitted). Plaintiffs cannot show that Energy Harbor committed any crime or fraud, sought legal advice with the intent to facilitate or conceal such crime or fraud, *In re Antitrust Grand Jury*, 805 F.2d 155, 168 (6th Cir. 1986), or that it used its attorneys to accomplish any crime or fraud. *See Nilavar v. Mercy Health Sys. W. Ohio*, No. 399-cv-612, 2004 WL 5345311, at *7–8 (S.D. Ohio Mar. 22, 2004). Plaintiffs' motion to compel the discovery of privileged documents based on the crime-fraud exception should therefore be denied.

B.    FES's Disclosure of the Memos Did Not Result in a Subject Matter Waiver ........ 19

Plaintiffs' argument that Energy Harbor's decision not to claim privilege over materials FES shared with FirstEnergy employee Joel Bailey resulted in a subject matter waiver are without merit. First, the memos were never privileged at the outset because they were not kept confidential. *See Reed v. Baxter*, 134 F.3d 351, 358 (6th Cir. 1998). Second, even if the memos had been privileged at the time of their disclosure, any waiver with respect to those documents was plainly unintentional and therefore not a basis to imply a subject matter waiver. *See* Fed. R. Evid. 502(a)(1). Third, even if there had been an "intentional" waiver in this case, a subject matter waiver is not appropriate because such a waiver is reserved for circumstances when fundamental fairness requires disclosure of privileged materials, such as when a litigant discloses some helpful privileged material as a "sword," while using the privilege as a "shield" to withhold other damaging privileged material. *United States v. Skeddle*, 989 F. Supp. 905, 912 (N.D. Ohio 1997). Here, Energy Harbor has not engaged in any such strategic or unfair waiver. Plaintiffs' motion to compel the discovery of privileged documents should therefore be denied.

CONCLUSION ....................................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Elec. Power Co. v. United States*,
    191 F.R.D. 132 (S.D. Ohio 1999) ...................................................................10, 12

*American Mun. Power, Inc. v. Voith Hydro, Inc.*,
    No. 2:17-cv-708, 2023 WL 3624783 (S.D. Ohio May 24, 2023) ...........................14

*In re Antitrust Grand Jury*,
    805 F.2d 155 (6th Cir. 1986) ..................................................................................17

*Cahoo v. SAS Inst. Inc.*,
    377 F. Supp. 3d 769 (E.D. Mich. 2019)..................................................................15

*In re CareSource Mgmt. Grp. Co.*,
    289 F.R.D. 251 (S.D. Ohio 2013) ...................................................................10, 12

*Clark v. United States*,
    289 U.S. 1 (1933)....................................................................................................17

*In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*,
    293 F.3d 289 (6th Cir. 2002) (cited at Mot. Compel 17–18).................................19

*In re Commercial Money Ctr., Inc., Equip. Lease Litig.*,
    248 F.R.D. 532 (N.D. Ohio 2008) ...................................................................21, 22

*Cooey v. Strickland*,
    269 F.R.D. 643 (S.D. Ohio 2010) ..........................................................................22

*Cornell v. Columbus McKinnon Corp.*,
    No. 13-cv-02188-SI, 2015 WL 4747260 (N.D. Cal. Aug. 11, 2015) ...............14, 15

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*,
    No. 2:18-md-2846, 2019 WL 4508924 (S.D. Ohio Sept. 19, 2019).......................21

*Eastman v. Thompson*,
    No. 8:22-cv-00099, 2022 WL 11030550 (C.D. Cal. Oct. 19, 2022) ......................16

*In re First Energy Corp. Secs. Litig.*,
    ECF No. 350 ........................................................................................................1, 20

*In re First Energy Corp. Secs. Litig.*,
    ECF No. 456 ............................................................................................................20

*GATX Corp. v. Appalachian Fuels, LLC*,
    No. Civ. A. 09-41, 2010 WL 5067688 (E.D. Ky. Dec. 7, 2010) ............................................25

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
    474 F.3d 288 (6th Cir. 2007) ............................................................................................10, 13

*Marquinez v. Dole Food Co.*,
    No. 1:20-mc-042, 2021 WL 122997 (S.D. Ohio Jan. 13, 2021)........................................10, 13

*McClung v. Roby Auto Grp.*,
    No. 2:05-cv-796, 2006 WL 8442309 (S.D. Ohio May 22, 2006)...........................................24

*McGlone v. Centrus Energy Corp.*,
    No. 2:19-cv-2196, 2020 WL 4462305 (S.D. Ohio Aug. 4, 2020) ..........................................14

*In re Modern Plastics Corp.*,
    890 F.3d 244 (6th Cir. 2018) .....................................................................................10, 12, 15

*Murray Energy Corp. v. Cassidy, Cogan, Chappell & Vogelin, L.C.*,
    No. 2:18-cv-440, 2019 WL 2240245 (S.D. Ohio May 24, 2019)...............................16, 17, 24

*Musarra v. Digital Dish, Inc.*,
    No. 2:05-cv-545, 2008 WL 4758699 (S.D. Ohio Oct. 30, 2008) ...........................................12

*Nilavar v. Mercy Health Sys. W. Ohio*,
    No. 399-cv-612, 2004 WL 5345311 (S.D. Ohio Mar. 22, 2004)............................................18

*North American Rescue Prods., Inc. v. Bound Tree Med., LLC*,
    No. 2:08-cv-101, 2010 WL 1873291 (S.D. Ohio May 10, 2010)......................................22, 23

*Pollitt v. Mobay Chem. Corp.*,
    95 F.R.D. 101 (S.D. Ohio 1982) ..........................................................................................13

*In re Public Def. Serv.*,
    831 A.2d 890 (D.C. 2003) ....................................................................................................18

*Reed v. Baxter*,
    134 F.3d 351 (6th Cir. 1998) ...............................................................................................19

*SEC v. Sierra Brokerage Servs., Inc.*,
    No. 2:03-cv-326, 2005 WL 6569571 (S.D. Ohio Oct. 18, 2005) ..........................................16

*Slorp v. Lerner*,
    No. 2:12-cv-498, 2016 WL 1252980 (S.D. Ohio Mar. 31, 2016) .........................................17

*Tolliver v. Abuelo's Int'l, LP*,
    No. 2:20-cv-3790, 2021 WL 3188420 (S.D. Ohio July 28, 2021) .........................................13

*Travelers Cas. & Sur. Co. v. Excess Ins. Co.*,
   197 F.R.D. 601 (S.D. Ohio 2000) ........................................................................21, 23

*In re United Mine Workers of Am. Emp. Ben. Plans Litig.*,
   159 F.R.D. 307 (D.D.C. 1994) ..........................................................................................21

*United States v. Collis*,
   128 F.3d 313 (6th Cir. 1997) ............................................................................................16

*United States v. Dupree*,
   No. 10-CR-627 KAM, 2011 WL 2006295 (E.D.N.Y. May 23, 2011) ....................................11

*United States v. Skeddle*,
   989 F. Supp. 905 (N.D. Ohio 1997) ..................................................................................24

*William Powell Co. v. Nat'l Indem. Co.*,
   No. 1:14-cv-00807, 2017 WL 1326504 (S.D. Ohio Apr. 11, 2017), *aff'd*, 2017
   WL 3927525 (S.D. Ohio June 21, 2017) ............................................................................23

**Other Authorities**

Fed. R. Civ. P. 26 ..................................................................................................10, 13

Fed. R. Civ. P. 45 ..................................................................................................... *passim*

Fed. R. Evid. 502 ...................................................................................................20, 25

## PRELIMINARY STATEMENT

Non-party Energy Harbor Corp. ("Energy Harbor"), formerly known as FirstEnergy Solutions ("FES"), has already produced an extensive set of documents in response to Plaintiffs' Rule 45 subpoena. The productions comprise documents from over 30 different custodians, including board materials, payment records, and many thousands of emails and text messages involving FES and Energy Harbor employees, during a nearly four-year period from September 1, 2016, to July 20, 2020. They include the 84,663 documents that Energy Harbor produced to the Department of Justice ("DOJ"), additional documents produced to the Securities and Exchange Commission ("SEC"), and a set of documents specifically requested by Plaintiffs and produced in November 2022—for a total of nearly half a million pages of discovery.

Plaintiffs now seek to compel Energy Harbor to search for, review, and produce more documents, namely: (1) nearly six additional months of documents from the period between July 21, 2020, and December 31, 2020 (the "Extended Time Period"), after the DOJ served a grand jury subpoena on Energy Harbor in connection with House Bill 6 ("H.B. 6"); and (2) privileged legal advice FES received about 501(c)(4) entities and draft energy legislation in 2018 and 2019. Mot. Compel 1. Both of these requests should be denied.

*First*, Plaintiffs' request for documents from the Extended Time Period is unlikely to result in the discovery of any relevant information, is unduly burdensome, and is disproportionate to the needs of the case. H.B. 6 was signed into law on July 23, 2019, over a year before the Extended Time Period begins. The subsequent referendum challenging that law ended in October 2019, nine months before the Extended Time Period begins. Thereafter, on February 27, 2020, Energy Harbor emerged from bankruptcy, completing its separation from its former parent, FirstEnergy Corp. ("FirstEnergy"), nearly five months before the Extended Time Period begins. Accordingly, the events in this case involving Energy Harbor were over long

before the Extended Time Period, and therefore a search of documents in that time period is not likely to yield relevant, non-privileged materials. In connection with its productions to the government, Energy Harbor searched for and produced documents through July 20, 2020, because that was the date of the grand jury subpoena. Neither the DOJ nor the SEC has requested the production of documents from the Extended Time Period, and nothing in Plaintiffs' submission justifies imposing on Energy Harbor the significant cost of a further supplemental production.

Plaintiffs argue that the "Class Period" in this securities litigation extends to July 21, 2020, one day after the period covered by Energy Harbor's productions, and that it is customary in securities litigation to permit some discovery after the end of the Class Period. Mot. Compel 8–13. This argument makes sense with reference to FirstEnergy, which is alleged to have made the various public statements that form the basis for Plaintiffs' securities fraud claims, including statements after July 21, 2020. But it makes no sense when directed at Energy Harbor, which had no affiliation with FirstEnergy after February 27, 2020, and no involvement in those public statements by FirstEnergy. Energy Harbor should not be required to expend additional time and money—estimated to be in the range of $1 million—to search for and review documents during a time period long after it could have had any involvement in FirstEnergy's conduct.

Indeed, upon the public announcement of criminal charges and its receipt of a grand jury subpoena on July 21, 2020, Energy Harbor promptly sought legal advice from internal and external counsel and disseminated a legal hold to its employees, such that any responsive documents from July 21, 2020, onwards will almost certainly be privileged. Plaintiffs' speculation that Energy Harbor employees may have had after-the-fact non-privileged communications during the Extended Time Period, following the announcement of criminal

charges against Householder, cannot support such an expensive fishing expedition—at Energy Harbor's expense.

*Second*, Plaintiffs' attempts to pierce the attorney-client privilege should be rejected as meritless.  Plaintiffs argue for the application of the crime-fraud exception based on Energy Harbor's involvement in the events that gave rise to the criminal charges against FirstEnergy and others—charges that have now resulted in criminal convictions and a deferred prosecution agreement in which FirstEnergy admitted its involvement in bribery.  Mot. Compel 14–16.  But Energy Harbor was, at most, an unwitting participant in FirstEnergy's unlawful scheme when it donated to a 501(c)(4) entity and lobbied for clean energy legislation, and there is no indication that Energy Harbor sought advice from its lawyers to facilitate crimes.  The crime-fraud exception does not apply.

*Finally*, Plaintiffs invoke "selective waiver" to suggest that non-party Energy Harbor waived privilege over certain legal memoranda to gain some litigation advantage.  Mot. Compel 17–18.  This is simply false.  Energy Harbor produced to Plaintiffs the same documents it produced to other third parties, including the DOJ and SEC, so there was no "selective waiver." And there also was no "subject matter" waiver.  The memos were produced because they were shared with an employee of FirstEnergy after March 31, 2018, which was the date that Energy Harbor filed for bankruptcy and formally separated its legal function from FirstEnergy, and therefore those memos are not protected by privilege.  Nor have Plaintiffs provided any basis to conclude that Energy Harbor has used privilege as a sword and a shield, by strategically producing certain privileged documents but withholding others.  Indeed, as noted, these same memos were produced to the DOJ more than two years ago, and the DOJ has never claimed that

production affected a subject matter waiver. Plaintiffs' bid to compel discovery of privileged materials from a non-party in this case should therefore be denied.

## BACKGROUND

### I. Statement of Relevant Facts

Non-party Energy Harbor, formerly FES, was once a subsidiary of defendant FirstEnergy and the operator of FirstEnergy's two nuclear power plants in Ohio. On March 31, 2018, FES filed for bankruptcy as part of a plan to separate from its parent. Almost two years later, on February 27, 2020, FES emerged from bankruptcy as a new, entirely independent company, Energy Harbor.

#### A. FES's Relationship with FirstEnergy in 2018 and 2019

At the beginning of 2018, FirstEnergy owned and controlled FES as its wholly owned subsidiary. But, as of the March 31, 2018 bankruptcy filing and then over the course of the next two years, the companies were in a process of separation. FES had its own board of directors and its own operations in this period, but FirstEnergy continued to provide certain services to FES pursuant to a series of shared services agreements. *See* Mot. Compel Ex. 1.

Contrary to Plaintiffs' claim that FES relied on FirstEnergy for its corporate "legal" function, Mot. Compel 2, as of the March 31, 2018 bankruptcy filing date, FES had its own separate legal department, led by Rick Giannantonio, its general counsel. Giannantonio Decl. ¶¶ 3, 7. It also had its own separate outside counsel. While Jones Day and Akin Gump Strauss Hauer & Feld LLP ("Akin") had previously represented both FirstEnergy and FES as outside counsel, after that date, Jones Day represented only FirstEnergy and Akin represented only FES. *Id.* ¶ 6. Prior to the bankruptcy filing, the legal departments of FirstEnergy and FES were overlapping and were treated as one for privilege purposes. After that date, they were separated. *Id.* ¶¶ 5, 7. Indeed, the two companies were often adverse during the bankruptcy, as their

respective creditors and stakeholders negotiated over how assets and liabilities would be divided after FES emerged from bankruptcy. *Id.* ¶ 9.

In 2018 and 2019, FES and FirstEnergy each had reasons to support the clean energy legislation that would become H.B. 6. Those interests differed in that FES only sought a subsidy that would benefit its nuclear energy plants, whereas FirstEnergy also wanted a provision to stabilize its revenues by "decoupling" the rates it received from the amount of energy it sold. Giannantonio Decl. ¶ 10. But the two companies had a mutual business interest in the successful passage of H.B. 6 and the defeat of the subsequent referendum, and they therefore coordinated their efforts to some degree. *Id.* ¶ 11. Dave Griffing led the FES government affairs team. *Id.* ¶ 12. Joel Bailey, a FirstEnergy employee who had responsibility for local and state government affairs, also assisted FES on matters concerning H.B. 6. *Id.* Other personnel at FirstEnergy led its H.B. 6 efforts. *Id.* However, FirstEnergy and FES never entered into any common legal interest agreement concerning H.B. 6. *Id.* ¶ 10.

With guidance from its lawyers and lobbyists at Akin, FES made a series of contributions to Generation Now, a 501(c)(4) entity associated with Householder. FES and its employees believed that these contributions would be used lawfully for advertising in support of H.B. 6 and, later, in opposition to the referendum to defeat H.B. 6. No one at FES knew or intended that any part of its contributions would be taken for the personal use of Householder or any other politician.

Before making its 501(c)(4) contributions, FES also sought legal advice from outside counsel at Calfee, Halter & Griswold LLP ("Calfee"). Calfee sent a memo about 501(c)(4) contributions (the "501(c)(4) Memo") to Giannantonio on August 9, 2018. Giannantonio ¶ 14 & Ex. A. The following day, August 10, 2018, an administrative assistant in FES's legal

department circulated the 501(c)(4) memo to a group that included both FES employees and Bailey, who remained an employee of FirstEnergy. *Id.* ¶ 15 & Ex. B. At the time, Giannantonio mistakenly believed that Bailey was providing shared services to FES and therefore entitled to receive FES privileged material. *Id.* ¶ 15.

The next year, FES again sought Calfee's advice regarding energy legislation. Calfee prepared two memos discussing draft legislation (collectively, the "Clean Air Memos"), which a Calfee attorney emailed directly to various FES recipients on March 11, 2019, and March 15, 2019, respectively. *Id.* ¶ 16 & Exs. C & D. As with the 501(c)(4) Memo, outside counsel at Calfee copied Bailey on the emails circulating the Clean Air Memos under the mistaken belief that Bailey was part of FES's privilege group. *Id.* ¶ 16.

**B. Energy Harbor's Response to the DOJ Investigation in 2020**

On July 21, 2020, the DOJ arrested Householder and others in connection with events relating to H.B. 6. That same day, the DOJ served Energy Harbor with a grand jury subpoena, dated July 20, 2020. *Id.* ¶ 17. Energy Harbor thereafter consulted extensively with inhouse and outside counsel regarding the DOJ investigation. *Id.* Energy Harbor also promptly disseminated document hold notices to its employees, dated July 22 and 23, 2020, requiring all personnel to preserve documents related to H.B. 6. *Id.* ¶ 18.

In response to the grand jury subpoena, Energy Harbor conducted a thorough search for any documents relating to H.B. 6. It collected documents from over 30 custodians for the almost four-year period of September 1, 2016, through July 20, 2020. Streeter Decl. ¶ 6. Lawyers then reviewed over 485,000 documents, and Energy Harbor produced almost 85,000 documents to the DOJ. *Id.* ¶ 7. Later, Energy Harbor produced those same documents and others in response to an SEC subpoena. *Id.*

In the course of its document review, Energy Harbor discovered that FES had shared the 501(c)(4) Memo and the Clean Air Memos with Bailey, a FirstEnergy employee, after the March 31, 2018 bankruptcy filing when the two companies formally separated their legal departments. *Id.* ¶ 17.  Because FirstEnergy therefore also had the memos and was producing documents to the DOJ, Energy Harbor's outside counsel from Dechert LLP ("Dechert") consulted with FirstEnergy's outside counsel at Jones Day about whether the memos should be considered privileged. *Id.* ¶ 18.  Counsel at Jones Day responded that the memos were not protected by privilege because Bailey was an employee of FirstEnergy, was not performing services for FES under the shared services agreements when FES disclosed the memos (which was after the March 31, 2018 bankruptcy filing), and no legal common interest agreement had been entered into between the two companies concerning H.B. 6. *Id.* ¶ 19.  Counsel at Jones Day further informed Dechert that FirstEnergy was going to produce these same materials to the DOJ. *Id.* ¶ 20.

Counsel at Dechert independently considered the privilege question under applicable Sixth Circuit law. *Id.* ¶ 21.  Dechert also concluded that the memos could not be withheld from the DOJ on the basis of privilege for several reasons. *Id.*  First, the memos had been shared at the outset with an employee of FirstEnergy, which FES treated as a third party after the March 31, 2018 bankruptcy filing, such that they were never treated as confidential and privileged. *Id.* Second, even if the memos had been privileged, the disclosure to FirstEnergy would have waived the privilege over those particular memos. *Id.*  In addition, no legal common interest agreement had been entered into between the companies concerning H.B. 6. *Id.*  Energy Harbor accordingly produced the memos to the DOJ, and later to the SEC and Plaintiffs in this case. *Id.*

## II.  Plaintiffs' Rule 45 Subpoena and the Related Disputes

Plaintiffs have asserted claims on behalf of a class of purchasers of FirstEnergy securities between February 21, 2017, and July 21, 2020, against FirstEnergy and its former officers.  The complaint alleges that these defendants secretly orchestrated a massive bribery scheme that they failed to disclose to investors.  Plaintiffs and the other investors claim they suffered billions of dollars in losses following the public announcement of the DOJ investigation on July 21, 2020, when the market learned about the defendants' misleading statements and material omissions.  Energy Harbor had no involvement in FirstEnergy's statements or omissions to its investors.

On June 6, 2022, Plaintiffs served a Rule 45 subpoena on Energy Harbor, seeking a broad range of documents relating to H.B. 6.  In response, Energy Harbor produced:  (a) 84,663 documents comprising 470,903 pages that Energy Harbor produced in response to the DOJ subpoena; (b) a list of custodians from whom documents were collected; (c) the search terms used to identify responsive documents; (d) a detailed privilege log identifying documents that had been redacted or withheld from that production; and (e) an additional production of documents made to the SEC.  Streeter Decl. ¶ 11.  These documents spanned a nearly four-year period, from September 1, 2016, to July 20, 2020.  *Id.*  After an extensive meet and confer process, Energy Harbor then ran additional search terms requested by Plaintiffs and reviewed and produced in November 2022 an additional 812 documents comprising 1,168 pages, as well as a detailed privilege log for that production.  *Id.* ¶ 12.  In total, Energy Harbor collected approximately 1.9 million documents and reviewed well over 500,000 documents for responsiveness and privilege.  *Id.* ¶ 8.

Months after Energy Harbor completed its productions, Plaintiffs now seek even more discovery from Energy Harbor.  First, Plaintiffs seek documents from the Extended Time Period.  No other party in any civil or criminal matter has requested documents from Energy Harbor from

this Extended Time Period, such that it will require an entirely new collection and review. Energy Harbor estimates that collecting, reviewing, and producing documents from this period will cost approximately $1 million in technical and legal fees.  *Id.* ¶ 16; *see id.* ¶¶ 6–9.  Second, Plaintiffs seek privileged documents based on two separate theories—that the crime-fraud exception requires disclosure of privileged documents, and that the disclosure of the 501(c)(4) and Clean Air Memos resulted in a subject matter waiver of the attorney-client privilege. Contrary to Plaintiffs' implication, Mot. Compel 7, Plaintiffs never met and conferred with Energy Harbor with respect to the crime-fraud issue—which Plaintiffs first raised with Energy Harbor in an email on June 25, 2023, at 9:56 PM, the night before Plaintiffs first raised the issues in the instant motion with this Court.  Streeter Decl. ¶ 15 & Streeter Ex. A.

## ARGUMENT

### I.  The Court Should Deny Plaintiffs' Request for Discovery from the Extended Time Period

Despite non-party Energy Harbor's production to Plaintiffs of hundreds of thousands of pages of documents from a nearly four-year period between September 1, 2016, to July 20, 2020, Plaintiffs now seek additional documents on all topics covered by their subpoena for an additional nearly six-month Extended Time Period from July 21, 2020, to December 31, 2020. Plaintiffs' request is unlikely to result in the discovery of any relevant information, is unduly burdensome, and is disproportionate to the needs of this case.  Collecting and reviewing documents from the Extended Time Period will likely cost Energy Harbor at least $1 million in legal and technical fees.  *Id.* ¶ 16; *see id.* ¶¶ 6–9.  Plaintiffs should not be permitted this fishing expedition at Energy Harbor's expense.

### A.  Documents from the Extended Time Period Are Irrelevant

Despite Plaintiffs' repeated assertion that FES was involved in a massive bribery scheme and entangled with FirstEnergy "[d]uring the Class Period" and "throughout the Class Period," Mot. Compel 1, 2, 9, the events related to H.B. 6 ended much earlier, in the fall of 2019, when the anti-H.B. 6 referendum efforts concluded.  Energy Harbor then emerged from bankruptcy as a separate company on February 27, 2020, well before the end of the Class Period on July 21, 2020.  As a result, based on timing alone, it is unlikely that Energy Harbor has any responsive, non-privileged documents from the Extended Time Period.

Rule 45 provides that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person [or entity] subject to the subpoena.  The court for the district where compliance is required must enforce this duty and impose an appropriate sanction . . . on a party or attorney who fails to comply."  Fed. R. Civ. P. 45(d)(1); *see also In re Modern Plastics Corp*., 890 F.3d 244, 251 (6th Cir. 2018) ("[O]n a timely motion, [a] Court must quash or modify a subpoena that . . . subjects a person to undue burden") (internal quotations and citation omitted).  "Courts are required to balance the need for discovery against the burden imposed on the person [or entity] ordered to produce documents, and the status of a person [or entity] as a non-party is a factor that weighs against disclosure."  *American Elec. Power Co. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999); *In re CareSource Mgmt. Grp. Co.*, 289 F.R.D. 251, 253 (S.D. Ohio 2013); *In re Modern Plastics*, 890 F.3d at 251.  Courts must also enforce limits on discovery "where the information sought is overly broad or would prove unduly burdensome to produce," *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007), or is not "proportional to the needs of the case,"  Fed. R. Civ. P. 26(b)(1); *Marquinez v. Dole Food Co.*, No. 1:20-mc-042, 2021 WL 122997, at *5 (S.D. Ohio Jan. 13, 2021).

Plaintiffs speculate that there may be relevant documents in Energy Harbor's possession from the Extended Time Period on the theory that its employees "may" have made statements about the events underlying the criminal investigation after it was announced on July 21, 2020. Mot. Compel 10–11.  But this speculation cannot justify the additional discovery Plaintiffs seek.

First, the argument that relevant, non-privileged documents exist from the Extended Time Period is not only speculative but almost certainly wrong.  Contrary to Plaintiffs' claim, the selection of the July 20, 2020 discovery cutoff was not "arbitrary."  Mot. Compel 13.  That is the date of the grand jury subpoena that Energy Harbor received from the DOJ.  The following morning, the DOJ publicly disclosed its investigation and served Energy Harbor with that subpoena, at which point Energy Harbor began consulting extensively with inhouse and outside counsel.  Giannantonio Decl. ¶ 17.  The July 20, 2020 cutoff was in recognition of the fact that Energy Harbor is unlikely to have any responsive and non-privileged documents after the date of the subpoena, and it would be extremely burdensome to review and exclude from production the many privileged documents from any collection after that date.  *See United States v. Dupree*, No. 10-CR-627 KAM, 2011 WL 2006295, at *4 (E.D.N.Y. May 23, 2011) (quashing subpoenas that sought "documents that [were] well outside the time frame of the counts with which" defendant was charged because they were not relevant).

In addition, the day after it received the DOJ subpoena, Energy Harbor issued litigation hold notices informing employees to preserve any documents related to H.B. 6.  *Id.* ¶ 18.  Energy Harbor and its personnel were therefore on notice that documents in their possession could be reviewed and produced to the DOJ as part of its criminal investigation.  It is thus highly unlikely that Energy Harbor personnel—if they had something to admit, which they did not—would have implicated themselves in an email or text.  Notably, in recognition that documents from the

period after July 20, 2020, are unlikely to be relevant and non-privileged, neither the DOJ nor the SEC has ever suggested that those documents should be searched.

Plaintiffs' motion to compel focuses almost entirely on FES's conduct in 2018 and 2019. *See, e.g.*, Mot. Compel 2–3, 11. But for the Extended Time Period, Plaintiffs ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████ Mot. Compel 9 & Ex. 31–32. Neither of these ██████ suggests ████████████████████████████ involvement in bribery, much less that any Energy Harbor documents during the subsequent six-month Extended Time Period are likely to contain the kind of "[a]fter-the-fact admissions" Plaintiffs hope to find. Mot. Compel 11. And to the extent there are any relevant communications between Energy Harbor and FirstEnergy employees after July 20, 2020, Plaintiffs already have them by virtue of their document requests to FirstEnergy. *Musarra v. Digital Dish, Inc.*, No. 2:05-cv-545, 2008 WL 4758699, at *3–4 (S.D. Ohio Oct. 30, 2008) (declining to impose the burden of producing documents on a non-party where documents were available from a party to the litigation). Finally, Plaintiffs have failed to explain how a potential statement by an Energy Harbor employee, many months after it had completely separated from FirstEnergy, and *not* shared with anyone at FirstEnergy, could be relevant to Plaintiffs' claims against FirstEnergy.

## B. Extending the Discovery Time Period Would be Unduly Burdensome

Requiring Energy Harbor to search for and review many thousands of irrelevant and privileged documents from the Extended Time Period based on speculation that there could be some relevant, non-privileged ones would impose an undue burden on non-party Energy Harbor. "Courts are required to balance the need for discovery against the burden imposed on the person [or entity] ordered to produce documents, and the status of a person [or entity] as a non-party is a factor that weighs against disclosure." *American Elec. Power*, 191 F.R.D. at 136; *In re*

*CareSource*, 289 F.R.D. at 253; *In re Modern Plastics*, 890 F.3d at 251. Courts must also enforce limits on discovery "where the information sought is overly broad or would prove unduly burdensome to produce," *Surles*, 474 F.3d at 305, or is not "proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1); *see also Marquinez*, 2021 WL 122997, at *5.

Energy Harbor estimates that the cost of additional collection, review, and production of documents would be approximately $1 million and would likely require at least 2,000 hours of attorney work. Streeter Decl. ¶¶ 16, 6–9. This cost is not proportional to the needs of the case because, as explained above, a document collection and review of this magnitude is unlikely to yield responsive, non-privileged documents that are relevant to the claims and defenses in this case. *See Surles*, 474 F.3d at 306 (affirming district court's denial of a motion to compel against Greyhound, where Greyhound estimated that the cost of retrieving and reviewing certain documents would take thousands of hours of time and cost approximately $200,000, and where the jury awarded Plaintiff $8 million in damages); *Pollitt v. Mobay Chem. Corp.*, 95 F.R.D. 101, 105 (S.D. Ohio 1982) (quashing subpoena seeking discovery that would cost a non-party over $300,000 despite the "vast financial resources available" to the nonparty's parent corporation).

The fact that FirstEnergy, a defendant in this lawsuit and the company that made the statements to investors on which Plaintiffs base their claims, agreed to collect documents from the Extended Time Period, does not mean that Energy Harbor should. Energy Harbor's involvement in the events described in the complaint was limited to 2018 and 2019. By February 27, 2020, Energy Harbor was a completely separate company. It had no involvement whatsoever in events during the second half of 2020, when FirstEnergy made various allegedly false statements to investors. The law makes clear that there are different discovery burdens imposed on parties versus non-parties. *See Tolliver v. Abuelo's Int'l, LP*, No. 2:20-cv-3790,

2021 WL 3188420, at *3 (S.D. Ohio July 28, 2021) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs."); *McGlone v. Centrus Energy Corp.*, No. 2:19-cv-2196, 2020 WL 4462305, at *4 (S.D. Ohio Aug. 4, 2020) ("[T]he fact of nonparty status may be considered by the court in weighing the burdens imposed in the circumstances."). While it may be true that Energy Harbor is not an "ordinary" non-party in the sense that it was previously a subsidiary of FirstEnergy and had some involvement in the underlying H.B. 6 facts of this case, this does not relieve Plaintiffs of their obligation not to subject Energy Harbor to undue burden by undertaking a costly fishing expedition involving the collection and review of thousands of privileged and irrelevant documents.

### C.  Plaintiffs Should Bear the Costs of Additional Discovery

If the Court is inclined to compel the production of documents from the Extended Time Period, Plaintiffs should bear the cost of collection, review, and production.  Rule 45(d)(2)(B)(ii) of the Federal Rules of Civil Procedure "has been deemed to make cost shifting mandatory in all instances in which a non-party incurs significant expense from compliance with a subpoena." *American Mun. Power, Inc. v. Voith Hydro, Inc.*, No. 2:17-cv-708, 2023 WL 3624783, at *2 (S.D. Ohio May 24, 2023) ("[C]ost shifting is required to protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder non-significant") (quotation marks and citation omitted).  In determining whether cost-shifting is appropriate, some courts consider "whether the non-party actually has an interest in the outcome of the case . . . whether the non-party can more readily bear its costs than the requesting party, and . . . whether the litigation is of public importance."  *Cornell v. Columbus McKinnon Corp.*, No. 13-cv-02188-SI, 2015 WL 4747260, at *2 (N.D. Cal. Aug. 11, 2015).  Other courts simply consider whether costs imposed on a non-party are "significant."  *Id.* at *2–3.

Contrary to Plaintiffs' claim, Energy Harbor has no interest in the outcome of this litigation.  Although it was previously affiliated with FirstEnergy, it no longer is, and it has not been for more than three years.  The outcome of this case will not help, harm, or otherwise affect Energy Harbor any more than FirstEnergy's deferred prosecution agreement (to which Energy Harbor was not a party) and the multiple criminal convictions already have.  Plaintiffs' claim that a positive outcome in this case for FirstEnergy will somehow reduce Energy Harbor's liability in other hypothetical matters, Mot. Compel 12–13, has no basis in law or fact.  Indeed, it is hard to understand how FirstEnergy's conduct related to H.B. 6 will even be litigated or disputed in this case, given that FirstEnergy has already admitted criminal liability in its deferred prosecution agreement with the DOJ.

There is, moreover, no evidence that Energy Harbor can "more readily bear" the costs of discovery as opposed to Plaintiffs.  The cost of the additional discovery requested is far from "modest," likely over a million dollars—a considerable amount for both Plaintiffs and Energy Harbor.  Mot. Compel 13; *In re Modern Plastics*, 890 F.3d at 252 ("[I]f an objection is made and the court orders the non-party to comply, the court must protect a non-party from significant expenses resulting from compliance.").  The "public importance" of this matter does not render Energy Harbor's expenses any less significant and thus, Plaintiffs should bear, or at minimum share in, the cost of additional discovery.  *See Cornell*, 2015 WL 4747260, at *3; *Cahoo v. SAS Inst. Inc.*, 377 F. Supp. 3d 769, 778 (E.D. Mich. 2019) (ordering cost sharing "allocated among all the parties" despite the fact that non-party had an interest in the litigation, could bear the cost of production as easily as the requesting party, and where the matter was of public importance).

## II. There Is No Basis to Discover Energy Harbor's Privileged Material

### A. Crime-Fraud

Plaintiffs seek discovery of privileged documents on the ground that Energy Harbor "sought the legal advice in furtherance of the commission of crime and fraud."  Mot. Compel 14. Despite an almost year-long meet and confer process, Plaintiffs invoked the crime-fraud exception for the first time in an email to counsel on June 25, 2023, at 9:56 PM, the night before they raised the issues in this motion in a status report to this Court.  Streeter Decl. ¶ 15 & Streeter Ex. A.  Plaintiffs are the first and only to suggest that the crime-fraud exception applies to Energy Harbor, after years of investigation and production of the exact same documents and privilege logs to multiple government agencies and other parties.  The argument is meritless.

The crime-fraud exception applies to communications with an attorney "undertaken for the purpose of committing or continuing a crime or fraud."  *United States v. Collis*, 128 F.3d 313, 321 (6th Cir. 1997).  Examples include the use of forged or falsified documents in connection with court proceedings, *see, e.g.*, *id.* at 319–21 (client submitted forged letter during probation revocation proceedings); *Eastman v. Thompson*, No. 8:22-cv-00099, 2022 WL 11030550, at *10 (C.D. Cal. Oct. 19, 2022) (client brought lawsuit based on false allegations of voter fraud), or the use of an attorney's letter to mislead a regulator, *see, e.g.*, *SEC v. Sierra Brokerage Servs., Inc.*, No. 2:03-cv-326, 2005 WL 6569571, at *7 (S.D. Ohio Oct. 18, 2005). The party invoking the crime-fraud exception must satisfy two elements:  "(1) that the client was engaged in or planning the misconduct when the attorney-client communications took place; and (2) that those communications were intended by the client to facilitate or conceal the criminal or fraudulent activity."  *Murray Energy Corp. v. Cassidy, Cogan, Chappell & Vogelin, L.C.*, No. 2:18-cv-440, 2019 WL 2240245, at *3 (S.D. Ohio May 24, 2019) (quotation marks and citations

- 16 -

omitted), *rpt. adopted*, No. 2019 WL 3406543 (S.D. Ohio July 29, 2019). Plaintiffs cannot show either.

Plaintiffs argue that Energy Harbor was involved in a scheme to bribe Householder through corporate contributions to a 501(c)(4) entity, as FirstEnergy later admitted in its deferred prosecution agreement. Mot. Compel 15–16. But Plaintiffs' characterizations cannot overcome the privilege. *See Clark v. United States*, 289 U.S. 1, 15 (1933) ("It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud."); *Slorp v. Lerner*, No. 2:12-cv-498, 2016 WL 1252980, at *3 (S.D. Ohio Mar. 31, 2016) ("allegations in a pleading are not evidence" and "[l]ifting the well-established privilege takes more than the mere allegation of fraud") (citation omitted). Energy Harbor has never been charged with any crime. Energy Harbor contributed to the Generation Now 501(c)(4) on the recommendation of its lobbyists, and with the blessing of its lawyers, with the understanding that the funds would be used for a media campaign in support of H.B. 6 and, later, to defeat the referendum. To the extent that these funds were instead diverted to Householder's personal use, Energy Harbor knew nothing about it. Energy Harbor's unwitting participation in FirstEnergy's bribery scheme does not support the application of the crime-fraud exception.

Nor can Plaintiffs show that Energy Harbor sought legal advice with the intent to facilitate or conceal any crime or fraud. As the Sixth Circuit has explained, "merely because some communications may be related to a crime is not enough to subject that communication to disclosure; the communication must have been made with an intent to further the crime." *In re Antitrust Grand Jury*, 805 F.2d 155, 168 (6th Cir. 1986). Here, as the memos already disclosed to Plaintiffs reveal, Calfee's advice in 2018 merely summarized the law concerning corporate donations to 501(c)(4) entities. Giannantonio ¶¶ 14–15 & Exs. A & B. In the 2019 memos,

- 17 -

Calfee gave comments on draft legislation. *Id.* ¶ 16 & Exs. C & D. While FES admittedly contributed money to media and anti-referendum campaigns in this period, there is no evidence that it sought legal advice to facilitate or conceal any crime, and therefore no basis to apply the crime-fraud exception. *See Murray Energy*, 2019 WL 2240245, at *8; *Slorp*, 2016 WL 1252980, at *5 (plaintiffs failed to proffer evidence "that the communications at issue were made with an intent to further a crime or fraud").

The crime-fraud exception applies in the narrow circumstance where a client uses its attorney to accomplish a fraud or a crime. *In re Public Def. Serv.*, 831 A.2d 890, 906 (D.C. 2003) ("To fall within the [crime-fraud] exception . . . the communication must further a crime, fraud or other misconduct. . . . Only when communications are intended directly to advance a particular criminal or fraudulent endeavor will their privileged status be forfeited by operation of the crime-fraud exception.") (alterations adopted) (quotation marks omitted); *Nilavar v. Mercy Health Sys. W. Ohio*, No. 399-cv-612, 2004 WL 5345311, at *7–8 (S.D. Ohio Mar. 22, 2004) (declining to apply the crime-fraud exception because the connection between the alleged misconduct and the privileged material was "far too remote").

That never happened here. Plaintiffs allege that "FES consulted lawyers to use 501(c)(4) entities and the 'dark money' nature of those donations to conceal it as a source of funding for Householder" and that FES "illegally" used "its lawyers to assist it in ghostwriting HB6 provisions to benefit FES." Mot. Compel 16. But making contributions to a 501(c)(4) and consulting a lawyer about legal guideposts for doing so, as well as engaging a lawyer to help draft legislation favorable to a company, are not crimes. And Plaintiffs' characterizations do not make them so. There was nothing unusual, much less criminal, about FES seeking legal advice

- 18 -

regarding 501(c)(4)s in order to make donations related to energy legislation or asking its lawyers to advise on and help draft such legislation.

### B. FES's Disclosure of the Memos Did Not Result in a Subject Matter Waiver

Plaintiffs next argue that Energy Harbor's decision not to claim privilege over materials FES shared with FirstEnergy employee Joel Bailey after FES's March 31, 2018 bankruptcy filing resulted in a subject matter privilege waiver. Mot. Compel 17.[1] Plaintiffs are wrong. As both FirstEnergy and Energy Harbor determined when producing documents to the DOJ, the memos were simply not protected by the privilege. Streeter Decl. ¶¶ 19–21. Nor were the memos shared with Bailey in 2018 and 2019 pursuant to any legal common interest agreement between FES and FirstEnergy, but rather on the mistaken belief that Bailey was among the group covered by FES's legal privilege. Giannantonio Decl. ¶¶ 14–16. In any event, Plaintiffs fail to identify any strategic advantage for Energy Harbor from disclosure of the memos that could support a subject matter waiver finding.

#### 1. The Documents Were Never Privileged

As an initial matter, even though they were marked as "Attorney-Client Privileged," the memos were never privileged at the outset because they were not kept confidential. *See Reed v. Baxter*, 134 F.3d 351, 358 (6th Cir. 1998) (discussion deemed "not held in confidence for purposes of the attorney-client privilege" where third parties "participated in the meeting" between the attorney and client). The three memos were shared contemporaneously with FES personnel and FirstEnergy employee Bailey in 2018 and 2019, after the formal separation of the

---

[1] Plaintiffs refer to "selective waiver," citing *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 302 (6th Cir. 2002) (cited at Mot. Compel 17–18), but selective waiver as described by the Sixth Circuit in *Columbia/HCA Healthcare* refers to the situation when privileged materials are disclosed to one party, such as the government, and withheld from another. That did not happen here, as Energy Harbor produced the same purportedly privileged documents to the DOJ, SEC, and Plaintiffs.

legal departments.  Giannantonio Decl. ¶¶ 5, 7.  Because Bailey received the memos "as [a] third part[y], the [memos] [were] not held in confidence for purposes of the attorney-client privilege," and thus were not privileged.  *Reed*, 134 F.3d at 358.  In other words, privilege could not have been waived because the memos were not privileged in the first place.

Plaintiffs well understand that legal advice contemporaneously shared with a third party is not privileged.  Indeed, they argued this very point in this litigation when it was to their advantage.  Specifically, in the course of another discovery dispute with Partners for Progress ("PFP") concerning PFP's assertion of privilege over communications between its counsel and the very same FirstEnergy employee, Bailey, Plaintiffs asserted that the documents had been shared with a "stranger to [the] attorney-client relationship" and thus, PFP had "not established an essential element of the attorney-client [privilege]."  Pl.'s and Def.'s Joint Mot. To Compel Doc. Produc., *In re First Energy Corp. Secs. Litig.*, ECF No. 350, Oct. 6, 2022.[2]  Plaintiffs now ignore this black-letter law when it does not serve their present cause, but the same basic principle applies.  The three memos were simply never privileged and therefore the contemporaneous sharing of them with Bailey in 2018 and 2019 did not result in a waiver of any kind.

### 2.  Any Privilege Waiver Was Unintentional

In addition, even if the memos had been privileged at the time of their disclosure to Bailey, any privilege waiver was plainly unintentional and therefore not a basis to imply a subject matter waiver.  Subject matter waiver is limited to intentional privilege waivers.  *See* Fed. R. Evid. 502(a)(1) (A "waiver extends to an undisclosed communication or information in a

---

[2] In the case of PFP, this Court ultimately accepted PFP's claim that it had a common legal interest with FirstEnergy such that the disclosure of privileged material did not waive the privilege.  Op. & Order, *In re First Energy Corp. Secs. Litig.*, ECF No. 456, May 9, 2023.

federal or state proceeding only if . . . the waiver is intentional."). Here, however, the memos were disclosed to Bailey at FirstEnergy under the mistaken understanding that he was part of the privilege group. Giannantonio Decl. ¶¶ 15–16. While such an unintentional disclosure to a party outside the privilege group can result in a waiver over the specific documents disclosed, it does not result in a subject matter waiver. *Cf. In re United Mine Workers of Am. Emp. Ben. Plans Litig.*, 159 F.R.D. 307, 312 (D.D.C. 1994) (evidence that certain legal memoranda were apparently disclosed to third parties under circumstances where such memoranda were not normally disclosed did not require disclosure of additional privileged material).

Plaintiffs suggest that a common interest existed between FES and FirstEnergy, such that the memos remained privileged after disclosure to Bailey, and that Energy Harbor is now not asserting the common interest privilege intentionally. But this argument fails for multiple reasons.

First, as discussed above, the memoranda were never privileged, and thus, the common interest exception has no application. *In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 537 (N.D. Ohio 2008) ("As the common interest doctrine is merely an extension of the attorney-client privilege and work product doctrine, where these privileges do not protect a document from disclosure, the common interest doctrine has no application.").

Second, even assuming *arguendo* that the documents were privileged, the common interest doctrine only applies when the parties sharing privileged information are "facing a common litigation opponent" or when information is exchanged between "friendly litigants" with "similar interests." *Travelers Cas. & Sur. Co. v. Excess Ins. Co.*, 197 F.R.D. 601, 606 (S.D. Ohio 2000) ("The purpose behind this rule is to protect the free flow of information from the client to the attorney when a number of clients share a common interest in *litigation*.")

- 21 -

(alterations adopted) (quotation marks omitted) (emphasis added); *see also In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, No. 2:18-md-2846, 2019 WL 4508924, at *5 (S.D. Ohio Sept. 19, 2019) (disclosure must be "made due to actual or anticipated litigation for the purpose of furthering a common interest.") (citations omitted).  At the time the memos were shared between FES and Bailey, there was no litigation regarding 501(c)(4)s or clean air legislation, nor was any anticipated or contemplated.

Third, for the common interest exception to apply, the common interest must be legal, not merely commercial.  *See North American Rescue Prods., Inc. v. Bound Tree Med., LLC*, No. 2:08-cv-101, 2010 WL 1873291, at *4 (S.D. Ohio May 10, 2010) ("[F]or the common interest exception to apply, the parties must have a common legal, as opposed to commercial, interest.") (quotation marks omitted); *America Mun. Power*, 2021 WL 4891307, at *2, 8 ("The common interest exception should be construed narrowly . . . [the] exception will only apply where the disclosures are made in the course of formulating a common *legal* strategy.") (quotation marks and citation omitted) (emphasis added).  Any shared interest between FES and FirstEnergy with respect to H.B. 6 in 2018 and 2019 was commercial, not legal.  Indeed, non-lawyers in both companies' government affairs departments led their respective efforts regarding H.B. 6.

Fourth, the common-interest doctrine applies "only when all attorneys and clients have agreed to take a joint approach in the matter at issue."  *Cooey v. Strickland,* 269 F.R.D. 643, 652 (S.D. Ohio 2010); *In re Commercial Money Ctr.*, 248 F.R.D. at 536 (indicating that the common interest doctrine preserves privilege when "attorneys [are] facing a common litigation opponent" and noting that the common interest doctrine is sometimes referred to as the "joint defense privilege").  While FES and FirstEnergy at times worked together on H.B. 6 after March 31,

- 22 -

2018, no one at either company entered into a legal common interest agreement with the other regarding H.B. 6.  Giannantonio Decl. ¶ 10; Streeter Decl. ¶ 19.

Plaintiffs claim that Energy Harbor has "inconsistently claimed a 'common interest' with FirstEnergy concerning documents shared with FirstEnergy legal after March 31, 2018."  Mot. Compel 6 & Ex. 28.  But there is no inconsistency.  The documents withheld and noted on Energy Harbor's privilege log that were "shared with FirstEnergy *legal*" personnel concerned *legal* matters relating to the bankruptcy litigation.  *See, e.g.*, Ex. 28 (EH_FESECURITIESLIT_PRIV02379).  At that time, FES and FirstEnergy did have a legal common interest understanding concerning that litigation.  *Travelers Cas. & Sur. Co.*, 197 F.R.D. at 607 ("The [common interest] rule applies when the parties have a common litigation opponent or when information is exchanged between friendly litigants with similar interests".) (quotation marks and citations omitted).

But the companies did not have a legal common interest agreement at that time concerning the commercial effort—run by non-lawyer government affairs personnel such as Griffing and Bailey—with respect to H.B. 6.[3]  *William Powell Co. v. Nat'l Indem. Co.*, No. 1:14-cv-00807, 2017 WL 1326504, at *24 (S.D. Ohio Apr. 11, 2017) (ordering production of documents when a party withheld communications between itself and third parties "without any

---

[3] Plaintiffs misleadingly cite various entries on Energy Harbor's privilege log.  For instance, Plaintiffs point to documents over which Energy Harbor has claimed privilege that relate to 501(c)(4) contributions and H.B. 6.  Mot. Compel 6 & Ex. 28 (EH_FESECURITIESLIT_PRIV04911-14, EH_FESECURITIESLIT_PRIV02929, EH_FESECURITIESLIT_PRIV0246776).  But these documents were never shared with anyone at FirstEnergy; as the privilege log shows, they were communications among FES employees and its outside counsel at Calfee and are therefore obviously privileged.  Plaintiffs also cite a document, dated October 20, 2017, that was shared with Bailey and was withheld for privilege. Mot. Compel 17 & Ex. 28 (EH_FESECURITIESLIT_PRIV01296).  But this was before the March 31, 2018 bankruptcy filing, at a time when the legal departments of FES and FirstEnergy were not separated and were treated as one for privilege purposes.

proof of a common interest or joint defense agreement."), *aff'd*, 2017 WL 3927525 (S.D. Ohio June 21, 2017); *see also North American Rescue*, 2010 WL 1873291, at *4.

Plaintiffs claim that Energy Harbor intentionally disclaimed privilege over the memos for some "after-the-fact strategic" reason, or to obtain some tactical or legal advantage. Mot. Compel 18–20. This is not true. FES did not disclose the memos to Bailey in the context of any litigation, much less as part of some strategic or "sword" and "shield" gambit. Indeed, disclosure of the memos to Bailey occurred more than a year before Energy Harbor became aware of the existence of any criminal investigation by the DOJ and certainly before the commencement of the instant securities litigation, to which Energy Harbor is not even a party and in which it has no interest. Energy Harbor then produced the memos more than two years ago to the DOJ, along with a detailed privilege log, and then later to the SEC and Plaintiffs in this case. Before producing the memos in response to the DOJ subpoena, Energy Harbor carefully considered the facts and the law, and ultimately determined that because Bailey was an employee of FirstEnergy and because there was no legal common interest understanding at the time, it could not claim privilege over them. Streeter Decl. ¶ 21. There was no intentional waiver of common interest or any other privilege.

### 3. Even if Intentional, Subject Matter Waiver Does Not Apply

Even if there had been an "intentional" waiver of privilege based on the initial disclosure of the memos to Bailey at FirstEnergy, or the subsequent decision to produce the memos to the DOJ and later to Plaintiffs, subject matter waiver does not apply in this case. Given the importance of the attorney-client privilege, granting access to privileged material on the grounds of subject matter waiver is an "extraordinary measure." *Murray Energy Corp.*, 2019 WL 2240245, at *3 ("The attorney-client privilege is fundamental to the functioning of our legal system. Accordingly, applying subject-matter waiver so that a party may access privileged

- 24 -

material is an extraordinary measure.") (citations omitted). Subject matter waiver is reserved for circumstances when fundamental fairness requires disclosure of privileged materials, such as when a litigant discloses some helpful privileged material as a "sword," while using the privilege as a "shield" to withhold other damaging privileged material. *United States v. Skeddle*, 989 F. Supp. 905, 912 (N.D. Ohio 1997); *see also McClung v. Roby Auto Grp.*, No. 2:05-cv-796, 2006 WL 8442309, at *6 (S.D. Ohio May 22, 2006) ("Under this measure of fairness, waiver prevents the privilege from being used as both a shield and a sword."); *GATX Corp. v. Appalachian Fuels, LLC*, No. Civ. A. 09-41, 2010 WL 5067688, at *6 (E.D. Ky. Dec. 7, 2010) (finding no subject matter waiver when party did not "put the contents of either of these emails at issue in order to prove its case"); *cf.* Fed. R. Evid. 502(a) (subject matter waiver applies only if "the disclosed and undisclosed communications or information concern the same subject matter; and they ought in fairness to be considered together.").

In an attempt to satisfy this requirement, Plaintiffs contend that Energy Harbor is tactically not claiming common interest privilege over the documents shared with Bailey. Specifically they claim Energy Harbor is "manipulating the privilege to imply that it did not coordinate with FirstEnergy in their contributions to" Generation Now and "using the privilege offensively" to disclaim that coordination. Mot. Compel 18, 20. This is simply false. Energy Harbor does not deny that it coordinated on various aspects of H.B. 6 with FirstEnergy. That fact is apparent on the face of many documents Energy Harbor itself produced. With respect to the privilege determinations, though, there was no tactical or strategic decision made as to which documents to withhold as privileged and which to produce. Counsel for Energy Harbor at Dechert merely concluded, after careful analysis of the facts and law, that FES and FirstEnergy never entered into a legal common interest agreement regarding H.B. 6, which was a commercial

endeavor led by non-lawyers in both companies' government affairs departments.  In other words, a good faith legal analysis was performed and documents over which privilege could be claimed were withheld while those over which it could not be claimed were not.  *See* Streeter Decl. ¶ 21.  Plaintiffs' claim of some sort of "offensive" use of privilege has no basis in the record.  Therefore, their attempt to breach the privilege should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel discovery from non-party Energy Harbor should be denied in its entirety.

Dated: Columbus, Ohio                        Respectfully submitted,
      July 21, 2023

      ZIEGER TIGGES & LITTLE LLP        DECHERT LLP

By: */s/ Marion H. Little, Jr.*

      Marion H. Little, Jr.                        Jonathan R. Streeter (pro hac vice)
      The Huntington Center                    Matthew L. Mazur (*pro hac vice* pending)
      41 S. High Street                            Tamer Mallat (*pro hac vice* pending)
      Suite 3500                                    Amy ElSayed (*pro hac vice* pending)
      Columbus, OH 43215                      Three Bryant Park
      (614) 365-9900                            1095 Avenue of the Americas
                                     New York, New York 10036
                                     (212) 698-3500

           *Attorneys for Non-Party Energy Harbor*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 21, 2023, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will cause notice of its filing to be served electronically upon all attorneys of record in this matter.  I shall also cause a copy of this brief, the accompanying declarations, and the unredacted exhibits to be filed *in camera* this same day by email to Chambers and to all counsel of record.

                                    */s/ Marion H. Little, Jr.*
                                    Marion H. Little, Jr.   (0042679)