**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | |
| ALL ACTIONS | ) ) ) ) | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |
| MFS Series Trust I, et al., | ) ) | Case No. 2:21-cv-05839-ALM-KAJ |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| FirstEnergy Corp., et al., | ) ) | |
| Defendant. | ) ) ) | |
| Brighthouse Funds Trust II – MFS Value Portfolio, et al., | ) ) ) | Case No. 2:22-cv-00865-ALM-KAJ |
| Plaintiff(s), | ) ) | |
| vs. | ) ) | |
| FirstEnergy Corp., et al., | ) ) | |
| Defendant. | ) ) | |

**FIRSTENERGY'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO
COMPEL DISCOVERY OF FIRSTENERGY'S "INTERNAL INVESTIGATION"**

**[REDACTED]**

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ............................................................................................................5

    A.    FirstEnergy Faced an Avalanche of Criminal Enforcement and Civil Litigation Actions in the Immediate Aftermath of Former Speaker Householder's July 2020 Arrest......................................................................5

    B.    FirstEnergy and Its Board Responded by Retaining Counsel to Conduct Internal Investigations..........................................................................................7

        1.    The Independent Directors Retained Squire to Conduct an Investigation...................................................................................................8

        2.    The Company Retained Jones Day to Conduct an Investigation................9

        3.    Investigation Counsel Communicated with FirstEnergy's Independent Auditor, PwCs......................................................................9

        4.    Investigation Counsel Helped Inform Employment Decisions .................11

ARGUMENT................................................................................................................11

I.    DISCOVERY OF THE INTERNAL INVESTIGATIONS IS BARRED BY THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE.................................................................................................................12

    A.    Movants Are Not Entitled to Discovery of Work Product or Attorney-Client Communications From the Investigations ..................................................12

Documents and communications related to FirstEnergy's internal investigations fall squarely within well-established standards for work product protection and the attorney-client privilege. Work product protection exists where documents are "created '*because of*' a party's subjective anticipation of litigation"; and "that subjective anticipation . . . was objectively reasonable." *United States* v. *Roxworthy*, 457 F.3d 590, 593–94 (6th Cir. 2006) (emphasis added). James F. O'Neil III, a FirstEnergy independent director who was on the FirstEnergy Board at the relevant time, has attested that FirstEnergy's internal investigations were undertaken because FirstEnergy and certain senior officers were implicated in a criminal bribery scheme. Following Larry Householder's arrest, FirstEnergy immediately faced grand jury subpoenas from the U.S. Department of Justice ("DOJ") in connection with a criminal investigation and faced a wave of civil lawsuits and enforcement actions that were anticipated to (and did) quickly materialize. Courts consistently recognize documents created in response to litigation or enforcement proceedings, even in less clear-cut circumstances, are work product and immune from discovery.

*See, e.g.*, *Upjohn Co.* v. *United States*, 449 U.S. 383, 397–99 (1981) (receipt of a tax summons was sufficient to trigger work product protection over "notes and memoranda of interviews" from the company's internal investigation). As to attorney-client privilege, FirstEnergy's confidential communications with its counsel during the internal investigations to "secure legal advice" about matters such as the developing investigatory record and the potential legal consequences, indisputably "are covered by the attorney-client privilege." *Upjohn Co.*, 449 U.S. at 394–7; *see Hobart Corp.* v. *Dayton Power & Light*, 2017 WL 3668848, at *3 (S.D. Ohio Aug. 24, 2017) (finding "interview summaries . . . protected in their entirety by the attorney-client privilege and the work product doctrine" as "communications . . . made in confidence . . . in order to secure legal advice"). Likewise confidential communications concerning legal assessments of how the internal investigations should affect employment-related determinations are "precisely the type of legal advice that is protected by the attorney-client privilege." *Fletcher* v. *ABM Bldg. Value*, 2017 WL 1536059, at *3 (S.D.N.Y. Apr. 18, 2017); *see Mitchell* v. *Columbus Urb. League*, 2019 WL 4727378, at *3 (S.D. Ohio Sept. 27, 2019) (denying motion to compel testimony from attorney about "the 'details underlying the grounds' for [] suspension and termination decisions" because those "communications . . . [we]re protected by attorney-client privilege").

B.    Movants' Purported "Business Purposes" for the Investigations Are Nonsensical ...........................................................................................................15

Despite the ample record showing that FirstEnergy's internal investigations were conducted because of pending and anticipated litigation and enforcement actions, Movants claim that the investigations were primarily for "business purposes." In making this claim, Movants simply ignore the extraordinary legal risk FirstEnergy immediately faced following the unsealing of the DOJ's complaint against Householder and advance theories that have no basis in fact or law. *First*, Movants claim that the internal investigations were undertaken for the "business purpose" of "assuag[ing]" Pricewaterhouse Coopers ("PwC"), FirstEnergy's auditor. (Br. at 14.) But Movants' own exhibits make clear ██████████████████████████████████ ████████████████████████████████████████████ *Second*, Movants claim that the investigations were conducted to address "day-to-day" employment decisions. (Br. at 15.) But FirstEnergy was deciding, for example, whether to terminate its Chief Executive Officer for involvement in the criminal matters that were being investigated, which is the polar opposite of "day to day" human resources work. And Mr. O'Neil has attested that any employment decisions were ancillary to, and not the purpose of, the internal investigations, which were focused on the criminal and litigation risk facing the Company. *Finally*, Movants claim that the investigations were conducted to "protect the Company's access to outside capital," which required negotiating a resolution with the DOJ. (Br. at 16.) As with their other theories, Movants have no support for their speculation, and in any event, communications and documents analyzing the potential impact of anticipated litigation, including the potential financial impact and settlement strategy, are protected by both the work product doctrine and the attorney client privilege. *See, e.g.*, *United States* v. *Adlman*, 134 F.3d at 1194, 1198–1202 (2d Cir. 1998); *Fair Isaac Corp.* v. *Experian Inc.*, 2008 WL 11348223, at *6–8 (D. Minn. Nov. 3, 2008); *Coltec Indus., Inc.* v. *Am. Motorists Ins. Co.*, 197 F.R.D. 368, 375 (N.D. Ill. 2000).

C.    Attorney-Client and Work Product Protections Apply Even if the Investigations Had Ancillary Business Purposes...................................................17

Contrary to Movants' claims, ancillary "business purposes" do not eliminate applicable protections. Work product created because of FirstEnergy's actual and anticipated litigation is not discoverable even if it also served business purposes. *See Roxworthy*, 457 F.3d at 599 (rejecting a "requirement that the primary or sole purpose of" a document "be in preparation of litigation" to qualify for work product protection). Similarly, where the predominant purpose of communications was "to render or solicit legal advice" the "mere fact that business considerations [were] weighed in the rendering of [that] legal advice does not vitiate the attorney-client privilege." *Abington Emerson Cap., LLC* v. *Landash Corp.*, 2019 WL 6167085, at *3 (S.D. Ohio Nov. 20, 2019) (citation omitted).

## II.     MOVANTS FAIL TO ESTABLISH THAT FIRSTENERGY WAIVED WORK PRODUCT PROTECTION OR THE ATTORNEY-CLIENT PRIVILEGE. ................................................................................................................18

### A.     FirstEnergy's Disclosures to Its Auditor Did Not Waive Work Product Protections................................................................................................................19

Movants claim that disclosure of work product to FirstEnergy's auditor resulted in waiver, but Movants ignore that work product protection is waived only when the disclosure is to an "adversary." *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 306 (6th Cir. 2002). The law is clear that a company's independent auditors, like PwC, "cannot be [an] adversary," and thus disclosure of work product to an auditor does not constitute waiver. *United States* v. *Deloitte LLP*, 610 F.3d 129, 140–41 (D.C. Cir. 2010) (emphasizing that if an adversarial conflict developed between a company and its auditor, it would "necessitate" the auditor's "withdrawal"); *see also New Phoenix Sunrise Corp.* v. *C.I.R.*, 408 F. App'x 908, 919 (6th Cir. 2010) (disclosure to an auditor is "consistent with the privilege"). To the contrary, FirstEnergy and its auditor shared a common interest in ensuring FirstEnergy's outside counsel conducted a thorough internal investigation and in evaluating allegations as to the sufficiency of FirstEnergy's internal controls over financial reporting, as alleged in this case. *See Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 229 F.R.D. 441, 448 (S.D.N.Y. 2004) (finding disclosure to auditor did not waive work product protection and emphasizing that "[a] business and its auditor can and should be aligned insofar as they both seek to prevent, detect, and root out corporate fraud," which "is precisely the type of limited alliance that courts should encourage"). FirstEnergy also had a reasonable expectation that its auditor would keep FirstEnergy's work product confidential because auditors are ethically bound to do so. *See* American Institute of Certified Public Accountants Code of Professional Conduct § 1.700.001; *Deloitte*, 610 F.3d at 142. Movants' claim of waiver based on disclosures to PwC thus fails.

### B.     The Testimonial Aid Disclosed Facts and Ultimate Findings, Not Work Product or Privileged Communications ................................................................22

None of the four statements that Movants challenge in the Rule 30(b)(6) testimonial aid disclosed attorney work product or privileged communications. As a preliminary matter, Ms. Johnson's testimony as to information she personally received through privileged communications is irrelevant to whether FirstEnergy shared privileged information or work product in its Rule 30(b)(6) testimonial aid. The testimonial aid summarized evidence disclosed to Movants during

discovery or certain findings from the internal investigations. And the law in this circuit (as well as other circuits) is clear: summarizing non-privileged facts and disclosing conclusions from an investigation do not waive attorney-client privilege or work product protection. *See, e.g.*, *E.E.O.C.* v. *Texas Hydraulics, Inc.*, 246 F.R.D. 548, 557 (E.D. Tenn. 2007); *In re Dayco Corp. Derivative Sec. Litig.* 99 F.R.D. 616, 618–19, 621 n.4 (S.D. Ohio 1983); *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 528–34 (S.D.N.Y. 2015). Accordingly, Movants' claim of waiver based on the 30(b)(6) testimonial aid is unavailing.

C.    The Selective Disclosure Doctrine Does Not Apply Because the Disclosed Information Is Not Privileged or Work Product and Is Not Being Used to Gain Any Litigation Advantage ............................................................................26

Movants wrongly assert that FirstEnergy is using attorney-client privilege and work product as a "sword" and a "shield." Indeed, Movants cannot identify any "sword" because FirstEnergy is not relying on privileged communications to sustain its defenses to liability: FirstEnergy is not asserting an advice-of-counsel defense and it is not relying on any post-class period actions to defend against Plaintiffs' claims. Because the "swords" of attorney-client privilege and work product have "stay[e]d sheathed" those "privilege[s] stand." *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005); *Lewis Env't, Inc.* v. *Emergency Response & Training Sols., Inc.*, 2019 WL 285641, at *3 (S.D. Ohio Jan. 22, 2019) (finding no waiver of privilege or work product where the party did not use an assertion of privilege to "sustain [its] claims or defenses in th[e] lawsuit").

D.    Counsel Provided Consistent Privilege Instructions to FirstEnergy Directors at Their Depositions ..............................................................................28

It is not clear what Movants are claiming about supposed contradictory privilege objections at depositions. FirstEnergy agrees with Movants that facts are discoverable, but "[a] fact is one thing and a communication concerning that fact is an entirely different thing." *Upjohn*, 449 U.S. at 395–96 (internal citations omitted). Consistent with *Upjohn*'s directive, at depositions, counsel did not object to questions eliciting underlying facts, but instructed witnesses not to disclose confidential communications with attorneys that were the witness's exclusive source of underlying facts. Movant's counsel gave *the very same instruction* to witnesses. *See Libertarian Party of Ohio* v. *Husted*, 2014 WL 3792727, at *5 (S.D. Ohio July 31, 2014) ("While the attorney-client privilege cannot be used to 'protect disclosure of the underlying facts by those who communicated with the attorney,' it does 'protect[] disclosure of communications' between the attorney and the client."). Counsel's privilege objections were entirely proper.

**CONCLUSION** ...........................................................................................................30

**APPENDIX A** ............................................................................................................33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abington Emerson Cap., LLC* v. *Landash Corp.*,
2019 WL 6167085 (S.D. Ohio Nov. 20, 2019)........................................................................18

*Allied Irish Banks* v. *Bank of Am., N.A.*,
240 F.R.D. 96 (S.D.N.Y. 2007) ..........................................................................................14

*Alomari* v. *Ohio Dep't of Pub. Safety*,
2013 WL 5180811 (S.D. Ohio Sept. 13, 2013) ...................................................................14

*Antoine* v. *Atlas Turner, Inc.*,
66 F.3d 105 (6th Cir. 1995) ................................................................................................30

*Boling* v. *First Util. Dist. of Knox Cnty.*,
1998 WL 917522 (E.D. Tenn. June 5, 1998)......................................................................25

*Buford* v. *Holladay*,
133 F.R.D. 487 (S.D. Miss. 1990) ......................................................................................25

*Burkhead & Scott, Inc.* v. *City of Hopkinsville*,
2014 WL 7335173 (W.D. Ky. Dec. 19, 2014).....................................................................19

*Calendar Research LLC* v. *StubHub, Inc.*,
2019 WL 11558873 (C.D. Cal. July 25, 2019).....................................................................14

*Cheryl & Co.* v. *Krueger*,
2019 WL 6521956 (S.D. Ohio Dec. 4, 2019) ......................................................................19

*Coltec Indus., Inc.* v. *Am. Motorists Ins. Co.*,
197 F.R.D. 368 (N.D. Ill. 2000)..........................................................................................17

*In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*,
293 F.3d 289 (6th Cir. 2002) ..............................................................................................26

*Crestwood Farms Bloodstock LLC* v. *Everest Stables Inc.*,
2011 WL 13156795 (E.D. Ky. Jan. 25, 2011) ....................................................................27

*In re Dayco Corp. Derivative Sec. Litig.*,
99 F.R.D. 616 (S.D. Ohio 1983)....................................................................................25, 26

*Denman* v. *Youngstown State Univ.*,
2007 WL 2781351 (N.D. Ohio Sept. 21, 2007)...................................................................24

*E.E.O.C.* v. *Texas Hydraulics, Inc.*,
    246 F.R.D. 548 (E.D. Tenn. 2007)...................................................................................24, 25

*Fair Isaac Corp.* v. *Experian Inc.*,
    2008 WL 11348223 (D. Minn. Nov. 3, 2008) ......................................................................17

*First Horizon Nat'l Corp.* v. *Hous. Cas. Co.*,
    2016 WL 5867268 (W.D. Tenn. Oct. 5, 2016) ....................................................................21

*Fletcher* v. *ABM Bldg. Value*,
    2017 WL 1536059 (S.D.N.Y. Apr. 18, 2017)......................................................................13

*Futhey* v. *United Transp. Union Ins. Ass'n*,
    2015 WL 2446169 (N.D. Ohio May 20, 2015).....................................................................18

*Gambrell* v. *Gen. Motors, LLC*,
    2022 WL 17253882 (E.D. Mich. Nov. 28, 2022) ...................................................................2

*In re Gen. Motors LLC Ignition Switch Litig.*,
    80 F. Supp. 3d 521 (S.D.N.Y. 2015).....................................................................................25

*Grae* v. *Corr. Corp. of Am.*,
    2020 WL 3035915 (M.D. Tenn. June 5, 2020).....................................................................21

*In re Grand Jury Proc. Oct. 12, 1995*,
    78 F.3d 251 (6th Cir. 1996) ...................................................................................................25

*Hilton-Rorar* v. *State & Fed. Commc'ns Inc.*,
    2010 WL 1486916 (N.D. Ohio Apr. 13, 2010) .....................................................................30

*Hobart Corp.* v. *Dayton Power & Light*,
    2017 WL 3668848 (S.D. Ohio Aug. 24, 2017)....................................................................13

*Hughbanks* v. *Hudson*,
    2008 WL 11508991 (S.D. Ohio Dec. 31, 2008) ..................................................................19

*Kennedy* v. *City of Zanesville*,
    2006 WL 8442130 (S.D. Ohio Oct. 20, 2006)...................................................................1, 2

*In re King Pharms., Inc. Sec. Litig.*,
    2005 WL 8142328 (E.D. Tenn. Sept. 21, 2005)...................................................................21

*Koumoulis* v. *Indep. Fin. Mktg. Group, Inc.*,
    295 F.R.D. 28 (E.D.N.Y. 2013)............................................................................................14

*Lawrence E. Jaffe Pension Plan* v. *Household Int'l*,
    244 F.R.D. 412 (N.D. Ill. 2006)...........................................................................................18

*Lewis Env't, Inc.* v. *Emergency Response & Training Sols., Inc.*,
   2019 WL 285641 (S.D. Ohio Jan. 22, 2019) .......................................................27

*Liang* v. *AWG Remarketing, Inc.*,
   2015 WL 8958884 (S.D. Ohio Dec. 16, 2015) ....................................................11

*Libertarian Party of Ohio* v. *Husted*,
   2014 WL 3792727 (S.D. Ohio July 31, 2014) ....................................................30

*LifeBio, Inc.* v. *Eva Garland Consulting, LLC*,
   2023 WL 3258586 (S.D. Ohio May 4, 2023) ......................................................26

*Lindon* v. *Kakavand*,
   2014 WL 4063821 (E.D. Ky. Aug. 15, 2014) .......................................................2

*In re Lott*,
   424 F.3d 446 (6th Cir. 2005) .............................................................................27

*In re LTV Sec. Litig.*,
   89 F.R.D. 595 (N.D. Tex. 1981) ........................................................................12

*Luxottica of Am. Inc.* v. *Allianz Glob. Risks US Ins. Co.*,
   2022 WL 1204870 (S.D. Ohio Apr. 22, 2022) ...................................................20

*McCullough* v. *Hanley*,
   2019 WL 3776962 (N.D. Ill. Aug. 12, 2019) ....................................................24

*Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*,
   229 F.R.D. 441 (S.D.N.Y. 2004) ..............................................................3, 20, 21

*Mitchell* v. *Columbus Urb. League*,
   2019 WL 4727378 (S.D. Ohio Sept. 27, 2019) .................................................14

*New Phoenix Sunrise Corp.* v. *C.I.R.*,
   408 F. App'x 908 (6th Cir. 2010) ......................................................................20

*In re OM Sec. Litig.*,
   226 F.R.D. 579 (N.D. Ohio 2005) ...............................................................14, 26

*S.E.C.* v. *Schroeder*,
   2009 WL 1125579 (N.D. Cal. Apr. 27, 2009) ...................................................25

*Schuh* v. *HCA Holdings, Inc.*,
   2014 WL 12768360 (M.D. Tenn. Sept. 16, 2014) ...............................................2

*Shumaker, Loop & Kendrick, LLP* v. *Zaremba*,
   403 B.R. 480 (N.D. Ohio 2009) ........................................................................19

*In re United Shore Fin. Servs, LLC*,
2018 WL 2283893 (6th Cir. Jan. 3, 2018) ..............................................................27

*United States* v. *Adlman*,
134 F.3d 1194 (2d Cir. 1998) ..........................................................................17, 18

*United States* v. *Deloitte LLP*,
610 F.3d 129 (D.C. Cir. 2010) .........................................................................20, 21

*United States* v. *Paulus*,
2021 WL 4494607 (E.D. Ky. Sept. 30, 2021) .......................................................26

*United States* v. *Roxworthy*,
457 F.3d 590 (6th Cir. 2006) ..........................................................................12, 17

*United States* v. *Sanmina Corp.*,
968 F.3d 1107 (9th Cir. 2020) ...............................................................................21

*Upjohn Co.* v. *United States*,
449 U.S. 383 (1981) ..............................................................................12, 13, 30

*In re VisionAmerica, Inc. Sec. Litig.*,
2002 WL 31870559 (W.D. Tenn. Dec. 18, 2002) .......................................2, 19, 24

*Yarberry* v. *Gregg Appliances, Inc.*,
2013 WL 4476681 (S.D. Ohio Aug. 19, 2013) .................................................4, 24

**Other Authorities**

American Institute of Certified Public Accountants Code of Professional Conduct
§ 1.700.001 .............................................................................................................20

## PRELIMINARY STATEMENT

In July 2020, following the Department of Justice's unsealing of a criminal complaint against then-Ohio House Speaker Larry Householder, FirstEnergy's receipt of federal Grand Jury subpoenas, and a 34% drop in its stock price, FirstEnergy recognized that it would soon be at the epicenter of law enforcement proceedings and civil lawsuits.  The first wave of lawsuits—including this Action—were filed within days.  To respond to the criminal subpoenas, develop its legal strategy, and defend against the newly filed and anticipated civil actions, an independent committee of FirstEnergy's Board of Directors and FirstEnergy itself each immediately retained their own outside counsel to conduct internal investigations.  Over the course of many months, those outside counsel interviewed witnesses, reviewed numerous documents, developed their legal analyses, and presented their recommendations, strategy, and findings to their respective clients.  Those activities are within the heartland of conduct protected by the attorney-client privilege and the work product doctrine.

Movants have made many discovery requests into the same underlying events investigated by FirstEnergy's outside counsel.[1]  And, in response, they have received almost 750,000 pages of documents from FirstEnergy, with discovery still open.  To date, Movants have taken or noticed 48 fact depositions.  But rather than develop their own analysis using the toolbox in the Federal Rules of Civil Procedure, Movants seek to invade the attorney work product and privileged communications of FirstEnergy's internal investigations.  This contravenes the long-established principle that discovery is not intended to enable a party "to perform . . . on wits borrowed from the adversary."  *Kennedy* v. *City of Zanesville*, 2006 WL 8442130, at 4 (S.D. Ohio

---

[1]     Movants are the Plaintiffs in this Action, direct action Plaintiffs, defendant Charles Jones (former FirstEnergy Chief Executive Officer) and defendant Michael Dowling (former FirstEnergy Senior Vice President of External Affairs).

Oct. 20, 2006) (alteration in original) (quoting *Hickman* v. *Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring)).

Courts in this Circuit routinely deny discovery motions seeking the attorney work product, mental impressions, opinions, and privileged communications of defense counsel retained to conduct internal investigations as criminal and civil litigation unfolds.  *See, e.g.*, *Lindon* v. *Kakavand*, 2014 WL 4063821, at *1 (E.D. Ky. Aug. 15, 2014) (internal investigation report properly withheld "because it is work product"); *Gambrell* v. *Gen. Motors, LLC*, 2022 WL 17253882, at *1–2 (E.D. Mich. Nov. 28, 2022) (denying motion to compel "documents related to Defendants' investigations into Plaintiffs' complaints").[2]  Consistent with this authority, Movants must analyze the evidence themselves, without improper intrusion into FirstEnergy's lawyers' communications and work product.

The Court should deny Movants' improper request for at least the following reasons:

*First*, it is black-letter law that the work product and privileged communications demanded by Movants from investigations conducted by outside counsel to help FirstEnergy and its board respond to an onslaught of criminal and civil actions are protected from discovery.  To try to end-run that law, Movants make the untenable claim—which they never raised during the parties' many meet and confers—that *all* the work undertaken by FirstEnergy's counsel is discoverable because their investigations were for "business purposes," such as "gather[ing] facts for human resources decisions."  (Movants' Brief, ECF No. 489 ("Br.") at 14–17.)  This argument

---

[2]     *See also Schuh* v. *HCA Holdings, Inc*., 2014 WL 12768360, at *1, *4, *10 (M.D. Tenn. Sept. 16, 2014) ("internal investigation" documents "appropriately protected under the work product doctrine");. *In re VisionAmerica, Inc. Sec. Litig*., 2002 WL 31870559, at *1, *4 (W.D. Tenn. Dec. 18, 2002) ("results of [outside counsel's] investigation and all its associated documents" properly withheld).

simply ignores the highly publicized events that unfolded in the aftermath of the Householder criminal complaint—including the filing of *this Action* (and over a dozen more)—and is directly refuted by the declaration of James O'Neil, a FirstEnergy director since 2017 and a member of the independent board committees that directed the internal investigations at issue here. As Mr. O'Neil affirms, the investigations were conducted because FirstEnergy was facing sudden and extraordinary legal risk from government investigations and litigation that implicated senior officers in criminal conduct. (Decl. of James O'Neil, dated July 26, 2023 ("O'Neil Decl.") ¶¶ 5–11, 29.)

*Second*, implicitly recognizing the implausibility of their "business purposes" theory, Movants argue that FirstEnergy's attorney-client privilege and work product protection have been waived. But Movants' waiver theories misapprehend the relevant facts and law.

Movants' first theory—that waiver occurred because attorney work product and privileged communications from FirstEnergy's internal investigation were disclosed to PwC fails because Movants' own evidence shows that privileged communications were *not* shared with PwC. (*See* Decl. of Jason A. Forge, dated June 30, 2023 ("Forge Decl."), Ex. 1 at -8014.) And work product protection is waived only where it is shared with "an adversary," and a company's relationship with its external auditor "simply is not the equivalent of an adversarial relationship contemplated by the work product doctrine." *Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 229 F.R.D. 441, 448 (S.D.N.Y. 2004). As such, any confidential disclosures to PwC could not have waived work product protection.

Movants' second theory of waiver fails because it is based on mischaracterizing the deposition testimony of Julia Johnson, a former FirstEnergy board member. Movants claim, among other things, that Ms. Johnson "confirmed" that "all information" in a testimonial aid

prepared for FirstEnergy's 30(b)(6) witness ("Testimonial Aid") "had come from [] lawyers."  (Br. at 7.)  Ms. Johnson said no such thing.  Instead, she testified merely that *she received* information that came from privileged communications with counsel in the investigations.  Rather than waive privilege, she did the opposite by declining to respond to questions at her deposition seeking to invade those privileged communications.  In any event, as shown below (*see* Part II.B, *infra*), the statements that Movants challenge from the Testimonial Aid contain factual information produced to Movants in discovery or publicly disclosed, and factual findings from the investigations.  Such disclosures do not trigger waiver.  *Yarberry* v. *Gregg Appliances, Inc.*, 2013 WL 4476681, at *4 (S.D. Ohio Aug. 19, 2013) (no waiver where the disclosed communications "d[id] not reveal the substance of [the attorney's] advice, any facts upon which [the attorney] based his advice upon, nor his reasoning behind his advice").

Finally, Movants' theory that FirstEnergy waived privilege by selective disclosure fares no better.  That doctrine bars disclosing some privileged communications as a sword to strategically benefit a party's litigation position, while at the same time asserting privilege as a shield over related, potentially harmful communications.  Nothing of the sort has happened here. FirstEnergy has not selectively disclosed any privileged communications to achieve a litigation benefit by, for example, asserting a defense based on investigation counsel's advice or the sufficiency of their investigations.  Nor are the purported selective disclosures on which Movants rely—a statement that FirstEnergy was not "aware of evidence" that certain individuals had knowledge of improper payments and political contributions, and the statement that FirstEnergy's Board acted "decisively" when it learned violations of its policies had occurred—swords because they are neither disclosures of privileged communications nor strategically beneficial to FirstEnergy.

This Court should deny the motion to compel in its entirety.

## BACKGROUND

A. **FirstEnergy Faced an Avalanche of Criminal Enforcement and Civil Litigation Actions in the Immediate Aftermath of Former Speaker Householder's July 2020 Arrest.**

Then-Ohio House Speaker Larry Householder's arrest on July 21, 2020 and the Department of Justice's ("DOJ") unsealing that same day of the criminal complaint against him ("Householder Complaint") precipitated a cascade of litigation and enforcement proceedings against FirstEnergy. Indeed, almost simultaneously, the DOJ issued criminal subpoenas to FirstEnergy, within days various plaintiffs' firms issued press releases announcing they were preparing lawsuits, and within weeks numerous civil litigants—including Plaintiffs here—filed actions against FirstEnergy in Ohio federal and state courts, all focused on H.B. 6-related conduct:

- *July 21, 2020*: FirstEnergy received "subpoenas for records from the U.S. Attorney's Office for the Southern District of Ohio" ("DOJ Subpoenas") in connection with its investigation related to the passage of H.B. 6. (Ex. 1 (FirstEnergy Corp., Notification of Late Filing at 2 (SEC Form 12b-25) (Aug. 10, 2020)).);[3]

- *July 22, 2020*: A plaintiffs' class action law firm announced it is "preparing a securities lawsuit on behalf of FirstEnergy shareholders" due to "allegations that FirstEnergy may have issued materially misleading business information" related to the Householder Complaint (*see* Ex. 12 (*EQUITY ALERT: Rosen Law Firm Announces Investigation of Securities Claims Against FirstEnergy Corp. – FE*, Business Wire (July 22, 2020))). Similar announcements from other law firms rapidly followed. (*See* Exs. 13–20.);

- *July 24, 2020*: The Ohio Attorney General sent a letter to FirstEnergy "notif[ying]

---

[3] Unless otherwise noted, all references to "Ex." are to Exhibits to the Declaration of Hilary M. Williams, dated July 26, 2023, submitted herewith.

[FirstEnergy] of its duty to not destroy documents in its custody or control regarding [H.B.] 6" (*see* Ex. 2 (FirstEnergy Corp. Quarterly Report at 32 (Form 10-Q));

- ***July 26 and 31, 2020***: Certain FirstEnergy directors and officers were named as defendants in shareholder derivative action lawsuits, alleging, among other things, breaches of fiduciary duty (*see Gendrich* v. *Anderson, et al.* and *Sloan* v. *Anderson, et al.* (Court of Common Pleas, Summit County, Ohio));

- ***July 27, 2020***: FirstEnergy and several of its officers were named as defendants in a class action complaint filed in the Southern District of Ohio alleging violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") (*see Smith* v. *FirstEnergy Corp. et al*. (S.D. Ohio));

- ***July 28, 2020***: FirstEnergy, together with its officers and directors, were named as defendants in the first-filed complaint in this Action claiming violations of the Securities Exchange Act (*see* ECF No. 1);

- ***July 31, 2020 and August 5, 2020***: FirstEnergy and FirstEnergy Solutions Corp. were named as defendants in class action lawsuits alleging civil violations of RICO and the Ohio Corrupt Activity Act (*see Buldas* v. *FirstEnergy Corp. et al.*; *Hudock and Cameo Countertops, Inc*. v. *FirstEnergy Corp. et al* (S.D. Ohio));

- ***August 4, 2020***: FirstEnergy was named as a defendant in a class action lawsuit alleging negligence and/or gross negligence, breach of contract, unjust enrichment, and unfair or deceptive consumer acts or practices (*see Emmons* v. *FirstEnergy Corp. et al.* (Court of Common Pleas, Cuyahoga County, Ohio));

- ***August 7, 2020***: FirstEnergy directors and officers were named as defendants in a shareholder derivative action, alleging breaches of fiduciary duty and violations of Section 14(a) of the Securities Exchange Act (*see Miller* v. *Anderson, et al.* (District Court, N.D. Ohio));

- ***August 10, 2020***: The Securities and Exchange Commission ("SEC") "issued an order directing an investigation of possible securities laws violations by

FirstEnergy ("SEC Investigation"), and on September 1, 2020, issued subpoenas to FirstEnergy and certain of its officers" (Ex. 3 (FirstEnergy Corp., Current Report at 3 (Form 8-K) (Nov. 2, 2020))); and

- ***September 23, 2020***:  The Ohio Attorney General filed a civil claim under the Ohio Corrupt Activity Act against FirstEnergy and other defendants (*see State of Ohio ex rel. Dave Yost, Ohio Attorney General* v. *FirstEnergy Corp. et al.* (Court of Common Pleas, Franklin County, Ohio)).

As shown in full in Appendix A, by the end of November 2020, FirstEnergy faced a DOJ criminal investigation, the SEC Investigation, an action by the Attorney General of Ohio, an audit and investigative proceedings by the Public Utilities Commission of Ohio ("PUCO"), and more than a dozen civil litigation matters.

### B.  Both FirstEnergy and Its Board Responded by Retaining Counsel to Conduct Internal Investigations

That FirstEnergy faced serious legal jeopardy was immediately obvious to the Company and its Board.  The Householder Complaint "alleg[ed] that Householder was a member of a criminal enterprise that helped pass Ohio House Bill 6 [("H.B. 6")] in exchange for payments from an unnamed company."  (O'Neil Decl. ¶ 3.)  As FirstEnergy board member Mr. O'Neil attests, "FirstEnergy management, as well as financial analysts and the media, understood that the unnamed company referred to FirstEnergy," and that the Householder Complaint "alleged that senior officers of that unnamed company had participated in this criminal enterprise."  (*Id.*)

When FirstEnergy learned of the criminal charges against Householder and was served with the DOJ Subpoenas on July 21, 2020, "Board members and FirstEnergy anticipated that the Company would face government investigations, civil litigation, and regulatory proceedings related to the Company's role in the alleged events described in the Householder Complaint."  (*Id.* ¶ 5.)  By the end of the next day, FirstEnergy's stock price had declined by about

34%, and "Board members and FirstEnergy anticipated that the drop in FirstEnergy's stock price would trigger the filing of claims under the federal securities laws." (*Id*.) Those expectations were borne out when, as detailed above, the first shareholder derivative lawsuit was filed on July 26, 2020, the anticipated securities class action—this case—was filed on July 28, 2020, and numerous additional matters were filed over the following weeks and months. (*See* App. A.)

### 1. The Independent Directors Retained Squire to Conduct an Investigation

Over the following days, the Board held several special meetings to discuss, among other things, the Company's response to the DOJ Subpoenas and other litigation against FirstEnergy. (O'Neil Decl. ¶ 12.) The Board decided to retain Squire Patton Boggs LLP ("Squire"), which did not engage in regular legal work for FirstEnergy, to conduct an independent internal investigation into the Householder Complaint's allegations. (*Id*. ¶ 13.) Joseph Walker, the lead partner on the Squire investigation team, was a highly experienced former criminal prosecutor with the DOJ who had led numerous internal investigations for large institutions. (*Id*.)

Shortly thereafter, the Board authorized the formation of a Special Investigation Committee ("SIC") to provide independent oversight over the initial phase of Squire's internal investigation of the allegations in the Householder Complaint. (*Id*. ¶¶ 14–15.) The SIC was composed of independent members of the Board (*i.e.*, members who were not part of FirstEnergy management), including Mr. O'Neil. (*Id*. ¶ 16.)

In early September 2020, the Board formed the Independent Review Committee ("IRC") to supersede the SIC. (*Id*. ¶ 18.) Like the SIC, the IRC exclusively comprised independent Board members, and included Mr. O'Neil. (*Id*. ¶ 19.) The IRC retained Squire and continued to provide independent oversight of Squire's investigative work and an independent assessment of the legal risk associated with the DOJ Subpoenas, the SEC Investigation, and

pending and anticipated litigation. (*Id.* ¶¶ 18–19.) Squire continued to advise the IRC until at least June 2021. (*Id.* ¶ 21.)

### 2. The Company Retained Jones Day to Conduct an Investigation

On or around July 22, 2020, FirstEnergy retained Jones Day to advise the Company on its response to the DOJ Subpoenas and to conduct an internal investigation into the allegations in the Householder Complaint. (*Id.* ¶ 22.)

Stephen Sozio led the Jones Day team. Prior to joining Jones Day, Mr. Sozio was an investigating prosecutor for the Organized Crime Strike Force Unit of the U.S. Attorney's Office for the Northern District of Ohio, and as a partner at Jones Day, Mr. Sozio had conducted numerous internal investigations involving federal and state criminal and regulatory action. (*Id.* ¶ 23.) The Jones Day internal investigation was "independent of and separate from the Squire investigation." (*Id.* ¶ 24.)[4] FirstEnergy also retained Jones Day to represent the Company in many of the H.B. 6-related lawsuits and to advise the Company in connection with the SEC Investigation. (*Id.* ¶ 25; *see* App. A.)

Neither of the Investigations would have been undertaken absent the threat of enforcement actions and litigations. (O'Neil. Decl. ¶¶ 26–29.)

### 3. Investigation Counsel Communicated with FirstEnergy's Independent Auditor, PwC

Neither Squire nor Jones Day was authorized to waive attorney-client privilege or

---

[4] The internal investigations undertaken by Squire on behalf of the SIC and IRC, and the internal investigation undertaken by Jones Day, are referred to collectively herein as the "Investigations." The PwC Memo that Movants submitted with their motion explicitly refers to two separate investigations: ███████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█ ██ ██ █████ ████ ████ █████ ██ █████████
████████████████████████████████████████████████

work product protections.  (*Id.* ¶ 30.)  Both Squire and Jones Day were authorized to respond to inquiries from FirstEnergy's auditor, PwC.  (*Id.*)  The Investigations implicated matters, such as the Company's internal controls, that are subject to an independent auditor's review.  (*Id.*)  In fact, in this action, the Company is alleged to have misrepresented its internal controls over financial reporting.  (*See, e.g.*, Consolidated Complaint ("Compl.") (ECF No. 72) ¶ 135(d), PageID 1593.) Because disclosure of work product to an external auditor does not effect a waiver (*see* Part II.A, *infra*), the Board and FirstEnergy understood that PwC could need and thus receive "confidential disclosure . . . of information uncovered in the investigations or, if necessary, confidential disclosure of attorney work product from the investigations."  (O'Neil Decl. ¶ 30.)  As Mr. O'Neil makes clear, responding to PwC's inquiries was collateral to the Investigations, and was not the reason for or primary purpose of the Investigations.  (*Id.* ¶¶ 27, 29.)

PwC memorialized its work in internal work papers.  Movants submitted with their motion an August 16, 2020 internal memorandum prepared by PwC and addressed to PwC's internal audit file and produced in this Action.  (*See, e.g.,* Br. at 5, 17, 20, citing to PwC Memo.) The PwC Memo indicates that ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████     ███████████████████████████

███████████████████████████████████     ███████████████████████

### 4. Investigation Counsel Helped Inform Employment Decisions

The H.B. 6 enforcement matters and litigations concerned actions by individuals, some of whom were FirstEnergy employees.  As a result, the Investigations included assessments of their conduct.  Where appropriate, Squire's and Jones Day's investigative work was used not only to guide the Company and its Board to respond to burgeoning enforcement actions and litigations, but also to help inform employment decisions.  (O'Neil Decl. ¶ 28.)  This in no way changed the fact that the Investigations were conducted because of the enforcement actions and litigations.  (*Id.* ¶ 29.)

## ARGUMENT

Movants demand sweeping relief—a finding of wholesale waiver and an order (i) requiring FirstEnergy to "produce *all previously withheld documents*"—in other words, all work product and privileged communications; (ii) compelling witnesses to answer "*all questions* (past and future) related to "the internal investigation"; and (iii) requiring FirstEnergy to "withdraw all asserted protections that are reflected in PwC's document productions."  (Br. at 3.)[5]  Under settled law, documents and communications from the Investigations are protected from discovery, and Movants have failed to establish any basis for waiver.

---

[5]  The parties agreed that privileged communications and work product concerning H.B. 6-related matters "dated after July 21, 2020" did not need to be logged.  (*See* Privilege Log Supplement to Joint Protocol for Production of Documents and Electronically Stored Information (ECF No. 295) at 2, PageID 6625 & Ex. A thereto.)  But as a result, Movants are asking the court to do what is essentially unheard of:  find general waiver over swaths of unidentified documents.  Indeed, the fact that Movants are dealing in generalities and not specifics prevents the Court from making required "prudential distinctions between what was revealed", if anything, "and what remains privileged."  *Liang* v. *AWG Remarketing, Inc.*, 2015 WL 8958884, at *5 (S.D. Ohio Dec. 16, 2015) (citations and internal quotations omitted).  This alone is a basis to deny Movants' request.

I.    **DISCOVERY OF THE INTERNAL INVESTIGATIONS IS BARRED BY THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE.**

A.    **Movants Are Not Entitled to Discovery of Work Product or Attorney-Client Communications From the Investigations.**

The documents that Movants seek fall within the well-established standards for work product protection and attorney-client privilege. Movants should not be permitted to intrude into FirstEnergy's and its directors' confidential communications with their counsel.

*First*, as to work product protection, the Sixth Circuit requires only that documents were (i) "created '*because of*' a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose"; and (ii) "that subjective anticipation of litigation was objectively reasonable." *United States* v. *Roxworthy*, 457 F.3d 590, 593–94 (6th Cir. 2006) (emphasis added). This is essentially a "but for" test: "a document will not be protected if it would have been prepared in substantially the same manner irrespective of the anticipated litigation." *Id.*

Here, the record overwhelmingly establishes that once FirstEnergy received the DOJ Subpoenas, there was "little doubt that additional litigation was on its way." *In re LTV Sec. Litig.*, 89 F.R.D. 595, 616 (N.D. Tex. 1981) ("anticipation of litigation cannot be disputed" where "SEC already had initiated its investigation"); *see also Upjohn Co.* v. *United States*, 449 U.S. 383, 397–99 (1981) (company's receipt of a tax summons was sufficient to trigger work product protection). As Mr. O'Neil attests, the Investigations were undertaken "because of" the DOJ criminal investigations, the drop in FirstEnergy's stock price, the SEC Investigation, and the many lawsuits that were anticipated to (and did) quickly follow. (O'Neil Decl. ¶¶ 5–11, 29; *see also* Compl. (ECF No. 72) ¶¶ 145–48, PageID 1598–1600 (noting 34% drop in FirstEnergy's stock price following Householder arrest); App. A (more than a dozen litigation and investigations in the months following unsealing of the Householder Complaint).) Here, there can be no doubt that the Board and the Company's "subjective anticipation of litigation was objectively reasonable."

-12-

*Second*, confidential communications between a company and its counsel during the course of an internal investigation to "secure legal advice" about potential civil or criminal liability indisputably "are covered by the attorney-client privilege." *Upjohn*, 449 U.S. at 394, 397; *see Hobart Corp.* v. *Dayton Power & Light*, 2017 WL 3668848, at *3 (S.D. Ohio Aug. 24, 2017) (applying *Upjohn* and finding "interview summaries" "protected in their entirety by the attorney-client privilege and the work product doctrine" as "communications . . . made in confidence . . . in order to secure legal advice"). Here, Investigations Counsel's analysis as to what acts had occurred, whether those acts were "illegal," and, if so, the consequences of those acts, plainly involves legal advice. *See Upjohn*, 449 U.S. at 395, 397 ("[C]ommunications by Upjohn employees to counsel" during counsel's internal investigation into "the possible illegality of payment" were "covered by the attorney–client privilege.").

In addition, the Householder Complaint suggested that a high-level FirstEnergy officer and senior executive were members of a criminal enterprise, and at the same time, certain employees denied any wrongdoing. (*Compare* Criminal Complaint, *United States* v. *Householder*, 1:20-cr-00077 (S.D. Ohio July 21, 2020), ECF No. 5 at ¶¶ 111–15, 240, PageID 125–26, 169 (S.D. Ohio July 21, 2020), *with* Compl., ECF No. 72 at ¶¶ 150–59, PageID 1601–04.) The IRC thus sought the advice of counsel in order to make legally sound employment decisions, as was publicly disclosed at the time. (*See* O'Neil Decl. ¶ 28); Ex. 5 (Nov. 19, 2020 Form 10-K/A) at ii ("*[I]n connection with the Company's internal investigation*, [the IRC] determined that certain former members of senior management, including the Company's former chief executive officer, violated certain Company policies and its code of conduct."). "[C]ommunicat[ing] [] legal analysis to the person ultimately deciding whether to fire an employee" is "precisely the type of legal advice that is protected by the attorney-client privilege." *Fletcher* v. *ABM Bldg. Value*, 2017 WL 1536059,

at *3 (S.D.N.Y. Apr. 18, 2017); *see Mitchell* v. *Columbus Urb. League*, 2019 WL 4727378, at *3 (S.D. Ohio Sept. 27, 2019) (denying motion to compel testimony from attorney about "the 'details underlying the grounds' for [] suspension and termination decisions" because those "communications . . . [we]re protected by attorney-client privilege"); *Alomari* v. *Ohio Dep't of Pub. Safety*, 2013 WL 5180811, at *2 (S.D. Ohio Sept. 13, 2013) (denying motion to compel testimony concerning meeting where defendants decided to terminate plaintiff because "the purpose of the meeting was to secure . . . legal advice related to the results of the administrative investigation").

Movants do not (and cannot) dispute that FirstEnergy and its directors faced, and anticipated, litigation when the Investigations were undertaken and engaged in privileged communications with their counsel throughout the Investigations. Instead, they simply ignore the DOJ criminal probe and the numerous lawsuits filed against FirstEnergy, including *this Action*, and cite to inapposite cases finding that investigations had a business purpose in the *absence* of threatened litigation. For example, in *In re OM Sec. Litig.* (*see* Br. at 14), a consultant assisting in outside counsel's investigation testified that his "engagement in the investigation was not expressly related to any litigation matters" and that there was "no discussion of litigation" when the consultant's "evidence and findings" were presented to the board of directors. 226 F.R.D. 579, 586 (N.D. Ohio 2005). Similarly, the investigation in *Allied Irish Banks* v. *Bank of Am., N.A.* (*see* Br. at 14) was led by a consulting firm that had retained legal counsel, but there was no indication that "any particular documents" prepared by counsel were "directed to litigation strategy or possibly litigation defenses." 240 F.R.D. 96, 101 (S.D.N.Y. 2007).[6] These cases bear no

---

[6] Plaintiffs' other cases are the same. *See also Koumoulis* v. *Indep. Fin. Mktg. Group, Inc.*, 295 F.R.D. 28, 43, 46 (E.D.N.Y. 2013), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014) (documents from investigation by human resources, *not* outside counsel, were discoverable where

resemblance to the extraordinary legal risk that FirstEnergy was facing.

**B.  Movants' Purported "Business Purposes" for the Investigations Are Nonsensical.**

During the meet and confer process, Movants never mentioned their strained theory that FirstEnergy and its Board committees conducted internal investigations "for pressing business purposes," and that any "legal purpose for the internal investigation[s] *was a distant second*."  (Br. at 14, 18 (emphasis added).)  Had Movants engaged with FirstEnergy on this issue, FirstEnergy would have explained, as shown below, that Movants' theory is baseless on both the facts and the law.

*First*, Movants claim that the Investigations were instigated "to assuage PwC so FirstEnergy could complete its required SEC filings," which Movants characterize as "squarely within the scope of [] *regularly conducted business activities*."  (Br. at 14 (emphasis added).)  But the PwC Memo, on which Movants rely, makes clear that ███████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ Movants cannot plausibly claim, at the same time, that the Investigations were "within the scope" of run-of-the-mill "business activities."  (Br. at 14.) And Movants' assertion that FirstEnergy "no doubt would have undertaken the investigation into the facts in connection with the Criminal Complaint *regardless* of any anticipated or actual legal proceedings" (Br. at 15) is belied both by the testimony of Mr. O'Neil and common sense.  (*See* O'Neil Decl. ¶¶ 26–29.)  The Householder Complaint described circumstances that put the Company at legal risk, including whether executives were engaging in illegal conduct, and that

---

"[d]efendants ha[d] *not offered evidence* that any of the documents were created *because of litigation*" (emphasis added)) (*see* Br. at 13, 15); *Calendar Research LLC* v. *StubHub, Inc.*, 2019 WL 11558873, at *5 (C.D. Cal. July 25, 2019) (only discoverable document from investigation was "purely factual" and prepared by non-lawyers) (*see* Br. at 13).

cannot be disentangled from the efforts to understand the extent of that risk.

 *Second*, Movants claim that the Investigations were undertaken "to gather facts for a series of human resource decisions, *starting with whether to retain or fire the Company's Chief Executive Officer*," which Movants—one of whom *is that former CEO*—characterize as "human resource work [that] is clearly *part of the day-to-day operation of a business*." (Br. at 15 (emphasis added).)  Deciding whether to fire a company's CEO over allegations of criminal bribery is the polar opposite of "day-to-day" human resources work.  Moreover, the timing of the "human resources decisions" undermines Movants' theory:  FirstEnergy disclosed that certain employee separations and terminations arose in connection with conduct that occurred *during the Investigations*—those employment decisions could not have been the impetus for the Investigations, which were initiated months earlier.[7]  (*See* Ex. 9 (Storsin Dep. Tr.) at 60:8–61:22 (testifying that in-house counsel Robert Reffner was separated because he "failed to reasonably ensure that relevant information was produced *in connection with the ongoing investigation . . . .*") (emphasis added).)  Mr. O'Neil has also confirmed that employment decisions were "ancillary" to the Investigations, which were focused on the criminal and civil litigation risk facing the Company. (O'Neil Decl. ¶¶ 28–29.)

 *Third*, Movants make the speculative claim that the Investigations were focused on the "business purpose" of "protect[ing] [FirstEnergy's] access to outside capital," which required

---

[7] Movants suggest that because FirstEnergy allegedly did not "recuse from the investigation" certain individuals whom FirstEnergy ultimately terminated or separated, the Investigations must have been conducted for business purposes.  (Br. at 17.)  It is unclear how Movants arrived at this conclusion, but in any event, the individuals in question could not have been "recused" at the outset of the Investigations because, as one would expect, the IRC did not have all relevant facts when the Investigations *began*, and, ██████████████████████████████████████████████████ ██████████  Employees cannot be "recused" based on events that have yet to occur.

"strik[ing] a deal with the government." (Br. at 16.) Obviously directors must protect the interests of a corporation, including in the face of criminal investigations and litigation. But that does not mean that their confidential communications with counsel to obtain legal advice are for "business purposes" and unprotected. And courts routinely reject Movants' argument that documents and communications analyzing the impact of anticipated litigation, including "the likelihood of settlement and its expected cost," are unprotected because they also serve "a business purpose." *United States* v. *Adlman*, 134 F.3d 1194, 1198–1202 (2d Cir. 1998); *see Fair Isaac Corp.* v. *Experian Inc.*, 2008 WL 11348223, at *6–8 (D. Minn. Nov. 3, 2008) (denying motion to compel "projections and analyses . . . of business implications of entering into" settlements because the analyses were generated because of litigation and "courts have consistently held" that "processes and analyses used by a party to arrive at [a] settlement are protected by the work product doctrine"); *Coltec Indus., Inc.* v. *Am. Motorists Ins. Co.*, 197 F.R.D. 368, 375 (N.D. Ill. 2000) (settlement and reserve evaluations based on outside counsel's legal advice "are protected from discovery under the attorney client privilege").

Movants' speculation regarding the supposed "business purposes" of the Investigations have no valid basis and should be rejected.

### C. Attorney-Client and Work Product Protections Apply Even if the Investigations Had Ancillary Business Purposes.

Even putting aside that Movants have not established that the Investigations were for a business purpose, Movants also misconstrue the law, which provides that work product protection and the attorney-client privilege apply even where investigations have ancillary business purposes.

As to work product, the Sixth Circuit in *Roxworthy* expressly rejected a "requirement that the primary or sole purpose of" a document "be in preparation of litigation."

457 F.3d at 599. Even the case Movants rely upon (Br. at 13) makes clear that work product protection applies unless the documents were created "*just for* business purposes." *Futhey* v. *United Transp. Union Ins. Ass'n*, 2015 WL 2446169, at *1 (N.D. Ohio May 20, 2015) (emphasis added). Movants also urge the Court to rely on bad law, citing *In re Kidder Peabody Sec. Litig.* for the proposition that work product protection applies only where documents were "created principally or exclusively to assist in contemplated or ongoing litigation." (*See* Br. at 14, n.7 (citing 168 F.R.D. 459, 463 (S.D.N.Y. 1996)).) But since *Kidder* was decided, the Second Circuit (like the Sixth Circuit in *Roxworthy*) has rejected the "primarily or exclusively" test for work product protection, and cited *Kidder* as a case decided in error. *Adlman*, 134 F.3d at 1198 & n.3.

As to privileged communications, they are protected from disclosure so long as "the predominant purpose of the communication is to render or solicit legal advice." *Abington Emerson Cap., LLC* v. *Landash Corp.*, 2019 WL 6167085, at *3 (S.D. Ohio Nov. 20, 2019) (Jolson, M.J.). "[T]he mere fact that business considerations are weighed in the rendering of legal advice does not vitiate the attorney-client privilege." *Id.* Indeed, communications reflecting legal advice are protected from disclosure even if they serve a dual purpose, such as ensuring an auditor meets "its obligations" to "ascertain whether [a company] had engaged in any illegal acts that would directly and materially affect the Company's financial statement." *Lawrence E. Jaffe Pension Plan* v. *Household Int'l*, 244 F.R.D. 412, 427 (N.D. Ill. 2006) (counsel's report protected from disclosure under attorney-client privilege and work product doctrine where board's audit committee "retained [outside counsel] to investigate [allegations] in order to comply with" SEC reporting obligations).

Movants' "business purpose" theory fails on both the facts and the law.

## II. MOVANTS FAIL TO ESTABLISH THAT FIRSTENERGY WAIVED WORK PRODUCT PROTECTION OR THE ATTORNEY-CLIENT PRIVILEGE.

Movants claim that FirstEnergy bears the burden to prove "the existence of the

privilege" *and* "non-waiver" of the privilege.  Though the law in this Circuit is unsettled as to the parties' precise burdens in deciding claims of waiver, numerous district courts have adopted a burden-shifting approach, such that the proponent of the privilege is "not required" to "[p]rov[e] privilege has not been waived," which "would require proving a negative." *Burkhead & Scott, Inc.* v. *City of Hopkinsville*, 2014 WL 7335173, at *1 (W.D. Ky. Dec. 19, 2014).  Instead, the party seeking to compel disclosure must establish "by a preponderance of the evidence" that "the communications in question are otherwise discoverable under an exception or waiver." *Shumaker, Loop & Kendrick, LLP* v. *Zaremba*, 403 B.R. 480, 484 (N.D. Ohio 2009); *see also Hughbanks* v. *Hudson*, 2008 WL 11508991, at *3 (S.D. Ohio Dec. 31, 2008) (same for work product); *but see Cheryl & Co. v. Krueger*, 2019 WL 6521956, at *2 (S.D. Ohio Dec. 4, 2019) (noting split among district courts in the Sixth Circuit as to burden shifting); *cf. In re VisionAmerica, Inc. Sec. Litig.*, 2002 WL 31870559, at *1–2 (W.D. Tenn. Dec. 18, 2002).  As shown below, Movants have not come close to establishing waiver on a preponderance (or any) standard.

### A. FirstEnergy's Disclosures to Its Auditor Did Not Waive Work Product Protections.

Movants make the overblown (and baseless) claim that FirstEnergy waived "any otherwise applicable protections" by "*shar[ing] nearly all information* from its internal investigation with its outside auditor," PwC.  (Br. at 19 (emphasis added).)  Movants offer no facts in support of that broad contention.

As to attorney-client privilege, Movants' own evidence makes clear █████████ ███████████ ████ ██ ███ ██ ████ ██ ███ █ ███ ██ ███ █ ████████████████████████████████████ ████████████████████████████████ ███████

-19-

As to work product, Movants ignore that the law permits confidential disclosure of work product to a company's auditor without waiver. As movants concede, work product protection is waived only "when 'the original disclosure . . . [is] to an 'adversary.'" (Br. at 18 (quoting *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 306 n.28 (6th Cir. 2002)) (alterations in original)); s*ee also Luxottica of Am. Inc.* v. *Allianz Glob. Risks US Ins. Co.*, 2022 WL 1204870, at *5 (S.D. Ohio Apr. 22, 2022) (same). PwC "cannot be [FirstEnergy's] adversary" because if an adversarial conflict developed between "an independent auditor and its client," it would "necessitate" the auditor's "withdrawal." *United States* v. *Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010). The Sixth Circuit cited to *Deloitte* with approval in *New Phoenix Sunrise Corp.* v. *C.I.R.*, 408 F. App'x 908, 919 (6th Cir. 2010), and squarely held that disclosure to an auditor "*[is] consistent with the privilege*." *Id*. (emphasis added).

Indeed, far from being adverse, PwC and FirstEnergy shared a "common interest." *Allegheny Energy*, 229 F.R.D. at 448. As *Allegheny Energy* held when upholding work product protection in a similar context, "[a] business and its auditor can and should be aligned insofar as they both seek to prevent, detect, and root out corporate fraud," which "is precisely the type of limited alliance that courts should encourage." Here, PwC and the FirstEnergy Board shared an interest in evaluating the sufficiency of Squire's investigative work and, more specifically, in evaluating allegations as to the sufficiency of FirstEnergy's internal controls over financial reporting, as now alleged in this case. (*See, e.g.*, Compl. (ECF No. 72) ¶ 135(d), PageID 1593.)

FirstEnergy also had "a reasonable basis for believing that the recipient would keep the disclosed material confidential," as is required in order to maintain work product protection. *Deloitte*, 610 F.3d at 141. Public accountants like PwC are ethically bound to "not disclose any *confidential client information* without the specific consent of the *client*." American Institute of

Certified Public Accountants Code of Professional Conduct ("CPA Code") § 1.700.001 (emphasis in original).  This professional obligation establishes FirstEnergy's "reasonable expectation of confidentiality."  *Deloitte*, 610 F.3d at 142 (citing CPA Code); *see also Allegheny Energy*, 229 F.R.D. at 448 (no waiver over work product shared with auditor "under an ethical and professional obligation to maintain materials received from its client [as] confidential").

Thus, as the D.C. Circuit emphasized in *Deloitte*, "[a]mong the district courts that have addressed [whether disclosing work product to an independent auditor constitutes waiver], most have found no waiver."  610 F.3d at 139 (collecting cases).  More recent district court and Circuit opinions have done the same.  *See, e.g.*, *Grae* v. *Corr. Corp. of Am.*, 2020 WL 3035915, at *6, *8 (M.D. Tenn. June 5, 2020) (work product protection applied where documents were "shared with non-counsel third parties," including "[defendant's] auditor"); *United States* v. *Sanmina Corp.*, 968 F.3d 1107, 1122 (9th Cir. 2020) ("As *Deloitte* and other courts have held . . . disclosure of [] attorney work product to an independent auditor does not constitute disclosure to an adversary sufficient to waive the protection.").

Movants not only ignore all this authority, but the cases they cite bear no resemblance to this one.  In *In re King Pharms., Inc. Sec. Litig.*, the court expressly declined to consider whether the auditor was the company's adversary and found that the documents at issue "were those normally furnished by King to its outside auditor" and "were not furnished 'in anticipation of litigation.'"  2005 WL 8142328, at *3 (E.D. Tenn. Sept. 21, 2005).  Likewise, *First Horizon* found that communications between a party and KPMG were made in the context of KPMG's preparation of a non-confidential audit report and "[could not] have been furnished 'in anticipation of litigation.'"  *First Horizon Nat'l Corp.* v. *Hous. Cas. Co.*, 2016 WL 5867268, at *9–10 (W.D. Tenn. Oct. 5, 2016).  By contrast, FirstEnergy's disclosures to PwC ███████

███████████████████████ that was well outside the ordinary course and were prepared in connection with actual and anticipated criminal and civil proceedings. (PwC Memo at PwC_FE_SecLitig_00027996; *see* O'Neil Decl. ¶¶ 5–11, 30.) Indeed, work product protection would be a dead letter if confidential disclosure to a public company auditor of findings related to allegations of corporate fraud or misconduct resulted in waiver of that protection.

**B.    The Testimonial Aid Disclosed Facts and Ultimate Findings, Not Work Product or Privileged Communications.**

Movants claim that FirstEnergy waived all privilege and work product protection because the Testimonial Aid for its 30(b)(6) witness allegedly included "extensive information" from "[FirstEnergy's] internal investigation." (Br. at 20.) In pressing this claim, Movants mischaracterize deposition testimony and conflate facts and conclusions with privileged communications or work product. These efforts fail.

*First*, in Movants' distorted telling, former FirstEnergy Board member Julia Johnson "confirmed" and "admitted" at her deposition that (i) "all [the publicly disclosed] information" regarding the executive terminations "had come from FirstEnergy's lawyers" (Br. at 7); and (ii) that "all the information FirstEnergy disclosed" to DOJ and "to the general public" in the DPA "came from its internal investigation" (*id*. at 8–9). Ms. Johnson said no such thing.

Ms. Johnson in fact testified that "[a]ll the information *that I received* in making our determination [to terminate] was a part of th[e] investigation" conducted by Squire as counsel to the IRC. (Ex. 6 at 508:7–25 (emphasis added); *see id*. at 394:20–21 (Ms. Johnson confirming that "in the time frame in October, November of 2020," the IRC did not "receive any factual presentations from non-lawyers"); *id*. at 482:9–11 ("Everything *that I know* about the DPA is information that *I obtained from discussions with our lawyers*" (emphasis added)).) Ms. Johnson's testimony as to information that she personally received through privileged

-22-

communications is not "confirmation" that FirstEnergy shared privileged information or work product in the Testimonial Aid or elsewhere.

*Second*, in claiming that FirstEnergy disclosed "privileged information" and "lawyer's conclusions," Movants focus only on the following statements in the Testimonial Aid:[8]



(Br. at 20–21, citing Forge Decl. Ex. 5 at 6, 13–14, 17, 23.)[10]

---

[8]     Movants include a laundry list of statements from the Testimonial Aid in the Background section of their brief, but the Argument is limited to only the four statements identified herein. (*Compare* Br. at 10–12 *with id.* at 20–21.)

[9]     Due to a scrivener's error, ████████████████████████████████████ ████████████████████████████████████████████████████████████

[10]     In asserting waiver based on the Testimonial Aid, Movants omit all mention of Movants Jones's and Dowling's motion to compel further 30(b)(6) deposition testimony from FirstEnergy, which was granted by this Court based on its finding, among other things, that "the agreed-upon deposition topics call for information *that is deeper and more specific*" than "information FirstEnergy [had] already disclosed publicly," and that "more specific" information was "surely within FirstEnergy's reasonable knowledge."   (Aug. 19, 2022 Order (ECF No. 333) at 8, PageID 7129 (emphasis added).)   FirstEnergy provided "more specific" information in the Testimonial Aid to assist its second 30(b)(6) witness, only to have Movants, including defendants Jones and Dowling, now perversely claim waiver.

None of these statements discloses attorney work product or privileged communications.  To begin, Statements 3 and 4 ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  Both of those documents were produced to Movants. "Summariz[ing] the evidence" (here, for a 30(b)(6) witness) does not amount to waiver because "privilege does not impede disclosure of information except to the extent that the disclosure would reveal confidential communications." *E.E.O.C.* v. *Texas Hydraulics, Inc.*, 246 F.R.D. 548, 557 (E.D. Tenn. 2007); *see also Denman* v. *Youngstown State Univ.*, 2007 WL 2781351, at *3 (N.D. Ohio Sept. 21, 2007) ("[R]eveal[ing] non-privileged information" does not "waive attorney-client privilege."); *McCullough* v. *Hanley*, 2019 WL 3776962, at *6 (N.D. Ill. Aug. 12, 2019) (same).

Statements 1 and 2 (and 4, in part) disclose, at most, findings, such as ████████ ████████████████████████████████████████████ But disclosing "findings, without revealing the facts that led to the findings . . . does not waive attorney-client privilege." *In re VisionAmerica Inc. Sec. Litig.,* 2002 WL 31870559, at *4; *see Yarberry*, 2013 WL 4476681, at *4 (denying motion to compel where communications "d[id] not reveal the substance of [the attorney's advice], any facts upon which [the attorney] based his advice

upon, nor his reasoning behind his advice").[11]  Instead, waiver requires that a party "reveal[] a significant part of the attorney's advice," which the challenged statements plainly do not do.  *In re Grand Jury Proc. Oct. 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996); *see also Boling* v. *First Util. Dist. of Knox Cnty.*, 1998 WL 917522, at *10–11 (E.D. Tenn. June 5, 1998) (attorneys did not waive work product protection by giving third party a "representation of what [they] believed the facts to be" while keeping the "communications themselves . . . confidential").[12]

    *E.E.O.C.* v. *Texas Hydraulics, Inc.* underscores that there is no waiver here.  The court rejected the defendant's claims of waiver by the EEOC, concluding that, in the litigation, the EEOC "had reveal[ed] [its] ultimate conclusion—its findings" from an internal investigation but, as here, "did not reveal the conclusions, legal advice or privileged communication of the EEOC's attorneys during the investigation" or "the legal reasoning upon which the ultimate conclusion was based." 246 F.R.D. at 557.  Likewise, in *In re Dayco Corp. Derivative Sec. Litig.*, the court denied a motion to compel and found no privilege or work product waiver where a company's press release that "summarized" the "'findings' and 'conclusions' of the [Board] Committee and counsel

---

[11]    *S.E.C.* v. *Schroeder*, 2009 WL 1125579, at *7 (N.D. Cal. Apr. 27, 2009) (denying motion to compel "any facts that are disclosed" in lawyers' interview notes or draft interview memoranda, although lawyers' final memoranda had been disclosed); *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 528–34 (S.D.N.Y. 2015) ("there is no basis to conclude that New GM waived either attorney-client privilege or the attorney work product doctrine with respect to . . . [i]nterview [m]aterials" even though the defendant published a written report with its findings and conclusions); *Buford* v. *Holladay*, 133 F.R.D. 487, 492 (S.D. Miss. 1990) (rejecting claim that the "mere fact that the end product of an attorney-client relationship is a [public] document" waives privilege, because "the ultimate conclusion" of such reasoning "would be that the mere filing of a complaint or answer abrogates the privilege as to all communications between an attorney and his client . . . prior to the filing of such a document").

[12]    Movants also wrongly claim that, during the meet and confer process, "FirstEnergy asserted that the answers to [] questions" about Mr. Strah's retirement "were privileged."  (Br. at 25.)  That is wrong.  FirstEnergy repeatedly explained that Movants could depose Mr. Strah about non-privileged discussions with FirstEnergy directors or personnel concerning his retirement, and that FirstEnergy did not intend to raise any privilege objections regarding those discussions.

in the report." 99 F.R.D. 616, 618–19, 621 n.4 (S.D. Ohio 1983). As in *Dayco* and *Texas Hydraulics*, the disclosures that Movants challenge in the Testimonial Aid do not constitute a waiver.

Movants principally rely on *In re OM Sec. Litig.*, where, in stark contrast to the circumstances here, the defendant had disclosed a "30 page" presentation that "listed detailed conclusions and cited specific findings, interviews and documents in support" of the company's internal investigation. 226 F.R.D. at 591–92. Movants' other cases (Br. at 20–21) are just as inapposite. *See In re Columbia*, 293 F.3d at 292–93, 302 (selective disclosure of privileged information to some, but not all, adversaries); *United States* v. *Paulus*, 2021 WL 4494607, at *6 (E.D. Ky. Sept. 30, 2021) (partial disclosure by defendant's consultant of its "expert review" to defendant's adversary (the government) required disclosure of remaining "data compiled and examined by" the expert); *LifeBio, Inc.* v. *Eva Garland Consulting, LLC*, 2023 WL 3258586, at *5–8 (S.D. Ohio May 4, 2023) (failure to claw back privileged documents).

Movants' attempt to turn facts and findings into work product and privileged communications fails to establish waiver.

**C.** **The Selective Disclosure Doctrine Does Not Apply Because the Disclosed Information Is Not Privileged or Work Product and Is Not Being Used to Gain Any Litigation Advantage**.

Movants conclude by claiming that FirstEnergy has selectively disclosed privileged information from the Investigations as a "sword," while asserting privilege over other materials as a "shield." (Br. at 25.) As supposed proof, Movants note that: (i) FirstEnergy's 30(b)(6) deponent testified that FirstEnergy was not aware of any evidence suggesting that certain individuals had knowledge of improper payments and political contributions; and (ii) the Testimonial Aid stated

████████████████████████████████████████████████████████

████████████ . (*Id.* at 26 (quoting Movants' Ex. 5 at 8, 12).) Both fail for the same simple

reason: neither is a defense to Plaintiffs' claims.

For a privileged communication to serve as a litigant's "sword," it must be used "to sustain [the litigant's] claims or defenses in th[e] lawsuit." *Lewis Env't, Inc.* v. *Emergency Response & Training Sols., Inc.*, 2019 WL 285641, at *3 (S.D. Ohio Jan. 22, 2019) (finding no waiver of privilege or work product); *see also In re United Shore Fin. Servs, LLC*, 2018 WL 2283893, at *2 (6th Cir. Jan. 3, 2018) ("Litigants cannot hide behind the privilege if they are *relying on privileged communications to make their case*.") (emphasis added) (quoting *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005)). "But, while the sword stays sheathed"—when a litigant does *not* rely on the privileged communications to sustain a claim or a defense—"*the privilege stands*." *Lott*, 424 F.3d at 454 (emphasis added).

FirstEnergy has kept the sword sheathed. It is not asserting an advice-of-counsel defense. (*See* Answer (ECF No. 239) ¶¶ 78–81, PageID 5441–42.) It is not relying on the Board's actions *after* the class period ended—decisive or otherwise—to defend against Plaintiffs' claims. (*See id.*) Nor is the statement that FirstEnergy was "not aware of evidence" of certain individuals' knowledge of improper payments or political contributions exculpatory as to FirstEnergy, which had admitted its own misconduct in the DPA.

Movants' supposedly "very similar" case, *Crestwood Farms Bloodstock LLC* v. *Everest Stables Inc.*, is anything but. (Br. at 26.) In *Crestwood*, a party "elicited privileged testimony" from *its own attorney* as to the applicability of a contractual exception. 2011 WL 13156795, at *3 (E.D. Ky. Jan. 25, 2011). That bears no relation to the situation here, where (i) FirstEnergy was testifying in response to *Plaintiffs'* questions at a deposition; and (ii) FirstEnergy is not asserting a claim or defense based on that information. Again, "awareness of evidence," or a lack thereof, of a particular employee's or director's knowledge at any given

-27-

time does not change *FirstEnergy's* knowledge and is not exculpatory for FirstEnergy, so it cannot be used as a sword.

### D. Counsel Provided Consistent Privilege Instructions to FirstEnergy Directors at Their Depositions.

Movants' claim regarding supposedly "contradictory" instructions from counsel at the depositions of former FirstEnergy directors Julia Johnson and Thomas Mitchell is entirely unclear. Movants do not suggest those instructions are a basis for waiver and cite only a pair of cases for the unremarkable proposition that "facts" are not privileged—which FirstEnergy does not dispute. (*See* Br. at 23–25.) Regardless of what Movants are attempting to achieve, the record is clear: Ms. Johnson's counsel's instructions were not only internally consistent, they were also consistent with instructions that Movant Dowling gave to Ms. Johnson.

Movants' claim of "contradictory instructions" relates to questions from Plaintiffs' counsel concerning the IRC's decisions to terminate Movants Jones and Dowling. (*See* Br. at 23.) Specifically, when asked whether the Testimonial Aid included "*at least some part of the basis* for the termination of Mr. Jones and Mr. Dowling," Ms. Johnson confirmed that it did, with no privilege objection from her counsel. (Ex. 6 at 528:8–12 (emphasis added); *see* Br. at 23.) Ms. Johnson's response to that question did not implicate privileged communications because the Testimonial Aid included the publicly disclosed, ultimate decision regarding Jones's and Dowling's employment, *i.e.*, that they were terminated for "violat[ing] certain [FirstEnergy] policies and [its] code of conduct." (*Compare* Ex. 5 (Nov. 19, 2020 Form 10-K/A at 63) *with* Testimonial Aid (Forge Decl. Ex. 5) at 3 (citing to same Form 10-K/A).)

Movants claim that Ms. Johnson was later asked "nearly the same questions" about the reasons for Movants Jones's and Dowling's terminations but was instructed by her counsel "not to confirm information" in the Testimonial Aid that was purportedly "set forth in

FirstEnergy's own Form 10-K."  (*See* Br. at 23, citing Ex. 6 (Johnson Tr.) at 544:1–546:19.)  But Plaintiffs' counsel had asked the *converse* question—he sought to have Ms. Johnson "confirm" (Br. at 23) that the IRC decided to terminate Movants Jones and Dowling based on specific information in the Testimonial Aid that is *not* in FirstEnergy's public disclosures—namely, (i) that a $4.3 million payment to former PUCO Chairman Samuel Randazzo described in the Testimonial Aid was "one of the reasons" Movant Jones was terminated (Ex. 6 at 544:25–545:1, *see also id.* at 545:13–16, 546:6–7); and (ii) that *all* the facts set out in the Testimonial Aid "were part of the reasons why Mr. Jones and Mr. Dowling were terminated" (*id*. at 557:24–558:4).  Those questions therefore called for disclosure of Ms. Johnson's privileged communications with counsel, and thus her counsel instructed her "not to answer and reveal any communications or discussions [she] had with counsel related to the internal investigation and the terminations of Mr. Jones and Mr. Dowling."  (*Id*. at 558:5–9.)

Notably, counsel for Movant Michael Dowling—with no objection from any other Movant—gave Ms. Johnson the same instruction at her deposition, cautioning her not to disclose "*any information*" obtained exclusively through privileged communications:

> Throughout this entire deposition, ***I don't want you to testify to any information that you have learned exclusively through a communication with a lawyer***. If you learned of a communication with a lawyer, ***but you also learned of it through another source, I want to know that information***. But ***if you've learned of it exclusively through a communication with a lawyer, then don't – don't, you know, provide that information, don't disclose that***.

(Ex. 6 (Johnson Tr.) at 348:1–10 (emphasis added); *see id*. at 362:20–22 (Dowling's counsel asking Ms. Johnson to respond "outside of any knowledge that you may have gained exclusively from communications with counsel").  The same instruction was given to other witnesses,

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

In light of this, Movants cannot seriously contend that counsel's privilege objections were "contradictory" or improper.

Instead, counsel's instruction properly reflects that, although "facts" are of course discoverable, "[a] fact is one thing and a communication concerning that fact is an entirely different thing." *Upjohn*, 449 U.S. at 395–96. "While the attorney-client privilege cannot be used to 'protect disclosure of the underlying facts by those who communicated with the attorney,' it does 'protect[] disclosure of communications' between the attorney and the client." *Libertarian Party of Ohio* v. *Husted*, 2014 WL 3792727, at *5 (S.D. Ohio July 31, 2014) (quoting *Upjohn*, 449 U.S. at 395) (alteration in original).

The cases Movants cite are, again, inapposite. (Br. at 24.) *Antoine* v. *Atlas Turner, Inc.* is irrelevant. The Sixth Circuit held that an attorney could not assert privilege when "asked if he had forwarded the judgments to [his client]" because "no privilege attaches to the mere mailing, or failure to mail" a document. 66 F.3d 105, 109–10 (6th Cir. 1995). Likewise, *Hilton-Rorar* v. *State & Fed. Commc'ns Inc.* expressly recognizes that attorney-client communications are protected even if the information is "not otherwise independently privileged" because "disclosure . . . would necessarily reveal the substance of a confidential client communication made seeking legal advice." 2010 WL 1486916, at *8 (N.D. Ohio Apr. 13, 2010) (emails with counsel were "immune from disclosure due to the attorney-client privilege").

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

-30-

Respectfully,

/s/ Thomas D. Warren
Thomas D. Warren, Trial Attorney (0077541)
WARREN TERZIAN LLP
30799 Pinetree Road, Suite 345
Pepper Pike, OH  44124
Telephone:  (213) 410-2620
tom.warren@warrenterzian.com

Robert J. Giuffra, Jr. (*pro hac vice*)
Sharon L. Nelles (*pro hac vice*)
David M.J. Rein (*pro hac vice*)
Hilary M. Williams (*pro hac vice*)
Tasha N. Thompson (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000

Kamil R. Shields (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone:  (202) 956-7040

*Counsel for Defendant FirstEnergy Corp.*

## DECLARATION OF SERVICE

I certify that the foregoing was filed electronically on July 26, 2023.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Thomas D. Warren*
Thomas D. Warren (0077541)

*Counsel for Defendant FirstEnergy Corp.*

**Appendix A:  FirstEnergy H.B. 6-Related Litigations and Investigations**

I.      **FirstEnergy H.B. 6 Related Litigations and Investigations**

| Litigation/Investigation | Date Initial Complaint Filed/Date First Subpoena Served | Date of First Jones Day Appearance |
|---|---|---|
| U.S. Department of Justice Grand Jury Subpoenas | July 21, 2020 | N/A |
| *Gendrich* v. *Anderson et al.*, No. CV-2020-07-2107 (Ohio Court of Common Pleas, Summit County) | July 26, 2020 | August 11, 2020 |
| *Smith* v. *FirstEnergy Corp. et al.*, No. 2:20-cv-3755 (S.D. Ohio) | July 27, 2020 | August 27, 2020 (ECF No. 10) |
| *Owens* v. *FirstEnergy Corp. et al.*, No. 2:20-cv-3785 (S.D. Ohio) | July 28, 2020 | August 12, 2020 (ECF No. 10) |
| *Sloan* v. *Anderson et al.*, No. CV-2020-08-2161 (Ohio Court of Common Pleas, Summit County) | July 31, 2020 | August 11, 2020 |
| *Buldas* v. *FirstEnergy Corp. et al.*, No. 2:20-cv-3987 (S.D. Ohio) | July 31, 2020 | August 27, 2020 (ECF No. 12) |
| *Emmons* v. *FirstEnergy Corp. et al.*, No. CV-20-935557 (Ohio Court of Common Pleas, Cuyahoga County) | August 4, 2020 | September 4, 2020 |
| *Hudock et al.* v. *FirstEnergy Corp. et al.*, No. 2:20-cv-3954 (S.D. Ohio) | August 5, 2020 | August 27, 2020 (ECF No. 6) |
| *Miller* v. *Anderson et al.*, No. 5:20-cv-1743 (N.D. Ohio 2020) | August 7, 2020 | September 9, 2020 (ECF No. 3) |
| SEC Formal Order of Investigation | August 10, 2020 | N/A |
| *Frand* v. *First Energy Corp. et al.*, No. 2:20-cv-4287 (S.D. Ohio 2020) | August 21, 2020 | September 9, 2020 (ECF No. 8) |
| *Bloom et al.* v. *Anderson et al.*, No. 2:20-cv-4534 (S.D. Ohio) | September 1, 2020 | September 10, 2020 (ECF No. 22) |
| SEC Subpoena | September 1, 2020 | N/A |

| Litigation/Investigation | Date Initial Complaint Filed/Date First Subpoena Served | Date of First Jones Day Appearance |
|---|---|---|
| *Employees Retirement System of the City of St. Louis* v. *Jones et al.*, No. 2:20-cv-4813 (S.D. Ohio) | September 9, 2020 | September 28, 2020 (ECF No. 8) |
| *State of Ohio ex rel. Dave Yost, Ohio Attorney General* v. *FirstEnergy Corp. et al.*, No. 20-cv-006821 (Ohio Court of Common Pleas, Franklin County) | September 23, 2020 | December 12, 2021 |
| *Beck* v. *Anderson et al.*, No. 2:20-cv-5020 (S.D. Ohio) | September 24, 2020 | October 5, 2020 (ECF No. 11) |
| *Electrical Workers Pension Fund, Local 103, I.B.E.W.* v. *Anderson et al.*, No. 2:20-cv-5128 (S.D. Ohio) | September 30, 2020 | October 14, 2020 (ECF No. 10) |
| *Massachusetts Laborers Pension Fund* v. *Anderson et al.*, No. 2:20-cv-5237 (S.D. Ohio 2020) | October 5, 2020 | October 22, 2020 (ECF No. 10) |
| *Mitchell* v. *FirstEnergy Corp. et al.* (Ohio Court of Common Pleas, Fairfield County, OH) | October 6, 2020 | N/A (voluntarily dismissed November 2, 2020) |
| *The City of Philadelphia Board of Pensions and Retirement* v. *Anderson et al.*, No. 2:20-cv-5529 (S.D. Ohio) | October 21, 2020 | November 2, 2020 (ECF No. 8) |
| *Katz* v. *FirstEnergy Corp.*, No. CV-2020-10-2973 (Ohio Court of Common Pleas, Summit County) | October 27, 2020 | November 23, 2020 |
| *Atherton* v. *Dowling et al.*, No. 2:20-cv-5610 (S.D. Ohio) | October 27, 2020 | N/A (represented by James A. Dyer and Schiff Hardin LLP) |
| *City of Cincinnati and City of Columbus* v. *FirstEnergy Corp.*, No. 20-cv-007005 (Ohio Court of Common Pleas, Franklin County) | October 27, 2020 | October 28, 2020 |

| Litigation/Investigation | Date Initial Complaint Filed/Date First Subpoena Served | Date of First Jones Day Appearance |
|---|---|---|
| *Behar* v. *Anderson et al.*, No. 2:20-cv-5876 (S.D. Ohio) | November 12, 2020 | N/A (represented by James A. Dyer and Schiff Hardin LLP) |
| FERC Division of Investigations serves FirstEnergy with notice of its investigation | January 26, 2021 | N/A |
| *Hauser* v. *FirstEnergy Corp.*, No. CV-21-944833 (Ohio Court of Common Pleas, Cuyahoga County) | March 5, 2021 | March 11, 2021 |
| SEC Subpoena | April 28, 2021 | N/A |
| *United States* v. *FirstEnergy Corp.*, No. 21-cr-00086 (S.D. Ohio) | July 22, 2021 | July 20, 2021 (ECF No. 3) |
| *MFS Series Trust I et al.*, v. *FirstEnergy Corp. et al.*, No. 21-cv-5839 (S.D. Ohio) | December 17, 2021 | January 12, 2022 (ECF No. 20) |
| *Brighthouse Funds II - MFS Value Portfolio et al.* v. *FirstEnergy Corporation et al.*, No. 22-cv-0865 (S.D. Ohio) | February 21, 2022 | February 25, 2022 (ECF No. 13) |
| SEC Subpoena | July 11, 2022 | N/A |

## II. Public Utilities Commission of Ohio H.B. 6 Related Proceedings

| Administrative Proceeding | Date Initiated | Counsel for FirstEnergy |
|---|---|---|
| *Political & Charitable Spending Review*, No. 20-1502-EL-UNC | September 15, 2020 | Jones Day |
| *Corporate Separation Audit*, No. 17-974-EL-UNC | November 4, 2020 | Jones Day |
| *Distribution Modernization Rider Audit*, No. 17-2474-EL-RDR | December 30, 2020 | Jones Day |
| *Delivery Capital Recovery Rider*, No. 20-1629-EL-RDR | March 10, 2021 | Jones Day |