# EXHIBIT 1

NT 10-Q 1 d949195dnt10q.htm NT 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 12b-25

---

### NOTIFICATION OF LATE FILING

COMMISSION FILE NUMBER 333-21011

*(Check One):* ☐ Form 10-K  ☐ Form 20-F  ☐ Form 11-K  ☒ Form 10-Q
☐ Form 10-D  ☐ Form N-CEN  ☐ Form N-CSR

For Period Ended: **June 30, 2020**

☐ Transition Report on Form 10-K
☐ Transition Report on Form 20-F
☐ Transition Report on Form 11-K
☐ Transition Report on Form 10-Q

For the Transition Period Ended: _____

---

*Read Instruction (on back page) Before Preparing Form. Please Print or Type.*
**Nothing in this form shall be construed to imply that the Commission has verified any information contained herein.**

---

If the notification relates to a portion of the filing checked above, identify the Item(s) to which the notification relates:

---

### PART I — REGISTRANT INFORMATION

**FirstEnergy Corp.**

**Full Name of Registrant**

**N/A**

Former Name if Applicable

**76 South Main Street**

Address of Principal Executive Office (Street and Number)

**Akron, Ohio 44308**

City, State and Zip Code

## PART II — RULES 12b-25(b) AND (c)

If the subject report could not be filed without unreasonable effort or expense and the registrant seeks relief pursuant to Rule 12b-25(b), the following should be completed. (Check box if appropriate)

(a) The reasons described in reasonable detail in Part III of this form could not be eliminated without unreasonable effort or expense;

☒ (b) The subject annual report, semi-annual report, transition report on Form 10-K, Form 20-F, Form 11-K, Form N-CEN or Form N-CSR, or portion thereof, will be filed on or before the fifteenth calendar day following the prescribed due date; or the subject quarterly report or transition report on Form 10-Q or subject distribution report on Form 10-D, or portion thereof, will be filed on or before the fifth calendar day following the prescribed due date; and

(c) The accountant's statement or other exhibit required by Rule 12b-25(c) has been attached if applicable.

## PART III — NARRATIVE

State below in reasonable detail why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-CEN, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

FirstEnergy Corp. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (the "Form 10-Q") within the prescribed time period without unreasonable effort and expense due to the circumstances described below.

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, the Company received subpoenas for records from the U.S. Attorney's Office for the Southern District of Ohio. The Company was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020. The Company is cooperating fully in the investigation. In addition to the subpoenas referenced above, in late July 2020, certain of the Company's stockholders and customers filed several lawsuits against the Company and certain current and former directors, officers and other employees, each relating to the allegations against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. In connection with the investigation, subpoenas and subsequent pending and threatened litigation, the Company requires additional time to complete its quarterly review and closing procedures and to provide appropriate disclosure in the Form 10-Q. While no assurance can be given, the Company intends to file the Form 10-Q on or before the fifth calendar day following the prescribed due date, in accordance with Rule 12b-25.

**Forward-Looking Statements:** This 12b-25 includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 based on information currently available to management. Such statements are subject to certain risks and uncertainties and readers are cautioned not to place undue reliance on these forward-looking statements. These statements include declarations regarding management's intents, beliefs and current expectations. These statements typically contain, but are not limited to, the terms "anticipate", "potential", "expect", "forecast", "target", "will," "intend," "believe," "project," "estimate," "plan" and similar words. Forward-looking statements involve estimates, assumptions, known and unknown risks, uncertainties and other factors that may cause actual results,

performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements, which may include the following: The extent and duration of COVID-19 and the impacts to our business, operations and financial condition resulting from the outbreak of COVID-19 including, but not limited to, disruption of businesses in our territories, volatile capital and credit markets, legislative and regulatory actions, the effectiveness of our pandemic and business continuity plans, the precautionary measures we are taking on behalf of our customers and employees, our customers' ability to make their utility payment and the potential for supply-chain disruptions; risks and uncertainties associated with the ongoing government investigations regarding Ohio House Bill 6 and related matters; risks and uncertainties associated with litigation, arbitration, mediation and like proceedings; mitigating exposure for remedial activities associated with retired and formerly owned electric generation assets, including, but not limited to, risks associated with the decommissioning of TMI-2; the ability to accomplish or realize anticipated benefits from strategic and financial goals, including, but not limited to, executing our transmission and distribution investment plans, controlling costs, improving our credit metrics, strengthening our balance sheet and growing earnings; legislative and regulatory developments, including, but not limited to, matters related to rates, compliance and enforcement activity; economic and weather conditions affecting future operating results, such as significant weather events and other natural disasters, and associated regulatory events or actions; changes in assumptions regarding economic conditions within our territories, the reliability of our transmission and distribution system, or the availability of capital or other resources supporting identified transmission and distribution investment opportunities; changes in customers' demand for power, including, but not limited to, the impact of climate change or energy efficiency and peak demand reduction mandates; changes in national and regional economic conditions affecting us and/or our major industrial and commercial customers or others with which we do business; the risks associated with cyber-attacks and other disruptions to our information technology system, which may compromise our operations, and data security breaches of sensitive data, intellectual property and proprietary or personally identifiable information; the ability to comply with applicable reliability standards and energy efficiency and peak demand reduction mandates; changes to environmental laws and regulations, including, but not limited to, those related to climate change; changing market conditions affecting the measurement of certain liabilities and the value of assets held in our pension trusts and other trust funds, or causing us to make contributions sooner, or in amounts that are larger, than currently anticipated; labor disruptions by our unionized workforce; changes to significant accounting policies; any changes in tax laws or regulations, or adverse tax audit results or rulings; the ability to access the public securities and other capital and credit markets in accordance with our financial plans, the cost of such capital and overall condition of the capital and credit markets affecting us, including the increasing number of financial institutions evaluating the impact of climate change on their investment decisions; actions that may be taken by credit rating agencies that could negatively affect either our access to or terms of financing or our financial condition and liquidity; the risks and other factors discussed from time to time in our SEC filings. The Company expressly disclaims any obligation to update or revise, except as required by law, any forward-looking statements contained herein or in the information incorporated by reference as a result of new information, future events or otherwise.

## PART IV — OTHER INFORMATION

(1)    Name and telephone number of person to contact in regard to this notification.

| Jason J. Lisowski | (800) | 736-3402 |
|---|---|---|
| **(Name)** | **(Area Code)** | **(Telephone Number)** |

(2)    Have all other periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 or Section 30 of the Investment Company Act of 1940 during the preceding 12 months or for such shorter period that the registrant was required to file such report(s) been filed? If the answer is no, identify report(s).

       ☒ Yes    ☐ No

(3)    Is it anticipated that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by the earnings statements to be included in the subject report or portion thereof?

       ☐ Yes    ☒ No

If so, attach an explanation of the anticipated change, both narratively and quantitatively, and, if appropriate, state the reasons why a reasonable estimate of the results cannot be made.

## FirstEnergy Corp.

**(Name of Registrant as Specified in Charter)**

has caused this notification to be signed on its behalf by the undersigned thereunto duly authorized.

Date: August 10, 2020

By:    /s/ Jason J. Lisowski

        Jason J. Lisowski
        Vice President, Controller and
        Chief Accounting Officer

INSTRUCTION: The form may be signed by an executive officer of the registrant or by any other duly authorized representative. The name and title of the person signing the form shall be typed or printed beneath the signature. If the statement is signed on behalf of the registrant by an authorized representative (other than an executive officer), evidence of the representative's authority to sign on behalf of the registrant shall be filed with the form.

| ATTENTION |
|---|
| **Intentional misstatements or omissions of fact constitute Federal Criminal Violations (See 18 U.S.C. 1001).** |

# EXHIBIT 2

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-Q**
(Mark One)
☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2020

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

| Commission File Number | Registrant; State of Incorporation; Address; and Telephone Number | I.R.S. Employer Identification No. |
|---|---|---|
| 333-21011 | **FIRSTENERGY CORP** (An Ohio Corporation) **76 South Main Street Akron OH 44308** Telephone (800) 736-3402 | 34-1843785 |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, $0.10 par value | FE | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large Accelerated Filer | ☑ |
| Accelerated Filer | ☐ |
| Non-accelerated Filer | ☐ |
| Smaller Reporting Company | ☐ |
| Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standard provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐ No ☑

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

| CLASS | OUTSTANDING AS OF JUNE 30, 2020 |
|---|---|
| Common Stock, $0.10 par value | 542,110,386 |

**FirstEnergy Website and Other Social Media Sites and Applications**

FirstEnergy's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, amendments to those reports and all other documents filed with or furnished to the SEC pursuant to Section 13(a) of the Securities Exchange Act of 1934 are made available free of charge on or through the "Investors" page of FirstEnergy's website at www.firstenergycorp.com. These documents are also available to the public from commercial document retrieval services and the website maintained by the SEC at www.sec.gov.

These SEC filings are posted on the website as soon as reasonably practicable after they are electronically filed with or furnished to the SEC. Additionally, FirstEnergy routinely posts additional important information, including press releases, investor presentations, investor factbook, and notices of upcoming events under the "Investors" section of FirstEnergy's website and recognizes FirstEnergy's website as a channel of distribution to reach public investors and as a means of disclosing material non-public information for complying with disclosure obligations under Regulation FD. Investors may be notified of postings to the

website by signing up for email alerts and Rich Site Summary feeds on the "Investors" page of FirstEnergy's website. FirstEnergy also uses Twitter® and Facebook® as additional channels of distribution to reach public investors and as a supplemental means of disclosing material non-public information for complying with its disclosure obligations under Regulation FD. Information contained on FirstEnergy's website, Twitter® handle or Facebook® page, and any corresponding applications of those sites, shall not be deemed incorporated into, or to be part of, this report.

and finalized separate regulations imposing $CO_2$ emission limits for new, modified, and reconstructed fossil fuel fired EGUs. Numerous states and private parties filed appeals and motions to stay the CPP with the D.C. Circuit in October 2015. On February 9, 2016, the U.S. Supreme Court stayed the rule during the pendency of the challenges to the D.C. Circuit and U.S. Supreme Court. On March 28, 2017, an executive order, entitled "Promoting Energy Independence and Economic Growth," instructed the EPA to review the CPP and related rules addressing GHG emissions and suspend, revise or rescind the rules if appropriate. On October 16, 2017, the EPA issued a proposed rule to repeal the CPP. To replace the CPP, the EPA proposed the ACE rule on August 21, 2018, which would establish emission guidelines for states to develop plans to address GHG emissions from existing coal-fired power plants. On June 19, 2019, the EPA repealed the CPP and replaced it with the ACE rule that establishes guidelines for states to develop standards of performance to address GHG emissions from existing coal-fired power plants. Depending on the outcomes of further appeals and how any final rules are ultimately implemented, the future cost of compliance may be material.

*Clean Water Act*

Various water quality regulations, the majority of which are the result of the federal CWA and its amendments, apply to FirstEnergy's facilities. In addition, the states in which FirstEnergy operates have water quality standards applicable to FirstEnergy's operations.

The EPA finalized CWA Section 316(b) regulations in May 2014, requiring cooling water intake structures with an intake velocity greater than 0.5 feet per second to reduce fish impingement when aquatic organisms are pinned against screens or other parts of a cooling water intake system to a 12% annual average and requiring cooling water intake structures exceeding 125 million gallons per day to conduct studies to determine site-specific controls, if any, to reduce entrainment, which occurs when aquatic life is drawn into a facility's cooling water system. Depending on any final action taken by the states with respect to impingement and entrainment, the future capital costs of compliance with these standards may be material.

On September 30, 2015, the EPA finalized new, more stringent effluent limits for the Steam Electric Power Generating category (40 CFR Part 423) for arsenic, mercury, selenium and nitrogen for wastewater from wet scrubber systems and zero discharge of pollutants in ash transport water. The treatment obligations phase-in as permits are renewed on a five-year cycle from 2018 to 2023. On April 13, 2017, the EPA granted a Petition for Reconsideration and on September 18, 2017, the EPA postponed certain compliance deadlines for two years. On November 4, 2019, the EPA issued a proposed rule revising the effluent limits for discharges from wet scrubber systems and extending the deadline for compliance to December 31, 2025. The EPA's proposed rule retains the zero discharge standard and 2023 compliance date for ash transport water, but adds some allowances for discharge under certain circumstances. In addition, the EPA allows for less stringent limits for sub-categories of generating units based on capacity utilization, flow volume from the scrubber system, and unit retirement date. Depending on the outcome of appeals and how any final rules are ultimately implemented, the future costs of compliance with these standards may be substantial and changes to FirstEnergy's operations may result.

On September 29, 2016, FirstEnergy received a request from the EPA for information pursuant to CWA Section 308(a) for information concerning boron exceedances of effluent limitations established in the NPDES Permit for the former Mitchell Power Station's Mingo landfill, owned by WP. On November 1, 2016, WP provided an initial response that contained information related to a similar boron issue at the former Springdale Power Station's landfill. The EPA requested additional information regarding the Springdale landfill and on November 15, 2016, WP provided a response and intends to fully comply with the Section 308(a) information request. On March 3, 2017, WP proposed to the PA DEP a re-route of its wastewater discharge to eliminate potential boron exceedances at the Springdale landfill. On January 29, 2018, WP submitted an NPDES permit renewal application to PA DEP proposing to re-route its wastewater discharge to eliminate potential boron exceedances at the Mingo landfill. On February 20, 2018, the DOJ issued a letter and tolling agreement on behalf of EPA alleging violations of the CWA at the Mingo landfill while seeking to enter settlement negotiations in lieu of filing a complaint. The EPA has proposed a penalty of $900,000 to settle alleged past boron exceedances at the Mingo and Springdale landfills. Negotiations are continuing and WP is unable to predict the outcome of this matter.

*Regulation of Waste Disposal*

Federal and state hazardous waste regulations have been promulgated as a result of the RCRA, as amended, and the Toxic Substances Control Act. Certain CCRs, such as coal ash, were exempted from hazardous waste disposal requirements pending the EPA's evaluation of the need for future regulation.

In April 2015, the EPA finalized regulations for the disposal of CCRs (non-hazardous), establishing national standards for landfill design, structural integrity design and assessment criteria for surface impoundments, groundwater monitoring and protection procedures and other operational and reporting procedures to assure the safe disposal of CCRs from electric generating plants. On September 13, 2017, the EPA announced that it would reconsider certain provisions of the final regulations. On July 17, 2018, the EPA Administrator signed a final rule extending the deadline for certain CCR facilities to cease disposal and commence closure activities, as well as, establishing less stringent groundwater monitoring and protection requirements. On August 21, 2018, the D.C. Circuit remanded sections of the CCR Rule to the EPA to provide additional safeguards for unlined CCR impoundments that are more protective of human health and the environment. On December 2, 2019, the EPA published a proposed rule accelerating the date that certain CCR impoundments must cease accepting waste and initiate closure to August

31, 2020. The proposed rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria. On July 29, 2020, the EPA published a final rule revising the date that certain CCR impoundments must cease accepting waste and initiate closure to April 11, 2021. The final rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria.

FE or its subsidiaries have been named as potentially responsible parties at waste disposal sites, which may require cleanup under the CERCLA. Allegations of disposal of hazardous substances at historical sites and the liability involved are often unsubstantiated and subject to dispute; however, federal law provides that all potentially responsible parties for a particular site may be liable on a joint and several basis. Environmental liabilities that are considered probable have been recognized on the Consolidated Balance Sheets as of June 30, 2020, based on estimates of the total costs of cleanup, FirstEnergy's proportionate responsibility for such costs and the financial ability of other unaffiliated entities to pay. Total liabilities of approximately $104 million have been accrued through June 30, 2020. Included in the total are accrued liabilities of approximately $68 million for environmental remediation of former MGP and gas holder facilities in New Jersey, which are being recovered by JCP&L through a non-bypassable SBC. FE or its subsidiaries could be found potentially responsible for additional amounts or additional sites, but the loss or range of losses cannot be determined or reasonably estimated at this time.

### OTHER LEGAL PROCEEDINGS

*United States v. Larry Householder, et al*

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020. FirstEnergy is cooperating fully in the investigation. No contingency has been reflected in FirstEnergy's consolidated financial statements as a loss is neither probable, nor is a loss or range of a loss reasonably estimable.

*Legal Proceedings Relating to United States v. Larry Householder, et al*

In addition to the subpoenas referenced above under "—United States v. Larry Householder, et. al,", certain FE stockholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, and the complaints in each of these suits is related to allegations in the complaint and supporting affidavit relating to Ohio House Bill 6 and the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder.

- *Gendrich v. Anderson, et al and Sloan v. Anderson, et al* (Common Pleas Court, Summit County, OH); on July 26, 2020 and July 31, 2020, respectively, purported stockholders of FE filed shareholder derivative action lawsuits against certain FE directors and officers, alleging, among other things, breaches of fiduciary duty.
- *Smith v. FirstEnergy Corp. et al* (Federal District Court, S.D. Ohio); on July 27, 2020, a purported customer of FirstEnergy filed a putative class action lawsuit against FE and FESC, alleging civil Racketeer Influenced and Corrupt Organizations Act violations.
- *Owens v. FirstEnergy Corp. et al* (Federal District Court, S.D. Ohio); on July 28, 2020, a purported stockholder of FE filed a putative class action lawsuit against FE and certain FE officers, purportedly on behalf of all purchasers of FE common stock from February 21, 2017 through July 21, 2020, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, alleging misrepresentations or omissions by FirstEnergy concerning its business and results of operations.
- *Buldas v. FirstEnergy Corp. et al* and *Hudock and Cameo Countertops, Inc. v. FirstEnergy Corp. et al* (Federal District Court, S.D. Ohio); on July 31, 2020 and August 5, 2020, respectively, purported customers of FirstEnergy filed putative class action lawsuits against FE and FESC alleging civil violations of the Racketeer Influenced and Corrupt Organizations Act and the Ohio Corrupt Activity Act.
- *Emmons v. FirstEnergy Corp. et al* (Common Pleas Court, Cuyahoga County, OH); on August 4, 2020, a purported customer of FirstEnergy filed a putative class action lawsuit against FE, FESC, OE, TE and CEI, alleging several causes of action, including negligence and/or gross negligence, breach of contract, unjust enrichment, and unfair or deceptive consumer acts or practices.
- *Miller v. Anderson, et al* (Federal District Court, N.D. Ohio); on August 7, 2020, a purported stockholder of FE filed a shareholder derivative action lawsuit against certain FE directors and officers, alleging, among other things, breaches of fiduciary duty and violations of Section 14(a) of the Securities Exchange Act of 1934.

The plaintiffs in each of the above cases, seek, among other things, to recover an unspecified amount of damages. The Ohio Attorney General may be considering legal action and, in a letter dated July 24, 2020, notified FE of its duty to not destroy documents in its custody or control regarding Ohio House Bill 6. The outcome of any of these lawsuits is uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. No contingency has been reflected in FirstEnergy's consolidated financial statements as a loss is neither probable, nor is a loss or range of a loss reasonably estimable.

*Nuclear Plant Matters*

Under NRC regulations, JCP&L, ME and PN must ensure that adequate funds will be available to decommission their retired nuclear facility, TMI-2. As of June 30, 2020, JCP&L, ME and PN had in total approximately $882 million invested in external trusts to be used for the decommissioning and environmental remediation of their retired TMI-2 nuclear generating facility. The values of these NDTs also fluctuate based on market conditions. If the values of the trusts decline by a material amount, the obligation to JCP&L, ME and PN to fund the trusts may increase. Disruptions in the capital markets and their effects on particular businesses and the economy could also affect the values of the NDTs.

On October 15, 2019, JCP&L, ME, PN and GPUN executed an asset purchase and sale agreement with TMI-2 Solutions, LLC, a subsidiary of EnergySolutions, LLC, concerning the transfer and dismantlement of TMI-2. This transfer of TMI-2 to TMI-2 Solutions, LLC will include the transfer of: (i) the ownership and operating NRC licenses for TMI-2; (ii) the external trusts for the decommissioning and environmental remediation of TMI-2; and (iii) related liabilities of approximately $900 million as of June 30, 2020. There can be no assurance that the transfer will receive the required regulatory approvals and, even if approved, whether the conditions to the closing of the transfer will be satisfied. On November 12, 2019, JCP&L filed a Petition with the NJBPU seeking approval of the transfer and sale of JCP&L's entire 25% interest in TMI-2 to TMI-2 Solutions, LLC. Also on November 12, 2019, JCP&L, ME, PN, GPUN and TMI-2 Solutions, LLC filed an application with the NRC seeking approval to transfer the NRC license for TMI-2 to TMI-2 Solutions, LLC. On Monday, August 10, 2020, JCP&L, ME, PN, GPUN, TMI-2 Solutions, LLC, and the PA DEP reached a settlement agreement regarding the decommissioning of TMI-2. The settlement agreement provides for increased and detailed oversight by the PA DEP over the decommissioning work, expenditures, and environmental impacts of the dismantlement of TMI-2 by TMI-2 Solutions, LLC. In addition, the PA DEP withdrew its objection to the TMI-2 transfer in the NRC proceedings. Both the NRC and NJBPU proceedings are ongoing. Assets and liabilities held for sale on the FirstEnergy Consolidated Balance Sheet associated with the transaction consist of asset retirement obligations of $709 million, NDTs of $882 million as well as property, plant and equipment with a net book value of zero, which are included in the regulated distribution segment.

*FES Bankruptcy*

On March 31, 2018, FES, including its consolidated subsidiaries, FG, NG, FE Aircraft Leasing Corp., Norton Energy Storage L.L.C. and FGMUC, and FENOC filed voluntary petitions for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court and emerged on February 27, 2020. See Note 3, "Discontinued Operations," for additional discussion.

*Other Legal Matters*

There are various lawsuits, claims (including claims for asbestos exposure) and proceedings related to FirstEnergy's normal business operations pending against FE or its subsidiaries. The loss or range of loss in these matters is not expected to be material to FE or its subsidiaries. The other potentially material items not otherwise discussed above are described under Note 9, "Regulatory Matters."

FirstEnergy accrues legal liabilities only when it concludes that it is probable that it has an obligation for such costs and can reasonably estimate the amount of such costs. In cases where FirstEnergy determines that it is not probable, but reasonably possible that it has a material obligation, it discloses such obligations and the possible loss or range of loss if such estimate can be made. If it were ultimately determined that FE or its subsidiaries have legal liability or are otherwise made subject to liability based on any of the matters referenced above, it could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows.

## 11. SEGMENT INFORMATION

FE and its subsidiaries are principally involved in the transmission, distribution and generation of electricity through its reportable segments, Regulated Distribution and Regulated Transmission.

The **Regulated Distribution** segment distributes electricity through FirstEnergy's ten utility operating companies, serving approximately six million customers within 65,000 square miles of Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York, and purchases power for its POLR, SOS, SSO and default service requirements in Ohio, Pennsylvania, New Jersey and Maryland. This segment also controls 3,790 MWs of regulated electric generation capacity located primarily in West Virginia, Virginia and New Jersey, of which, 210 MWs are related to the Yards Creek generating station that is being sold pursuant to an asset purchase agreement as further discussed below. The segment's results reflect the costs of securing and delivering electric generation from transmission facilities to customers, including the deferral and amortization of certain related costs. Included within the segment are $882 million of assets classified as held for sale as of June 30, 2020 and December 31, 2019 associated with the asset purchase and sale agreements with TMI-2 Solutions to transfer TMI-2 to TMI-2 Solutions, LLC. See Note 10, "Commitments, Guarantees and Contingencies" for additional information. Also included within the segment is $44 million of assets classified as held for sale as of June 30, 2020 associated with the asset purchase agreement with Yards Creek Energy, LLC to transfer JCP&L's 50% interest in the Yards Creek pumped-storage hydro generation station (210 MWs). See Note 9, "Regulatory Matters" for additional information.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

August 17, 2020

**FIRSTENERGY CORP.**
Registrant

/s/ Jason J. Lisowski
_____
Jason J. Lisowski
Vice President, Controller
and Chief Accounting Officer

78

**Exhibit 3.2(a)**

**AMENDMENT
TO THE FIRSTENERGY CORP.
AMENDED AND RESTATED CODE OF REGULATIONS**

**Effective May 19, 2020**

**Regulation 36 shall be amended as follows:**

**36. Amendments. Except as otherwise provided by law or by the Articles of Incorporation or this Code of Regulations, these Regulations or any of them may be amended (i) in any respect or repealed at any time at any meeting of shareholders or otherwise by the affirmative vote of the holders of shares entitling them to exercise a majority of the voting power of the Corporation voting together as a single class, provided that any amendment or supplement proposed to be acted upon at any such meeting has been described or referred to in the notice of such meeting or (ii) to the extent permitted by Chapter 1701 of the Ohio Revised Code, by the Board of Directors. Notwithstanding the foregoing provisions of this Regulation 36, no amendment to Regulations 31, 32, or 33 will be effective to eliminate or diminish the rights of persons specified in those Regulations existing at the time immediately preceding such amendment.**

- 1 -

**EXHIBIT 31.1**

**Certification**

I, Charles E. Jones, certify that:

1. I have reviewed this report on Form 10-Q of FirstEnergy Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 17, 2020

/s/ Charles E. Jones

Charles E. Jones
Chief Executive Officer

**EXHIBIT 31.2**

**Certification**

I, K. Jon Taylor, certify that:

1.  I have reviewed this report on Form 10-Q of FirstEnergy Corp.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 17, 2020

/s/ K. Jon Taylor
K. Jon Taylor
Senior Vice President and
Chief Financial Officer

**EXHIBIT 32**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**

In connection with the Report of FirstEnergy Corp. ("Company") on Form 10-Q for the period ended June 30, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each undersigned officer of the Company does hereby certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Charles E. Jones
Charles E. Jones
Chief Executive Officer

/s/ K. Jon Taylor
K. Jon Taylor
Senior Vice President and
Chief Financial Officer

Date: August 17, 2020

# EXHIBIT 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D. C. 20549

**FORM 8-K**

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): November 2, 2020

| Commission File Number | Registrant; State of Incorporation; Address; and Telephone Number | I.R.S. Employer Identification No. |
|---|---|---|
| 333-21011 | **FIRSTENERGY CORP** (An Ohio Corporation) 76 South Main Street Akron OH 44308 Telephone (800) 736-3402 | 34-1843785 |

**Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2.):**

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.10 par value per share | FE | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition**

On November 2, 2020, FirstEnergy Corp. (FirstEnergy or Company) issued two public documents which, among other things: provide results for the three and nine months ended September 30, 2020; update its full year 2020 GAAP guidance and affirm its operating (non-GAAP) earnings guidance for the full year 2020. FirstEnergy's Press Release and 3Q 2020 Strategic and Financial Highlights, which are attached as Exhibits 99.1 and 99.2, respectively, hereto and incorporated herein by reference, contain non-GAAP financial measures. Pursuant to the requirements of Regulation G and Item 10(e)(i) of Regulation S-K, FirstEnergy has provided quantitative reconciliations within the Press Release and 3Q 2020 Strategic and Financial Highlights of the non-GAAP financial measures to the most directly comparable financial measures calculated and presented in accordance with accounting principles generally accepted in the United States (GAAP). The information set forth in and incorporated into this Item 2.02 of this Current Report on Form 8-K is being furnished pursuant to Item 2.02 of Form 8-K and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference into any of the Company's filings under the Securities Act of 1933 or the Securities Exchange Act of 1934, whether made before or after the date hereof and regardless of any general incorporation language in such filings, except to the extent expressly set forth by specific reference in such a filing.

The attached Press Release and 3Q 2020 Strategic and Financial Highlights contain references to non-GAAP financial measures including, among others, Operating earnings (loss); Operating earnings (loss) per share; Operating earnings (loss) per share on a segment basis. Generally, a non-GAAP financial measure is a numerical measure of a company's historical or future financial performance, financial position, or cash flows that either excludes or includes amounts that are not normally excluded or included in the most directly comparable measure calculated and presented in accordance with GAAP. Operating earnings (loss), Operating earnings (loss) per share and Operating earnings (loss) per share by segment are not calculated in accordance with GAAP to the extent they exclude the impact of "special items." Special items represent charges incurred or benefits realized that management believes are not indicative of or may obscure trends useful in evaluating the Company's ongoing core activities and results of operations or otherwise warrant separate classification. Special items also reflect the adjustment to include the full impact of share dilution from the $2.5 billion equity issuance in January 2018. Special items are not necessarily non-recurring. The Company's management cannot estimate on a forward-looking basis the impact of these items in the context of Operating earnings (loss) per share growth projections because these items, which could be significant, are difficult to predict and may be highly variable. Consequently, the Company is unable to reconcile Operating earnings (loss) per share growth projections to a GAAP measure without unreasonable effort. Operating earnings (loss) per share and Operating earnings (loss) per share for each segment is calculated by dividing Operating earnings (loss), which excludes specials items as discussed herein, for the periods presented in 2020 by 542 million shares, 540 million shares for the third quarter of 2019 and 539 million for the first nine months of 2019, which reflects the full impact of share dilution from the equity issuance in January 2018. Basic EPS (GAAP) is based on 542 million shares for the periods presented in 2020, and 538 million and 533 million shares for the third quarter and first nine months of 2019, respectively. Management uses non-GAAP financial measures such as Operating earnings (loss) and Operating earnings (loss) per share to evaluate the Company's performance and manage its operations and frequently references these non-GAAP financial measures in its decision-making, using them to facilitate historical and ongoing performance comparisons. Additionally, management uses Operating earnings (loss) per share by segment to further evaluate FirstEnergy's performance by segment and references this non-GAAP financial measure in its decision-making. Management believes that the non-GAAP financial measures of Operating earnings (loss), Operating earnings (loss) per share and Operating earnings (loss) per share by segment provide consistent and comparable measures of performance of its businesses on an ongoing basis. Management also believes that such measures are useful to shareholders and other interested parties to understand performance trends and evaluate the Company against its peer group by presenting period-over-period operating results without the effect of certain charges or benefits that may not be consistent or comparable across periods or across the Company's peer group. All of these non-GAAP financial measures are intended to complement, and are not considered as alternatives to, the most directly comparable GAAP financial measures. Also, the non-GAAP financial measures may not be comparable to similarly titled measures used by other entities.

**Item 8.01 Other Events**

You should carefully consider the risk factors discussed in "Item 1A. Risk Factors" in FirstEnergy's Annual Report on Form 10-K for the year ended December 31, 2019, and its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2020 and June 30, 2020, which could materially affect FirstEnergy's business, financial condition or future results. The risk factor presented below, updates and should be read in conjunction with, the risk factors and information disclosed in FirstEnergy's Annual Report on Form 10-K for the year ended December 31, 2019, and its Quarterly Report on Form 10-Q for the quarters ended March 31, 2020 and June 30, 2020.

*We Have Received Requests for Information Related to Government Investigations. The Investigations and Related Litigation, as well as any Related Potential Adverse Impacts on Federal or State Regulatory Matters, Could Have a Material Adverse Effect on our Reputation, Business, Financial Condition, Results of Operations, Liquidity or Cash Flows.*

On July 21, 2020, we received subpoenas for records from the U.S. Attorney's Office for the Southern District of Ohio requesting the production of information concerning an investigation surrounding Ohio House Bill 6 involving the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Following the

announcement of the investigation surrounding Ohio House Bill 6, certain of our stockholders and customers filed several lawsuits against us and certain current and former directors, officers and other employees. In addition, on August 10, 2020, the United States Securities and Exchange Commission (SEC), through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FirstEnergy, and on September 1, 2020, issued subpoenas to FirstEnergy and certain of its officers. We are cooperating with the U.S. Attorney's Office and the SEC in their investigations. See Note 10, "Commitments, Guarantees and Contingencies," of the Notes to Consolidated Financial Statements in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2020, for additional details on the government investigation and subsequent litigation surrounding the investigation of Ohio House Bill 6

The investigations and related litigation could divert management's focus and result in substantial investigation expenses, or otherwise require the commitment of substantial corporate resources. Furthermore, the investigations have had, and are likely to continue to have, an adverse impact on the trading prices of our securities. The outcome of the government investigations and related litigation is inherently uncertain. If one or more legal matters were resolved against us, our reputation, business, financial condition, results of operations, liquidity or cash flows may be adversely affected. Further, such an outcome could result in significant compensatory or punitive monetary damages, remedial corporate measures or other relief against us that could adversely impact our operations.

Additionally, we are subject to comprehensive regulation by various federal, state and local regulatory agencies that significantly influence our operating environment. Any appearance of non-compliance with anti-corruption and anti-bribery laws could have an adverse impact on our reputation or relationships with regulatory authorities, result in a material inquiry or investigation by such federal, state and local regulatory agencies, and result in adverse rulings against us, which could have a material adverse impact on our financial condition and operating results. Specifically, the rates our utilities and transmission operating companies are allowed to charge may be decreased as a result of actions taken by the Federal Energy Regulatory Commission or by a state regulatory commission in which the utility operates, whether as a result of the investigations by the U.S. Attorney's Office and the SEC, the appearance of non-compliance with anti-corruption and anti-bribery laws, or otherwise.

We are unable to predict the outcome, duration, scope, result or related costs of the investigations and related litigation, or adverse impacts on federal or state regulatory matters, including with respect to rates, and, therefore, any of these risks could impact us significantly beyond expectations. Moreover, we are unable to predict the potential for any additional investigations, litigation or regulatory actions, any of which could exacerbate these risks or expose us to potential criminal or civil liabilities, sanctions or other remedial measures, and could have a material adverse effect on our reputation, business, financial condition, results of operations, liquidity or cash flows.

**Item 9.01 Financial Statements and Exhibits**

(d)     Exhibits

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release issued by FirstEnergy Corp., dated November 2, 2020 |
| 99.2 | 3Q 2020 Strategic and Financial Highlights, dated November 2, 2020 |
| 104 | Cover Page Interactive Data File (the cover page XBRL tags are embedded within the Inline XBRL document) |

**Forward-Looking Statements:** This Form 8-K includes forward-looking statements based on information currently available to management. Such statements are subject to certain risks and uncertainties and readers are cautioned not to place undue reliance on these forward-looking statements. These statements include declarations regarding management's intents, beliefs and current expectations. These statements typically contain, but are not limited to, the terms "anticipate," "potential," "expect," "forecast," "target," "will," "intend," "believe," "project," "estimate," "plan" and similar words. Forward-looking statements involve estimates, assumptions, known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements, which may include the following: the results of our ongoing internal investigation and evaluation of its controls framework, the extent and duration of COVID-19 and the impacts to our business, operations and financial condition resulting from the outbreak of COVID-19 including, but not limited to, disruption of businesses in our territories, volatile capital and credit markets, legislative and regulatory actions, the effectiveness of our pandemic and business continuity plans, the precautionary measures we are taking on behalf of our customers, contractors and employees, our customers' ability to make their utility payment and the potential for supply-chain disruptions; the risks and uncertainties associated with government investigations regarding Ohio House Bill 6 and related matters, including potential adverse impacts on federal or state regulatory matters; the risks and uncertainties associated with litigation, arbitration, mediation and similar proceedings; legislative and regulatory developments, including, but not limited to, matters related to rates, compliance and enforcement activity; mitigating exposure for remedial activities associated with retired and formerly owned electric generation assets, including, but not limited to, risks associated with the decommissioning of TMI-2; the ability to accomplish or realize anticipated benefits from strategic and financial goals, including, but not limited to, executing our transmission and distribution investment plans, controlling costs, improving our credit metrics, strengthening our balance sheet and growing earnings; economic and weather conditions affecting future operating results, such as a recession, significant weather events and other natural disasters, and associated regulatory events or actions in response to such conditions; changes in assumptions regarding economic conditions within our territories, the reliability of our transmission and distribution system, or the availability of capital or other resources supporting identified transmission and distribution investment opportunities; changes in customers' demand for power, including, but not limited to, the impact of climate change or energy efficiency and peak demand reduction mandates; changes in national and regional economic conditions affecting us and/or our major industrial and commercial customers or others with which we do business; the risks associated with cyber-attacks and other disruptions to our information technology system, which may compromise our operations, and data security breaches of sensitive data, intellectual property and proprietary or personally identifiable information; the ability to comply with applicable reliability standards and energy efficiency and peak demand reduction mandates; changes to environmental laws and regulations, including, but not limited to, those related to climate change; changing market conditions affecting the measurement of certain liabilities and the value of assets held in our pension trusts and other trust funds, or causing us to make contributions sooner, or in amounts that are larger, than currently anticipated; labor disruptions by our unionized workforce; changes to significant accounting policies; any changes in tax laws or regulations, or adverse tax audit results or rulings; the ability to access the public securities and other capital and credit markets in accordance with our financial plans, the cost of such capital and overall condition of the capital and credit markets affecting us, including the increasing number of financial institutions evaluating the impact of climate change on their investment decisions; actions that may be taken by credit rating agencies that could negatively affect either our access to or terms of financing or our financial condition and liquidity; and the risks and other factors discussed from time to time in our SEC filings. Dividends declared from time to time on FirstEnergy Corp.'s common stock during any period may in the aggregate vary from prior periods due to circumstances considered by FirstEnergy Corp.'s Board of Directors at the time of the actual declarations. A security rating is not a recommendation to buy or hold securities and is subject to revision or withdrawal at any time by the assigning rating agency. Each rating should be evaluated independently of any other rating. The foregoing factors should not be construed as exhaustive and should be read in conjunction with the other cautionary statements and risks that are included in our filings with the SEC, including but not limited to the most recent Annual Report on Form 10-K and any subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. The foregoing review of factors also should not be construed as exhaustive. New factors emerge from time to time, and it is not possible for management to predict all such factors, nor assess the impact of any such factor on FirstEnergy Corp.'s business or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statements. FirstEnergy expressly disclaims any current intention to update or revise, except as required by law, any forward-looking statements contained herein or the information incorporated by reference as a result of new information, future events or otherwise.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

November 2, 2020

FIRSTENERGY CORP.
Registrant

By: _____ /s/ Jason J. Lisowski
Jason J. Lisowski
Vice President, Controller and
Chief Accounting Officer

# EXHIBIT 4

**(Submitted *In Camera* Pursuant to § 8 of the Amended Stipulated Protective Order (ECF 411))**

# EXHIBIT 5

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K/A**
Amendment No.1
(Mark One)
☑   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the FISCAL YEAR ended December 31, 2019**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

| Commission File Number | Registrant; State of Incorporation; Address; and Telephone Number | I.R.S. Employer Identification No. |
|---|---|---|
| 333-21011 | **FIRSTENERGY CORP** (An   Ohio   Corporation) **76 South Main Street Akron   OH   44308** Telephone   (800) 736-3402 | 34-1843785 |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, $0.10 par value per share | FE | New York Stock Exchange |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**

**None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☑      No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐      No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑      No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☑      No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large Accelerated Filer | ☑ |
| Accelerated Filer | ☐ |
| Non-accelerated Filer | ☐ |
| Smaller Reporting Company | ☐ |
| Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).
Yes ☐      No ☑

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and ask price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter.

$22,724,895,037 as of June 30, 2019

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:

| CLASS | AS OF JANUARY 31, 2020 |
|---|---|
| Common Stock, $0.10 par value | 540,713,909 |

**Documents Incorporated By Reference**

| DOCUMENT | PART OF FORM 10-K INTO WHICH DOCUMENT IS INCORPORATED |
|---|---|
| Proxy Statement for 2020 Annual Meeting of Shareholders of FirstEnergy Corp. to be held May 19, 2020 | Part III |

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| **Explanatory Note** | ii |
| **Glossary of Terms** | iii |
| **Part II** | 1 |
| Item 8. Financial Statements and Supplementary Data | 1 |
| Report of Independent Registered Public Accounting Firm | 2 |
| Financial Statements |  |
| Consolidated Statements of Income (Loss) | 4 |
| Consolidated Statements of Comprehensive Income (Loss) | 5 |
| Consolidated Balance Sheets | 6 |
| Consolidated Statements of Stockholders' Equity | 7 |
| Consolidated Statements of Cash Flows | 8 |
| Notes to Consolidated Financial Statements | 9 |
| Item 9A. Controls and Procedures | 65 |
| **Part IV** | 67 |
| Item 15. Exhibits | 67 |

**EXPLANATORY NOTE**

On February 10, 2020, FirstEnergy Corp. (the "Company") filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2019 (the "Original 10-K"). On November 18, 2020, subsequent to the issuance of the Original 10-K, Company management, in consultation with the Audit Committee of the Company's Board of Directors, concluded that there was a material weakness in internal control over financial reporting that existed as of December 31, 2019, and continues to exist as of the end of the third quarter of 2020. A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

A committee of independent members of the Board of Directors ("Board") is directing an internal investigation related to ongoing government investigations. In connection with the Company's internal investigation, such committee determined that certain former members of senior management, including the Company's former chief executive officer, violated certain Company policies and its code of conduct. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates. It has not been determined if the payments were for the purposes represented within the consulting agreement. The matter is a subject of the ongoing internal investigation related to the government investigations.

The Company is filing this Amendment No. 1 to Annual Report on Form 10-K/A (this "Amendment") solely for the purpose of amending the Original 10-K to: (i) amend and restate the (a) disclosure in the section titled "Management's Report on Internal Control Over Financial Reporting" and (b) report of PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, in each case, to reflect that the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2019, and (ii) amend and restate the disclosure included in Item 9A. "Controls and Procedures," to reflect the ineffective disclosure controls and procedures as a result of the material weakness. In addition, the Company included Note 18, "Subsequent Events", in Item 8 "Financial Statements And Supplementary Data".

As required by Rule 12b-15 under the Securities Exchange Act of 1934, the Company's principal executive officer and principal financial officer are providing new currently dated certifications. In addition, the Company is filing a new consent from PricewaterhouseCoopers LLP. Accordingly, this Amendment amends Item 15. "Exhibits, Financial Statement Schedules" in the Original 10-K to reflect the filing of the new certifications and consent. Other than the foregoing, there are no changes being made to the Original 10-K. In addition, except as specifically described above, this Amendment does not reflect events occurring after the filing of the Original 10-K, nor does it modify or update disclosures therein in any way. Among other things, risk factors and forward-looking statements made in the Original 10-K have not been revised to reflect events that occurred or facts that became known to us after the filing of the Original 10-K, and any such forward looking statements should be read in their historical context. Accordingly, this Amendment should be read in conjunction with the Company's filings made with the Securities and Exchange Commission subsequent to the filings with the Original 10-K.

**GLOSSARY OF TERMS**

The following abbreviations and acronyms are used in this report to identify FirstEnergy Corp. and its current and former subsidiaries:

| | |
|---|---|
| AE | Allegheny Energy, Inc., a Maryland utility holding company that merged with a subsidiary of FirstEnergy on February 25, 2011, which subsequently merged with and into FE on January 1, 2014 |
| AESC | Allegheny Energy Service Corporation, a subsidiary of FirstEnergy Corp. |
| AE Supply | Allegheny Energy Supply Company, LLC, an unregulated generation subsidiary |
| AGC | Allegheny Generating Company, formerly a generation subsidiary of AE Supply that became a wholly owned subsidiary of MP in May 2018 |
| ATSI | American Transmission Systems, Incorporated, formerly a direct subsidiary of FE that became a subsidiary of FET in April 2012, which owns and operates transmission facilities |
| BSPC | Bay Shore Power Company |
| CEI | The Cleveland Electric Illuminating Company, an Ohio electric utility operating subsidiary |
| CES | Competitive Energy Services, formerly a reportable operating segment of FirstEnergy |
| FE | FirstEnergy Corp., a public utility holding company |
| FELHC | FirstEnergy License Holding Company |
| FENOC | FirstEnergy Nuclear Operating Company, a subsidiary of FE, which operates NG's nuclear generating facilities |
| FES | FirstEnergy Solutions Corp., together with its consolidated subsidiaries, FG, NG, FE Aircraft Leasing Corp., Norton Energy Storage L.L.C., and FGMUC, which provides energy-related products and services |
| FES Debtors | FES and FENOC |
| FESC | FirstEnergy Service Company, which provides legal, financial and other corporate support services |
| FET | FirstEnergy Transmission, LLC, formerly known as Allegheny Energy Transmission, LLC, which is the parent of ATSI, MAIT and TrAIL, and has a joint venture in PATH |
| FEV | FirstEnergy Ventures Corp., which invests in certain unregulated enterprises and business ventures |
| FG | FirstEnergy Generation, LLC, a wholly owned subsidiary of FES, which owns and operates non-nuclear generating facilities |
| FGMUC | FirstEnergy Generation Mansfield Unit 1 Corp., a wholly owned subsidiary of FG, which has certain leasehold interests in a portion of Unit 1 at the Bruce Mansfield plant |
| FirstEnergy | FirstEnergy Corp., together with its consolidated subsidiaries |
| Global Holding | Global Mining Holding Company, LLC, a joint venture between FEV, WMB Marketing Ventures, LLC and Pinesdale LLC |
| Global Rail | Global Rail Group, LLC, a subsidiary of Global Holding that owns coal transportation operations near Roundup, Montana |
| GPU | GPU, Inc., former parent of JCP&L, ME and PN, that merged with FE on November 7, 2001 |
| GPUN | GPU Nuclear, Inc., a subsidiary of FE, which operates TMI-2 |
| JCP&L | Jersey Central Power & Light Company, a New Jersey electric utility operating subsidiary |
| MAIT | Mid-Atlantic Interstate Transmission, LLC, a subsidiary of FET, which owns and operates transmission facilities |
| ME | Metropolitan Edison Company, a Pennsylvania electric utility operating subsidiary |
| MP | Monongahela Power Company, a West Virginia electric utility operating subsidiary |
| NG | FirstEnergy Nuclear Generation, LLC, a wholly owned subsidiary of FES, which owns nuclear generating facilities |
| OE | Ohio Edison Company, an Ohio electric utility operating subsidiary |
| Ohio Companies | CEI, OE and TE |
| PATH | Potomac-Appalachian Transmission Highline, LLC, a joint venture between FE and a subsidiary of AEP |
| PATH-Allegheny | PATH Allegheny Transmission Company, LLC |
| PATH-WV | PATH West Virginia Transmission Company, LLC |
| PE | The Potomac Edison Company, a Maryland and West Virginia electric utility operating subsidiary |
| Penn | Pennsylvania Power Company, a Pennsylvania electric utility operating subsidiary of OE |
| Pennsylvania Companies | ME, PN, Penn and WP |
| PN | Pennsylvania Electric Company, a Pennsylvania electric utility operating subsidiary |
| Signal Peak | Signal Peak Energy, LLC, an indirect subsidiary of Global Holding that owns mining operations near Roundup, Montana |
| TE | The Toledo Edison Company, an Ohio electric utility operating subsidiary |
| TrAIL | Trans-Allegheny Interstate Line Company, a subsidiary of FET, which owns and operates transmission facilities |
| Transmission Companies | ATSI, MAIT and TrAIL |
| Utilities | OE, CEI, TE, Penn, JCP&L, ME, PN, MP, PE and WP |
| WP | West Penn Power Company, a Pennsylvania electric utility operating subsidiary |

**18. SUBSEQUENT EVENTS**

*United States v. Larry Householder, et al.*

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020.

*Legal Proceedings Relating to United States v. Larry Householder, et al.*

In addition to the subpoenas referenced above under "—United States v. Larry Householder, et. al.", certain FE stockholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, and the complaints in each of these suits is related to allegations in the complaint and supporting affidavit relating to HB 6 and the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder.

- *Gendrich v. Anderson, et al. and Sloan v. Anderson, et al.* (Common Pleas Court, Summit County, OH); on July 26, 2020 and July 31, 2020, respectively, purported stockholders of FE filed shareholder derivative action lawsuits against certain FE directors and officers, alleging, among other things, breaches of fiduciary duty.
- *Smith v. FirstEnergy Corp. et al., Buldas v. FirstEnergy Corp. et al., and Hudock and Cameo Countertops, Inc. v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 27, 2020, July 31, 2020, and August 5, 2020, respectively, purported customers of FirstEnergy filed putative class action lawsuits against FE and FESC, as well as certain current and former FirstEnergy officers, alleging civil Racketeer Influenced and Corrupt Organizations Act violations and related state law claims. These actions have been consolidated.
- *Owens v. FirstEnergy Corp. et al.* and *Frand v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 28, 2020 and August 21, 2020, purported stockholders of FE filed putative class action lawsuits against FE and certain FE officers, purportedly on behalf of all purchasers of FE common stock from February 21, 2017 through July 21, 2020, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, alleging misrepresentations or omissions by FirstEnergy concerning its business and results of operations.
- *Emmons v. FirstEnergy Corp. et al.* (Common Pleas Court, Cuyahoga County, OH); on August 4, 2020, a purported customer of FirstEnergy filed a putative class action lawsuit against FE, FESC, OE, TE and CEI, along with FES, alleging several causes of action, including negligence and/or gross negligence, breach of contract, unjust enrichment, and unfair or deceptive consumer acts or practices. On October 1, 2020, plaintiffs filed a First Amended Complaint, adding as a plaintiff a purported customer of FirstEnergy and alleging a civil violation of the Ohio Corrupt Activity Act and civil conspiracy against FE, FESC and FES.
- *Miller v. Anderson, et al.* (Federal District Court, N.D. Ohio); *Bloom, et al. v. Anderson, et al.; Employees Retirement System of the City of St. Louis v. Jones, et al.; Beck v. Anderson et al.; Electrical Workers Pension Fund, Local 103, I.B.E.W. v. Anderson et al.; Massachusetts Laborers Pension Fund v. Anderson et al.; The City of Philadelphia Board of Pensions and Retirement v. Anderson et al.; Atherton v. Dowling et al; Behar v. Anderson, et al.* (U.S. District Court, S.D. Ohio); beginning on August 7, 2020, purported stockholders of FE filed shareholder derivative actions alleging the board and officers breached their fiduciary duties and committed violations of Section 14(a) of the Securities Exchange Act of 1934.
- *State of Ohio ex rel. Dave Yost, Ohio Attorney General v. FirstEnergy Corp., et al.* (Common Pleas Court, Franklin County, OH); on September 23, 2020, the OH AG filed a complaint against several parties including FE and FESC, alleging, one cause of action, a civil violation of the Ohio Corrupt Activity Act in connection with the passage of HB 6. The OH AG sought a preliminary injunction to prevent each of the defendants, including FE and FESC, through the end of 2020, from: (i) contributing to any groups whose purpose is to keep or modify HB 6; (ii) making any public statements for or against any repeal or modification legislation concerning HB 6; (iii) lobbying, consulting, or advising on these matters; or (iv) contributing to any Ohio legislative candidates. The court denied the OH AG's request for preliminary injunctive relief on October 2, 2020.
- *City of Cincinnati and City of Columbus v. FirstEnergy Corp.* (Common Pleas Court, Franklin County, OH); on October 27, 2020, the Cities of Cincinnati and Columbus filed a complaint against several parties including FE, alleging a civil violation of the Ohio Corrupt Activity Act and seeking to enjoin the collection of the zero nuclear credit included in HB 6.
- *Mitchell v. FirstEnergy Corp. et al.* (Common Pleas Court, Fairfield County, OH); on October 6, 2020, an unsuccessful candidate for the Ohio legislature filed an amended complaint adding FirstEnergy Corp. to a previously filed Ohio Corrupt Activity Act civil lawsuit against now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. The amended complaint sought an amount in excess of $875,000, plus treble damages and other relief. On November 2, 2020, the plaintiff moved to voluntarily dismiss the claims without prejudice.

The plaintiffs in each of the above cases, seek, among other things, to recover an unspecified amount of damages (unless otherwise noted). In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE

officers. The outcome of any of these lawsuits and investigations are uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows.

*Internal Investigation Relating to United States v. Larry Householder, et al.*

As previously disclosed, a committee of independent members of the Board of Directors is directing an internal investigation related to ongoing government investigations. In connection with FirstEnergy's internal investigation, such committee determined on October 29, 2020, to terminate FirstEnergy's Chief Executive Officer, Charles E. Jones, together with two other executives: Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding; and Michael J. Dowling, Senior Vice President of External Affairs. Each of these terminated executives violated certain FirstEnergy policies and its code of conduct. These executives were terminated as of October 29, 2020. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates. At this time, it has not been determined if the payments were for the purposes represented within the consulting agreement. Immediately following these terminations, the independent members of its Board appointed Mr. Steven E. Strah to the position of Acting Chief Executive Officer and Mr. Christopher D. Pappas, a current member of the Board, to the temporary position of Executive Director, each effective as of October 29, 2020. Mr. Donald T. Misheff will continue to serve as Non-Executive Chairman of the Board. Additionally, on November 8, 2020, Robert Reffner, Senior Vice President and Chief Legal Officer, and Ebony Yeboah-Amankwah, Vice President, General Counsel, and Chief Ethics Officer, were separated from FirstEnergy due to inaction and conduct that the Board determined was influenced by the improper tone at the top. The matter is a subject of the ongoing internal investigation as it relates to the government investigations.

*Short-Term Borrowings/ Revolving Credit Facilities*

FE and the Utilities and FET and certain of its subsidiaries participate in two separate five-year syndicated revolving credit facilities providing for aggregate commitments of $3.5 billion, which are available until December 6, 2022. Under the FE credit facility, an aggregate amount of $2.5 billion is available to be borrowed, repaid and reborrowed, subject to separate borrowing sublimits for each borrower including FE and its regulated distribution subsidiaries. Under the FET credit facility, an aggregate amount of $1.0 billion is available to be borrowed, repaid and reborrowed under a syndicated credit facility, subject to separate borrowing sublimits for each borrower including FE's transmission subsidiaries. On November 17, 2020, FE and the Utilities and FET and certain of its subsidiaries entered into amendments to the FE credit facility and the FET credit facility, respectively. The amendments provide for modifications and/or waivers of (i) certain representations and warranties and (ii) certain affirmative and negative covenants, contained therein, which allowed FirstEnergy to regain compliance with such provisions. In addition, among other things, the amendment to the FE credit facility reduces the sublimit applicable to FE to $1.5 billion, and the amendments increased certain tiers of pricing applicable to borrowings under the credit facilities.

**19. SUMMARY OF QUARTERLY FINANCIAL DATA (UNAUDITED)**

The following summarizes certain consolidated operating results by quarter for 2019 and 2018.

**FirstEnergy**

**CONSOLIDATED STATEMENTS OF INCOME (LOSS)**
*(In millions, except per share amounts)*

| | 2019 | | | | 2018 | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 31 | Sep. 30 | Jun. 30 | Mar. 31 | Dec. 31 | Sep. 30 | Jun. 30 | Mar. 31 |
| Revenues | $ 2,673 | $ 2,963 | $ 2,516 | $ 2,883 | $ 2,710 | $ 3,064 | $ 2,625 | $ 2,862 |
| Other operating expense | 809 | 758 | 606 | 779 | 770 | 739 | 684 | 940 |
| Provision for depreciation | 310 | 304 | 309 | 297 | 293 | 283 | 283 | 277 |
| Operating Income | 615 | 681 | 585 | 629 | 512 | 710 | 700 | 580 |
| Pension and OPEB mark-to-market adjustment | (674) | — | — | — | (144) | — | — | — |
| Income before income taxes | (249) | 496 | 422 | 448 | 169 | 520 | 409 | 414 |
| Income taxes | (68) | 107 | 81 | 93 | 35 | 121 | 101 | 233 |
| Income from continuing operations | (181) | 389 | 341 | 355 | 134 | 399 | 308 | 181 |
| Discontinued operations [1] (Note 3) | 70 | 2 | (29) | (35) | 4 | (857) | (9) | 1,188 |
| Net Income (Loss) | (111) | 391 | 312 | 320 | 138 | (458) | 299 | 1,369 |
| Income allocated to preferred stockholders [2] | — | — | 4 | 5 | 10 | 54 | 165 | 156 |
| Net income (loss) attributable to common stockholders | (111) | 391 | 308 | 315 | 128 | (512) | 134 | 1,213 |
| Earnings (loss) per share of common stock-[3] | | | | | | | | |
|   Basic - Continuing Operations | (0.33) | 0.72 | 0.63 | 0.66 | 0.24 | 0.68 | 0.30 | 0.05 |
|   Basic - Discontinued Operations (Note 3) | 0.13 | 0.01 | (0.05) | (0.07) | 0.01 | (1.70) | (0.02) | 2.50 |
|     Basic - Net Income (Loss) Attributable to Common Stockholders | (0.20) | 0.73 | 0.58 | 0.59 | 0.25 | (1.02) | 0.28 | 2.55 |
|   Diluted - Continuing Operations | (0.33) | 0.72 | 0.63 | 0.66 | 0.24 | 0.68 | 0.30 | 0.05 |
|   Diluted - Discontinued Operations (Note 3) | 0.13 | — | (0.05) | (0.07) | 0.01 | (1.70) | (0.02) | 2.49 |
|     Diluted - Net Income (Loss) Attributable to Common Stockholders | (0.20) | 0.72 | 0.58 | 0.59 | 0.25 | (1.02) | 0.28 | 2.54 |

[1] Net of income taxes

[2] The sum of quarterly income allocated to preferred stockholders may not equal annual income allocated to preferred stockholders as quarter-to-date and year-to-date amounts are calculated independently.

[3] The sum of quarterly earnings per share information may not equal annual earnings per share due to the issuance of shares and conversion of preferred shares throughout the year. See the FirstEnergy Consolidated Statements of Stockholders' Equity and Note 6, "Stock-Based Compensation Plans," for additional information.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**FIRSTENERGY CORP.**

BY:   /s/ Jason J. Lisowski

Jason J. Lisowski

Vice President, Controller and
Chief Accounting Officer

Date: November 19, 2020

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated:

/s/ Steven E. Strah
_____
Steven E. Strah
President and Acting Chief Executive Officer
(Principal Executive Officer)

/s/ Donald T. Misheff
_____
Donald T. Misheff
Director
(Non-Executive Chairman of Board)

| /s/ K. Jon Taylor | /s/ Jason J. Lisowski |
|---|---|
| K. Jon Taylor | Jason J. Lisowski |
| Senior Vice President and Chief Financial Officer | Vice President, Controller and Chief Accounting Officer |
| (Principal Financial Officer) | (Principal Accounting Officer) |
| /s/ Michael J. Anderson | /s/ Christopher D. Pappas |
| Michael J. Anderson | Christopher D. Pappas |
| Director | Director |
| /s/ Steven J. Demetriou | /s/ Sandra Pianalto |
| Steven J. Demetriou | Sandra Pianalto |
| Director | Director |
| /s/ Julia L. Johnson | /s/ Luis A. Reyes |
| Julia L. Johnson | Luis A. Reyes |
| Director | Director |
| /s/ Thomas N. Mitchell | /s/ Leslie M. Turner |
| Thomas N. Mitchell | Leslie M. Turner |
| Director | Director |
| /s/ James F. O'Neil III | |
| James F. O'Neil III | |
| Director | |

Date: November 19, 2020

70

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (Nos. 333-233340, 333-223509, 333-223473, 333-223472, and 333-48587) and Form S-8 (Nos. 333-238539, 333-226788, 333-222225, 333-204436, 333-202184, 333-172464, 333-165640, 333-146170, 333-101472, 333-89356, 333-72768, 333-56094, and 333-81183) of FirstEnergy Corp. of our report dated February 10, 2020, except with respect to Note 18 and our opinion on internal control over financial reporting insofar as it relates to the effects of the matter described in the penultimate paragraph of Management's Report on Internal Control over Financial Reporting, as to which the date is November 19, 2020, relating to the financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K/A.

/s/ PricewaterhouseCoopers LLP

Cleveland, Ohio
November 19, 2020

EXHIBIT 31.1

**Certification**

I, Steven E. Strah, certify that:

1. I have reviewed this report on Form 10-K/A of FirstEnergy Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 19, 2020

/s/ Steven E. Strah
Steven E. Strah
President and
Acting Chief Executive Officer

EXHIBIT 31.2

**Certification**

I, K. Jon Taylor, certify that:

1.  I have reviewed this report on Form 10-K/A of FirstEnergy Corp.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 19, 2020

/s/ K. Jon Taylor

K. Jon Taylor
Senior Vice President and
Chief Financial Officer

EXHIBIT 32

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**

In connection with the Report of FirstEnergy Corp. ("Company") on Form 10-K/A for the period ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each undersigned officer of the Company does hereby certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Steven E. Strah
_____
Steven E. Strah
President and
Acting Chief Executive Officer

/s/ K. Jon Taylor
_____
K. Jon Taylor
Senior Vice President and
Chief Financial Officer

Date: November 19, 2020

# EXHIBIT 6

**(Submitted *In Camera* Pursuant to § 8 of the
Amended Stipulated Protective Order (ECF 411))**

# EXHIBIT 7

**(Submitted *In Camera* Pursuant to § 8 of the Amended Stipulated Protective Order (ECF 411))**

# EXHIBIT 8

**(Submitted *In Camera* Pursuant to § 8 of the Amended Stipulated Protective Order (ECF 411))**

# EXHIBIT 9

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4

5      IN RE:  FIRSTENERGY CORP.       CIVIL ACTION NO.

            SECURITIES LITIGATION     2:20-CV-3785

6

7

     THIS DOCUMENT RELATES TO:

8      ALL ACTIONS.

             _____

9

10                     CONFIDENTIAL

11              UNDER THE PROTECTIVE ORDER

12             _____

13

      Videoconferenced video-recorded deposition of

14                   JOSEPH STORSIN

             as FIRST ENERGY CORP. 30(b)(6)

15

16                      VOLUME 1

17

                Tuesday, December 6, 2022

18

19                     Taken at:

                   Baker & Hostetler

20                 127 Public Square

                     Suite 2000

21                 Cleveland, Ohio

22

23      REPORTER:  PAMELA S. GREENFIELD, CRR, RDR

24

25      Job No. 5533436

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 2

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF OHIO

3    EASTERN DIVISION

4

5  IN RE:  FIRSTENERGY CORP.    CIVIL ACTION NO.

    SECURITIES LITIGATION    2:20-CV-3785

6

7

    THIS DOCUMENT RELATES TO:

8  ALL ACTIONS.

9

10      - - - -

11    Confidential Under the Protective Order

12  video-recorded deposition of JOSEPH STORSIN as

13  30(b)(6) witness of FIRST ENERGY CORP., taken

14  pursuant to the stipulations of counsel thereof,

15  at the offices of Baker & Hostetler, 127 Public

16  Square, Suite 2000, Cleveland, Ohio, on TUESDAY,

17  DECEMBER 6, 2022, beginning at 10:14 a.m. and

18  concluding at 7:09 p.m., before Pamela S.

19  Greenfield, CRR, RDR.

20

21

22

23

24

25

Page 3

1  APPEARANCES OF COUNSEL:

2  For Plaintiff Los Angeles County Employees

    Retirement Association:

3

    ROBBINS GELLER RUDMAN & DOWD LLP

4    BY:  JASON A. FORGE, ESQ. (Remote)

    BY:  ASHLEY KELLY, ESQ. (Remote)

5    BY:  RACHEL COCALIS GREGORY, ESQ. (Remote)

    BY:  TING LIU, ESQ. (Remote)

6    BY:  ANDREW W. HUTTON, ESQ. (Remote)

    BY:  DAVID MITCHELL, ESQ. (Remote)

7    655 West Broadway

    San Diego, California 92101

8    jforge@rgrdlaw.com

    akelly@rgrdlaw.com

9    rcocalis@rgrdlaw.com

    ahutton@rgrdlaw.com

10    dmitchell@rgrdlaw.com

11    -and-

12  MURRAY MURPHY MOUL + BASIL LLP

    BY:  JOSEPH F. MURRAY, ESQ. (Remote)

13    1114 Dublin Road

    Columbus, Ohio 43215

14    murray@mmmb.com

15

    For the Brighthouse Plaintiffs:

16

    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP:

17    BY:  RICHARD M. HEIMANN, ESQ.

    BY:  MICHAEL MIARMI, ESQ. (Remote)

18    275 Battery Street

    29th Floor

19    San Francisco, California  94111-339

    rheimann@lchb.com

20    mmiarmi@lchb.com

21

22

23

24

25

Page 4

1  APPEARANCES OF COUNSEL: (CONTINUED)

2  For Defendants FirstEnergy Corp.; Steven Strah;

    K. Jon Taylor; Jason J. Lisowski; George M.

3    Smart; Paul T. Addison; Michael J. Anderson;

    Steven J. Demetriou; Julia L. Johnson; Donald T.

4    Misheff; Thomas N. Mitchell; James F. O'Neil III;

    Christopher D. Pappas; Sandra Pianalto; Luis A.

5    Reyes; Jerry Sue Thornton and Leslie M. Turner:

    FirstEnergy Corp.:

6

    JONES DAY

7    BY:  GEOFFREY RITTS, ESQ.

    901 Lakeside Avenue

8    Cleveland, Ohio 44114

    -and-

9    BY:  MARJORIE P. DUFFY, ESQ.

    BY:  SHALINI B. GOYAL, ESQ. (Remote)

10    25 John H McConnell Boulevard

    Suite 600

11    Columbus, Ohio 43215

    gjritts@jonesday.com

12    mpduffy@jonesday.com

    sgoyal@jonesday.com

13

14  For Defendant Michael Dowling:

15    TUCKER ELLIS LLP

    BY:  JOHN F. McCAFFREY, ESQ.

16    BY:  HANNAH M. SMITH, ESQ.

    BY:  JOHN A. FAVRET, III, ESQ. (Remote)

17    950 Main Avenue, Suite 1100

    Cleveland, Ohio 44113

18    john.mccaffrey@tuckerellis.com

    hannah.smith@tuckerellis.com

19    john.favret@tuckerellis.com

    -and-

20

21    WINSTON & STRAWN

    BY:  STEVEN GRIMES, ESQ. (Remote)

22    BY:  A. MATTHEW DURKIN, ESQ.  (Remote)

    35 W Wacker Drive

23    Chicago, Illinois 60601

    sgrimes@winston.com

24    mdurkin@winston.com

25

Page 5

1  APPEARANCES OF COUNSEL: (CONTINUED)

2

    For Defendant Charles E. Jones:

3

    BAKER & HOSTETLER

4    BY:  CAROLE S. RENDON, ESQ.

    BY:  JEREMY S. DUNNABACK, ESQ.

5    BY:  TERA COLEMAN, ESQ.

    BY:  RACHAEL L. ISRAEL, ESQ. (Remote)

6    BY:  TAYLOR THOMPSON, ESQ. (Remote)

    BY:  ANDREA WILTROUT, ESQ. (Remote)

7    BY:  SARAH SPRING, ESQ. (Remote)

    BY:  TERRY BRENNAN, ESQ. (Remote)

8    Key Tower Suite 2000

    127 Public Square

9    Cleveland, Ohio 44114

    -and-

10    BY:  ALBERT G. LIN, ESQ. (Remote)

    BY:  JESSICA GREENBERG, ESQ. (Remote)

11    200 South Civic Center Drive

    Columbus, Ohio 43215

12    crendon@bakerlaw.com

    jdunnaback@bakerlaw.com

13    tcoleman@bakerlaw.com

    tthompson@bakerlaw.com

14    awiltrout@bakerlaw.com

    sspring@bakerlaw.com

15    tbrennan@bakerlaw.com

    alin@bakerlaw.com

16    jgreenberg@bakerlaw.com

    risrael@bakerlaw.com

17    -and-

18    GIBSON, DUNN & CRUTCHER LLP

    BY:  WILLIAM SCHERMAN, ESQ.

19    BY:  ROBERT K. HUR, ESQ.

    BY:  JENNIFER C. MANSH, ESQ.

20    1050 Connecticut Avenue, N.W.

    Washington, D.C. 20036

21    rhur@gibsondunn.com

    jmansh@gibsondunn.com

22    wscherman@gibsondunn.com

23

24

25

2 (Pages 2 - 5)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 6

1 APPEARANCES OF COUNSEL: (CONTINUED)
2
3 For Defendant Donald Schneider:
4     BUCKLEY LLP
    BY: JILL WINTER, ESQ. (Remote)
5     2001 M Street N.W., Suite 500
    Washington, D.C. 20036
6     jwinter@buckleyfirm.com
7     -and-
8     SANTEN & HUGHES
    BY: BRIAN P. O'CONNOR, ESQ. (Remote)
9     600 Vine Street
    Suite 700
10     Cincinnati, Ohio 45202
    Bpo@santenhughes.com
11
12
    For Defendant John Judge:
13
14     VORYS, SATER, SEYMOUR AND PEASE LLP
    BY: ANDREW P. GURAN, ESQ. (Remote)
15     50 S. Main Street, Suite 1200
    Akron, Ohio 44308
16     -and-
    BY: VICTOR A. WALTON, JR., ESQ. (Remote)
17     301 East 4th Street
    Cincinnati, Ohio 45202
18     apguran@vorys.com
    vawalton@vorys.com
19
20
21
22
23
24
25

Page 8

1 REMOTE APPEARANCES OF COUNSEL: (CONTINUED)
2
3 For Underwriter Defendants:
4     DAVIS POLK & WARDWELL LLP
    BY: KAMALI HOUSTON, ESQ. (Remote)
5     BY: ZULKAR KHAN, ESQ. (Remote)
    450 Lexington Avenue
6     New York, New York 10017
    kamali.houston@davispolk.com
7     zulkar.khan@davispolk.com
8 For Defendant Robert Reffner:
9     MCDERMOTT WILL & EMERY LLP
    BY: STEVEN S. SCHOLES, ESQ.
10     BY: PAUL HELMS, ESQ.
    444 West Lake Street, Suite 4000
11     Chicago, Illinois 60606
    sscholes@mwe.com
12     phelms@mwe.com
13     -and-
14     BROUSE McDOWELL
    BY: JOHN C. FAIRWEATHER, ESQ. (Remote)
15     388 South Main Street, Suite 500
    Akron, Ohio 44311
16     jfairweather@brouse.com
17
18 ALSO PRESENT:
19     MICHAEL KOSLEN, ESQ. FirstEnergy
    ERIKA OSTROWSKI, ESQ., FirstEnergy
20     PETER GRAVES, CLVS, Videographer
21 ALSO PRESENT: (REMOTE)
22     JON DiFILIPPO, Veritext Concierge
    KAREN PATTERSON, Veritext
23     STEVE HAGER, Veritext
24
25

Page 7

1 APPEARANCES OF COUNSEL: (CONTINUED)
2 For Defendant Leila Vespoli:
3     ARNOLD & PORTER
    BY: AARON F. MINER, ESQ. (Remote)
4     BY: ANDREW JOHNSON, ESQ. (Remote)
    BY: VERONICA CALLAHAN, ESQ. (Remote)
5     BY: JOHN NASSIKAS, ESQ. (Remote)
    BY: DANA OR, ESQ. (Remote)
6     BY: YIQING SHI, ESQ. (Remote)
    250 West 55th Street
7     New York, New York 10019-9710
    aaron.miner@arnoldporter.com
8     andrew.johnson@arnoldporter.com
    veronica.callahan@arnoldporter.com
9     john.nassikas@arnoldporter.com
    dana.or@arnoldporter.com
10     yiqing.shi@arnoldporter.com
11
    For Defendant James Pearson:
12
13     BALLARD SPAHR LLP
    BY: TIMOTHY D. KATSIFF, ESQ.
    BY: BRITTANY M. WILSON, ESQ. (REMOTE)
14     1735 Market Street, 51st Floor
    Philadelphia, Pennsylvania 19103
15     katsifft@ballardspahr.com
    wilsonbm@ballardspahr.com
16
17 For Defendant Dennis Chack:
18     MORGAN, LEWIS & BOCKIUS LLP
    BY: KAREN POHLMANN, ESQ. (REMOTE)
19     1701 Market Street
    Philadelphia, Pennsylvania 19103
20     karen.pohlmann@morganlewis.com
21
    For Defendant Ty Pine:
22
    TAFT STETTINIUS & HOLLISTER, LLP
23     BY: MICHAEL ZBIEGIEN, ESQ. (Remote)
    200 Public Square, Suite 3500
24     Cleveland, Ohio 44118
    mzbiegien@taftlaw.com
25

Page 9

1 W I T N E S S   I N D E X
2               PAGE
3 30(b)(6) CROSS-EXAMINATION
    JOSEPH STORSIN
4 BY MS. RENDON          14
5 30(B)(6) CROSS-EXAMINATION
    JOSEPH STORSIN
6 BY MR. McCAFFREY       73
7 CONTINUED 30(B)(6) CROSS-EXAMINATION
    JOSEPH STORSIN
8 BY MS. RENDON         168
9
10 E X H I B I T   I N D E X
11 EXHIBIT             PAGE
12     JD Exhibit 38, FE_CIV_SEC
13     0730404-407, name/title chart   16
    JD Exhibit 41, FE_CIV_SEC
14     0730339-349, "Deferred Prosecution
    Agreement" testifying aid   16
15     JD Exhibit 42, FE_CIV_SEC
    0730328-338, DPA pseudonym chart   16
16
17     JD Exhibit 50, FE_CIV_SEC
    0730506-508, "Testifying Aids/Sources
18     of Information"   18
19     JD Exhibit 39, FE_CIV_SEC
    0730452-475, "Topic 9: Terminations
20     and Separations" testifying aid   19
21     JD Exhibit 51, FE_CIV_SEC
    0482415-514, "FirstEnergy Board of
    Directors Compensation Committee
22     Meeting November 9, 2021"   34
23     JD Exhibit 44, FE_CIV_SEC
    0730434-451, "Part II: Randazzo +
24     $4.3M & PUCO Tenure" testifying aid   38
25

3 (Pages 6 - 9)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 10

1   E X H I B I T   I N D E X   C O N T I N U E D
2   EXHIBIT         PAGE
3   JD Exhibit 40, FE_CIV_SEC
    0730476-479, "Steven E. Strah's
4   Retirement" testifying aid      62
5   JD Exhibit 49, FE_CIV_SEC
    0730491-505, "Executive Compensation"
6   testifying aid          69
7   JD Exhibit 43, FE_CIV_SEC
    0730415-433, "Randazzo & Related
8   Entities" testifying aid      74
9   JD Exhibit 52, FE_CIV_SEC
    0668821-826, 11/19-11/21/14
10   Yeboah/Randazzo "Confidential
    Settlement Discussions -- Suggestions
11   for Settlement" email string    113
12   JD Exhibit 53, FE_CIV_SEC
    0002212-215, 1/30-1/31/19
13   Carthew/Lisowski, et al. "Urgent
    Request" email string     123
14
    JD Exhibit 54, FE_CIV_SEC 0002214,
15   spreadsheet for SFA      124
16   JD Exhibit 55, FE_CIV_SEC
    0002222-224, 1/30-1/31/19
17   Storsin/Lisowski, et al. "Urgent
    Request" email string     127
18
    JD Exhibit 56, FE_CIV_SEC 0002224,
19   spreadsheet for SFA      128
20   JD Exhibit 57, FE_CIV_SEC
    0360766-767, 11/24/20 Richards
21   "Accounting for Payments" email to
    Lisowski/Ashton       135
22
    JD Exhibit 58, FEV_CIV_SEC 0360767,
23   spreadsheet for IEU-Ohio     135
24   JD Exhibit 59, FE_CIV_SEC
    0136073-075, 12/19/18 "Chuck Jones -
25   iPhone" text messages     148

Page 11

1   E X H I B I T   I N D E X   C O N T I N U E D
2   EXHIBIT         PAGE
3   JD Exhibit 60, FE_CIV_SEC
    0136068-070, 11/8/18, "Chuck Jones
4   iPhone" text messages     152
5   JD Exhibit 61, FEC_CIV_SEC
    0156756-757, 6/4-6/5/18
6   Bingaman/Reffner, et al.
    "Sustainability Funding Alliance
7   Supplemental Payments" email string   157
8   JD Exhibit 62, FE_CIV_SEC
    0587314-338, 10/1/20 Mackin "IR BOD
9   Strategy Slides" email to Foster    180
10   JD Exhibit 63, FE_CIV_0373241,
    11/18/20 Staub "Bank Waiver Closed
11   Today" to Demetriou, et al.     184
12   JD Exhibit 64, FE_CIV_SEC 0479854,
    Irene Prezelj "Dividend Discussion"
13   presentation         202
    JD Exhibit 65, FE_CIV_SEC
14   0572355-515, 9/30/20 Fall "For
    Posting on the EC Portal" email to
15   Chandler, et al.       208
16
    JD Exhibit 45, FE_CIV_SEC
17   0730376-403, "Contributions:
    Generation Now & Partners for
18   Progress" testifying aid     231
19   JD Exhibit 66, FE_CIV_SEC 0068729,
    5/1/19 VanBuren "Language for
20   Generation Now to Put in an
    Email/Letter to Me" email to Bailey   240
21
    JD Exhibit 67, FE_CIV_SEC
22   0054028-054, 3/3/17
    VanBuren/McCarthy, et al.
23   "Organization Documents" email string   241
24
25

Page 12

1   E X H I B I T   I N D E X   C O N T I N U E D
2   EXHIBIT         PAGE
3   JD Exhibit 68, FE_CIV_SEC
    0135641-642, 1/21/20 DiNicola
4   "Confidential attachment" email to
    Housley          246
5
    JD Exhibit 46, FE_CIV_SEC
6   0730350-375, "Larry Householder,
    House Bill 6, ZEN Legislation and
7   Federal Intervention" testifying aid   249
8   JD Exhibit 47, FE_CIV_SEC
    0730480-490, "Executive Council &
9   Board Knowledge" testifying aid    255
10

11      INDEX OF PREVIOUSLY MARKED EXHIBITS

    EXHIBIT         PAGE
12   Exhibit 1          31
    Exhibit JD 21        46
13   Exhibit JD 4         80
    Exhibit JD 7         100
14   Exhibit JD 8         103
    Exhibit JD 10        111
15   Exhibit JD 25        189
    Exhibit JD 29        245
16
17
18
19
20
21
22
23
24
25

Page 13

1      THE VIDEOGRAPHER:   Good morning.
2   We are going on the record.   The time is
3   10:14 a.m. on December 6th, 2022.   Please
4   note that the microphones are sensitive and
5   may pick up whispering and private
6   conversations.   Please mute your phones at
7   this time.   Audio and video recording will
8   continue to take place unless all parties
9   agree to go off the record.
10      This is Media Unit 1 of the video
11   recorded deposition of Joseph Storsin as a
12   30(b)(6) witness taken by counsel for
13   defendant in the matter of In Re:
14   FirstEnergy Corp. Securities Litigation
15   filed in the United States District Court
16   for the Southern District of Ohio, Eastern
17   Division, Case Number 2:20-CV-03785
18   ALM-KAJ.
19      The location of the deposition is
20   Baker Hostetler in Cleveland, Ohio.
21      My name is Peter Graves
22   representing Veritext Midwest and I am the
23   videographer.   The court reporter is Pamela
24   Greenfield from the firm Veritext Midwest.
25      I am not related to any party in

4 (Pages 10 - 13)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 54

1 Q. So if there was another provision of the code of
2    business conduct or corporate, or another policy
3    that Mr. Jones had violated that the company was
4    aware of as of the date of his termination, it
5    would be listed in your testifying aid because
6    it's accurate and complete, correct?
7      I'm sorry, let me rephrase. Apparently I've
8    got my client's name in my head and not the
9    correct person who is that we're talking about,
10   which is Mike Dowling.
11     So my question is: So you just said your
12   testifying aid is accurate and complete, correct?
13 A. Yes.
14 Q. Okay. So the code provisions that FirstEnergy is
15   aware of that Mr. Dowling purportedly violated
16   resulting in his termination are listed on Page
17   11 and continue on to the top of Page 12,
18   correct?
19 A. Could you repeat that question for me, please?
20 Q. Mr. Storsin, the provisions that Mr. Dowling
21   purportedly violated that resulted in his
22   termination are listed on Page 11 and continue to
23   the top of Page 12, correct? You don't have to
24   read them to answer the question.
25     Delay is a great tactic, Mr. Storsin, but at

Page 55

1   some point somebody else is going to take a look
2   at whether or not this was a legitimate second
3   30(b)(6) deposition and I for one just want you
4   to answer my questions. I'm just trying to get
5   information to which my client is entitled.
6      MR. RITTS: Objection.
7      Argumentative.
8 A. I'm not delaying, but if you interrupt it will
9   take me longer to get my answer.
10     Can you repeat your question, please?
11 Q. No.
12 A. I don't recall what your question was.
13 Q. Okay. What policies was FirstEnergy aware of on
14   October 29th of 2020 that Mr. Dowling violated
15   that are not on Pages 11 and 12 of your
16   testifying aid?
17 A. The company has not made a determination whether
18   he violated any other policies.
19 Q. So the only policies the company has determined
20   that he violated are on Pages 11 and 12, correct?
21   You didn't intentionally omit something?
22 A. The policies that he violated were the corporate
23   policy 101 and corporate policy 702. The --
24 Q. Thank you.
25 A. And the company has not made a determination

Page 56

1   about any other policies being violated.
2 Q. That's fine. You can say that all you want.
3     My question was what did he violate and it's
4   in your testifying aid, right? What you know
5   that he violated in your opinion?
6 A. And when you say my opinion?
7 Q. FirstEnergy. That's who you are.
8 A. Mr. Dowling violated those two policies.
9 Q. Okay. Thank you.
10     All right. Let us turn to testifying aid,
11   we're still on that same testifying aid. Sorry.
12   Okay. Page 13 of that same exhibit, Exhibit 39,
13   do you have that in front of you?
14 A. Yes.
15 Q. And this page of your testifying aid is regarding
16   Mr. Reffner's separation from FirstEnergy; is
17   that right?
18 A. Yes.
19 Q. And Mr. Reffner was separated from FirstEnergy
20   because of the information that is listed on Page
21   13; is that right?
22 A. Yes.
23 Q. Is there anything else that FirstEnergy is aware
24   of that justified Mr. Reffner's separation from
25   FirstEnergy?

Page 57

1 A. This was enough information at the time to have
2   Mr. Reffner -- or to separate Mr. Reffner.
3 Q. Sitting here today is FirstEnergy aware of any
4   other justification for Mr. Reffner's separation
5   that it did not disclose on Page 13 of Exhibit
6   39?
7 A. Can you ask that again, please?
8 Q. Is there any other information that FirstEnergy
9   is aware of that justified Mr. Reffner's
10   separation that it failed to include on Page 13
11   of Exhibit 39?
12 A. Can you ask one more time, please?
13     MS. RENDON: No. Let's go off the
14   record, please.
15     THE VIDEOGRAPHER: We're going
16   off the record. The time is 11:45.
17     - - - -
18    (Thereupon, a recess was had.)
19     - - - -
20     THE VIDEOGRAPHER: We are now
21   back on the record. This is the beginning
22   of Media Unit 4. The time is 11:53.
23 BY MS. RENDON:
24 Q. Mr. Storsin, when we took a break we were on Page
25   13 of Exhibit 39. Do you still have that in

15 (Pages 54 - 57)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 58

1    front of you?
2  A.  Yes, ma'am.
3  Q.  Is there anything that FirstEnergy is aware of
4    that resulted in Mr. Reffner's separation that is
5    not on that page?
6  A.  No.
7  Q.  If you would look please at Page 14, that sets
8    forth the reason for Ebony Yeboah-Amankwah's
9    separation; is that correct?
10 A.  Yes.
11 Q.  Is there anything that FirstEnergy is aware of
12   that justified Ms. Yeboah-Amankwah's separation
13   that is not on Page 14?
14 A.  No.
15 Q.  Is it FirstEnergy's position that Mr. Reffner
16   intended that that 4.3 million dollar payment
17   would be a bribe to Sam Randazzo?
18       MR. SCHOLES:  Objection.
19 A.  No.
20 Q.  And is it FirstEnergy's position that
21   Ms. Yeboah-Amankwah intended that the 4.3 million
22   dollar payment to Mr. Randazzo would be a bribe?
23 A.  No.
24 Q.  Is it FirstEnergy's position that Mr. Reffner
25   should have recognized that the payment was a

Page 59

1    bribe and stopped it?
2  A.  I would say Mr. Reffner was aware of and
3    facilitated the processing of the 4.3 million
4    dollar payment to Randazzo and SFA.
5  Q.  Is it FirstEnergy's position that Mr. Reffner
6    should have refused to facilitate the processing
7    of that payment because he should have known it
8    was a bribe?
9  A.  Again, Mr. Reffner was aware of and facilitated
10   the processing of the 4.3 million dollar payment
11   to Mr. Randazzo and SFA.
12 Q.  Are you unable to answer that question with a yes
13   or no?
14 A.  I've answered your question with my response that
15   did not include a yes or no response.
16 Q.  So you're unable to answer it just yes or no?
17       MR. RITTS:  Objection.
18 A.  I'm not saying that.
19 Q.  Yes or no, does FirstEnergy believe that
20   Mr. Reffner should have prevented the 4.3 million
21   dollar payment to Mr. Randazzo?
22       MR. FORGE:  Objection.
23 A.  I would again repeat my same answer.
24 Q.  So you're not able to answer that question yes or
25   no?  Because the question was yes or no.  I just

Page 60

1    want to be clear for the record.
2  A.  Ask it again, please.
3  Q.  Yes or no:  Does FirstEnergy believe that
4    Mr. Reffner should have prevented the 4.3 million
5    dollar payment at the time that it was made, yes
6    or no?
7       MR. FORGE:  Objection.
8  A.  The company's position on the separation of
9    Mr. Reffner was he was separated due to inaction
10   and conduct that the board determined was
11   influenced by the improper tone at the top and he
12   was aware of and facilitated the processing of
13   the 4.3 million dollar payment to Randazzo/SFA
14   and he failed to reasonably ensure that relevant
15   information was produced in connection with the
16   ongoing investigation as it related to his
17   knowledge of payments to Mr. Randazzo through
18   SFA.  There has been no suggestion by the company
19   that Mr. Reffner was aware of the communications
20   between Mr. Jones, Mr. Randazzo or Mr. Dowling
21   including those that occurred when Mr. Randazzo
22   was in his position as PUCO chairman.
23 Q.  So, Mr. Storsin, I'm also able to read the words
24   on the page which are not responsive to the
25   question that I asked.  So I'm just going to take

Page 61

1    it that you're not able to answer that question
2    and I'll ask you a different question, which is:
3    What knowledge did Mr. Reffner -- what relevant
4    information did Mr. Reffner fail to produce in
5    connection with the ongoing investigation?
6  A.  Mr. Reffner failed to reasonably ensure that
7    relevant information was produced in connection
8    with the ongoing investigation as it related to
9    his knowledge of payments to Randazzo through
10   SFA.
11 Q.  So the information that he failed to produce was
12   what?
13 A.  As it related to his knowledge of payments to
14   Randazzo through SFA.
15 Q.  And that was something that he failed to tell the
16   internal investigation about; is that right?
17       MR. SCHOLES:  Objection.
18 A.  Again he failed to reasonably ensure that
19   relevant information was produced in connection
20   with the ongoing investigation as it related to
21   his knowledge of payments to Randazzo through
22   SFA.
23 Q.  Just for the record, I view these answers as
24   unresponsive so I'm going to move on.
25       - - - -

16 (Pages 58 - 61)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 62

1    (Thereupon, JD Exhibit 40, FE_CIV_SEC
2    0730476-479, "Steven E. Strah's Retirement"
3    testifying aid, was marked for purposes of
4    identification.)
5    - - - -
6  Q.  If you would look please at your testifying aid
7     number 40, as you know, Mr. Storsin, we have
8     limited time that we're permitted to ask you
9     questions and so when you don't answer questions,
10    it wastes our time, so I'm just going to move on.
11       And it is JD Exhibit 40, it's behind tab 40
12    in your testifying aids.  It's with regards to
13    Steven Strah's retirement.  Do you see that?
14 A.  Yes, ma'am.
15 Q.  And it says that, it references the public
16    disclosure; is that correct?
17 A.  I see it, yes.
18 Q.  Is there any reason that Mr. Strah was asked to
19    retire that is not listed in JD Exhibit 40?
20       MR. FORGE:   Objection.
21 A.  Not that the company is aware.
22 Q.  Why did the committee recommend that Mr. Strah
23    should be asked to retire?
24       MR. RITTS:   I'm going to object
25       to that.  To the extent it gets into the

Page 63

1     committee's communications with its
2     counsel, leave that out of the answer.
3  A.  The committee recommended to the board that
4     replacing Mr. Strah as CEO would serve the
5     company's best interests and that the company
6     commence a search for an external CEO candidate
7     to replace Mr. Strah.
8  Q.  Why would replacing Mr. Strah as CEO serve the
9     company's best interests?
10       MR. RITTS:   Same objection.
11       Leave out of that any consultations of the
12       committee with its counsel.
13 A.  The committee's recommendation was based on
14    privileged discussions with counsel.
15 Q.  What facts.  Not discussions, not legal analysis.
16    Facts.
17       What facts did the committee have that
18    supported the conclusion that it would serve the
19    company's best interest to replace Mr. Strah?
20 A.  The committee with the assistance of its counsel
21    utilized information and documents from
22    litigations and preceding investigations.
23 Q.  What facts did the committee have that supported
24    its recommendation that it would serve the
25    company's best interest to replace Mr. Strah?

Page 64

1       MR. RITTS:  Objection.
2  A.  Again the committee's recommendation was based on
3     privileged discussions with counsel.
4  Q.  I'm not asking for privileged discussions,
5     Mr. Storsin.  My question was very clear.
6       The question is what facts.  Facts are not
7     privileged.  What facts did the committee have
8     that supported, that caused it to recommend that
9     it would serve the company's best interests to
10    replace Mr. Strah?
11 A.  Again the committee with the assistance of
12    counsel utilized information and documents from
13    litigation, litigations and preceding
14    investigations.
15 Q.  Sir, with all due respect, that is not an answer
16    to my question.
17       My question was facts.
18       What facts.  What you're reading to me from
19    your testifying aid does not answer the question.
20    So reading it again is not going to help.
21       I'm going to ask it one last time and if
22    you're unable to answer it, that's fine.  Just
23    say "I'm not able to answer that question."
24       The question is:  What facts did the
25    committee have that caused it to conclude that it

Page 65

1     would serve the company's best interest to
2     replace Mr. Strah?
3       MR. RITTS:  Objection.
4  A.  Again the committee with assistance of its
5     counsel utilized information and documents from
6     litigation and preceding investigations and those
7     recommendations were based on privileged
8     discussions with counsel.
9  Q.  So you're unable to answer the question so I will
10    move on.
11       MR. RITTS:  He did answer it.
12       MS. RENDON:  Just noting it for
13       the record.  No.  That is not an answer to
14       the question, Mr. Ritts.  The question
15       asked for facts and instead he read me the
16       same thing three times, but I'm just going
17       to move on.  I'll just make the record and
18       we'll let the magistrate look at it at some
19       point in the future.
20 BY MS. RENDON:
21 Q.  Had Mr. Strah decided that he was not going to
22    retire, would he have been terminated or
23    separated?
24 A.  Could you repeat your question, please?
25 Q.  If Mr. Strah refused to retire, would he have

17 (Pages 62 - 65)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 254

1  A. Ms. Fluke was around executive compensation. The
2     question was surrounded executive compensation.
3  Q. And what did you learn?
4  A. I believe we just asked how the calculation
5     happened on the amounts for recoupment.
6  Q. Did you take notes during these meetings?
7  A. No, ma'am.
8  Q. Did FirstEnergy's lawyers take notes during these
9     meetings?
10 A. No, ma'am.
11 Q. So you're doing all of this from memory?
12        MR. RITTS: Objection.
13 A. There were no notes, that's correct, and I'm
14    going from memory, yes.
15 Q. And when did these interviews take place?
16 A. I don't recall the exact dates, but within the
17    last three weeks to, three to four weeks.
18 Q. So just a couple of questions and then we'll stop
19    for today and reserve the rest of our time.
20    Focusing back again on Mr. Householder, what
21    official action did Mr. Householder take as
22    Speaker of the House in exchange for the 1
23    million dollar payments that FirstEnergy made to
24    Generation Now in 2017?
25        MR. FORGE: Objection.

Page 255

1  A. FirstEnergy Corp. sought official action from
2     public -- from Mr. Householder in the form of
3     helping draft nuclear legislation that would
4     further the interests of FirstEnergy Corp. and
5     FES and by pressuring and advising public
6     officials to support nuclear legislation for
7     FirstEnergy Corp.'s and FES's benefit.
8  Q. Was that in 2017?
9     If you don't know, that's fine.
10 A. Could you repeat your question one more time
11    please.
12 Q. We'll just move on.
13        - - - -
14    (Thereupon, JD Exhibit 47, FE_CIV_SEC
15    0730480-490, "Executive Council & Board
16    Knowledge" testifying aid, was marked for
17    purposes of identification.)
18        - - - -
19 Q. Take a look at your testifying aid 47, Page 3.
20        MR. FORGE: So we're moving
21    beyond the last question of the day?
22 A. You said 47?
23 Q. Yes.
24 A. Page 3?
25 Q. Yes. JD 47, Page 3 and I just want to confirm

Page 256

1     that FirstEnergy's board received regular updates
2     about legislative initiatives including the ZEN
3     legislation and House Bill 6; is that correct?
4  A. Yes, ma'am.
5  Q. And your statements in your testifying aid 47 at
6     Page 3, those are all true and accurate?
7  A. Yes, ma'am.
8        MS. RENDON: And I think we will
9        reserve the remainder of our time for after
10       Mr. Forge's examination tomorrow. And how
11       much time would that be?
12       THE VIDEOGRAPHER: We are
13    currently at 6 hours and 7 minutes.
14       We are now going off the record.
15    The time is 7:09.
16       - - - -
17    (Signature not waived.)
18    (Deposition adjourned at 7:09 p.m.)
19       - - - -
20
21
22
23
24
25

Page 257

1
2
3
4        C E R T I F I C A T E
5
6  The State of Ohio, ) SS:
   County of Cuyahoga.)
7
        I, Pamela S. Greenfield, a Notary Public
8  within and for the State of Ohio, authorized to
   administer oaths and to take and certify
9  depositions, do hereby certify that the
   above-named witness was by me, before the giving
10 of their deposition, first duly sworn to testify
   the truth, the whole truth, and nothing but the
11 truth; that the deposition as above-set forth was
   reduced to writing by me by means of stenotypy,
12 and was later transcribed into typewriting under
   my direction; that this is a true record of the
13 testimony given by the witness; that the deponent
   or a party requested that the deposition be
14 reviewed by the deponent; that said deposition
   was taken at the aforementioned time, date and
15 place, pursuant to notice or stipulations of
   counsel; that I am not a relative or employee or
16 attorney of any of the parties, or a relative or
   employee of such attorney or financially
17 interested in this action.
18    IN WITNESS WHEREOF, I have hereunto set my
   hand and seal of office, at Cleveland, Ohio, this
19 19th day of December, 2022.
20
21
22
   Pamela S. Greenfield, CRR, RDR
23 Notary Public, State of Ohio
   My commission expires July 2, 2023
24
25

65 (Pages 254 - 257)

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

Page 258

```
1        Veritext Legal Solutions
            1100 Superior Ave
2              Suite 1820
            Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
   December 20, 2022
5
   To: Geoffrey J. Ritts, Esq.
6
   Case Name: In Re Firstenergy Corp. Securities Litigation v.
7
   Veritext Reference Number: 5533436
8
   Witness:  Joseph Storsin      Deposition Date:  12/6/2022
9
10 Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA
```

Page 260

```
1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 5533436
3  CASE NAME: In Re Firstenergy Corp. Securities Litigation
   DATE OF DEPOSITION: 12/6/2022
4  WITNESS' NAME: Joseph Storsin
   In accordance with the Rules of Civil
5  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
   as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____    _____
   Date           Joseph Storsin
14
       Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18     in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20     their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
   Notary Public
24
   _____
25 Commission Expiration Date
```

Page 259

```
1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 5533436
3  CASE NAME: In Re Firstenergy Corp. Securities Litigation
   DATE OF DEPOSITION: 12/6/2022
4  WITNESS' NAME: Joseph Storsin
5  In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____    _____
9  Date           Joseph Storsin
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
         Statement; and
14     Their execution of this Statement is of
         their free act and deed.
15
   I have affixed my name and official seal
16 this _____ day of_____, 20____.
17
   _____
18     Notary Public
19
   _____
     Commission Expiration Date
20
21
22
23
24
25
```

Page 261

```
1      ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 5533436
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____

   _____    _____
20 Date           Joseph Storsin
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23
       Notary Public
24
   _____
25     Commission Expiration Date
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 10

**(Submitted *In Camera* Pursuant to § 8 of the Amended Stipulated Protective Order (ECF 411))**

# EXHIBIT 11

**(Submitted *In Camera* Pursuant to § 8 of the
Amended Stipulated Protective Order (ECF 411))**

# EXHIBIT 12



# EQUITY ALERT: Rosen Law Firm Announces Investigation of Securities Claims Against FirstEnergy Corp. – FE

July 22, 2020 03:03 PM Eastern Daylight Time

NEW YORK--(BUSINESS WIRE)--Rosen Law Firm, a global investor rights law firm, announces investigation of potential securities claims on behalf of shareholders of FirstEnergy Corp. (NYSE: FE) resulting from allegations that FirstEnergy may have issued materially misleading business information to the investing public.

On July 21, 2010, Federal Bureau of Investigation agents arrested Ohio House Speaker Larry Householder in connection with an alleged illegal scheme involving bribery in return for Householder's championing of a state-funded bailout of two nuclear power plants formerly owned by FirstEnergy. The Company also issued a press release announcing that it had "received subpoenas in connection with the investigation surrounding Ohio House Bill 6."

On this news, FirstEnergy's stock price fell $7.01 per share, or over 16%, to close at $34.25 per share on July 21, 2020.

Rosen Law Firm is preparing a securities lawsuit on behalf of FirstEnergy shareholders. If you purchased securities of FirstEnergy please visit the firm's website at http://www.rosenlegal.com/cases-register-1903.html to join the securities action. You may also contact Phillip Kim of Rosen Law Firm toll free at 866-767-3653 or via email at mailto:pkim@rosenlegal.com or cases@rosenlegal.com.

Follow us for updates on LinkedIn: https://www.linkedin.com/company/the-rosen-law-firm or on Twitter: https://twitter.com/rosen_firm or on Facebook: https://www.facebook.com/rosenlawfirm.

Rosen Law Firm represents investors throughout the globe, concentrating its practice in securities class actions and shareholder derivative litigation. Rosen Law Firm was Ranked No. 1 by ISS Securities Class Action Services for number of securities class action settlements in 2017. The firm has been ranked in the top 3 each year since 2013. Rosen Law Firm has achieved the largest ever securities class action settlement against a Chinese Company. Rosen Law Firm's attorneys are ranked and recognized by numerous independent and respected sources. Rosen Law Firm has secured hundreds of millions of dollars for investors.

Attorney Advertising. Prior results do not guarantee a similar outcome.

## Contacts

Laurence Rosen, Esq.

Phillip Kim, Esq.

The Rosen Law Firm, P.A.

275 Madison Avenue, 40th Floor

New York, NY 10016

Tel: (212) 686-1060

Toll Free: (866) 767-3653

Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
cases@rosenlegal.com
www.rosenlegal.com

## Social Media Profiles

Rosen Law Firm on Twitter

Rosen Law Firm on LinkedIn

# EXHIBIT 13



# INVESTIGATION ALERT: Nationally Ranked Litigation Firm Labaton Sucharow Announces Investigation of FirstEnergy Corp (NYSE: FE) and Strongly Encourages Investors to Contact the Firm

July 22, 2020 01:01 PM Eastern Daylight Time

NEW YORK--(BUSINESS WIRE)--Labaton Sucharow LLP, a leading investor rights law firm announces it is investigating potential securities violations on behalf of stock, option, and derivative investors of FirstEnergy Corp (NYSE: FE) in the wake of allegations by federal authorities that Ohio Speaker Larry Householder and four associates funneled $60 million in dark money from an unnamed company to install a "power base" in the House and pass HB-6, a $1.5 billion taxpayer-funded bailout for FirstEnergy's nuclear and coal power plants.

FirstEnergy Corp, through its subsidiaries, generates, transmits, and distributes electricity in the United States. The company operates through Regulated Distribution and Regulated Transmission segments. It owns and operates coal-fired, nuclear, hydroelectric, natural gas, wind, and solar power generating facilities.

The investigation focuses on whether FirstEnergy issued false and misleading statements regarding its business practices, internal controls and prospects. Specifically, FirstEnergy allegedly spent approximately $2.9 million on Larry Householder's 2017 campaign. Householder became Ohio House Speaker in 2019 and allegedly returned the favor by enacting laws to support FirstEnergy's nuclear plants as well as a pair of coal plants. In total, political donations and bribes by FirstEnergy and other parties involved may have totaled as much as $60 million.

Householder and his alleged accomplices have been charged federally with "conspiracy to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity."

If you are a current FirstEnergy shareholder, option or derivative holder and wish to learn more or discuss the issues surrounding the investigation, please contact David J. Schwartz using the toll-free number (800) 321-0476 or via email at dschwartz@labaton.com.

**About the Firm**

Labaton Sucharow LLP is one of the world's leading complex litigation firms representing clients in securities, antitrust, corporate governance and shareholder rights, and consumer cybersecurity and data privacy litigation. Labaton Sucharow has been recognized for its excellence by the courts and peers, and it is consistently ranked in leading industry publications. Offices are located in New York, NY, Wilmington, DE, and Washington, D.C. More information about Labaton Sucharow is available at http://www.labaton.com.

Contacts
David J. Schwartz
(800) 321-0476
dschwartz@labaton.com

# EXHIBIT 14





# INVESTIGATION ALERT: The Schall Law Firm Announces it is Investigating Claims Against FirstEnergy Corp. and Encourages Investors with Losses of $100,000 to Contact the Firm

July 22, 2020 01:04 PM Eastern Daylight Time

LOS ANGELES--(BUSINESS WIRE)--The Schall Law Firm, a national shareholder rights litigation firm, announces that it is investigating claims on behalf of investors of FirstEnergy Corp. ("FirstEnergy" or "the Company") (NYSE: FE) for violations of the securities laws.

The investigation focuses on whether the Company issued false and/or misleading statements and/or failed to disclose information pertinent to investors. The FBI arrested Ohio House Speaker Larry Householder on July 21, 2020, over an alleged scheme in which Householder and others accepted bribes in connection with a state-funded bailout of two nuclear power plants formerly owned by FirstEnergy. Based on this news, shares of FirstEnergy fell by nearly 17% on the same day.

If you are a shareholder who suffered a loss, click here to participate.

We also encourage you to contact Brian Schall of the Schall Law Firm, 1880 Century Park East, Suite 404, Los Angeles, CA 90067, at 310-301-3335, to discuss your rights free of charge. You can also reach us through the firm's website at www.schallfirm.com, or by email at brian@schallfirm.com.

The class in this case has not yet been certified, and until certification occurs, you are not represented by an attorney. If you choose to take no action, you can remain an absent class member.

The Schall Law Firm represents investors around the world and specializes in securities class action lawsuits and shareholder rights litigation.

This press release may be considered Attorney Advertising in some jurisdictions under the applicable law and rules of ethics.

## Contacts

The Schall Law Firm

Brian Schall, Esq.

310-301-3335

info@schallfirm.com

www.schallfirm.com

## #Hashtags

#FE

## $Cashtags

$FE

# EXHIBIT 15



# INVESTOR ALERT: Law Offices of Howard G. Smith Announces Investigation of FirstEnergy Corp. (FE) on Behalf of Investors

July 22, 2020 01:25 PM Eastern Daylight Time

BENSALEM, Pa.--(BUSINESS WIRE)--Law Offices of Howard G. Smith announces an investigation on behalf of FirstEnergy Corp. ("FirstEnergy" or the "Company") (NYSE: FE) investors concerning the Company and its officers' possible violations of federal securities laws.

On July 21, 2020, media reported, in connection with the arrest of an Ohio lawmaker, that FirstEnergy engaged in an illegal scheme to have taxpayers bail out the Company's nuclear power plants. The Company also disclosed that it had received subpoenas in connection with an investigation into the passage of Ohio House Bill 6.

On this news, the Company's share price fell $7.01, or 17%, to close at $34.25 per share on July 21, 2020, on unusually heavy trading volume.

If you purchased FirstEnergy securities, have information or would like to learn more about these claims, or have any questions concerning this announcement or your rights or interests with respect to these matters, please contact Howard G. Smith, Esquire, of Law Offices of Howard G. Smith, 3070 Bristol Pike, Suite 112, Bensalem, Pennsylvania 19020 by telephone at (215) 638-4847, toll-free at (888) 638-4847, or by email to howardsmith@howardsmithlaw.com, or visit our website at www.howardsmithlaw.com.

This press release may be considered Attorney Advertising in some jurisdictions under the applicable law and ethical rules.

## Contacts

Law Offices of Howard G. Smith

Howard G. Smith, Esquire

215-638-4847

888-638-4847

howardsmith@howardsmithlaw.com

www.howardsmithlaw.com

## #Hashtags

#investors    #fraud

## $Cashtags

$FE

# EXHIBIT 16





## The Law Offices of Frank R. Cruz Announces Investigation of FirstEnergy Corp. (FE) on Behalf of Investors

July 22, 2020 04:00 PM Eastern Daylight Time

LOS ANGELES--(BUSINESS WIRE)--The Law Offices of Frank R. Cruz announces an investigation on behalf of FirstEnergy Corp. ("FirstEnergy" or the "Company") (NYSE: FE) investors concerning the Company and its officers' possible violations of federal securities laws.

If you are a shareholder who suffered a loss, click here to participate.

On July 21, 2020, media reported, in connection with the arrest of an Ohio lawmaker, that FirstEnergy engaged in an illegal scheme to have taxpayers bail out the Company's nuclear power plants. The Company also disclosed that it had received subpoenas in connection with an investigation into the passage of Ohio House Bill 6.

On this news, the Company's share price fell $7.01, or 17%, to close at $34.25 per share on July 21, 2020, on unusually heavy trading volume.

Follow us for updates on Twitter: twitter.com/FRC_LAW.

If you purchased FirstEnergy securities, have information or would like to learn more about these claims, or have any questions concerning this announcement or your rights or interests with respect to these matters, please contact Frank R. Cruz, of The Law Offices of Frank R. Cruz, 1999 Avenue of the Stars, Suite 1100, Los Angeles, California 90067 at 310-914-5007, by email to info@frankcruzlaw.com, or visit our website at www.frankcruzlaw.com. If you inquire by email please include your mailing address, telephone number, and number of shares purchased.

This press release may be considered Attorney Advertising in some jurisdictions under the applicable law and ethical rules.

## Contacts

The Law Offices of Frank R. Cruz, Los Angeles

Frank R. Cruz, 310-914-5007

fcruz@frankcruzlaw.com

www.frankcruzlaw.com

# #Hashtags

#classaction  #investors  #fraud

## $Cashtags

$FE

# EXHIBIT 17





# Glancy Prongay & Murray LLP, a Leading Securities Fraud Law Firm, Announces Investigation of FirstEnergy Corp. (FE) on Behalf of Investors

July 22, 2020 06:00 PM Eastern Daylight Time

LOS ANGELES--(BUSINESS WIRE)--Glancy Prongay & Murray LLP ("GPM"), a leading national shareholder rights law firm, today announced that it has commenced an investigation on behalf of FirstEnergy Corp. ("FirstEnergy" or the "Company") (NYSE: FE) investors concerning the Company and its officers' possible violations of the federal securities laws.

If you suffered a loss on your FirstEnergy investments or would like to inquire about potentially pursuing claims to recover your loss under the federal securities laws, you can submit your contact information at https://www.glancylaw.com/cases/firstenergy-corp/. You can also contact Charles H. Linehan, of GPM at 310-201-9150, Toll-Free at 888-773-9224, or via email at shareholders@glancylaw.com to learn more about your rights.

On July 21, 2020, media reported, in connection with the arrest of an Ohio lawmaker, that FirstEnergy engaged in an illegal scheme to have taxpayers bail out the Company's nuclear power plants. The Company also disclosed that it had received subpoenas in connection with an investigation into the passage of Ohio House Bill 6.

On this news, the Company's share price fell $7.01, or 17%, to close at $34.25 per share on July 21, 2020, on unusually heavy trading volume.

Follow us for updates on LinkedIn, Twitter, or Facebook.

**Whistleblower Notice:** Persons with non-public information regarding FirstEnergy should consider their options to aid the investigation or take advantage of the SEC Whistleblower Program. Under the program, whistleblowers who provide original information may receive rewards totaling up to 30 percent of any successful recovery made by the SEC. For more information, call Charles H. Linehan at 310-201-9150 or 888-773-9224 or email shareholders@glancylaw.com.

## About GPM

Glancy Prongay & Murray LLP is a premier law firm representing investors and consumers in securities litigation and other complex class action litigation. ISS Securities Class Action Services has consistently ranked GPM in its annual SCAS Top 50 Report. In 2018, GPM was ranked a top five law firm in number of securities class action settlements, and a top six law firm for total dollar size of settlements. With four offices across the country, GPM's nearly 40 attorneys have won groundbreaking rulings and recovered billions of dollars for investors and consumers in securities, antitrust, consumer, and employment class actions. GPM's lawyers have handled cases covering a wide spectrum of corporate misconduct including cases involving financial restatements, internal control weaknesses, earnings management, fraudulent earnings

guidance and forward looking statements, auditor misconduct, insider trading, violations of FDA regulations, actions resulting in FDA and DOJ investigations, and many other forms of corporate misconduct. GPM's attorneys have worked on securities cases relating to nearly all industries and sectors in the financial markets, including, energy, consumer discretionary, consumer staples, real estate and REITs, financial, insurance, information technology, health care, biotech, cryptocurrency, medical devices, and many more. GPM's past successes have been widely covered by leading news and industry publications such as *The Wall Street Journal*, *The Financial Times*, *Bloomberg Businessweek*, *Reuters*, the *Associated Press*, *Barron's*, *Investor's Business Daily*, *Forbes*, and *Money*.

This press release may be considered Attorney Advertising in some jurisdictions under the applicable law and ethical rules.

## Contacts

Glancy Prongay & Murray LLP, Los Angeles

Charles H. Linehan, 310-201-9150 or 888-773-9224

1925 Century Park East, Suite 2100

Los Angeles, CA 90067

www.glancylaw.com

shareholders@glancylaw.com

## #Hashtags

#investors   #fraud

## $Cashtags

$FE

# EXHIBIT 18



BES

# FIRSTENERGY ALERT: Bragar Eagel & Squire, P.C. is Investigating FirstEnergy Corp. on Behalf of Stockholders and Encourages Investors to Contact the Firm

July 22, 2020 08:00 PM Eastern Daylight Time

NEW YORK--(BUSINESS WIRE)--Bragar Eagel & Squire, P.C., a nationally recognized shareholder rights law firm, is investigating potential claims against FirstEnergy Corp. (NYSE: FE) on behalf of FirstEnergy stockholders. Our investigation concerns whether FirstEnergy has violated the federal securities laws and/or engaged in other unlawful business practices.

Click here to participate in the action.

On July 21, 2020, multiple news outlets reported that the Federal Bureau of Investigations had arrested Ohio House Speaker Larry Householder and four other individuals in connection with an alleged $60 million illegal bribery scheme in return for Householder's support for legislation that ultimately passed in 2019, and which bailed out two nuclear power plants of Energy Harbor Corp., a former subsidiary of FirstEnergy Corp. In addition, FirstEnergy announced that it had "received subpoenas in connection with the investigation surrounding" that legislation, Ohio House Bill 6.

On this news, FirstEnergy's shares fell from their July 21, 2020 opening price of $41.64 per share, to close at $34.25 per share on July 21, 2020.

If you purchased or otherwise acquired First Energy shares and suffered a loss, have information, would like to learn more about these claims, or have any questions concerning this announcement or your rights or interests with respect to these matters, please contact Melissa Fortunato or Marion Passmore by email at investigations@bespc.com, or telephone at (212) 355-4648, or by filling out this contact form. There is no cost or obligation to you.

**About Bragar Eagel & Squire, P.C.:**

Bragar Eagel & Squire, P.C. is a nationally recognized law firm with offices in New York and California. The firm represents individual and institutional investors in commercial, securities, derivative, and other complex litigation in state and federal courts across the country. For more information about the firm, please visit www.bespc.com. Attorney advertising. Prior results do not guarantee similar outcomes.

Contacts
Bragar Eagel & Squire, P.C.
Melissa Fortunato, Esq.
Marion Passmore, Esq.
(212) 355-4648
investigations@bespc.com
www.bespc.com

#Hashtags



#stocks    #legal    #FE    #investors    #FirstEnergy    #Investigation    #shareholderalert

#investoralert

Social Media Profiles

Bragar Eagel & Squire P.C. on LinkedIn

# EXHIBIT 19



# SHAREHOLDER ALERT: Investigation of FirstEnergy Announced by Holzer & Holzer, LLC

July 23, 2020 08:00 AM Eastern Daylight Time

ATLANTA--(BUSINESS WIRE)--Holzer & Holzer, LLC is investigating whether FirstEnergy Corp. ("FirstEnergy" or the "Company") (NYSE: FE) complied with federal securities laws. On July 21, 2020, various media outlets reported, in connection with the arrest of an Ohio lawmaker, that FirstEnergy engaged in an illegal scheme to have taxpayers bail out the Company's nuclear power plants. The Company also disclosed that it had received subpoenas in connection with an investigation into the passage of Ohio House Bill 6. The price of FirstEnergy's stock fell following the announcement.

If you purchased shares of FirstEnergy and suffered a loss on that investment, you are encouraged to contact Corey D. Holzer, Esq. at cholzer@holzerlaw.com or Luke R. Kennedy, Esq. at lkennedy@holzerlaw.com, or by toll-free telephone at (888) 508-6832 to discuss your legal rights.

Holzer & Holzer, LLC is an Atlanta, Georgia law firm that dedicates its practice to vigorous representation of shareholders and investors in litigation nationwide, including shareholder class action and derivative litigation. Since its founding in 2000, Holzer & Holzer attorneys have played critical roles in recovering hundreds of millions of dollars for shareholders victimized by fraud and other corporate misconduct. More information about the firm is available through its website, www.holzerlaw.com and upon request from the firm. Holzer & Holzer, LLC has paid for the dissemination of this promotional communication, and Corey D. Holzer is the attorney responsible for its content.

## Contacts

Corey D. Holzer, Esq.

(888) 508-6832 (toll-free)

cholzer@holzerlaw.com

# EXHIBIT 20





# FirstEnergy Corp. (FE) Alert: Gardy & Notis, LLP Announces Investigation of Potential Securities Fraud

July 24, 2020 05:19 PM Eastern Daylight Time

NEW YORK--(BUSINESS WIRE)--The law firm Gardy & Notis, LLP announces it is investigating a potential securities claim on behalf of stockholders of FirstEnergy Corp. ("FirstEnergy" or "the Company") (NYSE: FE) for violations of the securities laws.

If you are an investor who purchased FirstEnergy stock between February 22, 2017 and July 21, 2020 please contact Jennifer Sarnelli at Gardy & Notis, LLP, 126 East 56th Street, New York, New York 10022, email: jsarnelli@gardylaw.com, Telephone: 212-905-0509 to learn more about your legal rights.

On July 21, 2020, the FBI arrested Ohio House Speaker Larry Householder over an alleged scheme in which Householder and others accepted bribes millions of dollars in bribes from FirstEnergy. The bribes were made to clear the way for a state-funded bailout of two nuclear power plants formerly owned by FirstEnergy. The bribe money paid by FirstEnergy was allegedly untimely paid by FirstEnergy's ratepayers in the form of rate hikes.

On this news, FirstEnergy stock price closed at $27.09 on July 22, 2020, $14.00 per share lower than the closing price of $41.26 on July 20, 2020 prior to the news.

Gardy & Notis, LLP specializes in large, complex litigation in the fields of securities, corporate governance, and mergers and acquisitions. The attorneys at Gardy & Notis, LLP have served as a plaintiffs' lead counsel in some of the largest securities fraud class action recoveries.

Attorney Advertising. Past results do not guarantee future outcomes.

## Contacts

GARDY & NOTIS, LLP

Jennifer Sarnelli

126 East 56th Street

New York, New York 10022

Telephone: 212-905-0509 (option 3 at the message)

E-mail: jsarnelli@gardylaw.com

Website: www.gardylaw.com