# EXHIBIT 1

| | |
|---|---|
| **From:** | Rachel Cocalis |
| **To:** | "Thompson, Tasha N."; "Rein, David M.J."; "Williams, Hilary M."; "calee@jonesday.com"; "sgsozio@jonesday.com"; "gjritts@JonesDay.com"; "mpduffy@jonesday.com"; "giuffrar@sullcrom.com"; "Nelless@sullcrom.com" |
| **Cc:** | Jason Forge; Ting Liu; Tor Gronborg; Ashley Kelly |
| **Subject:** | RE: In re FirstEnergy Corp. Sec. Litig., No. 20-cv-03785-ALM-KAJ |
| **Date:** | Wednesday, May 10, 2023 10:44:19 AM |

Counsel,

It has come to our attention that FirstEnergy has not produced documents responsive to Plaintiffs' Requests for Production of Documents to FirstEnergy.  For example, as recently noted by the Plaintiffs in the *MFS* and *Brighthouse* actions, the document bates stamped SCR0001415 has not been produced by Defendants in this action.  However, the document hits on multiple agreed upon search terms and is responsive to Plaintiffs' Requests for the Production of Documents to FirstEnergy.  *See, e.g.*, Request No. 23 ("Documents concerning any consulting agreements entered into between FirstEnergy and Samuel Randazzo and/or Sustainability Funding Alliance of Ohio, Inc."); Request No. 19 ("Documents regarding any monetary payments, contributions, or reimbursements made by you, FES, FENOC, FESC, Energy Harbor, or any other FirstEnergy affiliate, whether directly or indirectly" to Samuel Randazzo or Sustainability Funding Alliance).  Nevertheless, Plaintiffs received this document for the first time last week from non-party, Samuel Randazzo. Accordingly, Plaintiffs request that FirstEnergy re-review all documents that hit on the term Randazzo and were purportedly non-responsive.

Best,
Rachel

# EXHIBIT 2

[Submitted *In Camera* Pursuant to §8 of the
Amended Stipulated Protective Order (ECF 411)]

EXHIBIT 3

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

September 1, 2023

Via E-mail

Ashley M. Kelly, Esq.,
Rachel A. Cocalis, Esq.,
    Robbins Geller Rudman & Dowd LLP,
        655 West Broadway, Suite 1900,
            San Diego, California  92101.

Re:    *In re FirstEnergy Corp. Sec. Litig.*,
           No. 2:20-cv-03785-ALM-KAJ (S.D. Ohio).

Dear Ashley and Rachel:

On behalf of FirstEnergy Corp. ("FirstEnergy"), I write in response to Plaintiffs' June 2, 2023 email ("June 2 Email") and June 6, 2023 letter ("June 6 Letter") concerning purported deficiencies in FirstEnergy's document productions. FirstEnergy disagrees with and disputes Plaintiffs' assertions and the characterizations of the sufficiency of FirstEnergy's productions in the June 2 Email and June 6 Letter, but limits its responses below to Plaintiffs' specific requests in that correspondence.[1]

## I.    The June 2, 2023 Email

Plaintiffs' June 2 Email makes five requests.  I respond to each of them below.

*First*, the email asks that FirstEnergy "confirm that the custodians were not able to delete emails after the date any applicable litigation hold for the relevant period was implemented, disclose the date the litigation hold was implemented, identify what sources besides email were searched for responsive documents, and confirm whether FirstEnergy

---

[1]    I note that since FirstEnergy received the requests in the June 2 Email and June 6 Letter, Plaintiffs have received multiple responses and updates concerning these requests and many others issued by Plaintiffs and other parties to this case addressing similar issues, some of which are restated herein for Plaintiffs' convenience.

Ashley M. Kelly, Esq.                                                                    -2-
Rachel A. Cocalis, Esq.

collected entire email boxes or first culled email boxes using search terms." (June 2 Email.)
FirstEnergy confirms that, after a litigation hold is implemented for a custodian, if that
custodian selects an email for deletion, that email will not be deleted from FirstEnergy's
systems until the litigation hold is lifted. Multiple litigation holds were implemented,
including one on July 22, 2020. As to the collection process for email, as a general matter,
FirstEnergy collected all emails custodial to each custodian within specified date ranges,
and then applied the relevant search parameters for the purpose of reviewing and producing
documents. FirstEnergy also searched (i) share drives on FirstEnergy's servers likely to
have relevant information or that were identified by the custodians as containing relevant
information, and (ii) certain data, such as text messaging and calendar entries, available at
the time the litigation hold was implemented from individual custodians' mobile devices
issued by FirstEnergy. As you are aware, FirstEnergy expects to produce additional
contents from Michael Dowling's and Charles Jones's mobile devices on or before
September 15, 2023.

   *Second*, the June 2 Email references an "attachment reflected in
SCR0001415," that Plaintiffs received from nonparty Samuel Randazzo and requests that
"Defendants undertake a search for any copies of [that] attachment" using specified search
terms. (*Id.*) As explained via email and in meet-and-confer calls, and at length in our
August 9 letter to counsel to Messrs. Jones and Dowling regarding SCR0001415 and its
attachment (the "August 9 Letter"), on which Plaintiffs were copied, "FirstEnergy does not
have copies of these documents in its possession, custody, or control. These documents
predate this action and any obligation to have a litigation hold in place." (August 9 Letter
at 3.) We have enclosed the August 9 Letter for your reference.

   *Third*, the June 2 Email requests that "Defendants add the term
'srandazzo@myvzw.com' to the Parties' current search parameters." (June 2 Email.) As
explained in our August 9 Letter, "[FirstEnergy] conducted a search of the entirety of its
email records for emails to or from srandazzo@myvzw.com," and that search did not
produce any hits. (August 9 Letter at 3.)

   *Fourth*, the June 2 Email requests that FirstEnergy "re-review all documents
that hit on the term Randazzo and were purportedly non-responsive," solely on the basis
that Plaintiffs identified a handful of emails that, in Plaintiffs' view, "suggest" Michael
Dowling may have responded to Randazzo's December 21, 2016 email discussed above or
had further communications with Randazzo. (June 2 Email.) The email itself, and all of
the other emails you cite in this request, are from 2016—*i.e.*, outside of the agreed-upon
search parameters—so the fact that FirstEnergy did not produce them indicates nothing
about the sufficiency of FirstEnergy's document production. Moreover, there is nothing
unusual about unanswered questions or time lags appearing in an email record.

Ashley M. Kelly, Esq.                                                                                    -3-
Rachel A. Cocalis, Esq.

        Further, your request that FirstEnergy "re-review all documents that hit on
the term Randazzo" is unduly burdensome and disproportionate to the needs of the case,
particularly in these circumstances, where Plaintiffs have not shown any deficiency in
FirstEnergy's production. Plaintiffs are also wrong to assume that it is "unlikely that many
documents hitting on the term Randazzo would have been tagged non-responsive." (*Id.*)
As an active participant in the energy industry for many years, including as counsel to
Industrial Energy Users-Ohio in various matters before the Public Utilities Commission of
Ohio in which FirstEnergy also participated but which have nothing to do with this case,
Mr. Randazzo's name would likely appear on many documents that are not responsive to
Plaintiffs' requests.

        *Finally*, the June 2 Email requests that FirstEnergy "disclose whether [it
has] any knowledge of any other documents that were not produced because they were
deleted, contemporaneously or otherwise, and confirm that you have conducted a
reasonable inquiry to form the basis for this representation." (*Id.*) As previously explained,
"FirstEnergy does not maintain records of deleted emails." (August 9 Letter at 2–3.)

## II.     FirstEnergy's Objections to Plaintiffs' Document Requests

        In your June 6 Letter, you noted that FirstEnergy objected to four of
Plaintiffs' document requests and stated that it would not produce documents in response
to those requests (June 6 Letter at 1 (citing Lead Plaintiffs' Second Set of Requests for the
Production of Documents, Nos. 5, 11, 24, and 59).) You ask whether FirstEnergy "is
refusing to produce [documents]" that are responsive to those requests "even if [the
documents] are located through the agreed upon search processes." (*Id.*) FirstEnergy
confirms that, after applying the agreed-upon search terms, custodians, and date ranges,
FirstEnergy produced non-privileged documents responsive to requests to which
FirstEnergy agreed to produce documents, subject to any objections to those requests.
FirstEnergy did not assess whether or not those documents were also responsive to
Requests 5, 11, 24 or 59.

## III.    Documents Related to FirstEnergy's 2020 Bond Offerings

### a.      Due Diligence Documents

        *First*, your June 6 Letter asks FirstEnergy to "confirm that all documents
concerning the contents of the 'data room'" set up to maintain documents related to the
challenged bond offerings "have been searched for and produced." (*Id.* at 2.) Plaintiffs
did not request, and FirstEnergy did not agree to search for, "all documents concerning the
contents of the 'data room,'" which was a temporary document repository. That said, the

Ashley M. Kelly, Esq.                                                                    -4-
Rachel A. Cocalis, Esq.

search terms agreed among the parties included multiple terms specific to the challenged bond offerings.[2]  To the extent that the agreed-upon search parameters captured documents "concerning the contents of the data room" that were identified during review as responsive to Plaintiffs' document requests and not privileged, FirstEnergy produced those documents.

  *Second*, you ask FirstEnergy to confirm "that documents concerning FirstEnergy's receipt, consideration of, and responses to due diligence document requests will be searched for and produced." (*Id.* at 2.)  Again, FirstEnergy confirms that it applied the agreed-upon search terms—including multiple terms relating to the at-issue bond offerings—and produced non-privileged documents that were responsive to Plaintiffs' document requests.

  *Third*, FirstEnergy confirms that it has substantially completed its review and production of responsive, non-privileged documents hitting on the terms "'due diligence' and '(note* OR bond* OR securit* OR underwrit*) AND (offering* OR roadshow* OR prospectus* OR "due diligence" OR "bring down") AND ("FirstEnergy" OR FES).'" (*Id.*)

  *Fourth*, you request that FirstEnergy apply the following new search terms "to capture any additional, responsive documents: 'data room' OR 'dataroom' OR 'Donnelley' OR *dfnsolutions.com" over the "limited date range of January 1, 2020 through December 31, 2020." (*Id.*)  FirstEnergy does not agree to your request.  The time for negotiating search terms has long passed and FirstEnergy has no obligation to negotiate or apply new search terms.  Plaintiffs served their second set of document requests on March 28, 2022, FirstEnergy served Responses and Objections on April 27, 2022, and FirstEnergy substantially completed its productions in response to those documents by November 18, 2022 (ECF No. 340)—eight months before Plaintiffs' June 6 letter.  According to the protocol ordered by the Court in this action, Plaintiffs were required to

---

[2]  For example, the search terms include: "due dilligence" OR "due diligence"; (note* OR bond* OR securit* OR underwrit*) AND (offering* OR roadshow* OR prospectus* OR "due diligence" OR "bring down") AND ("FirstEnergy" OR FES); ((offering OR issu*) W/15 (bond OR debt OR notes OR underwriting OR diligen*)) AND ("FirstEnergy" OR FES); ("kick-off" OR kickoff OR "Kick off") W/10 (offer* OR diligence OR meeting); diligence W/5 (customer* OR management OR mgmt OR financial OR legal OR tax OR audit* OR question*); as well as specific terms for the underwriters, including (citigroup* OR citi OR "citi.com" OR bednarski OR mehta*) AND ("FES" OR "firstenergy"); and (pnc* OR "pnc.com") AND ("FES" OR "firstenergy").

Ashley M. Kelly, Esq.                                                                                                          -5-
Rachel A. Cocalis, Esq.

identify all proposed search terms "within ten (10) days of the initial exchange of Proposed Search Terms" for a given set of document requests. Joint Protocol for Production of Documents and Electronically Stored Information § III(F). FirstEnergy has already reviewed and produced responsive, non-privileged documents identified in its review, including any documents that may have appeared in the data rooms and were duplicated in the agreed-upon custodians' data. Plaintiffs have not identified any reason to reopen negotiations over the scope of document review.

In addition, the requested terms are both overbroad and unlikely to lead to the discovery of responsive documents. The terms are over-inclusive because—Plaintiffs' proposed "limited date range" notwithstanding—terms like "data room" and "Donnelley" are not specific to the challenged bond offerings and are likely to capture many nonresponsive documents, particularly in the period after the second challenged bond offering in June 2020. For example, searches for the terms "data room" and "dataroom" are likely to capture numerous documents referring to data rooms in unrelated contexts. *See, e.g.*, FE_CIV_SEC_0395141 (industry newsletter mentioning a data room); FE_CIV_SEC_0224791 (discussing data room for a real estate transaction). Similarly, searches for the terms "Donnelley" and "*dfnsolutions.com" are likely to capture references to irrelevant SEC filings, because FirstEnergy used Donnelley Financial Solutions for SEC filings during the relevant time period. *See, e.g.*, FE_CIV_SEC_0421215 (automated cover page with Form 12b-25 filing).

*Finally*, FirstEnergy will produce the two inadvertently unproduced portions of FE_CIV_SEC_0669311 that you cite (a "January 24, 2020[] email from Stephen Blake" and a "February 3, 2020" response to that email from "Kevin Burgess"). (June 6 Letter at 2.) FirstEnergy has also searched for other communications in the same email thread (FE_CIV_SEC_0669311) and will produce all additional non-privileged and responsive communications in that thread.

### b. Market and Due Diligence Calls

Your June 6 Letter describes certain "due diligence calls" and a "market update call," and asks FirstEnergy to "confirm all documents related to these market and due diligence calls, including calendar entries, meeting materials, and any other notes or discussions (whether electronic or hardcopy) will be searched for and produced." (*Id.* at 2–3.) FirstEnergy confirms that it has substantially completed its review and production of responsive and non-privileged documents that hit on agreed-upon search terms. Furthermore, in response to your June 6 Letter, FirstEnergy searched its document collection on the five call dates identified (February 13, 2020, February 18, 2020,

Ashley M. Kelly, Esq.                                                                                    -6-
Rachel A. Cocalis, Esq.

February 20, 2020, June 2, 2020, June 8, 2020) for references to due diligence or market update calls, and identified no additional responsive documents.

### c. Communications with Ballard Spahr

You ask that FirstEnergy "confirm that all relevant communications between FirstEnergy and Ballard Spahr have been produced, including any email correspondence, calendar entries, meeting materials, and/or meeting notes or other discussions." (*Id.* at 3.) You are wrong to claim that FirstEnergy's production is somehow deficient because it included "only a handful of communications from Ballard Spahr" for a period of time when Ballard Spahr's time entries reflect "communicat[ions] with FirstEnergy on multiple occasions." (*Id.*) This makes no sense for at least two reasons. First, there is no reason to expect FirstEnergy's documentary records to reflect every call, in-person discussion, or meeting recorded in a law firm's time entries. Second, FirstEnergy's document production in this case was the result of search parameters negotiated extensively with Plaintiffs that may or may not have captured emails and calendar invitations to or from Ballard Spahr lawyers, particularly as Ballard Spahr represented third-party underwriters—not FirstEnergy—in connection with the at-issue bond offerings. FirstEnergy confirms that it has substantially completed its review and production of responsive and non-privileged documents that hit on agreed-upon search terms.

### IV.    Documents Concerning FERC's 2019-2022 Audit of FirstEnergy's Lobbying Activities

Your June 6 Letter asks that FirstEnergy "confirm that all responses to FERC's audit requests (including supplemental/updated requests), as well as any internal communications concerning those responses and the processes involved in drafting and/or submitting the responses to FERC have been searched for and produced." (*Id.* at 4.) Specifically, you claim that "[t]here is an absence of documents in this case concerning . . . FirstEnergy's deliberations and formulation" of stipulated facts, agreements with FERC, and responses to FERC. (*Id.*) That absence should not be surprising because such internal "deliberations and formulation" of responses to regulators in response to an audit request are likely to be protected from discovery as attorney-client privileged. As for "responses to FERC's audit requests (including supplemental/updated requests)," (*id.*), FirstEnergy has produced to Plaintiffs over 33,000 documents that FirstEnergy produced to FERC in connection with "FERC's 2019–2022 Audit." In response to the June 6 Letter, FirstEnergy identified approximately 1,000 documents that FirstEnergy previously produced to FERC but has not yet produced in this action, which FirstEnergy will produce.

Ashley M. Kelly, Esq.                                                                                    -7-
Rachel A. Cocalis, Esq.

## V.      Text Messages

Your June 6 Letter identifies several individual defendants—Jason Lisowski, K. Jon Taylor, Robert Reffner, Dennis Chack, John Judge, James Pearson, Donald Schneider, Steven Strah, and Leila Vespoli and all of the Director Defendants—and asks FirstEnergy to "confirm whether these defendants had any FirstEnergy-issued devices used for text messaging (including iPads and cell phones), and if so, that those devices were searched for information responsive to the Requests." (*Id.*)  As an initial matter, your claim that FirstEnergy has produced "few (or no) text messages" for those individuals is incorrect.  As Corey Lee of Jones Day explained in his June 19, 2023 letter to Plaintiffs on behalf of Director Defendants, "over 1,200 files were produced from the Director Defendants' mobile devices."  In any event, FirstEnergy confirms that it has searched for and produced responsive, non-privileged documents identified from its review of data processed from the mobile devices of Messrs. Lisowski, Taylor, Reffner, Chack, and Strah.  No mobile device data was collected from Messrs. Judge, Pearson, and Schneider, nor from Ms. Vespoli, because those individuals were either not FirstEnergy employees (Messrs. Judge and Schneider) or left FirstEnergy prior to the implementation of a litigation hold related to this action (Mr. Pearson and Ms. Vespoli).

## VI.     Additional Proposed Search Terms

FirstEnergy declines the request in your June 6 Letter to add 28 new search terms as untimely, overbroad, unduly burdensome, and not proportional to the needs of the case, except as to the search terms described below.  (*Id.* at 5−6, 5 n.1.)  As previously explained, Plaintiffs' request is long overdue.  FirstEnergy has already expended considerable resources conducting extensive document review using the agreed-upon search terms.  In addition, the proposed terms are overbroad or are otherwise unlikely to lead to new responsive documents.[3]  For example, your request for the search string "decoupl* w/15 (language or provision* or mechanism* or section* or rate* or charge* or

---

[3]      A hit report for the 28 additional search terms proposed in your June 6 Letter is set out in Appendix A hereto.  Your Letter did not specify a time period over which to run those proposed search terms.  Because the June 6 Letter refers to Ms. Cocalis's June 2 request for the addition of 3 proposed search terms over the time period January 1, 2014 to December 31, 2020, that date range was used to generate the search term hit report in Appendix A.  That date range exceeds the date ranges Plaintiffs and FirstEnergy agreed to and FirstEnergy objects to any such proposed date range as overbroad.

Ashley M. Kelly, Esq.                                                                                          -8-
Rachel A. Cocalis, Esq.

'baseline revenue')" alone generates 124,877 de-duplicated hits with families, and, in all, your requested search terms generate over 300,000 de-duplicated hits with families.

Nevertheless, in order to avoid burdening the Court with a discovery dispute about search parameters far into fact discovery, FirstEnergy agrees to search for documents hitting on the following search terms:

- "speaker LH"

- "rlhoynes@gmail.com"

- "one ohio united"

- Citizen* w/3 ("working America")

- pat.tully@ohiohouse.gov

- mymail987321@gmail.com

- SFAO

- "Sustainability Agreement"

FirstEnergy will search for documents only over the time period January 1, 2017 through December 31, 2020 and will search the custodial data of the currently agreed-upon custodians, as well as Carol Carthew and Judy Proffit, further discussed below. From this search, FirstEnergy will produce non-privileged documents, if any, that are responsive to Plaintiffs' document requests.

## VII. Custodians

FirstEnergy also objects to the request in your June 6 Letter to add Ms. Carthew and Ms. Proffit as custodians simply because FirstEnergy agreed to include Ms. Carthew and Ms. Proffit as custodians in certain limited searches in response to Mr. Jones's document requests. (*Id.* at 6–7.) Ms. Carthew and Ms. Proffit were added as custodians for a single document request propounded by Mr. Jones as part of a negotiated compromise. Thus, FirstEnergy's agreement to include them for Mr. Jones is no basis to re-open months-old negotiations over the scope of document review conducted in response to Plaintiffs' requests.

Ashley M. Kelly, Esq.                                                                                   -9-
Rachel A. Cocalis, Esq.


         Further, FirstEnergy reiterates that Ms. Carthew and Ms. Proffit are unlikely to have documents responsive to Plaintiffs' requests that are not otherwise covered by the more than 60 other custodians that FirstEnergy agreed to search and review as a result of its extensive negotiation with Plaintiffs over the scope of document review. In fact, only 318 unreviewed documents hit on the previously agreed-upon search parameters when applied to Ms. Carthew's and Ms. Proffit's custodial data. Nevertheless, in the spirit of compromise, FirstEnergy agrees to review these 318 documents (plus their families) and produce non-privileged documents, if any, responsive to Plaintiffs' requests.

         Relatedly, FirstEnergy is unable to answer "whether the additional agreed-upon custodians for Mr. Jones' requests who were not identified by FirstEnergy as having responsive documents for Plaintiffs' Requests have any documents in their custodial files that are responsive to Plaintiffs' requests" because FirstEnergy has not reviewed, and will not review, those custodial files for documents responsive to Plaintiffs' requests. (*Id.* at 7.) That would fundamentally re-trade the parties' agreement as to the scope of document discovery.

*          *          *

         As always, FirstEnergy remains willing to meet-and-confer to discuss these issues and any other concerns that you may have. Please do not hesitate to contact me at (212) 558-7775 or menillon@sullcrom.com if you would like to discuss.

Sincerely,

 */s/ Nicholas F. Menillo*<br>Nicholas F. Menillo

(Enclosure)

cc: All Counsel of Record

Ashley M. Kelly, Esq.  
Rachel A. Cocalis, Esq.

-10-

### APPENDIX A:  HIT REPORTS FOR PROPOSED SEARCH TERMS

| Proposed Search Term[4] | Deduped Hits Plus Families |
|---|---|
| "data room" OR "dataroom" OR "Donnelley" OR *dfnsolutions.com | 2,758 |

| Proposed Search Term[5] | Deduped Hits Plus Families |
|---|---|
| "the speaker" | 37,458 |
| "speaker LH" | 351 |
| "speaker HH" | - |
| "rlhoynes@gmail.com" | 22 |
| "lee.james@gmail.com" | - |
| "The farm" | 8,328 |
| Quasi w/3 farm | - |
| SLH | 1,448 |
| "one ohio united" | 90 |
| Citizen* w/3 ("working America") | 36 |
| OES | 28,795 |
| Schweitzer | 19,265 |
| Pat* w/3 (Tully or tulley) | 2,423 |
| pat.tully@ohiohouse.gov | 424 |
| "Charlie Palmer" or "the Palm" | 3,902 |
| greenbrier or "green brier" | 47,033 |
| decoupl* w/15 (language or provision* or mechanism* or section* or rate* or charge* or "baseline revenue") | 124,877 |
| (subsidy or subsidies) w/5 (nuclear or nuke or plant*) | 44,699 |
| larryl.householder@gmail.com | - |
| mymail987321@gmail.com | 355 |

[4] As you requested, we applied the January 1, 2020 to December 31, 2020 date range to generate a hit count for this search string.  The hit count consists of de-duplicated hits resulting from searches over the data from all agreed-upon custodians.

[5] We applied the January 1, 2014 through December 31, 2020 date range to generate hit counts for these search strings.  The hit counts consist of de-duplicated hits resulting from searches over the data from all agreed-upon custodians.

Ashley M. Kelly, Esq.                                                                                    -11-
Rachel A. Cocalis, Esq.

| Proposed Search Term[5] | Deduped Hits Plus Families |
|---|---|
| xyz.liberty@gmail.com | - |
| srandazzo@myvzw.com | - |
| SFAO | 14 |
| Rafeld | 3,854 |
| ("energy security plan" or "ESP IV") w/15 (oppos* or object*) | 8,277 |
| (Uncommitted w/30 Dollars) AND (Sustainability or SFA or IEU) | - |
| IEU w/10 Payout | - |
| "Sustainability Agreement" | 1 |
| **Total** | **300,836** |

EXHIBIT 4

**Robbins Geller**
**Rudman & Dowd LLP**

| | | |
|---|---|---|
| Boca Raton | Melville | San Diego |
| Chicago | Nashville | San Francisco |
| Manhattan | Philadelphia | Washington, D.C. |

Rachel A. Cocalis
rcocalis@rgrdlaw.com

September 5, 2023

<u>VIA EMAIL</u>

Hilary M. Williams
Nicholas F. Menillo
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

Re: *In re FirstEnergy Corp. Sec. Litig.*,
No. 2:20-cv-03785-ALM-KAJ (S.D. Ohio)

Dear Hilary and Nicholas:

I write with regard to defendant FirstEnergy Corp.'s ("FirstEnergy") September 1, 2023 letter in response to Plaintiffs' June 2, 2023 email and June 6, 2023 letter.

**First**, after Samuel C. Randazzo ("Randazzo") produced communications with defendant Michael Dowling ("Dowling") that suggested responsive documents are missing from FirstEnergy's document productions, Plaintiffs requested that FirstEnergy re-review all documents that hit on the term Randazzo and were purportedly non-responsive. R. Cocalis 6/2/23 email. Three months later, FirstEnergy refused Plaintiffs' request outright, claiming Plaintiffs have failed to establish any deficiencies in FirstEnergy's productions. N. Menillo 9/1/23 letter at 2-3. This is wrong for the reasons previously stated. R. Cocalis 6/2/23 email. Further, Plaintiffs recently identified even more responsive communications between Dowling and Randazzo that FirstEnergy failed to produce. R. Cocalis 9/1/23 email. Accordingly, Plaintiffs have established that there are concerning gaps in FirstEnergy's document production.

FirstEnergy also baldly contends that Plaintiffs' request is unduly burdensome and disproportionate to the needs of this case. N. Menillo 9/1/23 letter at 3. During the Parties' September 5, 2023 meet-and-confer, however, FirstEnergy failed to provide the volume of documents that would need to be re-reviewed or support its claim of undue burden in any way. In addition, FirstEnergy contends that many of the documents would not be responsive because during part of the relevant time period,

[Randazzo acted as] counsel to Industrial Energy Users-Ohio [("IEU-Ohio")] in various matters before the Public Utilities Commission of Ohio in which FirstEnergy also participated but which have nothing to do with this case.

4875-5574-6686.v1

# Robbins Geller
## Rudman & Dowd LLP

Hilary M. Williams
Nicholas F. Menillo
September 5, 2023
Page 2

N. Menillo 9/1/23 letter at 3.  But certain Individual Defendants "have denied the illicit purpose of [FirstEnergy's $4.3 million] payment," portraying it in recent depositions as a settlement for the benefit of IEU-Ohio.  4/5/23 Order, ECF 440 at 10060.  Thus, documents concerning Randazzo and IEU-Ohio are relevant as they "[would] make the respective positions of the Class Plaintiffs and the Defendants more or less reasonable."  *Id.*  Accordingly, Plaintiffs reiterate their June 2 request that FirstEnergy re-review the documents that hit on the term Randazzo and were purportedly non-responsive.  Further, to the extent that FirstEnergy refuses to re-review such documents on undue burden or proportionality grounds, Plaintiffs request that FirstEnergy provide sufficient information from which to evaluate its claims by September 8, 2023.

*Second*, in light of developments in discovery, Plaintiffs requested that FirstEnergy utilize three additional search terms for the period from January 1, 2014 to December 31, 2020.  R. Cocalis 6/2/23 email.  FirstEnergy has agreed to run the proposed term "Sustainability Agreement," but only for the period from January 1, 2017 to December 31, 2020.  N. Menillo 9/1/23 letter at 8.  Plaintiffs do not agree to Defendants' proposed time limitation.  As an initial matter, FirstEnergy's hit report reveals that the term hit on one document, and thus, any burden argument is meritless.  Further, the proposed term is intended to capture relevant information concerning FirstEnergy's purported consulting agreement with Randazzo's shell company, Sustainability Funding Alliance of Ohio, Inc. ("SFA"), which was signed in 2013.  In fact, Plaintiffs requested that this term be utilized because of a document dated in 2016.  R. Cocalis 6/2/23 email.  Accordingly, please confirm that FirstEnergy will utilize this search term and the June 6, 2023 proposed term "SFAO" for the period from January 1, 2014 to December 31, 2020 by September 8, 2023.  A. Kelly 6/6/23 letter at 6.

*Third*, please respond to Plaintiffs' August 25, 2023 letter concerning FirstEnergy's improper withholding of documents on attorney-client privilege grounds by September 8, 2023.

*Fourth*, we are discouraged by FirstEnergy's refusal, after a three-month delay, to agree to certain additional, limited search terms proposed by Plaintiffs.  And, we disagree with your characterization that Plaintiffs' additional proposed terms are "belated" under the ESI Protocol – in fact, that protocol expressly allows for additional search terms by agreement or Court Order. Discovery remains ongoing, and as document review progresses, so does identification of other relevant information and terms.

We understand from FirstEnergy's September 1, 2023 letter, that documents responsive to certain of the terms proposed by Plaintiffs in June will be produced.  In an effort to move forward on the remaining terms to which FirstEnergy has objected, we are providing the following counter-proposal, which modifies (or removes) certain terms, and revises the requested time period for others. We ask that to the extent FirstEnergy continues to object to the search terms, that the hit report be

**Robbins Geller**
**Rudman & Dowd LLP**

Hilary M. Williams
Nicholas F. Menillo
September 5, 2023
Page 3

provided, broken out by custodian so that we can properly evaluate any objections. Please produce that report within 7 days.[1]

| Proposed Search Term Proposed by Plaintiffs in June 2023 | Revised Proposal – September 5, 2023 |
|---|---|
| "the speaker" | "the speaker" and "the farm" |
| SLH | Include as proposed; SLH refers to Speaker Larry Householder |
| OES | OES and (Schweitzer or ads or advert* or mailer* or "tv spot*" or commercial* or radio or media or signature* or blocker* or conflict) |
| Pat* w/3 (Tully or tulley) | Revised time period: 1/1/2019 to 11/1/2019 |
| "Charlie Palmer" or "the Palm" | Revised time period: 12/1/2016-3/31/2017 |
| SFAO | Revised time period: 1/1/2014-12/31/2020 |

---

[1] We are reviewing the remaining terms concerning data rooms and reserve our rights to pursue those terms.

**Robbins Geller**
**Rudman & Dowd LLP**

Hilary M. Williams
Nicholas F. Menillo
September 5, 2023
Page 4

*Fifth*, during the course of negotiations on proposed custodians, FirstEnergy represented that certain proposed custodians did not have information responsive to Plaintiffs' requests, and thus objected to the inclusion of those individuals as custodians. We now understand some of those individuals may in fact have responsive information, including Plaintiffs' proposed custodians Carole Carthew and Judy Proffit, whose custodial files have yielded over 300 non-duplicative documents that hit on the agreed upon search terms.

As part of the negotiation process, Plaintiffs agreed to reserve a determination of the inclusion of certain proposed custodians, in part due to FirstEnergy's representation. Plaintiffs are now concerned that some of those proposed custodians do in fact have responsive information, based on FirstEnergy's findings with regard to Carthew and Proffit. Those individuals are Brian Knipe, Carmen Siminski, Dierdra Rudd, Diane Francis, Hans Rosebrock, Jennifer Spricigo, Kimberly Pelc, Mark Kanz, Misty Everson, Tracy Mayse, and Wanlu/William Wang. Please confirm whether FirstEnergy continues to object to inclusion of these proposed custodians based on its previous representation that they have no information responsive to Plaintiffs' requests.

*Sixth*, we understand that FirstEnergy will be producing to Plaintiffs approximately 1,000 documents that FirstEnergy previously produced to the U.S. Federal Energy Regulatory Commission ("FERC"). N. Menillo 9/1/23 letter at 6. As you know, documents related to FERC audits were requested by Plaintiffs over a year ago (*see, e.g.*, 3/28/2022 Lead Plaintiff's Second Set of Requests for Production of Documents to Defendants FirstEnergy Corp., Charles E. Jones, Jason J. Lisowski, and the Director Defendants, Request for Production No. 59), and the parties have had numerous discussions about the production of FERC audit documentation in this case since then. While we appreciate that FirstEnergy will produce additional documents, the belated production of these documents may require that Plaintiffs re-open any depositions relevant to the materials, findings, or information contained in the forthcoming production(s). Accordingly, Plaintiffs reserve their rights to re-open depositions to account for the belated production(s).

Best regards,

RACHEL A. COCALIS

ASHLEY M. KELLY

EXHIBIT 5

| Row | Bates Number / Priv Log ID | Family Privilege Log ID | Prior Privilege Log ID | Pages | Date | From/Author | To | CC | Associated Legal Personnel | Document Status | Privilege Assertion | Privilege Log Entry |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4189 | FE_Priv Log_03965 | FE_Priv Family_03360 | FE_Priv Log_03260 | 6 | 3/23/2018 | Tammerine, Nick** | Peddicord, Laurie* | Herriman, Jay**; Gasbarra, Jeff**; Travaglianti, Mark; Arcuri, James* | Tammerine, Nick**; Herriman, Jay**; Arcuri, James* | Withheld | Attorney-Client | Email seeking legal advice regarding Sustainability Funding Alliance agreement renewal. |
| 4190 | FE_Priv Log_03966 | FE_Priv Family_03361 | FE_Priv Log_03261 | 5 | 3/20/2018 | Peddicord, Laurie* | Tammerine, Nick** | Herriman, Jay**; Gasbarra, Jeff**; Travaglianti, Mark; Arcuri, James* | Tammerine, Nick**; Herriman, Jay**; Arcuri, James* | Withheld | Attorney-Client | Email seeking legal advice regarding Sustainability Funding Alliance agreement renewal. |
| 4191 | FE_Priv Log_03967 | FE_Priv Family_03362 | FE_Priv Log_03262 | 6 | 3/26/2018 | Peddicord, Laurie* | Tammerine, Nick** | Herriman, Jay**; Gasbarra, Jeff**; Travaglianti, Mark; Arcuri, James* | Tammerine, Nick**; Herriman, Jay**; Arcuri, James* | Withheld | Attorney-Client | Email seeking legal advice regarding Sustainability Funding Alliance agreement renewal. |
| 4192 | FE_Priv Log_03968 | FE_Priv Family_03363 | FE_Priv Log_03263 | 7 | 3/28/2018 | Tammerine, Nick** | Peddicord, Laurie* | Herriman, Jay**; Gasbarra, Jeff**; Travaglianti, Mark; Arcuri, James* | Tammerine, Nick**; Herriman, Jay**; Arcuri, James* | Withheld | Attorney-Client | Email seeking legal advice regarding Sustainability Funding Alliance agreement renewal. |
| 4193 | FE_Priv Log_03969 | FE_Priv Family_03364 | FE_Priv Log_03264 | 8 | 3/28/2018 | Peddicord, Laurie* | Tammerine, Nick** | Herriman, Jay**; Gasbarra, Jeff**; Travaglianti, Mark; Arcuri, James* | Tammerine, Nick**; Herriman, Jay**; Arcuri, James* | Withheld | Attorney-Client | Email seeking legal advice regarding Sustainability Funding Alliance agreement renewal. |

| Row | Bates Number | Pages | Date | From/Author | To | CC | Associated Legal Personnel | Document Status | Privilege Assertion | Privilege Log Entry |
|-----|--------------|-------|------|-------------|-----|-----|---------------------------|-----------------|---------------------|---------------------|
| 147 | FE_CIV_SEC_0487181-FE_CIV_SEC_0487183 | 3 | 2/8/2019 | Lisowski, Jason | Carthew, Carol; Storsin Jr, Joseph | | FirstEnergy Legal* | Redacted | Attorney-Client Privilege | Email reflecting legal advice regarding invoice records analysis. |

# EXHIBIT 6

[Submitted *In Camera* Pursuant to §8 of the
Amended Stipulated Protective Order (ECF 411)]

# EXHIBIT 7

[Submitted *In Camera* Pursuant to §8 of the
Amended Stipulated Protective Order (ECF 411)]

# EXHIBIT 8

[Submitted *In Camera* Pursuant to §8 of the
Amended Stipulated Protective Order (ECF 411)]

# EXHIBIT 9

[Submitted *In Camera* Pursuant to §8 of the
Amended Stipulated Protective Order (ECF 411)]

# EXHIBIT 10

[Submitted *In Camera* Pursuant to §8 of the
Amended Stipulated Protective Order (ECF 411)]

EXHIBIT 11

# Ohioans for Energy Security
# Fifth-Third Bank Account Number x8255

**GOVERNMENT EXHIBIT**

153

1:20-CR-077

## *DEPOSITS*

| DATE | PAYOR | AMOUNT |
|------|-------|--------|
| 8/12/2019 | GENERATION NOW, INC. | $ 3,000,000.00 |
| 8/14/2019 | GENERATION NOW, INC. | $ 400,000.00 |
| 8/30/2019 | GENERATION NOW, INC. | $ 1,200,000.00 |
| 9/6/2019 | GENERATION NOW, INC. | $ 1,220,000.00 |
| 9/13/2019 | GENERATION NOW, INC. | $ 1,100,000.00 |
| 9/20/2019 | GENERATION NOW, INC. | $ 2,400,000.00 |
| 9/26/2019 | GENERATION NOW, INC. | $ 700,000.00 |
| 9/30/2019 | GENERATION NOW, INC. | $ 700,000.00 |
| 10/3/2019 | GENERATION NOW, INC. | $ 825,000.00 |
| 10/4/2019 | GENERATION NOW, INC. | $ 160,000.00 |
| 10/4/2019 | GENERATION NOW, INC. | $ 1,300,000.00 |
| 10/8/2019 | GENERATION NOW, INC. | $ 1,700,000.00 |
| 10/10/2019 | GENERATION NOW, INC. | $ 1,350,000.00 |
| 10/10/2019 | GENERATION NOW, INC. | $ 2,000,000.00 |
| 10/15/2019 | GENERATION NOW, INC. | $ 2,500,000.00 |
| 10/17/2019 | GENERATION NOW, INC. | $ 2,500,000.00 |
| 10/18/2019 | LINCOLN STRATEGY GROUP, LLC | $ 27,525.00 |
| 10/23/2019 | GENERATION NOW, INC. | $ 150,000.00 |
| 11/12/2019 | GENERATION NOW, INC. | $ 17,500.00 |
| 11/18/2019 | GENERATION NOW, INC. | $ 100,000.00 |
| 12/18/2019 | STRATEGIC MEDIA PLACEMENT INC. | $ 39,152.69 |
| 2/4/2020 | GENERATION NOW, INC. | $ 40,000.00 |
| **TOTAL DEPOSITS** | | **$ 23,429,177.69** |

# Ohioans for Energy Security
## Fifth-Third Bank Account Number x8255

| SOURCE | % OF FUNDING | $ FUNDING |
|---|---|---|
| GENERATION NOW, INC. | *99.7%* | $ 23,362,500.00 |
| STRATEGIC MEDIA PLACEMENT INC. | *0.2%* | $ 39,152.69 |
| LINCOLN STRATEGY GROUP, LLC. | *0.1%* | $ 27,525.00 |
| **TOTAL** | **100.0%** | **$ 23,429,177.69** |



EXHIBIT 12

Ohioans for Energy Security

Fifth-Third Bank Account Number x8255

**GOVERNMENT
EXHIBIT**

154

1:20-CR-077

### *OUTFLOWS*

| DATE | PAYEE | AMOUNT |
|------|-------|--------|
| 8/14/2019 | CONSTANT CONTENT CO. | -$ 2,200,000.00 |
| 8/14/2019 | STRATEGIC MEDIA PLACEMENT INC. | -$ 1,180,400.00 |
| 8/22/2019 | ISAAC WILES | -$ 1,096.50 |
| 8/22/2019 | LOPARO PUBLIC RELATIONS | -$ 10,000.00 |
| 8/28/2019 | EFT | -$ 23.99 |
| 9/3/2019 | STRATEGIC MEDIA PLACEMENT INC. | -$ 1,200,000.00 |
| 9/10/2019 | LOPARO PUBLIC RELATIONS | -$ 10,000.00 |
| 9/10/2019 | STRATEGIC MEDIA PLACEMENT INC. | -$ 1,100,000.00 |
| 9/12/2019 | SERVICE CHARGE | -$ 106.50 |
| 9/19/2019 | STRATEGIC MEDIA PLACEMENT INC. | -$ 1,100,000.00 |
| 9/20/2019 | VOTER TO VOTER, LLC | -$ 150,000.00 |
| 9/25/2019 | VOTER TO VOTER, LLC | -$ 150,000.00 |
| 9/26/2019 | VOTER TO VOTER, LLC | -$ 700,000.00 |
| 9/30/2019 | CONSTANT CONTENT CO. | -$ 2,200,000.00 |
| 9/30/2019 | STRATEGIC MEDIA PLACEMENT INC. | -$ 700,000.00 |
| 10/3/2019 | THE STRATEGY GROUP FOR MEDIA, INC. | -$ 2,500.00 |
| 10/4/2019 | ISAAC WILES | -$ 152.50 |
| 10/4/2019 | LOPARO PUBLIC RELATIONS | -$ 10,000.00 |
| 10/4/2019 | OHIO OUTDOOR ADVERTISING, LLC | -$ 150,000.00 |
| 10/4/2019 | STRATEGIC MEDIA PLACEMENT INC. | -$ 824,590.00 |
| 10/4/2019 | VOTER TO VOTER, LLC | -$ 1,310,000.00 |
| 10/8/2019 | LINCOLN STRATEGY GROUP, LLC | -$ 50,000.00 |
| 10/9/2019 | VOTER TO VOTER, LLC | -$ 1,600,000.00 |
| 10/10/2019 | SERVICE CHARGE | -$ 317.50 |
| 10/11/2019 | LINCOLN STRATEGY GROUP, LLC | -$ 100,000.00 |
| 10/11/2019 | STRATEGIC MEDIA PLACEMENT INC. | -$ 833,090.00 |
| 10/11/2019 | VOTER TO VOTER, LLC. | -$ 2,472,403.07 |
| 10/15/2019 | LINCOLN STRATEGY GROUP, LLC | -$ 510,550.00 |
| 10/15/2019 | VOTER TO VOTER, LLC | -$ 1,500,000.00 |

Ohioans for Energy Security

Fifth-Third Bank Account Number x8255

| Date | Payee | Amount |
|---|---|---|
| 10/18/2019 | LINCOLN STRATEGY GROUP, LLC | -$ 27,525.00 |
| 10/18/2019 | VOTER TO VOTER, LLC | -$ 2,924,385.44 |
| 10/21/2019 | ISAAC WILES | -$ 4,220.00 |
| 10/21/2019 | OHIO, STATEHOUSE | -$ 50.00 |
| 10/21/2019 | RUSHORDER, RUSHORDERTEES | -$ 3,156.75 |
| 10/23/2019 | OHIO, STATEHOUSE | -$ 360.00 |
| 10/23/2019 | THE PRINTED IMAGE | -$ 195.65 |
| 10/23/2019 | VOTER TO VOTER, LLC | -$ 192,847.00 |
| 11/5/2019 | LOPARO PUBLIC RELATIONS | -$ 10,000.00 |
| 11/13/2019 | EFT | -$ 450.00 |
| 11/13/2019 | ISAAC WILES | -$ 2,975.00 |
| 11/18/2019 | MCTIGUE & COLOMBO LLC | -$ 40,767.85 |
| 11/18/2019 | STRATEGIC MEDIA PLACEMENT INC. | -$ 54,700.00 |
| 11/27/2019 | EMBEE MEDIA | -$ 3,000.00 |
| 12/12/2019 | EFT | -$ 126.00 |
| 12/12/2019 | LOPARO PUBLIC RELATIONS | -$ 10,000.00 |
| 12/16/2019 | MIGHTY GROUP, LLC | -$ 1,950.00 |
| 12/23/2019 | ISAAC WILES | -$ 21,623.56 |
| 1/13/2020 | SERVICE CHARGE | -$ 75.00 |
| 1/16/2020 | ISAAC WILES | -$ 825.00 |
| 2/4/2020 | DEBIT MEMO | -$ 7,500.00 |
| 2/4/2020 | MCTIGUE & COLOMBO LLC | -$ 52,495.35 |
| 2/12/2020 | SERVICE CHARGE | -$ 30.00 |
| 3/11/2020 | MCTIGUE AND MCGINN | -$ 455.81 |
| 3/11/2020 | SERVICE CHARGE | -$ 101.25 |
| 3/27/2020 | INTUIT | -$ 231.13 |
| 4/10/2020 | SERVICE CHARGE | -$ 65.00 |
| 5/12/2020 | SERVICE CHARGE | -$ 65.00 |
| 6/10/2020 | SERVICE CHARGE | -$ 65.00 |
| **TOTAL OUTFLOWS** | | **-$ 23,425,470.85** |

# Ohioans for Energy Security
## Fifth-Third Bank Account Number x8255

| PAYEE | % OF OUTFLOWS | $ OUTFLOW |
|---|---|---|
| VOTER TO VOTER, LLC. | *47.0%* | -$ 10,999,635.51 |
| STRATEGIC MEDIA PLACEMENT INC | *29.9%* | -$ 6,992,780.00 |
| CONSTANT CONTENT CO. | *18.8%* | -$ 4,400,000.00 |
| LINCOLN STRATEGY GROUP, LLC. | *2.9%* | -$ 688,075.00 |
| OHIO OUTDOOR ADVERTISING, LLC. | *0.6%* | -$ 150,000.00 |
| OTHER | *0.8%* | -$ 194,980.34 |
| **TOTAL** | **100.0%** | **-$ 23,425,470.85** |



# EXHIBIT 13

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                              -   -   -
 3
      UNITED STATES OF AMERICA,        : CASE NO. 1:20-CR-0077
 4                                     :
                      Plaintiff,       : JURY TRIAL, DAY 11
 5            vs.                      :
                                       :13th day of February, 2023
 6    LARRY HOUSEHOLDER, et al.        :
                                       :11:43 a.m.
 7                    Defendant.       :

 8                            -   -   -
                      TRANSCRIPT OF PROCEEDINGS
 9         BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
                              -   -   -
10
      APPEARANCES:
11
      For the Plaintiff:
12                         Emily N. Glatfelter, Esq.
                           Matthew Charles Singer, Esq.
13                         Megan Gaffney Painter, Esq.
                           Timothy S. Mangan, Esq.
14                         Assistant United States Attorneys
                           221 East Fourth Street, Suite 400
15                         Cincinnati, Ohio 45202

16    For the Defendant, Larry Householder:

17                         Nicholas R. Oleski, Esq.
                           Robert T. Glickman, Esq.
18                         McCarthy, Lebit, Crystal & Liffman Co.
                           1111 Superior Avenue East, Suite 2700
19                         Cleveland, Ohio 44114
                                       and
20                         Mark B. Marein, Esq.
                           Steven L. Bradley, Esq.
21                         Marien and Bradley
                           526 Superior Avenue, Suite 222
22                         Cleveland, Ohio 44114

23

24

25
```

1    and got him an Uber to the airport.

2        And he didn't -- he said, do you have a plane ticket

3    for me and I said, no, that's not my problem.  That's not my

4    job.  So I sent him to the airport and told the woman from

5    Lincoln Strategies, I just put a guy in a cab to the

6    airport, you have to deal with him.  And that was the extent

7    of my interaction with any of the petition people.

8    **Q.**   Did he give you anything while he was at the office?

9    **A.**   He did.  He gave me papers like I said.  He wanted to

10   give us whatever papers he had.  He gave me papers but they

11   were so disheveled and smelled so bad that we immediately

12   threw them away and didn't go through them and so actually

13   don't even know what the papers were.  I think they honestly

14   were just notes that he took in like, you know, these

15   meetings where they all decide they were going to go out and

16   gather signatures but they were so gross that they were

17   immediately just thrown away.

18   **Q.**   Did you ever receive a directive about how to treat the

19   files that you had on the ballot initiative?

20   **A.**   After the ballot initiative, after the referendum issue

21   was kind of quashed, I was directed to go ahead and delete

22   the files on my computer related to the effort.

23   **Q.**   Who directed you to do that?

24   **A.**   Mr. Clark and Mr. Longstreth.

25   **Q.**   Did they tell you why?

**ANNA LIPPINCOTT - DIRECT EXAM**                    1799

1   **A.**   They did.   They said the project's over.   Go ahead and

2   just delete everything.   And then they told me kind of more

3   privately after the fact that they were afraid maybe at some

4   point the anti House Bill 6 people would sue us.   So just go

5   ahead and remove everything.

6           MS. GAFFNEY-PAINTER:   Your Honor, may I have a

7   moment to confer?

8           THE COURT:   Yes.

9           MS. GAFFNEY-PAINTER:   Thank you.   No further

10  questions.

11          THE COURT:   Very well.   The attorneys for

12  Mr. Householder and Mr. Borges have an opportunity to ask

13  questions.

14      On behalf of Mr. Householder.

15          MR. OLESKI:   May I proceed, Judge?

16          THE COURT:   Yes.

17          MR. OLESKI:   Thank you.

18                       <u>**CROSS-EXAMINATION**</u>

19  BY MR. OLESKI:

20  **Q.**   Good morning, Ms. Lippincott.

21  **A.**   Good morning.

22  **Q.**   My name is Nick Oleski.   I'm one of Mr. Householder's

23  attorneys.

24      So, I want to start by, you know, walking through a

25  little bit of your background.   So you indicated that you

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

# EXHIBIT 14

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION
                            -  -  -
3
     UNITED STATES OF AMERICA,      : CASE NO. 1:20-CR-0077
4                                   :
                     Plaintiff,     : JURY TRIAL, DAY 16
5            vs.                     :
                                    : 22nd of February, 2023
6    LARRY HOUSEHOLDER, et al.       :
                                    :
7                    Defendant.     :

8                            -  -  -
                     TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
                            -  -  -
10
     APPEARANCES:
11
     For the Plaintiff:
12                        Emily N. Glatfelter, Esq.
                          Matthew Charles Singer, Esq.
13                        Megan Gaffney Painter, Esq.
                          Assistant United States Attorneys
14                        221 East Fourth Street, Suite 400
                          Cincinnati, Ohio 45202
15
     For the Defendant, Larry Householder:
16
                          Nicholas R. Oleski, Esq.
17                        Robert T. Glickman, Esq.
                          McCarthy, Lebit, Crystal & Liffman Co.
18                        1111 Superior Avenue East, Suite 2700
                          Cleveland, Ohio 44114
19                                  and
                          Mark B. Marein, Esq.
20                        Steven L. Bradley, Esq.
                          Marein and Bradley
21                        526 Superior Avenue, Suite 222
                          Cleveland, Ohio 44114
22

23

24

25
```

1    **Q**    Who was the Speaker at the time that you were hired

2    with the House of Representatives?

3    **A**    Larry Householder.

4    **Q**    What was your working relationship like with

5    Mr. Householder?

6    **A**    When I started or throughout?

7    **Q**    When you started, yeah.

8    **A**    I met him maybe crossed paths with him the first day,

9    but I don't think I had my first meeting with him until a

10   week or two after I started, but then after that, the

11   meetings became more frequent.

12   **Q**    Are you familiar with a piece of legislation called

13   "House Bill 6" from the 133rd General Assembly?

14   **A**    Yes.

15   **Q**    When was House Bill 6 introduced?

16   **A**    I don't know the exact date, but April 2019.

17   **Q**    Can you describe what your role was with regard to

18   House Bill 6?

19   **A**    Yeah.  Since that bill would fall under one of my

20   representative committees, I was charged with helping draft,

21   manage, oversee, provide recommendations, research, talk to

22   the sponsors, the chair, the Speaker, pretty much those

23   dealing with House Bill 6.

24   **Q**    Can you explain generally what House Bill 6 did?

25   **A**    Yeah.  It provided -- it created the Ohio Clean Air

1    legislation stating that House Bill 6 was in fact a tax?

2    **A**    Yes.

3    **Q**    And can you describe that legislation -- or that

4    amended legislation?

5    **A**    Yeah.  There was bill pending in one of my committees,

6    House Public Utilities, dealing -- it was Senate Bill 33 --

7    dealing with critical infrastructure.  Mr. Householder asked

8    me to draft an amendment basically to say that House Bill 6

9    was a tax.

10   **Q**    Can you explain why it mattered whether House Bill 6

11   was determined to be a tax?

12   **A**    My understanding is that if that is considered a tax,

13   it would not be subject to referendum.

14   **Q**    And do you recall whether you, in fact, drafted this

15   type of legislation?

16   **A**    Amendment, yes.

17   **Q**    Yeah, amended legislation.  Thank you.

18           MR. SINGER:  May we please show the witness for

19   identification what's been marked as Government's

20   Exhibit 635 A?

21           THE COURT:  Yes, show it to the witness and the

22   lawyers.  Up on the screen momentarily.

23           MR. SINGER:  And would you mind paging through this

24   document, please?

25   **Q**    And do you recognize this?

1    **A**    Yes.

2    **Q**    Okay.  Can you describe to the jury what you're

3    referring to?

4    **A**    So on the dinner reservation at Charlie Palmer

5    steakhouse on the 18th, it was a huge table.  It was

6    probably a room for, I'm going to guess, at least 20 people

7    at the table, and kind of right in the middle of the

8    restaurant, so there were a lot of people.  The restaurant

9    was packed and there were a lot of Ohio people there.  So at

10   any given time, there would be, you know, people popping in

11   to say hello or sitting down for a few minutes just kind of

12   back-and-forth that way most of the evening.  I was on one

13   end of the table, so it was me and Mike Dowling to my right.

14   Mr. Householder was at the other end of the table beside

15   Mr. Jones.

16   **Q**    All right.  Now, during the dinner conversation, you

17   said it was -- I'm sorry, the dinner or reception, it was a

18   large table?

19   **A**    Yes.

20   **Q**    All right.  And could you hear what was going on at

21   the other end of the table?

22   **A**    I could not.

23   **Q**    Okay.  And who was seated next to you?

24   **A**    Mr. Dowling.

25   **Q**    What do you recall about any conversations you had

1    with Mr. Dowling?

2    **A**    He said that they were going to be very supportive, we

3    need to get this moving, you need to get your (c)(4) set

4    up -- or you need to get your organization set up, and it

5    needed to be undisclosed and unlimited contributions.

6    **Q**    Okay.  So let's unpack that a little bit.  You said

7    that he mentioned FirstEnergy was going to be supportive?

8    **A**    Yes.

9    **Q**    All right.  What did you understand "supportive" to

10   mean?

11   **A**    I understood that to mean that they were going to be

12   supportive financially for Mr. Householder to become

13   Speaker.

14   **Q**    Is that sort of common in your line of work, where

15   people talk about being supportive, they're talking about

16   money?

17   **A**    That's correct.

18   **Q**    And so when you were talking about an organization,

19   you need to set up your organization, what did you

20   understand him to mean?

21   **A**    I took that to mean what became Generation Now, a

22   political organization, and whether it was a 501(c)(4) or an

23   LLC, didn't really matter, but one that didn't have to

24   report who gave to it and how much it gave, and also one

25   that didn't have campaign finance limits on how much they

1    could give.

2    Q    Now, during the weekend -- I'm sorry, not the weekend,

3    but during the time that you were in Washington, DC, did you

4    have any further interactions with FirstEnergy during that

5    trip?

6    A    I did.  The next night, a group of us, smaller group,

7    had dinner at -- and I can't read the screen, but it was on

8    there, at the Palm, I believe.

9    Q    That's okay.  Just tell us what you recall.

10   A    Yeah.  We had dinner the next night, and it was

11   Mr. Householder, myself, Mr. Jones, Mr. Dowling, and I

12   believe there were maybe one other, one other person I

13   think.  I think Mr. George was there.

14   Q    When you say "Mr. George" --

15   A    Tony George.

16   Q    I'm sorry?

17   A    I think Tony George might have been there.

18   Q    And who's Tony George?

19   A    He is a friend of Mr. Householder and a -- I don't

20   know if he had an official title within FirstEnergy, but he

21   was very, very good friends with Chuck Jones.

22   Q    Okay.  Now, when you are talking about the two

23   dinners, which one was -- which one was more intimate,

24   meaning like a smaller group of people?

25   A    The second one.

1  **Q**    Okay.  Was there any discussion about the Speaker's

2  race during this other dinner?

3  **A**    Yes.

4  **Q**    Okay.  Can you tell us about that, please?

5  **A**    Yes.  So the -- I can't remember if it was at the

6  beginning or very end of the dinner, but Mr. Householder

7  laid out the entire plan of how he was going to get elected

8  Speaker for Mr. Jones.

9  **Q**    And the gist of that plan was what?

10  **A**    Recruit candidates, raise money, get him elected, and

11  then have them vote for him for Speaker.

12  **Q**    Okay.  During this same conversation, was there a

13  discussion of what FirstEnergy needed?

14  **A**    Yes.

15  **Q**    What did -- what did the executives say?

16  **A**    At that time, they were looking primarily at a federal

17  solution.  They thought that they could -- they were

18  hoping -- well, they laid out the problem of the plants, you

19  know, they weren't profitable.  And then went into, we think

20  we have a solution potentially at the federal level, but if

21  not, we're going to need to do something at the state level,

22  and they laid out the whole -- they laid out in much better

23  detail than I remember about what the problems were with the

24  plants.

25  **Q**    Okay.  And a state-level solution would mean what?

1    **Q**    Now, after the signature collection effort ended

2    towards the end of October, did you have any conversations

3    with people about whether to delete information about House

4    Bill 6 and referendum?

5    **A**    Yes.

6    **Q**    Who were those conversations with?

7    **A**    So Ms. Lippincott, Ms. Fitzmartin and I were in my

8    office and got a call that I put on speaker from Mr. Clark,

9    and he said that there's a chance that we may get sued

10    because of the referendum process and that they can't

11    discover any documents that don't exist, so delete all of

12    your e-mails and any information about House Bill 6.

13    **Q**    Okay.  And after that call with Mr. Clark, what did

14    you do?

15    **A**    We did exactly that, deleted everything in regard to

16    the referendum.

17    **Q**    On the computer?

18    **A**    Yes.

19    **Q**    Now, after the referendum, are you familiar with an

20    initiative about term limits?

21    **A**    Yes.

22    **Q**    Okay.  And was there any polling with respect to the

23    term limit -- term limit initiative?

24    **A**    Yes.

25    **Q**    Okay.  Can you tell us about that?

# EXHIBIT 15

| | |
|---|---|
| **From:** | Thompson, Tasha N. |
| **To:** | Rachel Cocalis; Weldon, Christopher M. |
| **Cc:** | Williams, Hilary M.; Loh, Esther L.; Christina Kopko; Tor Gronborg; Ashley Kelly; Rein, David M.J. |
| **Subject:** | RE: FirstEnergy Securities Litigation - Status Report |
| **Date:** | Monday, September 18, 2023 12:48:58 PM |

EXTERNAL SENDER

Rachel,

There are no "unresolved issues" to raise in the status report today because the parties are still in the meet and confer process for Plaintiffs' latest requests, which are set forth in their August 25 and September 5 letters. There is no outstanding "months long delay" for these requests, and we continue to believe it is premature for Plaintiffs to raise these requests to the Court before FirstEnergy has provided Plaintiffs with its response to these letters. As I stated, we are working diligently to address Plaintiffs' requests and expect to be able to send you our response this week.

Thanks,
Tasha

**Tasha N. Thompson**
+1 212 558 3900 (T)

---

**From:** Rachel Cocalis <RCocalis@rgrdlaw.com>
**Sent:** Monday, September 18, 2023 2:31 PM
**To:** Thompson, Tasha N. <thompsontas@sullcrom.com>; Weldon, Christopher M. <weldonc@sullcrom.com>
**Cc:** Williams, Hilary M. <williamsh@sullcrom.com>; Loh, Esther L. <lohe@sullcrom.com>; Christina Kopko <CKopko@rgrdlaw.com>; Tor Gronborg <TorG@rgrdlaw.com>; Ashley Kelly <AshleyK@rgrdlaw.com>; Rein, David M.J. <reind@sullcrom.com>
**Subject:** [EXTERNAL] RE: FirstEnergy Securities Litigation - Status Report

Tasha,

As Plaintiffs advised FirstEnergy on September 8, 2023 after raising these issues in multiple meet-and-confers and correspondences, "FirstEnergy's continued months long delays in resolving discovery issues are unwarranted and compromising Plaintiffs' depositions of witnesses. **We will raise any unresolved issues in the next status report**." Cocalis 9/8/23 email. Nevertheless, FirstEnergy has not yet responded to Plaintiffs' September 5 letter concerning the following long outstanding issues: (1) Plaintiffs' May 10 and June 2 request that FirstEnergy identify the number of documents that hit on the term "Randazzo" and re-review all those documents that were withheld on the basis of being non-responsive; (2) FirstEnergy's improper withholding of documents identified in my August 25, 2023 letter; (3) Plaintiffs' modified proposed search terms; and (4) FirstEnergy's confirmation on whether it continues to object to the inclusion of certain proposed custodians based on its prior representations.

Thanks,

Rachel

---

**From:** Thompson, Tasha N. <thompsontas@sullcrom.com>
**Sent:** Monday, September 18, 2023 10:04 AM
**To:** Rachel Cocalis <RCocalis@rgrdlaw.com>; Weldon, Christopher M. <weldonc@sullcrom.com>
**Cc:** Williams, Hilary M. <williamsh@sullcrom.com>; Loh, Esther L. <lohe@sullcrom.com>; Christina Kopko <CKopko@rgrdlaw.com>; Tor Gronborg <TorG@rgrdlaw.com>; Ashley Kelly <AshleyK@rgrdlaw.com>; Rein, David M.J. <reind@sullcrom.com>
**Subject:** RE: FirstEnergy Securities Litigation - Status Report

EXTERNAL SENDER
Rachel,

We do not understand what Plaintiffs propose to raise in the status report due today.  The parties have not reached impasse on the requests raised in your recent letters, and we are actively working on a response that we anticipate providing to you this week.  Please clarify the issues on which Plaintiffs believe the parties have reached impasse.

Thanks,
Tasha

**Tasha N. Thompson**
+1 212 558 3900 (T)

---

**From:** Rachel Cocalis <RCocalis@rgrdlaw.com>
**Sent:** Monday, September 18, 2023 11:43 AM
**To:** Weldon, Christopher M. <weldonc@sullcrom.com>
**Cc:** Williams, Hilary M. <williamsh@sullcrom.com>; Thompson, Tasha N. <thompsontas@sullcrom.com>; Loh, Esther L. <lohe@sullcrom.com>; Christina Kopko <CKopko@rgrdlaw.com>; Tor Gronborg <TorG@rgrdlaw.com>; Ashley Kelly <AshleyK@rgrdlaw.com>
**Subject:** [EXTERNAL] RE: FirstEnergy Securities Litigation - Status Report

Chris,

Please send us FirstEnergy's insert regarding the outstanding discovery disputes outlined in Plaintiffs' 9/5/23 letter by 6:30 pm ET so Plaintiffs can circulate the draft joint status report at 7:00 ET.  Thank you.

Best,
Rachel

---

**From:** Weldon, Christopher M. <weldonc@sullcrom.com>
**Sent:** Monday, August 28, 2023 8:55 AM
**To:** Rachel Cocalis <RCocalis@rgrdlaw.com>

**Cc:** Williams, Hilary M. <williamsh@sullcrom.com>; Thompson, Tasha N.
<thompsontas@sullcrom.com>; Loh, Esther L. <lohe@sullcrom.com>
**Subject:** FirstEnergy Securities Litigation - Status Report

EXTERNAL SENDER
Rachel,

So that we can circulate the draft joint status report at 5:30pm Eastern, please send us your insert
regarding FirstEnergy's August 15 clawback by 5:15pm Eastern.

Thank you,
Chris

**Christopher Weldon**
**SULLIVAN & CROMWELL LLP**
125 Broad Street | New York, NY  10004-2498
+1 212 558 3938 (T)
WeldonC@Sullcrom.com | http://www.sullcrom.com [sullcrom.c]

---

This e-mail is sent by a law firm and contains information that may be privileged and
confidential. If you are not the intended recipient, please delete the e-mail and notify us
immediately.

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

---

**\*\*This is an external message from:** rcocalis@rgrdlaw.com **\*\***

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**