Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3                  - - - - -
4  IN RE: FIRSTENERGY CORP     ) CIVIL ACTION NO.
       SECURITIES LITIGATION) 2:20-cv-3785
5                              )
                               )
6  THIS DOCUMENT RELATES TO:   )
   ALL ACTIONS                 )
7
8

                   Conference held before
9                 Special Master Shawn Judge
10
11                Thursday, October 19th, 2023
                      11:07 a.m. EDT
12
13

                  Location:  Remote via Zoom
14
15
16
17                Victoria S. Fricano, RPR
18
19
20
21
22
23
24
25  Job No. MW 6161935

```
                                              Page 2
 1    APPEARANCES: (ALL VIA ZOOM)
 2
         On behalf of Class Plaintiffs:
 3            RACHEL COCALIS, ESQ.
            JASON A. FORGE, ESQ.
 4            KEVIN S. SCIARANI, ESQ.
            Robbins Geller Rudman & Dowd LLP
 5            655 West Broadway
            Suite 1900
 6            San Diego, California 92101
            619.231.1058
 7            rcocalis@rgrdlaw.com
            jforge@rgrdlaw.com
 8            ksciarani@rgrdlaw.com
 9
10       On behalf of Direct Action Plaintiffs:
            JOHN T. NICOLAOU, ESQ.
11            Lieff Cabraser Heimann & Bernstein, LLP
            250 Hudson Street
12            8th Floor
            New York, New York 10013
13            212.355.9500
            jnicolaou@lchb.com
14
15       On behalf of Defendant FirstEnergy Corp:
            BETH D. NEWTON, ESQ.
16          Sullivan & Cromwell LLP
            125 Broad Street
17            New York, New York 10004
            212.558.4000
18            newtonb@sullcrom.com
19
         On behalf of Defendant Donald R. Schneider:
20            BRIAN P. O'CONNOR, ESQ.
            Santen & Hughes
21            600 Vine Street
            Suite 700
22            Cincinnati, Ohio 45202
            513.721.4450
23            bpo@santenhughes.com
24
25
```

```
 1    APPEARANCES:  (Continued)
 2       On behalf of Defendant Charles E. Jones:
                RACHAEL L. ISRAEL, ESQ.
 3              DOUGLAS L. SHIVELY, ESQ.
                Baker & Hostetler LLP
 4              127 Public Square
                Suite 2000
 5              Cleveland, Ohio 44114
                216.621.0200
 6              risrael@bakerlaw.com
                dshively@bakerlaw.com
 7
 8       On behalf of Defendant James E. Pearson:
                TIMOTHY D. KATSIFF, ESQ.
 9              BRITTANY M. WILSON, ESQ.
                Ballard Spahr LLP
10               1735 Market Street
                 51st Floor
11               Philadelphia, Pennsylvania 19103
                 215.665.8500
12               katsifft@ballardspahr.com
                wilsonbm@ballardspahr.com
13
14       On behalf of Defendant John Judge:
                 EMILY J. TAFT, ESQ.
15              Vorys, Sater, Seymour and Pease LLP
                52 East Gay Street
16              Columbus, Ohio 43215
                614.464.6400
17              ejtaft@vorys.com
                     and
18              VICTOR A. WALTON, JR., ESQ.
                 Vorys, Sater, Seymour and Pease LLP
19               301 East Fourth Street
                 Suite 3500
20               Cincinnati, Ohio 45202
                 513.723.4027
21               vawalton@vorys.com
22
23
24
25
```

```
                                                    Page 4

 1   APPEARANCES: (Continued)
 2      On behalf of Defendants Jason J. Lisowski,
        George M. Smart, Paul T. Addison, Michael J.
 3      Anderson, Steven J. Demetriou, Julia L.
        Johnson, Donald T. Misheff, Thomas N.
 4      Mitchell, James F. O'Neil III, Christopher D.
        Pappas, Sandra Pianalto, Luis A. Reyes, Jerry
 5      Sue Thornton, Leslie M. Turner, Steven E.
        Strah, and K. John Taylor:
 6          JORDAN M. BAUMANN, ESQ.
            MARJORIE P. DUFFY, ESQ.
 7          Jones Day
            325 John H. McConnell Boulevard
 8          Suite 600
            Columbus, Ohio 43215
 9          614.281.3655
             jbaumann@jonesday.com
10          mpduffy@jonesday.com
11
        On behalf of Defendant Leila L. Vespoli:
12          AARON F. MINER, ESQ.
             Arnold & Porter
13           250 West 55th Street
             New York, New York 10019
14           212.836.7123
             aaron.miner@arnoldporter.com
15
16      On behalf of Underwriter Defendants:
            DAVID S. BLOOMFIELD, ESQ.
17          ROBERT W. TRAFFORD, ESQ.
            Porter, Wright, Morris & Arthur, LLP
18          41 South High Street
            Suite 2900
19          Columbus, Ohio 43215
            614.227.2000
20          dbloomfield@porterwright.com
            rtrafford@porterwright.com
21              and
            JOSHUA N. SHINBROT, ESQ.
22          Davis Polk & Wardwell LLP
             450 Lexington Avenue
23           11th Floor
             New York, New York 10017
24           212.450.3976
             joshua.shinbrot@davispolk.com
25
```

```
                                              Page 5
 1   APPEARANCES:  (Continued)
 2      On behalf of Defendant Michael Dowling:
               JOHN A. FAVRET, III, ESQ.
 3             Tucker Ellis LLP
               950 Main Avenue
 4             Suite 1100
               Cleveland, Ohio 44113
 5             216.696.2678
               john.favret@tuckerellis.com
 6
 7      On behalf of Energy Harbor:
               JONATHAN R. STREETER, ESQ.
 8             Dechert LLP
               1095 Sixth Avenue
 9             New York, New York, 10036
               212.698.3826
10             jonathan.streeter@dechert.com
11
        On behalf of Sam Randazzo and SFAO:
12             JEFFREY R. CORCORAN, ESQ.
               Allen Stovall Neuman & Ashton LLP
13             10 West Broad Street
               Suite 2400
14             Columbus, Ohio 43215
               614.221.8500
15             corcoran@asnalaw.com
                     and
16             ROGER P. SUGARMAN, ESQ.
               Kegler Brown Hill & Ritter
17             65 East State Street
               Suite 1800
18             Columbus, Ohio 43215
               614.462.5400
19             rsugarman@keglerbrown.com
20
21
22
23
24
25
```

1              P R O C E E D I N G S

2         MR. JUDGE:  It is October 19th, 2023.

3    It's 11:07.  We're on the record in the matter of

4    In Re: FirstEnergy Corp Securities Litigation,

5    Case Number 2:20-cv-3785.

6         We are here for purposes of oral

7    argument on two groupings of motion, the ECF

8    Number 491 involving nonparty Energy Harbor and

9    ECF Number 496 related to briefings regarding

10   nonparty Sam Randazzo.

11        We'll start with Number 491.

12        Counsel, if you would introduce

13   yourself, state your name and who you represent

14   for the client.

15        And after both sides have done that,

16   Movant, if you would proceed with argument.

17        MR. SCIARANI:  Good morning, Mr. Judge.

18   My name is Kevin Sciarani.  I'm counsel for

19   Class Plaintiffs, and I'll be handling the

20   plaintiffs' motion to compel Energy Harbor.

21        MR. STREETER:  Good morning.  My name is

22   Jonathan Streeter, and I'll be representing

23   Energy Harbor today in the argument.

24        MR. JUDGE:  Thank you.

25        Counsel, whenever you're ready.

Page 7

1          MR. SCIARANI:  Special Master Judge, I

2    will try to keep my comments brief, but feel free

3    to ask for any clarification if anything needs to

4    be addressed in a little bit more detail.

5          The first request in Plaintiffs' motion

6    to compel is that Energy Harbor should produce

7    documents dated between July 21st, 2020, which is

8    the date Larry Householder was arrested for his

9    involvement in the HB6 fraud, through

10   December 31st, 2020, which is a day which the

11   parties have agreed with FirstEnergy should

12   encompass the vast majority of their discovery

13   obligations.

14         And so it's important to realize that

15   Energy Harbor was formerly known as FirstEnergy

16   Solutions.  And during most of the class period,

17   it was a wholly-owned subsidiary of FirstEnergy

18   Corporation.  And FES, or FirstEnergy Solutions,

19   was a direct participant in the HB6 fraud.

20         As a result, Energy Harbor is not a

21   run-of-the-mill third party in this case.  And

22   you can see that in the deferred prosecution

23   agreement which was entered into by FirstEnergy

24   Corp with the DOJ.

25         In the DPA, which is short for the

Page 8

1    deferred prosecution agreement, FirstEnergy

2    admitted that it conspired to commit honest

3    service fraud.  And in part of that DPA included

4    working directly with FirstEnergy Solutions to

5    support Larry Householder through payments to

6    Generation Now.  Generation Now was

7    Mr. Householder's 501(c)(4) which he used for his

8    benefit and his piggy bank to perpetrate the

9    fraud on the people of Ohio.

10          In exchange for this, FirstEnergy

11   expected that Larry Householder would take

12   specific action, including passing HB6 and

13   defending it from a repeal referendum.

14          FirstEnergy Solutions' name appears more

15   than 50 time in the DPA, and FirstEnergy

16   Solutions contributed over $43 million of the

17   approximately $60 million which is attributed to

18   FirstEnergy in the DPA.

19          FES's own lobbyist, Juan Cespedes, pled

20   guilty for his involvement in assisting

21   Mr. Householder and FirstEnergy Solutions with

22   the HB6 scandal.  He testified at Larry

23   Householder's trial to his personal involvement,

24   orchestrating payments on behalf of FirstEnergy

25   Solutions for Larry Householder's benefit in

Page 9

1  exchange for official action.  And he

2  participated in managing FirstEnergy Solutions'

3  coordination with FirstEnergy and Larry

4  Householder's team during the time of the fraud.

5          FirstEnergy used FirstEnergy Solutions

6  as a bank to contribute approximately $43 million

7  to Generation Now.

8          For example, on October 2018,

9  Mr. Cespedes, along with FirstEnergy Solutions'

10  chief of external affairs, Dave Griffing, and

11  others had a face-to-face meeting with Larry

12  Householder where they handed him a $400,000

13  check made out to Generation Now.  At the

14  meeting, Householder was supportive of FES's need

15  for a nuclear bailout, which would be found in

16  HB6.

17          In 2019, FES made over $40 million in

18  payments to Generation Now to support the passage

19  of HB6 and defend it against a repeal referendum.

20          When FirstEnergy Solutions was not able

21  to pay any more money due to its bankruptcy

22  advisors cutting it off, it turned to FirstEnergy

23  Corporation to make 13-more-million dollars in

24  payments.

25          Dowling and Jones worked on the

Page 10

1  sidelines along with FirstEnergy agents and

2  employees to help commit this fraud.

3          Those employees and agents include

4  Defendant John Judge, in this case, who was the

5  CEO or is the CEO of Energy Harbor and was the

6  CEO of FES at the time; Juan Cespedes, its

7  lobbyist; and Energy Harbor's current executive

8  chairman, John Kiani.  They all authorized the

9  payments and held meetings with Larry Householder

10 or his team.

11         FirstEnergy Solutions was a key

12 beneficiary of the HB6 fraud, as the fraud was

13 intended to help resolve FES's nuclear problem.

14         FES owned two financially distressed

15 nuclear power plants, and the potential

16 decommissioning of those power plants could

17 subject FirstEnergy Corp, its parent company, to

18 contribute to the decommissioning costs.

19         FES's coordination with FirstEnergy Corp

20 was by design.  Even though FES was purportedly

21 independent after it filed for bankruptcy in

22 2018, it was, as the bankruptcy court found,

23 utterly incapable of operating independently.

24 FirstEnergy provides services to FES through a

25 shared services agreement, including IT, external

Page 11

1   affairs, certain legal services and things like

2   sending checks and sending wires.

3          In the bankruptcy settlement, which was

4   reached with FES's creditors, FirstEnergy agreed

5   to act as an agent of FES and cooperate in

6   lobbying matters.

7          So here we have FES and FirstEnergy

8   working together as part of this conspiracy to

9   bribe Mr. Householder in exchange for passing

10  HB6; however, although FirstEnergy has produced

11  about 21,000 documents dated on July 21st, 2020,

12  through December 31st, Energy Harbor's position

13  is that it should not have to produce any

14  documents.  This is inconsistent with the

15  discovery in this matter, and that's inconsistent

16  with FirstEnergy Solutions' deep involvement in

17  the HB6 fraud.

18         It's clear that FirstEnergy Solutions or

19  Energy Harbor, as it is today, possesses relevant

20  documents.  And by withholding documents on the

21  last day of the class period and the days

22  thereafter, we learned nothing of how Energy

23  Harbor reacted to the disclosure of Larry

24  Householder's arrest, any attempts it made at

25  creating public relations defensive maneuvers.

1   And, importantly, we don't see what happened to

2   Defendant John Judge in that time period.

3          Defendant Judge is a defendant in this

4   case, an individual defendant in this case, and

5   there's no basis for any differential treatment.

6          Furthermore, Energy Harbor engaged in a

7   parallel internal investigation into the matters

8   set forth relating to HB6 and Larry Householder.

9          The case law is consistent here.  In

10  complex class actions and securities class

11  actions, courts consistently understand the

12  discovery falling into the class period is

13  appropriate to provide context to the facts that

14  happened within the class period.

15         And, indeed, in certain cases like the

16  BFI holdings case, courts have held that --

17  extended the discovery period to account for

18  internal investigations is appropriate.

19         And if -- there is no legal basis

20  identified by Energy Harbor, other than a

21  criminal matter which did not concern civil

22  discovery, as to why it should be relieved of its

23  duty to produce documents after the class period.

24         And, finally, Energy Harbor's position

25  is inconsistent with Judge Jolson's views

Page 13

1    regarding Partners for Progress that are set

2    forth in her November 28th, 2022, and March 24th,

3    2023 orders.

4         So Partners for Progress was another

5    entity used by FirstEnergy to funnel money to

6    Larry Householder in support of his scheme.  And

7    Judge Jolson rejected Partners for Progress's

8    burden arguments based on its involvement and

9    contribution with Generation Now.

10        Energy Harbor is no different.  Its

11   contributions were greater than Partners for

12   Progress's to Generation Now.  And Judge Jolson

13   did not relieve it from being forced to search

14   its outside counsel for relevant materials even

15   though there may be privileged documents within

16   that collection.  Judge Jolson also denied

17   Partners for Progress's request for

18   cost-shifting.  And those reasons apply equally

19   to Energy Harbor here.

20        In her March 24th, 2023 order, she cites

21   American Muni Power and Modern Plastics for the

22   factors to consider when thinking about ordering

23   cost-shifting.

24        Energy Harbor has claimed it has no

25   interest in this case.  Plaintiffs find that hard

 1    to believe.  Although we understand that they are

 2    not being sued for damages here, its defendant --

 3    excuse me -- its current CEO is a defendant in

 4    this case; and, obviously, his reputation turns

 5    on whether or not he is found liable for

 6    securities fraud.

 7            Similarly, the company itself has been

 8    implicated in this matter.  And like I said

 9    earlier, its name appears repeatedly throughout

10    the DPA.

11            In the case even cited by Energy Harbor,

12    Cornell v. Columbus, it notes that Rule 45 is not

13    intended as a mechanism for entities to evade

14    discovery and the costs that are associated

15    arising from their involvement in the underlying

16    acts.  And that's true here.

17            The other factors considered by

18    Judge Jolson are the public interest, which this

19    case is of one of the utmost public interest

20    because it involved one of the greatest frauds

21    perpetrated on the people of Ohio.  It was

22    described as the biggest public corruption

23    scandal in Ohio history.  And FirstEnergy

24    identifies FES repeatedly in the DPA.

25            There is public interest in figuring out

1 who is responsible for enabling Larry

2 Householder, and that also turns on FirstEnergy

3 Solutions' involvement in this case.

4          And Energy Harbor can bear these costs

5 today.  It's in the process of being acquired.

6 It's an ongoing concern.  And it's important to

7 think about Rule 45's concern for significant

8 expense.

9          Here -- it's a relative term.  And,

10 here, Energy Harbor found it was able to donate

11 $43 million in exchange for a corporate bailout

12 while it was in bankruptcy.  That bailout was in

13 the range of over a billion dollars, and

14 investors have lost billions of dollars in this

15 case.

16          And so in comparison to those factors,

17 any costs that Energy Harbor has, which are

18 generally unsupported at this time, do not render

19 those expenses significant.

20          So, in conclusion, there is no question

21 that FirstEnergy Solutions was intimately

22 involved in the HB6 fraud; and its documents

23 dated after July 21st, 2020, are clearly

24 relevant.

25          Given it's close relationship to

1   FirstEnergy Corporation, it should be ordered to

2   produce those documents using the search terms

3   which it has already used to produce other

4   documents in this case.

5          Mr. Judge, before I move on to the next

6   request in Plaintiffs' motion, do you have any

7   questions for me?

8          MR. JUDGE:  I do not.  Yes, if you would

9   address privilege, please.

10          MR. SCIARANI:  Okay.  So the second

11  request in Plaintiffs' motion is that Energy

12  Harbor should produce attorney-client

13  communications or documents that have been

14  withheld for attorney-client privilege regarding

15  501(c)(4) donations and drafts to the draft

16  language -- excuse me -- and edits to the draft

17  language of HB6.

18          Energy Harbor sought its attorney's

19  advice regarding 501(c)(4) to conceal its key

20  involvement in the HB6 scandal and also used its

21  lures to help it draft the language of HB6 so

22  that it could reap the rewards of its fraudulent

23  conduct; therefore, under the crime-fraud

24  exception to the privilege, those documents are

25  not privileged and should be produced.

1          The policy of the crime-fraud exception

2     is that people cannot use their lawyers in

3     furtherance of a crime of fraud.  And there are

4     two prongs that need to be shown in order to

5     establish the crime-fraud privilege, and the

6     first is a prima facie showing of a sufficiently

7     serious crime of fraud.

8          In the Sixth Circuit, all a proponent

9     needs to show is that there's a reasonable basis

10    to suspect that a crime of fraud occurred, and

11    that's the standard set forth in the antitrust

12    grand jury case.

13         Just as kind of a contrast, allegations

14    that are completely unsupported by evidence are

15    not enough; however, the proponent does not need

16    to show enough evidence that would effect an

17    arrest or secure an indictment.

18         Here, that standard has been easily met.

19    As we discussed earlier, FirstEnergy, in its DPA,

20    admits that FES directly participated with

21    FirstEnergy Corporation in the fraud through

22    legal contributions, and FES also provided

23    on-the-ground support of the HB6 scheme.  Some of

24    those documents have been attached to the motion,

25    and some of those documents were also used at

Page 18

1    Mr. Householder's trial where he was convicted by

2    a jury for honest service fraud on the same

3    background of facts.

4              In addition, FirstEnergy Solutions' own

5    lobbyist, Juan Cespedes, pled guilty.  In his

6    guilty plea, he admitted that he orchestrated

7    payments on behalf of FirstEnergy Solutions.  And

8    so it is clear that there is a crime of fraud

9    related to FirstEnergy Solutions here.

10             The second prong is that the proponent

11   needs to show that the purpose or objective of

12   the request for attorney advice was in

13   furtherance of the fraud.  It could be asking aid

14   to help it commit a fraud or continue to a fraud.

15   And you see that in the U.S. v. Collis case.

16             Most fraudsters don't just ask a lawyer,

17   hey, help me commit fraud.  They oftentimes couch

18   their language in something perfectly legal.  And

19   that's what happened here.

20             So with respect to 501(c)(4)

21   communications, FirstEnergy Solutions, through

22   its employees and agents, sought advice on

23   501(c)(4)s for the purpose of concealing the

24   source of the contributions to Larry

25   Householder's criminal enterprise and, thereby,

1    allowed it to conceal a fraud from the public.

2          With respect to the HB6 draft language

3    edit, that was clearly in furtherance of the

4    fraud because the purpose of bribing

5    Mr. Larry Householder was so that he would

6    deliver HB.6, and FirstEnergy Solutions used its

7    lawyers to ensure that it got what it paid for,

8    in other words, a billion-dollar bailout of its

9    nuclear power plants.

10          Energy Harbor is wrong for focusing on

11   what the legal question is.  What's really

12   important to consider is what the purpose of the

13   legal ask was.

14          So there's almost no question that a

15   crime of fraud happened, which FirstEnergy

16   Solutions was a key participant.  This was

17   admitted by FirstEnergy and Juan Cespedes at

18   Larry Householder's trial.

19          And the two pieces of advice at issue

20   are clearly connected to FirstEnergy Solutions'

21   goal in concealing their involvement in the fraud

22   and to take advantage of the improper access it

23   had gained from the fraud.  These are all

24   activities in which the legal advice was sought

25   to further the HB6 fraud.

Page 20

 1          And so if there's ever a case where the

 2   application of the crime-fraud exception, this is

 3   one of them.

 4          But I'll briefly touch on the

 5   alternative basis for ordering Energy Harbor to

 6   produce the documents concerning 501(c)(4)

 7   contributions and the edits to the HB6 draft

 8   language.

 9          MR. JUDGE:  Yes.  If you would, walk me

10   through this part carefully.  From what I

11   understand, there are three memorandums that are

12   at issue here.

13          MR. SCIARANI:  Yes.

14          MR. JUDGE:  And they intentionally

15   produced the memoranda.  And your argument is, it

16   has firmly wiped out any claim of privilege, and

17   they're trying to backtrack on it now.

18          MR. SCIARANI:  That's correct.

19          So Plaintiffs' view is that Energy

20   Harbor selectively produced three memoranda

21   because they shared it.  And their basis for

22   doing so is that they shared it with Joel Bailey.

23   Joel Bailey was a FirstEnergy corporation

24   external affairs employee who reported to

25   Michael Dowling.

1          And Energy Harbor's position is that,

2     after the bankruptcy, Mr. Bailey was no longer

3     within the privileged group.  We believe that is

4     pretextual.  And I'll walk you through that.

5               MR. JUDGE:  Yes.

6               MR. SCIARANI:  And so the date at which

7     they claim the privilege ends between FirstEnergy

8     Solutions, FirstEnergy is the date of the filing

9     of the bankruptcy, which is in February of 2018.

10          So one of the important parts of

11     Plaintiffs' motion is that, in the Sixth Circuit

12     law, the law is strict.  There is no selective

13     waiver in any circumstances.  And in that

14     Columbia/HCA case, the court was clear to note

15     that selective waiver is prohibited in all of its

16     various forms.

17          And so, here, it's important to consider

18     some of the background that, prior to the

19     bankruptcy, FirstEnergy Solution and FirstEnergy

20     had the same legislative solution goal.  They

21     needed a legislature bailout of the nuclear power

22     plants.  And even after the bankruptcy, this

23     didn't change.  The goals didn't change.  The

24     activities didn't change.  Joel Bailey was

25     involved in HB6.  FirstEnergy Solutions, as we

1  discussed earlier, was involved in trying to get

2  HB6 across the line.

3         And so there's a consistent level of

4  activity at this point, right; although, there's

5  not a consistent level of activity with regard to

6  the assertions of privilege.

7         And FirstEnergy Solutions operated under

8  a shared service agreement with FirstEnergy, and

9  that involved using FirstEnergy's corporate

10  external affairs department and legal support.

11         In its bankruptcy settlement with

12  creditors, FirstEnergy agreed to act as FES's

13  agent in lobbying matters.  And so this activity

14  was conducted by FirstEnergy and FirstEnergy

15  Solutions in parallel.

16         However, after the allegations came to

17  light, after Mr. Householder's arrest, there's

18  been an incentive on behalf of FirstEnergy and

19  FirstEnergy Solutions to overstate that degree of

20  separation which was effected by the filing of

21  bankruptcy.  For example, in July 2020, Jones

22  said that FirstEnergy and FirstEnergy Solutions

23  were essentially completely separate after a

24  bankruptcy, but that wasn't true.  And

25  FirstEnergy had to release a statement to correct

1    that, noting that there was a shared service

2    agreement.

3         So in addition to this consistent action

4    undertaken by FirstEnergy and FirstEnergy

5    Solutions, you see an inconsistent withholding of

6    documents under a privilege.

7         If you look at Exhibit 28, there's a

8    privilege entry which notes, Documents that were

9    shared with FirstEnergy counsel dated after the

10   bankruptcy -- that is titled "FES Business Plan."

11   And that's what's held under the common interest.

12        So that's where you see the selective

13   waiver, that in the context of FES business plan,

14   those documents are being withheld.  In the

15   context of HB6 or 501(c)(4), for some reason,

16   those documents are not being withheld.

17        But the ultimate contradiction here is

18   that HB6 was a key part of FirstEnergy Solutions'

19   business plan.  It was necessary for FirstEnergy

20   Solutions to get HB6 passed to help it emerge

21   from bankruptcy successfully.

22        And so even though FirstEnergy and FES

23   had separate legal departments, they worked

24   together.  They worked together on HB6.  They

25   worked together on 501(c)(4) donations.  And they

Page 24

1  apparently worked together on FirstEnergy

2  Solutions' business plan, but they have

3  selectively decided to disclose documents shared

4  with Joel Bailey.

5          And so what the selective waiver -- the

6  selective waiver rules that the Sixth Circuit

7  have set forth are designed to do is to prevent

8  the offensive use of privilege.  And, here, we

9  have two examples in which that can occur.

10          The first is the idea that there is no

11  or little coordination between FirstEnergy and

12  FirstEnergy Solutions in the conspiracy to bribe

13  Mr. Householder.  The fact that they're waiving

14  the privilege with respect to the documents

15  shared with Joel Bailey suggest that FirstEnergy

16  and FirstEnergy Solutions independently arrived

17  at their discussions and not that FirstEnergy had

18  any control or gave direction to FirstEnergy

19  Solutions's decision-making.

20          The second matter in which you could see

21  an offensive use of the privilege is if you take

22  a look at Defendant John Judge's answer, and it

23  includes this idea that he relied in good faith

24  on others, which could also include relying on

25  counsel.  The problem here is that the counsel

Page 25

1    that these defendants are relying on, the

2    privilege is held by the company.  And so the

3    individual is unable to waive the privilege to

4    assert that defense.

5          So, here, what you see happen is, Energy

6    Harbor waives the privilege as to certain

7    documents which puts them into the record so that

8    Mr. Judge could rely on them in support of his

9    defense.

10         And so with respect to that defense, if

11   you look at the 501(c)(4) memorandum, for

12   example, that suggests that donations of

13   501(c)(4) that Energy Harbor or FirstEnergy

14   Solutions did were blessed by its lawyers.  But

15   Plaintiffs here have no other documents to assess

16   whether or not that reliance was done in good

17   faith, because the rest of those documents have

18   been withheld.

19         The HB6 draft memo suggests that certain

20   edits were not adopted by the legislature

21   regarding HB6, and that could be used to suggest,

22   on behalf of FirstEnergy or FirstEnergy

23   Solutions, that they didn't really have a level

24   of access that Plaintiffs allege.

25         So here we have Energy Harbor using a

Page 26

1  selective waiver to prevent a narrative that it

2  was not cooperating with FirstEnergy in

3  perpetrating the fraud that FirstEnergy has

4  admitted to committing and that their employees

5  were justified in their actions.

6          And so just going back to the general

7  principle of the Sixth Circuit, because all forms

8  of selective waiver are not permitted in the

9  Sixth Circuit, Energy Harbor has waived its

10 privilege with respect to the subject matter of

11 the 501(c)(4) donations memo and the draft edits

12 to the HB6 language.

13         MR. JUDGE:  Let's talk about that for a

14 moment.  In the relief requested at the end of

15 your initial -- the memorandum in support of the

16 motion to compel, I believe you phrased it as

17 that you were asking for -- I'm going to screw

18 this up unless I pull it up.  Hold on a second.

19         Okay.  Document Number ECF Number 491-1,

20 page ID number 10557, in your second point,

21 you're asking, quote, Produce all documents

22 withheld an attorney-client privilege concerning

23 donations to 501(c)(4) organizations and the

24 drafting of clean energy legislation, such as

25 HB6.

1       Why so expansive?  Why aren't we

2  targeting specific 501(c)(4) organization, not

3  just any that may be involved?  And why a wider

4  net of anything related to the drafting of clean

5  energy legislation?  Why not just related to HB6?

6       MR. SCIARANI:  So I'll start with

7  respect to the 501(c)(4) donations.

8       If we look at the memo, it was a Calfee

9  memo that describes just some of the rules and

10  regulations behind 501(c)(4) donations, including

11  that the IRS won't disclose certain names of

12  donors.  That memo is general in its effect.

13       However, I think, with respect to the

14  scope of discovery in this case, you're going to

15  focus on the 501(c)(4)s at issue in this.

16  Namely, for purposes of FirstEnergy Solutions,

17  it's going to be Generation Now or 501(c)(4)

18  donations in general.

19       So while the ask may seem a little bit

20  larger, I think, when you look at it in the

21  context of this case, it's actually quite narrow.

22  It would be anyone that Energy Harbor donated to

23  that ultimately could be attributed to

24  Mr. Householder's criminal conspiracy.

25       With respect to HB6, FirstEnergy and

Page 28

1    FirstEnergy Solutions had been looking for a

2    legislative solution throughout the class period,

3    and that's a big part of their motivation of

4    potential scienter -- basis for their scienter in

5    this case.

6            In 2017, they were proponents of this

7    thing called ZEN legislation, which also would

8    have resulted in a nuclear bailout for

9    FirstEnergy Solutions.

10           And so what you see here is that there

11   is a topic.  The subject matter is the bailout

12   legislation.  And so that could be HB6 or it

13   could be ZEN, but it's still a very narrow

14   concept.  We're not talking about other types of

15   energy legislation that they may have had an

16   interest in.

17           MR. JUDGE:  Okay.

18           MR. SCIARANI:  So, you know, that ends

19   my spiel here.  I'd like to just reserve time to

20   briefly address any comments that Mr. Streeter

21   may have.

22           MR. JUDGE:  Of course.  Thank you,

23   counsel.

24           Mr. Streeter.

25           MR. STREETER:  Thank you very much.

1         So I'm going to start with the last

2   point first which is the selective -- the subject

3   matter waiver point.

4         First of all, it's important to point

5   out that in their briefs and here today at this

6   argument they cite selective waiver cases in the

7   Sixth Circuit, the Columbia/HCA case.  And what

8   that case says, that when you give privileged

9   documents to one party, like the government or

10  your auditors, you can't withhold them from

11  another party like the plaintiffs.

12        That is not what happened here.  This is

13  not a selective waiver.  We have not selectively

14  picked and choose who we would give the documents

15  to and who we would not.  Everybody has the same

16  documents.  The plaintiffs have the same

17  documents.  The government has the same

18  documents.  Everybody has the same documents.

19  The Columbia/HCA case simply doesn't apply.  That

20  is a totally different concept.

21        What we are dealing with here instead is

22  a question of whether or not subject matter

23  waiver should apply.  And subject matter waiver

24  depends on whether or not, in fairness, the

25  document should be disclosed.  And what does that

Page 30

1    mean?

2           MR. JUDGE:  Talk to me about the Muni

3    case that they cited.

4           MR. STREETER:  So what the issue is, is

5    whether or not we have strategically offered

6    certain privileged documents but withheld other

7    ones for some strategic advantage, and it's

8    simply not the case that we have done that.

9           We have no strategic interest in this

10   litigation.  We simply do not.  We are not a

11   party.  We don't have any interest in the outcome

12   in the case.  We are not offering these documents

13   for anything.  We are producing them in response

14   to a subpoena.  We simply have no reason why we

15   would want to make some affirmative argument in

16   this case.  We are not making any affirmative

17   arguments in this case.

18          We simply made a good faith

19   determination that because these documents, a

20   year before there was any litigation, had been

21   inadvertently shared with Joel Bailey who worked

22   for a different company at the time, that we made

23   a determination, based on our good faith analysis

24   of the privilege law, that we could not assert

25   privilege over those documents, those several

Page 31

1    documents because they were inadvertently

2    disclosed to Joel Bailey.  We did not pick and

3    choose and make a strategic call:  Gee, we'd like

4    to turn this document over, but we're not going

5    to turn over this document.

6              We simply looked at the documents that

7    were shared with Joel Bailey, and we determined

8    that we could not withhold those based on

9    privilege, because Joel Bailey was not an

10   employee of our company and was not in our

11   privilege group.  That's what happened here.

12             There was no strategic gambit run or any

13   sort of attempt at gamesmanship or selectivity or

14   an attempt to disclose certain things but not

15   other things.

16             We simply went through and said, Joel

17   Bailey wasn't an employee; which documents was he

18   sent.  That was a year before any investigation

19   or any litigation was even imagined by anybody.

20   We're going to have to turn those over.

21             And by the way, we were told that

22   FirstEnergy, which had the documents because

23   Joel Bailey was their employee, intended to turn

24   them over as well.

25             So we turned those documents over

Page 32

```
 1   because a year earlier, before there was any
 2   litigation for anybody to have any strategy
 3   about, they had been inadvertently shared with
 4   Mr. Bailey.
 5            Now, there are two things about this
 6   that are important.
 7            Number one, the rules clearly say that
 8   an inadvertent disclosure of privileged material
 9   does not give rise to a subject matter waiver.
10   It gives rise to a waiver over the specific
11   document.  And we have acknowledged that, and
12   that's why we produced them.  But it does not
13   give rise to a subject matter waiver.
14            Judge Jolson, in the Murray Energy case,
15   made very clear -- and this is, you know, a very
16   thorough opinion, that subject matter waiver is
17   an extraordinary measure given the importance of
18   the privilege.
19            And she set forth in the Murray Energy
20   case that this is not to be done lightly; it is
21   to be analyzed very carefully; that it is
22   considered very narrowly.  And she also set forth
23   that fairness is the touchstone.  Did a party try
24   to gain strategic advantage by disclosing certain
25   documents and not other documents?  That's just
```

Page 33

1   not the case.

2           What happened was, a year before anybody

3   even imagined that there will be an investigation

4   about this, from 2018 and early 2019, some people

5   made a mistake and gave certain documents to

6   Joel Bailey.  And now, as a consequence of that,

7   we understand that the privilege doesn't apply to

8   them.  And so we produced them in this litigation

9   and to the DOJ and to the SEC and to the Attorney

10  General of Ohio.  We did not sit down and decide,

11  let's produce this one but not this one.  So

12  there is no strategic fairness question here.

13          And, furthermore, we have no strategy in

14  this litigation.  We're not a party to it.  So we

15  don't have any interest in strategizing about

16  these kinds of outcomes.  We're not a defendant

17  in this lawsuit.

18          So, you know, for those two reasons,

19  both because this was an inadvertent disclosure a

20  year before there was any litigation and because

21  we did not engage in sword-and-shield strategic

22  gamesmanship, there simply cannot be a subject

23  matter waiver, which is an extraordinary measure

24  that cannot be taken lightly.  These are

25  privileged documents that they're seeking to

Page 34

1    obtain, and this is an extraordinary measure.

2         Now, the argument that they make is that

3    we have declined to assert common interest

4    privilege over these documents.  There are two

5    serious flaws with that argument.

6         Number one, there was no common interest

7    agreement between these two companies.  Both the

8    general counsel of Energy Harbor has said that in

9    its declaration, and Jones Day informed me of

10   that in a conversation about what FirstEnergy's

11   position was.  We cannot create a common interest

12   agreement between two parties who don't have one.

13        And, secondly, there couldn't have been

14   one at the time that the documents were turned

15   over to Mr. Bailey because there was no

16   litigation.

17        The common interest privilege applies

18   when there is contemplated or actual litigation.

19        And a year earlier, before any

20   investigation, there was no litigation.  There

21   was no common interest, period.

22        And so there has been no strategic

23   declining to assert the common interest privilege

24   here, because we couldn't assert it because there

25   wasn't a common interest agreement, and there

Page 35

1  couldn't have been one because there was no

2  litigation around which to have a common interest

3  agreement.  And so the subject matter waiver

4  doctrine just simply didn't apply here.

5         And I'll pause there, because I know

6  that you have questions about this particular

7  issue, and I want to make sure that I address

8  them before I move to the other topics.

9         MR. JUDGE:  You made proceed.  If I have

10  a question, I won't be shy.  Trust me.

11         MR. STREETER:  Okay.  So now I want to

12  move to the crime-fraud sections of privilege.

13         Again, an extraordinary measure to

14  decide that there's a crime-fraud exception to

15  the privilege and to use that to access

16  privileged documents of the company.  I want to

17  make a couple of preliminary comments about this.

18         The Department of Justice and the SEC

19  have had all of these documents that the

20  plaintiffs have and all of the privilege logs

21  that the plaintiffs have for more than two years,

22  and they have never claimed that there was a

23  crime-fraud exception here that would result in

24  appreciation of the privilege.

25         They, also, by the way, have had all

Page 36

```
 1   these documents for two years and never claimed
 2   any kind of subject matter.  They've had the
 3   documents for much longer that the plaintiffs
 4   have had them.  They've never made that claim.
 5   And I think that's significant.
 6            The second thing I want to say about the
 7   crime-fraud exception is shedding light on the
 8   credibility of the plaintiffs' claim.  We had an
 9   almost yearlong meet-and-confer process before we
10   got to have this dispute brought before Judge
11   Jolson and now you.  In an almost yearlong
12   meet-and-confer process where me and Mr. Sciarani
13   and others from his firm were talking about all
14   of these issues -- and they never ever raised
15   crime-fraud once during that process.
16            At 9:56 p.m. the night before these
17   issues were raised before Judge Jolson, they sent
18   us an e-mail saying, Oh, by the way, it just
19   occurred to us to make this argument, too.
20            So they threw it in there at the last
21   minute.  And so that shed some light on their
22   credibility of the claim.
23            Now let me talk about the substance of
24   it.
25            MR. JUDGE:  Go ahead.
```

1        MR. STREETER:  Again, Judge Jolson has

2   written carefully in the Murray Energy case.

3   Again, the same case discusses both crime fraud

4   and subject matter waiver.  And I encourage you

5   to read it.  And she has very carefully set forth

6   that, again, this is not something to be done

7   lightly; and, furthermore, there are two elements

8   that need to be demonstrated:  Number one, that

9   the client was engaged in or planning a crime

10  when the communication occurred and that the

11  communication with the lawyer was intended to

12  facilitate that crime.

13        Now, neither of those things are true

14  here.  Let me tell you why.

15        Number one, I understand that there has

16  been an enormous amount of attention on the case

17  in Ohio.  But the reality is, as we sit here

18  right now, three years after Larry Householder's

19  arrest, Energy Harbor has not been charged with a

20  crime.  It has not been sued by the SEC.  It is a

21  defendant in a civil lawsuit before the Attorney

22  General.  It settled another lawsuit for $11

23  million.  It has not been accused of a crime.

24        And there's a reason for that.  And

25  here's why:  The documents that we produced to

Page 38

1  the plaintiffs show Energy Harbor's perspective

2  on this was that it was making donations to a

3  501(c)(4) so that that 501(c)(4) could fund a

4  media campaign in support of a piece of

5  legislation and fund an anti-referendum effort in

6  support of a piece of legislation.

7         There is no evidence in any of those

8  documents that anybody at Energy Harbor was

9  trying to engage in a quid pro quo with Larry

10 Householder or anybody else.

11        If you look at the documents attached to

12 Mr. Sciarani's declaration, both the original

13 declaration and the ones that they put in the

14 reply brief, which we have not had an opportunity

15 to respond to, you'll these that every one of

16 those documents, the text messages, the e-mails,

17 all of them involved Energy Harbor providing

18 money to fund media campaigns, providing money to

19 fund anti-referendum efforts.

20        And, Mr. Judge, I'm guessing you were

21 living in Ohio at the time and you saw the ads on

22 TV.  That's what Energy Harbor was paying for.

23 And you might have even had signature gatherers

24 come to your house and try to get you to sign a

25 referendum or an anti-referendum.  That's what

Page 39

1  Energy Harbor was paying for.

2        If you look at those documents, you will

3  see that every time that's what it's about.  For

4  instance, Exhibit 49, which Mr. Sciarani attached

5  to his reply declaration, is a request by the CEO

6  of Energy Harbor for the board of Energy Harbor

7  to approve a $15-million payment to Generation

8  Now to fund a media campaign, completely legal

9  conduct, First Amendment protected conduct.

10        Now, is it pretty?  Is it nice?  No.  I

11  don't think that American politics are always

12  pretty and nice.  But people donate money, and

13  they put money into media campaigns to support

14  legislation that helps them, and that's not

15  illegal.

16        What's illegal is bribing someone.  And

17  there is no evidence that anybody at FES had any

18  intention or knowledge that Larry Householder or

19  anybody else was being bribed.  And it's

20  important.

21        Mr. Sciarani has tried to mix these

22  companies together.  The way to think about this

23  is, these companies were in the middle of a

24  divorce.  They were separated, and they were

25  working on a divorce.  And the divorce finalized

Page 40

1    on February 27th, 2020.

2            But during the separation period,

3    between when bankruptcy was filed on March 31st,

4    2018, and February 27th, when they completely

5    separated, they had separate boards; they had

6    separate executives; they had separate legal

7    departments; they had separate general counsel;

8    they had separate outside counsel.

9            And yet Mr. Sciarani consistently says

10   we're trying to say that we didn't coordinate

11   with FirstEnergy.  That's just not true.  We

12   don't say that.  We absolutely acknowledge that

13   we did coordinate with them and that we did, you

14   know, receive advice from them about things we

15   should do.  There's no doubt about it, and we

16   don't run away from that fact at all.

17           We're not attempting to claim there was

18   no coordination as part of some sword-and-shield

19   scandal.  We don't claim it, and so it's just not

20   true.

21           The reality is that we were a separate

22   company that was in the middle of a divorce, and

23   the divorce was finalized in February of 2020.

24   But during that separation period, we believed --

25   and all the documents support this -- that we

Page 41

1   were paying for a media campaign and that we were

2   paying for an anti-referendum effort.

3        And to the extent any of those monies

4   were diverted to Larry Householder's benefit or

5   to someone else's benefit, they were stolen from

6   my client.  They were stolen from Energy Harbor.

7        And I can show you, and they were

8   produced in the documents that Mr. Sciarani has,

9   the bills from the media companies to pay for all

10  those ads that you saw and all those signature

11  gatherers that came and pounded on your door.

12  And that is not a bribe.  Paying for ads and

13  paying for signature gatherers is not a bribe.

14  And donating money to a 501(c)(4) so it can

15  support politicians running for office who

16  support your cause, namely, you know, a clean

17  energy bill in Ohio, is not a bribe.

18        And so that's why I say there was no

19  crime being committed by Energy Harbor,

20  FirstEnergy Solutions at this time.  Whether or

21  not Larry Householder and FirstEnergy and other

22  people were engaging in crime, I leave to others.

23  But the evidence has been, you know, produced to

24  the plaintiffs.

25        And if you look at those documents, you

Page 42

```
 1   will see every one of them is a discussion of
 2   funding a media campaign or an anti-referendum
 3   campaign, not a crime.
 4          Now, the second question, which
 5   Judge Jolson lays out in the Murray Energy case,
 6   is whether or not the communication was
 7   designed -- the communication with the lawyer was
 8   designed to facilitate a crime.  And that, also,
 9   element is not met here.
10          First of all, you could look at the
11   memorandums.  Getting ready to make a donation to
12   a 501(c)(4) and consulting with your lawyer about
13   the guideposts for doing so, which is what the
14   memo with Calfee is about -- it's about what are
15   the guideposts for 501(c)(4) contributions.  That
16   is not something unusual or strange.  501(c)(4)s
17   receive donations from companies all the time.
18   It's not a crime.  It's not anything facilitating
19   a crime.  And so that Calfee memo that was sent
20   in 2018 is just simply not part of facilitating a
21   crime or anything like that.
22          Secondly, there is the draft legislation
23   language.  So there are subsequent Calfee memos
24   where Calfee is giving advice about language that
25   should appear in the legislation.  Again, this is
```

Page 43

1  not a crime.  This happens all the time in our

2  politics, whether we like it or not, that

3  companies and interested people advocate to

4  legislatures about what should appear in

5  legislation that affects them.

6       And they go so far as to proposed

7  language.  And that's what was going on here, and

8  that's what Calfee was doing.  And Calfee was not

9  participating in or facilitating a crime.  They

10  were offering language that might appear in a

11  piece of regulation.  Nothing unusual about it.

12  Nothing illegal about it.

13       There was no evidence and there is no

14  evidence that Energy Harbor was engaged in some

15  sort of quid pro quo with Larry Householder.  As

16  I said, if some benefit and some money went to

17  Larry Householder to pay for his house in Florida

18  or his legal bills or whatever it went to or

19  whatever other purpose he might have used it for

20  other than the ones that my client agreed to, it

21  was stolen from my client, and my client was not

22  engaged in a crime.

23       And so, you know, the bottom line is

24  that the crime-fraud exception just doesn't

25  apply.  No one else in any of the other

Page 44

1    litigations has suggested that it does.  And the

2    plaintiffs themselves, you know, sort of threw

3    this in at the eleventh hour, 11:59 p.m., you

4    know, in the proverbial clock.

5             MR. JUDGE:  Without reading anything

6    into the following two questions I have, the

7    first one is, the cost-shifting.  Talk to me

8    about cost-shifting a little bit.

9             MR. STREETER:  Yes, I'll talk to you

10   about the -- let me talk to you about the

11   extended time period now, and I'll get to that

12   issue.

13            And, look, I mean, the first two

14   questions, the crime-fraud question and the

15   subject matter waiver question, these are legal

16   issues that, you know, is frankly not much of a

17   matter of discretion.

18            And I acknowledge that the question of

19   how long a period of time you want to subject us

20   to discovery is at your discretion.  And I came

21   into this thinking, you know -- and I'll explain

22   to you kind of what kind of a, you know,

23   potential compromise position is on that subject

24   matter.  First, I want to frame it out for a you

25   a little bit.

Page 45

1          So as we sit here today, Energy Harbor

2     has produced 85,000 documents to the plaintiffs.

3     They produced those documents over a four-year

4     period, from September of 2016 to July of 2020.

5          We did an exhaustive search and showed

6     them the list of custodians.  We showed them the

7     search terms.  We did an exhaustive search and

8     spent an enormous amount of time and effort

9     producing those documents to them and to other

10    litigants and to other parties.

11         As recently as last week, we produced

12    2,000 additional documents to them when they gave

13    us additional search terms that they wanted us to

14    run against certain people's materials.  And as

15    early as last week, we produced an additional

16    2,000 documents to them.  Prior to that, we

17    produced another, you know, 850 documents to them

18    that they had asked us to run certain search

19    terms.  And we ran them, and we produced the

20    documents.  We've given them detailed privilege

21    logs of everything, and that's what we've done so

22    far.

23         Now, let's frame the time period that

24    we're talking about, this so-called extended time

25    period, a period from July 21st, 2020, to

Page 46

1  December 31st, 2020, the period of time after

2  Larry Householder was arrested.

3           Now, let's talk about what that time

4  period is.  It is more than a year after House

5  Bill 6 became law and was passed by the Ohio

6  legislature and signed by Governor DeWine.  So

7  it's more than a year after the events that are

8  really at the heart and soul of this House Bill

9  6, you know, scandal.  It's nine months after the

10  referendum campaign had come to an end and failed

11  in October of 2019.  So it's nine months after

12  any of those events occurred, which I admit

13  wholly our client was involved in.

14           We were funding anti-referendum efforts

15  to try to support a piece of legislation that

16  included paying signature gatherers and paying

17  for TV ads and mailers to try to prevent that

18  referendum from succeeding.  Not a crime.

19  Unsavory, perhaps, but not a crime.  And it's

20  more than five months after the two companies

21  were completely separated when the divorce was

22  finalized on February 27th, 2020.  They were no

23  longer in any way connected after that.

24           You know, they obviously had, you

25  know -- and so it's just -- the extended time

Page 47

1    period that they're focused on is well after any
2    of the events in question and well after any
3    affiliation between the companies.
4         Now, they have offered up a couple of
5    reasons why they should get at documents from
6    this time period that's well after the events in
7    question which would impose enormous costs and
8    burden upon Energy Harbor.
9         First, they said we've made allegations
10   that are included in that time period; and that
11   is so, but those allegations are about
12   disclosures that FirstEnergy made or didn't make
13   or made inaccurately.  Energy Harbor, my client,
14   had absolutely nothing to do with those
15   disclosures.  It had been a separate company with
16   a totally separately existence, divorced in the
17   bankruptcy for more than five months at the point
18   when those disclosures were made.  And so Energy
19   Harbor had nothing to do with those disclosures.
20        And by the way, neither did John Judge,
21   who no longer worked for FirstEnergy for a long
22   period of time at that point in time.
23        Secondly, they have said that they
24   speculate or conjecture that maybe some people at
25   Energy Harbor said things that are inculpatory

Page 48

1   after the arrest of Larry Householder.  Now,

2   first of all, this is total speculation.

3           Secondly, I'm not sure how it is that a

4   statement by someone at a different party, made

5   many months after the events in question, could

6   be relevant to their lawsuit anyway, because it's

7   not admission by a party in a lawsuit.

8           The next thing is, that it's also highly

9   unlikely.  Because what happened, as soon as

10  Larry Householder was arrested, Energy Harbor got

11  a subpoena, immediately engaged counsel and sent

12  a document hold notice to all its employees

13  saying, Documents are going to be gathered.

14          So the likelihood that people made, you

15  know, inculpatory remarks when counsel was -- all

16  over the organization, when document hold notices

17  were being sent out, when a huge scandal had just

18  broken, is highly, highly unlikely.  And, also,

19  for the reasons I said, I'm not sure how it would

20  be relevant to a lawsuit against FirstEnergy.

21          Now -- and by the way, on this subject,

22  also, neither DOJ nor the SEC has asked for

23  documents after Larry Householder's arrest on

24  this theory again.

25          And, you know, but at the same time,

1  look, in the interest of trying to get to a

2  solution here that doesn't impose enormous

3  burdens on my client, I think it might make sense

4  for us to look at a one-month time period after

5  Larry Householder's arrest to try to find whether

6  or not there are these kind of inculpatory

7  documents that they are talking about.

8        But to extend it out to the end of the

9  year, it just makes no sense.  It's incredibly

10  expensive.  It's going to involve a huge

11  privilege ticket, because counsel had been

12  engaged in many, many communications about House

13  Bill 6, about these matters with counsel,

14  obviously.  It's going to be an absolute

15  privilege mess.  And wading through that is going

16  to be incredibly expensive.

17        So, you know, I think, in the interest

18  of compromise, we could look at a one-month time

19  period.  But if it's anything more than that --

20  would be wholly inappropriate.  That is, you

21  know, my thoughts on this.

22        In terms of, you know, the

23  cost-shifting, look, we certainly don't have any

24  interest in this litigation.  I understand that

25  we were, you know -- were a wholly-owned

1    subsidiary of FirstEnergy before.  And I get that

2    we donated the money we donated as part of this

3    media campaign and anti-referendum effort.  But

4    we do not have any interest in the litigation.

5         And so imposing a great deal of

6    additional costs on us is just not fair, and

7    that's -- my proposed solution is the one-month

8    solution to cut through that last issue.

9         MR. JUDGE:  How much would one month

10   cost you?

11        MR. STREETER:  Well, we estimated that

12   five months would cost us approximately a million

13   dollars.

14        And the way we did that is, we looked at

15   the time period we had collected for before that,

16   and we basically did kind of pro rata analysis.

17   So I think a fair estimate would be one-fifth of

18   one million, so one month, $200,000.

19        MR. JUDGE:  And are you using a private

20   vendor, or are you doing this in-house?

21        MR. STREETER:  We have a vendor that we

22   use regularly who's not part of our law firm but,

23   you know, who we paid pay, who houses documents.

24   So they will gather documents, house them,

25   platform them for us, and we'll review them.  But

Page 51

```
 1   otherwise, the review will be performed by
 2   lawyers at this law firm.
 3           MR. JUDGE:  What vendors do you use?
 4           MR. STREETER:  I can't remember what
 5   it's called as I sit here right now, Mr. Judge.
 6   It is a -- it's one that we sort of have a
 7   preferred arrangement with them, and they have
 8   platformed all the documents that we've, you
 9   know, produced so far, including the documents we
10   produced last week for the plaintiffs.
11           And, you know, the additional marginal
12   costs of platforming these documents, we can --
13   you know, we can zero in on that to the penny, if
14   we were so inclined.  I mean, candidly, that's
15   not where the money is.  The cost is in the
16   lawyer time to look at all these documents to
17   figure out, you know, whether they're responsive
18   and whether they're privileged and all those
19   kinds of things.
20           MR. JUDGE:  So what percentage of the
21   one million is lawyer time?
22           MR. STREETER:  I think my guess is, you
23   know, 95 percent.  It may be even more.  The
24   vendor bills are in the thousands of dollars a
25   month, not in the tens of thousands.
```

1          MR. JUDGE:  Do I have in front of me --
2    I don't recall seeing it.  I don't have any bills
3    in front of me or an affidavit laying out any
4    specific numbers, do I?
5          MR. STREETER:  You don't.  I mean, you
6    have my affidavit, which does this kind of pro
7    rata calculation, but you don't have legal bills
8    or vendor bills.  We can provide them if you
9    want.  We'd want them to be maintained in
10   privilege.
11         MR. JUDGE:  Sure.
12         MR. STREETER:  They're privileged
13   communications.
14         MR. JUDGE:  And my second question,
15   without reading anything into it, is to ask,
16   assuming innuendo kind of thing, is -- you heard
17   me question opposing counsel about the relief
18   that they requested, and is there a way to narrow
19   it down.  Even if I would buy their entire
20   argument, are they looking for too much?  Is
21   there a more narrow compromise in there that I
22   should be thinking about?
23         MR. STREETER:  I don't think so, other
24   than this one-month compromise.  And I'll tell
25   you why.

1          I mean, this company had lawyers doing a

2     lot of things.  The plaintiffs' notice -- there

3     are about 13,000 documents on our privilege

4     log -- more of a detailed privilege log.  And

5     trying to slice and dice that so there's -- I

6     mean, it's still going to be an enormous amount

7     of documents that are my client's privileged

8     documents that are going to be subject to

9     disclosure.  And that is a very serious thing,

10    and I don't think that -- well, if we don't have,

11    like, a handful of ten documents or something, we

12    could go look at, it's a -- you know, it's a

13    company that was in the middle of a bankruptcy

14    that was in the middle of this House Bill 6

15    effort.

16          There are multiple law firms, you know,

17    both Ohio law firms and national law firms, that

18    are working for them.  There are law firms

19    working for the creditor committees.  You know,

20    all kinds of -- that's why the privilege log is

21    so long here, because there were a lot of lawyers

22    working on all these issues.

23          MR. JUDGE:  Do you use in-house

24    associates to create -- review documents, code

25    them, create the privilege log, or are you using

1  any predictive coding?

2        MR. STREETER:  So we did not do that.

3  We used search terms, and then we put eyes on the

4  documents.

5        Given the high-profile nature of this,

6  given that there's a Department of Justice

7  investigation and an SEC investigation and now

8  we're, you know, joining as a third party into

9  some of these civil litigation, we didn't feel

10  comfortable kind of using a -- a kind of a short

11  form here.  It was important that -- first of

12  all, we needed to -- you know, we need to

13  understand everything.

14        And so it was important to, you know,

15  run search terms, narrow the documents that way,

16  put eyes on the documents, use that as a method

17  to determine the responsiveness and privilege.

18        MR. JUDGE:  Thank you, Mr. Streeter.

19        Rebuttal argument very briefly.

20        MR. SCIARANI:  I'll try and make this

21  brief.

22        Counsel for Energy Harbor, you know,

23  they mentioned what the SEC and the DOJ have

24  done.  I think it's important to know that we

25  don't really know what their thinking is at the

Page 55

1   SEC or the DOJ.  And there's some important

2   differences between our cases here.

3          This is a securities class action that's

4   focused on FirstEnergy.  The DOJ, you know,

5   initially, at least with respect to the trial,

6   was focused on Larry Householder and most of his

7   associates.

8          MR. JUDGE:  My perspective is, you know,

9   although interesting, I really don't care what

10  the SEC and DOJ are doing.  They may have

11  something planned.  They may not.  They may --

12  change of view.  I'm not going to engage in

13  mind-reading or attribute to them anything that's

14  going to form the decision.  So move on from that

15  point, please.

16         MR. SCIARANI:  Okay.  And so with that,

17  you know, Plaintiffs' allegations also include,

18  under Rule 10b-5, a scheme liability allegations,

19  which Judge Marbley has upheld.

20         So this case goes beyond just false

21  statement, lies of statement, false scienter.  It

22  also involves this scheme to defraud that's

23  alleged in the complaint.

24         To Mr. Streeter's comment about there

25  being no allegations or essentially the fraud

Page 56

1    being completed as of October 2019, Mr. Cespedes

2    testified at Mr. Householder's trial that

3    FirstEnergy Solutions was continuing to engage in

4    the Householder scheme by supporting the terms

5    limit initiative, which would have allowed

6    Mr. Householder to stay in office longer.  And

7    that happened up until February of 2020 before it

8    fell apart due to COVID.  And FirstEnergy

9    provided shared services until June of 2020.  So

10   they were still -- the divorce was not completely

11   finalize at the end of -- the emergence of Energy

12   Harbor from bankruptcy.

13          And just to touch base on that one-month

14   proposal, Plaintiffs think that's far too short.

15          Mr. Cespedes, you know, he enters his

16   guilty plea in October of 2020, and there's this

17   investigation Energy Harbor had.  And you've

18   heard Mr. Streeter say some of the conclusions

19   from the investigation, like the money was stolen

20   or, you know, they were unwitting participants.

21   The facts gathered in that investigation will be

22   relevant to those considerations and would help

23   perhaps point the finger at the individual

24   defendants in our case.

25          MR. JUDGE:  If one month is too short,

Page 57

1   what is a reasonable compromise?

2           MR. SCIARANI:  Well, I figured it'd be

3   just some period of time at least after the

4   firing of Jones and Dowling, and Cespedes' guilty

5   plea.  So you're looking at early November of

6   2021.

7           MR. JUDGE:  So give me a number.  How

8   long?

9           MR. SCIARANI:  Well, I think you'd want

10  a couple weeks after that, so November 15th,

11  2021.

12          MR. JUDGE:  Do you have any response to

13  Mr. Streeter's comments about the cost involved?

14          MR. SCIARANI:  You know, I think the

15  cost involved shows that Energy Harbor's

16  interested.  They're spending almost all their

17  money on lawyer time, ensuring that there's no,

18  you know, inadvertent disclosure of privileged

19  materials.  And that's all because, you know, in

20  this case, through -- as it progresses,

21  additional information about Energy Harbor's

22  involvement could come to light, and it certainly

23  needs to be careful about that.  And I understand

24  that would be what a prudent company would do.

25          And I think a lot of this still is

Page 58

```
1   premature in a sense that I don't think Energy
2   Harbor's collected the documents, run search
3   terms, you know.  And we are willing, of course,
4   especially under Rule 45, to take steps to
5   eliminate miss hits and unnecessary reviews.  And
6   perhaps there's search terms that were more
7   relevant to the SEC or DOJ's investigation.  And
8   so I think some of those arguments are premature
9   at this time.
10          And, certainly, Judge Jolson has already
11  rejected these arguments with respect to Partners
12  for Progress which donated a smaller amount of
13  money, had all its assets seized and had to pay
14  for its discovery itself, whereas Energy Harbor
15  is an ongoing concern.
16          MR. JUDGE:  When you say some of the
17  arguments are premature at this time, what
18  exactly do you mean?  I believe Mr. Streeter told
19  me you guys had been engaged in a meet-and-confer
20  for about a year before the motion to compel
21  landed on my doorstep.
22          MR. SCIARANI:  So the parties reached an
23  impasse on the time period early in the process.
24          Energy Harbor took a position that they
25  weren't going to produce those documents;
```

1    however, Plaintiffs wanted to review the

2    privilege log and go through some of the

3    privilege issues and raise them on the list form.

4            So there hasn't been any discussion on

5    the time period issue.  Most of our discussions

6    have been, as you could see, the complex -- a

7    little bit more complex nature of the

8    attorney-client privilege questions.

9            MR. JUDGE:  Okay.

10           MR. SCIARANI:  And if I may, I just have

11   a couple of quick responses.  I'd like to focus

12   on the crime-fraud exception.

13           Mr. Streeter notes the Murray Energy

14   case, and I submit that, you know, the

15   crime-fraud case in Judge Jolson's view might be

16   for extraordinary measures, but this is an

17   extraordinary case.

18           And, in fact, there is evidence that

19   really shows kind of the conspirator nature of

20   FirstEnergy Solutions' involvement in this case.

21           If I take you back to the October 2018

22   meeting with Mr. Cespedes, Dave Griffing of

23   FirstEnergy Solutions and a couple of the other

24   lobbyists, at that meeting, Cespedes testified a

25   FirstEnergy lobbyist slid a check across the

Page 60

 1   table to Mr. Householder.  And once

 2   Mr. Householder looked at it, he said that he was

 3   supportive of FirstEnergy Solutions' problem.

 4          So, you know, that's the kind of

 5   evidence that we have that showed that

 6   FirstEnergy Solutions is more than just an

 7   unwitting participant, that they actually went

 8   there, when Householder needed the money the

 9   most, and engaged in an action that optically

10   looks like a classic bribe.

11          MR. STREETER:  Special Master, can I

12   address that last point that was just raised now

13   in this whole argument for --

14          MR. JUDGE:  I'll give you a moment.

15   Just let him finish, and then I'll come back to

16   you.

17          MR. SCIARANI:  Okay.  And so there's two

18   other points that Mr. Streeter makes.  One, that

19   Energy Harbor is not charged.  I think we've

20   discussed that earlier.  We can't attribute

21   exactly the charging decisions of the DOJ here.

22          But moving on to the idea that they

23   didn't know Larry Householder got a pecuniary

24   benefit, that he used the money to pay off bills

25   or whatnot, we also have to recall that one of

Page 61

1  the benefits received by Mr. Householder -- and

2  this was known to FirstEnergy Solutions -- that

3  he was going to cement his power as getting

4  elected to speaker of the house, and that

5  required electing a full slate of pro-Larry

6  Householder candidates, sometimes referred to as

7  Team Householder.  So there is a known benefit

8  that FirstEnergy Solutions provided to

9  Mr. Householder.

10        And just really briefly over the subject

11  matter waiver, I think their argument really

12  turns on this idea that sharing of documents with

13  Mr. Bailey was inadvertent.

14        These documents were shared with him

15  over a long course of period of time, and it

16  doesn't seem like, even though they separated

17  their legal departments, there was no instruction

18  not to share documents; there's no attempt to

19  claw those documents back.

20        And if you look at their idea that, hey,

21  this is, you know -- hey, there was no common

22  interest, right, because it, A, wasn't

23  litigation -- that's contradicted by the

24  withholding of a business plan document under the

25  common interest theory that was shared with the

Page 62

1    FirstEnergy corporate.  And you can see that in

2    the excerpts of their privilege log.

3            And so what really needs to be focused

4    on is that there has been a selective use of

5    privilege here where certain documents are being

6    withheld and certain documents are being

7    disclosed.

8            So thank you very much for your time,

9    Special Master Judge.  And I can turn it over to

10   Mr. Streeter's final comment.

11           MR. JUDGE:  Thank you, Counsel.  I

12   appreciate it.

13           Mr. Streeter, briefly.

14           MR. STREETER:  Thank you.

15           So with respect to the last point about

16   the bankruptcy plan document, that's a document

17   that was created as part of a litigation, namely

18   a bankruptcy, which is a litigation; and there

19   was a common interest agreement between the two

20   companies as part of a litigation.  So that's why

21   that document was withheld, because it was a

22   litigation, and there was a common interest

23   agreement.

24           And so there was no strategic call made

25   to, you know, produce some and not others.  It

Page 63

```
 1    was just a down-the-middle what's privileged,
 2    what's not.  And that document was privileged
 3    because there was a pending litigation of
 4    bankruptcy, and there was a common interest
 5    agreement between the companies with respect to
 6    that bankruptcy litigation.  That's why that
 7    document was withheld.  It's not part of some
 8    gamesmanship or selectiveness.
 9           With respect to the October meeting with
10    Larry Householder, the handing over of the check
11    that occurred at that meeting -- and the
12    plaintiffs know this because they have the
13    documents that show it -- was recommended and
14    advised and directed by Akin Gump Strauss Hauer
15    and Feld, one of the most reputable law firms in
16    the country and one of the most reputable
17    government affairs advisors in the country.  And
18    those documents were produced to them because
19    they're lobbying documents, not legal advice.
20    And so we gave those documents to them.
21           Furthermore, Geoff Verhoff, a lobbyist
22    at Akin Gump, was at the meeting.  Certainly, Bob
23    Klaffky, a very reputable Ohio-based lobbyist
24    with a long, distinguished career, was at the
25    meeting.
```

Page 64

1          And so as I said before, some of this

2     stuff is not pretty.  There are campaign

3     donations in this country that are made, and

4     they're not done for people's health.  People

5     make campaign donations to try to get elected

6     politicians who they want to see support what

7     helps them.

8          And Akin Gump and Bob Klaffky did not

9     recommend the commission of a crime when they

10    recommended that FirstEnergy Solutions make a

11    donation to Generation Now so that it would

12    support politicians who would support their

13    agenda.  That is not a quid pro quo.  That is not

14    a crime.  It may be something that some of us

15    would like to outlaw, but right now it's not

16    illegal to make donations to support politicians

17    who are running for office, to try to get them

18    elected.

19          And that's what Akin Gump recommended,

20    and that's why an Akin Gump lobbyist was there in

21    the room when that even occurred, and that's why

22    Bob Klaffky, a reputable lobbyist from Ohio, was

23    there in the room.

24          And by the way, after they left that

25    meeting, they went to have a meeting with

Page 65

1   Governor DeWine, and they made a donation to

2   Governor DeWine at the meeting that they had

3   later that day.  And no one has suggested that

4   Governor DeWine engaged in a crime by accepting a

5   campaign donation.  It is what it is.  This is

6   not a crime.

7          MR. JUDGE:  Thank you, Mr. Streeter.

8          Thank you, Counsel, both for your

9   arguments.

10         I'll take the matter under advisement

11  and issue a order -- due course.

12         I ask that if anyone obtains a

13  transcript copy, I don't care if you necessarily

14  file it on the docket at this point.  Although,

15  if there would be an appeal of my order to

16  Chief Judge Marbley and Magistrate Judge Jolson,

17  it would need to be filed.  But I ask that if you

18  obtain a copy of the transcript you provide it

19  with me as soon as possible.  It would aid me in

20  my drafting, but it's not essential.

21         Okay.  Victoria, how are you doing?  Do

22  you need a break?

23         COURT REPORTER:  I'm okay.

24         MR. JUDGE:  Thank you.

25         That brings us to ECF Number 496.  This

Page 66

```
 1   is nonparty Sam Randazzo.  I believe we're going
 2   to have different counsel argue.
 3          Counsel if you would introduce yourself
 4   for purposes of the record.  And then upon
 5   completion of that, if the Movant would go first,
 6   I would appreciate it.  Thank you.
 7          MS. COCALIS:  Good morning, Mr. Judge.
 8          My name is Rachel Cocalis, and I
 9   represent the Class Plaintiffs.
10          MR. CORCORAN:  Good morning, Mr. Judge.
11          My name is Jeff Corcoran, and I
12   represent Mr. Randazzo and SFAO.  And as I
13   mentioned earlier, I also have cocounsel here
14   with me, Mr. Roger Sugarman.
15          MR. JUDGE:  Thank you.
16          Whenever you're ready.
17          MS. COCALIS:  Given the fact that
18   there's been a ton of briefing on this and you
19   said that you're familiar with the papers and
20   that there's multiple orders, I'd be happy to
21   just answer any questions straightaway, or I can
22   make a brief statement, whichever you'd prefer.
23          MR. JUDGE:  Why don't you do your brief
24   statement.  I mean, if there's anything that you
25   feel that I need to know that would be
```

Page 67

1   emphasized, please go ahead.  I don't have

2   questions from the briefing that are in dire need

3   of being answered.

4          You know, rather that just listen to

5   everybody just regurgitate the brief, you know,

6   give me your key points to what you want to

7   emphasize today on both sides.

8          MS. COCALIS:  Absolutely.

9          So one would be hard-pressed to find a

10  more interested party and a bigger player in this

11  litigation than Mr. Randazzo.

12         FirstEnergy had admitted to paying him a

13  $4.3 million bribe.  This is just one of the two

14  bribes at issue of this case, and is it, in fact,

15  the biggest bribe at issue.

16         Mr. Randazzo's underlying conduct is

17  referenced extensively throughout Plaintiffs'

18  complaint.  It has been referenced in -- more

19  than referenced; it has been the subject of

20  testimony in 31 fact depositions.

21         Further, because certain individual

22  defendants denied that this $4.3-million payment

23  was a bribe, it is one of the most hotly

24  contested issues in this case.  That is why the

25  discovery regarding a $4.3-million payment is so

Page 68

1   critical to the parties here.  And that is also

2   why, when Mr. Randazzo and SFAO refused to

3   produce these documents to Plaintiffs' subpoenas

4   seeking documents through December 31st, 2021,

5   solely on relevance grounds, Judge Jolson

6   unequivocally granted Plaintiffs' request and

7   ordered them to produce, quote, Any document

8   regarding the $4.3 million within their

9   possession and custody or control, full stop.

10          When Mr. Randazzo and SFAO were dragging

11  their feet, on May 16th, the court basically

12  said, you know, knock it off and produce any

13  document regarding the 4.3 within your

14  possession, custody, or control, as I had it

15  written in my order.

16          Fast-forward to six months, they're

17  still refusing to produce documents regarding the

18  4.3 million that are within their possession,

19  custody, or control, from November 21st, 2020, to

20  August 31st, 2021, a modified proposal from Class

21  Plaintiffs -- it's modified from the subpoena --

22  or to collect Mr. Randazzo's e-mail from 2019,

23  the year FirstEnergy admits to bribing him, for

24  him to conduct acts on their behalf, from

25  cloud-based server stored locations rather than

Page 69

1  clearly deficient local storage locations unless

2  Plaintiffs pay their costs.

3        These new objections and demands are

4  long overdue and waived.  Mr. Randazzo and SFAO

5  did not raise these objections pursuant to

6  Rule 45 when they responded to Plaintiffs'

7  subpoena.  They did not raise these objections

8  when Plaintiffs moved to compel the documents.

9  They did not raise these objections and new

10  demands to Judge Jolson before her April 5th

11  order.

12        When Judge Jolson issued her April 5th

13  order, they did not file an objection; they did

14  not file a motion for reconsideration; they did

15  not seek clarification based on any of these new

16  grounds and demands.  Same with the May 16 order.

17        From Plaintiffs' perspective, this is a

18  really easy case.  We're simply just asking you

19  to enforce the court's April 5th and May 16

20  orders directing them to produce any document

21  regarding the 4.3 million that is within their

22  possession, custody, or control.

23        Now, through my perspective and given

24  that you asked me to be brief, I don't want to

25  wast your time arguing these new objections like

Page 70

1   the cost-shifting argument.  But if you would

2   like me to do so, I'm happy to explain how the

3   overwhelming -- the case law generally and the

4   law of this case overwhelmingly confirm that

5   cost-shifting would not be warranted here.

6           MR. JUDGE:  Not at this time.  I

7   appreciate it.  Thank you.

8           MS. COCALIS:  Thank you.

9           MR. JUDGE:  Counsel, your turn.

10          MR. CORCORAN:  Thank you, Mr. Judge.

11          I want to start off with text of the

12  rules that are relevant here.

13          So under Rule 45, a party issuing a

14  subpoena is to supposed to take reasonable steps

15  to avoid imposing an undue burden or expense.

16          Then, of course, under Rule 26, there's

17  the requirement that the discovery sought be

18  proportionate.

19          My clients are nonparties to this case,

20  and yet the plaintiffs still don't really think

21  that there should be any meaningfully limit on

22  the discovery that's going to my clients.

23          So I want to touch very briefly on the

24  $4.3-million payment that was just referenced by

25  opposing counsel.

Page 71

1        MR. JUDGE:  Let's start with this

2    question I have, though:  What was ambiguous or

3    unclear about Magistrate Judge Jolson's April 5th

4    and May 16th orders?

5        MR. CORCORAN:  Well, I don't think --

6    Your Honor, I don't think, for example, she

7    intended for production of, let's say, privileged

8    communications between counsel, you know,

9    relating to a $4.3-million payment.

10       And, frankly, I don't even know what the

11   plaintiffs are saying that we haven't produced.

12   They're saying you just need to expand your time

13   search -- you know, your time period to look for

14   communications when Mr. Randazzo had retained

15   counsel, when he was preparing information for

16   them, and basically saying, see if you could find

17   anything in there.

18       I think that's the biggest problem, is

19   that they're trying to go far beyond the ultimate

20   events of the case, you know, where Mr. Randazzo

21   received a payment and things like that.  And

22   they're trying to go to, you know, what's almost

23   exclusively going to be or exclusively going to

24   be communications with counsel.  I think that's

25   our ultimate issue.

Page 72

1          I mean, conceivable speaking, we could

2    run a search for documents that were, you know,

3    he sent last week relating to the $4.3-million

4    payment.  I could almost guarantee you that all

5    of those are going to be privileged.

6          So at a certain point in the litigation,

7    I think everybody recognizes and, frankly, even

8    the plaintiffs recognize that it just doesn't

9    make sense to continue to search for documents

10   relating to a particular issue, and there has to

11   be some sort of cutoff.

12          The cutoff that we picked was

13   November 20th.

14          And I think it's interesting -- you

15   heard earlier -- the compromised position that

16   the plaintiffs were putting forward with regard

17   to Energy Harbor was November the 15th.

18          So we actually went beyond what the

19   plaintiffs' compromised position is with Energy

20   Harbor.  But the plaintiffs want us to get even

21   nine months beyond that and look for, again,

22   communications that are almost exclusively going

23   to be with counsel.

24          MR. JUDGE:  Tell me what you've produced

25   following Judge Jolson's orders.

Page 73

1          MR. CORCORAN:  Thank you.  Good

2    question.  I can't give you the chronology of

3    which date was -- I can tell you we've produced a

4    total of 7,000.  I think we've probably produced

5    a few thousand pages in the last, you know, few

6    months that I've been involved.  I forget what

7    the initial production was, but the total was

8    about 7,000 pages.

9          We ran 13 very complex search terms that

10   were crafted by the plaintiffs.  So they -- you

11   know, we originally did our initial analysis

12   relating to this before there was ever any kind

13   of subpoena.  We were trying to figure out for

14   ourselves what documents were there, and we had

15   run search terms.  We had our own cutoff being

16   November 20th, I believe, and we were just trying

17   to figure out what was there.  And, you know, it

18   was not like we were trying to limit what we

19   produced or anything like that.

20          And then, of course, the plaintiffs

21   said, No, you need to go beyond that.  You need

22   to run some additional search terms.

23          We ran 13 additional search terms, and

24   we produced responsive documents to that.  And so

25   we've done that through November 20th, 2021 --

Page 74

1    excuse me -- 2020, and we think that that's
2    ultimately what a reasonable cutoff would be.
3            Again, it's past the class period.  It's
4    well past the ultimate events of the case, and we
5    think that's perfectly reasonable.
6            MR. JUDGE:  Did you produce a privilege
7    log as well?
8            MR. CORCORAN:  Yes, in accordance with
9    the -- I think there's a protocol, I believe, in
10   the case for privilege logs.  We wouldn't have
11   logged communications between Mr. Randazzo and
12   his litigation counsel for this, but we did
13   include a privilege log.
14           And one of the things, Your Honor, that
15   really makes this review so difficult, at least
16   for the time period that I was, for example --
17   was reviewing documents, is Mr. Randazzo himself
18   was an attorney.  So you have to be very careful
19   about, you know, what's being reviewed here.
20           And then the time period -- I keep going
21   back to this -- that they're looking for is when
22   Mr. Randazzo already had counsel.  So they want
23   to go even beyond that, and they just want to go
24   through August of 2021.
25           And their purported basis for doing that

eleborate

Page 75

1    is that they say, Well, Mr. Randazzo was, you

2    know, still spending some of the money, you know,

3    that was from this purported bribe.

4            The problem with that, Your Honor, they

5    already know where the money went.  They served

6    subpoenas for bank records, and they've actually

7    got, I think, all the way through the period that

8    they're searching for, you know, the account

9    records.  So they know how the funds were

10   disbursed.  And that was ultimately, I think,

11   what the origin of this dispute was about.

12           You know, the plaintiffs had gone to the

13   court and said, We want documents related to the

14   $4.3-million payment.

15           You know, they want to know how it was

16   disbursed, because some of the defendants,

17   FirstEnergy representatives, had said, We think

18   we're making this $4.3-million payment for a

19   specific purpose.

20           And so the court said, you know, You

21   need to talk about -- you need to produce

22   documents that reflect how this was disbursed.

23           The plaintiffs have that information.

24   They know.

25           What they're looking for is a classic

Page 76

1   fishing expedition where they're saying, Well,

2   you know, he might have said something

3   inculpatory.

4         An attorney, Mr. Randazzo, who already

5   retained counsel, he might have, you know, said

6   something like, Oh, I just received this bribe or

7   something like that, which I think is

8   extraordinarily implausible, but that's what

9   they're fishing for.  That's what this period

10  would consist of.  That's the extended time

11  period.

12        And, you know, Your Honor, frankly, they

13  go back to -- they keep calling this a

14  $4.3-million bribe.  And, yes, FirstEnergy did

15  enter into the deferred prosecution agreement.

16  And I'm not privy to every single deposition

17  that's been taken in this case, but I know that

18  FirstEnergy was sanctioned, I believe, previously

19  for failing to provide somebody to substantiate

20  that.  And, in fact, I'm unaware of anybody with

21  personal knowledge that's willing to say that

22  Mr. Randazzo received a bribe.

23        Now, the big caveat is -- again, I'm not

24  counsel in this case, but from what I can see

25  publicly, it doesn't look like that's been

Page 77

 1   substantiated.

 2        So I don't think it's right to just

 3   assume that this was a bribe.  Mr. Randazzo had a

 4   consulting agreement.  The consulting agreement,

 5   there was a payment due, and that's what was

 6   paid.

 7        So, you know, the plaintiffs like to go

 8   back to just calling it a bribe.  And, frankly,

 9   you know -- and I don't think they've supported

10   that.

11        MR. SUGARMAN:  One clarification on the

12   dates, if I may.

13        MR. JUDGE:  Identify yourself for the

14   record.

15        MR. SUGARMAN:  Certainly.  I apologize.

16   This is Roger Sugarman.  I am also counsel for

17   Mr. Randazzo and SFAO.

18        Before any subpoena was issued, before

19   any involvement in this litigation, Mr. Randazzo

20   provided his electronic devices, which are at

21   issue here, to a third-party vendor in April of

22   2020, I believe it was.

23        MR. CORCORAN:  '21.

24        MR. SUGARMAN:  And that was done, and

25   the search was conducted at that point in time.

1          The time frame for that search, Your

2     Honor, began in 2016; and the end date was

3     November 20 of 2020.

4          The significance of the November 2020

5     date involved for that search and this purpose is

6     that's the date on which Mr. Randazzo resigned

7     from the Public Utilities Commission of Ohio.  So

8     it wasn't a random date selected out of thin air.

9     It was a date that was tied to whatever official

10    actions he may have been involved in while

11    serving his term on the Public Utilities

12    Commission of Ohio, which began in April of 2019.

13         So we went forward from 2016 through the

14    November 21, 2020 time frame.  And those are the

15    time frame for which documents were searched and

16    for which documents have been produced.

17         I just didn't want it to go unsaid that

18    somehow these were some randomly selected days by

19    either Mr. Randazzo or SFAO.  It has much

20    interest in obtaining what was on those devices

21    as anyone else, given the fact that those text

22    messages, for example, and other information was

23    out in the public domain.

24         Now what would be required, which is

25    important, is for those electronic devices to

Page 79

1    meet the demand that the plaintiffs have asked

2    for, for this extended period, which extends both

3    beyond the class period, extends beyond the

4    Harbor Energy time period that was the subject of

5    the preceding hour of argument and discussion,

6    Your Honor, is -- to extend that time would

7    require those electronic devices, again, to be

8    collected by the third-party vendor we've used.

9    And, again, it would involved the review of those

10   documents.  It would involve the analysis of what

11   is and what isn't privileged.  It would review

12   the analysis of what is and what isn't responsive

13   to what the plaintiffs' have requested.

14          To your earlier point in terms of what

15   was and wasn't done in response to this court's

16   prior orders, I submitted a declaration, and I

17   would submit it again today, that what is

18   accessible and available to Mr. Randazzo and to

19   SFAO relevant to and related to the -- not

20   relevant to, but relating to the $4.3 million,

21   within our custody, control, and possession, has

22   been provided to the plaintiffs.

23          What this motion to compel seeks is what

24   we believe and what we've described in our

25   papers -- and I don't think I need to repeat

Page 80

1   myself -- are inaccessible documents that may or

2   may not contain information that the plaintiffs

3   believe they're entitled to.

4           MR. JUDGE:  In which of those categories

5   did the 2019 e-mail -- I believe they've asked

6   that the 2019 e-mails be obtained from the

7   cloud-based services or sources rather than

8   otherwise.  Has that been produced, or where did

9   that fall in the categories?

10          MR. SUGARMAN:  Again, the search that

11  was conducted didn't reach to the cloud as I'm

12  aware of earlier.  So those devices would, again,

13  have to be resubmitted for further collection,

14  detection, and review.

15          The inquiries we didn't make of our

16  vendor -- and I think we advised plaintiffs of

17  this at the time.  You know, there may be audio

18  files.  There may be iTunes.  There may be

19  nothing in there, Judge.  We don't know is the

20  honest answer that I can sit here and give to you

21  today.  We just don't know.

22          But the e-mails were available, were

23  collected and were provided.

24          MR. CORCORAN:  Mr. Judge, if I may weigh

25  in on that as well or provide some insight on

Page 81

 1    that as well.

 2          The assumption that there's anything up

 3    there in the cloud that we haven't already

 4    produced is based on the assumption, as I

 5    understand it, that the devices would not have

 6    been synced at some point.  And I'm not aware of

 7    any reason to make that assumption and say that

 8    the devices weren't synced.

 9          So it's just one of those things where

10    the plaintiffs are saying there might be

11    something out there.  You know, why don't you

12    guys go spend some money to go figure out if

13    that's true or not?

14          And our position is, well, if you want

15    to do that, then you should bear some of the

16    costs, ultimately, if you're going to be saying,

17    you know, there's another source where you could

18    potentially search.  And we think it's not going

19    to be fruitful because we think that the devices

20    were synced the entire time.  We think that's

21    something that they should pay for.

22          And, of course, the plaintiffs' position

23    is, you know -- I think, for most of the time,

24    the plaintiff is basically saying, We're not

25    going to pay for anything.

1          I think they may have offered to

2    compromise on the issue of a cloud search by

3    saying, Well, we'll advance you certain money,

4    but we want it paid back if Mr. Randazzo's funds

5    in Mr. Sugarman's trust are unfrozen.

6          So they're not really agreeing to

7    shoulder any of the cost at all potentially.  And

8    so --

9          MR. JUDGE:  A cloud-based search, how

10   much does it cost?

11         MR. CORCORAN:  I think that's the one

12   that's in about the four-grand range just for the

13   search itself.

14         And I think what the idea was going to

15   be was to see if there's anything there that, you

16   know, wouldn't have been produced already from

17   the device itself.

18         And of course, you know, there could

19   potentially be some review time associated with

20   that if we have to review documents for that as

21   well.

22         MR. JUDGE:  And how did Mr. Randazzo

23   have his devices?  Were they automatically

24   synced?  Does deleting on the local device delete

25   from the cloud as well?  How did he have it set

Page 83

1 up?

2        MR. CORCORAN:  That's my understanding,

3 is that deleting from the local device deleted

4 from the cloud as well.

5        MR. SUGARMAN:  It's on auto delete after

6 30 days, Your Honor.

7        MR. JUDGE:  After 30 days.

8        MR. CORCORAN:  Yes.  For texts, those

9 would be auto-deleted after 30 days.

10        Special Master, there's also -- I think

11 you've already touched a little bit on the issue

12 of reasonable accessibility.  There's a separate

13 issue with regard to some of these e-mails that

14 are beyond May 1st, 2021, which is part of the

15 extended period.

16        We have already -- as Mr. Sugarman

17 referenced earlier, there are e-mails between

18 November 2020 and then April 2021 -- were already

19 collected as part of the initial collection.  But

20 if we have to go past May 1st, 2021, as the

21 plaintiffs are saying we should, we have to

22 perform an additional collection.  The devices

23 would have to be re-imaged.  I believe the

24 estimate we submitted for that was going to be

25 9,000, not including attorney time.

1         I think, you know, if there's

2    potentially documents that are there, they're

3    going to have to be reviewed.  Like I said, I'm

4    assuming that the vast majority of all of them,

5    and perhaps all of them, are going to be

6    privileged.  And so there's going to be an

7    expensive privilege review that would need to be

8    done as well.

9         And, again, it's one of those things

10   where we've said, you know, if the plaintiffs

11   really think that this is that important, if the

12   plaintiffs want to go fishing, then why aren't

13   the plaintiffs willing to pay anything for it?

14   The plaintiffs is just taking their hard-line

15   position that you just need to bear the cost for

16   everything.

17        And that's, of course -- we even

18   proposed a compromise.  Right before they moved

19   to compel, they said, we're at an impasse, and

20   then they moved to compel.

21        So I do want to address the

22   cost-shifting issue because I do think it's

23   important.

24        So the three factors I think the parties

25   agree on are whether the nonparties interested in

Page 85

```
 1    the case -- who can more readily bear the costs
 2    in the public importance.
 3           So the nonparty factor -- the first
 4    factor, my client's not a party to this case;
 5    doesn't own the parties; isn't bound by, you
 6    know, the determinations in this case.
 7           This case isn't going to impact whether
 8    the Department of Justice brings charges.  He
 9    really isn't an interested party in this case.
10           I mean, my opposing counsel mentioned
11    it's hard to imagine somebody who's more
12    interested.  Well, no.  You could think of a
13    nonparty owner or other -- or a nonparty employer
14    or something like that, someone who's very
15    closely connected.
16           You know, we are not aligned with
17    FirstEnergy.  We obviously vehemently dispute the
18    statements that are made in the deferred
19    prosecution agreement.
20           So it's not like we're Partners for
21    Progress, which is one of the cases that's been
22    cited, you know, where Partners for Progress was
23    funded by FirstEnergy and, you know, was
24    controlled by FirstEnergy and had a common legal
25    interest.  You know, Mr. Randazzo does not have a
```

Page 86

1   common legal interest with FirstEnergy.  And so

2   he really does not have an interest in this case.

3           I do want to bring up one mistake that

4   we did make in our filing.  You know, we said

5   that Partners for Progress -- in trying to

6   distinguish the case that was cited by opposing

7   counsel, we said that Partners for Progress had

8   pled guilty.  That was a mistake.  It was

9   actually Generation Now that had pled guilty.

10          But the point is, in distinguishing, you

11  know, the case that's been cited where Partners

12  for Progress was required to bear its cost,

13  Partners for Progress is a corporate entity,

14  again, exclusively funded and controlled by

15  FirstEnergy and was claiming a common legal

16  interest.

17          So the second factor is the relative

18  burden on the parties and who can more readily

19  bear the burden of the cost for responding.  And

20  I think it's pretty telling here that the

21  plaintiffs speak exclusively about Mr. Randazzo's

22  ability to pay.  They don't talk at all about

23  their inability to pay.  You know, the lead

24  plaintiff has assets of, I think, 58 million --

25  $58 billion.  You know, there are other

Page 87

```
 1   institutional investors that are also plaintiffs
 2   as well.
 3            So, you know, the court's supposed to be
 4   considering the comparison of the relative
 5   ability to pay, but the plaintiffs don't even
 6   want to talk about their ability to pay.  They
 7   just want to talk about Mr. Randazzo.  And,
 8   frankly, what I think they talk about is
 9   incomplete.
10            You know, Mr. Randazzo has been in
11   litigation with the Attorney General for some
12   time now.
13            The Attorney General has been trying to
14   freeze basically everything that Mr. Randazzo
15   owns.  You know, he's frozen Mr. Sugarman's trust
16   account.  He's filed affidavits of fact relating
17   to titles that have clouded title on my client's
18   property.
19            You know, there's this idea that
20   Mr. Randazzo just has all these resources.  But
21   the reality is, is that it ignores what's been
22   going on recently.
23            You know, there's also this statement
24   that there was a bunch of money paid to an
25   attorney for a trust account for Loeb & Loeb,
```

Page 88

1    which is one of my client's law firms.  You know,

2    I think there was a $2.5-million payment.  But my

3    understanding, that's not accessible to my

4    client.  That payment was deposited in

5    effectively the operating account for that firm.

6            So there's this idea that my client has

7    all this money to pay this.  And, I think, Your

8    Honor, frankly, that's just inaccurate.

9            On the same score, the plaintiffs talk

10   about how my client received $22 million from

11   FirstEnergy over a course of eight to ten years.

12   I forget the exact time period.  But the reality

13   is, is that, as the plaintiffs know, there's a

14   very significant portion of that money that was

15   not kept by Mr. Randazzo.  It was actually paid

16   out as part of a settlement agreement where

17   FirstEnergy was paying money.

18           So, again, I think, when you look at the

19   relative burden -- or excuse me -- the relative

20   ability to pay here, I think that factor weighs

21   very, very heavily in favor of cost-shifting.

22           MR. JUDGE:  What are your client's

23   liquid assets?  How much cash on hand?  If you're

24   talking about 13,000 for re-imaging and the

25   search to do the cloud-based search plus attorney

Page 89

1  time, how much are we talking?  You know, what

2  does your client have available?

3          MR. CORCORAN:  Well, I don't know, you

4  know, down to the penny of what my client has.

5          Like I said, the big thing that I know

6  about are the things that I just referenced, that

7  the plaintiffs have been referencing, you know,

8  the $3 million that's gone into trust accounts.

9  Part of that's frozen, and part of it's not

10 accessible.

11         MR. JUDGE:  No, I am not asking what's

12 unavailable.  I'm asking what's available.

13         MR. CORCORAN:  I can't speak to that

14 myself right now.  Mr. Sugarman, perhaps, has

15 more knowledge on that issue.

16         MR. SUGARMAN:  Well, let me just

17 start -- on our filing, we estimated the cost of

18 compliance with the motion to compel,

19 paragraph 30 of my declaration, Your Honor, to be

20 roughly -- you know, a range -- 25- to $31,000.

21         MR. JUDGE:  I mean, I appreciate that

22 that's -- within other people's resources.  How

23 can I evaluate whether it's fair to ask your

24 client to pay all of that, a portion of that, or

25 none of that when I don't know your client's

Page 90

1  circumstances?

2         MR. SUGARMAN:  Sure.  I don't want to

3  speculate, which is what I'd exactly have to do

4  to be responsive.

5         If you would want us to supplement what

6  we filed with some financial information to

7  address that point, we could certainly do that in

8  a timely fashion.  Otherwise, I'm just guessing,

9  frankly, because I don't know.

10         MR. JUDGE:  Thank you, Mr. Sugarman.

11         Counsel, you may continue.

12         MR. CORCORAN:  Sure.  With regard to the

13  cost-shifting issue, to wrap it up, you know,

14  it's fairly easy to request something if you

15  don't think that it's going to cost you anything.

16  And that's what the plaintiffs have done.

17  They've basically said they want us to bear all

18  costs that are connected with this.

19         Frankly, I think, if the plaintiffs had

20  to the bear the costs in connection with

21  reviewing a bunch of privileged documents that

22  are almost to certain to not really yield

23  anything, I think that they'd reconsider it.

24         And so that's really what we want, Your

25  Honor, is we think it should be the plaintiffs

Page 91

1   that actually have to bear some costs associated

2   with trying to go through e-mails from, you know,

3   November 2020 onward when Mr. Randazzo had

4   counsel, and the communications are almost

5   certainly going to be privileged.

6          MR. JUDGE:  So what's your opinion of a

7   fair percentage that they would need to bear?

8          MR. CORCORAN:  A fair percentage?

9          MR. JUDGE:  Yes.

10         MR. CORCORAN:  Well, Your Honor, we've

11  asked for all of it.

12         I think we proposed a compromise at one

13  point of 50/50, but I don't have -- I need to go

14  up and look exactly what the time period was.

15         I think our compromise that they

16  rejected before moving to compel was we would do,

17  I think, through April 2021.  So we would search

18  what we have.  We would try to find appropriate

19  exclusions so that way we would keep out, you

20  know, Mr. Sugarman's name, for      example --

21  would eliminated hits for that.  And I think our

22  proposal was to split it 50/50.  And, again,

23  Roger can correct me if I'm wrong on that.  But

24  that was -- I thought that was a pretty

25  reasonable proposal.

Page 92

1          MR. JUDGE:  Give me one moment.  I want

2     to look in my notes here.  Okay.  Thank you.

3          Go ahead.

4          MR. CORCORAN:  Your Honor, I don't have

5     anything further right now unless there are any

6     questions you have.

7          MR. JUDGE:  I do not.  Thank you very

8     much, both counsel.

9          Rebuttal briefly.

10         MS. COCALIS:  Can you hear me now?

11         MR. JUDGE:  Yes.

12         MS. COCALIS:  So I just want to respond

13    to a few points.

14         So, first, you asked how the court's

15    order was unambiguous.  You note that they did

16    not provide any answer to that question, because

17    they can't, because the court's order was in

18    response to Plaintiffs' subpoena which sought

19    documents through December 31st, 2021.  She did

20    not limit in any way.  She did not mention

21    cost-shifting.

22         And, again, they didn't provide any

23    reason for how these objection are timely.  They

24    were waived in 2022 and then again when

25    Plaintiffs moved to compel in April of 2023.

Page 93

1        Next, they talk about the complex search

2    terms that Plaintiffs had them run.  We just

3    asked them to simply run the term "FirstEnergy."

4    The fact that they submitted declarations

5    attesting that they conducted a reasonable search

6    for any document regarding the 4.3 million and

7    didn't even include the term "FirstEnergy" or any

8    version of 4.3 million speaks volumes.

9        And I'd like to address their post

10   production.  That production has nothing to do --

11   it doesn't resolve these issues in any way.  It

12   was simply the result of Plaintiffs' own efforts,

13   for example, identifying additional phones that

14   were not disclosed as part of their search

15   methodology.

16       Separately, they talked about how all

17   the documents are going to be exclusively

18   privileged.

19       First, when you make arguments regarding

20   undue burden, it is your burden to explain how

21   that's true.  They have submitted no declaration

22   saying that they are exclusively privileged.

23   They didn't say, Hey, I ran a sample of

24   documents, and ten out of ten came back

25   privileged.  Nothing.  Rather, they produced a

Page 94

```
 1   privilege log where less than 8 percent of the
 2   documents that they have produced in this
 3   litigation they were claiming are privileged.
 4        So from Plaintiffs' perspective, there's
 5   no reason to believe that all of these documents
 6   are going to be privileged.
 7        Further, that privilege log covers
 8   documents from November 2020 and from the time
 9   where Mr. Sugarman had already been hired.
10        So, again, there's no basis for them to
11   claim that all of these are exclusively
12   privileged.  That's simply their conjecture.
13        Further, they have not explained how
14   this time period, when Mr. Randazzo was not
15   acting as an attorney -- he had resigned as an
16   attorney from a firm years ago to pursue nonlegal
17   work about a payment that was not made -- that
18   was not about a legal payment -- would be
19   privileged.
20        Again, they talk about how we already
21   know where all the 4.3 went, and so they don't
22   need to produce them.
23        They made this argument to Judge Jolson
24   in their May 15th submission to the court.  And
25   her response to them was, Your position is
```

Page 95

1   inconsistent with my prior order; you need to

2   produce any document regarding the 4.3 million

3   within your possession, custody, or control.

4           Turning to the relevant factors

5   regarding cost-shifting, they overwhelmingly

6   weigh against cost-shifting under these facts and

7   circumstances.

8           Judge Jolson's March 24, 2023 order is

9   on point.  There, Judge Jolson held that, where

10  nonparties' search protocol was sufficient in

11  identifying documents responsive to Plaintiffs'

12  subpoena and the court's prior order, they had to

13  conduct additional searches at their own expense

14  because the first and third factors weighed

15  against cost-shifting.

16          First, here, there's no doubt that

17  Mr. Randazzo is an interested party.  FirstEnergy

18  has admitted to paying him $22 million from 2010

19  to 2019, 4.3 of which was a bribe to get him to

20  do whatever they said.

21          As Mr. Randazzo's own authority, the

22  2023 American Municipal Power v. Voith case,

23  holds, what makes their party interested is their

24  involvement in underlying conduct that led to

25  this litigation.  This litigation is about

Page 96

1   Mr. Randazzo's conduct.

2          And, further, Mr. Judge could simply end

3   his inquiry here, as Mr. Randazzo's authority,

4   again, notes that many courts refuse to shift

5   costs based on this factor alone.  In fact, in

6   that case, the court held where this was the only

7   factor that weighed against cost-shifting.  The

8   nonparty had to bear up to $500,000 in expenses.

9   It's says a lot that one of the best cases he

10  could find would demand that Plaintiffs' motion

11  be granted.

12         Secondly, with regard to the second

13  factor, Judge Jolson has held that where both

14  parties are well-resourced, that there does not

15  appear to be -- it would not be particularly

16  onerous for the nonparty to bear the expenses,

17  this factor is neutral.

18         As was evident by their remarks, there's

19  no reason to believe that this factor and that

20  Mr. Randazzo cannot be pay the, at most, 20- to

21  $30,000 in expenses here.

22         He has not submitted any declarations.

23  He has millions of dollars in his bank account.

24  FirstEnergy has admitted to paying him

25  $22 million.  He sold a house recently in 2021

Page 97

1    for $3.9 million.  He had enough money to give

2    away one of his homes to his child for free.

3            And since demanding that the plaintiffs

4    bear his costs for complying with two orders, he

5    has brought on two additional law firms to

6    represent him in this case and to fight

7    Plaintiffs.

8            Now, what Judge Jolson -- particularly

9    persuasive in her March order was that the

10   nonparties could expend resources litigating

11   compliance with Plaintiffs' subpoena.

12           As you can see from this long, sordid

13   history, Mr. Randazzo could clearly expend

14   resources fighting Plaintiffs.

15           Further, Mr. Randazzo's Voith authority,

16   again, cites cases showing that, far from being

17   relatively neutral, this factor weighs in

18   Plaintiff's favor.

19           For example, it cites the

20   United States v. Cardinal Growth case.  And in

21   that case, the court found that, where the

22   expenses were $44,000 approximately, the nonparty

23   had earned 2 million in fees.  This factor

24   weighed against cost-shifting.

25           Here, we have 11 times that.  He has

Page 98

1    earned $22 million from FirstEnergy.  And his

2    fees are purportedly 20- to $30,000, including

3    attorneys' costs.

4           Third, Judge Jolson has already held

5    that this litigation is of public importance, as

6    it involves one of the largest public corruption

7    schemes in U.S. history.  And, thus, a nonparty

8    has a particular obligation to -- Plaintiffs to

9    produce all the documents within their

10   possession, custody, or control, absent

11   cost-shifting.

12          The public importance of this case has

13   been echoed by Chief Judge Marbley, Judge Black,

14   and Judge Adams.

15          I did not hear Mr. Randazzo give any

16   reason as to why this court should disregard the

17   law of this case or the multiple district judges'

18   finding the public importance of this case.

19          Further, Mr. Randazzo and SFAO have

20   failed to establish their burden to show that the

21   expenses are significant.

22          As held in the 2021 American Municipal

23   Power v. Voith case and the State Farm v. Elite

24   case and the B.L. v. Schuhmann case, nonparties

25   must support their allegations of undue burden

Page 99

1    with detailed time and cost allegations supported

2    by knowledgeable declarations.

3           The declarations submitted here are not

4    knowledgeable.  They admit they don't have any

5    idea about the volume of documents.  Their vendor

6    cannot provide you a complete, accurate estimate

7    of the cost, because he -- or they -- excuse

8    me -- do not know the volume of documents that

9    need to be reviewed.

10          These are precisely the type of

11   affidavits from vendors and from lawyers that the

12   Voith court found insufficient for the nonparty

13   to meet its burden.

14          And, finally, I'd like to just address

15   their argument regarding the 2019 -- Plaintiffs'

16   specific -- so he says there's no reason to

17   believe that there's a problem with the 2019

18   e-mails.  There is only 10 percent of 2019

19   e-mails collected as compared to the prior four

20   years and 2.5 percent as compared to 2020.

21          Even Mr. Sugarman, when we saw these

22   numbers, admitted, huh, this is strange.  Why is

23   it so much lower?

24          Plaintiffs simply asked counsel to log

25   in to the cloud-based accounts and just check.

```
                                          Page 100

 1   Are they synced?  Are they not synced?  We're not

 2   going to ask you to spend money unless, if you go

 3   there and say, huh, they're not on the cloud

 4   either.

 5          That would take five us minutes.  But

 6   didn't do that.  Instead, they came back to

 7   counsel and said their vendor recommended that

 8   they collect the documents from the cloud.

 9          And so Plaintiffs are simply asking for

10   what they were entitled to in the April 5th

11   order.  And they have not provided any reason to

12   argue that these are timely objections or that

13   they don't fall under the April 5th order.

14          That's all I have, Your Honor.

15          MR. JUDGE:  Thank you, Counsel.

16          I appreciate the arguments from all

17   counsel involved.

18          Again, I will take the matter under

19   advisement and issue a decision in due course.

20          Counsel for Plaintiffs, I ask that you

21   resubmit to me by e-mail a Word version copy of

22   your proposed order that is already filed on the

23   docket as a PDF.  Please copy opposing counsel on

24   that e-mail to me in which you submit that to me.

25          MR. CORCORAN:  Mr. Judge, may I make a
```

Page 101

1   quick clarification of an issue that came up that

2   she just said?

3            She said that Mr. Randazzo has millions

4   of dollars in his bank account.  I'm not sure

5   what she's referencing there.  To the extent that

6   she's referring to the money that was in

7   Mr. Sugarman's account, it's frozen.  To the

8   extent she's referring to money that went to

9   Loeb & Loeb, it's not his money.

10           So it's just wrong to say that he

11  received -- that he had millions of dollars just

12  sitting around and he can just cut a check for

13  this.  And I've already addressed the $22-million

14  issue.  But the idea that he's just sitting

15  around and has all this money in this bank

16  account, that he should just have to pay it,

17  that's not correct.  I'm not sure what she's

18  relying on for that.

19           MR. JUDGE:  I'm not crediting that

20  figure.

21           Frankly, from the evidence submitted by

22  both sides, I have no idea how much

23  Mr. Randazzo -- money he has or does not have.

24  That hurts you.  That hurts him, the fact that I

25  don't know that.

Page 102

1          And, you know, I don't think it's a

2    surprise, you know, today's decision.  I'm going

3    to take it under advisement.  I'll issue a

4    decision.

5          Where I'm leading right now -- I need to

6    do a little bit of research -- is not in his

7    favor, in part, because of the dearth of

8    information in front of me.

9          Today was the day to submit that

10   information.  There's been ample briefing and

11   opportunity for oral argument.  And I'm not going

12   to extend the period to learn that information if

13   he didn't care to present it to me now.

14         So at this juncture, I'm ready to rule

15   against him.  I'm going to get the proposed

16   order.  I'm going to change quite a bit of it and

17   add to it and hopefully get a decision out in due

18   course.

19         Do we have any other matters related to

20   motions argued today that we need to discuss?

21         Victoria, if we could go off the record,

22   please.

23               -  -  -  -

24         (Proceedings concluded at 1:10 p.m.)

25               -  -  -  -

Page 103

1                    C E R T I F I C A T E

2

3    The State of Ohio, )  SS:
     County of Cuyahoga.)

4

5            I, Victoria S. Fricano, a Notary Public
     within and for the State of Ohio, duly commissioned
     and qualified, do hereby certify that the

6    proceedings given was by me reduced to stenotypy,
     afterwards transcribed, and that the foregoing is a

7    true and correct transcription of the proceedings
     given.

8

9            I do further certify that this proceeding
     was taken remotely at the time and place in the
     foregoing caption specified and was completed

10   without adjournment.  I do further certify that I
     am not a relative, employee, counsel or attorney

11   for either of the parties, or otherwise interested
     in the event of this action.

12

13           IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Cleveland,
     Ohio, on this 20th day of October, 2023.

14

15

16   *Victoria S. Fricano*

17   _____
     Victoria S. Fricano, RPR

18   Notary Public, State of Ohio
     My commission expires June 16, 2027 wear off

19

20

21

22

23

24

25

[& - 3785]

Page 1

**&**

**&** 2:4,11,16,20
3:3 4:12,17,22
5:12,16 87:25
101:9

**1**

**10** 5:13 99:18
**10004** 2:17
**10013** 2:12
**10017** 4:23
**10019** 4:13
**10036** 5:9
**10557** 26:20
**1095** 5:8
**10b** 55:18
**11** 37:22 97:25
**1100** 5:4
**11:07** 1:11 6:3
**11:59** 44:3
**11th** 4:23
**125** 2:16
**127** 3:4
**13** 9:23 73:9,23
**13,000** 53:3
88:24
**15** 39:7
**15th** 57:10
72:17 94:24
**16** 69:16,19
103:18
**16th** 68:11 71:4
**1735** 3:10
**1800** 5:17
**1900** 2:5

**19103** 3:11
**19th** 1:11 6:2
**1:10** 102:24
**1st** 83:14,20

**2**

**2** 97:23
**2,000** 45:12,16
**2.5** 88:2 99:20
**20** 78:3 96:20
98:2
**200,000** 50:18
**2000** 3:4
**2010** 95:18
**2016** 45:4 78:2
78:13
**2017** 28:6
**2018** 9:8 10:22
21:9 33:4 40:4
42:20 59:21
**2019** 9:17 33:4
46:11 56:1
68:22 78:12
80:5,6 95:19
99:15,17,18
**2020** 7:7,10
11:11 15:23
22:21 40:1,23
45:4,25 46:1
46:22 56:7,9
56:16 68:19
74:1 77:22
78:3,4,14
83:18 91:3
94:8 99:20

**2021** 57:6,11
68:4,20 73:25
74:24 83:14,18
83:20 91:17
92:19 96:25
98:22
**2022** 13:2
92:24
**2023** 1:11 6:2
13:3,20 92:25
95:8,22 103:13
**2027** 103:18
**20th** 72:13
73:16,25
103:13
**21** 77:23 78:14
**21,000** 11:11
**212.355.9500**
2:13
**212.450.3976**
4:24
**212.558.4000**
2:17
**212.698.3826**
5:9
**212.836.7123**
4:14
**215.665.8500**
3:11
**216.621.0200**
3:5
**216.696.2678**
5:5
**21st** 7:7 11:11
15:23 45:25

68:19
**22** 88:10 95:18
96:25 98:1
101:13
**22748** 103:16
**24** 95:8
**2400** 5:13
**24th** 13:2,20
**25** 89:20
**250** 2:11 4:13
**26** 70:16
**27th** 40:1,4
46:22
**28** 23:7
**28th** 13:2
**2900** 4:18
**2:20** 1:4 6:5

**3**

**3** 89:8
**3.9** 97:1
**30** 83:6,7,9
89:19
**30,000** 96:21
98:2
**301** 3:19
**31** 67:20
**31,000** 89:20
**31st** 7:10 11:12
40:3 46:1 68:4
68:20 92:19
**325** 4:7
**3500** 3:19
**3785** 1:4 6:5

| 4 | 5 | 614.281.3655 4:9 | absent 98:10 |
|---|---|---|---|

**4** 8:7 16:15,19 18:20,23 20:6 23:15,25 25:11 25:13 26:11,23 27:2,7,10,15,17 38:3,3 41:14 42:12,15,16

**4.3** 67:13,22,25 68:8,13,18 69:21 70:24 71:9 72:3 75:14,18 76:14 79:20 93:6,8 94:21 95:2,19

**40** 9:17

**400,000** 9:12

**41** 4:18

**43** 8:16 9:6 15:11

**43215** 3:16 4:8 4:19 5:14,18

**44,000** 97:22

**44113** 5:4

**44114** 3:5

**45** 14:12 58:4 69:6 70:13

**45's** 15:7

**450** 4:22

**45202** 2:22 3:20

**49** 39:4

**491** 6:8,11

**491-1** 26:19

**496** 6:9 65:25

**5**

**5** 55:18

**50** 8:15

**50/50** 91:13,22

**500,000** 96:8

**501** 8:7 16:15 16:19 18:20,23 20:6 23:15,25 25:11,13 26:11 26:23 27:2,7 27:10,15,17 38:3,3 41:14 42:12,15,16

**513.721.4450** 2:22

**513.723.4027** 3:20

**51st** 3:10

**52** 3:15

**55th** 4:13

**58** 86:24,25

**5th** 69:10,12,19 71:3 100:10,13

**6**

**6** 46:5,9 49:13 53:14

**60** 8:17

**600** 2:21 4:8

**614.221.8500** 5:14

**614.227.2000** 4:19

**614.281.3655** 4:9

**614.462.5400** 5:18

**614.464.6400** 3:16

**6161935** 1:25

**619.231.1058** 2:6

**65** 5:17

**655** 2:5

**7**

**7,000** 73:4,8

**700** 2:21

**8**

**8** 94:1

**85,000** 45:2

**850** 45:17

**8th** 2:12

**9**

**9,000** 83:25

**92101** 2:6

**95** 51:23

**950** 5:3

**9:56** 36:16

**a**

**a.m.** 1:11

**aaron** 4:12

**aaron.miner** 4:14

**ability** 86:22 87:5,6 88:20

**able** 9:20 15:10

**absent** 98:10

**absolute** 49:14

**absolutely** 40:12 47:14 67:8

**accepting** 65:4

**access** 19:22 25:24 35:15

**accessibility** 83:12

**accessible** 79:18 88:3 89:10

**accordance** 74:8

**account** 12:17 75:8 87:16,25 88:5 96:23 101:4,7,16

**accounts** 89:8 99:25

**accurate** 99:6

**accused** 37:23

**acknowledge** 40:12 44:18

**acknowledged** 32:11

**acquired** 15:5

**act** 11:5 22:12

**acting** 94:15

**action** 1:4 2:10 8:12 9:1 23:3 55:3 60:9 103:11

[actions - anybody]

actions 1:6
12:10,11 26:5
78:10
activities 19:24
21:24
activity 22:4,5
22:13
acts 14:16
68:24
actual 34:18
actually 27:21
60:7 72:18
75:6 86:9
88:15 91:1
adams 98:14
add 102:17
addison 4:2
addition 18:4
23:3
additional
45:12,13,15
50:6 51:11
57:21 73:22,23
83:22 93:13
95:13 97:5
address 16:9
28:20 35:7
60:12 84:21
90:7 93:9
99:14
addressed 7:4
101:13
adjournment
103:10

admission 48:7
admit 46:12
99:4
admits 17:20
68:23
admitted 8:2
18:6 19:17
26:4 67:12
95:18 96:24
99:22
adopted 25:20
ads 38:21 41:10
41:12 46:17
advance 82:3
advantage
19:22 30:7
32:24
advice 16:19
18:12,22 19:19
19:24 40:14
42:24 63:19
advised 63:14
80:16
advisement
65:10 100:19
102:3
advisors 9:22
63:17
advocate 43:3
affairs 9:10
11:1 20:24
22:10 63:17
affects 43:5
affidavit 52:3,6

affidavits 87:16
99:11
affiliation 47:3
affirmative
30:15,16
affixed 103:13
agenda 64:13
agent 11:5
22:13
agents 10:1,3
18:22
ago 94:16
agree 84:25
agreed 7:11
11:4 22:12
43:20
agreeing 82:6
agreement 7:23
8:1 10:25 22:8
23:2 34:7,12
34:25 35:3
62:19,23 63:5
76:15 77:4,4
85:19 88:16
ahead 36:25
67:1 92:3
aid 18:13 65:19
air 78:8
akin 63:14,22
64:8,19,20
aligned 85:16
allegations
17:13 22:16
47:9,11 55:17
55:18,25 98:25

99:1
allege 25:24
alleged 55:23
allen 5:12
allowed 19:1
56:5
alternative
20:5
ambiguous
71:2
amendment
39:9
american 13:21
39:11 95:22
98:22
amount 37:16
45:8 53:6
58:12
ample 102:10
analysis 30:23
50:16 73:11
79:10,12
analyzed 32:21
anderson 4:3
answer 24:22
66:21 80:20
92:16
answered 67:3
anti 38:5,19,25
41:2 42:2
46:14 50:3
antitrust 17:11
anybody 31:19
32:2 33:2 38:8
38:10 39:17,19

76:20
anyway 48:6
apart 56:8
apologize 77:15
apparently
24:1
appeal 65:15
appear 42:25
43:4,10 96:15
appearances
2:1 3:1 4:1 5:1
appears 8:14
14:9
application
20:2
applies 34:17
apply 13:18
29:19,23 33:7
35:4 43:25
appreciate
62:12 66:6
70:7 89:21
100:16
appreciation
35:24
appropriate
12:13,18 91:18
approve 39:7
approximately
8:17 9:6 50:12
97:22
april 69:10,12
69:19 71:3
77:21 78:12
83:18 91:17

92:25 100:10
100:13
argue 66:2
100:12
argued 102:20
arguing 69:25
argument 6:7
6:16,23 20:15
29:6 30:15
34:2,5 36:19
52:20 54:19
60:13 61:11
70:1 79:5
94:23 99:15
102:11
arguments
13:8 30:17
58:8,11,17
65:9 93:19
100:16
arising 14:15
arnold 4:12
arnoldporter....
4:14
arrangement
51:7
arrest 11:24
17:17 22:17
37:19 48:1,23
49:5
arrested 7:8
46:2 48:10
arrived 24:16
arthur 4:17

ashton 5:12
asked 45:18
48:22 69:24
79:1 80:5
91:11 92:14
93:3 99:24
asking 18:13
26:17,21 69:18
89:11,12 100:9
asnalaw.com
5:15
assert 25:4
30:24 34:3,23
34:24
assertions 22:6
assess 25:15
assets 58:13
86:24 88:23
assisting 8:20
associated
14:14 82:19
91:1
associates
53:24 55:7
assume 77:3
assuming 52:16
84:4
assumption
81:2,4,7
attached 17:24
38:11 39:4
attempt 31:13
31:14 61:18
attempting
40:17

attempts 11:24
attention 37:16
attesting 93:5
attorney 16:12
16:14 18:12
26:22 33:9
37:21 59:8
74:18 76:4
83:25 87:11,13
87:25 88:25
94:15,16
103:10
attorney's
16:18
attorneys 98:3
attribute 55:13
60:20
attributed 8:17
27:23
audio 80:17
auditors 29:10
august 68:20
74:24
authority 95:21
96:3 97:15
authorized
10:8
auto 83:5,9
automatically
82:23
available 79:18
80:22 89:2,12
avenue 4:22 5:3
5:8

**avoid** 70:15
**aware** 80:12
   81:6

**b**

**b.l.** 98:24
**back** 26:6
   59:21 60:15
   61:19 74:21
   76:13 77:8
   82:4 93:24
   100:6
**background**
   18:3 21:18
**backtrack**
   20:17
**bailey** 20:22,23
   21:2,24 24:4
   24:15 30:21
   31:2,7,9,17,23
   32:4 33:6
   34:15 61:13
**bailout** 9:15
   15:11,12 19:8
   21:21 28:8,11
**baker** 3:3
**bakerlaw.com**
   3:6,6
**ballard** 3:9
**ballardspahr....**
   3:12,12
**bank** 8:8 9:6
   75:6 96:23
   101:4,15
**bankruptcy**
   9:21 10:21,22

11:3 15:12
21:2,9,19,22
22:11,21,24
23:10,21 40:3
47:17 53:13
56:12 62:16,18
63:4,6
**base** 56:13
**based** 13:8
   30:23 31:8
   63:23 68:25
   69:15 80:7
   81:4 82:9
   88:25 96:5
   99:25
**basically** 50:16
   68:11 71:16
   81:24 87:14
   90:17
**basis** 12:5,19
   17:9 20:5,21
   28:4 74:25
   94:10
**baumann** 4:6
**bear** 15:4 81:15
   84:15 85:1
   86:12,19 90:17
   90:20 91:1,7
   96:8,16 97:4
**began** 78:2,12
**behalf** 2:2,10
   2:15,19 3:2,8
   3:14 4:2,11,16
   5:2,7,11 8:24
   18:7 22:18

25:22 68:24
**believe** 14:1
   21:3 26:16
   58:18 66:1
   73:16 74:9
   76:18 77:22
   79:24 80:3,5
   83:23 94:5
   96:19 99:17
**believed** 40:24
**beneficiary**
   10:12
**benefit** 8:8,25
   41:4,5 43:16
   60:24 61:7
**benefits** 61:1
**bernstein** 2:11
**best** 96:9
**beth** 2:15
**beyond** 55:20
   71:19 72:18,21
   73:21 74:23
   79:3,3 83:14
**bfi** 12:16
**big** 28:3 76:23
   89:5
**bigger** 67:10
**biggest** 14:22
   67:15 71:18
**bill** 41:17 46:5
   46:8 49:13
   53:14
**billion** 15:13
   19:8 86:25

**billions** 15:14
**bills** 41:9 43:18
   51:24 52:2,7,8
   60:24
**bit** 7:4 27:19
   44:8,25 59:7
   83:11 102:6,16
**black** 98:13
**blessed** 25:14
**bloomfield**
   4:16
**board** 39:6
**boards** 40:5
**bob** 63:22 64:8
   64:22
**bottom** 43:23
**boulevard** 4:7
**bound** 85:5
**bpo** 2:23
**break** 65:22
**brian** 2:20
**bribe** 11:9
   24:12 41:12,13
   41:17 60:10
   67:13,15,23
   75:3 76:6,14
   76:22 77:3,8
   95:19
**bribed** 39:19
**bribes** 67:14
**bribing** 19:4
   39:16 68:23
**brief** 7:2 38:14
   54:21 66:22,23
   67:5 69:24

**[briefing - check]**

**briefing** 66:18
67:2 102:10
**briefings** 6:9
**briefly** 20:4
28:20 54:19
61:10 62:13
70:23 92:9
**briefs** 29:5
**bring** 86:3
**brings** 65:25
85:8
**brittany** 3:9
**broad** 2:16
5:13
**broadway** 2:5
**broken** 48:18
**brought** 36:10
97:5
**brown** 5:16
**bunch** 87:24
90:21
**burden** 13:8
47:8 70:15
86:18,19 88:19
93:20,20 98:20
98:25 99:13
**burdens** 49:3
**business** 23:10
23:13,19 24:2
61:24
**buy** 52:19

**c**

**c** 6:1 8:7 16:15
16:19 18:20,23
20:6 23:15,25

25:11,13 26:11
26:23 27:2,7
27:10,15,17
38:3,3 41:14
42:12,15,16
103:1,1
**cabraser** 2:11
**calculation**
52:7
**calfee** 27:8
42:14,19,23,24
43:8,8
**california** 2:6
**call** 31:3 62:24
**called** 28:7
45:24 51:5
**calling** 76:13
77:8
**campaign** 38:4
39:8 41:1 42:2
42:3 46:10
50:3 64:2,5
65:5
**campaigns**
38:18 39:13
**candidates**
61:6
**candidly** 51:14
**caption** 103:9
**cardinal** 97:20
**care** 55:9 65:13
102:13
**career** 63:24
**careful** 57:23
74:18

**carefully** 20:10
32:21 37:2,5
**case** 6:5 7:21
10:4 12:4,4,9
12:16 13:25
14:4,11,19
15:3,15 16:4
17:12 18:15
20:1 21:14
27:14,21 28:5
29:7,8,19 30:3
30:8,12,16,17
32:14,20 33:1
37:2,3,16 42:5
55:20 56:24
57:20 59:14,15
59:17,20 67:14
67:24 69:18
70:3,4,19
71:20 74:4,10
76:17,24 85:1
85:4,6,7,9 86:2
86:6,11 95:22
96:6 97:6,20
97:21 98:12,17
98:18,23,24,24
**cases** 12:15
29:6 55:2
85:21 96:9
97:16
**cash** 88:23
**categories** 80:4
80:9
**cause** 41:16

**caveat** 76:23
**cement** 61:3
**ceo** 10:5,5,6
14:3 39:5
**certain** 11:1
12:15 25:6,19
27:11 30:6
31:14 32:24
33:5 45:14,18
62:5,6 67:21
72:6 82:3
90:22
**certainly** 49:23
57:22 58:10
63:22 77:15
90:7 91:5
**certify** 103:5,8
103:10
**cespedes** 8:19
9:9 10:6 18:5
19:17 56:1,15
57:4 59:22,24
**chairman** 10:8
**change** 21:23
21:23,24 55:12
102:16
**charged** 37:19
60:19
**charges** 85:8
**charging** 60:21
**charles** 3:2
**check** 9:13
59:25 63:10
99:25 101:12

checks 11:2
chief 9:10
  65:16 98:13
child 97:2
choose 29:14
  31:3
christopher 4:4
chronology
  73:2
cincinnati 2:22
  3:20
circuit 17:8
  21:11 24:6
  26:7,9 29:7
circumstances
  21:13 90:1
  95:7
cite 29:6
cited 14:11
  30:3 85:22
  86:6,11
cites 13:20
  97:16,19
civil 1:4 12:21
  37:21 54:9
claim 20:16
  21:7 36:4,8,22
  40:17,19 94:11
claimed 13:24
  35:22 36:1
claiming 86:15
  94:3
clarification
  7:3 69:15
  77:11 101:1

class 2:2 6:19
  7:16 11:21
  12:10,10,12,14
  12:23 28:2
  55:3 66:9
  68:20 74:3
  79:3
classic 60:10
  75:25
claw 61:19
clean 26:24
  27:4 41:16
clear 11:18
  18:8 21:14
  32:15
clearly 15:23
  19:3,20 32:7
  69:1 97:13
cleveland 3:5
  5:4 103:13
client 6:14
  16:12,14 26:22
  37:9 41:6
  43:20,21,21
  46:13 47:13
  49:3 59:8 88:4
  88:6,10 89:2,4
  89:24
client's 53:7
  85:4 87:17
  88:1,22 89:25
clients 70:19,22
clock 44:4
close 15:25

closely 85:15
cloud 68:25
  80:7,11 81:3
  82:2,9,25 83:4
  88:25 99:25
  100:3,8
clouded 87:17
cocalis 2:3 66:7
  66:8,17 67:8
  70:8 92:10,12
cocounsel
  66:13
code 53:24
coding 54:1
collect 68:22
  100:8
collected 50:15
  58:2 79:8
  80:23 83:19
  99:19
collection
  13:16 80:13
  83:19,22
collis 18:15
columbia 21:14
  29:7,19
columbus 3:16
  4:8,19 5:14,18
  14:12
come 38:24
  46:10 57:22
  60:15
comfortable
  54:10

comment 55:24
  62:10
comments 7:2
  28:20 35:17
  57:13
commission
  64:9 78:7,12
  103:18
commissioned
  103:5
commit 8:2
  10:2 18:14,17
committed
  41:19
committees
  53:19
committing
  26:4
common 23:11
  34:3,6,11,17,21
  34:23,25 35:2
  61:21,25 62:19
  62:22 63:4
  85:24 86:1,15
communication
  37:10,11 42:6
  42:7
communicati...
  16:13 18:21
  49:12 52:13
  71:8,14,24
  72:22 74:11
  91:4
companies 34:7
  39:22,23 41:9

42:17 43:3
46:20 47:3
62:20 63:5
**company** 10:17
14:7 25:2
30:22 31:10
35:16 40:22
47:15 53:1,13
57:24
**compared**
99:19,20
**comparison**
15:16 87:4
**compel** 6:20
7:6 26:16
58:20 69:8
79:23 84:19,20
89:18 91:16
92:25
**complaint**
55:23 67:18
**complete** 99:6
**completed** 56:1
103:9
**completely**
17:14 22:23
39:8 40:4
46:21 56:10
**completion**
66:5
**complex** 12:10
59:6,7 73:9
93:1
**compliance**
89:18 97:11

**complying** 97:4
**compromise**
44:23 49:18
52:21,24 57:1
82:2 84:18
91:12,15
**compromised**
72:15,19
**conceal** 16:19
19:1
**concealing**
18:23 19:21
**conceivable**
72:1
**concept** 28:14
29:20
**concern** 12:21
15:6,7 58:15
**concerning**
20:6 26:22
**concluded**
102:24
**conclusion**
15:20
**conclusions**
56:18
**conduct** 16:23
39:9,9 67:16
68:24 95:13,24
96:1
**conducted**
22:14 77:25
80:11 93:5
**confer** 36:9,12
58:19

**conference** 1:8
**confirm** 70:4
**conjecture**
47:24 94:12
**connected**
19:20 46:23
85:15 90:18
**connection**
90:20
**consequence**
33:6
**consider** 13:22
19:12 21:17
**considerations**
56:22
**considered**
14:17 32:22
**considering**
87:4
**consist** 76:10
**consistent** 12:9
22:3,5 23:3
**consistently**
12:11 40:9
**conspiracy**
11:8 24:12
27:24
**conspirator**
59:19
**conspired** 8:2
**consulting**
42:12 77:4,4
**contain** 80:2
**contemplated**
34:18

**contested** 67:24
**context** 12:13
23:13,15 27:21
**continue** 18:14
72:9 90:11
**continued** 3:1
4:1 5:1
**continuing**
56:3
**contradicted**
61:23
**contradiction**
23:17
**contrast** 17:13
**contribute** 9:6
10:18
**contributed**
8:16
**contribution**
13:9
**contributions**
13:11 17:22
18:24 20:7
42:15
**control** 24:18
68:9,14,19
69:22 79:21
95:3 98:10
**controlled**
85:24 86:14
**conversation**
34:10
**convicted** 18:1
**cooperate** 11:5

**cooperating**
26:2
**coordinate**
40:10,13
**coordination**
9:3 10:19
24:11 40:18
**copy** 65:13,18
100:21,23
**corcoran** 5:12
5:15 66:10,11
70:10 71:5
73:1 74:8
77:23 80:24
82:11 83:2,8
89:3,13 90:12
91:8,10 92:4
100:25
**cornell** 14:12
**corp** 1:4 2:15
6:4 7:24 10:17
10:19
**corporate**
15:11 22:9
62:1 86:13
**corporation**
7:18 9:23 16:1
17:21 20:23
**correct** 20:18
22:25 91:23
101:17 103:7
**corruption**
14:22 98:6
**cost** 13:18,23
44:7,8 49:23

50:10,12 51:15
57:13,15 70:1
70:5 82:7,10
84:15,22 86:12
86:19 88:21
89:17 90:13,15
92:21 95:5,6
95:15 96:7
97:24 98:11
99:1,7
**costs** 10:18
14:14 15:4,17
47:7 50:6
51:12 69:2
81:16 85:1
90:18,20 91:1
96:5 97:4 98:3
**couch** 18:17
**counsel** 6:12,18
6:25 13:14
23:9 24:25,25
28:23 34:8
40:7,8 48:11
48:15 49:11,13
52:17 54:22
62:11 65:8
66:2,3 70:9,25
71:8,15,24
72:23 74:12,22
76:5,24 77:16
85:10 86:7
90:11 91:4
92:8 99:24
100:7,15,17,20
100:23 103:10

**country** 63:16
63:17 64:3
**county** 103:3
**couple** 35:17
47:4 57:10
59:11,23
**course** 28:22
58:3 61:15
65:11 70:16
73:20 81:22
82:18 84:17
88:11 100:19
102:18
**court** 1:1 10:22
21:14 65:23
68:11 75:13,20
94:24 96:6
97:21 98:16
99:12
**court's** 69:19
79:15 87:3
92:14,17 95:12
**courts** 12:11,16
96:4
**covers** 94:7
**covid** 56:8
**crafted** 73:10
**create** 34:11
53:24,25
**created** 62:17
**creating** 11:25
**credibility** 36:8
36:22
**crediting**
101:19

**creditor** 53:19
**creditors** 11:4
22:12
**crime** 16:23
17:1,3,5,7,10
18:8 19:15
20:2 35:12,14
35:23 36:7,15
37:3,9,12,20,23
41:19,22 42:3
42:8,18,19,21
43:1,9,22,24
44:14 46:18,19
59:12,15 64:9
64:14 65:4,6
**criminal** 12:21
18:25 27:24
**critical** 68:1
**cromwell** 2:16
**current** 10:7
14:3
**custodians** 45:6
**custody** 68:9
68:14,19 69:22
79:21 95:3
98:10
**cut** 50:8 101:12
**cutoff** 72:11,12
73:15 74:2
**cutting** 9:22
**cuyahoga**
103:3
**cv** 1:4 6:5

[d - differential]

| d | | | |
|---|---|---|---|
| **d** 2:15 3:8 4:4 6:1 | **decided** 24:3 | **deficient** 69:1 | **describes** 27:9 |
| **damages** 14:2 | **decision** 24:19 55:14 100:19 102:2,4,17 | **defraud** 55:22 | **design** 10:20 |
| **date** 7:8 21:6,8 73:3 78:2,5,6,8 78:9 | **decisions** 60:21 | **degree** 22:19 | **designed** 24:7 42:7,8 |
| **dated** 7:7 11:11 15:23 23:9 | **declaration** 34:9 38:12,13 39:5 79:16 89:19 93:21 | **delete** 82:24 83:5 | **detail** 7:4 |
| **dates** 77:12 | **declarations** 93:4 96:22 99:2,3 | **deleted** 83:3,9 | **detailed** 45:20 53:4 99:1 |
| **dave** 9:10 59:22 | **declined** 34:3 | **deleting** 82:24 83:3 | **detection** 80:14 |
| **david** 4:16 | **declining** 34:23 | **deliver** 19:6 | **determination** 30:19,23 |
| **davis** 4:22 | **decommissio...** 10:16,18 | **demand** 79:1 96:10 | **determinations** 85:6 |
| **davispolk.com** 4:24 | **deep** 11:16 | **demanding** 97:3 | **determine** 54:17 |
| **day** 4:7 7:10 11:21 34:9 65:3 102:9 103:13 | **defend** 9:19 | **demands** 69:3 69:10,16 | **determined** 31:7 |
| **days** 11:21 78:18 83:6,7,9 | **defendant** 2:15 2:19 3:2,8,14 4:11 5:2 10:4 12:2,3,3,4 14:2 14:3 24:22 33:16 37:21 | **demetriou** 4:3 | **device** 82:17,24 83:3 |
| **dbloomfield** 4:20 | **defendants** 4:2 4:16 25:1 56:24 67:22 75:16 | **demonstrated** 37:8 | **devices** 77:20 78:20,25 79:7 80:12 81:5,8 81:19 82:23 83:22 |
| **deal** 50:5 | **defending** 8:13 | **denied** 13:16 67:22 | **dewine** 46:6 65:1,2,4 |
| **dealing** 29:21 | **defense** 25:4,9 25:10 | **department** 22:10 35:18 54:6 85:8 | **dice** 53:5 |
| **dearth** 102:7 | **defensive** 11:25 | **departments** 23:23 40:7 61:17 | **diego** 2:6 |
| **december** 7:10 11:12 46:1 68:4 92:19 | **deferred** 7:22 8:1 76:15 85:18 | **depends** 29:24 | **differences** 55:2 |
| **dechert** 5:8 | | **deposited** 88:4 | **different** 13:10 29:20 30:22 48:4 66:2 |
| **dechert.com** 5:10 | | **deposition** 76:16 | **differential** 12:5 |
| **decide** 33:10 35:14 | | **depositions** 67:20 | |
| | | **described** 14:22 79:24 | |

**difficult** 74:15
**dire** 67:2
**direct** 2:10 7:19
**directed** 63:14
**directing** 69:20
**direction** 24:18
**directly** 8:4
 17:20
**disbursed**
 75:10,16,22
**disclose** 24:3
 27:11 31:14
**disclosed** 29:25
 31:2 62:7
 93:14
**disclosing**
 32:24
**disclosure**
 11:23 32:8
 33:19 53:9
 57:18
**disclosures**
 47:12,15,18,19
**discovery** 7:12
 11:15 12:12,17
 12:22 14:14
 27:14 44:20
 58:14 67:25
 70:17,22
**discretion**
 44:17,20
**discuss** 102:20
**discussed** 17:19
 22:1 60:20

**discusses** 37:3
**discussion** 42:1
 59:4 79:5
**discussions**
 24:17 59:5
**dispute** 36:10
 75:11 85:17
**disregard**
 98:16
**distinguish**
 86:6
**distinguished**
 63:24
**distinguishing**
 86:10
**distressed**
 10:14
**district** 1:1,1
 98:17
**diverted** 41:4
**division** 1:2
**divorce** 39:24
 39:25,25 40:22
 40:23 46:21
 56:10
**divorced** 47:16
**docket** 65:14
 100:23
**doctrine** 35:4
**document** 1:6
 26:19 29:25
 31:4,5 32:11
 48:12,16 61:24
 62:16,16,21
 63:2,7 68:7,13

69:20 93:6
95:2
**documents** 7:7
 11:11,14,20,20
 12:23 13:15
 15:22 16:2,4
 16:13,24 17:24
 17:25 20:6
 23:6,8,14,16
 24:3,14 25:7
 25:15,17 26:21
 29:9,14,16,17
 29:18,18 30:6
 30:12,19,25
 31:1,6,17,22,25
 32:25,25 33:5
 33:25 34:4,14
 35:16,19 36:1
 36:3 37:25
 38:8,11,16
 39:2 40:25
 41:8,25 45:2,3
 45:9,12,16,17
 45:20 47:5
 48:13,23 49:7
 50:23,24 51:8
 51:9,12,16
 53:3,7,8,11,24
 54:4,15,16
 58:2,25 61:12
 61:14,18,19
 62:5,6 63:13
 63:18,19,20
 68:3,4,17 69:8
 72:2,9 73:14

73:24 74:17
75:13,22 78:15
78:16 79:10
80:1 82:20
84:2 90:21
92:19 93:17,24
94:2,5,8 95:11
98:9 99:5,8
100:8
**doing** 20:22
 42:13 43:8
 50:20 53:1
 55:10 65:21
 74:25
**doj** 7:24 33:9
 48:22 54:23
 55:1,4,10
 60:21
**doj's** 58:7
**dollar** 19:8
**dollars** 9:23
 15:13,14 50:13
 51:24 96:23
 101:4,11
**domain** 78:23
**donald** 2:19 4:3
**donate** 15:10
 39:12
**donated** 27:22
 50:2,2 58:12
**donating** 41:14
**donation** 42:11
 64:11 65:1,5
**donations**
 16:15 23:25

**[donations - energy]**

25:12 26:11,23
27:7,10,18
38:2 42:17
64:3,5,16
**donors** 27:12
**door** 41:11
**doorstep** 58:21
**doubt** 40:15
95:16
**douglas** 3:3
**dowd** 2:4
**dowling** 5:2
9:25 20:25
57:4
**dpa** 7:25 8:3,15
8:18 14:10,24
17:19
**draft** 16:15,16
16:21 19:2
20:7 25:19
26:11 42:22
**drafting** 26:24
27:4 65:20
**drafts** 16:15
**dragging** 68:10
**dshively** 3:6
**due** 9:21 56:8
65:11 77:5
100:19 102:17
**duffy** 4:6
**duly** 103:5
**duty** 12:23

**e**

**e** 3:2,8 4:5 6:1,1
36:18 38:16
68:22 80:5,6
80:22 83:13,17
91:2 99:18,19
100:21,24
103:1,1
**earlier** 14:9
17:19 22:1
32:1 34:19
60:20 66:13
72:15 79:14
80:12 83:17
**early** 33:4
45:15 57:5
58:23
**earned** 97:23
98:1
**easily** 17:18
**east** 3:15,19
5:17
**eastern** 1:2
**easy** 69:18
90:14
**ecf** 6:7,9 26:19
65:25
**echoed** 98:13
**edit** 19:3
**edits** 16:16
20:7 25:20
26:11
**edt** 1:11
**effect** 17:16
27:12

**effected** 22:20
**effectively** 88:5
**effort** 38:5 41:2
45:8 50:3
53:15
**efforts** 38:19
46:14 93:12
**eight** 88:11
**either** 78:19
100:4 103:11
**ejtaft** 3:17
**elected** 61:4
64:5,18
**electing** 61:5
**electronic**
77:20 78:25
79:7
**element** 42:9
**elements** 37:7
**eleventh** 44:3
**eliminate** 58:5
**eliminated**
91:21
**elite** 98:23
**ellis** 5:3
**else's** 41:5
**emerge** 23:20
**emergence**
56:11
**emily** 3:14
**emphasize** 67:7
**emphasized**
67:1
**employee** 20:24
31:10,17,23

103:10
**employees** 10:2
10:3 18:22
26:4 48:12
**employer** 85:13
**enabling** 15:1
**encompass**
7:12
**encourage** 37:4
**ends** 21:7 28:18
**energy** 5:7 6:8
6:20,23 7:6,15
7:20 10:5,7
11:12,19,22
12:6,20,24
13:10,19,24
14:11 15:4,10
15:17 16:11,18
19:10 20:5,19
21:1 25:5,13
25:25 26:9,24
27:5,22 28:15
32:14,19 34:8
37:2,19 38:1,8
38:17,22 39:1
39:6,6 41:6,17
41:19 42:5
43:14 45:1
47:8,13,18,25
48:10 54:22
56:11,17 57:15
57:21 58:1,14
58:24 59:13
60:19 72:17,19
79:4

**enforce** 69:19
**engage** 33:21
38:9 55:12
56:3
**engaged** 12:6
37:9 43:14,22
48:11 49:12
58:19 60:9
65:4
**engaging** 41:22
**enormous**
37:16 45:8
47:7 49:2 53:6
**ensure** 19:7
**ensuring** 57:17
**enter** 76:15
**entered** 7:23
**enterprise**
18:25
**enters** 56:15
**entire** 52:19
81:20
**entities** 14:13
**entitled** 80:3
100:10
**entity** 13:5
86:13
**entry** 23:8
**equally** 13:18
**especially** 58:4
**esq** 2:3,3,4,10
2:15,20 3:2,3,8
3:9,14,18 4:6,6
4:12,16,17,21
5:2,7,12,16

**essential** 65:20
**essentially**
22:23 55:25
**establish** 17:5
98:20
**estimate** 50:17
83:24 99:6
**estimated**
50:11 89:17
**evade** 14:13
**evaluate** 89:23
**event** 103:11
**events** 46:7,12
47:2,6 48:5
71:20 74:4
**everybody**
29:15,18 67:5
72:7
**evidence** 17:14
17:16 38:7
39:17 41:23
43:13,14 59:18
60:5 101:21
**evident** 96:18
**exact** 88:12
**exactly** 58:18
60:21 90:3
91:14
**example** 9:8
22:21 25:12
71:6 74:16
78:22 91:20
93:13 97:19
**examples** 24:9

**exception**
16:24 17:1
20:2 35:14,23
36:7 43:24
59:12
**excerpts** 62:2
**exchange** 8:10
9:1 11:9 15:11
**exclusions**
91:19
**exclusively**
71:23,23 72:22
86:14,21 93:17
93:22 94:11
**excuse** 14:3
16:16 74:1
88:19 99:7
**executive** 10:7
**executives** 40:6
**exhaustive** 45:5
45:7
**exhibit** 23:7
39:4
**existence** 47:16
**expand** 71:12
**expansive** 27:1
**expected** 8:11
**expedition** 76:1
**expend** 97:10
97:13
**expense** 15:8
70:15 95:13
**expenses** 15:19
96:8,16,21
97:22 98:21

**expensive**
49:10,16 84:7
**expires** 103:18
**explain** 44:21
70:2 93:20
**explained**
94:13
**extend** 49:8
79:6 102:12
**extended** 12:17
44:11 45:24
46:25 76:10
79:2 83:15
**extends** 79:2,3
**extensively**
67:17
**extent** 41:3
101:5,8
**external** 9:10
10:25 20:24
22:10
**extraordinarily**
76:8
**extraordinary**
32:17 33:23
34:1 35:13
59:16,17
**eyes** 54:3,16

**f**

**f** 4:4,12 103:1
**face** 9:11,11
**facie** 17:6
**facilitate** 37:12
42:8

**[facilitating - firstenergy]** Page 14

**facilitating**
42:18,20 43:9
**fact** 24:13
40:16 59:18
66:17 67:14,20
76:20 78:21
87:16 93:4
96:5 101:24
**factor** 85:3,4
86:17 88:20
96:5,7,13,17,19
97:17,23
**factors** 13:22
14:17 15:16
84:24 95:4,14
**facts** 12:13
18:3 56:21
95:6
**failed** 46:10
98:20
**failing** 76:19
**fair** 50:6,17
89:23 91:7,8
**fairly** 90:14
**fairness** 29:24
32:23 33:12
**faith** 24:23
25:17 30:18,23
**fall** 80:9 100:13
**falling** 12:12
**false** 55:20,21
**familiar** 66:19
**far** 43:6 45:22
51:9 56:14
71:19 97:16

**farm** 98:23
**fashion** 90:8
**fast** 68:16
**favor** 88:21
97:18 102:7
**favret** 5:2
**february** 21:9
40:1,4,23
46:22 56:7
**feel** 7:2 54:9
66:25
**fees** 97:23 98:2
**feet** 68:11
**feld** 63:15
**fell** 56:8
**fes** 7:18 9:17
10:6,14,20,24
11:5,7 14:24
17:20,22 23:10
23:13,22 39:17
**fes's** 8:19 9:14
10:13,19 11:4
22:12
**fifth** 50:17
**fight** 97:6
**fighting** 97:14
**figure** 51:17
73:13,17 81:12
101:20
**figured** 57:2
**figuring** 14:25
**file** 65:14 69:13
69:14
**filed** 10:21 40:3
65:17 87:16

90:6 100:22
**files** 80:18
**filing** 21:8
22:20 86:4
89:17
**final** 62:10
**finalize** 56:11
**finalized** 39:25
40:23 46:22
**finally** 12:24
99:14
**financial** 90:6
**financially**
10:14
**find** 13:25 49:5
67:9 71:16
91:18 96:10
**finding** 98:18
**finger** 56:23
**finish** 60:15
**firing** 57:4
**firm** 36:13
50:22 51:2
88:5 94:16
**firmly** 20:16
**firms** 53:16,17
53:17,18 63:15
88:1 97:5
**first** 7:5 17:6
24:10 29:2,4
39:9 42:10
44:7,13,24
47:9 48:2
54:11 66:5
85:3 92:14

93:19 95:14,16
**firstenergy** 1:4
2:15 6:4 7:11
7:15,17,18,23
8:1,4,10,14,15
8:18,21,24 9:2
9:3,5,5,9,20,22
10:1,11,17,19
10:24 11:4,7
11:10,16,18
13:5 14:23
15:2,21 16:1
17:19,21 18:4
18:7,9,21 19:6
19:15,17,20
20:23 21:7,8
21:19,19,25
22:7,8,12,14,14
22:18,19,22,22
22:25 23:4,4,9
23:18,19,22
24:1,11,12,15
24:16,17,18
25:13,22,22
26:2,3 27:16
27:25 28:1,9
31:22 40:11
41:20,21 47:12
47:21 48:20
50:1 55:4 56:3
56:8 59:20,23
59:25 60:3,6
61:2,8 62:1
64:10 67:12
68:23 75:17

76:14,18 85:17
85:23,24 86:1
86:15 88:11,17
93:3,7 95:17
96:24 98:1
**firstenergy's**
22:9 34:10
**fishing** 76:1,9
84:12
**five** 46:20
47:17 50:12
100:5
**flaws** 34:5
**floor** 2:12 3:10
4:23
**florida** 43:17
**focus** 27:15
59:11
**focused** 47:1
55:4,6 62:3
**focusing** 19:10
**following** 44:6
72:25
**forced** 13:13
**foregoing**
103:6,9
**forge** 2:3
**forget** 73:6
88:12
**form** 54:11
55:14 59:3
**formerly** 7:15
**forms** 21:16
26:7

**forth** 12:8 13:2
17:11 24:7
32:19,22 37:5
**forward** 68:16
72:16 78:13
**found** 9:15
10:22 14:5
15:10 97:21
99:12
**four** 45:3 82:12
99:19
**fourth** 3:19
**frame** 44:24
45:23 78:1,14
78:15
**frankly** 44:16
71:10 72:7
76:12 77:8
87:8 88:8 90:9
90:19 101:21
**fraud** 7:9,19
8:3,9 9:4 10:2
10:12,12 11:17
14:6 15:22
16:23 17:1,3,5
17:7,10,21
18:2,8,13,14,14
18:17 19:1,4
19:15,21,23,25
20:2 26:3
35:12,14,23
36:7,15 37:3
43:24 44:14
55:25 59:12,15

**frauds** 14:20
**fraudsters**
18:16
**fraudulent**
16:22
**free** 7:2 97:2
**freeze** 87:14
**fricano** 1:17
103:4,17
**front** 52:1,3
102:8
**frozen** 87:15
89:9 101:7
**fruitful** 81:19
**full** 61:5 68:9
**fund** 38:3,5,18
38:19 39:8
**funded** 85:23
86:14
**funding** 42:2
46:14
**funds** 75:9 82:4
**funnel** 13:5
**further** 19:25
67:21 80:13
92:5 94:7,13
96:2 97:15
98:19 103:8,10
**furtherance**
17:3 18:13
19:3
**furthermore**
12:6 33:13
37:7 63:21

## g

**g** 6:1
**gain** 32:24
**gained** 19:23
**gambit** 31:12
**gamesmanship**
31:13 33:22
63:8
**gather** 50:24
**gathered** 48:13
56:21
**gatherers**
38:23 41:11,13
46:16
**gay** 3:15
**gee** 31:3
**geller** 2:4
**general** 26:6
27:12,18 33:10
34:8 37:22
40:7 87:11,13
**generally** 15:18
70:3
**generation** 8:6
8:6 9:7,13,18
13:9,12 27:17
39:7 64:11
86:9
**geoff** 63:21
**george** 4:2
**getting** 42:11
61:3
**give** 29:8,14
32:9,13 57:7
60:14 67:6

73:2 80:20
92:1 97:1
98:15
**given** 15:25
32:17 45:20
54:5,6 66:17
69:23 78:21
103:6,7
**gives** 32:10
**giving** 42:24
**go** 36:25 43:6
53:12 59:2
66:5 67:1
71:19,22 73:21
74:23,23 76:13
77:7 78:17
81:12,12 83:20
84:12 91:2,13
92:3 100:2
102:21
**goal** 19:21
21:20
**goals** 21:23
**goes** 55:20
**going** 26:6,17
27:14,17 29:1
31:4,20 43:7
48:13 49:10,14
49:15 53:6,8
55:12,14 58:25
61:3 66:1
70:22 71:23,23
72:5,22 74:20
81:16,18,25
82:14 83:24

84:3,5,6 85:7
87:22 90:15
91:5 93:17
94:6 100:2
102:2,11,15,16
**good** 6:17,21
24:23 25:16
30:18,23 66:7
66:10 73:1
**government**
29:9,17 63:17
**governor** 46:6
65:1,2,4
**grand** 17:12
82:12
**granted** 68:6
96:11
**great** 50:5
**greater** 13:11
**greatest** 14:20
**griffing** 9:10
59:22
**ground** 17:23
**grounds** 68:5
69:16
**group** 21:3
31:11
**groupings** 6:7
**growth** 97:20
**guarantee** 72:4
**guess** 51:22
**guessing** 38:20
90:8
**guideposts**
42:13,15

**guilty** 8:20 18:5
18:6 56:16
57:4 86:8,9
**gump** 63:14,22
64:8,19,20
**guys** 58:19
81:12

**h**

**h** 4:7
**hand** 88:23
103:13
**handed** 9:12
**handful** 53:11
**handing** 63:10
**handling** 6:19
**happen** 25:5
**happened** 12:1
12:14 18:19
19:15 29:12
31:11 33:2
48:9 56:7
**happens** 43:1
**happy** 66:20
70:2
**harbor** 5:7 6:8
6:20,23 7:6,15
7:20 10:5
11:19,23 12:6
12:20 13:10,19
13:24 14:11
15:4,10,17
16:12,18 19:10
20:5,20 25:6
25:13,25 26:9
27:22 34:8

37:19 38:8,17
38:22 39:1,6,6
41:6,19 43:14
45:1 47:8,13
47:19,25 48:10
54:22 56:12,17
58:14,24 60:19
72:17,20 79:4
**harbor's** 10:7
11:12 12:24
21:1 38:1
57:15,21 58:2
**hard** 13:25
67:9 84:14
85:11
**hauer** 63:14
**hb.6** 19:6
**hb6** 7:9,19 8:12
8:22 9:16,19
10:12 11:10,17
12:8 15:22
16:17,20,21
17:23 19:2,25
20:7 21:25
22:2 23:15,18
23:20,24 25:19
25:21 26:12,25
27:5,25 28:12
**hca** 21:14 29:7
29:19
**health** 64:4
**hear** 92:10
98:15
**heard** 52:16
56:18 72:15

**heart** 46:8
**heavily** 88:21
**heimann** 2:11
**held** 1:8 10:9
  12:16 23:11
  25:2 95:9 96:6
  96:13 98:4,22
**help** 10:2,13
  16:21 18:14,17
  23:20 56:22
**helps** 39:14
  64:7
**hereunto**
  103:12
**hey** 18:17
  61:20,21 93:23
**high** 4:18 54:5
**highly** 48:8,18
  48:18
**hill** 5:16
**hired** 94:9
**history** 14:23
  97:13 98:7
**hits** 58:5 91:21
**hold** 26:18
  48:12,16
**holdings** 12:16
**holds** 95:23
**homes** 97:2
**honest** 8:2 18:2
  80:20
**honor** 71:6
  74:14 75:4
  76:12 78:2
  79:6 83:6 88:8

89:19 90:25
91:10 92:4
100:14
**hopefully**
  102:17
**hosteler** 3:3
**hotly** 67:23
**hour** 44:3 79:5
**house** 38:24
  43:17 46:4,8
  49:12 50:20,24
  53:14,23 61:4
  96:25
**householder**
  7:8 8:5,11,21
  9:12,14 10:9
  11:9 12:8 13:6
  15:2 19:5
  24:13 38:10
  39:18 41:21
  43:15,17 46:2
  48:1,10 55:6
  56:4,6 60:1,2,8
  60:23 61:1,6,7
  61:9 63:10
**householder's**
  8:7,23,25 9:4
  11:24 18:1,25
  19:18 22:17
  27:24 37:18
  41:4 48:23
  49:5 56:2
**houses** 50:23
**hudson** 2:11

**huge** 48:17
  49:10
**hughes** 2:20
**huh** 99:22
  100:3
**hurts** 101:24
  101:24

**i**

**idea** 24:10,23
  60:22 61:12,20
  82:14 87:19
  88:6 99:5
  101:14,22
**identified**
  12:20
**identifies** 14:24
**identify** 77:13
**identifying**
  93:13 95:11
**ignores** 87:21
**iii** 4:4 5:2
**illegal** 39:15,16
  43:12 64:16
**imaged** 83:23
**imagine** 85:11
**imagined** 31:19
  33:3
**imaging** 88:24
**immediately**
  48:11
**impact** 85:7
**impasse** 58:23
  84:19
**implausible**
  76:8

**implicated** 14:8
**importance**
  32:17 85:2
  98:5,12,18
**important** 7:14
  15:6 19:12
  21:10,17 29:4
  32:6 39:20
  54:11,14,24
  55:1 78:25
  84:11,23
**importantly**
  12:1
**impose** 47:7
  49:2
**imposing** 50:5
  70:15
**improper** 19:22
**inability** 86:23
**inaccessible**
  80:1
**inaccurate** 88:8
**inaccurately**
  47:13
**inadvertent**
  32:8 33:19
  57:18 61:13
**inadvertently**
  30:21 31:1
  32:3
**inappropriate**
  49:20
**incapable**
  10:23

**[incentive - jeff]**

**incentive** 22:18
**inclined** 51:14
**include** 10:3
    24:24 55:17
    74:13 93:7
**included** 8:3
    46:16 47:10
**includes** 24:23
**including** 8:12
    10:25 27:10
    51:9 83:25
    98:2
**incomplete**
    87:9
**inconsistent**
    11:14,15 12:25
    23:5 95:1
**incredibly** 49:9
    49:16
**inculpatory**
    47:25 48:15
    49:6 76:3
**independent**
    10:21
**independently**
    10:23 24:16
**indictment**
    17:17
**individual** 12:4
    25:3 56:23
    67:21
**information**
    57:21 71:15
    75:23 78:22
    80:2 90:6

102:8,10,12
**informed** 34:9
**initial** 26:15
    73:7,11 83:19
**initially** 55:5
**initiative** 56:5
**innuendo** 52:16
**inquiries** 80:15
**inquiry** 96:3
**insight** 80:25
**instance** 39:4
**institutional**
    87:1
**instruction**
    61:17
**insufficient**
    99:12
**intended** 10:13
    14:13 31:23
    37:11 71:7
**intention** 39:18
**intentionally**
    20:14
**interest** 13:25
    14:18,19,25
    23:11 28:16
    30:9,11 33:15
    34:3,6,11,17,21
    34:23,25 35:2
    49:1,17,24
    50:4 61:22,25
    62:19,22 63:4
    78:20 85:25
    86:1,2,16

**interested** 43:3
    57:16 67:10
    84:25 85:9,12
    95:17,23
    103:11
**interesting**
    55:9 72:14
**internal** 12:7
    12:18
**intimately**
    15:21
**introduce** 6:12
    66:3
**investigation**
    12:7 31:18
    33:3 34:20
    54:7,7 56:17
    56:19,21 58:7
**investigations**
    12:18
**investors** 15:14
    87:1
**involve** 49:10
    79:10
**involved** 14:20
    15:22 21:25
    22:1,9 27:3
    38:17 46:13
    57:13,15 73:6
    78:5,10 79:9
    100:17
**involvement**
    7:9 8:20,23
    11:16 13:8
    14:15 15:3

16:20 19:21
    57:22 59:20
    77:19 95:24
**involves** 55:22
    98:6
**involving** 6:8
**irs** 27:11
**israel** 3:2
**issue** 19:19
    20:12 27:15
    30:4 35:7
    44:12 50:8
    59:5 65:11
    67:14,15 71:25
    72:10 77:21
    82:2 83:11,13
    84:22 89:15
    90:13 100:19
    101:1,14 102:3
**issued** 69:12
    77:18
**issues** 36:14,17
    44:16 53:22
    59:3 67:24
    93:11
**issuing** 70:13
**it'd** 57:2
**itunes** 80:18

**j**

**j** 3:14 4:2,2,3
**james** 3:8 4:4
**jason** 2:3 4:2
**jbaumann** 4:9
**jeff** 66:11

**jeffrey** 5:12
**jerry** 4:4
**jforge** 2:7
**jnicolaou** 2:13
**job** 1:25
**joel** 20:22,23
  21:24 24:4,15
  30:21 31:2,7,9
  31:16,23 33:6
**john** 2:10 3:14
  4:5,7 5:2 10:4
  10:8 12:2
  24:22 47:20
**john.favret** 5:5
**johnson** 4:3
**joining** 54:8
**jolson** 13:7,12
  13:16 14:18
  32:14 36:11,17
  37:1 42:5
  58:10 65:16
  68:5 69:10,12
  94:23 95:9
  96:13 97:8
  98:4
**jolson's** 12:25
  59:15 71:3
  72:25 95:8
**jonathan** 5:7
  6:22
**jonathan.stre...**
  5:10
**jones** 3:2 4:7
  9:25 22:21
  34:9 57:4

**jonesday.com**
  4:9,10
**jordan** 4:6
**joshua** 4:21
**joshua.shinbrot**
  4:24
**jr** 3:18
**juan** 8:19 10:6
  18:5 19:17
**judge** 1:9 3:14
  6:2,17,24 7:1
  10:4 12:2,3,25
  13:7,12,16
  14:18 16:5,8
  20:9,14 21:5
  25:8 26:13
  28:17,22 30:2
  32:14 35:9
  36:10,17,25
  37:1 38:20
  42:5 44:5
  47:20 50:9,19
  51:3,5,20 52:1
  52:11,14 53:23
  54:18 55:8,19
  56:25 57:7,12
  58:10,16 59:9
  59:15 60:14
  62:9,11 65:7
  65:16,16,24
  66:7,10,15,23
  68:5 69:10,12
  70:6,9,10 71:1
  71:3 72:24,25
  74:6 77:13

  80:4,19,24
  82:9,22 83:7
  88:22 89:11,21
  90:10 91:6,9
  92:1,7,11
  94:23 95:8,9
  96:2,13 97:8
  98:4,13,13,14
  100:15,25
  101:19
**judge's** 24:22
**judges** 98:17
**julia** 4:3
**july** 7:7 11:11
  15:23 22:21
  45:4,25
**juncture**
  102:14
**june** 56:9
  103:18
**jury** 17:12 18:2
**justice** 35:18
  54:6 85:8
**justified** 26:5

**k**

**k** 4:5
**katsiff** 3:8
**katsifft** 3:12
**keep** 7:2 74:20
  76:13 91:19
**kegler** 5:16
**keglerbrown....**
  5:19
**kept** 88:15

**kevin** 2:4 6:18
**key** 10:11 16:19
  19:16 23:18
  67:6
**kiani** 10:8
**kind** 17:13 36:2
  44:22,22 49:6
  50:16 52:6,16
  54:10,10 59:19
  60:4 73:12
**kinds** 33:16
  51:19 53:20
**klaffky** 63:23
  64:8,22
**knock** 68:12
**know** 28:18
  32:15 33:18
  35:5 40:14
  41:16,23 43:23
  44:2,4,16,21,22
  45:17 46:9,24
  46:25 48:15,25
  49:17,21,22,25
  50:23 51:9,11
  51:13,17,23
  53:12,16,19
  54:8,12,14,22
  54:24,25 55:4
  55:8,17 56:15
  56:20 57:14,18
  57:19 58:3
  59:14 60:4,23
  61:21 62:25
  63:12 66:25
  67:4,5 68:12

**[know - litigation]**

71:8,10,13,20
71:22 72:2
73:5,11,17
74:19 75:2,2,5
75:8,9,12,15,15
75:20,24 76:2
76:5,12,17
77:7,9 80:17
80:19,21 81:11
81:17,23 82:16
82:18 84:1,10
85:6,16,22,23
85:25 86:4,11
86:23,25 87:3
87:10,15,19,23
88:1,13 89:1,3
89:4,5,7,20,25
90:9,13 91:2
91:20 94:21
99:8 101:25
102:1,2
**knowledge**
39:18 76:21
89:15
**knowledgeable**
99:2,4
**known** 7:15
61:2,7
**ksciarani** 2:8

**l**

**l** 3:2,3 4:3,11
**landed** 58:21
**language** 16:16
16:17,21 18:18
19:2 20:8

26:12 42:23,24
43:7,10
**larger** 27:20
**largest** 98:6
**larry** 7:8 8:5,11
8:22,25 9:3,11
10:9 11:23
12:8 13:6 15:1
18:24 19:5,18
37:18 38:9
39:18 41:4,21
43:15,17 46:2
48:1,10,23
49:5 55:6
60:23 61:5
63:10
**law** 12:9 21:12
21:12 30:24
46:5 50:22
51:2 53:16,17
53:17,18 63:15
70:3,4 88:1
97:5 98:17
**lawsuit** 33:17
37:21,22 48:6
48:7,20
**lawyer** 18:16
37:11 42:7,12
51:16,21 57:17
**lawyers** 17:2
19:7 25:14
51:2 53:1,21
99:11
**laying** 52:3

**lays** 42:5
**lchb.com** 2:13
**lead** 86:23
**leading** 102:5
**learn** 102:12
**learned** 11:22
**leave** 41:22
**led** 95:24
**left** 64:24
**legal** 11:1
12:19 17:22
18:18 19:11,13
19:24 22:10
23:23 39:8
40:6 43:18
44:15 52:7
61:17 63:19
85:24 86:1,15
94:18
**legislation**
26:24 27:5
28:7,12,15
38:5,6 39:14
42:22,25 43:5
46:15
**legislative**
21:20 28:2
**legislature**
21:21 25:20
46:6
**legislatures**
43:4
**leila** 4:11
**leslie** 4:5

**level** 22:3,5
25:23
**lexington** 4:22
**liability** 55:18
**liable** 14:5
**lieff** 2:11
**lies** 55:21
**light** 22:17 36:7
36:21 57:22
**lightly** 32:20
33:24 37:7
**likelihood**
48:14
**limit** 56:5 70:21
73:18 92:20
**line** 22:2 43:23
84:14
**liquid** 88:23
**lisowski** 4:2
**list** 45:6 59:3
**listen** 67:4
**litigants** 45:10
**litigating** 97:10
**litigation** 1:4
6:4 30:10,20
31:19 32:2
33:8,14,20
34:16,18,20
35:2 49:24
50:4 54:9
61:23 62:17,18
62:20,22 63:3
63:6 67:11
72:6 74:12
77:19 87:11

94:3 95:25,25
98:5
**litigations** 44:1
**little** 7:4 24:11
27:19 44:8,25
59:7 83:11
102:6
**living** 38:21
**llp** 2:4,11,16
3:3,9,15,18
4:17,22 5:3,8
5:12
**lobbying** 11:6
22:13 63:19
**lobbyist** 8:19
10:7 18:5
59:25 63:21,23
64:20,22
**lobbyists** 59:24
**local** 69:1
82:24 83:3
**location** 1:13
**locations** 68:25
69:1
**loeb** 87:25,25
101:9,9
**log** 53:4,4,20
53:25 59:2
62:2 74:7,13
94:1,7 99:24
**logged** 74:11
**logs** 35:20
45:21 74:10
**long** 44:19
47:21 53:21

57:8 61:15
63:24 69:4
97:12
**longer** 21:2
36:3 46:23
47:21 56:6
**look** 23:7 24:22
25:11 27:8,20
38:11 39:2
41:25 42:10
44:13 49:1,4
49:18,23 51:16
53:12 61:20
71:13 72:21
76:25 88:18
91:14 92:2
**looked** 31:6
50:14 60:2
**looking** 28:1
52:20 57:5
74:21 75:25
**looks** 60:10
**lost** 15:14
**lot** 53:2,21
57:25 96:9
**lower** 99:23
**luis** 4:4
**lures** 16:21

### m

**m** 3:9 4:2,5,6
**made** 9:13,17
11:24 30:18,22
32:15 33:5
35:9 36:4 47:9
47:12,13,18

48:4,14 62:24
64:3 65:1
85:18 94:17,23
**magistrate**
65:16 71:3
**mail** 36:18
68:22 80:5
100:21,24
**mailers** 46:17
**mails** 38:16
80:6,22 83:13
83:17 91:2
99:18,19
**main** 5:3
**maintained**
52:9
**majority** 7:12
84:4
**make** 9:23
30:15 31:3
34:2 35:7,17
36:19 42:11
47:12 49:3
54:20 64:5,10
64:16 66:22
72:9 80:15
81:7 86:4
93:19 100:25
**makes** 49:9
60:18 74:15
95:23
**making** 24:19
30:16 38:2
75:18

**managing** 9:2
**maneuvers**
11:25
**marbley** 55:19
65:16 98:13
**march** 13:2,20
40:3 95:8 97:9
**marginal** 51:11
**marjorie** 4:6
**market** 3:10
**master** 1:9 7:1
60:11 62:9
83:10
**material** 32:8
**materials** 13:14
45:14 57:19
**matter** 6:3
11:15 12:21
14:8 24:20
26:10 28:11
29:3,22,23
32:9,13,16
33:23 35:3
36:2 37:4
44:15,17,24
61:11 65:10
100:18
**matters** 11:6
12:7 22:13
49:13 102:19
**mcconnell** 4:7
**mean** 30:1
44:13 51:14
52:5 53:1,6
58:18 66:24

**[mean - names]** Page 22

72:1 85:10
89:21
**meaningfully**
70:21
**measure** 32:17
33:23 34:1
35:13
**measures** 59:16
**mechanism**
14:13
**media** 38:4,18
39:8,13 41:1,9
42:2 50:3
**meet** 36:9,12
58:19 79:1
99:13
**meeting** 9:11
9:14 59:22,24
63:9,11,22,25
64:25,25 65:2
**meetings** 10:9
**memo** 25:19
26:11 27:8,9
27:12 42:14,19
**memoranda**
20:15,20
**memorandum**
25:11 26:15
**memorandums**
20:11 42:11
**memos** 42:23
**mention** 92:20
**mentioned**
54:23 66:13
85:10

**mess** 49:15
**messages** 38:16
78:22
**met** 17:18 42:9
**method** 54:16
**methodology**
93:15
**michael** 4:2 5:2
20:25
**middle** 39:23
40:22 53:13,14
63:1
**mill** 7:21
**million** 8:16,17
9:6,17,23
15:11 37:23
39:7 50:12,18
51:21 67:13,22
67:25 68:8,18
69:21 70:24
71:9 72:3
75:14,18 76:14
79:20 86:24
88:2,10 89:8
93:6,8 95:2,18
96:25 97:1,23
98:1 101:13
**millions** 96:23
101:3,11
**mind** 55:13
**miner** 4:12
**minute** 36:21
**minutes** 100:5
**misheff** 4:3

**mistake** 33:5
86:3,8
**mitchell** 4:4
**mix** 39:21
**modern** 13:21
**modified** 68:20
68:21
**moment** 26:14
60:14 92:1
**money** 9:21
13:5 38:18,18
39:12,13 41:14
43:16 50:2
51:15 56:19
57:17 58:13
60:8,24 75:2,5
81:12 82:3
87:24 88:7,14
88:17 97:1
100:2 101:6,8
101:9,15,23
**monies** 41:3
**month** 49:4,18
50:7,9,18
51:25 52:24
56:13,25
**months** 46:9,11
46:20 47:17
48:5 50:12
68:16 72:21
73:6
**morning** 6:17
6:21 66:7,10
**morris** 4:17

**motion** 6:7,20
7:5 16:6,11
17:24 21:11
26:16 58:20
69:14 79:23
89:18 96:10
**motions** 102:20
**motivation**
28:3
**movant** 6:16
66:5
**move** 16:5 35:8
35:12 55:14
**moved** 69:8
84:18,20 92:25
**moving** 60:22
91:16
**mpduffy** 4:10
**multiple** 53:16
66:20 98:17
**muni** 13:21
30:2
**municipal**
95:22 98:22
**murray** 32:14
32:19 37:2
42:5 59:13
**mw** 1:25

**n**

**n** 4:3,21 6:1
**name** 6:13,18
6:21 8:14 14:9
66:8,11 91:20
**names** 27:11

**[narrative - okay]**

narrative 26:1
narrow 27:21
28:13 52:18,21
54:15
narrowly 32:22
national 53:17
nature 54:5
59:7,19
necessarily
65:13
necessary
23:19
need 9:14 17:4
17:15 37:8
54:12 65:17,22
66:25 67:2
71:12 73:21,21
75:21,21 79:25
84:7,15 91:7
91:13 94:22
95:1 99:9
102:5,20
needed 21:21
54:12 60:8
needs 7:3 17:9
18:11 57:23
62:3
neither 37:13
47:20 48:22
net 27:4
neuman 5:12
neutral 96:17
97:17
never 35:22
36:1,4,14

new 2:12,12,17
2:17 4:13,13
4:23,23 5:9,9
69:3,9,15,25
newton 2:15
newtonb 2:18
nice 39:10,12
nicolaou 2:10
night 36:16
nine 46:9,11
72:21
nonlegal 94:16
nonparties
70:19 84:25
95:10 97:10
98:24
nonparty 6:8
6:10 66:1 85:3
85:13,13 96:8
96:16 97:22
98:7 99:12
notary 103:4
103:18
note 21:14
92:15
notes 14:12
23:8 59:13
92:2 96:4
notice 48:12
53:2
notices 48:16
noting 23:1
november 13:2
57:5,10 68:19
72:13,17 73:16

73:25 78:3,4
78:14 83:18
91:3 94:8
nuclear 9:15
10:13,15 19:9
21:21 28:8
number 6:5,8,9
6:11 26:19,19
26:20 32:7
34:6 37:8,15
57:7 65:25
numbers 52:4
99:22

**o**

o 6:1
o'connor 2:20
o'neil 4:4
objection 69:13
92:23
objections 69:3
69:5,7,9,25
100:12
objective 18:11
obligation 98:8
obligations
7:13
obtain 34:1
65:18
obtained 80:6
obtaining
78:20
obtains 65:12
obviously 14:4
46:24 49:14
85:17

occur 24:9
occurred 17:10
36:19 37:10
46:12 63:11
64:21
october 1:11
6:2 9:8 46:11
56:1,16 59:21
63:9 103:13
offensive 24:8
24:21
offered 30:5
47:4 82:1
offering 30:12
43:10
office 41:15
56:6 64:17
103:13
official 9:1 78:9
oftentimes
18:17
oh 36:18 76:6
ohio 1:1 2:22
3:5,16,20 4:8
4:19 5:4,14,18
8:9 14:21,23
33:10 37:17
38:21 41:17
46:5 53:17
63:23 64:22
78:7,12 103:3
103:5,13,18
okay 16:10
26:19 28:17
35:11 55:16

**[okay - pay]** Page 24

59:9 60:17 65:21,23 92:2

**once** 36:15 60:1

**onerous** 96:16

**ones** 30:7 38:13 43:20

**ongoing** 15:6 58:15

**onward** 91:3

**operated** 22:7

**operating** 10:23 88:5

**opinion** 32:16 91:6

**opportunity** 38:14 102:11

**opposing** 52:17 70:25 85:10 86:6 100:23

**optically** 60:9

**oral** 6:6 102:11

**orchestrated** 18:6

**orchestrating** 8:24

**order** 13:20 17:4 65:11,15 68:15 69:11,13 69:16 92:15,17 95:1,8,12 97:9 100:11,13,22 102:16

**ordered** 16:1 68:7

**ordering** 13:22 20:5

**orders** 13:3 66:20 69:20 71:4 72:25 79:16 97:4

**organization** 27:2 48:16

**organizations** 26:23

**origin** 75:11

**original** 38:12

**originally** 73:11

**outcome** 30:11

**outcomes** 33:16

**outlaw** 64:15

**outside** 13:14 40:8

**overdue** 69:4

**overstate** 22:19

**overwhelming** 70:3

**overwhelmin...** 70:4 95:5

**own** 8:19 18:4 73:15 85:5 93:12 95:13,21

**owned** 7:17 10:14 49:25

**owner** 85:13

**owns** 87:15

**p**

**p** 2:20 4:6 5:16 6:1

**p.m.** 36:16 44:3 102:24

**page** 26:20

**pages** 73:5,8

**paid** 19:7 50:23 77:6 82:4 87:24 88:15

**papers** 66:19 79:25

**pappas** 4:4

**paragraph** 89:19

**parallel** 12:7 22:15

**parent** 10:17

**part** 8:3 11:8 20:10 23:18 28:3 40:18 42:20 50:2,22 62:17,20 63:7 83:14,19 88:16 89:9,9 93:14 102:7

**participant** 7:19 19:16 60:7

**participants** 56:20

**participated** 9:2 17:20

**participating** 43:9

**particular** 35:6 72:10 98:8

**particularly** 96:15 97:8

**parties** 7:11 34:12 45:10 58:22 68:1 84:24 85:5 86:18 96:14 103:11

**partners** 13:1,4 13:7,11,17 58:11 85:20,22 86:5,7,11,13

**parts** 21:10

**party** 7:21 29:9 29:11 30:11 32:23 33:14 48:4,7 54:8 67:10 70:13 77:21 79:8 85:4,9 95:17 95:23

**passage** 9:18

**passed** 23:20 46:5

**passing** 8:12 11:9

**past** 74:3,4 83:20

**paul** 4:2

**pause** 35:5

**pay** 9:21 41:9 43:17 50:23 58:13 60:24

69:2 81:21,25
84:13 86:22,23
87:5,6 88:7,20
89:24 96:20
101:16
**paying** 38:22
39:1 41:1,2,12
41:13 46:16,16
67:12 88:17
95:18 96:24
**payment** 39:7
67:22,25 70:24
71:9,21 72:4
75:14,18 77:5
88:2,4 94:17
94:18
**payments** 8:5
8:24 9:18,24
10:9 18:7
**pdf** 100:23
**pearson** 3:8
**pease** 3:15,18
**pecuniary**
60:23
**pending** 63:3
**pennsylvania**
3:11
**penny** 51:13
89:4
**people** 8:9
14:21 17:2
33:4 39:12
41:22 43:3
47:24 48:14
64:4

**people's** 45:14
64:4 89:22
**percent** 51:23
94:1 99:18,20
**percentage**
51:20 91:7,8
**perfectly** 18:18
74:5
**perform** 83:22
**performed** 51:1
**period** 7:16
11:21 12:2,12
12:14,17,23
28:2 34:21
40:2,24 44:11
44:19 45:4,23
45:25,25 46:1
46:4 47:1,6,10
47:22 49:4,19
50:15 57:3
58:23 59:5
61:15 71:13
74:3,16,20
75:7 76:9,11
79:2,3,4 83:15
88:12 91:14
94:14 102:12
**permitted** 26:8
**perpetrate** 8:8
**perpetrated**
14:21
**perpetrating**
26:3
**personal** 8:23
76:21

**perspective**
38:1 55:8
69:17,23 94:4
**persuasive** 97:9
**philadelphia**
3:11
**phones** 93:13
**phrased** 26:16
**pianalto** 4:4
**pick** 31:2
**picked** 29:14
72:12
**piece** 38:4,6
43:11 46:15
**pieces** 19:19
**piggy** 8:8
**place** 103:9
**plaintiff** 81:24
86:24
**plaintiff's**
97:18
**plaintiffs** 2:2
2:10 6:19,20
7:5 13:25 16:6
16:11 20:19
21:11 25:15,24
29:11,16 35:20
35:21 36:3,8
38:1 41:24
44:2 45:2
51:10 53:2
55:17 56:14
59:1 63:12
66:9 67:17
68:3,6,21 69:2

69:6,8,17
70:20 71:11
72:8,16,19,20
73:10,20 75:12
75:23 77:7
79:1,13,22
80:2,16 81:10
81:22 83:21
84:10,12,13,14
86:21 87:1,5
88:9,13 89:7
90:16,19,25
92:18,25 93:2
93:12 94:4
95:11 96:10
97:3,7,11,14
98:8 99:15,24
100:9,20
**plan** 23:10,13
23:19 24:2
61:24 62:16
**planned** 55:11
**planning** 37:9
**plants** 10:15,16
19:9 21:22
**plastics** 13:21
**platform** 50:25
**platformed**
51:8
**platforming**
51:12
**player** 67:10
**plea** 18:6 56:16
57:5

**please** 16:9 55:15 67:1 100:23 102:22

**pled** 8:19 18:5 86:8,9

**plus** 88:25

**point** 22:4 26:20 29:2,3,4 47:17,22 55:15 56:23 60:12 62:15 65:14 72:6 77:25 79:14 81:6 86:10 90:7 91:13 95:9

**points** 60:18 67:6 92:13

**policy** 17:1

**politicians** 41:15 64:6,12 64:16

**politics** 39:11 43:2

**polk** 4:22

**porter** 4:12,17

**porterwright....** 4:20,20

**portion** 88:14 89:24

**position** 11:12 12:24 21:1 34:11 44:23 58:24 72:15,19 81:14,22 84:15 94:25

**possesses** 11:19

**possession** 68:9 68:14,18 69:22 79:21 95:3 98:10

**possible** 65:19

**post** 93:9

**potential** 10:15 28:4 44:23

**potentially** 81:18 82:7,19 84:2

**pounded** 41:11

**power** 10:15,16 13:21 19:9 21:21 61:3 95:22 98:23

**preceding** 79:5

**precisely** 99:10

**predictive** 54:1

**prefer** 66:22

**preferred** 51:7

**preliminary** 35:17

**premature** 58:1 58:8,17

**preparing** 71:15

**present** 102:13

**pressed** 67:9

**pretextual** 21:4

**pretty** 39:10,12 64:2 86:20 91:24

**prevent** 24:7 26:1 46:17

**previously** 76:18

**prima** 17:6

**principle** 26:7

**prior** 21:18 45:16 79:16 95:1,12 99:19

**private** 50:19

**privilege** 16:9 16:14,24 17:5 20:16 21:7 22:6 23:6,8 24:8,14,21 25:2,3,6 26:10 26:22 30:24,25 31:9,11 32:18 33:7 34:4,17 34:23 35:12,15 35:20,24 45:20 49:11,15 52:10 53:3,4,20,25 54:17 59:2,3,8 62:2,5 74:6,10 74:13 84:7 94:1,7

**privileged** 13:15 16:25 21:3 29:8 30:6 32:8 33:25 35:16 51:18 52:12 53:7 57:18 63:1,2 71:7 72:5

79:11 84:6 90:21 91:5 93:18,22,25 94:3,6,12,19

**privy** 76:16

**pro** 38:9 43:15 50:16 52:6 61:5 64:13

**probably** 73:4

**problem** 10:13 24:25 60:3 71:18 75:4 99:17

**proceed** 6:16 35:9

**proceeding** 103:8

**proceedings** 102:24 103:6,7

**process** 15:5 36:9,12,15 58:23

**produce** 7:6 11:13 12:23 16:2,3,12 20:6 26:21 33:11 58:25 62:25 68:3,7,12,17 69:20 74:6 75:21 94:22 95:2 98:9

**produced** 11:10 16:25 20:15,20 32:12 33:8 37:25

41:8,23 45:2,3
45:11,15,17,19
51:9,10 63:18
71:11 72:24
73:3,4,19,24
78:16 80:8
81:4 82:16
93:25 94:2
**producing**
30:13 45:9
**production**
71:7 73:7
93:10,10
**profile** 54:5
**progress** 13:1,4
58:12 85:21,22
86:5,7,12,13
**progress's** 13:7
13:12,17
**progresses**
57:20
**prohibited**
21:15
**prong** 18:10
**prongs** 17:4
**property** 87:18
**proponent** 17:8
17:15 18:10
**proponents**
28:6
**proportionate**
70:18
**proposal** 56:14
68:20 91:22,25

**proposed** 43:6
50:7 84:18
91:12 100:22
102:15
**prosecution**
7:22 8:1 76:15
85:19
**protected** 39:9
**protocol** 74:9
95:10
**proverbial** 44:4
**provide** 12:13
52:8 65:18
76:19 80:25
92:16,22 99:6
**provided** 17:22
56:9 61:8
77:20 79:22
80:23 100:11
**provides** 10:24
**providing**
38:17,18
**prudent** 57:24
**public** 3:4
11:25 14:18,19
14:22,25 19:1
78:7,11,23
85:2 98:5,6,12
98:18 103:4,18
**publicly** 76:25
**pull** 26:18
**purported**
74:25 75:3
**purportedly**
10:20 98:2

**purpose** 18:11
18:23 19:4,12
43:19 75:19
78:5
**purposes** 6:6
27:16 66:4
**pursuant** 69:5
**pursue** 94:16
**put** 38:13 39:13
54:3,16
**puts** 25:7
**putting** 72:16

**q**

**qualified** 103:5
**question** 15:20
19:11,14 29:22
33:12 35:10
42:4 44:14,15
44:18 47:2,7
48:5 52:14,17
71:2 73:2
92:16
**questions** 16:7
35:6 44:6,14
59:8 66:21
67:2 92:6
**quick** 59:11
101:1
**quid** 38:9 43:15
64:13
**quite** 27:21
102:16
**quo** 38:9 43:15
64:13

**quote** 26:21
68:7

**r**

**r** 2:19 5:7,12
6:1 103:1
**rachael** 3:2
**rachel** 2:3 66:8
**raise** 59:3 69:5
69:7,9
**raised** 36:14,17
60:12
**ran** 45:19 73:9
73:23 93:23
**randazzo** 5:11
6:10 66:1,12
67:11 68:2,10
69:4 71:14,20
74:11,17,22
75:1 76:4,22
77:3,17,19
78:6,19 79:18
82:22 85:25
87:7,10,14,20
88:15 91:3
94:14 95:17
96:20 97:13
98:15,19 101:3
101:23
**randazzo's**
67:16 68:22
82:4 86:21
95:21 96:1,3
97:15
**random** 78:8

**randomly**
   78:18
**range** 15:13
   82:12 89:20
**rata** 50:16 52:7
**rather** 67:4
   68:25 80:7
   93:25
**rcocalis** 2:7
**reach** 80:11
**reached** 11:4
   58:22
**reacted** 11:23
**read** 37:5
**readily** 85:1
   86:18
**reading** 44:5
   52:15 55:13
**ready** 6:25
   42:11 66:16
   102:14
**reality** 37:17
   40:21 87:21
   88:12
**realize** 7:14
**really** 19:11
   25:23 46:8
   54:25 55:9
   59:19 61:10,11
   62:3 69:18
   70:20 74:15
   82:6 84:11
   85:9 86:2
   90:22,24

**reap** 16:22
**reason** 23:15
   30:14 37:24
   81:7 92:23
   94:5 96:19
   98:16 99:16
   100:11
**reasonable**
   17:9 57:1
   70:14 74:2,5
   83:12 91:25
   93:5
**reasons** 13:18
   33:18 47:5
   48:19
**rebuttal** 54:19
   92:9
**recall** 52:2
   60:25
**receive** 40:14
   42:17
**received** 61:1
   71:21 76:6,22
   88:10 101:11
**recently** 45:11
   87:22 96:25
**recognize** 72:8
**recognizes** 72:7
**recommend**
   64:9
**recommended**
   63:13 64:10,19
   100:7
**reconsider**
   90:23

**reconsideration**
   69:14
**record** 6:3 25:7
   66:4 77:14
   102:21
**records** 75:6,9
**reduced** 103:6
**referenced**
   67:17,18,19
   70:24 83:17
   89:6
**referencing**
   89:7 101:5
**referendum**
   8:13 9:19 38:5
   38:19,25,25
   41:2 42:2
   46:10,14,18
   50:3
**referred** 61:6
**referring** 101:6
   101:8
**reflect** 75:22
**refuse** 96:4
**refused** 68:2
**refusing** 68:17
**regard** 22:5
   72:16 83:13
   90:12 96:12
**regarding** 6:9
   13:1 16:14,19
   25:21 67:25
   68:8,13,17
   69:21 93:6,19
   95:2,5 99:15

**regularly** 50:22
**regulation**
   43:11
**regulations**
   27:10
**regurgitate**
   67:5
**rejected** 13:7
   58:11 91:16
**related** 6:9 18:9
   27:4,5 75:13
   79:19 102:19
**relates** 1:6
**relating** 12:8
   71:9 72:3,10
   73:12 79:20
   87:16
**relations** 11:25
**relationship**
   15:25
**relative** 15:9
   86:17 87:4
   88:19,19
   103:10
**relatively** 97:17
**release** 22:25
**relevance** 68:5
**relevant** 11:19
   13:14 15:24
   48:6,20 56:22
   58:7 70:12
   79:19,20 95:4
**reliance** 25:16
**relied** 24:23

**[relief - running]** Page 29

| | | | |
|---|---|---|---|
| **relief** 26:14 52:17 | 68:6 90:14 | **responses** 59:11 | **right** 22:4 37:18 51:5 |
| **relieve** 13:13 | **requested** 26:14 52:18 | **responsible** 15:1 | 61:22 64:15 |
| **relieved** 12:22 | 79:13 | **responsive** | 77:2 84:18 |
| **rely** 25:8 | **require** 79:7 | 51:17 73:24 | 89:14 92:5 |
| **relying** 24:24 | **required** 61:5 | 79:12 90:4 | 102:5 |
| 25:1 101:18 | 78:24 86:12 | 95:11 | **rise** 32:9,10,13 |
| **remarks** 48:15 | **requirement** | **responsiveness** | **risrael** 3:6 |
| 96:18 | 70:17 | 54:17 | **ritter** 5:16 |
| **remember** 51:4 | **research** 102:6 | **rest** 25:17 | **robbins** 2:4 |
| **remote** 1:13 | **reserve** 28:19 | **resubmit** | **robert** 4:17 |
| **remotely** 103:9 | **resigned** 78:6 | 100:21 | **roger** 5:16 |
| **render** 15:18 | 94:15 | **resubmitted** | 66:14 77:16 |
| **repeal** 8:13 | **resolve** 10:13 | 80:13 | 91:23 |
| 9:19 | 93:11 | **result** 7:20 | **room** 64:21,23 |
| **repeat** 79:25 | **resourced** | 35:23 93:12 | **roughly** 89:20 |
| **repeatedly** 14:9 | 96:14 | **resulted** 28:8 | **rpr** 1:17 103:17 |
| 14:24 | **resources** | **retained** 71:14 | **rsugarman** |
| **reply** 38:14 | 87:20 89:22 | 76:5 | 5:19 |
| 39:5 | 97:10,14 | **review** 50:25 | **rtrafford** 4:20 |
| **reported** 20:24 | **respect** 18:20 | 51:1 53:24 | **rudman** 2:4 |
| **reporter** 65:23 | 19:2 24:14 | 59:1 74:15 | **rule** 14:12 15:7 |
| **represent** 6:13 | 25:10 26:10 | 79:9,11 80:14 | 55:18 58:4 |
| 66:9,12 97:6 | 27:7,13,25 | 82:19,20 84:7 | 69:6 70:13,16 |
| **representatives** | 55:5 58:11 | **reviewed** 74:19 | 102:14 |
| 75:17 | 62:15 63:5,9 | 84:3 99:9 | **rules** 24:6 27:9 |
| **representing** | **respond** 38:15 | **reviewing** | 32:7 70:12 |
| 6:22 | 92:12 | 74:17 90:21 | **run** 7:21 31:12 |
| **reputable** | **responded** 69:6 | **reviews** 58:5 | 40:16 45:14,18 |
| 63:15,16,23 | **responding** | **rewards** 16:22 | 54:15 58:2 |
| 64:22 | 86:19 | **reyes** 4:4 | 72:2 73:15,22 |
| **reputation** 14:4 | **response** 30:13 | **rgrdlaw.com** | 93:2,3 |
| **request** 7:5 | 57:12 79:15 | 2:7,7,8 | **running** 41:15 |
| 13:17 16:6,11 | 92:18 94:25 | | 64:17 |
| 18:12 39:5 | | | |

| s | | | |
|---|---|---|---|
| **s** 1:17 2:4 4:16 6:1 18:23 27:15 42:16 103:4,17 | **schneider** 2:19 **schuhmann** 98:24 **sciarani** 2:4 6:17,18 7:1 16:10 20:13,18 | **searches** 95:13 **searching** 75:8 **sec** 33:9 35:18 37:20 48:22 54:7,23 55:1 | **seized** 58:13 **selected** 78:8 78:18 **selective** 21:12 21:15 23:12 |

**s** 1:17 2:4 4:16
  6:1 18:23
  27:15 42:16
  103:4,17
**sam** 5:11 6:10
  66:1
**sample** 93:23
**san** 2:6
**sanctioned**
  76:18
**sandra** 4:4
**santen** 2:20
**santenhughes...**
  2:23
**sater** 3:15,18
**saw** 38:21
  41:10 99:21
**saying** 36:18
  48:13 71:11,12
  71:16 76:1
  81:10,16,24
  82:3 83:21
  93:22
**says** 29:8 40:9
  96:9 99:16
**scandal** 8:22
  14:23 16:20
  40:19 46:9
  48:17
**scheme** 13:6
  17:23 55:18,22
  56:4
**schemes** 98:7

**schneider** 2:19
**schuhmann**
  98:24
**sciarani** 2:4
  6:17,18 7:1
  16:10 20:13,18
  21:6 27:6
  28:18 36:12
  39:4,21 40:9
  41:8 54:20
  55:16 57:2,9
  57:14 58:22
  59:10 60:17
**sciarani's**
  38:12
**scienter** 28:4,4
  55:21
**scope** 27:14
**score** 88:9
**screw** 26:17
**seal** 103:13
**search** 13:13
  16:2 45:5,7,7
  45:13,18 54:3
  54:15 58:2,6
  71:13 72:2,9
  73:9,15,22,23
  77:25 78:1,5
  80:10 81:18
  82:2,9,13
  88:25,25 91:17
  93:1,5,14
  95:10
**searched** 78:15

**searches** 95:13
**searching** 75:8
**sec** 33:9 35:18
  37:20 48:22
  54:7,23 55:1
  55:10 58:7
**second** 16:10
  18:10 24:20
  26:18,20 36:6
  42:4 52:14
  86:17 96:12
**secondly** 34:13
  42:22 47:23
  48:3 96:12
**sections** 35:12
**secure** 17:17
**securities** 1:4
  6:4 12:10 14:6
  55:3
**see** 7:22 12:1
  18:15 23:5,12
  24:20 25:5
  28:10 39:3
  42:1 59:6 62:1
  64:6 71:16
  76:24 82:15
  97:12
**seeing** 52:2
**seek** 69:15
**seeking** 33:25
  68:4
**seeks** 79:23
**seem** 27:19
  61:16

**seized** 58:13
**selected** 78:8
  78:18
**selective** 21:12
  21:15 23:12
  24:5,6 26:1,8
  29:2,6,13 62:4
**selectively**
  20:20 24:3
  29:13
**selectiveness**
  63:8
**selectivity**
  31:13
**sending** 11:2,2
**sense** 49:3,9
  58:1 72:9
**sent** 31:18
  36:17 42:19
  48:11,17 72:3
**separate** 22:23
  23:23 40:5,6,6
  40:7,8,21
  47:15 83:12
**separated**
  39:24 40:5
  46:21 61:16
**separately**
  47:16 93:16
**separation**
  22:20 40:2,24
**september** 45:4
**serious** 17:7
  34:5 53:9

| | | | |
|---|---|---|---|
| **served** 75:5 | **shift** 96:4 | **significant** 15:7 | 11:16,18 15:3 |
| **server** 68:25 | **shifting** 13:18 | 15:19 36:5 | 15:21 18:4,7,9 |
| **service** 8:3 18:2 | 13:23 44:7,8 | 88:14 98:21 | 18:21 19:6,16 |
| 22:8 23:1 | 49:23 70:1,5 | **similarly** 14:7 | 19:20 21:8,25 |
| **services** 10:24 | 84:22 88:21 | **simply** 29:19 | 22:7,15,19,22 |
| 10:25 11:1 | 90:13 92:21 | 30:8,10,14,18 | 23:5,18,20 |
| 56:9 80:7 | 95:5,6,15 96:7 | 31:6,16 33:22 | 24:2,12,16 |
| **serving** 78:11 | 97:24 98:11 | 35:4 42:20 | 25:14,23 27:16 |
| **set** 12:8 13:1 | **shinbrot** 4:21 | 69:18 93:3,12 | 28:1,9 41:20 |
| 17:11 24:7 | **shively** 3:3 | 94:12 96:2 | 56:3 59:20,23 |
| 32:19,22 37:5 | **short** 7:25 | 99:24 100:9 | 60:3,6 61:2,8 |
| 82:25 103:12 | 54:10 56:14,25 | **single** 76:16 | 64:10 |
| **settled** 37:22 | **shoulder** 82:7 | **sit** 33:10 37:17 | **solutions's** |
| **settlement** 11:3 | **show** 17:9,16 | 45:1 51:5 | 24:19 |
| 22:11 88:16 | 18:11 38:1 | 80:20 | **somebody** |
| **several** 30:25 | 41:7 63:13 | **sitting** 101:12 | 76:19 85:11 |
| **seymour** 3:15 | 98:20 | 101:14 | **soon** 48:9 65:19 |
| 3:18 | **showed** 45:5,6 | **six** 68:16 | **sordid** 97:12 |
| **sfao** 5:11 66:12 | 60:5 | **sixth** 5:8 17:8 | **sort** 31:13 |
| 68:2,10 69:4 | **showing** 17:6 | 21:11 24:6 | 43:15 44:2 |
| 77:17 78:19 | 97:16 | 26:7,9 29:7 | 51:6 72:11 |
| 79:19 98:19 | **shown** 17:4 | **slate** 61:5 | **sought** 16:18 |
| **share** 61:18 | **shows** 57:15 | **slice** 53:5 | 18:22 19:24 |
| **shared** 10:25 | 59:19 | **slid** 59:25 | 70:17 92:18 |
| 20:21,22 22:8 | **shy** 35:10 | **smaller** 58:12 | **soul** 46:8 |
| 23:1,9 24:3,15 | **sidelines** 10:1 | **smart** 4:2 | **source** 18:24 |
| 30:21 31:7 | **sides** 6:15 67:7 | **sold** 96:25 | 81:17 |
| 32:3 56:9 | 101:22 | **solely** 68:5 | **sources** 80:7 |
| 61:14,25 | **sign** 38:24 | **solution** 21:19 | **south** 4:18 |
| **sharing** 61:12 | **signature** 38:23 | 21:20 28:2 | **southern** 1:1 |
| **shawn** 1:9 | 41:10,13 46:16 | 49:2 50:7,8 | **spahr** 3:9 |
| **shed** 36:21 | 103:16 | **solutions** 7:16 | **speak** 86:21 |
| **shedding** 36:7 | **signed** 46:6 | 7:18 8:4,14,16 | 89:13 |
| **shield** 33:21 | **significance** | 8:21,25 9:2,5,9 | **speaker** 61:4 |
| 40:18 | 78:4 | 9:20 10:11 | |

**[speaking - sugarman's]**

| | | | |
|---|---|---|---|
| speaking 72:1 | statements | streeter 5:7 | subpoena |
| speaks 93:8 | 85:18 | 6:21,22 28:20 | 30:14 48:11 |
| special 1:9 7:1 | states 1:1 97:20 | 28:24,25 30:4 | 68:21 69:7 |
| 60:11 62:9 | stay 56:6 | 35:11 37:1 | 70:14 73:13 |
| 83:10 | stenotypy | 44:9 50:11,21 | 77:18 92:18 |
| specific 8:12 | 103:6 | 51:4,22 52:5 | 95:12 97:11 |
| 27:2 32:10 | steps 58:4 | 52:12,23 54:2 | subpoenas 68:3 |
| 52:4 75:19 | 70:14 | 54:18 56:18 | 75:6 |
| 99:16 | steven 4:3,5 | 58:18 59:13 | subsequent |
| specified 103:9 | stolen 41:5,6 | 60:11,18 62:13 | 42:23 |
| speculate 47:24 | 43:21 56:19 | 62:14 65:7 | subsidiary 7:17 |
| 90:3 | stop 68:9 | streeter's 55:24 | 50:1 |
| speculation | storage 69:1 | 57:13 62:10 | substance |
| 48:2 | stored 68:25 | strict 21:12 | 36:23 |
| spend 81:12 | stovall 5:12 | stuff 64:2 | substantiate |
| 100:2 | strah 4:5 | subject 10:17 | 76:19 |
| spending 57:16 | straightaway | 26:10 28:11 | substantiated |
| 75:2 | 66:21 | 29:2,22,23 | 77:1 |
| spent 45:8 | strange 42:16 | 32:9,13,16 | succeeding |
| spiel 28:19 | 99:22 | 33:22 35:3 | 46:18 |
| split 91:22 | strategic 30:7,9 | 36:2 37:4 | successfully |
| square 3:4 | 31:3,12 32:24 | 44:15,19,23 | 23:21 |
| ss 103:3 | 33:12,21 34:22 | 48:21 53:8 | sue 4:5 |
| standard 17:11 | 62:24 | 61:10 67:19 | sued 14:2 37:20 |
| 17:18 | strategically | 79:4 | sufficient 95:10 |
| start 6:11 27:6 | 30:5 | submission | sufficiently |
| 29:1 70:11 | strategizing | 94:24 | 17:6 |
| 71:1 89:17 | 33:15 | submit 59:14 | sugarman 5:16 |
| state 5:17 6:13 | strategy 32:2 | 79:17 100:24 | 66:14 77:11,15 |
| 98:23 103:3,5 | 33:13 | 102:9 | 77:16,24 80:10 |
| 103:18 | strauss 63:14 | submitted | 83:5,16 89:14 |
| statement | street 2:11,16 | 79:16 83:24 | 89:16 90:2,10 |
| 22:25 48:4 | 2:21 3:10,15 | 93:4,21 96:22 | 94:9 99:21 |
| 55:21,21 66:22 | 3:19 4:13,18 | 99:3 101:21 | sugarman's |
| 66:24 87:23 | 5:13,17 | | 82:5 87:15 |

91:20 101:7
**suggest** 24:15
25:21
**suggested** 44:1
65:3
**suggests** 25:12
25:19
**suite** 2:5,21 3:4
3:19 4:8,18 5:4
5:13,17
**sullcrom.com**
2:18
**sullivan** 2:16
**supplement**
90:5
**support** 8:5
9:18 13:6
17:23 22:10
25:8 26:15
38:4,6 39:13
40:25 41:15,16
46:15 64:6,12
64:12,16 98:25
**supported** 77:9
99:1
**supporting**
56:4
**supportive**
9:14 60:3
**supposed** 70:14
87:3
**sure** 35:7 48:3
48:19 52:11
90:2,12 101:4
101:17

**surprise** 102:2
**suspect** 17:10
**sword** 33:21
40:18
**synced** 81:6,8
81:20 82:24
100:1,1

**t**

**t** 2:10 4:2,3
103:1,1
**table** 60:1
**taft** 3:14
**take** 8:11 19:22
24:21 58:4
59:21 65:10
70:14 100:5,18
102:3
**taken** 33:24
76:17 103:9
**talk** 26:13 30:2
36:23 44:7,9
44:10 46:3
75:21 86:22
87:6,7,8 88:9
93:1 94:20
**talked** 93:16
**talking** 28:14
36:13 45:24
49:7 88:24
89:1
**targeting** 27:2
**taylor** 4:5
**team** 9:4 10:10
61:7

**tell** 37:14 52:24
72:24 73:3
**telling** 86:20
**ten** 53:11 88:11
93:24,24
**tens** 51:25
**term** 15:9
78:11 93:3,7
**terms** 16:2 45:7
45:13,19 49:22
54:3,15 56:4
58:3,6 73:9,15
73:22,23 79:14
93:2
**testified** 8:22
56:2 59:24
**testimony**
67:20
**text** 38:16
70:11 78:21
**texts** 83:8
**thank** 6:24
28:22,25 54:18
62:8,11,14
65:7,8,24 66:6
66:15 70:7,8
70:10 73:1
90:10 92:2,7
100:15
**theory** 48:24
61:25
**thin** 78:8
**thing** 28:7 36:6
48:8 52:16
53:9 89:5

**things** 11:1
31:14,15 32:5
37:13 40:14
47:25 51:19
53:2 71:21
74:14 81:9
84:9 89:6
**think** 15:7
27:13,20 36:5
39:11,22 49:3
49:17 50:17
51:22 52:23
53:10 54:24
56:14 57:9,14
57:25 58:1,8
60:19 61:11
70:20 71:5,6
71:18,24 72:7
72:14 73:4
74:1,5,9 75:7
75:10,17 76:7
77:2,9 79:25
80:16 81:18,19
81:20,23 82:1
82:11,14 83:10
84:1,11,22,24
85:12 86:20,24
87:8 88:2,7,18
88:20 90:15,19
90:23,25 91:12
91:15,17,21
102:1
**thinking** 13:22
44:21 52:22
54:25

| | | | |
|---|---|---|---|
| **third** 7:21 54:8 | 74:20 76:10 | **touch** 20:4 | **tucker** 5:3 |
| 77:21 79:8 | 77:25 78:1,14 | 56:13 70:23 | **tuckerellis.com** |
| 95:14 98:4 | 78:15 79:4,6 | **touched** 83:11 | 5:5 |
| **thomas** 4:3 | 80:17 81:20,23 | **touchstone** | **turn** 31:4,5,20 |
| **thornton** 4:5 | 82:19 83:25 | 32:23 | 31:23 62:9 |
| **thorough** 32:16 | 87:12 88:12 | **trafford** 4:17 | 70:9 |
| **thought** 91:24 | 89:1 91:14 | **transcribed** | **turned** 9:22 |
| **thoughts** 49:21 | 94:8,14 99:1 | 103:6 | 31:25 34:14 |
| **thousand** 73:5 | 103:9 | **transcript** | **turner** 4:5 |
| **thousands** | **timely** 90:8 | 65:13,18 | **turning** 95:4 |
| 51:24,25 | 92:23 100:12 | **transcription** | **turns** 14:4 15:2 |
| **three** 20:11,20 | **times** 97:25 | 103:7 | 61:12 |
| 37:18 84:24 | **timothy** 3:8 | **treatment** 12:5 | **tv** 38:22 46:17 |
| **threw** 36:20 | **title** 87:17 | **trial** 8:23 18:1 | **two** 6:7 10:14 |
| 44:2 | **titled** 23:10 | 19:18 55:5 | 17:4 19:19 |
| **thursday** 1:11 | **titles** 87:17 | 56:2 | 24:9 32:5 |
| **ticket** 49:11 | **today** 6:23 | **tried** 39:21 | 33:18 34:4,7 |
| **tied** 78:9 | 11:19 15:5 | **true** 14:16 | 34:12 35:21 |
| **time** 8:15 9:4 | 29:5 45:1 67:7 | 22:24 37:13 | 36:1 37:7 44:6 |
| 10:6 12:2 | 79:17 80:21 | 40:11,20 81:13 | 44:13 46:20 |
| 15:18 28:19 | 102:9,20 | 93:21 103:7 | 60:17 62:19 |
| 30:22 34:14 | **today's** 102:2 | **trust** 35:10 | 67:13 97:4,5 |
| 38:21 39:3 | **together** 11:8 | 82:5 87:15,25 | **type** 99:10 |
| 41:20 42:17 | 23:24,24,25 | 89:8 | **types** 28:14 |
| 43:1 44:11,19 | 24:1 39:22 | **try** 7:2 32:23 | |
| 45:8,23,24 | **told** 31:21 | 38:24 46:15,17 | **u** |
| 46:1,3,25 47:6 | 58:18 | 49:5 54:20 | **u.s.** 18:15 98:7 |
| 47:10,22,22 | **ton** 66:18 | 64:5,17 91:18 | **ultimate** 23:17 |
| 48:25 49:4,18 | **took** 58:24 | **trying** 20:17 | 71:19,25 74:4 |
| 50:15 51:16,21 | **topic** 28:11 | 22:1 38:9 | **ultimately** |
| 57:3,17 58:9 | **topics** 35:8 | 40:10 49:1 | 27:23 74:2 |
| 58:17,23 59:5 | **total** 48:2 73:4 | 53:5 71:19,22 | 75:10 81:16 |
| 61:15 62:8 | 73:7 | 73:13,16,18 | **unable** 25:3 |
| 69:25 70:6 | **totally** 29:20 | 86:5 87:13 | **unambiguous** |
| 71:12,13 74:16 | 47:16 | 91:2 | 92:15 |

**unavailable**
  89:12
**unaware**  76:20
**unclear**  71:3
**under**  16:23
  22:7 23:6,11
  55:18 58:4
  61:24 65:10
  70:13,16 95:6
  100:13,18
  102:3
**underlying**
  14:15 67:16
  95:24
**understand**
  12:11 14:1
  20:11 33:7
  37:15 49:24
  54:13 57:23
  81:5
**understanding**
  83:2 88:3
**undertaken**
  23:4
**underwriter**
  4:16
**undue**  70:15
  93:20 98:25
**unequivocally**
  68:6
**unfrozen**  82:5
**united**  1:1
  97:20
**unnecessary**
  58:5

**unsaid**  78:17
**unsavory**  46:19
**unsupported**
  15:18 17:14
**unusual**  42:16
  43:11
**unwitting**
  56:20 60:7
**upheld**  55:19
**use**  17:2 24:8
  24:21 35:15
  50:22 51:3
  53:23 54:16
  62:4
**used**  8:7 9:5
  13:5 16:3,20
  17:25 19:6
  25:21 43:19
  54:3 60:24
  79:8
**using**  16:2 22:9
  25:25 50:19
  53:25 54:10
**utilities**  78:7,11
**utmost**  14:19
**utterly**  10:23

**v**

**v**  14:12 18:15
  95:22 97:20
  98:23,23,24
**various**  21:16
**vast**  7:12 84:4
**vawalton**  3:21
**vehemently**
  85:17

**vendor**  50:20
  50:21 51:24
  52:8 77:21
  79:8 80:16
  99:5 100:7
**vendors**  51:3
  99:11
**verhoff**  63:21
**version**  93:8
  100:21
**vespoli**  4:11
**victor**  3:18
**victoria**  1:17
  65:21 102:21
  103:4,17
**view**  20:19
  55:12 59:15
**views**  12:25
**vine**  2:21
**voith**  95:22
  97:15 98:23
  99:12
**volume**  99:5,8
**volumes**  93:8
**vorys**  3:15,18
**vorys.com**  3:17
  3:21

**w**

**w**  4:17
**wading**  49:15
**waive**  25:3
**waived**  26:9
  69:4 92:24
**waiver**  21:13
  21:15 23:13

  24:5,6 26:1,8
  29:3,6,13,23,23
  32:9,10,13,16
  33:23 35:3
  37:4 44:15
  61:11
**waives**  25:6
**waiving**  24:13
**walk**  20:9 21:4
**walton**  3:18
**want**  30:15
  35:7,11,16
  36:6 44:19,24
  52:9,9 57:9
  64:6 67:6
  69:24 70:11,23
  72:20 74:22,23
  75:13,15 78:17
  81:14 82:4
  84:12,21 86:3
  87:6,7 90:2,5
  90:17,24 92:1
  92:12
**wanted**  45:13
  59:1
**wardwell**  4:22
**warranted**  70:5
**wast**  69:25
**way**  31:21
  35:25 36:18
  39:22 46:23
  47:20 48:21
  50:14 52:18
  54:15 64:24
  75:7 91:19

**[way - zoom]**                                            Page 36

92:20 93:11

**we've** 45:20,21
  47:9 51:8
  60:19 73:3,4
  73:25 79:8,24
  84:10 91:10

**wear** 103:18

**week** 45:11,15
  51:10 72:3

**weeks** 57:10

**weigh** 80:24
  95:6

**weighed** 95:14
  96:7 97:24

**weighs** 88:20
  97:17

**went** 31:16
  43:16,18 60:7
  64:25 72:18
  75:5 78:13
  94:21 101:8

**west** 2:5 4:13
  5:13

**whatnot** 60:25

**whereof** 103:12

**whichever**
  66:22

**wholly** 7:17
  46:13 49:20,25

**wider** 27:3

**willing** 58:3
  76:21 84:13

**wilson** 3:9

**wilsonbm** 3:12

**wiped** 20:16

**wires** 11:2

**withheld** 16:14
  23:14,16 25:18
  26:22 30:6
  62:6,21 63:7

**withhold** 29:10
  31:8

**withholding**
  11:20 23:5
  61:24

**witness** 103:12

**word** 100:21

**words** 19:8

**work** 94:17

**worked** 9:25
  23:23,24,25
  24:1 30:21
  47:21

**working** 8:4
  11:8 39:25
  53:18,19,22

**wrap** 90:13

**wright** 4:17

**written** 37:2
  68:15

**wrong** 19:10
  91:23 101:10

| y |
|---|

**year** 30:20
  31:18 32:1
  33:2,20 34:19
  45:3 46:4,7
  49:9 58:20
  68:23

**yearlong** 36:9
  36:11

**years** 35:21
  36:1 37:18
  88:11 94:16
  99:20

**yield** 90:22

**york** 2:12,12,17
  2:17 4:13,13
  4:23,23 5:9,9

| z |
|---|

**zen** 28:7,13

**zero** 51:13

**zoom** 1:13 2:1