IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE FIRSTENERGY CORP. SECURITIES LITIGATION, | Case No. 2:20-cv-3785 |
| This document relates to: | Chief Judge Algenon L. Marbley |
| ALL ACTIONS. | Magistrate Judge Kimberly A. Jolson |

**ORDER BY SPECIAL MASTER
ON MOTION TO COMPEL (ECF NO. 491)**

This matter is before the undersigned for consideration of the July 7, 2023 Motion to Compel Discovery from Non-Party Energy Harbor filed by Class Plaintiffs.[1] (Motion, ECF No. 491.) For the reasons that follow, the undersigned **GRANTS** the motion.

**BACKGROUND**

This case is a consolidated class action brought on behalf of all purchasers of securities in FirstEnergy Corp. ("FirstEnergy") between February 21, 2017 and July 21, 2020. (Amended Complaint, ECF No. 72 ¶ 1.) Class Plaintiffs seek relief under the Securities Act of 1933 and the Securities Exchange Act of 1934 against FirstEnergy, certain of its current and former employees, and "the investment banks which underwrote two FirstEnergy debt offerings during the Class Period." (*Id.*).

---

[1] In this context, "Class Plaintiffs" means Los Angeles County Employees Retirement Association and Plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund, City of Irving Supplemental Benefit Plan, and Wisconsin Laborers' Pension Fund from Case No. 2:20-cv-03785. The "Direct Action" Plaintiffs from S.D. Ohio Case Nos. 2:21-cv-05839 and 2:22-cv-00865 join in Class Plaintiffs' arguments. (Mot., ECF No. 491 at PageID 10531 fn.1.)

The crux of Plaintiffs' claims is that "FirstEnergy and its most senior executives bankrolled one of the largest corruption and bribery schemes in U.S. history" to influence Ohio elections and secure a $1.3 billion bailout for two of its failing nuclear plants, as well as $700 million in subsidized revenues for the company, through passage of Ohio House Bill 6 ("HB6"). (*Id.* ¶¶ 3, 5.) The theory behind the claims is that when FirstEnergy's role in this scheme was brought to light, the price of its stock fell sharply, resulting in "billions of dollars of losses" for FirstEnergy investors. (*Id.* ¶ 9.)

Parallel to this litigation, the government has pursued criminal charges against several defendants alleged to have participated in this scheme, including Householder. *See United States v. Larry Householder, et al.*, No. 1:20-cr-00077-TSB (S.D. Ohio). On March 9, 2023, a jury found Householder and co-defendant Matthew Borges guilty on charges of conspiracy under the Racketeer Influenced and Corrupt Organizations Act. (*Id.* at ECF No. 240.) During this jury trial, the government highlighted Jones's and Dowling's purported relationships with Householder and involvement in the conspiracy. (Transcript, ECF No. 444-2) (trial transcript from March 7, 2023, including government's closing argument). And multiple representations before the Court suggest that FirstEnergy's cooperation with government investigations is ongoing. (ECF No. 457 at 2–3.)

Against this backdrop, multiple discovery disputes have arisen. One of the latest is a dispute between Class Plaintiffs and non-party Energy Harbor, which was formerly known as FirstEnergy Solutions. Energy Harbor adopted its current name after emerging from bankruptcy in February 2020 as a separate company; prior to that point, the company was part of FirstEnergy.

Class Plaintiffs assert that, during the class period, FirstEnergy Solutions contributed $43 million of the $60 million paid to Householder and his affiliates in exchange for the official action of passing HB6 and defending it from a repeal referendum. Class Plaintiffs label FirstEnergy

Solutions "an indispensable party to the bribery scandal" and, summarizing generally here the facts discussed in the briefing, explain that the company's External Affairs Chief, David Griffing, the company's lobbyist, Juan Cespedes, and other company lobbyists met with Householder in October 2018 to deliver a $400,000 check made out to Householder's 501(c)(4) entity Generation Now.  Cespedes then coordinated weekly million-dollar payments from FirstEnergy Solutions to Generation Now to fund the anti-referendum efforts.  Cespedes has since pled guilty in the criminal proceedings.

Following the arrest of Householder and Cespedes, both FirstEnergy and FirstEnergy Solutions (by now Energy Harbor) conducted internal investigations into what had occurred.  In June 2022, Class Plaintiffs issued a subpoena to non-party Energy Harbor seeking various material.  A meet and confer followed, after which Class Plaintiffs requested additional material from Energy Harbor not included in documents that Energy Harbor had produced to the Department of Justice.  Additional back-and-forth followed, but multiples issues remain regarding what, if anything, Energy Harbor must produce.

Class Plaintiffs' motion to compel has been fully briefed.  *See* Briefing, ECF Nos. 491 (motion/memorandum), 506 (memorandum in opposition), and 515 (reply).  The motion then came on for an oral hearing on October 19, 2023.  At that hearing, counsel for Class Plaintiffs and counsel for Energy Harbor presented oral argument.  At the conclusion of the hearing, the undersigned took the motion under advisement.  In a November 16, 2023 status conference, the undersigned issued a preliminary, non-binding decision and informed the parties and counsel for Energy Harbor that the motion to compel would be granted with one modification.  The instant Order memorializes the rationale for and finalizes the granting of the motion to compel.

## **STANDARD INVOLVED**

Pursuant to the Court's September 12, 2023 Order Appointing Special Master, the Special Master "shall have the authority to address pretrial matters, including but not limited to the following: . . . [e]stablish discovery and other schedules; direct and supervise the production of discovery including electronically stored information; review and attempt to resolve informally any discovery conflicts, including issues such as discoverability of particular information, privilege, confidentiality, and access to trade secrets and other records; and generally supervise formal discovery and any informal exchanges of information." Order, ECF No. 541 at PageID 11684.

The Court has set forth the standard for addressing a motion to compel discovery from a non-party:

> Rule 26(b) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 45, for its part, provides that when a subpoena has been objected to, "the serving party may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i). "The proponent of a motion to compel discovery bears the initial burden of proving that the information sought is relevant." *Gruenbaum v. Werner Enters., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010) (citation omitted).
>
> . . .
>
> [I]f the movant makes an initial showing of relevance, "then the burden shifts to the non-movant to show that to produce the information would be unduly burdensome."

*In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-cv-3785, 2022 WL 17075838, at *2, *4 (S.D. Ohio Nov. 18, 2022) (citing *Ball v. Kasich*, 2018 WL 6242230, at *3 (S.D. Ohio Nov. 29, 2018) (alteration in original)).

In addition, Rule 45(d)(1) provides that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a

person subject to the subpoena." The Sixth Circuit has explained that "[u]ndue burden is to be assessed in a case-specific manner considering 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *In re: Mod. Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018) (quoting *Am. Elec. Power Co., Inc. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999)). The court of appeals has also explained that the need for discovery must be balanced against the burden imposed on the person ordered to produce documents, with the status of the person as a non-party a factor to be considered. *Id.*

## **DISCUSSION**

There is no question in the undersigned's mind that the material that Class Plaintiffs seek is likely relevant to the claims and defenses at issue in this litigation. There is also no question that Energy Harbor is not a typical non-party. Throughout the underlying period of questionable conduct, the company then known as FirstEnergy Solutions was a wholly owned subsidiary of FirstEnergy. It also appears that FirstEnergy Solutions was a direct participant in the underlying conduct constituting or at least informing the activities at the core of this litigation. Energy Harbor emerged from the bankruptcy reborn as a separate company, but that status does not erase its history and the relevance of its conduct to the proceedings with which this litigation is concerned.

The factual allegations of the deferred prosecution agreement alone make clear that FirstEnergy Solutions was an essential actor that was (knowingly or unknowingly) working with FirstEnergy in the underlying impropriety. The bankruptcy court found that FirstEnergy Solutions was incapable of operating independently from FirstEnergy. The shared services agreement that existed between FirstEnergy and FirstEnergy Solutions presents an intertwined bundle of

5

associations. Energy Harbor is justly a critical component of the discovery to be had in this litigation.

There is also no question in the undersigned's mind that the material that Energy Harbor has could yield relevant information, especially concerning the company's actions related to its parallel investigation and to the role of Defendant John Judge. To conclude that Energy Harbor has no interest in this litigation would necessitate a logical disconnect; the company by whatever name was and is involved, even if liability is not at issue. Moreover, the company's CEO is a named defendant here.

Relevance also partially informs the next issue, which is what is the appropriate period of discovery. Whether to permit discovery beyond a class period depends on the particular facts of the specific litigation involved; there is no blanket rule. It is well settled that, "[i]n general, courts allow discovery to extend to events before and after the period of actual liability so as to provide context." *In re New Century*, No. CV 07-0931, 2009 WL 9568860, at *2 (C.D.Cal. July 8, 2009). *See also Owens v. Sprint/United Mgmt. Co.,* 221 F.R.D. 649, 655 (D.Kan.2004) ("[D]iscovery of information both before and after the liability period . . . may be relevant and/or reasonably calculated to lead to the discovery of admissible evidence and courts commonly extend the scope of discovery to a reasonable number of years both prior to and following such period.").

Context undoubtedly matters in this litigation, and post-arrest events and information here will likely inform how pre-arrest conduct is characterized and construed. The undersigned reaches this conclusion in part based on the fact that fraud is involved here, which makes persuasive the reasoning of *Sheet Metal Workers Local 19 Pension Fund v. ProAssuarnce Corp.*, No. 2:20-CV-00856, 2022 WL 2528249 (N.D.Ala. June 23, 2022). That securities fraud case presented the question of how far beyond the class period should discovery extend, if at all. *Id.* at *5. The court

explained that "[e]xtending the discovery timeframe [to six months after the class period] would permit the discovery of relevant information without imposing disproportionate burdens on the defendants when viewed in context with the factors needed to prove securities fraud if fraud did occur." *Id.* at \*6. Cognizant that the fraud of the sort involved here is partly different than the fraud involved there, the undersigned still finds compelling the *ProAssurance* court's recognition that "'documents created after the alleged fraud was revealed may be relevant to scienter and falsity.'" *Id.* (quoting *In re Bofl Holding, Inc. Sec. Litig.*, No. 3:15-cv-02324, 2021 WL 1812822, at \*6 (S.D.Cal. May 6, 2021)). Given the facts and claims involved, the analogy is perhaps less than perfect, but the underlying principle remains applicable. This principle is that post-period discovery can provide context.

As Class Plaintiffs note in their briefing, documents dated after the fraud are relevant to the prior knowledge and intent of the co-conspirators and thereby relevant to Defendants' scienter in making false and misleading statements about that conduct to investors. Stated even more simply, post-period discovery here for the limited period sought will likely yield valuable information as to *why what was done during the class period was done* and *who knew what was done* and *when they knew it*.

Moreover, Energy Harbor has not presented a persuasive argument for why the extended discovery period is unreasonable. Counsel for the company asserted at oral argument that post-period discovery "would impose enormous costs and burden upon Energy Harbor." Hrg. Tr. at 47:4-8. He stated multiples times that discovery through December 31, 2020, would be "incredibly expensive" and that it would "involve a huge privilege ticket" would be "an absolute privilege mess." *Id.* at 49:9-10, 10-11, 14-15, 15-16. Counsel thus proposed a compromise cut-off period of one-month after Householder's arrest.

In response to questioning, counsel explained that the estimated cost of extended discovery would be $200,000 per month, comprised of a third-party vendor used to gather and house the documents for "thousands of dollars a month, not in the tens of thousands" and the rest, about 95%, going to attorney fees. *Id.* at 50:9-18, 51:22-25.  These figures matter in light of Magistrate Judge Jolson's sound reasoning as to why she rejected non-party Partners for Progress's similar arguments earlier in this litigation.  That rationale remains applicable here and leads into the issue of cost-shifting.

In her March 24, 2023 Order, Magistrate Judge Jolson concisely explained the requisite inquiry:

> If an objection is made to a Rule 45 subpoena, and a court orders a non-party to comply with the subpoena, it "must protect a non-party from significant expenses resulting from compliance." *In re: Modern Plastics Corp.*, 890 F.3d 244, 252 (6th Cir. 2018); Fed. R. Civ. P. 45(d)(2)(B).  It is within the discretion of the Court to determine what expenses are significant. *Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, No. 2:17-cv-708, 2021 WL 1084605, at *2 (S.D. Ohio Mar. 22, 2021).  And in deciding how much, if any, of the expenses the requesting party must bear, the Court considers factors including "whether the nonparty has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party, and whether the litigation is of public importance." *Id.* (citations omitted).

Order, ECF No. 431 at PageID 9758.  None of these factors weigh in favor of shifting costs here.

First, Energy Harbor may not be facing liability, but even the most limited degree of common sense would suggest that it has an interest in the outcome of the case, even if only from a reputational standpoint.

Second, there has been no evidence presented that Energy Harbor cannot more readily bear the estimated costs than Class Plaintiffs; at best, this is a neutral factor given the apparently ample resources of all involved. *See id.* at PageID 9759.  Notably, there was no evidence presented that Energy Harbors lacks funds so that $200,000 per month is in fact an undue burden.  To conclude

8

otherwise would be to engage in speculation unsupported by the record that Energy Harbor has presented to the undersigned. In fact, given that Energy Harbor has not engaged in collection of many of the documents involved here, it appears the $200,000 figure is just a guesswork estimate based on other collections, platform hosting, and review and not a specific number derived from the discovery under discussion here.

Third, Magistrate Judge Jolson has unambiguously held that "this litigation is of public importance." *Id.* at PageID 9759. Similar to Partners for Progress, Energy Harbor "has an obligation to the public and a particular obligation to potential class members to fairly and fully disclose the non-privileged information within its possession, custody, or control." *Id.*

Class Plaintiffs' subpoena for the time period July 21, 2020 through December 31, 2020, is therefore appropriate. The undersigned notes that counsel for Class Plaintiffs surprisingly suggested at oral argument that November 15, 2021, would be a reasonable cutoff, as opposed to the December 31, 2020 date requested in the motion and its supporting briefing. Hrg. Tr. at 57:9-11. At this juncture, the 2021 date is well beyond that which is likely to provide reasonable context and would constitute an impermissible fishing expedition. The 2021 date is rejected, subject to possible resurrection should the discovery obtained through the December 31, 2020 date present sufficient cause to think the additional 2021 discovery is needed and reasonable under the relevant tests. Class Plaintiffs' 2021 date is too extended, Energy Harbor's one-month date is too limited, and the December 31, 2020 date is a reasonable compromise that will not impose an undue burden.

Next for discussion is whether Energy Harbor must produce attorney-client material that has been withheld as privileged. Class Plaintiffs argue that the crime-fraud exception applies so that the documents are not privileged and must be produced. Much of the parties' dispute focuses

9

on how to apply *Murray Energy Corp. v. Cassidy, Cogan, Chappell and Voegelin, L.C.*, No. 2:18-cv-440, 2019 WL 2240245 (S.D. Ohio May 24, 2019), to this case.

In *Murray*, Magistrate Judge Jolson addressed both subject-matter waiver and the crime fraud exception. In so doing, she explained at the outset that because that case involved diversity jurisdiction, Ohio law governed the applicability of the attorney-client privilege. *Id.* at *3 (citing *Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*, No. 2:07-cv-116, 2012 WL 3731483, at *1 (S.D. Ohio Aug. 28, 2012)). The instant case is a federal question case. *See* Amended Complaint, ECF NO. 72 ¶ 14 (predicating jurisdiction on 28 U.S.C. § 1331). This would suggest that the analysis set forth in *Murray* is irrelevant here, but "[t]here is, however, no material difference between Ohio's attorney client privilege and the federal common law privilege." *Inhalation Plastics, Inc.*, 2012 WL 3731483, at *1. Thus, the backdoor leads us into *Murray*'s discussion of the crime-fraud exception, which permits piercing the privilege "only if the party seeking to discover privileged information provides evidence that a client sought the attorney's advice in furtherance of the alleged misconduct." *Murray*, 2019 WL 2240245, at *7. The exception requires "the party seeking to pierce the privilege [to] present evidence (1) that the client was engaged in or planning the misconduct when the attorney-client communications took place; and (2) that those communications were 'intended by the client to facilitate or conceal the criminal or fraudulent activity.'" *Id.*

Notably, no party has moved for the undersigned to conduct an in camera review of the allegedly privileged documents or more reasonably a statistically meaningful sampling of the documents to determine whether the exception should apply. This is no longer an option. *See Slorp v. Lerner*, No. 2:12-cv-498, 2016 WL 1252980, at *5 (S.D. Ohio Mar. 31, 2016) (Jolson, M.J.) ("Plaintiff has offered the Court no guidance on conducting an in camera review, and the

Court declines to engage in an exploratory mission without parameters."). Instead, the parties rely on the record evidence and their arguments to make their arguments under the two prongs set forth above with a wholesale *yes* or *no* covering the entire production requested.

Without question, there is a reasonable basis to conclude that fraud occurred. Again, the deferred prosecution agreement by itself supports that FirstEnergy Solutions was a direct participant in the execution of that fraud. The exhibits submitted with the motion to compel support the same proposition. And Cespedes admitted in his guilty plea that he made the targeted payments on behalf of FirstEnergy Solutions.

To be clear: whether FirstEnergy Solutions/Energy Harbor or CEO Defendant John Judge ultimately had the intent or knowledge to engage in fraud is different than whether there was a fraud that they assisted inadvertently. At oral argument, counsel for Energy Harbor suggested the company was the victim when he asserted that to the extent that any of the money paid by the company to Generation Now was diverted to Householder's benefit or someone else's benefit, the money was "stolen from Energy Harbor." Hrg. Tr. at 41:3-6. *See also id.* at 43:15-22. In contrast, Class Plaintiff point to abundant circumstantial evidence and essentially suggest that where there is smoke, there is fire. The truth remains to be established.

Class Plaintiffs have also directed the undersigned to sufficient evidence that suggests that FirstEnergy Solutions/Energy Harbor used counsel in furtherance of the commission of fraud. The 2018 memorandum and the 2019 memoranda discussed in the briefing all provide analysis and advice that ultimately effectuate a component of the apparent fraud. Energy Harbor argues that it was simply obtaining advice on how to engage in lawful and wholly permissible conduct that others may have used to effectuate a crime and that such a twist does not turn their solicitation of proper advice into advice on how to commit a crime.

11

The crime-fraud exception issue presents an extremely close call, especially given the protections afforded the attorney-client privilege. Obtaining advice regarding a legal course of action means privilege remains, while "requests for assistance or advice from counsel on how to commit fraud" would fall under the exception. *Id.* at *8 (quoting *Metro Fin. Servs. Corp. v. Geller*, No. 2:13-cv-2867, 2015 WL 12910697, at *8 (W.D. Tenn. Feb. 24, 2015)). Additionally, when the connection between alleged misconduct and privileged material is "far too remote," the exception will not apply. *Id.* But when an entity is engaged in or is planning the alleged misconduct when the attorney-client communications took place or when the communications were intended by the client to facilitate or conceal the criminal activity, the exception applies. *Id.* at *7.

Here, the advice known to be received addresses lawful conduct (contributions, lobbying)—but this lawful conduct can easily be regarded *as the means* to facilitate or conceal intended criminal activity (fraud, bribery). Thus, the inquiry is a bit more nuanced than suggested by Energy Harbor. The company essentially asks the undersigned to view its conduct broadly—asking whether contributions and lobbying are lawful—as opposed viewing this conduct in context. Contextualization places Energy Harbor's on-its-face lawful conduct into a broader course of conduct that a reasonable person may find damning. In other words, the conduct that is wholly lawful in most circumstances might be unlawful here.

Meeting the crime-fraud exception requires 'evidence . . . such that a prudent person [would] have a reasonable basis to suspect the perpetration of a crime of fraud.'" *Slorp*, 2016 WL 1252980, at *3 (Jolson, M.J.) (quoting *United States v. Collins*, 128 F.3d 313, 321 (6th Cir. 1997)). Circumstantial evidence suggests the reasonable inference of a quid pro quo, and the text messages of FirstEnergy employees suggest a criminal purpose underlying the contributions and lobbying

12

that, coupled with the then-interdependence of FirstEnergy and FirstEnergy Solutions, reasonably imply FirstEnergy Solutions knowingly engaged in criminal conduct and obtained legal advice to cover quid pro quo transactions with a smear of propriety.  The resultant discovery, for example the text message communication of Energy Harbor's John Kiania discussed in the briefing, will likely yield relevant information regarding entanglements, coordination, and even scienter.

Again, today's decision is *not* that FirstEnergy Solutions did anything wrong.  That is not the issue to be resolved today.  This is not a merits decision, and it is not the undersigned's task to opine on the ultimate issues in this litigation.  Instead, the expressly limited inquiry today is whether Class Plaintiffs have met their burden of presenting sufficient evidence that FirstEnergy Solutions was engaged in or planning criminal conduct when the attorney-client communications took place and that FirstEnergy Solutions intended those communications to facilitate or conceal the criminal activity.  Class Plaintiffs have just met their burden.

Even absent application of the crime-fraud exception, production is still warranted if Class Plaintiffs would prevail on their argument that subject matter waiver precludes asserting privilege.  FirstEnergy Solutions shared the three memoranda identified above with FirstEnergy's Joel Bailey, despite the fact that the bankruptcy that created Energy Harbor apparently eliminated Bailey from the scope of privileged recipients.  Other documents were withheld as privileged.  Class Plaintiffs argue that the rules in this Circuit are strict and that there is no selective waiver of privilege to enable the inconsistent narrative of independence and intermingling that Energy Harbor weaves.  Energy Harbor in turn denies that it has waived privilege and seeks to draws a distinction between turning over specific documents to some individuals or entities but not all individuals or entities versus waiver over subject matter.  Given the decision that the crime-fraud exception applies, the undersigned need not and does not opine on whether waiver applies to these circumstances.

This leaves the scope of production at issue. Class Plaintiffs potentially overreach in asking for the production of all documents withheld on attorney-client privilege concerning donations to 501(c)(4) entities and the drafting of clean energy legislation. FirstEnergy Solutions/Energy Harbor may have made donations to 501(c)(4) entities that have nothing to do with the claims asserted here and the underlying criminal conduct. Irrelevant material need not be produced.

At oral argument, the undersigned raised the point that the discovery may need to be limited. Counsel for Class Plaintiffs explained that they sought discovery related to "anyone that Energy Harbor donated to that ultimately could be attributed to Mr. Householder's criminal conspiracy." Hrg. Tr. at 27:22-24. Counsel confirmed that this included the "ZEN legislation" contemplated in 2017 and that "[t]he subject matter is the bailout legislation," whether it is HB6 or ZEN. *Id.* at 28:5-14. Counsel further explained that Class Plaintiffs are "not talking about other types of energy legislation that [FirstEnergy Solutions] may have had an interest in." *Id.* at 28:14-16.

Accordingly, Energy Harbor shall provide Class Plaintiffs a list of all 501(c)(4) entities and draft energy legislation to be involved in the mandated production and any 501(c)(4) entities and draft energy legislation not to be involved in the mandated production on the grounds that they are irrelevant. The list must contain sufficient information to enable Class Plaintiffs to access whether they agree with any excluded 501(c)(4) entities and draft energy legislation. In the event of disagreement, Class Plaintiffs and Energy Harbor shall meet and confer on the issue of which 501(c)(4) entities and draft energy legislation are to be involved in the mandated production. Any unresolved issues are to be brought to the attention of the undersigned promptly for resolution at a status conference. No briefing on any disagreements is permitted without obtaining leave.

## **CONCLUSION**

For the foregoing reasons, the Special Master **GRANTS** the motion to compel (ECF No. 491) and **ORDERS** as follows:

(1) Within 30 days from entry of this Order, Energy Harbor shall produce all documents responsive to Class Plaintiffs' subpoena for the time period July 21, 2020 through December 31, 2020.

(2) If necessary, Class Plaintiffs and Energy Harbor shall meet and confer on the issue of which 501(c)(4) entities and draft energy legislation are to be involved in the mandated production, with the directive that only relevant 501(c)(4) entities and draft energy legislation matter.

(3) Energy Harbor shall produce documents improperly withheld on the basis of attorney-client privilege concerning the subject matter of donations to relevant 501(c)(4) entities and the drafting of clean energy legislation.

(4) Attorney's fees and costs of Energy Harbor's production are to be born by Energy Harbor.

(5) Costs of the Special Master's work on this Energy Harbor dispute are to be born equally by the parties.

All entities are reminded of the Court's September 12, 2023 Order Appointing Special Master, which provides in relevant part: "Pursuant to Rule 53(f)(2), any party may file an objection to the Special Master's orders, reports or recommendations within 21 days of the date it is electronically filed. All such objections shall be directed to Chief Judge Marbley and Magistrate Judge Jolson simultaneously. Failure to meet these deadlines results in permanent waiver of any objection to the Special Master's orders, reports, or recommendations." (Order, ECF No. 541 at PageID 11687.)

**IT IS SO ORDERED.**

                                                  */s/ Shawn K. Judge*
                                                  SHAWN K. JUDGE (0069493)
                                                  SPECIAL MASTER

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 20, 2023, the foregoing was filed with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                    */s/ Shawn K. Judge*
                                                    Shawn K. Judge (0069493)