**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | Judge Algenon L. Marbley |
| ALL ACTIONS | ) ) | Magistrate Judge Kimberly A. Jolson |
| | ) | |
| MFS Series Trust I, et al., | ) ) | Case No. 2:21-cv-05839-ALM-KAJ |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| FirstEnergy Corp., et al., | ) ) ) | |
| Defendants. | ) ) | |
| Brighthouse Funds Trust II – MFS Value Portfolio, et al., | ) ) ) | Case No. 2:22-cv-00865-ALM-KAJ |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| FirstEnergy Corp., et al., | ) ) ) | |
| Defendants. | ) ) | |

**FIRSTENERGY'S OBJECTIONS TO THE SPECIAL MASTER'S ORDERS DATED
NOVEMBER 29, 2023 AND NOVEMBER 30, 2023**

**(ORAL ARGUMENT REQUESTED)**

**[REDACTED]**

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ......................................................................................1

**BACKGROUND** ..........................................................................................................9

      A.    FirstEnergy and Its Board Retained Squire and Jones Day To Investigate the Legal Risks Following Then-Speaker Householder's Indictment ....................9

      B.    Movants' Motion to Compel Production of the Internal Investigations ...............12

      C.    The Special Master's Order Holding That the Internal Investigations Are Not Protected By Attorney-Client Privilege or the Work Product Doctrine ........13

      D.    The Special Master Refused Amendment of Mr. O'Neil's Declaration...............15

      E.    Developments Following the November 29 and 30 Orders.................................16

**STANDARD OF REVIEW** ...........................................................................................17

**ARGUMENT** ..............................................................................................................17

**I.**     **THE SPECIAL MASTER ERRED BY EXCLUDING THE O'NEIL DECLARATION FROM CONSIDERATION AND SUMMARILY REFUSING TO ACCEPT AN AMENDED DECLARATION** ..................................17

      A.    The O'Neil Declaration Satisfied the "Substantial Compliance" Standard under 28 U.S.C. § 1746.........................................................................................17

The Special Master erroneously applied a strict compliance standard under 28 U.S.C. § 1746, the statute governing declarations, and excluded the O'Neil Declaration because it did not include the words "true and correct," even though it was signed under penalty of perjury. But the Sixth Circuit has ruled that Section 1746 requires only "substantial" compliance, and numerous courts, including the Second Circuit—the only circuit court to consider the issue—have held that a declaration made under penalty of perjury that omits "true and correct" satisfies that standard. *LeBoeuf, Lamb, Greene & MacRae, L.L.P.* v. *Worsham*, 185 F.3d 61, 65–66 (2d Cir. 1999). That is because declaring statements under penalty of perjury "necessarily represent[s] that what [the declarant] was saying ***was true***." *Callahan* v. *Emory Healthcare, Inc.*, 2019 WL 12405937, at *3 (N.D. Ga. Dec. 20, 2019).

      B.    The Special Master Applied the Wrong Standard in Assessing the O'Neil Declaration.........................................................................................................22

The Special Master further erred in concluding that a supposed "deficiency" in the O'Neil Declaration meant that it "necessarily" must be excluded. (Nov. 29 Order at PageID 12379.) Under Federal Rule of Evidence 104(a), when deciding "any preliminary question about

whether . . . a privilege exists . . . , the court is not bound by evidence rules, except those on privilege[.]" Under Rule 104(a), courts frequently consider inadmissible affidavits as long as they are reliable. *See*, *e.g.*, *United States* v. *Straker*, 596 F. Supp. 2d 80, 84 n.4 (D.D.C. 2009). Because the O'Neil Declaration was reliable, it should have been considered under Rule 104(a).

C.    The Special Master Erred by Ignoring Movants' Waiver of Objections to the O'Neil Declaration and Abused His Direction by Denying FirstEnergy An Opportunity to Be Heard.................................................................................23

Because Movants never moved to strike the O'Neil Declaration (and in fact affirmatively relied on it), "any objection to the declaration [is] waived." *Rogers* v. *Henry Ford Health Sys.*, 897 F.3d 763 (6th Cir. 2018); *see Wiley* v. *United States*, 20 F.3d 222 (6th Cir. 1994). Further, courts "normally decide only questions presented by the parties." *United States* v. *Burke*, 504 U.S. 229 (1992). Yet the Special Master elected *sua sponte* to base the outcome of this motion on the purported deficiency in the declaration, without notice to the parties or an opportunity to be heard. That was an abuse of discretion. *See*, *e.g.*, *Bennett* v. *City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (*sua sponte* grant of summary judgment was abuse of discretion where plaintiffs had no "notice that they would be forced to defend against a nonexistent motion").

D.    The Special Master Applied the Wrong Legal Standard and Abused His Discretion By Summarily Denying FirstEnergy Leave to Amend the O'Neil Declaration.................................................................................25

The Special Master erred when, less than 24 hours after issuing the November 29 Order, he denied what he construed as FirstEnergy's "oral motion" to amend without any briefing or argument. (Nov. 30 Conf. Tr., ECF No. 587 at PageID 12909.) The Special Master thus denied FirstEnergy proper process and erroneously applied a "good cause" standard, when the standard in the Sixth Circuit for leave to amend a technical deficiency in a declaration is whether the amendment would (i) "prejudice" the opposing party, and (ii) "serve[] the interest of justice in resolving [the issue] on its merits." *Fox*, 2010 WL 4983153, at *2. Courts reject any finding of prejudice where, as here, the amended declaration is substantively identical to the original, and the opposing party already responded to the original. *See* Movants' Reply, ECF No. 529 at PageID 11438. *See Ross* v. *City of Dublin, Ohio*, 2016 WL 7117389, at *8 (Marbley, C.J.) (permitting plaintiff to amend undated declaration that, as here, omitted "true and correct," and finding no prejudice where opposing party "addressed its substance in its reply brief"). And courts routinely find that curing a technical issue with a declaration "serves the interest of justice" by allowing a dispute to be "resolv[ed] on its merits." *Fox*, 2010 WL 4983153, at *2.

II.    THE SPECIAL MASTER ERRED IN COMPELLING DISCOVERY INTO FIRSTENERGY'S INTERNAL INVESTIGATIONS, WHICH ARE PROTECTED BY PRIVILEGE AND WORK PRODUCT ........................................28

A.    The Special Master Ignored Overwhelming Evidence Beyond the O'Neil Declaration Establishing That the Internal Investigations Were Conducted to Secure Legal Advice and Prepare for Litigation ...............................................28

With or without the O'Neil Declaration, the evidence establishes that the investigations were initiated because of anticipated *and actual* litigation and to obtain legal advice in the face of a severe corporate crisis. Mr. O'Neil testified that FirstEnergy initiated the investigations because it expected to (and did) face legal proceedings related to the allegations in the Householder Complaint. (Am. O'Neil Decl., ECF No. 592-3 at PageID 12994–95.) FirstEnergy and its Board immediately retained Jones Day and Squire, respectively, as a result. (*Id.* at PageID 12994–96, 98.) Independent evidence in the record before the Special Master established the same points, including that FirstEnergy faced multiple lawsuits and government inquiries, and that it conducted the investigations to respond to this legal risk. The Special Master thus erred by "fail[ing] to consider relevant evidence" contradicting his conclusion that "FirstEnergy's argument falls apart without the O'Neil Declaration." *See Contreras* v. *Sec'y of Health & Human Servs.*, 844 F.3d 1363, 1365, 1369 (Fed. Cir. 2017).

B.      The Special Master Applied the Wrong Legal Standard in Concluding
        That FirstEnergy's Attorney-Client Communications Were Not Privileged
        Because of Supposed "Business Purposes." ..........................................................30

After erroneously finding that the investigations were supposedly "prepared in the ordinary course of business," the Special Master wrongly concluded that the "attorney-client privilege does not apply" to any related communications. (Nov. 29 Order, ECF No. 571 at PageID 12385–86.) Whether a document is prepared "in the ordinary course of business" bears on work product, *not* attorney-client privilege. Privilege applies to confidential attorney-client communications reflecting a request for "legal advice of any kind." *Reed* v. *Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998). That test can be readily satisfied where legal advice is sought or provided "in the ordinary course of business" because legal advice obviously "is [often] rendered . . . in the operations of a business in a corporate setting." *Carhartt, Inc.* v. *Innovative Textiles, Inc.*, 333 F.R.D. 113, 117 (E.D. Mich. 2019). FirstEnergy retained Jones Day and Squire to perform legal work and render legal advice. (*See* Amended O'Neil Decl., ECF No. 592-3 at PageID 12996-98.) Accordingly, even if the investigations were conducted (which they were not) solely for business purposes, privilege would still apply to all communications with Jones Day and Squire concerning legal advice on those or other topics.

C.      The Special Master Erroneously Assessed Work Product Under a Standard
        that the Sixth Circuit Has Expressly Rejected .......................................................32

Irrespective of whether the Special Master accepted the O'Neil Declaration, his rulings on work product were erroneous. The work product doctrine shields documents "created 'because of' a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose," as long as "that subjective anticipation of litigation was objectively reasonable." *United States* v. *Roxworthy*, 457 F.3d 590, 593–94 (6th Cir. 2006) (emphasis added). The Sixth Circuit has expressly rejected a "requirement that the primary or sole purpose of" a document "be . . . preparation [for] litigation." *Id.* at 598-99. Where (as here) documents are prepared after litigation has commenced and concern core matters in that litigation, the *Roxworthy* standard is readily satisfied. *See Decker* v. *Chubb Nat'l Ins. Co.*, 2015 WL 5954584, at *6 (S.D. Ohio Oct. 14, 2015) (where "suit had already been filed by plaintiffs . . . any subjective anticipation of litigation would be objectively reasonable"). Here, FirstEnergy faced more than a dozen legal proceedings at the time it initiated internal investigations, and supplied additional evidence that the Company and

Board conducted the investigations "because of" those proceedings.  Courts have deemed work product protection applicable based on far less.  *See*, *e.g.*, *Upjohn Co.* v. *United States*, 449 U.S. 383, 397–99 (1981) (receipt of tax summonses sufficed to trigger protection).  The Special Master recited the *Roxworthy* standard (November 29 Order, ECF No. 571 at PageID 12376) but effectively adopted the "primary or sole purpose" test that *Roxworthy* rejected.  457 F.3d at 598-99.  He held that work product protection did not apply to the investigations because they were "ground[ed]" in "the business necessity and human resources/public relations arena, *even if those same issues also logically overlap with anticipated litigation*."  (ECF No. 571 at PageID 12384 (emphasis added.))  The Special Master thus adopted Movants' improper maneuver of portraying ancillary business *implications* of the investigations as the investigations' driving force.  Because business issues invariably intersect with litigation, that approach guts the work product protection, contrary to binding authority.  *Roxworthy*, 457 F.3d at 599 ("[A] document can be created for both use in the ordinary course of business and in anticipation of litigation without losing its work-product privilege.").

      D.     The Special Master Erred in Ordering Witnesses To Disclose Communications With Counsel. ............................................................................39

The Special Master wrongly ordered that deposition "[w]itnesses must answer all fact-related questions (past and future) related to the internal investigation," including questions seeking information obtained exclusively through communications with counsel.  (*See* November 29 Order at PageID 12387; November 30 Order at PageID 12422.)  That ruling would result in the disclosure of attorneys' privileged advice and work product.  For example, where a witness learns factual information solely through a communication with counsel, the witness cannot disclose that information without also disclosing counsel's communication, which will invariably be enmeshed with privileged advice.  *See*, *e.g.*, *Dzierbicki* v. *Twp. of Oscoda*, 2009 WL 1491116, at *1, *3 (E.D. Mich. May 26, 2009) (sustaining instruction not to answer questions "if the only basis for [the deponent's] answers is to recall a conversation [he] had . . . in the presence of counsel").  Further, requiring witnesses to testify to information learned from counsel threatens to reveal counsel's "mental impressions, conclusions, opinions, and legal theories" regarding that information, which are protected work product.  *Kennedy* v. *City of Zanesville*, 2006 WL 8442130, at *5 (S.D. Ohio Oct. 20, 2006).

**III.**    **FIRSTENERGY DID NOT WAIVE ATTORNEY-CLIENT PRIVILEGE OR WORK PRODUCT PROTECTION**.......................................................................42

      A.     FirstEnergy's Limited Disclosures to Its Auditor Did Not Waive Attorney-Client Privilege or Work Product Protection ........................................................42

Contrary to Movants' claim, disclosure of work product to FirstEnergy's auditor, PwC, did not waive protection over the investigations.  Work product waiver turns on whether PwC was "an adversary or a conduit to a potential adversary" of FirstEnergy at the time of the disclosure.  *Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 229 F.R.D. 441, 448 (S.D.N.Y. 2004).  Here, FirstEnergy's adversaries were the relevant government investigators and private plaintiffs—not PwC, which shared the Company's interest in "root[ing] out corporate fraud," *id.* at 448, and was obligated not to become a "conduit" for disclosure to FirstEnergy's adversaries, *United States* v. *Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) (auditor's obligations established "reasonable expectation of

confidentiality"). Movants cannot change that result by speculating that PwC could have become FirstEnergy's adversary because FirstEnergy determined after the relevant audit that misconduct occurred. A rule based on such post-hoc determinations would "run contrary to precedent by injecting uncertainty into application of . . . work product protection to internal investigations." *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 140 (D.C. Cir. 2015).

B.      FirstEnergy Did Not Waive Privilege or Work Product Protection By
        Making Limited Disclosures of Investigative Conclusions ...................................43

Movants wrongly contend that FirstEnergy waived privilege and work product protections by disclosing limited investigative conclusions in its Rule 30(b)(6) testimony and in public filings. FirstEnergy's disclosures under Rule 30(b)(6) did not include opinions of counsel or litigation strategy, but rather—under a Court order sought by Movants—summarized non-privileged evidence and conclusions. Such disclosures do not waive attorney-client privilege or work product protection. *See, e.g., E.E.O.C.* v. *Texas Hydraulics, Inc.*, 246 F.R.D. 548, 557 (E.D. Tenn. 2007) (no waiver where party "briefly summarized the evidence" and "reveal[ed] the EEOC's ultimate conclusion"). Indeed, such disclosures are often required where, as here, a public company terminates an executive following accusations of wrongdoing. *See* Form 8-K, Item 5.02(a)-(b) (requiring current report to be filed when any director or principal executive officer is terminated).

C.      FirstEnergy Did Not "Wield" the Investigations "as a Sword" By
        Responding to Deposition Questions Under a Court Order ...................................46

Movants claim that FirstEnergy waived privilege because testimony derived from the investigations could theoretically be used to support FirstEnergy's defenses. (Movants' Reply Br., ECF No. 529 at PageID 11449.) But "[s]word-shield" waiver applies only if a party discloses privileged communications and then relies on them "to make their case." *Lewis Env't, Inc.* v. *Emergency Response & Training Sols., Inc.*, 2019 WL 285641, at *3 (S.D. Ohio Jan. 22, 2019). Because FirstEnergy has neither disclosed privileged information nor relied on the investigations to sustain any of its defenses, sword-shield waiver does not apply.

D.      The Court Should Reject the Special Master's Decision To "Credit"
        Movants' "All or Nothing Approach'" to Waiver, Which FirstEnergy
        Opposed ...........................................................................................................47

Even if the Court accepts Movants' waiver arguments (it should not), they do not remotely support the disclosure of *all* documents withheld and the compelled testimony of all witnesses about the investigations. As the Sixth Circuit has directed, courts must "try to make prudential distinctions between what was revealed and what remains privileged." *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 255-56 (6th Cir. 1996). Here, Movants' waiver arguments concern only specific aspects of the investigations, such as executive terminations. Thus, if the Court determines that FirstEnergy may have waived protection over any aspect of the investigations, the Court should adopt a tailored approach, rather than letting Movants use "limited . . . factual disclosures" as "a bootstrap to discover [FirstEnergy's] entire investigative file." *United States* v. *Skeddle*, 989 F. Supp. 917, 920–21 (N.D. Ohio 1997).

**CONCLUSION** ................................................................................................................49

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abington Emerson Cap., LLC* v. *Landash Corp.*,
2019 WL 6167085 (S.D. Ohio Nov. 20, 2019)................................................................5

*Abington Emerson Capital, LLC* v. *Adkins*,
2021 WL 611998 (S.D. Ohio Jan. 22, 2021) ................................................................27

*AK Steel Corp.* v. *Sollac & Ugine*,
234 F. Supp. 2d 711 (S.D. Ohio 2002) ........................................................................17

*In re Allen*,
106 F.3d 582 (4th Cir. 1997) ......................................................................................31

*Allstate Ins. Co.* v. *Tox Testing, Inc.*,
2020 WL 13443548 (E.D. Mich. Sept. 24, 2020).........................................................25

*Baker* v. *Chevron USA, Inc.*,
2009 WL 10679565 (S.D. Ohio July 13, 2009).............................................................17

*Batista* v. *United States*,
792 F. App'x 134 (2d Cir. 2020) .................................................................................19

*Bennett* v. *City of Eastpointe*,
410 F.3d 810 (6th Cir. 2005) ......................................................................................24

*Bonds* v. *Cox*,
20 F.3d 697 (6th Cir. 1994) ........................................................................................18

*Callahan* v. *Emory Healthcare, Inc.*,
2019 WL 12405937 (N.D. Ga. Dec. 20, 2019)....................................................3, 19, 21

*Canter* v. *Alkermes Blue Care Elect Preferred Provider Plan*,
593 F. Supp. 3d 737 (S.D. Ohio 2022) ........................................................................25

*Carhartt, Inc.* v. *Innovative Textiles, Inc.*,
333 F.R.D. 113 (E.D. Mich. 2019) ..........................................................................5, 31

*Carrizo (Utica) LLC* v. *City of Girard, Ohio*,
661 F. App'x 364 (6th Cir. 2016).................................................................................25

*Catzin* v. *Thank You & Good Luck Corp.*,
899 F.3d 77 (2d Cir. 2018)...........................................................................................24

*Contreras* v. *Secretary of Health and Human Services*,
844 F.3d 1363 (Fed. Cir. 2017)........................................................................29

*Decker* v. *Chubb Nat'l Ins. Co.*,
2015 WL 5954584 (S.D. Ohio Oct. 14, 2015).............................................6, 33

*Delano* v. *Mastec, Inc.*,
2011 WL 1557863 (M.D. Fla. Apr. 25, 2011).................................................20

*Dzierbicki* v. *Twp. of Oscoda*,
2009 WL 1491116 (E.D. Mich. May 26, 2009)...............................................40

*E.E.O.C.* v. *Texas Hydraulics, Inc.*,
246 F.R.D. 548 (E.D. Tenn. 2007)................................................................8, 44

*Enigwe* v. *Diversity City Media*,
2008 WL 11352583 (S.D. Ohio June 2, 2008)................................................20

*Evans* v. *Jackson Cnty.*,
2015 WL 2170114 (D. Or. May 7, 2015).........................................................19

*Fed. Trade Comm'n* v. *Boehringer Ingelheim Pharms., Inc.*,
892 F.3d 1264 (D.C. Cir. 2018)..................................................................32, 40

*First Horizon Nat'l Corp.* v. *Houston Cas. Co.*,
2016 WL 5867268 (W.D. Tenn. Oct. 5, 2016).................................................42

*Fletcher* v. *ABM Bldg. Value*,
2017 WL 1536059 (S.D.N.Y. Apr. 18, 2017)..................................................32

*In re Fluor Intercontinental, Inc.*,
803 F. App'x 697 (4th Cir. 2020)..................................................................8, 45

*Fox* v. *Brown Mem'l Home, Inc.*,
2010 WL 4983153 (S.D. Ohio Dec. 2, 2010)...........................................4, 25, 27

*Frontczak* v. *City of Detroit*,
2021 WL 1526279 (E.D. Mich. Apr. 19, 2021)...............................................26

*Grand Fabrics Int'l Ltd.* v. *Melrose Textile, Inc.*,
2018 WL 6118439 (C.D. Cal. May 9, 2018)....................................................21

*In re Grand Jury Proceedings October 12, 1995*,
78 F.3d 251 (6th Cir. 1996)............................................................................47

*Greenlaw* v. *United States*,
554 U.S. 237 (2008).......................................................................................24

*Hernandez* v. *Lynch*,
2019 WL 6998774 (C.D. Cal. June 18, 2019) ............................................................................17

*Hopper* v. *Credit Assocs., LLC*,
2021 WL 5754732 (S.D. Ohio Dec. 3, 2021) .............................................................................28

*Jacobs* v. *Jacobs*,
2006 WL 8447064 (N.D. Ohio May 3, 2006)..............................................................................33

*In re Kellogg Brown & Root*,
796 F.3d 137 (D.C. Cir. 2015).....................................................................................................43

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014) ...............................................................................................31, 39

*Kennedy* v. *City of Zanesville*,
2006 WL 8442130 (S.D. Ohio Oct. 20, 2006)........................................................................7, 41

*In re King Pharms., Inc. Sec. Litig.*,
2005 WL 8142328 (E.D. Tenn. Sept. 21, 2005) .........................................................................42

*LeBoeuf, Lamb, Greene & MacRae, L.L.P.* v. *Worsham*,
185 F.3d 61 (2d Cir. 1999).................................................................................................3, 18, 20

*Leininger* v. *Reliastar Life Ins. Co.*,
2007 WL 2875283 (E.D. Mich. Sept. 28, 2007).........................................................................26

*Lewis Env't, Inc.* v. *Emergency Response & Training Sols., Inc.*,
2019 WL 285641 (S.D. Ohio Jan. 22, 2019) ..........................................................................8, 46

*Melea Ltd.* v. *All. Gas Sys.*,
2005 WL 8154557 (E.D. Mich. May 26, 2005)...........................................................................40

*Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*,
229 F.R.D. 441 (S.D.N.Y. 2004) ...........................................................................................42, 43

*Miami Valley Fair Hous. Ctr. Inc.* v. *Metro Dev. LLC*,
2017 WL 10980458 (S.D. Ohio May 16, 2017) .........................................................................33

*Montgomery* v. *Ruxton Health Care, IX, LLC*,
2006 WL 3746145 (E.D. Va. Dec. 15, 2006) .............................................................................19

*Muhammad* v. *Close*,
798 F. Supp. 2d 869 (E.D. Mich. 2011).....................................................................................28

*Mulbarger* v. *Royal Alliance Asscs., Inc.*,
172 F.3d 49 (6th Cir. 1998) ........................................................................................................24

*In re Muscatell*,
106 B.R. 307 (Bankr. M.D. Fla. 1989) ........................................................................20

*Myers* v. *City of Centerville*,
2023 WL 195427 (S.D. Ohio Jan. 17, 2023) ...........................................................3, 31

*Nat.Immunogenics Corp.* v. *Newport Trial Grp.*,
2018 WL 6168035 (C.D. Cal. June 12, 2018) ..............................................................28

*New Phoenix Sunrise Corp.* v. *Comm'r*,
408 F. App'x 908 (6th Cir. 2010) ................................................................................46

*Okeayainneh* v. *U.S. Dep't of Just.*,
2022 WL 1694505 (D.C. Cir. May 25, 2022)..........................................................26, 27

*In re OM Sec. Litig.*,
226 F.R.D. 579 (N.D. Ohio 2005) .........................................................................36, 45

*Peters* v. *Lincoln Elec. Co.*,
285 F.3d 456 (6th Cir. 2002) ................................................................................17, 18

*Quantum Sail Design Grp., LLC* v. *Jannie Reuvers Sails, Ltd.*,
827 F. App'x 485 (6th Cir. 2020) ..................................................................................9

*Reed* v. *Baxter*,
134 F.3d 351 (6th Cir. 1998) .......................................................................................30

*Rodrigues* v. *Jackson Cnty.*,
2015 WL 404577 (D. Or. Jan. 29, 2015) ....................................................................19

*Rogers* v. *Henry Ford Health Sys.*,
897 F.3d 763 (6th Cir. 2018) .......................................................................................23

*Ross* v. *City of Dublin, Ohio*,
2016 WL 7117389 (S.D. Ohio Dec. 7, 2016) ..................................................... *passim*

*Sandra T.E.* v. *S. Berwyn Sch. Dist. 100*,
600 F.3d 612 (7th Cir. 2010) ................................................................................31, 39

*Sfakianos* v. *Shelfby Cty. Gov't.*,
2010 WL 11493114 (W.D. Tenn. Dec. 30, 2010) ........................................................20

*Tarochione* v. *Roberts Pipeline, Inc.*,
62 F. Supp. 3d 821 (N.D. Ill. 2014) ............................................................................22

*Tishcon Corp.* v. *Soundview Commc'ns, Inc.*,
2005 WL 6038743 (N.D. Ga. Feb. 15, 2005) ........................................................19, 21

*United States* v. *Adlman*,
134 F.3d 1194 (2d Cir. 1998) .................................................................................38

*United States* v. *Bueno-Vargas*,
383 F.3d 1104 (9th Cir. 2004) ..........................................................................21, 23

*United States* v. *Deloitte LLP*,
610 F.3d 129 (D.C. Cir. 2010) ......................................................................7, 42, 43

*United States* v. *Garcia-Robles*,
562 F.3d 763 (6th Cir. 2009) .................................................................................27

*United States* v. *Holden*,
557 F.3d 698 (6th Cir. 2009) .................................................................................17

*United States* v. *Roxworthy*,
457 F.3d 590 (6th Cir. 2006) ..................................................................6, 32, 34, 35

*United States* v. *Sineneng-Smith*,
140 S. Ct. 1575 (2020) .......................................................................................3, 24

*United States* v. *Skeddle*,
989 F. Supp. 917 (N.D. Ohio 1997) .....................................................................9, 48

*United States* v. *Straker*,
596 F. Supp. 2d 80 (D.D.C. 2009) .........................................................................22

*Upjohn Co.* v. *United States*,
449 U.S. 383 (1981) ....................................................................................2, 33, 41

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2021 WL 2587784 (D.N.J. June 24, 2021) ...............................................................36

*Villavicencio* v. *Camoplast Crocker LLC*,
2010 WL 4318897 (W.D. Mich. Oct. 22, 2010) .......................................................26

*Welch* v. *Level 3 Communs., LLC*,
2017 U.S. Dist. LEXIS 85974 (E.D. Mich. 2017) ....................................................26

*Wheeler* v. *Baxter Healthcare Corp.*,
2011 WL 5402446 (E.D. Ark. Nov. 8, 2011) ...........................................................21

*Wiley* v. *United States*,
20 F.3d 222 (6th Cir. 1994) ..................................................................................23

*Wilson* v. *Hill*,
2012 WL 1068174 (S.D. Ohio Mar. 29, 2012) .........................................................26

*Wilson* v. *Russo*,
2022 WL 911271 (N.D. Ohio Mar. 29, 2022) .............................................................37

*In re World Trade Ctr. Disaster Site Litig.*,
722 F.3d 483 (2d Cir. 2013) .............................................................................20, 21

**Statutes**

18 U.S.C. § 1623(a) ........................................................................................21

28 U.S.C. § 1746 ..................................................................................... *passim*

Fed. R. Civ. P. 6(b)(1) ....................................................................................25

Fed. R. Civ. P. 16 .........................................................................................25

Fed. R. Civ. P. 26(b)(3)(A) ..........................................................................32, 41

Fed. R. Civ. P. 53 .............................................................................16, 17, 27, 28

Fed. R. Evid. 104(a) .....................................................................................3, 22

**Other Authorities**

Paul R. Rice ET AL., *Investigative Services—Internal Investigations of Illegal Activities*, 1 ATTORNEY-CLIENT PRIVILEGE IN THE U.S. (Dec. 2023) ...........................................37

Robert S. Bennett, Alan Kriegel, Carl S. Rauh & Charles F. Walker, *Internal Investigations and the Defense of Corporations in the Sarbanes-Oxley Era*, BUS. LAW. 55, 68 (Nov. 2006) ...............................................................................35

## PRELIMINARY STATEMENT

This is far from an ordinary discovery dispute.  In July 2020, following the Department of Justice's unsealing of a criminal complaint against then-Speaker of the Ohio House of Representatives Larry Householder, FirstEnergy received grand jury subpoenas from the DOJ about allegations that senior FirstEnergy executives—including its CEO—had bribed Mr. Householder and others to secure favorable legislation and regulatory treatment.  Within days, the Company faced a wave of civil suits and additional government inquiries, including these securities actions.  To obtain legal advice about the serious legal risk facing the Company and to respond to this onslaught of litigation, FirstEnergy's independent directors and the Company each retained outside counsel (Squire Patton Boggs and Jones Day, respectively) to conduct two separate investigations.

On November 29, 2023, the Special Master entered an unprecedented order compelling witness testimony and disclosure of ***all*** of FirstEnergy's withheld privileged communications and work product from the Squire and Jones Day internal investigations into the very conduct at issue in these cases.  (Order on Motion to Compel, ECF. No. 571 at PageID 12387 ("November 29 Order" or "Nov. 29 Order").)  The Special Master ruled on the basis (which he raised *sua sponte* in his November 29 Order) that a declaration submitted by FirstEnergy director James O'Neil (the "O'Neil Declaration") was, in the Special Master's view, technically deficient because, while Mr. O'Neil made it "under penalty of perjury," he did not also state that its contents were "true."  (*Id.* at PageID 12379.)

As a result of that "nuanced technicality" (*id.* at PageID 12375), the Special Master concluded that FirstEnergy had proffered no evidence to demonstrate that the internal investigations were conducted to obtain legal advice and prepare for litigation.  Instead, the Special Master accepted as "uncontroverted" Movants' strained theories that the investigations were for

"business purposes" (*id.* at PageID 12384–85),[1] even though FirstEnergy had submitted substantial other evidence, which he never referred to in his November 29 Order.  For example, FirstEnergy provided evidence of public records of dozens of legal proceedings initiated against the Company following the Householder indictment, and contemporaneous filings with the SEC and other documents describing the internal investigations were initiated in response to the DOJ investigation.  (*See* Part II.A., *infra*; *see* Appendix A.)  Even *Movants'* evidence shows that ████

████████████████████████████████████████████████████████

████████████████████████████████████████████ (Ex. 1 to June 30, 2023 Forge Decl., ECF No. 489-3 at PageID 10507 ("PwC Memo") (*in camera* at ███████████████████).)

Thus, by excluding the O'Neil Declaration and ignoring FirstEnergy's other evidence, the Special Master granted Movants' broad discovery into privileged communications and work product from FirstEnergy's investigative files.  In doing so, the Special Master put a cart of ancillary issues (employment decisions, public disclosures, credit risk) before the horse of serious legal risk facing FirstEnergy (criminal and civil liability for conspiring to bribe public officials), and thereby wiped out the Company's attorney-client privilege and work product protection.  The Special Master's order was contrary to long settled law governing internal investigations in response to government investigations and lawsuits.  *See*, *e.g.*, *Upjohn Co.* v. *United States*, 449 U.S. 383, 397–99 (1981) (communications with counsel related to internal investigation "are covered by the attorney-client privilege" and "notes and memoranda" from the investigation "are work product"); *Myers* v. *City of Centerville*, 2023 WL 195427, at *4 (S.D. Ohio Jan. 17, 2023)

---

[1]     Movants are Plaintiffs in the putative class action, plaintiffs in the two above-captioned opt-out actions, and defendants Charles Jones and Michael Dowling.

("It is well-established that the attorney-client privilege protects confidential employee communications made during a business's internal investigation led by company lawyers.").

This Court should reject the Special Master's ruling and deny Movants' motion to compel.

*1.* ***The O'Neil Declaration Complied with Section 1746***.  The Special Master erred as a matter of law in concluding that the O'Neil Declaration was defective under 28 U.S.C. § 1746 and could not be considered in evaluating Movants' motion.  *First*, the sole purported deficiency identified by the Special Master—the absence of the word "true"—did not mandate "exclusion" of a declaration.  Courts routinely hold that a declaration that omits "true" but is made "under penalty of perjury" substantially complies with Section 1746 because "penalty of perjury" "necessarily represent[s] that what [the declarant] was saying ***was true***." *Callahan* v. *Emory Healthcare, Inc.*, 2019 WL 12405937, at *3 (N.D. Ga. Dec. 20, 2019) (emphasis added); *see LeBoeuf, Lamb, Greene & MacRae, L.L.P.* v. *Worsham*, 185 F.3d 61, 65–66 (2d Cir. 1999) (declaration that omitted "true and correct" but included "under penalty of perjury" "substantially complie[d] with [] statutory requirements").

*Second*, even putting aside the O'Neil Declaration's substantial compliance with Section 1746, the Special Master erred in not considering it under Federal Rule of Evidence 104(a), which provides that when deciding "any preliminary question about whether . . . a privilege exists . . . , the court is not bound by evidence rules, except those on privilege[.]"

*Third*, Movants waived any objection by never raising the "nuanced technicality" identified by the Special Master, and courts "normally decide only questions presented by the parties." *United States* v. *Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).  The Special Master erred and abused his discretion by ruling on a ground identified *sua sponte*, with no notice to the parties or opportunity to be heard.

*Fourth*, the Special Master further erred by denying FirstEnergy leave to amend the declaration. The Special Master issued his denial orally less than 24 hours after *sua sponte* raising the O'Neil Declaration's compliance with Section 1746, stating that FirstEnergy's request was belated and it had not established "good cause" for an amendment. (Nov. 30 Conference Tr., ECF No. 587 at PageID 12909 ("Nov. 30 Conf. Tr.").) But in the Sixth Circuit, leave to amend a technical deficiency in a declaration does not require a showing of good cause—it turns on whether the amendment would (i) "prejudice" the opposing party and (ii) "serve[] the interest of justice in resolving [the issue] on its merits." *Fox* v. *Brown Mem'l Home, Inc.*, No. 2:09-CV-915, 2010 WL 4983153, at *2 (S.D. Ohio Dec. 2, 2010). Here, Movants would not be prejudiced by the Court's consideration of the amended O'Neil Declaration ("Amended O'Neil Declaration")[2] because it adds the words "true and correct" but does not change the content that Movants already addressed. And the Court's consideration of the Amended O'Neil Declaration would serve the interests of justice by having the important privilege issues raised by this motion decided on the merits and the full record rather than a "technicality." *See Ross* v. *City of Dublin, Ohio*, 2016 WL 7117389, at *8 (S.D. Ohio Dec. 7, 2016) (Marbley, C.J.) (permitting amendment of declaration that omitted date and "true and correct").

**2.     *The Squire and Jones Day Internal Investigations Were Not Undertaken for Ordinary-Course "Business Purposes."*** The Special Master was mistaken in three respects in ruling that the internal investigations were "prepared in the ordinary course of business" and not in response to the government investigations and litigation arising out of the H.B.6 scandal. (Nov. 29 Order at PageID 12385).

---

[2]     The original and amended O'Neil declarations are submitted herewith as exhibits to the Declaration of Hilary M. Williams, dated December 20, 2023.

*First*, the Special Master misread the record. Having erroneously excluded the O'Neil Declaration, the Special Master proceeded as though FirstEnergy had offered no opposition, and accepted Movants' claims that the investigations served "business purposes," such as completing an SEC filing and making personnel decisions. (*Id*. at PageID 12384–85; *see* Movants' Reply Br., ECF 529 at PageID 11437, 11440 ("Movants' Reply").) The Special Master also ignored substantial additional evidence, including SEC and court filings, independently confirming that FirstEnergy conducted these investigations in response to the H.B. 6 matter. (*See* App. A.)

*Second*, the Special Master erred by rejecting FirstEnergy's attorney-client privilege claims without addressing whether the investigations involved legal advice. The Special Master instead applied the work product standard, holding that because the investigations were supposedly "prepared in the ordinary course of business," the "attorney-client privilege does not apply." (Nov. 29 Order at PageID 12385-86.) But privilege does not turn on a communication's subject matter; it applies to *any* confidential attorney-client communication reflecting a request for or provision of legal advice—including advice sought "in the operations of a business in a corporate setting." *Carhartt, Inc.* v. *Innovative Textiles, Inc.*, 333 F.R.D. 113, 117 (E.D. Mich. 2019); *Abington Emerson Cap., LLC* v. *Landash Corp.*, 2019 WL 6167085, at *3 (S.D. Ohio Nov. 20, 2019) (Jolson, M.J.) (communications protected by attorney-client privilege because they "were made pursuant to [in-house counsel's] factual investigation into . . . allegations of wrongdoing").

*Third*, the Special Master applied the wrong standard in concluding that work product protection did not apply because the investigations were supposedly "ground[ed]" in "the business necessity and human resources/public relations arena, ***even if those same issues also logically overlap with anticipated litigation***." (Nov. 29 Order at PageID 12384 (emphasis added).) The Special Master thus effectively adopted a standard that the Sixth Circuit has expressly rejected:

"that the primary or sole purpose of" a document "be . . . preparation [for] litigation." *United States* v. *Roxworthy*, 457 F.3d 590, 598-99 (6th Cir. 2006). As the Sixth Circuit explained: under the correct standard, documents are protected as work product as long as (i) they are "created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose"; and (ii) "that subjective anticipation of litigation was objectively reasonable." *Id.* at 593–94. The Special Master's decision directly conflicts with the Sixth Circuit's holding in *Roxworthy* that "a document can be created for both use in the ordinary course of business and in anticipation of litigation without losing its work-product privilege." *Id.* at 599. Where, as here, litigation is not just "anticipated," but actually filed, courts routinely hold that work product protection applies. *See, e.g., Decker* v. *Chubb Nat'l Ins. Co.*, 2015 WL 5954584, at *6 (S.D. Ohio Oct. 14, 2015) (where "suit had already been filed . . . any subjective anticipation of litigation would be objectively reasonable").

The Special Master's ruling would eliminate work product protection in the context of internal investigations. The ancillary "business purposes" that the Special Master cited regularly arise in connection with almost every internal investigation conducted to analyze and defend against legal claims. For example, any public company conducting an investigation must comply with its reporting obligations and investigative results may drive employment decisions, but the Sixth Circuit has held that work product protects documents "created in order to assist with a business decision," unless the documents "would have been created in essentially similar form irrespective of the litigation." *Roxworthy*, 457 F.3d at 598–99

*Fourth*, the Special Master erred by compelling deposition witnesses to answer "all fact-related questions (past and future) related to the internal investigation," including questions seeking information provided solely by counsel. (*See* Nov. 29 Order at PageID 12387; Notice of

Order, ECF No. 575 at PageID 12422 ("November 30 Order" or "Nov. 30 Order").) Movants claim they seek only "facts" through this questioning, but where a witness learns information exclusively through privileged communications with counsel, the witness cannot disclose that information without also disclosing the substance of those communications. Witnesses' recollections of "facts" they learned only from counsel would inevitably overlap with, and reveal, (i) privileged advice they received regarding, for example, legal risk and potential settlement of claims; and (ii) counsel's work product-protected judgments about the reliability and relevance of particular information and inferences from among the vast investigative record. *See Kennedy* v. *City of Zanesville*, 2006 WL 8442130, at *4 (S.D. Ohio Oct. 20, 2006) (work product doctrine protects "an attorney's efforts at investigating and preparing a case, including . . . assembling of information, determination of the relevant facts," legal theories, strategy, and "mental impressions.").

      **3.**     ***FirstEnergy Did Not Waive Privilege or Work Product Protections***. The Special Master "left unaddressed" Movants' claim that FirstEnergy had waived attorney-client privilege and work product protection (Nov. 29 Order at PageID 12386–87), but that issue will be properly before the Court if it correctly reverses the rulings described above. The Court should reject Movants' claims, which aim to convert what are often required disclosures for public companies into waiver.

      *First*, Movants claim that FirstEnergy effected a waiver by disclosing work product to its outside auditor PwC, a non-adversary. But Movants admit that disclosure of work product results in waiver only where the recipient is an adversary. *See United States* v. *Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) (auditor "cannot be [client's] adversary" because conflict would "necessitate" auditor's "withdrawal"). Indeed, if disclosure of work product to an auditor tripped

a waiver, it would present a catch-22 for a public company attempting to meet its reporting obligations where it faces the type of legal risk that FirstEnergy faced here.

*Second*, Movants are wrong that FirstEnergy waived protection by disclosing limited findings and conclusions in deposition testimony and public filings. *See*, *e.g.*, *E.E.O.C.* v. *Texas Hydraulics, Inc.*, 246 F.R.D. 548, 557 (E.D. Tenn. 2007) (no waiver where plaintiff "briefly summarized the evidence" and "reveal[ed] the EEOC's ultimate conclusion"). Indeed, Movants Jones and Dowling successfully moved to compel FirstEnergy to make further disclosures of what the Company "reasonably knew" in a second 30(b)(6) deposition, and now turn around and claim those disclosures constitute a waiver. Moreover, companies conducting an internal investigation often *must* release information about the investigation's results to comply with disclosure obligations. Finding waiver here would encourage companies to "mak[e] vague or incomplete disclosures," contrary to investors' interests. *See In re Fluor Intercontinental, Inc.*, 803 F. App'x 697, 703 (4th Cir. 2020).

*Third*, Movants wrongly claim that selective waiver applies because FirstEnergy relied on privilege as both a sword and a shield. That doctrine applies only if a party relies on privileged communications "to make their case," *Lewis Env't, Inc.* v. *Emergency Response & Training Sols., Inc.*, 2019 WL 285641, at *3 (S.D. Ohio Jan. 22, 2019), such as with an advice-of-counsel defense. Movants contend that FirstEnergy's 30(b)(6) witness testified (following a motion to compel) about information supposedly derived from the investigations "concerning directors' and officers' lack of knowledge and 'decisive' action upon learning of misconduct" and speculate that the Company might later attempt to advance a good faith defense on that basis. (Movants' Reply at PageID 11448–49.) But selective waiver turns on a party's actual reliance on privileged communications, not hypothetical scenarios. FirstEnergy has not relied on legal advice or work

-8-

product from the investigations to sustain its defenses in this action.

*Fourth*, the Court should reject Movants' "all-or-nothing approach" adopted by the Special Master "in which everything is discoverable or nothing is." (Nov. 29 Order at PageID 12386.) Under black-letter law, any order must be narrowly tailored to avoid unwarranted disclosure of information protected by First Energy's attorney-client privilege and work product protection, rather than affirming the Special Master's decision whereby "limited, factual disclosures" become "a bootstrap to discover [FirstEnergy's] entire investigative file." *United States* v. *Skeddle*, 989 F. Supp. 917, 920–21 (N.D. Ohio 1997).

## BACKGROUND

### A.     FirstEnergy and Its Board Retained Squire and Jones Day To Investigate the Legal Risks Following Then-Speaker Householder's Indictment.

Mr. Householder's arrest on July 21, 2020 precipitated an avalanche of litigation and enforcement proceedings against FirstEnergy. On the day the indictment against Mr. Householder was unsealed, FirstEnergy received grand jury subpoenas from DOJ. (Plaintiffs' Amended Class Action Complaint, ECF No. 72 at PageID 1597 ("Am. Compl."); Ex. 1 to July 26, 2023 Williams Decl., ECF No. 511-2 at PageID 10946 (SEC Form 12b-25 dated Aug. 10, 2020).)[3] The next day,

---

[3]     In reviewing objections to a Special Master's order, courts "conduct[] an 'independent review of the record' and assume[] 'the ultimate responsibility for deciding' all matters*." Quantum Sail Design Grp., LLC* v. *Jannie Reuvers Sails, Ltd.*, 827 F. App'x 485, 491 (6th Cir. 2020) (quoting *Kansas* v. *Nebraska*, 574 U.S. 445, 453 (2015)). The record here includes, but is not limited to, the following docket entries and all evidence cited in and/or filed in connection therewith: (i) Movants' brief in support of motion to compel (ECF No. 489-1); (ii) Jason Forge's June 30, 2023 Declaration (ECF No. 489-2) and all exhibits thereto (ECF No. 489-3); (iii) FirstEnergy's opposition brief (ECF Nos. 510); (iv) the O'Neil Declaration (ECF No. 511-1); (v) Hilary Williams' July 26, 2023 Declaration (ECF No. 511) and all exhibits thereto (ECF No. 511-2); (vi) Movants' reply brief (ECF No. 529); (vii) Jason Forge's August 9, 2023 Declaration (ECF No. 529-1) and all exhibits thereto (ECF No. 529-2); (viii) Movants' supplemental brief (ECF No. 549); (ix) Jason Forge's October 5, 2023 Declaration (ECF No. 549-1) and all exhibits thereto (ECF No. 549-2); (x) FirstEnergy's supplemental brief (ECF No. 550); (xi) Hilary Williams' Oct. 5, 2023 Declaration (ECF No. 550-1) and all exhibits thereto (ECF No. 550-2); (xii) Hilary Williams' December 13, 2023 Declaration (ECF No. 592-2) and (xiii) the

FirstEnergy's stock price had declined by 34% (Am. Compl., ECF No. 72 at PageID 1600), and by July 22, 2020, law firms began issuing press releases announcing their intention to bring securities lawsuits against FirstEnergy. (*See* Exs. 12–20 to July 26, 2023 Williams Decl., ECF No. 511-2 at PageID 11000–11021.) On July 24, 2020, the Ohio Attorney General sent FirstEnergy a document retention letter regarding H.B. 6, the legislation at issue in the DOJ investigation. (Ex. 2 to July 26, 2023 Williams Decl., ECF No. 511-2 at PageID 10953 (SEC Form 10-Q dated Aug. 17, 2020).)

By July 25, 2020, the FirstEnergy Board retained Squire to conduct an internal investigation led by former DOJ prosecutor Joseph Walker and formed a committee of independent directors to oversee Squire's internal investigation. (Declaration of James O'Neil, ECF No. 511-1 at PageID 10940 ("O'Neil Decl."); Amended Declaration of James O'Neil, ECF No. 592-3 at PageID 12996 ("Am. O'Neil Decl."); PwC Memo., *in camera* at ███████████████████████████ ██.) That committee met with Squire lawyers regularly to "discuss facts and information gleaned from the investigation." (Ex. 2 to Oct. 5, 2023 Williams Decl., ECF No. 550-2 at PageID 11919–20 (Julia Johnson Dep. Tr.).)

Within days of Mr. Householder's arrest, the Company engaged Jones Day to conduct an investigation. (O'Neil Decl. at PageID 10941; Am. O'Neil Decl. at PageID 12997; PwC Memo., *in camera* at ██████████████████.) Steve Sozio, also a former prosecutor, led the Jones Day team. (*Id.*) Jones Day came to represent the Company in responding to most of the government investigations and civil litigation related to H.B. 6, including this action. (O'Neil Decl. at PageID 10941–42; Am. O'Neil Decl. at PageID 12997–98; App. A to FirstEnergy's Opp.

---

Amended O'Neil Declaration (ECF No. 592-3). FirstEnergy submits all of the above for the Court's consideration. Under Federal Rule of Civil Procedure 53(f)(3), the Court may also "receive evidence" when considering objections.

Br., ECF No. 510 at PageID 10930–32 (identifying Jones Day's publicly filed appearances on behalf of FirstEnergy in litigation related to H.B. 6).)

As expected, litigation began almost immediately. Between July 26 and 28, 2020, a derivative lawsuit, a RICO class action, and this action were commenced against FirstEnergy and others.[4] On August 10, 2020, FirstEnergy received a formal order of investigation from the SEC. (Ex. 3 to July 26, 2023 Williams Decl., ECF No. 511-2 at PageID 10963 (SEC Form 8-K dated Nov. 2, 2020).) Overall, before the end of 2020, more than 30 civil actions and government investigations were commenced against FirstEnergy. (*See* App. A to FirstEnergy's Opp. Br., ECF No. 510 at PageID 10930–32.)

In early September 2020, after Squire had completed its work on the initial phase of the investigation, "the Board formed [an] Independent Review Committee ("IRC")" to continue to oversee counsel's work and to provide ongoing review and assessment of legal risk from the pending litigation and investigations. (O'Neil Decl. at PageID 10941; Am. O'Neil Decl. at PageID 12997; *see also* Ex. 15 to Aug. 9, 2023 Forge Decl. (Feb. 16, 2021 Press Release), ECF No. 529-2 at PageID 11580.) FirstEnergy also disclosed in certified SEC filings that independent members of its Board were "directing an internal investigation related to ongoing government investigations" and that FirstEnergy was "cooperating fully in the DOJ's investigation." (*See* Exs. 2 and 5 to July 26, 2023 Williams Decl., ECF No. 511-2 at PageID 10953, 10971, 10973–974.) The IRC "met frequently" with Squire, and Squire "continued to advise the IRC until at least June 2021." (O'Neil Decl. at PageID 10941; Am. O'Neil Decl. at PageID 12997.)

The DOJ investigation was resolved through a Deferred Prosecution Agreement ("DPA")

---

[4]     *See Gendrich* v. *Andersen*, No. CV-2020-07-2107 (Ohio Ct. Common Pleas, July 26, 2020); *Smith* v. *FirstEnergy Corp.*, No. 20-cv-3755 (S.D. Ohio July 27, 2020); ECF No. 1.

between FirstEnergy and the DOJ dated July 22, 2021. (DPA, ECF No. 259-5 at PageID 6002, 6012 (cited in Movants' Mot. to Compel Br., ECF No. 489-1 at PageID 10470)).) The DPA stated that FirstEnergy, represented by Jones Day, "conduct[ed] a thorough internal investigation" into matters "likely [to] be of interest to the government." (*Id.* at PageID 6002.)

### B. Movants' Motion to Compel Production of the Internal Investigations

Movants have had extensive discovery into the underlying facts relevant to their claims. FirstEnergy has produced more than 1,000,000 pages of documents, including all discovery that FirstEnergy has provided to the DOJ, SEC, Federal Energy Regulatory Commission, Ohio Attorney General, and Public Utilities Commission of Ohio. Movants have taken or noticed depositions of more than fifty witnesses, most of whom must make themselves available for up to eighteen hours of record time over two days.

In contending that the investigations were not entitled to attorney-client privilege or work product protection, Movants claimed that the investigations were "primarily" for the following "business purposes": "(1) [to] assuage PwC in connection with the Company's required SEC filings, and evaluate the effectiveness of the Company's internal controls; (2) [to] gather facts to make human-resources decisions (including the retention or termination of employees); (3) [to] protect FirstEnergy's access to outside capital at manageable rates; and (4) [to] gather facts to use as a bargaining chip with the government." (Movants' Mot. to Compel Br., ECF No. 489-1 at PageID 10458 ("Movants' Br.").) In making this argument, Movants simply claimed that these common collateral effects of an internal investigation following allegations of criminal wrongdoing by senior executives and follow-on litigation were the investigations' primary cause. (*See id.* at PageID 10475–10480.) Movants' own evidence explicitly states that FirstEnergy's Board " ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██ .) And Mr. O'Neil denied that either investigation was conducted to "appease PWC," "because of concerns about raising capital," or for other "business reasons." (O'Neil Decl. at PageID 10942–43; Am. O'Neil Decl. at PageID 12998–99.) Instead, the investigations were undertaken to respond to the serious and mounting legal risk FirstEnergy suddenly faced in July 2020. (*Id.*) Although counsel's investigative work "help[ed] to inform employment decisions," Mr. O'Neil made clear that those "ancillary" issues were not the "primary reason for," the investigations. (*Id.*)

Movants also claimed that FirstEnergy waived any attorney-client privilege or work product protection applicable to the investigations by disclosing (i) certain work product (but not privileged communications) to PwC, a non-adversary; and (ii) limited information regarding investigative conclusions and employment decisions in required SEC filings and in a testimonial aid prepared for FirstEnergy's Rule 30(b)(6) representative. (Movants' Br., at PageID 10481–87.) Movants also claimed that FirstEnergy used privilege as a "sword," even though it has not asserted an advice-of-counsel defense or otherwise relied on legal advice or work product from the investigations to support its defenses. (*Id.* at PageID 10487–88.)

### C. The Special Master's Order Holding That the Internal Investigations Are Not Protected By Attorney-Client Privilege or the Work Product Doctrine

On November 29, 2023, the Special Master granted the motion to compel in an order that turned on the fact that Mr. O'Neil declared his statements "under penalty of perjury," without also stating that his statements were "***true***." (Nov. 29 Order at PageID 12377–79) (emphasis in original.) The Special Master ruled that the declaration was "deficient" and was "outside the scope of what evidence a federal court can consider" (*id.* at PageID 12379), even though Movants never raised this argument, which was neither briefed nor discussed at oral argument on September 28, 2023. FirstEnergy and Movants submitted supplemental briefing on issues the Special Master

identified at oral argument, which did not include the sufficiency of the declaration. (*See* Part I.C., *infra*.) In fact, the Special Master told the parties that he identified this issue as he was finalizing his decision.

Because he excluded the O'Neil Declaration, the Special Master found that "FirstEnergy [wa]s speculating about the why behind" the investigations and concluded that Movants' evidence of "business purpose" was "uncontroverted." (Nov. 29 Order at PageID 12377, 12384–85.) The Special Master did not address FirstEnergy's other record evidence described above. (*See* App. A.) Nor did he identify with specificity the evidence he relied upon, instead citing four pages of Movants' reply brief. (*See* Nov. 29 Order, at PageID 12384 (citing Movants' Reply at PageID 11437-38, 11440-41)).[5] The Special Master stated that this unspecified "evidence" "le[d] to the conclusion that the investigation would have occurred even in the absence of anticipated civil and criminal litigation." (Nov. 29 Order at PageID 12385.) At the same time, the Special Master recognized that "audit/SEC filing purposes and [] human resources decisions/public relations" purposes "also would likely inform litigation preparation," and that "the business necessity and human resources/public relations arena" "logically overlap with anticipated litigation." (*Id*. at PageID 12384.) He found that the Jones Day investigation "presents a closer call" than the Squire investigation but did not explain why. (*Id*. at PageID 12386.)

The Special Master concluded that work product protection and attorney-client privilege were categorically inapplicable to the Squire and Jones Day internal investigations. (*Id*. at

---

[5] In those pages of their reply, Movants asserted that (i) FirstEnergy delayed its second quarter 10-Q filing following the arrest of Larry Householder in June 2020; (ii) in July 2020, FirstEnergy's former CEO, Chuck Jones, publicly denied that he was a coconspirator identified anonymously in the Householder complaint; (iii) preliminary results of the Squire investigation were reported to PwC in August 2020 in advance of FirstEnergy's 10-Q filing; and (iv) certain employees were terminated or separated, which "had tremendous business implications." (Movants' Reply at PageID 11437-38, 11440-41.)

PageID 12386.)   The Special Master did not reach Movants' waiver theories, leaving them "unaddressed" as "moot."  (*Id.*)

The Special Master granted Movants the broad relief they sought, save for their request to depose the investigating attorneys.  Specifically, the Special Master ordered that:

- "FirstEnergy must produce all previously withheld documents related to the internal investigation."

- "Witnesses must answer all fact-related questions (past and future) related to the internal investigation" even if they "learned those facts from the investigation."  On November 30, the Special Master clarified that witnesses must answer questions about facts learned specifically from counsel, but that Movants cannot inquire into attorneys' legal conclusions or thought processes.

- The parties must meet and confer on which depositions, if any, must be reopened, and reopened depositions are limited to two hours, with FirstEnergy to bear costs.

- FirstEnergy must withdraw all asserted protections that are reflected in document productions made in this action by PwC.

(Nov. 29 Order at PageID 12387; Nov. 30 Conf. Tr. at PageID 12904.)

### D.     The Special Master Refused Amendment of Mr. O'Neil's Declaration

On November 30, the Special Master held an "emergency" conference at Movants' request to address the impact of the November 29 Order on upcoming depositions.  At the conference, FirstEnergy stated its intention to amend the O'Neil Declaration to include the words "true and correct," which had been inadvertently omitted while converting what was an affidavit into a declaration late in the drafting process for ease of execution.  (Nov. 30 Conf. Tr. at PageID 12890–91.)  This inadvertence is confirmed by the fact that, as the Special Master noted, the lawyer's declaration submitted by FirstEnergy with its opposition included the words missing from

-15-

Mr. O'Neil's declaration. (Nov. 29 Order at PageID 12383.) FirstEnergy noted that Chief Judge Marbley in *Ross*, 2016 WL 7117389, at *8, permitted amendment of a declaration that contained the same omission and was undated. (Nov. 30 Conf. Tr. at PageID 12890.)

The Special Master construed FirstEnergy's statements as an "oral motion" for leave to amend the O'Neil Declaration and, without briefing or argument, immediately denied leave to amend because he found "no good cause presented." (Nov. 30 Conf. Tr. at PageID 12909–10.) Although FirstEnergy raised its intention to amend the declaration less than 24 hours after the issue was first raised in the November 29 Order, the Special Master deemed FirstEnergy's request for leave to be "belated." (*Id.*)

The Special Master further explained that he did not cite *Ross* in the November 29 Order because he "thought it would open up the exact can of worms today where somebody's asking to supplement." (*Id.* at PageID 12907.) The Special Master then stated that in *Ross* the plaintiff had moved to amend "*before* the related summary judgment [motion] was decided," whereas FirstEnergy had "only . . . come forward" after the Special Master had ruled. (*Id.* at PageID 12909.) The Special Master did not acknowledge that Movants never objected to the O'Neil Declaration. He concluded, "I understand there is the authority to correct [the declaration]. There is no entitlement to do so and we need not do so. The oral motion is denied." (*Id*. at PageID 12909–10) The Special Master issued an order that day memorializing his rulings and incorporating the hearing transcript by reference. (Nov. 30 Order at PageID 12423.)

### E. Developments Following the November 29 and 30 Orders.

On December 1, 2023 this Court directed the Special Master to reduce his November 30 rulings to a report and recommendation. (*See* Order, ECF No. 578 at PageID 12722.) On December 13, 2023, FirstEnergy moved the Special Master for reconsideration of the November 29 and 30 orders, which remains pending. (ECF No. 592.)

## STANDARD OF REVIEW

Under Rule 53 and the Court's September 12, 2023 Order appointing the Special Master, the Court (i) "shall decide *de novo* all objections to conclusions of law" and "findings of fact" made or recommended by the Special Master; and (ii) "shall set aside a ruling by the Special Master on a procedural matter only for abuse of discretion." Fed. R. Civ. P. 53(f); (Order Appointing Special Master, ECF No. 541 at PageID 11687–88). Thus, the Special Master's findings and legal conclusions related to the application of the attorney-client privilege and work product protection are reviewed *de novo*.[6] As to purely procedural matters, it is an abuse of the Special Master's discretion "to commit legal error or find clearly erroneous facts." *United States* v. *Holden*, 557 F.3d 698, 703 (6th Cir. 2009).

## ARGUMENT

I. **THE SPECIAL MASTER ERRED BY EXCLUDING THE O'NEIL DECLARATION FROM CONSIDERATION AND SUMMARILY REFUSING TO ACCEPT AN AMENDED DECLARATION.**

    A. **The O'Neil Declaration Satisfied the "Substantial Compliance" Standard under 28 U.S.C. § 1746.**

In the Special Master's November 29 Order he concluded that Section 1746's "recipe" is "fixed" and that a declaration "must necessarily [be] exclude[d]" if any "ingredient" is missing. (Nov. 29 Order at PageID 12382–84.) By adopting this strict compliance standard, the Special

---

[6]     *See Baker* v. *Chevron USA, Inc.*, 2009 WL 10679565, at *1–2 (S.D. Ohio July 13, 2009) (reviewing *de novo* special master's findings of fact and conclusions of law regarding application of privilege and work product); *AK Steel Corp.* v. *Sollac & Ugine*, 234 F. Supp. 2d 711, 713-14 (S.D. Ohio 2002) (same, including as to waiver); *Hernandez* v. *Lynch*, 2019 WL 6998774, at *2 (C.D. Cal. June 18, 2019) (although special master's "rulings on procedural matters" are reviewed "for abuse of discretion," "discovery rulings . . . inextricably intertwined with conclusions of fact and law" are reviewed "*de novo*"); Fed. R. Civ. P. 53(g) advisory committee notes to 2003 amendment ("*Apart from factual and legal questions*, masters" may make "determinations" on "matters of procedural discretion.") (emphasis added)).

Master departed from (i) the plain language of Section 1746, which requires declarations to be made in "substantially the form" described in the statute; and (ii) this Circuit that, consistent with that text, Section 1746 "require[s] only substantial compliance." *Peters* v. *Lincoln Elec. Co.*, 285 F.3d 456, 475–76 (6th Cir. 2002).

In his November 29 Order, the Special Master relied principally on *Bonds* v. *Cox*, 20 F.3d 697 (6th Cir. 1994), which he characterized as holding that Section 1746 includes "four core elements" that "must" be met for a declaration to pass muster—the declaration "must be signed"; "must declare its contents to be true"; "must acknowledge that it is under penalty of perjury"; and "must be dated." (Nov. 29 Order at PageID 12379.) But *Bonds* never held that Section 1746 mandates four "elements." *See Bonds*, 20 F.3d at 702. To the contrary, in *Peters*, the Sixth Circuit rejected the notion that Section 1746's elements are "fixed" when it affirmed a district court's acceptance of an undated declaration on summary judgment. 285 F.3d at 475–76. The Sixth Circuit emphasized "courts have held that the absence of a date on such documents does not render them invalid" where the date of execution could be discerned from "extrinsic evidence." *Id.*

Consistent with the "substantial compliance" standard, the Second Circuit in *LeBoeuf,* 185 F.3d at 65–66, accepted a signed and dated declaration made "[u]nder penalty of perjury" that omitted the phrase "true and correct"—exactly like the O'Neil Declaration. The Second Circuit held that the declaration "substantially complie[d] with [the] statutory requirements" under Section 1746 and could be accepted as summary judgment evidence, even though it "d[id] not contain the exact language of Section 1746 nor state that the contents are 'true and correct.'" *Id.*[7]

---

[7]    *LeBoeuf*, which was decided by a panel comprised of then-Chief Judge Ralph Winter, former Chief Judge Jon Newman, and then-Circuit Judge Sonia Sotomayor, remains the sole Circuit-level decision to address the issue decided by the Special Master, and came to the opposite conclusion.

The Special Master characterized *LeBoeuf* as the "minority" view on this point (Nov. 29

Order at PageID 12381), but two of the three cases cited in the November 29 Order that considered

a declaration made under penalty of perjury without including "true and correct"—*LeBoeuf* and

*Callahan*, 2019 WL 12405937, at *3—held that the declaration substantially complied with

Section 1746. In fact, courts have repeatedly held that a declaration "signed under penalty of

perjury . . . is not invalid under § 1746 simply because it lacks the words 'true and correct.'"

*Montgomery* v. *Ruxton Health Care, IX, LLC*, 2006 WL 3746145, at *3 (E.D. Va. Dec. 15, 2006).[8]

And Chief Judge Marbley in *Ross* permitted, over defendants' objection, amendment of a

declaration that not only omitted the "true and correct" language, but also was undated. 2016 WL

7117389, at *8. *Ross* nowhere suggested that Section 1746 "mandated" that the declaration be

excluded.[9]

The Special Master also was mistaken in assuming that, notwithstanding that the sole on-

point Circuit-level decision rejected his approach, the Fifth and Eleventh Circuits would "agree"

---

[8]     *See, e.g.*, *Batista* v. *United States*, 792 F. App'x 134, 135 (2d Cir. 2020) (affirming denial of motion to strike declarations that "do not contain the precise phrase 'true and correct'" because "the plain language of Section 1746 itself requires only 'substantial[ ]' compliance"); *Rodrigues* v. *Jackson Cnty.*, 2015 WL 404577, at *2 (D. Or. Jan. 29, 2015) (declarations omitted phrase "true and correct" but because "both declarations state[d] that they are made 'under penalty of perjury'" and were signed and dated, the court was "satisfied these declarations are sworn"); *Evans* v. *Jackson Cnty.*, 2015 WL 2170114, at *1 (D. Or. May 7, 2015) (accepting declarations that did "not include the phrase 'true and correct'" because "both declarations state that they are made 'under penalty of perjury' and include the declarant's dated signatures"); *Tishcon Corp.* v. *Soundview Commc'ns, Inc.*, 2005 WL 6038743, at *4 (N.D. Ga. Feb. 15, 2005) (accepting declaration that did not include "the 'true and correct' language" because "the phrase, 'hereby declares under penalties of perjury'" satisfies Section 1746, and "under penalty of perjury . . . signal[s] that [the declarant] understands the legal significance of his statements and the potential for punishment if he lies").

[9]     The Special Master at the November 30 hearing incorrectly characterized *Ross* as consistent with his determination that the O'Neil declaration is legally defective. *Ross* did not reach that issue because the plaintiff in *Ross* did not challenge the defendant's characterization of the declaration as flawed and simply moved for "leave to file a substitute/corrected declaration," which Chief Judge Marbley granted. 2016 WL 7117389, at *8. And, in any event, the declaration in *Ross* was missing both "true and correct" and the date of signature. *Id.*

with his analysis. (*See* Nov. 29 Order at PageID 12380–81.) The Special Master pointed to *Nissho-Iwai American Corp.* v. *Kline* (*id.*), but there, the affidavit was rejected because, unlike Mr. O'Neil's declaration, it was "neither sworn nor stated to be true nor stated under penalty of perjury." 845 F.2d 1300, 1306 (5th Cir. 1988). The Second Circuit directly addressed why *Nissho-Iwai* does *not* support the Special Master's interpretation: "[b]y listing these requirements in the disjunctive, the Fifth Circuit indicated that a party need not satisfy all of them" for a court to accept a declaration. *LeBoeuf*, 185 F.3d at 66. And unlike here, the plaintiff in *Nissho-Iwai* "duly objected" to the declaration, such that the defendant could have "correct[ed]" it or explained why it "should be considered competent," but "[the defendant] made no response." 845 F.2d at 1305-06. As to the Eleventh Circuit's supposed support, in *Roy* v. *Ivy*, unlike here, the declaration "did not adopt or otherwise reference [] 'penalty of perjury' language." 53 F.4th 1338, 1349–50 (11th Cir. 2022). That language appeared only in a "table of contents" and "heading" in a brief that was not "sign[ed] and date[d]." *Id.*

The Special Master cited only one case excluding a declaration that omitted "true and correct" but included "under penalty of perjury." (Nov. 29 Order at PageID 12381.) In that thirty-four-year-old case, *In re Muscatell*, 106 B.R. 307, 307–08 (Bankr. M.D. Fla. 1989), the Bankruptcy Court for the Middle District of Florida, unlike here, was assessing the evidentiary sufficiency of the declaration in connection with a summary judgment motion, not a privilege determination. (*See* Part I.B., *infra*.) The District Court for the Middle District of Florida has since held that the "omission to state that the matters declared are 'true and correct' is not fatal" because a declaration that is signed, dated and expressly made under "penalties of perjury" "substantially complies with Section 1746." *Delano* v. *Mastec, Inc.*, 2011 WL 1557863, at *1

(M.D. Fla. Apr. 25, 2011).[10]

The common-sense reason that courts, including *LeBoeuf*, hold that signed and dated declarations made under penalty of perjury substantially comply with Section 1746 is that making a statement "under penalty of perjury" "necessarily represent[s] that what [the declarant] was saying was true, and signifie[s] her understanding of the legal significance of such a statement." *Callahan*, 2019 WL 12405937, at *3; *see also United States* v. *Bueno-Vargas*, 383 F.3d 1104, 1111 (9th Cir. 2004) ("[S]igning a statement under penalty of perjury . . . is a signal that the declarant understands the legal significance of the declarant's statements and the potential for punishment if the declarant lies."); *Tishcon Corp.*, 2005 WL 6038743, at *4 (same). Mr. O'Neil has since confirmed that he held exactly this understanding of "under penalty of perjury" when signing his original declaration. (*See* Am. O'Neil Decl. at PageID 12999.)

The Special Master nevertheless rejected cases following this logic as "less persuasive" and "more poorly reasoned," because, in the Special Master's view, "a declarant can state falsehoods" while "under penalty of perjury" because "the declarant has not declared the statement to be true[.]" (Nov. 29 Order at PageID 12381–82; Nov. 30 Conf. Tr. at PageID 12907.) This misconstrues the meaning of perjury. In fact, the federal perjury statute provides that

---

[10]    Other cases cited by the Special Master (i) involved different aspects of Section 1746, and/or (ii) permitted the party to cure the issue with the declaration. *See, e.g.*, *Sfakianos* v. *Shelby Cty. Gov't.*, 2010 WL 11493114, at *10 (W.D. Tenn. Dec. 30, 2010) (declaration not signed under penalty of perjury or dated); *Enigwe* v. *Diversity City Media*, 2008 WL 11352583, at *2 (S.D. Ohio June 2, 2008) (declaration not signed or dated, but declarant permitted to file correction); *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 487–88 (2d Cir. 2013) (rejecting declarations that omitted "under penalty of perjury" after affording multiple opportunities to cure); *Grand Fabrics Int'l Ltd.* v. *Melrose Textile, Inc.*, 2018 WL 6118439, at *6–7 (C.D. Cal. May 9, 2018) (rejecting declaration after granting defendant "additional opportunity" to revise declaration and eliminate qualifying language such as "to the best of my knowledge and recollection" where defendant had failed to do so); *Wheeler* v. *Baxter Healthcare Corp.*, 2011 WL 5402446, at *2–3 (E.D. Ark. Nov. 8, 2011) (rejecting undated declaration that was "not actually sign[ed]" but considering substance when deciding merits).

-21-

"[w]hoever . . . in any declaration, certificate, verification, or statement under penalty of perjury" under Section 1746 "knowingly makes any false material declaration" in a federal court or grand jury proceeding may be fined, imprisoned, or both. 18 U.S.C. § 1623(a). Accordingly, and consistent with *LeBoeuf*, the Second Circuit in *In re World Trade Center Disaster Site Litigation*, 722 F.3d at 488–89, rejected a certification that *included* "true and correct" but *omitted* "under penalty of perjury"—in other words, "true and correct" without "penalty of perjury" is *not* enough, but "penalty of perjury" without "true and correct" *is* enough.

### B. The Special Master Applied the Wrong Standard in Assessing the O'Neil Declaration.

Even putting aside whether the original O'Neil Declaration substantially complied with Section 1746, the Special Master erred in concluding that a supposed "deficiency" in the declaration necessarily "places the document outside the scope of what evidence a federal court can consider[.]" (Nov. 29 Order at PageID 12379.) Federal courts are bound by no such rule when making privilege determinations.

Under Federal Rule of Evidence 104(a), when deciding "any preliminary question about whether . . . a privilege exists . . . , the court is not bound by evidence rules, except those on privilege." Courts thus frequently consider affidavits under Rule 104(a) that bear indicia of reliability even if unsworn, defective, or otherwise inadmissible. *See, e.g.*, *United States* v. *Straker*, 596 F. Supp. 2d 80, 84 n.4 (D.D.C. 2009) (under Rule 104(a), the court could "consider the [unsworn] affidavit"); *Tarochione* v. *Roberts Pipeline, Inc.*, 62 F. Supp. 3d 821, 828 (N.D. Ill. 2014) (considering affidavit because "indicia of reliability"—*i.e.*, the affiant's deposition testimony and other record evidence—"support[ed] admission"). Technical evidentiary issues concerning whether a declaration is defective may be relevant at summary judgment or at trial, but for a privilege determination, those issues go at most to weight and do not require "exclusion."

The O'Neil Declaration was reliable and should have been accepted under Rule 104(a). Mr. O'Neil had personal knowledge of the facts in his declaration because he was a member of FirstEnergy's Board of Directors while the investigations were conducted and a member of the independent board committees that retained Squire and supervised its investigation. Mr. O'Neil's statements are also corroborated by other evidence. For example, he described the onslaught of litigation and government investigations that led to the investigations, and FirstEnergy cited extensive independent evidence reflecting the initiation of those litigations and investigations.[11] Mr. O'Neil also declared his statements to be made "under penalty of perjury," which, as the Ninth Circuit held, "is a signal that the declarant understands the legal significance of the declarant's statements and the potential for punishment if the declarant lies." *Bueno-Vargas*, 383 F.3d at 1111. The reliability of the O'Neil Declaration is further underscored by his prompt submission of an amended declaration including the words "true and correct" and otherwise averring to the exact same statements, also under penalty of perjury. (Amended O'Neil Decl. at PageID 12994, 12999.)

### C. The Special Master Erred by Ignoring Movants' Waiver of Objections to the O'Neil Declaration and Abused His Direction by Denying FirstEnergy An Opportunity to Be Heard.

Where, as here, an opposing party does not move to strike a purportedly non-compliant declaration, "any objection to the declaration [is] waived." *Rogers* v. *Henry Ford Health Sys.*, 897 F.3d 763, 767 n.1 (6th Cir. 2018); *see Wiley* v. *United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("If a party fails to object" to "affidavits or evidentiary materials submitted by the other party," any objections are "deemed to have been waived"). The Special Master ignored that Movants never

---

[11]    (O'Neil Decl. at PageID 10938–43; Am. O'Neil Decl. at PageID 12994–99; *see, e.g.*, App. A to FirstEnergy's Opp. Br., ECF No. 510 at PageID 10930–32; Ex. 2 to July 26, 2023 Williams Decl., ECF No. 511-2 at PageID 10953 (identifying investigations and civil lawsuits filed against FirstEnergy as of August 17, 2020).)

raised any issue with the O'Neil's Declaration, much less moved to strike it. To the contrary, Movants relied on the declaration in their reply. (*See* Movants' Reply at PageID 11438.)

Notwithstanding Movants' waiver, the Special Master elected to base the outcome of Movants' motion to compel solely on his own theory, even after requesting supplemental briefing on other issues that he identified at oral argument. But courts "normally decide only questions presented by the parties." *Sineneng-Smith*, 140 S. Ct. at 1579. Indeed, "[i]n our adversary system," courts rely on "the parties to frame the issues for decision" and retain "the role of neutral arbiter of matters the parties present." *Greenlaw* v. *United States*, 554 U.S. 237, 244 (2008). By addressing the purported deficiency with the O'Neil Declaration *sua sponte*, the Special Master violated "the principle of party presentation." *Id.*

Here, the Special Master not only acted on his own motion, but also decided the issue without *any* input from the parties. Appellate courts regularly find an abuse of discretion when courts act *sua sponte* without providing notice and an opportunity to be heard. *See, e.g.*, *Bennett* v. *City of Eastpointe*, 410 F.3d 810, 816–17 (6th Cir. 2005) (district court abused discretion in granting defendants summary judgment *sua sponte* where plaintiffs had no "notice that they would be forced to defend against a nonexistent motion" and were "surprised by the proceedings").[12] Here, the Special Master did not provide notice or opportunity, then compounded his error by faulting FirstEnergy for failing to bring the unknown issue with the O'Neil Declaration "to [his] attention until after an adverse decision was filed." (*See* Nov. 30 Conf. Tr., at PageID 12909.) The prejudice to FirstEnergy from this surprise ruling is obvious, as the November 29 Order

---

[12] *See Mulbarger* v. *Royal Alliance Asscs., Inc.*, 172 F.3d 49 (6th Cir. 1998) (abuse of discretion for district court to reinstate and grant previously denied motion to dismiss without allowing plaintiffs opportunity to respond); *Catzin* v. *Thank You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018) (abuse of discretion for district court to decline *sua sponte* to exercise supplemental jurisdiction "without affording the parties notice and an opportunity to be heard.").

broadly vitiates privilege and work product protections based on a fixable (and now fixed) "technicality."

### D. The Special Master Applied the Wrong Legal Standard and Abused His Discretion By Summarily Denying FirstEnergy Leave to Amend the O'Neil Declaration.

The Special Master also erred in immediately denying FirstEnergy leave to amend without any briefing or argument. Less than 24 hours after the Special Master issued the November 29 Order, he construed FirstEnergy's representation that it intended to file an amended declaration as an "oral motion," which he immediately denied. (Nov. 30 Conf. Tr. at PageID 12909.) In so doing, the Special Master not only denied FirstEnergy any proper process, but also applied the wrong legal standard. Specifically, the Special Master found that "[t]here was no good cause presented" for an amendment (*id.*), but the standard in the Sixth Circuit for leave to amend a technical error or omission in a declaration is whether the amendment would (i) "prejudice" the opposing party, and (ii) "serve[] the interest of justice in resolving [the issue] on its merits." *Fox*, 2010 WL 4983153, at *2. That standard is easily satisfied here.[13]

*First*, Movants never alleged and cannot claim any prejudice. Besides the addition of "true and correct," the Amended O'Neil Declaration is substantively identical to the original declaration.

---

[13] In opposing FirstEnergy's motion for reconsideration of the November 29 and 30 Orders, Plaintiffs wrongly claim that "the good cause standard [the Special Master] applied is the standard that applies to most motions for leave." (Movants' Opp. Br., ECF No. 605 at PageID 13134.) Three of the four cases Plaintiffs cite for this proposition do not concern requests to make technical amendments to a declaration, but instead concern requests for leave (i) to file supplemental briefing or (ii) to change a court-ordered deadline, which *are* subject to the good-cause standard . *See* Fed. R. Civ. P. 6(b)(1); Fed. R. Civ. P. 16; *Carrizo (Utica) LLC* v. *City of Girard, Ohio*, 661 F. App'x 364, 367–68 (6th Cir. 2016) (amendment of complaint after scheduling order's deadline); *Canter* v. *Alkermes Blue Care Elect Preferred Provider Plan*, 593 F. Supp. 3d 737, 744 (S.D. Ohio 2022) (sur-reply brief); *Allstate Ins. Co.* v. *Orthopedic, P.C.*, 2019 WL 13195622, at *2 (E.D. Mich. Jan. 29, 2019) (supplemental brief). In the fourth case, the court had stayed all motion practice "absent leave of Court for good cause shown" until it rendered decisions on certain pending motions. *Allstate Ins. Co.* v. *Tox Testing, Inc.*, 2020 WL 13443548, at *2 (E.D. Mich. Sept. 24, 2020).

Movants had every opportunity to respond to Mr. O'Neil's statements in their reply brief and at oral argument, and, in fact, affirmatively relied on the declaration in their reply. (*See* Movants' Reply at PageID 11438.)

Courts reject any finding of prejudice on these facts. That was the outcome in *Ross*, where Chief Judge Marbley allowed a plaintiff to amend an undated declaration that (as here) omitted the words "true and correct," emphasizing that the plaintiff should be permitted to amend because (again, as here) the opposing party "addressed its substance in its reply brief." 2016 WL 7117389, at *8. As in *Brown* v. *Dungarvin Ohio, Inc.*, Movants "cannot argue surprise or serious prejudice" because "they were plainly aware of" the content of the O'Neil Declaration when litigating the motion to compel. 2006 WL 8429937, at *2 (S.D. Ohio May 8, 2006). Courts in this circuit "regularly allow[]" amendments to cure a technical issue or omission in a declaration "because such a correction generally does not prejudice the opposing party." *Frontczak* v. *City of Detroit*, 2021 WL 1526279, at *2 (E.D. Mich. Apr. 19, 2021).[14] The absence of prejudice is even more pronounced because Movants never objected to the form of the original O'Neil Declaration.

At the November 30, 2023 conference, the Special Master stated that he had reviewed *Ross*, but had declined to cite it in the November 29 Order so as not to "open up [a] can of worms." (Nov. 30 Conf. Tr. at PageID 12907.) The Special Master noted that Chief Judge Marbley had found the declaration in *Ross* to be "defective" under Section 1746, and concluded that "[t]here's

---

[14]    *See Leininger* v. *Reliastar Life Ins. Co*., 2007 WL 2875283, at *6 (E.D. Mich. Sept. 28, 2007) (amendment permitted to add "under penalty of perjury" to declaration); *Welch* v. *Level 3 Commc'ns*., LLC, 2017 U.S. Dist. LEXIS 85974, at *2–3 (E.D. Mich. Mar. 9, 2017) (amendment permitted to add signature to declaration); *Wilson* v. *Hill*, 2012 WL 1068174, at *2 n.3 (S.D. Ohio Mar. 29, 2012) (amendment permitted to add missing pages to affidavit); *Villavicencio* v. *Camoplast Crocker LLC*, 2010 WL 4318897, at *3–4 (W.D. Mich. Oct. 22, 2010) (granting leave to add "under penalty of perjury" to declaration); *see also Okeayainneh* v. *U.S. Dep't of Just*., 2022 WL 1694505, at *1 (D.C. Cir. May 25, 2022) (granting leave to add "penalty of perjury" because doing so served "the interests of justice").

no gray area in that statement.  It's a substantively defective declaration and therefore not worthy

of consideration."  (*Id.*)[15]   Respectfully, Chief Judge Marbley came to the opposite conclusion in

*Ross*—the Court found that the plaintiff's declaration *was* worthy of consideration and ruled that

the plaintiff "should be able to amend his declaration to cure [] technical deficiencies," just as

FirstEnergy should be here.  2016 WL 7117389, at *8.

     *Second*, courts routinely find that curing a technical issue with a declaration "serves the

interest of justice" because it allows a dispute to be "resolv[ed] on its merits."  *Fox*, 2010 WL

4983153, at *2; *see Dungarvin Ohio*, 2006 WL 8429937, at *2 (granting leave to amend because

"declarations from the class members contain information relating to the crucial issue in this

case"); *Okeayainneh*, 2022 WL 1694505, at *1 ("Supplementing the record with the revised

declaration . . . which adds a penalty-of-perjury statement, is in the interests of justice.").  As

Magistrate Judge Jolson explained in granting leave to file an amended declaration to correct a

signature, courts "prefer[] to decide questions before [them] on the merits, not on technicalities."[16]

---

[15]     The Special Master also held FirstEnergy to an impossible standard in finding its request for leave to amend the O'Neil Declaration "belated[]." (Nov. 30 Order at PageID 12423.)  The Special Master distinguished *Ross* on the basis that plaintiff there had moved to amend the declaration "before the related summary judgment was decided," and faulted FirstEnergy for "only . . . com[ing] forward" after the Special Master had ruled.  (Nov. 30 Conf. Tr. at PageID 12909.)  But *Ross* concerned a motion to strike the original declaration, so plaintiff was on notice and was able to move before summary judgment was decided.  Here, Movants never objected to the original declaration, and FirstEnergy was unaware of the inadvertent omission of "true and correct" until the Special Master identified it in his November 29 Order and deemed that alleged deficiency to be "dispositive" of the issues before him.  (Nov. 29 Order at PageID 12377.)  The Special Master did not provide FirstEnergy with the opportunity to cure the perceived deficiency, but instead issued his November 29 Order, and the next day found FirstEnergy's request to amend to be "belated[]." (Nov. 30 Order,= at PageID 12423.)

[16]     Relatedly, there is no merit to Plaintiffs form over substance argument, made in their December 19 opposition to FirstEnergy's motion to reconsider the November 29 and 30 Orders, that the Special Master had no authority to grant leave to amend on November 30 because FirstEnergy had filed a notice of objections to the November 29 decision.  (Movants' Opp. Br., ECF No. 605 at PageID 13129.)  A notice of objections does not, as Plaintiffs claim, "divest" the Special Master of "jurisdiction over the matters [objected to]."  (*Id.*)  Plaintiffs' attempt to

*Abington Emerson Capital, LLC* v. *Adkins*, 2021 WL 611998, at *12 (S.D. Ohio Jan. 22, 2021),

*as corrected* (Feb. 8, 2021); *see also Hopper* v. *Credit Assocs., LLC*, 2021 WL 5754732, at *2

(S.D. Ohio Dec. 3, 2021), *report and recommendation adopted*, 2022 WL 889054 (S.D. Ohio Mar.

25, 2022) (adjudication on "technical grounds . . . elevate[s] form over substance and undermine[s]

the general proposition that courts prefer to decide cases on their merits.").[17]

## II. THE SPECIAL MASTER ERRED IN COMPELLING DISCOVERY INTO FIRSTENERGY'S INTERNAL INVESTIGATIONS, WHICH ARE PROTECTED BY PRIVILEGE AND WORK PRODUCT.

### A. The Special Master Ignored Overwhelming Evidence Beyond the O'Neil Declaration Establishing That the Internal Investigations Were Conducted to Secure Legal Advice and Prepare for Litigation.

With or without the O'Neil Declaration, the evidence establishes that the investigations

were initiated because of anticipated *and actual* litigation and to obtain legal advice in the face of

a severe corporate crisis.

Mr. O'Neil testified that FirstEnergy initiated the investigations for those reasons. His

---

analogize to a notice of appeal is inapt because a notice of appeal transfers a matter from the district court's jurisdiction to the appellate court's jurisdiction. *See United States* v. *Garcia-Robles*, 562 F.3d 763, 767 (6th Cir. 2009). The Special Master's authority is delegated from this Court and thus falls within the same jurisdiction. (*See* Order Appointing Special Master, ECF No. 541.) *See also* Fed. R. Civ. P. 53.

[17]     Under Rule 53(f)(1), the Court "may receive evidence" in "acting on a master's order." *See also* Fed. R. Civ. P. 53(f), Advisory Committee Note, 2003 Amendment ("The parties" may "seek permission to supplement the record with evidence."). As such, the Court may obviate the Special Master's errors in rejecting the O'Neil Declaration and denying FirstEnergy leave to amend the declaration simply by accepting the Amended O'Neil Declaration into evidence in connection with its consideration of these objections. Courts have broad discretion to consider evidence submitted upon an objection. *See Nat. Immunogenics Corp.* v. *Newport Trial Grp.*, 2018 WL 6168035, at *5 (C.D. Cal. June 12, 2018) ("[T]he Court exercises its discretion to receive the new evidence when considering the cross-objections to the Special Master's order"); *cf. Muhammad* v. *Close*, 798 F. Supp. 2d 869, 875 (E.D. Mich. 2011) (accepting new affidavit which was "key piece of evidence" and "submitted with timely objections to magistrate judge's report and recommendation"). To be clear, FirstEnergy is not asking the Court to consider new evidence, but only to accept as evidence the Amended O'Neil Declaration.

declaration establishes that following the unsealing of the Householder Complaint, "FirstEnergy anticipated that the Company would face government investigations, civil litigation, and regulatory proceedings related to the Company's role in the alleged events described in the Householder Complaint." (O'Neil Decl. at PageID 10938–40; Am. O'Neil Decl. at PageID 12994–96.) Those anticipated proceedings materialized within days, including civil litigation and investigations by criminal and civil government authorities. (*Id.*)

Moreover, Mr. O'Neil testified that on or around July 22, 2020, FirstEnergy retained Jones Day "to represent the Company in many of the lawsuits related to the allegations in the Householder Complaint and to advise the Company on its response to the SEC investigation"— *i.e.*, to provide legal advice and assist with litigation. (O'Neil Decl. at PageID 10941–42; Am. O'Neil Decl. at PageID 12997–98.) The Board decided to engage Squire to investigate those same allegations. (O'Neil Decl. at PageID 10940; Am. O'Neil Decl. at PageID 12996.) The Squire investigation did not conclude within 17 days, as Movants contend, but instead continued "***until at least June 2021***." (O'Neil Decl. at PageID 10941; Am. O'Neil Decl. at PageID 12997(emphasis added).) And Mr. O'Neil testified that both Squire and Jones Day were retained "to conduct internal investigations in response to the DOJ criminal investigation and the pending and anticipated litigation matters described above, which include this securities class action." (O'Neil Decl. at PageID 10942; Am. O'Neil Decl. at PageID 12998.)

The Special Master plainly erred by "fail[ing] to consider relevant evidence" in the record that independently established the same points. *Contreras* v. *Secretary of Health and Human Services*, 844 F.3d 1363, 1365, 1369 (Fed. Cir. 2017). FirstEnergy submitted exhibits reflecting that within the first few days and weeks following Mr. Householder's indictment, FirstEnergy received a DOJ subpoena and a formal investigation notice from the SEC. On top of that, nine

law firms announced that they were preparing investor lawsuits against the Company. (Exs. 12–20 to July 26, 2023 Williams Decl. ECF No. 511-2 at PageID 11000–21.)

Additional examples of record evidence identifying pending and threatened legal proceedings as the impetus for the investigations are set forth in Appendix A, including:

- FirstEnergy's November 2020 Form 10-K/A stated that "[a] committee of independent members of the Board of Directors ('Board') is directing an internal investigation related to ongoing government investigations." (Ex. 5 to July 26, 2023 Williams Decl., ECF No. 511-2 at PageID 10971, 10973–74 (SEC Form 10-K/A dated Nov. 19, 2020).)

- The deferred prosecution agreement that FirstEnergy ultimately entered into to resolve the DOJ investigation provided that FirstEnergy "conduct[ed] a thorough internal investigation" concerning "matters likely [to] be of interest to the government." The agreement identifies Jones Day as having represented FirstEnergy in connection with that investigation. (DPA, ECF No. 259-5 at PageID 6002, 6012.)

- Even Movants' own exhibits support FirstEnergy's point. In particular, the August 16, 2020 PwC memorandum on which they rely states that ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

## B. The Special Master Applied the Wrong Legal Standard in Concluding That FirstEnergy's Attorney-Client Communications Were Not Privileged Because of Supposed "Business Purposes."

Based on his erroneous finding that the investigations were supposedly "prepared in the ordinary course of business," the Special Master clearly erred in concluding that the "attorney-client privilege does not apply" to any related communications. (Nov. 29 Order, ECF No. 571 at PageID 12385–86.)

-30-

Whether a document is prepared "in the ordinary course of business" bears on work product, *not* attorney-client privilege. Privilege applies to confidential attorney-client communications reflecting a request for "*legal advice of any kind*." *Reed* v. *Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998) (emphasis added). That test is readily satisfied where, as here, attorneys conduct investigations "in connection with the provision of legal services." *Sandra T.E.* v. *S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 620 (7th Cir. 2010); *In re Allen*, 106 F.3d at 603 (holding attorney-client privilege applies because attorney "was retained to conduct an investigation . . . related to the rendition of legal services."). Having a "business purpose" does not undercut a claim of privilege because, as is obvious, "legal advice is rendered in the context of commercial transactions or in the operations of a business in a corporate setting." *Carhartt, Inc.* v. *Innovative Textiles, Inc.*, 333 F.R.D. 113, 117 (E.D. Mich. 2019). Holding otherwise would have the absurd result of depriving business organizations of the attorney-client privilege in their regular-course operations. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759 (D.C. Cir. 2014) (denying privilege over business communications would "eliminate the attorney-client privilege for numerous communications that are made for both legal and business purposes").

This standard does not differ just because an attorney-client communication occurs in the context of an internal investigation. "More than three decades ago [in *Upjohn*, 449 U.S. 383], the Supreme Court held that the attorney-client privilege protects confidential employee communications made during a business's internal investigation." *In re Kellogg Brown & Root*, 756 F.3d at 756. That is true even where (unlike here) an investigation is *not* conducted in anticipation of litigation, so long as counsel was "hired to perform legal work and to render legal advice." *Myers* v. *City of Centerville*, 2023 WL 195427, at *4 (S.D. Ohio Jan. 17, 2023).

FirstEnergy retained Jones Day and Squire to perform legal work and render legal advice

-31-

to the Company and the independent directors of the Board, respectively.[18]  Accordingly, even if

the investigations were conducted (which they were not) solely for the business purposes Movants

have suggested (*i.e.*, preparing SEC filings, managing credit risk through a settlement with DOJ,

or making "human resources" decisions), attorney-client privilege would still apply to all

communications with Jones Day and Squire concerning legal advice on those or other business

topics.  *See, e.g.*, *Fletcher* v. *ABM Bldg. Value*, 2017 WL 1536059, at *3 (S.D.N.Y. Apr. 18, 2017)

(privilege applies to legal advice regarding personnel decisions); *Fed. Trade Comm'n* v.

*Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1268 (D.C. Cir. 2018) (Kavanaugh, J.)

(privilege applies to legal advice regarding "business decision" of whether to settle claims).

### C.   The Special Master Erroneously Assessed Work Product Under a Standard That the Sixth Circuit Has Expressly Rejected.

The work product doctrine shields documents prepared "in anticipation of litigation or for

trial."  Fed. R. Civ. P. 26(b)(3)(A).  Where documents are prepared "in anticipation of litigation"—

*i.e.*, *before* litigation has been filed—courts in the Sixth Circuit ask (i) whether the documents were

"created 'because of' a party's subjective anticipation of litigation, as contrasted with an ordinary

business purpose"; and (ii) whether "that subjective anticipation of litigation was objectively

reasonable."  *Roxworthy*, 457 F.3d at 593–94.  The Sixth Circuit has expressly rejected a

---

[18]       *See* O'Neil Decl. at PageID 10940–42 (explaining that Squire and Jones Day were retained to advise the Company about the legal risks associated with the allegations in the Householder complaint); Am. O'Neil Decl. at PageID 12996–98 (same); Ex. 2 to Oct. 5, 2023 Williams Decl., ECF No. 550-2 at PageID 11919–20 (similar); PwC Memo., *in camera* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 6 to June 30, 2023 Forge Decl., ECF No. 489-3 at PageID 10522 (*in camera* at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 15 to Forge Aug. 9, 2023 Decl., ECF No. 529-2 at PageID 11580 (Board "with representation from independent counsel, is overseeing the ongoing internal investigation and monitoring the status of the various regulatory matters facing the company."); DPA, ECF No. 259-5 at PageID 6002, 6012 (Jones Day represented FirstEnergy in "conduct[ing] a thorough internal investigation" into matters "likely [to] be of interest to the government" in its investigation).

"requirement that the primary or sole purpose of" a document "be . . . preparation [for] litigation," and held that "a document can be created for both use in the ordinary course of business and in anticipation of litigation without losing its work-product privilege." *Id.* at 598–99.

The test in *Roxworthy* evaluates whether a litigant not yet facing litigation reasonably anticipates that it will do so in the future. But where (as here) documents are prepared after litigation has commenced and concern core matters in that litigation, the *Roxworthy* standard is so readily satisfied that it is hardly necessary to engage in the Sixth Circuit's two-step analysis. *See Decker* v. *Chubb Nat'l Ins. Co.*, 2015 WL 5954584, at *6 (S.D. Ohio Oct. 14, 2015) ("At the time these documents were created, suit had already been filed by plaintiffs. Thus, any subjective anticipation of litigation would be objectively reasonable.").

Accordingly, without more, the fact that FirstEnergy faced a criminal investigation and civil proceedings at the time it initiated internal investigations into the events underlying those proceedings is powerful evidence that work product protection applies. (App. A to FirstEnergy's Opp. Br., ECF No. 510 at PageID 10930–32.) *See Miami Valley Fair Hous. Ctr. Inc.* v. *Metro Dev. LLC*, 2017 WL 10980458, at *2 (S.D. Ohio May 16, 2017) (Jolson, M.J.) (document "was prepared because of this litigation" where it was "created after [plaintiff] 'had learned about the complaint' in this case and at the direction of counsel").

Although that readily establishes work product protection, FirstEnergy went further, supplying additional evidence reinforcing the obvious: that the Company and its Board conducted the investigations "because of" the extraordinary legal risks and slew of legal proceedings it faced as a result of the Householder indictment. (*See supra* Section II.A.) All of this evidence, which is not subject to serious contest, overwhelmingly establishes work product protection. *See*, *e.g.*, *Upjohn*, 449 U.S. at 397–99 (company's receipt of tax summonses sufficed to trigger work product

-33-

protection); *Jacobs* v. *Jacobs*, 2006 WL 8447064, at *1 (N.D. Ohio May 3, 2006) ("anticipation of litigation" could "be gleaned from the timing of events" where plaintiff's counsel retained accounting expert six months before plaintiff filed complaint).

The Special Master recited the *Roxworthy* standard (Nov. 29 Order at PageID 12376), but effectively adopted the "primary or sole purpose" test that *Roxworthy* rejected. 457 F.3d at 598-99. The Special Master held that work product protection did not apply to the investigations because they were "ground[ed]" in "the business necessity and human resources/public relations arena, *even if those same issues also logically overlap with anticipated litigation*." (Nov. 29 Order, at PageID 12384 (emphasis added.); *see id.* ("[A]udit/SEC filing purposes and [] human resources decisions/public relations . . . also would likely inform litigation preparation.").) That conclusion not only ignores the record, but also guts work product protection because, for any company, those issues invariably intersect, as reflected in binding Sixth Circuit authority that rejects the Special Master's approach. *Roxworthy*, 457 F.3d at 599 ("To the extent that the magistrate judge's findings turned on a requirement that the primary or sole purpose of the . . . memoranda be in preparation of litigation, . . . the magistrate judge relied upon an incorrect interpretation of the law.").

Movants claim, and the Special Master agreed, that FirstEnergy conducted the investigations to achieve three such purposes: (i) "satisfying PwC so it would bless FirstEnergy's [2020 second-quarter] Form 10-Q"; (ii) "evaluating whether to terminate senior executives"; and (iii) avoiding a potential declaration of default by the Company's lenders by "striking a deal with the government." (Movants' Reply at PageID 11437, 11440–42.) These contentions all suffer from the same flaw: they attempt to isolate ancillary business *implications* of the investigations and portray them as the investigations' driving force. The Court should reject that sleight of hand.

***PwC's Review of FirstEnergy's 2Q 2020 Form 10-Q***. The fact that FirstEnergy—like all

public companies—was required to file quarterly financial reports, which must be reviewed by its auditor, in the midst of the investigations does not deprive the investigations of work product protection. Documents "do not lose their work product privilege 'merely because [they were] created in order to assist with a business decision,' unless the documents 'would have been created in essentially similar form irrespective of the litigation.'" *Roxworthy*, 457 F.3d at 598–99 (documents created for both ongoing audit and anticipated litigation constitute work product).

The Special Master did not squarely conclude that work product protection was lost under this standard, observing only that "the evidence ***suggests*** that the investigation would have been prepared in substantially the same manner, regardless of the anticipated litigation." (Nov. 29 Order at PageID 12385 (emphasis added).) In any event, companies do not create the kind of work product prepared by Squire—such as witness interview memoranda (*see* Movants' Br. at PageID 10464)—in the regular course of preparing quarterly financial reports and conducting auditor review. Those documents are created in connection with internal investigations evaluating legal and litigation risk. *See, e.g.*, Robert S. Bennett, Alan Kriegel, Carl S. Rauh & Charles F. Walker, *Internal Investigations and the Defense of Corporations in the Sarbanes-Oxley Era*, 62 Bus. Law. 55, 68 (Nov. 2006) (explaining that a "principal component[] of an internal investigation" is "interviews of those employees who may be able to provide information").

There is no support for Movants' speculation that "an internal investigation would have occurred regardless of any pending or anticipated legal proceedings." (Movants' Reply at PageID 11438.) Given the nature of the events here, that counter-factual scenario makes no sense. The DOJ alleged serious wrongdoing by senior FirstEnergy executives, including its CEO, necessarily creating significant litigation risk for the Company. There is no scenario in which the Company faced those allegations but did not also "anticipate[] legal proceedings." (*Id.*) Accordingly, Mr.

O'Neil confirmed that the investigations were not conducted "to appease" PwC (O'Neil Decl. at

PageID 10942; Am. O'Neil Decl. at PageID 12998), and Movants' own exhibits reflect that Squire

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Movants' authority cited to the Special Master does not alter this analysis.  In *Allied Irish*

*Banks* v. *Bank of Am., N.A.*,  on which the Special Master also relied, the proponent of work

product protection, AIB, expressly "concede[d]" that it "had 'business-related purposes' in

generating the materials" claimed to constitute work product. 240 F.R.D. 96, 106 (S.D.N.Y. 2007).

The court also deemed "[n]otabl[e]" that "AIB d[id] not attempt to provide a witness to attest to

the question of what AIB 'would have' done had there been no threat of litigation." *Id.* at 107.

Here, by contrast, FirstEnergy has submitted extensive evidence identifying the purpose of the

investigations as responding to the DOJ's allegations, and Mr. O'Neil testified that the

investigations "would not have been undertaken" absent then-pending and anticipated legal

proceedings against the Company.  (O'Neil Decl. at PageID 10942–43; Am. O'Neil Decl. at

PageID 12998–300.)[19]

Similarly, *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,  2021 WL 2587784 (D.N.J. June 24,

2021), is inapplicable.  That case concerned a party's attempt to shield documents created by a

non-lawyer financial consultant for the purpose of investigating accounting irregularities.  *Id.* at

---

[19]    Plaintiffs challenged that assertion at the November 30 conference with the Special Master
on the basis that the Board had an obligation under the Company's code of conduct to investigate
alleged wrongdoing regardless of any pending or anticipated litigation.  (Nov. 30 Conf. Tr. at
PageID 12899–900.) That argument assumes a farcical hypothetical in which the same allegations
are made but the Company somehow faces no litigation risk.  And if Plaintiffs' hypothetical
somehow came to pass, Mr. O'Neil did not state that the Board would have done nothing.  Rather,
he stated that the Board would not have conducted *these investigations*—*i.e.*, faced with different
facts, the investigations also would have been different.  (O'Neil Decl. at PageID 10942–43; Am.
O'Neil Decl. at PageID 12998–99.)

\*3. In holding that work product protection did not apply, the court specifically relied on the absence of any evidence of attorney input "or of an internal investigation." *Id.* at \*8; *see also In re OM Sec. Litig.*, 226 F.R.D. 579, 586 (N.D. Ohio 2005) (work product protection did not apply to documents prepared by non-lawyer consultant whose engagement "was not expressly related to any litigation matters"). Here, unlike in *Valeant* or *OM*, Movants seek documents prepared by external counsel in connection with internal investigations stemming from a corporate crisis that resulted in an immediate onslaught of litigation against the Company.

   ***Employee terminations***. Movants similarly attempt to contort FirstEnergy's termination of executives involved in alleged misconduct into "business considerations" driving the investigations. (*See* Movants' Reply at PageID 11440.) That argument gets it backward. Termination of wrongdoers was not the ***cause*** of the investigations; it was an ***effect***. When companies facing serious allegations investigate, they often need to take employment action against the individuals involved. That does not convert the purpose of an investigation into a human resources exercise. *See Wilson* v. *Russo*, 2022 WL 911271, at \*4–7 (N.D. Ohio Mar. 29, 2022) (granting protective order over internal investigation report "[e]ven though the Report may have resulted in personnel decisions and . . . policy changes" because "th[at] evidence shows the Report was prepared because of the Village's subjective 'anticipation of litigation'"); *see also* Paul R. Rice ET AL., *Investigative Services—Internal Investigations of Illegal Activities*, 1 ATTORNEY-CLIENT PRIVILEGE IN THE U.S. § 7:18 (Dec. 2023) ("Legal counsel is often retained to conduct internal investigations of company employees for the purpose of detecting allegedly illegal practices. The attorney then provides advice and recommendations for future action, including accounting or personnel changes that are deemed necessary to prevent a recurrence of any detected wrongdoing. These investigative services are generally found to be legal in nature.").

-37-

The chronology of events underscores this point. *First*, several of the terminations on which Movants rely were based on conduct that occurred *during and in connection with* the investigations. (*See*, *e.g.*, Ex. 10 to June 30, 2023 Forge Decl., ECF No. 489-3 at PageID 10526 (submitted *in camera*, ███████████████████████████████████████ ███████████████████████████████████████████).) Those terminations could not have been the "purpose" of investigations initiated months earlier. *Second*, the critical executive terminations and separations had occurred by November 2020, but the investigations were still ongoing months later, including in July 2021 when the Company entered into the DPA.[20] If the Company had conducted the investigations in order to make employment decisions (or prepare its second-quarter 2020 Form 10-Q), there would have been no reason for the investigations to continue for many months after those events.

*Avoidance of credit risks*. Movants' theory that the Company initiated the investigations to avoid credit default risk is similarly unfounded. They assert that "an indictment would have triggered FirstEnergy's creditors to declare default and accelerate FirstEnergy's repayment obligations," and that FirstEnergy sought to "avoid" this outcome by "strik[ing] a deal with the government." (Movants' Reply at PageID 11442.) Here again, Movants attempt to portray obvious litigation risk (an indictment of the Company) as a business issue (a trigger for repayment obligations), even characterizing negotiations with the DOJ over FirstEnergy's criminal liability as an attempt to manage credit risk. But whether the Company considered potential financial

---

[20] *See* O'Neil Decl. at PageID 10941 ("Squire continued to advise the IRC until at least June 2021"); Am. O'Neil Decl. at PageID 12997 (same); Ex. 15 to Movants' Reply (Feb. 16, 2021 Press Release), ECF No. 529-2 at PageID 11580 ("The Independent Review Committee of the Board, with representation from independent counsel, is overseeing the ongoing internal investigation and monitoring the status of the various regulatory matters facing the company."); DPA, ECF No. 259-5 at PageID 6002, 6012 (referencing Jones Day's representation of FirstEnergy as of July 2021).

implications associated with litigating or settling the DOJ's potential claims does not deprive the investigations of work product protection. *See United States* v. *Adlman*, 134 F.3d 1194, 1200–1202 (2d Cir. 1998) (documents analyzing "the likelihood of settlement and its expected cost" do not lose protection just because they also serve "a business purpose").

Having adopted Movants' contentions regarding the "business purposes" supposedly driving the investigations, the Special Master arrived at the conclusion that FirstEnergy conducted the investigations "in the ordinary course of business." (Nov. 29 Order at PageID 12385.) This conclusion is directly contradicted by the undisputed facts that the investigations involved the creation of an independent committee of the Board and the retention of two law firms to investigate what Plaintiffs themselves have described as "the largest bribery and corruption scheme in Ohio history." (*See* Am. Compl. at PageID 1596.)

If the Special Master's theory were adopted, then the work product doctrine would effectively cease to exist for companies facing government enforcement and litigation risks. Every public company addressing these risks must at the same time address the implications for public reporting, possible human resources decisions, and their financial position. The Special Master's holding that internal investigations by counsel lose all work product protection where investigative results are also used in a business context would "disable most public companies from undertaking confidential internal investigations." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 762 (D.C. Cir. 2014) (Kavanaugh, J.).[21]

### D. The Special Master Erred in Ordering Witnesses To Disclose Communications With Counsel.

---

[21]     *See also Sandra T.E*, 600 F.3d at 622 ("True, the Board had other motivations as well—it was responding to the public distress about the allegations, the possible complicity of the school principal, and the urgent need to implement prospective protective measures—but this does not remove the investigation from the protection of the work-product doctrine.").

After concluding that the investigations are not protected by the attorney-client privilege or the work product doctrine, the Special Master erred in ordering that deposition "[w]itnesses must answer all fact-related questions (past and future) related to the internal investigation," including questions seeking disclosure of information obtained exclusively through communications with counsel.  (*See* Nov. 29 Order at PageID 12387; Nov. 30 Order at PageID 12422.)  Although Movants have argued that they seek disclosure from witnesses only of "facts," they actually seek to discover *attorney-client communications about facts*, which are inextricable from the attorneys' privileged advice and work product, for at least the following reasons.

*First*, where a witness learns factual information solely through communications with counsel, the witness cannot disclose that information without also disclosing counsel's communication.  Here, counsel's communications involved legal advice—Squire and Jones Day shared information with the Board and FirstEnergy executives in the context of advising on issues such as ongoing litigation and defending and resolving the DOJ's criminal claims.  (*See supra* n.18; App. A.)  The witnesses' understandings of the facts are thus enmeshed with counsel's privileged advice and are not discoverable.  *See*, *e.g.*, *Dzierbicki* v. *Twp. of Oscoda*, 2009 WL 1491116, at *1, *3 (E.D. Mich. May 26, 2009) (sustaining instruction not to answer questions "if the only basis" for answering was "a conversation [he] had . . . in the presence of counsel").

*Second*, compelling FirstEnergy witnesses to disclose information that they learned solely from counsel risks revealing the content of other privileged conversations in which *counsel* learned the relevant information.  Although "underlying facts and data" are discoverable, "transmission of factual information . . . for the purpose of assisting [counsel] in formulating her legal advice" is privileged.  *Boehringer Ingelheim Pharms.*, 892 F.3d at 1268; *Melea Ltd.* v. *All. Gas Sys.*, 2005 WL 8154557, at *3 (E.D. Mich. May 26, 2005) (denying motion to compel facts known to witness

-40-

based on privileged communications with counsel because "[a]ttorney-client privilege protects the 'communication' of facts **to or from** counsel") (emphasis added).

*Third*, requiring witnesses to testify to information learned from counsel threatens to reveal counsel's "mental impressions, conclusion, opinions, and legal theories," which "are entitled to protection under the work product doctrine." *Kennedy* v. *City of Zanesville*, 2006 WL 8442130, at *5 (S.D. Ohio Oct. 20, 2006). The particular facts that FirstEnergy's counsel chose to share with the Board and Company executives reflect counsel's judgments about the reliability, credibility, and relevance of that information. "[C]ompelled disclosure of such" information thus "would reveal [FirstEnergy's counsel's] mental processes," in violation of the work product doctrine. *See Upjohn*, 449 U.S. at 399–400.[22]

Movants have full access to the underlying facts through non-privileged sources, including FirstEnergy's production of more than 1,000,000 pages of documents, and witnesses with personal, contemporaneous knowledge, including many of the same people who were interviewed in connection with the internal investigations. There is neither a "substantial need" to depose witnesses about facts learned solely from counsel, nor is there an absence of "substantial equivalent" evidence. Fed. R. Civ. P. 26(b)(3)(A).

---

[22] Although Movants claim to have elicited testimony only as to "facts," they often actually sought counsel's evaluation of evidence identified in the investigations. For example, during FirstEnergy's 30(b)(6) deposition, Plaintiffs asked the witness to identify ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ .) Answering that question would invade the attorney-client privilege and "reveal [FirstEnergy's] attorneys' mental process in evaluating" documents and testimony during the internal investigations. *Upjohn*, 449 U.S. at 401.

## III. FIRSTENERGY DID NOT WAIVE ATTORNEY-CLIENT PRIVILEGE OR WORK PRODUCT PROTECTION.

### A. FirstEnergy's Limited Disclosures to Its Auditor Did Not Waive Attorney-Client Privilege or Work Product Protection.

Movants claim that FirstEnergy waived any protection by disclosing information about the investigations to PwC in connection with a financial statement audit. But those disclosures consisted exclusively of work product.[23] As Movants concede, disclosure does not waive work product protection unless the recipient is "an 'adversary.'" (Movants' Br. at PageID 10480–81 (quoting *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 306 n.28 (6th Cir. 2002)).) PwC was not FirstEnergy's adversary. As the Company's external auditor, it shared the Company's interest in "prevent[ing], detect[ing], and root[ing] out corporate fraud." *Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 229 F.R.D. 441, 448 (S.D.N.Y. 2004); (*see also* FirstEnergy's Opp. Br., ECF No. 510 at PageID 10916–19 and cases cited therein). Indeed, PwC "cannot be [FirstEnergy's] adversary" because if an adversarial conflict developed between them, it would "necessitate" PwC's "withdrawal," which has not happened. *See Deloitte LLP*, 610 F.3d at 140. These cases are consistent with the reality that companies conducting investigations (including public companies in particular) often need to disclose related information confidentially to their auditors in order to comply with financial reporting obligations. By contrast, the only two cases cited by Movants on this issue expressly did not decide whether the auditor was an adversary of its client.[24]

---

[23] In their reply brief before the Special Master, Plaintiffs incorrectly insinuated that FirstEnergy also disclosed privileged documents to PwC because FirstEnergy withheld eight documents from PwC. (Movants' Reply at PageID 11442–43.) This does not, as Plaintiffs argue, mean that "all" documents concerning the Squire investigation were provided to PwC. It simply means that of the documents responsive to PwC's requests at that time, eight were withheld.

[24] *See In re King Pharms., Inc. Sec. Litig.*, 2005 WL 8142328, at *3 (E.D. Tenn. Sept. 21, 2005) ("[W]hether PWC was an 'adversary' or not is beside the point" because documents "not

Movants pivoted on reply to an elaborate hypothetical: that FirstEnergy later determined that it had engaged in fraud that "extended throughout the 17-day Squire investigation"; that it was thus "entirely possible" FirstEnergy would be sued for the 10-Q filing that PwC assisted in preparing, and that "PwC was likewise exposed to liability for its role"; and that this possibility "raised joint-and-several liability issues placing FirstEnergy and PwC as direct adversaries." (Movants' Reply, ECF No. 529 at PageID 11443.) But waiver of work product protection turns on whether PwC was "an adversary or a conduit to a potential adversary" of FirstEnergy at the time of the disclosure. *Allegheny Energy*, 229 F.R.D. at 447. Plainly, it was not. FirstEnergy's adversaries were the government entities investigating the Company and the private plaintiffs that had sued it. PwC and FirstEnergy have never sued one another, and PwC remains FirstEnergy's auditor, confirming that Movants' fanciful theory never materialized. Nor, given its professional obligations, could PwC have become a "conduit" for sharing work product with Company adversaries. *See Deloitte*, 610 F.3d at 142 (auditor's obligations established "reasonable expectation of confidentiality").

If Movants' position were correct, it would destabilize companies conducting internal investigations. In Movants' view, if hindsight later shows that wrongdoing was ongoing during a company's internal investigation, any disclosure of work product to the company's auditors during the investigation loses protection. A rule based on such post-hoc determinations would "run contrary to precedent by injecting uncertainty into application of attorney-client privilege and work product protection to internal investigations." *In re Kellogg Brown & Root*, 796 F.3d at 140.

**B.    FirstEnergy Did Not Waive Privilege or Work Product Protection By Making Limited Disclosures of Investigative Conclusions.**

furnished 'in anticipation of litigation'"); *First Horizon Nat'l Corp.* v. *Houston Cas. Co.*, 2016 WL 5867268, at *10 (W.D. Tenn. Oct. 5, 2016) ("in anticipation of litigation" prong not met).

Movants next wrongly contend that FirstEnergy categorically waived privilege and work product protections by disclosing limited investigative conclusions in its Rule 30(b)(6) testimony and in public filings. (Movants' Br. at PageID 10482–84.) FirstEnergy's disclosures in connection with its 30(b)(6) deposition did not include opinions of counsel or litigation strategy. Instead, FirstEnergy testified to limited information concerning what employees did and knew in connection with the events underlying the Householder complaint. Movants in fact successfully **compelled** FirstEnergy to provide that testimony without suggesting it was privileged, only to claim after the fact that its disclosure effected a waiver. (*See* Op. & Order, ECF No. 333.)

Putting aside Movants' strategic maneuvering, their argument fails on both the facts and the law. *First*, Movants' position rests on a faulty premise, based on testimony of former FirstEnergy director Julia Johnson, that **all** information disclosed by the Company concerning the investigations "had come from FirstEnergy's lawyers." (Movants' Br. at PageID 10469.) But Ms. Johnson stated only that the information **she received** concerning employment decisions resulting from the investigations was conveyed to her by attorneys. (Ex. 6 to July 26, 2023 Williams Decl., ECF No. 511-2 at PageID 10982 (Julia Johnson's Dep. Tr. at 482:9–11; 508:7–25).) It does not follow that the only information possessed by the **Company**—the subject of the 30(b)(6) deposition—regarding the facts underlying the investigations came from counsel. Indeed, the corporate testimony that Movants claim triggered a waiver related largely to employees' knowledge and intent, which Movants contend "is attributable to the Company." (Movants' Reply at PageID 11447–48.) According to Movants' own theory, then, the Company (unlike an individual director overseeing the investigations) knew all of that information without the benefit

of any "mental impressions" of its attorneys. (*See id.* at PageID 11448.)[25]

*Second*, courts have repeatedly held that summarizing evidence and disclosing investigative conclusions do not waive attorney-client privilege or work product protection. *See*, *e.g.*, *E.E.O.C.* v. *Texas Hydraulics, Inc.*, 246 F.R.D. 548, 557 (E.D. Tenn. 2007) (no waiver where party "briefly summarized the evidence" and "reveal[ed] the EEOC's ultimate conclusion"). (*See also* FirstEnergy's Opp. Br. at PageID 10921 and cases cited therein.) Movants' only response is to cite inapposite cases involving far more extensive disclosures (or cases that turned on issues that are irrelevant here, like failure to claw back privileged communications). *See*, *e.g.*, *OM*, 226 F.R.D. at 591–92 (waiver triggered by disclosure of more than 30-page presentation "list[ing] detailed conclusions and cit[ing] specific findings, interviews and documents"). (*See also* FirstEnergy's Opp. Br., ECF No. 510 at PageID 10923 and cases cited therein.)

Here again, Movants' contention would have profound effects on companies that must conduct investigations to evaluate legal risk and discharge their duties to stakeholders. As the Fourth Circuit recently held, if courts found waiver based on companies' disclosures of "credible evidence of unlawful activity" and the "conclusion, often based on the advice of its counsel, that such activity has occurred," then companies would be incentivized to "err on the side of making vague or incomplete disclosures," contrary to the public interest. *See In re Fluor Intercontinental, Inc.*, 803 F. App'x 697, 698, 703 (4th Cir. 2020) (disclosing "summary of . . . findings" and conclusions from investigation did not effect waiver).

The same authority forecloses Movants' argument that FirstEnergy waived privilege by disclosing to the public that it had terminated senior executives as a result of the investigations.

---

[25]     In addition, as Movants acknowledge, the statements in the testimonial aid that they claim effected a waiver are in most instances derived almost verbatim from non-privileged record documents that FirstEnergy has produced to Movants. (Movants' Reply, at PageID 11446–47.)

(*See* Movants' Br. at PageID 10484.) Public companies conducting investigations following significant accusations of wrongdoing against senior executives (including, here, FirstEnergy's CEO) often **must** announce any resulting discipline of those employees in order to comply with their disclosure obligations. *See* Current Report (Form 8-K), Item 5.02(a)-(b) (requiring current report to be filed when any director or principal executive officer is terminated). If such disclosures also triggered a privilege waiver, companies would be disincentivized from investigating corporate misconduct for fear of being unfairly punished for doing so.

### C. FirstEnergy Did Not "Wield" the Investigations "as a Sword" By Responding to Deposition Questions Under a Court Order.

Movants also miss the mark in contending that FirstEnergy waived privilege and work product protection by supposedly engaging in selective waiver. (Movants' Br. at PageID 10487.) "Sword-shield" waiver applies only if a party discloses privileged communications and then "rel[ies] on [those] privileged communications to make their case," *Lewis Env't, Inc.* v. *Emergency Response & Training Sols., Inc.*, 2019 WL 285641, at *3 (S.D. Ohio Jan. 22, 2019), the classic example being an advice-of-counsel defense, *see*, *e.g.*, *New Phoenix Sunrise Corp.* v. *Comm'r*, 408 F. App'x 908, 919 (6th Cir. 2010). FirstEnergy has done no such thing here.

Citing only a case in which the party invoking privilege had affirmatively elicited testimony from its own attorney (*see* Movants' Br. at PageID 10488), Movants claim that FirstEnergy used the privilege as a sword by proffering testimony "concerning directors' and officers' lack of knowledge and 'decisive' action upon learning of misconduct" (Movants' Reply at PageID 11449). Movants wrongly claim that FirstEnergy thus selectively waived privilege because that testimony was derived from the investigations and could theoretically be used (i) to support FirstEnergy's good faith defense and (ii) in "any possible proportionate liability determinations." (*Id.*) But selective waiver does not turn on what a party imagines its opponent

might do in the future. It turns on what a litigant has actually done. *See Lewis*, 2019 WL 285641, at *3 (selective waiver results from "rel[iance] on" privileged materials). FirstEnergy has not relied on the investigations to sustain any of its defenses.

Movants' distortion of the law on selective waiver is underscored by their attempted reliance on FirstEnergy's Rule 30(b)(6) testimony to prove their point. FirstEnergy did not offer "unsolicited self-exculpatory testimony." (Movants' Br. at PageID 10488.) All deposition testimony is "solicited" through questioning, and the only reason FirstEnergy provided the cited testimony is that Movants moved to compel a second 30(b)(6) deposition over FirstEnergy's opposition, and the Court granted their motion, ordering FirstEnergy to interview current employees in advance of the deposition to ensure the corporate representative was prepared. (*See* Op. & Order, ECF No. 333.) The Court should reject Movants' gambit of demanding more detailed information under Rule 30(b)(6) only to claim that very testimony effected a waiver.[26]

### D. The Court Should Reject the Special Master's Decision To "Credit" Movants' "All or Nothing Approach'" to Waiver, Which FirstEnergy Opposed.

The Special Master found that "both sides have appeared to adopt an all-or-nothing approach in which everything is discoverable or nothing is." (Nov. 29 Order at PageID 12386.) That is not accurate. In its opposition, FirstEnergy argued against that approach and contended that it was in itself "a basis to deny Movants' request." (FirstEnergy's Opp. Br., ECF No. 510 at PageID 10908 n.5 (noting that Movants sought the "unheard of" result of "general waiver over

---

[26] It is irrelevant that FirstEnergy's 30(b)(6) testimony was "scripted" in advance of the deposition itself. (Movants' Reply, ECF No. 529 at PageID 11449.) FirstEnergy prepared scripts to assist its representative in providing the broad and detailed testimony sought by Movants. *See*, *e.g.*, Defendants Jones and Dowling's Notice of 30(b)(6) Deposition (ECF No. 319-4) at PageID 6823–25 (30(b)(6) notice seeking testimony on, among other topics, the "termination of Jones' and Dowling's employment" and "review of, approval of, rejection of, discussion of, [or] actions . . . undertaken by" the Board).

swaths of unidentified documents").) The Court should reject Movants' blunderbuss approach and the Special Master's decision to "credit" it. (*See* Nov. 29 Order at PageID 12387.)

Even if the Court accepts Movants' waiver arguments (it should not), they do not remotely support the blanket disclosure of all documents withheld as privileged or work product and the compelled testimony of all witnesses "past and future" about the investigations. (*See id.*) As the Sixth Circuit has directed, courts must "try to make prudential distinctions between what was revealed and what remains privileged." *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 255-56 (6th Cir. 1996) (reversing "the District Court's order to the extent it allow[ed] the government to ask . . . unlimited questions about [legal] advice on the entire marketing plan" where privilege proponent disclosed attorney advice concerning only one element of marketing plan).

Here, Movants' waiver arguments relate only to circumscribed aspects of the investigations. For example, Movants contend that FirstEnergy effected a waiver by disclosing information to PwC in connection with "the 17-day Squire investigation." That contention has nothing to do with the longer and more detailed Jones Day investigation. (*See, e.g.*, Movants' Reply at PageID 11436 (contending that there is "[n]o [b]asis to [p]rotect the *Squire Investigation*.") (emphasis added).)[27] In addition, Movants' contentions that FirstEnergy waived privilege through public disclosures and deposition testimony is specific to disclosures concerning aspects of executive terminations. (*See* Movants' Br. at PageID 10484.)

These arguments, if credited, would at most warrant a finding of waiver as to the specific subject each one addresses—not, as Movants contend, waiver over the entirety of both investigations. Thus, if the Court determines that FirstEnergy waived or may have waived

---

[27] *See also id.* at PageID 11444 (arguing that conclusions of "Squire investigation . . . could have been the subject of litigation between PwC and FirstEnergy"); *id.* at PageID 11445 ("[T]he Squire investigation was not furnished to PwC 'in anticipation of litigation'").

attorney-client privilege or work product protection over any aspect of the investigations, the resulting order should be tailored to the Court's findings to prevent any unwarranted disclosure. For example, the Court could order additional logging of privileged documents or sampling of documents for *in camera* review. The Court should not condone Movants' sweeping categorical approach, which aims to use "limited, factual disclosures as a bootstrap to discover [FirstEnergy's] entire investigative file." *United States* v. *Skeddle*, 989 F. Supp. 917, 920–21 (N.D. Ohio 1997).

## CONCLUSION

For the reasons set forth above, FirstEnergy respectfully asks the Court to enter an order (i) granting FirstEnergy leave to amend the O'Neil Declaration in the form submitted to the Court as the Amended O'Neil Declaration; (ii) reversing in full the Special Master's November 29 and November 30 Orders; and (iii) denying the Motion to Compel.

Respectfully,

*/s/ Thomas D. Warren*
Thomas D. Warren, Trial Attorney (0077541)
WARREN TERZIAN LLP
30799 Pinetree Road, Suite 345
Pepper Pike, OH 44124
Telephone: (213) 410-2620
tom.warren@warrenterzian.com

Robert J. Giuffra, Jr. (*pro hac vice*)
Sharon L. Nelles (*pro hac vice*)
David M.J. Rein (*pro hac vice*)
Beth D. Newton (*pro hac vice*)
Nicholas F. Menillo (*pro hac vice*)
Hilary M. Williams (*pro hac vice*)
Tasha N. Thompson (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

Kamil R. Shields (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.

Suite 700
Washington, D.C. 20006
Telephone:  (202) 956-7040

*Counsel for Defendant FirstEnergy Corp.*

## DECLARATION OF SERVICE

I certify that the foregoing was filed electronically on December 20, 2023.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Thomas D. Warren*
Thomas D. Warren (0077541)

*Counsel for Defendant FirstEnergy Corp*

**Appendix A:  Record Evidence the Special Master Ignored**

| Evidence | Description | Citation |
|---|---|---|
| **I. EVIDENCE OF ANTICIPATED AND ACTUAL LITIGATION** | | |
| Press Releases from Plaintiffs' Law Firms | • Between July 22 and 24, 2020, **nine plaintiff-side law firms** announced they were preparing lawsuits against FirstEnergy. | Exs. 12–20 to July 26, 2023 Williams Decl. (ECF No. 511-2 at PageID 11000–21) |
| Evidence of H.B. 6-Related Litigation and Investigations | • List of citations to the publicly available dockets in **31 civil actions and government enforcement proceedings** commenced against FirstEnergy related to H.B. 6 from July 26, 2020 to February 21, 2022.<br><br>• Citations for the docket entries for notices of appearance by Jones Day (which conducted the Company's internal investigation) on behalf of FirstEnergy in more than 20 H.B. 6-related actions. | App. A to Opp. Br. (ECF No. 510 at PageID 10930–32) |
| **II. EVIDENCE IN PUBLIC FILINGS** | | |
| FirstEnergy's Nov. 19, 2020 Form 10-K/A | • "A committee of independent members of the Board of Directors ('Board') is directing an internal investigation **related to ongoing government investigations**."<br><br>• "In connection with the Company's internal investigation" and "**related to the government investigations**," the Board learned that "certain former members of senior management . . . violated certain Company policies and its code of conduct."<br><br>• Identifying "**several lawsuits against FirstEnergy** and certain current and former directors, officers, and other employees" that "**related to [the] allegations in the complaint and supporting affidavit relating to H.B. 6** and the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder." | Ex. 5 to July 26, 2023 Williams Decl. (ECF No. 511-2 at PageID 10971, 10973–74) (emphasis added) |

| Evidence | Description | Citation |
|---|---|---|
| FirstEnergy's Aug. 17, 2020 Form 10-Q | • FirstEnergy **"received subpoenas" from the U.S. Attorney's Office** and "is **cooperating fully** in the investigation."<br><br>• Identifying a **potential "legal action" by the Ohio Attorney General** "related to allegations in the [Householder criminal] complaint."<br><br>• Identifying "**several lawsuits against FirstEnergy and certain current and former directors, officers and other employees**" where the complaints "related to [the] allegations in the complaint and supporting affidavit relating to Ohio House Bill 6 and the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder." | Ex. 2 to July 26, 2023 Williams Decl. (ECF No. 511-2 at PageID 10953) (emphasis added) |
| FirstEnergy's Aug. 10, 2020 Form 12b-25 | • "[I]n connection with" the government's investigation into "entities allegedly affiliated with Mr. Householder," the "**Company received subpoenas for records from the U.S. Attorney's Office for the Southern District of Ohio**" and "is **cooperating fully in the investigation**."<br><br>• As certified in FirstEnergy's Deferred Prosecution Agreement with the U.S. Department of Justice ("DOJ"), **Jones Day represented FirstEnergy in "cooperating fully in th[at] investigation."** | Ex. 1 to July 26, 2023 Williams Decl. (ECF No. 511-2 at PageID 10946) (emphasis added) |
| FirstEnergy's Nov. 2, 2020 Form 8-K | • FirstEnergy is "**cooperating with the U.S. Attorney's office and the SEC in their investigations.**"<br><br>• As certified in FirstEnergy's Deferred Prosecution Agreement with DOJ, **Jones Day represented FirstEnergy in "cooperating fully in th[at] investigation."** | Ex. 3 to July 26, 2023 Williams Decl. (ECF No. 511-2 at PageID 10963) (emphasis added) |

| Evidence | Description | Citation |
|---|---|---|
| **III.  EVIDENCE IN DEFERRED PROSECUTION AGREEMENT ("DPA")** | | |
| The DPA | • FirstEnergy "**conduct[ed] a thorough internal investigation**" into matters "**likely [to] be of interest to the government**" in its investigation<br><br>• Certification of Counsel, signed by Stephen Sozio on behalf of Jones Day, stating that Jones Day is "counsel for FirstEnergy Corp. in the matter covered by this Agreement" and "**[i]n connection with such representation . . . [has] examined carefully the relevant FirstEnergy Corp. records[.]**" | DPA (ECF No. 259-5 at PageID 6002, 6012) (emphasis added) |
| **IV.  OTHER EVIDENCE** | | |
| Former FirstEnergy Director, Julia Johnson's Deposition Testimony | • "[S]oon after the July 2020 DOJ announcements" the Board of Directors formed the "independent review committee."<br><br>• The special investigation committee **met with "Squire lawyers" to discuss "facts and information gleaned from the investigation** thus far" into "aspects relevant to FirstEnergy" within "the indictment [by] the government." | Ex. 2 to October 5, 2023 Williams Decl. (ECF No. 550-2 at PageID 11919–20) (emphasis added) |
| August 16, 2020, Pricewaterhouse Coopers' Memorandum | | Ex. 1 to June 30, 2023 Forge Decl. (ECF No. 489-3 at PageID 10507 |
| Former FirstEnergy Director, Thomas Mitchell's Deposition Testimony | | Ex. 6 to June 30, 2023 Forge Decl. (ECF No. 489-3 at PageID 10522) (submitted *in* |

-A-3-

| Evidence | Description | Citation |
|---|---|---|
| | ██████████████████████████ ██████████████████████████ ██████████████████████████ | *camera*, ███████ ███████). |
| Feb. 16, 2021 Press Release | • "The Independent Review Committee of the Board, with representation from independent counsel, is overseeing the ongoing internal investigation and monitoring the status of the various regulatory matters facing the company." | Ex. 15 to Aug. 9, 2023 Forge Decl. (ECF No. 529-2 at PageID 11580). |