UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | Judge Algenon L. Marbley |
| ALL ACTIONS. | ) ) ) | Magistrate Judge Kimberly A. Jolson |
| | ) | |

PLAINTIFFS' RESPONSE TO NON-PARTY ENERGY HARBOR'S OBJECTIONS TO
ORDER BY SPECIAL MASTER ON MOTION TO COMPEL (ECF 560)
**[REDACTED]**

MURRAY MURPHY MOUL
  + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com




Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com

Class Counsel

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................1

II.  RELEVANT FACTS AND PROCEDURAL HISTORY .....................................2

     A.   FirstEnergy and Energy Harbor's Interdependence During the Class
          Period ........................................................................................................2

     B.   Energy Harbor's Direct Participation in the Admitted Fraud ...................2

     C.   Energy Harbor Used Lawyers to Execute the Corruption Scheme...........4

     D.   The Special Master's Well-Reasoned Order ..............................................6

III. STANDARD OF REVIEW .....................................................................................7

IV.  ARGUMENT ..........................................................................................................7

     A.   The Order Relates to a Procedural Matter and Should Be Reviewed Only
          for an Abuse of Discretion ........................................................................7

     B.   The Special Master's Order Reasonably Found that Plaintiffs Established
          the Elements of the Crime-Fraud Exception.............................................8

          1.   Energy Harbor Was a Key Participant in Defendants' Fraud....................8

               a.   Multiple Coconspirators Implicate Energy Harbor........................8

               b.   Energy Harbor's Arguments Misconstrue the Facts and
                    Law .................................................................................................10

               c.   A *Prima Facie* Showing Is a Low Bar, and the Evidence
                    Here Would Clear the Highest Bar .................................................12

          2.   The Special Master Did Not Abuse His Discretion in Concluding
               that Energy Harbor Sought Legal Advice in Furtherance of a
               Crime and/or Fraud ........................................................................14

V.   CONCLUSION......................................................................................................15

4883-5124-8024.v1

# TABLE OF AUTHORITIES

Page

## CASES

*Campbell v. Warden, London Corr. Inst.*,
   2015 WL 422255 (S.D. Ohio Feb. 2, 2015)................................................................7

*Ciccio v. SmileDirectClub, LLC*,
   2022 WL 2182301 (M.D. Tenn. June 16, 2022).........................................................7

*Duttle v. Bandler & Kass*,
   127 F.R.D. 46 (S.D.N.Y. 1989) ..........................................................................11, 12

*E.E.O.C. v. Avery Dennison Corp.*,
   104 F.3d 858 (6th Cir. 1997) ..............................................................................13

*In re Antitrust Grand Jury*,
   805 F.2d 155 (6th Cir. 1986) ..............................................................................12

*In re Grand Jury Subpoena Duces Tecum*,
   731 F.2d 1032 (2d Cir. 1984)..............................................................................12

*In re Hardieplank Fiber Cement Siding Litig.*,
   2014 WL 5654318 (D. Minn. Jan. 28, 2014)............................................................7

*In re Sam Industrias S.A.*,
   653 B.R. 196 (Bankr. S.D. Fla. 2023).....................................................................13

*In re Sealed Case*,
   676 F.2d 793 (D.C. Cir. 1982) ............................................................................11

*Kuhn v. Washtenaw Cnty.*,
   709 F.3d 612 (6th Cir. 2013) ..............................................................................10

*Liberty Ford Lincoln Mercury, Inc. v. Ford Motor Co.*,
   2023 WL 4991718 (N.D. Ohio Aug. 4, 2023)...........................................................7

*Quantum Sail Design Grp., LLC v. Jannie Reuvers Sails, Ltd.*,
   827 F. App'x 485 (6th Cir. 2020) ...........................................................................7

*S.E.C. v. Sierra Brokerage Servs., Inc.*,
   2005 WL 8165238 (S.D. Ohio Feb. 14, 2005)..........................................................13

*Slorp v. Lerner*, 2016 WL 1252980
   (S.D. Ohio Mar. 31, 2016) ...................................................................................12

*SPX Corp. v. Bartec USA, LLC*,
   247 F.R.D. 516 (E.D. Mich. 2008) .........................................................................14

- ii -

**Page**

*United States v. Carter*,
  311 F.2d 934 (6th Cir. 1963) ...............................................................................................11

*United States v. Collis*,
  128 F.3d 313 (6th Cir. 1997) .................................................................................................8

*United States v. Householder*,
  No. 1:20-cr-00077-TSB, ECF 288
  (S.D. Ohio July 6, 2023) ........................................................................................................9

*United States v. Skeddle*,
  989 F. Supp. 890 (N.D. Ohio 1997)...............................................................12, 13, 14, 15

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
  Rule 53 ....................................................................................................................................8
  Rule 53(f) ...............................................................................................................................7

Ohio Rev. Code Ann
  §101.70 (E)-(G).....................................................................................................................11

4883-5124-8024.v1

Plaintiffs respectfully submit this response to Non-Party Energy Harbor's Objections to Order by Special Master on Motion to Compel (ECF 560) (ECF 589) ("Objections" or "Obj.").[1]

## I. INTRODUCTION

FirstEnergy Corp.'s wholly owned subsidiary, FirstEnergy Solutions (now known as "Energy Harbor"), was an integral part of FirstEnergy's confessed years-long corruption scheme. Energy Harbor committed this crime through multiple agents, including its registered lobbyist, Cespedes, whom Energy Harbor had hired to help it secure a legislative bailout for two struggling nuclear plants FirstEnergy had moved to Energy Harbor's balance sheet. This was the primary goal of FirstEnergy's corruption scheme, in which Cespedes has confessed to participating on behalf of Energy Harbor. FirstEnergy and Cespedes have admitted to using purported 501(c)(4) entities to send and receive tens of millions in illicit payments – largely because 501(c)(4) status allows companies to hide their contributions from the public, which is why such contributions were known as "dark money" within FirstEnergy. It is undisputed that a number of lawyers assisted in setting up, maintaining, and assessing technical compliance of the 501(c)(4) entities on which the scheme relied regardless of whether the lawyers were knowing participants in the criminal use of these entities. Tellingly, Energy Harbor has scrubbed Cespedes from its Objections, but it cannot ignore him or his guilty plea out of existence, which makes this a textbook case for the crime-fraud exception.

If the Special Master made any mistake, it was generously deeming this a close call. It's not and Plaintiffs respectfully request that the Court overrule Energy Harbor's Objections.

---

[1]    All terms not otherwise defined herein have the same meaning as set forth in the Memorandum of Law in Support of Class Plaintiffs' Motion to Compel Discovery from Non-Party Energy Harbor (ECF 491-1) ("Motion" or "Mot."). References to Exs. 1-36 are to the exhibits attached to the *in camera* declaration of Kevin S. Sciarani, dated July 7, 2023; all references to Exs. 37-49 are to the *in camera* declaration of Kevin S. Sciarani, dated July 28, 2023; and the reference to Ex. A is to the declaration of Kevin S. Sciarani, filed concurrently herewith. Unless otherwise noted, citations are omitted and emphasis is added. Opt-out plaintiffs in *MFS Series Trust I v. FirstEnergy Corp.*, No. 2:21-cv-05839-ALM-KAJ (S.D. Ohio), and *Brighthouse Funds Trust II – MFS Value Portfolio v. FirstEnergy Corp.*, No. 2:22-cv-00865-ALM-KAJ (S.D. Ohio), join in Plaintiffs' arguments.

4883-5124-8024.v1

## II.     RELEVANT FACTS AND PROCEDURAL HISTORY

### A.     FirstEnergy and Energy Harbor's Interdependence During the Class Period

Prior to and through most of the Class Period, Energy Harbor was FirstEnergy's wholly-owned subsidiary.  Although technically separate legal entities, a Shared Services Agreement obligated FirstEnergy to provide a whole host of corporate-level functions, including "legal, external affairs [i.e., lobbying and related political activities] and communications."  *In re Energy Harbor, LLC Pleasants Corp.*, No. 5:18-BK-50757, ECF 3135 at 6 (Bankr. N.D. Ohio Aug. 29, 2019).  The companies reinforced this arrangement in a bankruptcy settlement agreement, dated August 26, 2018, in which FirstEnergy agreed to continue to act as an agent of Energy Harbor and "provide reasonable cooperation and coordination on regulatory and governmental lobbying matters." (FirstEnergy Corp., Current Report (Form 8-K) (Aug. 27, 2018), Ex. 10.1, Settlement Agreement §2.6,      https://d18rn0p25nwr6d.cloudfront.net/CIK-0001031296/4f315006-b67a-4c33-95c4-d2804fd54caf.pdf.  Accordingly, during the Class Period, Energy Harbor was "utterly incapable of" managing its own affairs and relied on FirstEnergy to provide significant support for and guidance over Energy Harbor's political activities.  *Energy Harbor*, ECF 3135 at 6.

### B.     Energy Harbor's Direct Participation in the Admitted Fraud

Energy Harbor hired Cespedes "to assist [Energy Harbor] in attaining necessary funding through government action to allow for the financial stability/sustainability of its two nuclear power plants."  Ex. A (Crim. Trial Tr.) at 1865:22-2-1866:5 (Cespedes reading first paragraph of Scope of Services agreement between Energy Harbor and the consulting firm that Cespedes owned and operated); *see also* Ex. 2 at 1876:1-10.  As Cespedes testified at the Householder criminal trial: "Government action in this context is we were looking for legislation that would provide us financial stability in those power plants."  *Id*. at 1866:21-23.

Likewise, Cespedes testified to the following criminal conduct in pursuit of this bailout legislation for Energy Harbor:

> Initially, as a consultant for FirstEnergy Solutions, who was my client, I directed and coordinated a half million dollars in political contributions from my company [Energy Harbor] into Generation Now, which is a 501(c)(4) that's managed by Jeff Longstreth and Larry Householder for the purpose of getting legislation introduced and passed.

> Secondly, I also coordinated and directed $15 million of money from [Energy Harbor], my client, again, to Generation Now for the purpose of passing said legislation.

> After that, I again coordinated in the amount of over $35 million, contributions from [Energy Harbor], my client, to Generation Now, which was a (c)(4) again controlled by Jeff Longstreth and Mr. Householder, all for the purpose of defending our legislation and protecting some of the representatives who we cared about at the time.

> I also participated and acknowledged an attempt by our campaign to secure information from opposition campaign in the form of exchanging confidential information for a financial bribe.

Ex. A at 1863:5-24; *see also* Ex. 3 at 6; Ex. 2 at 1890:7-1902:9; Ex. 7 at 2130:11-2131:12.

As such, the Special Master was certainly correct in observing that Energy Harbor "is not a typical non-party." Order, ECF 560 at PageID 12226. It openly accepted its role as ████████ ██████ by funding over $43 million of the approximately $60 million in contributions that FirstEnergy and Energy Harbor's agent, Cespedes, admittedly orchestrated for Householder's benefit and in exchange for House Bill 6's ("HB6") bailout of Energy Harbor. *See* Ex. 6 at -130; Ex. 9. Energy Harbor's direct participation in FirstEnergy's scheme is indisputable because its agent, Cespedes, has pled guilty to it. In terms of specific overt acts, at an October 10, 2018 meeting, for example, Cespedes, Energy Harbor's government affairs chief, Griffing, and other Energy Harbor lobbyists slid a $400,000 Energy Harbor check to Householder that was payable to Generation Now, a payment "specifically tied to the [nuclear bailout] legislation [Energy Harbor] was looking to enact." Mot., ECF 491-1 at PageID 10540 (citing Ex. 2 at 1890:1-1902:9; Ex. 3 at 6. Cespedes

- 3 -

confirmed: "Mr. Householder was very affirmative to his support of [Energy Harbor's] issue" relating to bailout legislation after looking at the check. Ex. 2 at 1899:2-15. Following Householder's election to speaker of the Ohio House of Representatives, Griffing, Chief Executive Officer Judge, and executive chairman John Kiani ("Kiani"), as well as Cespedes coordinated with FirstEnergy, Householder, and his team to continue funneling Energy Harbor's contributions to Householder to ensure HB6 would be enacted. *See infra*, §IV.B.1.a.

Energy Harbor's direct participation is also evident in the fact that Cespedes was embedded in Householder's team overseeing the inflammatory media blitz supporting HB6 and opposing the repeal referendum. *See, e.g.*, Ex. 7 at 12-1978:13-12-1979:8; Ex. 8. Through Cespedes, Energy Harbor also financed illicit payments to corrupt the signature-gathering process that was essential to defeat a referendum effort that sought to put HB6 to the vote of Ohioans. Ex. 7 at 2130:16-2131:12; Ex. 3 at 6-7. Energy Harbor also directly participated in and benefited from Defendants' scheme to bribe former Public Utilities Commission of Ohio ("PUCO") Chairman (and recently indicted) Randazzo. In November 2018, Energy Harbor ███████████████████████████████████ ████████████████████████ Ex. 35 at -805. Energy Harbor representatives then attended a December 7, 2018 meeting with Randazzo just over a week before FirstEnergy agreed to pay him $4.3 million on December 18, 2018 to purchase his official action as the soon-to-be-nominated PUCO chair. Ex. 33 at -317; Ex. 35 at -805; DPA, ECF 259-5 at PageID 6034. Kiani and Judge met with Randazzo on March 19, 2019 ██████████████████████████████████████████████." Ex. 45 at 1; Ex. 46 at -512.

## C. Energy Harbor Used Lawyers to Execute the Corruption Scheme

The corruption scheme extensively used 501(c)(4) entities to funnel the illicit payments that fueled the corrupt enterprise. Indeed, FirstEnergy has admitted that it "used the 501(c)(4) corporate form as a mechanism to conceal payments for the benefit of public officials and in return for official

- 4 -

action." DPA, ECF 259-5 at PageID 6005. Cespedes likewise admitted that the Generation Now "payments . . . were designed to conceal the nature, source, ownership and control of the payments"; in other words, to conceal Energy Harbor's involvement in the conspiracy. Ex. 3 at 6. It was essential, therefore, for Energy Harbor and other coconspirators to maintain the 501(c)(4) status of these entities, a task largely entrusted to lawyers. These concerns are echoed in internal Energy Harbor documents and serve as the basis for the 2018 501(c)(4) memorandum identified in the Motion. Ex. 22, 49. For instance, the 501(c)(4) memorandum highlighted ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████." Ex. 22 at -204. Energy Harbor's privilege log also shows that ██████████████████████████████████████████

██████████████████." Ex. 28 at 3.

Energy Harbor also deployed its lawyers to ensure its corrupt nuclear bailout was ultimately enshrined in HB6 by being "involved in the drafting of the legislation" in which Cespedes would run paper copies of Energy Harbor's "edit[s and] rewrite[s]" to Householder's energy policy analyst, Pat Tully, to keep these edits from becoming "publicly consumable document[s]." Ex. 2 at 1922:25-1924:6. Energy Harbor engaged its lawyers for these edits and rewrites to analyze the draft versions of HB6 ████████████████████████████████████████

████████████████████████████████████. Ex. 24 at -537; Ex. 25 at -511.[2] The particular 2019 HB6 memoranda attached to Plaintiffs' Motion show that Energy Harbor's lawyers were used ████████████████████████████

_____

[2] The Special Master was able to conclude that these attorney-client memoranda effectuated the fraud because Energy Harbor produced them. As stated in the Motion, Plaintiffs believe Energy Harbor's limited disclosure of certain memoranda results in a subject-matter waiver of the privilege. Mot., ECF 491-1 at PageID 10551-57. Accordingly, if the Court sustains the Objections, Plaintiffs request that Court remand the Motion to the Special Master to rule on the third-party waiver issue.



. Ex. 25 at -511 (

).  Energy Harbor lawyers similarly

proposed edits to

*See, e.g.*, *id.* (

); Ex. 24 at -537

).

### D.    The Special Master's Well-Reasoned Order

Energy Harbor's objection is limited to the Special Master's findings regarding the applicability of the crime-fraud exception to two narrow categories of documents withheld on the attorney-client privilege by Energy Harbor: (1) documents concerning 501(c)(4) contributions; and (2) documents concerning Energy Harbor's attorney's review and edits to draft energy legislation, such as HB6.  After reviewing the briefing and exhibits and holding oral argument, the Special Master concluded that Plaintiffs had met their burden to establish the crime-fraud exception to the attorney-client privilege and ordered Energy Harbor to "produce documents improperly withheld on the basis of attorney-client privilege concerning the subject matter of donations to relevant 501(c)(4) entities and the drafting of clean energy legislation."  Order, ECF 560 at PageID 12236.

The Special Master made specific findings on each of the two elements of the crime-fraud exception.  First, he ruled that the crime-fraud exception was applicable because Plaintiffs had established a *prima facie* case that Energy Harbor was "a direct participant in the execution of [the] fraud" to bribe Householder in exchange for the passage of HB6, a multibillion-dollar bailout of Energy Harbor's nuclear power plants.  Order, ECF 560 at PageID 12232.  Second, the Special Master ruled that the crime-fraud exception was applicable because Plaintiffs had also established a *prima facie* case that Energy Harbor used its lawyers to "provide analysis and advice that ultimately effectuate a component of the apparent fraud."  *Id.*

- 6 -

## III.    STANDARD OF REVIEW

"Because a special master's ruling on the scope of permissible discovery is considered a procedural matter, the Court reviews for abuse of discretion." *Ciccio v. SmileDirectClub, LLC*, 2022 WL 2182301, at *1 (M.D. Tenn. June 16, 2022) (reviewing a special master's privilege decision for an abuse of discretion); *see also In re Hardieplank Fiber Cement Siding Litig.*, 2014 WL 5654318, at *1 (D. Minn. Jan. 28, 2014) (collecting cases and holding the special master's ruling on scope of discovery is procedural, and thus, reviewed for abuse of discretion). Abuses of discretion are limited to: (1) "an erroneous conclusion of law"; (2) "findings [that] are clearly erroneous," or (3) decisions that are "clearly unreasonable, arbitrary, or fanciful." *Campbell v. Warden, London Corr. Inst.*, 2015 WL 422255, at *2 (S.D. Ohio Feb. 2, 2015).

## IV.    ARGUMENT

### A.    The Order Relates to a Procedural Matter and Should Be Reviewed Only for an Abuse of Discretion

Energy Harbor asserts the Special Master made findings of fact and conclusions of law to claim that the Court should review the Order *de novo*. *See* Obj., ECF 589 at PageID 12943, 12949-50.[3] But the Order does not concern the type of binding fact finding envisioned by Rule 53(f) of the Federal Rules of Civil Procedure. The Special Master made an "expressly limited" discovery decision, confirming "[t]his is not a merits decision, and it is not the undersigned's task to opine on the ultimate issues in this litigation." Order, ECF 560 at PageID 12234. The Special Master further clarified he is not establishing the fact that "Energy Harbor did anything wrong." *Id.* Energy Harbor's citation to *Quantum Sail Design Grp., LLC v. Jannie Reuvers Sails, Ltd.*, 827 F. App'x 485, 491 (6th Cir. 2020) is inapposite, as that case involved summary judgment, a non-procedural

---

[3]    Energy Harbor's only other in-circuit authority for this point held that "special master's discovery ruling presents a procedural matter" reviewed for "an abuse of discretion." *Liberty Ford Lincoln Mercury, Inc. v. Ford Motor Co.*, 2023 WL 4991718, at *2 (N.D. Ohio Aug. 4, 2023).

dispositive matter reviewed *de novo* under Rule 53.  Obj., ECF 589 at PageID 12949.  So even if the Court overrules the Objections, as it should, the Special Master's findings are limited to procedural motion practice.  Nonetheless, Plaintiffs submit, the Special Master's Order is both reasonable and correctly decided, and thus should be upheld under either standard of review.

### B.    The Special Master's Order Reasonably Found that Plaintiffs Established the Elements of the Crime-Fraud Exception

To establish the crime-fraud exception, the proponent must establish: (1) a "prima facie showing that a sufficiently serious crime or fraud occurred"; and (2) "some relationship between the communication at issue and the prima facie violation."  *United States v. Collis*, 128 F.3d 313, 321 (6th Cir. 1997).

### 1.    Energy Harbor Was a Key Participant in Defendants' Fraud

Here, the Special Master easily concluded that a crime or fraud occurred because the overwhelming weight of the evidence confirms that it did.  The government has obtained guilty pleas from, or convictions of, FirstEnergy, Householder, Cespedes, Generation Now, and others for their involvement in FirstEnergy's criminal conspiracy.[4]  The Special Master cited the DPA, the exhibits submitted with the Motion and Cespedes' guilty plea as the basis for his conclusion that "[w]ithout question, there is a reasonable basis to conclude that fraud occurred."  Order, ECF 560 at PageID 12232.

### a.    Multiple Coconspirators Implicate Energy Harbor

Beyond the DPA, documentary evidence considered by the Special Master show Energy Harbor's critical connection to the guilty individuals/entities and their criminal activities.

---

[4]    On December 4, 2023, the government unsealed an 11-count indictment against Randazzo for accepting a $4.3 million bribe from FirstEnergy in exchange for official action in his role as the PUCO chair.

***FirstEnergy***.  FirstEnergy coordinated with Energy Harbor to pay millions for Householder's benefit and use in exchange for his efforts to pass HB6, which explains why "FES" (Energy Harbor) appears over 50 times in the DPA.  DPA, ECF 259-5.  FirstEnergy and Energy Harbor coordinated the plan to hand deliver to Householder a $400,000 check payable to Generation Now on October 10, 2018.  Ex. 4 at 1; Ex. 5 at 1.  Energy Harbor offered the check in exchange for Householder's support of the legislation that would become HB6.  Ex. 2 at 1899:2-15.  The entities then coordinated multiple corrupt payments to Generation Now at the behest of Householder throughout 2019.  Ex. 11 at 1-3; Ex. 13 at 1-3; Ex. 14 at 1-3.  Defendant Michael Dowling assured Kiani of Speaker Householder's "personal involvement" in supporting Energy Harbor's opposition to a referendum to repeal HB6.  Ex. 10 at 1-2.  John Judge and Kiani understood that Energy Harbor's payments to Householder obtained Householder's promise to introduce an alternative tax bill if HB6 was repealed.  Ex. 38 at 1-2; Ex. 39 at 2.

***Householder***.  Householder was convicted at trial for accepting approximately $60 million dollars of bribe payments from FirstEnergy and Energy Harbor in exchange for official acts related to HB6, and is now serving a 20-year sentence.  *United States v. Householder*, No. 1:20-cr-00077-TSB, ECF 288 (S.D. Ohio July 6, 2023).  Energy Harbor paid the lion's share of the bribes – over $43 million in contributions to Generation Now.  Ex. 9; DPA, ECF 259-5 at PageID 6015.  After receiving Energy Harbor's initial $500,000 payment during his 2018 campaign, Householder met with Energy Harbor CEO, Judge on March 19, 2019 to "███████████████████████ ████████████ Ex. 46 at -512; *see also* Ex. 45.  By April 30, 2019, Energy Harbor followed Householder's instruction that "FES [be] ready for a fight" regarding HB6 and began making weekly million-dollar-plus contributions to Generation Now, requiring approvals from CEO Judge and Executive chairman Kiani. Ex. 40 at 1; Exs. 8, 49.  Kiani treated then-Speaker Householder like his own paid employee and sought to hold Householder accountable for the results of his HB6 efforts.

- 9 -

Ex. 41 at 12-1998:23-2000:2; Ex. 42. In response to one interaction, Householder "assured him [HB6] will get done." Ex. 42 at 3-4.

*Cespedes*. As set forth above, Energy Harbor hired Cespedes to secure bailout legislation for Energy Harbor, which he did – illegally. *See supra*, §II.B.; *see also* Ex. 2; Ex. 3 at 6, 7; Ex. 41. At Householder's trial, he testified he learned that Kiani "was more than willing to, as he had done before [with HB6], spend money in exchange for legislation." Ex. 41 at 12-2040:14-21.

*Generation Now*. Energy Harbor's $43 million in contributions to Generation Now enabled Householder to surreptitiously receive illegal payments. Energy Harbor knew Generation Now was Householder's 501(c)(4). *See, e.g.*, Ex. 2 at 1901:12-24. Otherwise, it would make no sense for Energy Harbor representatives to hand Householder a check payable to Generation Now, an entity that otherwise had no apparent affiliation to Householder. Thus every time Energy Harbor contributed to Generation Now, Energy Harbor executives knew the money was for and ultimately controlled by Householder. *See, e.g.*, Ex. 11 at 1-2 (Cespedes confirming "[w]e need to submit the next $4M to the Spkr" and identifying "GenNow" as the 501(c)(4) through which to make the payments).

### b. Energy Harbor's Arguments Misconstrue the Facts and Law

Energy Harbor assigns an error of law to the Special Master for failing to assess Energy Harbor's state of mind when it sought legal advice. Obj., ECF 589 at PageID 12949. Because Energy Harbor claims it was at most an "unwitting" participant in Defendant's criminal conspiracy, it argues that it could not have known to seek the legal advice to further a crime or fraud. *Id.* at 12943, 12949. By ignoring Cespedes' guilty plea, Energy Harbor waives its right to contest that the crime he committed while serving as Energy Harbor's legislative agent, including his criminal intent, is directly attributable to Energy Harbor. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (the Sixth Circuit "has consistently held that arguments not raised in a party's opening brief,

as well as arguments adverted to in only a perfunctory manner are waived").  "[A] corporation, through the conduct of its agents and employees, may be convicted of a crime, including a crime involving knowledge and willfulness," when the "agent's illegal conduct [is] related to and done within the course of his employment and [has] some connection with the furtherance of the business of such corporation." *United States v. Carter*, 311 F.2d 934, 941-42 (6th Cir. 1963).

Energy Harbor hired Cespedes for the express purpose of helping it win legislation to subsidize its failing nuclear plants and that is exactly what Cespedes did – illegally.  *See* Ohio Lobbying Activity Center (OLAC), Initials View of Juan P. Cespedes (last visited Dec. 22, 2023), https://www2.jlec-olig.state.oh.us/olac/Reports/InitialView_Legislative.aspx?id=210874 (identifying Cespedes as Energy Harbor's legislative agent and the scope of his duties to include "[a]ll matters related to FirstEnergy Solutions"); Ohio Rev. Code Ann §101.70 (E)-(G) (classifying Energy Harbor as Cespedes' employer by "engag[ing him as] a legislative agent").  To support Cespedes' pursuit of legislation on behalf of the company, Energy Harbor authorized tens of millions in unprecedented payments to Householder.  *See, e.g.*, Ex. 8 (July 3, 2019 Cespedes email to Griffing seeking Energy Harbor approval for a Generation Now contribution request he received on behalf of Energy Harbor).  Therefore, there is no question that Cespedes' criminal acts were directly related to the performance of the duties Cespedes had authority to perform, which renders Energy Harbor criminally liable for the same crime.  Energy Harbor's reading of the law fails to recognize that wrongdoers cannot "insulate attorney-client communications used to further [its] fraud by keeping other participants in ignorance." *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 54 (S.D.N.Y. 1989); *see also In re Sealed Case*, 676 F.2d 793, 815, (D.C. Cir. 1982) ("A specific showing of the client's intent in consulting the attorney or the attorney's intent in performing his or her duties is not required").  Thus even if it were possible to conclude everyone else at Energy Harbor knew nothing

- 11 -

of the scheme, which it is not, "legal advice that furthers a fraudulent goal is not privileged, regardless of the innocence of the client seeking the advice." *Duttle*, 127 F.R.D. at 56.

Beyond Cespedes' confessed criminal conduct, which is directly attributable to Energy Harbor, the Special Master rightly held:

> Circumstantial evidence suggests the reasonable inference of a quid pro quo, and the text messages of FirstEnergy employees suggest a criminal purpose underlying the contributions and lobbying that, coupled with the then-interdependence of FirstEnergy and FirstEnergy Solutions, reasonably imply ***FirstEnergy Solutions knowingly engaged in criminal conduct*** and obtained legal advice to cover quid pro quo transactions with a smear of propriety.

Order, ECF 560 at PageID 11233-34.  Because the Special Master unambiguously considered Energy Harbor's intent, Energy Harbor's contrary contention fails.

### c.     A *Prima Facie* Showing Is a Low Bar, and the Evidence Here Would Clear the Highest Bar

In response to incriminating admissions by FirstEnergy and Cespedes, Energy Harbor asserts it is not "bound" to these admitted facts.  Obj., ECF 589 at PageID 12952.  Energy Harbor seeks to turn application of the crime-fraud exception into full-blown criminal trial requiring proof beyond a reasonable doubt.  This is clearly wrong (though it is also quite likely that Cespedes testimony and the overwhelming corroborating evidence would suffice to convict Energy Harbor at trial).  The *prima facie* showing of a crime or fraud "need not be as strong as that needed to effect an arrest or secure an indictment." *In re Antitrust Grand Jury*, 805 F.2d 155, 165-66 (6th Cir. 1986) (applying a "reasonable basis to suspect" a crime was committed standard).[5]  The proponent is "not . . . required to establish the 'fraudulent nature of the objective . . . definitively [and] there need only be presented a reasonable basis for believing that the objective was fraudulent.'" *United States v. Skeddle*, 989 F. Supp. 890, 901 (N.D. Ohio 1997) (quoting *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d

---

[5]     Energy Harbor's citation to *Slorp v. Lerner* is irrelevant to the analysis here, as the sole basis for a crime or fraud occurring in *Slorp* was the "pleadings and the denial of the motions to dismiss," not the extensive factual record obtained to date.  2016 WL 1252980, at *3 (S.D. Ohio Mar. 31, 2016).

1032, 1039 (2d Cir. 1984)) (some alterations in original);[6] *see also S.E.C. v. Sierra Brokerage Servs., Inc.*, 2005 WL 8165238, at *9 (S.D. Ohio Feb. 14, 2005) ("The SEC is required only to make a *prima facie* showing of the crime-fraud exception at this stage; the SEC is not required to prove the merits of their case."). "[A] *prima facie* case is defined as 'sufficient evidence in the type of case to get plaintiff past a motion for directed verdict in a jury case or motion to dismiss in a nonjury case; it is the evidence necessary to require defendant to proceed with his case.'" *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting "*prima facie,*" *Black's Law Dictionary* (6th ed. 1990)).

Irrespective of whether Energy Harbor is "bound" by its parent's and agent's admissions, it has offered no competent evidence to rebut those admissions. The fact that it has not been charged with a crime, when its agent has been ***charged and pled guilty***, is not dispositive and rebuts nothing. *See In re Sam Industrias S.A.*, 653 B.R. 196, 214 (Bankr. S.D. Fla. 2023) (collecting district court cases in which the crime-fraud exception was applicable even if the "client in the attorney-client communications had not been convicted, or even indicted for a crime, or had a judgment entered against him or her for fraud"). It borders on frivolous for Energy Harbor to contend that the guilty plea and extensive testimony of its agent, combined with abundant corroborating direct evidence and extensive circumstantial evidence, would not be sufficient to get a plaintiff past a motion for directed verdict on the question of whether Energy Harbor was part of the corruption scheme. Likewise, Energy Harbor's contention that it "contributed to Generation Now . . . with the blessing of lawyers" (Obj., ECF 589 at PageID 12950) proves nothing as to what Energy Harbor and its agents revealed to these lawyers. Far from a rebuttal, this contention proves lawyers were used to further the

---

[6] Energy Harbor misleadingly suggests the legal advice it sought is subject to a narrow exception identified in *Skeddle*. 989 F. Supp. at 901 (The privilege is retained when a client obtains attorney signoff "about the legal implications of a proposed course of action" which then later turns out to be illegal.). Energy Harbor points to no evidence here of specifically inquiring on the illegal conduct subject to Plaintiffs' motion for this scenario to apply.

scheme, and Energy Harbor's affirmative invocation of its reliance on counsel as a defense constitutes a separate and complete waiver of privilege. *See, e.g.*, *SPX Corp. v. Bartec USA, LLC*, 247 F.R.D. 516, 527 (E.D. Mich. 2008) ("'[o]nce a party announces that it will rely on advice of counsel . . . the attorney-client privilege is waived,' and that when the attorney-client privilege[] is waived as to one communication, 'the waiver applies to all other communications relating to the same subject matter'") (some alterations in original).

### 2. The Special Master Did Not Abuse His Discretion in Concluding that Energy Harbor Sought Legal Advice in Furtherance of a Crime and/or Fraud

The Special Master reasonably held that Energy Harbor sought legal advice in furtherance of Defendants' scheme after analyzing the context presented in the briefing. Order, ECF 560 at PageID 12233-34. In summary, the Special Master found:

> Circumstantial evidence suggests the reasonable inference of a quid pro quo, and the text messages of FirstEnergy employees suggest a criminal purpose underlying the contributions and lobbying that, coupled with the then-interdependence of FirstEnergy and FirstEnergy Solutions, reasonably imply FirstEnergy Solutions knowingly engaged in criminal conduct and obtained legal advice to cover quid pro quo transactions with a smear of propriety.

*Id.*

As the Special Master correctly observed: "The 2018 memorandum and the 2019 memoranda discussed in the briefing all provide analysis and advice that ultimately effectuate a component of the apparent fraud." Order, ECF 560 at PageID 12232. Far from contesting this determination, Energy Harbor reinforces that fact it used lawyers to facilitate the payments that its own parent corporation and agent have admitted were made for an illicit purpose. *See, .e.g.*, Obj., ECF 589 at PageID 12950 (contending that Energy Harbor "contributed to Generation Now . . . with the blessing of lawyers"). Because the use of lawyers to further Energy Harbor's HB6-related activities is not in dispute, this second factor is not in dispute. "Unawareness on the lawyer's part of the client's unlawful purpose or desire does not matter." *Skeddle*, 989 F. Supp. at 902. The bottom line is that even if Energy

- 14 -

Harbor had a lawful purpose for seeking legal advice *in addition to its agent's admitted unlawful purpose*, that would not defeat application of the crime-fraud exception.  *See, e.g.*, *id.* at 902 (applying crime-fraud exception when there was both a lawful and unlawful purpose for seeking legal advice).  Therefore, Energy Harbor's argument turns on the first factor, which overwhelmingly supports the Special Master's decision, as explained above.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court overrule Energy Harbor's Objections in their entirety, and order it to produce all documents subject to the Special Master's order within the later of 10 days of the lifting of the discovery stay (ECF 578) or the entering of the Court's order on the Objections.

DATED:  December 22, 2023                    Respectfully submitted,

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)

                                          */s/ Joseph F. Murray*
                                  JOSEPH F. MURRAY

1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
KEVIN S. SCIARANI (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
ksciarani@rgrdlaw.com

4883-5124-8024.v1

Class Counsel

4883-5124-8024.v1

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically on December 22, 2023.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Joseph F. Murray*
Joseph F. Murray (0063373)