UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | Judge Algenon L. Marbley |
| ALL ACTIONS. | ) ) | Magistrate Judge Kimberly A. Jolson |
| | ) | |

MOVANTS' RESPONSE TO FIRSTENERGY'S OBJECTIONS TO THE SPECIAL
MASTER'S ORDERS DATED NOVEMBER 29, 2023 AND NOVEMBER 30, 2023

**[REDACTED]**

MURRAY MURPHY MOUL
 + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com


Liaison Counsel

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com


Class Counsel

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................................1

II. STANDARDS OF REVIEW .................................................................................................2

    A.    Abuse of Discretion ........................................................................................................2

"[T]he Court shall decide de novo all objections to conclusions of law made or recommended by the Special Master; and the Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion." Special Master Order, ECF 541 at PageID 11687; Fed. R. Civ. P. 53(f)(4)-(5). Rulings on requests for leave to file documents are procedural and thus ruled for abuse of discretion. *See, e.g.*, *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, 2018 WL 6165522, at *5 (C.D. Cal. Jan. 24, 2018).

    B.    *De Novo* ........................................................................................................................2

"When the court conducts a *de novo* review, it literally looks at the totality of the circumstances 'anew.'" *United States v. Beauchamp*, 659 F.3d 560, 569 n.3 (6th Cir. 2011) (Marbley, J. sitting by designation). FirstEnergy's new arguments are waived and its new evidence improper: "'absent compelling reasons, [*de novo* review] does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate.'" *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000). The "Amended O'Neil Declaration" is new and FirstEnergy does not establish the requisite "compelling reasons" to justify its submission. Likewise, FirstEnergy failed to cite to the Special Master a full 84% of the authorities it now asks the Court to consider. This is improper, as it is inconsistent with a *de novo* review, unfair to the Special Master, and contrary to the purpose of the Court's appointment of a Special Master (to expedite this litigation, not delay it with new layers of litigation (*see* Special Master Order, ECF 541)).

III. RELEVANT FACTS .............................................................................................................5

    A.    Timing of FirstEnergy's Investigations ........................................................................5

    B.    FirstEnergy's Most Urgent Need for the Internal Investigation Was to Compile Facts for the Business Purpose of Obtaining Its Outside Auditor's Approval ........................................................................................................................6

    C.    FirstEnergy's Second Most Urgent Need for the Internal Investigation Was to Compile Facts for the Business Purpose of Determining Which Officers to Fire or "Separate" ...................................................................................6

    D.    FirstEnergy's Third Most Urgent Need for the Internal Investigation Was to Compile Facts for the Business Purpose of Preserving Its Access to Capital by Striking a Bargain with the Government.................................................9

    E.    FirstEnergy's Disclosures of Attorney Mental Impressions, Opinions, and Conclusions from the Internal Investigation.........................................................10

**Page**

1.      FirstEnergy Revealed Virtually Its Entire Internal Investigation to PwC ............................................................................................................10

2.      FirstEnergy's Extensive Disclosures During This Litigation (and to the Government) ..............................................................................11

        a.     All the Information Set Forth in the DPA Came from FirstEnergy's Internal Investigation .............................................12

        b.     FirstEnergy's Extensive Disclosures in PwC Memorandum and Deposition Scripts .............................................................12

F.     FirstEnergy Is Strategically Forbidding Witnesses from Discussing Any Facts that They Happened to Learn from a Lawyer ...............................14

IV.     RELEVANT LAW AND ARGUMENT .........................................................16

A.     FirstEnergy's Burden ..............................................................................16

FirstEnergy bears the burden of not only establishing the existence of the privilege, but also that it has not waived the protection. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999); *Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998) (enumerating privilege elements, including element of nonwaiver). FirstEnergy has failed to meet its burden as to either.

B.     FirstEnergy Has Failed to Prove Its Internal Investigation Was Primarily for Legal, as Opposed to Business Purposes, and Would Not Have Been Conducted in Substantially the Same Manner, Regardless of Anticipated Litigation ......................................................................................................17

FirstEnergy's internal investigation was primarily conducted for business purposes, which are not afforded protection under the attorney-client privilege or the work-product doctrine. "To be privileged, the communication must have the 'primary purpose of soliciting legal, rather than business, advice.'" *Zigler v. Allstate Ins. Co.*, 2007 WL 1087607, at *1 (N.D. Ohio Apr. 9, 2007). Here, the primary business purposes of the internal investigation were to: (1) obtain PwC's approval for the Company's required SEC filings; (2) gather facts for human-resources decisions; (3) protect FirstEnergy's access to outside capital at manageable rates; and (4) gather facts for bargaining chips with the government. FirstEnergy has failed to prove otherwise.

1.     FirstEnergy Falsely Accuses the Special Master of Applying the Incorrect Legal Standard to Its Belated Attempt to Amend the Deficient O'Neil Declaration ....................................................................19

There is no legal standard for amending declarations after the motions to which they pertain have been decided and the losing side has already filed an objection or notice of appeal regarding the decision because the filing of an objection or notice of appeal divests the original decision maker of jurisdiction. Moreover, even if the Special Master still had jurisdiction (he did not), the good cause standard he applied is the standard that applies to most motions for leave. *See, e.g.*, *Carrizo (Utica) LLC v. City of Girard, Ohio*, 661 F. App'x 364, 367 (6th Cir. 2016).

**Page**

  2.  FirstEnergy Inappropriately Blames the Special Master for Its Own
Failures .................................................................................................22

    a.  The O'Neil Declaration Lacked the Required Attestation of
Truth .................................................................................................22

A central requirement of all declarations is that they must be subscribed "***as true*** under penalty of perjury." 28 U.S.C. §1746. Nevertheless, FirstEnergy's entire argument seeks to read out of the statute this express requirement. "'Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous.'" *Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir. 2003) (quoting *Lake Cumberland Tr., Inc. v. United States E.P.A.*, 954 F.2d 1218, 1222 (6th Cir. 1992).

    b.  Courts May Exclude Evidence *Sua Sponte* ....................................23

FirstEnergy's assertion that Courts may not *sua sponte* identify evidentiary deficiencies or errors, but rather must turn a blind eye out of deference to the adversarial system lacks any legal basis. "[C]ourts may exclude evidence *sua sponte*." *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1034 (6th Cir. 2003) (citing *Maddox v. Patterson*, 905 F.2d 1178, 1180 (8th Cir. 1990) ("[i]t is clearly within the trial court's discretion to exclude evidence *sua sponte*")).

    c.  Key Assertions in the O'Neil Declaration Were Not Made
on Personal Knowledge ..................................................................24

"[I]n reviewing a lower court decision, [a reviewing court] may affirm for any reason presented in the record, even if the reason was not raised below." *Loftis v. United Parcel Serv., Inc.*, 342 F.3d 509, 514 (6th Cir. 2003). Another reason to exclude the deficient O'Neil declaration is because it fails the fundamental requirement that declarations and affidavits must be based on the personal knowledge of the declarant or affiant even where the court may consider evidence that is not necessarily admissible under the rules of evidence. *See, e.g.*, *Medley v. S. Health Partners, Inc.*, 2017 WL 3485641, at *7 (M.D. Tenn. Aug. 15, 2017); *Plaskolite, Inc. v. Zhejiang Taizhou Eagle Mach. Co., Ltd.*, 2008 WL 5190049, at *5 (S.D. Ohio Dec. 9, 2008) ("affidavits must be based on 'personal knowledge' and statements of 'belief' will not be considered").

  3.  The Internal Investigation was Essential to Convincing PwC to
Approve FirstEnergy's Mandatory SEC Filing .........................................26

FirstEnergy needed PwC's approval for its mandatory SEC filing, and that meant convincing PwC FirstEnergy had not engaged in unlawful conduct, despite an extensive Criminal Complaint indicating it had. Also, FirstEnergy would have undoubtedly undertaken an investigation into the activities described in the Criminal Complaint regardless of any anticipated or actual legal proceedings as it was required to evaluate the effectiveness of its internal controls. *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 2587784, at *11 (D.N.J. June 24, 2021).

  4.  The Internal Investigation Was Essential to Imperative Human
Resource Decisions .................................................................................27

The Government's Criminal Complaint made clear that FirstEnergy's officers and other employees had played integral roles in the corruption scheme. Thus, the second primary purpose of

the internal investigation was to gather facts for a series of human resource decisions, including whether to retain or fire FirstEnergy's Chief Executive Officer, Jones. "Despite its legal content, human resources work, like other business activities with a regulatory flavor, is part of the day-to-day operation of a business; it is not a privileged legal activity." *Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 44-46 (E.D.N.Y. 2013), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014).

5.      The Internal Investigation was Essential to Preserving FirstEnergy's Liquidity ................................................................................29

The internal investigation's third and fourth purposes were intertwined. The third is that FirstEnergy wanted to protect its access to outside capital at manageable rates. FirstEnergy's Treasurer confirmed the connection between FirstEnergy's access to capital and its need for a bargaining chip with the government, which was the fourth purpose of the investigation: assisting the government. "'If internal investigations are undertaken with an eye to later disclosing the results to a government agency, [work product protection does not apply].'" *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 306 (6th Cir. 2002) (quoting *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1429 (3d Cir. 1991)).

C.     FirstEnergy Waived Any Attorney-Client Privilege and Work-Product Protections.........................................................................................................31

Even if FirstEnergy's internal investigation was ever protected by the attorney-client privilege or the work-product doctrine (it was not), FirstEnergy waived those protections.

1.      FirstEnergy's Nearly Complete Disclosure of Its Internal Investigation to PwC Waived Any Attorney-Client Protection for the Internal Investigation ...........................................................................32

"Attorney-client privilege is not absolute, and 'if a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels – if not crown jewels.'" *LifeBio, Inc. v. Eva Garland Consulting, LLC*, 2023 WL 3258586, at *3 (S.D. Ohio May 4, 2023). The disclosure of documents to third-party accountants who are not assisting in any provision of legal advice waives any possible attorney-client privilege. *First Horizon Nat'l Corp. v. Houston Cas. Co.*, 2016 WL 5867268, at *10 (W.D. Tenn. Oct. 5, 2016).

2.      FirstEnergy's Nearly Complete Disclosure of Its Internal Investigation to PwC Waived Any Work-Product Protection for the Internal Investigation ...........................................................................33

FirstEnergy's near complete disclosure of the internal investigation to PwC waives work-product protection. *First Horizon*, 2016 WL 5867268, at *10; *In re King Pharms., Inc. Sec. Litig.*, 2005 WL 8142328, at *3 (E.D. Tenn. Sept. 21, 2005). "[A]ny information provided to [PwC] cannot have been furnished 'in anticipation of litigation' but was furnished to [PwC] in its capacity as an outside auditor." *First Horizon*, 2016 WL 5867268, at *10. The fact that FirstEnergy not only failed to safeguard the purportedly privileged material, but instead voluntarily revealed that material to PwC, eviscerates any possible protection FirstEnergy had concerning the investigation.

**Page**

3.   FirstEnergy's Extensive Internal Investigation Disclosures to Its
     Adversaries in This Litigation (and to the Government) Waived
     Any Protections .......................................................................................... 38

Testimony scripts created by counsel and produced by FirstEnergy in this action revealed extensive information from its investigation, including apparent quotes from investigative materials and witness interviews, numerous facts, and critically, the lawyers' ultimate conclusions and inferences regarding employees' intent, knowledge, candor, and violations of corporate policy. Revealing such a breadth of information is the antithesis of treating such information "'like jewels – if not crown jewels.'" *LifeBio*, 2023 WL 3258586, at *3. FirstEnergy's disclosures eliminate any possible nonwaiver argument. *See Columbia*, 293 F.3d at 302 ("we reject the concept of selective waiver, in any of its various forms"); *United States v. Paulus*, 2021 WL 4494607, at *4 (E.D. Ky. Sept. 30, 2021) ("[Third-party's] partial disclosure of the consultant's findings waives any privilege to those findings and necessitates disclosure of the balance of the findings.").

D.   Having Wielded the Internal Investigation as a Sword, FirstEnergy Cannot
     Now Shield It from Discovery .................................................................. 43

"'[L]itigants cannot hide behind the privilege if they are relying on privileged communications to make their case' or, more simply, cannot use the privilege as 'a shield and a sword.'" *In re United Shore Fin. Servs.*, 2018 WL 2283893, at *2 (6th Cir. Jan. 3, 2018) (quoting *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005)). Yet, FirstEnergy is attempting to do exactly that. "When a party reveals privileged communications or otherwise waives the protections of the attorney-client privilege, 'that party waives the privilege as to all communications on the same subject matter.'" *Mooney ex rel. Mooney v. Wallace*, 2006 WL 8434638, at *8 (W.D. Tenn. July 12, 2006) (quoting *United States v. Skeddle*, 989 F. Supp. 905, 908 (N.D. Ohio 1997)). Thus, any attorney-client privilege concerning the subject matter is waived in its entirety. *See, e.g.*, *Crestwood Farm Bloodstock LLC v. Everest Stables Inc.*, 2011 WL 13156795, at *3 (E.D. Ky. Jan. 25, 2011) (where plaintiff's attorney had obtained information only from plaintiff regarding an issue, plaintiff could not rely on that information "without opening discovery on other communications to and from [the attorney] on the [same issue]," as the situation "present[ed] the classic sword and shield privilege metaphor") (citing *Lott*, 424 F.3d at 454).

E.   Attorney-Client Privilege Does Not Extend to Facts a Witness Learned
     Through Communications with Counsel ................................................... 44

FirstEnergy has obstructed discovery by improperly instructing witnesses not to answer any questions about the factual bases for their own actions, decisions, or opinions if the witness happened to have learned those facts from a lawyer – even though FirstEnergy has repeatedly disclosed the facts themselves. The law is clear that "'while the privilege applies when a questioner directly asks a deponent about discussions with counsel, the "attorney-client privilege simply does not extend to facts known to a party that are central to that party's claims, even if such facts came to be known through communications with counsel who had obtained knowledge of those facts through an investigation into the underlying dispute."'" *Basulto v. Netflix, Inc.*, 2023 WL 3197655, at *14 (S.D. Fla. May 2, 2023).

V.   CONCLUSION .............................................................................................................. 46

4853-6467-2922.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allied Irish Banks v. Bank of Am., N.A.*,
  240 F.R.D. 96 (S.D.N.Y. 2007) ..................................................................18, 31

*Allstate Ins. Co. v. Orthopedic, P.C.*,
  2019 WL 13195622 (E.D. Mich. Jan. 29, 2019) ...............................................21

*Allstate Ins. Co. v. Tox Testing, Inc.*,
  2020 WL 13443548 (E.D. Mich. Sept. 24, 2020) ..............................................21

*B.C.F. Oil Refin., Inc. v. Consol. Edison Co. of NY, Inc.*,
  168 F.R.D. 161 (S.D.N.Y. 1996) .......................................................................45

*Basulto v. Netflix, Inc.*,
  2023 WL 3197655 (S.D. Fla. May 2, 2023) .......................................................45

*Bd. of Forensic Document Exam'rs, Inc. v. Am. Bar Ass'n*,
  2017 WL 11558075 (W.D. Tenn. Jan. 19, 2017) ...............................................25

*Calendar Rsch. LLC v. StubHub, Inc.*,
  2019 WL 11558873 (C.D. Cal. July 25, 2019) ...................................................17

*Canter v. Alkermes Blue Care Elect Preferred Provider Plan*,
  593 F. Supp. 3d 737 (S.D. Ohio 2022) ..............................................................21

*Carrizo (Utica) LLC v. City of Girard, Ohio*,
  661 F. App'x 364 (6th Cir. 2016) .......................................................................21

*Cheryl & Co. v. Krueger*,
  2019 WL 6521956 (S.D. Ohio Dec. 4, 2019) .....................................................16

*Crestwood Farm Bloodstock LLC v. Everest Stables Inc.*,
  2011 WL 13156795 (E.D. Ky. Jan. 25, 2011) ....................................................44

*E.E.O.C. v. Tex. Hydraulics, Inc.*,
  246 F.R.D. 548 (E.D. Tenn. 2007) ...............................................................41, 42

*First Horizon Nat'l Corp. v. Hous. Cas. Co.*,
  2016 WL 5867268 (W.D. Tenn. Oct. 5, 2016) ..................................10, 32, 33, 37

*HDM Flugservice GmbH v. Parker Hannifin Corp.*,
  332 F.3d 1025 (6th Cir. 2003) ...........................................................................24

*Hernandez v. Motorola Mobility, Inc.*,
  2013 WL 4773263 (S.D. Fla. Sept. 4, 2013) ......................................................45

**Page**

*Hickman v. Taylor,*
329 U.S. 495 (1947) ....................................................................................34, 45

*In re Anadarko Petroleum Corp. Sec. Litig.,*
2023 WL 2733401 (S.D. Tex. Mar. 31, 2023),
*reconsideration denied*, 2023 WL 4308750
(S.D. Tex. June 30, 2023) ...........................................................................42, 43

*In re Antitrust Grand Jury,*
805 F.2d 155 (6th Cir. 1986) ...........................................................................37

*In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.,*
293 F.3d 289 (6th Cir. 2002) ..................................................................... *passim*

*In re Fluor Intercontinental, Inc.,*
803 F. App'x 697 (4th Cir. 2020) .....................................................................42

*In re Grand Jury Subpoena,*
341 F.3d 331 (4th Cir. 2003) ...........................................................................42

*In re Grand Jury Subpoena, 93-2-1-01,*
9 F.3d 107, 1993 WL 453395 (6th Cir. 1993) ..................................................43

*In re Homestore.com, Inc. Sec. Litig.,*
347 F. Supp. 2d 811 (C.D. Cal. 2004) ..............................................................35

*In re Kidder Peabody Sec. Litig.,*
168 F.R.D. 459 (S.D.N.Y. 1996) ...............................................................18, 30

*In re King Pharms., Inc. Sec. Litig.,*
2005 WL 8142328 (E.D. Tenn. Sept. 21, 2005) ...........................................33, 37

*In re Lott,*
424 F.3d 446 (6th Cir. 2005) ......................................................................43, 44

*In re OM Sec. Litig.,*
226 F.R.D. 579 (N.D. Ohio 2005) .........................................................17, 39, 41

*In re Pfizer Inc. Sec. Litig.,*
1993 WL 561125 (S.D.N.Y. Dec. 23, 1993) .....................................................32

*In re United Shore Fin. Servs., LLC,*
2018 WL 2283893 (6th Cir. Jan. 3, 2018) ........................................................43

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.,*
2021 WL 2587784 (D.N.J. June 24, 2021) ........................................................27

**Page**

*In re VisionAmerica, Inc. Sec. Litig.*,
   2002 WL 31870559 (W.D. Tenn. Dec. 18, 2002) ....................................................16

*Kan. Wastewater, Inc. v. Alliant Techsystems, Inc.*,
   217 F.R.D. 525 (D. Kan. 2003)................................................................................45

*Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*,
   295 F.R.D. 28 (E.D.N.Y. 2013),
   *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014)......................................................17, 27

*Lake Cumberland Tr., Inc. v. United States E.P.A.*,
   954 F.2d 1218 (6th Cir. 1992) .................................................................................22

*Lauber v. Belford High Sch.*,
   2012 WL 13015132 (E.D. Mich. Apr. 6, 2012)...................................................22, 24

*LifeBio, Inc. v. Eva Garland Consulting, LLC*,
   2023 WL 3258586 (S.D. Ohio May 4, 2023) ......................................................32, 38

*Loftis v. United Parcel Serv., Inc.*,
   342 F.3d 509 (6th Cir. 2003) ...................................................................................24

*Maddox v. Patterson*,
   905 F.2d 1178 (8th Cir. 1990) .................................................................................24

*McNeil v. Mount Carmel Health Sys.*,
   2021 WL 5235103 (S.D. Ohio Nov. 10, 2021)...................................................17, 18

*Medinol, Ltd. v. Bos. Sci. Corp.*,
   214 F.R.D. 113 (S.D.N.Y. 2002) ..............................................................................36

*Medley v. S. Health Partners, Inc.*,
   2017 WL 3485641 (M.D. Tenn. Aug. 15, 2017) ......................................................25

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*,
   229 F.R.D. 441 (S.D.N.Y. 2004) .........................................................................33, 34

*Mitchell v. Chapman*,
   343 F.3d 811 (6th Cir. 2003) ...................................................................................22

*Mooney ex rel. Mooney v. Wallace*,
   2006 WL 8434638 (W.D. Tenn. July 12, 2006).......................................................43

*Muhammad v. Close*,
   798 F. Supp. 2d 869 (E.D. Mich. 2011)......................................................................3

4853-6467-2922.v1

**Page**

*Murr v. United States*,
    200 F.3d 895 (6th Cir. 2000) .................................................................3

*Nat.-Immunogenics Corp. v. Newport Trial Grp.*,
    2018 WL 6165522 (C.D. Cal. Jan. 24, 2018) ............................................2

*Okeayainneh v. Dep't of Just.*,
    __ U.S. __, 143 S. Ct. 512 (2022) ..........................................................21

*Okeayainneh v. United States Department of Justice*
    2022 WL 1694505 (D.C. Cir. May 25, 2022) ..................................21, 22

*Plaskolite, Inc. v. Zhejiang Taizhou Eagle Mach. Co., Ltd.*,
    2008 WL 5190049 (S.D. Ohio Dec. 9, 2008) ........................................25

*Protective Nat'l Inst. Co. of Omaha v.*
    *Commonwealth Ins. Co.*,
    137 F.R.D. 267 (D. Neb. 1989) ............................................................45

*Ravin Crossbows, LLC v. Hunter's Mfg. Co., Inc.*,
    2020 WL 7706257 (N.D. Ohio Dec. 29, 2020) .......................................2

*Reed v. Baxter*,
    134 F.3d 351 (6th Cir. 1998) ...............................................................16

*Smith v. Gen. Mills, Inc.*,
    2006 WL 7276959 (S.D. Ohio Apr. 13, 2006) ......................................45

*Thurmond v. Compaq Comput. Corp.*,
    198 F.R.D. 475 (E.D. Tex. 2000) ..........................................................46

*Turner v. Al[l]state Ins. Co.*,
    2017 WL 2274331 (M.D. Ala. May 24, 2017) ......................................46

*United States v. Arthur Young & Co.*,
    465 U.S. 805, 104 S. Ct. 1495, 79 L.Ed.2d 826 (1984) ........................36

*United States v. BAE Sys. Tactical Vehicle Sys., LP*,
    2017 WL 1457493 (E.D. Mich. Apr. 25, 2017) ....................................45

*United States v. Beauchamp*,
    659 F.3d 560 (6th Cir. 2011) .............................................................3, 4

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ...............................................................43

**Page**

*United States v. Dakota*,
  197 F.3d 821 (6th Cir. 1999) ...............................................................16

*United States v. Deloitte LLP*,
  610 F.3d 129 (D.C. Cir. 2010)..............................................................33

*United States v. Paulus*,
  2021 WL 4494607 (E.D. Ky. Sept. 30, 2021),
  *mandamus denied sub nom. In re King's Daughters*
  *Health Sys., Inc.*, 31 F.4th 520 (6th Cir. 2022) .......................................38

*United States v. Skeddle*,
  989 F. Supp. 905 (N.D. Ohio 1997)........................................................43

*Watkins v. Comm'r of Soc. Sec.*,
  2015 WL 5158938 (S.D. Ohio Sept. 3, 2015) ............................................3

*Westinghouse Elec. Corp. v. Republic of Philippines*,
  951 F.2d 1414 (3d Cir. 1991)...............................................................30

*Wiand v. Wells Fargo Bank, N.A.*,
  2013 WL 6170616 (M.D. Fla. Nov. 22, 2013) .........................................45

*Zen Design Grp. Ltd. v. Scholastic, Inc.*,
  327 F.R.D. 155 (E.D. Mich. 2018),
  *reconsideration denied*, 2019 WL 4891206
  (E.D. Mich. Mar. 26, 2019) ................................................................42

*Zigler v. Allstate Ins. Co.*,
  2007 WL 1087607 (N.D. Ohio Apr. 9, 2007).........................................17

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78m(a)(2) ......................................................................................35
  §78m(b)...........................................................................................35
  §78u-4(f)(2)...............................................................................35, 41

18 U.S.C.
  §1623(a) ....................................................................................22, 23

28 U.S.C.
  §631...............................................................................................3
  §1746.......................................................................................22, 23

**Page**

Federal Rules of Civil Procedure
    Rule 30(b)(6) .................................................................................... *passim*
    Rule 53(f)(4) ..........................................................................................2
    Rule 53(f)(5) ..........................................................................................2

17 C.F.R.
    §249.310 ...............................................................................................35

**SECONDARY AUTHORITIES**

8 J. Wigmore, Wigmore on Evidence (McNaughton rev. 1961)
    §2317 ...................................................................................................45

H. R. Rep. No. 94-1616, 1976 WL 14043 (Sept. 27, 1976) .......................................................23

4853-6467-2922.v1

## I.  INTRODUCTION

Rather than acknowledge its failure to file an adequate declaration or otherwise carry its burden, FirstEnergy resorts to a 49-page objection that mischaracterizes the Special Master's orders, misstates and ignores facts, invents legal standards, and defies case law (ECF 607).  It was FirstEnergy's burden to prove that its internal investigation would not have been prepared in substantially the same manner irrespective of anticipated litigation.  FirstEnergy failed, as the evidence demonstrates that the only urgent needs for the internal investigation were business purposes, including convincing its outside auditor to approve a mandatory SEC filing, making critical human resource decisions, and preserving its access to capital.

It was FirstEnergy's burden to prove that it did not waive any protections for its internal investigations.  FirstEnergy failed, as the evidence demonstrated unprecedented levels of disclosures and affirmative uses of investigating attorneys' opinions and impressions, including: whether laws were violated; whether someone conspired with someone else and if so, with whom; whether interviewees were candid; whether certain interviewees had reasonably ensured information was produced in connection with the internal investigation; whether employees had failed to act when confronting misconduct; whether employees had participated in the use of company devices and systems for inappropriate messaging; what certain FirstEnergy employees and directors knew or did not know; what the internal investigation uncovered and the FirstEnergy Board of Director's response; and, whether there is evidence of someone's knowledge.

The Special Master properly granted Movants' motion to compel and did not abuse his discretion in denying FirstEnergy's post-decision, post-objection verbal request to reopen the record and file an amended declaration.  Accordingly, Movants respectfully request that the Court overrule FirstEnergy's objections for all the reasons set forth in the papers and arguments, including this response, as well as those the Special Master found.

## II.     STANDARDS OF REVIEW[1]

### A.     Abuse of Discretion

FirstEnergy fails to acknowledge the applicability of the abuse-of-discretion standard for its belated verbal motion for leave to reopen the record (post-objection) and file an amended declaration.  "As provided in Rule 53(f)(4) and (5), the Court shall decide de novo all objections to conclusions of law made or recommended by the Special Master; and the Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion."  Special Master Order, ECF 541 at PageID 11687; Fed. R. Civ. P. 53(f)(4)-(5).  It is well established that rulings on "the scope of discovery" are procedural, so "the Court reviews the ruling only for abuse of discretion."  *Ravin Crossbows, LLC v. Hunter's Mfg. Co., Inc.*, 2020 WL 7706257, at *2 (N.D. Ohio Dec. 29, 2020).  Likewise, rulings on requests for leave to file documents are procedural and thus ruled for abuse of discretion.  *See, e.g.*, *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, 2018 WL 6165522, at *5 (C.D. Cal. Jan. 24, 2018) ("the Special Master did not abuse her discretion by declining to grant NIC's *ex parte* application for leave to file a second supplemental memorandum in support of its Crime-Fraud Motion after the late-disclosed evidence was produced").

### B.     *De Novo*

Although FirstEnergy acknowledges the applicability of the *de novo* standard for privilege disputes, it disregards the standard's meaning with a brief that consists almost exclusively of arguments based on cases it did ***not*** raise prior to the November 29, 2023 Order by Special Master

---

[1]     All terms not otherwise defined herein have the same meaning as set forth in the Memorandum of Law in Support of the Moving Parties' Motion to Compel Discovery Regarding FirstEnergy's Internal Investigation (ECF 489-1) ("Motion" or "Compel Mot."). Unless otherwise indicated, references to Exs. 1-10 are to the exhibits attached to the *in camera* declaration of Jason A. Forge, dated June 30, 2023 (Exhibits at ECF 489-3).  Additionally, unless otherwise noted, citations are omitted and emphasis is added throughout.  Movants Charles Jones and Michael Dowling join in the request that the Court overrule FirstEnergy's Objections, but, for reasons that are self-evident considering the emphasis on FirstEnergy's confessed criminality, they do not join this brief.

on Motion to Compel (ECF 571) (the "Compulsion Order").  As this Court has previously held when

sitting by designation on the Sixth Circuit, but "when the court conducts a *de novo* review, it literally

looks at the totality of the circumstances 'anew.'"  *United States v. Beauchamp*, 659 F.3d 560, 569

n.3 (6th Cir. 2011) (Marbley, J. sitting by designation).  Looking to the analogous Magistrate Judge

Act, 28 U.S.C. §631 *et seq.*, for guidance, FirstEnergy's new arguments are waived and its new

evidence improper:

> Courts have held that while the Magistrate Judge Act, 28 U.S.C. §631 *et seq.*, permits
> *de novo* review by the district court if timely objections are filed, absent compelling
> reasons, it does not allow parties to raise at the district court stage new arguments or
> issues that were not presented to the magistrate.

*Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000); *see also Watkins v. Comm'r of Soc.*

*Sec.*, 2015 WL 5158938, at *2 (S.D. Ohio Sept. 3, 2015) (same (citing *Murr*)).

Tellingly, FirstEnergy does not alert the Court to *Murr* (or *Watkins*), or even acknowledge

this binding authority.  Instead, FirstEnergy looks to a case from the Eastern District of Michigan,

which, respectfully, does not have authority to overrule the Sixth Circuit – all to support its attempt

to inject into these proceedings a new declaration that it never submitted to the Special Master.

FirstEnergy's Objections to the Special Master's Orders Dated November 29, 2023 and November

30, 2023 (ECF 607-1) (the "Objections") at PageID 13197 n.17 (citing *Muhammad v. Close*, 798 F.

Supp. 2d 869 (E.D. Mich. 2011)).  Worse, FirstEnergy tries to pass off this new declaration as "not

asking the Court to consider new evidence, but only to accept as evidence the Amended O'Neil

Declaration."  *Id.*  The Special Master issued the Compulsion Order on November 29, 2023.

FirstEnergy filed its objection to the Compulsion Order on November 29, 2023.  Notice of

Objections, ECF 572.  The "Amended O'Neil Declaration" is dated ***December 7, 2023***.  O'Neil

Decl., ECF 592-3 at PageID 13000.  Only FirstEnergy could maintain a straight face while

proclaiming that a December 7, 2023 declaration is not new evidence *vis-à-vis* the November 29,

2023 Compulsion Order ***to which it objected that day***.  After all, this is a company that previously

4853-6467-2922.v1

proclaimed to this Court that the First Amendment protected its underlying acts – just months before admitting the same underlying acts amounted to a massive criminal corruption scheme. *See* Motion to Dismiss Order, ECF 219 at PageID 4741 (rejecting First Amendment argument as "strain[ing] credibility").

FirstEnergy does not attempt to establish the requisite "compelling reasons" to justify its submission of new evidence. But this new declaration is just the tip of the iceberg. Tacitly admitting it failed to carry its burden before the Special Master, FirstEnergy's objection bears scant resemblance to its opposition (ECF 510) and supplemental submission (ECF 550) that comprise the entirety of its briefing to the Court and Special Master leading up to the November 29, 2023 Compulsion Order. All told, FirstEnergy's Objections cite a total of 64 cases and "other" authorities (out of only 76) *that it never cited prior to the Compulsion Order*. *Compare* Compel Opp., ECF 510 at PageID 10894-97 and FirstEnergy's Supp. Submission, ECF 550 at PageID 11890-91 *with* Objections, ECF 607-1 at PageID 13164-69. FirstEnergy failed to cite to the Special Master a full 84% of the authorities it now asks the Court to consider. This is improper, as it is inconsistent with a *de novo* review, unfair to the Special Master, and contrary to the purpose of the Court's appointment of a Special Master (to expedite this litigation, not delay it with new layers of litigation (*see* Special Master Order, ECF 541)), and just another way that FirstEnergy is trying to multiply and delay these proceedings. As this Court has explained, a *de novo* review "literally looks at the totality of the circumstances 'anew.'" *Beauchamp*, 659 F.3d at 569 n.3. It does not mean that parties who fail to carry their burdens of proof can remake their litigation strategy such that the Court winds up reviewing not the record of authorities and evidence below, but rather an almost (84%) completely new set of authorities and even new evidence. Accordingly, Movants respectfully request that the Court apply its *de novo* standard of review by considering the identical record the Special Master considered prior to issuing the Compulsion Order: Movants' Compel Mot., ECF 489; FirstEnergy's

Compel Opp., ECF 510; Movants' Compel Reply, ECF 529; 9/28/23 Hr'g Tr., ECF 612; Movants'

Compel Supp. Mem., ECF 549; and FirstEnergy's Supp. Submission, ECF 550.

## III.    RELEVANT FACTS

### A.    Timing of FirstEnergy's Investigations

The Court is well aware of the underlying facts here, and the Movants will not belabor the

relevant criminal allegations, guilty pleas, and recent guilty verdicts, other than to: (1) remind the

Court of the exceptionally detailed Criminal Complaint that the government unsealed on July 21,

2020; and (2) highlight the striking parallels between the Criminal Complaint and the Statement of

Facts that FirstEnergy admitted as part of its DPA.  *See* MTD Reply, Ex. A (Criminal Complaint),

ECF 192-2 at PageID 4348-24 and Status Report, Ex. 5 (DPA), ECF 259-5 at PageID 6013-43 (both

identifying a bailout for FirstEnergy's nuclear plants as the primary motive for the Householder

corruption; both identifying HB6's decoupling provision as guaranteeing fixed revenues for

FirstEnergy entities as an additional motive; both identifying Generation Now as a Householder-

controlled 501(c)(4) entity; both identifying approximately $59 million in dark money payments

from FirstEnergy entities to Generation Now as primary funding for the corrupt enterprise; both

relying extensively on text messages to and from Householder; both quoting FirstEnergy's HB6-

related statements in SEC filings; and, both quoting Jones's HB6-related public statements).  The

only real distinction between the documents is that the text messages quoted in the Criminal

Complaint involved individuals charged in the criminal proceedings and the text messages quoted in

the DPA involved individuals (Jones and Dowling) through whom FirstEnergy admitted it

committed its crime.  MTD Reply, Ex. A (Criminal Complaint), ECF 192-2 at PageID 4348-24;

Status Report, Ex. 5 (DPA), ECF 259-5 at PageID 6013-43.

- 5 -

B.     **FirstEnergy's Most Urgent Need for the Internal Investigation Was to Compile Facts for the Business Purpose of Obtaining Its Outside Auditor's Approval**

By the time the government unsealed its Criminal Complaint, three weeks had already passed since FirstEnergy's second financial quarter ended on June 30, 2020.  This meant FirstEnergy's mandatory SEC Form 10-Q had to be filed within weeks, which required the approval of FirstEnergy's independent auditor, PwC.  To achieve this feat, FirstEnergy had to gather facts to share with PwC, or at least create the appearance of doing so.  As such, FirstEnergy shared with PwC nearly its entire internal investigation – an investigation with which PwC ***did not assist***.  *See* Ex. 1 at -996, -001.  On August 13, 2020, FirstEnergy's investigation team advised PwC "that they have completed all of their investigative procedures."  *Id.* at -017.  On August 14, 2020, defendant Donald T. Misheff (Chairman of the "Special Investigation Committee" and member of the Audit Committee) confirmed for PwC that FirstEnergy's Special Investigation Committee "has no knowledge of any illegal acts or suspected illegal acts affecting the Company that were identified through the investigation or otherwise raised in communications from employees, former employees, analysts, regulators, short sellers, or others that have not been reported to PwC."  *Id.* at -020.  With this assurance, on August 16, 2020, PwC told Misheff and FirstEnergy executive defendants K. Jon Taylor and Jason J. Lisowski that PwC was "good for the Company to file first thing in the morning."  Ex. 2 at -453.  The next day, on August 17, 2020, FirstEnergy filed its SEC Form 10-Q for the quarter ending June 30, 2020.

C.     **FirstEnergy's Second Most Urgent Need for the Internal Investigation Was to Compile Facts for the Business Purpose of Determining Which Officers to Fire or "Separate"**

FirstEnergy director and IRC member Julia Johnson (who was also a member of the Special Investigation Committee) has already testified that the Board used lawyers to gather facts for the Board's employment decisions.  Ex. 3 at 391:20-392:2, 394:13-14, 395:24-396:24, 397:7-15,

488:6-489:4; *see also* Ex. 6 at 64:3-14, 98:24-99:5; Ex. 7 at 357:19-358:2. Another FirstEnergy director and Committee member, defendant Mitchell, testified that the Board did not even discuss whether Jones's or Dowling's actions amounted to criminal conduct (an arguably legal issue), but instead focused on violations of Company policies. Ex. 6 at 94:11-24, 102:2-103:1.

On October 29, 2020, two months after completing its investigative procedures and assuring PwC that there was no reason it would be inappropriate to rely on representations by Jones, FirstEnergy fired Jones, Dowling, and defendant Dennis M. Chack, and disclosed: "During the course of the Company's previously disclosed internal review related to the government investigations, the Independent Review Committee of the Board determined that these executives violated certain FirstEnergy policies and its code of conduct."[2] This determination was based entirely on the shared facts gathered in FirstEnergy's internal investigation. Ex. 3 at 488:6-489:4; *see also* Ex. 4 at PageID 10512-19 (24:24-25:17, 27:10-23, 137:7-21, 138:24-139:3); Ex. 5 at -454-63.

Less than two weeks later, on November 8, 2020, FirstEnergy "separated" its top two in-house counsel, defendant Reffner and Ebony Yeboah-Amankwah, for their involvement in and lack of candor regarding a key aspect of FirstEnergy's confessed criminal conduct: "the $4.3 million payment to [Samuel] Randazzo/S[ustainability Funding Alliance of Ohio ("SFAO")]." *See* Ex. 5 at -464-65. Again, this shared information and these conclusions were gathered and reached in FirstEnergy's internal investigation. Ex. 4 at PageID 10512-19 (24:24-25:17, 27:10-23, 137:7-21, 138:24-139:3).

Four months later, on February 23, 2021, FirstEnergy "separated" senior in-house counsel Bradley Bingaman ("Bingaman") and Mark Hayden ("Hayden") because, *inter alia,* ███████

---

[2] *See* Press Release, FirstEnergy, FirstEnergy Announces Leadership Transition (Oct. 29, 2020), https://investors.firstenergycorp.com/investor-materials/news-releases/news-details/2020/ FirstEnergy-Announces-Leadership-Transition/default.aspx.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ (*id.* at -474). Again, this shared information and these conclusions were gathered and reached in FirstEnergy's internal investigation. Ex. 4 at PageID 10512-19 (24:24-25:17, 27:10-23, 137:7-21, 138:24-139:3).

That same day, February 23, 2021, FirstEnergy tasked Acting Vice President of External Affairs Eileen Mikkelsen ("Mikkelsen") with providing Joel Bailey ("Bailey"), Justin Biltz ("Biltz"), and Ty R. Pine ("Pine") the reasoning behind their "separations," which was their involvement in several aspects of FirstEnergy's subsequently confessed criminal conduct. Ex. 5 at -470-73. Again, all this shared information and these conclusions were gathered and reached in FirstEnergy's internal investigation. Ex. 3 at 488:6-489:4; *see also* Ex. 4 at PageID 10512-19 (24:24-25:17, 27:10-23, 137:7-21, 138:24-139:3).

Three months after FirstEnergy had Mikkelsen inform Bailey, Biltz, and Pine of their "separations," on May 27, 2021, FirstEnergy "separated" Mikkelsen for her own involvement in several aspects of FirstEnergy's subsequently confessed criminal conduct, including using Randazzo to help with HB6. Ex. 5 at -466. Again, all this information and these conclusions were gathered and reached in FirstEnergy's internal investigation. Ex. 4 at PageID 10512-19 (24:24-25:17, 27:10-23, 137:7-21, 138:24-139:3).

All told, at least three critical in-house members of the FirstEnergy internal investigation (Reffner, Yeboah-Amankwah, and Mikkelsen) were "separated" due to their involvement in the very acts of criminal corruption that were ostensibly the subject of the investigation. Reffner was such a critical member of the investigation team that he delivered key assurances to PwC regarding the

documents reviewed in connection with the internal investigation, only eight of which were withheld from PwC for privilege.  Ex. 1 at -014, -021.  Yeboah-Amankwah was FirstEnergy's Chief Ethics Officer.  Ex. 5 at -465.  And Mikkelsen was such an insider that she was tasked with telling others they were being separated due to conduct that the internal investigation had uncovered.  Ex. 5 at -470-73.

FirstEnergy has never submitted a declaration, or any other indication, from PwC that its interests were in any way aligned with FirstEnergy's at a time when FirstEnergy was actively misleading it and still led by a CEO with whom FirstEnergy admittedly conspired to commit honest services wire fraud.

> **D.    FirstEnergy's Third Most Urgent Need for the Internal Investigation Was to Compile Facts for the Business Purpose of Preserving Its Access to Capital by Striking a Bargain with the Government**

A core aspect of FirstEnergy's Internal Investigation was facilitating FirstEnergy's analysis of how best to preserve its access to capital.  In a PowerPoint presentation for the Finance Committee of FirstEnergy's Board of Directors, FirstEnergy's Treasurer.  Steven Staub, laid out various "HB6 DOJ/*Internal Investigation* Scenarios."  *See* Ex. 8 at -857.  Staub's analysis ultimately concluded that, "[f]inal agreement with DOJ is our best chance for achieving waiver, extension, and preserving access to liquidity while minimizing onerous terms."  *Id.*

Consistent with its Treasurer's conclusion, FirstEnergy proceeded to reach a final agreement with the Department of Justice (the "DOJ").  On July 20, 2021, FirstEnergy entered into the DPA with the United States Attorney's Office for the Southern District of Ohio (the "USAO-SDOH").  FirstEnergy's very first obligation under the DPA was "[c]ooperation."  Status Report, Ex. 5 (DPA), ECF 259-5 at PageID 6002.  And the very first form of "substantial cooperation" the DPA acknowledged that FirstEnergy had already "provided" was "conducting a thorough internal investigation."  *Id.*  The DOJ also credited FirstEnergy for "proactively identifying issues and facts

- 9 -

that would likely be of interest to the government; making regular factual presentations to the government; sharing information that would not have been otherwise available to the government; and making such material available to the government on an expedited basis." *Id.* FirstEnergy committed to disclose "any information . . . requested by the government," and agreed to a detailed Statement of Facts that largely paralleled the Criminal Complaint that the government had unsealed almost exactly a year earlier. *Id.*

### E. FirstEnergy's Disclosures of Attorney Mental Impressions, Opinions, and Conclusions from the Internal Investigation

#### 1. FirstEnergy Revealed Virtually Its Entire Internal Investigation to PwC

To obtain PwC's imperative approval for its mandatory SEC filing, FirstEnergy shared with PwC nearly every aspect of its internal investigation, spanning the most critical aspects, from "detailed interview debriefs," to regular "[u]pdates on findings and conclusions," to a nearly complete provision of relevant documents (withholding only eight), to the ultimate (albeit later diametrically contradicted) conclusion:

- ***First***, FirstEnergy's "Investigation Team" provided PwC with "an understanding of the 'Investigation Team's scope, objectives and planned investigative procedures." *See* PwC's Memorandum re: "FirstEnergy Corp. Board of Directors [sic] Investigation into Possible Illegal Acts" (the "PwC Investigation Memo"). Ex. 1 at -996, -001.

- ***Second***, members of FirstEnergy's "Finance, Accounting and Treasury teams compiled supporting documentation for such payments [referenced in the Criminal Complaint] including the Company's authorization and approvals, contracts, and other relevant financial and accounting records." Ex. 1 at -002.

- ***Third***, "to assess the sufficiency of the investigation scope and investigative procedures performed, PwC participated in periodic discussions with the Investigation Team throughout the Investigation which included, but were not limited to, calls and video meetings" that included multiple "[u]pdate[s] on findings and conclusions" and multiple "Witness Interview debrief discussions." Ex. 1 at -003-04.

- ***Fourth***, the Investigation Team provided "detailed interview debriefs" of "individuals who provide Management Representations for the PwC Audit Team and

individuals who were referenced within the [Criminal] Complaint as having communications with Defendants." Ex. 1 at -004-05.

- **Fifth**, the Investigation Team assured PwC that only "eight (8) responsive documents [were] withheld from PwC based on the assertion of attorney-client or other legal privilege" and that "the documents withheld based on privilege do not change the conclusions of the Investigation." Ex. 1 at -014.

- **Sixth**, "[o]n August 13, 2020, PwC participated in a meeting with the Investigation Team to hear and document the results of the Investigation," the conclusions of which spanned over a page of redactions from the PwC Investigation Memo. Ex. 1 at -017-19.

- **Seventh**, the lead Investigation Counsel, Joseph Walker of Squire Patton Boggs LLP ("Squire"), assured PwC that "for the purpose of filing the Company's Quarterly Report on Form 10-Q for the period ended June 30, 2020":

     1.     ***Our investigation is complete***, subject to additional information that may in the future become available ***from*** regulators or law enforcement agencies.

*    *    *

     8.     We understand that PwC may rely on the representations of Mr. Chuck Jones, Mr. Jon Taylor, Jason Liskowski [*sic*], and Steven Strah and we know of no reason that such reliance would be inappropriate and that there has been no evidence of violations of laws by any of these individuals as it relates to this investigation.

Ex. 1 at -022-23.

- **Eighth**, FirstEnergy's Chief Legal Officer (lawyer and defendant Reffner) and FirstEnergy's criminal counsel (Steve Sozio of Jones Day) assured PwC that "[no] incremental work was necessary to support the conclusions [the Investigation Team and Investigation Counsel] were reaching." Ex. 1 at -023.

    **2.**    **FirstEnergy's Extensive Disclosures During This Litigation (and to the Government)**

FirstEnergy has repeatedly conceded that it has disclosed to its adversaries here (as well to the government) every fact that its internal investigations uncovered. 11/30/23 Hr'g Tr., ECF 587 at PageID 12898; Ex. 1 at -022 ("We have not reported relevant facts to the Special Committee, the Company, the Company's Advisors, ***or governmental regulators*** that we have not provided to PwC."); Status Report, Ex. 5 (DPA), ECF 259-5 at PageID 6002. Throughout all its briefs (including its Objection) and multiple oral arguments, FirstEnergy has never claimed that there is a

- 11 -

single fact its internal investigation uncovered that it has not already shared with Movants and the government.

### a. All the Information Set Forth in the DPA Came from FirstEnergy's Internal Investigation

FirstEnergy's Board authorized FirstEnergy to enter into the DPA, including all the many facts and admissions that FirstEnergy chose to disclose in it. Ex. 3 at 510:19-22. Director defendant Johnson admitted that all the information FirstEnergy disclosed to its adversary (the USAO-SDOH) and to the general public came from its internal investigation, on which FirstEnergy relied as the basis to instruct Johnson (and other witnesses) not to answer any questions about this information. *Id.* at 482:1-11. Further, Johnson acknowledged that the investigation used lawyers not so much as legal advisors, but more as fact finders so the Board could make the above-referenced business decisions to terminate employees and enter into the DPA. *Id.* at 397:7-15.

### b. FirstEnergy's Extensive Disclosures in PwC Memorandum and Deposition Scripts

In addition to the many disclosures FirstEnergy approved that comprise the unredacted portions of the PwC memorandum concerning the internal investigation, FirstEnergy made similarly extensive disclosures in written scripts it produced from its lawyers, who prepared the scripts based on the internal investigation. On May 19-20, 2022, and December 6-7, 2022, FirstEnergy provided deposition testimony pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure (the December dates were necessitated by FirstEnergy's lack of preparedness for the May deposition (Opinion and Order, ECF 333 at PageID 7122-31)). The testimony from both Rule 30(b)(6) witnesses relied on scripted answers FirstEnergy's lawyers had given them to then share with Plaintiffs and all other parties. *See, e.g.*, Ex. 4 at PageID 10512-19 (24:24-25:17, 27:10-23, 137:7-21, 138:24-139:3). In fact, FirstEnergy intentionally chose a Rule 30(b)(6) witness with no personal knowledge of the deposition topics so the only information she could provide would be the

information FirstEnergy's lawyers had scripted for her. *Id.* at PageID 10512-19 (33:22-34:4, 76:22-77:2).

FirstEnergy's Rule 30(b)(6) testimony scripts revealed extensive information from its internal investigation, including apparent quotes from investigative materials and witness interviews, numerous facts, and most importantly, the lawyers' ultimate conclusions and inferences regarding an employees' intent, knowledge, candor, and violations of corporate policy – all of which FirstEnergy's Rule 30(b)(6) witnesses and directors testified came from counsel. For example, FirstEnergy's lawyers told the witness to share the investigative conclusion that Jones and Dowling had each conspired with FirstEnergy to commit honest services wire fraud. Ex. 4 at PageID 10516 (54:18-55:20). Specifically, there were two documents that presented extensive conclusions and selected allegedly supporting facts regarding "TERMINATIONS AND SEPARATIONS" of 10 employees, including Jones and Dowling (Ex. 5 at -452) – again, according to former FirstEnergy director Johnson all this information came from FirstEnergy's internal investigation. Ex. 3 at 508:23-25 ("All the information that I received in making our [termination and separation] determination[s] was a part of that investigation."). According to the scripts prepared by FirstEnergy's lawyers, this extensive revelation of information elicited by the internal investigation included:





**F.    FirstEnergy Is Strategically Forbidding Witnesses from Discussing
Any Facts that They Happened to Learn from a Lawyer**

FirstEnergy openly acknowledges that it has been and intends to continue instructing

witnesses not to answer any questions about the factual bases for their own actions, decisions, or

opinions if the witness happened to have learned those facts from a lawyer – even though

FirstEnergy has repeatedly disclosed the facts themselves.  Movants will not belabor this point with

dozens of excerpts from multiple witnesses, but two excerpts from director Johnson's deposition and another from director Thomas Mitchell's deposition will give the Court a sense of FirstEnergy's obstructiveness:

> MS. DUFFY: Object, ***I object and instruct you to leave out from your answer any understandings that you gained from communications with counsel***.

> THE WITNESS: ***Everything that I know about the DPA is information that I obtained from discussions with our lawyers***.

Compel Supp. Mem., Ex. 21, ECF 549-2 at PageID 11846 (482:1-11).

> [MR. ALVAREZ:] And these facts were used to terminate Mr. Jones and Mr. Dowling; isn't that correct?

> \*       \*       \*

> MS. DUFFY: So – and I want to caution you here.  ***So don't reveal any*** privileged discussions with counsel or communication you had with counsel or ***information you received from counsel***.  To the extent you can answer the question, go ahead. But you have to exclude that information.

Compel Supp. Mem., Ex. 21, ECF 549-2 at PageID 11857 (517:9-23) (objections without instructions not to answer omitted throughout).

> [MR. ALVAREZ:] And I'm not talking about revealing any confidential conversations with counsel.  This is a public disclosure.  You – you authorized the filing of the 10-K, which had this public disclosure, correct?

> [THE WITNESS:] Correct.

> \*       \*       \*

> [Language from FirstEnergy's SEC Form 10-K for 2020 read into record]

> [MR. ALVAREZ:] And you understand that the Ohio government official was Mr. Sam Randazzo; is that correct?

> MS. DUFFY: Objection.  ***If you have that understanding from counsel, I instruct you not to answer***.

Compel Supp. Mem., Ex. 21, ECF 549-2 at PageID 11865, 867 (544:14-546:10).

> [DIRECT ACTION PLAINTIFFS' COUNSEL:] Q.  Are you saying that facts conveyed by counsel are privileged?

- 15 -

[FIRSTENERGY'S COUNSEL:] A.  Yes.

Ex. 6 at 189:4-6.

## IV.    RELEVANT LAW AND ARGUMENT

### A.    FirstEnergy's Burden

Though Movants originally brought this Motion, "[t]he burden of establishing the existence

of the privilege rests with the person asserting it." *United States v. Dakota*, 197 F.3d 821, 825 (6th

Cir. 1999).

> The elements of the attorney-client privilege are as follows: (1) Where legal advice
> of any kind is sought (2) from a professional legal adviser in his capacity as such, (3)
> the communications relating to that purpose, (4) made in confidence (5) by the client,
> (6) are at his instance permanently protected (7) from disclosure by himself or by the
> legal adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998).  Likewise, federal courts in this Circuit require

"the proponent of the privilege" to carry the burden of showing nonwaiver as an element of attorney-

client privilege.  *See In re VisionAmerica, Inc. Sec. Litig.*, 2002 WL 31870559, at *1-*2 (W.D. Tenn.

Dec. 18, 2002) (collecting cases and noting that the Sixth Circuit has favorably cited cases holding

that the party claiming privilege must also show nonwaiver); *Cheryl & Co. v. Krueger*, 2019 WL

6521956, at *2 (S.D. Ohio Dec. 4, 2019) (same).

As the Sixth Circuit has repeatedly observed, "[c]laims of attorney-client privilege are

'narrowly construed because [the privilege] reduces the amount of information discoverable during

the course of a lawsuit.'" *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289,

294 (6th Cir. 2002) (some alterations in original).  Accordingly, "[t]he privilege 'applies only where

necessary to achieve its purpose and protects only those communications necessary to obtain legal

advice.'" *Id.*

**B.** **FirstEnergy Has Failed to Prove Its Internal Investigation Was Primarily for Legal, as Opposed to Business Purposes, and Would Not Have Been Conducted in Substantially the Same Manner, Regardless of Anticipated Litigation**

Implicitly conceding the defectiveness of O'Neil's so-called declaration, FirstEnergy accuses the Special Master of "Ignor[ing] Overwhelming Evidence Beyond the O'Neil Declaration Establishing That the Internal Investigations Were Conducted to Secure Legal Advice and Prepare for Litigation." Objections, ECF 607-1 at PageID 13197. But it is FirstEnergy that is guilty of ignoring the applicable legal standard, which is not whether the internal investigations had ancillary purposes of supporting legal advice or for potential litigation. Rather, "[t]o be privileged, the communication must have the '***primary*** purpose of soliciting legal, rather than business, advice.'" *Zigler v. Allstate Ins. Co.*, 2007 WL 1087607, at *1 (N.D. Ohio Apr. 9, 2007) (emphasis in original). This same principle applies to internal investigations. *See, e.g.*, *Calendar Rsch. LLC v. StubHub, Inc.*, 2019 WL 11558873, at *4 (C.D. Cal. July 25, 2019) ("courts have declined to extend the protections of the attorney-client privilege where the purpose of a due diligence investigation was to obtain factual data for a business purpose"). In this regard, "[d]espite its legal content, human resources work, like other business activities with a regulatory flavor, is part of the day-to-day operation of a business; it is not a privileged legal activity." *Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 44-46 (E.D.N.Y. 2013), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014).

Similarly, regarding work-product protections for internal investigations: "***[I]f the item would have been prepared in substantially the same manner, regardless of the anticipated litigation, the [work-product] doctrine does not apply***.'" *McNeil v. Mount Carmel Health Sys.*, 2021 WL 5235103, at *4 (S.D. Ohio Nov. 10, 2021) (Jolson, M.J.); *see also In re OM Sec. Litig.*, 226 F.R.D. 579, 585-87 (N.D. Ohio 2005) (documents prepared in connection with audit committee's investigation of corporation's inventory problems, which began after shareholder

- 17 -

litigation had commenced, would have been prepared regardless of the possibility of additional litigation, and therefore documents were not protected by work-product doctrine).[3]

Even in FirstEnergy's self-serving framing of the situation it faced as of July 20, 2020, it admits that it was acting "in the face of a ***severe corporate crisis***." Objections, ECF 607-1 at PageID 13197. There was no immediate ***legal*** crisis. It did not face having to make any immediate legal decisions, and like all corporations, FirstEnergy's "liberty" was never at stake. It did not risk arrest or any other ***immediate*** peril from any legal proceedings, which (as this case confirms) take ***years*** to reach the merits. But because the government's extensive public disclosures clearly showed FirstEnergy at the epicenter of a massive criminal corruption scheme, it faced multiple imminent and intertwined existential ***business*** demands: mandatory SEC filings, which required approval from PwC and thus an immediate internal investigation to gather facts to comfort PwC; critical human resource decisions, which required an internal investigation to gather facts; and, maintaining access to outside capital, which under the circumstances here, required an internal investigation for FirstEnergy to gather facts to use as a bargaining chip with the government.

---

[3]     The inquiry "centers on whether documents were 'prepared or obtained because of the prospect of litigation[,]' as opposed to those 'prepared in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for non-litigation purposes.'" *McNeil*, 2021 WL 5235103, at *4 (alterations in original); *see also Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 106-09 (S.D.N.Y. 2007) (documents created by a law firm hired to investigate an alleged foreign currency trading scheme and make recommendations for changes were not protected by the work-product doctrine where party asserting privilege failed to present any testimony that the documents would not have been prepared without the threat of litigation); *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 463, 466 (S.D.N.Y. 1996) (documents generated during internal investigation of defendant corporation regarding scheme by trader to inflate earnings reports were not protected work product since the documents were not created principally or exclusively to assist in contemplated or ongoing litigation; inquiry was required for pressing business purposes and thus would have been undertaken regardless of whether litigation was threatened).

1.   **FirstEnergy Falsely Accuses the Special Master of Applying the Incorrect Legal Standard to Its Belated Attempt to Amend the Deficient O'Neil Declaration**

Rather than acknowledge these undisputed ***business***-oriented emergencies, FirstEnergy's Objection resorts to pages of misstatements and misplaced arguments, beginning with the false contention that "Mr. O'Neil testified" about anything.  Objections, ECF 607-1 at PageID 13197 (again at PageID 13198).  In fact, he has testified about nothing.  O'Neil merely signed a defective declaration replete with conclusory statements for which he lacks personal knowledge.  As the Special Master rightly found, the defective O'Neil declaration represents the ***only*** evidence FirstEnergy submitted to carry its burden of establishing that the ***primary*** purpose of the internal investigation was legal, not business, and that the internal investigation would not have been conducted in substantially the same manner, regardless of anticipated litigation.

FirstEnergy's primary argument accuses the Special Master of applying the wrong legal standard to a motion FirstEnergy never timely made.  Movants filed their Motion to Compel on June 30, 2023 (Compel Mot., ECF 489).  Over the five months that followed, the parties filed hundreds of pages of briefs and exhibits and the Special Master entertained lengthy oral arguments concerning the Motion.  *See, e.g.*, Compel Opp., ECF 510; Movants' Compel Reply, ECF 529; Jones' Supp. Statement, ECF 548; Movants' Compel Supp. Mem., ECF 549.  None of those submissions included a motion to file an amended declaration.  On November 29, 2023, the Special Master issued the Compulsion Order.  That same day, FirstEnergy filed its objection to the Compulsion Order, rather than a motion for leave to file a valid declaration.  Notice of Objections, ECF 572.  The next day, FirstEnergy filed a motion to stay the Compulsion Order, but still did not file a motion for leave to file a valid declaration.  Stay Mot., ECF 573.

Just a few hours after FirstEnergy moved to stay the Compulsion Order, the Special Master held a hearing on it.  11/30/23 Hr'g Tr., ECF 587.  The Special Master emphasized that FirstEnergy still had not moved for leave to file an amended declaration:

> *I don't have a motion in front of me to file an amended declaration*.  In *Ross*, there was a pending motion that was filed that was concurrently pending before the Court before the related summary judgment was decided.  So in other words, *you had a declaration that was supporting a motion that had not been decided* and there was a motion to amend the declaration.
>
> *That's not the scenario we had here*.  Here, there was a declaration filed to support the motion to compel briefing.  *There was a decision reached in that and only then did FirstEnergy come forward and say, "We would like to correct the deficiency*."  So I think Ross is distinguishable.  Ross doesn't create an entitlement here.  The local rules call for a motion when you want the Court to act and therefore, when you want to delegate an authority of the Special Master to be imposed, you have to file a motion.  *There is no motion here*.
>
> I'm going to construe the argument today as presenting me with an oral motion to amend which is denied.  *There was no good cause presented to me for the error other than it was simply not done correctly and no one brought it to the Court's attention, no one brought it to my attention until after an adverse decision was filed*.

11/30/23 Hr'g Tr., ECF 587 at PageID 12909.

It is hard to imagine anyone being clearer than the Special Master was about the significance of FirstEnergy's failure to move for leave to file an amended declaration prior to the issuance of the Compulsion Order.  Yet, FirstEnergy fails to cite a single case that establishes a standard for amending declarations after the motions to which they pertain have been decided and the losing side has already filed an objection, let alone a single Court that has ever granted such an unreasonable request.  Choosing quantity over quality, FirstEnergy cites about a dozen cases allowing amended declarations/affidavits, but none in which a Court granted leave to file an amended declaration after the motion to which the declaration pertained had already been decided, let alone already objected to.  It appears that no court has ever allowed a party to reopen the record and file an amended declaration or affidavit *after* the motion to which it relates has been decided and objected to, let

- 20 -

alone found error for a lower court refusing to do so. It is unclear whether the Special Master even had discretion to do what FirstEnergy demanded, so it could not possibly have been an abuse of discretion not to do so.

The reality is that there is no legal standard for amending declarations after the motions to which they pertain have been decided ***and*** the losing side has already filed an objection or notice of appeal regarding the decision because the filing of an objection or notice of appeal divests the original decision maker of jurisdiction. Moreover, even if the Special Master still had jurisdiction (he did not), the good cause standard he applied is the standard that applies to most motions for leave. *See, e.g.*, *Carrizo (Utica) LLC v. City of Girard, Ohio*, 661 F. App'x 364, 367 (6th Cir. 2016) ("a party seeking leave to amend after the scheduling order's deadline must meet Rule 16's good-cause standard in order for the district court to amend the scheduling order"); *Canter v. Alkermes Blue Care Elect Preferred Provider Plan*, 593 F. Supp. 3d 737, 744 (S.D. Ohio 2022) ("Although local rules generally do not permit parties to file sur-reply briefs, a party may request leave of the Court to do so upon a showing of good cause."); *Allstate Ins. Co. v. Tox Testing, Inc.*, 2020 WL 13443548, at *2 (E.D. Mich. Sept. 24, 2020) ("the Court is not persuaded that good cause exists to grant Defendants leave to file a motion for judgment on the pleadings prior to the Court's ruling on the pending discovery and sanctions motions"); *Allstate Ins. Co. v. Orthopedic, P.C.*, 2019 WL 13195622, at *2 (E.D. Mich. Jan. 29, 2019) ("The Court will thus grant Awaisi Defendants' motion for leave to file a supplemental brief only if they show good cause.").[4]

---

[4]    After multiple briefs and having scoured the dockets of courts throughout the country, the closest FirstEnergy could come to finding a case in which a Court allowed a losing party to amend a declaration after the motion to which it pertained had been decided and objected to is *Okeayainneh v. United States Department of Justice* 2022 WL 1694505, at *1 (D.C. Cir. May 25, 2022), cert. dismissed sub nom. *Okeayainneh v. Dep't of Just.*, __ U.S. __, 143 S. Ct. 512 (2022). *See* Reconsideration Reply, ECF 611 at PageID 13352. The fact that this is as close as FirstEnergy could get to a case supporting its argument confirms its argument is unsupportable, as *Okeayainneh* involved a situation where the ***prevailing*** side asked a ***reviewing*** court to allow it to supplement the record so as to ***moot*** an appeal. Moreover, *Okeayainneh* confirmed the propriety of the Special

- 21 -

The Special Master did not abuse his discretion in denying FirstEnergy's post-decision, post-objection verbal motion for leave to reopen the record and file an amended declaration.

### 2. FirstEnergy Inappropriately Blames the Special Master for Its Own Failures

#### a. The O'Neil Declaration Lacked the Required Attestation of Truth

A fundamental requirement of all declarations is that they must be subscribed "as true under penalty of perjury." 28 U.S.C. §1746. FirstEnergy's entire argument seeks to read out of the statute a critical component: the express requirement that declarants attest to the **_truth_** of whatever they declare under penalty. Objections, ECF 607-1 at PageID 13186-91 (declaring that "'true and correct' without 'penalty of perjury' is **_not_** enough, but 'penalty of perjury' without 'true and correct' **_is_** enough") (emphasis in original). In doing so, FirstEnergy violates one of the most foundational rules of statutory interpretation: "'Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.'" *Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir. 2003) (quoting *Lake Cumberland Tr., Inc. v. United States E.P.A.*, 954 F.2d 1218, 1222 (6th Cir. 1992)). In support of its attempt to rewrite 28 U.S.C. §1746, FirstEnergy actually rewrites 18 U.S.C. §1623(a), which provides in relevant part: "Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury **_as permitted_** under section 1746 of title 28, United States Code) . . . ." 18 U.S.C. §1623(a). FirstEnergy selectively quotes §1623(a) by excising from it the

---

Master's use of the good cause standard, as it applied an "interests of justice" standard, which is an interchangeable with "good cause." *Id.* at *1; *see also, e.g.*, *Lauber v. Belford High Sch.*, 2012 WL 13015132, at *2 (E.D. Mich. Apr. 6, 2012) ("The 'good cause' standard 'requires the moving party to provide an explanation for the default or to give reasons why vacation of the default would serve the interests of justice.' 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2696 at 141 (3d ed. 1998).").

highlighted "as permitted" requirement.  Objections, ECF 607-1 at PageID 13191.  It fails to cite a single case in which someone was convicted of violating 18 U.S.C. §1623(a) based on a declaration that did **not** contain the truth attestation that 28 U.S.C. §1746 requires, as such a declaration would not be "permitted" under §1746.

The legislative history for 28 U.S.C. §1746 confirms that Congress intended the truth attestation to be mandatory, not just read out of the statute as FirstEnergy demands:

> The requirement that the person who signs an affidavit must appear before a notary and be sworn can be inconvenient. . . .
>
> The legislation provides an alternative to affidavits and sworn documents **when it is necessary to require verification of the truthfulness of what the document contains**.
>
> *        *        *
>
> Section 1 of H.R. 15531 amends title 28 of the United States Code by adding a new section (1746) to authorize the use of unsworn statements subscribed to under penalty of perjury. . . .
>
> Section 1746 also sets forth the **language that must appear** in the document in order for it to qualify as an unsworn declaration under penalty of perjury.  If the document is executed within the United States, it must be described to as follows:
>
> I declare (or certify, verify, or state) under penalty of perjury **that the foregoing is true and correct**.  Executed on (date).

H. R. Rep. No. 94-1616, 1-2, 1976 WL 14043 (Sept. 27, 1976).  Because the O'Neil declaration lacked any attestation of truthfulness, the Special Master properly found it deficient under 28 U.S.C. §1746.

### b.    Courts May Exclude Evidence *Sua Sponte*

Similarly misguided is FirstEnergy's attack that, "[t]he Special Master ignored that Movants never raised any issue with the O'Neil's [sic] declaration, much less moved to strike it," and "the Special Master elected to base the outcome of Movants' motion to compel solely on his own theory." Objections, ECF 607-1 at PageID 13192-93.  The assertion that Courts may not *sua sponte* identify evidentiary deficiencies or errors, but rather must turn a blind eye out of deference to the adversarial

- 23 -

system lacks any reasonable basis.  "[C]ourts may exclude evidence *sua sponte*."  *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1034 (6th Cir. 2003) (citing *Maddox v. Patterson*, 905 F.2d 1178, 1180 (8th Cir. 1990) ("[i]t is clearly within the trial court's discretion to exclude evidence sua sponte")).  Therefore, the Special Master unquestionably had authority to exclude the deficient O'Neil declaration *sua sponte*.[5]

### c.    Key Assertions in the O'Neil Declaration Were Not Made on Personal Knowledge

It is well established that "in reviewing a lower court decision, [a reviewing court] may affirm for any reason presented in the record, even if the reason was not raised below."  *Loftis v. United Parcel Serv., Inc.*, 342 F.3d 509, 514 (6th Cir. 2003).  Another reason to exclude the deficient O'Neil declaration is because it fails the fundamental requirement that declarations and affidavits

---

[5]    Contrary to FirstEnergy's implication, Movants unquestionably challenged the O'Neil declaration (albeit on different grounds):

> The self-serving declaration FirstEnergy submits – from a **defendant** in these proceedings, director James F. O'Neil III ("O'Neil") – does not contend that that [sic] the Squire investigation would not have been prepared or presented in substantially the same manner (*i.e.*, as "complete" after only 17 days) but for anticipated litigation.  Instead, O'Neil offers the after-the-fact, lawyer-driven representation that "[w]ere it not for the DOJ criminal investigation . . . the internal investigations would ***not*** have been undertaken."  O'Neil Declaration, ECF 511-1 at PageID 10942, ¶29.  Obviously no internal investigations would have taken place but for the Department of Justice investigation because FirstEnergy and its CEO were still part of an ongoing criminal conspiracy, so it would have been senseless for the Company to jeopardize over $1 billion in expected illicit gains by initiating an investigation, and its directors had failed for years to address FirstEnergy's exponentially increased dark money spending.  But the only purpose of presenting the Squire investigation as "complete" after only 17 days was to appease PwC and file FirstEnergy's Form 10-Q.

> . . . O'Neil's statement that the investigations "were not undertaken to appease PwC or because of concerns about raising capital" (*id.* at PageID 10942, ¶27) – which does not reference, and is contradicted by, record evidence – is of no moment.

Compel Reply, ECF 529 at PageID 11438-39 (emphasis and some alterations in original).

must be based on the personal knowledge of the declarant or affiant even where the court may

consider evidence that is not necessarily admissible under the rules of evidence. *See, e.g.*, *Medley v.*

*S. Health Partners, Inc.*, 2017 WL 3485641, at *7 (M.D. Tenn. Aug. 15, 2017); *Bd. of Forensic*

*Document Exam'rs, Inc. v. Am. Bar Ass'n*, 2017 WL 11558075, at *2 (W.D. Tenn. Jan. 19, 2017)

("'All affidavits, regardless of the author, must be made on personal knowledge and set forth facts

that would be admissible in evidence.'"); *Plaskolite, Inc. v. Zhejiang Taizhou Eagle Mach. Co., Ltd.*,

2008 WL 5190049, at *5 (S.D. Ohio Dec. 9, 2008) ("affidavits must be based on 'personal

knowledge' and statements of 'belief' will not be considered").

O'Neil's declaration is riddled with statements for which there is no indication of O'Neil's

personal knowledge, including many for which he plainly lacks personal knowledge. *See, e.g.*,

O'Neil Decl., ECF 511-1 at PageID 10938, ¶3 (purporting to represent why FirstEnergy's

management brought the Householder Criminal Complaint to the attention of FirstEnergy's Board);

*id.* at PageID 10938-39, ¶5 (purporting to represent what Board members other than himself

"anticipated"); *id.* at PageID 10939, 42, ¶¶9, 26-27 ("I understand" statements); *id.* at PageID 10940,

¶13 (purporting to represent why Board members other than himself chose the law firm Squire to

conduct an internal investigation); *id.* at PageID 10941, ¶22 (purporting to represent why

FirstEnergy retained the Jones Day law firm); *id.*, ¶24 (purporting to represent that Jones Day's

investigation was independent of the Squire investigation); *id.* at PageID 10942-43, ¶29 (purporting

to represent what Board members other than himself and FirstEnergy would not have done under

several hypothetical conditions); *id.* at PageID 10943, ¶30 (purporting to represent what Board

members other than himself and FirstEnergy "understood"). Notwithstanding these many

fundamental deficiencies, FirstEnergy proclaims, "[t]he O'Neil declaration was clearly reliable."

Def's Mem., ECF 592-1 at PageID 12981. FirstEnergy's edict is no substitute for substance, and

- 25 -

O'Neil's "declaration" is unreliable due to a plain lack of personal knowledge as to many of its representations.

FirstEnergy and its Board members are represented by an army of lawyers, including one of the largest law firms in New York and the largest law firm in Ohio.  Yet, FirstEnergy blames the Special Master for not doing its lawyers' job for them.  Objections, ECF 607-1 at PageID 13196 n.15 (complaining that "the Special Master also held FirstEnergy to an impossible standard" by requiring a timely motion for leave to amend and "[t]he Special Master did not provide FirstEnergy with the opportunity to cure the perceived deficiency" before deciding a motion that had been pending for five months).  FirstEnergy's finger pointing is not well taken.  Just as it is not the job of a trial judge to help counsel during their closing arguments, it is not the Special Master's job to assist O'Neil, FirstEnergy, and their lawyers in compiling a competent declaration.  They alone are to blame for the deficient O'Neil declaration.

### 3. The Internal Investigation was Essential to Convincing PwC to Approve FirstEnergy's Mandatory SEC Filing

The record clearly shows that the Squire internal investigation focused on providing information to get PwC's approval for FirstEnergy's SEC Form 10-Q filing.  *See* Ex. 1 at -017, -020; Ex. 2 at -453.  It was effectively a show investigation for PwC, and not for FirstEnergy's reliance in any legal proceedings, as demonstrated by its rushed nature (completed in a few weeks), inclusion of multiple individuals with obvious conflicts of interest due to their involvement with the very conduct supposedly being investigated, and completely unreliable conclusions, which absolved Jones and FirstEnergy of any unlawful conduct just two months before FirstEnergy fired Jones and later admitted to conspiring with him in a massive criminal corruption scheme.

In addition to PwC's approval, the Form 10-Q filing required the Company to assess the sufficiency of its internal controls, which also required the internal investigation.  These functions are squarely within the scope of FirstEnergy's regularly conducted business activities.  Just like in

*OM*, FirstEnergy's audit committee needed the information gathered in the internal investigation, and PwC's resulting cooperation, regardless of the possibility of litigation.  That FirstEnergy later admitted to deficiencies in its internal controls following revelations of its unlawful conduct further demonstrates the internal investigation would have occurred regardless of any litigation.  In its Form 10-Q issued on November 19, 2020 – three months after FirstEnergy represented to PwC that the Company's investigation was "complete" – FirstEnergy admitted "its disclosure controls and procedures were not effective as of September 30, 2020" because the Company "did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top."  As FirstEnergy was ***required*** to evaluate the effectiveness of its internal controls, the Company no doubt would have undertaken an investigation into the activities described in the Criminal Complaint ***regardless*** of any anticipated or actual legal proceedings.  *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 2587784, at *11 (D.N.J. June 24, 2021) ("[I]rrespective of pending litigation against the Company, and even irrespective of malfeasance at the top of the organization, Valeant, had it discovered financial irregularities (even in the absence of investigations or media scrutiny), would have taken – and was obligated to take – exactly the same steps.").

### 4. The Internal Investigation Was Essential to Imperative Human Resource Decisions

While FirstEnergy was able to pull the wool over PwC's eyes the month after the Householder arrests, it was obvious from the government's Criminal Complaint that FirstEnergy's officers and other employees had played integral roles in the criminal corruption scheme.  Naturally, therefore, the second primary purpose of the internal investigation was to gather facts for a series of human resource decisions, starting with whether to retain or fire FirstEnergy's Chief Executive Officer, Jones.  As in *Koumoulis*, this human resource work is clearly part of the day-to-day operation of a business, as opposed to a privileged legal activity.  And similar to *Calendar Research*, FirstEnergy director and IRC member Johnson (who was also a member of the Special Investigation

- 27 -

Committee) has already testified that the Board used lawyers to gather **facts** for the **Board's** employment decisions. Ex. 3 at 391:20-392:2, 394:13-21, 395:24-396:7, 397:7-15, 488:6-489:4; Ex. 6 at 64:3-14, 98:24-99:5; Ex. 7 at 357:19-358:2. Another FirstEnergy director and Committee member, defendant Mitchell, testified that the Board did not even discuss whether Jones's or Dowling's actions amounted to criminal conduct (an arguably legal issue), but instead focused on violations of Company policies. Ex. 6 at 94:11-24, 102:2-103:1.

This Court has already reminded the parties that "[a] party asserting privilege must provide sufficient information to allow a court to determine whether the communications in question were in fact confidential communications relating to legal advice." Opinion and Order, ECF 378 at PageID 9011. Yet, throughout two full days of testimony, Johnson never identified a single category of legal **advice** that the Board sought from the internal investigation. Even the many instructions not to answer questions were completely untethered to any indication or condition that the answer would reveal a communication **concerning legal advice**: "I'm going to object and I'm going to instruct you to leave out any communications or information you received from your lawyers." Ex. 3 at 348:21-23.[6] In fact, over the course of four days of testimony from two directors, the only time legal advice was a condition of an instruction not to answer was during questioning about a meeting that occurred the week after Householder and several of his alleged co-conspirators were arrested – before the formation of the IRC. Ex. 6 at 172:1-175:20.

The decisions to terminate Jones and other officers were imperative **business** decisions with tremendous **business** implications, but FirstEnergy (which bears the burden of proof) has failed to identify a single **legal** issue related to the firings and separations of these at-will employees that

---

[6]    *See also* Ex. 3 at 359:16-18, 365:1-5, 365:12-14, 392:7, 392:15, 392:20, 393:1, 393:10, 393:17, 394:1-2, 395:2-5, 398:18, 398:23, 472:19-21, 482:6-8, 501:16-17, 502:24-503:1, 503:17-18, 507:7-16, 508:4-5, 508:10-14, 508:19-22, 541:12-15, 541:24-542:1, 543:8-10, 545:3-6, 546:8-10, 549:9-14, 553:9-12, 554:12-15, 558:5-9.

could have superseded the many obvious significant business considerations.  Instead, FirstEnergy resorts to the sophistic argument that because "certain" employment decisions concerned conduct that occurred during the internal investigation, the need for facts about employees' actions could not have been the "***cause***" of the investigation.  Objections, ECF 607-1 at PageID 13206.  This argument erroneously assumes FirstEnergy's Board had buried its head in the sand, when it could not possibly ignore the circumstances that left it with no choice but to seek facts concerning employees' conduct: the government's very public criminal case and the massive media reaction to it.  Moreover, even the premise of FirstEnergy's sophistic argument is faulty, as every single one of the ten employees FirstEnergy terminated or separated with had some connection to the underlying criminal conduct.  Ex. 5 at -454-75.  The fact that some may have ***also*** interfered in some way with the internal investigation simply confirms the unreasonableness of including in any investigation individuals who were personally involved in the activities that are the subject of the investigation.

### 5.     The Internal Investigation was Essential to Preserving FirstEnergy's Liquidity

The third and fourth purposes of the internal investigation were intertwined.  The third is that FirstEnergy wanted to protect its access to outside capital at manageable rates (*see, e.g.*, Exs. 8-9), which is clearly a business purpose.  One would be hard pressed to draw a clearer connection between FirstEnergy's internal investigation and this clear business purpose than FirstEnergy's Treasurer's PowerPoint presentation, which expressly outlined various "HB6 DOJ/***Internal Investigation*** Scenarios" for FirstEnergy's loans and credit lines.  *See* Ex. 8 at -857.  That same presentation also confirmed the direct connection between FirstEnergy's access to capital and its need for a bargaining chip with the government, concluding that, "[f]inal agreement with DOJ is our best chance for achieving waiver, extension, and preserving access to liquidity while minimizing onerous terms."  *Id.*

- 29 -

This is exactly how FirstEnergy used its internal investigation:  to assist the government. FirstEnergy's very first obligation under the DPA was "[c]ooperation."  Status Report, Ex. 5 (DPA), ECF 259-5 at PageID 6002.  And the very first form of "substantial cooperation" that the DPA acknowledges that FirstEnergy had already "provided" was "conducting a thorough internal investigation."  *Id.*  The DOJ also credited FirstEnergy for "proactively identifying issues and facts that would likely be of interest to the government; making regular factual presentations to the government; sharing information that would not have been otherwise available to the government; and making such material available to the government on an expedited basis."  *Id.*  All these presentations and all this information were generated by FirstEnergy's internal investigation.[7]

There is not a single exhibit and not a single sentence of sworn testimony supporting the facially unreasonable contention that FirstEnergy's internal investigation would ***not*** have been undertaken in substantially the same manner regardless of whether litigation or criminal proceedings were threatened or had commenced.  Here, as in *Kidder Peabody*, the investigation was required for pressing business purposes and would have been undertaken in substantially the same manner regardless of whether litigation or criminal proceedings were threatened or had commenced.[8]

---

[7]     "[A]s a matter of public policy,

> [i]f internal investigations are undertaken with an eye to later disclosing the results to a government agency, the outside counsel conducting the investigation may hesitate to pursue unfavorable information or legal theories about the corporation.  Thus, allowing a party to preserve the doctrine's protection while disclosing work product to a government agency could actually discourage attorneys from fully preparing their cases."

*Columbia*, 293 F.3d at 306 (quoting *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1429-30 (3d Cir. 1991)) (some alterations in original).

[8]     Because the considerations for assessing privilege and work-product protection overlap considerably, though they are not identical, Moving Parties address them together.  The waiver analysis differs somewhat, however, as addressed below.

4853-6467-2922.v1

FirstEnergy has not come close to proving that it would *not* have conducted the internal investigation in substantially the same manner were it not for the prospect of litigation.  At bottom, FirstEnergy cannot carry its burden to establish that *the* primary purpose of its internal investigation was legal advice because that simply was not *the* primary purpose.  Further, with or without possible litigation, FirstEnergy had to conduct its internal investigation to satisfy its outside auditor and comply with SEC filing requirements, as well as to determine which employees to retain and which to fire – all prototypical business purposes.  As the court in *Allied Irish Banks* observed, "the use to which the [investigative] Report was ultimately put provides further evidence of why it would have been generated in the same manner irrespective of the potential for litigation."  240 F.R.D. at 108.  Specifically:

> According to AIB's Group Chief Executive, the AIB board intended the Report to be used to "address[] culpability, accountability, control systems and organizational issues."  As noted, the Board publicly fired six individuals identified in the Report as "directly responsible for oversight of [inculpated foreign currency trader] Mr. Rusnak. . . . [C]onsistent with the findings and recommendations of the report," the Board also adopted a series of "organisational changes," to its "strategy and group structure" as well as to its corporate governance.  These actions evidence the importance of the . . . Ludwig investigation as a corporate management tool, not as a mechanism to assist in expected litigation.

240 F.R.D. at 108 (some alterations in original).  So too, here.

Under these circumstances, any legal purpose for the internal investigation was a distant second to these business considerations.

## C.  FirstEnergy Waived Any Attorney-Client Privilege and Work-Product Protections

Even if FirstEnergy's internal investigation was ever protected by the attorney-client privilege or the work-product doctrine (it was not), FirstEnergy waived those protections.

- 31 -

1.    **FirstEnergy's Nearly Complete Disclosure of Its Internal Investigation to PwC Waived Any Attorney-Client Protection for the Internal Investigation**

"Attorney-client privilege is not absolute, and 'if a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels – if not crown jewels.'" *LifeBio, Inc. v. Eva Garland Consulting, LLC*, 2023 WL 3258586, at *3 (S.D. Ohio May 4, 2023). "As a general rule, the 'attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties.'" *Columbia*, 293 F.3d at 294.  As such, the disclosure of documents to third-party accountants ***who are not assisting in any provision of legal advice*** waives any possible attorney-client privilege: "By voluntarily disclosing documents to KPMG, the Plaintiffs waived any attorney-client privilege they had in those documents." *First Horizon Nat'l Corp. v. Hous. Cas. Co.*, 2016 WL 5867268, at *10 (W.D. Tenn. Oct. 5, 2016) (citing *Columbia*, 293 F.3d at 306).  Regarding ***privilege*** waivers, this rule is nearly universal:

> Disclosure of documents to an outside accountant destroys the confidentiality seal required of communications protected by the attorney-client privilege, notwithstanding that the federal securities laws require an independent audit. "Confidentiality as to these documents is neither expected nor preserved, for they are created with the knowledge that independent accountants may need access to them to complete the audit."

*In re Pfizer Inc. Sec. Litig.*, 1993 WL 561125, at *7 (S.D.N.Y. Dec. 23, 1993).

There is no good-faith basis to dispute that FirstEnergy shared with PwC nearly its entire internal investigation, including all witness interviews and attorney opinions, while withholding only eight documents – an insignificant number compared to over 750,000 documents produced in this litigation, including 1,670 from PwC alone.  Compel Reply, ECF 529 at PageID 11442.  In any event, FirstEnergy does not dispute that any disclosures to PwC waived any privileges.  Yet, PwC's redactions indicate "FE Privilege," not FirstEnergy work product.  Therefore, because FirstEnergy waived any privileges for information shared with PwC, the redacted information must be disclosed.

- 32 -

2. **FirstEnergy's Nearly Complete Disclosure of Its Internal Investigation to PwC Waived Any Work-Product Protection for the Internal Investigation**

Though there is a split outside the Sixth Circuit as to whether disclosures to outside auditors waive work-product protections, there is no split within the Sixth Circuit. The only two district courts within the Sixth Circuit to address this issue both unequivocally held that disclosure of privileged communications to outside auditors renders both inapplicable. *First Horizon*, 2016 WL 5867268, at *10; *In re King Pharms., Inc. Sec. Litig.*, 2005 WL 8142328, at *3 (E.D. Tenn. Sept. 21, 2005). FirstEnergy cites only two cases – both from outside the Sixth Circuit – to support its argument against waiver. Objections, ECF 607-1 at PageID 13211-12. Both are readily distinguishable.

In *United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010), the court made clear that its nonwaiver ruling was fact-specific, rather than a blanket protection for all work-product disclosures to outside auditors. Yet, the ***facts*** of neither case FirstEnergy cites bear any resemblance to the facts surrounding FirstEnergy's virtually complete disclosure to PwC. The question in *Deloitte* was not whether the outside auditor was ***currently*** Dow's adversary, but rather whether it "could be Dow's adversary in the sort of litigation the [subject documents] address." *Id.* But Dow did not subsequently admit that it had been engaged in a criminal conspiracy when it provided the documents and that conclusions provided in the documents were false. *Id.* In other words, *Deloitte* is far removed from the Squire investigation, whose conclusions FirstEnergy later admitted were false, and it is clear those false conclusions could have been the subject of litigation between PwC and FirstEnergy.[9]

---

[9]    Similarly, in *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 444 (S.D.N.Y. 2004), the client did not later admit that the investigation's conclusions were false and the auditor did not rely on the investigation in any way that could have realistically led to any sort of adversarial proceeding between the client and the auditor concerning the investigation.

FirstEnergy's baseless attempt to manufacture a common interest between it and PwC highlights why the law and public policy strongly favor a waiver under the circumstances here. FirstEnergy asserts that PwC shared a common interest with FirstEnergy "in 'prevent[ing], detect[ing], and root[ing] out corporate fraud.'"  Objections, ECF 607-1 at PageID 13211 (quoting *Merrill Lynch*, 229 F.R.D. at 448) (alterations added by FirstEnergy).  This is precisely the kind of logic that the Sixth Circuit rejected when it flatly rejected any form of the selective-waiver doctrine:

> There is considerable appeal, and justification, for permitting selective waiver when the initial disclosure is to an investigating arm of the Government. Undoubtedly, by waiving privilege as to the Government, a client furthers the "truth-finding process." . . .
>
> However, this argument has several flaws. As noted by the First Circuit, it "has no logical terminus."  Insofar as the "truth-finding process" is concerned, a private litigant stands in nearly the same stead as the Government. . . .  A plaintiff in a shareholder derivative action or a qui tam action who exposes accounting and tax fraud provides as much service to the "truth finding process" as an SEC investigator. Recognizing this, a difficult and fretful linedrawing process begins, consuming immeasurable private and judicial resources in a vain attempt to distinguish one private litigant from the next.
>
> *        *        *
>
> The decision to enter into settlement negotiations, and to disclose otherwise confidential information in the process, is a tactical one made by the client and his or her attorney.  All litigation-related tactical decisions have an upside and a downside.
>
> *        *        *
>
> Many of the reasons for disallowing selective waiver in the attorney-client privilege context also apply to the work product doctrine.  The ability to prepare one's case in confidence, which is the chief reason articulated in *Hickman, supra*, for the work product protections, has little to do with talking to the Government.  Even more than attorney-client privilege waiver, waiver of the protections afforded by the work product doctrine is a tactical litigation decision.  Attorney and client both know the material in question was prepared in anticipation of litigation; the subsequent decision on whether or not to "show your hand" is quintessential litigation strategy. Like attorney-client privilege, there is no reason to transform the work product doctrine into another "brush on the attorney's palette," used as a sword rather than a shield.

*Columbia*, 293 F.3d at 303-07.  The Sixth Circuit's reasoning decidedly points to rejecting FirstEnergy's argument.  The work-product doctrine exists to protect the ability to prepare one's case for trial, not to supposedly "root out" corruption with the government or an outside auditor.

Of course, the premise of FirstEnergy's "common interest" argument is a total fabrication.  It bears the burden of proof, yet it has provided no evidence whatsoever that PwC's interests were at all aligned with a corporation that the government had just described as the driving force behind the biggest corruption scheme in state history.  FirstEnergy could have deposed PwC.  It did not.  If its contention were true, it could have obtained a declaration from PwC.  It did not.  It could have produced a common interest agreement with PwC.  It did not.  After all, it was entirely possible FirstEnergy would be sued for that filing, and PwC was likewise exposed to liability for its role.  This would have raised joint-and-several liability issues placing FirstEnergy and PwC as direct adversaries.  *See In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 811, 813 (C.D. Cal. 2004) (trier of fact to decide whether PwC "'knowingly'" committed securities violations, as required for proportionate liability determinations under 15 U.S.C. §78u-4(f)(2)).  Indeed, the filing of FirstEnergy's Form 10-Q amidst the inception of the Householder criminal proceedings aimed to reassure the market of the Company's reliability, which helped perpetuate the concealment of the criminal enterprise.  Irrespective of PwC's intent, its unknowing assistance in that endeavor plainly does not amount to a "common interest" worthy of protection from discovery.

Moreover, FirstEnergy's argument perverts the role of an outside auditor:

> In order to comply with various provisions of the federal securities laws requiring publicly-held corporations to file their financial statements with the Securities and Exchange Commission, *see* Securities and Exchange Act of 1934, 15 U.S.C. §§78m(a)(2), 78m(b) (2002); 17 C.F.R. §249.310 (2002), a company must open its books and records to an independent auditor for review. The independent auditor is required to express an opinion, based on a review according to generally accepted auditing standards . . . .

> . . . The independent auditor, however, must come to his own understanding of reasonableness, based on the evidence.  The auditor's review supports the

4853-6467-2922.v1

auditor's independent opinion about the fairness of the company's financial reports, not the audited company's litigation interests. Thus, the auditor's interests are not necessarily aligned with the interests of the company. And, as has become crystal clear in the face of the many accounting scandals that have arisen as of late, in order for auditors to properly do their job, they must not share common interests with the company they audit. "*[G]ood auditing requires adversarial tension between the auditor and the client*." Roberta S. Karmel, A New Watchdog for Public Accountants, N.Y. Law J., Aug. 15, 2002, at 3. As the Supreme Court has explained:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. *The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust*.

*United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18, 104 S. Ct. 1495, 1503, 79 L.Ed.2d 826 (1984) (emphasis in original).

*   *   *

While Boston Scientific held meetings of its Special Litigation Committee with an eye to litigation, the disclosures to the independent auditor had no such purpose. Boston Scientific and its outside auditor Ernst & Young did not share "common interests" in litigation, and disclosures to Ernst & Young as independent auditors did not therefore serve the privacy interests that the work product doctrine was intended to protect.

*Medinol, Ltd. v. Bos. Sci. Corp.*, 214 F.R.D. 113, 115-17 (S.D.N.Y. 2002). It is as if the *Medinol* Court (and the Supreme Court) anticipated FirstEnergy's argument and soundly debunked it.

*Mendinol*'s logic is particularly compelling where, as here, the company being audited (and its current CEO) have been credibly identified as the ringleaders of a massive corruption scheme. Under such circumstances, an outside auditor's position is much more akin to an adversary. After all, there is no question that FirstEnergy used its internal investigation to mislead PwC. FirstEnergy had complete access to all the same evidence of its crime – every text message, bank record, and email – from day one. When it wanted PwC's blessing, it used its internal investigation to assert that there was "no evidence of violations of laws." Ex. 1 at -023. When it wanted credit for assisting the

- 36 -

government to preserve its access to capital, it used its internal investigation to "proactively identify[] issues and facts that would likely be of interest to the government; making regular factual presentations to the government; sharing information that would not have been otherwise available to the government; and making such material available to the government on an expedited basis." Status Report, Ex. 5 (DPA), ECF 259-5 at PageID 6002.  FirstEnergy's deception of PwC is thus more analogous to a crime-fraud scenario than either of the cases FirstEnergy cites. *See, e.g.*, *In re Antitrust Grand Jury*, 805 F.2d 155, 164 (6th Cir. 1986) ("courts have applied an exception [to privilege and work-product protection] when the otherwise protected communications or materials are made in furtherance of a crime or fraud").  There is no legal or policy justification for protecting an internal investigation that was so clearly used to deceive an outside auditor.

These circumstances make for a far more compelling waiver argument than in *King Pharmaceuticals*, where the Court determined the company's disclosure of information to its outside auditor (PwC) was not protected by the work-product doctrine, as "King furnished documents to PWC ostensibly to enable PWC to prepare accurate audit reports and financial statements which in turn would have been publicly disseminated."  2005 WL 8142328, at *3.

Here, just as in *King Pharmaceuticals* and *First Horizon*, "any information provided to [PwC] cannot have been furnished 'in anticipation of litigation' but was furnished to [PwC] in its capacity as an outside auditor."  *First Horizon*, 2016 WL 5867268, at *10.  Equally important, this was not a superficial or summary-level disclosure, but rather a virtually complete reveal, spanning the most critical aspects of any investigation, from "detailed interview debriefs," to regular "[u]pdates on findings and conclusions," to a nearly complete provision of relevant documents (withholding only eight), to the ultimate (albeit later diametrically contradicted) conclusion. *See* Ex. 1 at -003-05, -017-23.  The fact that FirstEnergy is asserting that large swaths of information it shared with PwC are privileged from production to Movants (*see id.* (extensively redacted for "FE

- 37 -

Privilege")) confirms that FirstEnergy made precisely the kinds of extensive disclosures to an independent auditor that eviscerate any possible protections regarding the internal investigation, and also demonstrates the unreasonableness of FirstEnergy's privilege assertions regarding PwC's materials.  At the same time, the fact that FirstEnergy withheld information (albeit only eight documents (perhaps because they would have alerted PwC to a crime FirstEnergy would later confess)) from PwC further confirms that PwC was not assisting in the rendering of any legal advice nor helping FirstEnergy prepare for any litigation.

### 3. FirstEnergy's Extensive Internal Investigation Disclosures to Its Adversaries in This Litigation (and to the Government) Waived Any Protections

Although the quantity of FirstEnergy's work-product disclosures to PwC exceed those in this litigation, the quality of the disclosures here is unprecedented for maintaining any protections. FirstEnergy even used the phrase "[f]or example" when revealing such information: "For example, Jones authorized a $980,000 payment in January 2015 for Strategies for Results, Tony George's consulting entity, without knowing what Tony George did and without any supporting documentation."  Ex. 5 at -457.  Revealing "examples" of supposedly privileged information is the antithesis of treating such information "'like jewels – if not crown jewels.'"  *LifeBio*, 2023 WL 3258586, at *3.  It is simply not a luxury one can enjoy and keep the privilege.  *See also Columbia*, 293 F.3d at 302 ("we reject the concept of selective waiver, in any of its various forms"); *United States v. Paulus*, 2021 WL 4494607, at *4 (E.D. Ky. Sept. 30, 2021) ("[third party's] partial disclosure of the consultant's findings waives any privilege to those findings and necessitates disclosure of the balance of the findings"), *mandamus denied sub nom. In re King's Daughters Health Sys., Inc.*, 31 F.4th 520 (6th Cir. 2022).

The *OM* court's analysis regarding the scope of waiver is instructive here.  In *OM*, the investigation at issue was an audit committee investigation for presentation to the defendant

- 38 -

company's board of directors. 226 F.R.D. at 584. Outside accountants were *part* of the investigation team, not the recipients of the investigation for business purposes. Moreover, unlike here, the *OM* defendants did not use the investigative materials to attempt to exonerate themselves and "did not disclose snips and quotes of employee interviews from the underlying documents to a third party in order to obtain an unqualified audit opinion." *Id.* at 593. In fact, the *OM* court determined the audit committee's "substantial, intentional, and deliberate" disclosure "to OMG's Board" was particularly salient. *Id.* The court further explained that "[t]here is no reason Defendants, who voluntarily disclosed substantial information about an investigation *that led to a public announcement* that OMG anticipated a restatement of earnings, should now be able to withhold information that would allow Plaintiff to review the whole picture." *Id.* Accordingly, the court held that the defendants had broadly waived all protections to all underlying information related to the audit committee's presentation to the board of directors (though not information generated after the presentation).

FirstEnergy's disclosures and use of the investigation materials go well beyond those in *OM*. Unlike the single PowerPoint presentation to the board of directors in *OM*, FirstEnergy has disclosed to its adversaries, and used, in this litigation its attorneys' mental impressions and opinions concerning the most important aspects of its internal investigation:

- **Whether or not any laws were violated**. FirstEnergy disclosed to Movants its attorneys' impressions and opinions regarding whether Jones and others had violated any laws: "We understand that PwC may rely on the representations of Mr. Chuck Jones, Mr. Jon Taylor, Jason Liskowski [sic], and Steven Strah and we know of no reason that such reliance would be inappropriate and that *there has been no evidence of violations of laws by any of these individuals as it relates to this investigation*." Ex. 1 at -023.

- **Whether someone conspired with someone else and if so, with whom**. During FirstEnergy's initial Rule 30(b)(6) deposition, its representative admitted that the only preparation for her deposition consisted of meetings with lawyers and scripts provided by lawyers. Compel Supp. Mem., Ex. 22, ECF 549-2 at PageID 11879-80 (69:21-70:11); *id.*, Ex. 23, ECF 549-2 at PageID 11885-86 (222:14-223:8). Among the information FirstEnergy's lawyers provided this witness *to share with Movants*

- 39 -

was that FirstEnergy had conspired with Jones and Dowling to commit honest services wire fraud. Compel Supp. Mem., Ex. 22, ECF 549-2 at PageID 11875-76 (54:18-55:7).

- **Whether interviewees were candid**. FirstEnergy disclosed to Movants its attorneys' impressions and opinions regarding which individuals lacked candor during the investigation process. Ex. 5 at -464-65 ████████████████

- **Whether interviewees "reasonably ensur[ed] that information was produced in connection with the [then-]ongoing investigation**." FirstEnergy disclosed to Movants its attorneys' impressions and opinions regarding which individuals "failed to reasonably ensure that relevant information was produced in connection with the [then-]ongoing investigation." Ex. 5 at -468, -470, -474 ███████████████ ██████

- **Whether employees had failed to act when confronting misconduct**. FirstEnergy disclosed to Movants its attorneys' impressions and opinions regarding which individuals failed to act when confronting misconduct concerning FirstEnergy's illicit payments to Randazzo. Ex. 5 at -464-65 ████████████████

- **Whether employees had "participated in the use of company devices and systems for inappropriate messaging**." FirstEnergy disclosed to Movants its attorneys' impressions and opinions regarding which individuals had "participated in the use of company devices and systems for inappropriate messaging." Ex. 5 at -471, -473 ██████████

- **What someone knew or did not know**. FirstEnergy disclosed to Movants its attorneys' impressions and opinions regarding what others knew or did not know. *Id.* at -457, -468, -474 (what ██████████████████████████ knew).

- **What was discovered during the internal investigations, and the Board's response**. FirstEnergy disclosed to Movants its attorneys' impressions and opinions that "[t]he Board was not previously aware of Jones's conduct," "[t]he discovery was made during the course of the Company's internal review related to the government investigations," and "[a]s soon as the Board became aware of the violations of certain FirstEnergy policies and its code of conduct, they took decisive action." Ex. 5 at -459.

- **Whether there is any evidence of someone's knowledge**. FirstEnergy disclosed to Movants its attorneys' impressions and opinions regarding the lack of evidence that any of its current officers or outside directors knew of payments in exchange for official action or any impropriety relating to HB 6, political contributions, or any Randazzo payment. Compel Reply, Ex. 19, ECF 529-2 at PageID 11608.

Moreover, unlike in *OM*, where there was no affirmative use of information attributable to the investigation to exonerate anyone, FirstEnergy repeatedly used such information to attempt to

exonerate its Board and select employees – and thus itself as to any vicarious liability related to such individuals. And whereas, in *OM*, the defendant company "did not disclose snips and quotes of employee interviews from the underlying documents to a third party," that is exactly what FirstEnergy did – both with PwC (which received far more than snips and quotes) and with Moving Parties. *OM*, 226 F.R.D. at 583. All the foregoing opinions and impressions support FirstEnergy's defense that it acted in good faith (experienced lawyers investigated and found no evidence of unlawfulness). Likewise, FirstEnergy's lawyers scripted disclosures from its internal investigation to cast the Company and its Board in a better light, stating:

- "The Board was not previously aware of Jones's [or Dowling's] conduct. The discovery was made during the course of the Company's internal review related to the government investigations. As soon as the Board became aware of the violations of certain FirstEnergy policies and its code of conduct, they took decisive action." Ex. 5 at -459, -463.

- "There has been no suggestion by the Company that [defendant] Reffner [or Yeboah-Amankwah] was aware of the communications between Jones, Randazzo, or Dowling, including those that occurred when Randazzo was in his position as PUCO Chairman. Extent of knowledge was that Randazzo had been engaged as a consultant and a large payment had been authorized to him right before he became a public official." Ex. 5 at -464-65.

Naturally, FirstEnergy did this to support its defenses (including "good faith") (FirstEnergy's Answer, ECF 239 at PageID 5498) and to affect any possible proportionate liability determinations (*see* 15 U.S.C. §78u-4(f)(2)).

In the face of such comprehensive disclosures, FirstEnergy's citation to *E.E.O.C. v. Tex. Hydraulics, Inc.*, 246 F.R.D. 548 (E.D. Tenn. 2007) is misplaced. The issue there was whether the EEOC waived **privilege** by issuing a dismissal and right-to-sue letter setting forth merely "that there was no cause of action because there was no adverse employment action" as to an earlier discrimination charge a complainant had filed and the EEOC declined to pursue. *Id.* at 556. There was no disclosure of internal legal advice or communications, but rather a routine required disclosure of the EEOC's conclusion that it would not be pursuing an earlier discrimination charge that was

- 41 -

completely distinct from a second charge that the EEOC was pursuing in its case against Texas Hydraulics after it fired the same employee, whose termination obviously amounted to an adverse employment action. *Id.* at 550.[10]  Here, FirstEnergy's undisputed extensive internal-investigation disclosures to PwC waived any possible privilege claims.  Likewise, the deposition scripts it provided its client on a wide range of sensitive topics were actual attorney-client communications so producing these actual communications and affirmatively using them waived any possible privilege claims.

Courts consistently find subject-matter waivers for disclosures far less extensive than FirstEnergy's disclosures here.  *See, e.g.*, *Zen Design Grp. Ltd. v. Scholastic, Inc.*, 327 F.R.D. 155, 165 (E.D. Mich. 2018), *reconsideration denied*, 2019 WL 4891206 (E.D. Mich. Mar. 26, 2019). This past year, the court in *Anadarko Petroleum* found a complete waiver where: (1) the attorney-investigators and audit committee periodically updated the defendant's outside auditor on the investigation, which is minimal compared to FirstEnergy's virtually complete disclosure to PwC; (2) the audit committee produced documents to the SEC in response to requests, whereas FirstEnergy produced to the government documents and numerous electronic devices housing gigabytes of data; (3) the attorney-investigators presented their findings to the SEC, whereas FirstEnergy has disclosed its investigative findings to Movants, the DOJ, and the public; and (4) Anadarko provided JPMorgan with information regarding the investigation prior to a stock offering, whereas FirstEnergy provided

---

[10]     FirstEnergy's only other citation, *In re Fluor Intercontinental, Inc.*, 803 F. App'x 697, 702 (4th Cir. 2020), is similarly misplaced.  This out-of-circuit, unpublished decision was limited to a privilege dispute and also did ***not*** involve any disclosure of ***protected communications***.  More importantly, since FirstEnergy chose to cite *Fluor*, there the Fourth Circuit reiterated its position that statements in which a witness represents that his answers are based on the advice of a lawyer "waive[] attorney-client privilege because he [is] 'clearly stat[ing] to a third party that his attorney had advised him to answer "no"' to the relevant question, thereby disclosing the content of the underlying attorney-client communication itself." *Id.* (quoting *In re Grand Jury Subpoena*, 341 F.3d 331, 337 (4th Cir. 2003)).  Here, FirstEnergy provided four days of testimony related to its internal investigation through which it explicitly attributed its answers to its attorneys.  Since FirstEnergy wants the Court to apply *Fluor*, that is a clear waiver.

PwC with information about its investigation to enable the Company to make arguably the most important SEC filing in its history to that point.  *In re Anadarko Petroleum Corp. Sec. Litig.*, 2023 WL 2733401, at *1-*2, *5 (S.D. Tex. Mar. 31, 2023), *reconsideration denied*, 2023 WL 4308750 (S.D. Tex. June 30, 2023).  Just like in *Anadarko*, "[f]airness thus dictates that waiver extend to the entire subject matter of the . . . investigation."  *Id.* at *5.

### D. Having Wielded the Internal Investigation as a Sword, FirstEnergy Cannot Now Shield It from Discovery

"'[L]itigants cannot hide behind the privilege if they are relying on privileged communications to make their case' or, more simply, cannot use the privilege as 'a shield and a sword.'"  *In re United Shore Fin. Servs., LLC*, 2018 WL 2283893, at *2 (6th Cir. Jan. 3, 2018) (quoting *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005)).  "When a party reveals privileged communications or otherwise waives the protections of the attorney-client privilege, 'that party waives the privilege as to all communications on the same subject matter.'"  *Mooney ex rel. Mooney v. Wallace*, 2006 WL 8434638, at *8 (W.D. Tenn. July 12, 2006) (quoting *United States v. Skeddle*, 989 F. Supp. 905, 908 (N.D. Ohio 1997)).  "The privilege may be implicitly waived when the holder of the privilege asserts a claim that requires examination of protected communications."  *In re Grand Jury Subpoena, 93-2-1-01*, 9 F.3d 107 (Table), 1993 WL 453395, at *2 (6th Cir. 1993) (Guy, J., concurring) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)).  That is precisely what FirstEnergy is doing in these proceedings.

In particular, FirstEnergy offered the following unsolicited self-exculpatory testimony during its second Rule 30(b)(6) deposition:

> [THE WITNESS:]  FirstEnergy is aware of no evidence suggesting that any outside director knew of payments or contributions in exchange for specific official action for FirstEnergy's benefit and . . . FirstEnergy is aware of no evidence suggesting that any current officer or Mr. Strah knew of payments or contributions in exchange for specific official action for FirstEnergy's benefit.

- 43 -

Ex. 10 at 32:15-23. FirstEnergy admitted that its lawyers had scripted this testimony along with another exculpatory claim ("[a]s soon as the Board became aware of the violations of certain FirstEnergy policies and its code of conduct, they took decisive action") in one of its Rule 30(b)(6) scripts. Ex. 5 at -459, -463.

The court encountered a very similar situation in *Crestwood Farm*. There, in a breach of contract action, the plaintiff elicited testimony from its transactional attorney that no one had discussed an exception at issue prior to the case, so the "implication [wa]s that . . . the Agreement did not contemplate such an exception." *Crestwood Farm Bloodstock LLC v. Everest Stables Inc.*, 2011 WL 13156795, at *3 (E.D. Ky. Jan. 25, 2011). Since the attorney had obtained his information only from his client, the court ruled that the plaintiff could not create such an implication "without opening discovery on other communications to and from [the attorney] on the [same issue]," as the situation "present[ed] the classic sword and shield privilege metaphor." *Id.* (citing *Lott*, 424 F.3d at 454).

Here, the roles are reversed but the analysis and necessary consequence are identical. In fact, FirstEnergy's testimony went further than the mere "implication" in *Crestwood Farm*. Since FirstEnergy's lawyers comprised FirstEnergy's only source of information about purported evidence (or lack thereof) of its directors' and officers' knowledge, FirstEnergy cannot claim it is aware of no such evidence "without opening discovery on other communications to and from [the attorneys] on the [issue]." *Crestwood Farm*, 2011 WL 13156795, at *3. Accordingly, this is another basis for finding waiver regarding all information related to FirstEnergy's internal investigation.

### E. Attorney-Client Privilege Does Not Extend to Facts a Witness Learned Through Communications with Counsel

Last, we have the issue that started this whole conflict: FirstEnergy's obstruction of discovery by improperly instructing witnesses not to answer any questions about the factual bases for their own actions, decisions, or opinions if the witness happened to have learned those facts from

a lawyer – even though FirstEnergy has repeatedly disclosed those facts themselves.  The law is clear:

> "[W]hile the privilege applies when a questioner directly asks a deponent about discussions with counsel, the 'attorney-client privilege simply does not extend to facts known to a party that are central to that party's claims, even if such facts came to be known through communications with counsel who had obtained knowledge of those facts through an investigation into the underlying dispute.'"

*Basulto v. Netflix, Inc.*, 2023 WL 3197655, at *14 (S.D. Fla. May 2, 2023).  *Basulto*, issued in 2023, includes a compellingly thorough analysis of this issue, citing numerous other decisions.[11]

 *Basulto* was largely based on the seminal decision in *Protective National Institute Company of Omaha v. Commonwealth Insurance Company*, 137 F.R.D. 267 (D. Neb. 1989).  *Basulto*, 2023 WL 3197655, at *12 (quoting *Protective National* holding that "counsel was 'plainly wrong' when he took the position that the designee could not testify as to facts which had been communicated to her by Commonwealth's lawyers because the communications were supposedly protected by the attorney-client privilege").  Courts within the Sixth Circuit have also embraced its sound reasoning. *See, e.g.*, *Smith v. Gen. Mills, Inc.*, 2006 WL 7276959, at *3 (S.D. Ohio Apr. 13, 2006) ("*Protective Nat'l Ins. Co. v. Commonwealth Ins. Co.*, *supra*, is particularly persuasive."); *United States v. BAE Sys. Tactical Vehicle Sys., LP*, 2017 WL 1457493, at *5 (E.D. Mich. Apr. 25, 2017) (citing *Protective National* for "the well-established rule 'that [c]lients cannot refuse to disclose facts which

---

[11] *See, e.g.*, *Basulto*, 2023 WL 3197655, at *12 (*Hickman v. Taylor*, 329 U.S. 495, 508 (1947) and 8 J. Wigmore, Wigmore on Evidence §2317 (McNaughton rev. 1961) cited for principle that "[c]lients cannot refuse to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent sources"); *see also B.C.F. Oil Refin., Inc. v. Consol. Edison Co. of NY, Inc.*, 168 F.R.D. 161, 165 (S.D.N.Y. 1996); *Wiand v. Wells Fargo Bank, N.A.*, 2013 WL 6170616, at *1 (M.D. Fla. Nov. 22, 2013) (compelling disclosure over deponent's objection that he had no independent knowledge of the underlying facts outside of those learned through counsel); *Hernandez v. Motorola Mobility, Inc.*, 2013 WL 4773263, at *2 (S.D. Fla. Sept. 4, 2013) ("'A party's knowledge of facts, from whatever source, is not privileged.'"); *Kan. Wastewater, Inc. v. Alliant Techsystems, Inc.*, 217 F.R.D. 525, 528 (D. Kan. 2003) ("It is well established that a party may not withhold relevant facts from disclosure simply because they were communicated to, or learned from, the party's attorney.").

their attorneys conveyed to them and which the attorneys obtained from independent sources'") (alteration in original).[12]

FirstEnergy cannot have it both ways – facts and findings are either protected or they are not. If not, then FirstEnergy must produce all relevant facts and findings provided by its attorneys, and allow witnesses to testify about them (*e.g.*, every fact supporting FirstEnergy's DPA, every witness who seemed unreliable, every document deemed incriminating). If facts and findings are protected, then FirstEnergy waived any protections for its internal investigation by disclosing so many facts and findings regarding who knew what when, who lacked support for their actions, who was candid, and who took decisive action and when.

## V.     CONCLUSION

Movants respectfully request that the Court overrule FirstEnergy's Objections.

DATED:  January 3, 2024                    Respectfully submitted,

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)

s/ Joseph F. Murray
JOSEPH F. MURRAY

1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com

Liaison Counsel

---

[12]      *See also Turner v. Al[l]state Ins. Co.*, 2017 WL 2274331, at *2 (M.D. Ala. May 24, 2017) ("The issue is simply whether a question about what he considered is protected. It is not. It is not even if he had learned the fact from a lawyer."); *Thurmond v. Compaq Comput. Corp.*, 198 F.R.D. 475, 483 (E.D. Tex. 2000) (same).

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
JASON A. FORGE (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
jforge@rgrdlaw.com

Class Counsel

4853-6467-2922.v1

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed electronically on January 3, 2024.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Joseph F. Murray
Joseph F. Murray (0063373)
