UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE FIRSTENERCY CORP.               )
SECURITIES LITIGATION                 )
                                      )        CASE NO:  2:20-cv-3785
                                      )
THIS DOCUMENT RELATES TO:             )
                                      )
  ALL ACTIONS.                        )
_____ )


TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
DECEMBER 12, 2025; 9:30 A.M.
COLUMBUS, OHIO


APPEARANCES:

FOR THE PLAINTIFFS:
    Robbins Geller Rudman & Dowd LLP
    By:  Jason A. Forge, Esq.
         W. Mark Conover, Esq.
    655 West Broadway, Suite 1900
    San Diego, California  92101

    Murray Murphy Moul Basil LLP
    By:  Joseph F. Murray, Esq.
    1114 Dublin Road
    Columbus, Ohio  43215


SHAWNA J. EVANS,  FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD, COLUMBUS, OHIO  43215
614-719-3316

APPEARANCES CONTINUED:

FOR THE DEFENDANT FIRSTENERGY CORP.:
    Sullivan & Cromwell LLP
    By:  Robert J. Giuffra, Jr., Esq.
        Hilary M. Williams, Esq.
        Sheeva L. Nesva, Esq.
    125 Broad Street
    New York, New York  10004

    Dickie McCamey & Chilcote, P.C.
    By:  Paul J. Schumacher, Jr., Esq.
    600 Superior Avenue East, Suite 2330
    Cleveland, Ohio  44114

    Jones Day
    By:  Marjorie P. Duffy, Esq.
        M. Ryan Harmanis, Esq.
    325 John H. McConnell Boulevard, Suite 600
    Columbus, Ohio  43215

    Jones Day
    By:  Geoffrey J. Ritts, Esq.
    901 Lakeside Avenue
    Cleveland, Ohio  44114

FOR THE DEFENDANT CHARLES E. JONES:
    Baker & Hostetler LLP
    By:  Albert G. Lin, Esq.
    200 Civic Center Drive, Suite 1200
    Columbus, Ohio  43215

FOR THE DEFENDANT MICHAEL DOWLING:
    Tucker Ellis LLP
    By:  John A. Favret, III, Esq.
    950 Main Avenue, Suite 1100
    Cleveland, Ohio  44113

FOR THE DEFENDANT DENNIS CHACK:
    Morgan Lewis & Bockius LLP
    By:  Michael L. Kichline, Esq.
    2222 Market Street
    Philadelphia, Pennsylvania  19103

APPEARANCES CONTINUED:

FOR THE DEFENDANT ROBERT REFFNER:
     McDermott, Will & Schulte, LLP
      By:  Steven S. Scholes, Esq.
           Paul M.G. Helms, Esq.
      444 West Lake Street, Suite 4000
      Chicago, Illinois  60606

       Roetzel & Andress, LPA
       By:  John C. Fairweather, Esq.
       222 South Main Street, Suite 400
       Akron, Ohio  44308

FOR THE DEFENDANT JOHN JUDGE:
     Vorys Sater Seymour & Pease LLP
     By:  Emily J. Taft, Esq.
     52 East Gay Street
     Columbus, Ohio  43215

     Vorys Sater Seymour & Pease LLP
     By:  Andrew P. Guran, Esq.
     50 South Main Street, Suite 1200
     Akron, Ohio  44308

FOR THE DEFENDANT DONALD SCHNEIDER:
     Santen & Hughes
     By:  Brian P. O'Connor, Esq.
     600 Vine Street, Suite 2700
     Cincinnati, Ohio  45202

     Orrick, Herrington & Sutcliffe LLP
     By:  Preston Burton, Esq.
          Adam B. Miller, Esq.
     2100 Pennsylvania Avenue, NW
     Washington, D.C.  20037

APPEARANCES CONTINUED:

FOR THE DEFENDANTS BARCLAYS CAPITAL INC, *et al*.:
     Porter, Wright, Morris & Arthur LLP
     By: David S. Bloomfield, Jr., Esq.
     41 South High Street, Suite 2900
     Columbus, Ohio 43215

     Davis Polk & Wardwell LLP
     By: Eric M. Kim, Esq.
         Joshua N. Shinbrot, Esq.
     450 Lexington Avenue
     New York, New York 10017

- - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

SHAWNA J. EVANS, FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD, COLUMBUS, OHIO 43215
614-719-3316

5

FRIDAY MORNING SESSION

DECEMBER 12, 2025

- - -

THE COURT:  Good morning.

Ms. Hernandez, would you please call the case.

THE DEPUTY CLERK:  Case No. 2:20c-v-3785, et al., in re:  FirstEnergy Corp. Securities Litigation.

THE COURT:  Would counsel please identify themselves for the record beginning with counsel for the plaintiffs.

MR. FORGE:  Good morning, Your Honor.  Jason Forge for the plaintiffs.

THE COURT:  Good morning, Mr. Forge.  And counsel for the defense.

MR. GIUFFRA:  Good morning, Your Honor.  Robert Giuffra with Sullivan and Cromwell for the FirstEnergy defendant.

THE COURT:  Good morning, Mr. Giuffra.  Please be seated.

This matter comes before this Court following a limited remand by the Sixth Circuit.  As you all know so well by now, on August 13th, the Sixth Circuit vacated class certification to the extent that this Court previously applied the *Affiliated Ute* presumption of reliance; and, secondly, reversed class certification as to plaintiffs' Exchange Act claims and remanded for rigorous analysis of plaintiffs' proposed damages

6

methodology under *Comcast*. This Court remains tasked with, quote, "further consideration," quotes closed, of class certification under the standard set forth in the Sixth Circuit's FirstEnergy opinion.

Plaintiffs and defendant, FirstEnergy, submitted post-remand position statements on September 4th. And, on October 14th, this Court ordered the parties to appear for a hearing on November 6th to address two issues. The first was class certification under the *Basic* presumption of reliance, the second was whether, under *Comcast*, plaintiffs have set forth a methodology for calculating damages on a classwide basis that is susceptible of measurement across the class and satisfies the predominance requirement of 23(b)(3).

At the November 6th hearing, FirstEnergy requested an evidentiary hearing to hear live testimony of one of plaintiffs' expert witnesses, Mr. W. Scott Dalrymple, and plaintiffs registered no objection to that request.

In light of FirstEnergy's request, this Court held a telephonic status conference on November 13th to discuss holding the requested evidentiary hearing and to consider Mr. Dalrymple's damages methodology and calculations under its limited remand to aid in its application of a rigorous *Comcast* analysis.

This Court then ordered this hearing and noted that it would be -- I want counsel to hew closely to what I'm about to

say -- limited to consideration of whether Mr. Dalrymple has a methodology for calculating damages on a classwide basis that is susceptible of management across the entire class and satisfies the predominance requirement of Rule 23(b)(3) for plaintiffs' Exchange Act claims.

So, with lawyers of this level of sophistication and preeminent skill, that should be a godsend because you only have one thing to do.  It's simple and straightforward.  I am looking forward to your helping to educate the Court through this evidentiary hearing as to that single issue.

So now we are ready to proceed.  Mr. Forge, would you call your witness, please.

MR. FORGE:  Thank you, Your Honor.  Plaintiffs call W. Scott Dalrymple.

THE COURT:  Mr. Dalrymple, please come forward and be sworn.

(Witness sworn.)

THE COURT:  Mr. Dalrymple, please bend the microphone toward you and speak clearly into it.

Mr. Forge, you may proceed when you are ready.

MR. FORGE:  Thank you, Your Honor.

8

- - -

W. SCOTT DALRYMPLE

Called as a witness on behalf of the Plaintiffs, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FORGE:

Q. Good morning, Mr. Dalrymple.

A. Good morning.

Q. Mr. Dalrymple, your qualifications are not in dispute here, but just by way of introduction, could you please tell the Court what your post-high school education consisted of?

A. Certainly. I have an undergraduate degree in finance in the Business Honors Program from the University of Texas at Austin. I also have a graduate degree, a Master's of Science in Economics from the London School of Economics.

In addition, I am a CFA charter holder. CFA stands for Chartered Financial Analyst. It's a widely recognized professional designation in the areas of valuation securities analysis and portfolio management.

Q. Approximately how many years of experience do you have conducting financial analyses?

A. Well, I began working in financial advisory services for Pricewaterhouse in 1997. So I'm coming up on close to 30 years, noting that a couple of those years were spent pursuing a graduate degree at the London School of Economics.

9

Q. Approximately how many financial valuations have you performed throughout your career?

A. Well, it's difficult to put a number on that. Virtually, all of my work in some form or fashion comes back to valuation, whether it's the valuation of a company, an asset, a security interest or just simply information. It would have to be in the hundreds.

Q. Mr. Dalrymple, did Robbins Geller retain you as an expert in this case several years ago?

A. Yes.

Q. As part of that engagement, did you write and produce two expert reports?

A. I did, yes.

Q. If you could, please, there is a binder in front of you.

MR. FORGE: Your Honor, I believe the Court has the same binder.

THE COURT: Yes.

BY MR. FORGE:

Q. If you could, please, look at the document marked P1, and let me know if you recognize that exhibit.

A. Yes. This appears to be my expert report dated June 6th, 2022.

Q. Can you look at P2 and tell me if you recognize that document?

A. Yes. This appears to be my expert report dated

September 28th, 2022.

MR. FORGE: Your Honor, do you prefer for counsel to go through the formality of moving these into evidence? These documents are already in the court record.

MR. GIUFFRA: There's no objection, Your Honor.

THE COURT: Let's just have them admitted into evidence per stipulation of the parties.

MR. FORGE: Thank you, Your Honor. Thank you, Bob.

BY MR. FORGE:

Q. Mr. Dalrymple, as part of your engagement, did you determine whether FirstEnergy's common stock traded in an efficient market throughout the class period?

A. Yes, I did.

Q. If you could, please, turn to page 9 of P1 and tell me is that where your market efficiency analysis begins?

A. Yes, it is.

Q. If you could, flip through all the way to page 25 and tell me if that's where your market efficiency analysis concludes in your report.

A. That's correct. I reach that conclusion on page 25.

Q. What was your conclusion?

A. My conclusion was that shares of FirstEnergy traded in a market that was semi-strong form efficient throughout the class period.

Q. What does semi-strong efficiency mean?

11

A. When I refer to an efficient market, I refer specifically to the semi-strong form, which is widely referred to as an efficient market. In a semi-strong form efficient market, all publicly available information is reflected in the share price at any given time.

Q. What would be the difference between a semi-strong efficient market and a strong efficient market?

A. Let me put that into context. In a strong form efficient market, that would mean that all information is reflected in the share price all the time including private information; so information that is not known to the public. In U.S. markets and most western markets where there are laws against insider trading, the semi-strong form of market efficiency is what we typically would see for a stock like FirstEnergy that trades on the New York Stock Exchange.

Q. So, if I refer to as an efficient market this morning, can we agree that's referring to the top of the food chain in the United States. It's -- is an efficient market?

A. That's correct, yes.

THE COURT: Mr. Dalrymple, then, if the gold standard, if you will, is a strong efficient market and the bottom would be an inefficient market, would semi-strong mean that you're kind of right at the median on a continuum?

THE WITNESS: Your Honor, I would not characterize the strong form as the gold standard, so to speak. It's more of a

theoretical.

For instance, we do not see, in modern U.S. markets, the impact of nonpublic information because it's generally against the law to make trades on that.  So that would not be expected to affect the price.  At the bottom of the food chain, so to speak, would be a market that is inefficient in which the price cannot be inferred to reflect all information.

An intermediate step in there is called the weak form of market efficiency.

THE COURT:  The weak?

THE WITNESS:  The weak form.  So, in order for a market to be semi-strong form efficient in which all publicly available information is reflected, it also must be weak form efficient.

A weak form efficient market simply means that all previous return patterns, all previous price patterns, are reflected in the stock price.  So to the extent -- obviously, those are also publicly available information.  It's part of that set.  So any company that is semi-strong form efficient will also be weak form efficient.

THE COURT:  Where does semi-strong fit on the continuum between this theoretical strong market and -- or efficient market -- ultimately, efficient, maximally efficient market -- and an inefficient market?  Where is semi-strong located on that continuum?

THE WITNESS: On that continuum we have strong, semi-strong, weak, and then inefficient.

THE COURT: Semi-strong is not in the middle. It's more maybe three-quarters of a strong maximally efficient market?

THE WITNESS: That's correct. But, for practical purposes, we -- at least in modern U.S. markets, we observe semi-strong form as as efficient as any market is.

THE COURT: So semi-strong, in practical terms, is about as good as it's going to get because strong markets don't exist in nature, only in theory?

THE WITNESS: That's generally correct, yes.

THE COURT: Thank you. Please continue.

BY MR. FORGE:

Q. To follow up on Judge Marbley's question, Mr. Dalrymple, in terms of fairness to market participants, is a semi-strong efficient market the gold standard?

A. I'm sorry. Did you say in terms of --

Q. In terms of fairness to market participants.

A. Well, in terms of fairness, what we can say about the semi-strong form efficient market is that the price is reflective of all of publicly available information. So if we -- if you think of that as setting a level playing field, so to speak, perhaps that answers your question.

Any market participant that's participating in the

14

market is subject to a price that reflects all publicly available information.

Q.   In other words, if somebody is trading in the United States in a semi-strong efficient market versus somebody trading in a market in India, for example, that doesn't have prohibitions on insider trading, which is the more level playing field: the semi-strong or the strong in India?

A.   Well, in that example, the semi-strong form efficient market is the more level playing field because it ensures that the price reflects the same set of information across the board.

THE COURT:  And available to everyone?

THE WITNESS:  That's correct.

THE COURT:  Because the Indian market has participants who have access to insider trading that other participants do not; is that right?

THE WITNESS:  That's right, Your Honor.

BY MR. FORGE:

Q.   Mr. Dalrymple, did the defendant submit an expert report in response to your report?

A.   Yes, they did.

MR. GIUFFRA:  Your Honor, I just wanted to raise an objection.  I think that exceeds the scope, if he's going to start asking about our expert reports as opposed to his own expert report.

THE COURT: I'm going to hold that objection in abeyance because the only question pending is whether there was such a report. If he gets into the substance of that report or makes an apples-to-apples comparison, then you may renew your objection.

MR. GIUFFRA: My concern is our expert is not here today.

THE COURT: I understand.

BY MR. FORGE:

Q. Was that the report of Dr. Jennifer Marietta-Westberg?

A. Yes, that's the report.

Q. Did Dr. Westberg's report dispute in any way your conclusion that FirstEnergy's common stock traded in an efficient market throughout the class period?

A. No, that report did not.

Q. What does the fact that FirstEnergy's stock traded in an efficient market throughout the class period mean in terms of the share price reflecting all publicly available information whenever somebody is buying or selling it during the class period?

A. Well, it means that that price is reflective of all information regardless of even whether a particular investor knows that information. That information is reflected in the share price.

Q. So was it even possible during the class period for an

16

investor to purchase FirstEnergy common stock on the open market at a price that did not reflect all publicly available information?

A. No.

Q. I know this may sound like a silly question, but could the price of FirstEnergy stock reflect concealed information during the class period?

A. Well, no.

MR. GIUFFRA: Objection, Your Honor. I don't think that's in his expert report at all, as far as I can remember.

THE COURT: Overruled. You may answer.

THE WITNESS: Well, no. To the extent that the information is concealed, it is not publicly known and, therefore, would not be reflected in the share price.

BY MR. FORGE:

Q. Now, as part of your market efficiency analysis, did you set up an event study?

A. Yes.

Q. If you could, please, turn to page 17 of P1, and tell the Court whether that is the page in which your event study is described, at least the beginning of that description.

A. Yes. It looks like paragraph 69 is where my discussion of the event study begins.

Q. Does that event study description run through paragraph 82 of page 20?

17

A.   Yes.   That includes the event study and my conclusion from the event study.

Q.   Did Dr. Westberg dispute in any way the reliability of the event study as you described it in your report?

A.   No.

Q.   As far as you know, did the defendants dispute the reliability of this event study in any other way?

A.   Not to my knowledge.

Q.   So what is an event study in this context?

A.   Well, an event study is a widely used financial and economic tool that we use to study events.  Not to describe it with its definition, but it's fairly straightforward, conceptually.

In an efficient market, we can look to the share price reaction to information or events in order to measure how market participants respond to certain information.  And we do that by using an event study.  The event study itself is a regression analysis in which we measure the correlation of, say, FirstEnergy's returns in this case as they are explained by broad market movements like the S&P 500 and the Utilities Index.  We, for lack of a better word, remove the impact of the share price return that we would expect given how the market moves.  And from that we are left with a residual return on every day that we can use to measure the impact of information on the stock price.

18

Q.   Are you aware of any respected academic or other qualified expert who disputes the reliability of event studies as a method to assist in calculating share price inflation on a classwide basis?

A.   I'm not aware of any, no.

Q.   For the event study that you describe here that you used in this case, just walk us through -- what was the first step?

A.   Well, the first step of any event study is to identify the events.  Here we are -- we're testing whether FirstEnergy trades in a semi-strong form efficient market.  In order to do that, it is helpful to identify events where we have an ex-ante expectation that FirstEnergy would respond to this information in a way that is not explained by broad market movements.

Q.   Mr. Dalrymple, I'm going to stop you right there.  To the great disappointment of my Latin teacher, I stopped taking Latin after ninth grade.  What does ex-ante expectation mean?

A.   I'm sorry.  Yes.  Ex ante means beforehand.  So something that we can -- for instance, an earnings release in this case.  We know that, in general, stock prices tend to react strongly to new information about earnings.  So, even before we look at the earnings release, we have an ex-ante expectation that we would expect to see not necessarily a large return every time but a disproportionate number of large returns corresponding to those events.

Q.   Okay.  So, at paragraph 73 of P1 -- so that's at page

19

18 -- you list certain indices in there. At what point in constructing your event study is it important to identify the appropriate market and industry indices?

A.   That's another initial step we take based on the company that we're examining. So in this case FirstEnergy was part of the S&P 500. It's a broad market index. We would expect FirstEnergy's return to be correlated with board market S&P 500 returns. That would reflect changes in macro information like changes in interest rates or changes in economic growth expectations.

In addition, the -- we also identified an industry index. Here, we identify the S&P 500 Utility Sector Index. That is a sector of the S&P 500 that includes other utility companies. And similar to the broad market index, we would expect FirstEnergy's returns to be correlated with macroeconomic information that affects the utility sector in general. It might not affect FirstEnergy specifically, but to the extent that FirstEnergy is a utility, there is information contained in that index that we would expect to explain FirstEnergy's share price movements on a daily basis.

THE COURT: Just a second. Could I see counsel at sidebar?

(Thereupon, Court and Counsel conferred out of the hearing of open court and off the record.)

BY MR. FORGE:

Q.    Following up on the point you just made there about the utilities index, for example, when we're dealing with a situation now where AI is demanding a lot of electricity, is that the type of macro factor that you would expect to affect the entire industry as opposed to just one utility company?

A.    It certainly could, sure.  It could affect the broad market and then, specifically, the utility sector in a different way because of the demand for energy.

Q.    How do you actually, mechanically, get the pricing data for these indices and FirstEnergy?

A.    Well, we go to data services such as Bloomberg or S&P Capital IQ, and we essentially download the prices and the returns on every day over which we want to run the event study. So you can think of a spreadsheet with a row corresponding to every day and a column corresponding to FirstEnergy, a column corresponding to the market index and a column corresponding to the industry index.  We download all of those prices and returns, and we confirm that those returns, as an initial matter, are adjusted.

When I say that, what I mean is, when we look at FirstEnergy's returns, sometimes there's a change in the stock price that reflects an expected dividend payment.  So, in other words, if you hold the stock today, you're entitled to receive a dividend; but, if you hold it tomorrow, you're not.  That's a

21

predictable reduction in the share price tomorrow. So we ensure that the returns are adjusted to smooth out impacts like that.

We also take another step to remove the impact, if any, of the target company on the indices. As I explained earlier, FirstEnergy is a member of the S&P 500. So we remove FirstEnergy's return from the S&P 500's return. In practice, that's a very small adjustment because FirstEnergy is a very small part of the S&P 500 return; but, nevertheless, it's a standard step that one would take.

Q. Regarding the adjustment for dividends, I want to just clarify: FirstEnergy pays dividends on a regular basis; right?

A. Correct. I believe it's quarterly.

Q. So, when you said the person who buys tomorrow doesn't expect a dividend, you mean the dividend that was just paid. They would certainly expect the next dividend; right?

A. That's correct. I mean specifically the dividend that was just paid.

Q. These steps that you've described, these adjustments and taking FirstEnergy out of the indexes, are these standard steps for event studies, or is that something you do uniquely?

A. No, these are standard steps.

Q. Now, you also mention in paragraph 73c the use of indicator, or dummy, variables. What is that?

A. Well, an indicator, or dummy, variable is essentially a

22

one or a zero.  Remember, when we run an event study, we're running a regression, and we're running a regression over a certain window which we call an estimation window.  That is a timeframe over which we estimate the relationship between FirstEnergy and the market and industry indices.  We want to ensure that the daily returns over which we're making that measurement are representative of that relationship.

Sometimes, on certain days such as an earnings day or maybe a dividend announcement day, we have, again, an ex-ante expectation, an expectation that FirstEnergy's share price might move in a way that's not representative of its relationship with the market and industry index.  So, in order to account for that, we put in a binary variable within the regression.  That essentially removes the impact of the share price reaction on that day so that we have a cleaner estimation period.

Q.  Is that another standard step in performing an event study?

A.  Yes, it is.

Q.  So, once you've taken all of these steps we've described so far, concluding with the addition of the dummy variables, is your data set complete?

A.  Yes.  Once we've taken this step, then we are able to -- we have a complete data set, and we are able to actually implement the regression.

23

Q. Did you provide for production to the defendants back in 2022 this entire data set that you've been describing?

A. Yes.

Q. And what you provided provided defendants also with your dummy variables, the indices you used, the adjustments, everything you've described so far?

A. That's correct.

Q. So now we have our data set and we're going to run the event study. What happens next to actually run the event study?

A. Well, we have this data set, and we import it into a statistical package. We use a package called Stata. Stata is a widely used statistical program.

In Stata, we can run regression procedures that are used to estimate the event study. And so Stata essentially takes this information, this data set, and runs the regression procedures and then provides the output of the event study.

Q. What does it mean to run these regression procedures? What is Stata doing?

A. Well, in this particular application, what we have done is we have run an event study for every day of the class period. Ultimately, we're looking at how often we see an abnormal share price movement on each day of the class period. So, in order to do that from a practical standpoint, we will start by estimating the return on the -- on, say, the first day

24

of the class period.  That return is estimated based on the relationship between FirstEnergy and the market and industry indices.  The estimation window that we use for that in this application is the preceding year of returns, 252 trading days, approximately.

So, on the first day of the class period, we take the previous 252 trading days, and we regress FirstEnergy's share price returns on the returns to the market and industry indices and that provides, effectively, a correlation.  That correlation is used to predict FirstEnergy's return on the first day of the class period given what the market and industry index do.  From that we have a predicted return on day one of the class period.

Well, then we move to day two of the class period.  We retain that 252-day estimation window by moving it forward one day, by rolling it.  So we essentially include the first day of the class period, and then we drop one day at the back end. That procedure continues throughout the class period, and that is, in this application, how we estimate a predicted return on each day.

Q.   So, to use maybe a little more lay terms, does Stata basically look back 252 trading days to establish the relationship between FirstEnergy's stock price movement and the price movements of those two indices: the S&P 500 and the S&P 500 Utilities Index?

25

A.    That's correct.

Q.    When you say "predicted return," is that another way of saying that the expected return -- for example, if the S&P 500 goes up a half of a percent, Stata will look at that relationship over 252 days and give you an expected price movement for FirstEnergy, when all the information you have is what the S&P 500 did?

A.    Right; in addition to what the industry index did.  So the S&P 500 goes up half a percent, the industry index goes up 1 percent, and the regression model will predict that FirstEnergy would rise, say, .6 percent, .8 percent based on those movements.

Q.    And this prediction or expectation, is it -- to use Judge Marbley's term, is there a spectrum, or is it just a single number?

A.    Well, it is an expectation on each day.  So the model has a prediction, and that prediction is, for instance, .8 percent or .9 percent or negative .3 percent.  And that prediction is made on each day.

Q.    Does Stata express any sort of confidence level in the prediction?

A.    Well, just like any statistical package, that prediction or that expectation is made with sort of a confidence level.  In other words, you can think of, say, a prediction like .7 percent.  We can think of, say -- we can think of it as .7

percent plus or minus .3 percent.  And let's say that's a confidence band over which we're 90 or 95 percent sure that we expect the stock price to move.

Q.   So that confidence band or confidence interval would be the interval that Stata would tell us that you could be 90 percent confident that, if the price movement of FirstEnergy is only impacted by the industry, by the index, it would be within this plus-or-minus range.  Is that what you're saying?

A.   Yes.  I'd say that's fair.

Q.   Okay.  So how do you use this analysis to transition to measuring abnormal returns and damages?

A.   Well, bearing in mind that we now have a prediction on any day as to what we expect FirstEnergy to do, we can take FirstEnergy's actual return on a day and we can compare it to the prediction.

So, if the prediction is, say, .7 percent and we have -- and FirstEnergy's actual return is .8 percent, it's -- that's not a very large difference.  That's not that far outside what was predicted.  If, on the other hand, the prediction is .7 percent and FirstEnergy has a return of 7 percent or negative 10 percent, that's very far away from our predicted value.  We refer to the difference between the actual return and the predicted return, or the expected return, as the abnormal return.

The larger that return is, the further it is away from

the prediction, the more confidence we have that FirstEnergy's stock price movement on that day is not being explained by movements in the market and industry index.

Q. If it's not being explained by the market or industry index, is that another way of saying it's explained by some sort of company-specific value relevant information?

A. When we see a very large abnormal return, it is -- tends to be explained by company-specific value relevant information such as, for instance, an earnings release.

Q. So this full regression analysis that combines everything we've been discussing, did you produce all of that for production to the defendants back in 2022?

A. I did, yes. In addition to the data set, there's a code set that essentially processes the data and runs these regressions along with certain other alternative indices and alternative estimation windows. So, in other words, to show that the analysis is robust, we run it using a Dow Jones index, and we run the regression using a 126-day trailing estimation window, for instance, just to show robustness.

Q. Was all of that information also included in the data or production that you made for production to the defendants over three years ago?

A. Yes.

Q. Now, turning back to Exhibit P1 and looking at page 26, is that where you describe the measuring damages to

28

shareholders on a classwide basis?

A.   That's correct, yes.

Q.   Now, paragraph 105, you write, "Given that FirstEnergy's shares traded in a semi-strong form efficient market, the share price reactions to new, value-relevant information appropriately reflected the effects of such events on the share price."

Now, is that a conclusion that is building on what we've been discussing and what was described earlier in your report?

A.   Yes.  That conclusion follows from the analysis I've done in my report.

Q.   So you didn't repeat that full analysis here, but it is essentially cross-referencing that?

A.   That's correct.

Q.   Next you write, "Therefore, one can measure the impact of a curative event on FirstEnergy's share price using the abnormal returns, if any, following such disclosure using an event study approach."

Same question.  Is that sentence in reference to the event study approach -- although you didn't replicate everything in the pages before it, is that another cross-reference to the event study that you described earlier in your report?

A.   Yes, it is.

Q.   Is the event study methodology capable of reliably

calculating per share price inflation on a classwide basis in this case?

A.  Yes, it is.

Q.  If there was just one plaintiff in this case -- it wasn't even a class -- and that one plaintiff purchased a share of FirstEnergy stock on each day of the class period, would you use a different methodology or the same methodology?

A.  It would be the same methodology.

Q.  Why is that?

A.  Well, it's ultimately because shares in a publicly traded company are fungible; so what happens to one share happens to all shares.  They're all the same.  They all derive their value from an interest in the company such that there is no difference between holding share one, two, three or share A, B, C.  They're all the same instrument.

Q.  What about the reliability or accuracy of this methodology?  Are you making any compromises in the accuracy because we're doing this on a classwide basis versus an individual, or would it be the same analysis?

A.  It would be the same analysis.

Q.  Now, if you could, please, Mr. Dalrymple, pull out Exhibit P3.  That is the -- do you recognize that as the consolidated complaint in this case?

A.  Yes.

Q.  If you could, please, turn to page 51.  Starting with

paragraph 143 to paragraph 147 -- I'm not going to bore everyone and the Court by reading all of that.  It speaks for itself.  Just for the sake of our discussion, I'm going to represent to you that set forth in those paragraphs are allegations that, on July 21st and 22nd, there was news about a massive corruption investigation that was released and discussed on those days, and the media was able to connect the dots in the information that was released and identified FirstEnergy and its CEO, Chuck Jones, as being at the epicenter of this suspected corruption.

With that in mind, I want to turn to paragraph 148.  And the allegation there is that the price of FirstEnergy stock plummeted on this news.  And just to cut to the chase, in terms of the math, is the allegation in paragraph 148 that FirstEnergy's stock price dropped $14.17 on July 21st and 22nd?

A.    Yes.  I believe you did the math correctly.

Q.    Are you aware of any other new, value-relevant information that was company specific to FirstEnergy that could have contributed to that price drop other than the corruption-related information?

MR. GIUFFRA:  I just want to object.  This exceeds the scope of his expert report.

THE COURT:  Sidebar.

- - -

(The following proceeding was held at sidebar.)

MR. GIUFFRA: None of this is in his expert report. So I think it exceeds the scope of his expert report. If he wants to ask him to do simple math, I don't have a problem with that. When he starts asking questions about whether company-specific things and not company-specific things and market-specific things, none of that is in his expert report. A lot of the discussion you just heard was about a model for market efficiency. There is no a model for damages, as I'll establish on my examination.

THE COURT: I agree with the last statement you made. I assumed Mr. Forge was simply laying the context and the background for the ultimate question as to what the damages methodology is and why it is such that it's capable of being -- to ascertain damages across the class.

Go ahead, Mr. Forge.

MR. FORGE: I think he's already started to do that by saying that the event study that he refers to in his damages methodology section is the same event study he described earlier.

Of course, you're right. You're anticipating correctly we are going to walk through how the event study would work on a classwide basis to calculate the damages for these drops. To Mr. Giuffra's earlier point, he will be happy to hear that my

32

next, soon-to-be question is going to be whether Mr. Dalrymple conducted a full-blown analysis for confounding information. He's going to say no.

Right now I'm simply saying he is not aware of anything at this time, and their expert didn't identify anything.

THE COURT:  And just to be clear, whatever methodology he ultimately arrives at has to be a methodology that will allow us to calculate damages based on your theory of liability.  So there has to be that marriage before -- and I understand that you're just putting the pieces together now.

MR. FORGE:  That's exactly where I'm going to the point and the allegations of what caused these price drops, because that's our theory of liability.

MR. GIUFFRA:  None of this is in his expert report. He's making it up today and saying that the efficiency event study has some bearing on the damages event study.  It's all established.  They're different event studies.  He hasn't made any decisions.  That's what he testified to in his deposition, and now he's saying the drop was caused by the disclosures with respect to the HB6 investigation.  He hasn't done any work on that.  He's just speculating, and it's not before the Court.

THE COURT:  That speculation, A, will be exposed during your cross-examination; and, B, it goes to the -- it will go to the substance of this Court's analysis.

MR. GIUFFRA:  Correct.

33

THE COURT:  So, if it's speculative, then, of course, it's not going to have any persuasive impact.  And I'm going to give both a bit more latitude than I ordinarily would if we were before a jury.  He is an expert.  He knows what he's talking about.  You all are experts in what you do; so you know what you're talking about.  So some of the other guardrails that are typically in place for a jury trial don't need to be in place here because we do a good job of marshaling ourselves.

So, as this is prefatory, Mr. Giuffra, I'm going to overrule your objection at this time; but you may renew it.

MR. GIUFFRA:  Thank you, Your Honor.  I just wanted to make sure he doesn't go too far.

(The following proceeding was held in open court.)

THE COURT:  Please continue, Mr. Forge.

MR. FORGE:  Mr. Dalrymple, I apologize.  I don't know if we got an answer to the last question.

THE COURT:  You may have it read back.

MR. FORGE:  I can reask it.

BY MR. FORGE:

Q.   Are you aware of any other new, value-relevant information company specific to FirstEnergy that was released on July 21st or 22nd, 2020, that could have contributed to the price drop that day?

A.   I'm not aware of any.

Q.   Is the presence of, I would say, nonfraud-related or

noncurative-related information, value-relevant information, is that sometimes referred to as confounding information?

A.   Yes, sometimes it's referred to as confounding information.

Q.   So it confounds the analysis because you've got one set of information here, fraud-related information which is at the center of this case, and if you have other information that is also value relevant that's released at the same time, it confounds the analysis.  Is that -- in terms of determining what portion of a stock price drop is attributable to what information.  Is that a fair description?

A.   Well, I would say it confounds the share price decline on that day.  So, in other words, when we observe an abnormal return, if there is confounding information, it is also company specific and potentially value relevant, then there is a need to examine that additional information to remove the impact of that confounding information.

Q.   Now, I asked you if you were aware of any confounding information on these dates.  But, to be clear, did you conduct a full-blown analysis to scour for any potential confounding information?

A.   No, I have not conducted that analysis.

Q.   Did the defendants' expert identify any even alleged confounding information for July 21st and July 22nd?

MR. GIUFFRA:  Objection, Your Honor.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  No.  Dr. Marietta-Westberg did not identify any confounding information.

BY MR. FORGE:

Q.  Let's move on to the next alleged stock price drop.  And that's going to be set forth starting at page 62, paragraph 171.  If we look at paragraphs 171 through 174 and paragraph 176, I will represent to you, sir, without reading all of those paragraphs into the record, that the allegations there describe news that was released on October 29th and October 30th of 2020 regarding new corruption-related information at FirstEnergy, including the termination of its CEO defendant Charles Jones.

You can verify that, but I'm just going to ask you to accept my representation at this point -- and a downgrade in FirstEnergy's credit rating.  Okay?

A.  Okay.

Q.  Then, at paragraph 177, the allegation is that:  On this news, the price of FirstEnergy stock declined by 6.6 percent to close at $29.72 per share on October 30th as compared to $31.81 on October 29th, 2020.

Am I doing the math right that that's an alleged price drop of $2.09?

A.  Yes.  That's -- your math is correct.

Q.  Again, without having performed any sort of full-blown analysis for confounding information, as you sit here right

36

now, are you aware of any confounding information that would -- could have contributed to this price drop?

MR. GIUFFRA: Objection, Your Honor, same reason we discussed at sidebar.

THE COURT: For the same reasons given at that time, at this time I'm going to overrule the objection.

You may answer, Mr. Dalrymple.

THE WITNESS: I'm not aware of any, no.

BY MR. FORGE:

Q. Did the defendants' lone expert, Dr. Marietta-Westberg, did she identify any even alleged or potential confounding information for those dates and for this price drop?

A. No, she did not.

Q. Let's move on to the next alleged price drop at paragraph 186 in P2, page 65. The complaint alleges that, "On November 16th, 2020, media outlets reported that FBI agents had raided the home of PUCO chairman Randazzo."

I will represent to you that Mr. Randazzo's full name is Samuel Randazzo.

Then at paragraph 187, the complaint alleges, "On this news, the price of FirstEnergy stock declined by 3.4 percent to close at $28.50 per share on November 16th, 2020, as compared to $29.51 per share on November 13th, 2020."

Sir, am I doing the math right to come up with another alleged price drop of $1.01 on October -- I'm sorry, on

November 16th, 2020?

A. Yes. That math is correct.

Q. Same question. Without having performed a full-blown analysis, are you aware of any confounding information that could have contributed to this price drop?

MR. GIUFFRA: Same objection, Your Honor.

THE COURT: Overruled. You may answer.

THE WITNESS: I'm not aware of any, no.

BY MR. FORGE:

Q. Did defendants' lone expert, Dr. Marietta-Westberg, identify any even potential confounding information that could have contributed to this November 16th, 2020, price drop?

A. No, she did not.

Q. Let's move on to the next and I believe last alleged price drop, and we'll turn -- we'll stay on the same page, actually, starting at paragraph 189 and continuing through paragraph 199; so all the way through page 69.

And paragraph 199 I will represent to you that those paragraphs allege additional corruption-related news coming to the market on November 24th and -- I'm sorry, November 19th through the 24th of 2020, regarding more information related to corruption including more firings of officers, information about a $4 million payment that FirstEnergy would later admit was a bribe that it paid to Sam Randazzo, and a corruption-related credit downgrades.

38

And then this all culminates with paragraph 200, which alleges, "On this news, over the four-day trading period from November 19th, 2020, to November 24th, 2020, the price of FirstEnergy stock declined by 8.2 percent to close at $26.66 per share on November 24th, 2020, compared to $29.04 per share on November 19th, 2020."

Is my math right that that alleges another $2.38 price drop caused by the revelation of corruption-related information during the time period of November 19th through November 24th, 2020?

A.   Your math is right, yes.

Q.   Same question as before:  Without having done a complete analysis, as you sit here today, are you aware of any confounding information that could have contributed to that price drop?

MR. GIUFFRA:  Same objection, Your Honor.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  I'm not aware of any, no.

BY MR. FORGE:

Q.   Did the defendants' lone expert, Dr. Marietta-Westberg, did she identify any even potential confounding information that was released over those dates -- November 19th through November 24th, 2020 -- that could have contributed to that $2.38 price drop?

A.   She did not, no.

Q.    Now, without any confounding information, does that make the application of the event study methodology to measure damages simpler or more complicated?

A.    All else equal, it makes it simpler.

Q.    Why?

A.    Well, it's one less step to take.  Now, that said, there's still the step to confirm an absence of confounding information.  But, upon that confirmation, there is not a need to quantify the information.  So it is simpler.

Q.    If there were confounding information and, therefore, as you intimated, a need to quantify the confounding information, do the methodologies you describe in your report, would they enable you to do so?

A.    Yes, they would.

Q.    And we'll get to that in a minute.  Let's now stick with where we are and the price drops that we just went over that were alleged -- that are alleged in the consolidated complaint. How do you take the methodology described in your report and described in more detail today and use it for these price drops to measure damages on a classwide basis?

MR. GIUFFRA:  Objection, Your Honor, exceeds what's in his expert report.

THE COURT:  Well, it appears that the methodology itself was described in his report.

Mr. Dalrymple, was the application of the methodology to

40

these price drops set forth in any respect in your report which has been identified as Plaintiff's Exhibit 1?

THE WITNESS: Yes, Your Honor. If I could refer you to, I believe, beginning on page 26.

BY MR. FORGE:

Q. Are you referring to Exhibit P1?

A. Of Exhibit P1, yes.

THE COURT: All right. Be that the case, Mr. Giuffra, then that's going to be fertile ground for your cross. Your objection is overruled because Mr. Dalrymple has indicated that this is, in fact, in his report.

Please continue.

MR. FORGE: Your Honor, I do want to clarify for the record, I'm not suggesting that -- nor are we going to here -- that Mr. Dalrymple actually calculated the damages per share or that his report did so. We are simply walking through right now how it would do so and, therefore, the appropriateness of this methodology to calculate damages on a classwide basis.

BY MR. FORGE:

Q. If you could, Mr. Dalrymple, explain to us how this methodology that you've described to us today could be applied to these price drops to provide us with a calculation of damages on a classwide basis.

A. Well, as I explain in paragraph 106 of my report, I say: In cases where the abnormal return following a curative event

41

is statistically significant, it may be reasonable to conclude that that return was caused by the event in question provided the news became available and was disseminated to the market at that time.

What I mean by that is -- you know, we spoke earlier about the event study methodology and how that is used to measure the impact of company-specific information. And the curative events that you just stepped through, that information is all company specific. And given that we are able to apply the event study methodology, we can calculate an abnormal return that corresponds with those events to measure how investors reacted to that information at the time it was announced.

Q. So, for each of these alleged price drops where plaintiffs are alleging that they were caused by the release of this corruption-related information, you would have that price drop. But take us back to the way you described the functioning of the event study and tell us how you would go from that alleged price drop to actually coming up with a number that is attributable to that corruption-related information. In other words, how are you factoring out the effect of the industry or the market?

MR. GIUFFRA: That's a very long question. That's incomprehensible. But, in any event, it exceeds the scope of his expert report.

42

THE COURT:  Sidebar.

- - -

(The following proceeding was held at sidebar.)

THE COURT:  Read back the question.

(Thereupon, the last question was read by the court reporter.)

THE COURT:  I'm going to have you rephrase that question.  But while we're here, go ahead -- I think I understand the question.  I'm pretty sure that you understand the question.  Go ahead with your objection.

MR. GIUFFRA:  This is all completely new.  It's not in his expert report.  He was never subject to deposition questioning about this.  This is obviously the key issue in the case.  And the problem is what is going on here is they're taking an event study that was done for market efficiency and saying, well, I might do something like this for damages.  As I'll establish on my cross, he has not done an event study for damages at all; not a proposed one.  He even said that during his deposition.

And now what Mr. Forge is trying to do is backtrack and backfill.  And our view remains that they should deny class certification, let them go back and do a real event study and we can test that.  But he doesn't have one.  He hasn't put one forward to this Court, and now he's trying to just extrapolate and make up testimony, literally, on the fly in this courtroom.

43

THE COURT: Why doesn't that, Mr. Giuffra, go to the weight that this Court would give that study? Because you point out, and perhaps accurately -- I haven't heard all of Mr. Forge's direct examination, but this event study goes to market efficiency and not as to class damages.

MR. GIUFFRA: That's correct.

THE COURT: The question is, though, what is his theory of liability, and how does this methodology enable me as the Court to ascertain damages for a (b)(3) class? And can the methodology -- for instance, whatever his theory of liability is, if an event study on market efficiency would support me understanding damages across the class, then, even though it may seem that it's not an apples-to-apples but an apple-to-orange comparison, it may still be usable if, based on his theory of liability, I can ascertain what the damages are. There's nowhere written that his event study has to be a damages study, per se.

What *Comcast* seems to instruct is that whatever methodology there is applied for the predominance requirement in a (b)(3) class, it must support that theory of liability such that the Court can ascertain what the damages are across the class. So just because it's an event study of market efficiency, that's not, per se, exclusive. It may go to weight. And right now I'm feeling like it does go to weight, but the record is yet incomplete. So that's sort of my point.

44

I'm looking at this still as background because I haven't heard him say anything about where the rubber meets the road, that is, all right, based on our theory of liability in this case, I can take the methodology that I'm proposing here, and, Judge, this is how I can calculate damages across the class, because that's what I'm waiting to hear.

MR. GIUFFRA: The reason, Your Honor, is because it's not in his expert report. It was never in his expert report. That's why we thought they would come back and propose new expert reports. All he's trying to do is backfill and say, well, I can use this.

The concept of an event study, there's lots of kinds of event studies. You have to look at the event study and do the actual allegations. He's focused on the curative period. That's just the stuff with the stock drop. Essentially, just have him do math. Add up every one of the drops, say nothing else happened that day, that's the damages. You've got to go to the beginning of the class period and show how you would do an event study to assess what the inflation and the stock price is for the full three-and-a-half years. He's done nothing. There's nothing in his report.

THE COURT: Where is it in his report that would be responsive to the pending question?

MR. FORGE: Your Honor, his report -- the portion that he just read, paragraph 106, he's describing their -- granted,

45

he's describing it in summary fashion.

THE COURT:  In broad, general terms.

MR. FORGE:  Exactly, what we're walking through.  And, respectfully, I think what Mr. Giuffra seems to be taking issue with is he didn't actually calculate damages.  He doesn't have to do that.  The fact that we have an event study done for market efficiency is convenient by way of an example to show how that methodology would work for damages.

THE COURT:  But you're going to need more than that. You are going to have to be able to show to me how that event study supports your theory of liability.  If I find liability pursuant to your theory, that event study would then enable me to calculate damages across this large class.  And that's what I haven't heard yet.

MR. FORGE:  But my point, though, Your Honor -- and, respectfully, what we've just gone through is the allegations that the release -- this is our theory of liability.  The release of this corruption-related information caused the stock price to drop.  The theory of liability is that they concealed this information throughout -- the fact of this corruption scheme, they concealed it throughout the class period.

That is the theory of liability and that, once this information that they had concealed was released, it caused these price drops.  Then he would explain how the same methodology he's been describing could be used -- he's not

going to do it -- but could be used to estimate how much of those -- first of all, whether those price drops were caused by the corruption, those revelations of corruption, and what amount of those price drops would be caused by that -- those revelations.  These are --

THE COURT:  And I would have to, then, infer from the fact that we're dealing with a semi-efficient market how damages would be calculated across the class.  Is that what you're telling me?

MR. FORGE:  What he said earlier, that's always going to be true, is the damages calculations are the same for anybody who buys the share at any given time, whether it's one person or one thousand people.  What he's going to calculate is how much the share price was inflated by this alleged fraud.  That's what we're calculating here.  And so the damages would be the measure of that inflation.

Now, there's other fine-tuning that goes into the final analysis.  But Mr. Giuffra is right.  It is largely math that we're talking about.  Once you have your event study -- and we'll get to that next.  The event study we provided to the defendants -- and we're talking about thousands of pages here, Your Honor.  They have all the coding.  They could have just plugged those price drops in there, and it would have given them the same result, the ballpark inflation here.

THE COURT:  Okay.  I understand.

47

MR. GIUFFRA:  Your Honor --

THE COURT:  Just hear what I have to say --

MR. GIUFFRA:  I'll hear the boss.

THE COURT:  -- before you snatch defeat from the jaws of victory.

I understand what you're saying and what your argument is.  And what I'm going to allow Mr. Forge to do is to develop his record because it appears to me that his theory is that the event study of an efficient market is sufficient methodology for me to calculate damages across the class based on the theory that these illegalities caused fluctuations in the stock price.  Did I accurately state that?

MR. FORGE:  The revelations of --

THE COURT:  The revelations, right.

Now, upon reflection, once I have a complete record, that may or may not be sufficient.  Your theory may be correct that an event study of an efficient market will not enable the Court to determine damages across the class based on that theory.

But I'm going to allow Mr.-- it's like a -- for all of us who were trial lawyers in something less complicated than securities litigation, you always allow counsel to put into the record his or her theory of the case.  This is his theory of the case, and he's going to rise or fall on this event study of inefficient or semi-strong market.

MR. FORGE: I do want to make clear that we're using that event study that was used as part of the market efficiency to explain how the methodology works.

THE COURT: Exactly.

MR. FORGE: We'll get that from him.

THE COURT: But you aren't using any other methodology. That's the methodology that you're using.

MR. FORGE: Exactly. But what I'm saying is he could -- without any other difficulty, you could download an additional three months of pricing data and update the regression. But it's the same.

THE COURT: At the end of the day, that's your methodology.

MR. FORGE: Exactly.

MR. GIUFFRA: I'll cross him on it.

THE COURT: It's as simple as that.

MR. GIUFFRA: If plaintiffs were correct, the Sixth Circuit wouldn't have sent this back for rigorous analysis, because he talked about an event study in the Sixth Circuit. And, if all he had to do was say I'm going to do an event study and that was enough, then we wouldn't be here today.

MR. FORGE: Actually, I didn't talk about an event study in the Sixth Circuit.

MR. GIUFFRA: It was referenced, but it was referenced in your brief.

THE COURT:  I understand.  Thank you.

(The following proceeding was held in open court.)

THE COURT:  Rephrase your question.

BY MR. FORGE:

Q.   Mr. Dalrymple, we have gone over four alleged price drops.  Is that right, sir?

A.   I believe that's right.

Q.   As read from the consolidated complaint, plaintiffs' theory of liability here is that the revelations of the corruption-related information set forth in the paragraphs that I've referenced here caused those price drops.  Do you understand that, sir?

A.   I do.  I understand that.

Q.   And plaintiffs' theory of liability is that the defendants concealed that FirstEnergy had converted into a corrupt enterprise throughout the class period.  Do you understand that, sir?

A.   I do understand that.

Q.   So now that we have plaintiffs' theory of liability that FirstEnergy had converted to a corrupt enterprise and plaintiffs' theory of liability that the revelations of corruption-related news caused these price drops, could you explain, please, to the Court how an event study methodology could be used to measure the extent of these price drops that reflects corruption-related inflation?

50

MR. GIUFFRA:  Objection, Your Honor, exceeds the scope of his expert report.

THE COURT:  Noted.  Overruled.  You may answer.

THE WITNESS:  So, in order to use the event study, as I explained earlier, the event study measures the reaction of FirstEnergy's share price to new, value-relevant information after controlling for any movements in the broader market or in the industry.  So that's what I explained earlier was the abnormal return.

And the abnormal return is indicative of the share price reaction that cannot be explained by the broader market movements.  When that abnormal return is large, in other words, when it is very far away from what is predicted, we can show statistically that that abnormal return is what we would call statistically significant.  In other words, there is a very low likelihood that the return is explained entirely by what happened in the market in the industry.

From that we can infer that the reaction, the extent to which the return exceeded what we would expect or predict, is representative of the value of the information that became available to investors at the time.  From that, we can infer the extent to which the share price reacted to, in this case, the curative or corrective events.

Does that answer the question?

Q.   I think so.

Could you take the event study that you've described this morning and provided to the defendants over three years ago and apply it to the price drops we've gone over this morning?

A.   Yes.

THE COURT:  Is that because -- you've done an event study of an efficient market; is that right?  That's essentially kind of the purpose of what animated your event study; right?

THE WITNESS:  That is correct.  Yes, Your Honor.

THE COURT:  And the question for me, Mr. Dalrymple, is whether an event study of an efficient market will allow me to ascertain damages across the class based on the theory of liability about which Mr. Forge just inquired.

THE WITNESS:  Yes.  And that is because an event study measures the reaction to any information.  So, in order to establish that FirstEnergy traded in an efficient market, I identified earnings release days and dividend announcements to show that the share price systematically responds to new, value-relevant information.  I then conclude, based on that, as well as an examination of many other factors in my report, that FirstEnergy trades in an efficient market.

Based on that conclusion, I then can conclude that that analysis, that event study analysis, can also be used to measure the impact of the information that plaintiffs allege

52

cured or corrected the previous misstatements.

THE COURT: Then it becomes simple math; is that right?

THE WITNESS: I think that's fair.

THE COURT: Once you apply the methodology, it becomes simple math.

THE WITNESS: That's correct, Your Honor. It's simply a matter of computing the abnormal returns, which is an output of the event study for each of those days, in order to measure the impact of the curative events.

THE COURT: Thank you so much. Please continue, Mr. Forge.

BY MR. FORGE:

Q. Mr. Dalrymple, at the November 6th hearing that Judge Marbley referenced at the start of today's proceedings, he asked me to provide the Court with a ballpark for the damages or share price inflation in this case. And the answer I provided to the Court was $20 per share.

If anyone who knows how to use the Stata software, knows math, took the alleged price drops we've gone over this morning and inputs those drops and dates into the same event study you've described this morning, the same event study you provided to the defendants over three years ago, would they also get a ballpark of $20 of inflation?

MR. GIUFFRA: Objection, Your Honor. It's nowhere in

53

his expert report.  This is a critical issue in the case.  He's essentially just adding up the stock drops, doing simple arithmetic and backcasting it across the entire class period. That is impermissible, in any event; but it's not in his expert report.  It's the key issue in the case.  It exposes what's going on here.  It's basically saying, oh, the stock dropped by this much, oh, this is the drop, this is the inflation in the stock across the class period.  That is wrong economically, and it's not in his report.

THE COURT:  I'm going to sustain the objection.  I'm going to give you an opportunity, Mr. Forge, to lay the foundation for that question.  And by the foundation -- it's not your typical foundation for an expert because, since he is an expert, he can answer hypothetical questions.

However, our examination here was more narrow, and it is based, in part, at least, on Mr. Dalrymple's report and deposition.  If the defense has had an opportunity to prepare for this line of examination, then I'm going to allow this line of examination.  But, if this is new, then I'm not going to allow this line of examination because everyone knew what we were going to discuss here today and what the areas of inquiry would be.

So I'm going to give you an opportunity to establish why Mr. Giuffra would not be caught by surprise or ambushed by this line of questioning.  Please proceed.

54

BY MR. FORGE:

Q.   Let's start, Mr. Dalrymple, with Mr. Giuffra's objection.  Let's start with his assertion that all we're doing is adding up these price drops that are alleged in the complaint.  What I asked you, sir, was, if you take the alleged price drops and apply the event study to them, would you get a ballpark of about $20?

What I want to ask you is, Mr. Giuffra's assertion that that simply adds up the price drops, is that accurate -- the alleged price drops, that all we're doing is adding up the alleged price drops?

A.   If the question is whether adding up the alleged price drops would get to roughly $20, that is accurate.  If the question is is applying the event study in order to estimate the abnormal returns and then adding those up, I would expect those to be roughly in the ballpark of $20.

Q.   But is that as simple -- when applying the event study, is that as simple as just adding up the numbers, or is the event study actually enabling further analysis to be done?

A.   Well, the event study enables further analysis to be done in addition to adding up the abnormal returns.  I was answering the question as a matter of math.  If one were to apply the event study and add up the abnormal returns, I would expect the ballpark to be around $20.  But that is not the end of the utility of the event study in my methodology.

55

Does that answer your question?

Q. Not really. Let me see if I can be a little clearer.

The fact that the complaint alleges price drops caused by the revelations of FirstEnergy's corruption, just that fact that there is a price drop, that alone, does that tell you anything about the extent to which market price movements may have contributed to that price drop?

A. No. That information alone does not tell me that -- if you tell me there was a price drop and you don't tell me anything else, I don't know what the market or industry did specifically on that day.

Q. Does that information alone tell you the extent to which the S&P Utilities Index price movement contributed to that price drop?

A. No, that information alone does not tell me that.

Q. Is it the event study that enables you to essentially strip away whatever impact the S&P 500 had on that price drop?

A. That is correct. That is what the event study allows you to do.

Q. Is the event study what enables you to strip away whatever effect, if any, the S&P Utilities Index had on the each alleged price drop?

A. That's correct. That's what the event study allows you to do.

Q. That number, that stripped-away number, is the product

56

of the event study.  Is that right, sir?

MR. GIUFFRA:  Objection, Your Honor, not in his expert report.  It's not even a clear question.

THE COURT:  I understand that.  But I'm going to quote again what I advised the parties of, and that is that the hearing would be limited to consideration of whether Mr. Dalrymple has a methodology for calculating damages on a classwide basis that is susceptible of management across the entire class and satisfies the predominance requirement of Rule 23(b)(3) for plaintiffs' Exchange Act claims.

And it may -- as paragraph 106 was able to tell me, Mr. Giuffra -- or Mr. Dalrymple actually referred me to 106. When I looked at 106, it didn't have the precise language, but it had general language from which I could make inferences that this is the methodology that would be deployed and how that methodology would be deployed to theoretically ascertain damages.

So, if it's not in his report explicitly, that's one thing.  But, if you can make inferences from that which is in his report, I think that's fair game for the purpose of this hearing as well as for the purposes of your cross-examination. Because in a way that you would appreciate, Mr. Giuffra, that tees it up for your cross and for my consideration.

MR. GIUFFRA:  Thank you very much, Your Honor.

THE COURT:  Please continue.  And you have, to the

57

Court's satisfaction, established a basis on which to ask the preceding question that spawned the foundational questions that you just asked.  Please continue.

MR. FORGE:  Thank you, Your Honor.

BY MR. FORGE:

Q.  Mr. Dalrymple, if the defendants or anyone else took the event study that you've described this morning, that you provided to the defendants over three years ago, and they applied that event study to the alleged price drops we've gone over this morning, would that event study yield a rough ballpark of corruption-related price inflation of approximately $20 per share?

MR. GIUFFRA:  Objection, Your Honor.  It is nowhere in --

THE COURT:  I'm going to overrule the objection.  I understand the basis of it, Mr. Giuffra, and you may make this a continuing objection.  But based on the rationale from the previous objection, I'm going to overrule it, and you may inquire.  Please continue.

THE WITNESS:  It would yield a rough ballpark of roughly $20 at the end of the class period, based on the event study.

BY MR. FORGE:

Q.  Now, your -- the event study that you've described and that you provided to the defendants, that included pricing data

through what date?

A.    I believe it was through the end of the class period.

Q.    Would it take anything other than the mechanical exercise of downloading additional pricing data to extend that date range to, say, the end of November 2020?

A.    No.  If you were to download the additional data, you would simply run the same code through the end of November 2020.

THE COURT:  Just one second, Mr. Forge.

(Brief recess taken.)

THE COURT:  Please continue, Mr. Forge.

BY MR. FORGE:

Q.    Mr. Dalrymple, could you please pull out the exhibits that have been marked P4?

A.    All right.

Q.    Do you recognize P4 as the lone report of defendants' lone expert, Dr. Jennifer Marietta-Westberg?

MR. GIUFFRA:  Your Honor, same objection; exceeds the scope of the hearing.  We actually have other experts we proposed, including Dr. Garmaise, to deal with the issues post the Sixth Circuit decision.  And this exceeds the scope of what you directed -- you know, said should be the scope of this hearing.  She's not here, anyway, to defend herself.

THE COURT:  I understand.  I'm going to allow you to interpose, as I said earlier, any objection.  Right now the

only question pending is for him to refer to Dr. Westberg's --

Marietta-Westberg's report.  I don't know what he's going to

ask; so this objection may be premature.  But you may interpose

an objection on substantive grounds.  So it's overruled.

Please continue, Mr. Forge.

BY MR. FORGE:

Q.    Do you recognize that as the report of

Dr. Marietta-Westberg, the only expert the defendants submitted

in opposition to plaintiffs' motion for class certification?

A.    Yes.  This appears to be Dr. Marietta-Westberg's report.

Q.    If you could, sir, please turn to page 3 of the report,

Roman numeral three.  Is the heading for Roman numeral three

Summary of Opinions?

A.    Yes.

Q.    Are there three numbered paragraphs in section Roman

numeral three?

A.    Yes.

Q.    How many of those three numbered paragraphs pertain to

your opinions?

A.    Only one of those, paragraph 11.

Q.    Does paragraph 11 read -- not counting the

subparagraphs, but does paragraph 11 read, "Mr. Dalrymple fails

to specify how his proposed damages methodology would account

for time-varying inflation for FirstEnergy common stock

throughout the proposed class period, given the specific

60

circumstances of this case"?

A. Yes, that's what it says.

Q. As far as you know, is that Dr. Marietta-Westberg's lone rebuttal or criticism of your opinions?

MR. GIUFFRA: Objection. If he just wants to analyze what's in the report, that's what's in the report. But if he's going to go beyond that --

THE COURT: I'm not going to allow him to analyze Dr. Marietta-Westberg's report because you are correct, that was not the purpose of this hearing. But, Dr. Marietta-Westberg referred specifically to Mr. Dalrymple and his opinion, and it's fair game for Mr. Dalrymple in setting forth the methodology for calculating damages in a classwide basis that is susceptible to management across the entire class. That's an appropriate area of inquiry based on its internal limitations.

You may answer.

THE WITNESS: I'm sorry. Would you mind repeating the question?

BY MR. FORGE:

Q. Sure. As far as you know, is this sentence of paragraph 11, is that a description of the lone criticism or rebuttal Dr. Marietta-Westberg had of your report and opinions?

A. It is to my knowledge, yes.

Q. So, if the Court holds that it is premature to require a

level of precision at class certification that accounts for potential time variation, are you aware of any other criticisms of your report and opinions that defendants' own expert raised?

A.   No.   I'm only aware of what she has raised in this report.

Q.   Now, within that lone category of criticism, did Dr. Marietta-Westberg identify any potential category of potential time-varied inflation?

A.   She did.   She refers to time-varying inflation with respect to the passage of HB6.

Q.   Focusing specifically on subparagraph B, Dr. Marietta-Westberg writes, "Plaintiffs' theory of liability implies that the alleged misrepresentations concealed the corruption and bribery scheme whose purpose was to promote legislation that was favorable to FirstEnergy," and parenthetically, "i.e., HB6."

I do remember enough from my Latin class to know that i.e. stands for "that is."  Do you, Mr. Dalrymple, understand the distinction between an i.e. indicator versus an e.g. indicator?

A.   I believe I do although I do not know the Latin.

Q.   What is your understanding of the distinction?

A.   My understanding is that i.e. means -- I'll take your representation as "that is," or "in other words," as opposed to e.g. means "for example."

62

Q.   So, as far as you know, do you know any other type of beneficial legislation or any other type of benefit that Dr. Marietta-Westberg claimed could lead to potential time-varying inflation other than the passage and enactment of HB6?

MR. GIUFFRA:  Objection, Your Honor; exceeds the scope of his expert report.  She only was obviously opining about the nonevent study he said he might do, which you have to extrapolate from the efficiency event study, and she's not the only expert.  She didn't have the opportunity to do this.  Now he is attacking her for something she never had the opportunity to opine on.

THE COURT:  Ms. Evans, would you read back Mr. Forge's question, please.

(Thereupon, the last question was read by the court reporter.)

THE COURT:  Sustained.

BY MR. FORGE:

Q.   Does Dr. Marietta-Westberg identify any other information that your methodology would have to account for variations in throughout the class period other than the passage and enactment of HB6?

MR. GIUFFRA:  Same objection, Your Honor.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  In this report she refers only to

63

variation related to the passage of HB6.

BY MR. FORGE:

Q. In the sentence after the one that I just read, the "i.e. HB6" sentence, Dr. Marietta writes in part, "The likelihood of passage and enactment of potential favorable legislation necessarily varied over time during the proposed class period."

Mr. Dalrymple, I'm going to represent to you that the plaintiffs have already clearly stated that they are not seeking any fractional or incremental inflation prior to the passage and enactment of HB6, okay? Do you accept that representation?

A. Yes.

Q. With that representation in mind, does that mean that any variation from the passage and enactment of HB6 would be, for lack of a better term, a step -- so a one-time step up or a curve that would change over time?

MR. GIUFFRA: Objection, Your Honor, both to the form of the question; it exceeds the scope of his expert report. Dr. Marietta-Westberg hasn't had the opportunity to opine on these things, and he's trying to draw an inference from the report critiquing an event study that he doesn't even talk about in his expert report. We're going so far afield of the scope of his expert.

THE COURT: I'm going to sustain the objection to the

64

question as phrased because, in part, you're asking this witness to be inside the head of Dr. Marietta-Westberg telling the Court what she means.  It's one thing for him to identify that, yeah, she critiqued his report in this respect and he has a rejoinder.  But this is beyond that at this point.  This is almost a backdoor attempt to get an analysis of Marietta-Westberg's report, and that is not the point of this hearing.

I want to remind you, however, Mr. Giuffra, that the point of the hearing is not simply for you to have an opportunity to cross-examine Mr. Dalrymple simply on his report, but to cross-examine him on his methodology and its efficacy in assisting the Court in being able to ascertain damages across the class based on his methodology.

So you may ask a question within those parameters, but I don't want to continue down this road of "you tell me what Dr. Marietta-Westberg was thinking."

MR. FORGE:  I apologize, Your Honor, if that was implied.  That certainly wasn't my intention.  But I'll be even clearer.

THE COURT:  I believe you when you tell me that.  But that's what came out.

BY MR. FORGE:

Q.   Let's focus on the lone category, the lone source of alleged inflation variation identified in

Dr. Marietta-Westberg's report, and that is the passage and enactment of HB6.  Do the methodologies that you describe in your opening and in your rebuttal report enable you to calculate any potential additional inflation that the passage and enactment of HB6 would have contributed to FirstEnergy's share price?

MR. GIUFFRA:  Objection, Your Honor.  There's nothing in his expert report about this topic at all.  In fact, the expert report says he hadn't decided what methodology he was going to use.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Yes.  The methodologies I articulate in my expert report and in my rebuttal report to Dr. Marietta-Westberg's report, those are the same methodologies that could be used to measure the impact of HB6; so the passage of HB6, which I think was the question.

BY MR. FORGE:

Q.   Let's turn, first, to P1, your original report and specifically page 26, paragraph 107.  There you write, "To the extent that there are issues complicating the quantification of artificial inflation at the time of a curative event, standard financial analysis and valuation tools can be applied to measure inflation and damages in accordance with plaintiffs' theory of liability.  For instance, practitioners routinely measure the value of expected earnings using income and market

approaches, which may be used to quantify the impact of changes in expectations and perceived risk associated with a business or earnings stream."

Do you see that, sir?

A. Yes, I do.

Q. Would the anticipated benefits to FirstEnergy from the passage and enactment of HB6 qualify as an earnings stream as referenced in this paragraph?

A. Yes. I would say that's fair, that it is an impact on future earnings expectations, specifically.

Q. Now, you cite at the end of that sentence a treatise titled *Valuing a Business: The Analysis and Appraisals of Closely Held Companies* by Shannon Pratt. Is that right, sir?

A. Yes, I do.

Q. And the next sentence you write within that footnote, "Under the income approach, value today equals future cash flows discounted at the opportunity cost of capital, which reflects the risk associated with those cash flows."

Is what you're describing there also sometimes referred to as the discounted cash flow methodology?

A. Yeah, sometimes that is described as the discounted cash flow or DCF methodology.

Q. If you could, please, take out P5 and confirm that appears to be a true copy of Chapter 9 from the Pratt treatise.

A. Yes, this appears to be Chapter 9 from the Pratt

treatise.

Q.   I'm going to refer to specific pages here by reference to the page ID number that's in the upper right-hand corner of this exhibit.  Turn to page ID No. 20710.  Let me know when you're there.

A.   All right.

Q.   About two-thirds of the way down the page there is a heading that says Theory of Valuation.  The first sentence after that provides that, "The value of an asset is the present value of its expected returns."  Do you agree with that sentiment, sir?

A.   Yes.  That's a universally accepted premise in valuation.

Q.   Two sentences later, Mr. Pratt writes:  To convert this estimated stream of revenues [sic] to a value for the security, you must discount this stream at your required rate of return.

Is that another shorthand description of the DCF methodology, sir?

A.   That is what the DCF methodology does, yes.

Q.   Turning, then, to the next page, page ID 20711, about three-fourths down the page, the sentence beginning "in theory."  Are you there, sir?

A.   Yes, I am.

Q.   Mr. Pratt writes, "In theory, the value of a business or an interest in a business depends on the future economic

68

benefits that will accrue to that business, with the value of those future benefits being discounted back to a present value at some appropriate discount rate."

Do you agree with that sentiment, sir?

A.    I do agree with that.

Q.    Is that another expression or description of what you've referred to as the DCF or discounted cash flow methodology?

A.    Yes.  Again, that is what the DCF methodology does.

Q.    Two pages later on page ID 20713, we see that Mr. Pratt actually lays out the formula for calculating present values. Do you see that formula there?

A.    Yes, I do.

Q.    And this is all within the chapter of the Pratt treatise that you cited in support of your description in your expert report.  Is that right, sir?

A.    Yes.  This is all within Chapter 9 of the Pratt treatise.

Q.    Are you familiar with this present value formula?

A.    Yes, I'm familiar with it.

Q.    Have you used it many times?

A.    Countless times.

Q.    Do you consider it reliable?

A.    Yes.

Q.    Would you be able to use this formula to calculate the incremental additional benefit on a per share basis from the

69

passage and enactment of HB6 on July 23, 2019?

MR. GIUFFRA: Objection, Your Honor. All his expert report did was cite to this treatise, which is a standard treatise that people get in finance school about how to do a valuation. And DCF is one of the methodologies. In his expert report which --

THE COURT: Are you conceding, then, that these points are valid points --

MR. GIUFFRA: What I'm saying, Your Honor --

THE COURT: -- or we can just move along because you don't contest that, the fact that it's a treatise upon which experts rely in the field?

MR. GIUFFRA: I'm not contesting that. What I am contesting is his question which is that he can somehow use a model that gets referenced in a treatise when there's literally no discussion of how you would actually apply that model to the facts and circumstances of HB6 and this case.

THE COURT: So the legal basis for your objection is?

MR. GIUFFRA: The basis for my objection is, number one, there's nothing in his expert report that relates to the topic of the question; so he's exceeding the scope of the expert report contrary to Your Honor's opinion.

THE COURT: Yes. I understand that's an objection, but it's overruled because these are the types of treatises upon which experts in the field rely. He referenced it in his

report, and it will go to the methodology that he believes this Court can deploy in determining damages. So your objection is noted. I understand it because it's been repeated, but it's overruled. Please continue.

THE WITNESS: I believe the question is whether this is --

THE COURT: You want the question read back?

MR. FORGE: I can restate it, Your Honor.

THE WITNESS: If it's not too much trouble.

MR. FORGE: I'll spare the court reporter.

THE COURT: No. Ms. Evans is going to read the question back so that we can continue.

THE COURT REPORTER: "Question: Would you be able to use this formula to calculate the incremental additional benefit on a per share basis from the passage and enactment of HB6 on July 23, 2019?"

THE WITNESS: Yes. This is a formula that I could use to calculate that incremental value of that benefit, yes.

BY MR. FORGE:

Q. And how would you go about doing that?

MR. GIUFFRA: Your Honor, again, not in his expert report. He's basically -- look, we talked about having him do --

THE COURT: Sidebar.

71

- - -

(The following proceeding was held at sidebar.)

THE COURT: Go ahead, Mr. Giuffra. What I typically do more so in a jury trial than here, because he is an expert -- as are the two of you -- I don't allow narrative objections. But nobody has been trying to coach the witness on either objections or responses thereto; so it's not a problem. But I wanted you to have a chance to explicate fully the basis.

MR. GIUFFRA: The issue, Your Honor, is really quite simple. In the expert report, which is supposed to disclose, under the rules, the basis for his opinion, the Sixth Circuit sent this thing back to Your Honor to do a rigorous analysis, not just have some guy stand up and say I can use DCF or I can use an event study. There is a page and a half of analysis of how he would apply -- and I'll bring it out on cross. In his deposition he said he hadn't even decided which methodology he was going to use.

Now, he's basically asking this witness to say how he would use DCF to measure time-varying inflation in the facts and circumstances of this case. There's not one word in his expert report on that topic. There's not one word in his deposition about that topic. He's now doing it for the first time.

As we've said from the beginning, if you want to go in and put forward a new expert report, defendants had no

72

objection to it.  They said, no, they wanted to rest on the existing expert report, which was a page and a half long.  Now what he's trying to do is buttress his expert report.  We haven't had an opportunity to have our expert opine on whatever he's going to say and say whether it's fair game or not fair game.  That is simply not permitted by Rule 26, and it's certainly not a rigorous analysis to have him come in for the first time and start opining on how.  And that was the question:  You're going to use DCF to measure time-varying inflation in this case.  That's the guts of the case, as we'll establish on cross.

MR. FORGE:  First, as a preliminary basis, I will give Mr. Giuffra a running objection that every single question I ask is beyond the scope.  I don't agree with him.  I'll give him a running objection because it's starting to get very disruptive, and this examination could have been over probably in half the time.

That said, first of all, the report is far more than a page and a half.  As we've already established, he's cross-referencing other parts, and he's going to discuss his rebuttal report shortly.

Describing the methodology is what is necessary.  In order to facilitate the Court's rigorous analysis, and to allow Mr. Giuffra to test the methodologies -- he set forth his methodology.  He's going to explain how it worked.  Mr. Giuffra

73

can try to undermine that explanation that it wouldn't work that way. He's not going beyond his report and opinions. He is simply elaborating on them, which is exactly what the Sixth Circuit wants him to do.

THE COURT: Well, I don't know whether the Sixth Circuit wants him to do it. The Sixth Circuit wanted me to do a rigorous analysis that they didn't feel that I did, and that's what I'm going to do.

I think that you're correct with respect to the fact that he is explaining and amplifying on his report.

And I want to disabuse you, Mr. Giuffra, of the notion that everything is limited to just the report. You're too experienced for that objection. I gave you an opportunity to explain; so now you have to listen because the purpose of having an expert on the stand is to explain his report and to explain his methodology. And I have no doubt that the more information you have on the record, the more you can feast after lunch. So we're going to get to after lunch, and you're going to finish.

But it is not all just limited to what he wrote. What his explanation of what he wrote, that's what actually aids the Court in being able to make its assessment. So you'll have your turn. I know that you're just chomping at the bit, but you'll have your turn. Thank you.

(The following proceeding was held in open court.)

74

THE COURT: Please continue, Mr. Forge.

BY MR. FORGE:

Q. Mr. Dalrymple, could you please explain how you would use this DCF methodology identified in your reports to calculate the additional inflation attributable to the passage and enactment of HB6 on July 23rd, 2019?

A. Well, the passage of HB6 meant that FirstEnergy and FirstEnergy investors expected some future benefits from the provisions in HB6. There is a value to HB6's future earnings associated with those benefits -- the, for instance, decoupling. If we take that value that is expected to accrue to HB6's earnings from, say, the decoupling provision, we can measure the impact, the forward-looking impact, that investors expected from the decoupling provision at the time of the share price reaction at the end of the class period.

For instance, if it's worth a few cents per year going forward, investors would take that incremental value to earnings and they would discount it back to the present value based on FirstEnergy's cost of capital, essentially the same costs that we've referred to here that reflects the time value of money and risk associated with that future earning stream.

Does that make sense?

Q. And that -- whatever number you wound up with, with the present value on a per share basis, what would that mean for the inflation for a shareholder who purchased within the class

period but prior to July 23rd, 2019, versus a shareholder who purchased during the class period but on or after July 23rd, 2019?

A.    Effectively, the share price inflation would step down before the passage of HB6 in 2019 and would step up by that incremental benefit after the passage of HB6 in July of 2019.

Q.    Would that step up and down apply uniformly to everyone who bought prior to July 23rd, 2019?

A.    Yes.

Q.    So, again, whether we had one shareholder buying on each day or all shareholders buying on each day, same methodology?

A.    It's the same methodology, yes.

Q.    Same answer?

A.    Yes.

Q.    And whether we had one shareholder who bought after July 23rd, 2019, would that step up apply to them the same exact way?

A.    Yes.  It would be the same for all shareholders.

Q.    Whether there was one plaintiff or a class of plaintiffs.  Is that fair?

A.    That's correct, yes.

Q.    Now, in your rebuttal report, which is marked as Exhibit P2, you reference in paragraph 17, which is page 5, you wrote, "Dr. Marietta-Westberg does not directly dispute the feasibility of this approach."

76

And I'll represent you can look back at the earlier paragraphs that the approach is talking about your event study to measure out-of-pocket damages.

"Dr. Marietta-Westberg does not directly dispute the feasibility of this approach and quibbles only with the level of specificity that I provide.  She does not, however, contend that an event study or fundamental valuation approach cannot be used to examine specific dates or periods in which artificial inflation may have existed in FirstEnergy's common stock."

You then go on to say two sentences later, "Nor does Dr. Marietta-Westberg explain why an event study or fundamental valuation approach cannot be used to examine the impact of alleged curative disclosures to quantify the impact on FirstEnergy's common stock following a curative event."

Mr. Dalrymple, is the DCF methodology that we've been discussing, does that fit within the category of what you're referencing as a fundamental valuation approach?

A.   Yes, it does.

Q.   Is it a fundamental valuation approach that could be used to calculate this lone identified basis for time-variation inflation in this case?

A.   Yes, it could be used to do that.

Q.   But you continue in paragraph 18 to write, "While I have not determined whether inflation should be constant or variable during the proposed class period, as I have not been asked to

77

provide such an opinion at this stage, it is my opinion that standard financial analysis and valuation tools can be applied to measure inflation and damages in accordance with plaintiffs' theory of liability. In fact, I have presented damages calculations using event study and fundamental valuation techniques to derive scaling factors in previous matters."

Mr. Dalrymple, what did you mean with your reference to scaling factors?

A. What I mean there is a scaling factor is a factor I would use to adjust for any changes in artificial inflation over the class period. So we can think of a scaling factor as a factor between zero percent and a hundred percent. I guess, in theory, it could be a bit above a hundred percent. But just for simplicity, if inflation is measured at the end of a class period and there is a need to adjust it downward at some previous time in the class period, one can develop scaling factors in order to do that.

And what I set forth here in these examples are -- in paragraphs 19 and 20, those are examples in previous cases in which I measured share price inflation at the end of a class period and then applied scaling factors based on a fundamental valuation analysis in order to adjust the inflation during the class period.

THE COURT: Let me ask you this, Mr. Dalrymple. Is the development of scaling factors part and parcel of an

overall event study analytical paradigm?

THE WITNESS: Broadly speaking, it is although the scaling factors that I'm referring to here, they were based on a fundamental valuation analysis such as the discounted cash flow analysis that we had been talking about. But really, with fundamental valuation or with an event study, what we're really measuring is we're measuring the change in value in relation to a change in an information set. That is -- sometimes that can be reflected in a share price reaction, or it can be reflected in the underlying expectation of cash flows and risk associated with a company.

But, in theory, those two should converge in an efficient market because we can observe how investors react to that, and we can also measure it directly by looking at a future earning stream.

THE COURT: So, if this case goes to trial and the Court is trying to determine how to measure damages across the class and I deploy your event study analysis, would I, of necessity, have to develop scaling factors to reach my ultimate conclusion with respect to damages?

THE WITNESS: Not necessarily. I suppose it depends on how the facts unfold. What we just discussed --

THE COURT: Well, you developed scaling factors; right? That's what you're saying here on page 5; right?

THE WITNESS: Yes.

THE COURT:  And you developed them of necessity to reach a conclusion; is that right?

THE WITNESS:  In those cases.

THE COURT:  You developed scaling factors as an analytical tool, didn't you?

THE WITNESS:  Yes, I did develop them as an analytical tool.

THE COURT:  And it was a part of your event study overall analysis.  Is that also right?

THE WITNESS:  I developed it in order to adjust the inflation that I estimated from the event study.

THE COURT:  Okay.  Is there a scenario where, in order for me or the jury to ascertain damages, either the jury or I would have to do likewise?

THE WITNESS:  Well, I would anticipate, as I did in these cases, developing those scaling factors based on economics.  So those scaling factors are developed based on my economic analysis of how inflation could have shifted over the --

THE COURT:  You understand that neither the jury nor the Court is going to engage in an economic analysis, rather those two entities would have to engage in a damages analysis; right?  And that the purpose of this hearing is to determine whether the methodology that you use will allow either the jury or the Court to engage in the damages analysis across the

80

class. You understand that; right?

THE WITNESS: Yes, Your Honor, I do.

THE COURT: So all I'm simply asking is that, in order for us to determine what the damages are -- assuming for the purposes of my question that the liability is proven, all right, that the plaintiffs prove their theory of liability, then we have to go to damages to ascertain what those damages are across the class. What I'm asking you is whether, in doing so, I will have to or the jury will have to develop scaling factors?

THE WITNESS: No, Your Honor. That is something I would develop, if appropriate, as part of my analysis.

THE COURT: So that's not necessary for me to ascertain damages. It's just necessary for your economic analysis.

THE WITNESS: That's correct, yes.

THE COURT: All right. Please continue.

BY MR. FORGE:

Q. Mr. Dalrymple, I think these next series of questions will put a finer point on the point the Court is inquiring about.

In paragraph 19 of your report, you reference work you did on a case involving a for-profit prison company then known as CCA, and you describe your use of scaling factors to account for a structural change that CCA underwent during the class

81

period where it shifted from a C corp to a REIT, a real estate investment trust. Is that right, sir?

A. Yes.

Q. And the scaling factor would be necessary to adjust the inflation levels why in that instance?

A. In that instance the inflation related to an earning stream, specifically private prison contracts, that CoreCivic had an expectation of receiving earnings from when it was a REIT. Before it had converted to a REIT, it was a C corporation and, therefore, under a different tax structure such that the inflation arising from those contracts would have had a different tax treatment earlier in the class period than it did later in the class period.

To account for that, what that essentially means is that the interaction of the withheld information would have been different in, from what I recall, the first year of the class period versus the last three years of the class period when we actually take the final measurement of inflation. So I developed a scaling factor, which I applied to roughly the first year of the class period, to reduce inflation in order to account for that economic difference.

Q. Does that scaling factor essentially mean that a dollar of earnings, once CCA converted to a REIT, was worth a different amount than a dollar of earnings when it was a C corp?

82

A.   That's fair, yes.

Q.   Now, taking it into the context of a utility company, for example, if a utility company was at one point during the class period a hybrid, or part of it was competitive and part of it was regulated, and during the class period it shifted to being wholly regulated, is that the type of structural break that would warrant at least consideration and possible application of a scaling factor?

A.   Yes, that is similar.  It would warrant an examination and potentially an economic adjustment to inflation to account for that.

Q.   What would you examine to make that determination?

A.   Well, in this instance, if we have evidence that FirstEnergy converted from, say, a hybrid to a fully regulated entity, that is a structural shift in the business.  In other words, we would expect to see a difference in, say, the correlation between FirstEnergy's returns and the market and the industry returns.  We would expect possibly to see a shift in those regression outputs because FirstEnergy is now behaving more like a fully regulated utility company and less like a hybrid utility company.

In addition, we would also expect to see potentially a change in FirstEnergy's, say, earnings multiple.  If its risk went down as it transitioned from a competitive or hybrid competitive entity to something like a fully regulated entity,

83

and investors perceive that shift as being associated with lower risk, than a dollar of earnings after that conversion happened would essentially be worth more because it would correspond to a higher multiple reflecting the lower risk.

So those are -- we would see evidence of that, and we can detect evidence both in the record and specifically by performing certain statistical tests on the event studies, on the rolling event studies that I described earlier, to identify those structural breaks.

Q.   Are you saying that essentially a -- using a different analogy, a dollar of expected return from a CD that is insured by the FDIC and guaranteed has more expected value today than, say, a dollar of expected return from a junk bond?

A.   Generally speaking, yes.

Q.   Is that because the DCF methodology adjusts the expected value based on a risk element?

A.   Yes.  Specifically, risk is -- risk refers to uncertainty in returns.  And so, if we take the example of a CD that's FDIC insured, it's basically a guaranteed return.  There is no expected uncertainty or volatility as to the timing and the amount of the future payment.  That is different than a junk bond, a bond that is not highly rated by the credit agencies because those returns are less certain.  It's possible that the company may default.  It's possible that the company may restructure.

So, when you're looking at a dollar that you expect to earn from a junk bond, and you compare it to a dollar you expect to earn from a CD, the dollar that you expect to earn from the CD today is worth more than the dollar you expect to earn from the junk bond because it has to be discounted to account for that risk and uncertainty.

Q.   As things stand right now with this case, have you, in fact, determined whether a scaling factor is necessary?

A.   No.  I have not done that analysis to make the determinations.

Q.   Have you, in fact, determined what the value of a potential scaling factor would be?

A.   I have not done that analysis at this time.

Q.   Have you, in fact, performed a DCF analysis regarding the benefits from HB6?

A.   No.

Q.   Have you, in fact, calculated the damages that the alleged fraud caused under plaintiffs' theory of liability?

A.   No, I have not made that calculation.

Q.   Are you able, though, to do all of those things?  Are you able to calculate damages on a classwide basis consistent with plaintiffs' theory of liability using an event study methodology and additional tools such as DCF methodologies and scaling factors?

A.   Yes.

Q.    Is there any doubt in your mind --

THE COURT:  Just a second.  Mr. Dalrymple, is it possible for you to calculate damages, based on the plaintiffs' theory of liability in this case, using the event study methodology only?

THE WITNESS:  Well, setting aside that I have not actually performed the analysis -- so I do not know for sure until I perform the analysis.  However, I would be -- I would be hesitant to say that it is on the basis of what we just discussed, for instance.

THE COURT:  Let me approach it another way.  In order for you to give a damages methodology for calculating damages on a classwide basis that is susceptible to measurement across the entire class using the plaintiffs' theory of liability, do you have to use an event study methodology, a DCF -- combined with a DCF methodology, combined with developing scaling factors?  Do you have to do all of those things in tandem in order for you to calculate or deploy a damages methodology?

THE WITNESS:  I would expect to do all three of those things in tandem, recognizing that the development of the scaling factors is something that I would develop based on both -- based on any valuation tools that are available to me including an event study, including a DCF methodology.  So I would not anticipate using one to the exclusion of others because, as I testified earlier, these all measure the change

in expected future economic benefits.  They're different ways of measuring them.  So I would -- in order to have a complete analysis, I would anticipate applying all of the tools available to me that are applicable.

THE COURT:  Does one pressure test the other?  So, if you use an event study analysis only, would then you have to deploy a DCF methodology to confirm whether the event study analysis was correct?

THE WITNESS:  I think that's fair.  To say whether you have to, I don't know that you have to.  But, if you observe a share price reaction through an event study and then you look at the revisions to expectations at the time, you look at earnings revisions, for instance, you look at what happened to the expected multiples, those two should dovetail because they are looking at the same future economic benefits at the same time.  And, if they don't, it likely means that you've missed something.  You might have misspecified your event study.  You might have missed a piece of evidence that informs the fundamental valuation analysis.

So my approach is I will look at all of the information available to me and use that to arrive at the most reliable conclusion.

THE COURT:  Do you consider an event study analysis, DCF methodology, and the development of scaling factors one analytical tool or three analytical tools working in tandem?

87

THE WITNESS:  I would consider those techniques as a single overarching set of techniques that I use to perform a single estimate of value, for instance, on each day recognizing --

THE COURT:  Any of the three alone would be insufficient to perform a damages analysis across this class, but the three in concert would.  Is that a fair statement?

THE WITNESS:  I believe that's fair, recognizing that one could use any of these alone to estimate inflation. However, I would be concerned as to the potential shortcomings of such analysis that simply ignored another technique that's available.

THE COURT:  And you would agree that inflation is just one component of damages in this case; right?

THE WITNESS:  My understanding is inflation is one component of damages, and that is essentially an input into the calculation of out-of-pocket damages as limited by the PSLRA. Does that answer the question?

THE COURT:  Yes.  Please continue, Mr. Forge.

BY MR. FORGE:

Q.   Mr. Dalrymple, these techniques that would be used as part of an overall package, are they used that way irrespective of whether we're talking about one plaintiff or a class of plaintiffs?

A.   They're used irrespective of whether it's one plaintiff

or a class of plaintiffs.

Q. Do they apply on a classwide basis just as accurately and reliably as they would if it was just a single plaintiff who purchased a share on each day of the class period?

A. Yes.

Q. Is there any reason -- let me back up. Because we haven't completed even fact discovery yet in this case, have you done your final damages calculation?

A. No.

Q. Have you done your final scaling factor determination?

A. No, I have not.

Q. Have you done your final DCF determination of any benefits?

A. No, I have not.

Q. I believe what you said was you would expect to do all three as part of one overall package; is that right?

A. Yes. I would expect to look at all of the tools and techniques available to me that inform the damages analysis, and those three are included, yes.

Q. Do you view --

THE COURT: Just a second. You said those three are included. I want to make sure that the Court has a full understanding of how you would approach this. So are there other methodologies that you would integrate into these three acting in tandem about which you just testified?

THE WITNESS: Well, I also identified the market approach in my report. And the market approach is something I referred to earlier as market multiples. So that is -- it is a fundamental valuation. It is a type of fundamental valuation. It falls within that category.

THE COURT: So let me make sure that I understand this, then. The methodology that you would deploy, the overall methodology that you would deploy for calculating damages on a classwide basis that is susceptible of management across the entire class, would consist of an event study, a DCF methodology, the development of scaling factors, and a market analysis?

THE WITNESS: Yes, Your Honor, noting that, when I say fundamental valuation analysis, that includes DCF and market approach. So it's kind of category A and category B of fundamental value.

THE COURT: Ms. Evans, read back the Court's question.

(Thereupon, the last question was read by the court reporter.)

THE COURT: I'm just trying to make sure that I understand the components of the methodology that you would use to calculate damages across the class. And I thought I understood that it consisted of three components – event study, DCF methodology and development of scaling factors – but then you added the market analysis. It sounds like it's a four-part

test, if you will.  Did I misunderstand that?

THE WITNESS:  I don't think you did.  I'm just noting that we had referred to DCF as a specific, what we call the income approach in my report.  And I also referred to the market approach, which is also another form of fundamental valuation.  I think we had potentially used the terms DCF and fundamental valuation interchangeably.  I just wanted to be clear that when I refer to fundamental valuation, I'm referring to both of those techniques.

THE COURT:  Both DCF and market?

THE WITNESS:  Yes, Your Honor.

THE COURT:  So are they one in the same, or are there nuanced differences between the DCF market -- I mean, the DCF methodology and the market approach?

THE WITNESS:  Well, they are measuring the same thing.  But they are looking at different pieces of evidence, right?  The DCF, as we talked about earlier, that measures directly the value of a future dollar of income tomorrow.  And we use that by developing a discount rate, a rate at which we would expect to earn on the dollar that we invest today and discount it back.

The market approach reflects the same economics as the DCF approach.  But, in order to apply it, we look at earnings multiples, we look at multiples of earnings.

THE COURT:  If it will give you the same information,

then, is it a redundancy?

THE WITNESS: In a way it is a redundancy. It is a further way to corroborate a finding in valuation.

THE COURT: So you would deploy the market approach to pressure test the results that you got from deploying the DCF methodology?

THE WITNESS: That's correct.

THE COURT: Okay. Like a belt-and-suspenders approach.

THE WITNESS: It is a belt-and-suspenders approach which is standard in fundamental valuation practice.

BY MR. FORGE:

Q. Let me try to bring this home with an example. I'll turn back to Exhibit P1, page 26, footnote 141. Are you there?

A. Yes, I see that.

Q. Now, I read the first sentence earlier in which you wrote, "Under the income approach, value today equals future cash flows discounted at the opportunity cost of capital, which reflects the risk associated with those cash flows."

The next sentence says, "The market approach generally applies a multiple to a measure of future income such as earnings."

Is that the market approach you've been describing?

A. Yes.

Q. As the Court characterized it, is that a way of pressure

92

testing the results of your DCF analysis?

A.   Yes.

Q.   So bringing this home to this case, if you could, please, turn to Exhibit P3 and paragraph 158.  Mr. Dalrymple, I'll represent to you that paragraph 158 is quoting a portion of a July 24th, 2020, FirstEnergy earnings call.  During this portion that's quoted here, the FirstEnergy representative was discussing the consequences to FirstEnergy if HB6 were to be repealed as a result of the suspected corruption that had been revealed.

The last sentence of the first quoted paragraph, it reads, "So, if decoupling goes away, those are the types of benefits that are going to go away."  Then, in the next quoted paragraph, the FirstEnergy representative gives an estimate of what that means.  "It's a few pennies per share, probably maximum that would benefit us."

Do you see that, sir?

A.   Yes, I see that.

Q.   So could you -- you earlier described how the DCF would be used to calculate the inflation step from the enactment of HB6 on July 23rd, 2019; right?

A.   Yes.

Q.   How would the market approach be used to give the same type of information but through the market approach, given this estimate of a few pennies per share of earnings impact?

93

A.    Sure, bearing in mind that we're talking about the same revision to economic information as it relates to future expected earnings.  If we were to apply the market approach, for instance -- and let's -- I believe that Mr. Jones is referring to a few pennies per share in earnings per year.  If that number were to be a nickel per share, say, five cents per share, and that reduction in earnings were expected into perpetuity, then one could look at market multiples that were prevailing at the time, say, 15 -- say, FirstEnergy was trading at 15 times earnings.  If we take 15 times earnings and we apply it to an example of five cents per share, that is a value of 75 cents per share.

Q.    So that result from the income approach or income methodology could be used to pressure test whatever answer you got from a DCF methodology.  Is that right, sir?

A.    That's right, yes.

Q.    So, if we can bring all of this together, is the primary methodology you're using here an event study methodology?

A.    I think it's fair to say that that is the primary methodology.

Q.    Do the methodologies that we've been discussing in addition to that, such as scaling factors and fundamental valuation techniques including DCF and market, allow you to refine the results of the event study methodology to, for example, adjust for changes in inflation during the class

period?

A.   Yes, they do.

Q.   And do all of these techniques apply the same on a classwide basis?

A.   Yes, they do.

MR. FORGE:  Thank you, sir.

Your Honor, unless you have any further questions for Mr. Dalrymple --

THE COURT:  I have none at this time, Mr. Forge. Thank you.

MR. FORGE:  Thank you, Your Honor.

THE COURT:  It's 12:15.  We have two things to do over the lunch break.  One of them is to repair my realtime.  I don't know exactly how long that will take.  So we're going to stand in recess until 1:30, give us an hour and 15 minutes for lunch.

MR. GIUFFRA:  I have one question.  Again, I'm not sure what the rule is in this court.  Can counsel speak to the witness while the witness is on the stand during the break?

THE COURT:  Not while you're in the middle of your examination.  So you haven't begun your examination; so counsel can speak with his witness over the lunch break.  But, then, if we take an afternoon recess, he cannot speak to you because you will be in the middle of your cross.

MR. GIUFFRA:  Thank you, Your Honor.

95

THE COURT: Enjoy your lunch, everyone.

(Lunch recess taken from 12:15 p.m. to 1:30 p.m.)

- - -

FRIDAY AFTERNOON SESSION

DECEMBER 12, 2025

- - -

THE COURT: Mr. Giuffra, are you ready to proceed with your cross?

MR. GIUFFRA: Yes, I am, Your Honor.

THE COURT: All right.

- - -

CROSS-EXAMINATION

BY MR. GIUFFRA:

Q. Mr. Dalrymple, good afternoon. My name is Robert Giuffra. I represent FirstEnergy.

A. Good afternoon.

Q. Now, you're aware that FirstEnergy is a large regulated public utility; right?

A. Yes, I'm aware of that.

Q. You've reviewed the company's financial statements?

A. I reviewed the company's public filings.

Q. You're aware that the company has roughly 6 million customers?

A. That would not surprise me.

Q. And it operates in multiple states?

A.    Yes.  I'm aware of that.

Q.    You're aware that the company owns valuable transmission lines?

A.    I'm aware of that, or through its subsidiaries.

Q.    You're aware that in -- pick a year, 2017, the start of the proposed class period, FirstEnergy would have generated more than $10 billion a year in revenue?

A.    That sounds roughly in the ballpark of what I would expect.

Q.    Now, for a company -- for any public company, the company has certain risks; right?

A.    Yes, any public company has certain risks.

Q.    And a company like FirstEnergy, which is a regulated public utility, has certain risks; right?

A.    Yes, FirstEnergy would have certain risks as well.

Q.    One of those risks could be, for example, that its rates have to be approved by the public utility commission; right?

A.    I think in a general sense that's probably a risk that they would face.

Q.    You would agree with me that the market price of a public company's stock is impacted by the risks that the company faces; right?

A.    Yes, that's right.

Q.    And you would agree that public companies face changing risks over time; right?

97

A.    I would agree that risk can change over time that a public company might face, yes.

Q.    In this case, one of the plaintiffs' claims is that FirstEnergy had an undisclosed risk that it had engaged in misconduct, right, and that that would have an effect on future earnings?

A.    That sounds generally familiar.  I don't have the complaint committed to memory.  I don't recall specifically.

Q.    Generally, the allegation of the complaint is that the company should have put a risk factor in the company's financial statement saying we're engaging in making illegal campaign contributions; correct?

A.    I just don't recall that specifically from the complaint.

Q.    But the claim is that the company concealed the fact that it was making these illegal campaign contributions.  Is that the theory of the plaintiffs' case?

A.    Generally, I understand the plaintiffs allege that the company concealed that.

Q.    And there was a -- the claim is the company concealed various corruption-related information that, if disclosed, could affect the company's performance going forward; right?

A.    That sounds like it's part of the claim.  I just don't have the complaint committed to memory.

Q.    We heard this morning there was talk about how, at the

98

start of the class period, the company had converted from a regulated public utility into a corrupt enterprise. Do you remember those questions this morning?

A.    I remember those questions.

Q.    And the -- I guess the claim of the plaintiffs is is that the company did not disclose that it was no longer a regulated public utility that serviced 6 million customers but was now a corrupt business enterprise?

A.    I'm sorry.  I just -- I don't recall specifically what is alleged in the complaint.

Q.    Now, you would agree that one of the risks that the plaintiff says was not disclosed was the risk of the fact that the company was making illegal campaign contributions; right?

A.    Again, I don't have the complaint committed to memory. If you could point me to a part of the complaint.

Q.    You would agree with me that one of the risks that the company faced is that the government might learn that the company was making illegal campaign contributions; right?

A.    Well, when you say is "one of the risks that the company faced," I don't understand that to be a risk that investors understood the company faced.

Q.    But the company should have disclosed that it was making illegal campaign contributions.  Isn't that the claim that the plaintiffs are putting forward in this case?

A.    In a general sense, I understand that that could be part

99

of the claim.  I just don't have the complaint committed to memory.

Q.  Okay.  One of the claims that's been made -- you would agree with me, it wasn't certain that FirstEnergy would get caught making illegal campaign contributions; right?

A.  Well, I haven't reviewed the factual record, but I cannot imagine it was -- when you say "certain," I don't think it was certain that FirstEnergy would be caught.  I'm not aware of that.

Q.  You would agree with me that companies can have risks that don't materialize; right?

A.  In general, companies can have risks that do not materialize.

Q.  In this case, the risk of the fact that FirstEnergy was making these illegal campaign contributions first materialized when the Department of Justice arrested Mr. Householder in July 2020; right?

A.  Well, when you say the risk that they were -- my understanding is that FirstEnergy was making these illegal corruption and bribery payments throughout the class period. That's not really -- that's not a risk that FirstEnergy would have been able to disclose that could materialize because, based on my understanding of the allegations, those -- FirstEnergy was engaged in the scheme throughout the class period.  So, once that risk is disclosed that we're making

100

these illegal campaign contributions and there is a risk that we might be caught, that -- then they're caught.

Q.    You would agree with me, as a matter of common sense, if a company is making $200,000 in illegal campaign contributions, the risk, in terms of enforcement, is different than if the company has made $50 million in illegal campaign contributions; right?

A.    In terms of enforcement, I don't have a specific understanding as to what the law is around $200,000 versus 50 million.

Q.    But you haven't studied how the risks -- let me just keep going on.

So, look, as of the date of your deposition which was August '22, you had been retained by the Robbins Geller firm in at least five, as many as ten, cases; is that right?

A.    It looks like that's what -- are you showing me my deposition?

Q.    That's your deposition.  I'll represent that to you.

A.    Yes.  That sounds right.

Q.    Since your deposition in August '22, have you been retained by the Robbins Geller firm in any more cases?

A.    I don't recall.  Maybe a couple of others.  I would have to look.

Q.    Okay.  You're aware that, in August '25, the Sixth Circuit reversed class certification in this case; right?

A.    Yes, I'm aware of that.

Q.    And just put up -- this is directly from the opinion which is Exhibit D14.  I'll just read it to you, and then we will talk about it for a second.  This is the penultimate holding on the issues that we're here for.

Accordingly, we reverse the district court -- let me restart.  Quote, "Accordingly, we reverse the district court and remand for application of *Comcast* rigorous analysis to determine if plaintiffs, for their Exchange Act claims, set forth a methodology for calculating damages on a classwide basis that is susceptible of measurement across the entire class and satisfies the preponderance requirement of Rule 23(b)(3)," close quote.

You're aware of that holding, are you not?

A.    Yes, I'm aware of that.

Q.    And you would agree with me that the -- and you've done a lot of securities damages analyses in security cases during the course of your career; right?

A.    I have, yes.

Q.    And you would agree that not all security cases are the same; right?

A.    I would agree that no two cases are the same.

Q.    Now, were you aware that, prior to the Sixth Circuit decision, the plaintiffs had claimed that this case was primarily about omissions?

102

A.   I'm generally aware of that.  Are you showing me an excerpt from the Sixth Circuit?

Q.   I'm showing you that actually -- that's from the plaintiffs' class cert reply brief which is ECF 346 at page 7625.

A.   I'm sorry.  Let me read it.  Yes, I see that.

Q.   You don't disagree that the way the plaintiffs pled the case that it was an omissions case; right?

A.   I don't disagree with what's written here.

Q.   You're aware, are you not, that the Sixth Circuit, in reversing class certification, said that this case was all about misrepresentations?  And I'm putting before you D14. This is page ID 20016, which is page 33 of the Sixth Circuit's decision.

A.   Yes, I see that.

Q.   And you don't now disagree that the case is now all about misrepresentations, in the view of the Sixth Circuit?

A.   I don't disagree that this is what the Sixth Circuit wrote.

Q.   Now, since the Sixth Circuit's August '25 opinion, have you changed any of your opinions in this case?  No; right?

A.   No, my opinions have not changed.

Q.   Since the Sixth Circuit's decision, you have not submitted a new expert report; right?

A.   That's correct.

Q.   Now, let's put up your rebuttal expert report, which is Exhibit D3, and I just want to sort of understand how you go about calculating damages, just the pure math of it.  You say, quote, "Damages can be measured based on the difference between, (a), share price inflation associated with the shares purchased at the time they were purchased; and, (b), share price inflation associated with shares sold at the time they were sold after one or more curative events were held through the last of the curative events," close quote.

Do you see that?

A.   I see that.  Would you mind if I just -- if I took out the paper copy?

Q.   No problem.

A.   Thanks.

Q.   Just let me know when you have it.

A.   I'm there; paragraph 7, which I think is the one you have pulled up.

Q.   Yes, that's correct.

So you refer to the methodology that's on paragraph 7 of this report as your out-of-pocket damages methodology; right?

A.   In footnote 7 I say, "This is commonly referred to as the out-of-pocket damages methodology," yes.

Q.   Would you agree with me that share price inflation during the class period is a key input for measuring damages in a securities class action?

104

A. I think that's fair, at least in terms of the class actions on which I've been retained.

Q. And you would agree with me that you can use the share price inflation, quote, That was present in the stock on each day of the class period to arrive at damages for every class member. That's in your rebuttal report at paragraph 12?

A. That sounds like what I wrote.

Q. So you agree with that; correct?

A. I'm sorry. Let me -- you said paragraph 12? Here we go.

Yeah, I agree with what I wrote here in paragraph 12, yes.

Q. You would agree with me that, to calculate damages in a securities class action, you need to know the share price inflation on each trading day of the class period; right?

A. Yes; you would need to know share price inflation on each day of the class period.

Q. And that's because you have to calculate damages for investors who were buying shares at different times throughout the class period; right?

A. That's correct.

Q. And you're aware that the proposed class period here is three years and five months and runs from February 21, 2017, to July 21, 2020; right?

A. That sounds right.

105

Q.   And you would agree with me that all other things being equal, the longer the class period the greater the damages?

A.   I think that's -- all else equal, I think that's fair because the longer the class period, the more opportunities investors have to purchase.

Q.   And you're aware that there are 860 trading days in the plaintiffs' proposed class period?

A.   That sounds right.

Q.   Now, we had a little bit of discussion this morning about your event study with respect to market efficiency.  Do you remember that testimony?

A.   Yes.

Q.   In your initial expert report, you talked about something called release dates.  Do you remember that?

A.   Yes, I do.

Q.   And the release dates were the dates when curative information was, under plaintiffs' theory, released to the market; right?

A.   I don't think so.

Q.   Let me restate that.  I actually misstated what I said. You picked 16 days -- over the three-and-a-half-year period, you picked 16 days when the company had, like, an earnings announcement; right?

A.   I believe I selected the days in the class period on which there was an earnings announcement or a change in the

dividends.

Q. And so what you were doing, with respect to your event study for purposes of market efficiency, was trying to determine whether that information was reflected in the company's stock price on those days when the company made public disclosures of important information. Is that fair to say?

A. Well, generally, I was examining the evidence that the company's share price systematically responded to new, value-relevant information.

Q. The idea was to see whether the market price -- excuse me. Your goal was to determine whether when value -- information that was value-important information, whether that information was impacted into the company's stock price to determine whether the market for FirstEnergy's shares was efficient; right?

A. Yeah. Let me just rephrase that to simplify it a bit. When I was looking at the release days, I was looking at those on days in which we would expect to see a larger frequency of abnormal returns. And I then compared the frequency of the large, abnormal returns on the release days to the frequency of the abnormal returns on all the other days. Based on the difference in those frequencies, that supported my conclusion that FirstEnergy traded in an efficient market.

Q. The event studies that you did were being done solely to

measure market efficiency; right?

A. The event study that I set forth in my market efficiency section was to support the *Cammer* 5 analysis to support the inference of market efficiency. In addition, that same analysis showed that the same methodology could be applied to measure damages.

Q. Okay. That's not in your expert report, is it?

A. Well, I believe we referred to it in paragraph 106 this morning.

Q. But your expert report in paragraph 106 doesn't refer back to your event study that was done for purposes of analyzing market efficiency, does it?

A. Would you mind if I took a look at my report?

Q. That's fine. We can put it up, in fact. Why don't we put up paragraph 106 of his first expert report. That way everybody can have it.

You have it in front of you. Why don't I just ask you: You don't reference, in paragraph 106, the event study you did for purposes of ascertaining whether the market for FirstEnergy stock was efficient in paragraph 106; right?

A. Well, I reference the methodology. I'm sorry. I'm reading back to 105.

Q. We can put 105 up.

A. I believe 105 is where I reference the event study approach in the last sentence there.

108

Q.   Okay.   So one sentence in your expert report.   You think that's the sentence where you're sort of saying, well, I can do an event study for purposes of doing market efficiency; and, therefore, I can do an event study for analyzing damages across the entire class; right?

A.   Well, I would not agree with the characterization that it's one sentence.   It's really what I wrote here in this section, cross-referencing back to the previous section where I determine that FirstEnergy traded in an efficient market.

Q.   I don't see a cross-reference in paragraph 105 or 106. Do you see one there?   Yes or no?

A.   No.   I don't think I put a -- no, I did not cross-reference back to the previous section.

Q.   You would agree with me that the methodology that -- your damages methodology has got to be something that can calculate damages reliably for each class member based on the inflation in FirstEnergy's stock price when that individual class member purchased FirstEnergy shares; right?

A.   I think that's right.   It would -- yes, the methodology would provide an inflation estimate on each day.   And so depending on the day when an investor purchased the shares, that is the inflation that would be applicable.

Q.   So you got to be able to calculate that inflation in the company's share price for all 860 days of the -- that the stock was traded during the proposed three-and-a-half-year class

period; right?

A.   Yes.   There would be an inflation amount on each day, noting that it might be the same inflation amount.  But it would be one inflation amount per day.

Q.   Now, in your September 2022 rebuttal report -- let's put that up.  You wrote that, quote, "Standard financial analysis and valuation tools can be applied to measure inflation and damages in accordance with plaintiffs' theory of liability," close quote; correct?

A.   I think you read that correctly, yes.

Q.   At your August 1 deposition, you said that these standard financial analysis and valuation tools are very, very broad.  Do you remember that testimony?

A.   It looks like that is what you've pulled up here.  I'm not sure I have my deposition in front of me.

Q.   You don't disagree that the mere reference to standard financial analysis and valuation tools, that those are very, very broad -- that's a very broad category of methodology; right?

A.   Well, as I testified -- I don't have the context of the question.  As I testified to this morning, it encompasses different tools and techniques.  So, for instance, we talked about the discounted cash flow analysis and how we could use that to value a change in earnings streams.  We talked about the multiple approach and how we could use that to value the

110

change in earnings.

These are general techniques that can be applied to measures of future economic income. So, when I say they are broad and encompassing, it's because they're all measuring the same thing. They're measuring the value of future economic income, and there are different ways to estimate that future economic income.

Q. In your expert report --

THE COURT: Just a second. I apologize, Mr. Giuffra.

Mr. Dalrymple, could you bend the mic towards you and try to keep your voice up as you end your sentences?

BY MR. GIUFFRA:

Q. In your expert report, either the initial one or the rebuttal one, you don't attempt to apply any of those standard financial analyses and valuation of tools to the plaintiffs' allegations in the complaint, do you?

A. As I testified this morning, I have not done any inflation or damages analysis at this stage.

Q. In fact, I think you testified in your deposition that these standard financial analyses and valuation tools can cover any number of fundamental value techniques; right?

A. Yes, I see that.

Q. And you would agree with me -- I think you said this is your deposition also -- at least as of your deposition, you had not even determined which techniques are specifically

appropriate to use to -- in this case?

A.    Yes, that's what I said.

Q.    In fact, at your deposition, you said, quote, You have not begun, close quote, to decide which techniques to use to measure the inflation attributable to each of the misrepresentations throughout the 860 trading days in the class period?

A.    Yes, that's what I said.  Those types of specific determinations would be done when I actually performed the analysis.

Q.    If I had --

MR. FORGE:  I apologize for the interruption.  I interpose an objection for the record.  If Mr. Giuffra could take the time to identify for the record the document to which he's referring.  In that particular instance, I believe Mr. Giuffra actually used the word "quote," but I think, if you look at the actual document to which he's referring, he was not actually quoting.  He was more paraphrasing what Mr. Dalrymple said.

I think the record will be cleaner if he can identify the page and line numbers, and that way we know to what he's referring.

THE COURT:  I don't know that that was -- unless -- if it's an objection to the form of the question because it's a mischaracterization of the testimony, I will sustain it.

Mr. Giuffra, rephrase your question.

BY MR. GIUFFRA:

Q. Would you agree with me that sitting here today you have not begun to decide what techniques you're going to use to measure inflation attributable -- I'll restate it.

At your deposition in August, it would be fair to say you hadn't decided which of the various damages methodologies you were going to use to measure the inflation attributable to each of FirstEnergy's alleged misrepresentations during the 860 trading days of the class period?

A. Well, I think what I said is I have not begun -- I have not begun to analyze the extent of share price inflation, nor have I determined which techniques would be appropriate to do so at that time.

Q. And sitting here today, you haven't come to a determination as to which technique you would use to measure share price inflation across the 860 days of the proposed -- trading days of the proposed class period; right?

A. I have not settled on a specific technique. So, for instance, if I say -- we talked earlier about earnings multiples and DCF. I would expect to look at the evidence I have in relation to those, as well as any other evidence I have in relation to value, and that is something I would use in my analysis of inflation. But I have not determined which specific technique is, say, most appropriate.

Q.  And I believe that -- would you say that it's fair to say that, in order to decide what technique you would use, you would have to analyze the facts and circumstances of this case; right?

A.  Well, in order to reach a final determination as to what is the most reliable estimate of inflation, I would need to analyze the facts and circumstances of the case.  In order to describe the methodology that I would apply, that is -- that is a methodology that measures the value of future economic income.  And there are multiple techniques that I could use to do that.  I would not anticipate -- I would not anticipate not looking at evidence that was available through multiple of those techniques.  But making a determination, I would need to have the facts in front of me.

Q.  But, at the time you prepared your expert report, you had the allegations of the complaint in front of you; correct?

A.  Yes, I had the allegations in front of me.

Q.  And you would say that -- at the point when you wrote your expert report, you did not decide what methodologies or combination of methodologies would make sense, in light of the allegations that were in the complaint; correct?

A.  Well, I decided that the methodologies or the techniques that would apply here to the damages methodology are those tools and techniques that I discuss in my expert reports.

Q.  Isn't it fair to say that the tools and techniques that

114

you discussed in your expert reports, which is an event study, would be tools and techniques that you would use in any securities class action to try to ascertain damages across the class?

A.   I'm sorry.  Was your -- your question was about an event study?

Q.   Would it be fair to say that, if you were asked to determine damages across a class, one of the techniques you would use, regardless of whether it was the FirstEnergy case or the XYZ Corporation case, would be an event study; right?

A.   Well, here, FirstEnergy trades in an efficient market; so I can feel confident in the application of an event study. In other cases in which the share price trades in an efficient market, an event study is a widely used tool that I would typically apply.

Q.   But you haven't done any of the work to either develop the event study that you would use in this case, correct?

Let me restate the question.  You have not developed the event study that you would use in this case to calculate damages across the class.  Isn't that correct?

A.   Well, I would not agree with that.  I have identified an event study in my expert report that identifies the market index, the industry index, certain indicator variables, and I've also identified a number of variations on that event study; so alternative indices, alternative estimation windows.

115

And that was all provided as part of my expert report.

So I have done quite a bit of the work in determining what the specification of that event study is going to be. I have not made a final determination as to explicitly, precisely how I would run the event study for each of those days.

Q. Isn't it correct, sir, that at your deposition you testified that you thought it would be premature to present a specific technique or model before fact discovery was complete? Yes or no?

A. Yes, that is something I said.

Q. Now, at your deposition, I believe you testified that it was possible for the amount of inflation in a company's share price to vary over the course of the class period. You agree with that; correct?

A. Yes. Would you mind if I -- is my deposition here? Could I look at the --

Q. I'm just asking the question regardless of your deposition. You would agree with me that it's possible for inflation to vary over the course of a class period; correct?

A. Yes, it's possible.

Q. And you would agree with me that inflation may not necessarily be the same dollar inflation on day one of a class period as on the last day of a class period; right?

A. I would agree with that. It may not necessarily be the same.

116

Q.   And you have not made any determination in this case as to the extent to which inflation varied over the 860-day trading period of the proposed class here; right?

A.   I have not made that determination.

Q.   And you have not measured any of the inflation on any of the trading days in the 860 days of the proposed class period; correct?

A.   That's correct.  I have not measured inflation on any day in the class period.

Q.   So you've done no work to determine whether any of the methodologies that you've described for the Court actually will measure inflation in FirstEnergy's stock price on any of the 860 days in the class period; right?

A.   Well, Mr. Giuffra, I would disagree with your characterization of I have done no work because the event study methodology that I set forth in my expert report is a significant amount of work and research to determine that FirstEnergy trades in an efficient market.  That is the same research that would need to be done when preparing the ultimate event study model which I have not prepared.  But that is the same work that has to be done when preparing that event study regression.  And I would expect the event study to be very similar, but I have not settled on a final event study model that I would use to estimate inflation.  But it would be similar, if not the same, as the event study that I have set

forth in my expert report.

Q. Now, it would be fair to say that the event study that you referenced this morning was intended to measure market efficiency; right?

A. That's correct.

Q. Again, you have not done an event study to measure damages in this case; correct?

A. The event study that I described this morning was to measure -- was to examine support for market efficiency. I have not constructed the actual event study that would estimate damages.

Q. Your view is that the -- Judge Marbley is supposed to do a rigorous analysis of whether you have a methodology that can ascertain damages across a class, but you haven't even done the work to develop that event study or presented it to the Court?

A. Well, let me just -- let me try to answer your question in a way that's helpful just so you can know what work I've done and what work I have yet to do.

The work that I've done is the initial identification of, say, the market index, the industry index; so developing an understanding of the company and what market forces we might expect to determine, all else equal, the share price movements in FirstEnergy stock. I have done that research because that was research necessary to support my market efficiency opinion. That event study was run over the course of the class period.

118

What I have not done is I have not yet taken that event study and used it to measure the abnormal returns on each of the curative event days.  So that was an example.  We had talked about how the event study can change based on the abnormal return that you're using.  I have not yet run the event study and analyzed the abnormal returns associated with each of the curative event days.

Q.  You would agree with me that, in performing an event study, one of the important things is identifying the events themselves; right?

A.  I believe, as I testified this morning, that is an initial step, is to identify the events.

Q.  And over the 860 trading days in this case, there were lots of events that occurred; right?

A.  There were a lot of events related to FirstEnergy that occurred in the three-and-a-half-year period.  I tested 16, I think.

Q.  So you have not done a full -- let me restate the question.

Now, it would be fair to say that, in order to do an event study, you would have to identify what events you were actually going to do the study with respect to; right?

A.  I think that's fair.  You have to identify some event.

Q.  If you're only doing a curative event, those are the ones after, in this case, August 2020 when Householder was

arrested; right? Those would be the events that would be the ones that caused the stock price, or theory of the plaintiffs, to drop; right?

MR. FORGE: I have to object to lack of foundation. Mr. Giuffra's question assumes facts that are not only not in evidence, but they're contrary with respect to evidence, wherein the date.

THE COURT: Read the question back, Ms. Evans.

(Thereupon, the last question was read by the court reporter.)

THE COURT: I'm going to overrule the objection. I do recall you making inquiry about the effects of Householder's arrest and some of those other events around his arrest and the alleged illegalities that came out involving --

MR. FORGE: Just to be clear -- and I believe Mr. Giuffra just received a note to that effect. My objection was to the date he used.

MR. GIUFFRA: Your Honor, I made a mistake. It was July 2020. I stand corrected.

THE COURT: I stand corrected. Thank you, Mr. Forge. I believe Mr. Giuffra has corrected the record.

BY MR. GIUFFRA:

Q. I'll restate the question, make it simpler. Mr. Householder was arrested on -- in July 2020; correct?

A. Yes.

120

Q.   And you did an event study on that date; correct?

A.   I'm sorry.  Was it July 21st?

Q.   Yes, I believe that's the date.

A.   I think that's right.

Q.   And this morning -- just a yes or no.  You did an event study on that day; right?

A.   I did not identify that day as a release day.  But the regression I ran would have estimated an abnormal return on that day because I believe that's the last day in the class period.

Q.   You think the last day of the class period is July 2020?

A.   My recollection was that it was July 21st, 2020.  I can --

Q.   We'll come to that later in the examination.  Why don't we just keep going.

     Now, you would agree, though, that identifying what events you're going to encompass with an event study is critical for measuring damages across a class; correct?

A.   Did you say identifying what events you're going to -- identifying the events on which the information became available is necessary to perform an event study for purposes of estimating inflation.

Q.   Okay.  You mentioned earlier this morning the use of a discounted cash flow model to potentially model damages in this case.  Do you recall that?

121

A.    I recall our discussion of the DCF.

Q.    And you referenced a treatise by a man named Pratt; right?

A.    I recall testifying to that this morning.

Q.    That's a pretty well-regarded or well-known treatise; correct?

A.    The Pratt treatise is pretty well-regarded and widely accepted, yes.

Q.    You haven't done any work in this case on how you might use DCF to measure damages across the 860 days of this class period; right?

A.    Well, when you say I haven't done any work, I have -- I have not applied the DCF to measure inflation at all. I have confirmed that I think fundamental valuation techniques can be used in order to estimate or adjust inflation. But I have not actually done the work to make those estimates or adjustments.

Q.    You mentioned something called scaling factors this morning. Do you recall that?

A.    Yes, I do.

Q.    And you have not done the work to figure out what the scaling factors would be in this case; correct?

A.    I have not -- I have not developed any scaling factors in this case.

Q.    And you reference the fact that courts have accepted your scaling factors in two cases; is that right?

122

A.    Well, I don't -- I'm not sure precisely what I said.  I provided two cases in which I had estimated inflation using scaling factors.  And my understanding is those were both accepted by the courts.

Q.    And one of those cases was in Australia.  Am I right?

A.    Yes, that's correct.

Q.    Now, you referenced this morning -- we talked a little bit about the passage of HB6 which I think was July 23, 2019.  Do you remember that testimony?

A.    Generally, yes.

Q.    And you talked about the fact that the inflation in FirstEnergy's stock price before July 23rd, 2019, would be lower than after July 23rd, 2019, when HB6 was passed.  Do you recall that testimony this morning?

A.    Yeah.  I'm sorry.  Do you mind repeating -- I want to make sure I got the direction right.

Q.    Let's get the direction right.  HB6 passes on July 23rd, 2019; correct?

A.    That's my understanding.

Q.    And your testimony was that you thought that the inflation in FirstEnergy's stock price would be lower before the passage of HB6; right?

A.    Well, I believe I was responding to a question as to how I would make that adjustment based on the representation that Mr. Forge made to me about the need to remove the impact of

123

HB6.  And so, if that adjustment is made at the time of passage, then inflation would be lower than it would be after.

Q.  So what you're saying is that the inflation in the company's stock price, at least your speculation is, would be lower before the passage of HB6 than afterwards; correct?

A.  Well, I would not agree with the characterization that it was speculation.  I was simply answering Mr. Forge's question based on the representation he made to me.

Q.  But you haven't done the work to figure out what the inflation was in FirstEnergy's stock price before or after the passage of HB6; correct?

A.  As I testified earlier, I have not estimated inflation in this case.

Q.  And you have not validated whether an event study would work to estimate the inflation in FirstEnergy's stock price over the course of the 860-day trading period; correct?

A.  I would not agree with that.  And I can explain.

Q.  Let me restate the question.  Is there anything in your expert report indicating that you had done an analysis to validate whether an event study could be used to measure the inflation in FirstEnergy's stock price over the 860-day trading period?  Yes or no?

A.  If I could refer to my reports, I can -- I can point you to the section where I discuss the estimation of inflation during the class period, and I can see if that answers your

124

question.

Q.   Go ahead.

A.   I'm sorry.  Mr. Giuffra, would you mind repeating that question.

Q.   I think we've established that you have not done an event study to measure damages in this case across all 860 trading days; correct?

A.   I have not done that.  However, I think that the phrasing of your question is a bit misplaced.  I believe, when you say I have not done an event study to estimate inflation across all 860 days, the event study that I would expect to use is not an event study on each and every day.  It is an event study that estimates inflation at the time of the curative events and uses that estimate to estimate inflation on every day.

The event study that I produced in this case does span the 860-day period, but that is for the purposes of establishing market efficiency.

Q.   What you're basically saying is what you plan to do in this case is figure out what the inflation was in the company's stock price on the curative disclosure dates, figure out what that percentage is and backcast it across the entire class period with the inflation being the same on all the days before the first curative disclosure case.  Isn't that right?

A.   No, that is -- no, it's not right.

125

Q. This morning you talked about that you haven't really decided what techniques you might use in this case. Do you remember that testimony?

A. Yes.

Q. And you threw out an event study as a possibility; right? Correct?

A. Yes, I talked about an event study.

Q. And you talked about DCF; right?

A. I spoke about DCF as another --

Q. And you talked about scaling factors; right?

A. Yes, we talked about scaling factors.

Q. And you talked about market analysis; correct?

A. I believe I was referring to market -- to multiples, market multiples, perhaps.

Q. Would you say that -- would it be fair to say that each one of those techniques that I just referenced is a technique that's in the tool box of someone who engages in damages analyses in a securities class action; right?

A. These tools and techniques are in the tool box of any valuation practitioner. They're not necessarily available in each and every case.

Q. But you haven't done the work, again, to decide which ones you would use in this case; correct?

A. Well, as I testified earlier, I have determined that these are tools and techniques that are available to be used in

126

this case. And I would expect to look at all of the evidence and tools that I have available to me in forming my opinions. But I have not made a determination as to, for instance, what specifically is the most reliable tool to estimate inflation or make an adjustment.

Q. Okay. We've established you reviewed the complaint in this case; right?

A. Yes.

Q. And it would be fair to say that the plaintiffs allege numerous misstatements by my client, FirstEnergy; right?

A. I believe there are numerous alleged misstatements.

Q. And you would agree that I think the total is 46 alleged misstatements in this case?

A. That sounds about right.

Q. And you would agree with me that the amount of price inflation attributable to a company's statement depends on the content of the alleged misstatement; right?

A. The amount -- I'm sorry. Would you mind just repeating that.

Q. You would agree with me that the amount of price inflation attributable to a company's statement depends on what it actually told the market?

A. Well, in a general sense, I think that statement is probably a bit incomplete because it -- what matters is the economic substance of the information that was conveyed to the

127

market or that was not conveyed to the market.

Q. I agree 100 percent with that. You would agree with me that the economic substance of what was or was not conveyed to the market will affect the amount of inflation in a company's stock price; right?

A. I believe that that is accurate. If we -- yes, it's what was conveyed to the market or, at the same time, what was not conveyed to the market.

Q. Now, you would agree with me that a statement about a company's financial performance, that's generally a value-relevant disclosure; correct?

A. If it is new and unexpected, then that is something that can be value relevant. If it confirms previous expectations, then it may not be.

Q. Let's put up slide 42 which I used at the class cert hearing as an illustrative aid, which is the November 6th -- this is just -- this is just something to sort of reset us so we can all agree.

Would you agree with me that the example I'm giving here, if, in July '24, a company misstates its revenue but the revenue increase -- claim that it's going to have higher revenues causes the stock price to go up, and then the company restates its revenues six months later and the company falls by, say, $20 a share, you would agree with me that, in that case, it's fairly easy to calculate what the damages were per

128

share across the class period; right?

A. Well, there's -- there are a lot of assumptions in that hypothetical. There can be -- even if it's just six months, there can be factors that would cause the inflation to be the same or different. I would just have to understand more about the hypothetical.

Q. Okay. But, if you were just -- as an initial matter and you saw that a company announced it was going to earn $50 billion in revenue, and the stock price increased on the day of that announcement by $20 a share and, taking into account market and industry factors, there was a 20-dollar abnormal return in the company's stock price, you would attribute that increase to the disclosure of the fact it had increased earnings, right, or increased revenue?

A. Well, I think what your question presupposes is that that is a change in expectations. In other words, that is a -- that's an announcement that changes what was previously expected. So, if there is announcement that tells market participants that revenue is going to be higher, then we can reasonably expect the share price to go higher.

Q. If it turns out the company was engaged in fraud -- I worked on the HealthSouth case, and they literally made up revenue. Then it gets announced on a date, hey, revenue was just not there, gone, phoney, made up, and the stock price fell by $20 a share, the same $20 a share it went up to, you would

129

be able to calculate the damages across that class period pretty easily by those two data points. Am I correct?

A.   Well, I would just have to understand more about what happens between the two data points in that hypothetical.

Q.   You would agree with me that if someone bought, say, in August '24 or October '24, or December '24, and they, like everyone else in the market, thought the company was going to earn $50 billion in revenue and it was phoney money and it wasn't there, they all would have suffered the same exact loss; correct?

A.   Again, I'm -- I don't have a full understanding of your hypothetical. It sounds like you're contemplating a hypothetical where inflation is constantly $20.

Q.   And you would agree that, in a case where inflation is constant because it's one disclosure at the beginning and one corrective disclosure at the end, that's a situation where it's much easier to calculate the damages in a securities class action; right?

A.   I would not necessarily agree with that. It would just depend on what other factors would need to be taken into consideration.

Q.   Let's talk about the complaint in this case. The complaint here alleges statements about eight different topics at different times over a more than three-and-a-half-year class period. And we've just put before you paragraph 94 of the

complaint. Do you see that?

A. Yes.

Q. So one set of misstatements that FirstEnergy made -- and this is paragraph 94(a) -- was about its compliance with laws and regulations governing its business, operations, and disclosures to investors. You would agree with that. That was one set of misstatements FirstEnergy made; right?

A. Yes. I agree that that's what it says in the complaint.

Q. And you haven't done any event study to ascertain how you would measure the amount of inflation in FirstEnergy's stock price with respect to statements that it made about its, quote, "compliance with laws and regulations governing its business, operations, and disclosures to investors," close quote?

A. Well, like I said, I have not estimated inflation in this case yet. So I have not done that analysis at this stage.

Q. And the second category of statements in this case is, quote, "The adherence of FirstEnergy and its executives to the company's internal policies and code of conduct," close quote. Do you see that?

A. I do see that.

Q. And you haven't done any work to ascertain how much inflation was in the company's stock price because of those misstatements; right?

A. Well, like I said earlier, I have not estimated

131

inflation. These subparagraphs refer to what seem to be categories of misstatements. And my understanding of what plaintiffs contend is these all concealed the same economic substance or relevant truth.

Q. So sort of going back to the omission theory that was rejected by the Sixth Circuit; is that right?

A. Well, I'm not an attorney. So, when you say the omissions theory was rejected, if I recall the Sixth Circuit's opinion, it referred to different categories of misstatements. And those categories -- to paraphrase what I recall from the Sixth Circuit's opinion, they concealed information through things like half-truths.

So whether the Sixth Circuit, which I think even said it was taking a narrow definition of omissions -- from an economic standpoint, the economic substance doesn't change based on that ruling. It's still the same information that allegedly was concealed.

Q. Don't you have to ascertain the inflation in the company's stock price based on each of the 46 alleged misstatements across the 860 trading days in the class period?

A. Well, plaintiffs' theory in this case is that each of those misstatements concealed the same relevant truth. Now, when you're estimating inflation across the class period, it's possible that the finder of fact may find that the statements only began to conceal the relevant truth at some point during

132

the class period, at which point, if that's true, then inflation before that finding is zero.

Q.   You haven't done any analysis to ascertain, for example, whether a statement about FirstEnergy's general compliance with laws caused any inflation in the company's stock price, have you?

A.   You're asking me if I've done an analysis about whether FirstEnergy's compliance with laws caused inflation in the stock price?  No, I have not done an analysis.  I have an understanding of what's alleged, that when evidence came to light that FirstEnergy was not complying with laws that its share price declined.  But I have not attempted to estimate inflation at this stage.

Q.   And you have not attempted to ascertain inflation or whether it's even possible to measure inflation on a statement -- misstatement throughout the class period; correct?

A.   I would not agree with that.  In my opinion it is possible, as I've set forth in my reports, to estimate share price inflation on every day of the class period.

The -- to the extent certain statements are found to not have been -- to have been made, say, without falsity or scienter, to the extent there's no liability associated with certain statements, then if those -- if that finding is made, then inflation would be zero before -- up until that liability is found.  And then, once liability is found with respect to

the misstatements, then inflation is applicable.

Q. You've been involved in securities cases for at least a number of years. You're aware of the case law that stands for the proposition that statements that are too generic for investors to rely upon are not statements that can have a market impact; correct?

MR. FORGE: Objection. Number one, to the characterization of the law; and, number two, it's well outside the scope of what we're talking about here and the scope of Mr. Dalrymple's expertise.

THE COURT: We have talked about studies of an efficient market and factors that would impact on the market. So, in that respect, Mr. Giuffra's question is a fair question.

Mr. Dalrymple has never purported to be nor held himself out to be an expert on securities law. Therefore, that aspect of your question -- or your objection is sustained. The other aspect is overruled. Rephrase your question.

BY MR. GIUFFRA:

Q. From the standpoint of an economist, which is what you are, do puffery statements impact a company's stock price?

A. Well, when I hear the word "puffery," to me, that brings to mind legal connotations, and I am not a legal expert. I could not tell you exactly what statement is puffery or not.

What I could -- is there another word you can use besides puffery?

134

Q. Are there statements that are so general that no investor would rely upon them; and, therefore, those statements could not impact a company's stock price?

A. That's possible. But I would say that it was -- it's a bit incomplete because it suggests that, because the statement is general, it is therefore not something that investors rely on, and that's not necessarily true.

So, if a statement is general, like a statement that we're in compliance with the law, we have a code of conduct, those -- whether they're general or not is not something that really is in the purview of economics. But investors can rely on those, when making an investment decision, because it is -- while that doesn't necessarily change an expectation relative to when -- before the statement came out yesterday, it confirms the investors' expectation and understanding that, for instance, the company operates within the law. That's what I can tell you from an economic perspective.

Q. You've reviewed many public company financial statements; correct? Public disclosures?

A. I have, yes.

Q. Don't virtually every company have a general disclosure that they endeavor to comply with laws? Isn't that a standard disclosure that every company makes?

A. It would not surprise me. I have not actually -- I don't know. I have not analyzed whether every company makes

135

that disclosure or whether there's even a requirement there. There may be. It sounds like a legal question.

THE COURT: Mr. Dalrymple, maybe you would understand the question this way. In looking at the financial statements of many companies, have you run across, in those financial statements, a general statement saying that, you know, we comply with all applicable laws? Is that something you expect to find in the financial statements of publicly traded companies?

THE WITNESS: As a general matter, yes.

THE COURT: Please continue, Mr. Giuffra.

BY MR. GIUFFRA:

Q. I don't want to -- we'll be here until six o'clock, and Judge Marbley will not be happy with me.

If you just look at the categories of misstatements that are laid out in the complaint, there's eight different categories. Do you see them all there? Do any of those statements involve a financial metric of FirstEnergy?

A. Nothing here seems to directly refer to a financial metric. I suppose some of these could relate to financial metrics.

Q. None of these are quantitative disclosures by FirstEnergy; correct?

A. That's fair. I suppose the extent of the company's political contributions, some element of that is quantitative.

136

Q.    But these disclosures are what you might describe as qualitative disclosures; right?

A.    I think some of them are qualitative.  It's possible some could have been quantitative.

Q.    Can you identify any of the nine categories of statements that are identified -- excuse me, eight categories of statements that are identified in paragraph 94 of the complaint that are quantitative?

A.    The only one that comes to mind is the extent of the political contributions.

Q.    That would mean how much you were making contributions at a different moment in time; correct?  The dollar amounts?

A.    Yeah, I would imagine it does.

Q.    Now, would it be fair to say that the complaint in this case -- let me ask you this question.  How many times have you reviewed the complaint in this case?  Once?  Two?  Three times?

A.    Well, over the entire course of the engagement?  At least that.

Q.    When was the last time you reviewed the complaint?

A.    Well, yesterday.

Q.    Okay.  And you would agree that the complaint is the best statement of the plaintiffs' claims in this case; right?

A.    My understanding is that it's the statement of plaintiffs' claims.

Q.    And you're aware that the complaint alleges that

137

different statements were false for different reasons over the class period; correct?

A.    I don't have the complaint committed to memory.  That --

Q.    Why don't we put up paragraph 135(a) of the complaint which is page ID 1593.

In this paragraph -- this is paragraph 135(a).  The complaint alleges, quote, "FirstEnergy, its officers, employees, and other representatives and affiliates had launched an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the company and its affiliates," close quote. Do you see that?

A.    I do, yes.

Q.    And below that, this is 136.  The complaint alleges -- 136(a) at page ID 1593 -- quote, "That FirstEnergy, its officers, employees, and other representatives and affiliates had executed an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the company and its affiliates, including to secure the passage and preservation of HB6."

Do you see that?

A.    I do see that, yes.

Q.    In the first paragraph that I referenced which is 135(a), you see the word "launched," and then, in 136(a), it talks about execution; correct?

A.   Yes, I see that.

Q.   Let's put up slide 1.  You've seen this document before; right?

A.   It looks familiar.

Q.   And I assume your -- Mr. Forge or his team showed you the documents that we had prepared to be illustrative aids for purposes of this hearing before you testified today; right?

A.   Yes, I've seen those.

Q.   And you discussed those slides with counsel; correct?

MR. FORGE:  Objection, Your Honor, to inquiry for what the witness discussed with counsel.  It's certainly fair game to confirm that he has seen it, but discussions with counsel are off limits because that's work product.

THE COURT:  Sustained.

MR. GIUFFRA:  Actually, Your Honor, the law on this is, if someone is an expert, discussions between counsel and the expert are not privileged.  They are not privileged, is my understanding.

MR. FORGE:  Just for the record, Your Honor, I didn't say privilege.  I said work product.

THE COURT:  I understand the work product argument.  I have sustained the objection.  Please continue.  I don't think that this is pivotal to the issue in this case.

BY MR. GIUFFRA:

Q.   What I've shown you on slide 1 is the first day of the

class period which is February 21st, 2017.  Do you see that?

A.    I do see that, yes.

Q.    And then July 21, 2020, is the last day of the class period; right?

A.    Yes, I do see that.

Q.    That's the date of the Householder arrest, I believe. Actually, that's the last curative event in the entire case, is July 21, 2020.  Do you see that?

MR. FORGE:  Objection, Your Honor.  Lack of foundation because --

MR. GIUFFRA:  I'll restate.

MR. FORGE:  If I could please state my objection before Mr. Giuffra starts responding to it, I'd appreciate it.

THE COURT:  You may state your objection, but everybody must direct their comments to me.  I'm the only decision maker in the room.

MR. FORGE:  Your Honor, I object due to a lack of foundation because Mr. Giuffra's question assumes facts not in evidence.  Specifically, he characterized July 21st, 2020, as the date of the last curative event.  The --

MR. GIUFFRA:  That was a mistake by me.  I stand corrected; so we can keep moving.

THE COURT:  No.  No.  No.  Sidebar.

140

- - -

(The following proceeding was held at sidebar.)

THE COURT: You have been paragons of comportment up to this point. I expect no less from you for the rest of the day. Everybody's tired. It's been a long week. You all have worked hard to prepare a thorough case, and you have been expert in your preparation and presentation.

So here's how we're going to do this. If one lawyer is talking, the other one is going to wait until that one lawyer speaking has completed his statement. That's not aspirational. That's a directive.

MR. GIUFFRA: I apologize.

THE COURT: No worries. That happens. It happens in the heat of battle. You're trial lawyers. I understand that happens. That's why I'm here.

Now, go ahead finish your objection.

MR. FORGE: The objection was to the statement that July 21st, 2020, was the date of the last curative event. And --

MR. GIUFFRA: The objection --

THE COURT: You can't help yourself.

It's a quarter till three. We're going to take a recess until three o'clock.

(Recess taken from 2:47 p.m. to 3:00 p.m.)

THE COURT: All right. We didn't resolve the

141

objection.

Go ahead with your objection, Mr. Forge.

MR. FORGE:  Your Honor, I was simply objecting to the date that Mr. Giuffra characterized as being the date of the last curative event.

MR. GIUFFRA:  And I made a mistake, Your Honor.

THE COURT:  All right.  Please continue.

BY MR. GIUFFRA:

Q.   Mr. Dalrymple, you've identified event studies, generally, as a tool that you might use to calculate damages in this case; correct?

A.   That's correct.

Q.   And you've identified DCF as a tool you might use to calculate damages in this case; right?

A.   Yes.  Those are both tools I would expect to use.

Q.   And you've identified scaling as a tool you might use to calculate damages across the 860-day trading class period here; correct?

A.   Yes, I've identified scaling factors as well.

Q.   And you've identified market analyses as a technique you might use to calculate damages across the 860 days of the class period here; right?

A.   When you say "market analyses," you might be referring to market multiples which is what I referred to earlier as another technique under the umbrella of fundamental valuation.

142

Q.    Okay.  Have you explained to the Court how you would use event studies or an event study to calculate damages across the 860-day trading day class period here as applied to the allegations of the complaint?  Yes or no?

A.    I believe I explained that in my report, but I'm happy to clarify -- I'm happy to clarify anything that's unclear.

Q.    Your report doesn't identify whether you're going to use an event study and what the nature of the event study is; correct?

A.    My report does not specify exactly which event study I would use, that's correct.

Q.    In fact, this morning you said you might use an event study, you might use DCF, and you might use scaling or some combination of the three; correct?

A.    I believe what I said this morning is that, to the extent that those tools and techniques provide evidence that would be helpful in estimating inflation, I would examine those.

Q.    You have not explained for the Court how you would use an event study to calculate damages across the 860 trading days of the proposed class period based on the allegations of this complaint; correct?

A.    I would not agree with that.  I feel like my report does explain that.

Q.    Your initial report is a page and a half about your

damages calculation methodology; correct?

A.    I believe section 7 of my report is about a page and a half.

Q.    Anywhere in that page and a half do you explain how you would use any of the valuation techniques that you propose to use in this case to measure damages across the 860 trading days of the proposed class period and applying them to the allegations of the complaint?

A.    Well, I can, again, refer you in this report to paragraphs, for instance, 104, 105 and 106.  I discuss the application of the event study generally, and I then -- in 107 I explain that if there are issues complicating the quantification of artificial inflation, then there are standard financial analysis and valuation tools that I can use.

Q.    You're basically saying to Judge Marbley that's something you'll get to later; is that correct?

A.    Well, I would not agree with that characterization.  I am explaining the tools that I would use based on my understanding of plaintiffs' theory and what I have been asked to do at this point.  I have not been asked to actually estimate inflation; and so I have not provided, for instance, the level of specificity that I would have if I had a fully developed record in front of me and I were asked to estimate inflation.  I would -- for instance, I would be able to tell you that the event study technique is what I start with, but I

144

make an adjustment for this scaling factor or that scaling factor on this basis.

But, before I have actually had access to the entire record and been asked to perform that analysis, I have not decided, specifically, which techniques I would apply. But I would not anticipate ignoring any of the evidence that was probative.

Q. But you haven't done any analysis -- I'll restate that.

You have not explained in your expert report how you would actually use an event study to calculate damages across the class period here based on at least the allegations of the complaint?

A. Yeah, I would not agree with that. I feel like what I set forth in my expert report -- and, then, to the extent that Dr. Marietta-Westberg raised questions in her report, I've explained further in my rebuttal report how that would be done.

Q. In the complaint -- I have it in front of you, paragraph 94 -- it talks about eight separate categories of misleading statements that FirstEnergy allegedly made; correct?

A. I see that, yes.

Q. In your report have you explained how you would use an event study to measure the damages caused by FirstEnergy's statements about compliance with laws?

A. Well, I would say that my report addresses plaintiffs' theory in a general sense. At the time I prepared the reports,

this is not an issue that Dr. Marietta-Westberg raised. But my answer is the same, which is that these allegations under plaintiffs' theory all concealed the same relevant truth.

Q. Let's go back to -- obviously, you wrote your initial report before you even knew what Dr. Marietta-Westberg would say about your report; right?

A. That is correct.

Q. So, at least in your initial report, you have no explanation of how you would use any damages methodology to calculate the damages caused by any of the eight categories of documents -- alleged misstatements that are laid out in paragraph 94 of the complaint; correct?

A. Yeah, I do not -- I do not attempt to break out the inflation analysis by these categories because that was just not something I needed to do.

Q. Something you were not asked to do; right?

A. Well, it was not something -- it was something I was not asked to do, that's true. It was not something that I understood would need to be done based on what I understand to be plaintiffs' theory of liability.

Q. In fact, you don't reference any of the 94 categories of misstatements anywhere in your initial expert report, do you?

MR. FORGE: I'm going to object to the form of the question. I believe Mr. Giuffra misspoke when he said "94 categories."

146

MR. GIUFFRA:  Let me restate that.  I apologize.

THE COURT:  For the record, it's sustained.

BY MR. GIUFFRA:

Q.  Your initial expert report, you did not identify how you would use any damages methodology to calculate damages with respect to any of the eight categories of misstatements that are laid out in paragraph 94 of the complaint?

A.  I did not set forth a separate methodology for each of these categories because the methodology is the same across all of these categories.

Q.  Well, you basically just identified an event study as a tool you might use.  But would it be fair to say that there's nothing in your report where you're explaining to the Court how you would use an event study to determine the inflation in the company's stock price caused by any of the 46 alleged misstatements in the complaint?

A.  Yeah, I'm not sure that's a fair characterization.  I explain how I would use the event study.  I explain my understanding of plaintiffs' theory of liability.  To the extent it -- it is unclear what my understanding is, I believe -- I don't recall if they asked me about that at my deposition.  But I did not set out to provide a separate methodology for each of these categories of misstatements because that is not my understanding of plaintiffs' theory of liability.

Q.    Well, when you prepared your initial expert report, that was before the Sixth Circuit decision in this case; right?

A.    That's correct.

Q.    And the Sixth Circuit said this case was all about misstatements; right?

A.    I believe you showed me an excerpt from that opinion earlier.

Q.    And you don't reference any of the eight categories of misstatements that are identified in paragraph 94 in your expert report; right?

A.    Well, I reference the misstatements.  I don't recall specifically if I reference paragraph 94.  But my understanding of the Sixth Circuit's opinion is that opinion related to sort of a narrow interpretation of omissions for purposes of reliance.  It's not something that affects my opinion or view of the economic substance of the allegations.

Q.    Just to try to speed this up, if I ask a question that you can just say yes or no, I think we'll be done earlier.  I'm just trying to ascertain whether, in the page and a half of your initial damages report, you explained how you would use an event study to ascertain the inflation caused by any of the statements alleged to be misleading in the complaint.  I think the answer to that has got to be you didn't do the work.

A.    I do not provide -- yeah, I don't set that out in my initial report.

148

Q.    Let's turn to paragraph 137 of the complaint.    Paragraph 137 of the complaint alleges the amount of political contributions that FirstEnergy concealed in each year of the class period.    Do you see that?

A.    Yes.

Q.    And have you studied this particular paragraph of the complaint in preparing your expert report in this case?

A.    I had seen this, yes.

Q.    Seen it, but have you studied it?

A.    Well, when you say "studied it," I was aware of the data that it was providing here.

Q.    And is it your testimony that you've taken this data into account in your damages reports that have been submitted to the Court and that Judge Marbley needs to evaluate?

A.    Well, I took this data into account to the extent that it informed plaintiffs -- my understanding of plaintiffs' allegations; but I did not explicitly cite this paragraph, from what I recall.

Q.    Would it be fair to say that, at least according to the allegation of the complaint, the alleged concealed contributions were a million dollars in 2017; right?

A.    I think so.

Q.    And 1.4 million in 2018; right?

A.    Yes.    You're reading from the right-hand column, yes.

Q.    And they were 55-and-a-half million dollars in 2019; is

that correct?

A.   Roughly.

Q.   And the concealed contributions in 2019 were roughly 56 times bigger than the concealed contributions in 2017; right?

A.   Yes.  I assume you're taking the ratio between 56 million and a million, yes.

Q.   Yes.  Even though I became a lawyer, I can do that kind of basic math.

And that the alleged concealed donations in 2020 were $2 million; right?

A.   Yes.  Yes.  FirstEnergy's concealed contributions were $2 million.

Q.   Now, let's put up slide 5, which is an illustrative aid. This slide indicates the -- it basically plots out the amount of concealed contributions that FirstEnergy made over the course of the class period.  Do you see that?

A.   Yes.

Q.   And it looks like the first concealed contribution would have been for $250,000 in March 2017.  Do you see that?

A.   Yes.  You're referring to the green bar chart?

Q.   Yeah.

You would agree with me, would you not, that if FirstEnergy disclosed that it had made a $250,000 contribution that did not comply with law, that the stock price would not have dropped as much if it had disclosed that it made $38

150

million contributions that were not in compliance with law in 2019; correct?

A. I would not necessarily agree with that.

Q. Okay. So is it your position that the company's stock price -- you haven't analyzed how much the company's stock price was inflated as of February 21, 2017, have you?

A. As I testified earlier, I have not estimated inflation.

Q. And you don't know whether the inflation in the stock price was consistent across the entire three-and-a-half-year class period; right?

A. When you say "consistent," do you mean constant?

Q. Constant. Excuse me.

A. I have not determined whether it would be constant.

Q. And you haven't analyzed how much inflation was in FirstEnergy's stock price as of February 21, 2017; right?

A. Again, I have not determined how much inflation was in FirstEnergy's stock price, no.

Q. In fact, you haven't determined how much inflation was in FirstEnergy's stock price on any date between the start of the class period in February 21, 2017, and the first corrective disclosure date of July 21, 2020; correct?

A. I have not offered an opinion on share price inflation.

Q. Now, we showed you earlier today that the complaint itself divides the allegations into a launch phase and an execution phase. Do you remember when I showed you those

allegations in the complaint?

A.   I recall that.

Q.   And one of the things we talked about at the very beginning of your examination was the whole issue of risk.  Do you recall that?

A.   I recall discussing risk.

Q.   And you would agree with me that the risks -- the risks to FirstEnergy over the course of the three-and-a-half-year class period were different based on the amount of illegal contributions it made; correct?

A.   Yeah, I wouldn't agree with that.

Q.   So you think that the fact that FirstEnergy made a $250,000 contribution at the very beginning of the class period, that was the -- put the same amount of risk in the stock as when it became known that the company had made more than $50 million in political contributions?

A.   Well, Mr. Giuffra, I have not done the analysis.  But I'm -- from an economic perspective, I would not expect to find that there is some sort of linear relationship there.  But I have not done the analysis to confirm this at this stage.  But that said, the amount of the first payment, as opposed to the revelation -- the economic substance that FirstEnergy was involved in a bribery and corruption scheme, it is my expectation that the share price decline is driven more by the fact than maybe that particular detail.  But this is not

152

something -- I have not done this analysis at this stage.

Q. Well, if someone had bought stock on February 21, 2017, and then they held it throughout the class period, right, do you think that the inflation in the stock price was the same as it was in July '20 -- 2020, before Householder was arrested?

A. I do not think it would be. But, again, I have not formed a conclusion. But, for instance, we've talked about a couple of different reasons this morning as to why the stock price inflation might be different in 2020 versus 2017.

Q. And one of the key components of an out-of-pocket damages analysis is the amount of inflation on the date each shareholder purchased the stock; right?

A. Yes. That is one input that goes into damages.

Q. For example, if I bought the stock in February 21, 2017, held it all the way through, the inflation in the stock price was almost certainly less than it was right before the arrest of Mr. Householder; right?

A. When you say "almost certainly," I hesitate to agree with that because I have not done the analysis.

Q. Have you explained to the Court, other than saying "I'm going to use an event study," how you would calculate the inflation in the company's stock price on the first day of the class period?

A. Well, I believe we referred to some of those -- some of those calculations this morning. And, importantly, these are

153

all -- these are all classwide issues.  So what we've been talking about is what exactly is the inflation in 2020 versus 2017.  Regardless of what it is, it has the same impact on all shareholders.

But this morning we did talk some about what inflation might be or how it might have adjusted over the course of the class period.  But sitting here today I have not calculated inflation and I have not formed an opinion on that.

Q.   And you have not proposed a methodology that would allow the calculation of inflation in FirstEnergy's stock price other than saying "I'm going to use an event study on the first day of the class period;" correct?

A.   I would disagree with that characterization.

Q.   Well, on the first day of the class period, the company had done nothing, hadn't even made an illegal political contribution.  So, if the company said we have this inchoate idea we're going to do all of these things over the next three-and-a-half years, do you really think that would have caused inflation in the company's stock price?

MR. FORGE:  Your Honor, I'm going to object.

THE COURT:  Go ahead.

MR. FORGE:  To the extent the question requires expert opinion regarding an inchoate crime such as a conspiracy because Mr. Dalrymple is not an expert in criminal law and is not sufficiently well versed to opine on whether a conspiracy

can constitute a crime as of the start of the class period, even if no money has actually been paid.

THE COURT:  Ms. Evans, would you read back the question, please.

(Thereupon, the last question was read by the court reporter.)

THE COURT:  I'm not sure that he would have to be an expert on inchoate crimes for the purposes of that hypothetical.  So I'm going to allow -- but he is an expert on the other aspects of the question, and he has studied the effects of some of the crimes -- of the alleged crimes in this case on the stock price and on the market.  So I'm going to overrule the objection.

You may answer it, Mr. Dalrymple.

THE WITNESS:  Well, again, I will answer this as an economist.  First of all, if it is not a crime, I would not expect it to have the same impact because it's not against the law.  And, in my view as an economist, that is a fairly discrete question that you're asking.

If you're asking a question about something that is against the law but maybe it sounds like it's not quite as much against the law as something else, I think I would just have to understand a little bit more about it.

BY MR. GIUFFRA:

Q.   Okay.  But you have not studied the facts and

155

circumstances alleged in the complaint closely in preparing or saying what damages methodology you would use in this case to opine on damages across the 860 trading days of the proposed class period; right?

A. Well, I have studied the economic implications of the allegations in the complaint. I have studied what plaintiffs contend would be the curative events and the information that allegedly was concealed. So I've studied the economic substance of the allegations.

Q. We established at the beginning of your examination that the -- that the question -- excuse me. Let me restate that.

We established at the beginning of the exam that, if a company has undisclosed risks, that can cause inflation in its stock price; right?

A. I believe that we -- yeah, I believe I did say that. If a company -- I'm sorry. Did you say if a company has undisclosed risks?

Q. Yes.

A. That that could cause inflation. Yes, I think so.

Q. And so your basic point here is that -- let me restate the question.

Would you agree with me, based on your understanding of the complaint in this case, that the undisclosed risks of FirstEnergy's conduct changed over the course of the three-and-a-half-year class period; right?

A.   Well, that's not really my understanding.  My understanding of this case is that it's not necessarily about undisclosed risk, because the risk of being caught when you're involved in a corruption and bribery scheme, that's not a disclosable risk, economically.  You cannot disclose that you're involved in a corruption and bribery scheme, but there's only a 10 percent chance you're going to get caught.  That's not a sensible economic construct.  So that's not really my understanding of what plaintiffs are alleging.

Q.   Would it be fair to say that, if a company is engaged in a $250,000 illegal contribution, that the risks that the company faces are different than those if the company makes a $50 million cumulative amount of illegal campaign contributions?

A.   Well, I have not done the analysis; so I could -- it's possible.  It's also possible and, again, consistent with economic principles that, once a company commits a crime, that -- of this magnitude or of a magnitude of even $250,000 of the first million dollar payment, that has -- that carries a lot of weight with investors.  So I would not -- I have not done the analysis to try to determine whether -- the impact of that adjusts by some degree, but I would not expect it to adjust substantially with those particular details coming to light.

Q.   Let's turn to paragraph 136(e) of the complaint just for

a second.  Now, this is the allegation that FirstEnergy and its senior executive had disguised a $4 million payment in April of 2019 to benefit the incoming PUCO chairman.  Do you see that?

A.    Yes.

Q.    You're aware of that allegation; right?

A.    Yes.

Q.    Let's go back to the prior slide 5.

Now, as I understand plaintiffs' theory, FirstEnergy concealed that payment from investors; right?

A.    My understanding is that plaintiff -- I'm sorry, is that FirstEnergy allegedly concealed that.

Q.    Obviously, if someone had bought the stock in FirstEnergy before April 2019, that would not have been a risk in the company's stock price; right?

A.    Well, I think that's a slightly different question in that the $4 million payment is further evidence of the bribery and corruption scheme.  So I think your question kind of presupposes that it's a separate -- it's a separate act that started.  I don't know if it was.  But the way I see it economically unfolding is that this is further evidence of the bribery and corruption scheme.

Q.    You haven't done any analysis to determine whether the inflation in the company's stock price caused by the fact that the Randazzo $4 million payment was made and not disclosed to investors had a different effect on the inflation in the

company's stock price before and after that payment was made; right?

A. I have not done that analysis.

Q. And you haven't explained how you would do an event study to factor into the damages of people who bought before the Randazzo payment was even made and the inflation in the company's stock price prior to the Randazzo payment; right?

A. Well, just to try to simplify this a little bit, I understand that that payment is part of the alleged corruption and bribery scheme. It's further evidence of the corruption and bribery scheme.

Q. But, if the Sixth Circuit has -- I'm not going to go there. I'll save that for the Court.

You would agree that the nondisclosure of a payment could not have affected the company's stock price -- let me restate that.

You would agree with me that the nondisclosure of a company's illegal payment could not have affected the company's stock price before the payment was made; right?

A. The nondisclosure of a payment could not have affected the company's stock price before -- that's possible. I suppose it just depends on when the company engaged in the scheme to make the payment.

Q. And you haven't done any analysis to try to ascertain whether an event study could calculate the inflation that was

159

caused by the nondisclosure of the payment to Randazzo; right?
It's a yes or no question.

A.   Well, I have not done the analysis.  I think it's --
again, it's consistent with the methodology I set forth.  I
think you're pointing now to another curative event in, I
believe, November 2020 where the event study would apply.  But
I have not actually estimated the abnormal return associated
with that event.

Q.   But any decline in the company's stock price caused by
the disclosure of the Randazzo payment could not have caused
inflation for people who bought before the Randazzo payment as
a matter of common sense and economics; correct?

A.   Yeah, I would not agree with that.

Q.   Let's turn to paragraph 136 of the complaint.  You're
aware that statements a company made in 2019 and 2020 -- let me
restate that.  Let's go to (f).

You're aware that HB6 was passed; correct?

A.   Yes.

Q.   And then there was an effort made by citizens groups to
try to get it reversed; right?

A.   Yes.

Q.   Now, before HB6 was -- let me restate that.

There were statements allegedly made by FirstEnergy
after the passage of HB6; right?

A.   I'm sorry.  Did you say statements made by FirstEnergy

160

after the passage of HB6?

Q. Yes.

A. I believe that's right.

Q. You would agree that those statements could not have caused inflation of the stock price prior to the date when those statements were made; right?

A. Well, prior to -- they could have maintained inflation in the stock price. But they could not, logically, have caused it initially because they had not been made, if I understand your question.

Q. You haven't put before the Court any explication of how an event study could be used to ascertain the precise inflation on any of the trading days just caused by the statements FirstEnergy made about the citizen referendum?

A. I have not attempted to isolate any impact of that referendum because it would not make sense to me in the context of what plaintiffs have alleged.

Q. Let's -- you would agree that statements that FirstEnergy made between 2019 and October -- between July 2019 and October 2019 about the citizens' referendum could not have affected the company's stock price before HB6 was passed; right?

A. No statement can affect a price before the statement is made. I think that is your question?

Q. Yeah. Let's go back to slide 5. Just in terms of --

161

did all of the conduct that FirstEnergy engaged in during the class period, was it all illegal, as far as you know?

A.   I don't have a specific understanding as to precisely which aspects of the conduct were illegal.

Q.   You're aware, for example, FirstEnergy was seeking relief from the bankruptcy court with respect to its nuclear obligations; right?

A.   I'm aware of that, yes.

Q.   You're not aware of any bribes that FirstEnergy paid to the bankruptcy court to try to get a release approved; right?

A.   I'm not aware of anything.

Q.   And that conduct was perfectly legal; right?

MR. FORGE:  Objection, Your Honor, calling for an opinion as to what conduct is legal or illegal.

THE COURT:  Sustained.  Pose your next question, Mr. Giuffra.

BY MR. GIUFFRA:

Q.   Let's turn to paragraph 136(f) of the complaint.

I apologize.  I made I mistake.  Paragraph 136(g).

A.   Would you mind if I just took a moment to get the paper.

Q.   Sure.

A.   Okay.  I see it.

Q.   You would agree with me that the place to start, in trying to develop your damages methodology for this purpose that we're here for class certification, would be to look at

162

the complaint; right?

A.    Would be to look at -- I'm sorry.

Q.    At the complaint.

A.    The complaint.  I believe the complaint was the first document I reviewed.

Q.    Okay.  At paragraph 136, the plaintiffs in the complaint referenced statements made in 2019 and 2020 about various events with respect to, among other things, the citizen initiative to repeal HB6.  Do you recall that?

A.    I'm sorry.  Are you referring to -- are you referring to the highlighted portion here in (g)?

Q.    Why don't I restate the question and make it faster just because I'm worried about the time.

      You would agree that one of the allegations that plaintiffs make is that by not disclosing the conduct that was engaged in by FirstEnergy, that undisclosed conduct, quote, "FirstEnergy was subject to an extreme undisclosed risk of reputational, legal and financial harm," close quote?

A.    I recall that allegation.

Q.    You would agree with me that what plaintiffs are alleging in this paragraph of the complaint is that there was an undisclosed risk inherent in the company because of the conduct it was engaged in that was not fully disclosed to investors; right?

A.    When you say this paragraph in the complaint, are you

163

referring to paragraph 136(g)?

Q.   136(g).

A.   Okay.  136(g) says what it says in reference to (a) through (f) above.

Q.   Why don't we turn to paragraph 6 of the complaint. There's been a lot of discussion this morning about how FirstEnergy had a so-called corruption-based business model. Do you remember those questions put to you by Mr. Forge?

A.   I generally remember discussing that topic.

Q.   And so, again, in a case that's supposed to be about its statements, which is what the Sixth Circuit said, the plaintiffs' theory is somehow there was some undisclosed corruption-based business model that should have been disclosed to investors on the first day of the class period.  Is that the theory of the plaintiffs in this case?

A.   Yeah, I don't want to comment on the particulars of the theory.  I told you my understanding of the economic substance, which is that the bribery and the corruption scheme was concealed.

Q.   Well, you see how, in paragraph 6 of the complaint, it says, quote, "This corruption-based business model exposed FirstEnergy to catastrophic risk (and now the reality) of financial, regulatory, legal and reputational loss," close quote?

A.   I see that.

164

Q.   You would agree with me that the risks over the course of the three-and-a-half-year period -- class period changed. Isn't that right?

A.   The risk may have changed over the class period.

Q.   Have you explained to Judge Marbley how you're -- whatever event study you do, can measure the differences in the risks that the company faced over a three-and-a-half-year class period?

A.   Yeah, again, to simplify this, I don't understand plaintiffs' allegations to relate to some undisclosed risk because, as I testified earlier, there's -- it's illogical for a company to disclose a risk that it might be caught in a bribery and corruption scheme in which it's engaged.

Q.   But, if you're engaged in a bribery and corruption scheme, that risk may never be materialized if no one finds out about it; right?

A.   Possibly.

Q.   And the impact on the company will be greater if the bribery scheme is discovered than if it's not discovered; right?

A.   Well, I think in your hypothetical, it's not discovered.

Q.   But, if it's not discovered, then the company's stock price never goes down; right?

A.   I think in that hypothetical.  I'll take your word for it.

165

Q.   Okay.  This is paragraph 6 of the complaint.  The plaintiffs are talking about how the corruption-based business model exposed FirstEnergy to catastrophic risk of financial, regulatory, legal and reputational loss.  Now you're saying that's not really plaintiffs' theory in the case?  Am I right?

A.   I don't know that plaintiffs' theory is subsumed within a single sentence.

Q.   Why don't we turn to paragraph 231 of the complaint.

It says here -- I'll just read it.  Quote, "Defendants' extensive efforts to cover up their wrongdoing further bolster a compelling inference of scienter.  These efforts demonstrate that the defendants both knew of the adverse facts alleged herein; and, two, knew that their activities were unlawful and improper and risked material damage to the company and its investors if ever revealed," close quote.

Aren't the plaintiffs in this paragraph alleging that there was a concealed risk that was not disclosed to investors?

A.   Well, I read it as plaintiffs are alleging that there was a concealed fact that defendants were engaged in a corruption and bribery scheme.

Q.   Let's put up paragraph 252 of the complaint.  It's another one of plaintiffs' paragraphs in their complaint.

It says, quote, "For example, none of defendants' statements during the class period identified the participation of FirstEnergy and its senior executives in the bailout scheme,

which posed an extreme, undisclosed risk of reputational, legal and financial harm to the company and its investors," close quote. Do you see that?

A. Yes, I see that.

Q. Now, again, on the face of the complaint, which you say you have read, aren't plaintiffs alleging that it was the failure of the company to disclose the conduct that it was engaged in put risk in the company's stock price because of the reputational and political, financial and legal harm that could befall the company if it was discovered?

A. I don't want to characterize what's legally on the face of the complaint. I can just tell you the economic substance is that the bribery and corruption scheme was not disclosed, and that's not a risk that, at least economically, is disclosable.

Q. Let's put up slide 7. Slide 7 is an illustrative aid that we put in, and what it shows is the change in FirstEnergy's stock price over from February 1st, 2017, to July 21, 2020, which is the first curative disclosure date when Mr. Householder was arrested. Okay. You would agree with that at least; right?

A. July 21st, 2020, yes, I believe that's when Mr. Householder was --

Q. And we plotted out the amounts of the illegal contributions across the class period. Do you see that?

A.    I do see that, yes.

Q.    And we talked about -- this is directly from the complaint -- the so-called launch phase and the execution phase.  Do you see that?

A.    Yes, I see that.

Q.    And you haven't provided Judge Marbley with any explanation of how you would use an event study to ascertain the inflation of the company's stock price during the launch phase of February 21, 2017, to December 31, 2018?

A.    Well, my opinions relate to the entirety of the class period.  I do not recall the allegations varying between a launch phase and an execution phase.  My understanding is what's alleged is a bribery and corruption scheme throughout the class period.

Q.    So it's your testimony that the risks to the company were the same from day one of the class period until July 21st, 2020, when Mr. Householder was arrested?

A.    I would not say -- again, I am -- I haven't seen the record.  But I would -- I would be surprised if the risk of getting caught was the same.  The risk of getting caught could have changed.  What I'm saying is that is not a risk that could be disclosed in any sort of economic way.  And what's alleged here is the fact of the scheme is what was concealed.

Q.    So you agree with me that the risk of getting caught changed over the course of the three-and-a-half-year proposed

168

class period; right?

A.    Like I said, I haven't seen the record; but I will take your representation.

Q.    You would agree with me that the consequences from getting caught would be different from day one of the class period until the end of the class period; right?

A.    Well, I don't know that I would agree with that because that assumes that there's a real difference between the criminal activity at the beginning of the class period and at the end of the class period.

Q.    Well, the bribing of the head of the public utilities commission happened in 2019.  That's a pretty serious violation of law, isn't it?

A.    My understanding is that's a serious violation of the law.

Q.    And the consequences of trying to bribe your primary regulator are different than if you make a $250,000 contribution and you make it to an entity that is deemed after the fact to be illegal?

A.    Well, I think embedded in what you're saying is, again, sort of a variability in the degree of illegality.  You're suggesting that perhaps it was questionable, or maybe it was not illegal, when a particular bribe was made as compared to it was clearly illegal when another bribe was made.

Q.    In fact, whether some of these payments were made in

2017 and '18 even violated the law is an issue that is subject to debate. Are you aware of that?

A.    That would not surprise me.

Q.    Would it not surprise you that it was the cumulative amount of all of the contributions, coupled with the Randazzo payment, that ultimately resulted in the legal and financial consequences that were suffered by FirstEnergy?

A.    Just to bring this back, if there was no illegal activity up until a certain time, then my -- then my -- then inflation is zero. My understanding is there is no recoverable damages if there's no corruption. But that's an economic understanding. I don't have a specific understanding as to the law.

Q.    But you have not explained to the Court how you would do a damages method to take into account the inflation of the company's stock price over all 860 trading days in the class period; right?

A.    I would not agree with that. I think it's set forth in my report.

Q.    In the one-and-a-half pages of your initial expert report; correct?

A.    Well, those pages in conjunction with my findings as to market efficiency and then also as supplemented in my reply report.

Q.    Your expert report doesn't engage in any analysis of the

170

actual allegations in this complaint; correct?

A.    Again, my expert report sets forth the allegations and my understanding of plaintiffs' theory of liability.

Q.    But plaintiffs' theory of liability, as we just established, is that there was undisclosed risk to the company, and that risk evolved over time in light of the conduct that was engaged in by FirstEnergy; correct?

MR. FORGE:  Objection, Your Honor.  Lack of foundation.

THE COURT:  Sustained.

BY MR. GIUFFRA:

Q.    You have not -- again, you have not proposed a damages methodology -- you have not explained how you can -- how the damage methodologies that you proposed can identify the amount of inflation in FirstEnergy's stock on any individual date over the course of the class period; right?

A.    I believe I have explained that in my report and in my deposition.

Q.    I've got two investors here, two little people.  I've got Investor No. 1, who bought FirstEnergy stock very early on in the class period.  Maybe they made, by that point, a $250,000 contribution that arguably violated the law.  Have you proposed a methodology that would allow Judge Marbley to assess whether that methodology can valuate the inflation in FirstEnergy's stock price on the day when Investor 1 bought the

stock?

A.   Yes, I have.

Q.   That methodology is just the fact that you say you'll use an event study?

A.   I would use an event study in conjunction with the other tools and techniques that I referred to.  I think for the purposes -- it might be helpful to just explain this by reference to your example with Investor 1.

Under your hypothetical, you're suggesting that there is some variation in the consequences of the actions in 2017.  So, if those actions are not illegal, then my understanding is there's no inflation; so it's zero.  But, if for some reason that were to -- there was evidence that that varied by degree, then that just suggests that there would be some scaling factor that would apply based on that evidence.

Q.   But you have not proposed a scaling -- you've not done any analysis of scaling factors that you might use in this case.  You said that earlier during your testimony; correct?

A.   That's correct, I have not prepared an inflation analysis.  When you say I have not done -- just to clarify, when you say I have not done any analysis, I've responded to Ms. Marietta-Westberg's -- or Dr. Marietta-Westberg's critiques in my report.

Q.   What's at issue is your -- what you said you might do, not what Dr. Marietta-Westberg said in criticizing what you

172

did.  You've got to propose, since the Sixth Circuit decision, an analysis that will calculate the inflation in FirstEnergy's stock price over the entire 860 trading days of this proposed class period.  And all you've done is say, well, I might use an event study or I might use DCF or I might use a combination of the two.

Is there anything in any of your reports, looking at how you would use an event study, to calculate the different types of risks faced by FirstEnergy over the course of the proposed class period?  Isn't the answer to that no?

A.   As I explained earlier, that is not -- contemplating different levels of risk of being caught is not something that is economically sensible nor consistent with plaintiffs' theory of liability; so I have not articulated that in my report.

Q.   In your view, if a company has made $250,000 in questionably illegal contributions when someone has bought the stock, your analysis doesn't allow to figure out the inflation on that date versus the inflation after they tried to bribe the head of the PUCO?

A.   I disagree with that.  My inflation would allow for that, as I explained, through a scaling factor.

Q.   But you haven't provided any scaling factors to the Court.  You've done -- you haven't shown how the scaling factors would work.  You haven't said how the DCF and the event study would work together.  All correct, right?

173

A.   Again, I disagree with that characterization.

Q.   Let's talk about your rebuttal report.  And this is page 7749 to 50, paragraph 12.  Let's go back to seven just for a second.  I made a mistake.

You would agree with me that, if you looked at the inflation in the stock price on the day when Investor 2 bought the stock -- okay?  You see that?  That would have been sometime in 2020 right before the fraud was revealed.  You see that?

A.   I see Investor 2, yes.

Q.   And you would say that, from 2017 to 2020 right before Investor 2 bought, FirstEnergy kept the full scope of the fraud concealed; right?

A.   Mr. Giuffra, that sounds like a finding of fact.  And that's not a finding --

Q.   Am I right that, in order to do a damages analysis, you have to look at the allegations of the complaint; right?

A.   I've looked at the allegations in the complaint.

Q.   And other than saying you'll use an event study and maybe DCF, have you proposed a methodology for Judge Marbley and explained how you can figure out what the inflation in the stock price was when Investor 1 bought the stock versus Investor 2 bought the stock?

A.   Without agreeing to your preamble, yes, I have set forth that methodology.

174

Q.   Have you explained how, under the allegations of this complaint, not just some -- any securities complaint -- how -- whatever method you may use can figure out how much inflation there was in the stock, in FirstEnergy stock, on the day when Investor 1 bought versus Investor 2?

A.   Yes.  I will go back to my previous answer.  You seem to be presupposing a hypothetical in which inflation or the consequences of the withheld information may have been different between the time when Investor 1 bought and the time when Investor 2 bought.  I would apply, if appropriate, a scaling factor to scale the inflation that I measure at the end of the class period in order to measure the inflation at the time Investor 1 --

Q.   And the scaling --

A.   -- purchased, noting that this is all precisely how I come up with a scaling factor and what the inflation is, it is the same for all members of the class that bought on that same day as Investor 1 and the same day as Investor 2.

Q.   You haven't identified -- other than say you might use a scaling factor, you haven't identified what the scaling factor is; right?

A.   Well, the scaling factor is necessarily a fact-intensive determination, right?  I would not propose a scaling factor without having conducted a full analysis, including having looked at the record.

Q.   Okay.  But you haven't proposed a scaling factor in this case; correct?  It's a yes or no question.

A.   That's correct.

Q.   And the only courts that you can cite that have approved your scaling factor, one of them is an Australian court; right?

A.   Well, I am -- I don't necessarily think that that is a -- first of all, I'm not sure that courts approve or disapprove of a scaling factor.  I don't know if that is a comprehensive list.  I mean, I will note that in the *Acadia* matter, I made certain adjustments to inflation.  I would not characterize those as scaling factors.

Q.   If you don't know whether courts have relied upon scaling factors in assessing damages, how can you expect Judge Marbley to accept your testimony that you're going to use some undisclosed, to anyone, scaling factor to deal with all the complexity in the FirstEnergy case?

MR. FORGE:  Objection to the form of the question.  It's argumentative.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  This might help clarify.  The scaling factor is derived from fundamental economic principles.  And those principles are reflected in the tools and techniques that I discussed earlier.  They're reflected in the fundamental valuation methodologies.  They would be derived from DCF and market multiples and, if appropriate, event studies,

176

shareholder reactions to certain information. All of that information is available to us in this case to derive scaling factors that reflect economic principles and can be used to scale inflation to account for any changes in how the withheld information would have interacted with the stock price.

Q. But you have not identified any of the scaling factors that you would like Judge Marbley to rely upon in ruling that you have proposed a damages methodology that satisfies the Sixth Circuit standard; correct?

MR. FORGE: I object. This is asked and answered. Mr. Dalrymple has made it very clear he hasn't calculated damages. He hasn't calculated these different factors.

THE COURT: I'm going to sustain the objection. It has been asked and answered.

BY MR. GIUFFRA:

Q. Now, in your September '22 rebuttal report -- let's put it up there.

A. Just bear with me. I'd like to pick up the paper copy. Okay. I have it here.

Q. You said, quote, "It is the undisclosed corruption itself, not the expected outcome of the corruption that plaintiffs alleged caused FirstEnergy shares to be artificially inflated," close quote. Do you see that?

A. I do. If you could -- I'm sorry. Bear with me just one second. I think I might have had a page drop out. All right.

I'm sorry. You're reading from paragraph 12.

THE COURT: This is 12 of the rebuttal report?

MR. GIUFFRA: Correct, Your Honor.

BY MR. GIUFFRA:

Q. You agree with the statement that you made in your rebuttal report that I just read; correct?

A. Yes, I agree with that statement.

Q. And you wrote that statement after reviewing the complaint; correct?

A. That is correct.

Q. And we saw, as I just think I went through with you, that the undisclosed conduct -- let me restate that.

We saw, as we just went through, the undisclosed misconduct that changed over the course of the three-and-a-half-year class period; right?

A. Well, I think that's what you indicated to me, is that the conduct changed.

Q. You haven't made an assessment as to whether the conduct changed over the course of the class period; yet you want Judge Marbley to think that you proposed a damages methodology that can measure damages across the class?

A. Well, as I testified earlier, I have not reviewed the factual record in this case. And the other thing I would point out, as I say, it is the undisclosed corruption itself. Paragraph 12 refers to the undisclosed corruption. I don't see

178

where it refers to the conduct.

Q. Well, presumably, the undisclosed corruption is the conduct the company had engaged in over the course of the two-and-a-half-year class period; right?

A. Without drawing a legal conclusion, I understand that illegal conduct results in corruption. I don't know precisely where or how that happens, from a legal perspective.

Q. Well, you obviously read -- in order to propose a damages methodology, to the extent you did in this case, you needed to read the allegations of the complaint; right?

A. Yes, I read the allegations in the complaint.

Q. And isn't it fair to say that the allegations of the complaint allege undisclosed misconduct that changed over the three-and-a-half-year class period?

A. That would not surprise me. I would just have to look at the complaint. I think we might have referred to that earlier.

Q. In your expert report you never explained how you would measure that undisclosed misconduct in calculating the inflation in FirstEnergy stock price over the three-and-a-half-year class period; right?

A. Well, again, as I testified earlier, my understanding of plaintiffs' theory of liability is that it is the undisclosed corruption scheme that caused the share price to be inflated. I think we walked through a hypothetical earlier in which I

179

explained, to the extent that there was some sort of variability in the level of illegality in the conduct, that I could account for that; but I would need to have a record of some sort in order to develop a scaling factor.

Q. Well, of course, you had the complaint, and you could have used the complaint to develop your scaling factors; right?

A. No. I do not think the complaint provides sufficient detail to develop a scaling factor.

Q. Maybe we need to wait to see whether you can actually propose a damages methodology that can be sufficient under *Comcast* until the end of fact discovery.

A. I'm sorry. Are you asking me?

Q. You think that you've proposed, back in '22, a damages methodology that's capable of calculating damages across this three-and-a-half-year class period; right?

A. That is what I proposed in 2022, yes.

Q. And that was based on the allegations of the complaint; right?

A. In addition to my expert findings and opinions and analysis.

Q. Let's talk about your initial report in June '22. And let's look at paragraph 104 which is 6303.

A. Got it. Yes, I'm there.

Q. You would agree that it's critical that the methodology that you proposed needs to identify the amount of inflation in

180

the stock price at every day during the class period; right?

A. I apologize. Would you mind just repeating that.

Q. You would agree that it's critical that -- let me restate that.

The two factors in figuring out the out-of-pocket damages suffered by a shareholder is the amount of inflation in the stock price on the day that person bought; right?

A. Well, it's one of the factors. It's not one of two factors.

Q. The second one is what was the price they sold it at, right, sold the stock at, right?

A. Yes. But, in addition, there are limitations placed on that by the PSLRA.

Q. Understood. I agree with that.

Now, one of the things you've done so far -- I'm getting toward the end, near the end anyway. You're saying you need to estimate share price inflation by analyzing the impact of curative events; correct?

A. I testified to that generally earlier.

Q. And you don't think that you just look at the stock price decline, taking into account company -- let me restate that.

In order to figure out the inflation in the company's stock price on the first day, you don't look to the total stock drop, taking into account industry and market declines, and

181

just backcast it all the way to the beginning?

A.   No.   I don't believe that the analysis is that simple. As I testified earlier, we can start with share price declines, but there is a lot that I would need to look at.

Q.   You're aware that at the November 6th -- did you read the transcript of the November 6th hearing before Judge Marbley?

A.   I believe I did, yes.

Q.   And you saw that plaintiffs' counsel said that they were -- that they -- he claimed that the inflation in the company's stock price was $20 a share at that hearing.   The transcript -- this is page -- oral argument transcript page -- this is on line -- page 41, lines 10 to 12.

A.   I see that.

Q.   Okay.   Let's also look at what plaintiffs' counsel said. This is at 42, line 23 to 43, line 2.

Why don't you just read that into the record.

A.   The highlighted portion here?

Q.   Yes.

A.   The bottom line is, "In no later than March of 2017 -- I would submit in February of 2017, that they had converted the primary function of this business from one of legitimate operations to a criminal enterprise.   From that point forward, the inflation is the same."

Q.   Have you done any analysis to determine whether the

182

inflation in FirstEnergy's stock price was the same from the first day of the class period to the end of the class period?

A. As I testified earlier, I have not estimated inflation.

Q. Did you ever provide plaintiffs with a calculation of about $20 of constant inflation throughout the class period?

A. I don't believe so.

Q. And you would agree that, in order to figure out what the inflation was on the first day of the class period, you'd have to do all sorts of analyses; correct?

A. I would agree with that. I would have to do a lot of analysis to figure that out.

Q. So you have no basis to say whether there's any truth in what is being asserted by plaintiffs' counsel to the Court about how, quote: No later than March of 2017 -- and I would submit February of 2017, the inflation is the same in the company's stock price from the beginning of that period to the end?

A. Well, that might be what plaintiffs allege, but it's not something on which I've formed an opinion.

Q. And you would agree with me that you haven't explained -- let me restate that. There are five alleged curative events over the four months after the indictment -- the arrest of Mr. Householder; correct?

A. That sounds right.

Q. Let's put up slide --

183

A.    I'm sorry.  Did you say after?  That might be including.

Q.    This is a list.  This is a document.  You've seen this document before; right?

A.    I think this was part of the exhibit package.

Q.    That we provided to plaintiffs; correct?

A.    Yes.

Q.    So we just sort of go through the so-called curative events.  On July 21, Mr. Householder is arrested.  The indictment is unsealed, and it's disclosed that there were 60 million in improper political contributions from 2017 to 2020.  Do you see that?

A.    Yes, I do.

Q.    And the stock price dropped by about $7 that day, right?

A.    That's what it says here.

Q.    Then, on July 22nd after the close, the stock price dropped another $7.16; right?

A.    I see that.

Q.    And then it looks -- then we have, on the 29th of October, the senior management team is terminated for violating the company's code of conduct, and the stock price dropped the next day by $2.09; right?

A.    Yes, I see that.

Q.    Then, on November 19th, after the company amended its 10-K and disclosed that it was considering a potential fine, weakness in internal controls, gave more information about the

184

$4 million payment to Mr. Randazzo in 2019, the stock price fell another $2.38 cents. Do you see that?

A. I do see that, yes.

Q. So am I correct that you just sort of add the stock drops on those four dates, and you get to a number of about $20 a share; right?

A. It looks like these add up to about $18.64. I recall there might have been another alleged event on November 16th that's not here.

Q. And you haven't done an event study to calculate the -- how much of the drop in the company's stock price was company specific as opposed to caused by the market or industry factors for any of these corrective disclosure dates; right?

A. As I stated earlier -- and I suppose the exception might be July 21st, because July 21st is in the class period, I believe, in which case that -- the abnormal return on that day would have been estimated in my event study; but it would be straightforward to simply apply the same event study to these additional days.

Q. Essentially, what's going on, in terms of coming up with a number of even 18.64 is just simple arithmetic; right?

A. This is a number that I believe defendants prepared. But it looks like simple arithmetic to me.

Q. You wouldn't want to base an event study that could calculate damages across a 860-day class on simple arithmetic;

right?

A.    I think I testified how I would prepare inflation across the class period.

Q.    Let's put up Exhibit D5 which is the complaint again, paragraph 95.  It's ID 1576.

This is the very first -- this is when the class period begins; correct?

A.    I'm sorry.  Just bear with me one moment.  I'm sorry.  Did you ask:  This is when the class period begins?

Q.    It says the class period began on February 21st, 2017.  You see that?

A.    Yes.

Q.    You've read the complaint.  We have talked about that during the course of the day.  Then the company says in its 10-K, quote, "The company was pursuing" -- let me restate that.

The company was pursuing, quote, "Legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits," close quote.

Do you see that?

A.    Yes.

Q.    Now, you haven't analyzed whether that statement was false, have you?

A.    No, I have not analyzed whether that statement was false.

Q.    And then the company going further down talks about,

186

quote, "Additional assets sales and/or plant deactivations."
Do you see that as another potential option the company might
pursue?

A.   Yes, I see that.

Q.   And then restructuring FES's debt with its creditors.
Do you see that?  Close quote.

A.   Yes.

Q.   And then, quote, "Seeking protection under the U.S.
bankruptcy laws for FES and possibly FENOC."  Do you see that?
Close quote.

A.   Yes, I do.

Q.   You agree with me that there's nothing alleged in the
complaint that FirstEnergy did anything illegal in terms of
pursuing protection under the bankruptcy laws; right?

A.   I don't recall anything in the complaint alleging that.

Q.   Now, it would be fair to say the company was still
providing electric services to its 6 million customers as of
the start of the class period; right?

A.   I'm sure it was.

Q.   And the company still was a valuable company; right?

A.   Yes, the company had value.

Q.   Now, as I understand it -- let's put up the oral
argument transcript from November 6th, lines 42 to 23 -- 42
point dash -- let me restate that.  41.1.  I got the wrong
page.  This is 41/23 to 45/2, I believe.  And Mr. Forge advised

187

the Court that somehow FirstEnergy, quote, "Had converted the primary function of its business from one of legitimate operations to a criminal enterprise," close quote. Do you see that?

A. I do see that.

Q. And then he says, "From that point forward, the inflation is the same," close quote.

A. I see that.

Q. So, at least the theory of damages that's been put forward to the Court is that, literally, on the very first day of the class period when all the company did was disclose that it was pursuing, quote, legislative or regulatory solutions for generation assets, close quote, and bankruptcy solutions, that somehow the company had the same amount of inflation in its stock price as it did right before the arrest of Mr. Householder?

A. I'm sorry. Was that a question?

Q. Yes. It's a question for you.

A. Do you mind telling me --

Q. Have you done any analysis to determine whether the inflation was the same across the entire class period?

A. As I testified earlier, I have not done an inflation analysis.

Q. And let's suppose that FirstEnergy had not made any illegal contributions at all after the start of the class

188

period on February 17 -- excuse me, on February 21st, 2017; had not made any contributions, okay?

A.   Okay.

Q.   Would the company stock price have been inflated as of February 21st, 2017, by $20 a share?

A.   Well, you seem to be contemplating a hypothetical in which there's no corruption and bribery scheme.  So under that hypothetical I don't see how there's any inflation.

Q.   So the mere contemplation of a bribery scheme wouldn't have caused inflation in the company's stock price; right?

A.   Well, again, I'm an economist; so I can't tell you if the contemplation of a bribery scheme is against the law or where it crosses the line, so to speak.  But it sounds like thinking about something, I don't -- that doesn't sound like it's something that's illegal.

Q.   You would agree with me that the allegations in this complaint, with all of these undisclosed events and qualitative disclosures, is different from a case where a company lies about its revenues and then that gets revealed at the end of the class period; right?

THE COURT:  Can you read that question back, Ms. Evans?  I'm not sure I understood it.

(Thereupon, the last question was read by the court reporter.)

MR. GIUFFRA:  I'll go slower, Your Honor.  Let's put

up slide 7. And then --

THE COURT: The witness hasn't answered that. Can you answer that question? Do you understand the question, Mr. Dalrymple?

THE WITNESS: I believe so.

THE COURT: Can you answer it?

THE WITNESS: I would say that no two cases are the same.

BY MR. GIUFFRA:

Q. Let's put up slide 42 from the oral argument transcript. We had this up before, then I'll come back to this one and we're getting to the end.

I showed you this slide earlier. Now, in this fact pattern, a company misstates its revenues, the stock price goes up, and at the end of the class period, the company's stock price declines after it restates the revenues. Do you see that hypothetical?

A. I see the hypothetical.

Q. That would be -- you would agree with me that this is a straightforward quantitative disclosure case; right?

MR. FORGE: I object. It's been asked and answered with this slide before. Mr. Giuffra, in fact, in his preamble said we went over this before. This is asked and answered.

MR. GIUFFRA: I'll be done in two questions, Your Honor.

190

THE COURT:  I'm going to allow it.  I'm presuming it's for context to another area of inquiry.

MR. GIUFFRA:  Correct.  It is.

THE COURT:  If it's not, Mr. Forge, you may renew your objection.

THE WITNESS:  I think I understand the hypothetical. I don't understand it -- it does not strike me as plausible, but it's hard to say in the abstract without any of the facts around it.

BY MR. GIUFFRA:

Q.    You know what the concept of backcasting is; right?

A.    Yes.

Q.    And that's when you have an amount of inflation in a company's stock price that gets revealed on a curative disclosure date, correct, and then you backcast it to the beginning of the class period?

A.    Generally, yes.  But backcasting does not necessarily imply that it is exactly the same amount across the class period.

Q.    But Mr. Forge, in presenting argument to the Court, said that in this case the inflation was the same from the start of the class period to the end of the class period.  Do you remember seeing that testimony?

A.    I do.

Q.    And that would be classic backcasting where you take a

drop, you figure out how much the stock price dropped, and then you backcast that drop from the curative disclosure date to the beginning of the class period. And you said the inflation in the stock price was the same on every single day of the class period; right?

A. I would understand what Mr. Forge was referring to as plaintiffs' theory in that it was the same criminal conduct, the same corruption and bribery scheme all the way from the beginning of the class period. But that does not mean -- so that might be plaintiffs' theory, but that does not mean that the dollar amount of inflation may not need to be adjusted to account for how that concealed information might have interacted with the share price over a three-and-a-half-year period.

Q. Don't you have an obligation to propose a damages methodology to the Court that's consistent with plaintiffs' theory of liability? Yes or no?

A. I believe I've done that.

Q. But that's your obligation; correct?

A. Mr. Giuffra, when you say my obligation --

Q. Plaintiffs' counsel has said that the inflation was constant from the end of the class period to the beginning of the class period. You haven't done any sort of analysis to determine how you would even figure that out; correct?

A. Well, to be clear, I don't have an obligation to support

something that plaintiffs' counsel said. If I am asked to conduct the analysis, I do feel like I have an obligation to take into consideration all of the relevant economic conditions that might affect inflation on each day of the class period.

Q. Let's put up slide 7.

THE COURT: While they're putting up slide 7, Mr. Giuffra, I'm going to refer you to paragraph 16 of the supplemental report. That might inform certain of your questions going forward. I'm going to give you about five minutes to look at paragraph 16. It's on page 5 of Mr. Dalrymple's -- I don't know whether you call it -- it's his rebuttal report. Paragraph 16.

MR. GIUFFRA: I understand that, Your Honor. I can keep going. I know what the paragraph says.

BY MR. GIUFFRA:

Q. We're not asking you whether you've actually calculated damages in this case -- although Mr. Forge said that there had been some calculation of damages in this case. But what I am asking you is have you come up with a methodology, or propose a methodology, and explain to the Court how you could actually figure out the inflation of the company's stock price over the 860-day class period?

THE COURT: I'm going to help you out here.

MR. GIUFFRA: Okay, Your Honor. I could use it.

THE COURT: No. You made your point and, more

193

importantly, made your record. As the record stands right now, what he has said is that he has proposed a methodology that consists of event studies -- an event study, DCF methodology, and scaling and market analysis that he believes will allow me to calculate damages across the class. That's his argument in a nutshell. And so I think that that, coupled with what he sets forth plainly in paragraph 16, is his proposed methodology. Now, it may be usable; it may not be. But that is his methodology.

So I don't know whether you can ask it any differently if we stay here another couple of hours. He hasn't strayed from that testimony. That's his testimony. Now, you're free to attack it. And just because it's Friday doesn't mean that I won't stay here until we conclude. My responsibility is to provide -- preside over this proceeding so that I'll have sufficient information to do a rigorous *Comcast* analysis. I'm dedicated to doing that.

So question as long as you want, but I'm just giving you a road map. As Alice said, if you don't know where you're going, it doesn't matter which road you take. So he's told you the road that he is taking. It's up to you to tell him, or tell me, more importantly, whether it's the right road or the wrong road. Please proceed.

BY MR. GIUFFRA:

Q. Okay. You would agree with me that it wasn't $20 of

194

inflation in the company's stock price on the first day of the class period; right?

A. As I testified earlier, I have not calculated inflation.

Q. Okay. And we've talked a little bit about the fact that, all other things being equal, the reputational risk to FirstEnergy from disclosure of the alleged misconduct was greater when the contributions totaled 56 million by late 2019 versus $1 million in late 2017. You don't disagree with that, do you?

A. I believe what we discussed earlier is that the risk of FirstEnergy being caught might have changed, but the economic implications of the bribery scheme are not something that would change with that risk because it's not a risk that could plausibly be disclosed.

Q. Let's turn to -- you were an expert in a case called *Indiana Public Retirement System v. AAC*; correct?

A. Yes.

Q. And you were the plaintiffs' damages expert at class certification in that case; right?

A. Yes.

Q. And Robbins Geller retained you as their expert in that case; correct?

A. That's correct.

Q. And your opinion in that case was that damages could be measured classwide. Let me restate that.

195

Your opinion in that case was that damages could be measured classwide is substantially the same as the opinion on damages that you've offered in this case; right?

A.    I recall my opinion in that case was that damages could be measured on a classwide basis consistent with plaintiffs' theory of liability.

Q.    If we put up D15, slide 28.

Would it be fair to say that in that case -- this is up in the top on paragraph 90 in your expert report in that case. You effectively used largely the same language that you've used in your expert report in this case in paragraph 104?

A.    Yes, that language is similar.

Q.    So you essentially cut and pasted your expert report from *AAC* in this case; correct?

A.    I would not agree with that, no.

Q.    Well, when you prepare expert reports, you often look to see what your expert report was in another case; right?

A.    Well, when I am addressing the same topic, I will often use the same language because I like the way that I addressed the topic in another case.

Q.    Now, in *AAC* some of the alleged misrepresentations concerned the company's financial statements; right?

A.    I believe that's correct.  I don't have a strong recollection.

Q.    And some of the statements that were alleged to be false

196

concern the company's marketing practices with respect to its rehab services; correct?

A.    I generally recall that, but I don't really have a good specific recollection.

Q.    But there were different categories of statements that were challenged in that case; right?

A.    I believe that's correct.

Q.    Just like in this case, there are different types of statements that are alleged to be misleading; right?  We've established that?

A.    I've seen various groupings of the alleged misstatements in this case.

Q.    Do you recall that the Court in *AAC*, which is a case in the Middle District of Tennessee on February 24, '23, found that the marketing misrepresentation claims of the plaintiff were based on a materialization of the risk theory?

A.    I recall that generally.

Q.    And we put before the Court Exhibit D18, ECF 138, page ID 2827.  So you would agree that the marketing claims in that case were materialization of the risk claims; right?

A.    That's my general recollection.  I don't have -- I don't specifically know.

Q.    And do you recall that the Court in that case denied class certification because, quote -- let me restate that.  Do you recall the Court denied class certification in that case

because your report, quote, "omitted any consideration," close quote, of how to, quote, "factor in the risk on which the plaintiff bases its materialization of the risk theory," close quote?

A.    I generally recall that.

Q.    And because your report, which is very similar to the -- to what you propose to do here, the Court said that it would not certify a class; is that right?

A.    I recall the class not being certified with respect to the marketing claim.

Q.    And --

THE COURT:  Just a second.  Could I see counsel at sidebar?

- - -

(The following proceeding was held at sidebar.)

THE COURT:  The only question I had is, Mr. Forge -- or you may answer this too.  But are you advancing a materialization of the risk theory in this case?

MR. FORGE:  Absolutely not.

THE COURT:  Now, do you posit at all that they are somehow trying to backdoor that materialization of the risk theory here?

MR. GIUFFRA:  Your Honor, there's no question, if you read the complaint -- we went through the paragraphs of the complaint.  It talks about materialization of the risk.  That's

198

exactly what this is. He's talked about the undisclosed scheme.

THE COURT: Fair enough. You don't have to elaborate. As you told Mr. Dalrymple, it's a yes or no question that I asked you.

MR. GIUFFRA: I know. I should be --

THE COURT: That's okay.

Now, two other things. I just want to make it clear that under 26(b)(4)(C), you were correct in your objection. You argued, Mr. Giuffra, that Mr. Dalrymple is under an obligation to disclose certain things to -- on the record about his conversations with Mr. Forge. The Court overruled your objection. I just wanted to circle back to the basis.

And just to make the record completely correct, those remarks were the Cheshire Cat to Alice.

(The following proceeding was held in open court.)

THE COURT: Mr. Giuffra, please continue.

BY MR. GIUFFRA:

Q. Okay. You recall, Mr. Dalrymple, that the Court in *AAC Holdings* said, quote, "Plaintiffs' expert report as to the calculation of damages appears to omit any consideration of how to factor in the risk on which plaintiff bases its materialization of the risk theory," close quote. You see that?

A. I see that.

Q.    And you recall that testimony; right?  You recall that opinion; right?

A.    Generally.

Q.    Okay.  Then let's turn to further down in the opinion to ID 2833.  Do you recall that the Court further said, quote, "Dr. Dalrymple has provided no explanation as to how the risk of AAC's deceptive marketing claims will be factored into plaintiff's damages model, that is, how Dr. Dalrymple expects to show that the risk affected AAC's stock price at the time the risk was concealed or after it materialized (revealed)," end of quote.  Do you see that?

A.    Yes, I do.

Q.    In this case you've offered no explanation for the Court of how the risk of FirstEnergy's undisclosed misconduct would be factored into your damages model; correct?

A.    As I testified earlier in this case, I do not understand plaintiffs' theory to relate to materialization of risk.

Q.    Well, your understanding of plaintiffs' claim is that there was just sort of an undisclosed criminal scheme that wasn't disclosed on the first day of the class period?

A.    Well, my understanding is set forth in the complaint, but it's not -- my understanding is not that there was an undisclosed risk that FirstEnergy would be caught in this scheme.

Q.    Well, throughout the complaint, I think I showed you a

200

number of paragraphs where the complaint alleges an undisclosed risk. Do you recall those paragraphs?

A. Yes, I do.

Q. Obviously, when you have an undisclosed risk, it might or might not materialize; right?

A. That's fair. An undisclosed risk may or may not materialize.

Q. When the risk materializes, the market is reacting to the fact that the risk has become a certainty; right?

A. Well, if the risk is undisclosed, then the share price reaction is going to reflect the revelation of the information that was previously undisclosed. So, if the market never knew about the risk in the first place, it's just simply reacting to the information.

Q. You recall the Deepwater Horizon explosion in the Gulf of Mexico; right?

A. Yes, I do.

Q. Do you recall in that case, which was a prominent securities case, it was a question of BP allegedly concealing risk with its safety procedures. Remember that?

A. The blowout preventer.

Q. Yes.

A. I recall that.

Q. And the claim was, if BP had disclosed the risks, the market would have priced them into the stock of BP; right?

A.    I generally recall that.

Q.    And that the price reaction would not have been the same as the price reaction when the Deepwater Horizon rig blew up; right?

A.    At a very general level, I recall that argument.

Q.    You don't disagree with me that, if you have an undisclosed risk and it doesn't materialize, obviously, there is no impact on the stock price; right?

      Are you aware that the Court in BP did not certify a class?

A.    I would not be -- I would have no reason to doubt it.  I just don't recall.

Q.    Are you aware that the Court said, quote:  Although the pre-spill misrepresentations understated a known risk, compensating investors for the full value of the stock price drop from the materialization of that risk overcompensates investors for their harm, close quote?  Were you aware of that holding?

A.    I think I've read that at some point.

Q.    Am I correct that a pure backcasting approach to damages has the effect of overstating damages in a case involving a materialization of undisclosed risks?

A.    Well, again, I think that depends on what adjustments you make to the extent those adjustments are appropriate to address that theory.

Q.    Is it your testimony that you're not viewing -- to the extent you're proposing any methodology to the Court, you're not proposing one that addresses materialization of the risk theories?

A.    I am not proposing anything that addresses what you have set forth as the risk of FirstEnergy being caught in a criminal enterprise.  I'm proposing a methodology that I understand is consistent with plaintiffs' theory.

Q.    And that is that FirstEnergy elected to become a criminal enterprise on the first day of the class period, and regardless of what it did over the next three-and-a-half years, the risk was the same to investors?

A.    I don't think your characterization is quite accurate. I don't know -- when you say FirstEnergy elected to become a criminal enterprise, I don't recall that specifically.  What I'm saying is the risk that FirstEnergy would be caught is not something that's disclosable in any plausible economic scenario.

Q.    Is it your understanding that plaintiffs' theory here -- I'm almost done, Your Honor.

        THE COURT:  I can't see the last sentence; so if you can roll it up a little bit, the last sentence of the highlighted portion.

        MR. GIUFFRA:  You've been extremely courteous to us all.

BY MR. GIUFFRA:

Q.   Now, as you understand -- let me ask the question.

In preparing -- in making your proposal as to what damages methodology you're going to go forward with in this case, you obviously have to take into account plaintiffs' theory of the case; right?

A.   Yes.

Q.   And am I correct that your understanding of plaintiffs' theory of the case was that FirstEnergy converted into a criminal enterprise on the very first day of the class period?

A.   Again, I don't want to characterize plaintiffs' theory of the case in a way that's incorrect.  My understanding is that FirstEnergy engaged in I think what they called the bailout scheme from the beginning of the class period, which is a corruption and bribery scheme.

Q.   But have you taken into account plaintiffs' theory of liability here in making a proposal to Judge Marbley as to what damages theory you're going to use across the class period?

A.   Yes, I believe I've taken that into account and testified about that today.

Q.   Sitting here today, what do you think plaintiffs -- let me restate.

What do you think plaintiffs' liability theory is that you have relied on to make a proposal as to a damages theory that would allow for the calculation of damages across 860

204

trading days?

A.    My understanding is that plaintiffs allege that FirstEnergy engaged in a corruption and bribery scheme throughout the class period.

Q.    And you're not distinguishing in your analysis whether the nature of that bribery and corruption scheme as it evolved over the course of the class period; right?

A.    When you say the nature of the scheme, I think we talked earlier about what plaintiffs allege.  Plaintiffs allege it was a single crime.  It was a single bribery and corruption scheme. I think you had provided some hypotheticals in which that scheme may have varied by degree or only became illegal at certain points.  And, as I explained earlier, my methodology could account for that, if appropriate.

Q.    Let's put up slide 7, and I'll be done.  I think we've seen this slide before.  This is a slide that shows when the contributions occurred.  It shows the changes in the stock price.  It talks about the launch phase and the execution phase.  You've seen that; right?

A.    Yes.

Q.    Other than saying you would use perhaps an event study or a DCF analysis or some other kind of analysis, have you provided for the Court how you would measure inflation in the company's stock price over the 860 trading days, taking into account all the conduct it is alleged to have engaged in over

that period?

A. Again, I have proposed a classwide methodology that would measure inflation on all -- on every day of the class period. To the extent that that measurement would need to account for any differentiation in sort of the degree of conduct or whether or not certain actions are illegal, those -- that can be accounted for either because inflation -- there is no inflation when there's no illegal activity.

If there's evidence that suggests that somehow the degree of that illegal activity would have affected the ramifications -- I can't think of what that might be, but if there is some, then that is evidence that I could take into consideration using something like a scaling factor that we discussed earlier.

Q. Let's assume that Judge Marbley agrees this is a materialization of the risk case. Have you proposed a damages methodology to take into account how to factor in the risk on which this materialization of the risk theory is based?

A. As I testified earlier, it's not economically plausible that the risk could have been disclosed without the company getting caught.

Q. Well, in the *AAC* case the Court did not certify a class as to the marketing allegations because you did not provide sufficient evidence or explanation to the Court as to how you would factor in the risk on which plaintiff based a

206

materialization of the risk theory.  That's correct; right?

MR. FORGE:  Your Honor, this has been asked and answered.  I object.

THE COURT:  I'm going to sustain it.  And the plaintiffs have taken the position that this is not a materialization of the risk case.  Now, having said that, you certainly are free to argue, Mr. Giuffra, in your papers that irrespective of what they said, what they did was different.  And so, if you want to make a case for materialization of the risk and try to show how those cases are analogous to this case, you're perfectly free to do so.  But this witness, and Mr. Forge, have been consistent that this is not a materialization of the risk case.  And continuously asking him about it, as if to grind him down, is not going to make him cry uncle and "yes."  So proceed.

MR. GIUFFRA:  Two more questions.

BY MR. GIUFFRA:

Q.   The *AAC* case was decided in February '23; correct?

A.   That would not surprise me.  I don't recall.

Q.   You haven't, again, made any changes, in what you're proposing in this case, to take into account the criticisms that the Court raised in the *AAC* case; right?

A.   I have not changed my opinions in this case.

Q.   And that's because, in fact, your opinions in this case were rendered before the decision in the *AAC* case; right?

207

A.   Nothing in the *AAC* case would cause me to change my opinions.

MR. GIUFFRA:  No further questions.

THE COURT:  Thank you, Mr. Giuffra.

MR. FORGE:  I would like to inquire whether the court reporter and Mr. Dalrymple would like to take a short break.

THE COURT:  Okay.  Let's stand in recess until 5:05; give you 15 minutes.

(Recess taken from 4:52 p.m. to 5:06 p.m.)

THE COURT:  Mr. Forge, are you ready to proceed with your redirect?

MR. FORGE:  I am, Your Honor.  Thank you.

THE COURT:  Please proceed.

- - -

REDIRECT EXAMINATION

BY MR. FORGE:

Q.   Welcome back, Mr. Dalrymple.

A.   Thanks.

MR. FORGE:  Your Honor, I want to return to a portion of that transcript from the November 6th hearing.  And, if I could, please, ask counsel --

BY MR. FORGE:

Q.   Mr. Dalrymple, do you remember seeing this portion of the transcript which I'll represent to you is pages -- a portion of pages 42 and 43 of the transcript from that hearing?

Do you see that, sir?

A.    I do.

Q.    And you see there's underlining and highlighting.  It says from that point forward the inflation is the same.  Do you see that?

A.    Yes.

Q.    And then it says, "We don't need an expert for that.  We will have an expert talking about the different ways in which they continued to commit this crime."  And then the next sentence, which is neither highlighted nor underlined, says, "But as far as measuring that, that's for the jury."  Do you see that, sir?

A.    I do, yes.

Q.    On this theme of measuring or actually calculating inflation here, when you were asked a number of questions about analysis, damages analysis, damages estimate, proposing a scaling factor, did you understand those questions to be questions about whether you had actually calculated an amount of damages here, whether you had actually calculated the appropriate scaling factor here?

A.    Yes.  I understood those questions to relate to whether I had made that calculation.

Q.    And my understanding is you have not, at the class certification stage, actually calculated damages, have you, sir?

209

A.    That's correct.  I have not.

Q.    You have also not calculated what, if any, scaling factor would be appropriate during the class period.  Have you, sir?

A.    No, I have not make that calculation.

Q.    Okay.  Now, Mr. Giuffra referred several times to the fact that there were 860 trading days during the class period.  Do you remember that phrase being used?

A.    Yes, I do.

Q.    Is it your understanding that the value-relevant truth that FirstEnergy concealed throughout the class period -- so throughout those 860 trading days -- was the same or different?

A.    My understanding is that the value-relevant truth that allegedly was concealed is the same.

Q.    So, if the same value-relevant information is concealed throughout the class period, aside from the possibility of adjustments for scaling factors or adjustments such as for benefits obtained, like HB6, would you expect the inflation to remain the same based on the same concealed information?

        MR. GIUFFRA:  Objection, Your Honor.

        THE COURT:  Overruled.  You may answer.

        THE WITNESS:  Based on what you've said, I would expect inflation to remain the same.

BY MR. FORGE:

Q.    But, to actually calculate the inflation here, you would

go back and determine whether adjustments need to be made to that inflation figure at certain points during the class period. Is that right, sir?

THE COURT: Before you answer that, I want you -- because he is the expert. You would knowledge, of course, Mr. Forge, that that was leading. And because it's a critical point, I want him to answer that. So I want you to ask that same question in a nonleading way.

MR. FORGE: Okay. Your Honor, do you mind if I add a bit more of a windup for that question?

THE COURT: Not at all.

BY MR. FORGE:

Q. Mr. Dalrymple, we went over the alleged revelations from July, October, and November of 2020 this morning, right, sir?

A. Yes, we did.

Q. Okay. Did you use your existing event study, the same event study you provided to the defendants over three years ago, with all that data that they've had for over three years, did you apply those drops to that event study?

MR. GIUFFRA: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: I have made that calculation.

BY MR. FORGE:

Q. With that event study?

A. With that event study.

211

Q.   Did you reach a number that is about $20 per share?

A.   Roughly.

MR. GIUFFRA:  Objection, Your Honor.  It's not in his report.  I asked him the question, he gave the opposite answer that he's now about to give.

THE COURT:  That is not the Court's recollection.  I'm going to allow the answer to stand.  And it's important that we all bear in mind that you're going to have an opportunity to do post-hearing briefs.  So your recollection in real time may not be aligned with what was actually said because we've covered a lot since 9:30.  Please proceed, Mr. Forge.

BY MR. FORGE:

Q.   So, Mr. Dalrymple, the event study that you've described and provided to the defendants years ago, are you comfortable that that event study is capable of measuring the inflation that came out of FirstEnergy's share price in 2020?

A.   Yes, that event study is capable of doing that.

Q.   Now, these other techniques that we've discussed, fundamental valuation techniques such as DCF model, such as market multiple and a scaling factor, are these all techniques that you would use to determine how much, if at all, that inflation varied as you back up through the class period?

A.   Yes.  Those are techniques I would use to determine how much, if at all, inflation might have varied.

Q.   So, if the Court were to determine that class

212

certification is a stage at which it is premature to require time-varying inflation methodologies, would the event study be the only methodology that is relevant at this time?

A.    When you say "relevant," I guess what's relevant is probably up to the Court.  The event study is capable of measuring, on its own, inflation without adjustment at the end of the class period.

Q.    And the adjustment to which you are referring, is that adjustment for potentially varied inflation as you go back in the class period?

A.    Yes.  When I was referring to an adjustment, I was referring to going back during the class period.

Q.    Mr. Giuffra asked you -- and the Court also asked you -- if compliance with the laws is a fairly standard disclosure for companies.  Do you remember those questions?

A.    Generally.

Q.    Do you find that analysts, generally speaking, pay attention to changes in a company's disclosures?

A.    That is something that analysts would generally pay attention to.  Securities analysts, I assume you mean.

Q.    Yes.

A.    Yes.

Q.    If FirstEnergy had gone from a disclosure in 2016 that said what Mr. Giuffra describes as something generic such as we comply with all laws and regulations, and then in 2017 they

suddenly deleted that disclosure so there was no longer this so-called generic disclosure that we comply with all laws and regulations, is that something you would expect securities analysts to pick up on and perhaps question FirstEnergy about?

A.   Yes, I would expect securities analysts to note that.  I should clarify my previous answers.  I'm not suggesting that every time there is a statement that a company complies with the laws that securities analysts scrutinize that.  But I would agree that, if there were an absence of that statement, then that is something that I would expect analysts to point out.

Q.   Now, even for what Mr. Giuffra is describing as a so-called generic statement, is it your understanding of plaintiffs' theory of liability in this case is that, even for these so-called generic statements, the value-relevant information is not just the statement itself but rather the information that FirstEnergy revealed -- I'm sorry, concealed from that statement?

A.   I'm sorry.  Would you mind repeating that.

Q.   I appreciate the opportunity because I botched it.

Regarding these so-called generic statements such as "we comply with all laws and regulations," is it your understanding of plaintiffs' theory of liability that it is just the statement itself that was misleading, or is it the combination of the statement and the fact that it conceals or omits the fact that FirstEnergy was engaging in a corruption and bribery

214

scheme?

MR. GIUFFRA: Objection. Leading.

THE COURT: Overruled. You may answer.

THE WITNESS: My understanding is that plaintiffs allege that the statement was misleading by what it said and what it omitted. And I think that's consistent with what the Sixth Circuit laid out.

BY MR. FORGE:

Q. Now, for some reason, Mr. Giuffra asked you a lot of questions about the *AAC* case. Is it your understanding that the *AAC* case was denied class certification in its entirety?

A. That's not my recollection, no.

Q. So the class was certified as to certain claims. Is that your understanding?

A. That's my recollection.

Q. Is it your understanding that the marketing claims that were -- denied class certification concerned a disclosable risk?

A. I don't have a strong recollection of the *AAC* case.

THE COURT: I'm going to help you out here, Mr. Forge. If there is a legal basis on which you plan to distinguish *AAC*, you can do it in your papers. We don't have a jury here, and I want to use this expert to get his expert opinion on matters economics, not on matters legal, because you all are going to make those arguments as a matter of course anyway. And there's

no need to -- and I know that you are rehabilitating him, but the Court, of all of the arguments made, found that one probably the least compelling.

So you can dwell on it if you choose, or you can take the direction of the Court. It's your choice.

MR. FORGE: Your Honor, I find that direction to be most compelling and, with it, I will sit down. Thank you, sir.

MR. GIUFFRA: Your Honor, I think I'll say something that may be music to everyone's ears. I won't ask any more questions.

THE COURT: Well, if you have questions that you need to ask on recross, we have time.

MR. GIUFFRA: I'm fine, Your Honor, to let it sit where it is right now.

THE COURT: Good enough.

MR. GIUFFRA: The only issue we have to think about, when we have everybody, is the timing of the briefs.

THE COURT: That's kind of what I do. Have a seat. Just have a seat. Mr. Dalrymple, we're going to take care -- Mr. Giuffra, he's just ahead of himself right now.

Mr. Dalrymple, thank you very much, sir. You may be excused.

Now, I have here a -- first, what I have to do first, Mr. Giuffra, is determine how long it will take Ms. Evans to get the transcript from this proceeding.

Ms. Evans, how long do you think it will take?

(Discussion held off the record.)

THE COURT: We have approximately a 200-page transcript today. She can get that transcript out -- because there are other matters that are in her cue -- to you on the 22nd. Now, we aren't starting with the 22nd because the transcript from the oral argument was docketed on the 10th of November; so you've already had that a month. And I know that your firms are very efficient; so there have been a team of people that have begun work on it. So I'm guessing that with this edition, it will take you another two weeks for opening briefs. Tell me if that's unrealistic, Mr. Forge.

MR. FORGE: That is not unrealistic, Your Honor.

THE COURT: Mr. Giuffra?

MS. WILLIAMS: Your Honor, this is for December 5th? Sorry.

THE COURT: No. I'm talking about -- yes, January 5th.

MR. GIUFFRA: Can we move that to the 9h, Your Honor, only because of the holidays?

THE COURT: How many -- what day of the week is the 9th?

THE DEPUTY CLERK: It's a Friday.

THE COURT: Opening briefs, January 9th; simultaneous opening briefs, of course. Simultaneous replies, January 23rd.

MR. GIUFFRA:  Perfect.

THE COURT:  Okay.  The opening briefs shall be no more than 25 pages in length.  The reply briefs shall be no more than 15.  That, of course, does not include attachments; no argumentative attachments, just any attachments that you need to submit, you may do so.  I really do believe that you can get it said in 25 pages and said expertly.

Are there any other matters that we need to take up from the plaintiff, Mr. Forge?

MR. FORGE:  No, Your Honor.  Thank you.

THE COURT:  Mr. Forge, have safe travels back.

MR. FORGE:  Thank you very much, Your Honor.

THE COURT:  Anything further from the defense, Mr. Giuffra?

MR. GIUFFRA:  No, Your Honor, just to wish everybody a happy holiday.

THE COURT:  Mr. Giuffra, you have safe travels back. I want to wish everybody a safe and happy holiday.

MR. FORGE:  Your Honor, I want to thank the court staff, the court reporter.  It's been great being here in the courtroom.

THE COURT:  I have a great staff.

(Proceedings concluded at 5:28 p.m.)

- - -

218

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PLAINTIFF'S: | | | | |
| W. Scott Dalrymple | 8 | 95 | 207 | |

- - -

C E R T I F I C A T E

I, Shawna J. Evans, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable Algenon L. Marbley, Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.

s/Shawna J. Evans_____
Shawna J. Evans, RMR, CRR
Official Federal Court Reporter

December 22, 2025