UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| | ) | |
| This Document Relates To: | ) ) | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |
| ALL ACTIONS. | ) ) | |
| | ) | |

PLAINTIFFS' POST-REMAND BRIEF

MURRAY MURPHY MOUL
 + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com


Liaison Counsel

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com


Class Counsel

4926-1341-7606.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................................................1

II.     BACKGROUND .................................................................................................3

        A.      FirstEnergy's Confessed Corruption...........................................................3

        B.      Class Certification Litigation......................................................................4

        C.      Defendants' Rule 23(f) Appeal ...................................................................6

        D.      The Sixth Circuit's Decision.......................................................................7

                1.      The Sixth Circuit's Decision Changed Nothing About the
                        Substance of Plaintiffs' Allegations.................................................7

                2.      The Sixth Circuit Limits the Remand Proceedings...........................9

        E.      Post-Remand Proceedings .........................................................................10

III.    ARGUMENT......................................................................................................14

        A.      An Event Study Is Universally Recognized as a Reliable Methodology to
                Measure Damages on a Classwide Basis for a Share-Price Inflation Theory
                of Liability ................................................................................................14

        B.      It Is Premature to Require Methodologies to Address *Potential* Variations
                in Inflation................................................................................................16

        C.      Revisiting *Basic* Is Outside Scope of Remand .......................................17

        D.      Defendant Reffner's Belated, Baseless Argument....................................19

IV.     CONCLUSION..................................................................................................20

4926-1341-7606.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972)..................................................................................6, 7, 9

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................ *passim*

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ...........................................................2, 4, 19

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
   2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)...........................................15

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)................................................................................... *passim*

*Cosby v. KPMG, LLP*,
   2020 WL 3548379 (E.D. Tenn. June 29, 2020),
   *report and recommendation adopted*,
   2021 WL 1828114 (E.D. Tenn. May 7, 2021)............................................15

*Dougherty v. Esperion Therapeutics, Inc.*,
   2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) .......................................15

*Edwards v. McDermott Int'l, Inc.*,
   2024 WL 1769325 (S.D. Tex. Apr. 24, 2024),
   *report and recommendation adopted*,
   2024 WL 3085177 (S.D. Tex. June 21, 2024),
   *aff'd sub nom. Nova Scotia Health Emps.' Pension*
   *Plan v. McDermott Int'l, Inc.*,
   2025 WL 2814735 (5th Cir. Oct. 3, 2025)................................................16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)................................................................................16

*Ferris v. Wynn Resorts Ltd.*,
   2023 WL 2337364 (D. Nev. Mar. 1, 2023) ..............................................17

*FindWhat Inv. Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ...............................................................15

*Forsythe v. Teva Pharm. Indus. Ltd*,
   102 F.4th 152 (3d Cir. 2024) ...................................................................14

4926-1341-7606.v1

**Page**

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ...................................................................................................19

*In re Acuity Brands, Inc. Sec. Litig.*,
2020 WL 5088092 (N.D. Ga. Aug. 25, 2020) ...........................................................17

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020) ...............................................................................16

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
2024 WL 1142348 (E.D. Mich. Mar. 15, 2024) .......................................................18

*In re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025) ........................................................................2, 7, 8, 9

*In re Jackson Nat'l Life Ins. Co. Premium Litig.*,
209 F.R.D. 134 (W.D. Mich. 2002) ...........................................................................18

*In re Upstart Holdings, Inc. Sec. Litig.*,
348 F.R.D. 612 (S.D. Ohio 2025) ..............................................................................16

*In re Valley-Vulcan Mold Co.*,
5 Fed. App'x 396 (6th Cir. 2001) .........................................................................12, 17

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................2, 4, 19

*Shupe v. Rocket Cos., Inc.*,
752 F. Supp. 3d 735 (E.D. Mich. 2024) ....................................................................16

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
798 F. Supp. 3d 416 (S.D.N.Y. 2025) .......................................................................15

*Thompson v. Doane Pet Care Co.*,
470 F.3d 1201 (6th Cir. 2006) .............................................................................10, 15

*Tri Cnty. Wholesale Distribs., Inc. v. Labatt USA Operating Co., LLC*,
112 F. Supp. 3d 639 (S.D. Ohio 2015), *aff'd in part and rev'd
in part on other grounds*, 828 F.3d 421 (6th Cir. 2016) ...........................................12

*United States v. Campbell*,
168 F.3d 263 (6th Cir. 1999) .....................................................................................10

*Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.*,
2024 WL 3381259 (E.D. Tenn. July 11, 2024) .........................................................13

4926-1341-7606.v1

**Page**

*Vrakas v. United States Steel Corp.*,
2019 WL 7372041 (W.D. Pa. Dec. 31, 2019)..........................................................................17

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017).................................................................................................16, 17

*Weiner v. Tivity Health, Inc.*,
334 F.R.D. 123 (M.D. Tenn. 2020) ...................................................................................15, 16

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
§78j(b)..................................................................................................................................15, 20

Federal Rules of Civil Procedure
Rule 23(b)(3)..............................................................................................................................20
Rule 23(f) ...........................................................................................................................1, 6, 18

## SECONDARY AUTHORITIES

Jonathan R. Macey, *State Anti-Takeover Legislation and the National Economy*, 1988 Wis. L.
Rev. 467 (1988) ........................................................................................................................12

Eugene F. Fama & Kenneth R. French, *The Capital Asset Pricing Model: Theory and Evidence*,
18 J. of Econ. Perspectives 25 (2004) ......................................................................................13

Robert M. Lloyd, *Discounting Lost Profits in Business Litigation: What Every Lawyer and Judge
Needs to Know*, 9 Transactions: The Tenn. J. of Bus. L. 9 (2007) ...........................................13

Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*
(5th ed. 2008)............................................................................................................................12

Frank Partnoy & Elizabeth Pollman, *Business Organizations: A Contemporary Approach* (4th
ed. 2010) ..............................................................................................................................12, 17

Hon. Christopher S. Sontchi, *Valuation Methodologies: A Judge's View*, 20 Am. Bankr. Inst. L.
Rev. 1 (2012) ............................................................................................................................13

Daniel Fischel, *7 M&A Valuation Documents: Expert Report for AOL* (Jan. 11, 2017) ..............13

Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance*
(McGraw-Hill, 13th ed. 2020) ..................................................................................................13

Gilbert E. Matthews, *Recent Developments in Delaware Valuation Cases*, 40 Bus. Val. Rev. 20
(2021) .......................................................................................................................................13

4926-1341-7606.v1

## I.    INTRODUCTION

In conducting its rigorous analysis of Plaintiffs' damages methodology under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Court has carefully considered hundreds of pages of briefs, exhibits, and expert reports.  It has entertained hours of oral argument, actively engaging with counsel over the course of two hearings.  And, the Court presided over a full-day evidentiary hearing, posing over 30 questions of its own to Plaintiffs' expert and affording Defendants unlimited time for cross-examination.  The Court has thoroughly explored, tested, and confirmed that Plaintiffs' expert's damages methodology (an event study to be refined through standard valuation tools, such as discounted cash flow ("DCF"), market multiples, and scaling) can reliably calculate damages on a classwide basis, and is consistent with Plaintiffs' theory of liability.  In fact, courts in and outside the Sixth Circuit universally recognize the propriety of the event-study methodology to calculate damages in cases where, as here, the theory of liability is that conduct in which the Defendants engaged and omitted from their statements had caused a company's stock to trade at an inflated level and revelations of that previously concealed information caused the inflation to dissipate through share-price drops.[1]

Accordingly, the Court now need only enter an order confirming the rigor of its analysis of Plaintiffs' methodology, as the Supreme Court has made clear that damages are not to be ***calculated***

---

[1]    Defendants refers to defendant FirstEnergy Corp. ("FirstEnergy") and the other defendants who brought a Federal Rule of Civil Procedure 23(f) appeal: Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, George M. Smart, Jerry Sue Thornton, Leslie M. Turner, Jason J. Lisowski, James F. Pearson, Charles E. Jones, Donald R. Schneider, John Judge, Steven E. Strah, and K. Jon Taylor.  Plaintiffs refers to Class Representatives Los Angeles County Employees Retirement Association, Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund, City of Irving Supplemental Benefit Plan, and Wisconsin Laborers' Pension Fund.  Unless otherwise noted, all emphasis is added and citations are omitted.

at the class-certification stage.  Likewise, despite Defendants' repeated insistence (and their expert's sole objection) that any methodology also must account for *possible* class-period variations in inflation, every court to consider the issue has held that it is premature and unnecessary at the class-certification stage.  Nevertheless, consistent with the belt-and-suspenders approach the Court suggested at the evidentiary hearing, Plaintiffs respectfully request that the Court alternatively find that Plaintiffs' methodology also is capable of calculating potential variations in inflation on a classwide basis, consistent with Plaintiffs' theory of liability.

Finally, the Sixth Circuit's decision: (1) changed nothing about the nature of Plaintiffs' allegations and, in fact, confirmed that this entire alleged fraud is about omitted information concerning Defendants' corrupt conduct; and (2) expressly limited "**REMAND** for the district court to conduct a damages analysis under the proper standard set forth in *Comcast*."  *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 623 (6th Cir. 2025) (emphasis in original).  As such, Plaintiffs respectfully request that the Court find that any attempt by Defendants to now challenge the application of the *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) presumption of reliance to FirstEnergy's common stock would violate the Court's Scheduling Order, was waived (by not having been raised in Defendants' opposition to class certification), and would exceed the scope of the Sixth Circuit's expressly limited remand.  Nevertheless, Plaintiffs also respectfully request that the Court's order alternatively find that if it were appropriate to revisit *Basic*'s application, its post-remand rigorous analysis confirms the appropriateness of the fraud-on-the-market presumption, including Plaintiffs' satisfaction of all *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) factors.

- 2 -

## II.     BACKGROUND

### A.     FirstEnergy's Confessed Corruption

As alleged, corrupt conduct in which Defendants engaged and omitted from their statements had caused FirstEnergy's stock to trade at an inflated level, and revelations of the previously concealed information caused the inflation to dissipate through share-price drops. *See, e.g.*, Complaint, ECF 72 at PageID 1547-49 (¶¶3-9); *id.* at PageID 1632 (¶237). FirstEnergy's conversion to a corrupt enterprise was complete no later than March 7, 2017, when (as FirstEnergy has confessed), its co-conspirator (defendant Michael Dowling) executed its co-conspirators' (defendant Charles Jones and Larry Householder) agreement to $1 million in bribe payments that year through an initial $250,000 payment to Householder's 501(c)(4) entity to be followed shortly by another $750,000. Deferred Prosecution Agreement ("DPA"), ECF 259-5 at PageID 6015. All told, FirstEnergy has confessed that it made over $60 million in bribe payments to Householder and Samuel Randazzo, former Chairman of the Public Utilities Commission of Ohio. *Id.* at PageID 6015-16.

All this corruption was aimed at maintaining and inflating FirstEnergy's share price, as it has confessed that its "top priority" was "the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program." DPA, ECF 259-5 at PageID 6018. FirstEnergy's second priority concerned a "rate distribution case scheduled for 2024, [which it believed] would result in decreased revenue and negatively impact FirstEnergy Corp.'s financial outlook." *Id.* at PageID 6017. Financial analysts were keenly aware of the imminent rate case, which was negatively impacting FirstEnergy's share price, and FirstEnergy was determined to use its criminal conspiracy to "'***fix . . . the Ohio hole***.'" *Id.* at PageID 6017. "For example, on November 5, 2019, [Jones] texted to [Dowling] an article published that day, in which Morgan Stanley projected low growth for

- 3 -

FirstEnergy Corp. because of '***a rate case review in 2024***.'  In his note accompanying the article, [Jones] told [Dowling], '***Here's the MS down grade due to the "Ohio hole***.'""  *Id.* at PageID 6040.

Upon obtaining the legislative bailout, known as "House Bill 6" or "HB6," FirstEnergy boasted to investors that HB6 "takes about 1/3 of our company and [it] makes it somewhat recession-proof." Complaint, ECF 72 at PageID 1592 (¶132).  Likewise, when Randazzo fixed the "Ohio hole" by cancelling the rate case, Jones texted Randazzo to thank him for the resulting boost to FirstEnergy's share price:

> Specifically, [Jones] texted [Randazzo] an image showing FirstEnergy Corp.'s stock increase with a note that stated, "***Thank you!!***" [Randazzo] responded, "***Ha – as you know, what goes up may come down. [Matt] helped.  Thanks for the note.  Spoke to [Mike] last night***." [Jones] replied, "***Every little bit helps.  Those guys are good but it wouldn't happen without you.  My Mom taught me to say Thank you***," to which [Randazzo] replied, "***Thanks***."

DPA, ECF 259-5 at PageID 6041.

### B.     Class Certification Litigation

The Court's Scheduling Orders set an August 2022 deadline for Defendants to offer evidence and arguments against class certification.  Scheduling Order, ECF 255 at PageID 5902.

On June 6, 2022, Plaintiffs timely filed their motion for class certification, which included over 400 pages of briefing and exhibits, including reports from two different experts, one of whom was W. Scott Dalrymple.  Class Certification Mot. & Exs. A-G, ECFs 293-1 - 293-9 at PageID 6207-620.  Plaintiffs' papers established that: (1) FirstEnergy's common stock traded in an efficient market throughout the Class Period, as all the *Cammer* and *Krogman* factors were satisfied (Class Certification Mot., ECF 293-1 at PageID 6234-40); (2) the *Basic* presumption of reliance applied to FirstEnergy's common stock; and (3) damages attributable to Plaintiffs' theory of liability could be

- 4 -

4926-1341-7606.v1

readily calculated on a classwide basis using the event-study/out-of-pocket methodology.  Class Certification Mot., Ex. E (Dalrymple Report), ECF 293-7 at PageID 6294-97 & 6303-04.[2]

On August 1, 2022, Defendants deposed Plaintiffs' expert Dalrymple.  Class Certification Opp., Ex. B (Dalrymple Depo. Tr.), ECF 339-3 at PageID 7240-349.  On August 17, 2022, Defendants timely filed their opposition, comprising over 400 pages, including a 57-page brief, hundreds of pages of exhibits, and a report from their lone expert: Dr. Jennifer Marietta-Westberg. Class Certification Opp. & Exs. A-I, ECFs 339 - 339-10 at PageID 7161-578.  Defendants did not dispute that FirstEnergy's common stock traded in an efficient market throughout the Class Period (Class Certification Reply, Ex. P (Marietta-Westberg Depo. Tr.), ECF 346-10 at PageID 8239 (172:4-7)) or the *Basic* presumption of reliance's applicability to FirstEnergy's common stock (Class Certification Opp., ECF 339 at PageID 7199).  Nor did Defendants dispute the reliability of the event-study/out-of-pocket methodology or its consistency with Plaintiffs' theory of liability.  In fact, Defendants' expert, a former Chair of the Securities and Exchange Commission's Investment Advisory Committee and former Deputy Director and Deputy Chief Economist at the SEC's Division of Economic and Risk Analysis (Class Certification Opp., ECF 339 at PageID 7186), testified that the SEC has used the same methodology for measuring damages.  Class Certification Reply, Ex. P (Marietta-Westberg Depo. Tr.), ECF 346-10 at PageID 8208 (46:23-47:1); *see also id.* at PageID 8224 (113:11-14) ("Q.  [A]re you opining that [Jones' and Dalrymple's] proposed damages methodologies are not consistent with Plaintiffs' theory of liability?  A.  *No.*").  Defendants' lone criticism of Plaintiffs' damages methodology was that Plaintiffs did not explain how exactly they would account for possible variations in inflation during the Class Period, and the

---

[2]     Courts often use "event-study" and "out-of-pocket" interchangeably to refer to the same methodology that deploys an event study to measure out-of-pocket damages due to dissipation of share-price inflation.  As such, Plaintiffs refer to the methodology itself as the "event-study methodology."

lone source of variation that Defendants asserted was inflation attributable to the passage and enactment of the HB6 legislation.  Class Certification Opp., Ex. D (Marietta-Westberg Report), ECF 339-5 at PageID 7471 ("The likelihood of passage and enactment of potential favorable legislation necessarily varied over time during the Proposed Class Period . . . .").

On September 28, 2022, Plaintiffs timely filed their reply in support of class certification, comprising over 700 pages of briefing and exhibits, including rebuttal reports from Plaintiffs' two experts.  Class Certification Reply & Exs. H-P, ECFs 346 - 346-10 at PageID 7606-8343.

On March 17, 2023, the Court conducted a hearing on Plaintiffs' motion.  Plaintiffs expressly confirmed that Defendants had conceded the *Basic* presumption applies to FirstEnergy's common stock, which Defendants affirmed.  *See, e.g.*, 3/17/23 Hr'g Tr., ECF 437 at PageID 9855 (Plaintiffs: "Defendants concede that on the stock"); *id.* at PageID 9870 (Defendants: "[t]his is clearly a *Basic* case").  The Court had carefully considered the parties' voluminous submissions, including their arguments regarding damages, as demonstrated by the Court's active engagement throughout the hearing.  *See, e.g.*, 3/17/23 Hr'g Tr., ECF 437 at PageID 9861-68 & 9881-82.

On March 30, 2023, the Court issued its Class Certification Order.  Class Certification Order, ECF 435 at PageID 9781-831.

### C. Defendants' Rule 23(f) Appeal

On April 14, 2023, Defendants filed their petition for permission to appeal pursuant to Federal Rule of Civil Procedure Rule 23(f), which did not challenge (and actually advocated for) the application of the *Basic* presumption of reliance.  6th Cir. No. 23-0303, ECF 1-2 at Page 12 (contending that "*Basic* – not *Affiliated Ute* – [applied to Plaintiffs'] claims").  After the Sixth Circuit granted Defendants' petition, Defendants filed their brief on appeal, which again did not challenge (but rather advocated for) the application of the *Basic* presumption of reliance.  6th Cir. No. 23-3940, ECF 31 at Page 19.

4926-1341-7606.v1

### D. The Sixth Circuit's Decision

#### 1. The Sixth Circuit's Decision Changed Nothing About the Substance of Plaintiffs' Allegations

On August 13, 2025, the Sixth Circuit issued its decision on Defendants' appeal. *FirstEnergy*, 149 F.4th at 623.  The decision changed nothing about Plaintiffs' theory of liability: corrupt conduct in which Defendants engaged and omitted from their statements had caused FirstEnergy's stock to trade at an inflated price, and revelations of this information caused damages by dissipating this inflation.  Complaint, ECF 72 at PageID 1547-49 (¶¶3-9).  The Sixth Circuit merely created a new standard for application of the *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) presumption, which impacts 1 of the Complaint's 322 paragraphs.  *Compare* Complaint, ECF 72 at PageID 1640 (¶256) (the lone paragraph mentioning *Affiliated Ute*), *with id.* at PageID 1546-658 (¶¶1-255, 257-322) (no mention of the *Affiliated Ute* presumption of reliance).  The Sixth Circuit said the omissions in this case are misrepresentations for purposes of *Affiliated Ute* under that decision's "specialized . . . concept of 'omission'" but stressed that concept differs from the "colloquial, dictionary definition of 'omission.'"  *FirstEnergy*, 149 F.4th at 610.  It also noted that proving reliance on Defendants' misrepresentations, including omissions considered misrepresentations for *Affiliated Ute* purposes, is not a serious question.  *Id.* at 618-19 ("[R]eliance is in fact possible to prove here.  The question here is simple: can plaintiffs point to a misrepresentation and connect it to the injury?  The answer here is also simple: yes. . . .  Plaintiffs here need not prove reliance on something that never happened.  FirstEnergy's statements very much happened.").

Indeed, for all 13 categories of statements the Sixth Circuit examined, it confirmed that the alleged deceptiveness of each boiled down to the information about Defendants' corrupt conduct that the statements omitted:

- "The first grouping . . . stated the 'truth' only generally, '***omitting*** critical qualifying information': that it was pursuing solutions based in significant part on a ***bribery arrangement*** going on in the background." *FirstEnergy*, 149 F.4th at 612.

4926-1341-7606.v1

- "The second grouping . . . clearly alleges an affirmative misstatement: FirstEnergy was ***claiming that it was complying with regulations while breaking them***." *Id.*

- "The third grouping [yields] two ways to view this claim. Option 1 is that these statements were affirmative misstatements: the company represented that the disclosure controls and procedures were effective, but they could not have been effective if the bribery was going on the whole time. Option 2 is that these statements were half-truths: maybe the procedures were designed to exclude oversight of bribery schemes, so it was 'true' that the procedures were 'effective.' In that case, the half-truth would come from the ***omission*** of the critical qualifying information that the procedures didn't cover ***bribery***." *Id.* at 612-13.

- "The fourth grouping . . . misrepresented the overall picture in its listing of Risk Factors and the Management's Discussion & Analysis [because FirstEnergy] ***did not discuss*** its ***bribery arrangement*** as a Risk Factor . . . ." *Id.* at 613.

- "The fifth grouping . . . alleges an affirmative misstatement because the directors did allegedly ***omit*** necessary qualifying facts showing the full picture of the ***bribery arrangement***." *Id.*

- "The sixth grouping . . . is that FirstEnergy ***didn't mention*** that these initiatives, dialogue, and support also ***involved bribery***." *Id.* at 614.

- "The seventh grouping . . . is that these statements ***did not address*** the full truth that the company's actual behaviors included ***bribery***." *Id.*

- "The eighth grouping . . . is that FirstEnergy ***never revealed*** the ***bribery-and-bailout arrangement*** that violated these goals – ***critical qualifying information for investors to see the full picture*** of what was going on with the company." *Id.* at 614-15.

- The ninth grouping['s] . . . first sentence . . . ***didn't disclose the bribery***, which certainly qualifies as something that would have been caught in such oversight processes [and] [t]he second sentence . . . claimed that its political contributions were legal, but it had participated in ***bribery***." *Id.* at 615.

- "The tenth grouping . . . [are] half-truths [due to] the qualifying ***information that FirstEnergy did not share***[:] that its appreciation, sleeve-rolling, and optimism about legislation were all bundled with the ***bribery*** of legislative officials." *Id.* at 615-16.

- "The eleventh grouping . . . [are statements in which] FirstEnergy ***never shared*** the ***critical qualifying information*** that all these efforts were happening in the form of ***bribery***." *Id.* at 616-17.

- "The twelfth grouping . . . ***failed to disclose*** the ***critical qualifying information about the illegal political contributions*** it made in order to get HB6 passed [and] ***failed to disclose*** the alleged ***bribes***, which would certainly put such regulatory relationships and general legal respect/standing at great risk." *Id.* at 617-18 (some emphasis in original).

- 8 -

- "Finally, the thirteenth grouping [is] that FirstEnergy **did not accurately disclose** its political contributions because of the **concealed contributions** that were part of the **bribery arrangement**." *Id.* at 618.

The decision's only change to this case was that *Affiliated Ute* does not apply. But the presumption of reliance from *Basic* – alleged from the start (Complaint, ECF 72 at PageID 1639-40 (¶¶254-255)), always argued (Class Certification Mot., ECF 293-1 at PageID 6234-40; Class Certification Reply, ECF 346 at PageID 7650), and twice recognized as valid (Opinion & Order re motions to dismiss, ECF 219 at PageID 4766-71; Class Certification Order, ECF 435 at PageID 9822-23) – still does. The Sixth Circuit made that plain, stating it was "vacating the class-certification decision only to the extent that [this] court applied *Affiliated Ute*, which was the only [reliance/liability] issue presented to us on appeal" while at the same time acknowledging and leaving untouched this Court's "hold[ing] that 'Plaintiffs would be entitled to the *Basic* presumption of reliance even if *Affiliated Ute* were inapplicable.'" *FirstEnergy*, 149 F.4th at 620.

Also untouched are the "shape" or "theory" of the case, the allegations, and core basis for liability: FirstEnergy and its executives executed a massive corruption conspiracy, transforming FirstEnergy into a criminal enterprise – and they did so to inflate/maintain the price of FirstEnergy's stock through a multi-faceted scheme to defraud, false and misleadingly incomplete statements, and a fraudulent course of business. Complaint, ECF 72 at PageID 1547-49, 1646 (¶¶3-7, 270-271).

### 2. The Sixth Circuit Limits the Remand Proceedings

The Sixth Circuit made equally plain that it was cabining the issue that may be addressed on remand, "emphasiz[ing]" – under a "**Limited Remand**" heading – "that we are issuing a limited remand" and later reiterating a second time that it was only "**VACAT[ING]**" the class-certification order ***to the extent that it applied the Affiliated Ute presumption of reliance*** and **REMAND[ING]** for the district court to conduct a damages analysis under the proper standard set forth in *Comcast*." *FirstEnergy*, 149 F.4th at 620, 623 (some emphasis in original). The

4926-1341-7606.v1

expressly "limited" remand means this Court "is without authority to expand its inquiry beyond the matters forming the basis of the appellate court's remand." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999).  The court of appeals instead "explicitly outline[d] the issue[] to be addressed by [this Court] and create[d] a narrow framework within which [this Court] must operate." *Id.* at 265.

### E.     Post-Remand Proceedings

Following remand from the Sixth Circuit, the Court received and carefully considered multiple briefs from the parties.  On September 4, 2025, Plaintiffs filed their Post-Remand Position Statement, in which they agreed that, "to simplify the jury's task, Plaintiffs will not seek damages attributable to any fractional inflation prior to the dates any such successes were achieved."  Position Statement, ECF 848 at PageID 20176.  Likewise, on October 17, 2025, Plaintiffs provided notice that they are no longer pursuing Exchange Act claims for any debt securities.  Notice, ECF 869 at PageID 20598-600.

On November 6, 2025, the Court presided over a post-remand hearing, including a PowerPoint presentation from Defendants that exceeded 100 slides, questioning counsel from both sides.  FirstEnergy's Illustrative Aid, ECF 907-1 at PageID 23567-669.

On December 12, 2025, at Defendants' urging, the Court held an evidentiary hearing involving a full day of testimony from Plaintiffs' expert W. Scott Dalrymple, posing over 30 questions to Dalrymple directly and affording Defendants unlimited time for cross-examination.  Consistent with Sixth Circuit precedent, Dalrymple "supplement[ed], elaborate[d] upon, explain[ed] and subject[ed] himself to cross-examination upon his report[s]." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006).

- 10 -

Consistent with his prior reports,[3] Dalrymple testified unequivocally that an event study will measure damages across the class based on Plaintiffs' theory of liability.  *See, e.g.*, 12/12/25 Hr'g Tr., ECF 936 at PageID 24189-92.  Put simply:

> The event study itself is a regression analysis in which we measure the correlation of, say, FirstEnergy's returns in this case as they are explained by broad market movements like the S&P 500 and the Utilities Index.  We, for lack of a better word, remove the impact of the share price return that we would expect given how the market moves. And from that we are left with a residual return on every day that we can use to measure the impact of information on the stock price.

*Id.* at PageID 24157.

Further, Dalrymple explained how an event study would work here:

- The event study begins by carefully selecting independent variables – here the S&P 500 Total Return Index and a comparable industry index (the S&P 500 Utilities Sector GICS Level 1 Index).  *Id.* at PageID 24159.

- The pricing data for these indices and FirstEnergy's stock is downloaded from data services such as Bloomberg or S&P Capital IQ.  *Id.* at PageID 24160.

- Certain adjustments are made to these pricing data, which yields a complete data set.  *Id.* at PageID 24161-62.

- The complete data set is imported into a widely used statistical program called Stata, which runs the regression, meaning it determines the statistical relationship between FirstEnergy's share price movements and the price movements of the two indices (the difference in these returns is known as the ***abnormal return***).  *Id.* at PageID 24163-65.

- This regression analysis also allows one to calculate "confidence levels," or the likelihood that any given abnormal return was caused by new company-specific information versus non-company-specific information, as reflected by the indices.  *Id.* at PageID 24165-67.

- Here, on days where there were revelations about FirstEnergy's corruption and a corresponding share-price drop, the event study would calculate the amount of the share price drop attributable to this company-specific information versus market or industry forces.  *Id.* at PageID 24179-81, 24189-92.

---

[3]     Class Certification Mot., Ex. E (Dalrymple Report), ECF 293-7 at PageID 6294-97 & 6303-04.

- 11 -

4926-1341-7606.v1

Years ago, Plaintiffs provided to Defendants Dalrymple's entire event study, including all data sets, coding, dummy variables, and adjustments – everything Defendants would need to plug in the alleged price drops and confirm a $20 ballpark for total per-share price inflation. *Id.* at PageID 24162-63, 24186-87, 24189-91, 24197.

Dalrymple further explained that while the event study is the primary methodology for measuring damages attributable to Plaintiffs' theory of liability on a classwide basis, for any potential variations or other fine tuning for a final damages calculation, Dalrymple would use fundamental valuation techniques, such as DCF and the market approach, as well as scaling factors. *Id.* at PageID 24224, 24233-34, 24351.[4] As Defendants conceded at the evidentiary hearing, the DCF methodology is a standard valuation methodology taught in "finance school." *Id.* at PageID 24209.[5] It uses a formula to calculate the present value of expected future income streams. *Id.* at

---

[4] *See, e.g.*, Class Certification Mot., Ex. E (Dalrymple Report), ECF 293-7 at PageID 6303 n.141 (identifying DCF and market methodologies and citing Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008) ("*Valuing a Business*"), Chs. 3, 9 & 11); *see also* Plaintiffs' Reference Document, Ex. 1 (*Valuing a Business*, Chs. 3, 9 &11), ECF 877-1 at PageID 20710-13; Class Certification Opp., Ex. B (Dalrymple Depo. Tr.), ECF 339-3 at PageID 7287 (182:9-183:15) (describing such calculations as a "standard financial and valuation techniques"); *see also* Class Certification Reply, Ex. I (Dalrymple Rebuttal Report), ECF 346-3 at PageID 7750-52 (discussing fundamental valuation methodologies and the use of scaling factors).

[5] The DCF methodology is widely used by academics and practitioners and is commonly referred to as the "gold standard" for valuation. *See* Frank Partnoy & Elizabeth Pollman, *Business Organizations: A Contemporary Approach*, at 245 (4th ed. 2010) ("*Business Organizations*"); *see also* Jonathan R. Macey, *State Anti-Takeover Legislation and the National Economy*, 1988 Wis. L. Rev. 467, 480 (1988) ("The price of such stock reflects the market's estimation of the present value of the net future earnings of the firm. This estimate, in turn, is based on the publicly available information about the firm's performance, and the market's estimate of the firm's future earnings prospects. This observation is virtually self-evident. After all, a share of stock is simply an asset and asset values are a function of discounted future flows."). As with event studies, this Court and others widely accepted DCF analysis as a reliable expert methodology in a range of cases. This Court has embraced the use of the DCF methodology, where market multiples were used in tandem as a cross-check. *Tri Cnty. Wholesale Distribs., Inc. v. Labatt USA Operating Co., LLC*, 112 F. Supp. 3d 639, 658 (S.D. Ohio 2015), *aff'd in part and rev'd in part on other grounds*, 828 F.3d 421 (6th Cir. 2016). This is exactly what Dalrymple testified he would do here. 12/12/25 Hr'g Tr., ECF 936 at PageID 24230-31; *see also In re Valley-Vulcan Mold Co.*, 5 Fed. App'x 396, 399 (6th Cir. 2001) (noting, with approval, that expert's "valuations were based on discounted cash-flow

- 12 -

4926-1341-7606.v1

PageID 24206-10, 24214-15.[6] The market (or income) approach could be used as a sort of "pressure test" for the DCF methodology. *Id*. at PageID 24229-33. Under a market/income approach, one uses prevailing market multiples to convert, for example, expected earnings from HB6 to a value per share. *Id*. at PageID 24232-33. Scaling factors are used to account for "structural breaks" that occur during a Class Period. *Id.* at PageID 24216-22. For example, if a company converted from a C Corporation to a Real Estate Investment Trust (a "REIT") during a class period, its tax treatment changes, which means a dollar of earnings as a REIT is worth a different amount than a dollar of earnings as a C Corp. *Id.* at PageID 24221-22. Likewise, a scaling factor could be used to account

---

valuation, a well-recognized methodology for determining a business's going concern values" (alteration in original)); *Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.*, 2024 WL 3381259, at *17 (E.D. Tenn. July 11, 2024) ("The discounted cash flow approach which [the expert] used is a well-recognized valuation methodology."); Hon. Christopher S. Sontchi, *Valuation Methodologies: A Judge's View*, 20 Am. Bankr. Inst. L. Rev. 1, 16 (2012), https://commission.abi.org/sites/default/files/10sontchi.pdf ("It is important to remember that bankruptcy judges have become familiar and comfortable with the DCF, comparable companies and comparable transactions methodologies . . . ."); Gilbert E. Matthews, *Recent Developments in Delaware Valuation Cases*, 40 Bus. Val. Rev. 20 (2021), https://www.boustead1828.com/_files/ugd/76d6c1_704ef73c521e42398a055bafc8906ba5.pdf (describing recent use of DCF methodologies); Daniel Fischel, *7 M&A Valuation Documents: Expert Report for AOL* at 28 (Jan. 11, 2017) ("*Expert Report for AOL*"), https://elibrary.law.psu.edu/valuation/7 (determining the fair value of AOL common stock using a DCF method and describing the DCF method as "generally regarded as the most reliable non-market valuation method"); *Expert Report for AOL* at 28-29 n.87 ("These difficulties can frequently be avoided by a reliance on market prices when available, which in my opinion typically provide the best measure of the value of an asset.").

[6]    *See, e.g.*, Eugene F. Fama & Kenneth R. French, *The Capital Asset Pricing Model: Theory and Evidence*, 18 J. of Econ. Perspectives 25, 41 (2004), https://pubs.aeaweb.org/doi/pdfplus/10.1257/0895330042162430 ("A stock's price can always be expressed as the present value of expected future cash flows discounted at the expected return on the stock."); Robert M. Lloyd, *Discounting Lost Profits in Business Litigation: What Every Lawyer and Judge Needs to Know*, 9 Transactions: The Tenn. J. of Bus. L. 9 at 13 n.16 (2007), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2285750 ("*Discounting Lost Profits in Business Litigation*") ("The rigorous use of discounted cash flow has been traced back to ancient Babylon."); *see also Discounting Lost Profits in Business Litigation* at 25 ("The most straightforward [method for calculating value in business litigation] is the discounted cash flow method."); Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance* at 95 (McGraw-Hill, 13th ed. 2020), https://studylib.net/doc/27697865/principles-of-corporate-finance ("Value today always equals future cash flow discounted at the opportunity cost of capital.").

- 13 -

for the difference in value between an expected income stream from a Certificate of Deposit versus a Junk Bond.  *Id.* at PageID 24223-24.  Determining the appropriate scaling factor is "necessarily a fact-intensive determination" (*id*. at PageID 24314) "derived from DCF and market multiples and, if appropriate, event studies, shareholder reactions to certain information."  *Id*. at PageID 24315-16.

Perhaps most importantly in this context, Dalrymple testified that all these methodologies would apply the same whether this was a class action or case brought by a single individual.  *Id.* at PageID 24168-69, 24214-15, 24233-34.

## III.   ARGUMENT

### A.   An Event Study Is Universally Recognized as a Reliable Methodology to Measure Damages on a Classwide Basis for a Share-Price Inflation Theory of Liability

It is easy to see why FirstEnergy did not contest the reliability of Plaintiffs' event-study methodology to measure damages on a classwide basis here.  Every court in every circuit to consider this question has confirmed that an event study is a reliable way to measure damages where, as here, the theory of liability is that a fraud had caused a company's stock to trade at an inflated price and the inflation dissipated upon revelation of fraudulently concealed information:

> Here, the District Court concluded that [the plaintiff's] proposed damages model was consistent with his theory of liability.  The Court reasoned that the three "categories of misstatements identified by [the plaintiff] ultimately reach the same theory of the case," namely that [d]efendants made material misrepresentations and omissions[,] that [these] misrepresentations [artificially inflated] Teva's stock price[,] and [that] the stock price declined when the truth emerged[,] causing financial loss to [Forsythe] and the class.  The Court concluded that the proposed damages model – . . . loss causation" or the "disaggregati[on of] confounding factors to prove economic loss" need not be determined at the class certification stage.
>
> We agree with the District Court.

*Forsythe v. Teva Pharm. Indus. Ltd*, 102 F.4th 152, 158-59 (3d Cir. 2024) (cleaned up) (some alterations in original).  "An event study . . . is a statistical regression analysis that examines the effect of an event[, such as the release of information,] on a dependent variable, such as a

- 14 -

corporation's stock price." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 (11th Cir. 2011).[7] "[E]vent studies are . . . used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price." *Id.*

Here, the Court's order must simply reflect the rigorous analysis the Court has plainly demonstrated at multiple hearings. As outlined above, Dalrymple's testimony, which "supplement[ed], elaborate[d] upon, explain[ed] and subject[ed] himself to cross-examination upon his report[s]" (*Thompson*, 470 F.3d at 1203), provides all the necessary details – and this is largely attributable to the Court's questioning throughout the evidentiary hearing. Plaintiffs respectfully urge the Court to enter an order reflecting those details, confirming the Court's consideration of all Dalrymple's testimony, as well as all related submissions and arguments, and concluding that Plaintiffs' event-study methodology is capable of measuring damages attributable to Plaintiffs' theory of liability on a classwide basis – satisfying predominance.

There is no genuine dispute regarding predominance, as Defendants have never contended that there is even the potential for any individual damages evidence or determinations. Rather:

> All of [Defendants'] criticisms go to the accuracy of the damages model and loss causation, but do not prevent class certification because all of these alleged obstacles

---

[7]     District courts uniformly agree that event studies reliably measure damages from inflated stock prices. "[E]vent study methodology to measure out-of-pocket damages based upon [plaintiff's] sole theory of liability – that Defendants' material misstatements created or maintained artificial inflation in Goldman's stock price during the class period, causing losses when that inflation was released from the stock price following the disclosure of information revealing the fraud . . . has been endorsed repeatedly by courts in this Circuit." *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 478-79 (S.D.N.Y. 2025). "It is also consistent with *Comcast*, 569 U.S. 27, which requires only that a proposed class-wide damages methodology 'measure damages that result from the class's asserted theory of injury.'" *Sjunde AP-Fonden,* 798 F. Supp. 3d at 479; *see also Weiner v. Tivity Health*, *Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020) (same); *Cosby v. KPMG, LLP*, 2020 WL 3548379, at *26-*28 (E.D. Tenn. June 29, 2020), *report and recommendation adopted*, 2021 WL 1828114 (E.D. Tenn. May 7, 2021) (same); *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *6 (E.D. Mich. Nov. 19, 2020) (same); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("out-of-pocket or event study damages model, which is the standard measurement of damages in Section 10(b) securities cases") (gathering cases).

> for accurate calculation of the damages are the same if there is one plaintiff or one million plaintiffs.  Defendants can argue the merits of Plaintiffs' proposed damages model at summary judgment or trial, but whether the Court certifies a class or not has no impact on those arguments.  There is nothing about there being more plaintiffs that makes the damages model more or less accurate, because there is no argument here that damages would be individualized.

*In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 212-13 (D. Minn. 2020).  This is doubly true here, where the three class representatives purchased FirstEnergy common stock throughout nearly every month of the Class Period.  (Appointment Mot., Ex. B (LACERA Cert.), ECF 33-4 at PageID 779-81; Complaint, ECF 72 at PageID 1660-68).

**B.     It Is Premature to Require Methodologies to Address *Potential Variations in Inflation***

Courts are equally universal in concluding that it is premature at the class-certification stage to require plaintiffs to show how they could account for ***potential*** time-varying inflation or overreactions.[8]  The only circuit to consider this issue held: "Even accepting the Defendants' premises that inflation would have varied during the class period in this case and that such variation could not be accounted for, the Defendants' argument fails."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).  Every district court in every circuit, including the Sixth Circuit, to consider this issue has reached the same conclusion.  *See, e.g.*, *Shupe v. Rocket Cos., Inc.*, 752 F. Supp. 3d 735, 784 (E.D. Mich. 2024) ("*Comcast* does not suggest that damage calculations must be so precise at this juncture"); *Weiner*, 334 F.R.D. at 138 (holding that arguments that a plaintiff's proposed damages model did "not account for time-varying inflation and potential overreactions" were "premature").  *Edwards v. McDermott Int'l, Inc.*, 2024 WL 1769325, at *13 (S.D. Tex. Apr. 24,

---

[8]     The genesis for this universal holding lies in the Supreme Court, beginning with *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011), which unequivocally held that it is erroneous to require a plaintiff to prove loss causation at the class-certification stage, as the Court recognized last year in *In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 630 (S.D. Ohio 2025).  *Comcast* drove home this point by explicitly holding that for purposes of class certification, a damages model need only be consistent with the plaintiff's theory of liability, and "[c]alculations need not be exact."  569 U.S. at 35.

- 16 -

2024) ("I see no reason to depart from [the *Waggoner* court's] analysis."), *report and recommendation adopted*, 2024 WL 3085177 (S.D. Tex. June 21, 2024), *aff'd sub nom. Nova Scotia Health Emps.' Pension Plan v. McDermott Int'l, Inc.*, 2025 WL 2814735 (5th Cir. Oct. 3, 2025); *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at \*12 (D. Nev. Mar. 1, 2023) ("defendants' argument that [plaintiff's] method fails to account for the possibility that inflation is not necessarily constant over the entire class period is premature at this stage"); *In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at \*10 (N.D. Ga. Aug. 25, 2020) (same); *Vrakas v. United States Steel Corp.*, 2019 WL 7372041, at \*10 (W.D. Pa. Dec. 31, 2019) (same).

Plaintiffs respectfully urge the Court to join every other court to consider this issue by holding that it is premature at the class-certification stage to require Plaintiffs to propose a damages model to account for **potential** time-varying inflation and/or overreactions. Plaintiffs likewise respectfully urge the Court to also enter the following alternative finding: even if such a model were required at the class-certification stage, the Court has carefully considered Plaintiffs' DCF, market, and scaling factors methodologies, including the expert reports and lengthy testimony and cross-examination concerning them, and is satisfied that these methodologies, used in tandem with the event-study methodology, are capable of measuring potential time-varying inflation and overreactions on a classwide basis, under Plaintiffs' theory of liability.[9]

### C.     Revisiting *Basic* Is Outside Scope of Remand

As Plaintiffs have previously explained: "It is hard to imagine how the Sixth Circuit could have made any clearer that *Basic* – and everything else other than the Court's *Comcast* damages analysis – is off the table on remand." Supplement Mot. Opp., ECF 921 at PageID 23894. Plaintiffs incorporate by this reference all their prior arguments addressing the inappropriateness of revisiting

---

[9]     As noted *supra* §II.E, DCF is the "gold standard" for valuation (*Business Organizations* at 245) that courts also reference as a standard methodology (*see, e.g.*, *Valley-Vulcan Mold*, 5 Fed. App'x at 399-400).

*Basic* at this time, including those articulated in their Position Statement (ECF 848 at PageID 20172-77), Clarification Mot. (ECF 916-1 at PageID 23841-46), Supplement Mot. Opp. (ECF 921 at PageID 23886-98) and during the November 6, 2025 hearing (11/6/25 Hr'g Tr., ECF 914 at PageID 23771-820), which distill down to three fundamental points:

1. The Court's Scheduling Orders established an August 2022 deadline for any oppositions to class certification, and Defendants neither opposed application of the *Basic* presumption to FirstEnergy's common stock nor have they moved or established good cause to modify the scheduling orders (*see, e.g.*, Supplement Mot. Opp., ECF 921 at PageID 23890-91);

2. This Court's application of the *Basic* presumption remains the law of the case, as the Sixth Circuit's decision explicitly left it intact and did not alter any of the factors that overwhelmingly support its application (*see, e.g.*, *id.* at PageID 23891-94);[10] and

3. The Sixth Circuit's explicitly limited remand does not extend beyond the Court's rigorous analysis under *Comcast* (*see, e.g.*, *id.* at PageID 23894-97).

Knowing that the damages record resoundingly supports class certification for damages, Defendants are just trying to manufacture a new issue for a Rule 23(f) appeal on class certification for liability, despite having conceded and waived any such issues years ago. Accordingly, Plaintiffs

---

[10] In *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2024 WL 1142348 (E.D. Mich. Mar. 15, 2024), the court was presented with a mirror image of this situation, where the plaintiffs, not the defendants, "essentially ask[ed] for a do-over." *Id.* at *3. The same reasoning that required denial there applies here: "The Court never granted leave to file any second or subsequent [opposition to] class certification, and the present motion amounts to an attempt to [deny] the same relief that was [granted] by the Court more than [three] years ago in the ruling on the plaintiffs' original class motion." *Id.* "[T]he underlying facts and circumstances pertinent to the [Exchange Act] claim[] . . . have not changed since [2023] in any way that would alter materially the reasoning on which the Court relied when it" found the *Basic* presumption applicable to FirstEnergy's common stock. *Id.* at *4. "[Defendants] have failed to present good grounds for the Court to revisit the question of [the *Basic* presumption's applicability to the Exchange Act claim], and their [attempt to oppose *Basic*'s application] is tardy and procedurally improper at this stage of the litigation." *Id.*; *see also In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 209 F.R.D. 134, 138 (W.D. Mich. 2002) (then-District Judge McKeague applying law-of-the-case doctrine to prior class-certification ruling).

- 18 -

respectfully request that the Court enter an order finding that Defendants' arguments against application of the *Basic* presumption of reliance are untimely, have been waived, and are outside the scope of the Sixth Circuit's explicitly limited remand.

Nevertheless, consistent with the belt-and-suspenders approach the Court suggested, Plaintiffs respectfully request that the Court also enter the following alternative finding: even if revisiting the applicability of the *Basic* presumption of reliance was timely under the Court's Scheduling Orders, not waived, and within the scope of the Sixth Circuit's limited remand, the Court has carefully considered the issue and reaffirms that Plaintiffs are entitled to the fraud-on-market presumption for FirstEnergy's common stock, as: (1) the alleged statements were public (*e.g.*, Complaint, ECF 72 at PageID 1576-92 (¶¶95-134) and the subject and results of the alleged conduct were public-facing (*e.g.*, HB6) (*id.* at PageID 1547-48, 1574-75 (¶¶3-5, 93); (2) they were material, as demonstrated by the reactions to alleged revelation (*id.* at PageID 1549, 1596-1603, 1607-08, 1610-14, 1640-44 (¶¶9, 143-156, 158, 171-177, 189-200, 258-259, 261-262, 264-265)); (3) Plaintiffs traded the stock between when the misrepresentations were made and when the truth was revealed (*i.e.*, during the Class Period (Appointment Mot., Ex. B (LACERA Cert.) (ECF 33-4 at PageID 779-81)); Complaint, ECF 72 at PageID 1660-68); and (4) FirstEnergy's stock traded in an efficient market throughout the Class Period, as Plaintiffs established satisfaction of all five factors set forth in *Cammer*, 711 F. Supp. at 1286-87 and the three factors set forth in *Krogman*, 202 F.R.D. at 474 (Class Certification Mot., ECF 293-1 at PageID 6234-40). *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014).

### D.    Defendant Reffner's Belated, Baseless Argument

Late on the afternoon of the deadline for this brief, the Court entered an order allowing each side up to three additional pages to address the limited issues the Court is considering, as they apply to defendant Robert Reffner: "(1) Class certification under the *Basic* presumption of reliance; and

- 19 -

(2) whether, under *Comcast*, Plaintiffs have set forth a methodology for calculating damages on a classwide basis that is susceptible of measurement across the class and satisfies the predominance requirement of Fed. R. Civ. P. 23(b)(3)."  Order re Reffner Leave Mot., ECF 944 at PageID 24451. But the Court's Order also warned that Reffner had admitted that the issues he sought to raise are "distinct from the *Comcast . . .* and the *Basic*" issues that comprise the scope of the Court's consideration.  *Id.* at PageID 24451-52.  Reffner then proceeded to violate the Court's Order by: (1) filing a separate brief that (2) concerns issues outside the scope of the Court's consideration. Reffner Post-Remand Brief, ECF 946 at PageID 24472-76.  Accordingly, Plaintiffs stand on the points set forth in their January 7, 2026 opposition (Reffner Leave Mot. Opp. & Ex. A, ECFs 940 - 940-2 at PageID 24407-19), which is incorporated by this reference.

## IV.    CONCLUSION

There is no doubt that the Court has conducted the rigorous damages analysis required under the Sixth Circuit's explicitly limited remand.  As set forth above, Plaintiffs respectfully request that the Court enter an order demonstrating this reality by detailing the expansive record it has carefully considered and confirming that Plaintiffs' event-study methodology is capable of calculating damages on a classwide basis, consistent with Plaintiffs' theory of §10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b)) liability.  This would provide the lone missing component from the Court's class-certification Order.  Plaintiffs likewise respectfully urge the Court to make the alternate findings outlined above to minimize the risk of any further delays to this litigation.

DATED:  January 9, 2026

Respectfully submitted,

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)

s/ Joseph F. Murray
JOSEPH F. MURRAY

- 20 -

4926-1341-7606.v1

1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
JASON A. FORGE (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
jforge@rgrdlaw.com

Class Counsel

- 21 -

4926-1341-7606.v1

- 22 -

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically on January 9, 2026.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joseph F. Murray
JOSEPH F. MURRAY (0063373)

- 22 -

4926-1341-7606.v1