UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| | ) | |
| This Document Relates To: | ) ) | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFFS' REPLY TO DEFENDANT FIRSTENERGY CORP. AND CERTAIN DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

MURRAY MURPHY MOUL
 + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com

Liaison Counsel

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com

Class Counsel

4925-9051-6872.v1

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT........................................................................................................2

    A.    Defendants' "New Theory" Rhetoric Fails..............................................2

        1.    Defendants Have Had Dalrymple's Event Study for Years........................2

        2.    Since Day One, Plaintiffs Have Alleged FirstEnergy's Conversion to a Criminal Enterprise ...................................................................3

    B.    Defendants Mischaracterize FirstEnergy's Confession and the Corresponding Crimes ..........................................................................5

    C.    Defendants Ask the Court to Both: (1) Do Something Unprecedented; and (2) Misconstrue Dalrymple's Testimony ................................................7

        1.    Courts Universally Hold Class Certification Is Too Soon to Consider Potential Time Variations in Inflation...........................................7

        2.    Defendants Misconstrue Dalrymple's Testimony .......................................8

        3.    Defendants' Revisionism Extends to the Court .........................................10

    D.    Defendants' Characterization of the Alleged Misstatements Conflicts with the Sixth Circuit's Analysis ..................................................................11

    E.    Defendants' Materialization of Risk Argument Is Meritless................................12

    F.    Defendants' Arguments Against the *Basic* Presumption Fail...............................14

III.    CONCLUSION.................................................................................................15

4925-9051-6872.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)......................................................................................1, 14, 15

*Borteanu v. Nikola Corp.*,
    348 F.R.D. 239 (D. Ariz. 2025) ..................................................................................8

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).......................................................................................1, 14

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)......................................................................................13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)......................................................................................12

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................................9

*Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021)......................................................................................15

*In re FirstEnergy Corp. Sec. Litig.*,
    149 F.4th 587 (6th Cir. 2025) ......................................................................... *passim*

*Loritz v. Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015)........................................................................9

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018),
    *rev'd and remanded on other grounds*,
    64 F.4th 731 (6th Cir. 2023) ........................................................................................9

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) ..................................................................................12

*Star Waste Servs., LLC v. U.S. Waste, LLC*,
    2008 WL 2066442 (E.D. Tenn. May 13, 2008).........................................................................5

*United States v. Cui*,
    __F.4th__, 2026 WL 73014 (7th Cir. Jan. 9, 2026)...................................................................6

*United States v. Hills*,
    27 F.4th 1155 (6th Cir. 2022) ....................................................................................5

4925-9051-6872.v1

**Page**

*United States v. Householder*,
137 F.4th 454 (6th Cir. 2025), *petition for cert. filed,*
*Householder v. United States*, No. 25-756 (2025),
*and Borges v. United States*, No. 25-757 (2025) ........................................................6

*United States v. Rich*,
14 F.4th 489 (6th Cir. 2021) .......................................................................................6

*United States v. Turkette*,
452 U.S. 576 (1981).....................................................................................................5

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017).........................................................................................7

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
§78j(b)....................................................................................................................8, 15
§77k...............................................................................................................................9

18 U.S.C
§1343..............................................................................................................................6
§1346..............................................................................................................................6
§1349..............................................................................................................................6
§1962(d).........................................................................................................................6

Federal Rules of Civil Procedure
Rule 23(b)(3)..................................................................................................................2
Rule 23(f)........................................................................................................................7

- iii -

4925-9051-6872.v1

## I.    INTRODUCTION

Defendants' position has become so untethered from fact, law, and reason that they now contend FirstEnergy's $1 million bribery of Larry Householder in early 2017 was analogous to "driving at 60 mph in a 55 mph zone" because they later made so many more bribe payments. Defs' Supp. Mem., ECF 948 at PageID 24514. The $1 million bribery FirstEnergy committed in early 2017 was unprecedented and FirstEnergy recognized that mere indictment for such a crime would have likely ended its access to capital (and led to a corporate death sentence: bankruptcy). A more apt metaphor would be murdering someone with 1 lethal dose of poison versus 60 doses – either way, it is a capital crime.

What has driven Defendants to such an implausible place is the reality that the record supporting class certification here is conclusive. Every court to consider Plaintiffs' damages methodology, which the Court has carefully tested, has confirmed its appropriateness, and *predominance is undisputed*. There is no question that this same methodology would calculate inflationary damages for the three class representatives, who purchased FirstEnergy shares throughout the Class Period, as well as all other class members. No number of parsed quotes and made-up facts can change this reality. Nor can Defendants prevail by attacking the flawed strawman theories they try to substitute for Plaintiffs' meritorious theories.

Defendants also cannot alter the reality that the Sixth Circuit expressly limited its remand to the Court's rigorous analysis of Plaintiffs' damages methodology under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Defendants' *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) argument is not just untimely and waived, it is also irrelevant to class certification, as it applies to *only 2 of the 13 groupings* the Sixth Circuit identified, *leaving it undisputed that Basic applies to the remaining 11 groupings*. *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 612-18 (6th Cir. 2025).

- 1 -

4925-9051-6872.v1

## II.    ARGUMENT[1]

Plaintiffs have conclusively "set forth a methodology for calculating damages on a classwide basis that is susceptible of measurement across the entire class and satisfies the predominance requirement of Rule 23(b)(3)." *FirstEnergy*, 149 F.4th at 622.  Defendants respond by repeatedly altering facts and allegations to fit their arguments based on cases that are inapt to the facts and allegations here.  Due to space constraints, Plaintiffs cannot correct all Defendants' errors and misleadingly parsed quotes, but the examples below demonstrate a clear pattern.

### A.    Defendants' "New Theory" Rhetoric Fails

#### 1.    Defendants Have Had Dalrymple's Event Study for Years

A few weeks ago, Defendants represented to the Court: "Plaintiffs contend that Mr. [W. Scott] Dalrymple may even opine on their counsel's statements at the November 6 oral argument, including that (i) *some undisclosed 'event study* shows . . . about $20 of inflation.'" Mot. for Order, ECF 924-1 at PageID 23942 (alteration in original).  In reality, *over three years ago*, Plaintiffs disclosed to Defendants Dalrymple's entire event study – share and indices pricing data, dummy variables, adjustments, and regression analysis – comprising everything necessary to simply plug in the price drops alleged in the Complaint and confirm the $20 ballpark figure for share-price inflation.  12/12/25 Hr'g Tr., ECF 936 at PageID 24162-63, 24167, 24186, 24191, 24197.  This lack of awareness carried over to the evidentiary hearing and even to Defendants' post-remand supplemental brief, as Defendants consistently demonstrated no familiarity with, let alone command of, the actual event study they had been provided over three years ago and that served as the basis for Dalrymple's explanation of how he would use an event study to measure damages on a classwide

---

[1]    All capitalized terms have the same meaning as defined in Plaintiffs' Post Remand Brief (ECF 947).  Unless otherwise noted, all emphasis is added and citations are omitted.

basis here.[2]  This event study not only demonstrates the exact same *methodology* for calculating damages here, but it is also the same event study that will be used to calculate damages, needing only a simple download of additional pricing data spanning the alleged price drops.  12/12/25 Hr'g Tr., ECF 936 at PageID 24197-98.

### 2. Since Day One, Plaintiffs Have Alleged FirstEnergy's Conversion to a Criminal Enterprise

The following is a prototypical example of Defendants' mischaracterization of fact, followed by a misapplication of law, culminating in an attempt to usurp the jury's role:  "At the November 6, 2025 argument, Plaintiffs announced a new theory of liability: that FirstEnergy became a 'criminal enterprise' with '*no legitimate business*' in February 2017."  Defs' Supp. Mem., ECF 948 at PageID 24507, 24514, 24528.   As can be seen, Defendants deploy quotation marks to support their representation that Plaintiffs announced that FirstEnergy had "'no legitimate business'" as of February 2017.  *Id.*   Defendants characterize this purported announcement as a "new theory" Plaintiffs first presented at the November 6 oral argument.  *Id.*  There are two primary problems with this representation.   First, the quote is a fabrication.   In truth, what Plaintiffs stated was the following: "The bottom line is, in no later than March of 2017 – I would submit in February of 2017, they had converted the *primary* function of this business from one of legitimate operations to a criminal enterprise."  11/6/25 Hr'g Tr., ECF 914 at PageID 23813.  And second, the actual theory Plaintiffs described came straight from the Complaint.  In fact, it is the highlight of three of the Complaint's first eight paragraphs:

---

[2]      *See, e.g.*, 12/12/25 Hr'g Tr., ECF 936 at PageID 24184 (44:12-14) (Ignoring that Defendants have had the actual event study for over three years: "The concept of an event study, there's lots of kinds of event studies.  You have to look at the event study and do the actual allegations."); Defs' Supp. Mem., ECF 948 at PageID 24516 (Ignoring the thousands of pages comprising his event study that Dalrymple provided along with his *June 6, 2022* report: "In his original June 6, 2022 report, Mr. Dalrymple devoted only 1.5 pages to his discussion of classwide damages.").

4925-9051-6872.v1

- *Corruption became a fundamental aspect of the Company's business model* as the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges. Complaint, ECF 72 at PageID 1547 (¶4).

- This *corruption-based business model* exposed FirstEnergy to catastrophic risks (and now the reality) of financial, regulatory, legal and reputational loss, and FirstEnergy and its senior insiders went to great lengths during the Class Period to conceal these risks from investors. *Id.* at PageID 1548 (¶6).

- The Criminal Complaint detailed how *FirstEnergy (identified as 'Company A') had served as the criminal enterprise's corrupt corporate kingpin*, financing its illegal operations and closely coordinating with the criminal defendants to ensure the passage of HB6 and, later, thwart a democratic referendum to repeal the bill. *Id.* at PageID 1549 (¶8).

*See also id.* at PageID 1632 (¶237) (Bribery and corruption were at the core of FirstEnergy's business model and used to navigate the company's most pressing operational financial challenges.). From the outset, the Complaint has likewise made clear the pervasiveness of FirstEnergy's corruption:

> FirstEnergy's scheme to corrupt the political process and suborn the regulatory framework was not the work of rogue employees, but personally overseen and facilitated by the senior echelon of Company management, including FirstEnergy's then-Chief Executive Officer ("CEO") Charles E. Jones and numerous other executives responsible for FirstEnergy's regulatory affairs, legal compliance, financial reporting and investor disclosures.

Complaint, ECF 72 at PageID 1547 (¶4).[3]

Defendants' misrepresentation about this being a "new" theory is even more perplexing, considering that FirstEnergy has itself *confessed* to the accuracy of the foregoing allegations. *See,*

---

[3] At the evidentiary hearing, Defendants repeatedly demonstrated a poor grasp of the facts and allegations here. *See, e.g.,* 12/12/25 Hr'g Tr., ECF 936 at PageID 24258-59 (indicating Householder was arrested in August 2020, which would exclude the most significant alleged price drops from July 2020, when Householder was arrested); *id.* at PageID 24279 (stating "the last curative event in the entire case, is July 21, 2020," which would exclude most of the alleged price drops); *id.* at PageID 24310 (stating Plaintiffs' theory of liability is "that there was undisclosed risk to the company, and that risk evolved over time in light of the conduct that was engaged in by FirstEnergy," when Plaintiffs' have never alleged any sort of evolving risk theory); *id.* at PageID 24323-24 (asserting only "four dates" for stock price drops following corrective disclosures – overlooking altogether the November 16, 2020 corrective disclosure and corresponding price drop).

*e.g.*, DPA, ECF 259-5 at PageID 6014-42. FirstEnergy's top executives, top officers, and top lawyers all perpetrated, facilitated, and/or covered a corruption scheme to address FirstEnergy's "'top priority.'"[4] FirstEnergy has likewise admitted that the entire company had a material weakness in internal controls by virtue of this widespread corruption, "as our senior management failed to set an appropriate tone at the top." Complaint, ECF 72 at PageID 1612 (¶192).[5]

### B.  Defendants Mischaracterize FirstEnergy's Confession and the Corresponding Crimes

Throughout their post-remand supplemental brief, Defendants contend their crime began with a "$250,000 contribution[/payment]." Defs' Supp. Mem., ECF 948 at PageID 24514, 24522, 24523. In truth, however, FirstEnergy's conspiracy and bribery crimes began with its *agreement* to pay *$1 million* throughout 2017 in exchange for Householder "further[ing] FirstEnergy Corp.'s efforts to save the [nuclear] power plants." DPA, ECF 259-5 at PageID 6020; *see also id.* at PageID 6015.[6]

---

[4]  *See*, *e.g.*, DPA, ECF 259-5 at PageID 6018 ("'Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to the be introduced soon.'"); *see, e.g.*, Complaint, ECF 72 at PageID 1580, 1607-08, 1632 (¶¶103, 172-177, 237) (terminating CEO Jones and senior officer Michael Dowling for violations FirstEnergy later confessed included conspiring with it to engage in political corruption); *id.* at PageID 1610 (¶184) (terminating two top lawyers, Robert Reffner and Ebony Yeboah-Amankwah, for what FirstEnergy later confessed was facilitating a bribe payment and a lack of candor during investigation).

[5]  Defendants' argument that a legitimate business cannot shift to, or be overtaken by, a criminal enterprise belies the facts here, including FirstEnergy's own confession and decades of cases, recognizing that, "the primary purpose of [Racketeer Influenced and Corrupt Organizations Act] [("]RICO["]] is to cope with the infiltration of legitimate businesses [by criminal enterprises]." *United States v. Turkette*, 452 U.S. 576, 591 (1981); *see also Star Waste Servs., LLC v. U.S. Waste, LLC*, 2008 WL 2066442, at *9 (E.D. Tenn. May 13, 2008) (upholding sufficiency of RICO allegations, where alleged enterprise "operate[d] as a functioning network of trash collection companies").

[6]  Defendants try to characterize FirstEnergy's confessed $1 million bribe as a "political contribution[]." *See* Defs' Supp. Mem., ECF 948 at PageID 24523. This spin doctoring cannot be reconciled with FirstEnergy's confession, which admitted that all the money it paid into Householder's sham 501(c)(4) entity (which included the initial agreement for $1 million) was paid "in return for [Householder] pursuing nuclear legislation for FirstEnergy Corp.'s benefit in his capacity as a public official." DPA, ECF 259-5 at PageID 6016. That is bribe money, plain and simple, not a "political contribution." *See, e.g.*, *United States v. Hills*, 27 F.4th 1155, 1185 (6th Cir.

4925-9051-6872.v1

Defendants had agreed to this $1 million bribe in the January-February 2017 timeframe.  *United States v. Householder*, 137 F.4th 454, 464, 476 (6th Cir. 2025), *petition for cert. filed*, Petition for Writ of Certiorari, *Householder v. United States*, No. 25-756 (2025), *and* Petition for Writ of Certiorari, *Borges v. United States*, No. 25-757 (2025).  It is hornbook law that conspiracies under the RICO statutes and fraud statutes are complete upon agreement.[7]  Likewise, a bribe is complete upon *offer* of money or property in exchange for official action.[8]  Although Defendants try to downplay the significance of what was a $1 million conspiracy/bribery from the outset, they cite no larger corruption case in the history of the State of Ohio to support their dismissiveness.  Indeed, for 2017, the year Defendants committed their $1 million bribery offense, the median bribe amount for *federal bribery convictions* was $64,500,[9] which puts Defendants' $1 million bribe at 1,500% greater than the median – their comparison of such an offense to "driving at 60 mph in a 55 mph zone" (Defs' Supp. Mem., ECF 948 at PageID 24514) is not credible.  Similarly, Defendants' skepticism that such an unprecedented crime – at its inception – could have caused inflation amounting to 64% of FirstEnergy's value (*see, e.g.*, Defs' Supp. Mem., ECF 948 at PageID 24514-19) cannot be

---

2022) ("Honest services fraud (like Hobbs Act bribery) requires proof that the bribe or kickback was solicited in exchange for an 'official act.'").  After all these years, FirstEnergy still cannot help itself.  It is still trying to game the system, even at the risk of breaching its DPA.

[7]  Householder was convicted of an 18 U.S.C. §1962(d) violation (*Householder*, 137 F.4th at 470) and FirstEnergy has confessed to conspiring to commit honest services wire fraud in violation of 18 U.S.C. §§1343, 1346, 1349 (DPA, ECF 259-5 at PageID 6000).  Both are inchoate crimes that are complete upon agreement, even without an act in furtherance of them.  *United States v. Rich*, 14 F.4th 489, 494 (6th Cir. 2021) ("Section 1962(d) by contrast, has 'no requirement' of an overt act, and '*is even more comprehensive*' than [18 U.S.C §]371") (emphasis in original).

[8]  *See, e.g.*, *United States v. Cui*, __F.4th__, 2026 WL 73014, at *5 (7th Cir. Jan. 9, 2026) ("'"crime of offering a bribe is completed when a defendant expresses an ability and a desire to pay the bribe"'").

[9]  United States Sentencing Commission, *Quick Facts: Bribery Involving Public Officials (FY 2017)*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Bribery _FY17.pdf (last visited Jan. 20, 2026).

4925-9051-6872.v1

reconciled with FirstEnergy's own internal records, which recognized that a mere indictment, let alone conviction, for a serious felony would likely lead FirstEnergy's creditors to declare default and accelerate its obligation to pay its debts, also eliminating its access to capital. J-D's Mot. to Compel FirstEnergy Depo., Ex. 11, ECF 319-12 at PageID 6929 at (FE_CIV_SEC_0479857). Such a scenario would have meant bankruptcy – a corporate death sentence – so 64% inflation is hardly implausible and it is still *Plaintiffs'* theory; *Defendants* remain free to argue against it at trial.

### C. Defendants Ask the Court to Both: (1) Do Something Unprecedented; and (2) Misconstrue Dalrymple's Testimony

#### 1. Courts Universally Hold Class Certification Is Too Soon to Consider Potential Time Variations in Inflation

Plaintiffs' Post-Remand Brief cited multiple cases, confirming the universal conclusion that "it is premature at the class-certification stage to require plaintiffs to show how they could account for *potential* time-varying inflation or overreactions." Pltfs' Post-Remand Brief, ECF 947 at PageID 24498-99. Defendants fail to cite a single case to the contrary. In fact, the leading case for this holding is *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017), which Defendants cited in their opposition to class certification (ECF 339 at PageID 7192-93) and the Sixth Circuit relied on heavily in its Rule 23(f) opinion. *FirstEnergy*, 149 F.4th at 602, 607, 611, 619. Defendants' lone criticism of Plaintiffs' damages methodology is limited to challenging whether it can account for potential variations in inflation during the Class Period. 12/12/25 Hr'g Tr., ECF 936 at PageID 24200-03. Therefore, if the Court were to join every other court to consider the issue by concluding that it is premature at the class-certification stage, the only necessary methodology would be the event-study methodology (which is also standard and universally accepted).[10] *Id*. at PageID 24351-52.

---

[10] Given this universal acceptance, Dalrymple's frequent use and description of the event-study methodology is a positive, not a negative. His data set, including the indices and dates, is obviously tailored to this case, as would be the dates of his adjustments for earnings releases and dividends, as

- 7 -

### 2.        Defendants Misconstrue Dalrymple's Testimony

Dalrymple testified that the event study is his primary methodology, with the specific techniques he described (DCF, market multiples, and scaling factors) available to refine the event-study results, including to adjust for changes in inflation, if any, earlier in the Class Period.  12/12/25 Hr'g Tr., ECF 936 at PageID 24233-34, 24351.  Throughout the evidentiary hearing, Defendants failed to undermine Dalrymple's efforts and his detailed description of the event-study methodology.[11]

Realizing potential time-varying inflation is premature at the class-certification stage, Defendants misconstrue Dalrymple's testimony to blur the line between his primary damages methodology and the techniques he would use to adjust for potential variations or other possible complications, such as confounding information or a structural change in the company.[12]  For

---

would be the dates for the Class Period, as well as the dates and amounts of the alleged price drops. 12/12/25 Hr'g Tr., ECF 936 at PageID 24159-63, 24169-70, 24173-78, 24195-98.  In sum, the description of an event-study methodology should be the same across any range of cases, but Dalrymple explained that the actual inputs are case-specific.  This is why courts reject Defendants' argument.  *See, e.g.*, *Borteanu v. Nikola Corp.*, 348 F.R.D. 239, 261 (D. Ariz. 2025) (observing that event-study/out-of-pocket method is "'standard'" for "'virtually every Section 10(b) class action'" and concluding that, "[t]he Court is therefore unconvinced by Defendants' claim that a damages calculation methodology most frequently used in cases like this one is somehow rendered unreliable by the fact that [plaintiffs' expert], an expert in many of these cases, frequently uses it").

[11]    Q. . . .  You have not developed the event study that you would use in this case to calculate damages across the class.  Isn't that correct?

> A.  Well, I would not agree with that.  I have identified an event study in my expert report that identifies the market index, the industry index, certain indicator variables, and I've also identified a number of variations on that event study; so alternative indices, alternative estimation windows.  And that was all provided as part of my expert report.

12/12/25 Hr'g Tr., ECF 936 at PageID 24254-55 (114:16-115:1); *see also id.* at PageID 24256-58, 24293.

[12]    Defendants' criticism that FirstEnergy's undisputed conversion to a wholly regulated business during the Class Period means there are no other facts necessary to determine the appropriateness of a scaling factor for this structural break (Defs' Supp. Mem., ECF 948 at PageID

- 8 -

example, Defendants quote only the first line of what was a 7-line answer. *Compare* Defs' Supp. Mem., ECF 948 at PageID 24517, *with* 12/12/25 Hr'g Tr., ECF 936 at PageID 24252 (Defendants omit everything emphasized below):

> A. I have not settled on a specific technique. *So, for instance, if I say – we talked earlier about earnings multiples and DCF. I would expect to look at the evidence I have in relation to those, as well as any other evidence I have in relation to value, and that is something I would use in my analysis of inflation. But I have not determined which specific technique is, say, most appropriate.*

12/12/25 Hr'g Tr., ECF 936 at PageID 24252 (112:19-25). Defendants likewise omit Dalrymple's earlier testimony responding to the Court's questioning, explaining that he would expect to use the DCF and scaling factors techniques in tandem with his event study. *Id*. at PageID 24225. Throughout the evidentiary hearing, Dalrymple identified and explained each technique he would use, including that he will not know which technique will be the most reliable under the specific circumstances of this case until he performs his ultimate calculations. The hearing transcript disproves Defendants' inaccurate assertion that Dalrymple merely made "vague" references to his methodology and techniques.[13] Dalrymple's meticulous descriptions over hours of testimony completes a record that bears no resemblance to the cases Defendants cite.[14]

---

24519) and overlooks the likelihood that the market had already anticipated this break and accounted for it. Because only *new*, value-relevant information moves a company's share price in an efficient market, this is a critical fact-dependent determination and Defendants' criticism is misplaced.

[13]     *Compare, e.g.*, 12/12/25 Hr'g Tr., ECF 936 at PageID 24151-52, 24157, 24160, 24162-64, 24166, 24168-69, 24205-08, 24215-19, 24226-34, *with* Defs' Supp. Mem., ECF 948 at PageID 24515-16, 24518-19.

[14]     *Cf.* Defs' Supp. Mem., ECF 948 at PageID 24519-20 (citing *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *15-*16 (N.D. Ohio Aug. 14, 2018), *rev'd and remanded on other grounds*, 64 F.4th 731 (6th Cir. 2023) (plaintiffs failed to establish an efficient market, as expert relied on unprecedented single-day event study, precluding fraud-on-the-market presumption of reliance); *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) ("Plaintiffs failed to set forth any model of damages (let alone one tied to their theory of liability) in their opening brief."); and *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014) (Section 11 (15 U.S.C. §77k) case involving mortgage passthrough certificates traded in a "not particularly liquid" market, so ***no event study was***

- 9 -

### 3.     Defendants' Revisionism Extends to the Court

After creating a quote they attribute to Plaintiffs' counsel and misconstruing most of Dalrymple's testimony, Defendants turn their sights on the Court with the following:

> As the Court correctly recognized at the December 12 hearing, "I haven't heard him say . . . all right, based on our theory of liability in this case, I can take the methodology that I'm proposing here, and, Judge, *this is how I can calculate damages across the class*, because *that's what I'm waiting to hear*."

Defs' Supp. Mem., ECF 948 at PageID 24520 (alteration and emphasis in original).

Defendants used an ellipsis **after** the quote began, indicating that they were otherwise conveying the Court's entire sentiment. They were not. Defendants intentionally excised the critical start of the Court's sentence, which provided crucial context for the Court's statement: "*I'm looking at this still as background* because . . . ." 12/12/25 Hr'g Tr., ECF 936 at PageID 24184 (44:1). Indeed, the Court made this statement at page 44 of a 215-page transcript. Equally important context Defendants omit is that this was a sidebar to address one of Defendants' many objections. Far from the impression Defendants tried to create, the true gist of the Court's statement was for Defendants to be patient because Dalrymple's testimony was "still as *background*." *Id.* Defendants also omitted the remainder of this sidebar discussion, when Plaintiffs explained that their theory of liability is that Defendants concealed corruption-related information throughout the Class Period that caused FirstEnergy's stock price to be inflated, and the revelation of that information caused damages in the form of stock-price drops due to dissipating inflation – all of which is measured by the event-study methodology. *Id*. at PageID 24185-88 (45:3-48:14).

---

***proposed***)).  That such plainly inapt cases represent the best support Defendants can offer for their arguments confirms those arguments are unsupportable.

4925-9051-6872.v1

**D.      Defendants' Characterization of the Alleged Misstatements Conflicts
with the Sixth Circuit's Analysis**

As Plaintiffs' Post-Remand Brief explains, the Sixth Circuit dedicated 7 pages of its opinion to separating Defendants' alleged misstatements into 13 groupings. Pltfs' Post-Remand Brief, ECF 947 at PageID 24489-91 (citing *FirstEnergy*, 149 F.4th at 612-18). The appellate court's analysis indicated that the alleged deceptiveness of all 13 groupings boiled down to the omission of Defendants' corrupt conduct from the statements. *FirstEnergy*, 149 F.4th at 612-18. The court later accepted Plaintiffs' characterization of the alleged fraud as one that Defendants committed, "'through a series of acts and *statements* that concealed from investors a massive criminal conspiracy that FirstEnergy was executing to address its self-proclaimed "top priority" – bailing out its failing nuclear plants.'" *Id.* at 619 (emphasis in original). Nowhere in the Sixth Circuit's comprehensive analysis of Defendants' statements (or anywhere else) did the court describe Defendants' corrupt conduct as "evolving" or otherwise materially changing from what it was at inception: an unprecedented political-corruption scheme. Yet, Defendants assert as fact, their theory that an unprecedented $1 million corruption scheme, that could have easily led to FirstEnergy's bankruptcy, is so significantly different economically after the bribe amounts grew to $60 million, that Plaintiffs' damages methodology must account for this contrived distinction. Defs' Supp. Mem., ECF 948 at PageID 24520-23. Tellingly, Defendants fail to cite a single court that has issued such a holding, proving that their argument is just that – argument. It is not a legal standard or impediment to certifying a damages class here. It is irrefutable from Dalrymple's testimony that the event-study methodology can calculate all the inflation that came out of FirstEnergy's share price in 2020 upon revelations of Defendants' corrupt conduct. 12/12/25 Hr'g Tr., ECF 936 at PageID 24351 (211:13-17). *Plaintiffs' theory* is that because Defendants' corruption was unprecedented from inception, the inflation was constant. Defendants are certainly free to argue that the jury should

- 11 -

find less inflation at the start of Defendants' unprecedented corruption. Either way, the parties' arguments and the jury's ultimate determination will all be assisted by Dalrymple's event study.

### E. Defendants' Materialization of Risk Argument Is Meritless

*Defendants*' materialization-of-the-risk theory comprises layer upon layer of infirmities. First, it is untimely and waived, as it appears nowhere in Defendants' opposition to class certification, which the Court's Scheduling Order required to be filed in August 2022. Second, it is a fabrication, as Plaintiffs have never advanced a materialization-of-the-risk theory, something Plaintiffs spelled out for Defendants nearly three years ago and unequivocally reminded them during the evidentiary hearing:

> Plaintiffs here are not relying on a materialization-of-the-risk theory of liability. The disclosures in this case specifically revealed the fraudulent scheme that Defendants kept hidden from investors during the Class Period. Defendants know that. Nowhere in their opposition briefing or their expert's report do they ever contend that Plaintiffs are relying on a materialization-of-the-risk theory of liability.

Pltfs' Resp. to FirstEnergy's Supp. Auth., ECF 426 at PageID 9680; 12/12/25 Hr'g Tr., ECF 936 at PageID 24337 (197:16-19) ("Absolutely not.").

Third, Defendants ignore Sixth Circuit precedent making clear that a materialization-of-risk theory is a *causation* theory. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016) ("*OPERS*"). And Supreme Court precedent makes clear that it is erroneous to require a plaintiff to prove loss causation at the class-certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011).

Fourth, Defendants ignore that the materialization-of-risk theory plainly does not apply to this case, as it is an *alternative causation* theory that applies when there has not been a direct revelation of misconduct, but rather what is revealed is a consequence that lends itself to "'negative investor inference[]'" that "'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'" *OPERS*, 830 F.3d at 384-85. The facts here do not support

- 12 -

*Defendants*' untimely and waived corrective disclosure theory, as the disclosures directly revealed the corrupt conduct that Defendants had previously concealed. *See, e.g.*, Complaint, ECF 72 at PageID 1596-601, 1604-14 (¶¶143-150, 162-164, 170-176, 178-182, 184-186, 188-194, 196-199).

And fifth, even under *Defendants*' erroneous version of a materialization-of-the-risk theory, it is irrational here. Defendants urge a materialization-of-risk theory under which they should have disclosed the risk that they would get caught for engaging in unprecedented corruption, and that would have meant a lower level of inflation because "[d]isclosure of a risk *before* it materializes does not affect the stock price in the same way as the actual materialization of the risk." Defs' Supp. Mem., ECF 948 at PageID 24525 (emphasis in original). *Defendants*' theory is nonsensical. Under *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005), there are no damages without an economic loss and there can be no economic loss until some revelation *causes* at least some inflation to dissipate. This means there were no damages here until some revelation of Defendants' corrupt conduct. But if Defendants had disclosed "we have a 10% risk of getting caught for engaging in an unprecedented level of corruption," the dissipation would not have been capped at 10%. Rather, 100% of the inflation would have dissipated immediately because the risk of getting caught would materialize the moment Defendants disclosed it, just as Dalrymple explained. 12/12/25 Hr'g Tr., ECF 936 at PageID 24295-96 (155:22-156:9). On the other hand, a disclosable risk is one that will not automatically materialize upon disclosure (*e.g.*, the risk that a pipeline could fail).

*Defendants*' materialization-of-risk theory is unsustainable and does not change the fact that Plaintiffs have presented a damages methodology (an event study to be refined through standard valuation tools: DCF, market multiples, and scaling) that is readily capable of calculating damages on a classwide basis, and is consistent with *Plaintiffs*' theory of liability.

- 13 -

### F.     Defendants' Arguments Against the *Basic* Presumption Fail

As set forth in Plaintiffs' Post-Remand Brief (and in other filings and hearings), the Sixth Circuit made clear that *Basic* – and everything else other than the Court's *Comcast* damages analysis – is off the table on remand.  For all the reasons Plaintiffs have previously explained, Defendants' arguments against *Basic* are both untimely under the Court's Scheduling Order and waived.  *See, e.g.*, Supplement Mot. Opp., ECF 921 at PageID 23890-91.  This Court's application of the *Basic* presumption – which the Sixth Circuit explicitly left undisturbed *without extending its "limited remand" to revisiting Basic* – remains the law of the case.

Nevertheless, Plaintiffs will briefly explain why, in addition to being untimely, waived, and outside the scope of remand, Defendants' *Basic* argument fails on the merits.  First, it is based on *only 2 of the 13 groupings* the Sixth Circuit identified, *leaving it undisputed that Basic applies to the remaining 11 groupings*. *FirstEnergy*, 149 F.4th at 612-18 (the seventh and eighth groupings are the only ones the Sixth Circuit deemed "generic" and "aspirational").  Defendants can always challenge these statements at summary judgment.

Second, the seventh and eighth groupings do *not* include the statements that start the Class Period.  Rather, beginning statements fall within the Sixth Circuit's first through sixth groupings, including statements specifically discussing "legislative solutions and efforts" – all of which omitted the same value-relevant information, namely, that FirstEnergy was engaged in unprecedented political corruption. *FirstEnergy*, 149 F.4th at 612-14.  It is *Plaintiffs*' theory that the omission of the same value-relevant information would cause the same inflation throughout the Class Period. *See, e.g.*, 12/12/25 Hr'g Tr., ECF 936 at PageID 24349 (209:10-23).  Therefore, the seventh and eighth groupings are irrelevant to class certification.

And third, no court has ever found a price-impact "mismatch" for "generic" and "aspirational" statements about corporate integrity and law abidingness where, as here, what is later

- 14 -

revealed is a *pervasive* unprecedented corruption scheme directed by the company's CEO, involving the company's top officers and lawyers, to address the company's "'top priority'" and explicitly aimed at pumping up the company's share price. *See, e.g.*, DPA, ECF 259-5 at PageID 6015, 6017-18, 6040-41; Complaint, ECF 72 at PageID 1580, 1607-10, 1632 (¶¶103, 171-181, 237); J-D's Mot. to Compel FirstEnergy Depo., Ex. 2, ECF 319-3 at PageID 6813 (79-82).[15]

## III. CONCLUSION

The actual record and applicable caselaw here confirm that: (1) the Court has rigorously analyzed Plaintiffs' damages methodology (an event study to be refined through standard valuation tools: DCF, market multiples, and scaling); and (2) Plaintiffs' methodology is capable of calculating damages on a classwide basis, consistent with Plaintiffs' theory of §10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b)) liability. Finally, Plaintiffs continue to respectfully urge the Court to make the alternate findings outlined in their Post-Remand Brief to minimize any further delays. *See* Pltfs' Post-Remand Brief, ECF 947 at PageID 24499, 24501.

DATED: January 23, 2026

Respectfully submitted,

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)

s/ Joseph F. Murray
JOSEPH F. MURRAY

---

[15] If the Supreme Court intended to foreclose the *Basic* presumption for all "generic" and "aspirational" statements about corporate integrity and law abidingness, it would have said so, but it did not. *Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) (holding that "[t]he generic nature of a misrepresentation often will be important *evidence* of a lack of price impact"). Moreover, Dalrymple confirmed that securities analysts would likely flag FirstEnergy if it abruptly removed assurances about corporate integrity and law abidingness. 12/12/25 Hr'g Tr., ECF 936 at PageID 24352-53 (212:17-213:10).

- 15 -

1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com

Class Counsel

- 16 -

- 17 -

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically on January 23, 2026.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/ Joseph F. Murray
_____
JOSEPH F. MURRAY (0063373)

- 17 -

4925-9051-6872.v1