# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
|  | : |  |
|  | : | **Case No. 2:20-cv-3785** |
| *In re* **FIRSTENERGY CORP.** | : |  |
| **SECURITIES LITIGATION** | : | **Judge Algenon L. Marbley** |
|  | : |  |
| **This document relates to:** | : | **Magistrate Judge Kimberly A. Jolson** |
| **ALL ACTIONS.** | : |  |
|  | : |  |

## <u>OPINION & ORDER</u>

The captioned case is a consolidated action[1] for securities fraud brought by Lead Plaintiff Los Angeles County Employees Retirement Association on behalf of a putative class of investors in the Ohio-based electrical utility company FirstEnergy Corporation.  Plaintiffs[2] allege violations of the Securities Exchange Act of 1934 and the Securities Act of 1933 by FirstEnergy, its named officers and directors, and a group of underwriters,[3] in connection with the Ohio House Bill 6 scandal.

---

[1] All ECF docket entry citations ("ECF No. _") reference Case No. 2:20-cv-3785 unless otherwise indicated.

[2] Plaintiffs are Lead Plaintiff and Class Representative Los Angeles County Employees Retirement Association; Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund, and LongView Core Plus Fixed Income Fund; City of Irving Supplemental Benefit Plan; and Wisconsin Laborers' Pension Fund.

[3] Defendants are FirstEnergy Corp.; Charles E. Jones, James F. Pearson, Steven E. Strah, K. Jon Taylor, Michael Dowling, Dennis M. Chack, Ty R. Pine, Robert Reffner, Leila L. Vespoli; John Judge; and Donald R. Schneider; George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, and Leslie M. Turner; and Barclays Capital, Inc., BofA Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets, Inc., TD Securities (USA) LLC, US Bancorp Investments, Inc., and MUFG Securities Americas Inc.

This matter is before the Court on a limited remand by the Sixth Circuit following an earlier Opinion and Order certifying a class in this case pursuant to Fed. R. Civ. P. 23(b)(3). *In re FirstEnergy Corp. Sec. Litig.*, 2023 WL 2709373, at \*1 (S.D. Ohio Mar. 30, 2023) (Marbley, J.). The Sixth Circuit's limited remand has tasked this Court with applying *Comcast*'s rigorous analysis to determine whether Plaintiffs have set forth, for their Exchange Act claims, "a methodology for calculating damages on a classwide basis that is susceptible of measurement across the entire class and satisfies the predominance requirement of Rule 23(b)(3)." *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 601, 622 (6th Cir. 2025).

The parties have thoroughly addressed the issue through their post-remand statements and briefing, as well as at oral argument and an evidentiary hearing. At that evidentiary hearing, which Defendants requested, this Court heard live testimony from Mr. W. Scott Dalrymple, one of Plaintiffs' expert witnesses, who testified to Plaintiffs' damages methodology. Aided by the Sixth Circuit's guidance, the parties' briefing and argument, and Mr. Dalrymple's testimony, this Court now concludes that any question regarding the applicability of the *Basic* presumption of reliance is beyond the scope of the Sixth Circuit's limited remand, Plaintiffs' proffered expert witness's testimony is admissible, and Plaintiffs have provided a methodology for calculating damages on a classwide basis that is susceptible of measurement across the class and satisfies the predominance requirement.

## I.    BACKGROUND

### A.  Case Background

The facts of this case are taken as true based on Plaintiffs' well-pled allegations in the operative Complaint. (ECF No. 72). This Court has previously set them forth, along with detailing the many parties to this case, in its prior opinions denying Defendants' motions to dismiss and

2

granting Plaintiffs' motion for class certification. *FirstEnergy*, 2023 WL 2709373, at \*1–6; *In re FirstEnergy Corp.*, 2022 WL 681320, at \*1–5 (S.D. Ohio Mar. 7, 2022) (Marbley, J.); *see FirstEnergy*, 149 F.4th at 597 ("We borrow extensively from this summary."). These facts—as alleged—are summarized again below.

Between February 21, 2017, and July 21, 2020, "FirstEnergy and its most senior executives bankrolled one of the largest corruption and bribery schemes in U.S. history." (ECF No. 72 ¶ 3). Specifically, they paid approximately $60 million to Ohio's former Ohio Speaker of the House, Larry Householder, Ohio's former Public Utilities Commission Chairman Sam Randazzo, and others through a web of lobbyists, shell companies, and political action committees. (*Id.* ¶¶ 3–5, 8). In exchange, FirstEnergy received a bailout of its failing nuclear power plants through Ohio House Bill 6, which delivered approximately $2 billion to FirstEnergy: $1.3 billion in a ratepayer-funded subsidy and $700 million in a "decoupling" provision that would allow FirstEnergy to charge artificially high rates. The plan was revealed when Householder and his associates were arrested and charged in connection with the bribery scheme. (*Id.* ¶¶ 5, 8); *see also United States v. Householder*, 137 F.4th 454, 463–70, 486, 489 (6th Cir. 2025) (per curiam) (detailing factual background of Householder's criminal prosecution and affirming jury convictions of Householder and lobbyist Matthew Borges).

***Nuclear woes.*** To Plaintiffs, House Bill 6 was the culmination of a years-long effort to solve FirstEnergy's nuclear problems: the company's two aging nuclear power plants had been incurring climbing maintenance and repair costs, and nuclear power was becoming less competitive. The forecasted loss amount was estimated to be hundreds of millions of dollars—an obstacle standing in the way of FirstEnergy's exiting the energy-generation market. Investors were

increasingly concerned about FirstEnergy's nuclear liabilities, and the topic began to "dominate" earnings calls and analyst coverage. (ECF No. 72 ¶ 44; *see id.* ¶ 42–43).

In an attempt to shed these costs, FirstEnergy's subsidiaries operating the nuclear power plants filed for bankruptcy, and FirstEnergy proposed a settlement that would include releases of liability for FirstEnergy. (*Id.* ¶¶ 42, 45, 50–51). The Department of Justice and others objected, and the bankruptcy court halted the case. (*Id.* ¶¶ 52–57, 62). But FirstEnergy had a backup plan: it would attempt to delay the decommissioning of the two nuclear plants through legislative or regulatory means—culminating in the form of House Bill 6. (*Id.* ¶ 63; *see id.* ¶ 44).

Plaintiffs allege that FirstEnergy began courting Ohio State Representative Larry Householder early in 2017, flying him and his sons aboard its corporate jet to see President Trump's inauguration that January. (*Id.* ¶ 65). Then, on January 26 and February 7, 2017, respectively, FirstEnergy created Partners for Progress and Generation Now—two 501(c)(4) organizations that would serve as vehicles to funnel money to Householder and his affiliates. (*Id.*). Almost immediately, FirstEnergy "began making $250,000 quarterly payments to Generation Now" and "seed[ed] Partners for Progress with $5 million soon after its launch." (*Id.* ¶ 68). In 2017 and 2018, FirstEnergy had contributed $2.9 million toward the scheme. (*Id.* ¶ 67).

While it was making these clandestine contributions, FirstEnergy allegedly misled its shareholders about the nature of its political activity. For instance, in connection with a May 16, 2017 shareholder meeting, FirstEnergy urged shareholders to vote against a proposal that would require an annual report on lobbying policies and payments, referring shareholders to its Political Activity Policy, which represented that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements" and "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are

legally permissible and in the best interests of FirstEnergy." (*Id.* ¶¶ 110–11). Additionally, FirstEnergy's SEC filings disclosed that it pursued "[l]egislative or regulatory solutions" but did not mention the legal, financial, and reputational risks involved in the pursuit of those solutions. (*Id.* ¶¶ 95–102).

*House Bill 6.* FirstEnergy's funds had secured one powerful ally in Householder, who became Speaker of the Ohio House of Representatives in January 2019. (*Id.* ¶¶ 70–71). Next, FirstEnergy expanded its scheme with a $4.3 million payment to incoming Public Utilities Commission Chairman Randazzo, who then helped write and support House Bill 6. (*Id.* ¶ 72). Householder introduced the bill in April 2019, and it passed the Ohio House in May. (*Id.* ¶¶ 73–74). In those two months, FirstEnergy contributed at least $9.5 million in concealed payments to the scheme via the tax-exempt entities connected to Householder and his allies. (*Id.* ¶ 67); *FirstEnergy*, 149 F.4th at 598–99. FirstEnergy "paid over $7 million more to buy support in the Ohio Senate," which added a "lucrative 'decoupling'" provision effectively locking in FirstEnergy's 2018 revenue (and resulting in higher rates for the public). (ECF No. 72 ¶ 75). On July 23, 2019, the Ohio Senate passed the amended version of House Bill 6; that same day, the Ohio House approved it and Ohio Governor Mike DeWine signed it into law. (*Id.* ¶ 78).

Public opposition to House Bill 6 rose "immediately," and a referendum movement began to repeal it. That referendum needed approximately 265,000 signatures to appear on the upcoming ballot. FirstEnergy, Householder, and their allies now had to defend the new law and prevent a referendum. (*Id.* ¶ 81). From July to October 2019, FirstEnergy paid more than $38 million into its scheme, including via groups such as Ohioans for Energy Security (which received $23 million from Generation Now) and Partners for Progress. (*Id.* at ¶ 82). Millions of dollars were spent on an advertising campaign to discourage Ohioans from signing the referendum petition. That

campaign baselessly linked the referendum to the Chinese government and attempted to disrupt the referendum movement.  (*Id.* ¶¶ 83–85).

The referendum effort to repeal House Bill 6 failed on October 21, 2019.  The next day, FirstEnergy sent $3 million to Generation Now.  (*Id.* ¶ 86).  Because of "the Bailout Scheme and the claimed resolution of the financial problems posed by the Nuclear Plants," Plaintiffs argue that FirstEnergy stock traded at artificially high prices, and its credit ratings improved.  (*Id.* ¶¶ 242–46).  FirstEnergy was able to issue $2.5 billion in stock and $2.5 billion in debt securities.  (*Id.* ¶ 241).  Some of its officers—who are Defendants in this case—received large performance bonuses, and some sold FirstEnergy stock at inflated prices.  (*Id.* ¶¶ 248, 250).

*Collapse.*  FirstEnergy's scheme came crashing down on July 21, 2020, when the U.S. Attorney's Office for the Southern District of Ohio announced that Householder had been arrested and that he, his political strategist, three lobbyists, and Generation Now would be charged with a racketeering conspiracy involving honest services wire fraud, receipt of bribes, and money laundering.  (*Id.* ¶ 143).  Although the criminal complaint did not name FirstEnergy—referring to the financier only as "Company A"—when prosecutors announced Householder's arrest, they noted:  "Everyone in this room knows who Company A is."  (*Id.* ¶ 234).

The result was swift and dramatic.  FirstEnergy's stock dropped 17% on July 21 and another 21% on July 22, resulting in a total loss of over $7.68 billion in value.  (*Id.* ¶¶ 258–59).  FirstEnergy was soon hit with further bad news.  On October 29, 2020, Householder's political strategist and one of his lobbyists pleaded guilty to the racketeering conspiracy, admitting that they had committed criminal acts to conceal the nature and source of payments made to Generation Now in return for specific official action by Householder.  That same day, FirstEnergy terminated Defendants Jones (its chief executive officer), Chack, and Dowling for violations of company

6

policies. (*Id.* ¶¶ 171–72). Later, on November 8, the company terminated Defendant Reffner (its chief legal officer) and its general counsel and chief ethics officer for "inaction and conduct . . . influenced by the improper tone at the top" of FirstEnergy. (*Id.* ¶¶ 184, 191). In SEC filings submitted on November 19, 2020, FirstEnergy admitted to "material weakness in [its] internal control over financial reporting" that "could have resulted in material misstatements" in its financial statements. (*Id.* ¶¶ 189, 192). In February 2021, Generation Now would also plead guilty and admit to receiving money from "Company A" to be used in return for specific official action by Householder, as well as to concealing the nature and source of the payments. (*Id.* ¶ 205).

As further developments came to light, FirstEnergy's stock subsequently dropped 6.6% from October 29 to October 30, 2020, resulting in a loss of over $1.1 billion in value, and 8.2% from November 19 to November 24, 2020, resulting in further loss of approximately $1.3 billion. (*Id.* ¶¶ 261, 264; *see id.* ¶¶ 171–77, 193–200). The price of FirstEnergy's debt securities also declined during these periods of time. (*Id.* ¶¶ 260, 263, 266). By November, FirstEnergy's credit ratings had been downgraded to "junk status." (*Id.* ¶ 247). Plaintiffs allege that they, along with other FirstEnergy investors, lost billions of dollars as the value of the stock fell from artificially inflated highs. (*Id.* ¶ 13).

***The February and June 2020 Offerings.*** Plaintiffs also allege that two prospectus supplements filed by FirstEnergy on February 19 and June 4, 2020, contained untrue assertions of material fact and material omissions of fact and were not prepared in accordance with SEC rules and regulations. These prospectus supplements incorporated and formed part of a March 6, 2018, shelf registration statement that FirstEnergy had filed with the SEC, permitting it to make multiple securities offerings. From the February prospectus supplement, FirstEnergy solicited investors and sold over $1.7 billion FirstEnergy notes. Then, from the June prospectus supplement,

FirstEnergy solicited investors and sold $750 million FirstEnergy notes.  The Underwriter Defendants underwrote both offerings.  (*Id.* ¶¶ 285–91).

According to Plaintiffs, these prospectus supplements failed to disclose the fraudulent scheme in which FirstEnergy was engaged, these undisclosed facts exposed FirstEnergy to significant liability and diminished the actual value of the notes sold in both offerings, and Plaintiffs and other FirstEnergy investors suffered damages resulting from the decline in value of these notes.  (*Id.* ¶¶ 293, 308).

### B.  Class Certification, Appeal & Remand

This case was filed under the name *Owens, et al. v. FirstEnergy Corp., et al.*, on July 28, 2020, and was later consolidated with *Frand, et al. v. FirstEnergy Corp., et al.* (Case No. 2:20-cv-4287) on November 23, 2020, when this Court appointed Los Angeles County Employee Retirement Association as Lead Plaintiff.  (ECF Nos. 1; 65 at 32).  The Lead Plaintiff filed the operative Amended Consolidated Complaint on February 26, 2021.  (ECF No. 72).  The Complaint alleges five counts:  two for violations of the Exchange Act under §§ 10(b) (and SEC Rule 10b-5) and 20(a), *see* 15 U.S.C. §§ 78j(b), 78t(a), and three for violations of the Securities Act under §§ 11, 12(a)(2), and 15, *see* 15 U.S.C. §§ 77k, 77l(a)(2), 77o.  (*Id.* ¶¶ 1, 14, 268–322).  Plaintiffs moved for class certification on June 6, 2022.  (*See* ECF No. 293-1).  On March 30, 2023, this Court granted class certification for purchasers or acquirers of FirstEnergy securities between February 21, 2017, and July 21, 2020.  *FirstEnergy*, 2023 WL 2709372, at *1, *6 (citing ECF No. 293-1 at 1–2).  Two aspects of that class certification order are relevant here:  reliance and a rigorous analysis of Plaintiffs' proposed damages methodology under the Exchange Act.  Before considering how reliance and Plaintiffs' proposed damages methodology matter, it is useful to detail the two possible presumptions of reliance.

Securities law provides two separate presumptions of reliance deriving from two Supreme Court cases:  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972), and *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).  *See FirstEnergy*, 2023 WL 2709372, at *19.  In cases "'involving primarily a failure to disclose,'" *Affiliated Ute* establishes a presumption of reliance "if an alleged wrongdoer had an 'obligation to disclose' and 'the facts withheld [are] material in the sense that a reasonable investor might have considered them important in the making of [a] decision [to invest].'"  *FirstEnergy*, 149 F.4th at 602 (quoting *Affiliated Ute*, 406 U.S. at 153–54).  Next, in cases "'involving public material misrepresentations,'" *Basic* establishes a presumption of reliance "'on the integrity of the market price' and thus on the misrepresentations."  *Id.* (quoting *Basic*, 485 U.S. at 247).  To invoke *Basic*, a plaintiff must establish that:  (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed.  *Id.* (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014)).

Evaluating reliance, this Court determined that because the "communications at issue" were "primarily omissions-based," the *Affiliated Ute* presumption of reliance applied. *FirstEnergy*, 2023 WL 2709372, at *20.  This Court further concluded that even if the communications were primarily misstatements, "Plaintiffs would be entitled to the *Basic* presumption" of reliance and therefore "applie[d] the *Basic* presumption to the extent this case involve[d] misstatements."  *Id.* at *20–22.  With respect to Plaintiffs' proposed damages methodology, this Court simply stated that "predominance exist[ed] with respect to [Exchange Act] damages" for the same reasons expressed in its Securities Act analysis.  *Id.* at *19.

9

FirstEnergy and some of its current or former officers and directors appealed class certification on Count I of the Complaint:

> [T]hat FirstEnergy violated Exchange Act section 10(b) and SEC Rule 10b-5 because FirstEnergy '(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FirstEnergy securities during the Class Period.'

*FirstEnergy*, 149 F.4th at 600 (quoting ECF No. 72 ¶¶ 269–70)). The appeal of this Court's class-certification order was "narrow," raising two issues: the grant of class certification on the Exchange Act claims and the analysis of Plaintiffs' proposed classwide-damages methodology. *Id.* at 601.

First, the Sixth Circuit held that *Affiliated Ute* applies only in cases that are "purely or primarily based on omissions." *Id.* at 606. Recognizing that it previously had not "'definitively determined whether *Affiliated Ute* applies in cases with both misstatements and omissions,'" the court determined that *Affiliated Ute* could only apply in mixed cases "if that mixed case primarily involve[d] omissions." *Id.* at 605–06 (quoting *In re Acadia Healthcare Co.*, 2023 WL 3620955, at *3 (6th Cir. May 23, 2023)). Because this case was "primarily based on alleged misrepresentations," *Affiliated Ute* would not apply. *Id.* at 610–20.

Second, the Sixth Circuit correctly pointed out the error in eliding the damages analysis between the Securities Act and Exchange Act claims. Rule 23(b)(3) requires that Plaintiffs establish that "'damages are capable of measurement on a classwide basis,'" and at the class-certification stage district courts "'must conduct a rigorous analysis to determine whether' a plaintiff's damages case is consistent with its liability case." *Id.* at 620 (quoting *Comcast*, 569

10

U.S. at 34, 35). Because the Securities Act and Exchange Act "calculate damages entirely differently," and because the Exchange Act requires proof of loss causation, reference to the Securities Act methodology was inappropriate. *Id.* at 621–22. The appellate court also noted that FirstEnergy had "requested a hearing with live expert testimony to analyze loss causation" prior to class certification, to no avail. *FirstEnergy*, 149 F.4th at 622.

The Sixth Circuit (1) vacated class certification to the extent that this Court had applied the *Affiliated Ute* presumption of reliance; and (2) reversed class certification as to Plaintiffs' Exchange Act claims and remanded for a rigorous analysis of Plaintiffs' proposed damages methodology under *Comcast*. *FirstEnergy*, 149 F.4th at 620, 622. It tasked this Court with "further consideration" of class certification "under the standards set out in [its] opinion." *Id.* at 597.

### C. Post-Remand Proceedings

Following the Sixth Circuit's remand, Plaintiffs and certain Defendants[4] submitted post-remand position statements on September 4, 2025. Plaintiffs argued that there was nothing left except for this Court to conduct its analysis of their damages methodology. (ECF No. 848 at 1, 5). Meanwhile, Defendants requested a panoply of additional procedures: new class certification briefing and the allowance of additional expert evidence, a schedule for *Daubert* motions and

---

[4] Specifically, Defendant FirstEnergy Corp., Individual Defendants Steven E. Strah, K. Jon Taylor, Jason J. Lisowski, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neill III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, Leslie M. Turner, Donald R. Schneider, Dennis M. Chack, Leila L. Vespoli, James F. Pearson, John Judge, Robert P. Reffner, and Underwriter Defendants Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc., and MUFG Securities Americas Inc. (ECF No. 849 at 6–11).

11

expert depositions with the opportunity for live expert testimony, and an evidentiary hearing and oral argument for class certification.  (ECF No. 849 at 2–5).

The mandate in the case issued on September 8, (ECF No. 850), and on October 14, this Court ordered the parties to appear for oral argument to address the two issues covered by the Sixth Circuit's opinion and the limited remand to this Court.  (ECF No.  866 at 1–2).  Furthermore, the parties were informed that they would not be permitted to offer additional evidence and that they should be prepared to address the merits of the *Basic* presumption of reliance.  (ECF No. 874 at 2–3).  Defendants then requested leave to supplement the record, (*see* ECF Nos. 885; 886), which Plaintiffs opposed (ECF No. 921).

This Court heard argument from the parties on November 6, 2025, regarding the scope of the remand and ordered further briefing.  (ECF No. 913).  Then, this Court paused that briefing so that it could hold an evidentiary hearing and adduce the testimony of Plaintiffs' expert witness, Mr. W. Scott Dalrymple.  Mr. Dalrymple testified on December 12.  (ECF No. 936).

### D.  Evidentiary Hearing

At Defendants' request, this Court held an evidentiary hearing to elicit the live testimony of Mr. Dalrymple, one of Plaintiffs' expert witnesses.  (ECF Nos. 914 at 31, 45; 920 at 4–5).  Mr. Dalrymple was retained as an expert witness on behalf of Plaintiffs, and submitted an expert report in June 2022 analyzing whether FirstEnergy's common stock traded in an efficient market and addressing whether damages could be calculated using a common methodology.  (ECF No. 293-7 ¶ 1).  Mr. Dalrymple is an economist with degrees in economics and business administration who has lent his expertise to securities litigation matters.  (*Id.* ¶¶ 5–7; ECF No. 936 at 8–9).  He testified before this Court at the December 12, 2025 evidentiary hearing, (ECF No. 936), explaining his proposed damages methodology.  In his testimony, he confirmed that an event study would allow

this Court "to ascertain damages across the class" based on Plaintiffs' theory of liability—that FirstEnergy's corruption artificially inflated its stock, and that revelations of corruption-related information caused price drops—by computing abnormal returns and measuring the impact of curative events. (*Id.* at 49–52, 84; *see id.* at 17, 193).

Mr. Dalrymple testified that his proposed damages methodology could measure artificial inflation through the application of scaling factors throughout the class period, a discounted cash flow analysis, or a market approach (should adjustments be necessary to account for "changes in artificial inflation over the class period"). (*Id.* at 76–80, 211; *see also id.* at 204–05). Any of these three "valuation tools" would suffice; scaling factors could be developed based on the event study and a discounted cash flow analysis, and all three of these "valuation tools" would aid in the measurement of "change in expected future economic benefits." (*Id.* at 85–87; *see id.* at 66).

Mr. Dalrymple confirmed that his event study methodology would apply to all class members. (*Id.* at 74–75, 93–94). By way of an example, he explained how the event study could be used to measure the impact of House Bill 6. (*Id.* at 63–70, 74–75).

Following the evidentiary hearing, Plaintiffs, Defendants, and Defendant Reffner[5] submitted post-remand opening briefs on January 9, 2026, (ECF Nos. 946; 947; 948), and post-remand briefing was complete with the submission of Plaintiffs' and Defendants' reply briefs on January 23. (ECF Nos. 960; 962; *see* ECF No. 933).[6] Separately, Defendants also moved on January 9 to exclude Dalrymple as an expert. (ECF No. 949). Plaintiffs opposed on January 23,

---

[5] Defendant Reffner belatedly requested permission to submit a short standalone brief—a request that Plaintiffs opposed. (ECF Nos. 939; 940). This Court granted his request to separately address the issues on remand and permitted Plaintiffs and Defendants additional pages to address Reffner's arguments if necessary. (ECF No. 944 at 2–3).

[6] Defendant Reffner did not submit a reply brief.

and Defendants replied on February 6. (ECF Nos. 961; 974). These matters are now ripe for review.

## II.    LAW & ANALYSIS

Following a remand by a court of appeals, district courts are bound by the appellate court's mandate "to the scope of the remand issued." *Monroe v. FTS USA, LLC*, 17 F.4th 664, 669 (6th Cir. 2021). A remand may be limited or general: when a remand is general, a district court "is free to address all matters as long as it remains consistent with the appellate court's opinion." *Id.* By contrast, "a limited remand 'constrains' the district court's authority to the issue or issues specifically articulated in the appellate court's order." *Id.* (citation omitted).

As this Court has already observed, (*see* ECF No. 866 at 1), because the Sixth Circuit's remand was limited, this Court's authority is constrained to the issues that the Sixth Circuit has explicitly articulated. The Sixth Circuit addressed two issues. First, it stated that it was "issuing a limited remand" to vacate this Court's prior class certification under *Affiliated Ute*, without disturbing the holding that class certification was appropriate under *Basic*. *FirstEnergy*, 149 F.4th at 620. Second, it clearly delineated that its Exchange Act damages methodology remand was "for the application of *Comcast*'s 'rigorous analysis'" so that this Court may "determine if Plaintiffs for their Exchange Act claims set forth a methodology that is susceptible of measurement across the entire class and satisfies the predominance requirement of Rule 23(b)(3)." *Id.* at 601, 622.

Given the limited scope of the Sixth Circuit's remand, this Court ordered the parties to address two issues: (1) class certification under the *Basic* presumption of reliance; and (2) whether Plaintiffs had set forth an appropriate damages methodology. (ECF No. 866 at 2).

14

### A. *Basic* Presumption of Reliance

The first issue is whether the limited remand requires further analysis regarding the applicability of the *Basic* presumption of reliance. This Court concludes that the issue is outside the scope of the limited remand.

Previously, this Court ordered the parties to address class certification under the *Basic* presumption of reliance following the Sixth Circuit's decision. In its prior Opinion, this Court analyzed the instant case under both *Affiliated Ute* and *Basic*, determining that "*Affiliated Ute* would not be necessarily inapplicable even if this case were a mixed case of omissions and misstatements" and holding that Plaintiffs were entitled to the *Affiliated Ute* presumption of reliance because the challenged communications were "primarily omissions-based." *FirstEnergy*, 2023 WL 2709373, at *20. This Court went on to consider the *Basic* presumption of reliance as well, further concluding that "Plaintiffs would be entitled to the *Basic* presumption even if *Affiliated Ute* were inapplicable." *Id.* at *20–22.

The Sixth Circuit determined that "the allegations at issue make up a mixed case that is primarily based on misrepresentations" and therefore concluded that the appropriate analysis would be "under *Basic*, not *Affiliated Ute*." *FirstEnergy*, 149 F.4th at 603. Ultimately, the court held that its remand was "limited" and that it "vacat[ed] the class-certification decision *only to the extent* that the district court applied *Affiliated Ute*, which was the only [reliance] issue presented . . . on appeal." *Id.* at 620 (emphasis added). The court noted that the appeal was "not about whether it was proper for the district court to hold that 'Plaintiffs would be entitled to the *Basic* presumption of reliance even if *Affiliated Ute* were inapplicable.'" *Id.* (quoting *FirstEnergy*, 2023 WL 2709373, at *22).

Given the Sixth Circuit's conclusion that this case is subject to analysis under *Basic*, and that it had been an error and abuse of discretion to apply *Affiliated Ute*, this Court invited the parties to address what, if anything, was left to be decided regarding the presumption of reliance. (*See* ECF No. 874 at 2–3 ("[T]he parties shall be prepared to analyze class certification under only the *Basic* presumption of reliance . . . .")).

### 1. *The Parties' Arguments*

Plaintiffs argue that revisiting the *Basic* presumption of reliance is outside the scope of the Sixth Circuit's limited remand, that application of *Basic* remains the law of the case, and that any opposition on the part of any defendant to *Basic*'s applicability is untimely and therefore waived. (ECF No. 947 at 18–19; *id.* at 17 (citing ECF No. 921 at 6); *see also* ECF Nos. 921 at 7; 848 at 2). Plaintiffs alternatively request a finding that they remain "entitled to a fraud-on-the-market presumption for FirstEnergy's common stock." (ECF No. 947 at 19 (addressing the four *Basic* presumption requirements). Defendants rejoin that the Sixth Circuit left it for this Court to determine whether *Basic* applied, construing this Court's prior order requesting that the parties be prepared to address the *Basic* presumption of reliance post-remand as recognition of that fact. Defendants also suggest that the applicability of *Basic* is in question "[f]or the vast majority of the statements alleged," because the Sixth Circuit observed similarities between the challenged communications in this case and misrepresentations that the Second Circuit determined lacked a price impact and therefore could not support the *Basic* presumption in *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023), and because the challenged communications had a "substantive mismatch" with the curative events. (ECF Nos. 948 at 20–25; 948-2; *see* ECF No. 849 at 4 (citing *Shupe v. Rocket Cos.*, 752 F. Supp. 3d 735, 782 (E.D. Mich. 2024) (where statements lacked price impact, the ability to invoke *Basic* collapsed)).

16

Defendants assert that Plaintiffs fail to address the merits of their *Basic* arguments, relying instead on "procedural smokescreens." (ECF No. 962 at 14). They point out that the Sixth Circuit recently noted that alleged half-truths "cannot be misleading when the words spoken and the facts omitted operate on different 'levels of generality'"; rather, "the omitted facts must have a reasonably close fit to what defendants disclosed." *Newtyn Partners, LP v. Alliance Data Sys. Corp.*, 165 F.4th 947, 963 (6th Cir. 2026); (ECF No. 962 at 4). They also point out that courts are tasked with continuing to consider the appropriateness of class certification throughout a case.

Plaintiffs counter the merits of Defendants' *Basic* argument on several grounds. First, Plaintiffs argue that the only communications the Sixth Circuit characterized as generic or aspirational were in the seventh and eighth groupings. (ECF No. 960 at 14). Plaintiffs suggests that the communications covered within the seventh and eighth groupings are irrelevant to the class certification decision in the sense that they did not begin the class period but are pertinent because they "omitted the same value-relevant information" as the earlier communications. (ECF No. 960 at 14; *id.* at 15 n.15 (noting that the Supreme Court did *not* foreclose the *Basic* presumption of reliance for generic or aspirational statements). Moreover, Plaintiffs point out that the context of these generic statements and any price-impact is different here, given both Plaintiffs' allegations of a "*pervasive* unprecedented corruption" and Mr. Dalrymple's notable testimony that the removal of FirstEnergy's assurances of corporate integrity and law-abiding-ness would likely raise red flags to securities analysts. (*Id.* at 14–15; *id.* at 15 n.15 (citing ECF No. 936 at 212–13). Last, Plaintiffs argue that Defendants could challenge these statements at summary judgment. (*Id.* at 14).

## 2. Scope of the Remand

This Court first concludes that the Sixth Circuit's limited remand did not extend to any further consideration of the *Basic* presumption of reliance. The Sixth Circuit made clear that it was remanding the case for an Exchange Act damages methodology analysis. *FirstEnergy*, 149 F.4th at 622–23 ("[W]e . . . remand for the application of *Comcast*'s 'rigorous analysis' . . ."). It also emphasized the limits of its holding with respect to reliance. *Id.* at 620 ("[W]e emphasize that we are issuing a limited remand, vacating the class certification decision only to the extent that the district court applied *Affiliated Ute* . . .").

Plaintiffs are correct that the Sixth Circuit simply has not remanded for further consideration of this Court's prior holding regarding the applicability of the *Basic* presumption of reliance. (*See* ECF No. 947 at 17); *FirstEnergy*, 2023 WL 2709373, at *22 (holding that Plaintiffs "would be entitled to the *Basic* presumption of reliance . . . if *Affiliated Ute* were inapplicable"); *see id.* at *20–22. Nothing in the Sixth Circuit's opinion suggests otherwise. Although Defendants are correct that briefing was permitted on "class certification under the *Basic v. Levinson* presumption of reliance" post-remand, (ECF No. 948 at 20), this Court did so because Defendants had suggested that *Basic* could be in play post-remand. (*See* ECF No. 849 at 4).

Tellingly, Defendants do not suggest how this Court can square the Sixth Circuit's expressly "limited" remand with Defendants' invitation to revisit this Court's prior *Basic* determination that the Sixth Circuit did not reach. *FirstEnergy*, 149 F.4th at 620; *e.g.*, *In re Boeing Co. Aircraft Sec. Litig.*, _ F.3d __, 2026 WL 734721, at *15 (N.D. Ill. Mar. 16, 2026) ("At bottom, [the Sixth Circuit's decision in *FirstEnergy*] stands for the proposition that a district court must conduct the required analysis under *Comcast* for each theory of liability."). Though Defendants seize on the appellate court's description of the seventh and eighth grouping of challenged

18

communications as being "aspirational" and "generic corporate statements," as well as "nearly identical to the misrepresentations in *Goldman Sachs*," *id.* at 614–15 (citing *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 120 (2021)); (*see* ECF No. 948 at 20), the Sixth Circuit was underscoring that these communications were types of *misrepresentations*, not omissions, and that this case was "all about misrepresentations." *FirstEnergy*, 149 F.4th at 618; *id.* at 612 ("[W]e first classify each grouping as alleging either omissions or misrepresentations.").[7]

Defendants may be correct that the Sixth Circuit's comparison of the challenged communications here to the misrepresentations in *Goldman Sachs* was "pointed." (ECF No. 948 at 20). But it appears pointed in service of the Sixth Circuit's new "two-step analysis" rule that requires classifying claims as alleging either omissions or misrepresentations in mixed cases. *FirstEnergy*, 149 F.4th at 603. Reconsidering this Court's prior ruling that the class would be certified under *Basic* if not *Affiliated Ute* is outside the scope of the limited remand.

### 3. *Timeliness*

Defendants already had the opportunity to attack the application of the *Basic* presumption of reliance in this case. Defendants' deadline to oppose Plaintiffs' Motion for Class Certification was August 17, 2022. (ECF Nos. 255 at 1; 303). In their Motion for Class Certification, Plaintiffs

---

[7] It is true that the Supreme Court in *Goldman Sachs* determined that the defendant's statements—that it had "extensive procedures and controls . . . designed to identify and address conflicts of interest," that it placed its "clients' interests . . . first," and that "[i]ntegrity and honesty [were] at the heart of [its] business"—were all generic statements whose nature should be considered at the class certification stage. *Goldman Sachs*, 594 U.S. at 120–23. And the Second Circuit then did determine that the district court had erred by "gloss[ing] over and minimiz[ing] the genericness analysis," after acknowledging that certain of the defendant's business principles statements read like "platitudes" in isolation. *Goldman Sachs*, 77 F.4th at 93–95. At the same time, however, the Supreme Court did not categorically preclude generic statements from impacting a *Basic* presumption of reliance. Rather, it noted that "the generic nature of a misrepresentation often is important evidence of price impact that courts should consider at class certification." *Goldman Sachs*, 594 U.S. at 117.

19

sought class certification under the *Affiliated Ute* presumption of reliance, but also requested that the *Basic* fraud-on-the-market presumption of reliance apply in the alternative. (ECF No. 293-1 at 17–20). Defendants provided a detailed challenge to the applicability of *Basic* in their August 17, 2022 Opposition. (*See* ECF No. 327 at 24–46). At that time, the Supreme Court had already decided *Goldman Sachs* in 2021, and Defendants certainly could have advanced arguments about "generic" statements in their opposition to class certification then. They did not. (*See* ECF No. 327 at ii, 17 (citing *Goldman Sachs* twice for generalized reliance presumption propositions)).

This argument is now untimely and waived because Defendants already "had the opportunity to litigate" the issue but chose not to. *Howe v. City of Akron*, 801 F.3d 718, 742–43 (6th Cir. 2015); *see United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002) ("The law of the case doctrine . . . dictates what issues may be raised in the district court" following a limited remand, and issues already "foregone" are "considered waived."). This Court is obligated to follow the Sixth Circuit's limited remand and will not revisit the applicability of *Basic*.

### B. Plaintiffs' Damages Methodology

Second, this Court ordered the parties to address Plaintiffs' damages methodology following remand to inform this Court's analysis of the class-certification damages requirement under Federal Rule of Civil Procedure 23. This Court previously erred in conflating the Exchange Act with the Securities Act for the purposes of analyzing damages and thus failed to conduct a rigorous analysis to determine whether Plaintiffs' Exchange Act damages can be measured across the class. *FirstEnergy*, 149 F.4th at 621–22.

Rule 23 governs class actions. Once the numerosity, commonality, typicality, and adequacy prerequisites of Rule 23(a) are met, the district court may certify a class when it "finds that the questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Predominance requires "establishing that damages are capable of measurement on a classwide basis" because otherwise "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Damages calculations "need not be exact" at the class certification stage, but they must "measure only those damages attributable to [plaintiff's] theory" of liability." *Id.* at 35. District courts are obligated to "conduct a 'rigorous analysis' to determine whether" a plaintiff's "damages case is consistent with its liability case." *Comcast*, 569 U.S. at 35 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)); *FirstEnergy*, 149 F.4th at 620. Accordingly, this Court undertakes the required rigorous analysis pursuant to the Sixth Circuit's limited remand.

### 1.  *Plaintiffs' Arguments*

Following remand, Plaintiffs argued that the limited remand for a damages methodology is for this Court to undertake, not the parties, and that the Sixth Circuit opinion "did not reopen class-certification discovery, briefing, or argument." (ECF No. 848 at 2–3). They take the position that the existing record is sufficient, because quantifying the impact of FirstEnergy's misconduct only requires the application of an event study and standard regression analysis. (ECF No. 848 at 3). They also argue that total inflation "largely comprises inflation due to FirstEnergy having turned into a criminal enterprise with hidden future costs," (ECF No. 848 at 3; ECF No. 72 ¶ 237), a conversion that was completed by March 7, 2017, when Defendant Michael Dowling made an initial payment of $250,000, followed by another $750,000, to Larry Householder's 501(c)(4) entity. Plaintiffs take the position that the post-remand record provided sufficient explanation of event study damages methodology, citing to their expert reports submitted by Mr. Dalrymple and

Ms. Cynthia L. Jones. (ECF Nos. 293-7; 293-8). Plaintiffs readily agreed to an evidentiary hearing focused on Mr. Dalrymple's methodology at Defendants' request.

In their post-remand briefing, Plaintiffs argue that this Court has sufficiently tested their event study damages methodology and can now confirm that it is sufficient. Plaintiffs also reiterate that damages need not be calculated at the class certification stage and that it is premature for a damages methodology to account for "possible" class-period variations in inflation at the class certification stage. (ECF Nos. 947 at 1–2, 14–17; 960 at 7). Plaintiffs point out that the Sixth Circuit's decision "changed nothing about Plaintiffs' theory of liability" or the substance of their allegations; instead, it only created a new standard for the application of *Affiliated Ute*. (ECF No. 947 at 7–9). They argue that Mr. Dalrymple's testimony at the December 12, 2025 evidentiary hearing was "[c]onsistent with" his prior reports and that he "'supplement[ed], elaborate[d] upon, explain[ed] and subject[ed] himself to cross-examination'" consistent with the Federal Rules of Civil Procedure. (*Id.* at 10–14 (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006)). They also argue that Defendants cherry-pick Dalrymple's testimony (as well as the Court's statements made at sidebar) to misconstrue the import of the evidentiary hearing, suggesting that Dalrymple's testimony was contradictory or insufficient to establish a damages methodology. (ECF No. 960 at 8–10).

To the extent that Defendants suggested that Mr. Dalrymple's event study was not disclosed, Plaintiffs point out that they disclosed it more than three years ago. (*Id.* at 2–3). They also argue that Defendants mischaracterize their post-remand arguments and Complaint allegations to suggest that they have advanced a new theory of liability following the Sixth Circuit's decision, whereas in reality their allegations remain the same, and cannot now be

22

shoehorned into a materialization-of-the-risk theory.  (*Id.* at 3–7, 11, 12–13).  Thus, according to Plaintiffs, the Court need only confirm its analysis of the damages methodology.

### 2. *Defendants' Arguments*

For their part, Defendants argue after remand that even though "Plaintiffs may elect to stand on their prior expert evidence," class certification would be insufficient here now because Plaintiffs' prior evidence:  was based on the omissions theory that the Sixth Circuit rejected; would not satisfy the burden for certification under *Comcast* or in light of the Sixth Circuit's opinions in *FirstEnergy* or *Speerly*; and would not survive *Daubert* scrutiny in light of the Sixth Circuit's intervening opinion *In re Nissan*.  (ECF No. 849 at 2).  Defendants requested further briefing, new expert evidence, *Daubert* motions, expert depositions with "[l]ive testimony" to test whether expert methodologies could survive "the Sixth Circuit's rejection of [the omissions-based liability] theory," and an evidentiary hearing and oral argument.  (*Id.* at 2–5).

In their post-remand briefing, Defendants first argue that Mr. Dalrymple has not shown how he will measure the price of inflation on each trading day of the class period, which they argue he must do before a class may be certified under both *Comcast* and the Sixth Circuit's decision in *Speerly v. Gen. Motors, LLC*, 143 F.4th 306 (6th Cir. 2025) (en banc).  (ECF Nos. 948 at 2, 4–9; 962 at 5–8).  Specifically, Defendants point out that the Sixth Circuit held en banc in *Speerly* that the "predominance inquiry" cannot perform its function if the "hard questions" are deferred until later.  *Speerly*, 143 F.4th at 324.  Defendants agree that "damages . . . turn on an 'out-of-pocket' measure," but they argue that Mr. Dalrymple has not shown that he can measure inflation on each trading day of the class period—making his methodology insufficient at measuring the harmful event as alleged.  (ECF Nos. 948 at 5–7; 962 at 6, 8).

Next, Defendants argue that Plaintiffs have not proposed a methodology to account for varying inflation attributable to various statements concealing evolving conduct and have not addressed their materialization-of-the-risk theory, despite disclaiming that they offer such a theory. (ECF No. 948 at 2–3, 9–17; *id.* at 16 (arguing that the allegations claim Defendants "concealed *evolving* conduct and therefore evolving risks"); ECF No. 962 at 8–12). They dispute Plaintiffs' argument that even if there were time-varying inflation in this case, Mr. Dalrymple could address it later under his damages methodology, arguing that "time varying inflation is not merely 'potential[,]'" but instead "is at the heart of Plaintiffs' liability theory." (ECF No. 962 at 9). Last, Defendants argue that Plaintiffs have introduced a new, constant-inflation "criminal enterprise" theory that contradicts their Complaint and, when discussed in Mr. Dalrymple's testimony at the December 12, 2025 evidentiary hearing, was impermissible under Rules 26 and 37. (ECF Nos. 948 at 3–4, 17–19; 962 at 12–13).

### 3. *Analysis*

#### a. *The existing record allows this Court to analyze Plaintiffs' proposed damages methodology.*

***Evidence.*** As a threshold matter, this Court is not persuaded by Defendants' arguments that the prior evidence here is insufficient for class-certification purposes because it was based, at least in part, on Plaintiffs' *Affiliated Ute* theory of omissions. The existing record—even before Mr. Dalrymple testified at the evidentiary hearing—is enough for this Court to determine whether Plaintiffs' proposed damages methodology is sufficient.

Defendants conflate a legal standard with factual allegations that would not improperly stretch the dictionary definition of what an omission is. As the Sixth Circuit observed, "[e]very misrepresentation 'omits' some part of the truth." *FirstEnergy*, 149 F.4th at 609. In delineating

the circumstances where *Affiliated Ute* would apply, that court was engaging with "a narrow legal construction of what constitutes an omission" under "the specialized *Affiliated Ute* concept of 'omission,'" cautioning "against allowing concealment via half-truth to qualify for use of the *Affiliated Ute* presumption," and recognizing that *Affiliated Ute* must be understood to apply only in "a narrow case premised on the conceptual difficulty of proving reliance on a representation that was never made." *Id.* at 609–10. There is no reason why the opinions or testimony of Plaintiffs' damages experts would now be insufficient to the facts as alleged by Plaintiffs. Plaintiffs' argument in this regard is persuasive. (ECF No. 947 at 7).

*Time-varying inflation.* Next, this Court turns to Defendants' argument that Mr. Dalrymple must account for the calculation of inflation on each day of the class period under *Speerly*. True, the *Speerly* court cautioned against leaving "hard questions" for later in conducting the predominance inquiry for class certification. *Speerly*, 143 F.4th at 324. But *Speerly* is distinguishable in important ways. It involved "the perils [of] multi-state, multi-defect, multi-claim" case about alleged issues in some General Motors cars. *Id.* at 321. There, the court was skeptical that "common questions predominate[d]" with a class seeking to "apply nearly 60 causes of action across 26 states" with "two theories of defect, each with multiple moving parts" where the district court had not conducted a "state by state" analysis. *Id.* at 320–324. But "the facts (and reasoning)" of *Speerly* render it inapposite here, where there are not analogous "intra-class variations." *In re Humana, Inc.*, 163 F.4th 376, 382 (6th Cir. 2025). Perhaps most tellingly, the Sixth Circuit did not reference *Speerly* once in its *FirstEnergy* decision, despite the fact that the two decisions were close in time, and the en banc decision in *Speerly* predated the panel's decision in *FirstEnergy*.

25

Moreover, there can be no dispute that damages calculations "need not be exact." *Comcast*, 569 U.S. at 35. As one court recently explained, variations in inflation "that can be, but are not currently[] accounted for in an out-of-pocket damages model" do not render such a model unable to satisfy *Comcast*. *Boeing*, 2026 WL 734721 at *14. This Court is persuaded by the reasoning of other courts that have considered this issue and determines that "even accepting the Defendants' premises that inflation would have varied during the class period in this case" and that "Plaintiffs' damages model failed to account for variations in inflation over time," Plaintiffs' damages model is sufficient for class certification. *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017); *see Boeing*, 2026 WL 734721 at *13 ("[T]he existence of evolving public information does not prevent certification of a Class."); *accord Shupe*, 752 F. Supp. 3d at 784. For the same reasons, Defendants' arguments about potential varying inflation fail. Defendants may disagree with Plaintiffs' theory of the case and assert that the differing sizes of FirstEnergy's payments to Householder over time would, by "common sense," have different effects if disclosed based on their size, (ECF No. 948 at 11–12), but that is simply Defendants' theory of the case. Plaintiffs' theory may differ, (*see* ECF No. 960 at 11–12), but regardless, Plaintiffs have shown that Mr. Dalrymple's damages methodology will be able to assess damages in this case. Plaintiffs' proposed damages methodology is consistent with its liability case, and that is what is required at this stage.

***Loss causation and materialization of the risk.*** Defendants also argue that Plaintiffs' damages methodology does not match their theory of liability, asserting that Plaintiffs' theory of loss causation is one of materialization of the risk. Again, Defendants try to foist their theory onto Plaintiffs' case. Some background on loss causation is instructive. When a securities fraud plaintiff shows loss causation, they prove that alleged misrepresentations or omissions not only

caused the plaintiff to invest, but resulted in economic loss to the plaintiff. To do so, they can show a corrective disclosure: false information was provided and the price of the security went up, and when the truth was told, the price went down. Put differently, a plaintiff alleges a corrective disclosure when they allege that a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (quoting *Lentell*, 396 F.3d at 175 n.4).

By contrast, when there is no statement explicitly correcting the false information, plaintiffs may invoke a materialization of the risk theory, alleging that a concealed risk "comes to light in a series of revealing events that negatively affect stock price over time." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016). "Unlike corrective disclosures, these events do not identify prior company statements as misleading, but they must reveal new information previously concealed and fall within the 'zone of risk' concealed so that the events were foreseeable consequences of the fraud." *Id.* A plaintiff using a materialization of the risk theory of loss causation "must show that the loss was caused by materializations of the concealed risk and not other factors." *Id.*; *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortgage Corp.*, 830 F.3d 376, 384–85 (6th Cir. 2016) (These materialization of the risk cases involve a plaintiff "alleg[ing] 'proximate cause on the ground that negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'" (quoting *Omnicom*, 597 F.3d at 511)).

In this case, Plaintiffs have plausibly alleged a disclosure of fraud that corrected publicly available information regarding FirstEnergy, and Plaintiffs' theory is consistent with the

27

Complaint's allegations that FirstEnergy and other Defendants concealed corrupt conduct. (*E.g.*, ECF No. 72 at ¶¶ 143–50; 170–200). Courts generally find that allegations of "significant stock drops in response to announced [governmental] investigations are sufficient to plead loss causation." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273–74 (S.D.N.Y. 2010) (plaintiffs adequately pleaded loss causation where their complaint "identifie[d] several corrective disclosures that allegedly demonstrated the falsity of defendants' previous statements, and also alleges that the value of plaintiffs' Ambac stock declined immediately following the corrective disclosures").

Without expressing any view "on the ultimate merits of plaintiffs' theory of loss causation," Plaintiffs' well-pleaded allegations would not confine their theory of liability to the materialization of the risk, as Defendants argue. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34; *id.* at 233 n.7 (2d Cir. 2014) (finding complaint plausibly alleged corrective disclosures and rejecting alternative materialization of the risk theory as "simply untenable" where there was no allegation "that any such risk materialized, for example, in the form of a liquidity crisis or other financial distress, at the time of the decline" in stock price); *compare In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 284, 307 (S.D.N.Y. 2005) (concealed risk of a company's "massive undisclosed debt" materialized when company "suffered a liquidity crisis . . . and was unable to pay bonds as they came due. . . . That the true extent of the fraud was not revealed" until later was "immaterial," when the risk it had concealed already had materialized).

Regardless, this is an entirely new argument that Defendants only now advance against class certification, and it is a theory of loss causation, *see Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384–85, not a requirement for class certification. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563

U.S. 804, 812–13 (2011).  Loss causation arguments "in disguise" as damages methodology arguments "go[] beyond the Rule 23 inquiry."  *Boeing*, 2026 WL 734721 at \*18 (quoting *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at \*20 (S.D.N.Y. July 10, 2019)).  Defendants' new materialization-of-the-risk argument is unavailing.

      ***New theory.***    Finally, Defendants argue that Plaintiffs have presented a new "criminal enterprise" theory of the case.  Defendants say Plaintiffs have presented this theory so they can presume constant inflation and argue that this theory contradicts Plaintiffs' operative Complaint. Thus, Defendants also argue that Mr. Dalrymple's testimony at the December 12, 2025 evidentiary hearing was impermissible because it engaged with this new, undisclosed theory—an argument that recurs in Defendants' Motion to Exclude.  *See Section II(C)*, *infra*.  Defendants' argument challenging Plaintiffs' theory as "new" is without merit.  As Plaintiffs point out, and as both this Court and the Sixth Circuit have recognized, their theory of the case has consistently been that FirstEnergy undertook a "corruption-based business model."  (ECF No. 72 ¶ 6; *see id.* ¶¶ 3–8; 237); *FirstEnergy*, 149 F.4th at 597, 600 (quoting ECF No. 72 ¶¶ 3, 93); *FirstEnergy*, 2023 WL 2709373, at \*2–3 (quoting ECF No. 72 ¶ 3).  And FirstEnergy has admitted that it was "responsible for" funding Generation Now with "more than $59 million," beginning in early 2017, "in exchange for specific official action for FirstEnergy Corp.'s benefit."  (ECF No. 259-5).[8]

                        *b.  Plaintiffs have proposed a sufficient damages methodology.*

      This Court considers Plaintiffs' proposed damages methodology and determines that it is sufficient.  It would be sufficient based on the class certification record as it existed when this Court first ordered the class certified, consistent with this Court's approach to the Sixth Circuit's

---

[8] See pages 14–17 of the Deferred Prosecution Agreement.  *United States v. FirstEnergy Corp.*, No. 21-cr-86, ECF No. 3 at 14–17 (S.D. Ohio July 22, 2021) (Black, J.).

limited remand.  (*See* ECF No. 874 at 3).  Nothing changes in light of the parties' post-remand argument and Mr. Dalrymple's testimony at the December 12, 2025 evidentiary hearing.

Plaintiffs have proposed a single theory of liability under § 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. §§ 78a–78rr; *id.* § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  *See FirstEnergy*, 149 F.4th at 597, 620.  Specifically, they allege that Defendants engaged in a fraudulent scheme that artificially inflated the value of FirstEnergy's securities during the class period.  (*E.g.*, ECF Nos. 72 ¶¶ 3–8, 236–37, 257, 271; 960 at 3–7).

Plaintiffs propose using "an event study" methodology, (ECF Nos. 947 at 1; 936 at 51–52)—which they somewhat unhelpfully also previously referred to as an "out-of-pocket damages methodology," (ECF Nos. 346-3 ¶ 7 n.7; 346-3 at 52–53)—to calculate damages and the inflation present in a security.  Whether they call it an "event study methodology" or an "out-of-pocket damages methodology," this methodology is sufficient.[9]  *See* William Shakespeare, Romeo and Juliet act 2 sc. 1 ("What's in a name?  That which we call a rose / By any other name would smell as sweet.").  The "event study methodology to measure out-of-pocket damages" is a common methodology "endorsed repeatedly by courts," and is "consistent with *Comcast*."  *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 478–79 (S.D.N.Y. 2025) (adopting report and recommendation); *e.g.*, *Boeing*, 2026 WL 734721 at *12–15 (collecting cases and recognizing that the "vast majority" of district courts have determined that plaintiffs satisfy their evidentiary burden under *Comcast* by providing a general methodology for measuring damages); *SEB Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at *8 (N.D. Cal. Apr. 25, 2025) (finding

---

[9] Plaintiffs suggest that courts "often" use the terms interchangeably for a "methodology that deploys an event study to measure out-of-pocket damages due to dissipation of share-price inflation." (ECF No. 947 at 5 n.2).  Although this Court agrees with Defendants that Plaintiffs have "confuse[d] matters" with their varying use of terminology, (ECF No. 962 at 7 n.2), that does not actually impact the substance of Plaintiffs' proposed damages methodology, which is sound.

that "the out-of-pocket or event study method . . . [is] the standard method for calculating damages in virtually every Section 10(b) class action"); *accord In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 629 (S.D. Ohio 2025) (Marbley, J.) (An "'out-of-pocket' methodology to calculate damages . . . where artificial inflation at any given time [is] calculated class-wide using event studies" meets the requirements of *Comcast*.). Plaintiffs' proposed damages methodology here is sufficient.

Plaintiffs can use the event study methodology, along with valuation techniques such as discounted cash flow methodology, market multiples analysis, and scaling factors, to calculate artificial inflation across the class at different times because the markets trading in FirstEnergy securities were efficient. (ECF Nos. 346-3 ¶¶ 7 n.7, 18–20; 346 at 52–53; 293-7 ¶ 107 n.141; 936 at 66–69, 74–78, 84–94; *see* ECF Nos. 346-3 ¶¶ 6–7, 15–22; 293-7 ¶¶ 12, 82, 103–10). Under Plaintiffs' methodology, an individual plaintiff's damages can be calculated by taking the difference of "share price inflation associated with shares purchased at the time they were purchased" and the "share price inflation associated with shares sold at the time they were sold." (ECF Nos. 293-7 ¶ 109; 346-3 ¶ 7; *accord* 936 at 74–75). Thus, the damages formula "requires individual inputs only as to transaction data, such as dates and prices for purchases and sale" and links to Plaintiffs' underlying theory of classwide liability. *Upstart Holdings*, 348 F.R.D. at 629 (citing *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020)).

To the extent that Defendants argue that inflation necessarily would have varied over time, Plaintiffs' experts—both Mr. Dalrymple and Ms. Jones—have shown that they could account for time-varying inflation if need be in their proposed methods. (ECF Nos. 293-8 ¶¶ 103–04; 346-3 ¶¶ 15–22; 346-2 ¶ 65; ECF No. 960 at 8). Mr. Dalrymple reaffirmed this through his expert testimony. (ECF No. 936 at 76–80). This is sufficient at the class-certification stage, *see*

*Waggoner*, 875 F.3d at 106 ("*Comcast* does not suggest that damages calculations must be so precise at this juncture" as to "account for variations in inflation over time."), and Plaintiffs' proposed damages methodology, detailed by Mr. Dalrymple, satisfies *Comcast*. *Upstart*, 348 F.R.D. at 629–30; *Sjunde AP-Fonden*, 798 F. Supp. 3d at 479.

### C. Motion to Exclude Plaintiffs' Expert

At the evidentiary hearing, Mr. Dalrymple explained his credentials and expertise in securities matters, before explaining the proposed event study methodology and confirming that it could be used in accordance with Plaintiffs' theory of liability to calculate damages on a class-wide basis. (ECF No. 936 at 8–9, 51, 84); *see* Section I(D), *supra*. Following that hearing, the Defendants moved to exclude Mr. Dalrymple as an expert.

### 1. Legal Standard

This Court has broad discretion to determine whether to admit or exclude expert testimony. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). Where "challenged expert testimony is material" to class certification, a district court "must demonstrate the expert's credibility." *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253 (6th Cir. 2024). This is because the Supreme Court requires parties to "satisfy through evidentiary proof" that they "in fact" meet the elements in Rule 23, and insufficiently reliable expert testimony "cannot prove that the Rule 23(a) prerequisites have been met in fact through acceptable evidentiary proof." *Id.* (citations and internal quotation marks omitted). The party seeking to introduce expert testimony must demonstrate its admissibility under Federal Rule of Evidence 702 by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993).

Rule 702 provides that a witness who "is qualified as an expert by knowledge, skill, experience, training, or education" may testify if the proponent "demonstrates to the court that it

is more likely than not that . . . (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Several non-exclusive factors guide the reliability analysis under Rule 702: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific, technical, or other specialized community. *Daubert*, 509 U.S. at 592–94; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999). While instructive, these factors are not a "definitive checklist or test" and do not apply in every case. *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591). The "fundamental objective when considering the admissibility of expert testimony is to ensure the reliability and relevancy of that testimony." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (citation and internal quotation marks omitted).

In sum, the witness must be qualified, and his testimony must be relevant and reliable. *Scrap Metal*, 527 F.3d at 529. The district court "is imbued with discretion in determining whether or not a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007).

### 2. *Parties' Arguments*

Defendants do not challenge Mr. Dalrymple's qualifications, nor do they challenge the reliability of an event study methodology generally. Instead, the issue advanced by Defendants is

33

whether Mr. Dalrymple has sufficiently explained how he would or could apply his proposed methodology to the facts as alleged in the Complaint.  (ECF No. 949-1 at 9).

In making this challenge, Defendants advance two core arguments.  First, they challenge the substance of Mr. Dalrymple's expert opinion under Federal Rule of Evidence 702.  They argue that his original, pre-remand expert reports attempt and fail to "repurpose" a market efficiency event study into a damages event study.  Defendants contend that Mr. Dalrymple's expert reports fail to identify properly a damages methodology because they hijack a market efficiency analysis, merely "gestur[e] vaguely" to "unspecified" techniques, and cannot account for the Complaint's allegations of "continually evolving" conduct.  Moreover, they point out that  Mr. Dalrymple has conceded that he "has *not* determined how to measure 'share price inflation during the class period,'" and that while he could apply scaling factors if he needed to adjust inflation, he had not identified such factors or constructed them.  (*Id.* at 5, 8, 10–11, 13; *accord* ECF No. 974 at 9). Defendants point to *Strougo v. Tivity Health, Inc.*, 2025 WL 1415896, at *7–10 (M.D. Tenn. May 15, 2025),[10] where Mr. Dalrymple's expert opinions and testimony were excluded, and argue the same conclusion is warranted here.  (ECF No. 949-1 at 12–13).

Second, Defendants argue that Mr. Dalrymple's disclosure of "new" opinions at the December 12 hearing violated Federal Rules of Civil Procedure 26 and 37.  (ECF No. 949-1 at 8– 9).  To Defendants, Mr. Dalrymple's post-remand expert testimony fails because it "parrot[s]" Plaintiffs' newly debuted thesis that FirstEnergy "became a 'criminal enterprise' with no

---

[10] Though the *Strougo* court did not admit Mr. Dalrymple's expert opinions and testimony in that case, that case is distinct, and that court's reasoning included its determination that Mr. Dalrymple had failed to engage with the evidence before him, as well as that court's impression of Mr. Dalrymple's demeanor on the stand.  2025 WL 1415896, at *8.  Those determinations are inapplicable here.  And any limited persuasive value that court's opinion might offer is undercut by another court in this circuit that found Mr. Dalrymple's expert opinion admissible.  *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 808 F. Supp. 3d 828, 840 (M.D. Tenn. 2025).

'legitimate business services'" at the start of the proposed class period. Thus, they say Mr. Dalrymple has impermissibly relied upon attorney argument contradicting the allegations of the operative pleading. (ECF Nos. 949-1 at 6, 8, 13–15; 974 at 17, 18–19). They also say that Mr. Dalrymple's opinions that inflation would approximate $20 per share, that inflation should stay the same throughout the class period, and that his market efficiency event study could measure damages were impermissible, newly-disclosed opinions. (ECF No. 949-1 at 16–19).

Plaintiffs counter that Defendants have mischaracterized the record and Plaintiffs' theory of the case. (ECF No. 961 at 1). They argue that Dalrymple has reliably applied his proposed technique to the facts of the case, has offered a reasonable view of constant inflation that could, at any rate, rest on assumptions of liability at this stage in the case, and has not offered any new statement or opinion in violation of either Rule 26 or 37—rather, he responded to Defendants' questioning, elaborated upon his report, and provided this testimony only "at the absolute insistence of Defendants." (*Id.* at 12–20).

### 3. Analysis

There is no dispute that Mr. Dalrymple is qualified as an expert, and this Court finds that his knowledge will aid the fact-finder in understanding the evidence and determining facts in issue. And Mr. Dalrymple's testimony is certainly relevant to evaluating a damages methodology satisfying *Comcast*, particularly given that he has proposed the methodology. Indeed, the only Rule 702 issue here is reliability, as Defendants have challenged whether Mr. Dalrymple's methodology could apply, given Plaintiffs' allegations.

This Court is satisfied that Mr. Dalrymple's testimony is the product of reliable methods and principles—just as it is grounded in sufficient facts and data, and reliably applied the relevant principles and methods to those facts and data. As a threshold matter, and as discussed in some

detail *supra*, the "event study methodology to measure out-of-pocket damages" is a common methodology "endorsed repeatedly by courts," and is "consistent with *Comcast*." *Sjunde AP-Fonden*, 798 F. Supp. 3d at 478–79. Defendants do not contest the testing, peer review and publication, or acceptance of event study methodologies generally; instead, they attempt to undermine the possible accuracy of Mr. Dalrymple's proposed methodology in this particular instance. But Defendants advance this argument by misconstruing Mr. Dalrymple's testimony and recharacterizing Plaintiffs' theory of the case. *See, e.g.*, Section II(B)(3)(a), *supra* (discussing Defendants' attempts to recast Plaintiffs' theory of the case).

Plaintiffs have presented a viable, consistent, and classwide approach to damages. Their theory is that Defendants "concealed corrupt conduct," causing "FirstEnergy's stock to trade at an inflated price throughout the Class Period" such that "revelations of Defendants' corruption, beginning in July 202, caused this inflation to dissipate, damaging investors." (ECF No. 961 at 4). Under Plaintiffs' theory, it may be the case that inflation is constant, or it may be variable. This Court need not reach that argument, or Defendants' concern about Plaintiffs' supposedly new criminal enterprise theory. Even if the inflation is time-varying, the fact that a damages model does not account for such variation is not a reason to discount the damages model at this stage. *See Waggoner*, 875 F.3d at 106 ("*Comcast* does not suggest that damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that '[c]alculations need not be exact.'") (quoting *Comcast*, 569 U.S. at 35). This Court is satisfied by Mr. Dalrymple's testimony that any potential time variation in inflation could be accounted for under his proposed event study (or out-of-pocket) damages methodology. *Boeing*, 2026 WL 734721, at *14; *accord Upstart*, 348 F.R.D. at 640 ("Plaintiffs' expert notes that the evidence *may* show varied rates of artificial inflation and that, if so, the variance can be incorporate[d] into the damages model. More is not

36

required at the class certification stage." (emphasis added)). Overall, Defendants' challenges to the accuracy of Mr. Dalrymple's proposed methodology go "'to the weight of the evidence, not to its admissibility.'" *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1225 (6th Cir. 2025) (quoting *Scrap Metal*, 527 F.3d at 531).

To the extent that Defendants challenge Mr. Dalrymple's testimony as inconsistent with his earlier expert reports or violative of Rules 26 or 37, (ECF No. 949-1 at 16–17), neither argument is availing. This Court was required to perform a rigorous *Comcast* analysis under the limited remand, and Defendants specifically sought this testimony from Mr. Dalrymple to aid in this Court's determination of that remanded issue. (ECF No. 914 at 30–31 (Defense counsel: "What I would love to do, Your Honor . . . is have an evidentiary hearing and let me cross-examine [Dalrymple]. . . . We think the Sixth Circuit directed Your Honor to do a rigorous analysis, not a drive-by analysis. That's what they would like.")). This Court *ordered* the opportunity that *Defendants* requested for *Comcast* class-certification purposes. (ECF No. 918 at 1 ("[T]he Court . . . will hold an evidentiary hearing to hear live expert testimony of Mr. Dalrymple, as requested by Defendants, to consider his damages methodology and calculations under its limited remand to aid in its application of a *Comcast* rigorous analysis.")). Rule 26 "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson*, 470 F.3d at 1203. That is what Mr. Dalrymple did, at Defendants' request.

Ultimately, the question really is whether "the reasoning or methodology underlying [Mr. Dalrymple's] testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue," *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002), so that this Court can ascertain whether Plaintiffs set forth a methodology for calculating damages on a classwide basis that is susceptible of measurement across the entire class

and satisfies the predominance requirement of Rule 23(b)(3).  And as this Court has recognized, experts are "permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline."  *Kirkbride v. Kroger Co.*, 349 F.R.D. 160, 177 (S.D. Ohio 2025) (Marbley, J.) (citing *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012)) (cleaned up). These principles also dispose of Defendants' contention that Mr. Dalrymple's testimony parroted or otherwise relied on assumptions from Plaintiffs' counsel.

This Court is satisfied that Mr. Dalrymple is qualified and that his expert report, rebuttal, and testimony "rest[] on a reliable foundation and [are] relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  Defendants' Motion to Exclude is denied.

### D.  Defendant Reffner's Post-Remand Brief

Days before post-remand opening briefs were due, Defendant Reffner requested leave to file a three-page brief to address "highly limited class certification issues unique to him" that he stated were "distinct from the *Comcast* methodology and the *Basic* presumption questions."  (ECF No. 939 at 1).  Reffner attached the brief he wanted to file, which challenged whether Plaintiffs had met their burden with their "Section 20(a) . . . control person liability" claim against him. (ECF No. 939-1 at 1).  Although Reffner's requested brief referenced the Sixth Circuit's opinion in part, it really addressed arguments beyond the scope of the remand and the ordered issues, (*see id.* at 1–3), as Plaintiffs pointed out at the time.  (ECF No. 940 at 5 ("Reffner is effectively trying to hijacked the limited post-remand proceedings to file what amounts to a new motion to dismiss.")).

This Court granted Reffner's motion but warned him that it would do so "to the extent, and only to the extent," that the contents of his post-remand brief were "limited to the issues remanded

to this Court," noting that this Court "will not consider arguments on issues other than those within the scope of the Sixth Circuit's limited remand and the presently-ordered post-remand briefing." (ECF No. 944 at 2–3).  Nevertheless, Reffner's submitted brief raises the same Section 20(a) issues not within the scope of the Sixth Circuit's remand or the briefing that this Court ordered.  (ECF No. 946).

Consequently, this Court will not consider the merits of Reffner's post-remand brief, which does not brief the remanded issues *as ordered*.  Reffner already had the opportunity to brief a motion to dismiss, which he did in May 2021.  (ECF Nos. 162; 163).  He cannot now raise defenses or objections that were available to him previously, *see* Fed. R. Civ. P. 12(g)(2), that extend beyond the Sixth Circuit's limited remand, and that violate this Court's order on the scope of post-remand briefing.  (*See* ECF No. 944).

### III.    CONCLUSION

For the foregoing reasons, this Court finds that Plaintiffs have set forth a methodology for their Exchange Act claims that is susceptible of measurement across the entire class and satisfies the predominance requirement of Fed. R. Civ. P. 23(b)(3).  The previously certified class, *see FirstEnergy*, 2023 WL 2709373, at *25, remains **CERTIFIED**.  Defendants' Motion to Exclude (ECF No. 949) is **DENIED**.

Plaintiffs' Motion to Clarify (ECF No. 916) this Court's November 7, 2023 Order setting the post-remand briefing schedule is **DENIED** as moot.  Additionally, because the limited remand was confined to the record before this Court at the time of class certification, (*see* ECF No. 874 at

3), Defendants' Motion for Leave to Supplement the Record (ECF No. 885) is **DENIED**.

      **IT IS SO ORDERED.**

_____

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: April 30, 2026**